O5FKSECO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION,
4
                    Plaintiff,
5
              v.                          23 CV 9518 (PAE)
6
    SOLARWINDS CORP., et al.,
7                                         Oral Argument

8                   Defendants.

9   ------------------------------x
                                          New York, N.Y.
10                                        May 15, 2024
                                          2:00 PM
11
    Before:
12
                       HON. PAUL A. ENGELMAYER,
13
                                          District Judge
14
                          APPEARANCES
15
    U.S. SECURITIES AND EXCHANGE COMMISSION
16  BY:  CHRISTOPHER BRUCKMANN
         BRADLEY NEY
17       LORY STONE
         JOHN TODOR
18
    LATHAM & WATKINS LLP
19       Attorneys for Defendants
    BY:  SEAN BERKOWITZ
20       SERRIN TURNER
         KIRSTEN C. LEE
21       NICOLAS LUONGO

22

23

24

25

O5FKSECO

```
1              (Case called)
2              MR. BRUCKMAN:  Good afternoon, your Honor.
3    Christopher Bruckmann, for the SEC.
4              THE COURT:  All right.  Good afternoon.
5              MR. TODOR:  John Todor, for the SEC.
6              THE COURT:  Good afternoon.
7              MR. NEY:  Brad Ney, for the SEC.
8              THE COURT:  Good afternoon.
9              MS. STONE:  Lory Stone, for the SEC.
10             THE COURT:  Good afternoon.
11             You may all be seated.
12             MR. BERKOWITZ:  Sean Berkowitz, for SolarWinds and
13   Mr. Brown.
14             THE COURT:  Good afternoon.
15             MR. TURNER:  Serrin Turner here.
16             THE COURT:  Good afternoon.
17             MS. LEE:  Kirsten Lee, for defendant.
18             THE COURT:  Good afternoon.
19             MR. LUONGO:  Nicolas Luongo, for defendant.
20             THE COURT:  Good afternoon.
21             And good afternoon, as well, to the members of the
22   public who are here today.
23             Let me begin by just complimenting all of you on
24   genuinely first-rate briefs on both sides.  It's a fascinating
25   case, and I have been the beneficiary of really first-rate
```

O5FKSECO

1  lawyering.  So I thank you.

2          I know my law clerk reviewed with you the timing

3  constraints we're under, but I'm chairing a panel this

4  afternoon that requires me to have a hard stop at 4:00 o'clock.

5  We'll take a ten-minute break in between.  That means each of

6  you has 55 minutes.

7          SolarWinds will be going first, and I understand, from

8  my law clerk, that Mr. Berkowitz will go first and then

9  Mr. Turner.  And you wish to reserve ten minutes for rebuttal,

10  correct?

11          MR. BERKOWITZ:  Correct, your Honor.

12          THE COURT:  Very good.  All right.

13          So we'll take a break at about 2:45.  With that, the

14  floor is yours.

15          MR. BERKOWITZ:  A lot of ink has been spilled, as you

16  know, your Honor.  I want to focus on the areas that are of

17  most interest to you.

18          This is an unusual case in a lot of ways, including

19  that at the motion-to-dismiss stage, it's not just a case that

20  impacts SolarWinds, is incredibly important to SolarWinds, but

21  it also has deep policy implications with respect to your

22  ultimate decision, and that's why you saw the unusual situation

23  for amici filing briefs here.  The consequences of a denial of

24  a motion to dismiss, from a policy standpoint, are significant,

25  and we'll talk about those.

O5FKSECO

1          THE COURT:  May I just ask, without developing it at

2     this point, the claims or the issues that have broader

3     implications are the accounting controls and disclosure

4     controls ones and the response to the SUNBURST attack, but the

5     claims that are earlier in time seem very ordinary.  They sound

6     like a lot of cases that this and other courts see in which

7     companies make risk disclosures about products, and then learn

8     that there are some problems with their product.

9          Why is this any different or have bigger implications

10     than any of those cases?

11          MR. BERKOWITZ:  Yes.

12          Your Honor, the risk disclosure issue, in particular

13     of the two issues that relate to the prior in time, does have

14     significant implications.

15          Alleging that a risk factor is -- subjects somebody to

16     liability is actually an unusual issue, to begin with.

17     Typically, risk factors, as your Honor knows, are used in

18     bespeaks-caution cases as a shield against affirmative positive

19     statements that are elsewhere.  Here, it's being used as a

20     sword, as a standalone liability for disclosing a risk and not

21     disclosing more.

22          There are only limited circumstances — the *FBR* case

23     talks about this — only limited circumstances in the Second

24     Circuit that have ever allowed a risk factor to be used as a

25     standalone 10b-5 false statement, and those situations arise

O5FKSECO

| | |
|---|---|
| 1 | where the risk that is being warned against, such as in the |
| 2 | *Meyer* case or the *BDM* case, has already occurred, right?  We |
| 3 | are warning you against the fact that we could violate laws and |
| 4 | regulations, but, in fact, we're already violating them. |
| 5 | That's one instance where it has been found. |
| 6 | The other instance — and it's somewhat related — is |
| 7 | when you make a positive correlative statement within the risk |
| 8 | factors that is made misleading in some way by omission. |
| 9 | Neither of those is the situation here.  In this situation, |
| 10 | your Honor, the only two cases that deal directly with –- in |
| 11 | other words, the third issue is, there's no pure omission |
| 12 | liability.  Here, like *Macquarie* and others, you don't have an |
| 13 | independent duty to disclose these issues.  And so the only |
| 14 | cases that are on point are the *Equifax* and *Qudian* cases, and |
| 15 | in those cases, the court found that the risk factors, as they |
| 16 | stood alone, were not misleading. |
| 17 | THE COURT:  Well, there comes a point at which |
| 18 | Government Agency 1, or A, and Cybersecurity Firm B, putting |
| 19 | aside what happens later, report malware in what amounts to as |
| 20 | pled the company's chief product, this Orion software product, |
| 21 | which is said to be the 45 percent source of its revenues.  The |
| 22 | question is really whether the boilerplate or generic risk |
| 23 | disclosure is up to the challenge of capturing that once the |
| 24 | company knows that its chief product had two separate |
| 25 | customers — private sector, public sector — reporting malware |

1  in it, perhaps under circumstances under which it's fair to

2  generalize that that infects other customers' product, why is

3  the risk disclosure not terribly out of date at that point?

4         MR. BERKOWITZ:  At that point, your Honor, both -- so

5  you have the DOJ, which occurs in May, as reported to the

6  company in June, and then you have the PAN, Palo Alto Networks,

7  which is reported to the client in October.  Neither of those

8  issues -- and if you look at paragraphs 270 and 284 of the

9  complaint, amended complaint, the company does not make any

10 conclusions about the source of that attack.  And this is all

11 within the four corners of the amended complaint.  The DOJ

12 incident, your Honor, was an incident where they said we're not

13 sure what we have, and the company never determined what it

14 was.  It very well could have been, at the time, software or an

15 invasion on DOJ's network that somehow it infected or was

16 related to the SolarWinds' software.

17        Similarly, in October, at paragraph 284, there's no

18 conclusion that that incident was related to a specific issue

19 on SolarWinds' software as opposed to the customer software.

20        THE COURT:  Wasn't there chatter within relevant

21 players in SolarWinds connecting the two incidents?

22        MR. BERKOWITZ:  Say that again?

23        THE COURT:  Wasn't there discussion within your

24 client's company connecting the two incidents, tending to

25 suggest that this was not an artifact of some problem just

O5FKSECO

1    within DOJ or a problem within PAN as opposed to something that

2    was a problem within the product?

3          MR. BERKOWITZ:  There was discussion about whether it

4    was related, for sure, but the discussion did not arrive at a

5    conclusion, and there was never a conclusion that, in fact,

6    the -- that the incidents were related or that they were

7    related to a software infection.

8          According to the complaint, both DOJ and PAN reported

9    that somehow there was information that was being sent out of

10   the -- you know, related to the software, perhaps appearing to

11   be communicating or sending out information related to

12   SolarWinds, but there was no specific conclusion.  And if, at

13   the end of the day, what we're talking about is a scenario or

14   situation when you've got incidents to which there's no

15   conclusion, SolarWinds would have to report that, it would

16   create mass confusion.  There are customer incidents all the

17   time.  Microsoft gets customer incidents all the time.  And

18   where there is no specific conclusion or determination, it

19   would create havoc to say, hey, we may have something, we have

20   no idea exactly what it is, we have no idea how to fix it.

21         Looking at the statement, in fact, those are

22   consistent with the fact that we are vulnerable to attack, and

23   that's what we are ultimately talking about, is whether the

24   risk factor itself is misleading.

25         This is a company that, as soon as it learned that it

O5FKSECO

1    had software that had malware on its software, that it was

2    sending out through updates, reported it within two days.

3    There is no evidence in the record that suggests that that

4    determination or anything close to it was done.

5        THE COURT:  May I ask you this:  One of the questions

6    in the case involves the interplay between — and I'm stopping

7    the clock right now before SUNBURST --

8        MR. BERKOWITZ:  Yes.

9        THE COURT:  -- the interplay between the risk factor

10   disclosure in the relevant SEC filing and the security

11   statement, which is a big focus of the SEC's complaint, and the

12   thrust of which is that it blows sunshine over a bunch of

13   genuine security problems that is alleged to come home to

14   roost.  Are those really segregable?  In other words, can the

15   problems alleged in the security statement be considered in

16   considering, I guess it's, claims 5 and 6, which relate to the

17   filings?

18       MR. BERKOWITZ:  They absolutely are segregable, your

19   Honor.  This is not a situation where the customer-facing

20   security statement that Mr. Turner will talk about, which is on

21   the website under various clicks when you ultimately get to it,

22   was adopted or incorporated by reference.

23       I think it may be helpful — and we cited the *Marsh &*

24   *McLennan* case — to say you've got to look at the statement in

25   the context in which it's made, but let's pull up the risk

O5FKSECO

1  factor disclosure, your Honor.  Again, this is a robust

2  disclosure about the various concerns that are raised, talking

3  about systems being vulnerable and so forth, and it goes into

4  detail both at the general and specific, including

5  sophisticated named state attacks and so forth.  The final

6  bullet, and these were excerpts from risk factor, says,

7  "Despite our security measures, unauthorized access or security

8  breaches could result."  This is not like in the *Fannie Mae*

9  case, where they brag about how robust their risk compliance

10  is.  This is a situation where they say, look, despite our

11  security measures, unstated, unlinked to, unreferenced to a

12  security statement that dates back to pre-IPO, we are at risk

13  of all of these serious things happening.

14  So it's not fair to incorporate them by reference.  In

15  fact, the question is, is this statement misleading as it

16  stands, is this risk factor, which is warning of the exact risk

17  that materialized, inaccurate?

18  And the SEC doesn't really point to those two prior

19  issues.  Basically, what they say, when asked, is, well, there

20  should have been either more adverbs like heightened risk of

21  your critical assets, or you should have disclosed that you had

22  access control problems.

23  THE COURT:  Just a hypothetical:  At what point would

24  a series of customer reports about malware being found and a

25  common problem give rise to a viable claim that the risk

O5FKSECO

1    disclosure is too generic, that it's not up to the task of

2    capturing what the company then appreciates?

3            MR. BERKOWITZ:  I would say when the company makes a

4    conclusion that it has been hacked, your Honor.

5            THE COURT:  And you're saying that the pleadings from

6    the SEC pre-SUNBURST don't get there?

7            MR. BERKOWITZ:  Yeah, they do not.  The only principle

8    that you can look to, ultimately, when you're in the room

9    trying to figure out, okay, does this rise to the level of

10   being reportable, the only thing that you can do, the only

11   right line that's out there is materiality at the end of the

12   day.  What I can tell you is that the two customer reports here

13   are so far from the materiality line, particularly given the

14   specific allegations of the complaint, that there was no

15   determination made as to what the source, ultimately, of it

16   was.

17           THE COURT:  But had the company concluded, stitching

18   together reports it had gotten from multiple customers, that

19   these separate events must bespeak an attack that got in at the

20   SolarWinds level and not at the customer level, would that

21   change the outcome?

22           MR. BERKOWITZ:  Again, it comes back to materiality,

23   how big, what the exposure is, and those types of questions, I

24   would say, your Honor.  Regulation S-K obviously says you've

25   got to disclose the material risk if, in fact, you are not just

O5FKSECO

1    vulnerable, but you believe that that vulnerability has

2    actually occurred because of these various customer incidents,

3    then you would have an obligation to update it.

4         Here, there are no allegations that that occurred.

5         And what's really dangerous about this, and why we

6    sort of got off on this tangent as a critical issue, is you

7    asked whether this isn't just a garden-variety issue.  What

8    you're talking about here, right, is a determination that there

9    is a materiality obligation to disclose risks or incidents as

10   they're coming in.  You've got almost like a TikTok update

11   requirement of people saying, well, what about this, where do

12   we go, what about this particular risk issue, is that something

13   that we think is a particular concern or an area?  It's

14   dangerous to go down what is a slippery slope of saying one

15   report, two reports; you really have to draw a conclusion

16   that --

17        THE COURT:  One thing that's a little different about

18   this case, though, is that it's not a generic cybersecurity

19   risk that any company in America that sells pizza or TVs or

20   cars might have.  This is a cybersecurity risk involving a

21   company that sells cybersecurity, that sells software, and the

22   issue here is not do you have to disclose incremental problems

23   with your alarm system, it's at what point do we have to

24   disclose the fact that our flagship product might be corrupted.

25        MR. BERKOWITZ:  Well, look if we're away from having

O5FKSECO

1    disclosed –– to disclose problems in our cybersecurity

2    measures, and we're only focused on when you have that

3    obligation, your Honor, I think that's a different case than

4    what the SEC is suggesting.  That's more narrow.

5         But keep in mind, what you just said, this disclosure,

6    right, is not a generic restaurant disclosure.  The first line

7    is, "We're heavily dependent on our technology infrastructure,"

8    right?  Our systems are vulnerable to hackers and malicious

9    code.  It's leading with that issue, right?  This is a risk

10   disclosure that is specific to this company and the risks that

11   it faces.

12        And I think when we talk a little bit more when we get

13   to the 8-K, because there's a similar issue, shouldn't you have

14   disclosed those two incidents — we can get into a little more

15   detail about those two — but I think if we're really just

16   talking about those two, the fact that the company did not make

17   any conclusion about the source of those ought to be

18   dispositive from a materiality standpoint.

19        THE COURT:  When does the company as pled draw that

20   conclusion?

21        MR. BERKOWITZ:  When did the company?

22        THE COURT:  Yes.  Is it after SUNBURST, in effect

23   after December 12th?

24        MR. BERKOWITZ:  In December, Mr. Brown —

25   December 13th, I believe — and there's testimony, I think it's

O5FKSECO

1    in paragraph 308, it's in that range — says, once I actually

2    saw the uncompiled source code -- so what you had happen,

3    right, I think it was Mandiant/FireEye was the customer who

4    reported, hey, your updates have this malware.  And they

5    actually provided a copy of the malware.  And what that malware

6    showed was something that, to Mr. Brown, said, hey, this

7    malware is sending the same -- it looks like it's consistent

8    with what customer A and B had reported, that they were linked.

9         So, remember, when we were here last fall, I guess,

10   the SEC said, the fraud ends in January, when the company makes

11   its disclosure.  And all they disclosed in January — and it's

12   Exhibit 4 of our brief, and I'd urge you to look at it — is

13   that with the benefit of hindsight, the company concluded that

14   these customer incidents were linked to SUNBURST, not that they

15   were something that revealed anything much more meaningful than

16   that.

17        So, in December, there is a conclusion in Mr. Brown's

18   mind, and by January, the company reports it, but it was not

19   done before that.

20        So let me pivot, if I may, to scienter on this because

21   our discussion on this, on what's material and how difficult it

22   may be to grapple with that, it's stunning because you would

23   think that in a case charging 10b-5 and 17a-1, you would have a

24   situation where they said the maker of this statement knew that

25   it was wrong, that this risk disclosure was wrong, right?  The

1     only people who signed this are the CFO and CEO of the company,

2     and there is not any allegation that either of them acted with

3     intent.  Instead, the SEC has charged, at the time, the

4     vice president of security and architecture, later the CISO,

5     Tim Brown, was remarkable about the fact that he is the

6     individual who was supposedly acting with intent, is that he

7     never saw this risk factor we're looking at now.

8          THE COURT:  He never saw it or he never signed off on

9     it before it issued?

10         MR. BERKOWITZ:  He never saw it.  Paragraph 242 is the

11    specific allegation, and they concede he testified, he did not

12    review the precise disclosure language they use.

13         Mr. Brown is not a disclosure expert.  He wasn't even

14    an officer of the company at the time.  He was the chief

15    security and architecture.

16         THE COURT:  And do you understand, though, that the

17    SEC to be claiming that as to scienter on, I guess we're

18    talking here about, claim 5, right — that's the false filing

19    claim — that the scienter is anchored just in Mr. Brown's state

20    of mind?

21         MR. BERKOWITZ:  Yes.  I mean, they hinted at the

22    potential for some collective -- almost a throw-away, some

23    collective scienter, right, the *Teamsters-Dynex* case that cites

24    *Tellabs*, that if they say we've made a million trucks, and they

25    really haven't done any, somebody must have known, but

O5FKSECO

1  Mr. Brown is who they're relying on for their scienter here.

2  He never saw it.

3        All they allege is that he provided information to

4  people who ultimately did the risk factors.  They don't say

5  what he provided, when he provided it, or that he was intending

6  to withhold it.  And keep in mind that under *Seltzer*, right,

7  when you're looking at intent, there has to be a clear duty to

8  disclose, right?  A clear duty is not in existence here.  We're

9  debating, and we spilled a lot of paper on this.  And then you

10 have to prove that he acted with a requisite level of intent as

11 to the risk disclosure, right?

12       They failed at the start that he didn't even know the

13 specific statement that was made.  But even if they did, he has

14 to act with either knowledge or recklessness.  And recklessness

15 here, as your Honor knows, is acting essentially with actual --

16 is something approaching actual intent or an extreme departure.

17       THE COURT:  According to the pleadings, when did the

18 CEO and the CFO, who were responsible for the risk disclosure,

19 become aware of the earlier two cyberattacks by customers A and

20 B?

21       MR. BERKOWITZ:  I think that the -- I don't think the

22 record is clear on that, your Honor.  I think the -- I believe

23 that the disclosure that's made is in January.  But Mr. Brown,

24 there's no allegation that he was intentionally withholding it.

25 There is a disclosure issue where they say there's an incident

O5FKSECO

```
1    response plan.  One of the disclosure controls that's in place
2    is an incident response plan, where the company is supposed to
3    grade on 0 to 3 or 4.  And Mr. Brown grades both of these as 0,
4    meaning that the source of it is unknown, which is what they
5    concluded and what is in there.  And there's no allegation that
6    he did make that conclusion or that he was intentionally
7    withholding the information, nor would it make any sense.
8            There are a number of allegations — paragraph 121,
9    192, 167 — of Mr. Brown providing updates to the CIO, chief
10   information officer, chief technology officer, that make their
11   way to whatever.  There's not any allegation that there was an
12   intentional effort to hide this information so that it wouldn't
13   be disclosed to the public.
14           THE COURT:  While we're on that, let's just take a
15   detour.  I understand you're the right person to ask about the
16   disclosure controls claim.  Since we're dancing around it,
17   let's just address that right now, if I may.
18           MR. BERKOWITZ:  Yes.
19           THE COURT:  The argument anyway, but the allegation is
20   that the information of the heightened risk, however it's
21   characterized, didn't essentially reach the C-Suite, that the
22   control environment should have resulted in at least had the
23   potential to be a grave risk directed to a flagship product
24   should have hit the C-Suite and didn't.
25           MR. BERKOWITZ:  Correct, that's the allegation.
```

O5FKSECO

1          THE COURT:  Right.

2          MR. BERKOWITZ:  The simple answer is that there were

3    controls in place that were designed to raise to the level of

4    the people in charge of disclosures if --

5          THE COURT:  Sorry, but on the pleadings, where I have

6    to take the facts that are well pled as accurate, that sounds

7    like a factual dispute, whether or not there were adequate

8    controls in place.

9          MR. BERKOWITZ:  I, respectfully, disagree, your Honor.

10   I don't believe the SEC is suggesting the controls were

11   inadequate.  What they are saying is they weren't effective and

12   they weren't executed properly.

13         THE COURT:  They're saying the proof is in the

14   pudding, that while you can't always back out of a bad

15   disclosure controls environment from the failure on a

16   particular occasion, they're basically saying, hey, look it

17   happened twice and didn't reach the C-Suite, and, ultimately,

18   of course, it turns out to be an epic problem.

19         MR. BERKOWITZ:  Yes, but that, again, is an execution

20   issue, that is not a design issue.  The design was there.  What

21   they're saying is they have should have raised it a 2 or a 3.

22         THE COURT:  Right, they're saying that Mr. Brown, they

23   say, deliberately, but be that as it may, errantly miscast this

24   as a nothing burger where it was a something else that should

25   have been elevated, and because it happened twice and involved

O5FKSECO

the flagship product, they infer from that, that the disclosure

environment was not up to the task.  That's the thrust of it,

right?

MR. BERKOWITZ:  I think you've perhaps even

articulated their theory better than they did in the papers,

but what I would say is it still comes down -- this is two

incidents.  It's not a situation where we've got dozens of

incidents.  It's two incidents, both of which, in the complaint

itself, are alleged that they couldn't determine.  And, by the

way, it's not -- it's not unusual that they didn't.  If you

look at page 7 and on the CISO briefs, right, they tell you how

sophisticated this attack was.  I don't want to understate

that.  And it's a good pivot, perhaps, to the 8-K, as

Mr. Turner reminds me --

THE COURT:  Let's get to that, but the one question

is:  Both customers seem to treat this as a very big deal when

they report it to the company; they're not treating it as

something minor, right?  Doesn't the customer's labeling of it

matter?

MR. BERKOWITZ:  Nobody was treating it as a small

deal.  In fact, in this environment, everybody works together

to try and figure out what happened.

DOJ, the allegations are, they worked with two

security firms to try and understand what was happening.

Nobody concluded that the malware was inserted at SolarWinds,

O5FKSECO

1     and it was put out.  Nobody made that conclusion, neither PAN,

2     nor DOJ.  So it wasn't as if they said, hey, guys, you have

3     malware on your software.  That absolutely was never disclosed,

4     and they themselves didn't draw that conclusion.  They're

5     saying, hey, do you know what this is, is there anything that

6     we can come up with?

7          And so this is an incredibly difficult to figure out

8     situation.  Ultimately, it's figured out.  Maybe if we look at

9     what we're talking about.

10          If we can look at 4, and I will -- let's actually look

11     at the -- one more, yes.

12          This is an exhibit in the brief that's cited there,

13     your Honor.  The first three pieces of this --

14          THE COURT:  Sorry, just so we have a record, this is

15     the exhibit cited at defendants' brief at 5 and 18.

16          Go ahead.

17          MR. BERKOWITZ:  Correct.

18          So the first three steps here, to be really clear, are

19     the Russian state actor implanting in SolarWinds the malware.

20     And they actually inserted it in a way after it was production

21     ready right before it's shipped out.  That's where it was

22     inserted.

23          It then gets sent between March and June via hotspot

24     updates to up to 18,000 customers who downloaded it, could have

25     installed it, et cetera.  So what we're talking about here is

O5FKSECO

that those two customers, Mr. Brown ultimately linked them

saying, hey, they have this software.  Nobody concluded steps 1

through 3 at the stages of either the DOJ or the PAN incident.

THE COURT:  He drew a connection between the two, but

didn't you say drew a conclusion as to how they got there?

MR. BERKOWITZ:  Certainly not by those time periods.

That's absolutely right, your Honor.

THE COURT:  Before you move just to the 8-K, just one

final question on this point:  I take the defense's position to

be that the accounting control rules simply don't apply to this

situation, and that the disclosure rules, in theory, could, but

factually, are not -- it's ill pled?

MR. BERKOWITZ:  Correct, yes.

So, again, 4 and 5, to be clear, that's a backdoor.

The malware that's inserted on SolarWinds' software that gets

updated is a backdoor that, when running and connected to the

internet, allows the threat actor to potentially try and get in

the backdoor.  That's number 6 and 7.  That's the infiltration,

right?  4 and 5 were on the server.  6 and 7 is using that

backdoor, opening the door, and walking in to the customer

network, which is where all the valuable information ultimately

is.

THE COURT:  That ultimately happens to customer C, but

not as pled to A or B?

MR. BERKOWITZ:  There's actually no evidence in the

O5FKSECO

1    record that anybody was infiltrated, your Honor, and we'll talk

2    about that real quickly.

3         So let's get to 2, which is the 8-K disclosure.  I

4    want to make just a couple of key points on this.

5         So this is the 8-K disclosure.  When this was

6    disclosed, this dropped within a couple of days 25 percent,

7    okay?  Big deal disclosure.

8         Made aware of the cyberattack that inserted a

9    vulnerability.  That is the backdoor within its Orion

10   monitoring products which, if present, meaning if it was

11   actually downloaded and installed and activated, could

12   potentially, if it was connected to the internet, allow an

13   attacker to compromise the server.  Likely the result of a

14   highly sophisticated target attack.  This was inserted in

15   products from March to June and up to, SolarWinds currently

16   believes — this is the fourth bullet — that the actual number

17   of customers that may have had an installment of the products

18   containing the malware to be fewer than 18,000.  In other

19   words, up to 18,000 had this malware on their system.

20        And the fifth bullet says there have been significant

21   media coverage of attacks on U.S. governmental agencies and

22   other companies, with many of those reports attributing the

23   attack to a vulnerability.  And so this is a huge deal.  And

24   what the SEC is saying is, you should have disclosed that of

25   those 18,000 customers, you actually knew who two of them were.

O5FKSECO

1          THE COURT:  I think what they're saying is a little

2      bit different.  They're seizing on the word potentially in the

3      first bullet.  They're saying that the word potentially smudges

4      the fact that something actual had happened.

5          MR. BERKOWITZ:  And I think that's not a factual

6      issue, your Honor.  What they're saying is — and I believe it's

7      in 258, paragraph 258 — if this software, right, it's

8      downloaded by up to 18,000 customers, but those customers not

9      only have to download it, they have to install it, they have to

10     be running it, and it has to be connected to the internet.  A

11     lot of these companies have closed loop servers.  And they also

12     have situations where they have their own firewalls in place.

13          So this is an absolutely accurate and fair statement,

14     could potentially allow an attacker, right?  They allege --

15          THE COURT:  Sorry, but as to company C, did the facts

16     go beyond "potentially"?

17          MR. BERKOWITZ:  I don't -- it went beyond -- it did in

18     the sense that they were aware of the attack.  So I believe it

19     went beyond that because they downloaded it.

20          THE COURT:  Look, with company C, doesn't company C

21     basically say, yes, as to activated?

22          MR. BERKOWITZ:  No.  I mean, there was no breach of

23     company C.  All they did was call and say, hey, this is out

24     there.  They did not say -- but the "potentially" here is

25     saying that -- I want to really stress the significance,

O5FKSECO

1    your Honor.  This is not a, hey, it might be a problem.  This

2    is, there's a huge problem.

3        THE COURT:  No, no, no.  Look, the truth is in the

4    reaction.  The stock drops a lot.  It's a big-deal disclosure.

5    The SEC's argument is it doesn't go as far as what the company

6    knew, and what they're basically saying is it's a little bit

7    like saying tainted Tylenol, it could kill somebody when it, in

8    fact, already has.

9        MR. BERKOWITZ:  Again, what they're saying is that up

10   to 18,000 customers downloaded this malware, and it could

11   potentially be exploited.  It wasn't exploited or infiltrated,

12   it absolutely was not with respect to customer C, and there's

13   no allegation of it.

14       Take a look at the fourth bullet what's going on --

15   I'm sorry, the third bullet.  SolarWinds has retained

16   third-party experts to assist, including whether the

17   vulnerability, meaning the downloaded malware in the products,

18   was exploited as a point of infiltration.  That's the key issue

19   for people — did they access the networks, your Honor?  Did

20   they access the networks?

21       And there is no evidence — the record is bereft of any

22   evidence — that anybody had been exploited.  That was on that

23   chart, 6 and 7.  The backdoor existed.  The question is whether

24   people went through it.

25       THE COURT:  So just factually, what is it that

O5FKSECO

1   company C, as pled, tells SolarWinds on December 12th about

2   what, in fact, had happened to it?

3             MR. BERKOWITZ:  That there was a cyberattack -- that

4   there was the presence of this code on SolarWinds' software.

5   That's all.

6             THE COURT:  Not that it had reached the server of

7   company C?

8             MR. BERKOWITZ:  Correct.

9             THE COURT:  Go back to the "potentially" language,

10  please, on the slide.

11            So potentially modifies allowing the attack to

12  compromise the server.  I think what you are saying to me is,

13  while potentially might have been a problem with it modified

14  something else, it's not a problem with the clause that it

15  modifies because, in fact, the attacker, at least as revealed

16  at that point to SolarWinds, hadn't compromised the company C

17  server.  Is that accurate?

18            MR. BERKOWITZ:  Correct.

19            And I want to -- in our briefs, there were probably

20  particular hits on this.  I want to touch very briefly on this

21  because Mr. Brown did review the 8-K for technical accuracy,

22  but, again, he's not a disclosure expert, and the concept then,

23  looking at this statement, which is incredibly detailed, that

24  he should have made the conclusion that there was a clear duty

25  to talk about these two other issues or -- and, again, the

O5FKSECO

third issue was known to everybody, and none of them were

alleged to have done something wrong.  So the issue really is

those two prior folks.  That he should have had knowledge of

that is just absolutely -- there is no imputation.  He's the

one that they're trying to impute this issue to, your Honor.

And, in fact, when it's ultimately disclosed that these two

customer incidents were, quote, linked --

THE COURT:  Which is in January?

MR. BERKOWITZ:  Yeah.

-- nothing happens to the stock price.  That's not

dispositive, but that gives you a sense of how small a deal

that issue was.  And it was in the context of the company

updating, in detail — and I urge you to look at that — in

detail what the results of their investigation were.  And they

hadn't concluded by that time or at any time, relevant to this

complaint, that anybody had actually been infiltrated, meaning

that it had gone to the customer network, which is where all

the goods are.

So, your Honor, with that, I'm going to -- I'm happy

to answer other questions --

THE COURT:  No, let me hear from Mr. Turner on what

happened to the preceding claims involving the security

statement, and I understand that's what you've allocated to

him?

MR. BERKOWITZ:  Correct.

O5FKSECO

1          THE COURT:  Okay.  Thank you.

2          MR. TURNER:  Good afternoon, your Honor.

3          THE COURT:  Good afternoon.

4          MR. TURNER:  So the SEC's claim is based on the

5     security statement.  They rest, basically, on five assertions

6     in that statement.  And I'd --

7          THE COURT:  Before you get to the individual ones,

8     your colleague, Mr. Berkowitz, made a point of saying that it's

9     customer-focused, it's on the website.

10          MR. TURNER:  Yes.

11          THE COURT:  You're not arguing, though, that that

12     makes it, in some sense, incapable of being actionable as the

13     basis of a 10b-5, are you?

14          MR. TURNER:  Not incapable.  It makes their scienter

15     less plausible.

16          THE COURT:  Why is that?

17          MR. TURNER:  Because if the company actually had some

18     intentional plot to deceive investors about the security, you

19     would think they would say something affirmative about their

20     security in their investor disclosures, your Honor.  The

21     investor disclosures said nothing affirmative about the

22     company's cybersecurity.

23          And just to come back to that point, the key question

24     for the risk disclosures is whether they were misleading.  It's

25     not whether they were generic, it's whether they were

O5FKSECO

1    misleading.  The risk disclosure clearly disclosed the company

2    was vulnerable.  That was not misleading.

3          The issue of whether it's generic enough just goes to

4    whether it can be used for bespeaks-caution purposes.

5          THE COURT:  Right, I understand that.  But the SEC

6    makes a detailed set of allegations impugning the accuracy of

7    the security statement.  I know you're about to get into that

8    in detail, but if you assume, just for the purpose of this

9    moment in the argument, that the SEC has something there, and

10   that what is said in the security statement is impeached by

11   what was internally known, is there a reason why that couldn't

12   be the basis of a 10b-5?

13         MR. TURNER:  In terms of imputing Mr. Brown's intent,

14   no, that does not work.

15         THE COURT:  Well, he has said to have known not X when

16   the security statement says X.

17         MR. TURNER:  Right.  So that's the security statement,

18   but if we're talking about the risk disclosure, the important

19   intent that needs to be imputed is knowledge that the statement

20   in the risk disclosure is false.

21         THE COURT:  Wait, sorry.  Suppose the SEC had not

22   brought a claim based on the risk disclosure, but simply

23   brought a 10b-5 claim based on other statements, including in

24   the security statement.  Why would the risk disclosure matter?

25         MR. TURNER:  Right.  So if we're putting aside the

O5FKSECO

1    risk disclosure, and just talking about the security

2    statement --

3              THE COURT:  That's what I'm asking you about.

4              MR. TURNER:  Yes.

5         I just mean in terms of if the allegation is that

6    there was an intentional scheme to mislead investors, this is a

7    particularly odd way to do it.

8              THE COURT:  Through the customers?

9              MR. TURNER:  Yes.

10             THE COURT:  But, look, it's on the website, it's on

11    the website in apparently a way that's able to reach your

12    garden variety customer.  Why can't it do double duty and also

13    reach an investor?

14             MR. TURNER:  Your Honor, I'm not saying it's

15    impossible, I'm not saying legally it's completely wrong.  I'm

16    just saying if there really were an intentional scheme to

17    mislead investors, the clearest way to do that would be to

18    speak to investors and make claims to investors about the

19    quality of the cybersecurity code.  That isn't done in the risk

20    disclosure.  The customer-facing security statement was

21    customer-facing.

22             THE COURT:  Is there a case law that draws the line

23    you are drawing that, in effect, diminishes the probative

24    value, if you will, in a fraud case of the statements made to

25    customers?

O5FKSECO

|    |                                                                       |
|----|-----------------------------------------------------------------------|
| 1  | MR. TURNER:  There is one case, your Honor, the                       |
| 2  | *Allscripts* case, it's a Northern District of Illinois case, and     |
| 3  | it just notes that in that case, the statements were                  |
| 4  | particularly immaterial given that they were in a venue               |
| 5  | directed towards customers rather than shareholders.  I really        |
| 6  | don't want to get hung up on this issue because we're obviously       |
| 7  | not making our -- our main argument is not that it's                  |
| 8  | customer-facing, therefore there could be no fraud.  And the          |
| 9  | SEC has really walked away from their intentional scheme              |
| 10 | allegations.  They're really resting on just a recklessness or        |
| 11 | knowledge theory.  But there are a number of reasons why the          |
| 12 | idea that Mr. Brown was engaging in an intentional scheme is          |
| 13 | absurd to begin it, but I do want to make sure to get to the          |
| 14 | actual substance of the security statement, your Honor --             |
| 15 | THE COURT:  Go ahead.                                                  |
| 16 | MR. TURNER:  -- if you'll permit.                                      |
| 17 | THE COURT:  Yes, go ahead.                                             |
| 18 | MR. TURNER:  So, as I mentioned, there are five areas                 |
| 19 | where they focus on in the security statement.  But just to           |
| 20 | focus for a minute on the SEC's pleading burden here, these are       |
| 21 | statements of policy.  That's what they're challenging.  These        |
| 22 | are what the company works to achieve.  These would never be          |
| 23 | reasonably construed as guarantees of perfection.  The case law       |
| 24 | recognizes that, and the SEC recognizes that.                         |
| 25 | They keep repeating in their complaint, these are not                 |

O5FKSECO

1    isolated problems they're alleging, they're pervasive failures,

2    longstanding pervasive failures, et cetera, et cetera.  They

3    cannot just mouth those words.  That is not something that can

4    be alleged in a conclusory fashion.  Under Rule 9b, they have

5    to allege particular facts to show pervasive allegations.

6         They try to bluster their way past that pleading

7    burden with a large number of allegations, but they do not get

8    points for work count here.  They have to plead specific facts

9    showing how and why each of these statements in the security

10   statement is false, and they fail to do so.

11        THE COURT:  Well, look, the access controls, for

12   example, there are some pretty detailed allegations that the

13   company was touting the access controls as muscular whereas, in

14   fact, they were porous.  That's basically put in Mr. Brown's

15   mouth.

16        MR. TURNER:  I can jump to that one, your Honor.  I

17   was going to go through one by one.

18        THE COURT:  You're welcome to.  I want to make sure

19   you use your remaining time wisely, but there do appear to be

20   substantial allegations that Mr. Brown was on notice as to the

21   inaccuracy, at least, of some of these.

22        MR. TURNER:  His statements are not alleged to be --

23   adequately alleged to be inaccurate in the first place.  I can

24   argue that.  I can get to the access controls issue.  These are

25   the problems with the allegations, however, your Honor, just to

O5FKSECO

1    separate them out real quick, because it is important to

2    separate them out.  Even if the Court finds one or two of these

3    salvageable, it's very important to weed them out.  If they are

4    not salvageable, that is the other gatekeeping rule of 9b

5    here — to the extent the case goes forward at all, there's a

6    lot of work that can be done to narrow the scope of the

7    discovery and litigation.

8              But just to start with NIST, your Honor, so they have

9    this allegation that the company says it follows the NIST

10   framework.  We've explained in our brief that -- and as the SEC

11   itself acknowledges, the NIST framework is a self-evaluation

12   framework.  That's clearly articulated in the NIST guide --

13             THE COURT:  Your point is that this 800-53, that point

14   is just simply not pled?

15             MR. TURNER:  Your Honor, if you want to look it up,

16   it's on the internet, but 800-53 is just like an informative

17   reference that you can use.  It specifically said when you use

18   it that way, it's not like a checklist.

19             THE COURT:  That's why I went to the access.  I was

20   not seizing on that one.

21             MR. TURNER:  Yes.  I can skip back to the NIST

22   statement, if your Honor is already convinced on that point?

23             THE COURT:  Well, I'm not stipulating to that, but I

24   do agree that within the range of the allegations, this is not

25   their strongest one.

O5FKSECO

1          MR. TURNER:  The key point is you're using it as a

2    self-evaluation framework.  It's fundamentally what it is.

3    It's a statement about process, not substance, that you have a

4    process for evaluating your cybersecurity in these areas, and

5    you constantly evaluate yourself in using the framework.

6          But I think the SDL is also important to look at, your

7    Honor.

8          This is an important way in which the allegations

9    don't meet their pleading burden.  So they allege that

10   SolarWinds pervasively failed to follow an SDL, a software

11   development lifecycle.  That is directly contradicted by

12   documents the SEC cites in its own complaint.  So if you look

13   at what it describes as an audit in April 2018, even by that

14   early point, this document clearly states that the company had

15   implemented the SDL.

16         THE COURT:  I think paragraph 122, though, has

17   contrary allegations from December 2018, which is later, in

18   which the presentation says, "We have no formalized testing

19   with respect to" --

20         MR. TURNER:  That's pen testing.  First of all, they

21   say they didn't implement the SDL.  This says they did

22   implement the SDL.  Then you get the pen testing, right?  And

23   so, again, you have a document that says from August 2019, this

24   is the NIST scorecards again that they repeatedly cite and

25   credit.  It says, very clearly, the company had a program for

O5FKSECO

1    penetration testing in place, they gave itself a 4.  When you

2    look at what they are citing, your Honor — I'll jump to that —

3    they're citing things like -- here's what they cite:  One line

4    in a presentation that says that a particular pen testing

5    project was unfunded.  That doesn't mean there was a pervasive

6    failure to implement a program.  All it means is there was some

7    sort of line item that was unfunded.

8         If you look at other things they cite, this is from

9    October 2018, it indicates there was pen testing going on at

10   that time — pen testing complete for MSP products.  This is

11   external pen testing, bringing in somebody external to do the

12   pen testing.  Pen testing is good for Cloud products, not for

13   the Orion products, because there was an internal team staffed

14   for that.

15        So it's very important, your Honor, to look -- this is

16   not a case where the SEC has any witness who ever told them

17   that SolarWinds pervasively failed to do anything.  They had

18   three years to investigate.  They didn't give one witness.  All

19   they are doing is picking out -- cherrypicking snippets of

20   documents and trying to pass them off as pervasive failures.

21   And if you look at the documents we have put before the Court,

22   which are documents they cite, the allegations are contradicted

23   by those documents, and if you look at the counter-- the pieces

24   of evidence they're citing, they're making unreasonable

25   inferences from those documents.

O5FKSECO

1          And this is not a factual dispute, your Honor.  We're

2     not seeking to introduce our own evidence here to challenge the

3     SEC's allegations.  If you --

4          THE COURT:  Go to access controls, because it seems to

5     me that there's a different quality of the allegations there.

6     The representation in the security statement is that the access

7     controls are role-based and that the access controls to

8     sensitive data are set on a need-to-know least-privileged

9     necessary basis, and the SEC pleads facts that administrators

10    or employees were given unnecessary administrative rights that

11    most employees had.  I think there's an allegation that the

12    password was something like 123.

13         What's the problem with that pleading?

14         MR. TURNER:  Well, passwords and access controls are

15    two different issues they treat.  But passwords, that's a --

16    that's an example right there of the cherrypicking that's going

17    on.  That is one password on a single external server the

18    company was using for a particular purpose.  That does not

19    imply that there is a pervasive failure to implement a password

20    program.  All the time -- what a cybersecurity program does is

21    find gaps and remediate them.  That is the everyday functioning

22    of a cybersecurity program.

23         So when the company finds some system that it has an

24    errant password on and fixes it, that doesn't mean there's a

25    pervasive failure.  That is the company implementing and

O5FKSECO

1    maintaining its password policy, fixing that issue.  If you

2    look at -- we cite, your Honor, these -- I'll throw it up on

3    the screen for you.  Here are a number of cases we cite where

4    courts have found failures to adequately allege pervasive

5    problems.  *Hill v. Gozani* is a particularly informative one.

6    In that case, there were allegations about problems with

7    insurance reimbursements, pervasive problems, and the court

8    said -- you know, the plaintiffs filed a 70-page opinion, but

9    when you look at the actual allegations, it's just a smattering

10   of sort of random situations where there were some sort of

11   reimbursement issues.  That does not amount to pervasive

12   problems.

13           These are other cases found similarly.  That's what

14   we're asking your Honor to do here.  Look closely at the

15   specific allegations being made look closely at the documents

16   they're relying on they don't add up to pervasive problems.

17           Access controls is no different in that regard.

18           So they cite the access controls statement.  And then

19   what do they show as their evidence?

20           THE COURT:  So August 2019, Mr. Brown prepares a

21   presentation that says, "Access and privilege to critical

22   system/data is inappropriate."

23           MR. TURNER:  Correct.

24           THE COURT:  Why isn't that an admission that, on the

25   pleadings, can be taken as fairly pleading pervasiveness?  This

O5FKSECO

1    is the chief guy in this area saying something very declarative

2    like that.

3              MR. TURNER:  Something, but it's unclear what that

4    something is.  What exactly is inappropriate?

5              Access controls, there can be a wide variety of issues

6    affecting access controls.  For example, what the SEC was

7    actually told in depositions in this case — this is obviously

8    outside the record, but just to provide an --

9              MR. BRUCKMAN:  Objection.

10             THE COURT:  Overruled.

11             MR. TURNER:  -- example — is when employees were

12   onboarded or offboarded, the processes were manual in place

13   instead of automated, and that can be unreliable.  And so the

14   company was interested in maturing those controls to make them

15   automated.  It has nothing to do with least privilege, and it

16   has nothing to do with a pervasive failure to have access

17   controls.

18             THE COURT:  May I ask you, just connecting up to what

19   later happens, do the pleadings trace what ultimately winds up

20   being the SUNBURST attack to a security weakness within the

21   company?

22             MR. TURNER:  No, your Honor.  And that's really -- all

23   they say, for example -- all they say about the security

24   development lifecycle, for example, and the failure to

25   implement controls of the product quality, completely

O5FKSECO

1    irrelevant.  The attack that happened here was not an

2    exploitation of some existing vulnerability in SolarWinds'

3    product.  It was the Russians coming in and implanting their

4    own vulnerability.  It was not some sort of sloppiness in the

5    way it was coded.

6            THE COURT:  You're saying the complaint does not

7    allege that the Russians exploited some deficiency for which

8    SolarWinds was accountable?

9            MR. TURNER:  The only connection they try to make is

10   that they say that the attacker used the company's VPN.

11   There's nothing said in the security statement about the VPN in

12   the first place.

13           But the SUNBURST attack is being used as an excuse to

14   bring this case.  It's not really what the case is

15   fundamentally about, especially when it comes to the security

16   statement.

17           THE COURT:  Mr. Turner, you've got several more

18   minutes.  I want you to hit the most important points.

19           MR. TURNER:  That's the important thing, your Honor.

20           The Second Circuit has stressed, Rule 9b requires them

21   to allege exactly how and why whatever allegations they're

22   relying on show that the statement made was false.  And just

23   pointing to a one doesn't necessarily mean that these

24   statements, these specific statements, the access controls

25   sections were false.  They had three years to investigate.

O5FKSECO

1    They had three years to figure out what exactly that one means

2    and explain it to the Court.  So they can't just rely on that

3    conclusory or just sort of a vague allegation without tying it

4    specifically to the statement in the security statement.

5         But, your Honor, I would just say, if you're not

6    convinced, and access controls, you think there's been enough

7    pled to let it go forward, let the case be just about that.

8    There's so much narrowing so we can -- that is an issue that we

9    could have discovery on, finish up, and brief summary judgment

10   in 60 days.

11        THE COURT:  So let me ask you a final question, which

12   really picks up with the very first sentence of Mr. Berkowitz's

13   argument.  If the case reduced to the security statement as the

14   basis for a 10b-5 claim, to what degree does this implicate the

15   broad policy issues that Mr. Berkowitz is concerned about?

16        MR. TURNER:  I think if your Honor were to get rid of

17   the risk disclosure piece and get rid of the 8-K piece, and all

18   we're talking about is the security statement and pieces of it,

19   that would resolve many of the policy concerns at issue.

20        THE COURT:  At that point, it's an as-applied facts

21   and circumstances issue, and the issue before me is has the SEC

22   pled enough consistent with 9b to get to discovery.

23        MR. TURNER:  Yes.  And then we're not talking about --

24   we talked so much in the risk disclosures discussion about

25   those two prior incidents, and that's not really the focus of

O5FKSECO

1   their risk disclosure claim.  They're risk disclosure claim is,

2   companies should be disclosing a lot of details about their

3   cybersecurity programs and what's wrong with them in their risk

4   disclosures.  That's what amici are worried about, that's what

5   industry is worried about, because they are left in the lurch,

6   what are we supposed to disclose, there's no limiting

7   principle, there's no articulable principle here, and, all of a

8   sudden, we're being told that we have to disclose all sorts of

9   things that can be valuable to hackers.

10           THE COURT:  All right.  Very helpful and very helpful

11   context.

12           Let me ask you this:  You've got a PowerPoint that

13   you've drawn upon to something, but not merely as much as you

14   intended.  Can you please file a copy of it on the docket of

15   the case?  I'm going to mark it as Court Exhibit A.  It's

16   important that I make a record of what was before me during the

17   hearing.

18           MR. TURNER:  Of course, your Honor.

19           THE COURT:  We'll take a ten-minute comfort break, and

20   when we resume, I'll hear from the SEC.  Thank you.

21           (Recess)

22           THE COURT:  All right.  I'll hear now from the SEC,

23   and Mr. Bruckmann, I gather you're going first?

24           MR. BRUCKMANN:  Yes, your Honor.  And with the Court's

25   permission, I'll argue from the table, if that's all right.

O5FKSECO

1          THE COURT:  That's fine, just as long as you speak

2     into the mic.

3          MR. BRUCKMANN:  May it please the Court,

4     Christopher Bruckmann, for the SEC.

5          Material statements by public companies and their

6     leaders have to be truthful.  They have to convey the whole

7     truth.  And that is the case, and has long been the case,

8     regardless of the topic, whether it's a product under

9     development, security procedures that they're taking,

10    production figures.  Once a company speaks on a topic, it has

11    the obligation to tell the whole truth.

12         The defendants' core position here in seeking to

13    dismiss this entire case is that cybersecurity is the lone

14    exception to that longstanding rule.

15         They would have this Court find that because telling

16    the truth on cybersecurity can have consequences on

17    cybersecurity and cybersecurity alone, companies must be

18    permitted to lie.  No.  That cannot be the case.

19         This case is not just about the SUNBURST attack.  The

20    defendants violated the federal securities laws from the moment

21    of SolarWinds' IPO, well before the SUNBURST hack.  They did

22    that through material false statements and omissions regarding

23    the cybersecurity practices.  The security statement, with

24    specific affirmative representations as to actual practices

25    that SolarWinds was presently undertaking, was false throughout

O5FKSECO

1    the relevant time period.

2            THE COURT:  So let's start with that, just because

3    that's where Mr. Turner left off, and his contention is that

4    the SEC is effectively nitpicking and taking statements out of

5    context and that the pervasive security failures that the SEC

6    is pleading aren't backed up by the incorporated documents.

7            MR. BRUCKMANN:  Well, your Honor, let's look at some

8    of the incorporated documents.

9            If you look at Defendants' Exhibit 7, on the page

10   entitled "Protect" --

11           THE COURT:  Do you have a PowerPoint, or should I be

12   looking at --

13           MR. BRUCKMANN:  I'm old-fashioned, your Honor, if

14   your Honor doesn't mind paper.

15           THE COURT:  I've got the complaint handy.

16           MR. BRUCKMANN:  Well, I can simply describe it,

17   your Honor.

18           In Defense Exhibit 7, on the page entitled "Protect,"

19   in August of 2019, SolarWinds assessed that for the security

20   category authentication, authorization, and identity

21   management, they had a NIST level of 1.  And they said that

22   user identity, authentication, and authorization are in place

23   and actively monitored across the country.  The score of 1,

24   according to that same document, means that the organization

25   has an *ad hoc*, inconsistent, or reactive approach to the

O5FKSECO

1   security control objectives.

2           And as we explained in the complaint, that is

3   generally considered to be a poor score.  That is one of the

4   same documents that also says, "Access and privilege to

5   critical systems data is inappropriate."

6           Your Honor, I have an extra copy.

7           THE COURT:  I've got it in the version of the -- no,

8   here it is, I've got it.  I've got it as an attachment to

9   Mr. Turner's affidavit.

10          MR. BRUCKMANN:  Yes, that's the document I'm talking

11  about, your Honor.

12          Looking at the complaint itself, if you look at

13  paragraph 194, your Honor, there is a chart.  And this is from

14  one of the NIST 800-53 evaluations referenced in the complaint.

15  Regardless of why the NIST 800-53 evaluations were done, they

16  revealed specific information to Mr. Brown and others.  And one

17  of them was — and this is for the organization, not for just a

18  product — it says, "The organization (a) limits privileges to

19  change information system components and system-related

20  information within a production or operational environment."

21  The finding was, "No known privilege limitations."  That's the

22  last row of the chart in 194 in the amended complaint.

23          There are pervasive access control problems, not just

24  an isolated problem --

25          THE COURT:  That's of the five items that

O5FKSECO

1    Mr. Turner --

2                    MR. BRUCKMANN:  Yes.

3                    THE COURT:  -- specified.  Access controls is, from

4    your point of view, the strongest for your case?

5                    MR. BRUCKMANN:  Yes.

6                    But there's plenty to support the others as well.  On

7    the secure development lifecycle, part of a secure development

8    lifecycle is having training, threat modeling, and penetration

9    testing.  So while SolarWinds claims that they had established

10    a secure development lifecycle, that same document that we were

11    just looking at, Exhibit 7, rates it as a 2, on the page

12    "Identify."

13                    Well, 2, according to the scoring system in that very

14    document, means the organization has a consistent overall

15    approach to meeting the security control objectives, but it is

16    still mostly reactive and undocumented.

17                    THE COURT:  But by 2019, it's up to a 3, according

18    to --

19                    MR. BRUCKMANN:  It's the 2019 document that I'm

20    looking at, your Honor.

21                    THE COURT:  Right.  But there's a chart.  You've

22    chosen to highlight the score that the company gave itself in

23    2018 as a 2, but the next year, it gives itself a 3, where,

24    although it's not Mercedes-level adjectives here, it's a

25    perfectly solid set of evaluations.

O5FKSECO

1          MR. BRUCKMANN:  But, your Honor, if your Honor goes a

2     few pages forward in that same document, there's a specific

3     rating for the secure development lifecycle.  So that's on the

4     page — it's misspelled — "Indentify," but I believe it's

5     supposed to be "identify" at the top.

6          This one, your Honor.

7          THE COURT:  All right, keep going.  Yes.

8          MR. BRUCKMANN:  That's where there's a specific rating

9     in 2019 for the secure development lifecycle of a 2.  While it

10     means there's something in place, it also means that they do

11     not routinely measure or enforce policy compliance.  Then if

12     you look at the specific allegations in the amended complaint

13     in that same time regarding the lack of penetration testing,

14     the lack of security training, the lack of threat modeling,

15     that shows that they did not have what they represented in the

16     security statement.

17          THE COURT:  The document that you have just drawn my

18     attention to has a series of missed maturity level ratings --

19          MR. BRUCKMANN:  Yes.

20          THE COURT:  -- 3 being the average, as the company

21     averages out, aggregates them to an aggregate of 3.2.  Look, I

22     appreciate that measured against a level of optimal, that's

23     short, but measured against the company's statements, why is

24     that indicative of inaccuracy?

25          MR. BRUCKMANN:  Regarding the overall statement of

O5FKSECO

 1    following NIST, your Honor?

 2            THE COURT:  Yes.

 3            MR. BRUCKMANN:  Your Honor, rather than getting into a

 4    metaphysical debate over what "follow" means, our core

 5    allegation on the follow NIST statement is that it's a

 6    materially misleading omission to claim to follow NIST without

 7    revealing how poor they score on certain critical components of

 8    it.  In other words, it's a global that encompasses the other

 9    four specific allegations --

10            THE COURT:  But even the global here gives them a

11    maturity -- an aggregate level of just over 3, which,

12    adjectively, puts it at solid, if you will — my word there, not

13    theirs — but it's not an impeaching badly bad grade.

14            MR. BRUCKMANN:  If that were the only issue.  Follow

15    NIST versus an overall grade, that might be a fair way to

16    conclude, your Honor, but there are also specific conclusions

17    regarding critical representations that were made on the

18    website.  And those are specifically misleading.

19            So even --

20            THE COURT:  Give me your best examples of misleading

21    statements from the security statement on the website.

22            MR. BRUCKMANN:  Looking at Exhibit 5, Mr. Turner's

23    declaration, on page 4 of 5, under "Access Controls," where it

24    says "Role-Based Access" — forgive me.  It's page 4 of 5 of the

25    exhibit.

O5FKSECO

1          THE COURT:  Got it.

2          MR. BRUCKMANN:  Under "Access Controls, Role-Based

3     Access," that entire first paragraph, including the specific

4     representation that access controls to sensitive data in our

5     database systems and environment are set on a

6     need-to-know/least privilege necessary basis.  That is

7     specifically false as shown by, among other things,

8     paragraph 194.

9          A few paragraphs down, "Secure Development Lifecycle."

10    Again, that entire section is false, but among the specifics

11    are the second sentence, "Security and security testing are

12    implemented throughout the entire software development

13    methodology."  We have a number of allegations in the complaint

14    regarding the lack of testing, including the fact that there

15    was no penetration testing in December -- in 2018, as reflected

16    in the December 2018 presentation.

17         Even if they did penetration testing later, that still

18    means that this was false during the period of time where they

19    were a publicly traded company.  They can't get out of a 10b-5

20    allegation by making something true after it having been false

21    for a period of time.

22         THE COURT:  Although it might delimit the period of

23    time covered by the claim.

24         MR. BRUCKMANN:  It potentially could, it could go to

25    something like penalties, but in terms of pleading liability,

O5FKSECO

1    if it's false in October of 2018, it is false.

2         THE COURT:  May I ask you, just to the extent that

3    access control seems to be the strongest of the deficiencies

4    that you've pled, is there a link between that and what later

5    happens with SUNBURST?

6         MR. BRUCKMANN:  There absolutely is, your Honor.  We

7    don't say it's a but-for cause, but in paragraph 256 of the

8    complaint, we specifically talk about how the threat actors

9    exploited the lack of access controls in order to be able to

10   move throughout the SolarWinds network.

11        THE COURT:  And how is that known?  Paragraph 256

12   doesn't -- what's the factual basis for the statement that the

13   threat actors — Russia, I take it — exploited this particular

14   security problem?

15        MR. BRUCKMANN:  Those documents produced to the SEC by

16   SolarWinds.  I believe it was a presentation by the law firm

17   DLA Piper.  It was a series of PowerPoints that walked through

18   how the attack had happened, and that's where it talked about

19   that the first known access was in January of 2019, and it was

20   through the VPN network using a former employee's credentials.

21        THE COURT:  So stepping back, let's suppose, for

22   argument's sake, that the statements in the security -- what's

23   it called?

24        MR. BRUCKMANN:  The security statement.

25        THE COURT:  -- statement — thank you — were at some

O5FKSECO

point after the IPO regarded as misleading.  Explain to me the

theory of scienter here.  To begin with, is the company's

scienter here, as pled, solely derivative of Mr. Brown, or is

there some other basis on which the SEC is contending that the

company had the relevant scienter?

            MR. BRUCKMANN:  For the security statement, we're

saying it's through Mr. Brown.

            THE COURT:  Not through some other human being, it's

respondeat, in effect, through Mr. Brown?

            MR. BRUCKMANN:  Yes.

            THE COURT:  So what's the basis for Mr. Brown having

scienter to defraud investors as opposed to arguably to

overhype to customers?

            MR. BRUCKMANN:  Well, scienter is not a specific

requirement that someone have an intent to deceive investors.

I'm not aware of any case saying it has rise to that level.

The SEC has two theories regarding scienter.  We are not

backing away from either of them.

            The first is this was a deliberate scheme by

Mr. Brown, starting well before the relative period, to

affirmatively portray SolarWinds as a cybersecurity leader when

they were, in fact, a cybersecurity laggard.  And it began with

the posting of the security statement, and included his

podcasts, his presentations, press releases, and everything

else that went into it.

O5FKSECO

1          The second is simply — and this is in *Novak* and other

2    Second Circuit cases — that he knew or had access to

3    information that the specific representations in the security

4    statement were false, and that is pled throughout the brief,

5    your Honor, throughout the complaint.

6          THE COURT:  Although not necessary to plead it, not

7    irrelevant is motive.

8          What's his motive?

9          MR. BRUCKMANN:  The motive would be to have SolarWinds

10   continue to obtain and retain business.  And while that's not

11   enough to be establishing scienter on its own, it is a motive

12   that people can have.

13         THE COURT:  So if that's not enough to get there on

14   its own, what else do you cite as clearing the pleading bar for

15   Mr. Brown's scienter?  In other words, there's not, I think, a

16   pleading about stock trading of consequence, there's no

17   pleading about seeking promotion or something.  I gather part

18   of the theory is that he inherited a bad system as opposed to

19   put it in place.  What's the motive?

20         MR. BRUCKMANN:  So what we plead for scienter would

21   be, under *Novak*, that he knows information that contradicts the

22   public statements.  That is sufficient, without any motive

23   whatsoever, to establish scienter under *Novak*.

24         THE COURT:  Is there any allegation that he made false

25   statements north of him in the food chain?

O5FKSECO

1          MR. BRUCKMANN:  No, but there's information that is

2    not reported up.

3          THE COURT:  And what's the fair inference from that?

4          MR. BRUCKMANN:  That he doesn't want to be seen as

5    doing a bad job as the cybersecurity point person at the

6    company.

7          THE COURT:  All right.

8          What's the basis for Mr. Brown's -- assume, for

9    argument's sake, just that the risk disclosure were actionable.

10   What would be the basis for tying Mr. Brown to it, and for

11   pleading his scienter?  I should just ask, whose scienter is

12   relevant to the risk disclosure statement?  Who are you basing

13   that on?

14         MR. BRUCKMANN:  For that, we have two alternative

15   theories.  One is that it's Mr. Brown; and, two, that if it's

16   not Mr. Brown, that it would be, under *Teamsters* and other

17   cases, that essentially someone must have had scienter given

18   how different that was than the reality on the ground.  But

19   our --

20         THE COURT:  Let's focus on the Mr. Brown angle.

21   What's the basis?

22         MR. BRUCKMANN:  Courts in this district have

23   repeatedly held that the person who makes a statement does not

24   have to be the person who has scienter as long as there's

25   connective tissue between the person who has scienter and the

O5FKSECO

1    statement.

2          We go through, in the amended complaint, that

3    Mr. Brown was specifically consulted and asked questions and

4    knew that that was information that was going to feed into the

5    risk disclosure.  He is the person in charge of cybersecurity

6    at SolarWinds, and he certified, we believe incorrectly and

7    falsely, on various subcertifications regarding the state of

8    cybersecurity at SolarWinds that were used to reaffirm the risk

9    disclosure --

10          THE COURT:  So you are pleading that he, in effect,

11    misleads people north of him as to the health of the

12    cybersecurity environment?

13          MR. BRUCKMANN:  Through the subcertifications, yes.

14          THE COURT:  Where is that in the complaint?  I may

15    have missed that.

16          MR. BRUCKMANN:  Court's indulgence?

17          THE COURT:  Of course.

18          (Pause)

19          MR. BRUCKMANN:  Yes, page 93, paragraph 298, your

20    Honor.

21          THE COURT:  One moment.

22          "Nonetheless, Brown signed subcertifications relied on

23    by the senior executives" --

24          MR. BRUCKMANN:  Yes, exactly.

25          THE COURT:  -- "confirming that all discrepancies,

O5FKSECO

1    issues, or weaknesses had been disclosed to the executives

2    responsible for the security filings."  That's the money

3    sentence?

4              MR. BRUCKMANN:  Yes.

5              THE COURT:  Okay.

6              MR. BRUCKMANN:  And he had not reported up, among

7    other things, the combined U.S. Government Agency A and

8    Cybersecurity Firm B or the U.S. trustee problem and Palo Alto

9    Networks, the two entities.  He had not reported that up to the

10   C-Suite.

11             THE COURT:  So as to that, as to the -- the agency,

12   what is it government agency A and company B?

13             MR. BRUCKMANN:  Yes.

14             THE COURT:  Based on the pleadings, does knowledge of

15   that go north of Brown of those incidents at the time?

16             MR. BRUCKMANN:  One of them is reported to the chief

17   technology officer.

18             THE COURT:  Who at the time was Brown's boss?

19             MR. BRUCKMANN:  Brown's boss' boss, to be very

20   precise.

21             THE COURT:  Okay.

22             MR. BRUCKMANN:  But no one above Brown is told about

23   the combined two incidents.  And it is the combined two

24   incidents that really makes it material.  The one thing I think

25   that Mr. Berkowitz said that I agree with is that when figuring

O5FKSECO

1    out when something needs to be updated in the risk disclosure,

2    the question is materiality.  And after the U.S. Government

3    Agency A attack, Brown assessed — essentially this is one of

4    two things — either the hacker was already at U.S. Government

5    Agency A when SolarWinds arrived on the scene or someone is

6    looking to use Orion as part of a larger attack.  And it was

7    described as spooky and concerning within SolarWinds.

8             Once the second one happens, and numerous people

9    within SolarWinds are linking and talking about how similar

10   those are, essentially at that point, Brown either knew or was

11   reckless in not knowing that of the two scenarios he outlined,

12   it was the second one, that someone was looking to use Orion in

13   the scheme of broader attacks.

14             THE COURT:  As pled, what's the basis for the

15   similarity?  I thought it was not until C, that the company

16   actually gets its eyeballs on the code itself?

17             MR. BRUCKMANN:  So if your Honor looks at, I believe

18   it's, paragraph 281 --

19             THE COURT:  They say multiple employees -- you say

20   recognize the similarities.  One of them says seems similar,

21   another says, "we have similar case."

22             That's about it.  I mean, other people reference the

23   other attack, but don't say similar.  But beyond the fact that

24   you've got that top-level use of the word "similar," is there

25   any factual basis?  For example, is there any pleading about

O5FKSECO

1    what these employees based that on collusion on?

2              MR. BRUCKMANN:  Yes, your Honor.  It talks about both

3    using the business-layer host, which is a specific part of the

4    Orion improvement program in order to conduct the attack.  And

5    if you continue into paragraphs 282 and 283, when having a

6    phone call with company B, company B asked pointblank if

7    SolarWinds had seen similar activity before.  SolarWinds knew

8    they had seen similar activity before and denied it.  And

9    that's what led to that instant message of the employee, "Well,

10   I just lied."

11             THE COURT:  Right.  Is that something that Brown is

12   accountable for?

13             MR. BRUCKMANN:  It's people within his group.  We

14   don't have him directly tied to that, but those two people

15   report to Brown.

16             THE COURT:  Okay.

17             Same question, though:  Is there a basis for Brown

18   knowing that some underling of his, in effect, ducked the

19   question of whether there was some prior incident?

20             MR. BRUCKMANN:  We don't have Brown tied directly to

21   that statement, no, your Honor.

22             THE COURT:  Look, Mr. Berkowitz's argument about

23   attacks A and B was that they weren't well tied together and

24   they didn't ultimately impeach the risk disclosure, which

25   describes this very thing.

O5FKSECO

1          I'd welcome if you want to examine the language of the

2     risk disclosure.  I understood you to be focusing on the

3     distinction between potential and something else.

4          MR. BRUCKMANN:  Yes.

5          THE COURT:  I think we need to have the risk

6     disclosure up.  Let me ask defense counsel, just for --

7          MR. BRUCKMANN:  We can do that.

8          THE COURT:  -- for everyone's benefit, let's put the

9     risk disclosure up.

10          Sorry, that's the risk disclosure.  Yeah, that's

11     right.

12          So what is actionable about the risk disclosure once

13     Company B reports to SolarWinds?

14          MR. BRUCKMANN:  The risk disclosure — and this is the

15     way SolarWinds described it in their brief at page 4 — simply

16     discloses that, like any technology company, SolarWinds is

17     vulnerable to there being cyber attacks.  It does not contain

18     company-specific assessment about their individualized and

19     heightened risk due to their poor cybersecurity framework

20     overall and the specific incidents that they had seen in 2020,

21     which include both the U.S. Government Agency A and

22     Cybersecurity Firm B, but also, as we discuss in the amended

23     complaint, the series of attacks on their MSP customers that

24     indicated that there were potential reasons to think that

25     someone had gotten inside of SolarWinds because of the way they

1    were able to attack the MSP customers.

2         THE COURT:  What about the case law that Mr. Berkowitz

3    cited on risk disclosures in particular?

4         MR. BRUCKMANN:  Well, your Honor, I think the best

5    case on risk disclosure specifically is the Second Circuit's

6    decision in *Meyer*, where it says, "A generic warning of risk

7    will not suffice when undisclosed facts on the ground would

8    substantially affect a reasonable investor's calculations of

9    probability."  SolarWinds did recite all of the things that

10   could happen if they were hacked.  We don't dispute that.  They

11   did not give any indication as to why it was more likely that

12   they would be hacked compared to any company, which they should

13   have, given the problems and red flags they had seen.

14        THE COURT:  Did they have that obligation, in your

15   view, after learning from just Government Agency A?

16        MR. BRUCKMANN:  Well, we think they had an obligation

17   from the moment of their IPO, based on the overall flawed

18   cybersecurity posture, the lack of access controls, et cetera.

19   But in terms of was there something specific triggered by the

20   attacks, we're saying certainly after the second one and the

21   linking, that that's when, regarding the attacks, there's an

22   obligation.

23        THE COURT:  Is there any evidence that Mr. Brown — who

24   seems to be the principal basis of your pleading scienter,

25   based on the risk disclosure — drew the connection between A

O5FKSECO

```
1    and B?

2               MR. BRUCKMANN:  Well, he knew that the

3    BusinessLayerHost was used in both.  That's in paragraph 280.

4    He had described the attack on U.S. Government Agency A as

5    unique.  So when you have an attack that you think is unique,

6    that you're describing as, you know, one of two scenarios, and

7    then you see another hack attack happening in a similar

8    fashion, I mean, we don't need Brown to have said, "I put it

9    together."  The standard cannot be that someone has to actually

10   type down in a document that they have linked two things, in

11   order for it to be actionable conduct.

12              THE COURT:  Do you have communications with Brown that

13   analogize or link, even in somebody else's mind, A and B?

14              MR. BRUCKMANN:  Court's indulgence.

15              (Pause)

16              MR. BRUCKMANN:  In paragraph 280 there's the talk

17   about the similarity of the use of the BusinessLayerHost in

18   both attacks.

19              THE COURT:  Is Brown on those communications?

20              MR. BRUCKMANN:  Yes.

21              THE COURT:  Yes, it says:  An email later forwarded to

22   him, a couple of days later, said that B -- it seems like they

23   had a breach similar to A.  This does not appear to be OIP,

24   that we know of yet, related, but the BusinessLayer was used in

25   the attack chain, according to them.
```

O5FKSECO

```
 1              What does "OIP" mean?

 2              MR. BRUCKMANN:  That's the Orion Improvement Program.

 3    That is explained in an earlier part of the complaint.

 4              THE COURT:  I see.

 5              "In this case, however, it was to do," and then it

 6    says, "[BusinessLayer] running some malicious download."

 7              Is it clear from those sentences that Brown is being

 8    told that these two are related, or is it just --

 9              MR. BRUCKMANN:  Yes.

10              THE COURT:  -- being theorized?

11              MR. BRUCKMANN:  Well, the language of the email is

12    "Cybersecurity Firm B in touch with customer support, and it

13    seems they had a breach similar to U.S. Government Agency A."

14              THE COURT:  Right.  And then it says, "It doesn't

15    appear to be Orion-related," suggesting that there's a breach

16    but apparently not deriving from the Orion, meaning the

17    SolarWinds software.

18              MR. BRUCKMANN:  No.  OIP is a specific part of Orion,

19    the Orion Improvement Program.  Earlier in the complaint it

20    makes very clear that the Cybersecurity Firm B attack was

21    definitively Orion.

22              THE COURT:  All right.

23              I guess I'm trying to decode a not completely lucid

24    email chain from an anonymous employee that is forwarded to

25    Brown, and trying to understand the extent to which it should
```

O5FKSECO

1    put him on notice that these are very likely deriving from the

2    same actor as opposed to bearing some similarity.

3        MR. BRUCKMANN:  Both are definitively Orion.  Brown

4    describes U.S. Government Agency A, around the time it happens,

5    as unique, as very concerning, and of one of two things, either

6    someone is already there or they are looking to use Orion in

7    part of a broader attack.

8        Then he gets an email saying that B, also Orion, is

9    similar.  He knows that BusinessLayerHost is again involved.

10       And the only sort of contraindication, I guess, is

11   that the specific subpart of Orion, the Orion Improvement

12   Program, according to this email, was not necessarily involved

13   in the second one.

14       THE COURT:  So what, from your perspective, after B,

15   should -- if Brown was responsible for getting the company to

16   adjust its risk disclosure, at this point there's, from your

17   perspective, circumstantial evidence, but not dispositive

18   evidence.  What's the change that is required to be made to the

19   risk disclosure, from your perspective, at that point, to bring

20   it into compliance?

21       MR. BRUCKMANN:  Well, Brown's specific responsibility

22   would have been to report it to the disclosure committee, to

23   the C-Suite, that he had concluded that there was a potential

24   similarity between two attacks.

25       THE COURT:  Right.  But that's not what the claim is

O5FKSECO

 1    against Brown.

 2              MR. BRUCKMANN:  Right.

 3              THE COURT:  That may have been an employment misstep

 4    by him, but it's not a basis for liability.  I appreciate that

 5    you've got a disclosure controls question, and Brown's

 6    nondisclosure of that may be probative, or not, on that.

 7              But my question to you is:  What's the correction to

 8    the risk disclosure that's needed to make it not, from your

 9    perspective, misleading after the company knows about B?

10              MR. BRUCKMANN:  After the company knows about B, it

11    also already knows about the series of attacks on the MSP

12    customers, and it knows about issues like its access controls.

13    It had some obligation to update the risk disclosure to

14    indicate something about the increased probability of an attack

15    at SolarWinds as compared to a generic technology company.

16              That's what *Meyer* talks about --

17              THE COURT:  Without binding yourself to specific

18    language, give me an example of language that would have

19    captured the somewhat uncertain state that the company was in

20    at that point.

21              MR. BRUCKMANN:  I mean, it's not the SEC's job to

22    write disclosures for companies, but --

23              THE COURT:  But if the SEC can't come up with language

24    that would be up to the task, it raises a question of what

25    whether this is a viable theory.

O5FKSECO

1          I welcome, just broadly — what do you have in mind

2     here?  "We disclose that we are presently investigating the

3     presence of malicious software on two customers of our Orion

4     product"?  Is that essentially what you have in mind?

5          MR. BRUCKMANN:  Something along that, or "We've seen

6     indications that someone is looking to use Orion in a broader

7     attack," which was Brown's essential conclusion in the first

8     email.  It's one of two things.  But, by B, it's pretty obvious

9     which of the two it is.

10          THE COURT:  Okay.  In effect, what you're saying is

11     that the allegation really needed to capture the newsflash that

12     there had been two seemingly similar attacks through Orion?

13          MR. BRUCKMANN:  Yes.

14          THE COURT:  What did the company know from the two

15     customers, as of the time of the two disclosures?  What did

16     they understand, as reported by the customers, to have

17     happened, according to the pleadings?

18          MR. BRUCKMANN:  So, for U.S. Government Agency A, that

19     they were doing a test run of Orion, and then when doing that

20     test run, they saw it reach out to an apparently malicious

21     server.

22          THE COURT:  Okay.  And B?

23          MR. BRUCKMANN:  B reported it to SolarWinds as being

24     part of what they called a red-team exercise.  That ends up not

25     being truthful, frankly.  Cybersecurity Firm B was being

O5FKSECO

1    cautious in terms of what they revealed about their own

2    cybersecurity problems to SolarWinds.

3         THE COURT:  Well, truthful or not, what did SolarWinds

4    understand at the time?

5         MR. BRUCKMANN:  I want to make sure I get this

6    correct, your Honor.  That it was, again, the Orion server

7    reaching out --

8         THE COURT:  To a malicious server?

9         MR. BRUCKMANN:  I believe that's the case, your Honor,

10   but I want to make sure I get it correctly.

11        So it's paragraph 279.  And, yes, it was described as

12   malicious activity by the Orion software, including the

13   BusinessLayerHost reaching out to a website and downloading a

14   malicious file.

15        THE COURT:  So the BusinessLayerHost reaching out to a

16   malicious website is the connective tissue between A and B, as

17   known to SolarWinds after B?  Is that a fair synopsis of the

18   similarity?

19        MR. BRUCKMANN:  To be super precise with the language

20   of the amended complaint, Cybersecurity Firm B isn't described

21   as describing it as a malicious website; it was reaching out to

22   a website and downloading a malicious file.  But reaching out

23   to a website with malicious activity, I think, is the

24   connective tissue between the two.

25        THE COURT:  Come back, then, just to the issue of

O5FKSECO

1    scienter as to that.

2            If the information flow stops effectively with Brown

3    at that point, putting aside whether he should have done his

4    job better, what's the scienter point here with respect to him

5    and the risk disclosure?  I take it he has no authorship of the

6    risk disclosure, and, on the pleadings, I don't think it's ever

7    really run by him for review.

8            I completely get the theory of scienter with him as to

9    the security statement, but as to the risk disclosure?

10    MR. BRUCKMANN:  He is the person with the knowledge of

11    the events, who is supposed to report it up, according to the

12    company's disclosure policy, which requires incidents that

13    could impact -- or for which multiple customers are

14    susceptible, to be reported up, and he doesn't.  And by failing

15    to do that, the information is unable by the company to be

16    assessed and reported out.

17    THE COURT:  Sure.  Why isn't the other word for that

18    is that he was negligent?

19    MR. BRUCKMANN:  Because he had actual knowledge of the

20    information regarding Cybersecurity Firm B and Government

21    Agency A.

22    THE COURT:  And he booted a job requirement.  But

23    that's a little different from securities fraud scienter?

24    MR. BRUCKMANN:  Well, we go back to the same subcerts

25    then, your Honor, we discussed previously, that he is signing,

O5FKSECO

```
 1   saying all information has been reported up when, with regard
 2   to --
 3               THE COURT:  Does he do that after B?  Is the
 4   allegation that at some point after B he falsely signs a
 5   relevant certification?
 6               MR. BRUCKMANN:  My memory is that the
 7   subcertifications are quarterly.  I'm trying to remember if
 8   that is in the amended complaint or not.
 9               I think it's a fair implication, looking at 298 and
10   299, because 299 talks about the quarterly reports that are
11   done based on the subcertifications.
12               THE COURT:  All right.  You had mentioned that there
13   was an alternative theory of scienter with respect to the risk
14   disclosure that is not Brown.
15               What is that theory?
16               MR. BRUCKMANN:  Under the *Teamsters* case and other
17   cases, at the pleading stage, the plaintiff does not have to
18   identify whose specific scienter is imputing to the company
19   where the statements are so divorced from reality that somebody
20   must have had scienter.
21               THE COURT:  And at what point then -- is it summary
22   judgment at which you would be accountable to that --
23               MR. BRUCKMANN:  Yes.
24               THE COURT:  -- the *respondeat* theory?
25               MR. BRUCKMANN:  Yes.
```

O5FKSECO

```
 1              THE COURT:  All right.

 2              I want to make sure you have enough time to address

 3    the back end here, involving SUNBURST.  I don't know if that is

 4    you or Mr. Ney who's doing that.

 5              MR. BRUCKMANN:  The 8-K issue would be me as well,

 6    your Honor.

 7              THE COURT:  Go ahead.

 8              And maybe I'll ask defense counsel, just because it

 9    does facilitate the discussion, if you don't mind putting up

10    the relevant 8-K.  Is the December 14 one?

11              MR. TURNER:  Certainly, your Honor.

12              THE COURT:  Thank you.  I appreciate it.

13              All right.  This disclosure is pretty bad news, and it

14    drops the stock, apparently, by 25 percent, allowing for other

15    market activity.

16              Is the problem with the word "potentially"?

17              MR. BRUCKMANN:  That's one of the problems.  There are

18    several portions of this that indicate, essentially, it's

19    unknown whether this has been successfully exploited or not.

20    But there were clear conclusions by Brown and others that it

21    had been successfully exploited by that point.

22              Defense points to the word "infiltration," but I want

23    to point to some language that was used by Brown at the time.

24              Court's indulgence.

25              THE COURT:  Of course.  Just give me the cites to the
```

O5FKSECO

 1    complaint.

 2            MR. BRUCKMANN:  Of course.  That's what I'm looking

 3    for, your Honor.

 4            So paragraph 315, your Honor.

 5            THE COURT:  Go ahead.

 6            MR. BRUCKMANN:  So, before that 8-K, internally,

 7    SolarWinds had concluded that the U.S. Government Agency A

 8    attack was a "customer compromise" and an "attack that was

 9    successful," and knew that the Cybersecurity Firm B attack was

10    considered "a breach."

11            So quibbling over the precise definition of

12    "infiltration" isn't the point.  The point is, if that's the

13    conclusion inside SolarWinds, it's at least a material omission

14    to say "it could potentially allow an attacker to compromise

15    the server" without disclosing that this is what had already

16    happened.

17            THE COURT:  Well, sorry.  It's a customer compromise

18    insofar as the Orion product has been corrupted in that way,

19    but that's being disclosed, the vulnerability is inserted.  Why

20    doesn't that itself explain the words "customer compromise"?

21    In other words, why does "customer compromise" mean that

22    something beyond what's being disclosed here, which is the

23    vulnerability inserted into the customer-bought product,

24    qualify?

25            MR. BRUCKMANN:  Well, then focus on the next one, your

O5FKSECO

1    Honor, "attack that was successful."

2              THE COURT:  Right.

3              MR. BRUCKMANN:  There's nothing about this 8-K that

4    conveys that there had been attack that was successful --

5              THE COURT:  What is meant by an attack that had been

6    successful?  What has Government Agency A told SolarWinds at

7    this point beyond the fact that it has discovered this

8    vulnerability in the Orion product?

9              MR. BRUCKMANN:  That it's reaching out and contacting

10   a malicious server.

11             THE COURT:  What does "successful" mean?  Just that

12   the server was contacted, or that some follow-on damage was

13   done?  It's not a very specific term.

14             MR. BRUCKMANN:  The case law makes clear that what's

15   at issue here is not the literal truth of any word but whether,

16   as a whole, this statement accurately conveys information to

17   investors.  There had been two attacks over a period of six

18   months that were actively exploiting this vulnerability.  And

19   to say that simply it's potential and we're investigating

20   whether it has been used, when they knew that twice it had

21   actively been used --

22             THE COURT:  But, sorry, the "potential" modifies

23   something, "potentially allow an attacker to compromise the

24   server."  I thought what you were saying is SolarWinds knew, at

25   the time of December 14th, that in fact the attacker had

O5FKSECO

1    compromised a customer server.

2              Is that what you're saying?

3              MR. BRUCKMANN:  It depends what you mean by

4    compromised a server potentially, your Honor, and that's

5    probably a factual dispute.

6              THE COURT:  No.  It's maybe a pleading problem.  I

7    mean, that's the point here.

8              I appreciate that there are lots of different ways

9    this could be written, but if you're trying to claim scienter,

10   if you're not prepared to tell me that an attacker has, in

11   fact, compromised the server on which the Orion products run,

12   if you're not citing a factual basis to contend that Brown or

13   SolarWinds knew that, what's wrong with the word "potentially"?

14             MR. BRUCKMANN:  Well, look at the last bullet point on

15   the screen, your Honor.

16             The last sentence of that is, "SolarWinds is still

17   investigating whether, and to what extent, a vulnerability in

18   the Orion products was successfully exploited in any of the

19   reported attacks."

20             They know that successfully Orion is reporting out to

21   malicious servers, they know that successfully Orion is

22   downloading malicious code onto Cybersecurity Firm B --

23             THE COURT:  But they are stating unequivocally in the

24   first sentence that, in point of fact, the vulnerability has

25   been inserted into a product that has been bought by customers.

O5FKSECO

1          MR. BRUCKMANN:  Right.

2          THE COURT:  So what does it mean for it to be

3     thereafter successful?  Does it mean that some degree of

4     follow-on damages have been done to the customer?  Does it mean

5     that certain customer information has been liberated from the

6     customer and sent back to the Russians?  The problem with

7     "successfully" is that it's a somewhat hazy term, so I am

8     having a little bit of difficulty finding the term

9     "successfully exploited" to be awful clear.  It's not a term of

10    art.

11         Putting the first and last bullet points together, the

12    implication is that "successfully exploited" means some

13    follow-on damage beyond the vulnerability being put in the

14    customer product.

15         MR. BRUCKMANN:  At Cybersecurity Firm B, it reaches

16    out to the website and downloads a malicious file onto the

17    Cybersecurity Firm B computer server.  That is not just

18    potentially.  That is an actual act that shows this was being

19    exploited.

20         Now, whether it's an infiltration or not, that is

21    information that is materially different than what is conveyed

22    here.

23         THE COURT:  In other words, you're contending that the

24    act of downloading necessarily means a compromise?

25         MR. BRUCKMANN:  And it shows a --

O5FKSECO

1      THE COURT:  Is that what makes bullet point 1

2  misleading?

3      MR. BRUCKMANN:  Yes.  I think to have malicious

4  software downloaded onto a server is a compromise.

5      THE COURT:  May I ask you — look, it's not lost on me

6  that this has got to be a corporate crisis of the first order

7  and within 48 hours, if not less, they pumped this thing out,

8  which is pretty dramatic.

9      Does the case law give any allowance for the fast pace

10  of events?

11      MR. BRUCKMANN:  I think that's one fact that could be

12  taken into account when looking at scienter, but what we have

13  here is clear testimony from Brown that he essentially had

14  instantly linked to all of these things together.  So while we

15  might have a very difficult factual time in some cases

16  establishing that by the time of the disclosure, 48 hours

17  later, someone had put it all together, he testified that he

18  had.

19      THE COURT:  Well, look, that suggests perhaps a

20  different theory, on your part, which is that the fundamental

21  problem with this disclosure is that it suggests there's just

22  one, rather than three, cyber attacks.

23      Is that part of your theory of what's misleading?

24      MR. BRUCKMANN:  Yes.  The number is clearly part of

25  what we allege is incorrect, as well as the length of time it's

O5FKSECO

1    been going on.

2         THE COURT:  Because essentially bullet points 1 and 2

3    are phrased in the singular, a cyber attack, and this incident,

4    as opposed to what somebody might take away as being more

5    serious, which is three in some reasonably rapid succession?

6         MR. BRUCKMANN:  Well, it was actually over a period of

7    six months, which I think makes it even worse, your Honor, the

8    fact that this had been out there and, you know, contacting,

9    reaching out, for six months.  This isn't just stray code that

10   could be a problem.  This is stray code that is actively acting

11   up and downloading, in one instance, malicious code.

12        THE COURT:  If this disclosure had been made after B,

13   and instead of saying "a cyber attack," just to clean it up,

14   said "two," would you have any problem with it?

15        MR. BRUCKMANN:  The devil is in the detail, but if

16   there had been some disclosure along these lines after B, I

17   think that would have largely solved the specific problem with

18   regard to the A and B attacks.

19        THE COURT:  Okay.  So what makes C worse is -- what

20   more is known about C than about B and A?  It's that it

21   breached the server?  It's that it was downloaded?

22        MR. BRUCKMANN:  No, the download is B.

23        THE COURT:  Okay.  If this would have been basically

24   adequate, subject to wordsmithing for B, what is it about C

25   that makes this now problematic, inadequate?

O5FKSECO

           You've just said to me, in substance --

           MR. BRUCKMANN:  Yeah, I regret --

           THE COURT:  You may regret it, but you've just said
this language essentially would have more or less done the
trick, if issued after B and referred to two and not one.

           So what is it that's new that's learned about C that
makes this language, put aside the number of cyber attacks,
actionable?

           MR. BRUCKMANN:  I spoke too quickly when I said I
would do it for A and B.  So this does not convey that it had
been actively exploited and the length of time when it had been
actively exploited.  That is the critical missing information.

           THE COURT:  Do you have any example of a case where a
company is, in effect, responding to some exigency like this
and a court has sustained as viable a disclosure as being
inadequately fulsome?

           MR. BRUCKMANN:  None comes to mind, but that goes to
scienter, not to falsity.  If it's false, it's false.

           THE COURT:  Well, it's not false.  It may be
misleading, but it's not false.

           MR. BRUCKMANN:  If it's misleading, it's misleading.
The rapid timing could go to scienter as a matter of
evidentiary proof.

           THE COURT:  Who is the scienter based on, to the
extent you're relying on the December 14th 8-K?

O5FKSECO

1          MR. BRUCKMANN:  Brown.

2          THE COURT:  And what's Brown's connection in the

3    development of the 8-K?

4          MR. BRUCKMANN:  He's in the room when it is being

5    drafted and tasked with ensuring that it is technically and

6    factually accurate.

7          THE COURT:  All right.

8          And your point is that Brown, in effect, should have

9    said, this is literally accurate but incomplete because it

10   doesn't get to the full extent of the problem?

11         MR. BRUCKMANN:  He should have said something about

12   the A and B attacks and said nothing about the A and B attacks.

13         THE COURT:  I've got a few more minutes for you

14   because I've taken you perhaps off track.  Continue on with the

15   argument.  I want to make sure you and your team cover what you

16   need to cover.

17         MR. BRUCKMANN:  I just want to check on time here.  I

18   do want to allow some time for the internal accounting controls

19   piece of the argument as well, your Honor.

20         THE COURT:  Okay.  Just one moment.

21         (Pause)

22         THE COURT:  Let's go ahead and move to that.

23         MR. NEY:  Thank you, your Honor.

24         Your Honor, Brad Ney for the Securities and Exchange

25   Commission.

O5FKSECO

1          Your Honor, following briefing, the parties are left

2     with a very narrow disagreement on the internal accounting

3     controls issue, and a brief example will make this abundantly

4     clear:

5          Your Honor, I previously worked in the restaurant

6     industry and the restaurant storeroom.  And that storeroom had

7     a padlock on it, and two managers had the key to that padlock.

8     And that was the storeroom that kept all of the liquor for that

9     restaurant.

10          In order for an --

11          THE COURT:  The statute of limitations has run on the

12     war story you're about to tell me?

13          MR. NEY:  Your Honor, it was an effective internal

14     control — that's what I can tell you — and an internal

15     accounting control.

16          In order to get access to that room, in order to get

17     stock for the bar, you had to go to one of those two managers;

18     that manager had to use their key to open the padlock so that

19     they could be present as you took what was in that room out of

20     the room.  Your Honor, that padlock was an internal accounting

21     control, in that context.

22          Now, if your Honor held up a padlock and said to me,

23     counselor, is this an internal accounting control, the answer

24     would be, it depends what you use it for, your Honor.  The same

25     with the two managers.  The fact that only two managers had a

O5FKSECO

1    key to that storeroom was also an internal accounting control.

2              Again, your Honor, if you held up a key --

3              THE COURT:  That's because a valuable asset could get

4    stolen?

5              MR. NEY:  That's correct.  That's because there was a

6    valuable asset in that room.

7              Your Honor, if the padlock is used as part of a plan

8    or procedure to restrict unauthorized access to the

9    corporation's assets, then it's an internal accounting control.

10   That's why I said this is a very narrow issue for your Honor.

11   The only question is whether or not SolarWinds' source code,

12   its Orion product code, its customer databases, and its IT

13   network were assets.  And, your Honor, the answer is simple,

14   and the answer is yes.

15             THE COURT:  So any company that's got holes in its

16   computer infrastructure, in that case — if materially bad

17   things could happen to the company, if that hole is exploited —

18   is liable under this theory?

19             MR. NEY:  If an actor could get access to the assets

20   of the company through that website.  For example, your Honor,

21   if this was a paint company and the paint company had a website

22   that was out there for purposes of advertising to people — here

23   are the different colors of our paint — but you couldn't get

24   access to the company's assets through that website, then the

25   controls against malicious activity on that website would not

O5FKSECO

1    be an internal accounting control.

2             THE COURT:  Sorry.  I was struck, from the briefs, by

3    the absence, I think, of any case that articulates the theory

4    you're articulating.

5             Do you have a case that says something like this?

6             MR. NEY:  Your Honor, I would say the *World-Wide Coin*

7    case actually makes this abundantly clear in the physical

8    space.  So, in *World-Wide Coin*, it was a coin company, they had

9    bags of valuable coins that were left in hallways and in

10   unlocked conference rooms, they had a vault that was left open

11   that every employee had access to.  And the Court found that

12   the company had ineffective internal --

13            THE COURT:  Somebody could walk off with them

14   depriving the company of that?

15            MR. NEY:  They could --

16            THE COURT:  What's depriving SolarWinds of its

17   software just because its software may be a bum product?  In

18   other words, if you're the customer you're pretty disappointed,

19   and maybe you want your money back, but why does that make it

20   an accounting control?

21            MR. NEY:  It's an accounting control, your Honor,

22   because SolarWinds software code and because its Orion product

23   are assets.  They are not just assets in the colloquial sense,

24   like the Chamber of Commerce says; these are assets in the

25   accounting sense.  They show up on SolarWinds' financial

O5FKSECO

1  statements.  They're intangible assets.  They're described as

2  developed product technology --

3           THE COURT:  Sorry, SolarWinds still has its software

4  code.  What it has sold to its customer has been compromised,

5  but back at the shop they've got their software code.

6           Again, the customer could be plenty peeved, but I'm

7  having difficulty understanding why they have lost this asset

8  as opposed to sold a bum product to a customer.

9           MR. NEY:  Your Honor, this goes to the argument that

10  counsel made in their reply brief, which is that somehow

11  intangible assets are not subject to loss.  You can't have a

12  loss of intangible asset — I think counsel said — because it

13  doesn't vanish when someone steals it.

14           Your Honor, it's totally inconsistent with the legal

15  definition of "loss."  So, your Honor --

16           THE COURT:  Wait a minute, wait a minute.

17           Upon learning about this, presumably, SolarWinds gets

18  some techie who solves the problem and then it's got its

19  software again in shipshape.

20           What asset has it lost?  It's treated a customer

21  shabbily, but ultimately it is able to presumably restore the

22  problem by basically debugging the system.

23           MR. NEY:  Your Honor, let me give an example.

24           If a person was to walk up to the Mona Lisa, slash it

25  with a knife, that could be fixed, but the fact that a person

O5FKSECO

1    went up and slashed that with a knife caused a loss at the

2    moment that happened.  And whoever owns that painting is going

3    to have to spend a lot of money in order to fix that painting.

4    The money it takes to fix that painting, the money it takes to

5    fix this software code, is a loss to the company.

6        THE COURT:  Is there any pleading as to how much money

7    it cost the firm to repair the software code to get the bug

8    out?

9        MR. NEY:  That is not pled in the complaint, your

10   Honor.

11       THE COURT:  Is there any pleading that that is

12   material as -- just the corrective?  Is it on the pleadings?

13   Could it have taken some smart person a day just to clean up

14   the bug?

15       MR. NEY:  So, your Honor, there is not a materiality

16   requirement with respect to Section 13(b)(2)(B) in the first

17   instance.  If an individual is able to get access to the

18   company's assets and do malicious things with the company's

19   access, that is a problem under Section 13(b)(2)(B).

20       Your Honor --

21       THE COURT:  There's no pleading here of the downstream

22   damage from customers wanting their money back.  That was a

23   silent part of the complaint, that the customers who are buying

24   a product that turns out to be corrupted -- there's no

25   allegation here about what that cost the company to make things

O5FKSECO

1    right with the customers.

2            MR. NEY:  There is not, your Honor.  We do know that

3    the Orion product accounted for 45 percent of the company's

4    revenue.  We know that it took money for the company to fix

5    that, but --

6            THE COURT:  There's no pleading?

7            MR. NEY:  There's no pleading on that, your Honor,

8    that is correct.

9            Your Honor, I will give another example, and I think

10   this speaks to it:  I would just suggest that it would be an

11   astonishing outcome to say that intangible assets, because they

12   don't vanish when they are stolen, somehow are not an asset or

13   not an asset subject to loss.

14           THE COURT:  The defendant says the astonishing outcome

15   would be to call what happened here an accounting control

16   violation as opposed to some other, like, cybersecurity control

17   violation.

18           MR. NEY:  Well, your Honor, again, the reason it's an

19   accounting control violation is because they were assets of the

20   company, and they were valued as such.  If SolarWinds had been

21   trying to sell its assets at the time that its software was

22   compromised and another party realized that software was

23   compromised, that software would be worth far less than what it

24   stated it was worth.  That is the difference.

25           At the time the software was compromised — and we know

O5FKSECO

1    now this was for a long period of time, it was for many months,

2    at the least — during that period of time, that software was

3    worth less than what SolarWinds claims it was worth.

4           Your Honor, if someone stole Coke's secret formula,

5    the fact that Coke still has that formula written down does not

6    change the fact that they've lost that information --

7           THE COURT:  Well, it's because Coke then has a

8    competitor.  That's not what's alleged here.

9           Mr. Ney, you're over the SEC time.  I need to give the

10   other side its opportunity to rebut, but thank you.

11          MR. NEY:  Thank you, your Honor.

12          THE COURT:  Mr. Turner, just before we get to that,

13   this may be on Mr. Berkowitz's side of the house, but just a

14   brief response on where we just were on accounting controls.

15          MR. TURNER:  Accounting controls, your Honor, it all

16   comes down to bean counting.  It's about securing the beans so

17   they can be counted.  So it's about tangible inventory assets.

18   Yes, it's tangible assets.  Nobody stole the software here.

19   Vulnerability was inserted in the software.  That's something

20   bad that happened to the software; it's not a loss of the

21   software.

22          THE COURT:  But Mr. Ney's argument is that there's no

23   materiality dimension, and so whatever damage needed to be

24   corrected, at some cost, reflected at least a temporary

25   diminution or a cost item for the company.

O5FKSECO

1          MR. TURNER:  This has nothing to do with what that

2     provision is about.  That provision is about making sure that

3     assets — tangible, countable assets — can be secured so they

4     can be accurately counted.  This is not an asset that can be

5     counted, in the first place.  If we're talking about boxes of

6     software on a shelf, that's one thing, but this is just the

7     code.  So I'll let our brief speak for itself.

8          THE COURT:  Very good.

9          MR. TURNER:  Your Honor, there's been so much

10     discussion about the DOJ and the PAN attacks and when they

11     should have been disclosed.  I think there's been a lot of

12     confusion, including from the SEC, about what this case is

13     ultimately about.  When they brought this case, at the initial

14     conference, they said this case is different from previous SEC

15     cases, where there was a cybersecurity incident that wasn't

16     necessarily disclosed in a timely fashion.  Once SolarWinds

17     became aware of a breach, they quickly made a disclosure.

18          This is not a case about a company that knew a

19     material attack had occurred and failed to disclose it.  The

20     company would only have an obligation to disclose a

21     cybersecurity incident if they had determined they had suffered

22     one and that it was material.

23          THE COURT:  Sorry, but, if I may, the SEC says that

24     there was connective tissue between A and B that its pleadings

25     sufficiently allege.

O5FKSECO

1          MR. TURNER:  Let me just back up, your Honor, because

2     these incidents that we keep talking about, these were not

3     customers reporting that they had discovered malware in Orion.

4     That's not what's even alleged.  They allege suspicious

5     activity.  The Orion server is contacting some unknown website.

6     What is that?

7          So the company is trying to figure out what it is, but

8     they never determine the root cause.  This is the SEC looking

9     back in hindsight and making it sound easy.

10          THE COURT:  So you have several employees who, at

11     least according to the complaint, are drawing out the

12     similarity, apparently, to Brown.

13          MR. TURNER:  Similarities and differences, your Honor.

14          So you looked at a statement earlier that said, "This

15     does not appear to be OIP," the Orion Improvement Program.  The

16     Orion Improvement Program was involved in DOJ.  So that

17     statement was basically saying this PAN incident does not look

18     like it involves OIP.  That was a difference.

19          THE COURT:  How do we know OIP was involved in DOJ?

20          MR. TURNER:  That's part of what's alleged, and that's

21     true.

22          THE COURT:  Okay.

23          MR. TURNER:  So the point is, there are some

24     similarities here but there is no conclusion drawn.  The

25     company is trying to figure it out.  They're looking at --

O5FKSECO

trying to find vulnerabilities in their own software to explain
what's happening.  They can't find it.  And part of this, your
Honor, is that the mere fact that a server looks like it's
contacting a website doesn't necessarily mean there is a
problem with the software, in the first place.  It could be the
attacker disguising their activity to look like it's coming
from SolarWinds when it's actually not.  There are lots of
things going on here that the company has to figure out.

The bottom line is, they allege in their complaint
repeatedly, SolarWinds never was able to determine the root
cause.  That means they don't know what happened.  They don't
know that there's malware in their system.  They don't know
that a breach of SolarWinds is the root cause.  That means
there's no material incident to report.

THE COURT:  Come back to the December 2014 8-K.

Putting aside the "potentially," the argument based on
that word, it is notable that they describe this as a cyber
attack.  But, as of this point, hadn't the company drawn some
connection between the Victim C cyber attack and Victims A and
B?

MR. TURNER:  This is, again, the problem with
ambiguities of language.  As your Honor was getting at earlier,
what Brown was able to figure out, according to the complaint,
is, he was able to link the suspicious activity that he had
seen before to this malware that this third customer had

1   informed him about.  So all that he's concluded is that DOJ and

2   PAN had the malware on their system.

3           And I would add, your Honor, they justly conceded

4   something that they did not allege in their complaint, they

5   didn't disclose in their complaint.  PAN described what

6   happened to them as a red-team exercise, in other words, a

7   simulation that they were doing.  They didn't even disclose

8   that it was an actual attack on them.

9           THE COURT:  In other words, we have to take as true

10  what was known to --

11          MR. TURNER:  Yes.

12          THE COURT:  -- SolarWinds, and what was described to

13  SolarWinds, to some degree, minimized the facts that might have

14  enabled it to draw a better connection?

15          MR. TURNER:  They never allege that Mr. Brown or

16  anybody else at SolarWinds concluded there has been an attack

17  on SolarWinds and that's what explains these two incidents.

18  Never.  What they do is, they say "knew or should have known."

19  This is SEC hindsight, looking back, and saying "should have

20  known," but there's no allegation that anyone actually knew it.

21          THE COURT:  The question I asked SEC counsel involving

22  quick responses by corporations to crises like that — is there

23  a line of cases that evaluates the latitude a company has in

24  trying to get something out in a very short period of time?

25          MR. TURNER:  It's a Seventh Circuit case, your Honor,

O5FKSECO

```
 1   that we cite in the brief — Higginbotham I believe it is — that
 2   we cite in our brief.  And it basically explains what your
 3   Honor is getting at, that the company here said it was still
 4   investigating.  It was still investigating whether this
 5   downloaded software, that up to 18,000 had downloaded — that's
 6   what it was disclosing here — it was still investigating
 7   whether the attacker had used that successfully to infiltrate
 8   the network.
 9           Again, if you look at this diagram, what Brown
10   allegedly linked to the DOJ and PAN incidents was the malware.
11   So he knows, allegedly, that the malware was on DOJ and PAN
12   systems.  The malware, by design, beacons back.  That's the
13   malware acting.  That was what it was coded to do.
14           In terms of successfully exploiting that back door, it
15   takes more than that.  The attacker then has to see the malware
16   beacon back and say, hey, I've got a server I can infiltrate,
17   go through that server and get to the rest of the network --
18           THE COURT:  That just gets to what the meaning is of
19   "successfully exploits."
20           MR. TURNER:  It has to mean that --
21           THE COURT:  What's the "that"?
22           MR. TURNER:  "Exploit" here has to mean something more
23   than just having the malware downloaded in your system.  The
24   company had disclosed that up to 18,000 customers had the
25   malware downloaded on their system.
```

O5FKSECO

1          So when they're saying they're investigating whether

2     it was successfully exploited, they're not talking about

3     whether it was successfully downloaded.  They're talking about

4     whether it was successfully used by the attacker --

5          THE COURT:  What might exploitation or use be?  What

6     would be the next bad step?

7          MR. TURNER:  It's 6 and 7 on this diagram.  This is a

8     judicially noticeable report from the U.S. Government.  So,

9     once the malicious code beacons out of a threat actor, then the

10    threat actor can try to use the back door to get into the rest

11    of the system, the rest of the network.  That's where the

12    valuable information is.  The attacker doesn't care what's in

13    the Orion server.  That's not where the customer's valuable

14    information is.  They're trying to use the Orion server as a

15    doorway into the rest of the network.

16         They never allege that DOJ or PAN ever told SolarWinds

17    that it happened to them or the third customer.

18         THE COURT:  Got it, all right.

19         MR. TURNER:  What does this matter anyway?  The

20    disclosure essentially disclosed that the Russians had a back

21    door in up to 18,000 customers.  Who cares whether two of those

22    customers were known specifically to SolarWinds?

23         THE COURT:  In other words, that's the response to the

24    singular versus the plural?

25         MR. TURNER:  That's the response generally to the

O5FKSECO

1    fixation that the SEC has on the DOJ and PAN incidents, because

2    there are two out of up to 18,000, and that's where the market

3    reacted to, is up to 18,000.  That is the outer universe of

4    liability here.  That's what an investor would be concerned

5    about.

6              On scienter, your Honor:  There's just a couple of

7    things I want to get to there.

8              In terms of scienter, as to the risk disclosure, the

9    key point is that if they're trying to impute Mr. Brown's

10   scienter, the scienter has to be knowledge that that statement,

11   that the risk disclosure statement, is false.  He couldn't even

12   have that knowledge if he never even saw the statement to begin

13   with.

14             THE COURT:  Sorry, what's the basis that he never saw

15   it, as opposed to he didn't author it?

16             MR. TURNER:  Paragraph 242, your Honor.  But,

17   generally, they never allege that he saw it, reviewed it,

18   approved it.  They only vaguely allege he gave some information

19   that may have been used as part of it, but that's not enough on

20   its face, and they don't --

21             THE COURT:  I take it he was deposed and so, had he

22   admitted seeing it, that was available to be cited?

23             MR. TURNER:  He was deposed, your Honor.

24             In terms of like intentionally hiding or -- excuse me,

25   not intentionally, but not passing up information to officials,

O5FKSECO

1    officers north of them, first of all, it's not even a

2    negligence issue; it could be a disclosure controls issue

3    potentially.

4          But in terms of not reporting stuff, most of their

5    allegations about the supposed weaknesses in SolarWinds'

6    security controls are from presentations Mr. Brown made to

7    management.  They repeatedly cite the quarterly risk reviews.

8    That is Mr. Brown apprising on a quarterly basis the people

9    above him about cybersecurity risks.

10          In terms of the subcerts they point to, those subcerts

11    were for internal controls over financial reporting, SOX

12    systems specifically.  The Chamber of Commerce brief notes that

13    the company's auditor found no material deficiency with respect

14    to those controls.

15          So it's just a nonissue.  And the risk disclosure was

16    not about internal controls over financial reporting.  The

17    subcerts are just a complete red herring here.

18          THE COURT:  What about the SEC's argument that on the

19    pleadings it can allege scienter without pegging it to a

20    particular actor within the company?

21          MR. TURNER:  They're trying to draw on the collective

22    scienter doctrine.  We explain this in our brief, your Honor.

23    That only applies where the misstatement is so dramatic that

24    you have to assume that somebody knew -- like, for example, if

25    a company had asserted that it had sold a million vehicles or

O5FKSECO

manufactured a million vehicles and it actually had

manufactured zero.  Here, we're talking about the risk

disclosure, which says the company was vulnerable, which was

true.

    I mean, to say that that is so dramatically

inaccurate --

    THE COURT:  In other words, there's a *res ipsa*

quality.  If the statement is blindingly false, it's reasonable

to infer that there's a person with knowledge, but if it is --

    MR. TURNER:  Blindingly true.

    THE COURT:  -- or arguable, arguably imprecise and

with a different colorations that the parties have, you're

saying, even taking the SEC's characterization, it doesn't have

that same *res ipsa* quality?

    MR. TURNER:  I don't even know what the

characterization is.  Your Honor, you asked him repeatedly, on

several occasions, what language should the company have used.

And they paused and they said, well, it's not our job.  That is

the whole problem here.  Again and again, they can't articulate

any principle for their position.

    That's why you have amici who have filed the briefs in

these cases — because if the SEC's position stands, then public

companies across the spectrum are going to be left guessing,

what do we have to disclose?  If Microsoft has some customer

incident, which they get hundreds of times a month, where it

O5FKSECO

```
 1    receives suspicious activity, does that mean that we now have

 2    to run and file an 8-K or update our risk disclosure?  What

 3    does this mean?  They can't articulate it.  That is why these

 4    theories should be dismissed.

 5              THE COURT:  Thank you, Mr. Turner.

 6              Before we adjourn, I want to again thank all counsel

 7    for not just very effective briefs but a very effective and

 8    illuminating argument.  I'll take the case under advisement.

 9              I want to also, as well, say what I didn't say before,

10    which is, to the extent there are representatives of the amici

11    here, thank you, as well, for participating in the way you did.

12    That added a lot of value, and I appreciate it.

13              We stand adjourned.

14              (Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```