P3ELSECC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

            v.                         23 CV 9518 (PAE)

SOLARWINDS CORP., et al.,
                                       Telephone Conference

                Defendants.

------------------------------x
                                       New York, N.Y.
                                       March 14, 2025
                                       9:30 a.m.

Before:

                    HON. PAUL A. ENGELMAYER,

                                       District Judge

                         APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
BY:  CHRISTOPHER BRUCKMANN
     BENJAMIN BRUTLAG
     CHRISTOPHER CARNEY
     KRISTEN WARDEN
     LORY STONE
     JOHN TODOR

LATHAM & WATKINS LLP
     Attorneys for Defendants
BY:  SEAN BERKOWITZ
     SERRIN TURNER

P3ELSECC

```
 1              (Case called)

 2              THE COURT:  Do I have for the Securities and Exchange

 3   Commission Christopher Carney?

 4              MR. CARNEY:  Yes, your Honor.  Good morning.

 5              THE COURT:  And Mr. Carney, will you be taking the

 6   lead for the Commission today?

 7              MR. CARNEY:  Yes, your Honor.

 8              THE COURT:  Mr. Carney, do I have your colleagues?

 9   Rather than going one by one, I will list five people and ask

10   you if they are on the line:  Christopher Bruckmann, Benjamin

11   Brutlag, Kristen Warden, Lory Stone, and John Todor.

12              MR. CARNEY:  Yes, your Honor.  They are all on the

13   line now, your Honor.

14              THE COURT:  Very good.

15              And for the defendants, SolarWinds Corp. and Timothy

16   Brown, do I have Sean Berkowitz on the line?

17              MR. BERKOWITZ:  Yes, you do, your Honor.

18              THE COURT:  All right.  Good morning.  And is Serrin

19   Turner on the line with you, Mr. Berkowitz?

20              MR. BERKOWITZ:  He is, and he will be taking the lead

21   in discussions on the summary judgment issues to the extent you

22   want to cover those, your Honor.

23              THE COURT:  All right.  Should I direct the

24   conversation to him, not you?

25              MR. BERKOWITZ:  Correct.
```

P3ELSECC

1          THE COURT:  Very good.  And is our court reporter on

2     the line?

3          THE COURT REPORTER:  Yes, your Honor.

4          THE COURT:  Good morning, and thank you, as always,

5     for your service.

6          The limited purpose of this conference is to serve as

7     a premotion conference.  The SEC has indicated an intention to

8     move for summary judgment, and SolarWinds and Brown have

9     expressed an intention to move for summary judgment.  The SEC

10    has indicated that it will oppose the motion.  I expect this

11    call will be relatively brief.  You have set out your

12    respective positions, and this is not the time to argue them as

13    much as for me to make sure I understand where we are headed

14    here, and I am able to put in place a prompt schedule for the

15    filing of joint stipulated facts, which will precede the

16    submission of briefs, further submission of briefs, and then

17    also for oral argument, which I am confident we will have in

18    this case, so I will schedule that today.

19         I will ask everyone, please, not to interrupt.  And

20    when I do call on you, although I will call on people by name,

21    just as a matter of good order and clarity for the court

22    reporter, please begin your remarks by stating your name so

23    that the court reporter can follow.

24         Let me just begin, SEC, with one threshold question,

25    and I know you will understand the spirit in which I am asking.

P3ELSECC

| 1 | This is not at all a comment on the facts or strengths or not
| 2 | of the case, but just a recognition of the fact of potential
| 3 | changing enforcement priorities.  Can you confirm for certain
| 4 | that this case is proceeding forward through summary judgment,
| 5 | SEC?
| 6 | MR. CARNEY:  Your Honor --
| 7 | THE COURT:  Mr. Carney, is that you speaking?
| 8 | MR. CARNEY:  Yes.  I'm sorry.  Apologies, your Honor.
| 9 | This is Chris Carney for the SEC.
| 10 | I can confirm that as of today we have not received
| 11 | any indication or guidance that this case is not proceeding
| 12 | forward to summary judgment or beyond because of any change in
| 13 | enforcement priorities.  Obviously, that can change because
| 14 | there is a lot in flux now, but as of right now that is not a
| 15 | consideration.
| 16 | THE COURT:  OK.  That's all I needed to hear from you.
| 17 | We don't need to go further.
| 18 | That being said, should there be any change in that, I
| 19 | will ask you to alert your adversaries immediately and for
| 20 | counsel to contact the Court.  I am not in the business of
| 21 | having people do wasted work, and so if there is good reason to
| 22 | think that that may change, I know we would all appreciate that
| 23 | heads-up just in the interests of economy of work.
| 24 | All right.  With that, I have a few questions for
| 25 | SolarWinds and Mr. Brown.  And Mr. Turner, I understand you are

P3ELSECC

1  the person to put them to, so here goes.  From the letter, I

2  understand that you intend to move for summary judgment on

3  three distinct grounds:  Falsity, scienter, and materiality.

4  Am I correct about that?

5            MR. TURNER:  Yes, your Honor.

6            THE COURT:  If this is Mr. Turner --

7            MR. TURNER:  Yes, this is Mr. Turner, your Honor.

8  That's correct.

9            THE COURT:  OK.  Question for you.  In the course of

10  the discussion, there was separately a point, and I think you

11  made this in the context of the scienter point.  The sentence

12  says, "Mr. Brown was not even responsible for creating and

13  approving the security statement."  And the SEC read that, as I

14  did, to suggest that you were potentially disputing the

15  sufficiency of the evidence of whether Mr. Brown could be held

16  liable as the maker of the statement.  On the other hand, the

17  structure of the letter suggests you were breaking that out as

18  a separate point.

19            Just for my visibility, is that a separate point on

20  which you expect to be moving for summary judgment?

21            MR. TURNER:  Yes, although there is a broader point

22  than that, I think, your Honor.  Even if he is technically the

23  maker, it just plays into the scienter analysis overall, and

24  that there is absolutely no reason to believe he had any intent

25  to deceive or that he had any sort of specific knowledge of

P3ELSECC

1   falsity.  The life extent of his involvement just undermines

2   the scienter case more broadly, even if he were technically

3   considered a maker, but we expect to dispute that point as

4   well.

5           THE COURT:  I understand that you would dispute it

6   were there a trial, but as a matter of summary judgment, will

7   there be a separate point that says Mr. -- there is

8   insufficient evidence on which a jury could find Mr. Brown to

9   have been the maker of the security statement statement?

10          MR. TURNER:  We are reserving our right to make that

11  argument.

12          THE COURT:  OK.  Next question for you, Mr. Turner.

13  The security statement embeds, or at least as it has been

14  presented to date, five distinct buckets or areas of

15  representations.  With respect to the issue of falsity, is it

16  correct that I should expect the briefing, in effect, to be

17  dealing with each of those serially?

18          MR. TURNER:  Absolutely.  Yes, your Honor, we will go

19  through each of those one by one.

20          THE COURT:  OK.  And then as it relates, though, to

21  materiality, is the materiality question a statement by

22  statement, in other words, 1, 2, 3, 4, and 5, those separate

23  statements each on its own terms, or is the nature of the

24  analysis with respect to any statement that there is evidence

25  on which a finder of fact could find falsity, do those

P3ELSECC

1    statements, if found actionable, together amount to something

2    material?

3         In other words, is the materiality issue one that

4    proceeds just on a statement-specific basis, or is it

5    considered at the level of all actionable statements within the

6    security statement?

7         MR. TURNER:  I think we have arguments to make, your

8    Honor, on both.  I think the evidence in the record is that

9    investors never looked at the security statement.  Analysts

10   never looked at the security statement.  Analysts generally

11   don't look at statements like this because --

12        THE COURT:  Mr. Turner, I am not asking you to make

13   the argument.  I am just asking you --

14        MR. TURNER:  Sure.  I was just trying to make sure the

15   Court understood the nature of the arguments we were making.

16   But the answer is both, your Honor.

17        So I think we would argue the security statement

18   generally is not material to investors, but I think the

19   ultimate question is whether the alleged misstatements were

20   material.  That's the standard.

21        THE COURT:  Supposing for argument's sake that I were

22   to find that -- again, just for argument's sake -- that the

23   first two statements within the security statement, which were

24   the ones that the motion to dismiss decision focused on, were

25   actionable and, hypothetically, that 3, 4, and 5 were not.

P3ELSECC

1    Would the materiality issue then aggregate statements 1 and 2

2    and whether those two would be material, or would the analysis

3    be each one individually?

4            MR. TURNER:  I think what we would point to, your

5    Honor, is whatever the supposed falsity was, it would not be of

6    a sufficient degree to be material to investors, whether

7    considered singularly with respect to each statement or in

8    combination.  And this will just be easier to explain once all

9    the facts are laid out, but the issues the SEC is relying on,

10   to the extent the Court were to find that they rendered the

11   statements false, misleading any way -- and we would completely

12   deny that, but if they were, they would just be minor issues

13   that would not rise to the level of something material to

14   investors.

15           THE COURT:  Thank you.  That's helpful.

16           Continuing with you, Mr. Turner.  From the exchange of

17   letters, it looks as if at a macro level with respect to

18   falsity, you are saying, look, there's literally no witness who

19   acknowledges any falsity here, and you also excerpt statements

20   from the SEC expert which you contend support that.  The SEC is

21   largely relying, it appears, on contemporaneous records,

22   e-mails, communications of the sort that are spatially negative

23   about aspects of security.  On the face of things, without

24   actually seeing the tangible evidence, both of you are saying

25   there are facts on which we can get to the jurist.

P3ELSECC

1              Are you making a proposition here that circumstantial

2       evidence of the sort, or evidence of the sort that the SEC is

3       relying on, which is to say contemporaneous commentary about

4       security issues, without, you know, testimony saying there are

5       security problems, is insufficient to reach a jury?

6              MR. TURNER:  Your Honor, I think, first of all, all

7       this will make much more sense when the facts have been laid

8       out in detail and it's very clear what the statements in the

9       security statement say, and then it will be clear what sort of

10      evidence would be needed to show that they were false.

11             The documents that the SEC is relying on, as we argued

12      from the outset, are just snippets of documents they don't

13      really understand, and the -- there is no witness who were

14      involved in those documents that support their interpretation

15      of it.  These are fundamentally ambiguous documents.  Their own

16      expert has said you can't really tell from the documents

17      themselves what exactly these documents are referring to.  And

18      they just are trying to speculate and put their own gloss on it

19      to suggest that there was some sort of pervasive problems with

20      implementing the specific practices in the security statement.

21      That won't cut it at this stage.  It may have cut it at the

22      motion to dismiss stage, but we will have case law for your

23      Honor that will basically say the SEC can't just say, "Well, we

24      think the document means something else, even though the

25      knowledgeable witnesses have denied it."  That's not sufficient

P3ELSECC

1    at this stage.  They have to come up with evidence to support

2    their interpretation of the documents, and they have not.

3           THE COURT:  That's helpful.

4           Mr. Turner, one thought just for your briefing, so far

5    as you are going first.  Because the issue has been joined to

6    some degree both by the complaint and then on the motion to

7    dismiss, it seems to me that it would be fruitful for me if in

8    your opening brief, in addition to making the points you have

9    already indicated you are going to make about the lack of

10   affirmative testimony by people at SolarWinds to the effect

11   that there were problems along these lines, it would be

12   worthwhile for you to take the significant documents that you

13   know the SEC is relying on and start the conversation about

14   them in your opening brief, rather than sandbagging and letting

15   the SEC first deal with that in its opposition, and then only

16   engaging for the first time with those exhibits in the reply.

17          It will assist me if, in effect, all three briefs are

18   dealing with what you know to be the central documents that the

19   SEC, at least in its pleadings, has relied on.  I am just

20   saying that -- I see already that I will benefit from having

21   three briefs rather than two, engaging with how to make sense

22   of the central documents on which the SEC is relying.

23   Understood?

24          MR. TURNER:  Absolutely, your Honor.  We are on the

25   same page.

P3ELSECC

 1          I just want to note that we have already been in

 2     discussions with the SEC about a joint 56.1 statement.  And we

 3     have raised this specific point, that the joint statement

 4     should address as much as possible any documents the SEC

 5     intends to rely on, and we can get out a joint statement, you

 6     know, what we agree on about those documents, because I think

 7     we actually can agree on a good bit about those documents, and

 8     the rest is for legal argument.  So the parties are working

 9     exactly along that track.

10          THE COURT:  Good for you.  I am delighted to hear

11     that.  That will be super helpful for me, insofar as it sounds

12     as if a lot of the debate here is going to be what weight, a

13     lot, a little, or none, can be put on, you know,

14     contemporaneous exhibits.

15          OK.  Let me turn to you, Mr. Carney, first of all,

16     just on the methodological point I raised with Mr. Turner.

17     With respect to falsity, is it a statement-by-statement

18     analysis that will be litigated at the summary judgment level;

19     in other words, which of the five statements, in effect, there

20     is evidence to get to the jury on?

21          MR. CARNEY:  Your Honor, so I think the way your Honor

22     actually laid it out in the motion to dismiss decision is sort

23     of the framework that we think is appropriate, where you said

24     that the, sort of -- what you referred to as the five

25     challenged set of representations, that those have to be

P3ELSECC

1    considered distinctly for purposes of falsity.

2         But as to your Honor's second question to Mr. Turner

3    as to materiality, your Honor had said in the motion to dismiss

4    ruling that their approach was methodologically wrong in

5    seeking to break apart those representations, and that,

6    instead, they have to be viewed together as collectively

7    bearing on SolarWinds's, you know -- on the central thesis of

8    the security statement, which is that the cybersecurity

9    practices of SolarWinds, software vendors, private and public

10   customers expect that it's reliably airtight against

11   cybersecurity intrusions.

12        And your Honor had noted that a holistic assessment

13   follows from the precept that the investment public evaluates

14   the information available to it, including that provided by the

15   issuer, as a whole, and not in a -- I think you referred to it

16   as a pointillistic fashion.  So we think that would be the

17   proper approach for the materiality, is to look at the state of

18   SolarWinds's cybersecurity as a whole.

19        THE COURT:  And so from the perspective of summary

20   judgment, I will be called upon, in effect, to assess each of

21   the five buckets on its own terms, and then to the extent that

22   one or more of the five is found by the Court to contain --

23   insofar as the Court finds sufficient evidence of falsity as to

24   one or more of the five, the materiality issue would then focus

25   on the subset of the five that -- where falsity could reach the

P3ELSECC

1    jury.

2              MR. CARNEY:  Exactly.  And as I think your Honor

3    pointed out, even a single misstatement or omission can be

4    sufficient for liability.  So, yes, I think that's the approach

5    that we are envisioning.

6              THE COURT:  OK.  Next question.  It was hard to avoid

7    the conclusion, reading the briefs, that you are focusing

8    heavily on contemporaneous communications largely within

9    SolarWinds that have seemingly negative commentary about one

10   security arrangement or another.

11             I didn't hear there or see there any reference to

12   testimony by people at SolarWinds, in effect, drawing that

13   conclusion.  Is that accurate, that that testimony wasn't

14   adduced?

15             MR. CARNEY:  Your Honor, we took a number of

16   depositions.  We asked witnesses about these documents.  And

17   the way that I would describe it is that there's no witness

18   that comes out and says, "Yeah, you know, the SEC is right, you

19   know, this security statement was false."  But, I mean, one

20   example I can point you to -- and this is a document that we

21   reference in our response to the premotion letter, and that is

22   the document where in October 2018, the same month as the IPO,

23   Tim Brown, the codefendant, he makes a presentation for the

24   SolarWinds's chief information officer that, "The current state

25   of security leaves us in a very vulnerable state for critical

P3ELSECC

1    assets."  And this is a document that your Honor cited in the

2    decision.  It's a statement that he made in a number of

3    presentations leading up to that.

4            And at his deposition, he didn't say that, "This was

5    false" or that "I was incorrect in saying that our current

6    state of security leaves us in a vulnerable state."  He at one

7    point said, "Well, I had just joined the company."  For a later

8    document, he said, you know, "It was puffery.  I was trying to

9    get a bigger budget for my department."  Later on, at the time

10   of the October 2018 IPO, he said, "Well, there's some yellow

11   shading here, so that means that some improvements had been

12   made," but that there were still things to be done.

13           So what we think is that, you know, that there are,

14   obviously, instances where witnesses walked away from documents

15   that we think a jury could look at and say, "No, it's pretty

16   clear what that document says."  But there are other instances

17   where, not so much walk away, but the witnesses didn't really

18   shed any sort of contradictory light on what the plain document

19   says about the state of cybersecurity.  And that's just one

20   example, your Honor.

21           THE COURT:  And to the extent there are statements

22   like that, where you have a snippet that says -- uses words

23   like "very vulnerable state," do the contemporaneous records

24   tend to supply content as to what that is referring to?  I say

25   that because there are bad adjectives, and then there are bad

P3ELSECC

1   adjectives that are supported by factual matter.

2          If you were at trial and had to decode what was meant

3   by "very vulnerable state," is there contemporaneous evidence

4   you would be able to point to that shows what it is he knew at

5   the time that he was speaking and what "very vulnerable state"

6   appears to refer to?

7          MR. CARNEY:  We believe so, your Honor.  So this, of

8   course, was -- this document that I am referring to here is an

9   entire PowerPoint presentation, so we think we can point to --

10  obviously, your Honor wouldn't let us do that, just show the

11  one page of the presentation.  We would show the entire

12  presentation to the jury and walk through the different pages

13  of it that we think lend support to why they are making these

14  statements.

15          And so a lot of the disagreement, for instance, with

16  the NIST scores that your Honor has heard about, has to do with

17  witnesses saying, "Well, you are misinterpreting what that

18  means when we give ourselves a low NIST score, and it means

19  something else."  So part of it is going to be the jury looking

20  at these documents as a whole, the witnesses being

21  cross-examined as to, "Well, why did you write -- if you are

22  saying it's mere puffery, why would you tell your superiors

23  that we are in a vulnerable state of security?  Was it just to

24  get an increased budget?"

25          And so we just think those types of credibility issues

P3ELSECC

1    are best weighed by a finder of fact, particularly in a summary

2    judgment context where, obviously, the evidence has to be

3    construed in the non-movant's -- here, the SEC's -- favor.

4              THE COURT:  All right.  Thank you.

5              SolarWinds says, to synopsize, that the SEC's expert

6    doesn't, in effect, support the SEC's case.  I will, no doubt,

7    get the report and testimony from the expert, but -- it may be

8    for space reasons, but I didn't get anything from your letter

9    that gave much content as to what your expert opines.  Can you

10   give me just a short synopsis?

11             MR. CARNEY:  Yes, absolutely, your Honor.  So our

12   expert opined in a number of different areas with respect to

13   access controls, with respect to the secure development, life

14   cycle, with respect to passwords.  He pointed to what in his

15   expertise as a -- in a decades-long career on the technical

16   side of cybersecurity, what he saw as serious deficiencies in

17   their cybersecurity practices that were directly at odds with

18   the statements in the security statement.

19             And it's our, you know, our impression at least -- and

20   they have an expert too -- is that their expert's goal is to

21   kind of show that, well, they had these policies in place and,

22   you know, and that's enough to satisfy the security statement;

23   whereas, our expert is pointing to instances where the flaws

24   and mistakes and mishaps with respect to cybersecurity were so

25   serious that they rendered the statements in the security

P3ELSECC

1    statement to be not true.

2              THE COURT:  OK.  Understood.

3              The raw material that your expert reviewed, was that

4    limited to, you know, in effect, documents produced in

5    discovery, or was there some hands-on opportunity that the

6    expert had, although, perhaps out of date?  What was the raw

7    material that your expert relied upon?

8              MR. CARNEY:  The former.  Your Honor had it right.

9    Since this is a retroactive assessment, his methodology really

10   was to look at what was in the security statement, and then

11   compare that to what the employees themselves were saying about

12   cybersecurity and problems that were going on with

13   cybersecurity at the time, and lending his expertise as to the

14   severity of those problems and whether they were minor or not.

15             So he is, in effect, relying -- because, as your Honor

16   sort of alluded to, it's hard to go back years after the fact

17   retrospectively and assess cybersecurity at a past point in

18   time.  But what he is doing is looking at SolarWinds's own

19   evaluations at the time and assessing whether those match up

20   with the, sort of, robust statements in the security statement.

21   And he found, in many instances, they fell seriously short.

22             THE COURT:  OK.  Thank you.

23             Let me move on then on that subject.  Neither of you

24   had indicated any intention to make a Daubert challenge with

25   respect to the respective experts, but I am going to ask now

P3ELSECC

 1  because, in theory, if there were one -- and I am not in any

 2  way suggesting there is a bona fide one.  I absolutely have no

 3  idea.  But if there were one that was successful in knocking

 4  out the expert, that would, in effect, knock out some of the

 5  evidence on which the party whose expert got struck would be

 6  relying.

 7        So just a yes or no.  SEC, Mr. Carney, do you expect

 8  to be making any Daubert challenge to the testimony of

 9  SolarWinds's expert?

10        MR. CARNEY:  Your Honor, not to jump ahead, but when

11  Mr. Turner and I discussed a briefing schedule to propose to

12  your Honor that we hoped would be acceptable, one of the things

13  that we built in for that schedule was that SolarWinds intends

14  to file a Daubert motion contemporaneously with the summary

15  judgment motion.  I know that -- I recognize now that that was

16  a mission on our part that did not appear in the parties'

17  premotion letters, but that was the idea, and that we would at

18  the same time file our Daubert motion with respect to their

19  cybersecurity expert.

20        THE COURT:  Let me cut you off.  I think what you are

21  saying, Mr. Carney, is that both sides presently intend to move

22  against the other's expert on Daubert grounds.  Yes or no; is

23  that right?

24        MR. CARNEY:  Yes, your Honor.

25        THE COURT:  OK.  And so in a moment I will hear from

P3ELSECC

1    you what the schedule is.  But I take it the idea is to have

2    the Daubert briefing contemporaneous, in effect, with the first

3    brief -- I guess I will get to dates in a moment -- so that I

4    can resolve that as promptly as possible, because it sounds

5    like the logic sequence to me will have to be to resolve

6    whether the expert evidence is in or to what degree it is in

7    order to see how much there is to reach the jury.

8           All right.  Let me do this.  Mr. Carney, you have now

9    referenced a couple of times a proposed schedule.  Why don't

10   you set out -- it sounds like you are representing to me the

11   parties reached agreement on a proposal to me.

12          MR. CARNEY:  Yes, your Honor.  And I would, sort of,

13   start by saying that not only have we reached an agreement, but

14   we took into account certain personal obligations on both sides

15   that are sort of important family matters in coming up with

16   this schedule in case it seems at first a little longer than

17   may be anticipated.  But we think that the complexity of the

18   case, the fact that we are wrapping the Daubert motions in, and

19   then accommodating these family schedules help.

20          So our proposal -- and, obviously, this is

21   SolarWinds's motion, so I don't mean to speak for Mr. Turner --

22   is that SolarWinds's brief would be due April 25.  And on that

23   same day, both parties would file their respective Daubert

24   motions.  Then our proposal was for the oppositions to

25   SolarWinds's summary judgment motion and then to the respective

P3ELSECC

1    Daubert motions to be June 13, and then the summary judgment

2    reply by SolarWinds and the respective replies to the Daubert

3    motions to be due July 11.

4         THE COURT:  All right.  May I ask you -- and

5    Mr. Carney, I take it that preceding April 25 would be a

6    deadline for what I call the JSF, or what was referred to

7    earlier as the joint 56.1 statement.  Mr. Carney, did the

8    parties reach agreement on a deadline for that?

9         MR. CARNEY:  So we had a meet-and-confer on it

10   yesterday.  Just for your Honor's background, we received --

11   SolarWinds gave us a very comprehensive draft on Monday.  We

12   had a meet-and-confer about it yesterday, and we have a game

13   plan to give them a week from today the documents that your

14   Honor alluded to that you would like included in the joint

15   statement, and then the following Tuesday to give them an

16   actual red line of -- sort of tweaking their language and

17   adding in any joint facts that we would like.  We haven't, sort

18   of, come up with a final date yet, but we have these, sort of,

19   interim dates that we have agreed on.

20        THE COURT:  Got it.  All right.

21        MR. TURNER:  Your Honor, may I?

22        THE COURT:  Is that Mr. Turner?  Sure.  Go ahead.

23        MR. TURNER:  Yes, this is Mr. Turner.  I just wanted

24   to suggest -- I mean, we had not been planning on filing the

25   56.1 ahead of the summary judgment filing.  If the Court would

1    prefer to do that, that's fine, but I would suggest that we

2    have a date that's relatively close to the filing itself just

3    to give the parties sufficient time to work out as many

4    disagreements as they can, to get the maximum number of facts

5    into that joint statement of facts.  We are working

6    cooperatively toward that end, and I think the more time we

7    have to do that, the more beneficial it will be for the Court.

8            THE COURT:  Yes.  Mr. Turner, I mean, you are speaking

9    my language.  This is a very familiar problem, which is how to

10   sequence this.  But I have to say, when I have parties who are

11   clearly working together collegially, and where you are already

12   out of the gate on the drafting, I think I am more comfortable

13   setting a due date close to the summary judgment brief;

14   something like a week or ten days before the due date.  But,

15   you know, as a general matter, the 56.1, the joint statement,

16   provides a huge risk for all of you in your statement of the

17   facts to me.  And so at some level you need it reasonably in

18   hand, you know, at least a week before the briefs are due, ten

19   days before, just so that you can assuredly brief, knowing what

20   is stipulated to.

21           But given that, Mr. Turner, I take it you are seeking

22   something like a hard stop of a week before the opening briefs

23   are in.

24           MR. TURNER:  I think that would be fine with us.

25           THE COURT:  Mr. Carney, does that work for you as

P3ELSECC

1   well?

2           MR. CARNEY:  Yes, your Honor.  And one thing I did

3   neglect to mention, and I think your Honor is well aware of it,

4   is the possibility -- and I don't know what the odds are right

5   now -- of a government shutdown tonight, and that we would need

6   to, sort of, account for that possibility.  And the parties

7   have talked about that, and if there were to be a shutdown, we

8   would think that the best approach, given we don't know how

9   long it would last, would be to come back to the Court with

10  proposed new dates.  At this point it might be that that's not

11  an issue, that the government is not going to shut down.  I

12  just would be remiss if I didn't raise it.

13          THE COURT:  Look, you are right to raise it, but

14  candidly, it's March 14, and the opening brief isn't due until

15  April 25, and it sounds like you are well on your way towards

16  the JSF.  So even if there were a shutdown, it would take a

17  pretty long shutdown to, I think, disturb the proposed schedule

18  here.

19          Look, counsel, I will be candid with you, this is

20  longer than I expected, and it's a little bit of a problem

21  because I have a substantial criminal trial in a, safe to say,

22  completely different area of the law that kicks in in July into

23  August.  But I am also very much respectful of the point that

24  Mr. Carney made, which is that you have elected to schedule

25  around a lot of personal obligations.

P3ELSECC

```
 1              So with a little bit of reluctance, I will approve
 2      your schedule, but it has to be on the understanding that I am
 3      not going to be seeking an extension request.  Maybe if the
 4      government shut down from tomorrow through June or July, we
 5      will talk.  But barring something epically cataclysmic, this is
 6      etched in stone.
 7              Do I have your understanding on that, Mr. Carney?
 8              MR. CARNEY:  Yes, you do, your Honor.
 9              THE COURT:  Mr. Turner?
10              MR. TURNER:  Yes, your Honor.
11              THE COURT:  All right.  Given that, look, I make it a
12      point of encouraging collegiality and encouraging people to be
13      solicitors of each other's schedules, work and personal.  You
14      exhibited that throughout this case, including now, and the
15      reward is my deference to the proposed schedule.
16              So I will issue an order likely on Monday that
17      memorializes these dates.  I then need to schedule oral
18      argument.  That's where I get hemmed in a little bit by the
19      murder trial.  I was going to propose that we gather on the
20      afternoon of Tuesday, July 22, which works for me, and the
21      following week I am on trial for awhile.
22              Mr. Carney, does that work?
23              MR. CARNEY:  That works.  Yes, your Honor.
24              THE COURT:  Mr. Turner?
25              MR. TURNER:  I am just checking my calendar, your
```

P3ELSECC

1  Honor.

2          Yes, I can make that work.

3          THE COURT:  Mr. Brutlag, I know you are part of the --

4          MR. BRUTLAG:  I am looking at my calendar as well.

5  Just give me a moment.  I apologize, your Honor.

6          THE COURT:  Of course.

7          MR. BRUTLAG:  Looks like I have to be somewhere on the

8  23rd, which means that the 22nd should work.

9          THE COURT:  All right.  Why don't we schedule

10 arguments then for 1:00 p.m. on Tuesday, July 22.  And you

11 should block out the afternoon.  It may not take all that much

12 time, but just to play it safe.  Mr. Brutlag, in particular, if

13 that somewhere requires you to get on a plane, assume you will

14 be in my courtroom through 5:00 o'clock, just for safety sake.

15         MR. BRUTLAG:  I appreciate that, your Honor.

16         THE COURT:  OK.  All right.  Look, with that, I look

17 forward to the briefing.

18         I assume, by the way, Mr. Carney, that the expectation

19 is the Daubert brief will be a standalone document; that is,

20 essentially, on each of the relevant dates, the Daubert will be

21 contained in a separate document.  It seems to be sensible that

22 way.  I take it that's what you had in mind, Mr. Carney.

23         MR. CARNEY:  Yes, your Honor, and that we would file a

24 notice of motion with the Daubert motion so it is a separate

25 docket item.

P3ELSECC

1          THE COURT:  All right.  Look, that all works for me.

2          The one remaining thing I think I need to take up just

3    involves settlement.  I am mindful that I referred the case to

4    Magistrate Judge Moses for settlement purposes and that no

5    settlement resulted.  Just for the record, the referral remains

6    in place.  You don't need me to go back to her.  So in the

7    event settlement discussions break out, you know, I don't think

8    you need a referral back to Judge Moses, and I know she stands

9    ready to help out if the parties rekindle an interest in all

10   that.  But for the time being, I am assuming that's not the

11   direction this is headed in.

12          Let me go around the horn just to see if there is any

13   other way I can be useful to all of you before we adjourn.

14   Mr. Carney.

15          MR. CARNEY:  Your Honor, if I could ask for one

16   clarification.  My understanding from your practice is that the

17   joint statement of facts that the parties are submitting, that

18   the parties are not in any way stipulating to the materiality

19   of the facts; that they are, in fact, you know -- the other

20   side might want to use a fact for a reason, and so we are not

21   objecting to it, that it's an accurate fact, but we are also

22   not acknowledging that it's material.

23          THE COURT:  Yes.  And I am glad you mentioned that.

24   Thank you, Mr. Carney.  This is usually a separate digression I

25   have in these calls, and because you all were ahead of me in

P3ELSECC

1  talking about the joint stipulated facts, I forgot to mention

2  it, so let me do that.  Thank you very much.

3      I am going to have my law clerk e-mail to each side

4  three or four models or go-bys of prior JSFs, or joint

5  stipulated facts, that we have found useful.  But what I expect

6  is that there will be a separate, discreet number for each

7  individual factoid.  The facts may be statements of fact in the

8  world, to wit, SolarWinds is a publicly-traded company, or they

9  may be a fact such as, you know, Exhibit 18 is an e-mail sent

10  from Smith to Jones on July 22, and attaching it.  But each of

11  them should be an individual, discrete factual proposition.

12      As you do turns, I would ask you not to -- and I don't

13  think there is any risk of this group doing that -- try to

14  monkey around with the other's statement of facts to smuggle in

15  some facts of yours.  Just put that in a separate factual

16  proposition.  It makes for a cleaner presentation.  And to the

17  extent you are able to organize the JSF in some orderly way,

18  whether chronologically or topically, I would ask you to do

19  that.  These are hugely useful documents not just for you, but

20  for me and my law clerk in organizing the facts for summary

21  judgment decision.  So to the extent that you can impose

22  logical order on them, that's a big gift to us.

23      To your question, Mr. Carney, you are 100 percent

24  right.  You are stipulating solely to the factual accuracy of

25  the proposition.  You are not stipulating to its importance and

P3ELSECC

1   you are not stipulating to its admissibility.

2          And so, Mr. Carney, if it is important to you that the

3   Yankees have 27 world championships, you are going to have to

4   stipulate to that because it's true, but that would be a good

5   argument that has nothing to do with this case.  So you are not

6   in any way limiting your range of motion in trying to exclude

7   stuff at trial.  You are purely stipulating to factual

8   accuracy, but that stipulation binds you throughout.  And so,

9   you know, when the time comes for trial, you can't run away

10  from the factual stipulation.  You can merely argue that it is

11  inadmissible, it's irrelevant, it's hearsay, whatever it might

12  be.  Understood, Mr. Carney?

13          MR. CARNEY:  Yes, your Honor.  And I do think the

14  Yankees world championships are important.  So thank you.

15          THE COURT:  Thank you.  Well, I won't go further, but

16  yeah.

17          Mr. Turner, make sense to you?

18          MR. TURNER:  Yes, your Honor.

19          THE COURT:  OK.  So Mr. Carney, back to you.  Anything

20  further I can helpfully address today?

21          MR. CARNEY:  Not at this time, your Honor.  I don't

22  think so, unless one of my colleagues has a question, but not

23  from me.

24          THE COURT:  All right.  Mr. Turner, anything further

25  from you?

P3ELSECC

```
 1              MR. TURNER:  No, your Honor.  We look forward to
 2      briefing the motions.
 3              THE COURT:  Yeah, I look forward to receiving them.
 4      They were extremely high quality last time around, and I know
 5      they will be again.  But again, I want to just give a shout out
 6      to your all working together.  Clearly, you have very different
 7      views of the merits of the case, but I also very much
 8      appreciate the productive working together.  And, again, for
 9      that reason I am happy to approve your schedule, you know.  You
10      have shown your solicitude to each other and to the Court, and
11      I want to reward that.
12              Be well.  I look forward to hearing from you down the
13      road and seeing all of you on July 22.  Thanks, everybody.
14              (Adjourned)
15
16
17
18
19
20
21
22
23
24
25
```