**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                            )
SECURITIES AND EXCHANGE COMMISSION, )
                                                            )
                                        Plaintiff,     )          Judge Paul A. Engelmayer
                                                            )
                        v.                               )          Civil Action No. 23-cv-9518-PAE
                                                            )
SOLARWINDS CORP. and TIMOTHY G.      )
BROWN,                                                )
                                                            )
                                        Defendants.   )
_____)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE**
**OR LIMIT THE TESTIMONY AND OPINIONS OF GREGORY RATTRAY**

**BACKGROUND** ...............................................................................................................1

   I.  SolarWinds Security Statement Misrepresentations ...........................................1

   II.  Mark Graff's Expert Report and Opinions ........................................................2

   III. Gregory Rattray's Expert Report and Opinions.................................................4

**ARGUMENT** ..................................................................................................................5

   I.  Legal Standard ...................................................................................................5

   II.  Dr. Rattray Improperly Narrates SolarWinds' Version of the Facts in Opining That the Security Statement was Accurate..........................................................6

      A.  Dr. Rattray Offers a Factual Narrative as to Why SolarWinds had a Security Statement..........................................................................................8

      B.  Dr. Rattray Improperly Narrates Testimony and Documents to Opine That the Security Statement Accurately Described Access Controls ..........................9

      C.  Dr. Rattray Provides an Improper Narration of Fact Testimony and Documents Regarding SolarWinds Password Policies .................................12

      D.  Dr. Rattray Simply Narrates SolarWinds' Factual Testimony About Network Monitoring ...............................................................................................14

      E.  Dr. Rattray Offers an Improper Factual Narrative Regarding SolarWinds's Software Development Lifecycle...............................................................16

      F.  Dr. Rattray Offers an Unreliable Narrative of His Own Relevant Qualifications.......19

      G.  Dr. Rattray's Expert Testimony Should be Limited to His Critiques of the SEC's Expert Mark Graff..............................................................................21

**CONCLUSION** ..............................................................................................................22

**Cases**

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ....................................................... 6, 7, 16, 18

*Alves v. Affiliated Care of Putnam, Inc.*,
    2022 WL 1002817 (S.D.N.Y. Mar. 30, 2022) ............................................ 21

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ................................................................. 6, 21

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .................................................................. 6, 9

*Highland Cap. Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................................................... 7

*Island Intell. Prop. LLC v. Deutsche Bank AG*,
    2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ............................................ 7

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) ................................................. 15

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    720 F. App'x 24 (2d Cir. 2017) ...................................................... 15

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................... 21

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y.2007) .................................................. 12

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ................................................... 10, 12, 14

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995) .......................................................... 22

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) .................................................... 5, 9, 16

*Packard v. City of New York*,
    2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020) .......................................... 21

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................................. 7

*SEC v. SolarWinds Corp.*,
    741 F. Supp. 3d 37 (S.D.N.Y. 2024) .................................................................................... 8

*SEC v. Terraform Labs Pte. Ltd.*,
    708 F. Supp. 3d 450 (S.D.N.Y. 2023) ..................................................................... 7, 19

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) .................................. 6, 7, 8, 13, 14, 18

*United States v. Cruz*,
    981 F.2d 659 (2d Cir.1992) ..................................................................... 9, 16

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003) ...................................................................... 9, 18

*United States v. Jiau*,
    734 F.3d 147 (2d Cir. 2013) .......................................................................... 7

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2020) .......................................................................... 5

**Rules**

Fed. R. Civ. P. 702 ........................................................................... 1, 5, 6, 9, 15

**Other Authorities**

*Trial Judges-Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility*
    *of Expert Testimony Without Invading the Jury's Province to Evaluate the Credibility and*
    *Weight of the Testimony?*,
    84 Marq. L. Rev. 1 (2000)) ........................................................................... 19

Pursuant to the Court's March 14, 2025, Scheduling Order (ECF No. 163) and Federal Rule of Evidence 702, Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its Motion to Exclude or Limit the Testimony and Opinions of Defendants' proffered expert witness, Gregory Rattray. The bulk of Dr. Rattray's proposed expert testimony is simply him narrating SolarWinds' version of the facts to bolster the testimony of SolarWinds' witnesses. Such "expert" narration and bolstering of witness credibility is prohibited under the Federal Rules of Evidence.

## BACKGROUND

### I.  SolarWinds Security Statement Misrepresentations.

As alleged in the Amended Complaint, SolarWinds and Timothy Brown materially misrepresented the company's cybersecurity practices in the "Security Statement" made publicly available on SolarWinds' website. *See* AC, ¶¶ 1-4 (ECF No. 85). Specifically, the SEC alleges that the Security Statement was materially misleading in several aspects, including representations about SolarWinds' access controls, its password practices, and the secure development lifecycle it purportedly used to develop software. *Id.* ¶ 7. The misleading Security Statement concealed from the investing public SolarWinds' internally known poor cybersecurity practices in each of these areas. *Id.* ¶ 8.

Numerous internal documents prepared by Brown and others reflect internal assessments that sharply contrasted with the robust cybersecurity practices depicted in the Security Statement. *See e.g., id.* ¶¶ 62-66. SolarWinds also omitted information from the Security Statement necessary to make the information included within it not misleading. *Id.* ¶ 72. As alleged in the Amended Complaint, the known cybersecurity failures, risks, and incidents, "so affected SolarWinds' cybersecurity posture that SolarWinds needed to, at a minimum, disclose their

collective effect, especially considering the Security Statement's positive portrayal of SolarWinds' cybersecurity practices." *Id.* ¶ 73.

## II.    **Mark Graff's Expert Report and Opinions.**

The SEC has proffered Mark Graff to testify as a cybersecurity expert and to compare the internal cybersecurity assessments Brown and other SolarWinds employees made contemporaneously with the representations made by Brown and the company in the Security Statement. As Dr. Rattray's report and opinions are largely offered in response to Mr. Graff's opinions, and the stark difference in their qualifications serves to highlight the "narrator" role the defense impermissibly seeks to have Dr. Rattray perform, the SEC first briefly summarizes Mr. Graff's background, work, and opinions, which will be discussed more thoroughly in opposition to Defendants' anticipated *Daubert* motion.

Mr. Graff submitted an initial expert report on October 25, 2024. Exhibit 1. Dr. Rattray then submitted his report on November 22, 2024. Mr. Graff then submitted a rebuttal report on January 24, 2025, in response to the critiques offered by Dr. Rattray.

Mr. Graff holds a Bachelor of Science degree in Computer Science. He has over 40 years' experience as a computer programmer, technologist, and cybersecurity executive. Exhibit 1, ¶ 1. He has "designed cyber defenses, managed the groups that operated those defenses, written security plans and security policies, and overseen the response to many cybersecurity incidents." *Id.* Mr. Graff currently operates a cybersecurity consulting company, Tellagraff LLC, through which he consults businesses and the government, provides expert testimony, and teaches college courses regarding cybersecurity and secure software development. *Id.* ¶¶ 1, 5. As a consultant, he works with clients to evaluate and remediate cybersecurity threats and risks. *Id.* ¶ 2.

Previously, Mr. Graff served as the Chief Information Security Officer ("CISO") of NASDAQ OMX and as the Chief Cyber Security Officer at Lawrence Livermore National Laboratory. *Id*. ¶ 3. At NASDAQ, he led a team that secured NASDAQ's worldwide operations against cyber-attacks by foreign countries, criminal organizations, and other hostile entities. *Id.* He also directed NASDAQ's global security policy, implemented their cybersecurity awareness training, and developed secure software applications. *Id.* At Lawrence Livermore, Mr. Graff managed the organization's cybersecurity program, where he conducted numerous cybersecurity research projects and risk analyses in the interest of national security. *Id.*

Prior to these positions, Mr. Graff spent twenty years in various cybersecurity roles at different companies. *Id.* ¶ 4. In those roles he worked on incident prevention and response, threat analysis, and risk evaluation. *Id.* He also served as Chairman of the Forum of Incident Response and Security Teams ("FIRST"), an international association of enterprise cyber-defense teams. *Id.* Mr. Graff has also co-authored three books about security and software. *Id.* ¶ 6. One of his books has been used at dozens of universities to teach how to design and build secure software-based systems. *Id.* Additionally, Mr. Graff has testified before Congress on matters of Internet and software security. *Id.* ¶ 7.

In this matter, Mr. Graff performed a technical comparison between the state of cybersecurity depicted in the SolarWinds Security Statement and SolarWinds' own internal assessments and communications regarding the state of cybersecurity in the 2017-2020 timeframe. *Id.* ¶ 17. Specifically, he focused his analysis on access control, user authentication, use of a secure development lifecycle, and adherence to the NIST Cybersecurity Framework. *Id.* In addition to considering SolarWinds' own internal analyses of the company's cybersecurity,

Mr. Graff considered the deposition testimony of SolarWinds employees taken in this case as well as contemporaneous documents and other materials. *Id.* ¶ 18.

Based on his vast experience evaluating the cybersecurity practices of large organizations, his review of SolarWinds' own internal cybersecurity assessments and considering the language of the Security Statement, Mr. Graff concluded that the state of cybersecurity in SolarWinds' internal assessments did not match the Security Statement in several areas. *Id.* ¶ 20. Specifically, he concluded that "with respect to access control, user authentication, and secure development lifecycle processes, there were significant discrepancies between the cybersecurity practices SolarWinds claimed to be performing and the cybersecurity practices [he] observed from its internal documents." *Id.* ¶ 23.

### III.    Gregory Rattray's Expert Report and Opinions.

Dr. Rattray submitted an expert report on November 22, 2024. On December 30, 2024, he issued a corrected report (Ex. 2).

Dr. Rattray has a bachelor's degree in political science and military history. *See* Rattray Depo., 13:5-11 (Ex. 3). His master's degree is in public policy and his PhD is in international security from the Fletcher School of Law and Diplomacy and involved no courses in computer science. *Id.* 13:17-14:15.

The Rattray corrected report is divided into two halves. In the first half of the report, Dr. Rattray endorses the testimony of SolarWinds' fact witnesses in each of the cybersecurity areas in dispute in the case to conclude that the representations in the Security Statement were accurate. Specifically, he contends that SolarWinds representations about following the NIST framework were accurate. Rattray Corrected Report, ¶¶ 30-39 (Ex. 2). He opines the same

regarding access controls (*id.* ¶¶ 40-57), passwords (*id.* ¶¶ 58-70), network monitoring (*id.* ¶¶ 71-82)[1], and the secure software development lifecycle (*id.* ¶¶ 83-97).

In the second half of the report, Dr. Rattray purports to critique Mr. Graff's opinions in each of these respective technological areas. He explains why he disagrees with Mr. Graff's conclusions concerning access controls (*id.* ¶¶ 114-155), passwords (*id.* ¶¶ 156-177), and the secure software development lifecycle (*id.* ¶¶ 182-216). He ultimately concludes that Mr. Graff's expert opinions do not cause him to change his views about the accuracy of the Security Statement. *Id.* ¶ 98.

As shown below, the entire first half of Dr. Rattray's report consists of improper narration of factual evidence.

## ARGUMENT

### I.  <u>Legal Standard.</u>

"The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence." *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[1] For purposes of summary judgment and trial, the SEC no longer intends to argue that the Security Statement was misleading with respect to network monitoring. However, because Dr. Rattray's opinions regarding network monitoring suffer from the same infirmities as his other opinions, we nonetheless address them below.

> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The trial court acts as a gatekeeper in determining whether to admit expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "To determine whether a proposed expert's testimony passes muster under Rule 702, [the] Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (collecting cases). The party seeking to introduce the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 & n.10. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Moreover, "an expert may not provide merely a narrative of the case which a trier of fact is equally capable of constructing." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 30 (S.D.N.Y. 2020) (Engelmayer, J.) (cleaned up).

## II. Dr. Rattray Improperly Narrates SolarWinds' Version of the Facts in Opining That the Security Statement was Accurate.

Defendants have hired Dr. Rattray to act as a narrator of their version of the facts—a version of the facts that even if true does not establish the accuracy of the Security Statement. Dr. Rattray contends in his report that he has "sought to approximate the methodology that [he] (and other cybersecurity experts) apply in conducting an external assessment of whether an organization has certain cybersecurity controls in place." Rattray Corrected Report, ¶ 17 (Ex. 2).

However, the entire first half of his report simply regurgitates the statements made by SolarWinds' witnesses at their depositions, which he attempts to bolster by pointing to "samples" of documents supposedly showing SolarWinds following the cybersecurity practice at issue. However, Dr. Rattray does not offer any analysis of his chosen samples—he simply describes them. Yet, a jury can understand and decide whether it credits the testimony of those witnesses and the generic documents without Dr. Rattray's narration. *See United States v. Jiau,* 734 F.3d 147, 154 (2d Cir. 2013) (holding that "expert testimony that seeks to address lay matters which the jury is capable of understanding and deciding without the expert's help is not relevant and is therefore inadmissible.") (cleaned up).

Courts in this District have repeatedly recognized that an expert is not permitted to merely narrate the facts of the case:

- *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 470 (S.D.N.Y. 2023) (excluding expert's "testimony because it consists of a factual narrative that would not aid a jury.");

- *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 30 (expert not permitted to offer "merely a narrative of the case");

- *Tourre*, 950 F. Supp. 2d at 675 ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.");

- *Island Intell. Prop. LLC v. Deutsche Bank AG*, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) ("No proposed expert will be allowed to act as a vehicle for lengthy factual narrative.");

- *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008) ("[A]n expert's factual narrative is unnecessary and [the expert] has no personal knowledge of the underlying facts.");

- *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (holding that such narration is not proper for an expert and "is properly presented through percipient witnesses and documentary evidence.").

Courts repeatedly reach this conclusion because "[m]ere narration . . . fails to fulfill *Daubert*'s most basic requirements" and "narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion." *Tourre*, 950 F. Supp. 2d at 675. Yet, as demonstrated below, this is precisely what Dr. Rattray seeks to do in this case.

### A. Dr. Rattray Offers a Factual Narrative as to Why SolarWinds had a Security Statement.

Even before offering his blessings to SolarWinds' factual account of their cybersecurity practices, Dr. Rattray parrots their explanation as to the purpose of the Security Statement. Rattray Corrected Report, ¶¶ 28-29 (Ex. 2). In fact, in his report he expressly acknowledges that he is simply agreeing with witness testimony in offering his opinion regarding the Security Statement:

> *Based on witness testimony*, the Security Statement was designed to answer basic questions from customers about SolarWinds' security. *As Tim Brown explained*, it was a high-level FAQ that would allow a company conducting light diligence of SolarWinds to tick a "checkbox" denoting that it had cybersecurity practices in place. In other words, the Security Statement was designed for customers that considered SolarWinds to be a low-criticality vendor. The information in the Security Statement was not detailed enough to meet the more demanding diligence required by customers that considered SolarWinds to be a high-criticality vendor. *As witnesses testified*, those customers would send SolarWinds detailed questionnaires requesting information going beyond what was in the Security Statement, which SolarWinds would provide only under an NDA.

*Id.* ¶ 28 (emphasis added).

Based on his endorsement of this witness testimony, Dr. Rattray states that he "disagree[s] with the SEC's characterization of the Security Statement as 'touting' that Solar Winds [*sic*] had particularly 'strong' cybersecurity controls in place." *Id.* ¶ 29; *but see SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 79 (S.D.N.Y. 2024) ("Notwithstanding that the Security Statement was aimed at persuading customers to buy SolarWinds' ostensibly cybersecure

products—making its misleading claims potentially part of a fraud on customers, too—the Statement was on SolarWinds' public website and accessible to all, including investors.").

Yet, a jury does not need an "expert" to tell them to believe SolarWinds' factual explanations as to the purpose of their Security Statement. Moreover, it is axiomatic that it is improper for an expert to comment "under the guise of expert opinion, on the credibility of trial testimony from crucial fact witnesses." *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005); *United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2003) (holding that the expert acted improperly at trial as a summary witness and "the effect was a bolstering of the testimony of [fact witnesses] and an impinging upon the exclusive function of the jury."). Accordingly, Dr. Rattray should not be permitted to offer "expert testimony [that] may improperly bolster the account given by the fact witnesses." *Nimely*, 414 F.3d at 398; *United States v. Cruz*, 981 F.2d 659, 663 (2d Cir.1992)).[2]

## B. Dr. Rattray Improperly Narrates Testimony and Documents to Opine That the Security Statement Accurately Described Access Controls.

Dr. Rattray follows the same narrative "methodology" when he opines that the Security Statement accurately depicted SolarWinds' access controls. To support his opinion, he simply repeats what fact witnesses described regarding a form—known as a "system access request form" or "SARF"—that was filled out at SolarWinds. *See* Rattray Corrected Report, ¶ 43 (block

---

[2] Dr. Rattray also offers an opinion that SolarWinds used the NIST Cybersecurity Framework to evaluate its cybersecurity program. *See* Rattray Corrected Report, ¶ 39 (Ex. 2). However, the parties have stipulated to that fact for purposes of summary judgment. *See* Joint Statement of Facts, ¶ 64 (ECF No. 166). Thus, Dr. Rattray's "opinion" would not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Moreover, his opinion that this use of the NIST Cybersecurity Framework makes the Security Statement accurate on that issue, is nothing more than *ipse dixit*. *See* Rattray Corrected Report, ¶ 30 (Ex. 2). This is not a permissible form of expert testimony. *See Joiner*, 522 U.S. at 146.

quoting the deposition of Joe Kim and citing to two other depositions) (Ex. 2). Dr. Rattray offers

no analysis, let alone expert analysis of this testimony. He simply endorses it.[3]

To bolster his regurgitation of this fact testimony, he states "I have reviewed samples

from over a thousand SARFs I have received that were filled out for newly hired employees

during the Relevant Period, evidencing they were completed as a regular practice." *Id.* ¶ 44. Yet,

his "analysis" fares no better when it comes to these documents. As he described in his

deposition, in selecting his eight samples he first relied on a "tranche" that was "created for" him

and that he received from defense counsel. Rattray Depo. 123:17-124:18 (Ex. 3). Even though he

states in the report that he received "over a thousand SARFs" he actually only looked at "50 to

70" of them. *Id.* 124:19-125:18. He opined that "I *felt like* 50 to 70 was more than enough to

indicate that the SARF process was in placed and executed fully." *Id.* 125:3-18 (emphasis

added). Dr. Rattray did not follow any statistical sampling methodology to identify the

appropriate number of SARFs to analyze or pick the "50 to 70" SARFs he looked at, instead he

tried to vary them across different business units and geographic locations. *Id.* 126:6-11.[4]

Importantly, he did not evaluate the content of *any* SARFs—he simply noted the

existence of the documents. He checked neither if the SARF indicated that the correct access

requests were put in, nor if the SARF accurately reflected the permissions that were ultimately

---

[3]  Moreover, to the extent SolarWinds plans to have Dr. Rattray testify as to what their own fact witnesses said during depositions, this would obviously be inadmissible hearsay. Rather than have Dr. Rattray tell the jury what these witnesses said, the witnesses must come to court and be subject to cross-examination. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013).

[4]  It is unclear whether Dr. Rattray actually looked at the SARFs he cites in his report relating to changes in access levels. *Compare* Rattray Corrected Report, ¶ 49 (referring to "samples from numerous SARFs") and Rattray Depo. 162:6-164:9 (offering confusing explanation as to whether he actually looked at the SARFs or not).

provided to the employee (nor if it was a piece of paper that had no bearing on actual access

provided). Even when a specific SARF indicated internal inconsistencies within SolarWinds'

access control processes, as he testified in his deposition, he speculated that "there may be good

reasons for why this SARF is the way it is. But more fundamentally, they had a SARF process."

*Id.* 180:2-21; *see also id.* 178:9-179:3. "Q. So when you make the statement the person who

specified the time period may have gotten it from the temps manager, you were speculating; is

that fair? A. Oh yeah . . .You know, the fact that a SARF has, you know, ambiguity at this level

is not the level I was operating on for this assessment. It is they had a SARF process, right? . .

. . ").

   Dr. Rattray continues this pattern—restate deposition testimony and point to the mere

existence of documents without any analysis or evaluation of them—throughout the access

control section of his report. For his "opinion" as to how system access requests were

implemented, he simply summarized and quoted what SolarWinds employees Brad Cline and

Eric Quitugua said at their depositions. *See* Rattray Corrected Report, ¶ 45 (Ex. 2) (block quoting

the deposition of Cline); ¶ 46 (quoting Cline and Quitugua). He does the same for administrative

access to sensitive systems. *Id.* ¶ 47 (block quoting Cline).

   The narration of fact testimony and documents continues as Dr. Rattray recounts witness

testimony about "user access reviews" or "UARs" conducted by SolarWinds. *Id.* ¶ 53. Dr.

Rattray states, "as multiple witnesses testified, these user access reviews were completed on a

regular basis by the IT team, which would inventory user access control lists on key systems, to

confirm that access privileges were appropriately assigned—and to catch any potential errors that

might be made in the provisioning process." *Id.* (quoting Johnson, Cline, Quitugua, and Brown

depositions). Like with the SARFs, he then points to "samples from over 50 user access reviews"

that he was given. *Id.* ("The reviews *appear* to go through all of the active accounts on various systems used by the team being reviewed.") (emphasis added). However, when asked to explain who or even how the user access reviews he pointed to were created he responded, "So in terms of the exact way these were generated, I did not and felt like it was not necessary to understand that. Having seen many types of document -- process documentation, this looks very clean and organized." Rattray Depo. 173:18-174:11 (Ex. 3).

Dr. Rattray concludes his narration of SolarWinds' access control by purporting to summarize various audits of SolarWinds conducted by outside auditors. *See* Rattray Corrected Report, ¶¶ 54-56. Rather than offer his own analysis of SolarWinds' access controls, Dr. Rattray simply repeats the (hearsay) statements of the auditors. *Id.* ¶ 56 (quoting Lurie, LLP and Holtzmann Partners, LLP). Yet, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y.2007)). "The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Id.* If SolarWinds wanted to introduce at trial the findings of various outside auditors, it should have identified those auditors as witnesses in their initial disclosures.[5] They cannot use Dr. Rattray as a "conduit" for such hearsay.

### C. Dr. Rattray Provides an Improper Narration of Fact Testimony and Documents Regarding SolarWinds Password Policies.

Dr. Rattray continues wending his way through SolarWinds' version of the facts by summarizing various documents and fact testimony pertaining to the company's purported

---

[5] SolarWinds identified in their initial disclosures two witnesses who were involved in the external audits of their financial statements, but not witnesses from Lurie, LLP or Holtzmann Partners, LLP.

password policies. *See* Rattray Corrected Report, ¶¶ 58-70 (Ex. 2). He first points back to the "sample" of user access reviews he, without providing a description of his statistical methodology, "selected at random" in connection with his access control opinions to opine that SolarWinds provisioned users with unique account IDs. *Id.* ¶ 60. Then, Dr. Rattray summarizes a document he describes as reflecting SolarWinds' written password policy. *Id.* ¶ 61. He explains that he knows that this document is the operative password policy, because Jason Bliss, the company's 30(b)(6) witness said it was. *Id.* ¶ 61 & n. 60. He also points to the fact that some security training slides he looked at mentioned a password policy as supporting his opinion that there was in fact such a policy. *Id.* ¶ 62. Yet, simply narrating the fact that he saw some documents and read some testimony that mentioned a password policy does not convey an opinion based on Dr. Rattray's expertise and improperly invades the province of the jury. *See Tourre*, 950 F. Supp. 2d at 675.

Next, Dr. Rattray offers his opinion that the Security Statement's unqualified representation that SolarWinds enforced the use of complex passwords actually meant that they would enforce it "where it was feasible to do so." *See* Rattray Corrected Report, ¶ 65. To support his personal interpretation as to the meaning of this external pronouncement by the company in its Security Statement, Dr. Rattray block quotes "an internal policy document" that he says "explains SolarWinds' password practices for purposes of SOX audits." *Id.* [6] Dr. Rattray offers no analysis of the internal policy document, nor does he explain how such a non-public document explains the meaning of SolarWinds' public statements to customers and investors— instead he simply quotes it. Once again, simply serving as a conduit for fact documents that

---

[6] Ironically, at one point Rattray includes a quote from a portion of this document called the "User Access Process *Narrative*." *Id.* ¶ 66 (emphasis added).

SolarWinds wants to put in evidence is not permissible expert testimony under Rule 702. *See Marvel Characters, Inc*, 726 F.3d at 136. And even if the statements in the internal document had been available to the investing public, Dr. Rattray offers no explanation or basis why a jury would need his assistance in comparing these two documents.

To support his opinion that SolarWinds did indeed enforce its password complexity rules, Dr. Rattray once again narrates deposition testimony of SolarWinds' employees. *See* Rattray Corrected Report, ¶ 66 ("As multiple witnesses testified, the main way SolarWinds did so was by automatically enforcing password complexity on Active Directory, which, again, was the primary system the company used to manage users on its network."). Dr. Rattray offers no analysis of this deposition testimony, he simply quotes it. *See id.* (quoting Cline, Bliss, Quitugua and Brown depositions). He then attempts to bolster this deposition testimony by recounting a 2017 chat between Brown and Mr. Quitugua in which the latter shared a screenshot showing password complexity requirements enabled. *Id.* ¶ 67. This narration of facts fails to convey opinions based on expertise. *Tourre*, 950 F. Supp. 2d at 675.

Dr. Rattray sums up his password opinions—as he did for access controls—by simply purporting to restate the findings of various external auditors. *See* Rattray Corrected Report, ¶ 69. As with access controls, it is improper for SolarWinds to seek to have Dr. Rattray testify to a jury as to the hearsay statements of external auditors.

**D. Dr. Rattray Simply Narrates SolarWinds'
      <u>Factual Testimony About Network Monitoring</u>.**

As with his other "opinions", Dr. Rattray resorts to summarizing SolarWinds deposition testimony when opining that the Security Statement's representations concerning network

monitoring were accurate.  *See Id.* ¶¶ 71-82.[7]  His entire opinion concerning change management

practices at SolarWinds consists of him extensively quoting and summarizing Mr. Cline's

deposition testimony.  *Id.* ¶ 74.  He then discusses his review of "samples" of "change

management request" or "CMR" tickets and "samples" of calendar invites for "Change

Administration Board" or "CAB" meetings.  *Id.* ¶ 75.  His understanding of these documents and

their purpose were based on his conversations with Mr. Cline.  *Id.*

His opinion regarding the auditing and logging of network traffic follows this same

pattern.  He quotes the deposition testimony of Cline, Brown, and Quitugua to conclude that

SolarWinds logged its network traffic.  *Id.* ¶ 77.  He then points to a small sample of reports that

Brown told him were generated by SolarWinds' network monitoring system.  *Id.* ¶ 78.  He

concludes that this sample of reports confirms the accuracy of Cline, Brown, and Quitugua's

deposition testimony.  *Id.*

Dr. Rattray offers the same type of opinion with respect to SolarWinds' use of firewalls.

*Id.* ¶¶ 80-81.  Most of this opinion consists of a several paragraph block quote of Mr. Cline's

testimony about firewalls.  *Id.* ¶ 80 ("Based on the evidence I have reviewed, SolarWinds did in

fact use next-generation firewalls to monitor its network for threats. Mr. Cline testified

extensively to this at his deposition.").  He then cites to a "sample" of monitoring reports that

Brown explained to him were generated by SolarWinds' firewalls.  *Id.* ¶ 81.  In his view not only

---

[7]  As noted above, the SEC has made the strategic decision to no longer argue on summary judgment or at trial that the Security Statement's representations regarding network monitoring were inaccurate.  Accordingly, Dr. Rattray's opinions on this issue are not helpful to the trier of fact and are therefore inadmissible.  *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016) ("To be admissible, expert testimony must be of the type that will 'help the trier of fact to understand the evidence or to determine a fact in issue.'") (Engelmayer, J.) (quoting Fed. R. Evid. 702.), *aff'd*, 720 F. App'x 24 (2d Cir. 2017).

did the sample reports confirm that SolarWinds' used firewalls, they were also consistent with Brown and Mr. Cline's testimony and the Security Statement.  *Id*.

Once again, this is exactly the type of factual narration that experts are forbidden from undertaking under Rule 702.  *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 30. Moreover, Dr. Rattray's endorsement of fact witness testimony, if permitted at trial, would improperly bolster those witnesses' accounts.  *See Nimely*, 414 F.3d at 398; *Cruz*, 981 F.2d at 663.

### E.  Dr. Rattray Offers an Improper Factual Narrative Regarding SolarWinds's Software Development Lifecycle.

Dr. Rattray concludes his narration by opining on the accuracy of the Security Statement as it pertains to SolarWinds' software development lifecycle. His opinion is that the first paragraph of this section of the Security Statement simply means that SolarWinds follows a particular software development methodology. *See* Rattray Corrected Report, ¶ 85 (Ex. 2). He then concludes that this statement was accurate because "as multiple witnesses testified, SolarWinds followed an 'Agile' software development methodology." *Id.* (quoting SolarWinds' current and former employees Colquitt, Brown, and Kim depositions); *see also id.* ¶ 89 (noting that "multiple witnesses testified that SolarWinds followed an Agile software development methodology" and block quoting Colquitt deposition).

The second paragraph in this section provides that SolarWinds' software development lifecycle "follows standard security practices including vulnerability testing, regression testing, penetration testing, and product security assessments." *Id.* ¶ 87. Dr. Rattray concludes this is accurate in part because he saw a 2015 training presentation discussing the process that was

supposed to be followed. *Id.* ¶ 90 & n. 106.[8]  When asked to explain at his deposition why these training slides were relevant to his opinion—though not entirely clear—he seemed to indicate that it illustrated the Colquitt deposition testimony that he was relying on for his opinion:

> You know, there -- you know, this slide deck, you know, was used to evidence that SolarWinds had, you know, moved to the Agile process and that security was present. It was, you know, it was part of the full set of evidence along with Mr. Colquitt's depositions and other technology leaders about how they implemented the Agile process and the security processes associated with it. You know, it's an element of the evidence I examined.

*See* Rattray Depo. 200:10-202:24 (Ex. 3).

As with his other opinions, Dr. Rattray again points to "samples" of documents he received. *See* Rattray Corrected Report, ¶¶ 93-96 (Ex. 2). Once again, Dr. Rattray does not analyze these documents, but merely fulfils his narrator role by describing them. He describes "as the most significant artifacts" of the software development process, "Final Security Reviews" or "FSRs" prepared by engineers. *Id.* ¶ 94. Dr. Rattray reviewed 14 "randomly selected samples" of approximately 100 FSRs that he received. *Id.* ¶ 95[9]. From these randomly selected samples he "observed they contain numerous artifacts of security testing." *Id.* However, when asked to

---

[8]  Another document he relies on for his opinion that SolarWinds indeed followed a secure software development lifecycle methodology is a one-page document that shows how the process *was supposed to work*. *Id.* ¶ 90 & n. 107.

[9]  When asked to describe how the 100 FSRs were selected he explained, "I requested, you know, evidence from the Latham team of, you know, implementation --you know, implementation including things like, you know, the outputs of implementation processes like final security reviews. So they selected -- they selected the hundred." *See* Rattray Depo. 204:10-22 (Ex. 3).

explain at his deposition it was unclear whether he had looked at these "artifacts" for the 14 samples he selected. *See* Rattray Depo. 208:14-212:25 (Ex. 3).[10]

For example, one of the three headings from these FSRs that Dr. Rattray highlighted in his report as evidence of "addressing security design considerations" was "Proactive Review of all FAS (High Level Design) Documents." *See* Rattray Corrected Report, ¶ 210 (Ex. 2). However, when asked in his deposition, he did not know what the acronym "FAS" stood for. *See* Rattray Depo. 237:17-22 (Ex. 3). Similarly, one of the 14 "sample" FSRs he listed in his report included nothing but an empty table under the heading "Proactive Review of all FAS (High Level Design) Documents." When asked about how this document shows security testing, he stated: "You know, in this case, the table is empty. But the statement is about, you know, the fact that FSRs are asking the teams to, you know, look at, you know -- you know, design documents in light of security . . . ." *Id.* 237:23-239:3. In other words, Dr. Rattray was not able to explain, even for the 14 FSRs that *he* chose to present in his report, why he believes that "they contain numerous artifacts of security testing." *See* Rattray Corrected Report, ¶ 95 (Ex. 2).

Dr. Rattray again is not applying any expertise or performing any analysis of the documents to which he points—he is acting as summary witness and a narrator. This is improper under Rule 702. *See Dukagjini*, 326 F.3d at 55; *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 30; *Tourre*, 950 F. Supp. 2d at 675.

---

[10] With respect to threat modeling, Dr. Rattray admitted that he was speculating when he opined what SolarWinds employees meant when they assessed that "no threat modeling or analysis is performed as part of any [MSP] process except MSP backup engineering." *See* Rattray Depo. 233:6-235:2 ("So because of that, you know, I was—you know, I speculated that they may have a formalized view of threat modeling, because what they found was in the face of what I saw related to the existence of threat modeling, you know.").

**F.  Dr. Rattray Offers an Unreliable
Narrative of His Own Relevant Qualifications.**

Additionally underscoring the danger of letting Dr. Rattray serve as a narrator is the fact that he would be an unreliable narrator at best. *See Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d at 471 ("In sum, the Court excludes Dr. Parlour's testimony because it would place her not in the role of expert, but of narrator — *and not even a reliable narrator, at that*.") (emphasis added). Ironically, Dr. Rattray—who essentially seeks to testify that SolarWinds' Security Statement did not contain any material misrepresentations about its cybersecurity practices—himself misstates his own professional cybersecurity experience. His candor about his professional experience as a CISO is directly relevant to the opinions he seeks to offer in this case and the foundation for that testimony. *See* Edward J. Imwinkelried, *Trial Judges-Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert Testimony Without Invading the Jury's Province to Evaluate the Credibility and Weight of the Testimony?*, 84 Marq. L. Rev. 1, 40 (2000) (proposing that trial judges have a greater role to play in assessing an expert's credibility when it directly bears on *Daubert* inquiry).

In his report Dr. Rattray states, "from 2014 to 2019, I was Chief Information Security Officer & Head of Global Cyber Partnerships at JPMorgan Chase, where I directed its cyber defense program and oversaw more than 1,000 personnel and a $500 million budget." Rattray Corrected Report, ¶ 8 (Ex. 2). His curriculum vitae contains a similar description of his time at JPMorgan:

**Chief Information Security Officer & Head of Global Cyber Partnerships**                    2014 - 2019
**Managing Director, JP Morgan Chase**

- Lead JPMC response to major cyber breach; ensured Board, CEO, senior management, regulators, government and external audiences confident in JPMC response and remediation
- Directed JPMC cyber defense program overseeing over 1000 personnel and $500 million budget including the establishment of advanced security operations, red teaming and cyber exercise programs
- Established JPMC program to engage government and industry partners to protect financial sector globally
- Architect and initial co-president Financial Systemic Analysis and Resiliency Center
- Founder and President of global Coalition to Reduce Cyber Risk advocating for Fortune 100 companies
- Board & Executive Committee member, Sheltered Harbor LLC improving sector resiliency for cyber attacks

Rattray CV (Ex. 4).

Dr. Rattray's *claimed* experience as the Chief Information Security Officer ("CISO") at JPMorgan Chase for five years and having overseen its cybersecurity program is significant because this case centers on the actions of Brown who oversaw the cybersecurity program at SolarWinds, and functioned as SolarWinds CISO even if he did not hold that title at the time. However, Dr. Rattray *was not* the CISO at JPMorgan for five years as stated in his report and CV. He left that position after one year to assume the "Head of Global Cyber Partnerships" spot, which did not involve overseeing JP Morgan's cyber defense program. *See* Rattray Depo. 83:20-24 (Ex. 3). Indeed, contrary to the description in his report and resume, he directed JP Morgan's cyber defense program for one year, not five years. *Id.* 83:19-85:7. For most of his time at JPMorgan he only oversaw a small group of less than 20 people. *Id. See also* June 2015 Bloomberg article entitled, "JPMorgan Reassigns Security Team Leader a Year After Data Breach" (Ex. 5 / Rattray Depo. Ex. 3) (reporting that Dr. Rattray had "been reassigned, after a year on the job that included controversy over his handling of a massive data breach and the departure of several top security team members."); *cf.* Rattray Depo. 88:13-89:7 (Ex. 3) (denying he had been removed or reassigned).

20

In preparing his expert report for a case involving allegations of federal securities law violations related to the accuracy of cybersecurity representations, Dr. Rattray had to know that it was critical that he be forthright in describing his own cybersecurity bona fides. Instead, he chose to significantly overstate his tenure as CISO of JPMorgan. If the Court permits him to testify, it will be for the jury to determine his credibility. Yet, the Court in its gatekeeping capacity can ensure that Dr. Rattray does not improperly assume the role of a narrator of facts— particularly where his ability to accurately narrate even his own professional history has been called into question. *See Alves v. Affiliated Care of Putnam, Inc.*, 2022 WL 1002817, at *6 (S.D.N.Y. Mar. 30, 2022) ("Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a 'gatekeep[er]' to ensure that the expert testimony is reliable and relevant before it is presented to the jury.") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

### G. Dr. Rattray's Expert Testimony Should be Limited to His Critiques of the SEC's Expert Mark Graff.

The second half of Dr. Rattray's report consists of his response and critiques of the opinions of the SEC's cybersecurity expert, Mark Graff. *See* Rattray Corrected Report, ¶¶ 98-216. Though, as detailed above in the Background section, Dr. Rattray lacks the technical education and training of Graff, nonetheless he possesses adequate cybersecurity experience to offer these opinions. The limitations in his technical expertise and the flaws in his opinions can be explored on cross-examination by the SEC. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Packard v. City of New York*, 2020 WL 1479016, at *3 (S.D.N.Y. Mar. 25, 2020) (holding that disputes regarding "the strength of [an expert's] credentials, faults in his … methodology, or lack

of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.") (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion and preclude Dr. Rattray from offering a factual narrative of SolarWinds' witness testimony and documents.

Dated:  April 25, 2025                    Respectfully submitted,

*/s/ Christopher J. Carney*
Christopher J. Carney
Christopher M. Bruckmann
(SDNY Bar No. CB-7317)
Kristen M. Warden
(admitted *pro hac vice*)
John J. Todor
(admitted *pro hac vice*)
William B. Ney
(admitted *pro hac vice*)
Benjamin Brutlag
(SDNY Bar No. BB-1196)
Lory Stone
(admitted *pro hac vice*)
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
202-551-2379 (Carney)
202-551-5986 (Bruckmann)
202-551-4661 (Warden)
202-551-5381 (Todor)
202-551-5317 (Ney)
202-551-2421 (Brutlag)
202-551-4931 (Stone)
Carneyc@sec.gov
BruckmannC@sec.gov
WardenK@sec.gov
TodorJ@sec.gov
NeyW@sec.gov
BrutlagB@sec.gov
StoneL@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*

23