# EXHIBIT 3

**Page 1**

1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF NEW YORK
3
4  SECURITIES AND EXCHANGE  )
   COMMISSION,           )
5                         )
      Plaintiff,      )
6                   )  Civil Action No.
   v.          )  23-cv-9518-PAE
7                   )
   SOLARWINDS CORP. and   )
8  TIMOTHY G. BROWN,      )
                      )
9      Defendants.     )
   _____)
10
11
12
13
14      VIDEO RECORDED EXAMINATION OF
15           GREGORY RATTRAY
16      WEDNESDAY, FEBRUARY 12, 2025
17         NEW YORK, NEW YORK
18
19
20
21
22
   CERTIFIED STENOGRAPHER:
23 JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
   CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24 CCR-WA (No. 21007264), CSR-CA (No. 14420),
   REALTIME SYSTEMS ADMINISTRATOR
25 JOB NO. 250212JWAA

1

**Page 2**

1
2
3       VIDEO RECORDED EXAMINATION of
4  GREGORY RATTRAY, taken before
5  JESSICA R. WAACK, Registered Professional
6  Reporter, Registered Merit Reporter,
7  Certified Realtime Reporter, Registered
8  Diplomate Reporter, California Certified
9  Realtime Reporter, New Jersey Certified Court
10 Reporter (License No. 30XI008238700); Texas
11 Certified Shorthand Reporter (License No.
12 11958); Washington State Certified Court
13 Reporter (License No. 21007264); California
14 Certified Shorthand Reporter (License No.
15 14420); New York Association Certified
16 Reporter, New York Realtime Court Reporter
17 and Notary Public of Washington, D.C. and the
18 States of New York, Pennsylvania, Delaware,
19 Maryland and Virginia, at Latham & Watkins,
20 1271 Avenue of the Americas, New York, New
21 York, on Wednesday, February 12, 2025,
22 commencing at 9:41 a.m. and concluding at
23 6:46 p.m.
24
25

2

**Page 3**

1            A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFF:
4      SECURITIES AND EXCHANGE COMMISSION
5      BY:  CHRISTOPHER CARNEY, ESQ.
6      BY:  JOHN TODOR, ESQ.
7      BY:  CHRISTOPHER BRUCKMANN, ESQ.
8      BY:  KRISTEN WARDEN, ESQ. (Remote)
9      BY:  LORY STONE, ESQ. (Remote)
10     100 F Street, N.E.
11     Washington, D.C.  20549
12     PHONE:  800-732-0330
13     EMAIL:  Carneyc@sec.gov
14
15 ON BEHALF OF THE DEFENDANTS:
16     LATHAM & WATKINS LLP
17     BY:  SERRIN TURNER, ESQ.
18     BY:  MATTHEW VALENTI, ESQ. (Remote)
19     1271 Avenue of the Americas
20     New York, New York  10020
21     PHONE:  212-906-1330
22     EMAIL:  Serrin.turner@lw.com
23
24
25

3

**Page 4**

1            A P P E A R A N C E S
2
3  ON BEHALF OF THE DEFENDANTS:
4      LATHAM & WATKINS LLP
5      BY:  SEAN M. BERKOWITZ, ESQ.
6      BY:  MAURICE BAYNARD, ESQ.
7      330 North Wabash Avenue, Suite 2800
8      Chicago, Illinois  60611
9      PHONE:  312-777-7016
10     EMAIL:  Sean.berkowitz@lw.com
11
12         A L S O   P R E S E N T
13            (REMOTE)
14 ANNIE GRAVELLE
15 BECKY MELTON
16
17       A L S O   P R E S E N T
18
19 DANNY ORTEGA, videographer
20 ERIC COLE
21 ROZALIA (ROZI) KEPES
22
23         --o0o--
24
25

4

Page 5:

1    INDEX TO EXAMINATION
2    WITNESS:  GREGORY RATTRAY
3
4        EXAMINATION          PAGE
5  BY MR. CARNEY              10
6  BY MR. TURNER             303
7  BY MR. CARNEY            309
8
9        INDEXED PAGES
10                PAGE
11  GREGORY RATTRAY, sworn            9
12  REPORTER CERTIFICATE            313
13  DECLARATION UNDER PENALTY OF PERJURY   314
14  ERRATA SHEET            315
15
16
17    INFORMATION REQUESTED
18        None
19
20  WITNESS INSTRUCTED NOT TO ANSWER
21        None
22
23
24
25

5

Page 7:

1    INDEX TO EXHIBITS
2    WITNESS:  GREGORY RATTRAY
3    Wednesday, February 12, 2025
4  MARKED        DESCRIPTION          PAGE
5  Exhibit 10 Ticket: 260058;
6        SW-SEC-SONY_00050922      176
7  Exhibit 11 SolarWinds Development Process
8        slide deck          199
9  Exhibit 12 Final Security Review SRM
10        (2019.4); SW-SEC-SONY
11        _00055119          205
12  Exhibit 13 Email chain ending on
13        November 18, 2019;
14        SW-SEC00254254        217
15  Exhibit 14 MSP Products Security
16        Evaluation - confidential -
17        July 2019; SW-SEC00166790    231
18  Exhibit 15 Final Security Review
19        ipMonitor (Doberman - 2019.4);
20        SW-SEC-SONY_00069825      237
21  Exhibit 16 Final Security Review IPAM
22        (2019.2 Finn);
23        SW-SEC-SONY_00055006      240
24
25

7

Page 6:

1    INDEX TO EXHIBITS
2    WITNESS:  GREGORY RATTRAY
3    Wednesday, February 12, 2025
4  MARKED        DESCRIPTION          PAGE
5  Exhibit 1  Gregory Rattray expert report
6        dated November 22, 2024      41
7  Exhibit 2  Expert report of Gregory
8        Rattray dated November 22,
9        2024          42
10  Exhibit 3  Article, "JPMorgan Reassigns
11        Security Team Leader a Year
12        After Data Breach"        91
13  Exhibit 4  Article, "Building a Focused
14        Approach to Cyber Defense"    99
15  Exhibit 5  "SolarWinds Security
16        Statement"        119
17  Exhibit 6  SARF dated December 12, 2017;
18        SW-SEC-SONY_0005545      131
19  Exhibit 7  Ticket : 193821;
20        SW-SEC-SONY_00049602      147
21  Exhibit 8  Ticket : 202365;
22        SW-SEC-SONY_00047323      159
23  Exhibit 9  MailAssure User Access
24        Follow-Ups          171
25

6

Page 8:

1    INDEX TO EXHIBITS
2    WITNESS:  GREGORY RATTRAY
3    Wednesday, February 12, 2025
4  MARKED        DESCRIPTION          PAGE
5  Exhibit 17 Native document;
6        SW-SEC00168780        285
7
8  ** EXHIBITS BOUND SEPARATELY ***
9
10
11        --o0o--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

8

1                     ******
2                  PROCEEDINGS
3        February 12, 2025, 9:41 a.m.
4              New York, New York
5                     ******
6          THE VIDEOGRAPHER:  We are now on the
7    record.
8          My name's Danny Ortega, and I'm the
9    legal videographer for Gradillas Reporting.
10   Today's date is February 12, 2025, and the time is
11   9:41 a.m.
12         This video deposition is being held at
13   1271 Avenue of the Americas, New York, New York,
14   in the matter of SEC vs. SolarWinds Corp., et al.
15         The deponent today is Gregory Rattray.
16   All counsel will be noted on the stenographic
17   record.
18         The court reporter today is Jessie
19   Waack, and will now swear in the witness.
20                     *****
21         GREGORY RATTRAY, sworn
22   on oath and/or affirmed, called as a witness
23   herein, was examined and testified as follows:
24                     *****
25   ///

9

1                  EXAMINATION
2    BY MR. CARNEY:
3        Q.    Good morning, Dr. Rattray.
4        A.    Good morning.
5        Q.    Just we haven't met before.  My name's
6    Chris Carney.  I'm an attorney with the SEC.
7          Sir, you've had your deposition taken
8    before, right?
9        A.    Yes, I have.
10       Q.    So I know you know the ground rules,
11   but let me just walk through some of them really
12   quickly.
13         So obviously our court reporter here
14   is taking down everything we're saying, so it's
15   important that we don't talk over each other.  So
16   even if you see where I'm going, just let me
17   finish my question, and then you respond, and
18   we'll have a clean record.
19         Is that okay?
20       A.    Understood.
21       Q.    And we'll take breaks from time to
22   time, but if at any point you need a break, just
23   let me know.
24         And the only thing I would ask is that
25   if there's a question pending, that you just

10

1    answer the question, and then we can take the
2    break.
3          And obviously the most important thing
4    is that you're under oath the same as if you were
5    in a court.  So just give the answers truthfully
6    to the best of your abilities.
7          Is that okay?
8        A.    Yep, I understand.
9        Q.    Okay.  And is there anything that
10   would prevent you from being able to testify fully
11   and truthfully today?
12       A.    No.
13       Q.    All right.  And were you retained to
14   provide expert services in this case?
15       A.    Yes, I was.
16       Q.    And who are you retained by?
17       A.    The -- Latham, the law firm.
18       Q.    Okay.  And so you were hired directly
19   by Latham & Watkins?
20       A.    Actually, Serrin, you know, I --
21         THE WITNESS:  I believe we were hired
22   by Latham, right?
23         You know, I don't know if the
24   contractual relationship is with SolarWinds
25   directly.

11

1    BY MR. CARNEY:
2        Q.    Okay.  All right.  When you get paid,
3    is it Latham & Watkins that pays you?
4        A.    Again, my team invoices, and I get
5    paid.  So I'm actually not exactly sure --
6          MR. TURNER:  I can represent that
7    SolarWinds pays the invoices.
8          THE WITNESS:  SolarWinds.
9    BY MR. CARNEY:
10       Q.    And do you know how much you've been
11   paid so far in this case?
12       A.    I don't know the total amount.
13       Q.    Okay.  Do you know how many hours you
14   personally have spent on this case?
15       A.    I would say 200-ish, yeah.
16       Q.    All right.  And for purposes of this
17   case, what do you consider your area of expertise
18   to be?
19       A.    My area of expertise relevant to this
20   case is, you know, understanding how companies,
21   enterprises control their information environment,
22   implement security controls.
23       Q.    Okay.  And is there a field of
24   expertise that you would fold that into?
25       A.    You know, different labels are used,

12

1    but information security or cybersecurity.
2        Q.    Okay.  And do you consider yourself an
3    expert in cybersecurity?
4        A.    Yes, I do.
5        Q.    Okay.  You don't hold a degree in
6    computer science, do you?
7        A.    I hold a bachelor of science, but I
8    don't hold a computer science degree.
9        Q.    And a bachelor of science in political
10   science and military history, right?
11       A.    Yes, I do.
12       Q.    And have you taken any courses in
13   computer engineering?
14       A.    I've taken courses in technology
15   policy.  I haven't taken any -- any university
16   courses in computer science or engineering.
17       Q.    And your master's degree, as I
18   understand, is in public policy; is that right?
19       A.    That's correct.
20       Q.    And you have a PhD in international
21   security; is that correct?
22       A.    That's where I wrote -- at Tufts
23   University where I wrote my dissertation on the
24   future of cyber warfare.
25       Q.    And that was at the Fletcher School?

13

1        A.    That's correct.
2        Q.    And as I understand it, at the
3    Fletcher School a PhD in international security is
4    a concentration within the international relations
5    PhD program; is that right?
6        A.    The Fletcher School is the Fletcher
7    School of Law and Diplomacy.  There's actually
8    not -- you know, there's not a specific
9    concentration inside the school for the PhD
10   program.  You know, you have to have areas of
11   study.  One of mine was technology policy.
12       Q.    Okay.  And did your PhD course or
13   program at Fletcher require any computer science
14   courses?
15       A.    No computer science courses.
16       Q.    Did your PhD program require any
17   courses in information security to complete the
18   degree?
19       A.    I did research courses, sort of guided
20   research courses with professors around the
21   evolution of at that time a fairly nascent
22   computer and information security, but there was
23   no -- there was no formal course in information
24   security.
25            I'm not sure that such courses existed

14

1    at the time.
2        Q.    Can you remind me what year you
3    received your PhD?
4        A.    1998.
5        Q.    Did your PhD program require any
6    courses in software security to complete the
7    degree?
8        A.    No.
9        Q.    Did your PhD program require any
10   courses in computer network security to complete
11   the degree?
12       A.    No, it did not.
13       Q.    Have you ever taken a course in
14   software security?
15       A.    I have not taken a course in software
16   security.
17       Q.    Okay.  Have you ever taken a course in
18   computer network security?
19       A.    Again, I've done a lot of guided
20   research by professors in the technology field
21   that included, you know, information technology,
22   computer technology, security controls, but it
23   wasn't a formal course.  It was a formal course in
24   the sense that I got credit.
25            It wasn't a, you know, predesigned

15

1    course.  It was an independent-guided research
2    course.
3        Q.    Okay.  Did your PhD program require
4    any courses in applied cryptography?
5        A.    No.
6        Q.    Okay.  And have you taken any courses
7    in applied cryptography?
8        A.    No.
9        Q.    All right.  Have you personally
10   designed any cybersecurity systems?
11            MR. TURNER:  Object to the form of the
12   question.
13            THE WITNESS:  I designed quite a few
14   cybersecurity systems in terms of programs that
15   companies run.  You know, red team operations and
16   processes, vulnerability assessment, you know,
17   processes, you know.
18            So everything from major
19   organizations, information security, you know,
20   approaches to certain types of operations that
21   take place inside those programs, I've designed
22   those processes and programs.
23   BY MR. CARNEY:
24       Q.    And you mentioned you did this for
25   companies.

16

1     Which companies did you design these
2  cybersecurity systems for?
3     A.    I designed the cybersecurity program
4  for JPMorganChase while I was the CISO.  I helped
5  with the formulation of the nation cybersecurity
6  strategy when I was at the White House and then,
7  you know, at while -- in two different commands in
8  cybersecurity in the Air Force.
9        Designed different programs including,
10  you know, the Air Force's red team and penetration
11  testing program.
12        As a consultant, I've helped
13  companies design their programs both overall
14  cybersecurity programs and specific threat
15  intelligence and red team and penetration testing
16  programs.
17     Q.    Okay.  And when you were -- let's use
18  JPMorgan for an example.  That was the first one
19  you mentioned.
20        When you designed their cybersecurity
21  program, were you responsible for any of the
22  technical implementation of that program?
23     MR. TURNER:  Object to form.
24     THE WITNESS:  I was, as the CISO,
25  responsible for the oversight of the entire

17

1  program including its technical implementation.
2  BY MR. CARNEY:
3     Q.    Did you do any of the actual coding
4  involved in creating the cybersecurity controls?
5     A.    You know, I did not do any coding.
6  The control structures included both technical
7  and, you know, nontechnical controls.  You know,
8  the program as a whole, you know -- yeah, I
9  work -- design -- was responsible for the design
10  and oversight of the entire program.
11     Q.    Okay.  With respect to you mentioned
12  technical controls, do you have the capability
13  yourself to code technical controls?
14     MR. TURNER:  Object to form.
15     THE WITNESS:  Technical controls often
16  don't involve coding, so I'm not a coder.
17  BY MR. CARNEY:
18     Q.    Okay.  What do they involve then if
19  they don't involve coding?
20     A.    You know, many involve -- if we're
21  talking about -- are we talking about technical
22  controls?
23     Q.    Yes, technical controls.  Thank you,
24  sir.
25     A.    In a technical control such as network

18

1  monitoring, you're often using tools that are in
2  place on devices and networks to, you know,
3  monitor whether -- you know, whether these things
4  occurred.
5     Q.    And do you -- how are those tools
6  created?
7     MR. TURNER:  Object to form.
8     THE WITNESS:  You know, the tools are
9  created initially through coding, though the point
10  at which enterprises use them, they're usually
11  not -- there's no coding involved with the tools
12  at the point at which an enterprise deploys the
13  tools.
14  BY MR. CARNEY:
15     Q.    Okay.  And do you have the technical
16  skills and capability to deploy those tools
17  yourself?
18     MR. TURNER:  Object to form.
19     THE WITNESS:  There's a wide variety
20  of tools.  Some of them are pretty simple.  I'm
21  not a hands-on technologist.
22        So, you know, the ones that are
23  relatively straightforward for a user to deploy, I
24  can deploy.
25  ///

19

1  BY MR. CARNEY:
2     Q.    What about the tools that are deployed
3  at an enterprise level?  Do you have the skill set
4  to be able to do that?
5     MR. TURNER:  Object to form.
6     THE WITNESS:  I think we'd have to get
7  a little more specific as to -- you know, again,
8  relatively simple, you know, user level tools are
9  deployed in an enterprise, and then there's more
10  sophisticated -- you know, there's more
11  complicated tools deployed.
12  BY MR. CARNEY:
13     Q.    Well, I think you -- the example you
14  gave was network monitoring tools.
15        Do you -- would you have the technical
16  capability to deploy network monitoring tools at
17  an enterprise level for, say, JPMorgan?
18     A.    No, I would not.
19     Q.    Okay.  And what kind of skills would
20  someone need to have to do that?
21     A.    So we're talking about the skills
22  necessary to deploy a network monitoring system?
23     Q.    Yes, Doctor.
24     A.    And just deploy it, right?  Are we
25  talking separate from the operation of that --

20

1    Q.    Just to deploy it.
2    A.    Yeah.  You know, it would basically
3  be, you know, experience in software deployment,
4  which is usually residual in the -- you know, the
5  architecture or infrastructure teams in a large
6  enterprise.
7    Q.    Okay.  Do you hold any cybersecurity
8  certifications?
9    A.    Defining "certification" as -- can we
10  just get a definition of what we mean by
11  "certification"?
12    Q.    Well, I'll give you an example.
13         Are you familiar with CompTIA, and
14  that's C-o-m-p-T-I-A?
15    A.    Yes, I am.
16    Q.    And they offer cybersecurity
17  certifications, right?
18    A.    Yes, they do.
19    Q.    And do you hold any of those?
20    A.    I do not.
21    Q.    Are you familiar with -- and this is
22  all caps I-S-C 2, which is the International
23  Information Systems Security Certification
24  Consortium?
25    A.    Yes, I am.

21

1    Q.    And what is ISC2?
2    A.    It's a number -- one of a number of
3  different bodies in the -- in the cybersecurity
4  field that, you know, works to train and certify
5  people.
6    Q.    Okay.  And ISC2 offers cybersecurity
7  certifications, right?
8    A.    I believe they do.
9    Q.    And do you hold any of those?
10    A.    I do not.
11    Q.    And do you have -- I'll spell it out
12  -- C-I-S-S-P certification?
13    A.    I do not.
14    Q.    Do you have any -- do you have any
15  SANS GSEC certification?
16    A.    I'm not sure what those certifications
17  are.  I don't hold them.
18    Q.    And are you familiar with CertNexus,
19  and that's C-e-r-t and then capital N-e-x-u-s?
20    A.    I don't believe I am.
21    Q.    And, Doctor, you're aware that this
22  litigation involves SolarWinds's security
23  statement, right?
24    A.    Yes, I am.
25    Q.    And before reading SolarWinds's

22

1  security statement for this litigation, had you
2  ever read other company's security statements?
3    A.    Yes, I have.
4    Q.    And in what context?  Why had you done
5  that?
6    A.    Both in the context of, you know, I
7  guess, you know, I want to make sure that we're
8  talking -- when you say "a security statement,"
9  you know, we might want to define that a little
10  bit.
11         If it's about public declarations of
12  the company's security posture, you know, I just
13  want to make sure that's the frame we're putting
14  on it as the answer to the question.
15    Q.    Sure, sure.
16         So I'm talking now about the
17  SolarWinds's public-facing --
18    A.    Yep.
19    Q.    -- security statement that's at issue
20  in this case --
21    A.    Yes.
22    Q.    -- as well.  I'm asking about
23  analogous security statements at other companies.
24    A.    Yes, I've seen them.  You know, at
25  JPMorgan, when I was a CISO there, we made --

23

1  that's why I wanted to clarify.
2         We made public statements about our
3  security that I don't think we put it in the form
4  of a security statement like we see at SolarWinds.
5         I've also seen them in consulting, you
6  know, engagements that I've had, you know, much
7  more similar to the SolarWinds situation.
8    Q.    Okay.  And let me break that down.
9         So have you ever written the
10  public-facing securities statement of an
11  organization?
12    A.    I have been involved in the -- you
13  know, the creation, the establishment of, again,
14  public-facing security statements.
15         Again, I guess the question is, how
16  close to the -- you know, how much am I looking at
17  exactly the type of statement that SolarWinds had.
18         But I've been -- I've certainly been
19  involved in the creation of public-facing
20  statements about security.  You know, I think
21  that's -- we can refine it if necessary.
22    Q.    Sure.  And about how many companies
23  have you done that for?
24    A.    Again -- well, it probably gets to the
25  idea that the way securities statements are, you

24

1   know, established publicly usually is not an
2   individual, you know, activity, and it wasn't in
3   the case of SolarWinds, right?
4           I've been involved in processes where
5   companies are deliberating about what to say about
6   their security posture, commenting on draft
7   language, drafting language at times.
8       Q.   Okay.  And are there specific
9   companies you can recall doing that for?
10      A.   You know, again, certainly with
11  JPMorgan when we were making public statements
12  about security, I was involved in those.
13          And in consulting work, I, you know,
14  basically am under nondisclosure agreements about
15  the specifics of activities I undertook.
16          When I was the chief security advisor
17  to ICANN Internet Corporation For Assigned Names
18  and Numbers, we made -- you know, we made -- we
19  may have made statements.  I don't remember
20  exactly, so I probably was involved during the
21  period I was there.
22      Q.   Okay.  And have you ever in your work
23  had to advise a company -- forgive me if this covers what
24  you already said.
25          But have you ever been called upon to

25

1   advise a company on their security statement that
2   they were writing?
3       A.   Again, you know, a lot of times
4   they're not called security statements, you know,
5   sort of -- but I have advised on the establishment
6   of public-facing security language for companies.
7       Q.   Have you ever, in your work prior to
8   this case, had to analyze the security statement
9   of an organization to see if it matched what they
10  were actually doing?
11      A.   I've conducted numerous assessments of
12  companies, cybersecurity postures, control
13  structures.  That has informed in the cases where
14  I've been consulting my opinion about, you know,
15  things that they're going to say publicly.  You
16  know, I would say that would be the way to
17  characterize my experience.
18      Q.   Okay.  Have you ever taken a
19  public-facing security statement and analyzed
20  whether what the company was doing matched what
21  they said in that public-facing security
22  statement?
23      A.   You know, to the extent that which
24  security statements, you know, describe control
25  structures and you assess, you know, you know,

26

1   description of practices, I've done that over and
2   over again, yes.
3       Q.   And have you ever had to advise a
4   company to modify its security statement, because
5   their practices didn't match what the security
6   statement said?
7       A.   You know, I'm just -- I'm seeking to
8   recall.  I think -- you know, I can't recall a
9   specific instance of modifying language related to
10  a public-facing statement.
11          Again, are we -- are we good with you
12  saying security statement, and me thinking about
13  this more broadly as, you know, public statements
14  made by companies related to their security?  Are
15  we saying the same thing?
16      Q.   Yeah, I think we're saying the same
17  thing.
18      A.   Okay.
19      Q.   All right.  Let me delve in a little
20  bit in your expertise in cybersecurity.
21          And if it helps -- I'm going to hand
22  it to you in a little bit.  I have your CV here.
23  So if you need it, let me know.
24          But where in your background do you
25  have expertise in access control?

27

1       A.   You know, starting in my military
2   career, you know, as we started to define, you
3   know, what we initially called information warfare
4   and then called cybersecurity cyber warfare, you
5   know, I was involved, you know, in the development
6   of approaches both -- you know, both policy and
7   procedural.
8           But also operational related to, you
9   know, how Air Force organizations, you know, would
10  need to implement that.
11          And then as commander of two separate
12  Air Force organizations, which in these cases were
13  cybersecurity organizations, we -- we were
14  required to implement the information security
15  practices of the Air Force as commander and,
16  therefore, had oversight of an information
17  security program which had detailed access control
18  provisions.
19          One of those organizations also wrote
20  the first set of what we call tactics, techniques
21  and procedures for cybersecurity, which would
22  have -- you know, which did include, you know, the
23  full set of things that an organization should
24  perform while the -- defending their networks,
25  which would include access controls.  So that

28

1 probably describes my Air Force experience.
2        As, you know -- as a consultant, you
3 know, in conduct of -- you know, information
4 security assessments of organizations, I have led
5 and reviewed assessment reports about the presence
6 of access controls in a large number of
7 organizations.
8        In the JPMorgan role, we had -- access
9 controls were, you know, part of the broader
10 information security program where we had policies
11 and procedures.
12        I reviewed those policies and
13 procedures as well as, you know, had metrics
14 provided to me about the implementation of our
15 policies and procedures. I think that's a fairly
16 comprehensive review.
17        MR. TURNER: I just want to flag for
18 the court reporter, it's "tactics, techniques and
19 procedures."
20 BY MR. CARNEY:
21    Q.    All right. So thank you for that.
22        In addition reviewing the policies and
23 procedures and receiving metrics on the
24 implementation of those policies and procedures,
25 do you have any sort of technical skills or acumen

29

1        You know, similar to password, you
2 know -- the implementation of password controls,
3 user identification is usually an element in most,
4 you know -- some policy and procedure approaches
5 around naming conventions for users on a network.
6        So I've certainly been involved in the
7 development of, you know, user access controls and
8 agreements, which, you know, specify the level of,
9 you know -- like, how people will be identified in
10 a user identification system.
11        I'd say that probably characterizes my
12 experience.
13    Q.    And similar to my earlier question, do
14 you have any sort of technical skills as it
15 relates to implementing user identification
16 requirements?
17        MR. TURNER: Object, again, to form.
18 "Technical."
19        THE WITNESS: Right. The
20 implementation of user identification systems is
21 not a particularly technical activity, you know,
22 in terms of it's mostly a process, you know,
23 setting activity.
24        And, again, I've described and I can
25 repeat if you like, sort of my, you know, my

31

1 as it relates to designing access controls?
2        MR. TURNER: Object to form.
3        THE WITNESS: You know, I've been
4 involved in, you know, deciding, you know, how
5 strong certain access controls, things like, you
6 know, password complexity and how hard should we
7 make it or provisions for -- in a data loss
8 prevention systems, you know, what are the things
9 that would be flagged down to the implementation
10 level of those systems in terms of what would be
11 present in the implementations of those systems.
12        Again, I'm not a coder, so I did not
13 go down to the coding level in my experience with
14 the implementation of security controls.
15 BY MR. CARNEY:
16    Q.    Okay. What is -- what about the sort
17 of same question as it relates to user
18 identification?
19        What's your experience as it relates
20 to user identification?
21    A.    You know, both as a user in many
22 organizations -- we can go through them, but I
23 don't think we need to, you know, in the different
24 sort of organizations I've been involved with over
25 the years.

30

1 experience in the process setting side of things.
2        You know, the tools are, you know,
3 developed and deployed as we've already discussed.
4        But, you know, at an enterprise level,
5 it's almost all a decision about the processes you
6 develop and deploy on those tools in order to
7 achieve a security control, which, again, I've
8 been involved pretty directly in that.
9 BY MR. CARNEY:
10    Q.    Okay. Have you -- do you have any
11 involvement or experience in developing software?
12        MR. TURNER: Object to form.
13        THE WITNESS: I have certainly, you
14 know, overseen programs that are, you know,
15 responsible for ensuring the security and the
16 development of software.
17        I'm not a coder, so, you know, if the
18 question is, do I do coding, I don't do coding.
19 BY MR. CARNEY:
20    Q.    And so what was your responsibility
21 for ensuring the security in the development of
22 software?
23    A.    Oversight of and then consulting on
24 secure software development, you know, procedures
25 in -- you know, in the development environment in

32

1  different countries -- not countries -- companies.
2      Q.    And what different companies were you
3  involved in the secure development lifecycle
4  process?
5      A.    At JPMorgan, we had a secure
6  development, you know, emphasis -- right? -- you
7  know, inside the security programming in
8  conjunction with the application developers in the
9  company.
10         I -- you know, in consulting reviews,
11  you know, again, secure development is an element
12  of most security reviews at this stage, so I've
13  been involved in sort of numerous reviews and
14  assessments of secure development environments.
15      Q.    And what -- what kind of software was
16  JPMorgan developing that used the -- can I call it
17  SDL process?
18      A.    Yeah, call it -- yeah, we'll use SDL.
19         You know, JPMorgan develops a wide
20  variety of applications for both, you know,
21  internal use and external, you know, use by
22  customers.  You know, very large numbers of
23  different applications was -- this process was --
24  was part of.
25      Q.    And when you were the CISO at

33

1  JPMorgan, you had some involvement in that
2  process?
3      A.    I had oversight of the, you know --
4  in, you know, review of the processes we had asked
5  the technology teams to implement.
6      Q.    The SDL process that JPMorgan
7  followed, was that -- you know, was that based on
8  the Microsoft SDL process?
9      A.    I'm not at liberty to get into sort of
10  any specifics because of my exit agreement with
11  JPMorgan about specifics inside the JPMorgan
12  security program.
13      Q.    Okay.  Have you ever personally
14  conducted threat modeling?
15      A.    Many times.  In basically the idea
16  that a security program, a -- you know, the
17  development of technology for a company needs to
18  take into account, you know, threat-based risks,
19  you know.
20         You know, I've been the -- many person
21  identifying threats to organizations, you know, at
22  the organizational, even the national level in
23  terms of, you know, how -- who are threat actors?
24         How do they behave?  How do they pose
25  risk to companies?  Are the control structures in

34

1  the company -- you know, attune to that?
2         Are we feeding our knowledge of how
3  threat actors behave into, you know, processes
4  like software development.  So I have a lot of
5  experience with, you know, threat modeling.
6      Q.    So as an expert in cybersecurity, how
7  would you define threat modeling?
8      A.    You know, in practice, and, again,
9  across a wide variety of organizations and
10  experiences, threat modeling is, you know, used
11  fairly broadly to describe, you know, how a -- a
12  sort of process or a callout to, you know, look at
13  risks that, in particularly security risks or
14  cybersecurity threats and, you know, understand
15  how that is affecting, you know, the security
16  process you're either implementing or the project
17  that you've got underway.
18         That's how I think about threat
19  modeling.
20      Q.    And I know from your report, you're
21  familiar with NIST, right?
22      A.    The National Institute of Standards
23  and Technology?
24      Q.    Yes.
25      A.    Yes, I am.

35

1      Q.    And you're familiar with ISO?
2      A.    The institute, the International
3  Standards Organization.  Yeah, I'm aware of both
4  of those organizations.
5      Q.    And are you familiar with those
6  organizations' specific threat model structures
7  that they have put out?
8      A.    I've not yet -- I don't know that
9  either organization's put out any threat modeling.
10  They may have, right?  I'm more familiar with
11  cybersecurity frameworks that they've, you know,
12  put out.
13      Q.    And I guess what I'm trying to
14  understand is that the way you describe threat
15  modeling, you don't think of it necessarily as a
16  specific set of defined activities; is that fair
17  to say?
18      A.    That's fair.  I mean, there's -- a lot
19  of people do it a lot of different ways, in my
20  experience.
21      Q.    And if a company was performing threat
22  modeling, what sort of evidence would you expect
23  to see?
24      A.    I mean, you know, one would want to
25  see, you know, evidence that they were considering

36

1   threats that security concerns were baked into,
2   you know, development processes for technology
3   that were, you know, being considered that,
4   again -- you know, the notion that threat-based
5   risks were being considered as, you know -- you
6   know, and then incorporated in the activities that
7   were being -- you know, were underway.
8       That's how I think about, you know,
9   both threat modeling and, you know, what you would
10  be looking for in order to evidence the presence
11  of it.
12     **Q.**   And you've touched on a bit your
13  experience with cybersecurity assessments.
14      Have you ever had an experience in
15  which an organization was not following some of
16  the cybersecurity policies that it professed to
17  follow?
18     **A.**   You know, in general -- in general,
19  when one does an assessment, it's not a binary
20  sort of determination of, you know, follow versus
21  not follow.
22      It's, you know -- you know, an
23  assessment of the full set of procedures,
24  understanding evidence that you have available to
25  you.

37

1      You know, talking with, you know,
2  people in the company as well as if others have
3  assessed the same sort of, you know, either
4  program or process and, you know, determining, you
5  know, the degree of which, you know, in an
6  assessment, you know, that -- if we're looking at
7  a control or a control structure, that, you know,
8  that's in place in its maturity.
9     **Q.**   Just hypothetically, you've never had
10  a situation where a company said, we follow such
11  and such password policy, and then you went in,
12  looked under the hood, and they weren't actually
13  following that policy?
14     **A.**   I'm just trying to think of -- you
15  know, I definitely had instances where, you know,
16  you see a, you know, small number of violations in
17  a large organization, right?
18      I mean, that's natural, and it's
19  actually good that you're doing an assessment in
20  order to determine, you know, whether the
21  implementation all the way down to humans who make
22  errors are doing things in a -- you know, in a
23  situation.
24      You know, it is very rare, and I'm
25  trying to, you know, rack my brain to see that an

38

1   organization that said it had a policy is just
2  fundamentally absent in the performance of that.
3      Because, again, it's a -- sort of a
4  gradation from, you know, the presence of the
5  call-out to do something to how much is it being
6  done, right?  You know, either more or less.
7     **Q.**   Okay.  And I just want to back up a
8  second to -- before we get too far away from it.
9      You had talked about -- when I asked
10  you whether you personally conducted threat
11  modeling, and you said that you had done it many
12  times basically in the idea that in a security
13  program, you need to take into account
14  threat-based risks and identify threats to
15  organizations and threat actors.
16      And I'm just wondering, the sort of
17  steps that you listed that you've personally done,
18  would you consider these to be standard steps of
19  threat modeling in the cybersecurity field?
20     **A.**   You know, I don't think there's a
21  standard in this area.  This area in particular is
22  one of those where the concept is there, but
23  people execute it in very different ways.
24      So, you know, I don't -- in my
25  opinion, there's not a standard approach to doing

39

1   this.  There's a call-out to do it.
2     **Q.**   There's a couple -- we'll get to your
3  report in a second.  I promise.  But there's a
4  couple instances in your report were you mention
5  SOX -- and that's all caps S-O-X --
6     **A.**   Yeah.
7     **Q.**   -- audits.
8      Do you personally have any experience
9  with SOX audits?
10      MR. TURNER:  Object to form.
11      You're asking whether he's done them
12  or had experience.
13      MR. CARNEY:  Involvement whether he's
14  done them; involvement, any sort of experience
15  with them.
16      THE WITNESS:  Yes.  I -- you know,
17  again, broadly defined in terms of experience,
18  I've been, you know, in organizations including
19  JPMorgan that have undergone SOX audits.
20      And I've, you know, reviewed them many
21  times often as part of assessment processes, you
22  know, in companies just to take a look at what the
23  SOX audits show about -- you know, my focus has
24  generally been information security controls.
25  ///

40

BY MR. CARNEY:
Q.    In conjunction with the SOX audits,
have you had to make any determinations as to
whether particular controls related to financially
material systems?
A.    I have not --
MR. TURNER:  Object to form.
THE WITNESS:  Okay.
I have not been an auditor, so I
haven't, you know, made SOX audit determinations.
You know, again, I haven't played the auditor
role.
BY MR. CARNEY:
Q.    Okay.  Have you had any experience
within -- and this is capital S-O-C 2 audits?
A.    Yes.  Pretty much similar experiences.
You know, JPMorgan underwent SOC 2
audits.  I've seen a lot of SOC 2 auditing reports
in consulting engagements just in terms of, you
know, what SOC 2 auditors have said about control
structures and in organizations I've worked with.
Q.    All right.
(Whereupon, Exhibit 1 is marked for
identification.)
///

41

(Whereupon, Exhibit 2 is marked for
identification.)
MR. CARNEY:  The shorter one is
Number 1.  The bigger one is Number 2.  Here's
Number 2.  I might have another copy if you...
MR. TURNER:  No, that's fine.  I've
seen it before.
THE WITNESS:  I assume I'm not allowed
to write on these?
MR. TURNER:  I'm just going to put the
exhibit number on them.
THE WITNESS:  Okay.
BY MR. CARNEY:
Q.    All right.  Dr. Rattray, I've handed
you what the court reporter has marked as Rattray
Exhibits 1 and 2.
A.    Uh-huh.
Q.    And just for the record, Exhibit 1 --
and you can confirm this for me -- if you look at
the back, the last page, it should have a
December 30, 2024, date; is that right?
A.    The last page of the main report?
Q.    The last page of the entire document.
A.    Oh, the entire document?
Q.    Yeah.

42

A.    Yes.
Q.    Okay.
A.    Yes, December 30, 2024.
Q.    Right.
A.    Yeah.
Q.    And so this was a corrected report, if
you will, that made some sort of minor
typographical corrections to your earlier report;
is that right?
A.    That's what I remember as well.
Q.    Okay.  And so unfortunately, that
report didn't have the same appendices to it, so
I've handed you what's been marked as Exhibit 2,
which has your appendices with your documents
reviewed, your CV and your prior testimony.
MR. TURNER:  We would have been happy
to attach the same attachments, for the future.
Happy to send you something like that.
MR. CARNEY:  Not a big deal.
MR. TURNER:  Okay.
MR. CARNEY:  There's no...
MR. TURNER:  Killed a few trees in the
process.
MR. CARNEY:  Yeah.
///

43

BY MR. CARNEY:
Q.    So is it fair to say then, to
Mr. Turner's point, that the appendices in your
original report from November would be the same
appendices that would be attached to Exhibit 1?
A.    Yeah, as I remember reviewing the
minor revisions, I didn't see anything when I
reviewed them that would have indicated a change
in any of the attachments from the original
report.
Q.    Okay.  Great.
So let's focus on Exhibit 1 for the
moment.
Have you finished all the work that
you were assigned to do in this case?
A.    You know, I believe I have the right
if I receive new evidence to augment.  I don't
have any current plans to do so.
Q.    Okay.  Did you yourself write
Exhibit 1, your expert report?
MR. TURNER:  Object to form.
THE WITNESS:  I wrote the report.
And, you know, with the -- you know, with the
assistance and, you know, collaboration with the
law firm, Latham -- Latham & Watkins.

44

1  BY MR. CARNEY:
2      Q.    And aside from Latham & Watkins, did
3  anyone else help you write your report?
4      A.    I had research assistants from --
5  analysts from my consulting firm, but they did not
6  write any of my report.
7      Q.    And who were those research
8  assistants?
9      A.    Helen Lee.
10     Q.    Okay.  And do you know what Ms. Lee's
11 background is?
12     A.    I do.
13     Q.    And what is it?
14     A.    She's a graduate of Columbia
15 University, and it -- has a master's degree with a
16 focus on cybersecurity from the School of
17 International and Public Affairs and has been an
18 employee in my consulting group Next Peak.
19     Q.    So she's an employee of Next Peak?
20     A.    Yes.
21     Q.    And besides Ms. Lee, did anyone else
22 help you?
23     A.    No.
24     Q.    Okay.  Did anyone from SolarWinds help
25 you write this report?

45

1      A.    No.
2      Q.    I don't want you to tell me the
3  substance of it.  Your communications with counsel
4  are covered by the work product, Rule 26.
5           But did you -- did counsel provide
6  comments to you on your drafts of this report?
7      A.    Yes.
8      Q.    And did you incorporate some of those
9  comments?
10          MR. TURNER:  I'm just going to object
11 to the questions in terms of starting to get into
12 the details of the drafting process.
13          MR. CARNEY:  Okay.
14 BY MR. CARNEY:
15     Q.    I don't want to get into the details
16 of the drafting process.  But I'm just trying to
17 understand how this came about.
18          Did -- you're familiar with Tim Brown,
19 right?
20     A.    I am.
21     Q.    Did he provide any comments or
22 suggestions to your draft reports?
23     A.    I had one conversation with Tim about
24 specifics on how, you know, his practice reviewed
25 logging data.  He did not comment on the report.

46

1      Q.    And when you say "logging data," is
2  that related to access controls?
3      A.    It may be related -- we should look at
4  the specifics.
5      Q.    Okay.
6      A.    You know, it may be access controls.
7  It may be, you know, firewall -- the use of
8  firewall.  But we can look into the specifics in
9  the report.
10     Q.    Okay.  And are all of the opinions
11 you're offering in this case set forth in this
12 report, Exhibit 1?
13     A.    You know, as of today, yes.
14     Q.    And as of today, you said, I think,
15 you don't plan to offer any additional opinions?
16     A.    That's --
17          MR. TURNER:  Objection.
18          (Pause in testimony.)
19          THE STENOGRAPHER:  I don't have a full
20 answer.
21          THE WITNESS:  You know, as I answered
22 previously, I don't have any current plans to
23 revise this report.
24 BY MR. CARNEY:
25     Q.    Okay.  And if you could just briefly

47

1  look at Exhibit 2.  And, actually, it might be
2  helpful that we have it as two separate exhibits,
3  because you can look at them side by side.
4           If you look at Appendix A to
5  Exhibit 2, is that a copy of your CV?
6      A.    Yes, it is.
7      Q.    And is this -- I'm not going to ask
8  you to review the whole thing, but as far as you
9  know it, does this accurately reflect your
10 education and experience?
11     A.    I believe it does.
12     Q.    And you've served as an expert in a
13 couple other cases; is that right?
14     A.    That's correct.
15     Q.    And how many -- was it two?
16     A.    It's two, yeah.
17     Q.    Okay.  And has your expert testimony
18 ever been excluded in whole or in part by a Court?
19     A.    No.
20     Q.    Has the Court ever imposed any kind of
21 limitations on your ability to offer your expert
22 opinions?
23     A.    No.
24     Q.    In the course of serving as an expert
25 witness, has opponent ever filed a Daubert motion

48

1  against you?
2      **A.**    Not to my knowledge.
3      **Q.**    And we talked a little bit about
4  your -- you know, your arrangement here, but can
5  you just describe to me how did you become -- come
6  to be retained as an expert in this case?  Who
7  contacted you?
8          THE WITNESS:  I believe, Serrin, it
9  was you.  But it was definitely from Latham &
10  Watkins.
11  BY MR. CARNEY:
12      **Q.**    And had you ever worked with
13  Mr. Turner before this case?
14      **A.**    I had not.
15      **Q.**    And do you know how he got your name
16  or who referred you to him?
17      **A.**    I don't know how he got my name.
18      **Q.**    Man of mystery.
19      **A.**    I mean, again --
20      **Q.**    Yeah.
21      **A.**    -- I don't know.
22          MR. TURNER:  He has a reputation in
23  this space.  What can I tell you?
24          MR. CARNEY:  All right.
25  ///

49

1  BY MR. CARNEY:
2      **Q.**    Okay.  Prior to your retention, did
3  you know anything about the SEC's case against
4  SolarWinds?
5      **A.**    Yes.  I was aware that -- I'm trying
6  to remember if the case had been filed, but I was
7  aware that there was, you know, activity between
8  the SEC and SolarWinds.
9      **Q.**    Okay.  Did you recall when you were
10  retained on this case?
11      **A.**    I believe it was about October -- I
12  don't want to be held to the month -- of 2023.
13          MR. TURNER:  Chris, whenever you have
14  a moment, we've been going for about an hour.
15  Take a break.
16          MR. CARNEY:  Sure.  We can take a
17  break now.  Want to take?
18          MR. TURNER:  Yeah, thanks.
19          MR. CARNEY:  10 minutes?
20          THE VIDEOGRAPHER:  The time right now
21  is 10:32 a.m.
22          We are off the record.
23          (Whereupon, a recess was taken at
24          10:32 a.m.)
25          THE VIDEOGRAPHER:  The time right now

50

1  is 10:44 a.m.
2          We're back on the record.
3  BY MR. CARNEY:
4      **Q.**    Okay.  Dr. Rattray, before we broke,
5  you had mentioned that you had some familiarity
6  with the SEC's case against SolarWinds before you
7  became personally involved in the case; is that
8  right?
9      **A.**    That's right.
10      **Q.**    And how did you acquire that
11  knowledge?
12      **A.**    You know, in my field, you know, in
13  what I do, you know, you're reading news related
14  to cybersecurity.
15          So the SEC action, and I forget the
16  sort of specific legal terminology around the
17  action, but sort of the original, you know,
18  publicly known investigation, you know, I was just
19  reading reporting on that.
20      **Q.**    Okay.  And were you familiar with what
21  was known as the Sunburst incident?
22      **A.**    Yes, I am.  Yes, I am.
23      **Q.**    Okay.  And did you write any articles
24  on that, do you recall?
25      **A.**    No.  I did not, that I can recall.

51

1      **Q.**    And I'll remind you this:  When I'm
2  asking you this question, I understand you're not
3  a lawyer.  I'm not asking you for legal opinions
4  or conclusions, but what is your understanding as
5  to the basis of the SEC's case against SolarWinds
6  and Tim Brown, as we sit here today?
7          MR. TURNER:  Object to form.
8          THE WITNESS:  You know, again, with
9  your disclaimer, like, I'm not a lawyer and, you
10  know, I'm not trying to offer legal opinion, you
11  know, my understanding is the SEC is asserting
12  that, you know -- assertions in the security
13  statement are potentially fraudulent, because
14  SolarWinds and Tim Brown, you know, knew that the
15  state of their security was not -- not in line
16  with what was, you know, said in the security
17  statement.
18  BY MR. CARNEY:
19      **Q.**    Okay.  And once again, setting aside
20  legal requirements, as a cybersecurity
21  professional, do you believe it's important for
22  companies and individuals to be truthful when
23  making statements about their cybersecurity
24  practices?
25      **A.**    Yes, I do.

52

1    Q.    And why do you believe that?
2    A.    You know, in general, you know,
3    cybersecurity is a complex, challenging field.
4    And, you know, in -- our ability to pursue it, you
5    know, needs to be based on, you know, good
6    information that we need to trust that when we're
7    communicating with each other, that, you know, to
8    the best of an individual's, you know, ability,
9    that they're representing things accurately.
10    Q.    And if I could ask you, sir, to turn
11    to paragraph 13 of Exhibit 1.
12          And you can read that whole paragraph
13    to yourself if you want, but --
14    A.    Oh, sorry.  I turned to page 13.
15    Q.    I'm sorry.  Page 5, paragraph 13.
16          MR. TURNER:  Which one are we on?
17    Exhibit 1 or Exhibit 2?
18          MR. CARNEY:  Exhibit 1.  Thank you.
19          THE WITNESS:  Yes.  I've read it.
20    BY MR. CARNEY:
21    Q.    And in the third sentence, you say, "I
22    understand that the Securities & Exchange
23    Commission (SEC) has alleged that these
24    representations were false or misleading during
25    the time period from SolarWinds's initial public

53

1    offering which occurred on October 19, 2018, to
2    January 12, 2021."
3          And you refer to that as the relevant
4    period.
5          Once again, not asking for a legal
6    opinion, but what is your understanding as to what
7    it means for a representation to be false or
8    misleading as you use that term in this sentence?
9    A.    Yeah, I'm not quite sure how I can --
10    you know, I could reframe words, but to me, those
11    are pretty -- you know, do you want me to define
12    what's a falsehood?
13    Q.    And fair question.  I'm just trying to
14    understand your use of the term, so let me give
15    you a -- try to give you a hypothetical.  And once
16    again, this is a hypothetical.  I'm not saying
17    this is SolarWinds's here.
18          But let's say you refer to a time
19    period October of 2018 to January of 2021.  Let's
20    say that they -- a company said they were
21    following certain cybersecurity practices during
22    that period --
23    A.    Yes.
24    Q.    -- but they're only following it for a
25    short amount of that period.

54

1          Would that be, in your view, a
2    misstatement?
3          MR. TURNER:  Object to form.
4          THE WITNESS:  You know, I don't know
5    that -- I think in that particular set of
6    hypothetical circumstances, you know, I think
7    you'd have to go deeper and, you know -- does it
8    cover 99 percent of the period?  Did it cover
9    2 percent of the period?
10          Again --
11    BY MR. CARNEY:
12    Q.    Let's say --
13    A.    -- no --
14    Q.    All right.  I'll change my
15    hypothetical then to fit that then.
16    A.    Okay.
17    Q.    Let's say instead of it being from --
18    the policy being -- follow from October of 2018 to
19    January of 2021, it was followed from October of
20    2018 to October of 2019, would that be a
21    misleading statement if they said they followed it
22    for that entire period?
23          MR. TURNER:  Object to form without
24    more specifics.
25          THE WITNESS:  Again, we're talking

55

1    about, again, in this case, the company saying
2    something -- you know, they -- they performed --
3    you know, they said they performed a practice and
4    they only performed it for half the time of a
5    period --
6    BY MR. CARNEY:
7    Q.    Yes.
8    A.    -- I just want to make sure I'm
9    understanding.
10          You know, in terms of that being false
11    or misleading, I think it would have to link to
12    whether the company -- the company had represented
13    they were following it for the full period or not,
14    right, you know.
15    Q.    Okay.
16    A.    Yeah.
17    Q.    So my hypothetical was they said,
18    we're doing this, let's say it's strong access
19    controls for this entire period, but it turned out
20    they were only doing it for that year.
21          And I'm just trying to make the
22    hypothetical as simple as possible.
23          MR. TURNER:  Object to form.  Object
24    to the term "strong."
25          THE WITNESS:  Yeah, I actually think,

56

```
 1   you know, not being a lawyer and not, you know,
 2   understanding what, you know, is defined as false
 3   or misleading -- right? -- and my job was to just,
 4   you know, look at the presence, you know,
 5   basically were they doing what they represented.
 6   So we might come back to this.
 7           But, like, in determining whether
 8   something is false or misleading probably wasn't
 9   in the scope for me.  It was -- I was trying to
10   determine what -- what they said in the statement,
11   were they doing it, which in all cases of things I
12   examined, they were.
13   BY MR. CARNEY:
14       Q.    Okay.  I'll change my hypothetical to
15   match that then.
16           Let's say the company said, we have a
17   complex password policy that we followed from
18   October of 2018 to January of 2021.
19           Do you follow that so far?
20       A.    Yeah.  Hypothetical that the company
21   said they had a complex password policy during
22   that period.
23       Q.    Okay.
24           MR. TURNER:  Object to form.
25   ///
```

57

```
 1   BY MR. CARNEY:
 2       Q.    And then but in actuality after a
 3   year, they just completely stopped enforcing that
 4   password policy in 2019.
 5           Would that statement, in your view,
 6   not a legal view, be incorrectly describing their
 7   cybersecurity practices?
 8       A.    I just want to make sure I understand,
 9   you know.  Is the question whether they, you know,
10   misrepresented on having a policy, or is it a
11   question -- a question of if they stopped -- you
12   used the word "enforcement" in the middle of the
13   period, you know, did they -- I'd have to look at
14   the actual written statement to make a
15   determination of misrepresentation if, you know,
16   they had a policy and then the details around what
17   constituted the drop-off in enforcement to make a
18   determination around this misrepresentation.
19       Q.    All right.  Fair enough.  I'll adjust
20   the hypothetical to address that.
21           Let's say after the year, company --
22   internal email memo said, we are no longer -- have
23   this policy, this complex password policy from now
24   on, but they represented to the public that they
25   had it for the entire 2.5 year period.
```

58

```
 1       A.    You know, to the extent to which --
 2   you know, I'd have to understand the context
 3   around the email, whether it was an authoritative
 4   statement, you know, to the company.
 5           I mean, yeah, so if -- you know, if
 6   they -- if they said they were doing something and
 7   then, you know -- and in a -- you know, provably
 8   factual way they said they stopped doing it during
 9   the period but continued to represent that they
10   were -- I mean, in some ways it just goes --
11   revolves around to if they were saying they were
12   doing it during a period and they, you know, had
13   said that they weren't doing it in the same
14   period, you know, that probably seems to be a
15   misrepresentation.
16       Q.    Okay.  Prior to your retention by
17   SolarWinds via Latham & Watkins, had you ever
18   discussed this case with any SolarWinds employee?
19       A.    No.
20       Q.    Aside from your work on this case,
21   have you ever done any other work for SolarWinds?
22       A.    No.
23       Q.    So you've never consulted on
24   cybersecurity issues for SolarWinds apart from
25   this case?
```

59

```
 1       A.    That's correct.
 2       Q.    Prior to your work on this case, have
 3   you ever done any work for Latham & Watkins?
 4       A.    No.
 5       Q.    And I think it's in your report, but
 6   do you recall what your hourly rate is for this
 7   case?
 8       A.    It's $1,100 an hour.
 9       Q.    Okay.  And I think you said that you
10   personally billed about 200 hours; is that right?
11       A.    Yeah.  Again, I have not looked at
12   each of the invoices over the period.  I think
13   that's in the ballpark, but it might be a big
14   ballpark.
15       Q.    And was it -- was it Ms. Lee that you
16   said also worked on the case with you?
17       A.    That's right.
18       Q.    And do you know how many hours she's
19   billed?
20       A.    I don't know how many hours she's
21   billed.
22       Q.    Just quickly, did do you anything to
23   prepare for the deposition today?
24       A.    Yes, I did.
25       Q.    And what did you do?
```

60

1    A.    I primarily reviewed my report and
2  Mr. Graff's report, you know, some of the
3  documentation that was cited in both reports, I
4  had discussions with the Latham team.
5    Q.    Okay.  Did you meet with the Latham
6  team in preparation for your deposition?
7    A.    Yes, I did.
8    Q.    And how many times did you meet with
9  them?
10   A.    I would say probably three sessions
11 focused on this deposition.
12   Q.    Okay.  And were those sessions in
13 person?
14   A.    I was here Monday afternoon and
15 yesterday.  So two of those -- you know, two of
16 those were in person.
17   Q.    Okay.  Did you speak with anyone else
18 other than counsel in preparation for your
19 deposition?
20   A.    No.
21   Q.    And so how long did you meet with
22 defense counsel in total to prepare for your
23 deposition would you say in terms of hours?
24   A.    Meet with counsel?  You know, I would
25 say -- again, focused on the deposition --

61

1    A.    I --
2        MR. TURNER:  Object to form.
3        THE WITNESS:  Yeah.
4        MR. TURNER:  And object to getting
5  into any conversations with counsel about that.
6  BY MR. CARNEY:
7    Q.    Yeah.  I don't want to get into any
8  conversations.  I want to understand what the
9  process by which you received these documents
10 were.
11        Did you choose them?  Did they choose
12 them?  How did that come about?
13        MR. TURNER:  Do you want to ask more
14 generally about the types of documents he was
15 interested in reviewing?
16 BY MR. CARNEY:
17   Q.    I guess I want to understand, did you
18 have a role in selecting what documents you looked
19 at, or did someone else select them for you?
20        MR. TURNER:  Object to the form.
21 "Select."
22        THE WITNESS:  Proceed?
23        MR. TURNER:  Yes, you can.
24        THE WITNESS:  Yes, I did have a role
25 in that.

63

1  right? -- 10, 12 -- between 10 and 15 hours maybe.
2    Q.    All right.  Sir, I want to ask you
3  now -- and I'm going to ask you on Exhibit 2, you
4  have an Appendix C at the back.  It's the -- I
5  think it's the last appendix --
6    A.    Yep.
7    Q.    -- list of materials you considered in
8  preparing your report.
9        And did you personally review each of
10 the materials listed in Appendix C?
11   A.    Yes, I did.
12   Q.    And over what time period did you
13 review all of those materials?
14   A.    You know, there's materials, you know,
15 that I received during the course of this.  A
16 large amount of the materials, but particularly
17 what I call these tranches of data about the
18 presence of controls, you know, I really only
19 reviewed in October and November of this past
20 fall.  So October and November of 2024.
21        But, again, I had access to some of
22 the documents cited from earlier -- you know,
23 earlier in the proceeding.
24   Q.    Okay.  Did counsel choose the
25 documents for you to look at?

62

1  BY MR. CARNEY:
2    Q.    And what was your role?
3    A.    You know, as I was conducting my, you
4  know, work, I wanted -- I requested to see, you
5  know, documentation, you know, particularly around
6  the implementation of practices and controls.
7    Q.    Okay.  Did you provide counsel with
8  search terms to use in looking for documents?
9    A.    You know, to the extent to which I
10 gave language around -- around the types of
11 controls that I was looking for, evidence, you
12 know, of practice, I don't know if we call those
13 search terms or not, but I definitely used
14 language to communicate to them what I was looking
15 for.
16   Q.    Did you have a keyword list that
17 you --
18        MR. TURNER:  I'll object to form.
19        These are conversations with counsel.
20 I can represent that the witness asked for various
21 types of documents related to the security domains
22 at issue, and SolarWinds tried to provide
23 documents that were responsive to those requests.
24 BY MR. CARNEY:
25   Q.    And so Solar -- did you have any

64

1  communications directly with SolarWinds about the
2  documents that you wanted?
3      A.   I had conversations with SolarWinds,
4  two short conversations with SolarWinds people
5  about questions I had upon looking at the
6  documents.  I did not -- I did not request
7  directly from SolarWinds documentation.
8      Q.   Okay.  And were those conversations
9  with Mr. Brown and Mr. Kline?
10      A.   That's correct.
11      Q.   Okay.  So, first of all, the
12  conversation with Mr. Brown, what did you discuss
13  with him?
14      A.   Again, in both cases, I was just
15  trying to understand some of the more detailed,
16  you know, documentation and how the teams that
17  they were responsible for, you know -- you know,
18  worked with that documentation logging data and
19  those sorts of things.
20      Q.   And were those conversations over the
21  phone?
22      A.   I'm trying to remember if they were
23  Zoom or phone or -- they were remote
24  conversations.
25      Q.   Okay.  And were they separate

65

1  conversations, your conversation with Mr. Brown
2  and with Mr. Kline?
3      A.   Yes, they were.
4      Q.   And do you recall when those
5  conversations took place?
6      A.   Not specifically.  I believe it
7  probably was November '24.
8      Q.   Okay.  And was it just you and
9  Mr. Brown on the call, or were counsel on the call
10  as well?
11      A.   Counsel was on the call.
12      Q.   In preparing your opinions set forth
13  in Exhibit 1, did you consider any sources not
14  cited in Exhibit 1 in Appendix C?
15      A.   Can you just sort of restate that?
16      Q.   Sure.
17      A.   I just want to make sure I get the
18  causality.
19      Q.   Yeah.  All I'm getting at is, are
20  there documents that aren't sort of reflected or
21  described in your report?
22      A.   No, I don't think so.
23      Q.   Okay.  On page 1 of Exhibit 1,
24  paragraph 2, you say, "Having conducted or
25  overseen numerous cybersecurity assessments, I'm

66

1  very familiar with how such assessments are
2  ordinarily done.
3          "An outside expert assessing whether a
4  company has certain controls in place gathers
5  information from people in the company who are
6  knowledgeable about the controls in order to
7  understand how they are designed and looks for
8  artifacts generated from the operation of those
9  controls to ensure that they were implemented."
10          So I want to ask you about that.
11      A.   Uh-huh.
12      Q.   In this case, you were in 2024 trying
13  to assess whether SolarWinds had certain controls
14  in place during what you described as the relevant
15  period of October of 2018 to January of 2021,
16  right?
17      A.   That's correct.
18      Q.   Prior to this case, have you ever
19  previously been asked to assess whether a company
20  had cyber -- cybersecurity controls in place years
21  earlier than the time at which you were conducting
22  your assessment?
23      A.   Yes.
24      A.   And when was that?
25      A.   Certainly in the matter that's listed

67

1  where I was an expert, the Insulet case.  That was
2  the situation there as well.
3      Q.   And what was the situation in the
4  Insulet case?
5      A.   The Insulet case was a trade secret
6  matter, and so it was the plaintiff.  And the
7  defendants -- there were questions by the
8  defendants about the presence of reasonable
9  measures that, you know -- in place at Insulet.
10          And, you know, my -- role was to
11  assess whether those information security measures
12  were in place.
13      Q.   And were you an expert for the
14  defendant in that case?
15      A.   No.  I was an expert for the plaintiff
16  Insulet.
17      Q.   For Insulet.
18          And you were assessing whether the
19  controls that they said they had in place to
20  protect the trade secrets were actually there?
21      A.   Yeah.  I mean, you know, in trade
22  secret cases, you know, the language, I believe,
23  is -- not being a lawyer -- is reasonable
24  measures.  So, you know, my -- my expert opinion,
25  you know, talked to the measures they had and

68

1 their information security practice.
2     Q.   Okay.  And in that case, were you
3 looking at the policies that Insulet had in place,
4 or were you also looking at the artifacts showing
5 the implementation of those policies?
6     A.   Both.
7     Q.   And how many years earlier were you
8 looking from when you were offering your
9 assessment?
10     A.   Many.  You know, from -- as -- you
11 know, even earlier to a degree, but probably would
12 call the start date 2007 and -- to about 2014 --
13 that was the period where, you know -- that was
14 the focus.
15     Though -- the case did -- did require
16 me to look post-2015, effectively up to the
17 present day.  But the focus was in that earlier
18 period.
19     Q.   And did you testify at trial in that
20 case?
21     A.   I did.
22     Q.   And what was the result of that case?
23     A.   Insulet won that case.
24     Q.   Now, sir, in paragraph 3, the first
25 sentence is -- you say, "Applied these standard

69

1 practices in assessing whether SolarWinds
2 implemented the practices at issue in the
3 securities statement."
4     So my question for you is:  What are
5 the standard practices in conducting an assessment
6 as to whether a company employed cybersecurity
7 practices years earlier than the time you're
8 looking at?
9     MR. TURNER:  Object to form.
10     THE WITNESS:  You know, in my opinion,
11 you know, having, again, done it in the one case,
12 but in almost all assessments, you're looking to
13 some degree into the past, right?  You know, in
14 terms of -- you know, the presence of policies,
15 some of which can be -- have been in place for
16 years.
17     So I guess is the question about is
18 there a distinction between the methodology for
19 past situations and current situations, or just
20 was is the standard methodology?
21     Q.   Yeah, so why don't we do both.
22     A.   Okay.
23     Q.   Why don't we say what is the standard
24 methodology, and then you can tell me if there's a
25 difference.

70

1     A.   Okay.  Yes.  So if -- I'll answer the
2 second question first, there's not really a
3 difference, right, you know?
4     Q.   Okay.
5     A.   So in terms of, you know, how one
6 conducts an assessment, you know, you are looking
7 for, you know, the presence of policy and
8 procedure.  You know, evidence that managers, you
9 know, are -- you know, are running those policies
10 and procedures.
11     Could be through interviews, in the
12 case of SolarWinds, this case, significant
13 testimony through depositions.
14     And then, you know, artifacts showing
15 those practices and implementation as well as
16 looking at, if it's available, other outside
17 assessments, you know, that are -- you know, sort
18 of who are -- have also been conducted such as
19 we've discussed, the Sarbanes-Oxley and the SOC 2
20 audits.
21     So my -- you know, my approach to this
22 practice or what I believe to be standard practice
23 is using those sets of evidence to assess whether
24 the practice is in place.
25     Q.   All right.  And I just want to sort of

71

1 backtrack to something that I asked you about
2 before the break.
3     You're not an accountant, right?
4     A.   I'm not.  I don't hold a certified
5 public accounting certification, no.
6     Q.   And you don't have expertise as to
7 whether a statement is material within the meaning
8 of GAAP, right?
9     MR. TURNER:  Object to form.
10     THE WITNESS:  Yeah, and I assume GAAP,
11 you're talking about generally accepted accounting
12 principles?
13 BY MR. CARNEY:
14     Q.   Right.
15     A.   Can you repeat the question?
16     Q.   Sure.
17     You don't have expertise in whether a
18 statement is material within the meaning of GAAP,
19 right?
20     A.   No.
21     Q.   Okay.  And you don't have -- profess
22 to have expertise as to whether an accountant, a
23 CPA would find a statement to be misleading under
24 GAAP, right?
25     MR. TURNER:  Object to form.

72

1      THE WITNESS:  Yeah, I don't.
2  BY MR. CARNEY:
3      Q.    Okay.  All right.  Let me ask you,
4  paragraph 4, which is on page 2, you say -- with
5  regards to Mr. Graff's report, there's a statement
6  down in sort of the middle of the paragraph, you
7  say, "The documents he cites generally have little
8  to do with the practices described in the security
9  statement, et al."
10     What does that mean?
11     A.    Generally -- right? -- you know, I
12 found that some -- you know, the documents such as
13 some of the emails and PowerPoint documents, you
14 know, were not direct evidence of whether the
15 practices in the securities statement were in
16 place.
17     Q.    But when you say they have little to
18 do with the practices, are you saying they're just
19 completely unrelated to cybersecurity at
20 SolarWinds?
21     MR. TURNER:  Object to form.
22     THE WITNESS:  You know, this sentence,
23 you know, is focused on the fact that those
24 documents are not the most relevant documents
25 related to the practices.

73

1  BY MR. CARNEY:
2      Q.    And what do you mean by that?  When
3  you say "practices," what do you mean?
4      A.    Things like the presence of access
5  controls or password.
6      Q.    All right.  Can you think of an
7  example that he cites as little to do with the
8  practices described in the securities statement?
9      A.    I mean, one would be the -- you know,
10 the FedRAMP assessment.
11     Q.    And why does that have little to do
12 with the practices described in the securities
13 statement?
14     A.    Because that assessment was conducted
15 in a quick and dirty fashion for a budgeting
16 exercise.
17     Q.    But would you agree that the subject
18 of the assessment related to the practices at
19 issue in the security statement?
20     A.    Can you repeat the question?
21     Q.    Sure.
22     Would you agree that the subject of
23 the FedRAMP assessment related to the practices at
24 issue in the security statement?
25     MR. TURNER:  Object to form.

74

1      Are you asking whether the FedRAMP
2  assessment was an assessment of the securities
3  statement?
4      MR. CARNEY:  No.  I'm asking -- he
5  said that the documents had little to do with the
6  practices described in the securities statement.
7  BY MR. CARNEY:
8      Q.    And I'm simply asking whether the
9  FedRAMP items that were being assessed did, in
10 fact, relate to the practices that are described
11 in the securities statement.
12     A.    You know, I just want to make sure,
13 because it wasn't a security assessment and, you
14 know -- you know, it really didn't, you know, have
15 bearing on whether SolarWinds had done the things
16 that they said in the securities assessment,
17 right?
18     Yeah, I mean, again, that's why I --
19 you know, that's an example of something that he
20 cites that is really not, in this case, related to
21 the security statement.
22     Q.    All right.  Is there an industry
23 standard for determining whether a company has
24 properly employed cybersecurity practices?
25     A.    There are lots of standards about

75

1  cybersecurity practices.
2      Q.    But is there a sort of overarching
3  standard that's used in determining whether a
4  company is properly employing the security --
5  cybersecurity practices it professes to follow?
6      MR. TURNER:  Object to form.
7      And the witness has already explained
8  what he understood to be the standard approach to
9  assessing that issue.
10     THE WITNESS:  Again, there are, you
11 know, systems and frameworks, you know,
12 promulgated by different organizations around
13 cybersecurity.  You know -- you know, my
14 estimation is there's not one overarching singular
15 standard.
16 BY MR. CARNEY:
17     Q.    Okay.  And I guess in a related
18 question, so is there not -- is there a particular
19 standard that you followed in determining whether
20 SolarWinds employed the cybersecurity practices it
21 professed to employ that you're saying that
22 Mr. Graff didn't follow?
23     A.    My assessment was based on, you know,
24 my experience in, you know, the conduct of
25 assessments that utilize a variety of -- you know,

76

1  my experience includes assessments that are done
2  under a number of different frameworks, which I've
3  cited in my report.
4      The assessment wasn't aligned to a
5  specific standard.
6      Q.    All right.  Now I want to get into
7  your qualifications briefly.
8      So maybe if you have -- you have
9  your -- your report, which is Exhibit 1, and then
10 Exhibit 2, we have your CV?
11     A.    Uh-huh.
12     Q.    If you could just open up your CV --
13     A.    Yep.
14     Q.    -- that would be great.  So in
15 paragraph 6, it says that you're currently a
16 partner at Next Peak LLC, a cybersecurity
17 consulting company that you cofounded in 2019; is
18 that right?
19     A.    That's right.
20     Q.    And then over on your CV, Exhibit 2,
21 you see it has a similar entry.
22     Do you see that?
23     A.    Am I looking at two different things
24 or --
25     Q.    Yeah.  So I was looking at -- side by

77

1  side, I was looking at page 2 --
2      A.    Okay.
3      Q.    -- of Exhibit 1 --
4      A.    Gotcha.
5      Q.    -- sorry about that.
6      A.    No worries.  Okay.
7      Q.    And, yeah.  So paragraph 6 describes
8  your work at Next Peak; is that right?
9      A.    That's correct.
10     Q.    And then your CV also has a similar
11 entry about that, right?
12     A.    That's correct.
13     Q.    And then in paragraph 6, it says --
14 the last sentence, it says, "My teams also assist
15 our clients in conducting penetration testing and
16 red team exercises, both of which involve
17 structured testing efforts to find flaws and
18 vulnerabilities in IT defenses."
19     So have you -- I'm just trying to
20 understand how this works.  Have you personally
21 ever conducted penetration testing?
22     A.    I guess my -- can I ask a
23 clarification?
24     Q.    Absolutely.
25     A.    You know, I have had, you know,

78

1  oversight of teams.  So personally conducted, I
2  have been in rooms during the conduct of
3  penetration tests and red team exercises.
4      As we've discussed, I'm not a coder,
5  and I did not launch the specific tools during --
6  you know, during penetration testing and
7  exercises.
8      I very much read the results, the
9  outputs and, you know, been involved in the
10 determination of, you know, the data we received
11 back and how to report it to the clients.
12     Q.    Okay.  And you mentioned that you
13 didn't launch the specific tools.  Is that
14 something you could do, though, launch the
15 specific tools for penetration testing?
16     A.    Again, I'm just trying to be precise.
17 I could launch them, right?
18     I would probably not want myself to be
19 doing that, because you want people that know how
20 to use those tools and have a -- sort of
21 experience and are proficient in them, which is
22 not my expertise.
23     Q.    Okay.  And then it also mentions red
24 team exercises.
25     Have you personally conducted red team

79

1  exercises?
2      MR. TURNER:  Object to form.
3      THE WITNESS:  Again, I mean, I think
4  I've answered that in the sense that it -- what I
5  said about being physically present -- you know,
6  designing the exercises, being physically present
7  during their execution.  Being part of the team
8  that decided, you know, what we saw in -- you
9  know, and discussed -- you know.
10     To me that's participation at a deep
11 level in the conduct of the exercise.
12 BY MR. CARNEY:
13     Q.    Okay.  But a similar -- so, first of
14 all, do you need any certain certifications to be
15 able to conduct red team exercises?
16     A.    Legally?  I mean, like, required?
17 Required by whom?
18     Q.    Or just from a technical standpoint.
19     A.    Again, required?  You used the verb
20 "required."
21     Q.    Right.
22     A.    I'm just trying to -- like, who's
23 requiring it?
24     Q.    Could someone carry out a red team
25 exercise if they didn't have certain technical

80

1  certifications?
2      **A.**   I wouldn't advise that, but it's
3  legally permissible.
4      **Q.**   Okay.  And what type of certifications
5  does someone have who's conducting a red team
6  exercise?
7      **A.**   There are certifications -- well,
8  again, the conduct involves many people, you know,
9  in terms of design, you know, oversight, you know,
10 technical activity, you know, analysis and
11 reporting.
12         So, you know, different certifications
13 are probably applicable to different -- to
14 different activities and different qualifications
15 exist across that set of things that, you know,
16 are inherent in the conduct of a red team exercise
17 or a pen test.
18     **Q.**   Have you taken any formal training in
19 pen tests?
20     **A.**   Formal training, I have not undertaken
21 any formal training.
22     **Q.**   All right.  Let me move on to the next
23 paragraph.  It says, "Additionally, I am the chief
24 strategy and risk officer for Andesite AI, early
25 stage company focused on the improvement of

81

1  cybersecurity operations through advanced data
2  science and artificial intelligence."
3         So -- and looks -- if you look at your
4  CV next to it, it says 2023 to the present.
5         So you've had both these jobs at
6  Andesite and Next Peak at the same time?
7      **A.**   That's correct.
8      **Q.**   And do you collect a salary from
9  Andesite?
10     **A.**   Yes, I do.
11     **Q.**   Okay.  Are you an owner of Andesite?
12     **A.**   I have a small amount of equity in
13 Andesite.
14     **Q.**   And what are --
15     **A.**   Actually, they're options.  So they
16 haven't been exercised yet.
17     **Q.**   And is Andesite publicly traded?
18     **A.**   No.
19     **Q.**   I guess it says right there.
20         What are your responsibilities at
21 Andesite?
22     **A.**   I'm on the senior management team.
23 You know, again as -- primarily as the chief
24 strategy officer, I advise the CEO and the board
25 on, you know, the direction of the company,

82

1  everything from market opportunity to, you know,
2  the direction of the product.
3      **Q.**   How do you split your time between
4  Next Peak and Andesite, 50/50 or more at one?
5      **A.**   It's probably close to 50/50.  You
6  know, it very much varies from week to week.
7      **Q.**   Okay.  All right.  Okay.  If we move
8  on to paragraph 8, it says, "From 2014 to 2019, I
9  was chief information security officer and head of
10 global cyber partnerships at JPMorganChase where I
11 directed its cyber defense program and oversaw
12 more than a thousand personnel in a $500 million
13 budget."
14         And if be we look over in Exhibit 2 on
15 A-2, second page of your CV, it also says, "chief
16 information security officer and head of global
17 cyber partnerships 2014 to 2019"; is that right?
18     **A.**   That is right.
19     **Q.**   So let me break that down.
20         So from 2014 to 2019, you were what
21 was called the CISO at JPMorganChase?
22     **A.**   I was the CISO for a year, 2014 to
23 2015, and then I was asked to take a broader role
24 as the head of global cyber partnerships.
25     **Q.**   So on your risumi, on your CV, and in

83

1  the report, where it says that you were the CISO
2  from 2014 to 2019, that's not accurate, is it?
3      **A.**   You know, I believe it's accurate to
4  say that I was -- during that period, I was the
5  chief information security and then had a role as
6  the head of global cyber partnerships.
7      **Q.**   Okay.  The second part of the first
8  sentence in paragraph 8 where it says, "Where I
9  directed its cyber defense program," that's the
10 responsibilities of the CISO -- right? -- to
11 direct the cyber defense program?
12     **A.**   It is the -- you know, the
13 responsibility of the -- the team that CISO is the
14 senior director.  I would agree with that.
15     **Q.**   Okay.  And a CISO is the one that
16 directs the cyber defense program, right?
17     **A.**   Yeah, I mean -- yes.
18         MR. TURNER:  Are you asking at
19 JPMorgan?
20         MR. CARNEY:  At JPMorganChase.
21         THE WITNESS:  Yeah, yeah --
22         MR. CARNEY:  Yes.
23         THE WITNESS:  -- yeah.
24 BY MR. CARNEY:
25     **Q.**   So you directed the cyber defense

84

1   program at JPMorgan from 2014 to 2015, right?
2     **A.**   That's right.
3     **Q.**   You didn't direct the cyber defense
4   program at JPMorgan from 2014 to 2019, did you?
5     **A.**   From 2015 to 2019?
6     **Q.**   From 2015 to 2019.
7     **A.**   That's right.
8     **Q.**   Okay. So is it fair to say that this
9   sentence here in your report is inaccurate?
10     **A.**   No. Because the sentence reads I was
11   the chief information security officer and had
12   global cyber partnerships, and I did direct the
13   cyber defense program during that period.
14     **Q.**   But you only -- you would agree that
15   it says from 2014 to 2019, right?
16     **A.**   Right.
17     **Q.**   And you only directed that program
18   from 2014 to 2015; is that right?
19     **A.**   Right. I think it's, you know, an
20   issue of, you know, semantic interpretation, you
21   know, my interpretation would be that that --
22   during that period, that was one of my duties.
23     **Q.**   Okay. And if we look over at your CV
24   on page A-2, it says, "chief information security
25   officer and head of global cyber partnerships,

1   managing director, JPMorganChase from 2014 to
2   2019," right?
3     **A.**   That's correct. The same as the other
4   document. That's correct.
5     **Q.**   So you would agree that on your CV, it
6   represents that you were the CISO from 2014 to
7   2019, right?
8     **A.**   No. It represents that I had two
9   roles, the chief information security officer role
10   and the head of global cyber partnerships role.
11     **Q.**   So you -- you think that someone
12   reading your report or reading your CV would
13   understand that you were not the CISO from 2014 to
14   2019?
15     **A.**   I mean, my CV includes a -- you know,
16   more bullets on things that were head of global
17   cyber partnership roles than they were chief
18   information security officer roles.
19     So, you know, I think it's -- it's
20   fair to say the reader would understand that some
21   of this was CISO role and some of this was head of
22   global cyber partnership role.
23     **Q.**   Okay. When -- all right. Let's focus
24   on the second part of that sentence where it talks
25   about more than a thousand personnel.

1     **A.**   Uh-huh.
2     **Q.**   When you were the CISO, did you
3   oversee more than a thousand personnel?
4     **A.**   Yes.
5     **Q.**   When you were the head of global cyber
6   partnerships, how many personnel did you oversee?
7     **A.**   A much more limited, again, to my --
8   you know, number than 1,000. Hesitant to give an
9   exact number, because: A, it changed; and B, I
10   have obligations to JPMorgan not to disclose --
11   it's a pretty broad obligation not to disclose
12   details.
13     **Q.**   Would it be fair to say that it was
14   less than 10 people?
15     **A.**   Not necessarily, you know, yeah. At
16   times it probably was more than 10 people.
17     **Q.**   Would it be fair to say that it was
18   less than 20 people?
19     **A.**   Yes.
20     **Q.**   And when it talks about a $500 million
21   budget, did you oversee a $500 million budget when
22   you were the CISO?
23     **A.**   Yes. Well -- yes. You know, we were
24   moving to a $500 million budget in the 2015 time
25   frame.

1     **Q.**   Okay. And, in fact, at the time that
2   you left as CISO, JPMorgan's cybersecurity budget
3   was around $250 million; is that right?
4     **A.**   I don't -- I don't -- I mean: A, I'm
5   not at liberty to say what it was. You know, and,
6   B, I don't agree that that was the number.
7     **Q.**   And are you aware of public news
8   reports that JPMorgan planned to increase its
9   cybersecurity budget from $250 million to
10   $500 million over a period of five years?
11     **A.**   I'm not aware of that public news
12   report.
13     **Q.**   When you -- when you say that you were
14   asked to go -- I think you described, asked to go
15   into a broader role at the company, is it actually
16   true that you were removed as the CISO in 2015?
17     **A.**   That's not true.
18     **Q.**   Okay. Did you -- why is that not
19   true?
20     **A.**   Because I was asked to take a broader
21   role as the head of global cyber partnerships.
22     **Q.**   And when you were asked to take the
23   broader role, did you object to being removed as
24   the CISO?
25     **A.**   I did not. Again, I wasn't removed as

1   the CISO, so there was no objection to be made.
2       Q.    Well, you were no longer the CISO
3   beginning in 2015, right?
4       A.    That's correct. I was asked to be the
5   head of global cyber partnerships and work with
6   the industry globally on matters of regulation and
7   protection of the financial system.
8       Q.    And within the JPMorgan structure, a
9   CISO is the -- a higher position than the head of
10  global cyber partnerships, right?
11      A.    When I took the head of global cyber
12  partnerships, I was a direct report to the chief
13  administrative officer -- I'm sorry, the -- yeah,
14  the chief administrative officer was actually a
15  higher level of management than the chief
16  information security officer.
17      Q.    Is that Paul Compton --
18      A.    Uh-huh.
19      Q.    -- that was the chief administrative
20  officer?
21      A.    That's correct.
22      Q.    And before you reported to Paul
23  Compton, who were you reporting to?
24      A.    Dana Deasy and Jim Cummings.
25      Q.    And, in fact, Rohan Amin became the

89

1   CISO at JPMorgan in 2015, right?
2       A.    That's correct.
3       Q.    In 2014, when you were the CISO at
4   JPMorgan, the company suffered one of the world's
5   largest ever data breaches, right?
6       A.    It actually experienced the breach
7   itself prior to my arrival at JPMorgan.
8       Q.    Okay. And is it fair to describe it
9   that hackers exposed the names, addresses, phone
10  numbers and email addresses of 83 million
11  households and small business accounts?
12      A.    "Exposed" would probably be a
13  mischaracterization.
14      Q.    Is it fair to say that when you -- so
15  you were leading the response to the cybersecurity
16  breach on behalf of JPMorgan; is that right?
17      A.    That's correct.
18      Q.    And is it fair to say that during the
19  time you were leading that response, that you had
20  conflicts with federal law enforcement agencies;
21  is that right?
22      A.    That's not true.
23      Q.    Do you recall having conflicts with
24  the Secret Service?
25          MR. TURNER: Object to form.

90

1          THE WITNESS: No, I -- I mean, I
2   recall discussions with the Secret Service. I
3   wouldn't call them -- I wouldn't call them
4   conflicts.
5   BY MR. CARNEY:
6       Q.    Okay. Do you know Matthew Zames?
7       A.    I do know Matthew Zames.
8       Q.    Who is Matthew Zames?
9       A.    When I knew Matthew Zames, he was the
10  chief operating officer for JPMorganChase.
11      Q.    Okay. And do you know Joseph
12  Demarest?
13      A.    I do know Joseph Demarest. At the
14  time, I believe he was the head of the -- he was
15  the assistant director of the FBI for cyber.
16      Q.    And are you aware that Joseph Demarest
17  with the FBI called Matthew Zames, the COO of
18  JPMorgan, to discuss delays in access to the
19  breached data that they wanted?
20      A.    I'm not at liberty to talk about the
21  specifics of that incident.
22          (Whereupon, Exhibit 3 is marked for
23          identification.)
24  BY MR. CARNEY:
25      Q.    All right. Dr. Rattray, I've handed

91

1   you what's been marked as Exhibit 3. And this is
2   a June 30, 2015, article from Bloomberg.
3          Have you ever seen this article
4   before?
5       A.    Yes, I have.
6       Q.    And when was the first time you saw
7   it?
8       A.    It was published in June 2015. I
9   don't remember distinctly, but I probably saw it
10  not long after its publication.
11      Q.    Okay. So if we can look at the first
12  page of this article, and the article is entitled,
13  "JPMorgan Reassigns Security Team Leader a Year
14  After Data Breach."
15          In that second paragraph, it says that
16  "Greg Rattray, a former U.S. Air Force commander
17  for information warfare and a cyber expert at the
18  National Security Council under President
19  George W. Bush no longer works as JPMorgan's chief
20  information security officer, according to an
21  internal memo sent June 11 and reviewed by
22  Bloomberg News."
23          Have you ever seen that memo?
24      A.    I actually don't know what memo this
25  refers to.

92

1    Q.    Okay.  On the next page, it says,
2    "Rohan Amin, a former cybersecurity executive at
3    Lockheed Martin Corp. who joined JPMorgan last
4    August, has replaced Rattray according to the
5    memo."
6         Was that an accurate statement?
7    A.    Rohan took the job as the chief
8    information security officer.
9    Q.    And then the next sentence says that,
10   "Rattray will oversee a few employees instead of
11   the hundreds he managed in JPMorgan's
12   cybersecurity unit."
13        Is that accurate?
14   A.    Again, I think the hundreds figure is
15   low.  You know, in terms of it numbered over a
16   thousand at that point.  You know, I manage a
17   small team initially when I took over and built
18   the global cyber partnerships practice.
19   Q.    All right.  And then there's a bold
20   heading that says, "Limited access," and then in
21   the second paragraph, it says, "The Secret Service
22   grew so frustrated that it threatened to seize the
23   evidence, and Joseph Demarest, then assistant
24   director of the FBI's cyber division, called chief
25   operations officer Matthew Zames to discuss -- to

93

1    discuss the delays."
2         Do you have any reason to question the
3    accuracy of that?
4    A.    I do.  But I can't go into the
5    specifics of how we handled the incident.
6    Q.    Okay.  And then it says, "The
7    situation was resolved with a formal agreement to
8    share information."
9         Is that accurate?
10   A.    Again, I can't go into the specifics
11   of our interactions between -- or not interactions
12   between JPMorganChase and the federal government.
13   Q.    Okay.  So just, sir, turning back to
14   your report, paragraph 8 -- after everything we
15   just discussed and looked at, do you stand by the
16   accuracy of that sentence from 2014 to 2019, "I
17   was chief information security officer and head of
18   global cyber partnerships at JPMorganChase where I
19   directed its cyber defense program and oversaw
20   more than a thousand personnel on a $500 million
21   budget"?
22   A.    Yes, I do.
23   Q.    All right.
24        MR. CARNEY:  Actually, I'm moving on
25   to a different subject.  Do you want to take

94

1    break?
2         MR. TURNER:  Sure.
3         THE VIDEOGRAPHER:  The time right now
4    is 11:40 a.m.
5         We are off the record.
6         (Whereupon, a recess was taken at
7         11:41 a.m.)
8         THE VIDEOGRAPHER:  The time right now
9    is 11:55 a.m.
10        We're back on the record.
11   BY MR. CARNEY:
12   Q.    Okay.  Dr. Rattray, I had just a
13   couple quick follow-ups about if we look at
14   Exhibit 2, your CV, page A-1.
15   A.    Uh-huh.
16   Q.    You see where it says, "Cofounder and
17   partner of Next Peak 2019 to the present"?
18   A.    Yes.
19   Q.    And did you hold both those positions
20   from 2019 to the present?
21   A.    Both what positions?
22   Q.    Cofounder and partner?
23   A.    Well, yeah.  I mean --
24   Q.    Okay.
25   A.    -- I'm a cofounder and a partner --

95

1    Q.    Got it --
2    A.    -- yeah.
3    Q.    -- okay.
4         And then similar with chief strategy
5    and risk officer, Andesite AI, 2023 to the
6    present, did you hold both of those positions from
7    2023 to the present?
8    A.    Actually, no.  I was originally just a
9    chief strategy officer, and then the team decided
10   to do sort of -- formally add "risk officer" to my
11   title.
12   Q.    And when was that added?
13   A.    Spring of 2024, I believe.
14   Q.    All right.  And then just with respect
15   to what we talked about on the next page, chief
16   information security officer and head of global
17   cyber partnerships, 2014 to 2019, sir, you'd agree
18   with me that in -- there's nowhere in your report
19   where it mentions that you stopped being the CISO
20   in 2015; is that right?
21   A.    Yeah, it's not relevant to the -- my
22   task, you know, and assessment of the securities
23   statement.
24   Q.    Okay.  All right.  Let's see.
25   Speaking of security statements, we talked a

96

1  little bit about them earlier.
2        But in terms of the public-facing
3  security statements that we were talking about
4  earlier, what is your understanding of the role
5  that they play?
6     **A.**   You know, such -- you know, such
7  public statements about security can play a very
8  wide range of roles.
9     **Q.**   And what are those very wide range of
10  roles?
11    **A.**   They can be, you know, just awareness
12  that the company, you know, is -- you know,
13  engaged -- you know, engaged in security.  It can
14  be, you know, as some of the things that were -- I
15  was involved with, with JPMorgan statements, you
16  know, that support industry efforts in
17  cybersecurity.
18        They can be -- you know, for the
19  purpose that the SolarWinds statement was for,
20  which is to sort of give people that are thinking
21  about purchasing products some information about
22  security practices of the company.
23        I mean, the -- it was -- you know, we
24  can continue with this, but there's probably
25  very -- you know, very many purposes for a public

1  statement about security.
2     **Q.**   Okay.  And based on your experience,
3  for instance, your experience at JPMorgan, do
4  investors care about the cybersecurity practices
5  of the firms in which they invest?
6        MR. TURNER:  Objection to form.  And
7  outside the scope of his assignment.
8        THE WITNESS:  Again, I don't -- you
9  know -- you know, I don't know exactly what
10  investors care about, right?
11  BY MR. CARNEY:
12     **Q.**   Okay.  So when you were at JPMorgan,
13  for instance, was there -- and you mentioned
14  JPMorgan put out public statements about its
15  cybersecurity practices; is that right?
16    **A.**   At times, you know -- you know,
17  especially related to joining industry
18  associations and those sorts of things, we made
19  statements we were involved with different sorts
20  of security-related activities.
21     **Q.**   And were -- was one of the reasons
22  that you were making those statements to inform
23  investors about the company's cybersecurity
24  practices?
25        MR. TURNER:  Objection to the form.

1  And foundation.
2        THE WITNESS:  I don't know, you
3  know -- I mean, how do I -- there were statements
4  made.  I'm not aware of statements that were made,
5  you know, specifically to inform investors.
6  BY MR. CARNEY:
7     **Q.**   So when you were making these public
8  statements about cybersecurity at JPMorgan, who
9  was the audience for those statements?
10        MR. TURNER:  Objection to form.  And
11  foundation.
12        THE WITNESS:  You know, again, in some
13  cases, you know, we -- you know, we were working
14  on, you know, things like the financial services
15  sector cyber risk index that we worked together
16  with NIST on.  And there were, you know -- we
17  declared our support for that -- for that effort.
18        (Whereupon, Exhibit 4 is marked for
19        identification.)
20  BY MR. CARNEY:
21     **Q.**   I've handed you, Dr. Rattray, a
22  document that's been marked as Exhibit 4, and it's
23  a publication on Next Peak's website.
24    **A.**   Uh-huh.
25     **Q.**   It's called "Building a Focused

1  Approach to Cyber Defense."
2        Did you write this article?
3    **A.**   You know, similar to other discussions
4  we've had, I think the team put it together.
5        Yeah, so I don't have a recollection
6  specifically about who -- who was the original
7  drafter.
8     **Q.**   All right.  If you would please, sir,
9  turn to the third page of this article.
10    **A.**   Uh-huh.
11     **Q.**   Under the second paragraph under the
12  heading "Why Next Peak Can Help," it -- it says,
13  "Many companies, especially in the financial
14  sector, often suffer drops in stock price
15  following a cyberattack, however, JPMC stock
16  actually rose slightly after the breach
17  demonstrating how the steps the companies take
18  during and after an incident can go a long way in
19  reassuring stakeholders."
20        Do you see that?
21    **A.**   I do see that.
22     **Q.**   And do you agree with that statement?
23    **A.**   I mean, I do agree with those
24  statements.  The data we cite is a Harvard
25  Business Review -- Harvard Business Review

1  article.
2      Q.    Do you agree -- let me break that up
3  then.
4          Do you agree that the steps that
5  companies take during and after a cybersecurity
6  incident can go a long way in reassuring
7  stakeholders?
8      A.    Yes, I do.
9      Q.    And why was it relevant in your
10 article that the stock price rose at JPMorgan
11 following the attack?
12     A.    You know, the stock -- you know,
13 stockholders are stakeholders in a company, right?
14 And so this is an article meant to sort of
15 portray, you know, concerns and how, again, as you
16 just -- you know, you quoted why Next Peak can
17 help.
18     Q.    And stockholders are investors in the
19 company, right?
20     A.    Stockholders are equity owners in a
21 company.
22     Q.    Okay.  And so, in your view, as
23 expressed in this article, stockholders are
24 interested in companies' cybersecurity practices
25 and how they respond to breaches, right?

1      MR. TURNER:  Object to form.
2      THE WITNESS:  You know, the article
3  doesn't say, you know, stockholders are
4  interested.  So maybe we need to reframe the
5  question or I need to rehear the question.
6  BY MR. CARNEY:
7      Q.    Okay.  All right.
8      MR. TURNER:  Are you asking him
9  whether stockholders care about public statements
10 like the securities statement, or are you asking
11 about something else?
12     MR. CARNEY:  I'm asking him generally,
13 stockholders care about a company's cybersecurity
14 practices --
15 BY MR. CARNEY:
16     Q.    -- right?  According to your
17 article --
18     MR. TURNER:  I'm just going to
19 object --
20         (Simultaneous unreportable crosstalk
21         occurs among parties.)
22         (Stenographer requests one speaker at a
23         time.)
24     MR. TURNER:  I'm going to object.
25     You called two witnesses who you

1  called to testify about materiality, that issue.
2  Mr. Rattray has not offered any opinion as to
3  materiality.  That's not a subject of his report.
4  So I'm just gonna object.
5          This is outside the scope of his
6  expert testimony.
7      MR. CARNEY:  Okay.  And I think under
8  the Federal Rules, you could have just used that
9  last part, outside the scope.
10     MR. TURNER:  Well, I explained why it
11 was outside the scope.
12     MR. CARNEY:  That's called a speaking
13 objection --
14     MR. TURNER:  I understand.
15     MR. CARNEY:  -- which are improper.
16     MR. TURNER:  It's needed in this case.
17 As it may --
18     MR. CARNEY:  There's no provision in
19 the Federal Rules that call for speaking
20 objections being needed, but okay.
21     THE WITNESS:  Are you going to repeat
22 the question?
23 BY MR. CARNEY:
24     Q.    Yeah.  So the question was:  The
25 premise of your article that you wrote was that

1  shareholders could be reassured if a company went
2  out and showed how they were dealing with a cyber
3  breach, right?
4      A.    The premise was -- of the article was
5  that we could help build that focused approach to
6  cyber -- that's the premise of the article.
7      Q.    All right.  Sir, I want to ask you
8  about your opinions related to the NIST
9  Cybersecurity Framework.
10     A.    Uh-huh.
11     Q.    And if you look -- I think if you turn
12 to paragraph 31.
13     A.    Of my expert report?
14     Q.    Of your expert report, Exhibit 1, it
15 should be.
16     A.    Uh-huh.
17     Q.    And you say that the NIST
18 Cybersecurity Framework was first established in
19 2014, right?
20     A.    Again, I made a mistake.  I looked at
21 page 31, not paragraph 31.
22     Q.    Yeah, page 10.
23     A.    Yes.
24     Q.    Okay.
25     A.    And I'm on page -- paragraph 31.

1    Q.    Okay.  And you state that the NIST
2  Cybersecurity Framework was first established in
3  2014, right?
4    A.    That's correct.
5    Q.    And that was during the time that you
6  were at JPMorgan, right?
7    A.    Yes, that's correct.  Again, I don't
8  know if it was early 2014 and if I had arrived at
9  JPMorgan, but I arrived at JPMorgan in the summer
10  of 2014.
11    Q.    Did JPMorgan follow the NIST
12  Cybersecurity Framework when you were there?
13    A.    JPMorgan -- again, I can't -- I'm
14  going to sort of be limited to how detailed I can
15  go.
16        JPMorgan led an industrywide effort
17  to, you know, create an industry-driven framework
18  called the cyber risk index based on the NIST
19  Cybersecurity Framework.
20        What was...
21        You know -- you know, so, yeah, you
22  know, that was clearly, you know, something that
23  actually I led as the head of global cyber
24  partnerships for the firm and for the industry.
25    Q.    So the cyber risk index was based on

105

1  the NIST Cybersecurity Framework?
2    A.    Yes.  Or it's actually cyber risk
3  institutes, you know, cyber framework.  I'm sorry.
4  I shouldn't have said "index."  I should have said
5  "institute."
6    Q.    Okay.  And you say it was based on the
7  NIST Cybersecurity Framework.
8        What does that mean?
9    A.    We were in a situation where the
10  industry was getting from various regulators
11  different -- different regulatory requirements.
12  And as an industry, there was an effort to work to
13  establish a framework that was NIST aligned.
14        But specific to cybersecurity, NIST
15  had supported such efforts with other industries
16  and supported the effort that we undertook, you
17  know, in the financial services industry.
18    Q.    And did you have any responsibility
19  for ensuring that JPMorgan followed that framework
20  that you just discussed?
21    A.    I was in constant discussions with the
22  leadership team about the nature of the framework
23  that was being derived and how it would enable
24  our, you know, cyber program and compliance.
25    Q.    Okay.  When you say "the leadership

106

1  team," who was on the leadership team?
2    A.    The CISO, the chief compliance officer
3  of the firm, the implementation people for
4  regulatory compliance within the cybersecurity
5  team.
6    Q.    So who had responsibility at JPMorgan
7  for ensuring that this framework that you just
8  discussed was followed?
9    A.    Again, there was no -- there was --
10  there was no requirement for compliance with the
11  framework.
12    Q.    Okay.  Putting aside a requirement for
13  compliance, was JPMorgan trying to follow the
14  Cyber Risk Institute framework that you discussed?
15    A.    Again, during --
16        MR. TURNER:  Object to form.
17        THE WITNESS:  Right.
18        Again, that developed over a period of
19  years.  JPMorgan, you know, broadly utilized the
20  cyber -- the cybersecurity -- the NIST
21  Cybersecurity Framework, and then, you know, that
22  informed its work on the -- what became the Cyber
23  Risk Institute's framework, which is deeply NIST
24  CSF based.
25        Just like, you know, NIST called for

107

1  as general guidance for, you know, firms to
2  understand their state of practice and, you know,
3  guide -- guide efforts for the NIST Cybersecurity
4  Framework is not something to be followed, per se.
5  It's guidance to enable cybersecurity program.
6  BY MR. CARNEY:
7    Q.    And so I guess my question then is
8  that JPMorgan -- whatever they were doing with the
9  NIST Cybersecurity Framework, using it as
10  guidance --
11    A.    Uh-huh.
12    Q.    -- who had responsibility for ensuring
13  that they were using the NIST Cybersecurity
14  Framework as guidance?
15        MR. TURNER:  Object to form.
16        THE WITNESS:  Yeah, I mean, the --
17  there wasn't a singular person.  It was a
18  decision, you know, by a number of people, and
19  basically the people that I've described, probably
20  others involved including the general counsel,
21  about, you know, what sort of framework should
22  guide the program in a -- in a heavily regulated
23  environment.
24        So, you know, there was not a singular
25  individual responsible.

108

109

1  BY MR. CARNEY:
2      Q.    And you -- you said there were a group
3  of individuals.
4          Were you one of the individuals?
5      A.    Yes --
6      Q.    Okay.
7      A.    -- I mean, okay, yes.
8      Q.    What is the basis for your statement
9  that the NIST Cybersecurity Framework is not
10  something to be followed?
11      A.    You know, I just want to use the quote
12  that I provided in -- in my report, which
13  basically is NIST language around, you know, this
14  is a voluntary -- oh, quoting from the framework.
15          "The framework is voluntary and there
16  is no right or wrong way to do it."
17      Q.    What page are you on?
18      A.    I'm on page 13, the end of
19  paragraph 36.
20      Q.    Sir, I'm going to ask you -- let me
21  back up for a second.
22          Did JPMorgan ever perform assessments
23  to see whether it was compliant with the NIST
24  Cybersecurity Framework?
25          MR. TURNER:  Objection to form.

110

1          "Compliant."
2          THE WITNESS:  Yeah, I'm not probably
3  at liberty to talk about exactly how JPMorgan
4  self-assessed itself.
5  BY MR. CARNEY:
6      Q.    Without getting into the details, did
7  they assess themselves under the NIST
8  Cybersecurity Framework?
9      A.    Again, that's a detail, in my
10  estimation.  I mean --
11          (Zoom participant interrupts.)
12          THE STENOGRAPHER:  Excuse me.  Can the
13  people on Zoom please mute themselves?
14          Sorry.  If you could repeat your
15  answer.
16          THE WITNESS:  Can we repeat that
17  question?
18  BY MR. CARNEY:
19      Q.    Sure.
20          Without getting into details, did
21  JPMorgan assess themselves under the NIST
22  Cybersecurity Framework?
23      A.    Again, I think, you know, the details
24  of JPMorgan's self-assessment probably goes beyond
25  what I, you know, am obligated not to do.

111

1      Q.    Okay.  Putting aside JPMorgan, do you
2  personally have any experience assessing whether a
3  company was compliant with the NIST Cybersecurity
4  Framework?
5          MR. TURNER:  Object to form.
6          "Compliant."
7          THE WITNESS:  Right.  Again, as just
8  described, the framework is voluntary, and there's
9  no right or wrong way to use it.  It explicitly
10  doesn't call for compliance.  It calls for you,
11  you know, voluntarily use in self-evaluation.
12          To the point of the question, I have
13  numerous experiences helping companies assess
14  themselves under the NIST Cybersecurity Framework.
15  BY MR. CARNEY:
16      Q.    And what was your role in those
17  assessments?
18      A.    You know, everything from interviewing
19  people about the presence of controls and certain
20  control areas up to working with the leadership
21  team about the -- you know, the outputs of the
22  evaluation and the scoring and even at times in
23  some of the cases helping brief -- brief the
24  assessment company leadership.
25      Q.    Have you ever personally assessed

112

1  maturity levels under the NIST Cybersecurity
2  Framework?
3      A.    Yes.
4      Q.    And what was your role in assessing
5  maturity levels?
6      A.    As I just described, everything for
7  certain control areas down to looking at the
8  presence of policy, talking with leaders, looking
9  for specific evidence that control structures were
10  in -- and implementation or active and also
11  looking at other assessments like audit
12  assessments about the presence of the practice.
13      Q.    Okay.  Doctor, if you could look at
14  page 62 of your report, please.
15      A.    Page 62, correct?
16      Q.    Yes, sir.  And it's paragraph 112,
17  which starts on the prior page.
18      A.    Uh-huh.
19      Q.    And do you see within the body of the
20  report sort of towards the end of page 62, you
21  quote the General Motors Financial Company 10-K
22  for fiscal year 2023?
23      A.    I do see that.
24      Q.    And it states, "We design and assess
25  our program based on the National Institutes of

```
 1   Standards and Technology Cybersecurity Framework,"
 2   and then in parentheses, "NIST CSF."
 3              "This does not imply that you meet any
 4   technical standards, specifications or
 5   requirements, but rather that we use the NIST CSF
 6   as a guide to help us identify, assess and manage
 7   cybersecurity risks relevant to our business."
 8              Did I read that correctly?
 9       A.    Yes.
10       Q.    All right.  And you have in footnote
11   in -- in Footnote 145 to that paragraph --
12       A.    Uh-huh.
13       Q.    -- you quote the 10-Ks of Digital
14   Realty Trust and SkyWest; is that right?
15       A.    I just want to make sure that we get
16   the right companies.  I see SkyWest.  I see GMFC.
17   I'm just -- I'm just looking for the digital
18   real -- there it is.  Yep, I see all three
19   companies in the footnote.
20       Q.    Great.  And Digital Realty Trust Inc.
21   and SkyWest Inc., they have similar language to
22   the GMFC 10-K statement regarding the NIST
23   framework, right?
24       A.    Yes.
25       Q.    And specifically each of them include
```

113

```
 1   the sentence "This does not imply that we meet any
 2   particular technical standards, specifications or
 3   requirements but rather that we use the NIST CSF
 4   as a guide to help us identify, assess and manage
 5   cybersecurity risks relevant to our business,"
 6   right?
 7       A.    Yeah, I would agree that all three
 8   companies have similar language in these 10-K
 9   declarations.
10       Q.    And what is your understanding of the
11   purpose of that sentence in those three 10-Ks?
12       A.    I couldn't speak to the -- you know,
13   why any given company decided to put that sentence
14   in, because the NIST Cybersecurity Framework lays
15   out itself, you know, in detail that that is the
16   case.
17              I mean, this says NIST framework is --
18   you know, does not imply that you should meet any
19   particular technical standard, and it's voluntary
20   to be used as a company sees fit.
21       Q.    Okay.  And let's just use the General
22   Motors Financial Company as one example.
23       A.    Uh-huh.
24       Q.    Would you agree that without that
25   sentence, that the meaning of the paragraph is
```

114

```
 1   different?
 2       A.    No.
 3       Q.    So you think that sentence adds
 4   nothing, in your opinion?
 5       A.    As I just stated, because NIST
 6   basically makes itself -- makes the statements
 7   that, you know, are outlined here, we could look
 8   at specifics from the framework.
 9              But NIST itself says in publishing the
10   framework that it's not, you know -- does not
11   require or imply that a company does anything
12   specific in terms of technical standards and
13   specifications.  And it's meant to be used as a
14   guide.
15              You know, I find the sentence
16   repetitive and not -- you know, not additive.
17       Q.    Okay.  So in the first sentence, it
18   says, "We designed and assess our program based on
19   the National Institutes of Standards and
20   Technologies Cybersecurity Framework, right?
21       A.    Uh-huh.  Yes.
22       Q.    And you don't think that that second
23   sentence adds anything to clarify what they mean
24   by that first sentence?
25       A.    I mean, that's up to the people making
```

115

```
 1   this statement about whether they -- you know,
 2   they believe -- I believe it's repetitive,
 3   because, you know, the NIST Cybersecurity
 4   Framework itself tells you the things that are in
 5   that sentence.
 6       Q.    So one would have to go look at the
 7   NIST Cybersecurity Framework itself to understand
 8   the first sentence without that second sentence,
 9   right?
10       A.    Yeah, I'm just trying to process what
11   the question is.
12              MR. TURNER:  Object to form.
13              Go ahead.
14   BY MR. CARNEY:
15       Q.    Yeah, the question is that without
16   that second sentence or some independent
17   understanding of what NIST itself has said about
18   the cybersecurity framework, that first sentence
19   would mean something different, right?
20       A.    No.  It would mean exactly what it
21   said, right?  Like, we design and assess our
22   program based on the NIST -- the National
23   Institute of Standards in Technology's
24   Cybersecurity Framework.  I don't understand how
25   -- I just don't understand how dropping the second
```

116

```
 1    sentence changes the meaning of the first
 2    sentence.
 3         Q.    Okay.  All right.  And I'll represent
 4    to you that according to the NIST website, the
 5    cybersecurity framework is a set of best
 6    practices, standards and recommendations.
 7         Do you have any reason to disagree
 8    with that?
 9         A.    Well, I, yeah, need to see where in
10    the -- you know, the NIST website, which is
11    probably voluminous, because, you know, as stated
12    in my, you know, expert report, it basically says
13    that that -- you know, it's voluntary.  And, you
14    know, is to be used as see fit.  So it's not
15    directive.
16         Again, we probably have to compare the
17    language you just said to, you know, other
18    language within the NIST cybersecurity framework's
19    website.
20         Q.    Okay.  And you just said the website
21    is voluminous; is that right?
22         A.    Well, you know, as I said, I think
23    it's probably voluminous, because, you know,
24    having been on NIST websites, you know, they --
25    they sort of link to a lot of things, right?
```

117

```
 1         So I don't know what the front page of
 2    the NIST Cybersecurity Framework website looks
 3    like at the moment.  I don't know what it looked
 4    like specifically during the relevant period.
 5         I do know that, you know, it clearly
 6    stated, you know, that the framework itself is
 7    voluntary and calls on the companies to, you know,
 8    use it as they see fit.
 9         Q.    And is that -- is somewhere on the
10    voluminous website that it states that it's a
11    voluntary standard?
12         A.    As I said, I don't know for sure if
13    it's voluminous.  I said I expect that it is
14    having been on standard-setting organizations'
15    websites many times, and often they are -- they
16    have a lot of links and, therefore, there's a lot
17    of information on it.
18         I don't know specifically, you know,
19    what instance of the website at what time we're
20    discussing here.
21         MR. TURNER:  I'll note for the record,
22    Mr. Graff is quoting a document that is found on
23    the NIST website as reflected in his report.
24         MR. CARNEY:  All right.
25    ///
```

118

```
 1         (Whereupon, Exhibit 5 is marked for
 2    identification.)
 3    BY MR. CARNEY:
 4         Q.    All right.  Dr. Rattray, I've handed
 5    you what's been marked as Exhibit 5.  And I'll
 6    represent to you that this is a copy of
 7    SolarWinds's security statement that the parties
 8    have stipulated is basically the way it appeared
 9    during the relevant period.
10         Have you seen this document before
11    or --
12         A.    Yes, I have --
13         Q.    -- some version of it?
14         A.    -- yep.
15         Q.    Sir, if you could turn to -- on the
16    first page where it says -- under organizational
17    security, it says, "SolarWinds follows the NIST
18    Cybersecurity Framework with layered security
19    controls to help identify, prevent, detect and
20    respond to security incidents."
21         You see that, right?
22         A.    I do.
23         Q.    And you would agree with me that that
24    statement does not have a caveat like the ones
25    that we looked at for General Motors, for Digital
```

119

```
 1    Realty Trust or for SkyWest; is that right?
 2         A.    You know, we have the security
 3    statement in front of us.  It doesn't have a
 4    caveat in -- for the -- as I mentioned previously,
 5    the caveats were repetitive.
 6         Q.    Okay.  And if we look at -- on page 62
 7    that we were just looking at in Exhibit 1
 8    underneath the quote from GMFC --
 9         A.    Yes.
10         Q.    -- you write, "I understand the
11    representation about the NIST CSF in the
12    securities statement in the same way" --
13         A.    Uh-huh.
14         Q.    -- "not a statement that SolarWinds
15    met any particular technical standards, but rather
16    as a statement about its cybersecurity governance,
17    i.e., a statement that it regularly assessed its
18    cybersecurity posture and used the NIST CSF as a
19    guide in doing so."
20         Do you see that?
21         A.    I do see that.
22         Q.    So is it -- is it fair to say that
23    even though the securities statement doesn't
24    contain the caveat that the other companies
25    included, you are interpreting it as if it did?
```

120

1    A.    I'm just trying to understand the
2  question.
3         You know, I don't need to -- I guess
4  the -- my thinking is revolving around the notion
5  of the word "interpret," right?
6         The NIST Cybersecurity Framework
7  itself says it's, you know, not meant to be a set
8  of technical standards, and it's supposed to be a
9  guide to cybersecurity governance.
10        So there's really, you know, no need
11 for interpretation, because the framework itself
12 calls for this.
13    Q.    Would you expect that, let's say a
14 layperson, someone who is not an expert in
15 cybersecurity, would read SolarWinds's security
16 statement and also read in that limitation or
17 caveat into it?
18    A.    I believe that the security statement
19 is not designed to be read by laypersons.  The
20 security statement is meant -- you know, was built
21 and is designed in order to, you know, provide
22 information to potential users of SolarWinds's
23 products about its security practices.
24        And that to me means the people
25 looking at this have some understanding of

121

1  want to be sure, because I'm reading the first
2  sentence of that paragraph 40, and I don't see the
3  word "accurate" in it.  I just want to make sure
4  I'm on the --
5         (Simultaneous unreportable crosstalk
6         occurs among parties.)
7         (Stenographer requests one speaker at a
8         time.)
9         THE WITNESS:  Yeah, so I see the
10 heading (c) above paragraph 40 saying the
11 securities statement's representation about
12 role-based were accurate.
13        Yeah, just to clarify, because I went
14 right to the paragraph 40.
15 BY MR. CARNEY:
16    Q.    Understand.  Thank you.
17        Sir, if you could turn a couple pages
18 forward, I just wanted to sort of show you what
19 section we were in, but paragraph 44 --
20    A.    Uh-huh.
21    Q.    -- you state, "I have reviewed samples
22 from over a thousand SARFs" -- and that's S-A-R-F,
23 and then plural, SARFs --
24    A.    Uh-huh.
25    Q.    -- "I have received that were filled

123

1  cybersecurity and cybersecurity governance.
2         MR. TURNER:  Chris, just want to flag,
3  the next 15 minutes or so would be good to break
4  for lunch, whenever is good.
5         MR. CARNEY:  Yeah, so why don't we
6  break in 15 then?  Is that cool?
7         MR. TURNER:  In 15 minutes?
8         MR. CARNEY:  Yeah.
9         MR. TURNER:  Sure.
10 BY MR. CARNEY:
11    Q.    All right.  I'm going to shift topics
12 now, sir, to ask you about role-based access
13 controls.  So if you look at the page 40 of
14 Exhibit 1 -- I'm sorry.  Apologies.  I just did
15 that myself.
16    A.    Oh.
17    Q.    If you look at page 15,
18 paragraph 40 --
19    A.    Paragraph 40 --
20    Q.    -- and there's a heading that says
21 "The Securities Statement Representations About
22 Role-Based Access Controls Were Accurate."
23        And I want to direct your attention,
24 sir, to a couple pages forward on page --
25    A.    Excuse me.  Just what you -- I just

122

1  out for newly hired employees during the relevant
2  period, evidencing they were completed as a
3  regular practice."
4         So I want to ask you -- and there's a
5  Footnote --
6    A.    Uh-huh.
7    Q.    -- 28, and by my count, there are
8  eight examples listed there, eight samples.
9         First of all, who selected these
10 samples for you?
11    A.    As we've discussed, when I asked for
12 evidence of, like, the SARFs, that just some
13 access request forms -- or, you know, evidence of
14 the presence of practice around role-based access
15 control, that I called them data tranches.
16        The tranche was created for me, and I
17 received it from Latham.  I made the selection of
18 the cited examples in the report.
19    Q.    Okay.  And how did you go about
20 choosing those eight samples?
21    A.    I reviewed, you know, usually 50 to
22 70 documents in these tranches and, you know,
23 decided, you know, looked at if the proper number
24 is 8 -- I think -- yeah, I'll just assume it's 8,
25 you know, 8 or 10 in many cases of these large

124

1  evidence sets that, you know, sort of illustrative
2  examples from the 50 to 70 that I reviewed.
3      Q.    And putting aside the -- so aside from
4  the 50 to 70 that you reviewed, how do you know
5  what were in the other, let's say, thousand or so
6  SARFs that you didn't look at?
7      A.    You know, similar to, you know, any
8  sort of large data set practice where you're
9  trying to look at -- you know, 50 to 70 is
10 actually a large number to look at in the conduct
11 of an assessment or, you know, of a security
12 control in terms of, you know, getting a sense of
13 whether, you know, this implementation was
14 actually, you know, well -- well conducted in
15 practice.
16     So I felt like 50 to 70 was more than
17 enough to indicate that the SARF process was in
18 place and executed fully.
19     Q.    Why was 50 to 70 more than enough?
20     A.    Because that's a pretty -- like, there
21 was very little deviation in those samples.  They
22 showed the right sort of process, execution.  And
23 they're actually very -- sort of very deep in
24 that -- in that sense.
25     So, again, having done many, many

125

1  assessments, that level of sort of evidence
2  examination, you know, is more than sufficient in
3  my estimation to, sort of, you know, validate
4  that -- this element of the role-based access
5  processes was well executed.
6      Q.    Now, to pick the 50 to 70, did you use
7  any kind of sampling methodology?
8      A.    I wanted to make sure I looked across
9  the relevant period, that I looked across
10 different business units, different geographic
11 locations of the company.
12     Q.    Okay.  And so what led you, if you
13 did, to believe that the eight samples that you
14 cite in Footnote 28 are representative of the
15 larger body of SARFs at SolarWinds?
16     A.    I chose them based on those same
17 criteria that I just mentioned across that
18 relevant period; business units, to the extent to
19 which I could, and then geographic regions.
20     Q.    The exclusion that you've reached -- I
21 think you mentioned a little while ago that this
22 element of the role-based access processes was
23 well executed.
24     Was that based on the mere existence
25 of the SARF, or did you reach your conclusions

126

1  based on the content of the SARF documents
2  themselves?
3          MR. TURNER:  Objection to form.
4          And objection -- just --
5          THE WITNESS:  Go ahead.  Yep.
6          MR. TURNER:  Yeah, objection to form.
7  And to the characterization of the report.
8          THE WITNESS:  You know, it was
9  basically the second, though, of course -- you
10 know, the fact that they existed was part of the
11 evaluation that their -- you know, a policy and
12 procedure for role-based access was in place.
13     But, you know, examining that, you
14 know, the reports themselves, you know, my -- my
15 judgment, you know, based upon seeing how this
16 access control is provisioned, you know, and
17 managed in other environments, this seemed a very
18 thorough, sort of above and beyond process for
19 doing so.
20 BY MR. CARNEY:
21     Q.    All right.  So you said basically it
22 was the second.
23     So you were relying on the content of
24 the SARFs themselves?
25          MR. TURNER:  Objection --

127

1          THE WITNESS:  No, I said it was --
2          MR. TURNER:  -- vague.
3          THE WITNESS:  Yeah, go ahead.
4          MR. TURNER:  Object to form.
5          Go ahead.
6          THE WITNESS:  No.  I said it was both,
7  right?  I mean, I literally said, you know, that
8  the -- you know, the first is important to show
9  that they had a -- you know, general process, you
10 know, for doing this which, you know, I have no
11 reason to doubt was well executed, you know,
12 across the company.
13     And then I looked at the specific
14 content to make sure that the execution itself was
15 at -- you know, a strong level.
16 BY MR. CARNEY:
17     Q.    And that's -- when you looked at the
18 specific content, did you only look at the
19 specific content for these eight samples?
20     A.    No.  I looked at the specific content
21 for the 50 to 70 samples.
22     Q.    And so what would a SARF document have
23 to include for you to conclude that SolarWinds's
24 access controls were inconsistent with the
25 assertions in the securities statement?

128

1    A.   I think I want to work a little bit on
2 just what the question is.
3    Q.   Sure.
4    A.   I mean, you know, like, I'm trying to
5 figure out how you could even find evidence in
6 something of inconsistency -- right? -- like, you
7 know, on a given form.
8         You know, so could you just repeat the
9 question one time?
10    Q.   Sure, sure.
11        I'm trying to understand, you looked
12 at these SARF documents --
13    A.   Right.
14    Q.   -- and concluded that they were
15 consistent with what SolarWinds said in its
16 public- --
17    A.   Right.
18    Q.   -- facing security statement --
19    A.   Right.
20    Q.   -- right?
21    A.   Yeah.
22    Q.   And I'm wondering what would you have
23 had to have seen in the SARFs, hypothetically, to
24 have reached the opposite conclusion that
25 SolarWinds was not doing what it said in the

129

1 security statement?
2         MR. TURNER:  Object to form.
3         THE WITNESS:  You know, again, it
4 would have -- well, first, it would have been a
5 matter of degree of execution, because they had a
6 policy.  They, you know, clearly had process --
7 the SARF process in place.
8         And it was -- you know, again, lots of
9 data showing its implication.  And actually
10 outside auditors had also reviewed the same data
11 and said that this was -- you know, that they were
12 implementing this process and made no findings.
13        You know, in -- you know, my case, if
14 I had sort of consistently seen that the -- you
15 know, the name field was not filled in, that --
16 you know, at some large number of the sample --
17 the 50 to 70 I looked at were missing the name
18 field, that would have been -- that would have
19 been a -- you know, a red flag.
20        In which case, I probably would have
21 looked to -- you know, talked to the people like I
22 did in those other couple cases we've talked about
23 related to evidence samples about how they used
24 the data.
25        But, like, I did not see that level of

130

1 inconsistency anywhere.
2 BY MR. CARNEY:
3    Q.   All right.  And if you guys can
4 indulge me for a couple more minutes, I have one
5 exhibit related to this, and then we'll break.
6         (Whereupon, Exhibit 6 is marked for
7         identification.)
8 BY MR. CARNEY:
9    Q.   All right, Doctor.  And take as much
10 time as you need to look at it, but I've handed
11 you what's been marked as Exhibit 6.
12        And I'm tell you what I did is I took
13 the eight SARFs you cite as samples in
14 Footnote 28, and I put them together as one
15 exhibit.  I tried to do it in Bates number order.
16        But if we can look at the first page,
17 the first SARF --
18    A.   Uh-huh.
19    Q.   -- and it's Bates ending in -- so it's
20 SW-SEC-SDNY- --
21    A.   Uh-huh.
22    Q.   -- 55459, just, for the record.
23    A.   Uh-huh.
24    Q.   You see that an employee named Zouhair
25 Khadija is being requested -- is having access

131

1 requested, right?
2    A.   Yes.
3         MR. TURNER:  Object to form.
4         It's labeled "change in role/access."
5         THE WITNESS:  Oh, okay.
6 BY MR. CARNEY:
7    Q.   All right.
8         MR. TURNER:  I'm just clarifying that
9 they're not getting access for the first time, if
10 that's what you -- request access.
11        THE WITNESS:  All right.
12        MR. CARNEY:  Thanks for the
13 clarification.
14 BY MR. CARNEY:
15    Q.   What access was this employee being
16 given?
17    A.   As was just mentioned, this is a
18 change in -- so this, again, is not initial
19 provisioning of access.
20        This is the portion of the process
21 where SolarWinds also -- you know, if they -- a
22 person changed roles, you know, the process looked
23 through to redefine, you know -- that the
24 role-based access based on the new role.
25        You know, you see on the reverse of

132

1  the form -- right? -- you know, detail about for
2  certain roles, you know, what were the standard
3  accesses for those roles.
4        So, you know, and then we see system
5  and area under the, you know, "Outlook
6  Distribution Lists." So this -- this entire
7  process, you know, would have re-roled his access
8  in, you know, according to a standardized process
9  that SolarWinds had for different -- different
10 roles within the company.
11       Q.    Okay. And to sort of counsel's
12 objection, clarification, that this was a change
13 in the access that this individual had --
14       A.    Uh-huh.
15       Q.    -- what was it being changed from?
16 What was it before?
17       MR. TURNER: Objection. Foundation.
18       THE WITNESS: Again, you know, in this
19 case, it's pretty clear from what's on the form
20 itself that he was going to a new location in
21 Austin and -- you know, a new division, finance.
22 Yeah, so, I mean -- you know.
23       But, again -- you know, I did not --
24 you know, analyze every field of every of the 50
25 to 70 forms nor the eight that are presented.

133

BY MR. CARNEY:
2        Q.    Can you tell from this form what
3  access rights this employee was given as opposed
4  to what he was supposed to be given?
5        MR. TURNER: Objection to form.
6        THE WITNESS: Yeah, you know, this
7  form implements a process that was also described
8  in depositions by the technology leadership that,
9  you know, was meant to, you know, provide a lot of
10 control over what access is.
11       This is a process that there's a lot
12 of instances on, so they -- they move to, you
13 know, increasing levels of automation even during
14 the period -- you know, the relevant period in the
15 execution of the SARF process.
16       So I think, you know, in terms of this
17 form in which of the distro- -- like, the -- the
18 role itself has accesses -- you can map to
19 accesses on the back form.
20       The form would then go to the
21 technology team for implementation. So the form
22 wasn't the only part of the process, right?
23 BY MR. CARNEY:
24       Q.    Okay. So what would you need to look
25 at to see that the access rights that the employee

134

1  was given actually match up with what's on the
2  SARF?
3        A.    What's the question? What...
4        Q.    Yeah, so I'm just trying to understand
5  how we know that this person that accessed this
6  form says they should be given is what they were
7  given. That's all I'm trying to understand.
8        A.    Yeah, I mean, the securities statement
9  calls for the presence of role-based access.
10 There's a process in this form, you know, in --
11 you know, and the testimony indicates that this
12 form maps directly to accesses that the IT team
13 would implement for different job descriptions
14 like Austin and finance.
15       You know, the fact that this process
16 is -- you know, robust and detailed, even years
17 after, we can find artifacts about how this was
18 occurred -- makes me highly confident that what
19 they said they were doing, they did.
20       MR. TURNER: Why don't we break here.
21 You've been going 20 minutes.
22       MR. CARNEY: Just one more question.
23       MR. TURNER: One more.
24       THE WITNESS: Uh-huh.
25 ///

135

1  BY MR. CARNEY:
2        Q.    And I'm just asking from, like, a
3  technical standpoint. Zouhair Khadija, if I
4  wanted to know that this person got the accesses
5  that this form indicates they were gonna get back
6  in 2017, what would I look at to make sure it was
7  done correctly?
8        A.    Yeah, I, you know, is this a
9  hypothetical --
10       Q.    No. This is about this person here.
11       A.    Okay. You know, I'm just trying to --
12 like, the form tells you which of the systems are
13 listed in the back for role -- are you asking
14 whether you're actually gonna go to the person's
15 computer and, like, assess, you know, computer by
16 computer whether that person actually can only
17 get -- you know, has access to the things that are
18 listed in the process, you know -- they can go --
19 you could go to the person's computer at the point
20 in time and determine whether the accesses -- you
21 know, sort of outlined by the form.
22       But the point of the securities
23 statement and, you know, the assessment I did was
24 to basically, you know, look at the fact that
25 these things were in place. And this is the

136

1 typical way the companies do this.
2        And the executives of the companies
3 said they did it, and outside auditors also
4 validated that they had proper role-based access
5 control.
6     Q.    Okay.  Last question before we break.
7        What I'm understanding is there's no
8 way you've described an artifact that I can look
9 at now and say -- see that Zouhair Khadija got the
10 specific access controls that are listed in this
11 document; is that fair to say?
12        MR. TURNER:  Objection to form.  And
13 foundation.
14        THE WITNESS:  You know, we -- I mean,
15 there could be discovery probably about -- you
16 know, forensic images of his computer.  I don't
17 know if those exist or not.
18        So I'm hesitant to say there's no
19 artifact you could go look for.  But it's not
20 necessary in the nature of the assessment I did,
21 because there's deep evidence that there -- you
22 know, that this is an implementation of a practice
23 of role-based access control.
24        You know, they clearly had process.
25 They were doing the process.  The management

137

1 testified that that process was in place and being
2 executed.  Outside auditors looked at the process
3 and validated that it was in place.
4        So there was no need to go deeper than
5 this.
6 BY MR. CARNEY:
7     Q.    All right.  Thanks.
8        THE VIDEOGRAPHER:  The time right now
9 is 12:52 p.m.
10        We are off the record.
11        (Whereupon, a break for lunch was taken
12        from 12:52 p.m. to 1:49 p.m.)
13        THE VIDEOGRAPHER:  The time right now
14 is 1:49 p.m.
15        We're back on the record.
16 BY MR. CARNEY:
17     Q.    Good afternoon, Doctor.
18        Over the break, did you have any
19 substantive discussions about the case or the
20 deposition with anyone?
21     A.    I did talk to the Latham team.
22     Q.    Okay.  About the deposition?
23     A.    Yes.
24     Q.    All right.  When we broke, you were
25 looking at Exhibit 6, which was the samples of the

138

1 SARFs from Footnote 28 in your report.
2     A.    Yes.
3     Q.    I just want -- one more question about
4 these.
5        You understand that there are tickets
6 associated with SARFs; is that right?
7     A.    I understand that, you know, SARFs
8 generate user access requests or, you know,
9 tickets.
10     Q.    Okay.  And with respect to the eight
11 samples that are in Exhibit 6, did you examine the
12 tickets associated with these SARFs?
13     A.    You know, I -- I examined a number of
14 the tickets.  I actually don't remember if I
15 met -- I don't remember mapping those tickets to
16 these SARFs.
17     Q.    Okay.  So you're not sure one way or
18 the other whether you looked at the tickets
19 associated with these SARFs?
20     A.    Yeah.  That was, again, sort of below
21 the level of analysis that I thought was
22 appropriate -- given that, you know, the fact that
23 both that SARF process and that user access
24 request, you know, tickets really demonstrated
25 what the security statement called for.

139

1     Q.    What does "below the level of
2 analysis" mean?
3     A.    That, you know, the securities
4 statement, you know, says that SolarWinds has
5 certain processes and practices in place.
6        And, you know, the approach I took to
7 my assessment, you know -- you know, clearly
8 indicated to me, just as in other instances, you
9 know, that I've done this in the industry and
10 observed others do it, that those were, you
11 know -- that those were in place, things like the
12 process for system access -- you know, implemented
13 by the system access request for forms and the
14 user access request.
15     Q.    Okay.  So why don't we just quickly
16 look at what was Exhibit 5, which was the
17 securities statement.
18     A.    Uh-huh.
19     Q.    So on the page ending in 337108, which
20 would be the second-to-last page.
21        Do you see that?
22     A.    Okay.  Yep.
23     Q.    And under "Access Controls," it says,
24 "Role-based access."  And so the first sentence
25 says, "Role-based access controls are implemented

140

1    for access to information systems."
2        What is -- what does the SARFs in
3    Exhibit 6 tell you about whether or not role-based
4    access controls were implemented for access to
5    information systems?
6        A.    I mean, this is part of a process of
7    implementation for role-based access controls.
8        Q.    Okay.  Is there anything about the
9    SARFs standing alone that tell you that the access
10   controls were actually implemented?
11       A.    You know, there was a -- I mean, the
12   issue is the SARFs don't standalone, right?
13   There's policy, there's the deposition testimony
14   of leaders, you know, that goes into detail about
15   how this access control was implemented.
16       There are SARFs is one of the
17   mechanisms that are used along with user access
18   requests so -- as well as the fact that outside
19   auditors all looked at the same control set and
20   validated it was in place.
21       So, you know, the SARFs are not an
22   isolated piece of data related to role-based
23   access control -- or, you know -- yeah.
24       Q.    Okay.  And the reason I asked that is
25   because earlier in response to one of my questions

141

1    you said that the SARF process and the user access
2    request -- and you said you note tickets really
3    demonstrated what the securities statement called
4    for.
5        So are you saying that you need to
6    look at more than the SARF and the tickets to see
7    whether this -- what the security statement called
8    for was followed?
9        A.    I think what I'm saying is, you know,
10   the SARFs and user access controls were among the
11   data that I used, you know, to -- example, you
12   know, the presence or practice around role-based
13   access.
14       As I've said many times, I used -- you
15   know, common, you know, approach in the industry
16   of, you know, looking for policy and procedure,
17   you know, talking to or looking at depositions of
18   management about how they implemented these
19   things, artifacts like the SARFs and the UARs.
20       And, you know, the fact that in many
21   cases, outside audits also look at the same
22   controls.  So, you know, that -- it was the
23   approach that I took across all of the areas that
24   I evaluated.
25       Q.    Okay.  And, Doctor, let me just ask

142

1    you one more question about that -- one more
2    sentence in that paragraph.  The third sentence
3    says, "Access controls to sensitive data in our
4    database's systems and environments are set on a
5    need-to-know/least privilege necessary basis."
6        Is there anything about the SARFs that
7    we're looking at in Exhibit 6 that show you that
8    statement that I just read you about the need to
9    know least privileged necessary base was followed?
10       A.    Well, again, the SARFs are, again,
11   part of a system of implementation about need to
12   know and privilege.
13       You know, they -- they do provision.
14   You know -- they're part of the process of
15   provisioning a user with a proper, you know,
16   access at the least privilege necessary level.
17       Q.    So you would agree then that SARFs and
18   the tickets alone don't demonstrate that the
19   securities statement was followed with respect to
20   access controls, right?
21       MR. TURNER:  Object to form.
22   Mischaracterization of testimony.
23       THE WITNESS:  As I said, the SARFs and
24   the user access -- yeah, the user access request
25   can't -- can't be taken in isolation in evaluating

143

1    a part -- you know, an aspect of the security
2    statement.
3        And there's a much richer set of
4    evidence about the presence of these controls that
5    I did use.
6    BY MR. CARNEY:
7        Q.    Okay.  So can you, maybe just to
8    clarify for me, why it wasn't necessary to look at
9    the specific tickets associated with these SARFs
10   you used as examples?
11       A.    You know, as is typical, when you
12   know, people are assessing something like the
13   practices, you know, there's a rich set of
14   evidence which, you know, I can, again, repeat in
15   terms of the presence of policy, clear deposition
16   statements about how that was executed by
17   management, strong documentation, you know, SARFs,
18   user access.
19       Again, auditors also looking at these
20   process and saying there was sufficient evidence
21   to say that these things were in place, you can't
22   go down to the -- you know, the specific level on
23   any specific form and, you know, and look at it.
24       It's just beyond the scope of what was
25   necessary to see that the securities statement

144

1  depicted, you know, SolarWinds's conduct in a way
2  that the readers of the securities statement would
3  expect.
4      Q.   All right.  Sir, if I could ask you to
5  turn to page 20, paragraph 45.
6      A.   Of -- yeah, my statement.  I see.
7      Q.   Yeah.  Sorry.  Of Exhibit 1.
8      A.   Uh-huh.
9      Q.   And you see there's a paragraph there,
10  paragraph 45 that talks about tickets.  And if you
11  turn over to the next page, you say, "As with the
12  SARF forms, I have reviewed samples from thousands
13  of these tickets I received from the relevant
14  period evidencing that they were generated as a
15  regular process as part of the SARF process."
16          Do you see that?
17      A.   Yeah.  I just want to orient a bit.
18          Are we talking about the bottom of
19  page 21?
20      Q.   So what I just read was from the top
21  of 21, and then it has a Footnote 36 at the bottom
22  that has the samples, I believe, of the tickets
23  that you selected; is that right?
24      A.   I mean, what I'm reading is, "As with
25  the SARF form, I reviewed samples."

                        145

1          Is that what you were quoting?
2      Q.   Yes.
3      A.   For me, that's on the bottom of
4  page 21, just to be -- just to be precise about
5  it.
6      Q.   Are you looking at Exhibit 1?
7      A.   Oh, you know what?  I'm probably
8  looking at Exhibit 2.  Sorry.
9          And the page reference?
10      Q.   Page 21, please.
11      A.   21.
12      Q.   20 over to 21.
13      A.   Okay.  Yeah, I just want to make sure
14  I read the context for it properly.
15      Q.   Sure.  Of course.
16          (Pause for reading/reviewing.)
17      A.   Okay.
18      Q.   Similar to what I asked you earlier,
19  how were the samples that you have in Footnote 36
20  selected?
21      A.   In a similar fashion as with the
22  SARFs.
23      Q.   And I'll represent that I counted that
24  you have nine samples listed in Footnote 36.
25      A.   Uh-huh.

                        146

1          (Whereupon, Exhibit 7 is marked for
2          identification.)
3  BY MR. CARNEY:
4      Q.   All right.  As with the SARFs from
5  Footnote 28, I put together the tickets from
6  Footnote 36 --
7      A.   Uh-huh.
8      Q.   -- as one exhibit.  And I'm not going
9  to go through all of them, but if we look at the
10  first page, the first ticket, do you know what
11  employee this relates to?
12      A.   You know, in terms of, you know, which
13  employee, I don't know specifically.  I assume,
14  you know, that it's Makins Rickey.  But, you know,
15  I did not analyze each of these forms, in detail.
16          I mean, I analyzed the nature of the
17  form, but I didn't look at the specific, you know,
18  data in each field of the form.
19      Q.   Okay.  And if we look at that first
20  page ending in 49602, down in the notes, if we
21  look at the bottom note, does it appear to relate
22  to someone named Mark Fraser?
23      A.   Can you point me a little more
24  generally to what I'm looking for?
25      Q.   Sure.  Sure.  If we look at the ticket

                        147

1  info in the subject line, it also mentions Mark
2  Fraser.
3          Do you see that?
4      A.   Again, I -- which -- I may be looking
5  at the wrong --
6      Q.   On the first -- the first page.
7          MR. TURNER:  It's right here.
8          THE WITNESS:  Oh.
9  BY MR. CARNEY:
10      Q.   4960.
11      A.   Okay.  Yeah, well, I see an email down
12  at the bottom, two lines, the very bottom with an
13  email from Mark Fraser.
14          What else am I looking at here?
15      Q.   I'm just wondering if that sort of
16  refreshes your recollection or helps you
17  understand that this ticket relates to Mark Fraser
18  rather than Rickey Makins?
19      A.   That was, again, below the level that
20  I was looking at these, you know, tickets in this
21  case.
22          You know, the presence of the tickets
23  sort of clearly indicated that the things that
24  management said were in place, were in place in
25  terms of a process for role-based access and, you

                        148

1    know, implementing that.
2        You know, I did not -- did not feel it
3    was necessary to look at the implementation in
4    each specific example.
5        Q.    And just to be clear, I'm just talking
6    about the nine examples --
7        A.    Uh-huh.
8        Q.    -- that you cited in your report.
9        You didn't think it was necessary to
10   look at those?
11       A.    I mean, I did look at them, and I
12   selected them.
13       Q.    Okay.  Can you tell what access level
14   this employee was being given?
15       A.    I -- the person who would have
16   received this would have been the person that
17   needed to be able to, you know, interpret what
18   each of these fields are.
19       I'm very confident that, you know,
20   this process, you know, allowed, you know, the
21   recipient of a user access, you know, request to,
22   you know, conduct the process properly.
23       You know, as you can see, the forms
24   are complicated and -- you know, I wasn't trained
25   as a SolarWinds, you know, recipient of this

149

1    ticket, so I don't know exactly.
2        Q.    Did you look at the SARF associated
3    with this particular ticket?
4        A.    No.  I didn't feel like I needed to.
5    But I was looking for in both cases, the SARF
6    process and these tickets, was the existence of
7    the process which clearly demonstrated SolarWinds
8    had a role-based access approach that, you know,
9    was utilized in order to, you know, appropriately
10   provision access.
11       Q.    How does the existence of the process
12   tell you that it was appropriately used?
13       A.    Well, you know, again, I didn't rely
14   solely on the artifacts that showed existence of
15   the process.
16       There was testimony by the management
17   under oath and depositions that the process was
18   being conducted.  There were other outside
19   assessments that also found the same.
20       So, you know, as we've been talking
21   about quite a bit, the assessment I did, it wasn't
22   necessary to get to the level of, you know,
23   mapping each individual, you know, ticket to its
24   execution, because I don't think that's necessary.
25       I mean, we're sort of making the

150

1    assumption that they would do all this for -- you
2    know, and not actually conduct all the activity.
3    These processes are heavy weight and, you know, in
4    place in order to accomplish what was in the
5    security statement.
6        And it's pretty clear that, you know,
7    the reader of the security statement would
8    understand that, you know, SolarWinds was doing,
9    you know -- meeting the representations in the
10   security statement.
11       Q.    In your mind, is having a process in
12   place mean that the process is followed?
13       A.    Is this a hypothetical question?
14       Q.    Not really.  It's just I'm wondering
15   if you see that --
16       A.    I mean, just in general outside of
17   this specific situation?
18       Q.    Yes.
19       A.    And, again, could you create a process
20   document and do nothing to implement it?  That's
21   possible.  But it's clearly not the case in what
22   we see here with SolarWinds.
23       Even those documents, which are not
24   process documents, they're implementation
25   documents demonstrate, you know, efforts to

151

1    implement the process.
2        Q.    And you said could you create a
3    process document and do nothing to implement it.
4        How about could you create a process
5    document and not implement it correctly?  Is that
6    possible?
7        A.    Again, we're sort of abstracting out
8    of any specific in the SolarWinds case?
9        Q.    Yes.
10       A.    Yes.  Improper process implementation
11   is theoretically possible.
12       Q.    And in the case of -- let's use the
13   SolarWinds SARF ticket process.
14       What would you have had to have seen
15   to know whether or not the process was being
16   implemented improperly?
17       A.    You know, again, my assignment was to
18   sort of evaluate the security statement and, you
19   know, assess whether the things that were, you
20   know, asserted there were in place.
21       You know, clearly, you know, the
22   presence of, you know, not just process
23   documentation but many, many artifacts of
24   implementation indicated that the process was
25   there.

152

1      It wasn't my role to look at sort of
2  at the granular level, you know, the implement --
3  the exact implementation of it in detail.  I
4  mean -- you know, at an instance-by-instance
5  detail.
6      Q.    So is it fair to say that at a high
7  level, in this case, you're offering the opinion
8  that during the relevant period, as you've defined
9  it, the SolarWinds security statement was not
10  inaccurate or misleading?
11      A.    It is my opinion that the SolarWinds
12  security statement was -- was accurate.
13      Q.    Okay.  And it's your opinion that by
14  virtue of that, this securities statement was not
15  misleading?
16      A.    Yeah, I do not believe the security --
17  the SolarWinds security statement was misleading,
18  no.
19      Q.    Is it fair to say that's sort of the
20  crux of your expert opinion?
21      A.    You know, the crux of my expert
22  opinion was, you know, as detailed in my expert
23  report.  I looked at the security statement, you
24  know, focused on particular areas that I -- you
25  know, believe are at issue in the case.

153

1      And, you know, saw evidence of a
2  variety -- you know, variety of sorts that
3  indicated the assertions made in the security
4  statement were true.
5      Q.    All right.  Sir, if I could ask you to
6  turn to page 23, paragraph 49.
7      A.    Uh-huh.
8      MR. TURNER:  Can you just give me a
9  minute, Chris.  I'm having trouble tracking down
10  Exhibit 1.
11      MR. CARNEY:  Oh, I might have another
12  copy, if you want.
13      THE WITNESS:  Did I steal that one
14  too?  I don't think so.
15      (Whereupon, discussion held off the
16  written record to find document.)
17      THE WITNESS:  Exhibit 1 again.
18  BY MR. CARNEY:
19      Q.    Yes, sir.  So page 23, paragraph 49.
20      A.    Okay.  You know, may I have a quick
21  moment to just read the paragraph?
22      Q.    Of course.  Anytime you need that,
23  just --
24      A.    Okay.
25      (Pause for reading/reviewing.)

154

1      A.    Okay.
2      Q.    Okay.  Sir, in the last sentence of
3  paragraph 49 you say, "Again, I have samples from
4  numerous SARFs I received requesting such changes
5  along with corresponding tickets evidencing that
6  this practice was commonly followed during the
7  relevant period."
8      So I want to ask you about that.
9      What does it mean that it was commonly
10  followed?
11      A.    Again, with the SARF that I received
12  with tickets, it looks like they were executing
13  the practice, which was the level at which I was
14  trying to, you know, see that direct evidence of
15  the practice and implementation.
16      That, you know, I was not looking to
17  statistically analyze the full -- the full set,
18  you know.  So commonly followed was -- with the
19  evidence I saw, it was followed.
20      Q.    When you say you were "not looking to
21  statistically analyze the full set," what do you
22  mean by that?
23      A.    Well, I think it sort of -- I didn't
24  look at every SARF related to a change, and all of
25  the corresponding tickets and -- and do a

155

1  statistical analysis, because it was unnecessary
2  as we've assessed quite a bit.
3      You know, the process -- you know, the
4  clear, deep, you know, documents -- you know,
5  documentary evidence that they had these processes
6  and they were doing them is the level at which my
7  analysis was conducted and is -- you know, the
8  level of analysis that I think would be expected
9  in terms of the security statement.
10      Q.    Okay.  And you'd agree, commonly
11  followed doesn't mean uniformly followed, right?
12      A.    If you're asking that, you know -- is
13  the question that -- I'm just trying to
14  understand --
15      Q.    Sure, sure.
16      A.    -- you know, is the question that --
17  whether, you know, I'm asserting by saying
18  "commonly followed" that every -- every SARF or,
19  you know, for change was done perfectly?
20      Because, yeah, it definitely doesn't
21  mean that they achieved the standard of
22  perfection.
23      Q.    Okay.  And just picking up on your
24  comment about not having done a statistical
25  analysis, so it's fair to say you didn't look to

156

1  see what percentage of the time this process was
2  followed, right?
3          MR. TURNER:  Object to form.
4          THE WITNESS:  You know, we've
5  discussed this a lot, and I've -- we may do it
6  quite a bit this afternoon.  That was out -- you
7  know, outside the scope on the sense that, you
8  know, I had multiple sources of information that,
9  you know, clearly indicated -- you know, that
10  SolarWinds was doing the practices, in this case,
11  proper role-based access control that the
12  securities statement; and, therefore, you know, I
13  did not do an analysis of, you know, every
14  instance of the SARFs across the entire relevant
15  period.
16  BY MR. CARNEY:
17      Q.    Okay.  And let me just ask you a
18  hypothetical then --
19      A.    Uh-huh.
20      Q.    -- this is not SolarWinds, just a
21  hypothetical.
22          If the access -- companies' user
23  access policy was followed 95 percent of the time,
24  but the 5 percent of the time that it was not
25  followed involved elevated permissions being

157

1  granted to employees who should not have had them,
2  would your opinion change about whether the --
3  following it -- what's the word?  I'm sorry, let
4  me -- whether following it commonly was enough?
5          MR. TURNER:  Object to form.
6          THE WITNESS:  Again, you know, the
7  statement we've been reading this last sentence of
8  paragraph 49 is not the sole basis for my, you
9  know -- you know, my assessment that SolarWinds's
10  security statement related to role-based access is
11  correct.
12          There's many, many other sources of
13  information that sort of indicated that they were
14  doing the things that there are in the security
15  statement.
16          You know, in terms of a statistical --
17  you know, the 95/5, I mean, it's very
18  hypothetical.  I would have to understand a lot of
19  context around the company of concern, you know,
20  again -- you know, the -- the errors in why that
21  error rate.
22          But that was out of scope for, you
23  know, the exercise here, which was to look at the
24  securities statement and, you know, assess whether
25  SolarWinds was, you know, performing as they

158

1  affirmed they were performing in the security
2  statement.
3  BY MR. CARNEY:
4      Q.    Okay.  All right.
5          (Whereupon, Exhibit 8 is marked for
6          identification.)
7  BY MR. CARNEY:
8      Q.    All right.  Doctor, you've been handed
9  what's been marked as Exhibit 8.  And I'll
10  represent to you that these are the -- in that
11  last sentence of paragraph 49 we just looked at,
12  you say that you, "have samples from numerous
13  SARFs I received requesting such changes along
14  with the corresponding tickets."
15          And that -- so these appear to be the
16  samples that are in Footnote 44 --
17      A.    Okay.
18      Q.    -- do you see that?
19      A.    Yes.
20      Q.    And so first of all, would you -- if
21  you could just flip through this --
22      A.    Uh-huh.
23      Q.    -- are all these documents tickets or
24  any of them SARFs, as you understand, in your
25  Footnote 44?

159

1          MR. TURNER:  I'm just confused.  The
2  footnote is citing what I assume are SARFs, and
3  then it says, "I understand the tickets have been
4  produced with the corresponding SARFs attached."
5          Maybe I read it backwards, but...
6          MR. CARNEY:  Right.  So I'm just --
7          MR. TURNER:  The footnote is
8  referencing both, and there's obviously
9  attachments missing here.
10          MR. CARNEY:  You say there's
11  attachments missing.
12          MR. TURNER:  It says -- the footnote
13  says, "I understand the tickets have been produced
14  with the corresponding SARF forms attached."
15          So if these are the tickets, I assume
16  there were SARF forms attached to the production,
17  and they're missing here.
18          MR. CARNEY:  Okay.
19  BY MR. CARNEY:
20      Q.    All right.  And you can -- you can
21  look through -- you can look through the Bates
22  numbers that are cited in Footnote 44 and tell me
23  if I'm missing any of the documents that you cite
24  to in that footnote.
25          MR. TURNER:  We can go off the record

160

1  if you like.  I think, Maurice maybe can explain
2  this.
3          But I think basically if you -- the
4  way the documents were electronically produced,
5  the SARFs were an attachment to the document just
6  like with an email.
7          MR. BAYNARD:  I believe the tickets
8  were produced earlier and then we produced the
9  SARF form [indiscernible].
10         THE STENOGRAPHER:  I can't hear you.
11         MR. BAYNARD:  That we produced the
12 SARF forms later with an overlay so they were
13 linked in the review database so you could see the
14 attached ticket -- further attached form to each
15 ticket.
16         MR. CARNEY:  Okay.
17 BY MR. CARNEY:
18    Q.    And with that --
19         MR. TURNER:  So there was no way -- I
20 just -- to clarify, so I'm not sure there's a way
21 of citing to SARFs directly.
22         MR. CARNEY:  So you're saying they
23 don't have Bates numbers, is what --
24         THE WITNESS:  That may be.
25         MR. BAYNARD:  They have Bates numbers,

161

1  but they just aren't sequential, because they were
2  produced at a later date.
3          MR. CARNEY:  Okay.  And thank you for
4  that clarification.
5  BY MR. CARNEY:
6    Q.    So, Doctor, would you have looked at
7  the SARFs that are associated with the tickets
8  that are listed in Footnote 44?
9    A.    Yes.  As we were just discussing, you
10 know, as these -- as this evidence was produced,
11 you know, I looked at it.
12         I don't know that I can map each one
13 of these to the SARF, but, you know, there is a --
14 you know, again, I think we just heard, there's a
15 process for that.
16         But, you know, again, I clearly looked
17 at these tickets, you know, to the notion of this
18 paragraph, which is there was an implementation,
19 you know, in place for the change process.
20         I think if you read through these,
21 it's pretty clear that they were implementing --
22 you know -- they were implementing changes to --
23 you know, role-based changes.
24    Q.    Okay.  And I was really just trying to
25 understand from a technical standpoint if you

162

1  followed the process that Mr. Baynard described
2  and looked at the associated SARFs?
3          MR. TURNER:  If -- just to make the
4  record clear, I think that what happened is the
5  documents were produced to Mr. Rattray before they
6  were produced to y'all in the form we just
7  discussed.
8          So he may have gotten the tickets with
9  the SARFs attached, but in order to produce them
10 to you, the tickets had already been produced, so
11 we were overlaying them with those so they
12 wouldn't appear as attachments.  It's complicated.
13         MR. CARNEY:  Okay.
14         MR. TURNER:  But as far as I
15 understand, Mr. Rattray would have received them
16 originally as tickets, and attached --
17         (Simultaneous unreportable crosstalk
18         occurs among parties.)
19         THE WITNESS:  And I would have
20 reviewed that as a group, if they were -- if the
21 SARFs were attached to the tickets.
22 BY MR. CARNEY:
23    Q.    Okay.  And do you recall whether the
24 SARFs were attached to the tickets when you looked
25 at these samples?

163

1    A.    You know, I believe they were.  But,
2  again, as you can -- you know, you can well see,
3  there was a lot of evidence we were working
4  through.
5          Again, my assignment was to make sure
6  that the tickets in this case from SARFs related
7  to changes, that the process -- you know, the
8  SARFs generated tickets and the tickets were acted
9  upon.
10    Q.    Okay.  All right.  And once again, I
11 don't want to go through all these tickets, so
12 let's just use one as an example.  If we look at
13 the first page --
14    A.    Uh-huh.
15    Q.    -- ending in 47323, can you tell what
16 type of access request change is being made here?
17         MR. TURNER:  Just take your time --
18         THE WITNESS:  Yeah --
19         MR. TURNER:  -- to read through the
20 document.
21         THE WITNESS:  -- uh-huh.
22         Again, as we look at what, you know,
23 this filled out ticket, you know -- where, again,
24 I was looking at not any specific access change
25 but the presence of a process and, you know, an

164

1  implementation of a process for ticketing to make
2  sure the changes got done.
3          You know, I read a sentence that
4  please note that Andy is not [indiscernible].
5          THE STENOGRAPHER:  I can't understand
6  you.
7          THE WITNESS:  Okay.  Yeah.  So as I
8  read this, there's a sentence that says, "Please
9  note that Andy is now an employee of SolarWinds
10 MSP UK.  Can his access be amended to reflect the
11 change from contractor to employee?"
12         So I believe, you know, that would
13 probably be the -- you know, the access change
14 requested.
15 BY MR. CARNEY:
16     Q.    And what's the difference in access
17 from a contractor to an employee at SolarWinds?
18         MR. TURNER:  Objection.  Foundation.
19         THE WITNESS:  You know, I don't know
20 the specifics of what systems contractors get
21 versus employees.
22         As we've talked about a lot, it's
23 clear that SolarWinds had a process to control and
24 properly provision role-based access, and that's
25 what I was looking for.

                        165

1  BY MR. CARNEY:
2      Q.    All right.  Sir, if I could -- you can
3  put that one aside.
4      A.    Uh-huh.
5      Q.    If I could ask you to turn to page 24.
6  You state -- and you can -- if you need -- at any
7  time, if you need to go back to get context --
8      A.    Uh-huh.
9      Q.    -- please feel free, but it says, "All
10 these are the source of artifacts I would look for
11 had I been hired in the ordinary business context
12 to conduct an assessment of SolarWinds's
13 role-based access controls.
14         "In my opinion, they easily
15 demonstrate that the representations in the
16 securities statement relating to role-based access
17 controls were true."
18         And then you --
19     A.    I'm just trying to -- I'm actually not
20 tracking where you are reading.
21     Q.    Oh, sorry.  I'm on page 24.
22     A.    Exhibit 1.
23     Q.    Exhibit 1.  Paragraph 52.
24     A.    Okay.  Got it.  I'm now seeing it.
25 Yeah.  I may read this contextually when you

                        166

1  finish --
2      Q.    Okay.
3      A.    -- but why don't you please proceed.
4      Q.    Sure.
5          So I just read that -- that paragraph
6  to you.  I won't read --
7      A.    Yeah.  You don't need to read it
8  again --
9      Q.    -- it again?
10     A.    -- but the first two sentences of
11 paragraph 52.
12     Q.    Got it.
13         And then you quote from the security
14 statement regarding access controls.
15         Let me just focus you on the last
16 sentence --
17     A.    Uh-huh.
18     Q.    -- it says, "Access controls to
19 sensitive data in our database systems and
20 environments are set on a need-to-know/least
21 privilege necessary basis."
22         How -- you state in paragraph 52 that
23 the artifacts you looked at easily demonstrate
24 that the representations in the securities
25 statement relating to role-based access controls

                        167

1  were true.
2          And can you just explain to me how
3  these samples that we just looked at easily
4  demonstrate to you that SolarWinds was only
5  allowing access on a need-to-know/least privilege
6  necessary basis?
7          MR. TURNER:  Object to form.
8  Mischaracterization.
9          Go ahead.
10         THE WITNESS:  Okay.  The whole SARF
11 process where, you know, role-based access is
12 basically the same as need-to-know, right?
13         So, you know, we've had the discussion
14 about these SARFs and tickets that I've reviewed,
15 you know, being -- you know, among the evidence I
16 used for role-based access, and, again, which is
17 synonymous with need-to-know.
18         So, you know, that's why I made --
19 that's why I'm confident in this statement.
20 BY MR. CARNEY:
21     Q.    And just to make sure I'm
22 understanding, the individual SARFs and tickets
23 that you looked at by themselves don't demonstrate
24 to you that the representations in the securities
25 statement relating to role-based access controls

                        168

1    were true, right?
2            MR. TURNER:  Object to form.
3            THE WITNESS:  I've answered, I
4    believe, this -- pretty much the same question,
5    right?
6            That the SARFs -- and, you know, the
7    associated tickets were an element of a -- you
8    know, an element of a system and a set of, you
9    know -- a subset of their total amount of data
10   that I used to, you know, make the assertion that
11   all of these are the sorts of artifacts I would
12   look for, right?
13           So I looked for these for presence of
14   implementation in the form of, you know, a
15   process, which the SARF -- the SARFs show how they
16   did.  System access request and the tickets show
17   how that was -- you know, how that moved through
18   to the implementation.
19           So, you know....
20           So that is how I made -- you know,
21   made the judgment in this case.
22   BY MR. CARNEY:
23       Q.   Can you have role-based access that is
24   not synonymous with a need-to-know basis?
25       A.   Are we talking about some sort of

                      169

1    hypothetical situation?
2        Q.   Yes.
3        A.   Yeah, probably want to avoid any kind
4    of given hypothetical.  But role-based access is
5    the way companies, you know, as common practice
6    and language now, you know, handle access
7    controlling.
8            And, you know, in the case of the
9    securities statement, you know, that's the
10   expectation of the reader of the securities
11   statement and, you know, vendor management teams
12   is to see that a company like SolarWinds, when
13   you're buying their products, you know,
14   understands that they need to have role-based
15   access in place.
16           I mean, that's what the purpose of
17   this statement is, and that is why I examined what
18   I examined.
19       Q.   All right.  Sir, if I could direct
20   your attention to paragraph 53, which is on
21   page 25 of Exhibit 1.
22       A.   Okay.  Sorry.  I went to -- before all
23   I should say, remember, Greg, it's paragraph 53
24   not page 53.  I'm there, paragraph 53.
25       Q.   Okay.  And then it goes over on to the

                      170

1    next page.
2        A.   Yep.
3        Q.   And in that paragraph, you discuss
4    user access reviews.
5            Do you see that?
6        A.   I'm going to read the paragraph --
7        Q.   Sure.
8        A.   -- so -- yeah, just so we can proceed
9    when I have enough context.
10           (Pause for reading/reviewing.)
11           (Whereupon, Exhibit 9 is marked for
12           identification.)
13           THE WITNESS:  Yeah, I've read
14   paragraph 53.
15   BY MR. CARNEY:
16       Q.   And in Footnote 51, you cite a number
17   of samples of user access reviews that you looked
18   at, right?
19       A.   Yes.
20       Q.   Okay.  I -- all right.  And I'll just
21   tell you this Exhibit 9, I think this was printed
22   out in the native format, so it doesn't have the
23   Bates number on it, but this would be the first
24   sample in Footnote 51, which is SW-SEC-00296522.
25       A.   Yes.

                      171

1        Q.   And have you looked at this particular
2    user access review before?
3        A.   You know, the user access reviews
4    cited in Footnote 51, I looked through each of
5    those.
6            I mean, basically clicked through, you
7    know, extensive set of, you know, user access
8    reviews, right?  Do I remember, you know, that
9    this one is Bates numbered -- each particular
10   Bates number here, I do not.
11       Q.   I would not expect that, sir.
12           But the format of this, does this look
13   familiar --
14       A.   Yes.
15       Q.   -- to user access reviews you looked
16   at?
17           Okay.  Can you tell from looking at
18   this user access review who conducted it?
19       A.   Let me just take a quick look through
20   the whole thing.
21           You know, in terms of who conducted
22   it, you know, I think one perspective on the
23   question is "who" might not be the right word.
24           Because user access reviews are
25   probably generated as a -- I mean, in many places

                      172

1 are generated as a normal set of data production
2 out of an automated system in order to make sure
3 that you're reviewing who had access, right?
4 So, you know, especially the -- you
5 know, the deep long, you know, fields and fields
6 of data that we see are clearly, you know, outputs
7 from, you know, an automated logging system.
8 So I'm not sure there's a single who
9 associated with the generation of this.
10 But what I was looking for was, you
11 know -- and, again, you know, as the -- as the
12 paragraph says, you know, as we'd talked about
13 SARFs and user access forms, the fact of regular
14 user access -- you know, regular review of user
15 access rights is just an additional layer of
16 confirmation for the processes, you know, outlined
17 in the securities statement.
18 Q. Okay. So rather than who conducted
19 it, what system was used to generate this user
20 access review?
21 A. You know, I asked for production of,
22 you know, data related to -- you know, role-based
23 access control, and user access reviews were
24 highlighted as one of the sources of information
25 that showed the implementation of the processes.

173

1 So in terms of the exact way these
2 were generated, I did not and felt like it was not
3 necessary to understand that. Having seen many
4 types of document -- process documentation, this
5 looks very clean and organized.
6 And to the extent to which, you know,
7 do I feel this provides good granularity and
8 ongoing confidence that SolarWinds reviewed the
9 access their users had, this data set, you know,
10 to me very clearly indicates that that was the
11 case.
12 Q. And what makes this data set clean?
13 A. Just well organized, right? You know,
14 in terms of, you know, the fields that are in
15 here, the account types that are in here.
16 You know, again, cleaning and pretty
17 comprehensive, right? You know, the locations,
18 the names, the email addresses, right?
19 You know, in terms of, you know,
20 output that would, you know, show that a process
21 existed in addition to the, you know, SARF and,
22 you know, user access ticketing process that
23 they're actually reviewing it and confirming that
24 their role-based access program was in place, this
25 is good documentation of that.

174

1 Q. And what, if any, conclusions can you
2 draw about whether user access was only allowed on
3 a need-to-know/least privilege necessary basis
4 from looking at user access reports like this?
5 A. You know, again, the assertion that I
6 made in the -- regarding the security statement in
7 terms of need-to-know and least privileged was the
8 presence of the system that, you know, the
9 role-based access system of which this is just one
10 cross-check on that system.
11 And so, you know, these user access
12 reviews allowed -- you know, would allow for
13 checking whether the process of, you know,
14 provisioning of users was -- you know, the data
15 there to check that it was done properly.
16 Q. Okay. All right. Sir, if I could ask
17 you to please turn to page 65 of your report.
18 In paragraph 119, it starts at the
19 bottom. And you can look at paragraph 118 might
20 be help -- provide some context too.
21 A. Uh-huh.
22 Q. You're talking about a help desk
23 ticket that Mr. Graff cited.
24 Do you recall that?
25 A. Yeah. If it's okay, I just would like

175

1 to read 18, 19 --
2 Q. Sure.
3 A. -- and maybe 20 just so I get the full
4 context?
5 Q. Of course.
6 (Pause for reading/reviewing.)
7 A. Okay. I think I'm ready.
8 Q. All right. So if you look -- now that
9 you have the context, if you look in
10 paragraph 119, the second sentence, you say,
11 "First, it's not even clear from the chat that the
12 one-year time period was incorrect. The person
13 who specified the time period may have gotten it
14 from the temps manager."
15 I want to stop right there.
16 Have you seen any documents indicating
17 that the person who specified the time period got
18 it from the temps manager?
19 A. Well, first, shouldn't we be looking
20 at the artifact we're talking about here?
21 Q. If you would like to, sure.
22 A. Yeah, I mean, that would be useful.
23 (Whereupon, Exhibit 10 is marked for
24 identification.)
25 MR. CARNEY: And just for the record,

176

1    I've handed you Exhibit 10. And that is the
2    artifact that you requested, and it's Bates number
3    SW-SEC-SDNY_00050922.
4            THE WITNESS: Okay. Yeah, I got the
5    artifact.
6    BY MR. CARNEY:
7        Q.   Okay. So my question was: In
8    paragraph 119 of your report, you say, "The person
9    who specified the time period may have gotten it
10   from the temps manager."
11           And I asked: Have you seen any
12   evidence to that effect?
13       A.   You know, I think, you know, in the --
14   the general context here, that the point being
15   made in that sentence is there are a lot of
16   explanations for what might or might not be on
17   this form.
18           But that this is one form out of
19   thousands of, you know, SARFs. And the specifics
20   here, which, again, I've said, you know, I was
21   trying to illuminate that, you know, we don't know
22   exactly how any specific form, you know, would be
23   filled out.
24           In terms of the question, have I seen,
25   you know, evidence that the -- you know, that

177

1    the -- that the person who needed the time period
2    defined could have gotten it from the temps
3    manager, I have not seen such evidence.
4            But as we've talked a lot about, I
5    didn't go to that level of analysis. I was sort
6    of asserting here or saying here, there's a lot of
7    reasons that this form could have been filled out
8    the way it is.
9        Q.   Okay. So when you make the statement,
10   "The person who specified the time period may have
11   gotten it from the temps manager," you were
12   speculating; is that fair?
13       A.   Oh, yeah. You know, it was sort of
14   with a distant illustration of, you know, more
15   fundamentally by focusing on this particular, you
16   know, ticket.
17           You know, the fact that a SARF has,
18   you know, ambiguity at this level is not the level
19   I was operating on for this assessment.
20           It's that they had a SARF process,
21   right? If you look -- if you look at the SARF and
22   the dialogue, it shows that they're trying hard to
23   figure out what is appropriate access, right?
24           Like, they're not just willy-nilly
25   implementing things. There's a dialogue with

178

1    notes. That is, you know, strong implementation
2    of a -- you know, a role-based access and control
3    system.
4        Q.   All right. So instead of focusing on
5    the one ticket, in the second part of that
6    sentence in paragraph 119, you say, "Or that
7    period may have been a standard employment period
8    for a temp."
9            Do you see that?
10       A.   I do.
11       Q.   Okay. Have you seen any documents
12   among the thousands of SARF tickets you had access
13   to indicating that the one-year period was a
14   standard employment period for a temp?
15       A.   This is a -- I think another example
16   of I wasn't looking for documentation at that
17   level. This was just illustrative of why there
18   might -- you know, what might be going on, you
19   know, in the case of this SARF.
20           And, again, to illuminate the fact
21   that they had a very strong process. And that,
22   you know, there wasn't a need at my -- you know,
23   for me to see if they had a role-based access
24   control process, like, stated in the securities
25   statement to look for that level of sort of

179

1    procedure -- you know, procedural execution.
2        Q.   Okay. So is it fair to say that when
3    you said the period may have been a standard
4    employment period for a temp, that you were
5    speculating?
6            MR. TURNER: Object to form.
7            He's already explained the purpose of
8    the remark.
9            THE WITNESS: Yes. And as you know, I
10   can repeat the entire statement I just made.
11   Hopefully the record will -- you know, will show
12   that that wasn't my task to determine, you know,
13   all the specific procedural implementation.
14           This paragraph was meant to say, in
15   any specific case, you know, there may be good
16   reasons for why this SARF is the way it is. But
17   more fundamentally, they had a SARF process.
18           This SARF indicates a strong effort to
19   make sure that it was implemented in a thoughtful
20   way. And that was sufficient for me to affirm
21   what was in the securities statement.
22   BY MR. CARNEY:
23       Q.   Okay. In that same paragraph towards
24   the end, you mentioned that, "A separate SARF
25   would be submitted upon an employee's

180

1  termination."
2       Do you see that?
3       **A.**  I do.
4       **Q.**  Have you seen the SARF ticket
5  decommissioning this temp's access after they left
6  the company?
7       MR. TURNER:  Objection.  Assumes facts
8  not in evidence.
9       THE WITNESS:  You know, I think
10 we're -- we're gonna have the same conversation
11 once again.  You know, the point of paragraph 119
12 is that -- to show that there's a lot of reason
13 any individual SARF may have been written the way
14 it is.
15       But my -- you know, my expert report,
16 you know, starts the next paragraph with, "But
17 more fundamentally."
18       And this is the point; that one
19 particular SARF is really not -- not relevant to
20 judging whether SARFs or more generally the full
21 set of evidence, you know, presented around the
22 presence of role-based access is sufficient for me
23 to determine that, you know, I feel confident that
24 the securities statement is -- is accurate.
25 ///

181

1  BY MR. CARNEY:
2       **Q.**  All right.  Sir, I'm going to switch
3  topics to -- I'm going to ask you some
4  questions --
5       THE WITNESS:  Can I ask for a break?
6  I have to go to the bathroom.
7       MR. CARNEY:  Sure, sure.
8       THE WITNESS:  How long have we been
9  going?
10      MR. TURNER:  An hour.
11      THE VIDEOGRAPHER:  The time right now
12 is 2:52 p.m.
13      We're going off the record.
14      (Whereupon, a recess was taken at
15      2:52 p.m.)
16      THE VIDEOGRAPHER:  The time right now
17 is 3:04 p.m.
18      We're back on the record.
19 BY MR. CARNEY:
20      **Q.**  Dr. Rattray, if I could ask you to
21 please look at page 35 of Exhibit 1, paragraph 67.
22      **A.**  Okay.
23      **Q.**  You say, "There's clear evidence in
24 the record that SolarWinds did enforce password
25 complexity on active directory."

182

1       And then, "In particular, I have
2  reviewed a chat between Tim Brown and Eric
3  Quitugua," and then you go on to describe the
4  chat.
5       Do you see that?
6       **A.**  I do.  I'm just going to -- as we've
7  been doing the last little while, I just want to
8  make sure I've got the context for things as, you
9  know, we go into your questions.
10      MR. TURNER:  Go ahead.  Take the time
11 you need for it.
12      (Pause for reading/reviewing.)
13      THE WITNESS:  Okay.  I think I'm good
14 for a moment.
15 BY MR. CARNEY:
16      **Q.**  And so you see paragraph 67, the chat
17 you reference?
18      **A.**  Yes.
19      **Q.**  And Mr. Quitugua sends back a
20 screenshot in the chat; is that right?
21      **A.**  Yes.  I -- yeah.
22      **Q.**  Is that correct?
23      **A.**  Yes, it -- that's right.  You know, it
24 happened in 2017, which was quite a bit outside
25 the relevant period, but, yeah, I see that.

183

1       **Q.**  And so if it happened quite a bit
2  outside the relevant period, why did you rely on
3  that chat?
4       **A.**  Because I think it, you know, was just
5  the start of the process which would have
6  continued into the relevant period.
7       **Q.**  Okay.  So you would agree that in
8  assessing the cybersecurity practices of a
9  company, it is acceptable to review and rely on
10 chat messages between employees regarding those
11 practices, right?
12      MR. TURNER:  Objection to form.
13      I think he's relying on what's
14 depicted in the chat message.
15      MR. CARNEY:  Okay.  Speaking
16 objection, that's completely improper.
17      MR. TURNER:  I'm just clarifying the
18 objection.  It was objection to
19 mischaracterization of testimony.
20      MR. CARNEY:  How did I
21 mischaracterize it?  He relied on the chat.
22      MR. TURNER:  He's relying on the
23 screenshot that's in the chat.
24      MR. CARNEY:  Which is part of the
25 chat, so your speaking objection --

184

1    MR. TURNER: You're speaking now. I'm
2  trying to just clarify. If you left it there, I
3  wouldn't have to keep speaking.
4    MR. CARNEY: Okay. You're coaching
5  the witness during a deposition.
6    MR. TURNER: Go ahead, Chris.
7    MR. CARNEY: It's improper. I don't
8  like it. It's against the Federal Rules of Civil
9  Procedure.
10    MR. TURNER: Chris, I made a very
11  short description about the form that I was
12  objecting to.
13    Please continue.
14    MR. CARNEY: All right.
15  BY MR. CARNEY:
16    Q.   Doctor, so would you agree that in
17  assessing the cybersecurity practices of a
18  company, it is acceptable to review and rely on
19  chats messages between employees regarding those
20  practices?
21    A.   You know, the set of evidence I relied
22  upon, you know, in this case, you know, looked at
23  a chat that showed, you know, direct evidence of
24  the -- you know, password -- you know, how active
25  directory, you know, was -- was utilized, right?

185

1    So, you know, the evidence is that,
2  you know, active directory in the following
3  paragraph discussing how Microsoft guidance around
4  password complexity. You know, in my case, that's
5  the evidence I was relying upon.
6    Q.   Okay. And as you indicated, it was
7  from quite a bit outside the relevant period,
8  right?
9    A.   Right. The point there being they put
10  this in place early as they were -- you know, as
11  testified in multiple places, you know,
12  increasingly using active directory so that active
13  directory, you know, was increasingly the -- the
14  source of implementation of password complexity.
15    Q.   Okay. And you would then also agree
16  that in assessing the cybersecurity practices of a
17  company, it is permissible to look at documents
18  from outside the relevant period you're studying,
19  right?
20    A.   In the case of showing that things
21  were in place earlier that had every -- you know,
22  reason to believe were continued and in this case
23  testimony that says active directory was the
24  primary place at which SolarWinds was seeking
25  to -- you know, manage identity.

186

1    You know, in this case, it was useful
2  to show that that had been in place, because it
3  was -- there's a whole evidentiary basis to say
4  they were increasing the use of active directory.
5    Q.   If I can ask you, sir, to look at
6  page 87, paragraph 158.
7    A.   Page 87.
8    Q.   Yes. Thank you. In the last sort of
9  clause of that paragraph, you state that there's
10  evidence establishing that, "SolarWinds generally
11  implemented password controls in a manner
12  consistent with the representations in the
13  security statement."
14    Do you see that?
15    A.   Again, I'm going to read all of 158,
16  and then -- yeah, I'll answer the -- I'll ask you
17  to repeat the question, and I'll answer.
18    Q.   Okay.
19    (Pause for reading/reviewing.)
20    A.   Okay.
21    Q.   And my question was about the
22  statement that "SolarWinds generally implemented
23  password controls in a manner consistent with the
24  representations in the security statement."
25    Do you see that?

187

1    A.   I do.
2    Q.   And what did you mean by the word
3  "generally" in that sentence?
4    A.   You know, as we've been discussing
5  throughout the day, you know, my task was to look
6  at the security statement and, you know, examine
7  whether the things in the security statement were,
8  you know -- there was -- you know, the presence of
9  process and procedure and implementation.
10    And I saw that consistent with the
11  representations in the security statement.
12    Q.   All right. If I could ask you to look
13  at -- hopefully you still have in front of you
14  Exhibit 5, the securities statement.
15    A.   [Speaking sotto voce]. Got it.
16    Q.   On the second-to-last page with the
17  actual text on it, the page ending in 337108.
18    A.   Yes.
19    Q.   And under "Access Controls" and then
20  under "Authentication/Authorization," do you see
21  the sentence that says, "Our password best
22  practices enforce the use of complex passwords
23  that include both alpha and numeric characters
24  which are deployed to protect against unauthorized
25  use of the password."

188

1          Do you see that?
2     A.    Yes, I do.
3     Q.    And you'd agree that this assertion
4   does not include the word "generally," right?
5     A.    The word "generally" is not in the
6   sentence you just read.
7     Q.    And do you agree that the statement
8   would be different if it included the word
9   "generally" in it?
10          MR. TURNER:  Objection to form.
11          THE WITNESS:  Different -- different
12   how?
13   BY MR. CARNEY:
14     Q.    Would it have a different meaning if
15   that same sentence I just read had the word
16   "generally" in it?
17          MR. TURNER:  Object to form.
18          THE WITNESS:  I'm not sure in the
19   context of the securities statement that's even
20   true.  I don't necessarily agree with that
21   assertion.
22   BY MR. CARNEY:
23     Q.    Why is that not true?
24     A.    Because the securities statement is,
25   you know, a document that is, you know, depicting

189

1   to, you know, the vendor management people who
2   read it is the narrow -- you know, the purpose for
3   this securities statement.
4          And, you know, all -- all it's meant
5   to do is, you know, illuminate that SolarWinds
6   understood the types of controls that they had and
7   that they were -- there were practices in place.
8          So, you know, whether you said
9   generally we do that, because no one's holding
10   this to a bar of perfection, or we are -- our
11   parts were practices -- you know, in terms of the
12   use of this statement, I'm not sure it does make
13   any difference.
14     Q.    If I could turn you back now to
15   paragraph 65 of Exhibit 1.  I'll give you a page
16   number.
17     A.    Okay.
18     Q.    Page 33.
19     A.    Uh-huh.
20     Q.    You state that --
21     A.    Oh --
22     Q.    I'm sorry.  Paragraph 65 --
23     A.    -- I did it again.
24     Q.    -- paragraph 33.
25     A.    Yeah, I'm there.

190

1     Q.    All right.  And you can -- I'm going
2   to ask my question.  You can have as much time as
3   you want to read for context.
4          But you say, "Given this context, my
5   understanding of the securities statement's
6   representation that SolarWinds's best practices
7   were to enforce the use of complex passwords is
8   that SolarWinds's automatically enforced password
9   complexity through technical measures where it was
10   feasible to do so."
11          Do you see that?
12     A.    I do.  I'm going to take a moment just
13   to make sure I read the, you know, entire
14   paragraph so that I understand, you know, the
15   full -- the full context.
16          (Pause for reading/reviewing.)
17     A.    Okay.
18     Q.    Okay.  Regarding that first sentence
19   that I just read in paragraph 65 where it ends
20   with, "Where it was feasible to do so," do you
21   agree that the securities statement does not
22   include the phrase "where it is feasible to do
23   so"?
24     A.    That --
25     Q.    With respect to passwords?

191

1     A.    Right.  I'm just trying to -- I'm just
2   reorienting myself to that sentence.
3          The sentence, you know, doesn't need
4   to, you know, say "as feasible to do so," you
5   know, in the sense that you can't do things that
6   aren't feasible.  It doesn't -- so, therefore, the
7   wording's unnecessary, but it's not there.
8     Q.    So what would it mean for it to be not
9   feasible to do so?
10     A.    You know, in terms of, you know,
11   enforcement of password complexity, you know, it
12   needs to be done through technical measures, you
13   know, in order to -- to, you know, automatically
14   enforce as, you know, that sentence you read said,
15   you know.
16          Therefore, you know, because you would
17   need the technology in place to automatically
18   enforce, which is the best -- which is the best
19   practice being referenced here, again, that's --
20   you know, that's why the language about not -- you
21   know, the language is missing related to
22   feasibility, because it's unnecessary.
23     Q.    Okay.  And if I could ask you to look
24   at the securities statement again --
25     A.    Uh-huh.

192

```
 1       Q.    -- you should have it in front of you,
 2   that same page we were looking at.
 3       A.    Right.
 4       Q.    And in that same paragraph under
 5   "Authentication/Authorization," it states, "Our
 6   password policy covers all applicable information
 7   systems, applications and databases."
 8            Do you see that?
 9       A.    I do.
10       Q.    And what does that mean to you?
11       A.    That means there are written, you
12   know, guidance to the -- the company, you know, is
13   applicable to all -- applicable -- you know,
14   all applicable to information systems,
15   applications and databases.
16       Q.    And, once again, you would agree it
17   doesn't say "where feasible to do so," right?
18            MR. TURNER:  Objection to form.
19            THE WITNESS:  Yeah.  Correct.  That
20   sentence doesn't have the clause that says, "where
21   feasible to do so."
22   BY MR. CARNEY:
23       Q.    And is it fair to say that you're
24   reading that into the securities statement?
25            MR. TURNER:  Objection to form.
```

```
 1            Objection to the characterization of
 2   the report and the testimony.
 3            THE WITNESS:  Okay.  That's -- repeat
 4   the question again, please.
 5   BY MR. CARNEY:
 6       Q.    When you state in paragraph 65 that
 7   you understand the security statement's
 8   representation that SolarWinds's best practices
 9   were to enforce the use of complex passwords, that
10   that means that SolarWinds automatically enforced
11   password complexity through technical measures
12   where it was feasible to do so, you're reading the
13   phrase "feasible to do so" into that paragraph of
14   the securities statement, right?
15            MR. TURNER:  Objection to form to that
16   sentence.
17            THE WITNESS:  You know, as, you know,
18   the paragraph goes on to state, you know, their
19   user access process narrative, you know, talks
20   about the fact that, you know, the use of active
21   directory as a, you know, automated means of
22   password complexity through technical measures, it
23   was the focus here.
24            And I think the securities statement
25   is just noting for a potential, you know, vendor
```

```
 1   management team that there was -- you know, where
 2   feasible, the -- you know, again, you don't need
 3   to -- didn't need to say it.  I added it to the --
 4   to paragraph 65.
 5            But, you know, that for enforcement,
 6   you need automation, and that -- you know, that
 7   was how they enforced password best practices
 8   where it was feasible.
 9   BY MR. CARNEY:
10       Q.    Okay.  And just to address my friend
11   Mr. Turner's objection.
12            Does the "where it's feasible" concept
13   apply to the sentence that says, "Our password
14   policy covers all applicable information systems,
15   applications and databases"?
16       A.    No.  Because the two sentences are
17   pretty distinct, and they're -- you know, what
18   they're trying to articulate.  That, you know,
19   they're -- the overall password policy, you know,
20   is -- is a general obligation, you know, across
21   those applicable information systems, applications
22   and databases.
23            The best practices language, you know,
24   necessarily is about enforcement.  And you can
25   enforce where it's feasible to do so.
```

```
 1            So the -- as written in paragraph 65,
 2   the feasible -- you know, the "where feasible to
 3   do so" language applies to the best practices were
 4   used to enforce complex passwords.
 5       Q.    And you mentioned just a little while
 6   ago vendor management, and I think -- you can
 7   correct me if I'm wrong, but the securities
 8   statement was addressed towards vendor management;
 9   is that right?
10       A.    Yeah, that's my understanding.
11       Q.    And what does "vendor management" mean
12   to you?
13       A.    To me, you know, vendor management
14   teams are teams that are assessing, you know, a
15   supplier.
16            In this case, SolarWinds is a supplier
17   of products.  And, you know, among many things
18   they do, one of the things they do is look at, you
19   know, those organizations.
20            And, you know, do they have the proper
21   security in place, is the risk -- you know, what
22   sort of risk does that product pose?
23            So my understanding is that origins of
24   this security statement were meant to provide, you
25   know, those type of teams an understanding of what
```

1  SolarWinds's practices were.
2      Q.    So in your use of the word "vendor,"
3  SolarWinds would be the vendor?
4      A.    Right.
5      Q.    Okay.
6      A.    The team -- just to be -- just as a
7  clarification, the vendor management teams would
8  be talking about would be diligencing or looking
9  at SolarWinds and potentially the securities
10 statement, because, yeah, SolarWinds was selling
11 something, and the vendor management team was
12 looking at SolarWinds.
13     Q.    All right.  Sir, I'm going to ask you
14 to turn to -- let me give you a page number --
15 page 45 --
16     A.    Uh-huh.
17     Q.    -- paragraph 83.
18     A.    Yep.
19     Q.    And it's -- it's in the section where
20 you're talking about software development --
21     A.    Uh-huh --
22     Q.    -- do you see that?
23     A.    -- yep.
24     Q.    And you touched on a little bit your
25 involvement in overseeing the software development

197

1  lifecycle at JPMorgan.
2          Do you recall that?
3      A.    Yeah, it was one of the places where I
4  was involved with that security aspects of
5  software development, yes.
6      Q.    And did JPMorgan follow a waterfall or
7  an Agile process?
8      A.    You know, during -- during the period
9  I was there, there were actually -- you know, it
10 was a large organization, and at -- they were
11 moving towards an Agile process in some software
12 development.
13         I would imagine, you know, that some
14 of it was still developed by a waterfall, very
15 contextually -- you know, contextual.
16     Q.    Okay.  So if we flip forward a few
17 pages to paragraph 90 on page 49, you state in the
18 middle of that paragraph, "I have reviewed various
19 guidance documents from Confluence" -- and that's
20 with a capital C --
21     A.    Uh-huh.
22     Q.    -- "that indicate SolarWinds followed
23 an Agile development process."
24         And you say, "In particular, I've
25 reviewed a document titled 'Security Testing

198

1  Process' created in 2016 and last updated on
2  June 22, 2018, focused on how security testing was
3  integrated into the process."
4          Do you see that?
5      A.    I do.  Once more, I just think it's
6  easier for us, can I review that paragraph 90 --
7      Q.    Sure.
8      A.    -- and just make sure I got -- I got
9  the full context -- for this.
10         (Pause for reading/reviewing.)
11     A.    Okay.  Let's proceed.
12     Q.    Okay.  So in the sentences that I
13 read, first of all, there's a Footnote 106 and you
14 refer to a document as a -- and you can read
15 Footnote 106, but as a "slide deck from 2015
16 explaining basics of Agile process, including the
17 bug 'scrub' done during each sprint."
18         Do you see that?
19     A.    Uh-huh.
20     Q.    And here we can...
21         (Whereupon, Exhibit 11 is marked for
22         identification.)
23 BY MR. CARNEY:
24     Q.    And just for the record, I've handed
25 you what's been marked as Exhibit 11.  And this is

199

1  the presentation you reference in Footnote 106 and
2  begins with Bates number SW-SEC-SDNY_00184276.
3      A.    That's right.  And if you don't mind,
4  I'd like to just take a moment and --
5      Q.    Sure.
6      A.    -- look through the full presentation
7  as we go forward.
8          (Pause for reading/reviewing.)
9      A.    Okay.
10     Q.    So, sir, just my question:  Why did
11 you rely on a slide deck from 2015 for your
12 understanding as to SDL practices SolarWinds was
13 following in what you defined as the relevant
14 period of October 2018 to January of 2021?
15     A.    You know, similar to the other
16 discussion we had, you know -- I -- you know, if
17 you look at the full set of evidence, including,
18 you know, Mr. Colquitt's deposition, he -- he was
19 building on this foundation, right?
20         So, you know, using this foundation
21 where they were, you know -- you know, this deck
22 is pretty foundational in terms of, you know, how
23 to do Agile.  This was a foundation that they --
24 they built upon.
25         So this was -- you know, the document

200

1  really, you know, got to the point that:  A, they
2  were using Agile, and, B, the security testing
3  process was part of how they did Agile.  You know,
4  it was the best illustration of that.
5      Q.    And if we turn to the third page of
6  this document --
7      A.    Uh-huh.
8      Q.    -- ending in 276, do you see there's
9  a -- there's an agenda on there?
10     A.    Are we talking about the contents
11 page?
12     Q.    Yeah, the contents page.
13     A.    Right.
14     Q.    Exactly.
15     A.    Yeah.
16     Q.    With time allotments --
17     A.    Uh-huh.
18     Q.    -- including for a break?
19     A.    Right.
20     Q.    Is it your understanding that this was
21 part of a presentation?
22     A.    You know, I don't -- it does appear to
23 be part of a presentation -- or not part of a
24 presentation.  It looks like a deck that is meant
25 to be presented --

201

1      Q.    Okay.
2      A.    -- you know, which is maybe a
3  different answer.
4      Q.    And do you know who it was presented
5  to?
6      A.    You know, this is, you know, pretty
7  clearly a deck that is meant to be presented to
8  technologists related to the development process.
9      Q.    And so would you agree that in some
10 instances, it's appropriate to review slide decks
11 to gain an understanding of the cybersecurity
12 practices that a company is following?
13          MR. TURNER:  Objection to form.
14          THE WITNESS:  You know, there -- you
15 know, this slide deck, you know, was used to
16 evidence that SolarWinds had, you know, moved to
17 the Agile process and that security was present.
18          It was, you know, it was part of the
19 full set of evidence along with Mr. Colquitt's
20 depositions and other technology leaders about how
21 they implemented the Agile process and the
22 security processes associated with it.
23          You know, it's an element of the
24 evidence I examined.
25 ///

202

1  BY MR. CARNEY:
2      Q.    Okay.  In paragraph 94 on page 52,
3  you -- I'll let you get to that.
4      A.    Okay.  Yes.  I'm going to read the
5  paragraph about the final security reviews.
6          (Pause for reading/reviewing.)
7      A.    Okay.  Yeah.
8      Q.    Okay.  In that paragraph 94, you
9  describe final security reviews or FSRs as "the
10 most significant artifacts I've reviewed from
11 SolarWinds's software development process."
12          So let me ask you:  Why are these the
13 most significant artifacts?
14     A.    Well, you know, again -- or this is in
15 the context of the more general discussion of, you
16 know, the software development lifecycle and the
17 security aspects of it.
18          So, you know, the most significant,
19 you know, related to the fact that, you know,
20 these were -- these final security reviews
21 demonstrated, you know, both, you know, deep
22 process related to, you know, how they approached,
23 you know, secure development.
24          As -- you know, as well as, you know,
25 lots of -- lots of the supporting evidence for

203

1  other elements of the -- you know, the
2  implementation of evidence in addition to the
3  other sources of evidence that exist for the
4  implementation of things like testing processes.
5      Q.    Okay.  In paragraph 95, you talked
6  about -- that you reviewed a sample from
7  approximately 100 FSRs you received.
8          Do you see that?
9      A.    That's right.
10     Q.    And who selected the samples that you
11 looked at?
12     A.    You know, it was similar to the
13 other -- I call these evidence tranches.  I may
14 have said that before.  I think we were talking
15 about the SARFs, but maybe others as well.
16          I requested, you know, evidence from
17 the Latham team of, you know, implementation --
18 you know, implementation including things like,
19 you know, the outputs of implementation processes
20 like final security reviews.
21          So they selected -- they selected the
22 hundred.
23     Q.    And then you selected the -- I'm going
24 to -- I think I counted 14-or-so samples that are
25 identified in Footnote 120?

204

1    **A.**    Right.  Similar process.  I looked --
2    in this case, I know I looked at more than 50,
3    but, again, that 50 to 70 in this case as well.
4          And then I selected the subset that
5    I've cited in the report.
6          (Whereupon, Exhibit 12 is marked for
7          identification.)
8    BY MR. CARNEY:
9    **Q.**    Okay.  Dr. Rattray, I've handed you
10   what's been marked as Exhibit 12.  And, for the
11   record, this is just the first sample that you
12   identify in Footnote 120 of the FSR, and it starts
13   with the Bates stamp SW-SEC-SDNY_00055119.
14         And could you just help me, just walk
15   me through this FSR, tell me what it shows.
16   **A.**    I'm gonna just read it through myself
17   real quick --
18   **Q.**    Sure.
19   **A.**    -- and then, you know, I'll walk you
20   through it.
21   **Q.**    Thank you.
22         (Pause for reading/reviewing.)
23   **A.**    I looked through it.
24         How should we proceed?  Do you want to
25   ask the question again and, you know, give me some

205

1    parameters for the walkthrough?
2    **Q.**    Yeah.  How about I'll just ask you, to
3    speed things up.
4          Can you just tell me how documents
5    like this FSR establish to you that, if it does
6    establish that to you, that SolarWinds followed
7    all aspects of the SDL in its securities
8    statement?
9    **A.**    Again, the FSRs were an element of the
10   determinations I made around, you know,
11   SolarWinds's, you know, software development and,
12   you know, the statements made in the securities
13   statement.
14         You know, the presence of this review
15   as process and the type of, you know,
16   implementation that we see in these reviews, you
17   know, is a pretty strong, you know -- you know,
18   not pretty.
19         It's a very strong, you know, capstone
20   on a -- on a set of the processes outlined in the
21   securities statement.
22         You know, it includes things like
23   requirements analysis, back to our -- you know,
24   its phase, there's a template, there's a series of
25   things with structure that guide the -- the

206

1    development process from a security perspective,
2    you know, so that the teams that are, you know,
3    working on a given product or application, you
4    know, are guided -- you know, guided in this
5    fashion.
6          So, again, it has requirements
7    analysis.  Again, as we talked about things like
8    threat -- threat modeling, you know, understanding
9    security requirements are part of the element of
10   things like threat modeling.
11         It talks to the type of testing
12   outlined in the security statement.  It even
13   requires scheduling of testing early.  Shows
14   test -- testing results of a variety of sorts, you
15   know, all the phases outlined in the security
16   statement, you know, mapped here including to the
17   sort of product security review.
18         You know, this is the -- this is a --
19   a process that constitutes product security
20   review, you know, shows -- shows that the
21   appropriate players were involved in the -- you
22   know, the review -- an approval phase, phase 4.
23   **Q.**    So you mentioned that it shows testing
24   results of a variety of sorts.
25         Is it -- does this Exhibit 12 do that?

207

1    Does it show test results?
2    **A.**    I see checkmarks reports specifically
3    as test results.
4    **Q.**    What page are you on?
5    **A.**    I'm on the second page.
6          MR. TURNER:  For the record, it's on
7    all four pages.
8          THE WITNESS:  Oh, yeah.  Fair enough.
9    Second page, third page --
10         MR. TURNER:  From the first as well.
11         THE WITNESS:  -- and the last page.
12   Yeah, yeah, bottom of the first page.
13   BY MR. CARNEY:
14   **Q.**    And there are -- so are you saying
15   that there are test results in this document, or
16   that it links to other documents that purport to
17   contain test results?
18   **A.**    No.  There's test results in this
19   document.  The checkmark report and the data
20   there, you know, high, medium, low, you know, as
21   stated in basically all pages are test results.
22   **Q.**    So just for the record, the results
23   themselves are in this document?
24         MR. TURNER:  Just object to form.
25         Go ahead.

208

1    THE WITNESS:  Yeah, it's a question of
2  what you consider results.  But, you know, the --
3  the results summary in terms of high, medium and
4  low are -- you know, the test results are
5  summarized here, you know, in a few places as
6  checkmark report and I believe -- yeah, dates are
7  given.
8    And it looks like there's a link to
9  the PDF where the more detail, you know, report
10  would be available.
11  BY MR. CARNEY:
12    Q.    And did you look at that more detailed
13  report?
14    A.    I looked at a large number of testing
15  reports including checkmarks report.
16    Q.    Did you look at the testing reports
17  associated with the samples that you have in
18  Footnote 120?
19    A.    No.  Similar to the other sets of
20  data, I was looking for the existence of the right
21  process and clear evidence of its implementation.
22    You know, in the case of the security
23  reviews, I've been looking at testing reports,
24  again, just to, you know, know or confirm that,
25  you know -- that the checkmark -- you know, the

209

1  that.
2    The problem is these can't be printed
3  today with the links live, but the linked
4  documents were produced separately and covered in
5  the footnote.
6  BY MR. CARNEY:
7    Q.    Okay.  And to counsel's whatever that
8  was, did you look at the linked documents?
9    A.    There was a set of linked documents
10  produced, and I did look at those.
11    Q.    And did you look at the linked
12  documents for the samples that you selected in
13  Footnote 120?
14    A.    The -- you know, the -- you know,
15  looked at a produced set of links.  Again, you
16  know, in the process of producing, you know, the
17  material, you know, both for the security review
18  and the presence of supporting, you know, JIRA --
19  JIRA-based documentation, as -- it was just
20  described, you know, that turned out to be not at
21  the same time.
22    So I didn't have the FSRs with the --
23  I'm sorry, had the JIRA tickets associated with an
24  FSR in sort of a single production.
25    You know, I made an effort to -- you

211

1  types of things that were in their checkmark
2  reports, how those reports were organized, there
3  was absolutely no reason for me to believe if they
4  listed a checkmark report in any FSR, it
5  wouldn't -- you know, it wouldn't be there.
6    It would be a lot of work, you know,
7  to create summaries of results from reports that
8  didn't exist.  I felt no need to look at the
9  specific reports when it was very clear that the
10  testing was, you know, going on.
11    Q.    Okay.  And in that same paragraph, the
12  last sentence, you said that, "The FSRs included
13  sections for engineers to post links to tickets,"
14  and in parentheses, you have, "(stories) in JIRA
15  concerning security issues found and addressed
16  through security testing, as well as places to
17  post summaries of or links to results with
18  vulnerability scans and penetration tests."
19    Can you show me where in this
20  Exhibit 12 are the sections for the engineers to
21  post links to tickets concerning security issues
22  found?
23    MR. TURNER:  I have to object here.
24    Because this issue is noted in
25  Footnote 120.  I want to make sure you've seen

210

1  know, when I went through the JIRA reports to, you
2  know, look at, you know, as process, the types of
3  things they linked back to.
4    I did not map every, you know -- every
5  FSR to the JIRA reports that I was looking at,
6  because as we've been discussing today, that sort
7  of analysis was well below the level necessary to
8  sort of understand that the securities statements,
9  you know -- you know, illumination.
10    Or when the security statement said
11  there was a secure development process -- you
12  know, set of activities, you know, such as testing
13  activities, the final security reviews provided,
14  you know, strong evidence of that, you know, that
15  I saw that were linked to issue identification.
16    I saw tickets that indicated that
17  that -- you know, that -- those JIRA links did
18  exist, right?  They were broken in some of the FSR
19  documentation.
20    And that this robust process was, you
21  know, being executed and, you know, met -- you
22  know, met what I needed in terms of how the
23  industry would approach validating that the things
24  in the security statement, you know, such as pen
25  testing and static testing were in place.

212

1    **Q.**    Sir, if I could ask you to turn to
2  paragraph 101 of Exhibit 1.
3    **A.**    Uh-huh.
4    **Q.**    And this is on page 56.
5         And you're discussing what you
6  perceived to be problems with Mr. Graff's
7  methodology, right?
8    **A.**    Yeah, I should, again --
9    **Q.**    Okay.
10   **A.**    -- read these as you start to ask
11 questions.  Is that -- I shouldn't assume that's
12 fine.
13   **Q.**    Of course.  Of course.
14        (Pause for reading/reviewing.)
15   **A.**    Okay.
16   **Q.**    In paragraph 101, maybe it's the
17 fourth sentence down, you say, "Cybersecurity
18 assessments generally do not involve reviewing
19 employees' emails or presentations to management
20 in the first place."
21        And then parenthesis, "(let alone
22 stray comments or notations in such documents that
23 lack appropriate context)."
24        Do you see that?
25   **A.**    Right.

213

1    **Q.**    We looked at -- a little while ago,
2  you relied on a presentation that documented what
3  you thought was the company's SDL process, right?
4        MR. TURNER:  Object to form.
5        THE WITNESS:  If we're talking about
6  the presentation about Agile -- right? -- you
7  know, it included, you know -- it included how
8  Agile is conducted and then security steps during
9  Agile development.
10 BY MR. CARNEY:
11   **Q.**    Okay.  And you made an assessment
12 using your cybersecurity experience that it was
13 appropriate to rely on that presentation from 2015
14 to -- in forming your opinions, right?
15   **A.**    That was an element of, you know, what
16 I looked at.  You know, I looked at, you know,
17 unlike Mr. Graff, you know, the policies, a very
18 large set of documentary evidence, you know,
19 process, things like FSRs.
20        I used that document because it was a
21 good baseline, as we said, about what they were --
22 you know, how they understood that process of
23 Agile and where a security fit into it, but it was
24 not the base -- you know, the sole basis of my,
25 you know, assessment of their secure development

214

1  practices.
2    **Q.**    But you exercised your judgment and
3  determined that it was appropriate to look at that
4  particular presentation, right?
5    **A.**    Yes.
6    **Q.**    Okay.  And with the chat we looked at
7  earlier with the screenshot, you exercised your
8  judgment and determined that it was appropriate to
9  look at that particular chat with the screenshot,
10 right?
11        MR. TURNER:  Object to form.
12        THE WITNESS:  Right.  You know, the
13 sentence, you know, continues to say, "let alone
14 stray comments or notations in documents."
15        You know, in the case of the
16 PowerPoint presentation on Agile, it was a full
17 presentation that was, again, illuminating that --
18 this sort of foundational, you know, movement and
19 conceptualization of SolarWinds in that area.
20        It was not a single notation inside,
21 you know -- you know, inside a presentation.  It
22 was, you know -- it was a -- sort of the full
23 presentation.  You know, I felt like it was -- it
24 was very useful in illustrating how -- you know,
25 how they were thinking about this, which was what

215

1  I was trying to do there.
2        You know, as we discussed in the case
3  of the email, it was, you know, documenting
4  Microsoft's, you know, process.  It was contained
5  within an email, but the point was active
6  directory, you know, had strong -- the ability to
7  implement strong -- strong passwords.
8        So it wasn't an opinion.  It wasn't a
9  comment.  It was, you know, linkage to a global
10 technologies company's, you know, product and its
11 features regarding strong passwords.
12 BY MR. CARNEY:
13   **Q.**    Okay.  Let me ask you, please, to turn
14 to paragraph 121.  And this is on page 67.
15   **A.**    Uh-huh.
16   **Q.**    And I'll just let you know that
17 paragraphs 121 through 126, you discuss this issue
18 of developer access to billing data for test
19 purposes.
20        And you can look -- as we go along,
21 you can look --
22   **A.**    Uh-huh.
23   **Q.**    -- at as much of it as you want to get
24 context.  But I'm gonna hand you the email
25 that's -- that you're discussing.

216

1      A.    Okay.
2            (Whereupon, Exhibit 13 is marked for
3      identification.)
4            THE WITNESS:  I'm going to take a
5      quick moment and, you know, just read the material
6      and the statement related to this situation.
7      BY MR. CARNEY:
8      Q.    Okay.
9            (Pause for reading/reviewing.)
10     A.    I just want to familiarize, you
11     know...
12           Yep.  I'm ready.
13     Q.    Great.
14           So you've been handed what's been
15     marked as Exhibit 13 --
16     A.    Uh-huh.
17     Q.    -- and this is an email chain that you
18     reference in Footnote 160 of your report, and it's
19     Bates stamped SW-SEC-00254254.
20     A.    Understood.
21     Q.    All right.  So if we could -- I just
22     want to see if we can agree on some things.
23           If we go to the second-to-last page of
24     this document --
25     A.    Uh-huh.

217

1      Q.    -- which is -- ends in 265.
2      A.    Okay.
3      Q.    And if we look at that email --
4      because these threads are obviously in reverse
5      chronological order.
6      A.    Yep.
7      Q.    If we look at that email at the bottom
8      from Sean O'Shea, it says in the first bullet,
9      "They're currently using a shared login currently
10     of a different SolarWinds employee.  This is
11     definitely a security incident and needs to stop."
12           Do you agree with that sentiment, that
13     this was definitely a security incident that
14     needed to stop?
15           MR. TURNER:  Objection to form.
16     Foundation.
17           THE WITNESS:  You know, the -- the
18     identification of this is an incident and, you
19     know -- and I'm also aware that they did, you
20     know -- yeah, they -- they treated this, you know,
21     with a lot of, you know, attention.
22           So I guess -- if the question is:
23     Is -- you know, is the fact that a different
24     SolarWinds employee using a password as a security
25     incident, yes.

218

1      BY MR. CARNEY:
2      Q.    Great.  And that's --
3      A.    Okay.
4      Q.    -- all I was asking.  Thank you.
5            And based on your cybersecurity
6      experience, why is that a security incident?
7            MR. TURNER:  Object to form.
8            THE STENOGRAPHER:  Excuse me.  I
9      couldn't hear you.
10           MR. TURNER:  And the term "incident."
11           THE WITNESS:  The sharing of -- this
12     is a -- you know, are we talking about this
13     specific situation or just generally password
14     sharing?
15     BY MR. CARNEY:
16     Q.    Well, you had said in your prior
17     response that a fact that a different SolarWinds
18     employee using a password is a security incident,
19     and I'm just trying to understand why it was a
20     security incident.
21     A.    You know, again, just sort of
22     generally password sharing, you know, is not seen
23     as something that should occur, and, you know,
24     security policies, you know, user -- you know,
25     user access policies where people are told about

219

1      what -- how they should use their -- use their
2      access, you know, you generally don't -- you know,
3      generally say you should not do that.
4      Q.    Okay.  And would sharing login
5      information violate any of the tenets of the
6      SolarWinds's public-facing security statement?
7      A.    No, it would not.
8      Q.    And why do you say that?
9      A.    Because, you know, the -- you know,
10     when I -- as we read the security statement,
11     there's no specific prohibition about password
12     sharing.
13     Q.    So if I could ask you to look back at
14     the security statement, Exhibit 5.
15     A.    Uh-huh.
16     Q.    You have that in front of you?
17     A.    Yes.
18     Q.    Okay.  And the page ending in 337108.
19           Do you see that?
20     A.    Yes, I do.
21     Q.    And under "Authentication and
22     Authorization," the first sentence says, "We
23     require that authorized users be provisioned with
24     unique account IDs."
25           Do you see that?

220

1      A.    I do.
2      Q.    In your mind, does that statement
3  prohibit the sharing of login information between
4  employees?
5      A.    No.
6      Q.    And why not?
7      A.    Because, I mean, it's talking about
8  provisioning, not how people use their IDs.
9      Q.    And just so I'm clear, nothing in
10  SolarWinds's security statement precludes
11  employees from sharing their logins and passwords
12  with each other?
13      A.    You know, as we just discussed, the
14  fact that authorized users are provisioned with
15  unique account IDs is what the security statement
16  says, and there's nothing in there -- nothing in
17  the security statement about shared passwords.
18      Q.    All right.  In the email above in the
19  thread, that same page that we're at --
20      A.    Sorry.  I'm just sorting my
21  documentation.
22      Q.    -- exhibit -- yeah, Exhibit 13.
23      A.    Yeah, I'm just trying to get the other
24  documentation out.  Okay.
25          So we're -- I'm back to the point we

221

1  were at where -- like, the last email.  So, yeah,
2  I'm --
3      Q.    Okay.
4      A.    Yep.
5      Q.    And the email above --
6      A.    Uh-huh.
7      Q.    -- there's one from Chris Day.
8          Do you see that?
9      A.    Yep.
10      Q.    And he writes, "Hello.  Highlighted
11  item needs to stop immediately.  Under no
12  circumstances is development to be done in
13  production.  If that impacts deliverables, please
14  let August know.  This is a significant security
15  and SOX violation."
16          Do you see that?
17      A.    I do.
18      Q.    Do you agree with Mr. Day's statement
19  that under no circumstances is development to be
20  done in production?
21          MR. TURNER:  Objection to form.
22          THE WITNESS:  Not necessarily.  I
23  don't -- you know, I don't know the -- I mean, the
24  context, you know, of -- in which he was writing
25  this email.

222

1          But I don't -- I don't generally agree
2  that under no circumstances is development to be
3  done in production.
4  BY MR. CARNEY:
5      Q.    Why do you say you don't know the
6  context in which he was writing this email?
7      A.    I mean, he's urgently responding to
8  this initial email.  You know, he -- I think he's
9  showing urgency around, you know, a situation
10  which he wants to get control.
11          You know, that's what I know about the
12  context of this.
13      Q.    Okay.  And, in fact, in your report,
14  Exhibit 1, starting at paragraph 122 --
15      A.    Uh-huh.
16      Q.    -- don't you write several paragraphs
17  about this particular incident that Mr. Day is
18  discussing?
19      A.    Right.  No.  I have a lot of context
20  about the incident as a whole.  I think the point
21  I'm making is any given email -- you know, I don't
22  know what he was doing at that time of day and why
23  he chose the language that, you know, is here,
24  which, again, I disagree with, because, you
25  know -- you know, there's elements of this that

223

1  show urgency.
2          So I don't know what was happening to
3  Chris Day at that time when he decided to write
4  this email this way.
5      Q.    When Mr. Day said that "This is a
6  significant security and SOX violation," do you
7  agree with him?
8      A.    The notion that "significant," I don't
9  agree with.
10      Q.    Why not?
11      A.    This was, you know, a minor incident.
12  You know, and -- you know, as they went through
13  the process, it was -- I'm just gonna check and
14  make sure I got the right word, but I believe that
15  the chief -- you know, the head of information
16  security, Tim, you know, said he thought the risk
17  was low.
18          And so, you know, again, I don't think
19  it's a significant security violation.
20      Q.    Did you ever talk to Chris Day?
21      A.    I did not.
22      Q.    Did you ask to talk to him?
23      A.    I did not.
24      Q.    What do you understand the
25  statement -- well, first of all, let me back up a

224

| | |
|---|---|
| 1 second. | 1 like, the safety of financial controls. |
| 2     Do you agree that it's a SOX | 2     **Q.**   All right. And so you -- just so |
| 3 violation? | 3 we're clear, you don't think either the sharing of |
| 4     MR. TURNER: Objection to form and | 4 the passwords or the development being done in the |
| 5 foundation. | 5 production environment were significant security |
| 6     THE WITNESS: You know, I don't know | 6 issues? |
| 7 all the specific provisions of SOX. I know pretty | 7     **A.**   You know, in this instance, no. |
| 8 deeply that the provisions that relate to | 8     MR. CARNEY: A couple more questions |
| 9 information security, you know, shared passwords, | 9 on this, and then we'll take a break. |
| 10 may be identified as a specific SOX violation, you | 10     MR. TURNER: Thank you. |
| 11 know, in which case, you know, that would be a | 11     THE WITNESS: Uh-huh. |
| 12 violation, yes. | 12 BY MR. CARNEY: |
| 13 BY MR. CARNEY: | 13     **Q.**   Do you agree that not sharing |
| 14     **Q.**   Well, and just to be clear, the | 14 passwords is a cybersecurity best practice? |
| 15 highlighted portion that he's referring to is the | 15     **A.**   Yes. Yeah. |
| 16 development being done in production, right? | 16     **Q.**   Okay. |
| 17     **A.**   Right. But that doesn't necessarily | 17     **A.**   It's a best practice, because humans |
| 18 mean that the violation is -- you know, is that | 18 tend to want to do things that are easy. And the |
| 19 element of what he's highlighted that Chris Day is | 19 type of practice that requires constant attention |
| 20 talking about. | 20 that occurs quite often, but it's not -- you know, |
| 21     **Q.**   Well, and just for context, he says in | 21 it's not practice that we wanted to have happen in |
| 22 his email, "Highlighted item needs to stop | 22 a security practice. |
| 23 immediately," right? | 23     MR. CARNEY: Okay. We can take a |
| 24     **A.**   Yes. Because Chris's email says, "The | 24 break now. |
| 25 highlighted item needs to stop immediately." | 25     THE WITNESS: Okay. |
| 225 | 227 |

| | |
|---|---|
| 1     **Q.**   And so when he's saying, "This is a | 1     THE VIDEOGRAPHER: The time right now |
| 2 significant security and SOX violation," he's | 2 is 4:11 p.m. |
| 3 referring to development being done in production | 3     We are off the record. |
| 4 environment, right? | 4     (Whereupon, a recess was taken at |
| 5     **A.**   Yes. It does appear -- | 5     4:12 p.m.) |
| 6     **Q.**   Okay. | 6     THE VIDEOGRAPHER: The time right now |
| 7     **A.**   -- so. | 7 is 4:28 p.m. |
| 8     **Q.**   And were your earlier responses to my | 8     We're back on the record. |
| 9 questions reflecting that, or were they reflecting | 9 BY MR. CARNEY: |
| 10 the password sharing issue? | 10     **Q.**   All right. Dr. Rattray, before we |
| 11     MR. TURNER: Object to form. | 11 broke, we were looking at Exhibit 13. I just had |
| 12     THE WITNESS: Yeah, well, in general, | 12 one -- |
| 13 I don't agree that it was a significant security | 13     **A.**   Oh, yeah. Okay. |
| 14 instance. | 14     **Q.**   -- the email -- |
| 15     I don't know which aspect of this | 15     **A.**   Uh-huh. |
| 16 specific minor incident he's referring to, the SOX | 16     **Q.**   And I just want to ask you: You had |
| 17 violation, you know, you did just read that, you | 17 mentioned that when we were talking about Chris |
| 18 know, the email refers to development. | 18 Day's email in particular -- |
| 19     May -- he may have been referring to | 19     **A.**   Right. |
| 20 that in terms of a SOX violation -- | 20     **Q.**   -- that you didn't know what was |
| 21 BY MR. CARNEY: | 21 happening to him that day. |
| 22     **Q.**   Okay. | 22     What did you mean by that? |
| 23     **A.**   -- which is not, you know, necessarily | 23     **A.**   You know, I think as I mentioned, |
| 24 an information security violation, because the SOX | 24 there was a lot of urgency in this email. You |
| 25 is a -- you know, a control structure around -- | 25 know -- you know, that -- actually, I sort of see |
| 226 | 228 |

1 this email, you know, in a very good way in terms
2 of just overall SolarWinds security practice
3 where, you know, the technology leaders, you know,
4 over and over, again, you know, see it imperative
5 to, you know, highlight things that are
6 security -- you know, potential security issues
7 and, you know, be clear like a coach is clear in
8 practice that if you miss a block, you really
9 shouldn't do that in a game.
10     So, you know, I don't know whether the
11 urgency in the email is him seeking to be a good
12 coach or, you know, a day where he had a lot going
13 on and, you know, wanted to get this, you know,
14 urgency delivered quickly.  This is a pretty short
15 email.
16     Q.    So I understand, is it your view that
17 with most emails, you sort of need to know what
18 was going on with the person's day to be able to
19 understand them or to rely on them?
20     A.    You know, I think this is one of the
21 reasons why emails like this are not great sources
22 of assessment of security -- you know, the
23 presence of the -- you know, the practices
24 outlined in this securities statement.
25     You do need context for emails to

                        229

1 understand, you know, what -- you know, what was
2 happening, you know, in -- and it's very difficult
3 to get that context.
4     So, you know, in typical industry
5 practice, you know, you may -- you may use, you
6 know, artifacts that are found in emails, but
7 you're really not looking at this sort of
8 chat-type email as the assessment of a presence of
9 a practice.
10     Q.    Okay.  And you just -- you used an
11 analogy about missing a block during practice and
12 being told not to do it during a game.
13     Does that -- does that apply here?
14 Was this practice that we're talking about, or was
15 this the game?
16     A.    You know, I don't think this was
17 that -- you know, was not a significant security
18 incident.  You know, the ongoing, you know,
19 practice of security, you know, requires
20 encouragement, you know, in an ongoing basis,
21 right?
22     So, you know, that was just an analogy
23 to sort of talk to why the urgency might be here.
24 I don't have the context for this statement.
25     Q.    Okay.  Sir, if I could ask you to

                        230

1 please turn to paragraph 212 of Exhibit 1 of your
2 expert report.  And I'll get you a page number.
3 My outline just has the paragraph numbers.  That's
4 why it takes me a while.
5     A.    [Speaking sotto voce].
6     The paragraph again?  I could probably
7 just go right to the paragraph.
8     Q.    It is 212, which was on page 116.
9     A.    Okay.
10     Q.    And you're discussing a document that
11 Mr. Graff cites relating to threat modeling.  I
12 have the document right here if you need to see
13 it.
14     And just -- to let you know, I'm not
15 trying to hide documents from you.  I'm just
16 trying to move this along.  But if you need the
17 document, I got it.
18     A.    Uh-huh.
19     MR. TURNER:  I would prefer if you.
20     (Simultaneous unreportable crosstalk
21     occurs among parties.)
22     THE WITNESS:  I think that's probably
23 a good idea.
24     (Whereupon, Exhibit 14 is marked for
25     identification.)

                        231

1 BY MR. CARNEY:
2     Q.    Okay.  So in paragraph 212 of your
3 report, you're discussing a document that
4 Mr. Graff cited, and in Footnote 358 of your
5 report, you cite to the document.
6     And so what I've handed you that's
7 been marked as Exhibit 14 is that document.  And,
8 for the record, it has Bates stamp
9 SW-SEC-00166790.
10     And in the paragraph in your report,
11 you state sort of about halfway down through that
12 paragraph in 212, "The authors who wrote this
13 assessment who are not deposed may have had in
14 mind a formalized type of threat modeling that
15 they wanted to be done rather than meaning to say
16 that no type of threat modeling was being done in
17 any sense."
18     Do you see that?
19     A.    Yes.
20     Q.    Have you seen any document indicating
21 that the people who wrote "no threat modeling or
22 analysis is performed as part of any process
23 except MSP backup engineering" meant something
24 other than no threat modeling or analysis is
25 performed as part of any process?

                        232

1    A.    That was a pretty complex question.
2    Q.    Sure.
3    A.    Can you restate --
4    Q.    Sure.
5    A.    -- it?
6    Q.    I'll break it down for you.
7          Paragraph 212, you say that Mr. Graff
8    cites a notation in this assessment --
9    A.    Yes.
10    Q.    -- Exhibit 14, that says no threat
11    modeling or analysis is performed as part of any
12    process except MSP backup engineering, right?
13    A.    Yes.  I see that, yep.
14    Q.    And then you say that it's -- you go
15    on to say, "It's unclear exactly what was meant by
16    the remark in the document," right?
17    A.    That's right.
18    Q.    And you also go on to say that the
19    authors who wrote this assessment, they may have
20    had in mind a formalized type of threat modeling
21    that they wanted to be done rather than meaning to
22    say that no type of threat modeling was being done
23    in any sense.
24          I wonder, what is the basis for your
25    statement about what they may have had in mind.

233

1    A.    You know, well, it starts from the
2    discussion that we had, you know, I think at the
3    beginning, you know, of today, which is, you know,
4    "threat modeling" is, you know, a broad term.
5          And, you know, as we've discussed
6    during the course of the day, you know, I see
7    evidence, you know, that threat modeling, you
8    know, existed in SolarWinds's practice noting that
9    threat modeling is not part of the securities
10    statement.
11          But, you know -- you know, I did sort
12    of look at the SolarWinds practices to the extent
13    that they, you know, evidenced threat modeling,
14    and I find that evidence there.
15          So because of that, you know, I was --
16    you know, I spec -- you know, speculated that they
17    may have a formalized view of threat modeling,
18    because I -- what they found was in the face of
19    what I saw related to the existence of threat
20    modeling, you know.
21          And I reviewed the -- the FSRs for
22    those specific, you know, products or applications
23    just the fact that there was an FSR is evidence of
24    threat modeling in my mind.
25          So that was why I thought that they

234

1    might have a more formalistic view of threat
2    modeling.
3    Q.    And what would a formalistic view of
4    threat modeling entail?
5    A.    You know, again, because I don't --
6    you know, I see it broadly.  You know, I've seen,
7    you know, at times detailed descriptions of threat
8    modeling processes.
9          You know, that maybe, again, they were
10    looking for a checklist around, you know, the
11    performance of threat modeling specifically or the
12    production of specific threat modeling artifacts.
13          Which, again, there are processes that
14    exist that cause that to happen.  But, you know,
15    it's -- as discussed, you know, multiple times, I
16    don't see that as sort of the general industry
17    approach for threat modeling.
18          It's more a broad set of activities
19    related to identification of security risk, taking
20    that into account as you do software development.
21    Q.    So specifically related to MSP
22    products, which this exhibit that we were looking
23    at is discussing Exhibit 14 --
24    A.    Uh-huh.
25    Q.    -- what, if any, documents did you

235

1    review regarding threat modeling in MSP products?
2    A.    Well, you know, as stated in my
3    report, I looked at the FSRs for the software
4    releases for the three cited, you know, RMM,
5    backup and N-Central.
6          And, you know, they show that the
7    development teams were doing threat modeling, you
8    know, identifying risks to software and developing
9    mitigation.
10          So that was the documentation that I
11    used in this specific case.
12    Q.    Okay.  So let's take a look at that
13    then.
14          If I could ask you to turn to
15    page 114, paragraph 210 of your report.
16    A.    Uh-huh.
17    Q.    And you state that, "I've also seen
18    evidence of threat modeling and FSRs that I've
19    reviewed.  The FSRs have sections addressing
20    security design considerations with such headings
21    as proactive review of all FAS, high-level design
22    documents, documents with security design
23    implications for security-related features
24    identified by teams."
25          Do you see that?

236

1    A.    Yes.
2    Q.    So the first quote that you have where
3    it says, "Proactive review of all" -- and this is
4    in all caps, "FAS," and then parentheses,
5    "(high-level design documents,)" you cite to --
6    you have Footnote 346, and you cite to a document.
7        Do you see that?
8    A.    Yes.
9        (Whereupon, Exhibit 15 is marked for
10       identification.)
11   BY MR. CARNEY:
12   Q.    And just, for the record, you've been
13   handed what's been marked as Exhibit 15.  And this
14   is the document that you cite in Footnote 346,
15   paragraph 210, and the Bates stamp is
16   SW-SEC-SDNY_00069825.
17       First of all, what does -- in this
18   sentence that I just read, "Proactive Review of
19   All FAS High-Level Design Documents," what does
20   FAS mean?
21   A.    I don't know.  I do not know what
22   that -- that breakdown of that acronym is.
23   Q.    And would you agree that under
24   "Proactive Review of All FAS High-Level Feature
25   Design Documents," which is on the first page of

237

1    this document --
2    A.    Uh-huh.
3    Q.    -- there's an empty table?
4    A.    You know, in this case, the table is
5    empty.  But the statement is about, you know, the
6    fact that FSRs are asking the teams to, you know,
7    look at, you know -- you know, design documents in
8    light of security.
9        The first statement of paragraph -- or
10   sorry, yeah, the first statement of paragraph 210
11   is to the point where -- to the point that broadly
12   you have threat modeling is about bringing in
13   security to design considerations.
14       And the point being made is -- it's
15   actually the second sentence, that the FSRs
16   have -- are as templates have sections that are,
17   you know, asking -- you know, the teams in terms
18   of the security element of their, you know,
19   software -- yeah, the security -- yeah, security
20   element of this software development to consider
21   things.
22       In any given instance, it -- you know,
23   I'm not trying to say that, you know, every FSR
24   needs to, you know, have implementations of, you
25   know, the headings that are in the FSR.

238

1        The point here is that this FSR
2    process is an element of, you know, them having
3    generally threat modeling.
4    Q.    Okay.  So, first of all, this document
5    is the one document that you cite related to
6    proactive review of all FAS high-level design
7    documents, right?
8    A.    Yes.  This is the document.
9    Q.    Okay.
10   A.    Yeah.  I cite it as showing that FSRs
11   have headings, and the heading is in the document.
12   Q.    And so is it fair to say that you're
13   relying on the heading on the document and not the
14   substance of any design review that was done,
15   right?
16       MR. TURNER:  In this particular case?
17       MR. CARNEY:  In the one example that
18   he selected, yes.
19       THE WITNESS:  Yeah, the -- I mean, you
20   know, the sentence is not intended to, you know,
21   look at any of these specific FSRs as -- you know,
22   any of these specific FSRs.
23       It's to make the point that the
24   process of final security reviews included design
25   considerations, which is part of, you know, a

239

1    broad conception of threat modeling, which is not
2    even in the securities statement.
3    BY MR. CARNEY:
4    Q.    Okay.  And so -- but would you agree,
5    that given there's an empty table here, that this
6    particular document does not support the statement
7    that SolarWinds's developers conducted proactive
8    reviews of all FAS documents?
9        MR. TURNER:  Object to form.
10       THE WITNESS:  No.  I mean, because the
11   simple point being made in paragraph 210 is the
12   FSR process, you know, included, you know, these
13   callouts to look at these things.  The sentence
14   was never to look at the -- the specific
15   implementation against a specific, you know,
16   app -- application.
17       Again, it's just making the general
18   point that they had a strong FSR process, and that
19   that -- you know, also meant that they were -- you
20   know, especially because of the way they
21   implemented it, they were doing threat modeling.
22       (Whereupon, Exhibit 16 is marked for
23       identification.)
24   BY MR. CARNEY:
25   Q.    All right.  Doctor, I've handed you --

240

1  if you look at the next sort of part of that
2  sentence, it refers to -- in paragraph 210 of
3  Exhibit 1, first to "documents with security
4  design implications," and there's a Footnote 347.
5       Do you see that?
6   A.   Yes.
7   Q.   Okay.  And so what you've been handed
8  as Exhibit 16 is the document that is cited in
9  Footnote 347.
10      MR. CARNEY:  And, for the record,
11  that's SW-SEC-SDNY_00055006.
12  BY MR. CARNEY:
13   Q.   Do you -- where it says "Documents
14  With Security Design Implications or Data Privacy
15  Concerns" at the top, do you see the table
16  underneath that?
17   A.   I do.
18   Q.   And that table has -- appears to have
19  links to two documents?
20   A.   That's correct.
21   Q.   Have you been able to access either
22  the documents that these links point to?
23   A.   There was no need for me to access
24  either of those documents.
25   Q.   And why not?

241

1   A.   Because as we were just discussing
2  with the heading proactive review of all FAS
3  high-level design documents, that the heading
4  documents with design implications was simply to
5  illuminate that the FSRs have, as a -- as
6  templates, you know -- you know, look at, you
7  know, security as a feature in there.
8       And, you know, call out for
9  development teams, because they will go through
10  the FSR process to look for the presence of these
11  things.
12      As I said in the last conversation
13  around the proactive review of all FAS high-level
14  design documents, the intent of that sentence was
15  never to look at a specific, you know, FSR, you
16  know, as evidence of implementation of, you know,
17  threat modeling.
18      It was to show that the FSR process
19  hit the things that threat modeling, you know,
20  calls for.
21   Q.   Okay.  So the documents in that table,
22  do you know whether they relate to security design
23  implications versus data privacy concerns?
24   A.   I feel like I just answered that
25  question.  You know, I answered that I didn't look

242

1  at the documents for the reasons that that was
2  unnecessary.
3   Q.   Let me ask you:  Outside of litigation
4  when you're assessing the cybersecurity of a
5  company, would it be your practice to rely on the
6  title of a section in a document versus looking at
7  the underlying documentation?
8       MR. TURNER:  Object to form.
9       THE WITNESS:  In terms of, you know --
10  can you repeat the question?
11  BY MR. CARNEY:
12   Q.   Sure.
13      I'm just -- I'm trying to understand
14  this -- you know, you talk about how Next Peak
15  does this cybersecurity --
16   A.   Uh-huh.
17   Q.   -- assessments, and I'm wondering if
18  the concept of looking at a heading in a final
19  security review without looking at the underlying
20  documentation is consistent with the sort of
21  non-litigation cybersecurity assessments that you
22  perform at Next Peak?
23      MR. TURNER:  Object to form.
24      THE WITNESS:  That -- you know,
25  this -- we're talking about a specific sentence

243

1  where I look at the presence of headings in
2  documents.
3       I've -- you know, as we've talked
4  about, looked at over 50 FSRs, right?  There was a
5  simple point being made here that the FSRs, you
6  know, do lead a security team through a process
7  that includes, you know, things that, you know,
8  you would expect if you were -- you know, to see
9  if threat modeling.
10      So, you know, this -- again, was a
11  sort of a specific assessment of implementation of
12  threat modeling for an application.
13      This was the articulation of the fact
14  that the FSRs clearly called at the process level
15  for doing this.  So this is just one of many
16  elements of, you know, my overall assessment that
17  threat modeling was occurring.
18      Again, something that was not present
19  in the securities statement, but that I do
20  believe, you know, the evidence in total, not this
21  sentence only, you know, clearly indicates that
22  they were doing.
23  BY MR. CARNEY:
24   Q.   Okay.  In that same paragraph 210, you
25  say, "Some of the FSRs also include design reviews

244

1    by the architecture team further reflecting
2    consideration of security at the design stage."
3        Do you see that?
4    **A.**    Yes.
5    **Q.**    You didn't add a citation to that
6    sentence, did you?
7    **A.**    I did not.
8    **Q.**    Okay.  Do you recall which FSRs you
9    had in mind here?
10   **A.**    I don't recall the specific FSRs.
11   **Q.**    And have you been able to look at any
12   design reviews by the architecture team?
13   **A.**    It would be similar to the -- the
14   answer to the previous question.  That was, you
15   know, not the point of this paragraph as a whole.
16       It's to the point that the FSR process
17   includes steps, and at times, you know, included,
18   you know, this step, design reviews by an
19   architecture team.
20       You know, my -- my approach is similar
21   to what's used in the industry.  You're not trying
22   to check, you know, every -- you know, every
23   implementation down to the specific, you know --
24   the specific -- you know, the follow-through on
25   every single specific FSR.

245

1        The FSR process at the level of the
2    security statement, you know, demonstrates what
3    people reading that security statement would
4    expect from SolarWinds.
5    **Q.**    Okay.  So in reviewing the FSRs, you
6    assessed whether SolarWinds had the opportunity to
7    do threat modeling, but not whether they actually
8    did threat modeling, right?
9    **A.**    No.  You know, I looked at a lot of
10   FSRs.  The FSRs, you know -- you know, show
11   activity that falls in, you know, the conduct of
12   threat modeling.
13       Again, you know, threat modeling is
14   not part of the securities statement, but there's
15   no reason to believe that the steps that are
16   outlined in the FSRs in the documentation that is,
17   you know -- you know, present -- you know, the
18   lengths of the documentation present in the FSRs,
19   you know, would not have occurred, right?
20       There's just every reason to believe
21   these FSRs are -- you know, the FSR process
22   itself, you know, threat modeling is -- it's a
23   strong process that there's no reason to believe
24   that the things that are called for, you know,
25   when they're present and the FSR didn't happen.

246

1    **Q.**    Well, let me just see if I can break
2    that down a little bit.
3        Would you agree with me that "threat
4    modeling" is a term of art in cybersecurity?
5    MR. TURNER:  Object to form.
6    THE WITNESS:  Yeah, term of art is --
7    I'm not -- I'm not quite sure what you mean by
8    "term of art."
9    BY MR. CARNEY:
10   **Q.**    It has a, sort of, generally accepted
11   meaning in cybersecurity, the term "threat
12   modeling"?
13   **A.**    You know, "threat modeling" is one of
14   the terms in cybersecurity where there are a lot
15   of, you know, sort of interpretations of what
16   those words mean.
17       Yeah, you know, so I think a lot of
18   people have a -- you know, different
19   conceptualizations of what is meant when you use
20   the words "threat modeling" in cybersecurity.
21   **Q.**    In your view, is threat modeling the
22   same as risk identification?
23   **A.**    You know, threat is an element of
24   risk.  They're not synonymous, but they're -- you
25   know, I guess I would consider them overlapping.

247

1    **Q.**    So what's the difference between
2    threat modeling and risk identification?
3    **A.**    Well, risk identification, you know,
4    also includes the understanding of vulnerability.
5    You know, that's sort of classic terminology in
6    cybersecurity regarding risk is its threat and
7    vulnerability.
8    **Q.**    Okay.  Is there a difference between
9    threat modeling and risk mitigation?
10   **A.**    In general in the field or --
11   **Q.**    In the cybersecurity field.
12   **A.**    Yes, there's -- the two things, they
13   are different.  "Threat modeling" could be an
14   element -- to me is a broader term of risk
15   mitigation.
16   **Q.**    Are you aware of any steps that are
17   part of threat modeling as a cybersecurity best
18   practice?
19   MR. TURNER:  Objection to form.
20   THE WITNESS:  You know -- you know, I
21   think we've discussed this.  That, you know,
22   threat modeling is -- you know, broadly, you know,
23   the identification of, you know, what act -- you
24   know, actors could do in terms of threatening a
25   specific, you know, organization.

248

1    You know, identifying those as
2  security concerns working towards, you know -- in
3  the case of software development, you know, that
4  informing the software development.
5  BY MR. CARNEY:
6    Q.    Okay.  And I guess what I'm trying to
7  understand as -- you know, as a layperson is -- is
8  there, like, a typical, like, written output that
9  you would expect to see from a threat modeling
10  being conducted?
11    A.    No.  Not necessarily.  You know, in
12  the broad conception of threat modeling, it's --
13  you know, the -- in these processes, some of which
14  are in this paragraph, you know, being present is
15  indicative of, you know, getting the team to think
16  about how threat affects, you know, the
17  development in this case.
18    So specific artifacts, you know, are
19  not necessarily an outcome of threat modeling.
20    Q.    When you've been involved in threat
21  modeling in the past, have you or a team working
22  for you typically produced a written output?
23    A.    You know, I've seen outputs of a
24  formalistic threat modeling process, but that --
25  I've also seen teams discuss, you know, threat

249

1  and, you know, not produce a formal -- a specific
2  output from that exercise.
3    Q.    All right.  And the times where you've
4  seen outputs of a formalistic threat modeling
5  process, what did that output look like?
6    A.    You know, it could be lists of
7  specific actors.  It could be lists of, you know,
8  threat actor, you know -- you know, approaches.
9  But, you know, more broadly, again, the concept of
10  threat modeling doesn't necessarily call for these
11  outputs.
12    And, you know, in the case that we
13  have in front of us, there isn't even a specific
14  identification that threat modeling is part of
15  what's promised in the secure -- you know,
16  asserted to be one of the -- SolarWinds's, you
17  know, activities in the securities statement.
18    Q.    All right.  Sir, if I could ask you to
19  look at paragraph 211 of your report --
20    A.    Uh-huh.
21    Q.    -- page 115.  And you have a
22  discussion there of Mr. Colquitt's email.
23    Do you see that?
24    A.    Yes, I do.  I should probably, you
25  know, look at both the email and his explanation

250

1  in the deposition, but I see -- I see that
2  sentence here.
3    Q.    Okay.  I don't -- right now I don't
4  want to focus on the substance so much as I want
5  to understand your process for forming your
6  opinions about Mr. Colquitt's email in this
7  report.
8    And I'm wondering, when you are
9  discussing Mr. Colquitt's testimony about what the
10  email he wrote meant, were you sort of accepting
11  it at face value, his explanation?
12    MR. TURNER:  You mean was he assuming
13  it was true?
14    MR. CARNEY:  Right.
15    THE WITNESS:  Again, I think -- I
16  think in this case it's important, because this,
17  you know, sentence talks both about an email and
18  then it talks about what he said in his deposition
19  when he wrote the email.
20    So, you know, in most of the sentence,
21  you know, where -- you know, I'm looking at two
22  sentences, but most of that is quotation.
23    MR. TURNER:  I think the question is
24  simply whether you were assuming Mr. Colquitt was
25  truthful in his testimony.

251

1    THE WITNESS:  I believe he was
2  truthful in his testimony, yes.  I mean, that is
3  an assumption in the way I wrote my -- you know,
4  my report.
5  BY MR. CARNEY:
6    Q.    And so specifically I want to focus
7  you on the sentence in the middle of paragraph 211
8  were you write, "In saying that, 'We are just
9  barely beginning to understand how teams are going
10  to be doing this activity,' he was not, 'talking
11  about doing a threat modeling itself,' but was
12  rather talking about how teams were going to be
13  documenting that activity."
14    For purposes of that sentence that you
15  wrote there, is it fair to say that you just
16  relied on Mr. Colquitt's explanation of what his
17  email actually meant?
18    A.    You know, in terms of SolarWinds's
19  conducting threat modeling, I wasn't, you know,
20  solely reliant on this statement.  We've talked a
21  lot about, you know, the evidence I relied upon to
22  find that, you know, threat modeling was occurring
23  in SolarWinds.
24    As we just stated, I believe, you
25  know, in terms of what I quoted, I believe he was

252

1   telling the truth in his deposition.
2      Q.   And my question is:  Have you seen any
3   independent evidence to support Mr. Colquitt's
4   statement that he was not talking about doing
5   threat modeling itself but simply was talking
6   about how teams were going to be documenting
7   threat modeling?
8      A.   Again, you know, I just want to make
9   sure that I'm, you know, correct about this.  But
10  if we had, you know, the timing of the email, you
11  know, that would help.
12      Because, you know, as I've said over
13  and over again, the -- one of the primary sources
14  of, you know, my finding that threat modeling was
15  occurring is the presence of the -- the FSRs.
16      You know, again, those were put in
17  place just prior to the relevant period.  But I --
18  you know, I don't remember the exact timing of
19  this statement.
20      But, you know, those would certainly
21  be independent of his assertion that they were not
22  just talking about, you know -- you know, that
23  they were doing threat modeling, and that what he
24  was talking about was documenting the activity.
25      Q.   All right.  So if the first sentence

253

1   of 211, you say, "With respect to Mr. Colquitt's
2   email, it appears to me Mr. Graff takes this email
3   out of context."  So let's stop there.
4      What do you mean that he took the
5   email out of context?  What's the context?
6      A.   Well, I mean, the context is explained
7   by Mr. Colquitt in his deposition.
8      Q.   Okay.  Is there any other context?
9      MR. TURNER:  Object to form.
10  BY MR. CARNEY:
11      Q.   That you feel Mr. Graff failed --
12      A.   I -- I -- you know, I'd like to look
13  at the email.
14      Q.   So I don't have a copy of the email,
15  because you quoted most of it in your report.
16  But --
17      A.   Yeah, I don't -- I don't have specific
18  memory of the entire email.
19      Q.   Okay.  Did you ever interview
20  Mr. Colquitt?
21      A.   I did not.
22      Q.   Dr. Rattray, is it fair to say that it
23  is your opinion that SolarWinds did not
24  100 percent of the time conform to the
25  cybersecurity practices described in the security

254

1   statement?
2      MR. TURNER:  Object to form.  And
3  foundation.
4      THE WITNESS:  As my report, you know,
5  states, basically no security practice can, you
6  know, conduct a perfect implementation of the set
7  of things that are listed in the securities
8  statement.
9      Perfection is -- you know, is not the
10  goal here.  It's not the expectation of readers of
11  the security statement.
12  BY MR. CARNEY:
13      Q.   Fair enough.  And I'm just trying
14  to -- really right now I'm just trying to
15  understand your opinion.
16      A.   Uh-huh.
17      Q.   Is it fair to say that it's your
18  opinion that whatever lapses there were, were not
19  pervasive or frequent at SolarWinds?
20      A.   I think that's fair.  There were --
21  you know, these were not pervasive, you know,
22  systemic lapses, you know, to the extent that any
23  of them existed.
24      Q.   And is it fair to say that it's your
25  opinion that a small number of lapses over a

255

1   multiyear period do not render this assertions in
2   the security statement untrue?
3      A.   Can you just repeat one time for me?
4      Q.   Sure.
5      Is it fair to say that it's your
6   opinion that a small number of lapses over a
7   multiyear period do not render the assertions in
8   the security statement untrue?
9      A.   Excuse me.  It's fair to say that, you
10  know, the security statement calls for, you
11  know, the presence of, you know, activity and practices.
12      And that, you know, given the nature
13  of cybersecurity, you.
14      (Stenographer asks for clarification.)
15      THE WITNESS:  You will not achieve
16  perfection, you know, in the implementation of
17  those practices.  You know, and so -- you know,
18  that's -- that's sort of, you know, my opinion.
19  And, you know, that's what -- you know, we're
20  looking for here.
21      I don't think any reader of the
22  securities statement is looking to that statement
23  to sort of hold -- you know, hold SolarWinds to
24  its -- to its -- you know, to perfection in the
25  execution.

256

BY MR. CARNEY:
1   BY MR. CARNEY:
2       Q.    So is there a number of lapses that,
3   in your opinion, would render the assertions in
4   the security statement untrue?
5       A.    You know, that is not the way we look
6   at, you know, sort of evaluating things like, you
7   know, the presence of controls or activities,
8   like, laid out in the security, you know -- in the
9   security statement.
10          So you have -- the determination is
11  not numerical. I mean, I haven't done very -- you
12  know, done large numbers of assessments and read
13  large numbers of assessments on things like access
14  controls.
15          There's not a quantification, you
16  know -- you know, involved in security assessment
17  and, you know, evaluating the presence of
18  practices.
19      Q.    So is it fair to say that there's a
20  qualitative aspect of such an assessment?
21      A.    Yes, it is fair to say.
22      Q.    And so, for instance, if a company
23  enforced their cybersecurity controls 99 percent
24  of the time, but the 1 percent of the time they
25  didn't was for the most critical systems, that

257

1   would matter in a cybersecurity assessment, right?
2       A.    You know, in terms of the assessment
3   of the security statement, which is not about sort
4   of -- it's about the presence of processes, right?
5          It says SolarWinds's -- you know --
6   you know, I don't want to -- to the -- you know,
7   it says -- I just want to be precise -- you know,
8   that SolarWinds is conducting activities.
9          You know, the magnitude -- it does not
10  discuss, you know -- again, I have to take a quick
11  look, but I do not think it discusses, you know,
12  the -- the magnitude of anything.
13          It discusses, you know, activities
14  that SolarWinds conducts. So in terms of
15  assessing this statement and what it asserts, the
16  magnitude of any specific, you know, problem that
17  might be identified actually is not relevant to
18  the securities statement.
19      Q.    This is a hypothetical --
20      A.    Uh-huh.
21      Q.    -- but can you think of a type of
22  cybersecurity mistake that is so serious that even
23  one instance of it would indicate a major flaw
24  with an organization cybersecurity controls?
25          MR. TURNER: Object to form.

258

1           THE WITNESS: Please repeat the
2   question.
3   BY MR. CARNEY:
4       Q.    Sure.
5          Can you think of a type of
6   cybersecurity mistake that is so serious that even
7   one instance of it would indicate a major flaw
8   with an organization's cybersecurity controls?
9          MR. TURNER: Object to form.
10          THE WITNESS: You know, I'm just
11  trying to think of -- the answer is generally, no,
12  right? Because, you know -- you know -- or maybe
13  we have to talk about what "flaw" means.
14          But, you know, cybersecurity is
15  difficult, and perfection is basically impossible
16  to achieve. So the fact that there's a flaw, that
17  does not mean that -- you know, the
18  organization -- you know, again, we're in a
19  hypothetical here -- isn't actually good at that
20  control, right?
21          You know, I cite the example, you
22  know, in my report of an error that occurred in
23  the World Series by a fielder that hadn't had any
24  errors, right? So that was a pretty serious flaw
25  but, you know, like, flaws happen, right?

259

1           So I don't think it's -- you know,
2   certainly a singular incident isn't sort of a
3   reflection of, you know, on -- isn't a reflection
4   on a judgment related to the -- you know --
5   whether a control structure is there or, you
6   know -- yeah, is there.
7   BY MR. CARNEY:
8       Q.    And just for the record, that
9   reference to that error was a personal affront to
10  me, and it was painful so soon after the World
11  Series, but that's --
12      A.    I understand.
13      Q.    -- neither here nor there.
14          So let me give you a hypothetical.
15  Let's say -- this is a hypothetical. U.S.
16  government accidentally leaks the passwords that
17  are needed to use the nuclear weapons, like the --
18  what is it? -- the biscuit?
19      A.    It's not a biscuit. But the
20  briefcase.
21      Q.    The briefcase?
22      A.    Briefcase moves around with the
23  President.
24      Q.    Got it.
25      A.    Yes.

260

1    Q.    And it happens only once.
2        Would you agree that despite this
3    mistake not being frequent, it could still
4    indicate a significant issue with the government
5    cybersecurity controls?
6        MR. TURNER:  I'm going to object to
7    form.
8        A "significant issue," do you mean a
9    consequential one or do you mean a pervasive one?
10   BY MR. CARNEY:
11       Q.    Well, you can answer.
12           Significant in that it's important.
13       A.    Yeah, I mean, you know, the
14   distinction being made, you know, "significant"
15   can be -- you know, an issue of magnitude, which
16   is -- we were just discussing, you know, a
17   singular mistake doesn't, you know, mean a
18   control -- control process is not strong.
19           You know, mistakes get made.  You
20   know, its magnitude could be grave in a single
21   instance, but it's not -- you know, not an
22   indication of a pervasive failure of, you know,
23   any given process or control.
24       Q.    If the military attache that was
25   supposed to be guarding that briefcase routinely

261

1    left it in the restroom but only one time did
2    someone take it, would that be -- could that be
3    indicative of a systemic problem, even though it
4    was only leaked that once?
5        MR. TURNER:  Again, I'm sorry.  But he
6    routinely left it unattended in the restroom?
7    That was your...
8        MR. CARNEY:  Right.
9    BY MR. CARNEY:
10       Q.    But it was only stolen once.
11       MR. TURNER:  But it was done
12   routinely?
13       MR. CARNEY:  Right.
14       MR. TURNER:  Okay.
15       THE WITNESS:  Again, we're talking
16   about -- obviously we're talking about --
17   BY MR. CARNEY:
18       Q.    A different hypothetical?
19       A.    -- a hypothetical, right, and actually
20   knowing people that have been responsible for
21   carrying that briefcase personally.  You know,
22   there's a lot of process that goes into avoiding,
23   you know, routine misbehavior like that.
24           You know, because it's a -- an error
25   would be grave.  So, you know, if -- you know, if

262

1    the -- the bad event was the result of clearly
2    numerous indications of, you know, misapplication
3    of the -- the control, you know, you would want to
4    be reviewing that, you know, when you had the
5    incident.
6        You know, that's my sort of
7    perspective on that hypothetical.
8        Q.    But in the original hypothetical, if
9    it was -- only happened one time, that wouldn't
10   warrant the review of the controls?
11       A.    I didn't say it wouldn't warrant a
12   review.
13       Q.    And it could possibly be evidence of a
14   serious problem with the controls, right?
15       A.    Yeah.  Again, you would look at the
16   context.  You know, in most cases -- and, again,
17   we're talking very hypothetically, so whether this
18   applies to SolarWinds or not, it largely doesn't
19   apply to the security statement for the reasons
20   I've said, which is the security statement is
21   about the presence of activities and programs.
22       You know, if a serious error was to
23   occur, there would be a review.  You know, yeah.
24   So, you know, that's generally what happens in,
25   you know, these types of processes like your

263

1    hypothetical.
2        Certainly I am sure that if the
3    briefcase was, you know -- you know, lost, it
4    would be a very significant review of why that
5    occurred.
6        Q.    And the briefcase is the football,
7    right, and the biscuit is the thing the President
8    carries, right?
9        A.    The briefcase is sometimes referred to
10   as a football, right, you know.
11       Q.    So, sir, if I could ask you to look at
12   paragraph 104.  This is the bottom of page 57, and
13   Exhibit 1 and carries over to page 58.
14       A.    I did it again [speaking sotto voce].
15       MR. TURNER:  Do you just want to give
16   him a chance to read it?
17       MR. CARNEY:  Yeah.
18       THE WITNESS:  So we're gonna -- we're
19   gonna discuss material in paragraph 104?
20   BY MR. CARNEY:
21       Q.    Yes.
22       A.    Okay.
23           (Pause for reading/reviewing.)
24       A.    Okay.  I would have looked through
25   paragraph 104.

264

1    Q.    Okay.  At the end of paragraph 104,
2  the last sentence you say, "Nor does Mr. Graff
3  identify any benchmark for an expected or
4  acceptable error rate against switch to judge
5  implementation of SolarWinds's controls even
6  though he acknowledges repeatedly that errors and
7  lapses occur in any cybersecurity program."
8    A.    Right.
9    Q.    I want to ask you:  Is it your opinion
10  that Mr. Graff should have identified an
11  acceptable error rate against which to judge the
12  implementation of SolarWinds's controls?
13    A.    Yes, it is.  Because Mr. Graff is
14  making assertions around pervasiveness and
15  systemic issues, which inherently involve, you
16  know, a -- you know, some sort of expectation of
17  what constitutes pervasive versus systemic.
18    Q.    Okay.  And you yourself did not
19  calculate acceptable error rate, did you?
20    A.    Yeah, because we were doing very
21  different things.
22    Q.    And in your concept of the acceptable
23  error rate, what is the numerator in the rate?
24    A.    I didn't make any assertions around
25  pervasiveness or systemic.  And I -- and I -- so

265

1  for the places where Mr. Graff is asserting that
2  something is pervasive or systemic, I'd have to
3  look at that specific situation.
4        But, you know, it certainly wasn't
5  within, you know, the -- the task I had at hand to
6  determine those rates.
7    Q.    Right.  And I'm just trying to
8  understand the error rate that Mr. Graff -- that
9  you feel he should have calculated.
10        What would be the numerator in that
11  rate that he should have calculated?
12        By that I don't mean the actual
13  number.  I mean what category of items would go
14  into the numerator?
15    A.    Again, this is completely contextually
16  dependent.
17        MR. TURNER:  I think you might be
18  talking past each other.
19        Are you saying, like, what is the
20  numerator?
21        MR. CARNEY:  Right.
22  BY MR. CARNEY:
23    Q.    What is in the formula?
24        MR. TURNER:  If errors are systemic,
25  what is the -- what is the numerator?

266

1        MR. CARNEY:  What is the numerator,
2  what is the denominator for the --
3        THE WITNESS:  Yeah, I don't know for a
4  given control.
5        (Simultaneous unreportable crosstalk
6              occurs among parties.)
7        THE WITNESS:  If the denominator is
8  tens of thousands of, you know, instances of
9  occurrence, how many errors, you know -- I don't
10  -- again, I can't in this question say if that
11  number is 10, 100.  You know, those sorts of
12  things.
13        And what that number is, is very
14  dependent on what control and situation.  Even the
15  factors that go into determining -- determining if
16  it's 10 or 100.
17        MR. TURNER:  Can I try?
18        Go ahead if you want.  I think I know
19  what you're getting at.
20  BY MR. CARNEY:
21    Q.    Yeah.  And I'm not looking for you to
22  quantify it or give me a number between 1 and a
23  million.
24    A.    Right.
25    Q.    I just want to know what types of

267

1  activities go into the numerator versus into the
2  denominator in calculating that error rate?  Is it
3  incidents go into the numerator?
4    A.    Controls have such -- you know, there
5  are a lot of controls, and even the data that is
6  used for those controls varies widely.  I don't
7  know what goes into the numerator for any --
8  unless we talk about a specific control.
9    Q.    All right.  So is it fair to say that
10  the error rate that you say that Mr. Graff should
11  have calculated, you yourself don't know how that
12  would have been calculated?
13    A.    No.  That's not what I said.  I said
14  you need to give -- you need to talk to me about a
15  control, and I'll talk to you about how -- how I
16  might go about it theoretically given that that
17  was not the task that I had at hand.
18    Q.    Okay.  Let's use passwords then.
19        So how would you calculate an error
20  rate for the password policy?
21    A.    You know, again, you know, you would
22  look at, you know, how many instances of -- again,
23  the -- you know, the password policy, you know,
24  has different stages.
25        But let's just say the number of times

268

1  you issued a new employee password and you would
2  have -- you know, you would seek to devine a
3  denominator -- you know, you would -- data that
4  gave you sort of a denominator that -- to that.
5        And then, you know, if you were going
6  to say it was systemic, you would work at, you
7  know, probably through a structure, you know,
8  of -- you know, interaction of, like, what
9  percentage -- I mean, we have risk metrics all the
10 time.
11       So you sort of set thresholds for,
12 okay, you know, 5 percent error rate, you know,
13 starts to get on a -- you know -- on a risk
14 reporting, you know, ledger, right?
15       So, you know, it is certainly possible
16 and happens quite frequently in terms of measuring
17 control implementation that metrics are put in
18 place that include determinations and numerators
19 that are relevant to the denominators.
20       MR. TURNER:  Just to -- I just want to
21 be -- just to be clear.
22       THE WITNESS:  Hopefully -- I'm trying
23 to answer the question.
24       MR. TURNER:  Just to be sure, by
25 "numerator," he's talking the errors, like the

269

1  noncompliant passwords --
2       A.    Right-
3       Q.    -- and the total number --
4       (Simultaneous unreportable crosstalk
5       occurs among parties.)
6       (Stenographer requests one speaker at a
7       time.)
8       THE STENOGRAPHER:  It's not clear for
9  the record.
10      MR. TURNER:  Do you want me to repeat?
11      THE STENOGRAPHER:  Please.
12      MR. TURNER:  Just I want to make
13 clear, I think by "numerator," we're talking about
14 the number of noncompliant passwords, the
15 denominator would be the total number of passwords
16 in that particular example.
17      THE WITNESS:  Yeah, I'm good -- I
18 agree with that.
19      MR. CARNEY:  Okay.  All right.  It's
20 been an hour, I think.
21      We can take a break.  Thanks.
22      THE WITNESS:  Okay.
23      THE VIDEOGRAPHER:  The time right now
24 is 5:27 p.m.
25      We are off the record.

270

1        (Whereupon, a recess was taken at
2        5:27 p.m.)
3        THE VIDEOGRAPHER:  The time right now
4  is 5:48 p.m.
5        We are back on the record.
6  BY MR. CARNEY:
7       Q.    All right.  Dr. Rattray, I'm going to
8  ask you a little bit about password protection.
9        Do you agree that, sort of, after the
10 fact, incident response cannot fully compensate
11 for inadequate password protection?
12      A.    I think it's very contextual.
13      Q.    Okay.  Well, all right.  Do you agree
14 that poor password security can lead to breaches
15 that happen too quickly or too stealthily for
16 incident response to mitigate them effectively?
17      MR. TURNER:  Objection to form.
18      THE WITNESS:  You know, again, we
19 should look at the specific context.  You know,
20 again, these are a very, sort of, abstract
21 question.
22 BY MR. CARNEY:
23      Q.    Right.  And in fairness, you're an
24 expert witness, so I'm --
25      A.    Uh-huh.

271

1       Q.    -- permitted to ask these kind of
2  abstract questions.
3       A.    Okay.
4       Q.    So I'm talking just at a general
5  level, can there be situations where poor password
6  security leads to a breach that just happens too
7  quickly for the incident response to mitigate it
8  effectively?
9        Are you aware of such situations?
10      MR. TURNER:  Object to form.
11      THE WITNESS:  Yeah, I mean, I think
12 that the general proposition that a control lapse
13 could lead to a breach that -- you know, evolved
14 quickly, you know, it's not just password
15 protection.
16       You know, other security controls, you
17 know, could lead to, you know -- again, very
18 theoretically, could lead to rapidly, you know,
19 evolving situations.
20 BY MR. CARNEY:
21      Q.    And what other security controls are
22 you thinking of?
23      A.    I'm just trying to -- I mean, almost
24 all security controls, if they fail dramatically,
25 can be highly problematic.

272

1       So, yeah, you know, misconfiguration
2  on a -- you know, on a device or an unpatched
3  system, you know, would be other types of security
4  controls that could lead to a similar situation.
5       Q.    Okay.  And do you agree that once
6  attackers gain valid login credentials, they can
7  often escalate privileges and move laterally
8  across a network in minutes?
9            MR. TURNER:  Objection to form.
10           THE WITNESS:  Yeah, that's not
11  generally how it occurs.  So, yeah, generally I
12  don't agree with that.
13  BY MR. CARNEY:
14      Q.    I don't think I used the word
15  "generally" --
16      A.    Okay.  Okay.  All right.
17           MR. TURNER:  What are you asking,
18  Chris?  That sometimes an attacker can get in and
19  escalate privileges and move laterally across a
20  network?
21           MR. CARNEY:  In minutes, right, yes.
22           THE WITNESS:  Yeah, that's why I said,
23  you know --
24           MR. TURNER:  Is that possible?  Is
25  that the question?

273

1  know, you layer security controls, and, you know,
2  you can have compensating controls.
3            And, you know, you look at those, and
4  if you're looking at a specific situation and, you
5  know, hopefully -- you know, you're looking to
6  have a layered set of controls that, you know, if
7  one doesn't work well, others compensate for that.
8       Q.    Right.  And do you agree that even if
9  an incident response team detects a breach
10  quickly, damage may already be done?
11      A.    Not necessarily, right?  You know,
12  again, compensating controls that limit damage for
13  a breach are not just incident response.
14      Q.    Do you agree that a password leak may
15  be used months later bypassing any immediate
16  response efforts?
17           MR. TURNER:  I don't even understand
18  the grammar of the question.
19           But object to the form.
20           THE WITNESS:  Could you just restate,
21  please.
22  BY MR. CARNEY:
23      Q.    Yeah, a leaked password, someone could
24  sit on it for months and not use it until months
25  after it was leaked, right?

275

1  BY MR. CARNEY:
2       Q.    It happens, right?
3       A.    Yeah.  Rarely.
4       Q.    I mean, if -- you know, if you want me
5  to tell you -- you know, the purpose of the -- I'm
6  not required to --
7       A.    Uh-huh.
8       Q.    -- but the -- isn't it true that after
9  the fact, incident remediation is not a substitute
10  for strong password protection, right?  Would you
11  agree with that statement?
12           MR. TURNER:  Objection.
13           THE WITNESS:  Um --
14           MR. TURNER:  Objection to the form of
15  the question.
16           THE WITNESS:  I wouldn't, because
17  security controls are not considered substitutes
18  for each other.
19  BY MR. CARNEY:
20      Q.    Right.  So you couldn't just say, we
21  have quick remediation procedures, therefore, we
22  don't need password protection, right?
23      A.    In my estimation, you know, I never
24  heard a conversation where that sort of
25  consideration has ever come up.  So I just -- you

274

1       A.    Yeah, theoretically that could happen.
2       Q.    And is it fair to say that you accept
3  that at least in one incident in 2019, a security
4  researcher reported finding a SolarWinds password
5  contained in the code repository that had
6  accidentally been made publicly available on
7  GitHub?
8       A.    Yes, I remember that specific
9  situation.
10      Q.    And just so I understand your opinion
11  about that, is it your opinion that this incident
12  was quickly remediated after the external security
13  researcher reported it?
14      A.    That's my understanding is it was
15  quickly remediated.
16      Q.    And why does it matter that it was
17  quickly remediated after the discovery?
18      A.    You know, I think -- you know, we
19  should probably look specifically at how I
20  phrased --
21      Q.    Sure.
22      A.    -- phrased that, because I think
23  you're asking for -- you're asking me --
24      Q.    Sure.
25      A.    -- for why I said that, right?  So can

276

1 we point -- can you point me to where this is
2 discussed?
3    Q.   Sure.  I think it's in paragraph 132
4 of your report.  Exhibit 1.
5    A.   Uh-huh.  Yeah, we're in -- that's the
6 right area.
7    Q.   Page 72.
8    A.   Yes.  So I'm reading, yeah,
9 paragraph 132.
10        And, you know, is the question why I
11 mentioned the fact that the -- the incident was
12 remediated immediately after?
13    Q.   Well, we can start with that.
14        Why did you mention it?
15    A.   Because -- yeah, I mean -- in numerous
16 places in Mr. Graff's report, he talks to -- about
17 the severity of incidents, you know, and the fact
18 that, you know, this incident was, you know,
19 remediated immediately, you know, is relevant to,
20 you know, the judgment of whether it was, you
21 know -- you know, the magnitude of the risk was
22 high.
23        It also, you know, shows more
24 generally that -- you know, SolarWinds as a
25 security practice, you know, again, more

277

1 generally, you know, had layers of controls, had a
2 series of compensating controls to deal with, you
3 know, any singular isolated lapse like the one in
4 this incident.
5    Q.   Okay.  And in your view as someone in
6 the cybersecurity field, why is it important that
7 a password leak be remediated quickly?
8    A.   You know, I think, you know, the
9 general practice in the field is to try to
10 remediate any, you know, security lapse as fast as
11 possible.
12    Q.   All right.  So we're talking about
13 this particular --
14    A.   Uh-huh.
15    Q.   -- one here.
16        What are the consequences of not
17 remediating it quickly?
18    A.   You know, are you asking what -- in
19 this specific context, what might have happened
20 badly if they didn't have quick remediation?
21    Q.   Right.
22    A.   As it states in the report, it was
23 another compensating control around digital
24 signature that also, you know, would have -- you
25 know, remediated the -- you know, the potential

278

1 negative consequences here.
2        So, you know, the fact that they -- I
3 actually think that the fact that they remediated
4 it quickly is just evidence that they -- they were
5 constantly looking for problems and acting quickly
6 when they can.
7        I actually don't -- you know, again,
8 because it was another compensating control, the
9 two layers of control quickens a response and, you
10 know, digital signature, you know, meant that --
11 this incident wasn't significant.
12    Q.   Okay.  You mentioned digital
13 signature --
14    A.   Uh-huh.
15    Q.   -- was that one of the compensating
16 controls that, for lack of a better term, failed
17 in connection with the Sunburst incident, as you
18 understand it?
19        MR. TURNER:  Objection to form.
20        THE WITNESS:  No.
21 BY MR. CARNEY:
22    Q.   You don't recall any aspect of that
23 incident relating to the digital signature?
24        MR. TURNER:  Different question.
25        Go ahead.

279

1        THE WITNESS:  Yeah, you know -- you
2 know, my understanding of the Sunburst incident
3 is, you know, the highly sophisticated Russian,
4 you know, intelligence agency that intruded on
5 SolarWinds got inside their software development
6 process.
7        And, you know -- you know, in the
8 distribution of that, you know -- you know,
9 distributed software that, you know, I don't have
10 the forensics, but probably was digitally signed.
11 So it's a very different sort of situation.
12 BY MR. CARNEY:
13    Q.   Okay.  If a cybersecurity incident
14 such as a password leak is not remediated quickly,
15 what can happen?  What are the consequences?
16        MR. TURNER:  Objection to form.
17        THE WITNESS:  Yeah, that is very
18 dependent on the situation.
19 BY MR. CARNEY:
20    Q.   I'm trying to understand why it
21 mattered to you that they remediated the password
22 leak quickly?  How does that reflect on whether
23 they were following their password practices or
24 not?
25    A.   As I said, you know, and Mr. Graff in

280

```
 1   numerous cases, you know, discusses, you know --
 2   you know, these particular incidents and makes
 3   assertions around their magnitude and severity.
 4         And, you know, this particular, you
 5   know, callout on the compensating controls
 6   including the speed of investigation, you know,
 7   both sort of addresses the fact that this
 8   wasn't -- you know, a major or serious incident.
 9         And more generally, you know, shows
10   that SolarWinds had strong security practice,
11   which would then -- you know, I mean that -- you
12   know, in areas like password security or across
13   the full set of, you know, activities in the
14   security statement that this was a practice that
15   was strong and one would expect was doing the
16   things in the security statement.
17   Q.    Did you review any risk acceptance
18   forms in conjunction with your work in this case?
19   A.    Yes, I did.
20   Q.    And why did you review risk acceptance
21   forms?
22   A.    You know, in some of the incidents, a
23   determination was made that, you know -- you know,
24   there was a risk acceptance that, you know -- that
25   helped address what happened, you know, or was
```

281

```
 1   part of addressing what happened in the incident.
 2   Q.    Do you recall which incident?
 3   A.    I believe, but I want to confirm, you
 4   know, that this is the incident that involves the
 5   access of developers -- in the billing system or
 6   the -- the -- yeah, the -- the billing -- you
 7   know, the billing system, you know, event or, you
 8   know, situation.
 9   Q.    So doing development work in the
10   production environment; is that fair to say?
11   A.    I just want to make sure that I'm
12   correct and, you know, that is one of the places
13   that I looked at risk assessment.  Pretty sure.
14   There's a lot of detail in this case.
15   Q.    So if you look at, I think,
16   paragraph 123 of your report --
17   A.    Uh-huh.
18   Q.    -- on page 68.
19   A.    Yeah, okay.  So that's correct.
20   Q.    So -- I --
21         MR. TURNER:  I just want to make sure
22   I'm looking at the right part.
23         What are you looking at, Chris?
24         MR. CARNEY:  So if you look at the
25   bottom of page 68.
```

282

```
 1         MR. TURNER:  Okay.
 2   BY MR. CARNEY:
 3   Q.    So -- and I just want to ask you about
 4   risk acceptance forms generally.
 5   A.    Uh-huh.
 6   Q.    Do you agree that risk acceptance
 7   forms can show that an organization identified
 8   certain risks stemming from violation of a policy?
 9   A.    Just risk acceptance forms that -- you
10   know, are a -- you know, the form itself is sort
11   of the documentation of a process that, you know,
12   if an activity is deemed risky, judgments are made
13   about, you know, what is acceptable behavior, you
14   know, or the acceptable path or not going forward
15   in terms of the risk acceptance process.
16         And, you know, again, the form is the
17   documentation of that process occurring and
18   decisions being made.
19   Q.    Got it.
20         And all I'm trying to understand is
21   that -- will that form contain an assessment of
22   the risks that you face if you violate the given
23   policy?
24   A.    Yeah.  I mean, usually I think it
25   does.  Again, are we talking in this specific case
```

283

```
 1   about this specific incident or generally?
 2   Because risk acceptance forms are per- -- you
 3   know, risk acceptance is a common way of dealing
 4   with, you know, security situations and risks.
 5         And, again, it -- I've seen it in many
 6   different contexts.
 7         So are we talking about a general
 8   process or the specific case here?
 9   Q.    So right now I'm asking generally.
10   A.    Okay.
11   Q.    And I'll ask you specifically --
12   A.    Right.
13   Q.    -- in a second.
14         So just generally I'm trying to
15   understand, do risk acceptance forms generally
16   show the risks that a company will face if they
17   were to accept the given risk and violate the
18   policy?
19   A.    Yeah, they -- I mean, often they're
20   not, sort of, you know, judgments on the policy as
21   a whole.  You know, they tend to be, again,
22   context driven and situation specific.
23         But, you know, yes, you know, in my,
24   you know, experience, you know, this process and
25   those forms do identify what risks are being, you
```

284

1  know, considered in -- for acceptance or not
2  generally.
3      Q.   All right.  Maybe it's easier, I'll
4  just show you the specific example that we're
5  talking about --
6      A.   Uh-huh --
7      Q.   -- here.
8      A.   -- right.
9           (Whereupon, Exhibit 17 is marked for
10          identification.)
11 BY MR. CARNEY:
12     Q.   And just for the record, what you've
13 been handed as Exhibit 17 is the native version of
14 a document that had Bates stamp SW-SEC00168780.
15 And it was a July 2020, RAF or risk acceptance
16 form spreadsheet.  And it was cited in Mr. Graff's
17 report.
18          And I want to ask you, sir -- and just
19 so you -- it's a sort of a big spreadsheet --
20     A.   Uh-huh.
21     Q.   -- just the way it's set up is that
22 each row, if you will, spans two pages.  So if you
23 could turn to the third page.
24     A.   So page 3 of 8 in this --
25     Q.   Page 3 of 8 in this exhibit.

285

1  spreadsheet shows that SolarWinds accepted the
2  risk that developers had write access to
3  production data?
4          MR. TURNER:  Generally, or are you
5  talking about in this specific instance?
6          MR. CARNEY:  In this specific
7  instance, yes.
8          Thank you.
9          THE WITNESS:  Yes.
10 BY MR. CARNEY:
11     Q.   And do you agree that that same cell
12 that we're looking at here, this would be
13 Column C --
14     A.   Uh-huh.
15     Q.   -- states that, "APIs have write
16 permissions which are not used or needed"?
17     A.   Yes.  I mean, this sentence has -- you
18 know, they are using the APIs just to pull data,
19 but those three APIs have write permissions which
20 are not used.
21     Q.   And do you agree that access that is
22 not used or needed is not the least necessary
23 amount of access?
24          MR. TURNER:  Object to form.
25          THE WITNESS:  Not necessarily.  You

287

1      A.   Uh-huh.
2      Q.   And you'll see Row 9, the BizApps
3  Billing DB.
4          Do you see that?
5      A.   Yeah, I do.
6      Q.   And then if you want to see the entire
7  row, you would turn to page 4 of 8.
8      A.   Okay.  Yeah.
9      Q.   And if you look in Column M on page 4,
10 you see, "11/18/19.  Risk reviewed and accepted by
11 Tim Brown."
12          Do you see that?
13     A.   I mean, I think -- I just want to make
14 sure.
15          So I see Columns J and K.  K has, you
16 know, Tim Brown's name on Approved By.  Uh-huh,
17 yeah, if that's what the question was, the
18 answer's yes.
19     Q.   Okay.  And then if you look in
20 Column M, that has under "Compensating Control,"
21 there's actually a date and a notation, "Risk
22 reviewed by and accepted by Tim Brown."
23          Do you see that?
24     A.   I do.
25     Q.   So would you agree that Row 9 of this

286

1  know, my understanding of this situation is the
2  way that technology was set up, you know, at the
3  time, you know, you didn't have a choice to have,
4  you know -- you know, to use the technology
5  without write permissions.
6          So, you know, all sort of least
7  privilege and rule-based access is sort of in the
8  context of, you know, what you need to do to do
9  your job.  And the developers, to do their job,
10 needed to use these APIs.
11 BY MR. CARNEY:
12     Q.   Is it your understanding that
13 SolarWinds had a policy to separate development
14 from production?
15          MR. TURNER:  Object to form.
16          Yeah, in the network security portion,
17 I believe of the security -- let's just check
18 that.
19 BY MR. CARNEY:
20     Q.   Of Exhibit 5.
21     A.   Yeah.  Yeah, it's in the network
22 security portion of the security statement.
23     Q.   And are you specifically referring to
24 the first sentence of the second paragraph --
25     A.   Yeah.

288

1    Q.    -- where it says, "SolarWinds
2  maintains separate development and production
3  environments"?
4    A.    Yes, I am.
5    Q.    Do you agree that the risk outlined
6  here where developers had access to production
7  data is inconsistent with separating development
8  from production?
9    A.    Are we talking about the write aspect
10 of it or some other element of this?
11   Q.    So we are talking about the developers
12 having read and write access to production data
13 where they were doing their development work.
14        You recall this from our discussion
15 earlier, right?
16        MR. TURNER:  "You" here is asking --
17 even with read access, would be reading production
18 data.
19        So I think he's asking do your
20 questions relate to this or another aspect of --
21        THE WITNESS:  Yeah, I mean, we're on
22 this notion that, you know, the risk was poised
23 because they had write access, and then we, you
24 know, pivoted to development and production
25 environment.

289

1        You know, as something SolarWinds --
2  I'm just trying to relate the two.
3  BY MR. CARNEY:
4    Q.    Okay.  So, well, let me break it apart
5  then.
6        Do you agree that these developers
7  had -- were performing development work in a
8  production environment?
9    A.    Yes.
10   Q.    Okay.  And do you agree that
11 SolarWinds had a policy against allowing
12 development in production environment?
13        MR. TURNER:  Chris, are we talking
14 about the security policy --
15        (Simultaneous unreportable crosstalk
16        occurs among parties.)
17        THE WITNESS:  Yeah --
18 BY MR. CARNEY:
19   Q.    Yes.
20   A.    And, again, SolarWinds had a network
21 security, you know -- set in the network security
22 portion of its securities statement that it
23 maintains network, you know, by implication,
24 separation of development and production network
25 environments.

290

1        That's different than developers as
2  people conducting activity, you know -- you know,
3  developers inside the production environment.
4  It's -- to my mind, an apple and an orange.
5    Q.    So you don't believe that SolarWinds
6  had a -- relating to your second point, a policy
7  of preventing people conducting development inside
8  the production environment?
9        MR. TURNER:  Objection to form.
10       You're asking was there a policy
11 beyond what's in the securities statement?
12       MR. CARNEY:  No.
13       MR. TURNER:  Okay.
14       THE WITNESS:  Yeah, are you saying
15 that the securities statement in some way
16 obligated, you know, SolarWinds to prohibit, you
17 know, developers from operating in the production
18 environment?  Is that --
19 BY MR. CARNEY:
20   Q.    Yes.
21   A.    -- is that the question?
22   Q.    Exactly.
23   A.    I don't see that language in the
24 security statement.  But, again, maybe I need to
25 read more -- more thoroughly every sentence.

291

1  Because the network security element of it
2  doesn't -- doesn't address the people aspect of
3  this.
4        It talks about -- it's about network
5  separation.
6    Q.    All right.  Well, so let -- let me ask
7  you then:  Do you agree as a cybersecurity
8  professional that it is -- I'm talking about best
9  practices here --
10   A.    Uh-huh.
11   Q.    -- that it's not part of a secure
12 software development lifecycle to develop inside
13 the production environment?
14       MR. TURNER:  Object to form.
15       THE WITNESS:  Again, are we talking
16 separate from the security statement and just sort
17 of abstractly about best practice?
18 BY MR. CARNEY:
19   Q.    I'm not gonna -- I'm not gonna argue
20 with you about what the security statement covers,
21 so right now I just want to ask you about best
22 practices.
23       You can put aside the security
24 statement for a second.
25       Do you agree that it is not part of a

292

1  secure software development lifecycle to allow
2  development inside the production environment?
3      A.    No.  I think that's a case-by-case
4  determination based on, you know, what the
5  business needs in terms of development.  And, you
6  know, one might seek to keep developers out of the
7  production environment.
8          There's no absolute in this case, and
9  there may be business-driven reasons to allow for
10  developers to work in the production environment.
11     Q.    Do you agree that "SDL, secure
12  development lifecycle," is a term of art within
13  the cybersecurity field?
14     A.    Yes.  It's a term of art within the
15  cybersecurity field.
16     Q.    And do you know which organization
17  invented or first documented the SDL?
18     A.    You know, again, I'm not quite sure
19  why we're working on history at this point, but,
20  you know, I know that Microsoft had an early role
21  in, you know, the concept of secure -- you know,
22  secure software development.
23     Q.    Do you recognize Microsoft as an
24  authority on the SDL process?
25     A.    You know, there might -- you know, so

293

1  is, you know, part of what, you know, in my
2  practice, I'm looking for in this area, because
3  there's plenty of good guidance.
4      Q.    Okay.  Do you acknowledge that threat
5  modeling is a security best practice within an
6  SDL?
7      A.    I would say threat modeling is
8  mentioned in, you know, that security -- you know,
9  secure software development, you know, practices,
10  yes.
11     Q.    Okay.  And do you agree that threat
12  modeling is a standard practice within the SDL?
13     A.    You know --
14          MR. TURNER:  Wait a minute.  Wait a
15  minute.  Within the SDL?
16          MR. CARNEY:  Within an SDL.
17          THE WITNESS:  So, yeah, we're saying,
18  sort of, conceptually if an organization is doing
19  software development and secure development, is
20  threat modeling a standard?
21  BY MR. CARNEY:
22     Q.    Standard practice, right.
23     A.    You know, I don't have the data.  You
24  know, I guess if "standard" means, you know, some,
25  you know -- some high percentage of the

295

1  there are many authorities on -- you know, or
2  many, sort of, organizations that, you know,
3  provide advice around, you know, the conduct of
4  secure software development.
5          You know, that device is used by
6  teams, you know, in order to hopefully, you know,
7  improve security practice, you know, generally --
8  you know, as a sort of general perspective on
9  how -- how this works in the field.
10     Q.    Have you ever read the book by Michael
11  Howard and Steve Lipner produced by Microsoft,
12  "The Security Development Lifecycle"?
13     A.    I'm aware of the book, but I haven't
14  read it.
15     Q.    Okay.  Do you recognize that book as
16  an authority in the field?
17     A.    As I said, I don't actually look to
18  find authoritative sources related to secure, you
19  know, software development.
20          Just, you know -- you know, practices
21  and procedures that are, you know, advised to
22  companies in pursuit of that -- you know, pursuit
23  of secure software development.
24          But you know, the issue of an
25  authoritative source is sort of not something that

294

1  organizations that do software development, you
2  know, use threat modeling, I actually don't know
3  whether that's a case, because there's some pretty
4  small organizations that do software development.
5          And, you know, they -- they -- my
6  sense is there's probably a lot of them that are
7  not doing threat modeling, so I wouldn't call it a
8  standard.
9      Q.    Okay.  Do you recall whether the
10  Microsoft SDL book has an entire chapter on threat
11  modeling?
12     A.    I don't.
13     Q.    Okay.  Would it surprise you that it
14  does?
15     A.    No, it would not.
16     Q.    All right.  Do you agree that
17  "penetration testing" is a term of art within the
18  cybersecurity field?
19     A.    Yes.
20          MR. TURNER:  I'm just going to object
21  to form.
22          THE WITNESS:  Okay.
23          MR. TURNER:  Go ahead.
24          THE WITNESS:  I'm going too fast.
25          Yes.

296

BY MR. CARNEY:
Q.    And what is penetration testing,
according to standard cybersecurity practices?
A.    Again, the notion that, you know,
there's standard practice in cybersecurity is --
you know -- you know, often really not the case.
I mean, there are a lot of ways to conduct
penetration testing, so, you know, I don't know
that there's a standard way.
There are probably plenty of, you
know, people that depict how they think you should
do penetration testing.
But, you know, the notion of, you
know, from -- you know, looking at a -- a code --
like, an application or a network and seeing if it
can be -- in the case of penetration testing
intruded upon, I think that's what people think
about when they think about pen testing.
Q.    Okay.  If we could just quickly look
at paragraph 6 of your report --
A.    Uh-huh.
Q.    -- page 2 carrying over to page 3.
A.    Repeat the location again?
Q.    Sure.
It's page 2 to 3, paragraph 6 --

297

A.    Uh-huh.
Q.    -- the last sentence of paragraph 6,
you say, "My teams also assisted our clients in
conducting penetration testing in red team
exercises both of which involved structured
testing efforts to find flaws and vulnerabilities
in IT defenses."
A.    Correct.
Q.    What do you mean by "structured
testing efforts"?
A.    You know, that -- you know, when we
conduct, you know, penetration testing or
network-based red teaming, that, you know, there
is a structure to our conduct of that activity in
terms of what -- what we will do, how -- how that
will interact with the client network, procedures
for, you know, starting the testing.
You know, notifying clients about the
fact that it's occurring.  You know, procedures
for if their incident response team, you know,
detects the testing, you know, how to handle that.
You know, structure in terms of the
nature of the reporting that we would undergo, you
know, we would provide at the end of, kind of,
conducting either pen testing or red teaming.

298

You know, generally, that's what I'm
referring to when I talk about structured testing.
Q.    Okay.  And what are the forms of
penetration testing that you recommend to your
clients?
A.    Yeah, again, it -- it really is, you
know, situation dependent, yeah.  It's very much
situation dependent.
Q.    Based on the documents that you've
reviewed, how does SolarWinds perform penetration
testing?
A.    You know, during their -- you know,
software development process, is it -- a series of
tools that are used, reports that are generated,
you know, related to penetration testing.  I mean,
the FSRs in many cases document that.
Q.    Are you aware of SolarWinds
conducting -- having any external penetration
testing conducted?
MR. TURNER:  Objection to form.
External penetration testing of
software or external penetration testing of their
network?
BY MR. CARNEY:
Q.    Of their software.

299

A.    You know, I didn't analyze, you know,
what -- I mean, yeah, I didn't analyze if they had
external, you know, penetration testing of -- of
software.
You know, again, they had a very
robust process for, you know, pen testing, you
know, in the -- you know, in the -- you know, the
evidence I examined and the -- also the -- the
leaders of SolarWinds testified that they were
doing it.
Q.    All right.  I could show you in your
report, but just tell me if this is wrong.
In paragraph 87, you say that,
"Penetration testing of software is often done
with the assistance of automated tools which can
simulate various types of attack -- attacks."
Is that true?
A.    In paragraph 87, you know -- let's
see.  Down in, like, paragraph -- paragraph (c),
okay.  Let me just take a quick read.
(Pause for reading/reviewing.)
A.    So I think you read a portion of this,
but maybe just restate.
Q.    All right.  So in paragraph 87,
subparagraph (c) --

300

1    A.    Uh-huh --
2    Q.    -- on page 48 --
3    A.    -- yes.
4    Q.    -- you say in the second sentence, "As
5    with vulnerability testing, penetration testing of
6    software is often done with the assistance of
7    automated tools which can simulate various types
8    of attack."
9    A.    Correct.
10    Q.    Are there any other penetration
11    testing activities that -- other than those that
12    use automated tools that you're familiar with?
13    A.    I mean, yes.
14    Q.    And what are they?
15    A.    You know, you could, you know, have --
16    and I have seen, you know, this executed, you
17    know, that the pen tester could just use -- and,
18    again, maybe this is a nuance in terms of
19    automated tools, but not pen testing tools, the
20    normal ability of a computer to interact with
21    another computer and see if they can gain access
22    to the tested -- you know, either application or
23    computer.
24         So I wouldn't call that sort of
25    activity automated tools.

301

1    Q.    All right.  And just a second ago when
2    we were talking about paragraph 6 --
3    A.    Uh-huh.
4    Q.    -- and your team conducting
5    penetration testing, which involves structured
6    testing --
7    A.    Uh-huh.
8    Q.    -- efforts, I'm just trying to
9    understand, what's the specific structure that you
10    follow?
11    A.    As I talked about it, you know, the
12    structure that I'm talking about there is
13    structure around the process by which we do it.
14    Mostly to ensure that the safety and -- of the
15    client.
16         Again, our penetration testing tends
17    to be network penetration testing.  We actually
18    don't do application-level penetration testing,
19    which is what, you know, is at issue in the
20    SolarWinds case.
21    MR. CARNEY:  Okay.  Could we take,
22    like, two minutes.
23    MR. TURNER:  Sure.
24    ///
25    ///

302

1    THE VIDEOGRAPHER:  The time right now
2    is 6:29 p.m.
3         We are off the record.
4         (Whereupon, a recess was taken at
5         6:29 p.m.)
6    THE VIDEOGRAPHER:  The time right now
7    is 6:36 p.m.
8         We're back on the record.
9    MR. CARNEY:  All right.  Dr. Rattray,
10    I have no further questions at this time.  I want
11    to thank you for your time today.
12    THE WITNESS:  Thank you.
13    MR. CARNEY:  It was nice to meet you.
14         EXAMINATION
15    BY MR. TURNER:
16    Q.    Should be pretty brief.
17         So, Dr. Rattray, let's pick up where
18    Mr. Carney had left off a little while ago.
19         He asked you about whether the terms
20    "secure development lifecycle" is a term of art.
21         Do you remember that?
22    A.    I do.
23    Q.    And he asked you about whether it
24    comes from Microsoft.
25         Do you remember that?

303

1    A.    I do.
2    Q.    I think what Mr. Carney was getting
3    at -- and correct me if I'm wrong -- is that if
4    SolarWinds uses the phrase "our secured
5    development life cycle" --
6    A.    Right.
7    Q.    -- in its security statement, would
8    that be understood in the industry to mean that it
9    does everything that Microsoft includes in its
10    SDL?
11    A.    No, no.
12    MR. CARNEY:  Objection.  Leading.
13    BY MR. TURNER:
14    Q.    And why not?
15    A.    You know, "secure development
16    lifecycle," you know, again, is a broad -- you
17    know, broadly interpreted term.  You know,
18    generally means there are things that you should
19    do in order to make sure security is baked into
20    your software development.
21         You know, the term at the level of
22    secure development lifecycle is that broad, and
23    you know -- you know, is not pinned to any
24    specific, you know, set of practices.
25    Q.    And so in your experience, do

304

1    companies tend to do software -- excuse me, secure
2    development lifecycle the same way, or do they
3    take different approaches?
4        **A.**    Yeah.  There's many different
5    approaches.
6        **Q.**    And in your experience, is it possible
7    to have a secure development lifecycle without
8    having formal threat modeling?
9        **A.**    Yes.  You could say you're doing
10   secure development, you know, in a lifecycle
11   fashion without threat modeling.
12       **Q.**    Your report in places relies on some
13   documents that date back before the relevant
14   period; is that right?
15       **A.**    That's true.
16       **Q.**    For example, I think we talked about
17   you cited a chat containing a screenshot of the
18   password policy settings from before the relevant
19   period?
20       **A.**    That's right.
21       **Q.**    Why, in your view, did you believe
22   that that was reliable evidence of SolarWinds's
23   practice during the relevant period?
24       **A.**    You know, first, that screenshot is --
25   you know, the type of direct evidence you're

305

1    looking for just, in general, when you're doing
2    these sorts of assessments.
3        You know, they -- they say that
4    they're -- you know, conducting enforcement and,
5    you know, the mechanism by which they were doing
6    that is the use of active directory to enforce
7    strong passwords.
8        That particular artifact, you know,
9    shows that that -- that statement that, you know,
10   of how they were doing their practice is just
11   directly true.
12       It just shows the practice in
13   implementation.
14       You know, it also -- have evidence
15   to -- you know, that demonstrates that that
16   continued, you know, into the -- into the relevant
17   period, both in terms of, you know, testimony and
18   auditors also looking at that specific situation
19   and showing that that -- that implementation of
20   the -- you know, the password practices was in
21   place during the relevant period.
22       **Q.**    And with respect to the training slide
23   that we looked at earlier --
24       **A.**    Yes.
25       **Q.**    -- the SolarWinds development

306

1    process --
2        **A.**    Uh-huh.
3        **Q.**    -- this was from before the relevant
4    period, right?
5        **A.**    That's correct.
6        **Q.**    Why did you consider this to be
7    relevant evidence as to SolarWinds's practices
8    within the relevant period?
9        **A.**    Again, we -- we know from this -- you
10   know, both, again, statements of executives and
11   the presence of artifacts in the relevant -- you
12   know, in the relevant period, like the final
13   security reviews, that, you know, the practices
14   outlined in that deck, which appears to be a
15   training deck, you know, extended, you know, into
16   the relevant period.
17       But that -- that particular deck shows
18   SolarWinds starting a process of doing Agile
19   development, and ensuring security is part of
20   their approach to Agile development.
21       **Q.**    As early as --
22       (Simultaneous unreportable crosstalk
23       occurs among parties.)
24       (Stenographer requests one speaker at a
25       time.)

307

1    BY MR. TURNER:
2        **Q.**    As early as 2015; is that right?
3        **A.**    Yes.  As earlier as 2015 and then,
4    again, evidenced during the relevant period in
5    execution of the things that were outlined that
6    had started as early as 2015.
7        **Q.**    Let's go way back to sort of the
8    beginning of the deposition.
9        You were asked about whether you have
10   any certifications in various cybersecurity
11   areas --
12       **A.**    Yes, I remember being asked.
13       (Simultaneous unreportable crosstalk
14       occurs among parties.)
15   BY MR. TURNER:
16       **Q.**    -- or from cybersecurity authorities.
17       Let me ask you:  Are certifications
18   seen as important in the cybersecurity field, in
19   your experience?
20       MR. CARNEY:  Objection.  Vague.
21       THE WITNESS:  You know, in general,
22   especially for the type of activity I was
23   conducting here in terms of, you know, assessments
24   of the presence of processes, you know, they're
25   not, you know, seen as sort of necessary or even

308

1  sometimes particularly relevant to one's expertise
2  in order to conduct these processes.
3  BY MR. TURNER:
4      Q.    And has any of your clients ever asked
5  you for certifications before engaging you to
6  conduct cybersecurity assessments?
7      A.    No.
8          MR. TURNER:  No further questions.
9          MR. CARNEY:  Just one brief follow-up
10  question.
11                EXAMINATION
12  BY MR. CARNEY:
13      Q.    Mr. Turner had asked you about your
14  reliance on evidence or documents from before the
15  relevant period.
16          Do you recall that?
17      A.    Yes.
18      Q.    Okay.  And so, for instance, he
19  mentioned the slide deck relating to SDL.
20          Do you recall that?
21      A.    I think -- I think it's development
22  process.  You know, I mean, it was in our
23  discussion of SDL, but -- this slide deck --
24      Q.    Yeah.
25      A.    -- is I believe what we were talking

309

1  processes during the relevant period.
2      Q.    And then actually just one more.
3          The folks that work for you at Next
4  Peak, that, for instance, do penetration testing,
5  did they have the certifications that Mr. Turner
6  was asking you about?
7          MR. TURNER:  Object to form.
8          THE WITNESS:  Yeah, for the pen
9  testers?
10  BY MR. CARNEY:
11      Q.    Yes.
12      A.    You know, I actually don't know
13  necessarily if they -- they have those
14  certifications or not.  I mean, I'm -- yeah, I
15  don't know for certain whether they have them.
16          MR. CARNEY:  All right.  No further
17  questions, sir, thank you.
18          THE WITNESS:  All right.
19          MR. TURNER:  None for me.
20          THE VIDEOGRAPHER:  The time right now
21  is 6:45 p.m.
22          We are off the record.
23          THE STENOGRAPHER:  Mr. Turner, did you
24  want a rough draft?
25          MR. TURNER:  Yes, please.

311

1  about -- I was talking about with Mr. Turner.
2      Q.    Okay.  And the fact that you relied on
3  documents like the slide deck that predated the
4  relevant period, does that mean you were unable to
5  find equivalent documentation to that slide deck
6  from during the relevant period?
7      A.    No.  I mean, it does not mean that.
8  As I stated, the types of things that were, you
9  know, begun, you know, in training starting in,
10  you know, 2015 as outlined in this deck were
11  evidenced by, you know -- you know, processes like
12  we discussed at length like the final security
13  review, which was definitely prevalent throughout
14  the -- you know, the relevant period.
15      Q.    But did you find an equivalent slide
16  deck from the relevant period?
17      A.    I didn't -- I'm not sure even why I
18  would have looked for one.  You know, the point
19  was -- you know, at least in my assessment was to
20  show that, you know, they had -- they had in
21  place, you know, during the relevant period per
22  the securities statement processes.
23          This deck shows they initiated those
24  processes and other evidence, you know, shows that
25  they -- you know, they were implementing those

310

1          THE STENOGRAPHER:  And regular
2  delivery on final?
3          MR. TURNER:  Yeah, that's fine.
4          (Time noted:  6:46 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

312

```
 1              REPORTER CERTIFICATE
 2      I, the undersigned, do hereby certify:
 3      That GREGORY RATTRAY was by me duly sworn
 4  in the within-entitled cause; that said
 5  deposition was taken at the time and place
 6  herein named; and that the deposition is a
 7  true record of the witness's testimony as
 8  reported by me, a disinterested person, and
 9  thereafter was transcribed.
10      I further certify that I am not
11  interested in the outcome of the said
12  action, nor connected with, nor related to
13  any of the parties in said action, nor to
14  their respective counsel.
15      IN WITNESS WHEREOF, I have hereunto set
16  my hand this 25th day of February, 2025.
17  Signature: __Requested__Waived_X_Not Requested
18
19
20      _____
21           JESSICA R. WAACK
          Registered Diplomate Reporter
22         Certified Realtime Reporter
       California Certified Realtime Reporter
23       New York Realtime Court Reporter
         New York Association Court Reporter
24       Notary Public, State of New York
       CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
25       CCR-WA (No. 21007264), CSR-CA (No. 14420)
```

313

```
 1              CERTIFICATE OF WITNESS
 2
 3      I, GREGORY RATTRAY, do hereby declare under
 4  penalty of perjury that I have read the entire
 5  foregoing transcript of my deposition testimony,
 6  or the same has been read to me, and certify that
 7  it is a true, correct and complete transcript of
 8  my testimony given on February 12, 2025, save and
 9  except for changes and/or corrections, if any, as
10  indicated by me on the attached Errata Sheet, with
11  the understanding that I offer these changes and/or
12  corrections as if still under oath.
13      _____ I have made corrections to my deposition.
14      _____ I have NOT made any changes to my deposition.
15
16  Signed: _____
             GREGORY RATTRAY
17
18
19  Dated this _____ day of _____ of 20____.
20
21
22
23
24
25
```

314

```
 1              ERRATA SHEET
 2  Deposition of: GREGORY RATTRAY
    Date taken: FEBRUARY 12, 2025
 3  Case: SEC v. SOLARWINDS CORP., et al.
 4  PAGE  LINE
            CHANGE: _____
 5      REASON: _____
 6            CHANGE: _____
        REASON: _____
 7
            CHANGE: _____
 8      REASON: _____
 9            CHANGE: _____
        REASON: _____
10
            CHANGE: _____
11      REASON: _____
12            CHANGE: _____
        REASON: _____
13
            CHANGE: _____
14      REASON: _____
15            CHANGE: _____
        REASON: _____
16
            CHANGE: _____
17      REASON: _____
18            CHANGE: _____
        REASON: _____
19
            CHANGE: _____
20      REASON: _____
21            CHANGE: _____
        REASON: _____
22
            CHANGE: _____
23      REASON: _____
24  Signed_____
25  Dated_____
```

315

## A

**A-1** 95:14
**A-2** 83:15 85:24
**a.m** 2:22 9:3,11 50:21,24 51:1 95:4,7,9
**abilities** 11:6
**ability** 48:21 53:4,8 216:6 301:20
**able** 11:10 20:4 80:15 149:17 229:18 241:21 245:11
**absent** 39:2
**absolute** 293:8
**absolutely** 78:24 210:3
**abstract** 271:20 272:2
**abstracting** 152:7
**abstractly** 292:17
**accept** 276:2 284:17
**acceptable** 184:9 185:18 265:4,11,19,22 283:13,14
**acceptance** 281:17,20,24 283:4,6,9,15 284:2,3,15 285:1,15
**accepted** 72:11 247:10 286:10,22 287:1
**accepting** 251:10
**access** 6:23 27:25 28:17,25 29:6,8 30:1,5 31:7 47:2,6 56:18 62:21 74:4 91:18 93:20 122:12,22 124:13,14 126:4,22 127:12,16 128:24 131:25 132:9,10,15,19,24 133:7,13 134:3,10,25 135:9 136:17 137:4,10,23 139:8,23 140:12,13,14,23 140:24,25 141:1,4,4,7,9,15 141:17,23 142:1,10,13 143:3,16,20,24,24 144:18 148:25 149:13,21 150:8,10 157:11,22,23 158:10 164:16,24 165:10,13,16,24 166:13,16 167:14,18,25 168:5,11,16,25 169:16,23 170:4,6,15 171:4,17 172:2 172:3,7,15,18,24 173:3,13 173:14,15,20,23,23 174:9 174:22,24 175:2,4,9,11 178:23 179:2,12,23 181:5 181:22 188:19 194:19 216:18 219:25 220:2 241:21,23 257:13 282:5 287:2,21,23 288:7 289:6 289:12,17,23 301:21
**accessed** 135:5
**accesses** 133:3 134:18,19

**accidentally** 260:16 276:6
**accomplish** 151:4
**account** 34:18 39:13 174:15 220:24 221:15 235:20
**accountant** 72:3,22
**accounting** 72:5,11
**accounts** 90:11
**accuracy** 94:3,16
**accurate** 84:2,3 93:6,13 94:9 122:22 123:3,12 153:12 181:24
**accurately** 48:9 53:9
**achieve** 32:7 256:15 259:16
**achieved** 156:21
**acknowledge** 295:4
**acknowledges** 265:6
**acquire** 51:10
**acronym** 237:22
**act** 248:23
**acted** 164:8
**acting** 279:5
**action** 1:6 51:15,17 313:12 313:13
**active** 112:10 182:25 185:24 186:2,12,12,23 187:4 194:20 216:5 306:6
**activities** 25:15 36:16 37:6 81:14 98:20 212:12,13 235:18 250:17 257:7 258:8 258:13 263:21 268:1 281:13 301:11
**activity** 25:2 31:21,23 50:7 81:10 151:2 246:11 252:13 253:24 256:11 283:12 291:2 298:14 301:25 308:22
**activity,'** 252:10
**actor** 250:8
**actors** 34:23 35:3 39:15 248:24 250:7
**actual** 18:3 58:14 188:17 266:12
**actuality** 58:2
**acumen** 29:25
**add** 96:10 245:5
**added** 96:12 195:3
**addition** 29:22 174:21 204:2
**additional** 47:15 173:15
**Additionally** 81:23
**additive** 115:16
**address** 58:20 195:10 281:25 292:2
**addressed** 196:8 210:15
**addresses** 90:9,10 174:18

281:7
**addressing** 236:19 282:1
**adds** 115:3,23
**adjust** 58:19
**administrative** 89:13,14,19
**ADMINISTRATOR** 1:24
**advanced** 82:1
**advice** 294:3
**advise** 25:23 26:1 27:3 81:2 82:24
**advised** 26:5 294:21
**advisor** 25:16
**Affairs** 45:17
**affirm** 180:20
**affirmed** 9:22 159:1
**affront** 260:9
**afternoon** 61:14 138:17 157:6
**agencies** 90:20
**agency** 280:4
**agenda** 201:9
**Agile** 198:7,11,23 199:16 200:23 201:2,3 202:17,21 214:6,8,9,23 215:16 307:18,20
**ago** 126:21 196:6 214:1 302:1 303:18
**agree** 74:17,22 84:14 85:14 86:5 88:6 96:17 100:22,23 101:2,4 114:7,24 119:23 143:17 156:10 184:7 185:16 186:15 189:3,7,20 191:21 193:16 202:9 217:22 218:12 222:18 223:1 224:7,9 225:2 226:13 227:13 237:23 240:4 247:3 261:2 270:18 271:9,13 273:5,12 274:11 275:8,14 283:6 286:25 287:11,21 289:5 290:6,10 292:7,25 293:11 295:11 296:16
**agreement** 34:10 94:7
**agreements** 25:14 31:8
**ahead** 116:13 127:5 128:3,5 168:9 183:10 185:6 208:25 267:18 279:25 296:23
**AI** 81:24 96:5
**Air** 17:8,10 28:9,12,15 29:1 92:16
**al** 9:14 73:9 315:3
**aligned** 77:4 106:13
**alleged** 53:23
**allotments** 201:16
**allow** 175:12 293:1,9

**allowed** 42:8 149:20 175:2 175:12
**allowing** 168:5 290:11
**alpha** 188:23
**ambiguity** 178:18
**amended** 165:10
**Americas** 2:20 3:19 9:13
**Amin** 89:25 93:2
**amount** 12:12 54:25 62:16 82:12 169:9 287:23
**analogous** 23:23
**analogy** 230:11,22
**analysis** 81:10 139:21 140:2 156:1,7,8,25 157:13 178:5 206:23 207:7 212:7 232:22 232:24 233:11
**analysts** 45:5
**analyze** 26:8 133:24 147:15 155:17,21 300:1,2
**analyzed** 26:19 147:16
**and/or** 9:22 314:9,11
**Andesite** 81:24 82:6,9,11,13 82:17,21 83:4 96:5
**Andy** 165:4,9
**ANNIE** 4:14
**answer** 5:20 11:1 23:14 47:20 71:1 110:15 187:16 187:17 202:3 245:14 259:11 261:11 269:23
**answer's** 286:18
**answered** 47:21 80:4 169:3 242:24,25
**answers** 11:5
**Anytime** 154:22
**apart** 59:24 290:4
**APIs** 287:15,18,19 288:10
**Apologies** 122:14
**app** 240:16
**appear** 147:21 159:15 163:12 201:22 226:5
**appeared** 119:8
**appears** 241:18 254:2 307:14
**appendices** 43:12,14 44:3,5
**appendix** 48:4 62:4,5,10 66:14
**apple** 291:4
**applicable** 81:13 193:6,13 193:13,14 195:14,21
**application** 33:8 207:3 240:16 244:12 297:15 301:22
**application-level** 302:18
**applications** 33:20,23 193:7 193:15 195:15,21 234:22

**applied** 16:4,7 69:25
**applies** 196:3 263:18
**apply** 195:13 230:13 263:19
**approach** 6:14 39:25 71:21
  76:8 100:1 104:5 140:6
  142:15,23 150:8 212:23
  235:17 245:20 307:20
**approached** 203:22
**approaches** 16:20 28:6 31:4
  250:8 305:3,5
**appropriate** 139:22 178:23
  202:10 207:21 213:23
  214:13 215:3,8
**appropriately** 150:9,12
**approval** 207:22
**Approved** 286:16
**approximately** 204:7
**architecture** 21:5 245:1,12
  245:19
**area** 12:17,19 39:21,21
  133:5 215:19 277:6 295:2
**areas** 14:10 111:20 112:7
  142:23 153:24 281:12
  308:11
**argue** 292:19
**arrangement** 49:4
**arrival** 90:7
**arrived** 105:8,9
**art** 247:4,6,8 293:12,14
  296:17 303:20
**article** 6:10,13 92:2,3,12,12
  100:2,9 101:1,10,14,23
  102:2,17 103:25 104:4,6
**articles** 51:23
**articulate** 195:18
**articulation** 244:13
**artifact** 137:8,19 176:20
  177:2,5 306:8
**artifacts** 67:8 69:4 71:14
  135:17 142:19 150:14
  152:23 166:10 167:23
  169:11 203:10,13 230:6
  235:12 249:18 307:11
**artificial** 82:2
**aside** 45:2 52:19 59:20
  107:12 111:1 125:3,3
  166:3 292:23
**asked** 34:4 39:9 64:20 67:19
  72:1 83:23 88:14,14,20,22
  89:4 124:11 141:24 146:18
  173:21 177:11 303:19,23
  308:9,12 309:4,13
**asking** 23:22 40:11 52:2,3
  54:5 75:1,4,8 84:18 102:8
  102:10,12 136:2,13 156:12

**applies** 219:4 238:6,17 273:17
  276:23,23 278:18 284:9
  289:16,19 291:10 311:6
**asks** 256:14
**aspect** 144:1 226:15 257:20
  279:22 289:9,20 292:2
**aspects** 198:4 203:17 206:7
**asserted** 152:20 250:16
**asserting** 52:11 156:17
  178:6 266:1
**assertion** 169:10 175:5
  189:3,21 253:21
**assertions** 52:12 128:25
  154:3 256:1,7 257:3
  265:14,24 281:3
**asserts** 258:15
**assess** 26:25 67:13,19
  68:11 71:23 110:7,21
  111:13 112:24 113:6 114:4
  115:18 116:21 136:15
  152:19 158:24
**assessed** 38:3 75:9 111:25
  120:17 156:2 246:6
**assessing** 67:3 68:18 70:1
  76:9 111:2 112:4 144:12
  184:8 185:17 186:16
  196:14 243:4 258:15
**assessment** 16:16 29:5
  37:19,23 38:6,19 40:21
  67:22 69:9 70:5 71:6 74:10
  74:14,18,23 75:2,2,13,16
  76:23 77:4 96:22 111:24
  125:11 136:23 137:20
  140:7 150:21 158:9 166:12
  178:19 214:11,25 229:22
  230:8 232:13 233:8,19
  244:11,16 257:16,20 258:1
  258:2 282:13 283:21
  310:19
**assessments** 26:11 29:4
  33:14 37:13 66:25 67:1
  70:12 71:17 76:25 77:1
  109:22 111:17 112:11,12
  126:1 150:19 213:18
  243:17,21 257:12,13 306:2
  308:23 309:6
**assigned** 25:17 44:15
**assignment** 98:7 152:17
  164:5
**assist** 78:14
**assistance** 44:24 300:15
  301:6
**assistant** 91:15 93:23
**assistants** 45:4,8
**assisted** 298:3

**associated** 139:6,12,19
  144:9 150:2 162:7 163:2
  169:7 173:9 202:22 209:17
  211:23
**Association** 2:15 313:23
**associations** 98:18
**assume** 42:8 72:10 124:24
  147:13 160:2,15 213:11
**Assumes** 181:7
**assuming** 251:12,24
**assumption** 151:1 252:3
**attach** 43:17
**attache** 261:24
**attached** 44:5 160:4,14,16
  161:14,14 163:9,16,21,24
  314:10
**attachment** 161:5
**attachments** 43:17 44:9
  160:9,11 163:12
**attack** 101:11 300:16 301:8
**attacker** 273:18
**attackers** 273:6
**attacks** 300:16
**attention** 122:23 170:20
  218:21 227:19
**attorney** 10:6
**attune** 35:1
**audience** 99:9
**audit** 41:10 112:11
**auditing** 41:18
**auditor** 41:9,11
**auditors** 41:20 130:10 137:3
  138:2 141:19 144:19
  306:18
**audits** 40:7,9,19,23 41:2,15
  41:18 71:20 142:21
**augment** 44:17
**August** 93:4 222:14
**Austin** 133:21 135:14
**Authentication** 220:21
**Authentication/Authoriza...**
  188:20 193:5
**authoritative** 59:3 294:18,25
**authorities** 294:1 308:16
**authority** 293:24 294:16
**Authorization** 220:22
**authorized** 220:23 221:14
**authors** 232:12 233:19
**automated** 173:2,7 194:21
  300:15 301:7,12,19,25
**automatically** 191:8 192:13
  192:17 194:10
**automation** 134:13 195:6
**available** 37:24 71:16
  209:10 276:6

**Avenue** 2:20 3:19 4:7 9:13
**avoid** 170:3
**avoiding** 262:22
**aware** 22:21 36:3 50:5,7
  88:7,11 91:16 99:4 218:19
  248:16 272:9 294:13
  299:17
**awareness** 97:11

---

**B**

**B** 87:9 88:6 201:2
**bachelor** 13:7,9
**back** 39:7 42:20 51:2 57:6
  62:4 79:11 94:13 95:10
  109:21 134:19 136:5,13
  138:15 166:7 182:18
  183:19 190:14 206:23
  212:3 220:13 221:25
  224:25 228:8 271:5 303:8
  305:13 308:7
**background** 27:24 45:11
**backtrack** 72:1
**backup** 232:23 233:12 236:5
**backwards** 160:5
**bad** 263:1
**badly** 278:20
**baked** 37:1 304:19
**ballpark** 60:13,14
**bar** 190:10
**barely** 252:9
**base** 143:9 214:24
**based** 34:7 53:5 76:23 98:2
  105:18,25 106:6 107:24
  112:25 115:18 116:22
  126:16,24 127:1,15 132:24
  219:5 293:4 299:9
**baseline** 214:21
**basically** 21:2 25:14 34:15
  39:12 57:5 108:19 109:13
  115:6 117:12 119:8 127:9
  127:21 136:24 161:3
  168:12 172:6 208:21 255:5
  259:15
**basics** 199:16
**basis** 52:5 109:8 143:5
  158:8 167:21 168:6 169:24
  175:3 187:3 214:24 230:20
  233:24
**Bates** 131:15,19 160:21
  161:23,25 171:23 172:9,10
  177:2 200:2 205:13 217:19
  232:8 237:15 285:14
**bathroom** 182:6
**Baynard** 4:6 161:7,11,25
  163:1

**bearing** 75:15
**BECKY** 4:15
**beginning** 89:3 234:3 252:9
  308:8
**begins** 200:2
**begun** 310:9
**behalf** 3:3,15 4:3 90:16
**behave** 34:24 35:3
**behavior** 283:13
**believe** 11:21 22:8,20 44:16
  48:11 49:8 50:11 52:21
  53:1 66:6 68:22 71:22 84:3
  91:14 96:13 116:2,2
  121:18 126:13 145:22
  153:16,25 161:7 164:1
  165:12 169:4 186:22 209:6
  210:3 224:14 244:20
  246:15,20,23 252:1,24,25
  282:3 288:17 291:5 305:21
  309:25
**benchmark** 265:3
**BERKOWITZ** 4:5
**best** 11:6 53:8 117:5 188:21
  191:6 192:18,18 194:8
  195:7,23 196:3 201:4
  227:14,17 248:17 292:8,17
  292:21 295:5
**better** 279:16
**beyond** 110:24 127:18
  144:24 291:11
**big** 43:19 60:13 285:19
**bigger** 42:4
**billed** 60:10,19,21
**billing** 216:18 282:5,6,7
  286:3
**binary** 37:19
**biscuit** 260:18,19 264:7
**bit** 23:10 27:20,22 37:12
  49:3 97:1 129:1 145:17
  150:21 156:2 157:6 183:24
  184:1 186:7 197:24 247:2
  271:8
**BizApps** 286:2
**block** 229:8 230:11
**Bloomberg** 92:2,22
**board** 82:24
**bodies** 22:3
**body** 112:19 126:15
**bold** 93:19
**book** 294:10,13,15 296:10
**bottom** 145:18,21 146:3
  147:21 148:12,12 175:19
  208:12 218:7 264:12
  282:25
**BOUND** 8:8

**brain** 38:25
**breach** 6:12 90:6,16 92:14
  100:16 104:3 272:6,13
  275:9,13
**breached** 91:19
**breaches** 90:5 101:25
  271:14
**break** 10:22 11:2 24:8 50:15
  50:17 72:2 83:19 95:1
  101:2 122:3,6 131:5
  135:20 137:6 138:11,18
  182:5 201:18 227:9,24
  233:6 247:1 270:21 290:4
**breakdown** 237:22
**breaks** 10:21
**brief** 111:23,23 303:16
  309:9
**briefcase** 260:20,21,22
  261:25 262:21 264:3,6,9
**briefly** 47:25 77:7
**bringing** 238:12
**broad** 87:11 234:4 235:18
  240:1 249:12 304:16,22
**broader** 29:9 83:23 88:15,20
  88:23 248:14
**broadly** 27:13 35:11 40:17
  107:19 235:6 238:11
  248:22 250:9 304:17
**broke** 51:4 138:24 228:11
**broken** 212:18
**Brown** 1:8 46:18 52:6,14
  65:9,12 66:1,9 183:2
  286:11,22
**Brown's** 286:16
**BRUCKMANN** 3:7
**budget** 83:13 87:21,21,24
  88:2,9 94:21
**budgeting** 74:15
**bug** 199:17
**build** 104:5
**building** 6:13 99:25 200:19
**built** 93:17 121:20 200:24
**bullet** 218:8
**bullets** 86:16
**Bush** 92:19
**business** 90:11 100:25,25
  113:7 114:5 126:10,18
  166:11 293:5
**business-driven** 293:9
**buying** 170:13
**bypassing** 275:15

_____

**C**

**c** 3:1 4:1 62:4,10 66:14
  123:10 198:20 287:13

  300:19,25
**C-e-r-t** 22:19
**C-I-S-S-P** 22:12
**C-o-m-p-T-I-A** 21:14
**calculate** 265:19 268:19
**calculated** 266:9,11 268:11
  268:12
**calculating** 268:2
**California** 2:8,13 313:22
**call** 28:20 33:16,18 62:17
  64:12 66:9,9,11 69:12 91:3
  91:3 103:19 111:10 204:13
  242:8 250:10 296:7 301:24
**call-out** 39:5 40:1
**called** 9:22 25:25 26:4 28:3
  28:4 83:21 91:17 93:24
  99:25 102:25 103:1,12
  105:18 107:25 124:15
  139:25 142:3,7 244:14
  246:24
**callout** 35:12 281:5
**callouts** 240:13
**calls** 111:10 118:7 121:12
  135:9 242:20 256:10
**capability** 18:12 19:16 20:16
**capital** 22:19 41:15 198:20
**caps** 21:22 40:5 237:4
**capstone** 206:19
**care** 98:4,10 102:9,13
**career** 28:2
**Carney** 3:5 5:5,7 10:2,6 12:1
  12:9 16:23 18:2,17 19:14
  20:1,12 29:20 30:15 32:9
  32:19 40:13 41:1,13 42:3
  42:13 43:19,21,24 44:1
  45:1 46:13,14 47:24 49:11
  49:24 50:1,16,19 51:3
  52:18 53:18,20 55:11 56:6
  57:13 58:1 63:6,16 64:1,24
  72:13 73:2 74:1 75:4,7
  76:16 80:12 84:20,22,24
  91:5,24 94:24 95:11 98:11
  99:6,20 102:6,12,15 103:7
  103:12,15,18,23 108:6
  109:1 110:5,18 111:15
  116:14 118:24 119:3 122:5
  122:8,10 123:15 127:20
  128:16 131:2,8 132:6,12
  132:14 134:1,23 135:22
  136:1 138:6,16 144:6
  147:3 148:9 154:11,18
  157:16 159:3,7 160:6,10
  160:18,19 161:16,17,22
  162:3,5 163:13,22 165:15
  166:1 168:20 169:22

  171:15 176:25 177:6
  180:22 182:1,7,19 183:15
  184:15,20,24 185:4,7,14
  185:15 189:13,22 193:22
  194:5 195:9 199:23 203:1
  205:8 208:13 209:11 211:6
  214:10 216:12 217:7 219:1
  219:15 223:4 225:13
  226:21 227:8,12,23 228:9
  232:1 237:11 239:17 240:3
  240:24 241:10,12 243:11
  244:23 247:9 249:5 251:14
  252:5 254:10 255:12 257:1
  259:3 260:7 261:10 262:8
  262:9,13,17 264:17,20
  266:21,22 267:1,20 270:19
  271:6,22 272:20 273:13,21
  274:1,19 275:22 279:21
  280:12,19 282:24 283:2
  285:11 287:6,10 288:11,19
  290:3,18 291:12,19 292:18
  295:16,21 297:1 299:24
  302:21 303:9,13,18 304:2
  304:12 308:20 309:9,12
  311:10,16
**Carneyc@sec.gov** 3:13
**carries** 264:8,13
**carry** 80:24
**carrying** 262:21 297:22
**case** 11:14 12:11,14,17,20
  23:20 25:3 26:8 44:15
  47:11 49:6,13 50:3,6,10
  51:6,7 52:5 56:1 59:18,20
  59:25 60:2,7,16 67:12,18
  68:1,4,5,14 69:2,15,20,22
  69:23 70:11 71:12,12
  75:20 103:16 114:16
  130:13,20 133:19 138:19
  148:21 151:21 152:8,12
  153:7,25 157:10 164:6
  169:21 170:8 174:11
  179:19 180:15 185:22
  186:4,20,22 187:1 196:16
  205:2,3 209:22 215:15
  216:2 225:11 236:11 238:4
  239:16 249:3,17 250:12
  251:16 281:18 282:14
  283:25 284:8 293:8 296:3
  297:6,16 302:20 315:3
**case-by-case** 293:3
**cases** 26:13 28:12 48:13
  57:11 65:14 68:22 99:13
  111:23 124:25 130:22
  142:21 150:5 263:16 281:1
  299:16

category 266:13
causality 66:18
cause 235:14 313:4
caveat 119:24 120:4,24
  121:17
caveats 120:5
CCR-NJ 1:23 313:24
CCR-WA 1:24 313:25
CCRR 1:23
cell 287:11
CEO 82:24
certain 16:20 30:5 54:21
  67:4,13 80:14,25 111:19
  112:7 133:2 140:5 283:8
  311:15
certainly 24:18 25:10 31:6
  32:13 67:25 253:20 260:2
  264:2 266:4 269:15
CERTIFICATE 5:12 313:1
  314:1
certification 21:9,11,23
  22:12,15 72:5
certifications 21:8,17 22:7
  22:16 80:14 81:1,4,7,12
  308:10,17 309:5 311:5,14
certified 1:22 2:7,8,9,11,12
  2:14,15 72:4 313:22,22
certify 22:4 313:2,10 314:6
CertNexus 22:18
chain 7:12 217:17
challenging 53:3
chance 264:16
change 44:8 55:14 57:14
  132:4,18 133:12 155:24
  156:19 158:2 162:19
  164:16,24 165:11,13 315:4
  315:6,7,9,10,12,13,15,16
  315:18,19,21,22
changed 87:9 132:22
  133:15
changes 117:1 155:4 159:13
  162:22,23 164:7 165:2
  314:9,11,14
chapter 296:10
characterization 127:7
  194:1
characterize 26:17
characterizes 31:11
characters 188:23
chat 176:11 183:2,4,16,20
  184:3,10,14,21,23,25
  185:23 215:6,9 305:17
chat-type 230:8
chats 185:19
check 175:15 224:13 245:22

288:17
checking 175:13
checklist 235:10
checkmark 208:19 209:6,25
  210:1,4
checkmarks 208:2 209:15
Chicago 4:8
chief 25:16 81:23 82:23 83:9
  83:15 84:5 85:11,24 86:9
  86:17 89:12,14,15,19
  91:10 92:19 93:7,24 94:17
  96:4,9,15 107:2 224:15
choice 288:3
choose 62:24 63:11,11
choosing 124:20
chose 126:16 223:23
Chris 10:6 50:13 122:2
  154:9 185:6,10 222:7
  224:3,20 225:19 228:17
  273:18 282:23 290:13
Chris's 225:24
CHRISTOPHER 3:5,7
chronological 218:5
circumstances 55:6 222:12
  222:19 223:2
CISO 17:4,24 23:25 33:25
  83:21,22 84:1,10,13,15
  86:6,13,21 87:2,22 88:2,16
  88:24 89:1,2,9 90:1,3
  96:19 107:2
citation 245:5
cite 100:24 126:14 131:13
  160:23 171:16 232:5 237:5
  237:6,14 239:5,10 259:21
cited 61:3 62:22 66:14 77:3
  124:18 149:8 160:22 172:4
  175:23 205:5 232:4 236:4
  241:8 285:16 305:17
cites 73:7 74:7 75:20 231:11
  233:8
citing 160:2 161:21
Civil 1:6 185:8
clarification 78:23 132:13
  133:12 162:4 197:7 256:14
clarify 24:1 115:23 123:13
  144:8 161:20 185:2
clarifying 132:8 184:17
classic 248:5
clause 187:9 193:20
clean 10:18 174:5,12
cleaning 174:16
clear 133:19 144:15 149:5
  151:6 156:4 162:21 163:4
  165:23 176:11 182:23
  209:21 210:9 221:9 225:14

227:3 229:7,7 269:21
  270:8,13
clearly 105:22 118:5 130:6
  137:24 140:7 148:23 150:7
  151:21 152:21 157:9
  162:16 173:6 174:10 202:7
  244:14,21 263:1
clicked 172:6
client 298:16 302:15
clients 78:15 79:11 298:3,18
  299:5 309:4
close 24:16 83:5
coach 229:7,12
coaching 185:4
code 18:13 276:5 297:14
coder 18:16 30:12 32:17
  79:4
coding 18:3,5,16,19 19:9,11
  30:13 32:18,18
cofounded 77:17
cofounder 95:16,22,25
COLE 4:20
collaboration 44:24
collect 82:8
Colquitt 251:24 254:7,20
Colquitt's 200:18 202:19
  250:22 251:6,9 252:16
  253:3 254:1
Columbia 45:14
Column 286:9,20 287:13
Columns 286:15
come 49:5 57:6 63:12
  274:25
comes 303:24
commander 28:11,15 92:16
commands 17:7
commencing 2:22
comment 46:25 156:24
  216:9
commenting 25:6
comments 46:6,9,21 213:22
  215:14
Commission 1:4 3:4 53:23
common 142:15 170:5
  284:3
commonly 155:6,9,18
  156:10,18 158:4
communicate 64:14
communicating 53:7
communications 46:3 65:1
companies 12:20 16:15,25
  17:1,13 23:23 24:22 25:5,9
  26:6,12 27:14 33:1,2 34:25
  40:22 52:22 100:13,17
  101:5 111:13 113:16,19

114:8 118:7 120:24 137:1
  137:2 170:5 294:22 305:1
companies' 101:24 157:22
company 26:1,20 27:4 33:9
  34:17 35:1 36:21 38:2,10
  54:20 56:1,12,12 57:16,20
  58:21 59:4 67:4,5,19 70:6
  75:23 76:4 77:17 81:25
  82:25 88:15 90:4 97:12,22
  101:13,19,21 104:1 111:3
  111:24 112:21 114:13,20
  114:22 115:11 126:11
  128:12 133:10 158:19
  170:12 181:6 184:9 185:18
  186:17 193:12 202:12
  243:5 257:22 284:16
company's 23:2,12 98:23
  102:13 214:3 216:10
compare 117:16
compensate 271:10 275:7
compensating 275:2,12
  278:2,23 279:8,15 281:5
  286:20
complete 14:17 15:6,10
  314:7
completed 124:2
completely 58:3 73:19
  184:16 266:15
complex 53:3 57:17,21
  58:23 188:22 191:7 194:9
  196:4 233:1
complexity 30:6 182:25
  186:4,14 191:9 192:11
  194:11,22
compliance 106:24 107:2,4
  107:10,13 111:10
compliant 109:23 110:1
  111:3,6
complicated 20:11 149:24
  163:12
comprehensive 29:16
  174:17
CompTIA 21:13
Compton 89:17,23
computer 13:6,8,13,16
  14:13,15,22 15:10,18,22
  136:15,15,16,19 137:16
  301:20,21,23
concentration 14:4,9
concept 39:22 195:12
  243:18 250:9 265:22
  293:21
conception 240:1 249:12
conceptualization 215:19
conceptualizations 247:19

conceptually 295:18
concern 158:19
concerning 210:15,21
concerns 37:1 101:15
241:15 242:23 249:2
conclude 128:23
concluded 129:14
concluding 2:22
conclusion 129:24
conclusions 52:4 126:25
175:1
conduct 29:3 76:24 79:2
80:11,15 81:8,16 125:10
145:1 149:22 151:2 166:12
246:11 255:6 294:3 297:7
298:12,14 309:2,6
conducted 26:11 34:14
39:10 66:24 71:18 74:14
78:21 79:1,25 125:14
150:18 156:7 172:18,21
173:18 214:8 240:7 249:10
299:19
conducting 64:3 67:21 70:5
78:15 81:5 252:19 258:8
291:2,7 298:4,25 299:18
302:4 306:4 308:23
conducts 71:6 258:14
confidence 174:8
confident 135:18 149:19
168:19 181:23
confidential 7:16
confirm 42:19 209:24 282:3
confirmation 173:16
confirming 174:23
conflicts 90:20,23 91:4
Confluence 198:19
conform 254:24
confused 160:1
conjunction 33:8 41:2
281:18
connected 313:12
connection 279:17
consequences 278:16
279:1 280:15
consequential 261:9
consider 12:17 13:2 39:18
66:13 209:2 238:20 247:25
307:6
consideration 245:2 274:25
considerations 236:20
238:13 239:25
considered 37:3,5 62:7
274:17 285:1
considering 36:25
consistent 129:15 187:12

187:23 188:10 243:20
consistently 130:14
Consortium 21:24
constant 106:21 227:19
constantly 279:5
constituted 58:17
constitutes 207:19 265:17
consultant 17:12 29:2
consulted 59:23
consulting 24:5 25:13 26:14
32:23 33:10 41:19 45:5,18
77:17
contacted 49:7
contain 120:24 208:17
283:21
contained 216:4 276:5
containing 305:17
content 127:1,23 128:14,18
128:19,20
contents 201:10,12
context 23:4,6 59:2 146:14
158:19 166:7,11 171:9
175:20 176:4,9 177:14
183:8 189:19 191:3,4,15
199:9 203:15 213:23
216:24 222:24 223:6,12,19
225:21 229:25 230:3,24
254:3,5,5,6,8 263:16
271:19 278:19 284:22
288:8
contexts 284:6
contextual 198:15 271:12
contextually 166:25 198:15
266:15
continue 97:24 185:13
continued 59:9 184:6
186:22 306:16
continues 215:13
contractor 165:11,17
contractors 165:20
contractual 11:24
control 12:21 18:6,25 26:12
26:24 27:25 28:17 32:7
34:25 38:7,7 41:20 111:20
112:7,9 124:15 125:12
127:16 134:10 137:5,23
141:15,19,23 157:11
165:23 173:23 179:2,24
223:10 226:25 259:20
260:5 261:18,18,23 263:3
267:4,14 268:8,15 269:17
272:12 278:23 279:8,9
286:20
controlling 170:7
controls 12:22 15:22 18:4,7

18:12,13,15,22,23 28:25
29:6,9 30:1,5,14 31:2,7
40:24 41:4 47:2,6 56:19
62:18 64:6,11 67:4,6,9,13
67:20 68:19 74:5 111:19
119:19 122:13,22 128:24
137:10 140:23,25 141:4,7
141:10 142:10,22 143:3,20
144:4 166:13,17 167:14,18
167:25 168:25 187:11,23
188:19 190:6 227:1 257:7
257:14,23 258:24 259:8
261:5 263:10,14 265:5,12
268:4,5,6 272:16,21,24
273:4 274:17 275:1,2,6,12
278:1,2 279:16 281:5
conventions 31:5
conversation 46:23 65:12
66:1 181:10 242:12 274:24
conversations 63:5,8 64:19
65:3,4,8,20,24 66:1,5
COO 91:17
cool 122:6
copy 42:5 48:5 119:6 154:12
254:14
Corp 1:7 9:14 93:3 315:3
Corporation 25:17
correct 13:19,21 14:1 48:14
60:1 65:10 67:17 78:9,12
82:7 86:3,4 89:4,21 90:2
90:17 105:4,7 112:15
158:11 183:22 193:19
196:7 241:20 253:9 282:12
282:19 298:8 301:9 304:3
307:5 314:7
corrected 43:6
corrections 43:8 314:9,12
314:13
correctly 113:8 136:7 152:5
corresponding 155:5,25
159:14 160:4,14
Council 92:18
counsel 9:16 46:3,5 61:18
61:22,24 62:24 63:5 64:7
64:19 66:9,11 108:20
313:14
counsel's 133:11 211:7
count 124:7
counted 146:23 204:24
countries 33:1,1
couple 40:2,4 48:13 95:13
122:24 123:17 130:22
131:4 227:8
course 14:12,23 15:13,15
15:17,23,23 16:1,2 48:24

62:15 127:9 146:15 154:22
176:5 213:13,13 234:6
courses 13:12,14,16 14:14
14:15,17,19,20,25 15:6,10
16:4,6
court 1:1 2:9,12,16 9:18
10:13 11:5 29:18 42:15
48:18,20 313:23,23
cover 55:8,8
covered 46:4 211:4
covers 25:23 193:6 195:14
292:20
CPA 72:23
create 105:17 151:19 152:2
152:4 210:7
created 19:6,9 124:16 199:1
creating 18:4
creation 24:13,19
credentials 273:6
credit 15:24
criteria 126:17
critical 257:25
cross-check 175:10
crosstalk 102:20 123:5
163:17 231:20 267:5 270:4
290:15 307:22 308:13
CRR 1:23
crux 153:20,21
cryptography 16:4,7
CSF 107:24 113:2,5 114:3
120:11,18
CSR-CA 1:24 313:25
CSR-TX 1:23 313:24
Cummings 89:24
current 44:18 47:22 70:19
currently 77:15 218:9,9
customers 33:22
CV 27:22 43:15 48:5 77:10
77:12,20 78:10 82:4 83:15
83:25 85:23 86:5,12,15
95:14
cyber 6:14 13:24 28:4 67:20
83:10,11,17,24 84:6,9,11
84:16,25 85:3,12,13,25
86:10,17,22 87:5 88:21
89:5,10,11 91:15 92:17
93:18,24 94:18,19 96:17
99:15 100:1 104:2,6
105:18,23,25 106:2,3,24
107:14,20,22
cyberattack 100:15
cybersecurity 13:1,3 16:10
16:14 17:2,3,5,8,14,20
18:4 21:7,16 22:3,6 26:12
27:20 28:4,13,21 35:6,14

36:11 37:13,16 39:19
45:16 51:14 52:20,23 53:3
54:21 58:7 59:24 66:25
67:20 70:6 73:19 75:24
76:1,5,13,20 77:16 82:1
88:2,9 90:15 93:2,12 97:17
98:4,15,23 99:8 101:5,24
102:13 104:9,18 105:2,12
105:19 106:1,7,14 107:4
107:20,21 108:3,5,9,13
109:9,24 110:8,22 111:3
111:14 112:1 113:1,7
114:5,14 115:20 116:3,7
116:18,24 117:5,18 118:2
119:18 120:16,18 121:6,9
121:15 122:1,1 184:8
185:17 186:16 202:11
213:17 214:12 219:5
227:14 243:4,15,21 247:4
247:11,14,20 248:6,11,17
254:25 256:13 257:23
258:1,22,24 259:6,8,14
261:5 265:7 278:6 280:13
292:7 293:13,15 296:18
297:3,5 308:10,16,18
309:6
**cycle** 304:5

**D**

**D.C** 2:17 3:11
**damage** 275:10,12
**Dana** 89:24
**Danny** 4:19 9:8
**data** 6:12 30:7 46:25 47:1
62:17 65:18 79:10 82:1
90:5 91:19 92:14 100:24
124:15 125:8 130:9,10,24
141:22 142:11 143:3
147:18 167:19 169:9 173:1
173:6,22 174:9,12 175:14
208:19 209:20 216:18
241:14 242:23 268:5 269:3
287:3,18 289:7,12,18
295:23
**database** 161:13 167:19
**database's** 143:4
**databases** 193:7,15 195:15
195:22
**date** 9:10 42:21 69:12 162:2
286:21 305:13 315:2
**dated** 6:6,8,17 314:19
315:25
**dates** 209:6
**Daubert** 48:25
**day** 69:17 188:5 222:7

223:17,22 224:3,5,20
225:19 228:21 229:12,18
234:6 313:16 314:19
**Day's** 222:18 228:18
**DB** 286:3
**deal** 43:19 278:2
**dealing** 104:2 284:3
**Deasy** 89:24
**December** 6:17 42:21 43:3
**decided** 80:8 96:9 114:13
124:23 224:3
**deciding** 30:4
**decision** 32:5 108:18
**decisions** 283:18
**deck** 7:8 199:15 200:11,21
201:24 202:7,15 307:14,15
307:17 309:19,23 310:3,5
310:10,16,23
**decks** 202:10
**DECLARATION** 5:13
**declarations** 23:11 114:9
**declare** 314:3
**declared** 99:17
**decommissioning** 181:5
**deemed** 283:12
**deep** 80:10 125:23 137:21
156:4 173:5 203:21
**deeper** 55:7 138:4
**deeply** 107:23 225:8
**defendant** 68:14
**defendants** 1:9 3:15 4:3
68:7,8
**defending** 28:24
**defense** 6:14 61:22 83:11
84:9,11,16,25 85:3,13
94:19 100:1
**defenses** 78:18 298:7
**define** 23:9 28:2 35:7 54:11
**defined** 36:16 40:17 57:2
153:8 178:2 200:13
**Defining** 21:9
**definitely** 38:15 49:9 64:13
156:20 218:11,13 310:13
**definition** 21:10
**degree** 13:5,8,17 14:18 15:7
15:11 38:5 45:15 69:11
70:13 130:5
**Delaware** 2:18
**delays** 91:18 94:1
**deliberating** 25:5
**deliverables** 222:13
**delivered** 229:14
**delivery** 312:2
**delve** 27:19
**Demarest** 91:12,13,16 93:23

**demonstrate** 143:18 151:25
166:15 167:23 168:4,23
**demonstrated** 139:24 142:3
150:7 203:21
**demonstrates** 246:2 306:15
**demonstrating** 100:17
**denominator** 267:2,7 268:2
269:3,4 270:15
**denominators** 269:19
**dependent** 266:16 267:14
280:18 299:7,8
**depict** 297:11
**depicted** 145:1 184:14
**depicting** 189:25
**deploy** 19:16,23,24 20:16,22
20:24 21:1 32:6
**deployed** 20:2,9,11 32:3
188:24
**deployment** 21:3
**deploys** 19:12
**deponent** 9:15
**deposed** 232:13
**deposition** 9:12 10:7 60:23
61:6,11,19,23,25 138:20
138:22 141:13 144:15
185:5 200:18 251:1,18
253:1 254:7 308:8 313:5,6
314:5,13,14 315:2
**depositions** 71:13 134:8
142:17 150:17 202:20
**derived** 106:23
**describe** 26:24 35:11 36:14
49:5 90:8 183:3 203:9
**described** 31:24 66:21
67:14 73:8 74:8,12 75:6,10
88:14 108:19 111:8 112:6
134:7 137:8 163:1 211:20
254:25
**describes** 29:1 78:7
**describing** 58:6
**description** 6:4 7:4 8:4 27:1
185:11
**descriptions** 135:13 235:7
**design** 17:1,13 18:9,9 81:9
112:24 116:21 236:20,21
236:22 237:5,19,25 238:7
238:13 239:6,14,24 241:4
241:14 242:3,4,7,14,22
244:25 245:2,12,18
**designed** 16:10,13,21 17:3
17:9,20 67:7 115:18
121:19,21
**designing** 30:1 80:6
**desk** 175:22
**despite** 261:2

**detail** 110:9 114:15 133:1
141:14 147:15 153:3,5
209:9 282:14
**detailed** 28:17 65:15 105:14
135:16 153:22 209:12
235:7
**details** 46:12,15 58:16 87:12
110:6,20,23
**detect** 119:19
**detects** 275:9 298:21
**determination** 37:20 58:15
58:18 79:10 257:10 281:23
293:4
**determinations** 41:3,10
206:10 269:18
**determine** 38:20 57:10
136:20 180:12 181:23
266:6
**determined** 215:3,8
**determining** 38:4 57:7 75:23
76:3,19 267:15,15
**develop** 32:6 292:12
**developed** 32:3 107:18
198:14
**developer** 216:18
**developers** 33:8 240:7
282:5 287:2 288:9 289:6
289:11 290:6 291:1,3,17
293:6,10
**developing** 32:11 33:16
236:8
**development** 7:7 28:5 31:7
32:16,21,24,25 33:3,6,11
33:14 34:17 35:4 37:2
197:20,25 198:5,12,23
202:8 203:11,16,23 206:11
207:1 212:11 214:9,25
222:12,19 223:2 225:16
226:3,18 227:4 235:20
236:7 238:20 242:9 249:3
249:4,17 280:5 282:9
288:13 289:2,7,13,24
290:7,12,24 291:7 292:12
293:1,2,5,12,22 294:4,12
294:19,23 295:9,19,19
296:1,4 299:13 303:20
304:5,15,20,22 305:2,7,10
306:25 307:19,20 309:21
**develops** 33:19
**deviation** 125:21
**device** 273:2 294:5
**devices** 19:2
**devine** 269:2
**dialogue** 178:22,25
**difference** 70:25 71:3

165:16 190:13 248:1,8
**different** 12:25 17:7,9 22:3
  30:23 33:1,2,23 36:19
  39:23 76:12 77:2,23 81:12
  81:13,14,14 94:25 98:19
  106:11,11 115:1 116:19
  126:10,10 133:9,9 135:13
  189:8,11,11,14 202:3
  218:10,23 219:17 247:18
  248:13 262:18 265:21
  268:24 279:24 280:11
  284:6 291:1 305:3,4
**difficult** 230:2 259:15
**digital** 113:13,17,20 119:25
  278:23 279:10,12,23
**digitally** 280:10
**diligencing** 197:8
**Diplomacy** 14:7
**Diplomate** 2:8 313:21
**direct** 73:14 84:11 85:3,12
  89:12 122:23 155:14
  170:19 185:23 305:25
**directed** 83:11 84:9,25
  85:17 94:19
**direction** 82:25 83:2
**directive** 117:15
**directly** 11:18,25 32:8 65:1
  65:7 135:12 161:21 306:11
**director** 84:14 86:1 91:15
  93:24
**directory** 182:25 185:25
  186:2,12,13,23 187:4
  194:21 216:6 306:6
**directs** 84:16
**dirty** 74:15
**disagree** 117:7 223:24
**disclaimer** 52:9
**disclose** 87:10,11
**discovery** 137:15 276:17
**discuss** 65:12 91:18 93:25
  94:1 171:3 216:17 249:25
  258:10 264:19
**discussed** 32:3 59:18 71:19
  79:4 80:9 94:15 106:20
  107:8,14 124:11 157:5
  163:7 216:2 221:13 234:5
  235:15 248:21 277:2
  310:12
**discusses** 258:11,13 281:1
**discussing** 118:20 162:9
  186:3 188:4 212:6 213:5
  216:25 223:18 231:10
  232:3 235:23 242:1 251:9
  261:16
**discussion** 154:15 168:13

200:16 203:15 234:2
  250:22 289:14 309:23
**discussions** 61:4 91:2
  100:3 106:21 138:19
**disinterested** 313:8
**dissertation** 13:23
**distant** 178:14
**distinct** 195:17
**distinction** 70:18 261:14
**distinctly** 92:9
**distributed** 280:9
**distribution** 133:6 280:8
**DISTRICT** 1:1,2
**distro-** 134:17
**division** 93:24 133:21
**Doberman** 7:19
**Doctor** 20:23 22:21 112:13
  131:9 138:17 142:25 159:8
  162:6 185:16 240:25
**document** 8:5 42:23,24 86:4
  99:22 118:22 119:10
  128:22 137:11 151:20
  152:3,5 154:16 161:5
  164:20 174:4 189:25
  198:25 199:14 200:25
  201:6 208:15,19,23 214:20
  217:24 231:10,12,17 232:3
  232:5,7,20 233:16 237:6
  237:14 238:1 239:4,5,8,11
  239:13 240:6 241:8 243:6
  285:14 299:16
**documentary** 156:5 214:18
**documentation** 61:3 64:5
  65:7,16,18 144:17 152:23
  174:4,25 179:16 211:19
  212:19 221:21,24 236:10
  243:7,20 246:16,18 283:11
  283:17 310:5
**documented** 214:2 293:17
**documenting** 216:3 252:13
  253:6,24
**documents** 43:14 62:22,25
  63:9,14,18 64:8,21,23 65:2
  65:6 66:20 73:7,12,13,24
  73:24 75:5 124:22 127:1
  129:12 151:23,24,25 156:4
  159:23 160:23 161:4 163:5
  176:16 179:11 186:17
  198:19 206:4 208:16 211:4
  211:8,9,12 213:22 215:14
  231:15 235:25 236:22,22
  237:5,19,25 238:7 239:7
  240:8 241:3,13,19,22,24
  242:3,4,14,21 243:1 244:2
  299:9 305:13 309:14 310:3

**doing** 25:9 26:10,20 38:19
  38:22 39:25 56:18,20 57:5
  57:11 59:6,8,12,13 79:19
  108:8 120:19 127:19
  128:10 129:25 135:19
  137:25 151:8 156:6 157:10
  158:14 183:7 223:22 236:7
  240:21 244:15,22 252:10
  252:11 253:4,23 265:20
  281:15 282:9 289:13
  295:18 296:7 300:10 305:9
  306:1,5,10 307:18
**domains** 64:21
**doubt** 128:11
**Dr** 10:3 42:14 51:4 91:25
  95:12 99:21 119:4 182:20
  205:9 228:10 254:22 271:7
  303:9,17
**draft** 25:6 46:22 311:24
**drafter** 100:7
**drafting** 25:7 46:12,16
**drafts** 46:6
**dramatically** 272:24
**draw** 175:2
**driven** 284:22
**drop-off** 58:17
**dropping** 116:25
**drops** 100:14
**duly** 313:3
**duties** 85:22

**E**

**E** 3:1,1 4:1,1,12,12,17,17
**earlier** 31:13 43:8 62:22,23
  67:21 69:7,11,17 70:7 97:1
  97:4 141:25 146:18 161:8
  186:21 215:7 226:8 289:15
  306:23 308:3
**early** 81:24 105:8 186:10
  207:13 293:20 307:21
  308:2,6
**easier** 199:6 285:3
**easily** 166:14 167:23 168:3
**easy** 227:18
**education** 48:10
**effect** 177:12
**effectively** 69:16 271:16
  272:8
**effort** 99:17 105:16 106:12
  106:16 180:18 211:25
**efforts** 78:17 97:16 106:15
  108:3 151:25 275:16 298:6
  298:10 302:8
**eight** 124:8,8,20 126:13
  128:19 131:13 133:25

139:10
**either** 35:16 36:9 38:3 39:6
  227:3 241:21,24 298:25
  301:22
**electronically** 161:4
**element** 31:3 33:11 126:4,22
  169:7,8 202:23 206:9
  207:9 214:15 225:19
  238:18,20 239:2 247:23
  248:14 289:10 292:1
**elements** 204:1 223:25
  244:16
**elevated** 157:25
**email** 3:13,22 4:10 7:12
  58:22 59:3 90:10 148:11
  148:13 161:6 174:18 216:3
  216:5,24 217:17 218:3,7
  221:18 222:1,5,25 223:6,2
  223:21 224:4 225:22,24
  226:18 228:14,18,24 229:1
  229:11,15 230:8 250:22,25
  251:6,10,17,19 252:17
  253:10 254:2,2,5,13,14,18
**emails** 73:13 213:19 229:17
  229:21,25 230:6
**emphasis** 33:6
**employ** 76:21
**employed** 70:6 75:24 76:20
**employee** 45:18,19 59:18
  131:24 132:15 134:3,25
  147:11,13 149:14 165:9,11
  165:17 218:10,24 219:18
  269:1
**employee's** 180:25
**employees** 93:10 124:1
  158:1 165:21 184:10
  185:19 221:4,11
**employees'** 213:19
**employing** 76:4
**employment** 179:7,14 180:4
**empty** 238:3,5 240:5
**enable** 106:23 108:5
**encouragement** 230:20
**ends** 191:19 218:1
**enforce** 182:24 188:22
  191:7 192:14,18 194:9
  195:25 196:4 306:6
**enforced** 191:8 194:10
  195:7 257:23
**enforcement** 58:12,17 90:20
  192:11 195:5,24 306:4
**enforcing** 58:3
**engaged** 97:13,13
**engagements** 24:6 41:19
**engaging** 309:5

engineering 13:13,16
232:23 233:12
engineers 210:13,20
ensure 67:9 302:14
ensuring 32:15,21 106:19
107:7 108:12 307:19
entail 235:4
enterprise 19:12 20:3,9,17
21:6 32:4
enterprises 12:21 19:10
entire 17:25 18:10 42:23,24
55:22 56:19 58:25 133:6
157:14 180:10 191:13
254:18 286:6 296:10 314:4
entitled 92:12
entry 77:21 78:11
environment 12:21 32:25
108:23 226:4 227:5 282:10
289:25 290:8,12 291:3,8
291:18 292:13 293:2,7,10
environments 33:14 127:17
143:4 167:20 289:3 290:25
equity 82:12 101:20
equivalent 310:5,15
Eric 4:20 183:2
Errata 5:14 314:10 315:1
error 158:21 259:22 260:9
262:24 263:22 265:4,11,19
265:23 266:8 268:2,10,19
269:12
errors 38:22 158:20 259:24
265:6 266:24 267:9 269:25
escalate 273:7,19
especially 98:17 100:13
173:4 240:20 308:22
ESQ 3:5,6,7,8,9,17,18 4:5,6
establish 106:13 206:5,6
established 25:1 104:18
105:2
establishing 187:10
establishment 24:13 26:5
estimation 76:14 110:10
126:3 274:23
et 9:14 73:9 315:3
evaluate 152:18
evaluated 142:24
evaluating 143:25 257:6,17
evaluation 7:16 111:22
127:11
event 263:1 282:7
evidence 36:22,25 37:10,24
44:17 64:11 71:8,23 73:14
93:23 112:9 124:12,13
125:1 126:1 129:5 130:23
137:21 144:4,14,20 154:1

155:14,19 156:5 162:10
164:3 168:15 177:12,25
178:3 181:8,21 182:23
185:21,23 186:1,5 187:10
200:17 202:16,19,24
203:25 204:2,3,13,16
209:21 212:14 214:18
234:7,14,23 236:18 242:16
244:20 252:21 253:3
263:13 279:4 300:8 305:22
305:25 306:14 307:7
309:14 310:24
evidenced 234:13 308:4
310:11
evidencing 124:2 145:14
155:5
evidentiary 187:3
evolution 14:21
evolved 272:13
evolving 272:19
exact 87:9 153:3 174:1
253:18
exactly 12:5 24:17 25:20
98:9 110:3 116:20 150:1
177:22 201:14 233:15
291:22
examination 1:14 2:3 5:1,4
10:1 126:2 303:14 309:11
examine 139:11 188:6
examined 9:23 57:12 139:13
170:17,18 202:24 300:8
examining 127:13
example 17:18 20:13 21:12
74:7 75:19 114:22 142:11
149:4 164:12 179:15
239:17 259:21 270:16
285:4 305:16
examples 124:8,18 125:2
144:10 149:6
Exchange 1:4 3:4 53:22
excluded 48:18
exclusion 126:20
excuse 110:12 122:25 219:8
256:9 305:1
execute 39:23
executed 125:18 126:5,23
128:11 138:2 144:16
212:21 301:16
executing 155:12
execution 80:7 125:22
128:14 130:5 134:15
150:24 180:1 256:25 308:5
executive 93:2
executives 137:2 307:10
exercise 74:16 80:11,25

81:6,16 158:23 250:2
exercised 82:16 215:2,7
exercises 78:16 79:3,7,24
80:1,6,15 298:5
exhibit 6:5,7,10,13,15,17,19
6:21,23 7:5,7,9,12,15,18
7:21 8:5 41:23 42:1,11,18
43:13 44:5,12,20 47:12
48:1,5 53:11,17,17,18 62:3
66:13,14,23 77:9,10,20
78:3 83:14 91:22 92:1
95:14 99:18,22 104:14
119:1,5 120:7 122:14
131:5,6,11,15 138:25
139:11 140:16 141:3 143:7
145:7 146:6,8 147:1,8
154:10,17 159:5,9 166:22
166:23 170:21 171:11,21
176:23 177:1 182:21
188:14 190:15 199:21,25
205:6,10 207:25 210:20
213:2 217:2,15 220:14
221:22,22 223:14 228:11
231:1,24 232:7 233:10
235:22,23 237:9,13 240:22
241:3,8 264:13 277:4
285:9,13,25 288:20
exhibits 6:1 7:1 8:1,8 42:16
48:2
exist 81:15 137:17 204:3
210:8 212:18 235:14
existed 14:25 127:10 174:21
234:8 255:23
existence 126:24 150:6,11
150:14 209:20 234:19
exit 34:10
expect 36:22 118:13 121:13
145:3 172:11 244:8 246:4
249:9 281:15
expectation 170:10 255:10
265:16
expected 156:8 265:3
experience 21:3 26:17 29:1
30:13,19 31:12 32:1,11
35:5 36:20 37:13,14 40:8
40:12,14,17 41:14 48:10
76:24 77:1 79:21 98:2,3
111:2 214:12 219:6 284:24
304:25 305:6 308:19
experienced 90:6
experiences 35:10 41:16
111:13
expert 6:5,7 11:14 13:3 35:6
44:20 48:12,17,21,24 49:6
67:3 68:1,13,15,24 92:17

103:6 104:13,14 117:12
121:14 153:20,21,22
181:15 231:2 271:24
expertise 12:17,19,24 27:20
27:25 72:6,17,22 79:22
309:1
explain 161:1 168:2
explained 76:7 103:10 180:7
254:6
explaining 199:16
explanation 250:25 251:11
252:16
explanations 177:16
explicitly 111:9
exposed 90:9,12
expressed 101:23
extended 307:15
extensive 172:7
extent 26:23 59:1 64:9
126:18 174:6 234:12
255:22
external 33:21 276:12
299:18,21,22 300:3

---

**F**

F 3:10
face 234:18 251:11 283:22
284:16
facing 129:18
fact 73:23 75:10 88:1 89:25
127:10 135:15 136:24
139:22 141:18 142:20
173:13 178:17 179:20
194:20 203:19 218:23
219:17 221:14 223:13
234:23 238:6 244:13
259:16 271:10 274:9
277:11,17 279:2,3 281:7
298:19 310:2
factors 267:15
facts 181:7
factual 59:8
fail 272:24
failed 254:11 279:16
failure 261:22
fair 36:16,18 44:2 54:13
58:19 85:8 86:20 87:13,17
90:8,14,18 120:22 137:11
153:6,19 156:25 178:12
180:2 193:23 208:8 239:12
252:15 254:22 255:13,17
255:20,24 256:5,9 257:19
257:21 268:9 276:2 282:10
fairly 14:21 29:15 35:11
fairness 271:23

fall 62:20
falls 246:11
false 53:24 54:7 56:10 57:2
   57:8
falsehood 54:12
familiar 21:13,21 22:18
   35:21 36:1,5,10 46:18
   51:20 67:1 172:13 301:12
familiarity 51:5
familiarize 217:10
far 12:11 39:8 48:8 57:19
   163:14
FAS 236:21 237:4,19,20,24
   239:6 240:8 242:2,13
fashion 74:15 146:21 207:5
   305:11
fast 278:10 296:24
FBI 91:15,17
FBI's 93:24
feasibility 192:22
feasible 191:10,20,22 192:4
   192:6,9 193:17,21 194:12
   194:13 195:2,8,12,25
   196:2,2
feature 237:24 242:7
features 216:11 236:23
February 1:16 2:21 6:3 7:3
   8:3 9:3,10 313:16 314:8
   315:2
federal 90:20 94:12 103:8
   103:19 185:8
FedRAMP 74:10,23 75:1,9
feeding 35:2
feel 149:2 150:4 166:9 174:7
   181:23 242:24 254:11
   266:9
felt 125:16 174:2 210:8
   215:23
field 12:23 15:20 22:4 39:19
   51:12 53:3 130:15,18
   133:24 147:18 248:10,11
   278:6,9 293:13,15 294:9
   294:16 296:18 308:18
fielder 259:23
fields 149:18 173:5,5 174:14
figure 93:14 129:5 178:23
filed 48:25 50:6
filled 123:25 130:15 164:23
   177:23 178:7
final 7:9,18,21 203:5,9,20
   204:20 212:13 239:24
   243:18 307:12 310:12
   312:2
finance 133:21 135:14
financial 89:7 99:14 100:13

106:17 112:21 114:22
   227:1
financially 41:4
find 72:23 78:17 115:15
   129:5 135:17 154:16
   234:14 252:22 294:18
   298:6 310:5,15
finding 253:14 276:4
findings 130:12
fine 62:4 213:12 312:3
finish 10:17 167:1
finished 44:14
Finn 7:22
firewall 47:7,8
firm 11:17 44:25 45:5
   105:24 107:3
firms 98:5 108:1
first 17:18 28:20 65:11
   69:24 71:2 80:13 84:7 92:6
   92:11 104:18 105:2 115:17
   115:24 116:8,18 117:1
   119:16 123:1 124:9 128:8
   130:4 131:16,17 132:9
   140:24 147:10,10,19 148:6
   148:6 159:20 164:13
   167:10 171:23 176:11,19
   191:18 199:13 205:11
   208:10,12 213:20 218:8
   220:22 224:25 237:2,17,25
   238:9,10 239:4 241:3
   253:25 288:24 293:17
   305:24
fiscal 112:22
fit 55:15 114:20 117:14
   118:8 214:23
five 88:10
flag 29:17 122:2 130:19
flagged 30:9
flaw 258:23 259:7,13,16,24
flaws 78:17 259:25 298:6
Fletcher 13:25 14:3,6,6,13
flip 159:21 198:16
focus 40:23 44:12 45:16
   69:14,17 86:23 167:15
   194:23 251:4 252:6
focused 6:13 61:11,25
   73:23 81:25 99:25 104:5
   153:24 199:2
focusing 178:15 179:4
fold 12:24
folks 311:3
follow 37:17,20,21 38:10
   55:18 57:19 76:5,22
   105:11 107:13 198:6
   302:10

follow-through 245:24
follow-up 309:9
follow-ups 6:24 95:13
followed 34:7 55:19,21
   57:17 76:19 106:19 107:8
   108:4 109:10 142:8 143:9
   143:19 151:12 155:6,10,18
   155:19 156:11,11,18 157:2
   157:23,25 163:1 198:22
   206:6
following 37:15 38:13 54:21
   54:24 56:13 100:15 101:11
   158:3,4 186:2 200:13
   202:12 280:23
follows 9:23 119:17
football 264:6,10
footnote 113:10,11,19 124:5
   126:14 131:14 139:1
   145:21 146:19,24 147:5,6
   159:16,25 160:2,7,12,22
   160:24 162:8 171:16,24
   172:4 199:13,15 200:1
   204:25 205:12 209:18
   210:25 211:5,13 217:18
   232:4 237:6,14 241:4,9
Force 17:8 28:9,12,15 29:1
   92:16
Force's 17:10
foregoing 314:5
forensic 137:16
forensics 280:10
forget 51:15
forgive 25:23
form 16:11 17:23 18:14 19:7
   19:18 20:5 24:3 30:2 31:17
   32:12 40:10 41:7 44:21
   52:7 55:3,23 56:23 57:24
   63:2,20 64:18 70:9 72:9,25
   73:21 74:25 76:6 80:2
   90:25 98:6,25 99:10 102:1
   107:16 108:15 109:25
   111:5 116:12 127:3,6
   128:4 129:7 130:2 132:3
   133:1,19 134:2,5,7,17,19
   134:20,21 135:6,10,12
   136:5,12,21 137:12 143:21
   144:23 145:25 147:17,18
   157:3 158:5 161:9,14
   163:6 168:7 169:2,14
   177:17,18,22 178:7 180:6
   184:12 185:11 189:10,17
   193:18,25 194:15 202:13
   208:24 214:4 215:11
   218:15 219:7 222:21 225:4
   226:11 240:9 243:8,23

247:5 248:19 254:9 255:2
   258:25 259:9 261:7 271:17
   272:10 273:9 274:14
   275:19 279:19 280:16
   283:10,16,21 285:16
   287:24 288:15 291:9
   292:14 296:21 299:20
   311:7
formal 14:23 15:23,23 81:18
   81:20,21 94:7 250:1 305:8
formalistic 235:1,3 249:24
   250:4
formalized 232:14 233:20
   234:17
formally 96:10
format 171:22 172:12
former 92:16 93:2
forming 214:14 251:5
forms 124:13 133:25 140:13
   145:12 147:15 149:23
   160:14,16 162:14 173:13
   281:18,21 283:4,7,9 284:2
   284:15,25 299:3
formula 266:23
formulation 17:5
forth 47:11 66:12
forward 122:24 123:18
   198:16 200:7 283:14
found 73:12 118:22 150:19
   210:15,22 230:6 234:18
foundation 99:1,11 133:17
   137:13 165:18 200:19,20
   200:23 218:16 225:5 255:3
foundational 200:22 215:18
four 208:7
fourth 213:17
frame 23:13 87:25
framework 104:9,18 105:2
   105:12,17,19 106:1,3,7,13
   106:19,22 107:7,11,14,21
   107:23 108:4,9,14,21
   109:9,14,15,24 110:8,22
   111:4,8,14 112:2 113:1,23
   114:14,17 115:8,10,20
   116:4,7,18,24 117:5 118:2
   118:6 119:18 121:6,11
framework's 117:18
frameworks 36:11 76:11
   77:2
Fraser 147:22 148:2,13,17
fraudulent 52:13
free 166:9
frequent 255:19 261:3
frequently 269:16
friend 195:10

**front** 118:1 120:3 188:13 193:1 220:16 250:13
**frustrated** 93:22
**FSR** 205:12,15 206:5 210:4 211:24 212:5,18 234:23 238:23,25 239:1 240:12,18 242:10,15,18 245:16,25 246:1,21,25
**FSRs** 203:9 204:7 206:9 210:12 211:22 214:19 234:21 236:3,18,19 238:6 238:15 239:10,21,22 242:5 244:4,5,14,25 245:8,10 246:5,10,10,16,18,21 253:15 299:16
**full** 28:23 37:23 47:19 56:13 155:17,17,21 176:3 181:20 191:15,15 199:9 200:6,17 202:19 215:16,22 281:13
**fully** 11:10 125:18 271:10
**fundamentally** 39:2 178:15 180:17 181:17
**further** 161:14 245:1 303:10 309:3 311:16 313:10
**future** 13:24 43:17

### G

**G** 1:8
**GAAP** 72:8,10,18,24
**gain** 202:11 273:6 301:21
**game** 229:9 230:12,15
**gathers** 67:4
**general** 37:18,18 53:2 108:1 108:20 112:21 114:21 119:25 128:9 151:16 177:14 195:20 203:15 226:12 235:16 240:17 248:10 272:4,12 278:9 284:7 294:8 306:1 308:21
**generally** 40:24 63:14 72:11 73:7,11 102:12 147:24 181:20 187:10,22 188:3 189:4,5,9,16 190:9 213:18 219:13,22 220:2,3 223:1 239:3 247:10 259:11 263:24 273:11,11,15 277:24 278:1 281:9 283:4 284:1,9,14,15 285:2 287:4 294:7 299:1 304:18
**generate** 139:8 173:19
**generated** 67:8 145:14 164:8 172:25 173:1 174:2 299:14
**generation** 173:9
**geographic** 126:10,19

**George** 92:19
**getting** 63:4 66:19 106:10 110:6,20 125:12 132:9 249:15 267:19 304:2
**GitHub** 276:7
**give** 11:5 21:12 54:14,15 87:8 97:20 154:8 190:15 197:14 205:25 260:14 264:15 267:22 268:14
**given** 114:13 129:7 132:16 134:3,4 135:1,6,7 139:22 149:14 170:4 191:4 207:3 209:7 223:21 238:22 240:5 256:12 261:23 267:4 268:16 283:22 284:17 314:8
**global** 83:10,16,24 84:6 85:12,25 86:10,16,22 87:5 88:21 89:5,10,11 93:18 94:18 96:16 105:23 216:9
**globally** 89:6
**GMFC** 113:16,22 120:8
**go** 30:13,22 55:7 88:14,14 94:4,10 100:18 101:6 105:15 116:6,13 124:19 127:5 128:3,5 134:20 136:14,18,19 137:19 138:4 144:22 147:9 160:25 164:11 168:9 178:5 182:6 183:3,9,10 185:6 200:7 208:25 216:20 217:23 231:7 233:14,18 242:9 266:13 267:15,18 268:1,3 268:16 279:25 296:23 308:7
**goal** 255:10
**goes** 59:10 110:24 141:14 170:25 194:18 262:22 268:7
**going** 10:16 26:15 27:21 42:10 46:10 48:7 50:14 62:3 102:18,24 103:21 105:14 109:20 122:11 133:20 135:21 147:8 171:6 179:18 182:2,3,9,13 183:6 187:15 191:1,12 197:13 203:4 204:23 210:10 217:4 229:12,18 252:9,12 253:6 261:6 269:5 271:7 283:14 296:20,24
**gonna** 103:4 136:5,14 181:10 205:16 216:24 224:13 264:18,19 292:19 292:19
**good** 10:3,4 27:11 38:19

53:5 122:3,4 138:17 174:7 174:25 180:15 183:13 214:21 229:1,11 231:23 259:19 270:17 295:3
**Gotcha** 78:4
**gotten** 163:8 176:13 177:9 178:2,11
**governance** 120:16 121:9 122:1
**government** 94:12 260:16 261:4
**gradation** 39:4
**Gradillas** 9:9
**graduate** 45:14
**Graff** 76:22 118:22 175:23 214:17 231:11 232:4 233:7 254:2,11 265:2,10,13 266:1,8 268:10 280:25
**Graff's** 61:2 73:5 213:6 277:16 285:16
**grammar** 275:18
**granted** 158:1
**granular** 153:2
**granularity** 174:7
**grave** 261:20 262:25
**GRAVELLE** 4:14
**great** 44:11 77:14 113:20 217:13 219:2 229:21
**Greg** 92:16 170:23
**Gregory** 1:15 2:4 5:2,11 6:2 6:5,7 7:2 8:2 9:15,21 313:3 314:3,16 315:2
**grew** 93:22
**ground** 10:10
**group** 45:18 109:2 163:20
**GSEC** 22:15
**guarding** 261:25
**guess** 23:7 24:15 36:13 63:17 70:17 76:17 78:22 82:19 108:7 121:3 218:22 247:25 249:6 295:24
**guidance** 108:1,5,10,14 186:3 193:12 198:19 295:3
**guide** 108:3,3,22 113:6 114:4 115:14 120:19 121:9 206:25
**guided** 14:19 15:19 207:4,4
**guys** 131:3

### H

**hackers** 90:9
**half** 56:4
**halfway** 232:11
**hand** 27:21 216:24 266:5 268:17 313:16

**handed** 42:14 43:13 91:25 99:21 119:4 131:10 159:8 177:1 199:24 205:9 217:14 232:6 237:13 240:25 241:7 285:13
**handle** 170:6 298:21
**handled** 94:5
**hands-on** 19:21
**happen** 227:21 235:14 246:25 259:25 271:15 276:1 280:15
**happened** 163:4 183:24 184:1 263:9 278:19 281:25 282:1
**happening** 224:2 228:21 230:2
**happens** 261:1 263:24 269:16 272:6 274:2
**happy** 43:16,18
**hard** 30:6 178:22
**Harvard** 100:24,25
**head** 83:9,16,24 84:6 85:25 86:10,16,21 87:5 88:21 89:5,9,11 91:14 94:17 96:16 105:23 224:15
**heading** 93:20 100:12 122:20 123:10 239:11,13 242:2,3 243:18
**headings** 236:20 238:25 239:11 244:1
**hear** 161:10 219:9
**heard** 162:14 274:24
**heavily** 108:22
**heavy** 151:3
**held** 9:12 50:12 154:15
**Helen** 45:9
**Hello** 222:10
**help** 45:3,22,24 100:12 101:17 104:5 113:6 114:4 119:19 175:20,22 205:14 253:11
**helped** 17:4,12 281:25
**helpful** 48:2
**helping** 111:13,23
**helps** 27:21 148:16
**hereunto** 313:15
**hesitant** 87:8 137:18
**hide** 231:15
**high** 153:6 208:20 209:3 277:22 295:25
**high-level** 236:21 237:5,19 237:24 239:6 242:3,13
**higher** 89:9,15
**highlight** 229:5
**highlighted** 173:24 222:10

225:15,19,22,25
**highly** 135:18 272:25 280:3
**hired** 11:18,21 124:1 166:11
**history** 13:10 293:19
**hit** 242:19
**hold** 13:5,7,8 21:7,19 22:9
22:17 72:4 95:19 96:6
256:23,23
**holding** 190:9
**hood** 38:12
**hopefully** 180:11 188:13
269:22 275:5 294:6
**hour** 50:14 60:8 182:10
270:20
**hourly** 60:6
**hours** 12:13 60:10,18,20
61:23 62:1
**House** 17:6
**households** 90:11
**Howard** 294:11
**humans** 38:21 227:17
**hundred** 204:22
**hundreds** 93:11,14
**hypothetical** 54:15,16 55:6
55:15 56:17,22 57:14,20
58:20 136:9 151:13 157:18
157:21 158:18 170:1,4
258:19 259:19 260:14,15
262:18,19 263:7,8 264:1
**hypothetically** 38:9 129:23
263:17

———————— **I** ————————

**I-S-C** 21:22
**i.e** 120:17
**ICANN** 25:17
**idea** 24:25 34:15 39:12
231:23
**identification** 30:18,20 31:3
31:10,15,20 41:24 42:2
91:23 99:19 119:2 131:7
147:2 159:6 171:12 176:24
199:22 205:7 212:15 217:3
218:18 231:25 235:19
237:10 240:23 247:22
248:2,3,23 250:14 285:10
**identified** 31:9 204:25
225:10 236:24 258:17
265:10 283:7
**identify** 39:14 113:6 114:4
119:19 205:12 265:3
284:25
**identifying** 34:21 236:8
249:1
**identity** 186:25

**IDs** 220:24 221:8,15
**Illinois** 4:8
**illuminate** 177:21 179:20
190:5 242:5
**illuminating** 215:17
**illumination** 212:9
**illustrating** 215:24
**illustration** 178:14 201:4
**illustrative** 125:1 179:17
**images** 137:16
**imagine** 198:13
**immediate** 275:15
**immediately** 222:11 225:23
225:25 277:12,19
**impacts** 222:13
**imperative** 229:4
**implement** 12:22 28:10,14
34:5 135:13 151:20 152:1
152:3,5 153:2 216:7
**implementation** 17:22 18:1
29:14,24 30:9,14 31:2,20
38:21 64:6 69:5 71:15
107:3 112:10 125:13
134:21 137:22 141:7
143:11 149:3 151:24
152:10,24 153:3 155:15
162:18 165:1 169:14,18
173:25 179:1 180:13
186:14 188:9 204:2,4,17
204:18,19 206:16 209:21
240:15 242:16 244:11
245:23 255:6 256:16 265:5
265:12 269:17 306:13,19
**implementations** 30:11
238:24
**implemented** 67:9 70:2
140:12,25 141:4,10,15
142:18 152:16 180:19
187:11,22 202:21 240:21
**implementing** 31:15 35:16
130:12 149:1 162:21,22
178:25 310:25
**implements** 134:7
**implication** 130:9 290:23
**implications** 236:23 241:4
241:14 242:4,23
**imply** 113:3 114:1,18 115:11
**important** 10:15 11:3 52:21
128:8 251:16 261:12 278:6
308:18
**imposed** 48:20
**impossible** 259:15
**improper** 103:15 152:10
184:16 185:7
**improperly** 152:16

**improve** 294:7
**improvement** 81:25
**inaccurate** 85:9 153:10
**inadequate** 271:11
**incident** 51:21 91:21 94:5
100:18 101:6 218:11,13,18
218:25 219:6,10,18,20
223:17,20 224:11 226:16
230:18 260:2 263:5 271:10
271:16 272:7 274:9 275:9
275:13 276:3,11 277:11,18
278:4 279:11,17,23 280:2
280:13 281:8 282:1,2,4
284:1 298:20
**incidents** 119:20 268:3
277:17 281:2,22
**include** 28:22,25 113:25
128:23 188:23 189:4
191:22 244:25 269:18
**included** 15:21 18:6 120:25
189:8 210:12 214:7,7
239:24 240:12 245:17
**includes** 77:1 86:15 206:22
244:7 245:17 248:4 304:9
**including** 17:9 18:1 40:18
108:20 199:16 200:17
201:18 204:18 207:16
209:15 281:6
**inconsistency** 129:6 131:1
**inconsistent** 128:24 289:7
**incorporate** 46:8
**incorporated** 37:6
**incorrect** 176:12
**incorrectly** 58:6
**increase** 88:8
**increasing** 134:13 187:4
**increasingly** 186:12,13
**independent** 116:16 253:3
253:21
**independent-guided** 16:1
**index** 5:1 6:1 7:1 8:1 99:15
105:18,25 106:4
**INDEXED** 5:9
**indicate** 125:17 198:22
258:23 259:7 261:4
**indicated** 44:8 140:8 148:23
152:24 154:3 157:9 158:13
186:6 212:16 314:10
**indicates** 135:11 136:5
174:10 180:18 244:21
**indicating** 176:16 179:13
232:20
**indication** 261:22
**indications** 263:2
**indicative** 249:15 262:3

**indiscernible** 161:9 165:4
**individual** 25:2 108:25
133:13 150:23 168:22
181:13
**individual's** 53:8
**individuals** 52:22 109:3,4
**indulge** 131:4
**industries** 106:15
**industry** 75:22 89:6 97:16
98:17 105:24 106:10,12,17
140:9 142:15 212:23 230:4
235:16 245:21 304:8
**industry-driven** 105:17
**industrywide** 105:16
**info** 148:1
**inform** 98:22 99:5
**information** 5:17 12:21 13:1
14:17,22,23 15:21 16:19
21:23 28:3,14,16 29:3,10
40:24 53:6 67:5 68:11 69:1
83:9,16 84:5 85:9,21 86:9
86:18 89:16 92:17,20 93:8
94:8,17 96:16 97:21
118:17 121:22 141:1,5
157:8 158:13 173:24 193:6
193:14 195:14,21 220:5
221:3 224:15 225:9 226:24
**informed** 26:13 107:22
**informing** 249:4
**infrastructure** 21:5
**inherent** 81:16
**inherently** 265:15
**initial** 53:25 132:18 223:8
**initially** 19:9 28:3 93:17
**initiated** 310:23
**inside** 14:9 16:21 33:7 34:11
215:20,21 280:5 291:3,7
292:12 293:2
**instance** 27:9 98:3,13
118:19 157:14 226:14
227:7 238:22 257:22
258:23 259:7 261:21 287:5
287:7 309:18 311:4
**instance-by-instance** 153:4
**instances** 38:15 40:4 134:12
140:8 202:10 267:8 268:22
**institute** 35:22 36:2 106:5
107:14 116:23
**Institute's** 107:23
**institutes** 106:3 112:25
115:19
**INSTRUCTED** 5:20
**Insulet** 68:1,4,5,9,16,17 69:3
69:23
**integrated** 199:3

**Gregory Rattray**
**2/12/2025**

12

**intelligence** 17:15 82:2
  280:4
**intended** 239:20
**intent** 242:14
**interact** 298:16 301:20
**interaction** 269:8
**interactions** 94:11,11
**interested** 63:15 101:24
  102:4 313:11
**internal** 33:21 58:22 92:21
**international** 13:20 14:3,4
  21:22 36:2 45:17
**Internet** 25:17
**interpret** 121:5 149:17
**interpretation** 85:20,21
  121:11
**interpretations** 247:15
**interpreted** 304:17
**interpreting** 120:25
**interrupts** 110:11
**interview** 254:19
**interviewing** 111:18
**interviews** 71:11
**intruded** 280:4 297:17
**invented** 293:17
**invest** 98:5
**investigation** 51:18 281:6
**investors** 98:4,10,23 99:5
  101:18
**invoices** 12:4,7 60:12
**involve** 18:16,18,19,20
  78:16 213:18 265:15
**involved** 18:4 19:11 24:12
  24:19 25:4,12,20 28:5 30:4
  30:24 31:6 32:8 33:3,13
  51:7 79:9 97:15 98:19
  108:20 157:25 198:4
  207:21 249:20 257:16
  298:5
**involvement** 32:11 34:1
  40:13,14 197:25
**involves** 22:22 81:8 282:4
  302:5
**IPAM** 7:21
**ipMonitor** 7:19
**ISC2** 22:1,6
**ISO** 36:1
**isolated** 141:22 278:3
**isolation** 143:25
**issue** 23:19 64:22 70:2
  74:19,24 76:9 85:20 103:1
  141:12 153:25 210:24
  212:15 216:17 226:10
  261:4,8,15 294:24 302:19
**issued** 269:1

**issues** 59:24 210:15,21
  227:6 229:6 265:15
**item** 222:11 225:22,25
**items** 75:9 266:13
**itself,'** 252:11

———————————
**J**
———————————

**J** 286:15
**January** 54:2,19 55:19
  57:18 67:15 200:14
**Jersey** 2:9
**JESSICA** 2:5 313:21
**Jessie** 1:23 9:18
**Jim** 89:24
**JIRA** 210:14 211:18,23
  212:1,5,17
**JIRA-based** 211:19
**job** 1:25 57:3 93:7 135:13
  288:9,9
**jobs** 82:5
**JOHN** 3:6
**joined** 93:3
**joining** 98:17
**Joseph** 91:11,13,16 93:23
**JPMC** 100:15
**JPMorgan** 6:10 17:18 20:17
  23:25 25:11 29:8 33:5,16
  33:19 34:1,6,11,11 40:19
  41:17 84:19 85:1,4 87:10
  88:8 89:8 90:1,4,7,16
  91:18 92:13 93:3 97:15
  98:3,12,14 99:8 101:10
  105:6,9,9,11,13,16 106:19
  107:6,13,19 108:8 109:22
  110:3,21 111:1 198:1,6
**JPMorgan's** 88:2 92:19
  93:11 110:24
**JPMorganChase** 17:4 83:10
  83:21 84:20 86:1 91:10
  94:12,18
**judge** 265:4,11
**judging** 181:20
**judgment** 127:15 169:21
  215:2,8 260:4 277:20
**judgments** 283:12 284:20
**July** 7:17 285:15
**June** 92:2,8,21 199:2

———————————
**K**
———————————

**K** 286:15,15
**keep** 185:3 293:6
**KEPES** 4:21
**keyword** 64:16
**Khadija** 131:25 136:3 137:9
**Killed** 43:22

**kind** 20:19 33:15 48:20
  126:7 170:3 272:1 298:24
**Kline** 65:9 66:2
**knew** 52:14 91:9
**know** 10:10,10,23 11:20,23
  11:23 12:10,12,13,20,25
  14:8,10 15:21,25 16:15,16
  16:17,19 17:7,10 18:5,7,7
  18:8,20 19:2,3,8,22 20:7,8
  20:10 21:2,3,4 22:4 23:6,7
  23:9,12,24 24:6,6,13,16,20
  25:1,2,10,13,18 26:3,4,14
  26:16,23,24,25,25 27:7,8
  27:13,23 28:1,2,3,5,6,9,9
  28:22,22 29:2,3,3,9,13
  30:3,4,4,6,8,21,23 31:1,2,4
  31:7,8,9,21,22,25 32:2,2,4
  32:14,14,17,24,25 33:6,7
  33:10,11,19,20,21,22 34:3
  34:4,7,16,18,19,20,21,23
  35:1,3,5,8,10,11,12,14,15
  35:20 36:8,11,24,25 37:2,3
  37:4,5,6,7,8,9,18,20,22,22
  38:1,1,3,4,5,6,7,15,15,16
  38:20,22,24,25 39:4,6,20
  39:24 40:16,18,20,22,23
  41:10,11,17,20 44:16,23
  44:23,24 45:10 46:24 47:6
  47:7,13,21 48:9 49:4,15,17
  49:21 50:3,7 51:12,12,13
  51:17,18 52:8,10,11,12,14
  52:16 53:2,2,4,5,5,7,8
  54:10,11 55:4,4,6,7 56:2,3
  56:10,14 57:1,1,2,4,4 58:9
  58:9,13,15 59:1,2,4,5,7,7
  59:12,14 60:18,20 61:2,15
  61:24 62:14,14,18,22 64:3
  64:4,5,5,9,12,12 65:16,17
  65:17 68:9,10,21,22,24,25
  69:10,11,13 70:10,11,13
  70:14 71:3,5,6,7,8,9,9,14
  71:17,17,21 73:11,12,14
  73:22,23 74:9 75:12,14,14
  75:14,19 76:11,11,13,13
  76:23,24,25 78:25,25 79:6
  79:9,10,19 80:5,8,9,9 81:8
  81:9,9,10,12,15 82:23,25
  83:1,6 84:3,12 85:19,20,21
  86:15,19 87:8,15,23 88:5
  91:6,7,11,13 92:24 93:15
  93:16 96:22 97:6,6,11,12
  97:12,13,14,16,18,23,25
  98:9,9,9,16,16 99:2,3,5,12
  99:13,13,14,16 100:3
  101:12,12,15,16 102:2,3

  105:8,17,21,21,22,22
  106:3,17,24 107:19,21,25
  108:1,2,18,21,24 109:11
  109:13 110:23,25 111:11
  111:18,21 114:12,15,18
  115:7,10,15,16 116:1,3
  117:10,11,12,13,14,17,22
  117:23,24 118:1,3,5,5,6,7
  118:12,18,18 120:2 121:3
  121:7,10,20,21 124:13,21
  124:22,23,25 125:1,4,7,7,9
  125:11,12,13,14 126:2,3
  127:8,10,11,13,14,14,15
  127:16 128:7,8,9,10,10,11
  128:15 129:4,7,8 130:3,6,8
  130:11,13,13,15,16,19,21
  132:21,22,23,25 133:1,2,4
  133:5,7,8,18,21,22,23,24
  134:6,9,9,13,14,16 135:5
  135:10,11,15,16 136:4,8
  136:11,15,17,18,21,23,24
  137:14,16,17,22,24 139:7
  139:8,13,22,24 140:3,4,6,7
  140:7,9,11,12 141:11,14
  141:21,23 142:9,11,12,15
  142:15,16,17,20,22 143:9
  143:12,13,14,15 144:1,11
  144:12,13,14,17,22,23
  145:1 146:7 147:10,12,12
  147:13,14,14,17 148:20,22
  149:1,2,17,19,20,20,21,22
  149:23,24,25 150:1,8,9,13
  150:20,22,23 151:2,3,6,8,9
  151:25 152:15,17,19,20,21
  152:21,22 153:2,4,21,22
  153:24,25 154:1,2,20
  155:14,16,18 156:3,3,4,4,7
  156:12,16,17,19 157:4,7,8
  157:9,9,12,13 158:6,9,9,16
  158:17,19,20,23,24,25
  162:10,11,12,13,14,16,17
  162:19,22,23 164:1,2,7,22
  164:23,25 165:3,12,13,19
  165:19 168:11,13,15,15,18
  169:6,8,9,10,14,17,19,20
  170:5,6,8,9,11,13 172:3,7
  172:7,8,21,22 173:4,5,5,6
  173:7,11,11,12,14,16,21
  173:22,22 174:6,9,13,14
  174:16,17,19,19,20,21,22
  175:5,8,11,12,13,14
  177:13,13,19,20,21,21,22
  177:25,25 178:13,14,16,17
  178:18 179:1,2,18,19,22
  179:22 180:1,9,11,12,15

181:9,11,15,16,21,23
183:9,23 184:4 185:21,22
185:22,23,24,24,25 186:1
186:2,4,10,11,13,21,25
187:1 188:4,5,6,8,8 189:25
189:25 190:1,2,4,5,8,11
191:13,14 192:3,4,5,10,10
192:11,13,13,14,15,16,20
192:21 193:12,12,13
194:17,17,18,19,20,21,25
195:1,2,5,6,17,18,19,20,23
196:2,13,14,17,19,20,21
196:25 198:8,9,13,15
200:15,16,16,18,20,21,21
200:22,25 201:1,3,22
202:2,4,6,6,14,15,15,16,18
202:23 203:14,16,18,19,19
203:21,21,22,23,24,24
204:1,12,16,17,18,19
205:2,19,25 206:10,11,12
206:14,15,17,17,17,19,22
206:23 207:2,2,4,4,8,15,16
207:18,20,22 208:20,20
209:2,4,5,9,22,24,24,25,25
210:5,6,10 211:14,14,16
211:16,17,18,20,25 212:1
212:2,2,4,9,9,12,12,14,14
212:17,21,21,22,24 214:7
214:7,15,16,16,17,18,22
214:24,25 215:12,13,15,18
215:21,21,22,23,24 216:2
216:3,4,6,9,10,16 217:5,11
218:17,19,20,20,21,23
219:12,21,22,23,24,24
220:2,2,9,9 221:13 222:14
222:23,23,24 223:5,8,9,11
223:11,21,22,23,25,25
224:2,11,12,12,15,16,18
225:6,6,7,9,11,11,18
226:15,17,18,23,25 227:7
227:20 228:20,23,25,25
229:1,3,3,4,5,6,7,10,10,12
229:13,13,17,20,22,23
230:1,1,2,4,5,6,16,17,18
230:18,19,20,22 231:14
234:1,2,3,3,4,5,6,7,8,11,11
234:13,15,16,16,20,22
235:5,6,6,7,9,10,14,15
236:2,4,6,8 237:21,21
238:4,5,6,7,7,17,17,18,22
238:23,24,25 239:2,20,20
239:21,25 240:12,12,15,19
240:20 242:6,6,7,8,15,16
242:16,19,22,25 243:9,14
243:24 244:3,6,7,7,8,10,16

244:20,21 245:15,17,18,20
245:22,22,23,24 246:9,19
246:10,10,11,13,17,17,17
246:19,21,22,24 247:13,15
247:17,18,23,25 248:3,5
248:20,20,21,22,22,23,24
248:25 249:1,2,3,7,11,13
249:14,15,16,18,23,25
250:1,6,7,8,8,9,12,15,17
250:25 251:17,20,21,21
252:3,18,19,21,22,25
253:8,9,10,11,12,14,16,18
253:20,22,22 254:12 255:4
255:6,9,21,21,22 256:10
256:10,11,12,16,17,17,18
256:19,19,23,24 257:5,6,7
257:8,12,16,16,17 258:2,5
258:6,6,7,9,10,11,13,16
259:10,12,12,14,17,18,21
259:22,25 260:1,3,4,6
261:13,14,15,16,17,19,20
261:21,22 262:21,23,24,25
262:25 263:2,3,4,6,16,22
263:23,24,25 264:3,3,10
265:16,16 266:4,5 267:3,8
267:9,11,18,25 268:4,7,11
268:21,21,22,23,23 269:2
269:3,5,7,7,8,12,12,13,14
269:15 271:18,19 272:13
272:14,16,17,17,18 273:1
273:2,3,23 274:4,5,23
275:1,1,3,5,5,6,11 276:18
276:18 277:10,17,18,18,19
277:20,21,21,23,24,25
278:1,3,8,8,10,18,24,25,25
279:2,7,10,10 280:1,2,3,4
280:7,7,8,8,9,25 281:1,1,2
281:4,5,6,8,9,11,12,13,22
281:23,23,24,25 282:4,7,7
282:8,12 283:10,10,11,13
283:14,16 284:3,4,20,21
284:23,23,24,24 285:1
286:16 287:18 288:1,2,3,4
288:4,6,8 289:22,24 290:1
290:21,23 291:2,2,16,17
293:4,6,16,18,20,20,21,21
293:25,25 294:1,2,3,5,6,6
294:7,8,19,20,20,21,22,24
295:1,1,8,8,9,13,23,24,24
295:25 296:2,2,5 297:4,6,6
297:8,8,11,13,14,14
298:11,11,12,13,17,18,19
298:20,21,22,24 299:1,7
299:12,12,15 300:1,1,3,5,6
300:7,7,7,18 301:15,15,16

301:17,22 302:11,19
304:15,16,17,17,21,23,23
304:24 305:10,24,25 306:3
306:4,5,8,9,14,15,16,17,20
307:9,10,12,13,15,15
308:21,23,24,25 309:22
310:9,9,10,11,11,14,18,19
310:20,21,24,25 311:12,12
311:15
knowing 262:20
knowledge 35:2 49:2 51:11
knowledgeable 67:6
known 51:18,21
KRISTEN 3:8

---

**L**

L 4:12,17
labeled 132:4
labels 12:25
lack 213:23 279:16
laid 257:8
language 25:7,7 26:6 27:9
64:10,14 68:22 109:13
113:21 114:8 117:17,18
170:6 192:20,21 195:23
196:3 223:23 291:23
lapse 272:12 278:3,10
lapses 255:18,22,25 256:6
257:2 265:7
large 21:5 29:6 33:22 38:17
62:16 124:25 125:8,10
130:16 198:10 209:14
214:18 257:12,13
largely 263:18
larger 126:15
largest 90:5
laterally 273:7,19
Latham 2:19 3:16 4:4 11:17
11:19,22 12:3 44:25,25
45:2 49:9 59:17 60:3 61:4
61:5 124:17 138:21 204:17
launch 79:5,13,14,17
law 11:17 14:7 44:25 90:20
lawyer 52:3,9 57:1 68:23
layer 173:15 275:1
layered 119:18 275:6
layers 278:1 279:9
layperson 121:14 249:7
laypersons 121:19
lays 114:14
lead 244:6 271:14 272:13,17
272:18 273:4
Leader 6:11 92:13
leaders 112:8 141:14 202:20
229:3 300:9

leadership 106:22,25 107:1
111:20,24 134:8
leading 90:15,19 304:12
leads 272:6
leak 275:14 278:7 280:14,22
leaked 262:4 275:23,25
leaks 260:16
led 29:4 105:16,23 126:12
ledger 269:14
Lee 45:9,21 60:15
Lee's 45:10
left 88:2 181:5 185:2 262:1,6
303:18
legal 9:9 51:16 52:3,10,20
54:5 58:6
legally 80:16 81:3
length 310:12
lengths 246:18
let's 17:17 44:12 54:18,19
55:12,17 56:18 57:16
58:21 86:23 96:24 114:21
121:13 125:5 152:12
164:12 199:11 236:12
254:3 260:15 268:18,25
288:17 300:18 303:17
308:7
level 20:3,8,17 30:10,13
31:8 32:4 34:22 80:11
89:15 126:1 128:15 130:25
139:21 140:1 143:16
144:22 148:19 149:13
150:22 153:2,7 155:13
156:6,8 178:5,18,18
179:17,25 212:7 244:14
246:1 272:5 304:21
levels 112:1,5 134:13
liberty 34:9 88:5 91:20
110:3
License 2:10,11,13,14
life 304:5
lifecycle 33:3 198:1 203:16
292:12 293:1,12 294:12
303:20 304:16,22 305:2,7
305:10
light 238:8
limit 275:12
limitation 121:16
limitations 48:21
limited 87:7 93:20 105:14
line 52:15 148:1 315:4
lines 148:12
link 56:11 117:25 209:8
linkage 216:9
linked 161:13 211:3,8,9,11
212:3,15

links 118:16 208:16 210:13
  210:17,21 211:3,15 212:17
  241:19,22
Lipner 294:11
list 62:7 64:16
listed 39:17 62:10 67:25
  124:8 136:13,18 137:10
  146:24 162:8 210:4 255:7
lists 133:6 250:6,7
literally 128:7
litigation 22:22 23:1 243:3
little 20:7 23:9 27:19,22 49:3
  73:7,17 74:7,11 75:5 97:1
  125:21 126:21 129:1
  147:23 183:7 196:5 197:24
  214:1 247:2 271:8 303:18
live 211:3
LLC 77:16
LLP 3:16 4:4
location 133:20 297:23
locations 126:11 174:17
Lockheed 93:3
logging 46:25 47:1 65:18
  173:7
login 218:9 220:4 221:3
  273:6
logins 221:11
long 61:21 92:10 100:18
  101:6 173:5 182:8
longer 58:22 89:2 92:19
look 35:12 40:22 42:19 47:3
  47:8 48:1,3,4 57:4 58:13
  62:25 69:16 82:3 83:14
  85:23 92:11 95:13 104:11
  112:13 115:7 116:6 120:6
  122:13,17 125:6,9,10
  128:18 131:10,16 134:24
  136:6,24 137:8,19 140:16
  142:6,21 144:8,23 147:9
  147:17,19,21,25 149:3,10
  149:11 150:2 153:1 155:24
  156:25 158:23 160:21,21
  164:12,22 166:10 169:12
  172:12,19 175:19 176:8,9
  178:21,21 179:25 182:21
  186:17 187:5 188:5,12
  192:23 196:18 200:6,17
  209:12,16 210:8 211:8,10
  211:11 212:2 215:3,9
  216:20,21 218:3,7 220:13
  234:12 236:12 238:7
  239:21 240:13,14 241:1
  242:6,10,15,25 244:1
  245:11 250:5,19,25 254:12
  257:5 258:11 263:15

264:11 266:3 268:22
  271:19 275:3 276:19
  282:15,24 286:9,19 294:17
  297:19
looked 38:12 60:11 63:18
  94:15 104:20 118:3 119:25
  124:23 126:8,9 128:13,17
  128:20 129:11 130:17,21
  132:22 138:2 139:18
  141:19 153:23 159:11
  162:6,11,16 163:2,24
  167:23 168:3,23 169:13
  171:17 172:1,4,15 185:22
  204:11 205:1,2,23 209:14
  211:15 214:1,16,16 215:6
  236:3 244:4 246:9 264:24
  282:13 306:23 310:18
looking 24:16 37:10 38:6
  64:8,11,14 65:5 69:3,4,8
  70:8,12 71:6,16 77:23,25
  78:1 112:7,8,11 113:17
  120:7 121:25 138:25
  142:16,17 143:7 144:19
  146:6,8 147:24 148:4,14
  148:20 150:5 155:16,20
  164:24 165:25 172:17
  173:10 175:4 176:19
  179:16 193:2 197:8,12
  209:20,23 212:5 228:11
  230:7 235:10,22 243:6,18
  243:19 251:21 256:20,22
  267:21 275:4,5 279:5
  282:22,23 287:12 295:2
  297:14 306:1,18
looks 67:7 82:3 118:2
  155:12 174:5 201:24 209:8
LORY 3:9
loss 30:7
lost 264:3
lot 15:19 26:3 35:4 36:18,19
  41:18 117:25 118:16,16
  134:9,11 157:5 158:18
  164:3 165:22 177:15 178:4
  178:6 181:12 210:6 218:21
  223:19 228:24 229:12
  246:9 247:14,17 252:21
  262:22 268:5 282:14 296:6
  297:7
lots 75:25 130:8 203:25,25
low 93:15 208:20 209:4
  224:17
lunch 122:4 138:11

—————————
M

M 4:5 286:9,20

magnitude 258:9,12,16
  261:15,20 277:21 281:3
MailAssure 6:23
main 42:22
maintains 289:2 290:23
major 16:18 258:23 259:7
  281:8
making 25:11 52:23 98:22
  99:7 115:25 150:25 223:21
  240:17 265:14
Makins 147:14 148:18
Man 49:18
manage 93:16 113:6 114:4
  186:25
managed 93:11 127:17
management 82:22 89:15
  137:25 142:18 144:17
  148:24 150:16 170:11
  190:1 195:1 196:6,8,11,13
  197:7,11 213:19
manager 176:14,18 177:10
  178:3,11
managers 71:8
managing 86:1
manner 187:11,23
map 134:18 162:12 212:4
mapped 207:16
mapping 139:15 150:23
maps 135:12
Mark 147:22 148:1,13,17
marked 6:4 7:4 8:4 41:23
  42:1,15 43:13 91:22 92:1
  99:18,22 119:1,5 131:6,11
  147:1 159:5,9 171:11
  176:23 199:21,25 205:6,10
  217:2,15 231:24 232:7
  237:9,13 240:22 285:9
market 83:1
Martin 93:3
Maryland 2:19
master's 13:17 45:15
match 27:5 57:15 135:1
matched 26:9,20
material 41:5 72:7,18
  211:17 217:5 264:19
materiality 103:1,3
materials 62:7,10,13,14,16
matter 9:14 67:25 68:6
  130:5 258:1 276:16
mattered 280:21
matters 89:6
Matthew 3:18 91:6,7,8,9,17
  93:25
maturity 38:8 112:1,5
Maurice 4:6 161:1

mean 21:10 36:18,24 38:18
  49:19 59:5,10 68:21 73:10
  74:2,3,9 75:18 80:3,16
  84:17 86:15 88:4 91:1
  95:23 97:23 99:3 100:23
  106:8 108:16 109:7 110:10
  114:17 115:23,25 116:19
  116:20 128:7 129:4 133:22
  135:8 137:14 140:2 141:6
  141:11 145:24 147:16
  149:11 150:25 151:12,16
  153:4 155:9,22 156:11,21
  158:17 170:16 172:6,25
  176:22 188:2 192:8 193:10
  196:11 221:7 222:23 223:7
  225:18 228:22 237:20
  239:19 240:10 247:7,16
  251:12 252:2 254:4,6
  257:11 259:17 261:8,9,13
  261:17 266:12,13 269:9
  272:11,23 274:4 277:15
  281:11 283:24 284:19
  286:13 287:17 289:21
  297:7 298:9 299:15 300:2
  301:13 304:8 309:22 310:4
  310:7,7 311:14
meaning 72:7,18 114:25
  117:1 189:14 232:15
  233:21 247:11
means 54:7 121:24 193:11
  194:10,21 259:13 295:24
  304:18
meant 101:14 115:13 121:7
  121:20 134:9 180:14 190:4
  196:24 201:24 202:7
  232:23 233:15 240:19
  247:19 251:10 252:17
  279:10
measures 68:9,11,24,25
  191:9 192:12 194:11,22
measuring 269:16
mechanism 306:5
mechanisms 141:17
medium 208:20 209:3
meet 61:5,8,21,24 113:3
  114:1,18 303:13
meeting 151:9
MELTON 4:15
memo 58:22 92:21,23,24
  93:5
memory 254:18
mention 40:4 277:14
mentioned 16:24 17:19
  18:11 51:5 79:12 98:13
  120:4 126:17,21 132:17

180:24 196:5 207:23
228:17,23 277:11 279:12
295:8 309:19
**mentions** 79:23 96:19 148:1
**mere** 126:24
**Merit** 2:6
**message** 184:14
**messages** 184:10 185:19
**met** 10:5 120:15 139:15
212:21,22
**methodology** 70:18,20,24
126:7 213:7
**metrics** 29:13,23 269:9,17
**Michael** 294:10
**Microsoft** 34:8 186:3 293:20
293:23 294:11 296:10
303:24 304:9
**Microsoft's** 216:4
**middle** 58:12 73:6 198:18
252:7
**military** 13:10 28:1 261:24
**million** 83:12 87:20,21,24
88:3,9,10 90:10 94:20
267:23
**mind** 151:11 200:3 221:2
232:14 233:20,25 234:24
245:9 291:4
**mine** 14:11
**minor** 43:7 44:7 224:11
226:16
**minute** 154:9 295:14,15
**minutes** 50:19 122:3,7
131:4 135:21 273:8,21
302:22
**misapplication** 263:2
**misbehavior** 262:23
**mischaracterization** 90:13
143:22 168:8 184:19
**mischaracterizes** 184:21
**misconfiguration** 273:1
**misleading** 53:24 54:8
55:21 56:11 57:3,8 72:23
153:10,15,17
**misrepresentation** 58:15,18
59:15
**misrepresented** 58:10
**missing** 130:17 160:9,11,17
160:23 192:21 230:11
**misstatement** 55:2
**mistake** 104:20 258:22
259:6 261:3,17
**mistakes** 261:19
**mitigate** 271:16 272:7
**mitigation** 236:9 248:9,15
**model** 36:6

**modeling** 34:14 35:5,7,10
35:19 36:9,15,22 37:9
39:11,19 207:8,10 231:11
232:14,16,21,24 233:11,20
233:22 234:4,7,9,13,17,20
234:24 235:2,4,8,11,12,17
236:1,7,18 238:12 239:3
240:1,21 242:17,19 244:9
244:12,17 246:7,8,12,13
246:22 247:4,12,13,20,21
248:2,9,13,17,22 249:9,12
249:19,21,24 250:4,10,14
252:11,19,22 253:5,7,14
253:23 295:5,7,12,20
296:2,7,11 305:8,11
**modify** 27:4
**modifying** 27:9
**moment** 44:13 50:14 118:3
154:21 183:14 191:12
200:4 217:5
**Monday** 61:14
**monitor** 19:3
**monitoring** 19:1 20:14,16
20:22
**month** 50:12
**months** 275:15,24,24
**morning** 10:3,4
**motion** 48:25
**Motors** 112:21 114:22
119:25
**move** 81:22 83:7 134:12
231:16 273:7,19
**moved** 169:17 202:16
**movement** 215:18
**moves** 260:22
**moving** 87:24 94:24 198:11
**MSP** 7:15 165:10 232:23
233:12 235:21 236:1
**multiple** 157:8 186:11
235:15
**multiyear** 256:1,7
**mute** 110:13
**mystery** 49:18

**N**

**N** 3:1 4:1,12,17
**N-Central** 236:5
**N-e-x-u-s** 22:19
**N.E** 3:10
**name** 49:15,17 130:15,17
286:16
**name's** 9:8 10:5
**named** 131:24 147:22 313:6
**names** 25:17 90:9 174:18
**naming** 31:5

**narrative** 194:19
**narrow** 190:2
**nascent** 14:21
**nation** 17:5
**national** 34:22 35:22 92:18
112:25 115:19 116:22
**native** 8:5 171:22 285:13
**natural** 38:18
**nature** 106:22 137:20
147:16 256:12 298:23
**necessarily** 36:15 87:15
189:20 195:24 222:22
225:17 226:23 249:11,19
250:10 275:11 287:25
311:13
**necessary** 20:22 24:21
137:20 143:5,9,16 144:8
144:25 149:3,9 150:22,24
167:21 168:6 174:3 175:3
212:7 287:22 308:25
**need** 10:22 20:20 27:23
28:10 30:23 39:13 53:6
80:14 102:4,5 117:9 121:3
121:10 131:10 134:24
138:4 142:5 143:8,11
154:22 166:6,7 167:7
170:14 179:22 183:11
192:3,17 195:2,3,6 210:8
229:17,25 231:12,16
241:23 268:14,14 274:22
288:8 291:24
**need-to-know** 168:12,17
169:24 175:7
**need-to-know/least** 143:5
167:20 168:5 175:3
**needed** 103:16,20 149:17
150:4 178:1 212:22 218:14
260:17 287:16,22 288:10
**needs** 34:17 53:5 192:12
218:11 222:11 225:22,25
238:24 293:5
**negative** 279:1
**neither** 260:13
**network** 15:10,18 18:25
20:14,16,22 31:5 273:8,20
288:16,21 290:20,21,23,24
292:1,4 297:15 298:16
299:23 302:17
**network-based** 298:13
**networks** 19:2 28:24
**never** 38:9 59:23 240:14
242:15 274:23
**new** 1:2,17,17 2:9,15,16,18
2:20,20 3:20,20 9:4,4,13
9:13 44:17 132:24 133:20

133:21 269:1 313:23,23,24
**newly** 124:1
**news** 51:13 88:7,11 92:22
**nice** 303:13
**nine** 146:24 149:6
**NIST** 35:21 99:16 104:8,17
105:1,11,18 106:1,7,13,14
107:20,23,25 108:3,9,13
109:9,13,23 110:7,21
111:3,14 112:1 113:2,5,22
114:3,14,17 115:5,9 116:3
116:7,17,22 117:4,10,18
117:24 118:2,23 119:17
120:11,18 121:6
**non-litigation** 243:21
**noncompliant** 270:1,14
**nondisclosure** 25:14
**nontechnical** 18:7
**normal** 173:1 301:20
**North** 4:7
**Notary** 2:17 313:24
**notation** 215:20 233:8
286:21
**notations** 213:22 215:14
**note** 118:21 142:2 147:21
165:4,9
**noted** 9:16 210:24 312:4
**notes** 147:20 179:1
**notifying** 298:18
**noting** 194:25 234:8
**notion** 37:4 121:4 162:17
224:8 289:22 297:4,13
**November** 6:6,8 7:13 44:4
62:19,20 66:7
**nuance** 301:18
**nuclear** 260:17
**number** 22:2,2 29:6 38:16
42:4,4,5,11 77:2 87:8,9
88:6 108:18 124:23 125:10
130:16 131:15 139:13
171:16,23 172:10 177:2
190:16 197:14 200:2
209:14 231:2 255:25 256:6
257:2 266:13 267:11,13,22
268:25 270:3,14,15
**numbered** 93:15 172:9
**numbers** 25:18 33:22 90:10
160:22 161:23,25 231:3
257:12,13
**numerator** 265:23 266:10
266:14,20,25 267:1 268:1
268:3,7 269:25 270:13
**numerators** 269:18
**numeric** 188:23
**numerical** 257:11

numerous 26:11 33:13
66:25 111:13 155:4 159:12
263:2 277:15 281:1
**NYACR** 1:23
**NYRCR** 1:23

_____

**O**

**O** 4:12,17
**O'Shea** 218:8
**o0o--** 4:23 8:11
**oath** 9:22 11:4 150:17
314:12
**object** 16:11 17:23 18:14
19:7,18 20:5 30:2 31:17
32:12 40:10 41:7 44:21
46:10 52:7 55:3,23 56:23
56:23 57:24 63:2,4,20
64:18 70:9 72:9,25 73:21
74:25 76:6 80:2 88:23
90:25 102:1,19,24 103:4
107:16 108:15 111:5
116:12 128:4 130:2 132:3
143:21 157:3 158:5 168:7
169:2 180:6 189:17 208:24
210:23 214:4 215:11 219:7
226:11 240:9 243:8,23
247:5 254:9 255:2 258:25
259:9 261:6 272:10 275:19
287:24 288:15 292:14
296:20 311:7
**objecting** 185:12
**objection** 47:17 89:1 98:6
98:25 99:10 103:13 109:25
127:3,4,6,25 133:12,17
134:5 137:12 165:18 181:7
184:12,16,18,18,25 189:10
193:18,25 194:1,15 195:11
202:13 218:15 222:21
225:4 248:19 271:17 273:9
274:12,14 279:19 280:16
291:9 299:20 304:12
308:20
**objections** 103:20
**obligated** 110:25 291:16
**obligation** 87:11 195:20
**obligations** 87:10
**observed** 140:10
**obviously** 10:13 11:3 160:8
218:4 262:16
**occur** 219:23 263:23 265:7
**occurred** 19:4 54:1 135:18
246:19 259:22 264:5
**occurrence** 267:9
**occurring** 244:17 252:22
253:15 283:17 298:19

**occurs** 102:21 123:6 163:18
227:20 231:21 267:6 270:5
273:11 290:16 307:23
308:14
**October** 50:11 54:1,19
55:18,19,20 57:18 62:19
62:20 67:15 200:14
**offer** 21:16 47:15 48:21
52:10 314:11
**offered** 103:2
**offering** 47:11 54:1 69:8
153:7
**offers** 22:6
**officer** 81:24 82:24 83:9,16
85:11,25 86:9,18 89:13,14
89:16,20 91:10 92:20 93:8
93:25 94:17 96:5,9,10,16
102:4
**oh** 42:24 53:14 109:14
122:16 132:5 146:7 148:8
154:11 166:21 178:13
190:21 208:8 228:13
**okay** 10:19 11:7,9,18 12:2
12:13,23 13:2,5 14:12
15:17 16:3,6 17:17 18:11
18:18 19:15 20:19 21:7
22:6 24:8 25:8,22 26:18
27:18 30:16 32:10 34:13
39:7 41:8,14 42:12 43:2,11
43:20 44:11,19 45:10,24
46:13 47:5,10,25 48:17
50:2,9 51:4,20,23 52:19
55:16 56:15 57:14,23
59:16 60:9 61:5,12,17
62:24 64:7 65:8,11,25 66:8
66:23 69:2 70:22 71:1,4
72:21 73:3 76:17 78:2,6
79:12,23 80:13 81:4 82:11
83:7,7 84:7,15 85:8,23
86:23 88:1,18 90:8 91:6,11
92:11 93:1 94:6,13 95:12
95:24 96:3,24 98:2,12
101:22 102:7 103:7,20
104:24 105:1 106:6,25
107:12 109:6,7 111:1
112:13 114:21 115:17
117:3,20 120:6 124:19
126:12 132:5 133:11
134:24 136:11 137:6
138:22 139:10,17 140:15
140:22 141:8,24 142:25
144:7 146:13,17 147:19
148:11 149:13 153:13
154:20,24 155:1,2 156:10
156:23 157:17 159:4,17

160:18 161:16 162:3,24
163:13,23 164:10 165:7
166:24 167:2 168:10
170:22,25 171:20 172:17
173:18 175:16,25 176:7
177:4,7 178:9 179:11
180:2,23 182:22 183:13
184:7,15 185:4 186:6,15
187:18,20 190:17 191:17
191:18 192:23 194:3
195:10 197:5 198:16
199:11,12 200:9 202:1
203:2,4,7,8 204:5 205:9
210:11 211:7 213:9,15
214:11 215:6 216:13 217:1
217:8 218:2 219:3 220:4
220:18 221:24 222:3
223:13 226:6,22 227:16,23
227:25 228:13 230:10,25
231:9 232:2 236:12 239:4
239:9 240:4 241:7 242:21
244:24 245:8 246:5 248:8
249:6 251:3 254:8,19
262:14 264:22,24 265:1,18
268:18 269:12 270:19,22
271:13 272:3 273:5,16,16
278:5 279:12 280:13
282:19 283:1 284:10 286:8
286:19 290:4,10 291:13
294:15 295:4,11 296:9,13
296:22 297:19 299:3
300:20 302:21 309:18
310:2
**once** 52:19 54:5,15 164:10
181:11 193:16 199:5 261:1
262:4,10 273:5
**one's** 190:9 309:1
**one-year** 176:12 179:13
**ones** 19:22 119:24
**ongoing** 174:8 230:18,20
**open** 77:12
**operating** 91:10 178:19
291:17
**operation** 20:25 67:8
**operational** 28:8
**operations** 16:15,20 82:1
93:25
**opinion** 26:14 39:25 52:10
54:6 68:24 70:10 103:2
115:4 153:7,11,13,20,22
158:2 166:14 216:8 254:23
255:15,18,25 256:6,18
257:3 269:5 276:10,11
**opinions** 47:10,15 48:22
52:3 66:12 104:8 214:14

251:6
**opponent** 48:25
**opportunity** 83:1 246:6
**opposed** 134:3
**opposite** 129:24
**options** 82:15
**orange** 291:4
**order** 32:6 37:10 38:20 67:6
121:21 131:15 150:9 151:4
163:9 173:2 192:13 218:5
294:6 304:19 309:2
**ordinarily** 67:2
**ordinary** 166:11
**organization** 24:11 26:9
28:23 36:3 37:15 38:17
39:1 198:10 248:25 258:24
259:18 283:7 293:16
295:18
**organization's** 36:9 259:8
**organizational** 34:22 119:16
**organizations** 16:19 28:9,12
28:13,19 29:4,7 30:22,24
34:21 35:9 36:4 39:15
40:18 41:21 76:12 196:19
294:2 296:1,4
**organizations'** 36:6 118:14
**organized** 147:5,13 210:2
**orient** 145:17
**original** 44:4,9 51:17 100:6
263:8
**originally** 96:8 163:16
**origins** 196:23
**Ortega** 4:19 9:8
**outcome** 249:19 313:11
**outline** 231:3
**outlined** 115:7 136:21
173:16 206:20 207:12,15
229:24 246:16 289:5
307:14 308:5 310:10
**Outlook** 133:5
**output** 174:20 249:8,22
250:2,5
**outputs** 79:9 111:21 173:6
204:19 249:23 250:4,11
**outside** 67:3 71:16 98:7
103:5,9,11 130:10 137:3
138:2 141:18 142:21
150:18 151:16 157:7
183:24 184:2 186:7,18
243:3
**overall** 17:13 195:19 229:2
244:16
**overarching** 76:2,14
**overlapping** 247:25
**overlay** 161:12

**overlaying** 163:11
**oversaw** 83:11 94:19
**oversee** 87:3,6,21 93:10
**overseeing** 197:25
**overseen** 32:14 66:25
**oversight** 17:25 18:10 28:16
32:23 34:3 79:1 81:9
**owner** 82:11
**owners** 101:20

**P**

**P** 3:1,1 4:1,1,12,17
**p.m** 2:23 138:9,12,12,14
182:12,15,17 228:2,5,7
270:24 271:2,4 303:2,5,7
311:21 312:4
**page** 5:4,10 6:4 7:4 8:4
42:20,22,23 53:14,15
66:23 73:4 78:1 83:15
85:24 92:12 93:1 95:14
96:15 100:9 104:21,22,25
109:17,18 112:14,15,17,20
118:1 119:16 120:6 122:13
122:17,24 131:16 140:19
140:20 145:5,11,19 146:4
146:9,10 147:10,20 148:6
154:6,19 164:13 166:5,21
170:21,24 171:1 175:17
182:21 187:6,7 188:16,17
190:15,18 193:2 197:14,15
198:17 201:5,11,12 203:2
208:4,5,9,9,11,12 213:4
216:14 217:23 220:18
221:19 231:2,8 236:15
237:25 250:21 264:12,13
277:7 282:18,25 285:23,24
285:25 286:7,9 297:22,22
297:25 301:2 315:4
**pages** 5:9 122:24 123:17
198:17 208:7,21 285:22
**paid** 12:2,5,11
**painful** 260:10
**paragraph** 53:11,12,15
66:24 69:24 73:4,6 77:15
78:7,13 81:23 83:8 84:8
92:15 93:21 94:14 100:11
104:12,21,25 109:19
112:16 113:11 114:25
122:18,19 123:2,10,14,19
143:2 145:5,9,10 154:6,19
154:21 155:3 158:8 159:11
162:18 166:23 167:5,11,22
170:20,23,24 171:3,6,14
173:12 175:18,19 176:10
177:8 179:6 180:14,23

181:11,16 182:21 183:16
186:3 187:6,9 190:15,22
190:24 191:14,19 193:4
194:6,13,18 195:4 196:1
197:17 198:17,18 199:6
203:2,5,8 204:5 210:11
213:2,16 216:14 223:14
231:1,3,6,7 232:2,10,12
233:7 236:15 237:15 238:9
238:10 240:11 241:2
244:24 245:15 249:14
250:19 252:7 264:12,19,25
265:1 277:3,9 282:16
288:24 297:20,25 298:2
300:13,18,19,19,24 302:2
**paragraphs** 216:17 223:16
**parameters** 206:1
**parentheses** 113:2 210:14
237:4
**parenthesis** 213:21
**part** 29:9 33:24 40:21 48:18
80:7 84:7 86:24 103:9
127:10 134:22 141:6
143:11,14 144:1 145:15
179:5 184:24 201:3,21,23
201:23 202:18 207:9
232:22,25 233:11 234:9
239:25 241:1 246:14
248:17 250:14 282:1,22
292:11,25 295:1 307:19
**participant** 110:11
**participation** 80:10
**particular** 39:21 41:4 55:5
76:18 114:2,19 120:15
150:3 153:24 172:1,9
178:15 181:19 183:1
198:24 215:4,9 223:17
228:18 239:16 240:6
270:16 278:13 281:2,4
306:8 307:17
**particularly** 31:21 35:13
62:16 64:5 309:1
**parties** 102:21 119:7 123:6
163:18 231:21 267:6 270:5
290:16 307:23 308:14
313:13
**partner** 77:16 95:17,22,25
**partnership** 86:17,22
**partnerships** 83:10,17,24
84:6 85:12,25 86:10 87:6
88:21 89:5,10,12 93:18
94:18 96:17 105:24
**parts** 190:11
**password** 30:6 31:1,2 38:11
57:17,21 58:4,23 74:5

182:24 185:24 186:4,14
187:11,23 188:21,25 191:8
192:11 193:6 194:11,22
195:7,13,19 218:24 219:13
219:18,22 220:11 226:10
268:20,23 269:1 271:8,11
271:14 272:5,14 274:10,22
275:14,23 276:4 278:7
280:14,21,23 281:12
305:18 306:20
**passwords** 188:22 191:7,25
194:9 196:4 216:7,11
221:11,17 225:9 227:4,14
260:16 268:18 270:1,14,15
306:7
**path** 283:14
**Paul** 89:17,22
**Pause** 47:18 146:16 154:25
171:10 176:6 183:12
187:19 191:16 199:10
200:8 203:6 205:22 213:14
217:9 264:23 300:21
**pays** 12:3,7
**PDF** 209:9
**Peak** 45:18,19 77:16 78:8
82:6 83:4 95:17 100:12
101:16 243:14,22 311:4
**Peak's** 99:23
**pen** 81:17,19 212:24 297:18
298:25 300:6 301:17,19
311:8
**penalty** 5:13 314:4
**pending** 10:25
**penetration** 17:10,15 78:15
78:21 79:3,6,15 210:18
296:17 297:2,8,12,16
298:4,12 299:4,10,15,18
299:21,22 300:3,14 301:5
301:10 302:5,16,17,18
311:4
**Pennsylvania** 2:18
**people** 22:5 31:9 36:19 38:2
39:23 65:4 67:5 79:19 81:8
87:14,16,18 97:20 107:3
108:18,19 110:13 111:19
115:25 121:24 130:21
144:12 190:1 219:25 221:8
232:21 246:3 247:18
262:20 291:2,7 292:2
297:11,17
**per-** 284:2
**perceived** 213:6
**percent** 55:8,9 157:23,24
254:24 257:23,24 269:12
**percentage** 157:1 269:9

295:25
**perfect** 255:6
**perfection** 156:22 190:10
255:9 256:16,24 259:15
**perfectly** 156:19
**perform** 28:24 109:22
243:22 299:10
**performance** 39:2 235:11
**performed** 56:2,3,4 232:22
232:25 233:11
**performing** 36:21 158:25
159:1 290:7
**period** 25:21 53:25 54:4,19
54:22,25 55:8,9,22 56:5,13
56:19 57:22 58:13,25 59:9
59:12,14 60:12 62:12
67:15 69:13,18 84:4 85:13
85:22 88:10 107:18 118:4
119:9 124:2 126:9,18
134:14,14 145:14 153:8
155:7 157:15 176:12,13,17
177:9 178:1,10 179:7,7,13
179:14 180:3,4 183:25
184:2,6 186:7,18 198:8
200:14 253:17 256:1,7
305:14,19,23 306:17,21
307:4,8,12,16 308:4
309:15 310:4,6,14,16,21
311:1
**perjury** 5:13 314:4
**permissible** 81:3 186:17
**permissions** 157:25 287:16
287:19 288:5
**permitted** 272:1
**person** 34:20 61:13,16
108:17 132:22 135:5 136:4
136:10,16 149:15,16
176:12,17 177:8 178:1,10
313:8
**person's** 136:14,19 229:18
**personal** 260:9
**personally** 12:14 16:9 34:13
39:10,17 40:8 51:7 60:10
62:9 78:20 79:1,25 111:2
111:25 262:21
**personnel** 83:12 86:25 87:3
87:6 94:20
**perspective** 172:22 207:1
263:7 294:8
**pervasive** 255:19,21 261:9
261:22 265:17 266:2
**pervasiveness** 265:14,25
**phase** 206:24 207:22,22
**phases** 207:15
**PhD** 13:20 14:3,5,9,12,16

15:3,5,9 16:3
phone 3:12,21 4:9 65:21,23
90:9
phrase 191:22 194:13 304:4
phrased 276:20,22
physically 80:5,6
pick 126:6 303:17
picking 156:23
piece 141:22
pinned 304:23
pivoted 289:24
place 16:21 19:2 38:8 66:5
67:4,14,20 68:9,12,19 69:3
70:15 71:24 73:16 125:18
127:12 130:7 136:25 138:1
138:3 140:5,11 141:20
144:21 148:24,24 151:4,12
152:20 162:19 170:15
174:24 186:10,21,24 187:2
190:7 192:17 196:21
212:25 213:20 253:17
269:18 306:21 310:21
313:5
places 172:25 186:11 198:3
209:5 210:16 266:1 277:16
282:12 305:12
plaintiff 1:5 3:3 68:6,15
plan 47:15
planned 88:8
plans 44:18 47:22
play 97:5,7
played 41:11
players 207:21
please 100:8 110:13 112:14
146:10 165:4,8 166:9
167:3 175:17 182:21
185:13 194:4 216:13
222:13 231:1 259:1 270:11
275:21 311:25
plenty 295:3 297:10
plural 123:23
point 10:22 19:9,12 44:3
93:16 111:12 136:19,22
147:23 177:14 181:11,18
186:9 201:1 216:5 221:25
223:20 238:11,11,14 239:1
239:23 240:11,18 241:22
244:5 245:15,16 277:1,1
291:6 293:19 310:18
poised 289:22
policies 29:10,12,15,22,24
37:16 69:3,5 70:14 71:9
214:17 219:24,25
policy 13:15,18 14:11 28:6
31:4 38:11,13 39:1 55:18

57:17,21 58:4,10,16,23,23
71:7 112:8 127:11 130:6
141:13 142:16 144:15
157:23 193:6 195:14,19
268:20,23 283:8,23 284:18
284:20 288:13 290:11,14
291:6,10 305:18
political 13:9
poor 271:14 272:5
portion 132:20 225:15
288:16,22 290:22 300:22
portray 101:15
pose 34:24 196:22
position 89:9
positions 95:19,21 96:6
possible 56:22 151:21 152:6
152:11 269:15 273:24
278:11 305:6
possibly 263:13
post 210:13,17,21
post-2015 69:16
posture 23:12 25:6 120:18
postures 26:12
potential 121:22 194:25
229:6 278:25
potentially 52:13 197:9
PowerPoint 73:13 215:16
practice 35:8 46:24 56:3
64:12 69:1 71:22,22,24
93:18 108:2 112:12 124:3
124:14 125:8,15 137:22
142:12 155:6,13,15 170:5
192:19 227:14,17,19,21,22
229:2,8 230:5,9,11,14,19
234:8 243:5 248:18 255:5
277:25 278:9 281:10,14
292:17 294:7 295:2,5,12
295:22 297:5 305:23
306:10,12
practices 27:1,5 28:15
52:24 54:21 58:7 64:6 70:1
70:2,5,7 71:15 73:8,15,18
73:25 74:3,8,12,18,23 75:6
75:10,24 76:1,5,20 97:22
98:4,15,24 101:24 102:14
117:6 121:23 140:5 144:13
157:10 184:8,11 185:17,20
186:16 188:22 190:7,11
191:6 194:8 195:7,23
196:3 197:1 200:12 202:12
215:1 229:23 234:12
254:25 256:11,17 257:18
280:23 292:9,22 294:20
295:9 297:3 304:24 306:20
307:7,13

precise 79:16 146:4 258:7
precludes 221:10
predated 310:3
predesigned 15:25
prefer 231:19
premise 103:25 104:4,6
preparation 61:6,18
prepare 60:23 61:22
preparing 62:8 66:12
presence 29:5 37:10 39:4
57:4 62:18 68:8 70:14 71:7
74:4 111:19 112:8,12
124:14 135:9 142:12 144:4
144:15 148:22 152:22
164:25 169:13 175:8
181:22 188:8 206:14
211:18 229:23 230:8
242:10 244:1 253:15
256:11 257:7,17 258:4
263:21 307:11 308:24
present 30:11 69:17 80:5,6
82:4 95:17,20 96:6,7
202:17 244:18 246:17,18
246:25 249:14
presentation 200:1,6 201:21
201:23,24 214:2,6,13
215:4,16,17,21,23
presentations 213:19
presented 133:25 181:21
201:25 202:4,7
President 92:18 260:23
264:7
pretty 19:20 32:8 41:16
54:11 87:11 125:20 133:19
151:6 162:21 169:4 174:16
195:17 200:22 202:6
206:17,18 225:7 229:14
233:1 259:24 282:13 296:3
303:16
prevalent 310:13
prevent 11:10 119:19
preventing 291:7
prevention 30:8
previous 245:14
previously 47:22 67:19
120:4
price 100:14 101:10
primarily 61:1 82:23
primary 186:24 253:13
principles 72:12
printed 171:21 211:2
prior 26:7 43:15 50:2 59:16
60:2 67:18 90:7 112:17
219:16 253:17
privacy 241:14 242:23

privilege 143:5,12,16
167:21 168:5 175:3 288:7
privileged 143:9 175:7
privileges 273:7,19
proactive 236:21 237:3,18
237:24 239:6 240:7 242:2
242:13
probably 24:24 25:20 29:1
31:11 57:8 59:14 61:10
66:7 69:11 79:18 81:13
83:5 87:16 90:12 92:9
97:24 108:19 110:2,24
117:11,16,23 130:20
137:15 146:7 165:13 170:3
172:25 231:6,22 250:24
269:7 276:19 280:10 296:6
297:10
problem 211:2 258:16 262:3
263:14
problematic 272:25
problems 213:6 279:5
procedural 28:7 180:1,13
procedure 31:4 71:8 127:12
142:16 180:1 185:9 188:9
procedures 28:21 29:11,13
29:15,19,23,24 32:24
37:23 71:10 274:21 294:21
298:16,19
proceed 63:22 167:3 171:8
199:11 205:24
proceeding 62:23
PROCEEDINGS 9:2
process 7:7 31:22 32:1 33:4
33:17,23 34:2,6,8 35:12,16
38:4 43:23 46:12,16 63:9
116:10 125:17,22 127:18
128:9 130:6,7,12 132:20
132:22 133:7,8 134:7,11
134:15,22 135:10,15
136:18 137:24,25 138:1,2
139:23 140:12 141:6 142:1
143:14 144:20 145:15,15
148:25 149:20,22 150:6,7
150:11,15,17 151:11,12,19
151:24 152:1,3,4,10,13,15
152:22,24 156:3 157:1
162:15,19 163:1 164:7,25
165:1,23 168:11 169:15
174:4,20,22 175:13 178:20
179:21,24 180:17 184:5
188:9 194:19 198:7,11,23
199:3,16 201:3 202:8,17
202:21 203:11,22 205:1
206:15 207:1,19 209:21
211:16 212:2,11,20 214:3

214:19,22 216:4 224:13
232:22,25 233:12 239:2,24
240:12,18 242:10,18 244:6
244:14 245:16 246:1,21,23
249:24 250:5 251:5 261:18
261:23 262:22 280:6
283:11,15,17 284:8,24
293:24 299:13 300:6
302:13 307:1,18 309:22
**Process'** 199:1
**processes** 16:16,17,22 25:4
32:5 34:4 35:3 37:2 40:21
126:5,22 140:5 151:3
156:5 173:16,25 202:22
204:4,19 206:20 235:8,13
249:13 258:4 263:25
308:24 309:2 310:11,22,24
311:1
**produce** 163:9 250:1
**produced** 160:4,13 161:4,8
161:8,11 162:2,10 163:5,6
163:10 211:4,10,15 249:22
294:11
**producing** 211:16
**product** 46:4 83:2 196:22
207:3,17,19 216:10
**production** 160:16 173:1,21
211:24 222:13,20 223:3
225:16 226:3 227:5 235:12
282:10 287:3 288:14 289:2
289:6,8,12,17,24 290:8,12
290:24 291:3,8,17 292:13
293:2,7,10
**products** 7:15 97:21 121:23
170:13 196:17 234:22
235:22 236:1
**profess** 72:21
**professed** 37:16 76:21
**professes** 76:5
**professional** 2:5 52:21
292:8
**professors** 14:20 15:20
**proficient** 79:21
**program** 14:5,10,13,16 15:5
15:9 16:3 17:3,11,21,22
18:1,8,10 28:17 29:10
34:12,16 38:4 39:13 83:11
84:9,11,16 85:1,4,13,17
94:19 106:24 108:5,22
112:25 115:18 116:22
174:24 265:7
**programming** 33:7
**programs** 16:14,21,22 17:9
17:13,14,16 32:14 263:21
**prohibit** 221:3 291:16

**prohibition** 220:11
**project** 35:16
**promise** 40:3
**promised** 250:15
**promulgated** 76:12
**proper** 124:23 137:4 143:15
157:11 196:20
**properly** 75:24 76:4 146:14
149:22 165:24 175:15
**proposition** 272:12
**protect** 68:20 188:24
**protection** 89:7 271:8,11
272:15 274:10,22
**provably** 59:7
**provide** 11:14 46:5,21 64:7
64:22 121:21 134:9 175:20
196:24 294:3 298:24
**provided** 29:14 109:12
212:13
**provides** 174:7
**provision** 103:18 143:13
150:10 165:24
**provisioned** 127:16 220:23
221:14
**provisioning** 132:19 143:15
175:14 221:8
**provisions** 28:18 30:7 225:7
225:8
**public** 2:17 13:18 23:11 24:2
25:11 27:13 45:17 53:25
58:24 72:5 88:7,11 97:7,25
98:14 99:7 102:9 313:24
**public-** 129:16
**public-facing** 23:17 24:10
24:14,19 26:6,19,21 27:10
97:2 220:6
**publication** 92:10 99:23
**publicly** 25:1 26:15 51:18
82:17 276:6
**published** 92:8
**publishing** 115:9
**pull** 287:18
**purchasing** 97:21
**purport** 208:16
**purpose** 97:19 114:11
170:16 180:7 190:2 274:5
**purposes** 12:16 97:25
216:19 252:14
**pursue** 53:4
**pursuit** 294:22,22
**put** 24:3 36:7,9,12 42:10
98:14 100:4 114:13 131:14
147:5 166:3 186:9 253:16
269:17 292:23
**putting** 23:13 107:12 111:1

125:3

---

**Q**

**qualifications** 77:7 81:14
**qualitative** 257:20
**quantification** 257:15
**quantify** 267:22
**question** 10:17,25 11:1
16:12 23:14 24:15 30:17
31:13 32:18 52:2 54:13
58:9,11,11 70:4,17 71:2
72:15 74:20 76:18 94:2
102:5,5 103:22,24 108:7
110:17 111:12 116:11,15
121:2 129:2,9 135:3,22
137:6 139:3 143:1 151:13
156:13,16 169:4 172:23
177:7,24 187:17,21 191:2
194:4 200:10 205:25 209:1
218:22 233:1 242:25
243:10 245:14 251:23
253:2 259:2 267:10 269:23
271:21 273:25 274:15
275:18 277:10 279:24
286:17 291:21 309:10
**questions** 46:11 65:5 68:7
141:25 182:4 183:9 213:11
226:9 227:8 272:2 289:20
303:10 309:8 311:17
**quick** 74:15 95:13 154:20
172:19 205:17 217:5
258:10 274:21 278:20
300:20
**quickens** 279:9
**quickly** 10:12 60:22 140:15
229:14 271:15 272:7,14
275:10 276:12,15,17 278:7
278:17 279:4,5 280:14,22
297:19
**quite** 16:13 54:9 150:21
156:2 157:6 183:24 184:1
186:7 227:20 247:7 269:16
293:18
**Quitugua** 183:3,19
**quotation** 251:22
**quote** 109:11 112:21 113:13
120:8 167:13 237:2
**quoted** 101:16 252:25
254:15
**quoting** 109:14 118:22
146:1

---

**R**

**R** 2:5 3:1 4:1,12,17 313:21
**rack** 38:25

**RAF** 285:15
**range** 97:8,9
**rapidly** 272:18
**rare** 38:24
**Rarely** 274:3
**rate** 60:6 158:21 265:4,11,19
265:23,23 266:8,11 268:2
268:10,20 269:12
**rates** 266:6
**Rattray** 1:15 2:4 5:2,11 6:2,5
6:8 7:2 8:2 9:15,21 10:3
42:14,15 51:4 91:25 92:16
93:4,10 95:12 99:21 103:2
119:4 163:5,15 182:20
205:9 228:10 254:22 271:7
303:9,17 313:3 314:3,16
315:2
**RDR** 1:23
**re-roled** 133:7
**reach** 126:25
**reached** 126:20 129:24
**read** 23:2 53:12,19 79:8
113:8 121:15,16,19 143:8
145:20 146:14 154:21
160:5 162:20 164:19 165:3
165:8 166:7,25 167:5,6,7
171:6,13 176:1 187:15
189:6,15 190:2 191:3,13
191:19 192:14 199:13,14
203:4 205:16 213:10 217:5
220:10 226:17 237:18
257:12 264:16 289:12,17
291:25 294:10,14 300:20
300:22 314:4,6
**reader** 86:20 151:7 170:10
256:21
**readers** 145:2 255:10
**reading** 22:25 51:13,19
86:12,12 123:1 145:24
158:7 166:20 193:24
194:12 246:3 277:8 289:17
**reading/reviewing** 146:16
154:25 171:10 176:6
183:12 187:19 191:16
199:10 200:8 203:6 205:22
213:14 217:9 264:23
300:21
**reads** 85:10
**ready** 176:7 217:12
**real** 113:18 205:17
**really** 10:11 62:18 71:2
75:14,20 121:10 139:24
142:2 151:14 162:24
181:19 201:1 229:8 230:7
255:14 297:6 299:6

**Realtime** 1:24 2:7,9,16 313:22,22,23
**Realty** 113:14,20 120:1
**reason** 94:2 117:7 128:11 141:24 181:12 186:22 210:3 246:15,20,23 315:5 315:6,8,9,11,12,14,15,17 315:18,20,21,23
**reasonable** 68:8,23
**reasons** 98:21 178:7 180:16 229:21 243:1 263:19 293:9
**Reassigns** 6:10 92:13
**reassured** 104:1
**reassuring** 100:19 101:6
**recall** 25:9 27:8,8 50:9 51:24 51:25 60:6 66:4 90:23 91:2 163:23 175:24 198:2 245:8 245:10 279:22 282:2 289:14 296:9 309:16,20
**receive** 44:17
**received** 15:3 62:15 63:9 79:10 123:25 124:17 145:13 149:16 155:4,11 159:13 163:15 204:7
**receiving** 29:23
**recess** 50:23 95:6 182:14 228:4 271:1 303:4
**recipient** 149:21,25
**recognize** 293:23 294:15
**recollection** 100:5 148:16
**recommend** 299:4
**recommendations** 117:6
**record** 9:7,17 10:18 42:18 50:22 51:2 95:5,10 118:21 131:22 138:10,15 154:16 160:25 163:4 176:25 180:11 182:13,18,24 199:24 205:11 208:6,22 228:3,8 232:8 237:12 241:10 260:8 270:9,25 271:5 285:12 303:3,8 311:22 313:7
**RECORDED** 1:14 2:3
**red** 16:15 17:10,15 78:16 79:3,23,25 80:15,24 81:5 81:16 130:19 298:4,13,25
**redefine** 132:23
**refer** 54:3,18 199:14
**reference** 146:9 183:17 200:1 217:18 260:9
**referenced** 192:19
**referencing** 160:8
**referred** 49:16 264:9
**referring** 225:15 226:3,16 226:19 288:23 299:2

**refers** 92:25 226:18 241:2
**refine** 24:21
**reflect** 48:9 165:10 280:22
**reflected** 66:20 118:23
**reflecting** 226:9,9 245:1
**reflection** 260:3,3
**reframe** 54:10 102:4
**refreshes** 148:16
**regarding** 113:22 167:14 175:6 184:10 185:19 191:18 216:11 236:1 248:6
**regards** 73:5
**regions** 126:19
**Registered** 2:5,6,7 313:21
**regular** 124:3 145:15 173:13 173:14 312:1
**regularly** 120:17
**regulated** 108:22
**regulation** 89:6
**regulators** 106:10
**regulatory** 106:11 107:4
**rehear** 102:5
**relate** 74:10 147:21 225:8 242:22 289:20 290:2
**related** 27:9,14 28:8 41:4 47:2,3 51:13 64:21 73:25 74:18,23 75:20 76:17 98:17 104:8 130:23 131:5 141:22 155:24 158:10 164:6 173:22 192:21 202:8 203:19,22 217:6 234:19 235:19,21 239:5 260:4 294:18 299:15 313:12
**relates** 30:1,17,19 31:15 147:11 148:17
**relating** 166:16 167:25 168:25 231:11 279:23 291:6 309:19
**relations** 14:4
**relationship** 11:24
**relatively** 19:23 20:8
**releases** 236:4
**relevant** 12:19 54:3 67:14 73:24 96:21 101:9 113:7 114:5 118:4 119:9 124:1 126:9,18 134:14 145:13 153:8 155:7 157:14 181:19 183:25 184:2,6 186:7,18 200:13 253:17 258:17 269:19 277:19 305:13,18 305:23 306:16,21 307:3,7 307:8,11,12,16 308:4 309:1,15 310:4,6,14,16,21 311:1
**reliable** 305:22

**reliance** 309:14
**reliant** 252:20
**relied** 184:21 185:21 214:2 252:16,21 310:2
**relies** 305:12
**rely** 150:13 184:2,9 185:18 200:11 214:13 229:19 243:5
**relying** 127:23 184:13,22 186:5 239:13
**remark** 180:8 233:16
**remediate** 278:10
**remediated** 276:12,15,17 277:12,19 278:7,25 279:3 280:14,21
**remediating** 278:17
**remediation** 274:9,21 278:20
**remember** 25:19 43:10 44:6 50:6 65:22 92:9 139:14,15 170:23 172:8 253:18 276:8 303:21,25 308:12
**remind** 52:2 52:1
**remote** 3:8,9,18 4:13 65:23
**removed** 88:16,23,25
**render** 256:1,7 257:3
**reorienting** 192:2
**repeat** 31:25 72:15 74:20 103:21 110:14,16 129:8 144:14 180:10 187:17 194:3 243:10 256:3 259:1 270:10 297:23
**repeatedly** 265:6
**repetitive** 115:16 116:2 120:5
**replaced** 93:4
**report** 6:5,7 35:20 40:3,4 42:22 43:6,8,12 44:4,10,20 44:22 45:3,6,25 46:6,25 47:9,12,23 60:5 61:1,2 62:8 66:21 73:5 77:3,9 79:11 84:1 85:9 86:12 88:12 89:12 94:14 96:18 103:3 104:13,14 109:12 112:14,20 117:12 118:23 124:18 127:7 139:1 149:8 153:23 175:17 177:8 181:15 194:2 205:5 208:19 209:6,9,13,15 210:4 217:18 223:13 231:2 232:3 232:5,10 236:3,15 250:19 251:7 252:4 254:15 255:4 259:22 277:4,16 278:22 282:16 285:17 297:20 300:12 305:12

**reported** 89:22 276:4,13 313:8
**reporter** 2:6,6,7,8,9,10,11 2:13,14,16,16 5:12 9:18 10:13 29:18 42:15 313:1 313:21,22,22,23,23
**reporting** 9:9 51:19 81:11 89:23 269:14 298:23
**reports** 29:5 41:18 46:22 61:3 88:8 127:14 175:4 208:2 209:15,16,23 210:2 210:2,7,9 212:1,5 299:14
**repository** 276:5
**represent** 12:6 59:9 64:20 117:3 119:6 146:23 159:10
**representation** 54:7 120:11 123:11 191:6 194:8
**representations** 53:24 122:21 151:9 166:15 167:24 168:24 187:12,24 188:11
**representative** 126:14
**represented** 56:12 57:5 58:24
**representing** 53:9
**represents** 86:6,8
**reputation** 49:22
**request** 65:6 124:13 132:10 139:24 140:13,14 142:2 143:24 149:21 164:16 169:16
**requested** 5:17 64:4 131:25 132:1 165:14 177:2 204:16 313:17,17
**requesting** 155:4 159:13
**requests** 64:23 102:22 123:7 139:8 141:18 270:6 307:24
**require** 14:13,16 15:5,9 16:3 69:15 115:11 220:23
**required** 28:14 80:16,17,19 80:20 274:6
**requirement** 107:10,12
**requirements** 31:16 52:20 106:11 113:5 114:3 206:23 207:6,9
**requires** 207:13 227:19 230:19
**requiring** 80:23
**research** 14:19,20 15:20 16:1 45:4,7
**researcher** 276:4,13
**residual** 21:4
**resolved** 94:7
**respect** 18:11 96:14 139:10

143:19 191:25 254:1
306:22
**respective** 313:14
**respond** 10:17 101:25
119:20
**responding** 223:7
**response** 90:15,19 141:25
219:17 271:10,16 272:7
275:9,13,16 279:9 298:20
**responses** 226:8
**responsibilities** 82:20 84:10
**responsibility** 32:20 84:13
106:18 107:6 108:12
**responsible** 17:21,25 18:9
32:15 65:17 108:25 262:20
**responsive** 64:23
**restate** 66:15 233:3 275:20
300:23
**restroom** 262:1,6
**result** 69:22 263:1
**results** 79:8 207:14,24
208:1,3,15,17,18,21,22
209:2,3,4 210:7,17
**retained** 11:13,16 49:6
50:10
**retention** 50:2 59:16
**reverse** 132:25 218:4
**review** 7:9,18,21 29:16 34:4
48:8 62:9,13 100:25,25
161:13 172:2,18 173:14,20
184:9 185:18 199:6 202:10
206:14 207:17,20,22
211:17 236:1,21 237:3,18
237:24 239:6,14 242:2,13
243:19 263:10,12,23 264:4
281:17,20 310:13
**reviewed** 29:5,12 40:20
43:15 44:8 46:24 61:1
62:19 92:21 123:21 124:21
125:2,4 130:10 145:12,25
163:20 168:14 174:8 183:2
198:18,25 203:10 204:6
234:21 236:19 286:10,22
299:10
**reviewing** 29:22 44:6 63:15
173:3 174:23 213:18 246:5
263:4
**reviews** 33:10,12,13 171:4
171:17 172:3,8,15,24
173:23 175:12 203:5,9,20
204:20 206:16 209:23
212:13 239:24 240:8
244:25 245:12,18 307:13
**revise** 47:23
**revisions** 44:7

**revolves** 59:11
**revolving** 121:4
**rich** 144:13
**richer** 144:3
**Rickey** 147:14 148:18
**right** 10:8 11:13,22 12:2,16
13:10,18 14:5 16:9 20:24
21:17 22:7,23 25:3 27:19
29:21 31:19 33:6 35:21
36:10 38:17 39:6 41:22
42:14,21 43:4,9 44:16
46:19 48:13 49:24 50:20
50:25 51:8,9 55:14 56:14
57:3 58:19 60:10,17 62:1,2
67:16 70:13 71:3,25 72:3,8
72:14,19,24 73:3,11 74:6
75:17,22 77:6,18,19 78:8
78:11 79:17 80:21 81:22
82:19 83:7,17,18 84:10,16
85:1,2,7,15,16,18,19 86:2
86:7,23 88:3 89:3,10 90:1
90:5,16,21 91:25 93:19
94:23 95:3,8 96:14,20,24
98:10,15 100:8 101:13,19
101:25 102:7,16 104:3,7
104:19 105:3,6 107:17
109:16 111:7,9 113:10,14
113:16,23 114:6 115:20
116:9,19,21 117:3,21,25
118:24 119:4,21 120:1
121:5 122:11 123:14
125:22 127:21 128:7 129:6
129:13,17,19,20 131:3,9
132:1,7,11 133:1 134:22
138:7,8,13,24 139:6
141:12 143:20 145:4,23
147:4 148:7 154:5 156:11
157:2 159:4,8 160:6,20
164:10 166:2 168:12 169:1
169:5,12 170:19 171:18,20
172:8,23 173:3 174:13,17
174:18 175:16 176:8,15
178:21,23 179:4 182:2,11
182:16 183:20,23 184:11
185:14,25 186:8,9,19
188:12 189:4 191:1 192:1
193:3,17 194:14 196:9
197:4,13 200:3,19 201:13
201:19 204:9 205:1 209:20
212:18 213:7,25 214:3,6
214:14 215:4,10,12 217:21
221:18 223:19 224:14
225:16,17,23 226:4 227:2
228:1,6,10,19 230:21
231:7,12 233:12,16,17

239:7,15 240:25 244:4
246:8,19 250:3,18 251:3
251:14 253:25 255:14
258:1,4 259:12,20,24,25
262:8,13,19 263:14 264:7
264:8,10 265:8 266:7,21
267:24 268:9 269:14
270:19,23 271:3,7,13,23
273:16,21 274:2,10,20,22
275:8,11,25 276:25 277:6
278:12,21 282:22 284:9,12
285:3,8 289:15 292:6,21
295:22 296:16 300:11,24
302:1 303:1,6,9 304:6
305:14,20 307:4 308:2
311:16,18,20
**Right-** 270:2
**rights** 134:3,25 173:15
**risk** 34:25 81:24 96:5,10
99:15 105:18,25 106:2
107:14,23 196:21,22
224:16 235:19 247:22,24
248:2,3,6,9,14 269:9,13
277:21 281:17,20,24
282:13 283:4,6,9,15 284:2
284:3,15,17 285:15 286:10
286:21 287:2 289:5,22
**risks** 34:18 35:13,13 37:5
39:14 113:7 114:5 236:8
283:8,22 284:4,16,25
**risky** 283:17
**risumi** 83:25
**RMM** 236:4
**robust** 135:16 212:20 300:6
**Rohan** 89:25 93:2,7
**role** 29:8 41:12 63:18,24
64:2 68:10 83:23 84:5 86:9
86:10,21,22 88:15,21,23
97:4 111:16 112:4 132:24
134:18 136:13 153:1
293:20
**role-based** 122:12,22
123:12 124:14 126:4,22
127:12 132:24 135:9 137:4
137:23 140:24,25 141:3,7
141:22 142:12 148:25
150:8 157:11 158:10
162:23 165:24 166:13,16
167:25 168:11,16,25
169:23 170:4,14 173:22
174:24 175:9 179:2,23
181:22
**role/access** 132:4
**roles** 86:9,17,18 97:8,10
132:22 133:2,3,10

**rooms** 79:2
**rose** 100:16 101:10
**rough** 311:24
**routine** 262:23
**routinely** 261:25 262:6,12
**row** 285:22 286:2,7,25
**ROZALIA** 4:21
**ROZI** 4:21
**Rule** 46:4
**rule-based** 288:7
**rules** 10:10 103:8,19 185:8
**run** 16:15
**running** 71:9
**Russian** 280:3

---

**S**

**S** 3:1 4:1,12,12,17,17
**S-A-R-F** 123:22
**S-O-C** 41:15
**S-O-X** 40:5
**safety** 227:1 302:14
**salary** 82:8
**sample** 130:16 171:24 204:6
205:11
**samples** 123:21 124:8,10,20
125:21 126:13 128:19,21
130:23 131:13 138:25
139:11 145:12,22,25
146:19,24 155:3 159:12,16
163:25 168:3 171:17
204:10,24 209:17 211:12
**sampling** 126:7
**SANS** 22:15
**Sarbanes-Oxley** 71:19
**SARF** 6:17 125:17 126:25
127:1 128:22 129:12 130:7
131:17 134:15 135:2
139:23 142:1,6 145:12,15
145:25 150:2,5 152:13
155:11,24 156:18 160:14
160:16 161:9,12 162:13
168:10 169:15 174:21
178:17,20,21 179:12,19
180:16,17,18,24 181:4,13
181:19
**SARFs** 123:22,23 124:12
125:6 126:15 127:24
129:23 131:13 139:1,6,7
139:12,16,19 141:2,9,12
141:16,21 142:10,19 143:6
143:10,17,23 144:9,17
146:22 147:4 155:4 157:14
159:13,24 160:2,4 161:5
161:21 162:7 163:2,9,21
163:24 164:6,8 168:14,22

169:6,15 173:13 177:19
181:20 204:15
**save** 314:8
**saw** 80:8 92:6,9 154:1
155:19 188:10 212:15,16
234:19
**saying** 10:14 27:12,15,16
54:16 56:1 59:11 73:18
76:21 123:10 142:5,9
144:20 156:17 161:22
178:6 208:14 226:1 252:8
266:19 291:14 295:17
**says** 77:15 78:13,14 81:23
82:4,19 83:8,15 84:1,8
85:15,24 92:15 93:1,9,20
93:21 94:6 95:16 100:12
114:17 115:9,18 117:12
119:16,17 121:7 122:20
135:6 140:4,23,25 143:3
160:3,12,13 165:8 166:9
167:18 173:12 186:23
188:21 193:20 195:13
218:8 220:22 221:16
225:21,24 233:10 237:3
241:13 258:5,7 289:1
**scans** 210:18
**scheduling** 207:13
**school** 13:25 14:3,6,7,9
45:16
**science** 13:6,7,8,9,10,16
14:13,15 82:2
**scope** 57:9 98:7 103:5,9,11
144:24 157:7 158:22
**scoring** 111:22
**screenshot** 183:20 184:23
215:7,9 305:17,24
**scrub'** 199:17
**SDL** 33:17,18 34:6,8 200:12
206:7 214:3 293:11,17,24
295:6,12,15,16 296:10
304:10 309:19,23
**se** 108:4
**Sean** 4:5 218:8
**Sean.berkowitz@lw.com**
4:10
**search** 64:8,13
**SEC** 9:14 10:6 50:8 51:15
52:11 53:23 315:3
**SEC's** 50:3 51:6 52:5
**second** 39:8 40:3 71:2 83:15
84:7 86:24 92:15 93:21
100:11 109:21 115:22
116:8,16,25 127:9,22
176:10 179:5 208:5,9
225:1 238:15 284:13

288:24 291:6 292:24 301:4
302:1
**second-to-last** 140:20
188:16 217:23
**secret** 68:5,22 90:24 91:2
93:21
**secrets** 68:20
**section** 123:19 197:19 243:6
238:16
**sections** 210:13,20 236:19
238:16
**sector** 99:15 100:14
**secure** 32:24 33:3,5,11,14
203:23 212:11 214:25
250:15 292:11 293:1,11,21
293:22 294:4,18,23 295:9
295:19 303:20 304:15,22
305:1,7,10
**secured** 304:4
**securities** 1:4 3:4 24:10,25
53:22 70:3 73:15 74:8,12
75:2,6,11,16 96:22 102:10
120:12,23 122:21 123:11
128:25 135:8 136:22 140:3
140:17 142:3 143:19
144:25 145:2 153:14
157:12 158:24 166:16
167:24 168:24 170:9,10
173:17 179:24 180:21
181:24 188:14 189:19,24
190:3 191:5,21 192:24
193:24 194:14,24 196:7
197:9 206:7,12,21 212:8
229:24 234:9 240:2 244:19
246:14 250:17 255:7
256:22 258:18 290:22
291:11,15 310:22
**security** 6:11,15 7:9,15,18
7:21 12:22 13:1,21 14:3,17
14:22,24 15:6,10,14,16,18
15:22 16:19 21:23 22:22
23:1,2,8,12,19,23 24:3,4
24:14,20 25:6,12,16 26:1,4
26:6,8,19,21,24 27:4,5,12
27:14 28:14,17 29:4,10
30:14 32:7,15,21 33:7,12
34:12,16 35:13,15 37:1
39:12 40:24 52:12,15,16
64:21 68:11 69:1 73:8
74:19,24 75:13,21 76:4
83:9,16 84:5 85:11,24 86:9
86:18 89:16 92:13,18,20
93:8 94:17 96:16,25 97:3,7
97:13,22 98:1 119:7,17,18
119:20 120:2 121:15,18,20
121:23 125:11 129:18

130:1 139:25 142:7 144:1
151:5,7,10 152:18 153:9
153:12,16,17,23 154:3
156:9 158:10,14 159:1
167:13 175:6 187:13,24
188:6,7,11 194:7 196:21
196:24 198:4,25 199:2
201:2 202:17,22 203:5,9
203:17,20 204:20 207:1,9
207:12,15,17,19 209:22
210:15,16,21 211:17
212:10,13,24 214:8,23
218:11,13,24 219:6,18,20
219:24 220:6,10,14 221:10
221:15,17 222:14 224:6,16
224:19 225:9 226:2,13,24
227:5,22 229:2,6,6,22
230:17,19 235:19 236:20
236:22 238:8,13,18,19,19
239:24 241:3,14 242:7,22
243:19 244:6 245:2 246:2
246:3 249:2 254:25 255:5
255:11 256:2,8,10 257:4,8
257:9,16 258:3 263:19,20
271:14 272:6,16,21,24
273:3 274:17 275:1 276:3
276:12 277:25 278:10
281:10,12,14,16 284:4
288:16,17,22,22 290:14,21
290:21 291:24 292:1,16,20
292:23 294:7,12 295:5,8
304:7,19 307:13,19 310:12
**security-related** 98:20
236:23
**see** 10:16 24:4 26:9 36:23
36:25 38:16,25 44:7 64:4
77:21,22 95:16 96:24
100:20,21 109:23 112:19
112:23 113:16,16,18 117:9
117:14 118:8 119:21
120:20,21 123:2,9 130:25
131:24 132:25 133:4
134:25 137:9 140:21 142:6
144:25 145:6,9,16 148:3
148:11 149:23 151:15,22
155:14 157:1 159:18
161:13 164:2 170:12 171:5
173:6 179:9,23 181:2
183:5,16,25 187:14,25
188:20 189:1 191:11 193:8
197:22 199:4,18 201:8
204:8 206:16 208:2 213:24
217:22 220:19,25 222:8,16
228:25 229:4 231:12
232:18 233:13 234:6 235:6

235:16 236:25 237:7 241:5
241:15 244:8 245:3 247:1
249:9 250:23 251:1,1
286:2,4,6,10,12,15,23
291:23 300:19 301:21
**seeing** 127:15 166:24
297:15
**seek** 269:2 293:6
**seeking** 27:7 186:24 229:11
**seen** 23:24 24:5 41:18 42:7
92:3,23 119:10 129:23
130:14 152:14 174:3
176:16 177:11,24 178:3
179:11 181:4 210:25
219:22 232:20 235:6
236:17 249:23,25 250:4
253:2 284:5 301:16 308:18
308:25
**sees** 114:20
**seize** 93:22
**select** 63:19,21
**selected** 124:9 145:23
146:20 149:12 204:10,21
204:21,23 205:4 211:12
239:18
**selecting** 63:18
**selection** 124:17
**self-assessed** 110:4
**self-assessment** 110:24
**self-evaluation** 111:11
**selling** 197:10
**semantic** 85:20
**send** 43:18
**sends** 183:19
**senior** 82:22 84:14
**sense** 15:24 80:4 125:12,24
157:7 192:5 232:17 233:23
296:6
**sensitive** 143:3 167:19
**sent** 92:21
**sentence** 53:21 54:8 69:25
73:22 78:14 84:8 85:9,10
86:24 93:9 94:16 114:1,11
114:13,25 115:3,15,17,23
115:24 116:5,8,8,16,18
117:1,2 123:2 140:24
143:2,2 155:2 158:7
159:11 165:3,8 167:16
176:10 177:15 179:6 188:3
188:21 189:6,15 191:18
192:2,3,14 193:20 194:16
195:13 210:12 213:17
215:13 220:22 237:18
238:15 239:20 240:13
241:2 242:14 243:25

Gregory Rattray
2/12/2025

23

244:21 245:6 251:2,17,20
252:7,14 253:25 265:2
287:17 288:24 291:25
298:2 301:4
**sentences** 167:10 195:16
199:12 251:22
**sentiment** 218:12
**separate** 20:25 28:11 48:2
65:25 180:24 288:13 289:2
292:16
**separately** 8:8 211:4
**separating** 289:7
**separation** 290:24 292:5
**sequential** 162:1
**series** 206:24 259:23 260:11
278:2 299:13
**serious** 258:22 259:6,24
263:14,22 281:8
**Serrin** 3:17 11:20 49:8
**Serrin.turner@lw.com** 3:22
**served** 48:12
**Service** 90:24 91:2 93:21
**services** 11:14 99:14 106:17
**serving** 48:24
**sessions** 61:10,12
**set** 20:3 28:20,23 36:16
37:23 47:11 55:5 66:12
81:15 117:5 121:7 125:8
141:19 143:4 144:3,13
155:17,21 167:20 169:8
172:7 173:1 174:9,12
181:21 185:21 200:17
202:19 206:20 211:9,15
212:12 214:18 253:18
255:6 269:11 275:6 281:13
285:21 288:2 290:21
304:24 313:15
**sets** 71:23 125:1 209:19
**setting** 31:23 32:1 52:19
**settings** 305:18
**severity** 277:17 281:3
**share** 94:8
**shared** 218:9 221:17 225:9
**shareholders** 104:1
**sharing** 219:11,14,22 220:4
220:12 221:3,11 226:10
227:3,13
**Sheet** 5:14 314:10 315:1
**shift** 122:11
**short** 54:25 65:4 185:11
229:14
**shorter** 42:3
**Shorthand** 2:11,14
**show** 40:23 123:18 128:8
143:7 169:15,16 174:20

180:11 181:12 187:2 208:1
210:19 224:1 236:6 242:18
246:10 283:7 284:16 285:4
300:11 310:20
**showed** 104:2 125:22
150:14 173:25 185:23
**showing** 69:4 71:14 130:9
186:20 223:9 239:10
306:19
**shows** 178:22 205:15
207:13,20,20,23 277:23
281:9 287:1 306:9,12
307:17 310:23,24
**side** 32:1 48:3,3 77:25 78:1
**signature** 278:24 279:10,13
279:23 313:17
**signed** 280:10 314:16
315:24
**significant** 71:12 203:10,13
203:18 222:14 224:6,8,19
226:2,13 227:5 230:17
261:4,8,12,14 264:4
279:11
**similar** 24:7 31:1,13 41:16
77:21 78:10 80:13 96:4
100:3 113:21 114:8 125:7
146:18,21 200:15 204:12
205:1 209:19 245:13,20
273:4
**simple** 19:20 20:8 56:22
240:11 244:5
**simply** 75:8 242:4 251:24
253:5
**simulate** 300:16 301:7
**Simultaneous** 102:20 123:5
163:17 231:20 267:5 270:4
290:15 307:22 308:13
**single** 173:8 211:24 215:20
245:25 261:20
**singular** 76:14 108:17,24
260:2 261:17 278:3
**sir** 10:7 18:24 53:10 62:2
69:24 94:13 96:17 100:8
104:7 109:20 112:16
119:15 122:12,24 123:17
145:4 154:5,19 155:2
166:2 170:19 172:11
175:16 182:2 187:5 197:13
200:10 213:1 230:25
250:18 264:11 285:18
311:17
**sit** 52:6 275:24
**situation** 24:7 38:10,23 68:2
68:3 94:7 106:9 151:17
170:1 217:6 219:13 223:9

266:3 267:14 273:4 275:4
276:9 280:11,18 282:8
284:22 288:1 299:7,8
306:18
**situations** 70:19,19 272:5,9
272:19 284:4
**skill** 20:3
**skills** 19:16 20:19,21 29:25
31:14
**SkyWest** 113:14,16,21
120:1
**slide** 7:8 199:15 200:11
202:10,15 306:22 309:19
309:23 310:3,5,15
**slightly** 100:16
**small** 38:16 82:12 90:11
93:17 255:25 256:6 296:4
**SOC** 41:17,18,20 71:19
**software** 15:6,14,15 21:3
32:11,16,22,24 33:15 35:4
197:20,25 198:5,11 203:11
203:16 206:11 235:20
236:3,8 238:19,20 249:3,4
280:5,9 292:12 293:1,22
294:4,19,23 295:9,19
296:1,4 299:13,22,25
300:4,14 301:6 304:20
305:1
**Solar** 64:25
**SolarWinds** 1:7 6:15 7:7
9:14 11:24 12:7,8 24:4,7
24:17 25:3 45:24 50:4,8
51:6 52:5,14 59:17,18,21
59:24 64:22 65:1,3,4,7
67:13 70:1 71:12 73:20
75:15 76:20 97:19 119:17
120:14 126:15 129:15,25
132:21 133:9 140:4 149:25
150:7 151:8,22 152:8,13
153:9,11,17 157:10,20
158:25 165:9,17,23 168:4
170:12 174:8 182:24
186:24 187:10,22 190:5
194:10 196:16 197:3,9,10
197:12 198:22 200:12
202:16 206:6 215:19
218:10,24 219:17 229:2
234:12 246:4,6 252:23
254:23 255:19 256:23
258:8,14 263:18 276:4
277:24 280:5 281:10 287:1
288:13 289:1 290:1,11,20
291:5,16 299:10,17 300:9
302:20 304:4 306:25
307:18 315:3

**SolarWinds's** 22:22,25
23:17 53:25 54:17 119:7
121:15,22 128:23 145:1
158:9 166:12 191:6,8
194:8 197:1 203:11 206:11
220:6 221:10 234:8 240:7
250:16 252:18 258:5 265:5
265:12 305:22 307:7
**sole** 158:8 214:24
**solely** 150:14 252:20
**soon** 260:10
**sophisticated** 20:10 280:3
**sorry** 53:14,15 78:5 89:13
106:3 110:14 122:14 145:7
146:8 158:3 166:21 170:22
190:22 211:23 221:20
238:10 262:5
**sort** 14:19 26:5 29:25 30:16
30:24 31:14,25 33:13 34:9
35:12 36:22 37:20 38:3
39:3,16 40:14 43:7 51:16
51:17 66:15,20 71:17,25
73:6 76:2 79:20 96:10
97:20 101:14 105:14
108:21 112:20 117:25
123:18 125:1,8,22,23
126:1,3 127:18 130:14
133:11 136:21 139:20
148:15,23 150:25 152:7,18
153:1,19 155:23 158:13
169:25 178:5,13 179:25
187:8 196:22 207:17
211:24 212:6,8 215:18,22
219:21 228:25 229:17
230:7,23 232:11 234:11
235:16 241:1 243:20
244:11 247:10,15 248:5
251:10 256:18,23 257:6
258:3 260:2 263:6 265:16
269:4,11 271:9,20 274:24
280:11 281:7 283:10
284:20 285:19 288:6,7
292:16 294:2,8,25 295:18
301:24 308:7,25
**sorting** 221:20
**sorts** 65:19 98:18,19 154:2
169:11 207:14,24 267:11
306:2
**sotto** 188:15 231:5 264:14
**source** 166:10 186:14
294:25
**sources** 66:13 157:8 158:12
173:24 204:3 229:21
253:13 294:18
**SOUTHERN** 1:2

**SOX** 40:5,9,19,23 41:2,10
222:15 224:6 225:2,7,10
226:2,16,20,24
**space** 49:23
**spans** 285:22
**speak** 61:17 114:12
**speaker** 102:22 123:7 270:6
307:24
**speaking** 96:25 103:12,19
184:15,25 185:1,3 188:15
231:5 264:14
**spec** 234:16
**specific** 14:8 17:14 20:7
25:8 27:9 36:6,16 51:16
77:5 79:5,13,15 106:14
112:9 115:12 128:13,18,19
128:20 137:10 144:9,22,23
147:17 149:4 151:17 152:8
164:24 177:22 180:13,15
210:9 219:13 220:11 225:7
225:10 226:16 234:22
235:12 236:11 239:21,22
240:14,15 242:15 243:25
244:11 245:10,23,24,25
248:25 249:18 250:1,7,13
254:17 258:16 266:3 268:8
271:19 275:4 276:8 278:19
283:25 284:1,8,22 285:4
287:5,6 302:9 304:24
306:18
**specifically** 66:6 99:5 100:6
113:25 118:4,18 147:13
208:2 235:11,21 252:6
276:19 284:11 288:23
**specifications** 113:4 114:2
115:13
**specifics** 25:15 34:10,11
46:24 47:4,8 55:24 91:21
94:5,10 115:8 165:20
177:19
**specified** 176:13,17 177:9
178:10
**specify** 31:8
**speculated** 234:16
**speculating** 178:12 180:5
**speed** 206:3 281:6
**spell** 22:11
**spent** 12:14
**split** 83:3
**spreadsheet** 285:16,19
287:1
**Spring** 96:13
**sprint** 199:17
**SRM** 7:9
**stage** 33:12 81:25 245:2

**stages** 268:24
**stakeholders** 100:19 101:7
101:13
**stamp** 205:13 232:8 237:15
285:14
**stamped** 217:19
**stand** 94:15
**standalone** 141:12
**standard** 39:18,21,25 69:25
70:5,20,23 71:22 75:23
76:3,8,15,19 77:5 114:19
118:11 133:2 156:21 179:7
179:14 180:3 295:12,20,22
295:24 296:8 297:3,5,9
**standard-setting** 118:14
**standardized** 133:8
**standards** 35:22 36:3 75:25
113:1,4 114:2 115:12,19
116:23 117:6 120:15 121:8
**standing** 141:9
**standpoint** 80:18 136:3
162:25
**start** 69:12 184:5 213:10
277:13
**started** 28:2 308:6
**starting** 28:1 46:11 223:14
298:17 307:18 310:9
**starts** 112:17 175:18 181:16
205:12 234:1 269:13
**state** 2:12 52:15 105:1 108:2
123:21 166:6 167:22 187:9
190:20 194:6,18 198:17
232:11 236:17 313:24
**stated** 115:5 117:11 118:6
179:24 208:21 236:2
252:24 310:8
**statement** 6:16 22:23 23:1,8
23:19 24:4,10,17 26:1,8,19
26:22 27:4,6,10,12 52:13
52:17 55:21 57:10 58:5,14
59:4 70:3 72:7,18,23 73:5
73:9,15 74:8,13,19,24 75:3
75:6,11,21 93:6 96:23
97:19 98:1 100:22 102:10
109:8 113:22 116:1 119:7
119:24 120:3,12,14,16,17
120:23 121:16,18,20
122:21 128:25 129:18
130:1 135:8 136:23 139:25
140:4,17 142:3,7 143:8,19
144:2,25 145:2,6 151:5,7
151:10 152:18 153:9,12,14
153:17,23 154:4 156:9
157:12 158:7,10,15,24
159:2 166:16 167:14,25

168:19,25 170:9,11,17
173:17 175:6 178:9 179:25
180:10,21 181:24 187:13
187:22,24 188:6,7,11,14
189:7,19,24 190:3,12
191:21 192:24 193:24
194:14,24 196:8,24 197:10
206:8,13,21 207:12,16
212:10,24 217:6 220:6,10
220:14 221:2,10,15,17
222:18 224:25 229:24
230:24 233:25 234:10
238:5,9,10 240:2,6 244:19
246:2,3,14 250:17 252:20
253:4,19 255:1,8,11 256:2
256:8,10,22,22 257:4,9
258:3,15,18 263:19,20
274:11 281:14,16 288:22
290:22 291:11,15,24
292:16,20,24 304:7 306:9
310:22
**statement's** 123:11 191:5
194:7
**statements** 23:2,23 24:2,14
24:20,25 25:11,19 26:4,24
27:13 52:23 96:25 97:3,7
97:15 98:14,19,22 99:3,4,8
99:9 100:24 102:9 115:6
144:16 206:12 212:8
307:10
**states** 1:1 2:18 112:24
118:10 193:5 255:5 278:22
287:15
**static** 212:25
**statistical** 156:1,24 158:16
**statistically** 155:17,21
**steal** 154:13
**stealthily** 271:15
**stemming** 283:8
**Stenographer** 1:22 47:19
102:22 110:12 123:7
161:10 165:5 219:8 256:14
270:6,8,11 307:24 311:23
312:1
**stenographic** 9:16
**step** 245:18
**steps** 39:17,18 100:17 101:4
214:8 245:17 246:15
248:16
**Steve** 294:11
**stipulated** 119:8
**stock** 100:14,15 101:10,12
**stockholders** 101:13,18,20
101:23 102:3,9,13
**stolen** 262:10

**STONE** 3:9
**stop** 176:15 218:11,14
222:11 225:22,25 254:3
**stopped** 58:3,11 59:8 96:19
**stories** 210:14
**straightforward** 19:23
**strategy** 17:6 81:24 82:24
96:4,9
**stray** 213:22 215:14
**Street** 3:10
**strong** 30:5 56:18,24 128:15
144:17 179:1,21 180:18
206:17,19 212:14 216:6,7
216:7,11 240:18 246:23
261:18 274:10 281:10,15
306:7
**structure** 38:7 89:8 206:25
226:25 260:5 269:7 298:14
298:22 302:9,12,13
**structured** 78:17 298:5,9
299:2 302:5
**structures** 18:6 26:13,25
34:25 36:6 41:21 112:9
**study** 14:11
**studying** 186:18
**subject** 74:17,22 94:25
103:3 148:1
**submitted** 180:25
**subparagraph** 300:25
**subset** 169:9 205:4
**substance** 46:3 239:14
251:4
**substantive** 138:19
**substitute** 274:9
**substitutes** 274:17
**suffer** 100:14
**suffered** 90:4
**sufficient** 126:2 144:20
180:20 181:22
**suggestions** 46:22
**Suite** 4:7
**summaries** 210:7,17
**summarized** 209:5
**summary** 209:3
**summer** 105:9
**Sunburst** 51:21 279:17
280:2
**supplier** 196:15,16
**support** 97:16 99:17 240:6
253:3
**supported** 106:15,16
**supporting** 203:25 211:18
**supposed** 121:8 134:4
261:25
**sure** 12:5 14:25 22:16 23:7

23:13,15,15 24:22 50:16
54:9 56:8 58:8 66:16,17
72:16 74:21 75:12 95:2
110:19 113:15 118:12
122:9 123:1,3 126:8
128:14 129:3,10,10 136:6
139:17 146:13,15 147:25
147:25 156:15,15 161:20
164:5 165:2 167:4 168:21
171:7 173:2,8 176:2,21
180:19 182:7,7 183:8
189:18 190:12 191:13
199:7,8 200:5 205:18
210:25 224:14 233:2,4
243:12 247:7 253:9 256:4
259:4 264:2 269:24 276:21
276:24 277:3 282:11,13,21
286:14 293:18 297:24
302:23 304:19 310:17
**surprise** 296:13
**SW-SEC-00166790** 232:9
**SW-SEC-00254254** 217:19
**SW-SEC-00296522** 171:24
**SW-SEC-SDNY-** 131:20
**SW-SEC-SDNY_00050922**
177:3
**SW-SEC-SDNY_00055006**
241:11
**SW-SEC-SDNY_00055119**
205:13
**SW-SEC-SDNY_00069825**
237:16
**SW-SEC-SDNY_00184276**
200:2
**SW-SEC-SONY** 7:10
**SW-SEC-SONY_00047323**
6:22
**SW-SEC-SONY_00049602**
6:20
**SW-SEC-SONY_00050922**
7:6
**SW-SEC-SONY_00055006**
7:23
**SW-SEC-SONY_0005545**
6:18
**SW-SEC-SONY_00069825**
7:20
**SW-SEC00166790** 7:17
**SW-SEC00168780** 8:6
285:14
**SW-SEC00254254** 7:14
**swear** 9:19
**switch** 182:2 265:4
**sworn** 5:11 9:21 313:3
**synonymous** 168:17 169:24

247:24
**system** 20:22 31:10 89:7
133:4 140:12,13 143:11
169:8,16 173:2,7,19 175:8
175:9,10 179:3 273:3
282:5,7
**systemic** 255:22 262:3
265:15,17,25 266:2,24
269:6
**systems** 1:24 16:10,14 17:2
21:23 30:8,10,11 31:20
41:5 76:11 136:12 141:1,5
143:4 165:20 167:19 193:7
193:14 195:14,21 257:25

--- 
**T**
---

**T** 4:12,17
**table** 238:3,4 240:5 241:15
241:18 242:21
**tactics** 28:20 29:18
**take** 10:21 11:1 16:21 34:18
39:13 40:22 50:15,16,17
83:23 88:20,22 94:25
100:17 101:5 131:9 164:17
172:19 183:10 191:12
200:4 217:4 227:9,23
236:12 258:10 262:2
270:21 300:20 302:21
305:3
**taken** 2:4 10:7 13:12,14,15
15:13,15,17 16:6 26:18
50:23 81:18 95:6 138:11
143:25 182:14 228:4 271:1
303:4 313:5 315:2
**takes** 231:4 254:2
**talk** 10:15 91:20 110:3
138:21 224:20,22 230:23
243:14 259:13 268:8,14,15
299:2
**talked** 39:9 49:3 68:25 96:15
96:25 130:21,22 165:22
173:12 178:4 204:5 207:7
244:3 252:20 302:11
305:16
**talking** 18:21,21 20:21,25
23:8,16 38:1 55:25 72:11
97:3 112:8 142:17 145:18
149:5 150:20 169:25
175:22 176:20 197:8,20
201:10 204:14 214:5
219:12 221:7 225:20
228:17 230:14 243:25
252:10,12 253:4,5,22,24
262:15,16 263:17 266:18
269:25 270:13 272:4

278:12 283:25 284:7 285:5
287:5 289:9,11 290:13
292:8,15 302:2,12 309:25
310:1
**talks** 86:24 87:20 145:10
194:19 207:11 251:17,18
277:16 292:4
**task** 96:22 180:12 188:5
266:5 268:17
**team** 6:11 12:4 16:15 17:10
17:15 61:4,6 78:16 79:3,24
79:25 80:7,15,24 81:5,16
82:22 84:13 92:13 93:17
96:9 100:4 106:22 107:1,1
107:5 111:21 134:21
135:12 138:21 195:1 197:6
197:11 204:17 244:6 245:1
245:12,19 249:15,21 275:9
298:4,20 302:4
**teaming** 298:13,25
**teams** 21:5 34:5 65:16 78:14
79:1 170:11 196:14,14,25
197:7 207:2 236:7,24
238:6,17 242:9 249:25
252:9,12 253:6 294:6
298:3
**technical** 17:22 18:1,6,12,13
18:15,21,23,25 19:15
20:15 29:25 31:14,18,21
80:18,25 81:10 113:4
114:2,19 115:12 120:15
121:8 136:3 162:25 191:9
192:12 194:11,22
**techniques** 28:20 29:18
**technologies** 115:20 216:10
**technologist** 19:21
**technologists** 202:8
**technology** 13:14 14:11
15:20,21,22 34:5,17 35:23
37:2 113:1 134:8,21
192:17 202:20 229:3 288:2
288:4
**Technology's** 116:23
**tell** 46:2 49:23 70:24 131:12
134:2 141:3,9 149:13
150:12 160:22 164:15
171:21 172:17 205:15
206:4 274:5 300:12
**telling** 253:1
**tells** 116:4 136:12
**temp** 179:8,14 180:4
**temp's** 181:5
**template** 206:24
**templates** 238:16 242:6
**temps** 176:14,18 177:10

178:2,11
**tend** 227:18 284:21 305:1
**tends** 302:16
**tenets** 220:5
**tens** 267:8
**term** 54:8,14 56:24 219:10
234:4 247:4,6,8,11 248:14
279:16 293:12,14 296:17
303:20 304:17,21
**termination** 181:1
**terminology** 51:16 248:5
**terms** 16:14 30:10 31:22
34:23 40:17 41:19 46:11
56:10 61:23 64:8,13 70:14
71:5 81:9 93:15 97:2
115:12 125:12 134:16
144:15 147:12 148:25
156:9 158:16 172:21 174:1
174:14,19 175:7 177:24
190:11 192:10 200:22
209:3 212:22 226:20 229:1
238:17 243:9 247:14
248:24 252:18,25 258:2,14
269:16 283:15 293:5
298:15,22 301:18 303:19
306:17 308:23
**test** 81:17 207:14 208:1,3,15
208:17,18,21 209:4 216:18
**tested** 301:22
**tester** 301:17
**testers** 311:9
**testified** 9:23 138:1 186:11
300:9
**testify** 11:10 69:19 103:1
**testimony** 43:15 47:18
48:17 71:13 103:6 135:11
141:13 143:22 150:16
184:19 186:23 194:2 251:9
251:25 252:2 306:17 313:7
314:5,8
**testing** 17:11,15 78:15,17
78:21 79:6,15 198:25
199:2 201:2 204:4 207:11
207:13,14,23 209:14,16,23
210:10,16 212:12,25,25
298:4,6,10,12,17,21,25
299:2,4,11,15,19,21,22
300:3,6,14 301:5,5,11,19
302:5,6,16,17,18 311:4
**tests** 79:3 81:19 210:18
**Texas** 2:10
**text** 188:17
**thank** 18:23 29:21 53:18
123:16 162:3 187:8 205:21

219:4 227:10 287:8 303:11
303:12 311:17
**thanks** 50:18 132:12 138:7
270:21
**theoretically** 152:11 268:16
272:18 276:1
**thing** 10:24 11:3 27:15,17
48:8 172:20 264:7
**things** 19:3 26:15 28:23
30:5,8 32:1 38:22 53:9
57:11 65:19 74:4 75:15
77:23 81:15 86:16 97:14
98:18 99:14 116:4 117:25
136:17,25 140:11 142:19
144:21 148:23 152:19
158:14 178:25 183:8
186:20 188:7 192:5 196:17
196:18 204:4,18 206:3,22
206:25 207:7,10 210:1
212:3,23 214:19 217:22
227:18 229:5 238:21
240:13 242:11,19 244:7
246:24 248:12 255:7 257:6
257:13 265:21 267:12
281:16 304:18 308:5 310:8
**think** 20:6,13 24:3,20 27:8
27:16 29:15 30:23 35:18
36:15 37:8 38:14 39:20
47:14 55:5,6 56:11,25 60:5
60:9,12 62:5 66:22 74:6
80:3 85:19 86:11,19 88:14
93:14 100:4 103:7 104:11
110:23 115:3,22 117:22
124:24 126:21 129:1
134:16 142:9 149:9 150:24
154:14 155:23 156:8 161:1
161:3 162:14,20 163:4
171:21 172:22 176:7
177:13 179:15 181:9
183:13 184:4,13 194:24
196:6 199:5 204:14,24
223:8,20 224:18 227:3
228:23 229:20 230:16
231:22 234:2 247:17
248:21 249:15 251:15,16
251:23 255:20 256:21
258:11,21 259:5,11 260:1
266:17 267:18 270:13,20
271:12 272:11 273:14
276:18,22 277:3 278:8
279:3 282:15 283:24
286:13 289:19 293:3
297:11,17,17,18 300:22
304:2 305:16 309:21,21
**thinking** 27:12 97:20 121:4

215:25 272:22
**third** 53:21 100:9 143:2
201:5 208:9 285:23
**thorough** 127:18
**thoroughly** 291:25
**thought** 139:21 214:3
224:16 234:25
**thoughtful** 180:19
**thousand** 83:12 86:25 87:3
93:16 94:20 123:22 125:5
**thousands** 145:12 177:19
179:12 267:8
**thread** 221:19
**threads** 218:4
**threat** 17:14 34:14,23 35:3,5
35:7,10,18 36:6,9,14,21
37:9 39:10,15,19 207:8,8
207:10 231:11 232:14,16
232:21,24 233:10,20,22
234:4,7,9,13,17,19,24
235:1,4,7,11,12,17 236:1,7
236:18 238:12 239:3 240:1
240:21 242:17,19 244:9,12
244:17 246:7,8,12,13,22
247:3,11,13,20,21,23
248:2,6,9,13,17,22 249:9
249:12,16,19,20,24,25
250:4,8,10,14 252:11,19
252:22 253:5,7,14,23
295:4,7,11,20 296:2,7,10
305:8,11
**threat-based** 34:18 37:4
39:14
**threatened** 93:22
**threatening** 248:24
**threats** 34:21 35:14 37:1
39:14
**three** 61:10 113:18 114:7,11
236:4 287:19
**thresholds** 269:11
**ticket** 6:19,21 7:5 147:10,25
148:17 150:1,3,23 152:13
161:14,15 164:23 175:23
178:16 179:5 181:4
**ticketing** 165:1 174:22
**tickets** 139:5,9,12,14,15,18
139:24 142:2,6 143:18
144:9 145:10,13,22 147:5
148:20,22 150:6 155:5,12
155:25 159:14,23 160:3,13
160:15 161:7 162:7,17
163:8,10,16,21,24 164:6,8
164:8,11 168:14,22 169:7
169:16 179:12 210:13,21
211:23 212:16

**Tim** 46:18,23 52:6,14 183:2
224:16 286:11,16,22
**time** 9:10 10:21,22 14:21
15:1 50:20,25 53:25 54:18
56:4 62:12 67:21 70:7 82:6
83:3 87:24 88:1 90:19
91:14 92:6 95:3,8 102:23
105:5 118:19 123:8 129:9
131:10 132:9 136:20 138:8
138:13 157:1,23,24 164:17
166:7 176:12,13,17 177:9
178:1,10 182:11,16 183:10
191:2 201:16 211:21
223:22 224:3 228:1,6
254:24 256:3 257:24,24
262:1 263:9 269:10 270:7
270:23 271:3 288:3 303:1
303:6,10,11 307:25 311:20
312:4 313:5
**times** 25:7 26:3 34:15 39:12
40:21 61:8 87:16 98:16
111:22 118:15 142:14
235:7,15 245:17 250:3
268:25
**timing** 253:10,18
**TIMOTHY** 1:8
**title** 96:11 243:6
**titled** 198:25
**today** 9:15,18 11:11 47:13
47:14 52:6 60:23 211:3
212:6 234:3 303:11
**Today's** 9:10
**TODOR** 3:6
**told** 219:25 230:12
**tools** 19:1,5,8,11,13,16,20
20:2,8,11,14,16 32:2,6
79:5,13,15,20 299:14
300:15 301:7,12,19,19,25
**top** 145:20 241:15
**topics** 122:11 182:3
**total** 12:12 61:22 169:9
244:20 270:3,15
**touched** 37:12 197:24
**tracking** 154:9 166:20
**trade** 68:5,20,21
**traded** 82:17
**train** 22:4
**trained** 149:24
**training** 81:18,20,21 306:22
307:15 310:9
**tranche** 124:16
**tranches** 62:17 124:15,22
204:13
**transcribed** 313:9
**transcript** 314:5,7

**treated** 218:20
**trees** 43:22
**trial** 69:19
**tried** 64:22 131:15
**trouble** 154:9
**true** 88:16,17,19 90:22
154:4 166:17 168:1 169:1
189:20,23 251:13 274:8
300:17 305:15 306:11
313:7 314:7
**trust** 53:6 113:14,20 120:1
**truth** 253:1
**truthful** 52:22 251:25 252:2
**truthfully** 11:5,11
**try** 54:15 267:17 278:9
**trying** 36:13 38:14,25 46:16
50:5 52:10 54:13 56:21
57:9 65:15,22 67:12 78:19
79:16 80:22 107:13 116:10
121:1 125:9 129:4,11
135:4,7 136:11 155:14
156:13 162:24 166:19
177:21 178:22 185:2 192:1
195:18 216:1 219:19
221:23 231:15,16 238:23
243:13 245:21 249:6
255:13,14 259:11 266:7
269:22 272:23 280:20
283:20 284:14 290:2 302:8
**Tufts** 13:22
**turn** 53:10 100:9 104:11
119:15 123:17 145:5,11
154:6 166:5 175:17 190:14
197:14 201:5 213:1 216:13
231:1 236:14 285:23 286:7
**turned** 53:14 56:19 211:20
**Turner** 3:17 5:6 12:6 16:11
17:23 18:14 19:7,18 20:5
29:17 30:2 31:17 32:12
40:10 41:7 42:6,10 43:16
43:20,22 44:21 46:10
47:17 49:13,22 50:13,18
52:7 53:16 55:3,23 56:23
57:24 63:2,4,13,20,23
64:18 70:9 72:9,25 73:21
74:25 76:6 80:2 84:18
90:25 95:2 98:6,25 99:10
102:1,8,18,24 103:10,14
103:16 107:16 108:15
109:25 111:5 116:12
118:21 122:2,7,9 127:3,6
127:25 128:2,4 130:2
132:3,8 133:17 134:5
135:20,23 137:12 143:21
148:7 154:8 157:3 158:5

160:1,7,12,25 161:19
163:3,14 164:17,19 165:18
168:7 169:2 180:6 181:7
182:10 183:10 184:12,17
184:22 185:1,6,10 189:10
189:17 193:18,25 194:15
202:13 208:6,10,24 210:23
214:4 215:11 218:15 219:7
219:10 222:21 225:4
226:11 227:10 231:19
239:16 240:9 243:8,23
247:5 248:19 251:12,23
254:9 255:2 258:25 259:9
261:6 262:5,11,14 264:15
266:17,24 267:17 269:20
269:24 270:10,12 271:17
272:10 273:9,17,24 274:12
274:14 275:17 279:19,24
280:16 282:21 283:1 287:4
287:24 288:15 289:16
290:13 291:9,13 292:14
295:14 296:20,23 299:20
302:23 303:15 304:13
308:1,15 309:3,8,13 310:1
311:5,7,19,23,25 312:3
**Turner's** 44:3 195:11
**turning** 94:13
**two** 17:7 28:11 48:2,15,16
61:15,15 65:4 77:23 86:8
102:25 148:12 167:10
195:16 241:19 248:12
251:21 279:9 285:22 290:2
302:22
**type** 24:17 81:4 164:16
196:25 206:15 207:11
227:19 232:14,16 233:20
233:22 258:21 259:5
305:25 308:22
**types** 16:20 63:14 64:10,21
174:4,15 190:6 210:1
212:2 263:25 267:25 273:3
300:16 301:7 310:8
**typical** 137:1 144:11 230:4
249:8
**typically** 249:22
**typographical** 43:8

**U**

**U.S** 92:16 260:15
**UARs** 142:19
**uh-huh** 42:17 67:11 77:11
87:1 89:18 95:15 99:24
100:10 104:10,16 108:11
112:18 113:12 114:23
115:21 120:13 123:20,24

124:6 131:18,21,23 133:14
135:24 140:18 145:8
146:25 147:7 149:7 154:7
157:19 159:22 164:14,21
166:4,8 167:17 175:21
190:19 192:25 197:16,21
198:21 199:19 201:7,17
213:3 216:15,22 217:16,25
220:15 222:6 223:15
227:11 228:15 231:18
235:24 236:16 238:2
243:16 250:20 255:16
258:20 271:25 274:7 277:5
278:14 279:14 282:17
283:5 285:6,20 286:1,16
287:14 292:10 297:21
298:1 301:1 302:3,7 307:2
**UK** 165:10
**Um** 274:13
**unable** 310:4
**unattended** 262:6
**unauthorized** 188:24
**unclear** 233:15
**undergo** 298:23
**undergone** 40:19
**underlying** 243:7,19
**underneath** 120:8 241:16
**undersigned** 313:2
**understand** 11:8 13:18 14:2
35:14 36:14 46:17 52:2
53:22 54:14 58:8 59:2 63:8
63:17 65:15 67:7 78:20
86:13,20 103:14 108:2
116:7,24,25 120:10 121:1
123:16 129:11 135:4,7
139:5,7 148:17 151:8
156:14 158:18 159:24
160:3,13 162:25 163:15
165:5 174:3 191:14 194:7
212:8 219:19 224:24
229:16,19 230:1 243:13
249:7 251:5 252:9 255:15
260:12 266:8 275:17
276:10 279:18 280:20
283:20 284:15 302:9
**understanding** 12:20 37:24
52:4,11 54:6 56:9 57:2
97:4 114:10 116:17 121:25
137:7 168:22 191:5 196:10
196:23,25 200:12 201:20
202:11 207:8 248:4 276:14
280:2 288:1,12 314:11
**understands** 170:14
**understood** 10:20 76:8
190:6 214:22 217:20 304:8

**undertaken** 81:20
**undertook** 25:15 106:16
**underway** 35:17 37:7
**underwent** 41:17
**unfortunately** 43:11
**uniformly** 156:11
**unique** 220:24 221:15
**unit** 93:12
**UNITED** 1:1
**units** 126:10,18
**university** 13:15,23 45:15
**unnecessary** 156:1 192:7
192:22 243:2
**unpatched** 273:2
**unrelated** 73:19
**unreportable** 102:20 123:5
163:17 231:20 267:5 270:4
290:15 307:22 308:13
**untrue** 256:2,8 257:4
**updated** 199:1
**urgency** 223:9 224:1 228:24
229:11,14 230:23
**urgently** 223:7
**use** 17:17 19:10 33:18,21,21
47:7 54:8,14 64:8 79:20
109:11 111:9,11 113:5
114:3,21 118:8 126:6
144:5 152:12 164:12 187:4
188:22,25 190:12 191:7
194:9,20 197:2 220:1,1
221:8 230:5 247:19 260:17
268:18 275:24 288:4,10
296:2 301:12,17 306:6
**useful** 176:22 187:1 215:24
**user** 6:23 19:23 20:8 30:17
30:20,21 31:3,7,10,15,20
139:8,23 140:14 141:17
142:1,10 143:15,24,24
144:18 149:21 157:22
171:4,17 172:2,3,7,15,18
172:24 173:13,14,14,19,23
174:22 175:2,4,11 194:19
219:24,25
**users** 31:5 121:22 174:9
175:14 220:23 221:14
**uses** 304:4
**usually** 19:10 21:4 25:1 31:3
124:21 283:24
**utilize** 76:25
**utilized** 107:19 150:9 185:25

**V**

**v** 1:6 315:3
**vague** 128:2 308:20
**VALENTI** 3:18

**valid** 273:6
**validate** 126:3
**validated** 137:4 138:3
141:20
**validating** 212:23
**value** 251:11
**varies** 83:6 268:6
**variety** 19:19 33:20 35:9
76:25 154:2,2 207:14,24
**various** 64:20 106:10
198:18 300:16 301:7
308:10
**vendor** 170:11 190:1 194:25
196:6,8,11,13 197:2,3,7,11
**verb** 80:19
**version** 119:13 285:13
**versus** 37:20 165:21 242:23
243:6 265:17 268:1
**video** 1:14 2:3 9:12
**videographer** 4:19 9:6,9
50:20,25 95:3,8 138:8,13
182:11,16 228:1,6 270:23
271:3 303:1,6 311:20
**view** 55:1 58:5,6 101:22
229:16 234:17 235:1,3
247:21 278:5 305:21
**violate** 220:5 283:22 284:17
**violation** 222:15 224:6,19
225:3,10,12,18 226:2,17
226:20,24 283:8
**violations** 38:16
**Virginia** 2:19
**virtue** 153:14
**voce** 188:15 231:5 264:14
**voluminous** 117:11,21,23
118:10,13
**voluntarily** 111:11
**voluntary** 109:14,15 111:8
114:19 117:13 118:7,11
**vs** 9:14
**vulnerabilities** 78:18 298:6
**vulnerability** 16:16 210:18
248:4,7 301:5

**W**

**W** 92:19
**Waack** 1:23 2:5 9:19 313:21
**Wabash** 4:7
**Wait** 295:14,14
**Waived_X_Not** 313:17
**walk** 10:11 205:14,19
**walkthrough** 206:1
**want** 23:7,9,13 29:17 36:24
39:7 46:2,15 50:12,17
53:13 54:11 56:8 58:8 62:2

63:7,8,13,17 66:17 67:10
71:25 75:12 77:6 79:18,19
94:25 104:7 109:11 113:15
122:2,23 123:1,3 124:4
129:1 139:3 145:17 146:13
154:12 155:8 164:11 170:3
176:15 183:7 191:3 205:24
210:25 216:23 217:10,22
227:18 228:16 251:4,4
252:6 253:8 258:6,7 263:3
264:15 265:9 267:18,25
269:20 270:10,12 274:4
282:3,11,21 283:3 285:18
286:6,13 292:21 303:10
311:24
**wanted** 24:1 64:4 65:2 91:19
123:18 126:8 136:4 227:21
229:13 232:15 233:21
**wants** 223:10
**WARDEN** 3:8
**warfare** 13:24 28:3,4 92:17
**warrant** 263:10,11
**Washington** 2:12,17 3:11
**wasn't** 15:23,25 25:2 57:8
75:13 77:4 88:25 108:17
134:22 144:8 149:24
150:21 153:1 179:16,22
180:12 216:8,8 252:19
266:4 279:11 281:8
**waterfall** 198:6,14
**Watkins** 2:19 3:16 4:4 11:19
12:3 44:25 45:2 49:10
59:17 60:3
**way** 24:25 26:16 36:14
38:21 59:8 100:18 101:6
109:16 111:9 119:8 120:12
137:1,8 139:17 145:1
161:4,19,20 170:5 174:1
178:8 180:16,20 181:13
224:4 229:1 240:20 252:3
257:5 284:3 285:21 288:2
291:15 297:9 305:2 308:7
**ways** 36:19 39:23 59:10
297:7
**we'll** 10:18,21 33:18 40:2
131:5 227:9
**we're** 10:14 18:20 20:21
23:7,13 27:16 38:6 51:2
53:6 55:25 56:18 95:10
118:19 138:15 143:7
150:25 152:7 176:20
181:10,10 182:13,18 214:5
221:19,25 227:3 228:8
230:14 243:25 256:19
259:18 262:15,16 263:17

264:18,18 270:13 277:5
278:12 285:4 287:12
289:21 293:19 295:17
303:8
**we've** 32:3 50:14 71:19 79:4
100:4 124:11 130:22
150:20 156:2 157:4 158:7
165:22 168:13 178:4 183:6
188:4 212:6 234:5 244:3
248:21 252:20
**weapons** 260:17
**website** 99:23 117:4,10,19
117:20 118:2,10,19,23
**websites** 117:24 118:15
**Wednesday** 1:16 2:21 6:3
7:3 8:3
**week** 83:6,6
**weight** 151:3
**went** 38:11 104:1 123:13
170:22 212:1 224:12
**weren't** 38:12 59:13
**WHEREOF** 313:15
**White** 17:6
**wide** 19:19 33:19 35:9 97:8
97:9
**widely** 268:6
**willy-nilly** 178:24
**within-entitled** 313:4
**witness** 5:2,20 6:2 7:2 8:2
9:19,22 11:21 12:8 16:13
17:24 18:15 19:8,19 20:6
30:3 31:19 32:13 40:16
41:8 42:8,12 44:22 47:21
48:25 49:8 52:8 53:19 55:4
55:25 56:25 63:3,22,24
64:20 70:10 72:10 73:1,22
76:7,10 80:3 84:21,23 91:1
98:8 99:2,12 102:2 103:21
107:17 108:16 110:2,16
111:7 123:9 127:5,8 128:1
128:3,6 130:3 132:5,11
133:18 134:6 135:24
137:14 143:23 148:8
154:13,17 157:4 158:6
161:24 163:19 164:18,21
165:7,19 168:10 169:3
171:13 177:4 180:9 181:9
182:5,8 183:13 185:5
189:11,18 193:19 194:3,17
202:14 208:8,11 209:1
214:5 215:12 217:4 218:17
219:11 222:22 225:6
226:12 227:11,25 231:22
239:19 240:10 243:9,24
247:6 248:20 251:15 252:1

255:4 256:15 259:1,10
262:15 264:18 267:3,7
269:22 270:17,22 271:18
271:24 272:11 273:10,22
274:13,16 275:20 279:20
280:1,17 287:9,25 289:21
290:17 291:14 292:15
295:17 296:22,24 303:12
308:21 311:8,18 313:15
314:1
**witness's** 313:7
**witnesses** 102:25
**won** 69:23
**wonder** 233:24
**wondering** 39:16 129:22
148:15 151:14 243:17
251:8
**word** 58:12 121:5 123:3
158:3 172:23 188:2 189:4
189:5,8,15 197:2 224:14
273:14
**wording's** 192:7
**words** 54:10 247:16,20
**work** 18:9 25:13,22 26:7
44:14 46:4 59:20,21 60:2,3
64:4 78:8 89:5 106:12
107:22 129:1 210:6 269:6
275:7 281:18 282:9 289:13
290:7 293:10 311:3
**worked** 41:21 49:12 60:16
65:18 99:15
**working** 99:13 111:20 164:3
207:3 249:2,21 293:19
**works** 22:4 78:20 92:19
294:9
**World** 259:23 260:10
**world's** 90:4
**worries** 78:6
**wouldn't** 81:2 91:3,3 163:12
185:3 210:5,5 263:9,11
274:16 296:7 301:24
**write** 42:9 44:19 45:3,6,25
51:23 100:2 120:10 223:16
224:3 252:8 287:2,15,19
288:5 289:9,12,23
**writes** 222:10
**writing** 26:2 222:24 223:6
**written** 24:9 58:14 154:16
181:13 193:11 196:1 249:8
249:22
**wrong** 109:16 111:9 148:5
196:7 300:12 304:3
**wrote** 13:22,23 28:19 44:22
103:25 232:12,21 233:19
251:10,19 252:3,15

|  | X |
| :-: | :-: |
|  | Y |

**y'all** 163:6
**yeah** 12:15 18:8 21:2 27:16
33:18,18 36:3 40:6 42:25
43:5,24 44:6 48:16 49:20
50:18 54:9 56:16,25 57:20
59:5 60:11 63:3,7 66:19
68:21 70:21 72:10 73:1
75:18 77:25 78:7 84:17,21
84:21,23 87:15 89:13
95:23 96:2,21 100:5
103:24 104:22 105:21
108:16 110:2 114:7 116:10
116:15 117:9 122:5,8
123:9,13 124:24 127:6
128:3 129:21 133:22 134:6
135:4,8 136:8 139:20
141:23 143:24 145:6,7,17
146:13 148:11 153:16
156:20 164:18 165:7
166:25 167:7 170:3 171:8
171:13 175:25 176:22
177:4 178:13 183:21,25
187:16 190:25 193:19
196:10 197:10 198:3
201:12,15 203:7 206:2
208:8,12,12 209:1,6 213:8
218:20 221:22,23 222:1
226:12 227:15 228:13
238:10,19,19 239:10,19
247:6,17 254:17 260:6
261:13 263:15,23 264:17
265:20 267:3,21 270:17
272:11 273:1,10,11,22
274:3 275:23 276:1 277:5
277:8,15 280:1,17 282:6
282:19 283:24 284:19
286:5,8,17 288:16,21,21
288:25 289:21 290:17
291:14 295:17 299:6,7
300:2 305:4 309:24 311:8
311:14 312:3
**year** 6:11 15:2 56:20 58:3,21
58:25 83:22 92:13 112:22
**years** 30:25 67:20 69:7 70:7
70:16 88:10 107:19 135:16
**yep** 11:8 23:18 62:6 77:13
113:18 119:14 127:5
140:22 171:2 197:18,23
217:12 218:6 222:4,9
233:13
**yesterday** 61:15
**York** 1:2,17,17 2:15,16,18

2:20,21 3:20,20 9:4,4,13
9:13 313:23,23,24

**Z**

**Zames** 91:6,7,8,9,17 93:25
**Zoom** 65:23 110:11,13
**Zouhair** 131:24 136:3 137:9

**0**

**00055119** 7:11

**1**

**1** 6:5 41:23 42:4,16,18 44:5
44:12,20 47:12 53:11,17
53:18 66:13,14,23,23 77:9
78:3 104:14 120:7 122:14
145:7 146:6 154:10,17
166:22,23 170:21 182:21
190:15 213:2 223:14 231:1
241:3 257:24 264:13
267:22 277:4
**1,000** 87:8
**1,100** 60:8
**1:49** 138:12,14
**10** 5:5 7:5 50:19 62:1,1
87:14,16 104:22 124:25
176:23 177:1 267:11,16
**10-K** 112:21 113:22 114:8
**10-Ks** 113:13 114:11
**10:32** 50:21,24
**10:44** 51:1
**100** 3:10 204:7 254:24
267:11,16
**10020** 3:20
**101** 213:2,16
**104** 264:12,19,25 265:1
**106** 199:13,15 200:1
**11** 7:7 92:21 199:21,25
**11/18/19** 286:10
**11:40** 95:4
**11:41** 95:7
**11:55** 95:9
**112** 112:16
**114** 236:15
**115** 250:21
**116** 231:8
**118** 175:19
**119** 6:16 175:18 176:10
177:8 179:6 181:11
**11958** 1:23 2:12 313:24
**12** 1:16 2:21 6:3,17 7:3,9 8:3
9:3,10 54:2 62:1 205:6,10
207:25 210:20 314:8 315:2
**12:52** 138:9,12
**120** 204:25 205:12 209:18

210:25 211:13
**121** 216:14,17
**122** 223:14
**123** 282:16
**126** 216:17
**1271** 2:20 3:19 9:13
**13** 7:12 53:11,14,15 109:18
217:2,15 221:22 228:11
**131** 6:18
**132** 277:3,9
**14** 7:15 231:24 232:7 233:10
235:23
**14-or-so** 204:24
**14420** 1:24 2:15 313:25
**145** 113:11
**147** 6:20
**15** 7:18 62:1 122:3,6,7,17
237:9,13
**158** 187:6,15
**159** 6:22
**16** 7:21 240:22 241:8
**160** 217:18
**17** 8:5 285:9,13
**171** 6:24
**176** 7:6
**18** 7:13 176:1
**19** 54:1 176:1
**193821** 6:19
**199** 7:8
**1998** 15:4

**2**

**2** 6:7 21:22 41:15,17,18,20
42:1,4,5,16 43:13 48:1,5
53:17 55:9 62:3 66:24
71:19 73:4 77:10,20 78:1
83:14 95:14 146:8 297:22
297:25
**2.5** 58:25
**2:52** 182:12,15
**20** 87:18 135:21 145:5
146:12 176:3 314:19
**200** 60:10
**200-ish** 12:15
**2007** 69:12
**2014** 69:12 83:8,17,20,22
84:2 85:1,4,15,18 86:1,6
86:13 90:3 94:16 96:17
104:19 105:3,8,10
**2015** 83:23 85:1,5,6,18
87:24 88:16 89:3 90:1 92:2
92:8 96:20 199:15 200:11
214:13 308:2,3,6 310:10
**2016** 199:1
**2017** 6:17 136:6 183:24

**2018** 54:1,19 55:18,20 57:18
67:15 199:2 200:14
**2019** 7:13,17 55:20 58:4
77:17 83:8,17,20 84:2 85:4
85:5,6,15 86:2,7,14 94:16
95:17,20 96:17 276:3
**2019.2** 7:22
**2019.4** 7:10,19
**2020** 285:15
**2021** 54:2,19 55:19 57:18
67:15 200:14
**2023** 50:12 82:4 96:5,7
112:22
**202365** 6:21
**2024** 6:6,9 42:21 43:3 62:20
67:12 96:13
**2025** 1:16 2:21 6:3 7:3 8:3
9:3,10 313:16 314:8 315:2
**205** 7:11
**20549** 3:11
**21** 145:19,21 146:4,10,11,12
**210** 236:15 237:15 238:10
240:11 241:2 244:24
**21007264** 1:24 2:13 313:25
**211** 250:19 252:7 254:1
**212** 231:1,8 232:2,12 233:7
**212-906-1330** 3:21
**217** 7:14
**22** 6:6,8 199:2
**23** 154:6,19
**23-cv-9518-PAE** 1:6
**231** 7:17
**237** 7:20
**24** 66:7 166:5,21
**240** 7:23
**25** 170:21
**250** 88:3,9
**250212JWAA** 1:25
**25th** 313:16
**26** 46:4
**260058** 7:5
**265** 218:1
**276** 201:8
**28** 124:7 126:14 131:14
139:1 147:5
**2800** 4:7
**285** 8:6

**3**

**3** 6:10 69:24 91:22 92:1
285:24,25 297:22,25
**3:04** 182:17
**30** 42:21 43:3 92:2
**303** 5:6
**309** 5:7

**30XI008238700** 1:23 2:10
313:24
**31** 104:12,21,21,25
**312-777-7016** 4:9
**313** 5:12
**314** 5:13
**315** 5:14
**33** 190:18,24
**330** 4:7
**337108** 140:19 188:17
220:18
**346** 237:6,14
**347** 241:4,9
**35** 182:21
**358** 232:4
**36** 109:19 145:21 146:19,24
147:6

**4**

**4** 6:13 73:4 99:18,22 207:22
286:7,9
**4:11** 228:2
**4:12** 228:5
**4:28** 228:7
**40** 122:13,18,19 123:2,10,14
**41** 6:6
**42** 6:9
**44** 123:19 159:16,25 160:22
162:8
**45** 145:5,10 197:15
**47323** 164:15
**48** 301:2
**49** 154:6,19 155:3 158:8
159:11 198:17
**4960** 148:10
**49602** 147:20

**5**

**5** 6:15 53:15 119:1,5 140:16
157:24 188:14 220:14
269:12 288:20
**5:27** 270:24 271:2
**5:48** 271:4
**50** 124:21 125:2,4,9,16,19
126:6 128:21 130:17
133:24 205:2,3 244:4
**50/50** 83:4,5
**500** 83:12 87:20,21,24 88:10
94:20
**51** 171:16,24 172:4
**52** 166:23 167:11,22 203:2
**53** 170:20,23,24,24 171:14
**55459** 131:22
**56** 213:4
**57** 264:12

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:23-cv-09518-PAE |
| ) | |
| SOLARWINDS CORP. and TIMOTHY G. ) | |
| BROWN, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**Notice of Errata – Deposition of Gregory Rattray**
**(February 12, 2025)**

I, the undersigned, do hereby declare that I have read the deposition transcript of Gregory Rattray dated February 12, 2025 and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | **From** | **To** | |
| 14:22 | information security, but | Information security field, but | Clarification |
| 17:4-6 | I helped with the formulation of the nation cybersecurity strategy | I helped with the formulation of the nation's cybersecurity strategy | Typographical error |
| 17:9 | Designed different programs | I designed different programs | Typographical error |
| [various]¹ | security statement | Security Statement | Typographical error |

---

¹ 23:1; 23:19; 74:19; 74:24; 75:21; 119:7; 121:18; 121:20; 129:18; 130:1; 139:25; 142:7; 151:5; 151:7; 151:10; 152:18; 153:9; 153:12; 153:17; 153:23; 156:9; 158:10; 175:6; 187:13; 187:24; 188:6; 188:7; 188:11; 194:7; 196:24; 207:12; 212:10; 212:24; 220:6; 220:10; 220:14; 221:10;

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | **From** | **To** | |
| 26:11-12 | I've conducted numerous assessments of companies, cybersecurity postures, control structures. | I've conducted numerous assessments of companies' cybersecurity postures and control structures. | Typographical error |
| 28:8 | operational | operationally | Typographical error |
| 31:22 | mostly a process, | mostly a process of, | Typographical error |
| 32:18 | do I do coding, I don't do coding | do I do coding?; I don't do coding | Clarification |
| 34:15 | In basically the idea | It's basically the idea | Typographical error |
| 34:20 | I've been the -- many person | I've been the main person | Typographical error |
| 35:1 | attune | attuned | Typographical error |
| 54:10 | I could reframe words | I could reframe the words | Typographical error |
| 59:4 | to the company | of the company | Clarification |
| 65:9 66:2 | Kline | Cline | Typographical error |
| 68:9 | in place at Insulet | were in place at Insulet | Clarification |

---

221:15; 221:17; 246:2; 246:3; 255:11; 256:2; 256:8; 256:10; 257:4; 257:9; 258:3; 263:19; 263:20; 281:14; 281:16; 288:22; 291:24; 292:16; 292:20; 304:7.

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | From | To | |
| [various][2] | securities statement | Security Statement | Typographical error |
| 72:10 | I assume GAAP | I assume by GAAP | Clarification |
| 74:5 | controls or password. | controls or password policies. | Clarification |
| 83:25 | risumi | resume | Typographical error |
| 84:13-14 | the team that CISO is the senior director. | the team that the CISO is the senior director of. | Clarification |
| 93:16 | manage | managed | Typographical error |
| 126:20 | exclusion | conclusion | Typographical error |
| 111:24 | assessment company leadership | assessment to company leadership | Clarification |
| 113:17–18 | the digital real | the Digital Reality | Typographical error |
| 134:11-12 | This is a process that there's a lot of instances on, | This is a process that there's a lot of testimony on, | Typographical error |
| 140:13-14 | by the system access for forms and the user access request. | by the system access forms and the user access requests. | Typographical error |
| 141:16-18 | There are SARFs is one of the mechanisms that are used along with user access requests so -- as | SARFs are one of the mechanisms that are used along with user access requests, so that as | Clarification |

---

[2] 70:3; 73:15; 74:8; 75:6; 75:11; 102:10; 120:12; 120:23; 122:21; 123:11; 128:25; 135:8; 140:17; 142:3; 143:19; 144:25; 145:2; 153:14; 157:12; 158:24; 166:16; 170:9; 173:17; 180:21; 181:24; 188:14; 189:19; 189:24; 190:3; 191:5; 191:21; 192:24; 193:24; 194:14; 194:24; 206:21; 212:8; 229:24; 240:2; 244:19; 246:14; 250:17; 256:22; 258:18; 290:22; 291:11; 291:15; 310:22.

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | From | To | |
| 144:19 | auditors also looking at these | auditors are also looking at these | Clarification |
| 150:5 | But I was looking for | What I was looking for | Typographical error |
| 151:25 | documents demonstrate | documents that demonstrate | Clarification |
| 155:11 | SARF | SARFs | Typographical error |
| 156:2 | as we've assessed quite a bit | as we've discussed quite a bit | Typographical error |
| 161:9 | [indiscernable] | later | Typographical error |
| 161:14 | -- further attached form | -- attached form | Clarification |
| 163:12 | wouldn't appear as attachments | would appear as attachments | Typographical error |
| 169:13 | So I looked for these for presence of | So I looked through these for the presence of | Clarification |
| 174:16 | cleaning and pretty | clean and pretty | Typographical error |
| 175:7 | privileged | privilege | Typographical error |
| 176:1 | to read 18, 19 | to read 118 and 119 | Clarification |
| 176:3 | 20 | 120 | Clarification |
| 195:24-25 | And you can enforce where it's feasible to do so. | And you can only enforce where it's feasible to do so. | Clarification |

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | **From** | **To** | |
| 202:19-20 | Mr. Colquitt's depositions and other technology leaders about how | Mr. Colquitt's deposition and other technology leaders' testimony about how | Clarification |
| 208:2 209:15 | checkmarks | Checkmarx | Typographical error |
| 208:19 209:6 210:1 210:4 | checkmark | Checkmarx | Typographical error |
| 211:23 | had the JIRA tickets | didn't have the JIRA tickets | Clarification |
| 212:9 | illumination | to illuminate | Clarification |
| 214:23 | where a security fit into it | where security fit into it | Clarification |
| 218:24-25 | using a password as a security incident | using a password was a security incident | Typographical error |
| 232:9 | SW-SEC-00166790 | SW-SEC00166790 | Typographical error |
| 238:11-12 | broadly you have threat modeling is about | broadly threat modeling is about | Clarification |
| 244:9 | if threat modeling | if they were threat modeling | Clarification |
| 246:22-25 | it's a strong process that there's no reason to believe that the things that are called for, you know, when they're present and the FSR, didn't happen. | it's a strong process and there's no reason to believe that the things that are called for, you know, when they're present in the FSR, didn't happen. | Clarification |
| 248:14 | me is a | me of a | Clarification |

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | **From** | **To** | |
| 257:11 | haven't | have | Typographical error |
| 288:16 | Yeah, in the network security portion | THE WITNESS: Yeah, in the network security portion | Typographical error |
| 294:5 | device | advice | Typographical error |

6

I declare under penalty of perjury that the foregoing is true and correct.

Date:   March 20 , 2025          Signed: _____

Gregory Rattray