# EXHIBIT 45

**Page 1**

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3
4  SECURITIES AND EXCHANGE        )
   COMMISSION,                    )
5                                 )
            Plaintiff,            )
6                                 ) Case No.
        v.                        ) 23-cv-9518-PAE
7                                 )
   SOLARWINDS CORP. and TIMOTHY G. )
8  BROWN,                         )
                                  )
9           Defendants.           )
   _____)
10
11
12
13
14    (30)(b)(6) STENOGRAPHIC VIDEOTAPED DEPOSITION OF
15      SOLARWINDS CORPORATION BY ITS DESIGNEE
16            JASON WALLACE BLISS
17         WEDNESDAY, OCTOBER 16, 2024
18
19
20
21
22
23
   Reported by:
24 BRIDGET LOMBARDOZZI,
   CSR, RMR, CRR, CLR
25 Job No. 241016BLO

**Page 2**

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3
4  SECURITIES AND EXCHANGE        )
   COMMISSION,                    )
5                                 )
            Plaintiff,            )
6                                 ) Case No.
        v.                        ) 23-cv-9518-PAE
7                                 )
   SOLARWINDS CORP. and TIMOTHY G. )
8  BROWN,                         )
                                  )
9           Defendants.           )
   _____)
10
11
12
13       Stenographic (30)(b)(6) videotaped deposition
14 of SOLARWINDS CORP. by its designee JASON WALLACE BLISS,
15 taken on behalf of Plaintiff, held at the offices of
16 Latham & Watkins, 1271 Avenue of the Americas, Floor 33,
17 New York, New York, commencing at 9:50 a.m. and ending
18 at 7:47 p.m., on Wednesday, October 16, 2024, before
19 Bridget Lombardozzi, Certified Shorthand Reporter,
20 Certified Realtime Reporter, Registered Merit Reporter,
21 and Notary Public of the states of New York and New
22 Jersey, pursuant to notice.
23
24
25

**Page 3**

1  APPEARANCES OF COUNSEL:
2
3
4  FOR THE PLAINTIFF:
5
6
7    SECURITIES AND EXCHANGE COMMISSION
8    100 F Street, N.E.
9    Washington, D.C.  20549-6553
10   Telephone:  202.551.4661
11   Email:  todorj@sec.gov
12       carneyc@sec.gov
13       wardenk@sec.gov
14       stonel@sec.gov
15   BY:  JOHN "JJ" TODOR, ESQUIRE
16     CHRISTOPHER CARNEY, ESQUIRE
17     KRISTEN M. WARDEN, ESQUIRE
18     LORY STONE, ESQUIRE (Remote)
19
20
21
22
23
24
25

**Page 4**

1  A P P E A R A N C E S (Continued):
2
3  FOR THE DEFENDANTS:
4
5    LATHAM & WATKINS LLP
6    1271 Avenue of the Americas
7    New York, New York
8    Telephone:  212.906.1330
9    Email:  serrin.turner@lw.com
10       maurice.baynard@lw.com
11       matthew.valenti@lw.com.
12       nicolas.luongo@lw.com
13   BY:  SERRIN TURNER, ESQUIRE
14     MAURICE BAYNARD, ESQUIRE
15     MATTHEW VALENTI, ESQUIRE
16     NICOLAS LUONGO, ESQUIRE (Remote)
17
18 ALSO PRESENT:
19
20   JONATHAN JUAREZ, VIDEOGRAPHER
21   BECKY MELTON, In-house Counsel for SolarWinds
22
23
24
25

**Page 29**

1  that I just mentioned sat within a hundred yards
2  of each other in an Austin office, so there were a
3  number of informal discussions and meetings that
4  were conducted as well, whether through
5  one-on-ones or the conversations in offices.
6      Q.  Turning to the employees in the InfoSec
7  group, during the 2018 to 2020 time frame, how
8  many employees reported to Mr. Brown in that
9  InfoSec group?
10      A.  During, sorry, '18 to 2020?
11      Q.  '18 to '20, yes.
12      A.  Roughly around -- and you mean all --
13  the whole group, not just who reported to Tim?
14      Q.  Correct.
15      A.  Okay.
16      Q.  The whole group.
17      A.  So roughly around five to eight, I
18  believe.
19      Q.  And there's an executive, Eric Quituga.
20  Was he the -- I guess the principal deputy to
21  Mr. Brown?
22      A.  Yes.  Eric -- Eric had been with the
23  company as far back as 2015 and -- as an
24  information security principal.
25      Q.  Did Mr. Brown ever request to have more

**Page 30**

1  personnel starting in -- okay.
2      First, was Mr. Brown hired sometime in
3  the middle of 2017?
4      A.  Yes.
5      Q.  Did Mr. Brown ever request more people
6  to have working for him between, let's say, that
7  2017 time frame and 2020?
8      A.  I don't recall if he ever requested
9  more people, but I'd be shocked if he never did
10  because we all did.  That's part of what a company
11  does.
12      Q.  And what was the annual budget for the
13  information security group in this 2018 to 2020
14  time frame roughly?
15      A.  It -- it changed, but I would say
16  mid/high single digits to low double digits in the
17  millions.
18      Q.  Did that include salaries and technical
19  resources they had available?
20      A.  That would include salaries, bonus, cash
21  compensation in general.  It would include tools
22  that would be allocated to that group.  What it
23  does not include, which is part of cybersecurity,
24  are other elements in the business that would
25  handle product security, for instance, or, as I

**Page 31**

1  mentioned before, the legal department, who'd had
2  a compliance function with cybersecurity.  So that
3  would only be his information security group
4  budget.
5      MR. TURNER:  I just want to
6  note my objection to -- for the record,
7  an objection to scope with respect to
8  budget.  I don't believe that was
9  specified in the notice.
10      MR. TODOR:  I'll just note
11  that compensation is listed there in
12  Topic 2.
13      MR. TURNER:  That's fine, but I
14  said budget.  The witness was not
15  specifically prepared to testify about
16  specific budget numbers, so I just wanted
17  to note that for the record.
18  BY MR. TODOR:
19      Q.  In terms of locations of the employees
20  in the InfoSec group, where were the employees
21  located?
22      A.  There were -- so Tim was in Austin.
23  Eric was in Austin.  There was an individual --
24  actually, Josh is in Austin.  So mostly in Austin.
25  There was an individual that came online in

**Page 32**

1  Ireland.  And I believe that was it.
2      Q.  Okay.  Was there a Tomas Sejna within
3  the InfoSec group?
4      A.  I don't have him in the Infosec group,
5  as I recall.  I believe Tomas Sejna either was
6  prior to the relevant period or was in product
7  security.
8      Q.  Okay.  And the individual in Ireland you
9  referred to, is that Harry Griffiths?
10      A.  That is.
11      Q.  And did Josh Vanhoose -- is that the
12  Josh you were referring to?
13      A.  Correct.
14      Q.  Any others that you're aware of?
15      A.  There's a gentleman by the name of Ralph
16  Greer.  I don't know his location.  And there was
17  one other I can't recall.
18      Q.  What were Kellie Pierce's duties as they
19  related to cybersecurity?
20      A.  Kellie was within the CIO office and
21  she was a program manager.  So Kellie's role was
22  more to make sure that the trains were running on
23  time, that notes were taken accordingly, that
24  materials were produced.  She wasn't a technical
25  resource.

1    **Q.**   Okay.  In terms of the people with
2    the -- providing the technical know-how for
3    cybersecurity as they related to SolarWinds'
4    cybersecurity group, would that include the
5    information security group and would it include
6    anyone else?
7              MR. TURNER:  Object to form.
8    **A.**   Can you clarify your question, what you
9    mean by the technical --
10   **Q.**   Okay.  So you said Mrs. -- Ms. Pierce,
11   for example, was not providing technical content.
12            Who were the people who were providing
13   the technical content?
14   **A.**   For?
15   **Q.**   The cybersecurity --
16   **A.**   For the information security group?
17   **Q.**   -- issues in 2018 through 2020 time
18   frame?
19            THE REPORTER:  I'm sorry.  You
20            were speaking over one another.  Can
21            you please repeat that?
22   BY MR. TODOR:
23   **Q.**   Okay.  So you mentioned Kellie Pierce
24   was not providing technical content.  My question
25   was, who were the people providing the technical

33

1    content within SolarWinds as they related to
2    cybersecurity issues in the 2018 through 2020 time
3    frame?
4              MR. TURNER:  And object to
5              form.  I don't know exactly whether we're
6              still talking about information security
7              or product security or something else.
8              MR. TODOR:  Okay.
9    BY MR. TODOR:
10   **Q.**   So do you understand the question, sir?
11   **A.**   I do.
12            There are numerous resources in groups,
13   both in information security and beyond, within
14   the company that would provide technical advice.
15   As it relates to the internal IT environment, that
16   would predominantly be InfoSec and folks within
17   the CIO office like IT ops or business
18   applications group.
19            And as it pertained to product security
20   issues, there would be people in the engineering
21   group with the product security team.
22   **Q.**   And by "the engineering group," are you
23   referring to Mr. Colquitt's group?
24   **A.**   He would be one person in that group,
25   but ultimately the engineering group --

34

1    engineering groups came together at Joe Kim and
2    Steven Colquitt was one of the leaders within the
3    Core-IT engineering team.
4    **Q.**   And by "Core IT," you're referring to
5    the difference between Core-IT and MSP, managed
6    service provider, product lines?
7    **A.**   Predominantly, yes.  There was also a
8    product line that goes by different names of
9    cloud, application management, or app man, or
10   cloud monitoring.  And that was a very small
11   business group that would have a closer
12   relationship with Core-IT but was a separate
13   group, yeah.
14   **Q.**   So there were three general product
15   lines:  Core-IT, MSP, and cloud?
16   **A.**   Correct.
17   **Q.**   And each of those product line groups
18   would report up to Mr. Kim?
19   **A.**   Correct.
20   **Q.**   And what were the cybersecurity duties
21   that the product teams would have with respect to
22   those products?
23            MR. TURNER:  Object to form.
24   **A.**   So when we were developing software and
25   thinking about securing the product, most of the

35

1    responsible actions would be on the engineering
2    teams.  They would be advised by the information
3    security team, but they were the responsible
4    parties.
5              Also, as vulnerabilities were reported,
6    that often was triaged by information security,
7    but the work that had to be done would be on the
8    engineering side of the house.
9    **Q.**   What do you mean by "triaged by
10   information security"?
11   **A.**   As things were reported internally or
12   externally, it was the initial intake method could
13   vary.  So it could come in through customer
14   support, it could come in directly to information
15   security group, but they would bring those
16   together to monitor the activities of
17   engineering.
18   **Q.**   And turning back to the information
19   security group, did Mr. Brown request an increase
20   in the budget for the info -- information security
21   group in the 2018 to 2020 time frame?
22   **A.**   Yes.
23   **Q.**   What -- what was he requesting an
24   increase to do?
25            MR. TURNER:  Object to form.  I

36

1        MR. TURNER:  Object to form.
2     **A.**  If your question is whether there was a
3  formal audit process on all of those answers to
4  make sure there was accuracy throughout there, I
5  don't recall a specific formal audit, but I know
6  legal would look at answers provided to customers
7  and ask questions for accuracy purposes.  And I do
8  know that our -- our mission was to provide
9  accurate information to our customers.
10    **Q.**  Okay.  I'm just trying to understand
11 processwise.
12    **A.**  Right.
13    **Q.**  There were questionnaire responses that
14 had been generated at some point prior to the
15 initial draft of the security statement being
16 generated.  A draft of the security statement was
17 created largely using those preexisting
18 questionnaire responses.
19       Was there an effort after that to go
20 back and determine whether those original
21 questionnaire responses were accurate?
22       MR. TURNER:  Object to form.
23    **A.**  When the security statement was pulled
24 together leveraging that knowledge base and those
25 items in there, I don't know if changes were made

81

1  in the initial draft, but the review process
2  between Tim, between Rani, between legal was
3  making sure that these statements were still
4  accurate.
5     **Q.**  How -- breaking that down, what was
6  Mr. Brown's role in making sure that the technical
7  statements were accurate in the security
8  statement?
9     **A.**  I think, as I previously said, he would
10 review it.  And what his processes were of
11 reaching out to folks, I don't know that answer.
12 But he was in a review to look at this document
13 and be comfortable with this document.
14    **Q.**  Okay.  Do you have anything to add to
15 Mr. Brown's deposition in terms of what steps he
16 took to verify the information in the security
17 statement?
18    **A.**  I do not.
19    **Q.**  And with respect to Ms. Johnson's review
20 of the technical accuracy of the -- the
21 information in the security statement, what was
22 her role in that?
23    **A.**  Similar to Tim's.
24    **Q.**  Who at SolarWinds maintained this
25 knowledge base that you're referring to in your

82

1  answers?
2        MR. TURNER:  Object to scope.
3     **A.**  I don't know if there was a single
4  custodian, to use legal language, of this one
5  document, but it's certainly something that was
6  seen between Eric Quitugua, between legal, for
7  instance.
8     **Q.**  Was there a quality control process for
9  this knowledge base information?
10       MR. TURNER:  Object to scope
11       and form.
12    **A.**  Yes.  As I mentioned before, we would go
13 to the experts that could answer those questions
14 to make sure we got the highest quality accurate
15 information presented and legal was involved to
16 varying degrees to look at it as well.
17    **Q.**  Which individuals at SolarWinds were
18 involved in this quality control?
19    **A.**  Whoever was the expert on the question,
20 depending on the question, and members of the
21 legal team.
22    **Q.**  Was there a -- a written process for
23 it?
24    **A.**  No.  As I explained before, there was
25 not a rigid process for this sort of activity.

83

1     **Q.**  I turn your attention to the statements
2  in the security statement under "Organizational
3  Security."  The second paragraph states
4  "SolarWinds follows the NIST cybersecurity
5  framework with layered security controls to help
6  identify, prevent, detect, and respond to security
7  incidents."
8        What information was relied upon to
9  generate that statement?
10       MR. TURNER:  The -- go ahead.
11    I'm sorry.  Go ahead.
12    **A.**  This, as early as 2017, we were looking
13 at the NIST cybersecurity framework as a voluntary
14 framework we were using to help guide our
15 cybersecurity program.
16    **Q.**  When you say you were looking at it
17 "as a voluntary framework," is that the same
18 thing as you're saying you follow the NIST
19 cybersecurity framework as it says in the security
20 statement?
21    **A.**  Yeah.  I don't think following the NIST
22 cybersecurity framework means much more than we
23 used the framework as it was intended to be used
24 in terms of measuring, identifying issues,
25 assessing our overall cybersecurity program.

84

1    **Q.**  What degree of control did Mr. Brown
2  have over SolarWinds' cybersecurity practices as
3  they relate to following the NIST cybersecurity
4  framework?
5          MR. TURNER:  Object to form.
6    **A.**  I don't understand.
7    **Q.**  Did Mr. Brown have the authority to say,
8  yes, we're going to follow NIST cybersecurity
9  framework or some other approach?
10   **A.**  He certainly could have provided that
11 input, yes.
12   **Q.**  Who would have made the decision on that
13 ultimately?
14         MR. TURNER:  Object to form.
15   **A.**  That level of decision probably would
16 have been made from not just Tim in a vacuum, but
17 it would have included Rani as well and perhaps
18 even Joe.
19   **Q.**  You say SolarWinds started looking, I
20 think you said in your prior response, at the NIST
21 cybersecurity framework in 2017.
22         At -- at some point did SolarWinds start
23 having scorecards for its maturity level on this
24 cybersecurity framework?
25   **A.**  When you say "scorecard," what exactly

85

1  do you mean?
2    **Q.**  So in the quarterly risk reviews and the
3  security compliance quarterlies, there would be
4  scorecards.  We might see some of them later.
5    **A.**  Yes.
6    **Q.**  Why was that decision made and -- and
7  did that reflect some -- let's answer that one
8  first.  Why was that decision made?
9    **A.**  So the scorecard was a template or a
10 format that presented the underlying NIST
11 assessments.  The decision was made to create that
12 template or that visual because it provided
13 distilled information at the level for the
14 audience there, which in the QRRs were
15 executives.
16   **Q.**  Okay.  Was SolarWinds tracking maturity
17 levels on the NIST cybersecurity framework before
18 it started having the scorecards on the
19 presentations to the senior executives?
20   **A.**  Yes.
21   **Q.**  When did it start doing that?
22   **A.**  I don't know a precise date, but I know
23 that Eric Quitugua was looking at the NIST
24 cybersecurity framework in early 2017.
25   **Q.**  Was that an organizational decision that

86

1  Mr. Quitugua would be making that analysis or was
2  that something Mr. Quitugua did on his own?
3          MR. TURNER:  Object to form.
4    **A.**  I'm not aware of the exact process
5  there.
6    **Q.**  Were there any action items as a result
7  of maturity levels on the NIST cybersecurity
8  framework within SolarWinds during the relevant
9  time period as in you need to improve X area as a
10 result of NIST cybersecurity maturity levels that
11 were measured?
12         MR. TURNER:  Object to form.
13   **A.**  Are you saying did we adjust overall
14 resources and activities with the scorecard or the
15 underlying NIST framework assessment in response
16 to those?
17   **Q.**  Yes.
18   **A.**  Yes.  That's part of the purpose of the
19 CSF, is to identify and assess your environment
20 and look at where you have existing activities and
21 to measure what is being done.
22   **Q.**  What -- who at SolarWinds would be
23 making that kind of decision?
24   **A.**  I think it would be varied based on the
25 materiality of those activities.

87

1    **Q.**  I turn your attention later to the
2  page 3 of the document where it says "Access
3  Controls."
4          What, if any, control did Mr. Brown have
5  over SolarWinds' cybersecurity practices that
6  related to access controls as described in this
7  paragraph?
8    **A.**  Again, he would be a very important
9  voice in advising on what's happening in the
10 industry, how it's evolving, how we should
11 evolve, and advising IT operations who, in this
12 specific example, implemented role-based access
13 controls.
14   **Q.**  Looking to the next section on
15 "Authentication and Authorization."  And you can
16 familiarize yourself with the section as you need
17 to.  My question will be similar.
18         What degree of control did Mr. Brown
19 have over SolarWinds' cybersecurity practices as
20 they relate to authentication and authorization as
21 described in this section?
22   **A.**  It's difficult to answer because the
23 statements are very high level.  For instance, we
24 say "We require that authorized users be
25 provisioned with unique account IDs."  That is

88

1 addressed questions we were getting, the trust
2 center came to be.
3     Q.   I'm not asking you to get into technical
4 details, but what were the other kinds of items
5 that were included in the trust center other than
6 the security statement?
7           MR. TURNER:  Object to scope.
8     A.   I don't recall without looking at it
9 right now the other elements.
10     Q.   Why was the security statement included
11 in the trust center?
12     A.   I don't know why it was included in the
13 trust center other than it needed a place to land
14 and maybe this was simplifying the website to have
15 one place with various artifacts that might relate
16 to each other.
17     Q.   Okay.  Did the items in the trust center
18 all relate to security in some fashion?
19     A.   I -- I don't know what else was out
20 there.
21           MR. TURNER:  Object to scope.
22           THE WITNESS:  Sorry.
23     Q.   Did -- was the trust center more
24 prominent on the SolarWinds website than the
25 security statement was prior to its inclusion in

121

1 the trust center?
2           MR. TURNER:  Object to scope,
3     form, foundation.
4     A.   I don't know.
5     Q.   Who at SolarWinds was responsible for
6 deciding what content would be placed in the trust
7 center?
8           MR. TURNER:  Objection to scope
9     and foundation.
10     A.   I don't know.
11     Q.   What was the process of approval of
12 content to be placed in the trust center?
13           MR. TURNER:  Same objection.
14     A.   I don't know.
15     Q.   Did Mr. Brown have any approval -- role
16 in that process?
17           MR. TURNER:  Same objection.
18     A.   I don't know.
19     Q.   Did SolarWinds ever direct customers to
20 look at the trust center for any reason?
21           MR. TURNER:  Objection to scope
22     and foundation.
23     A.   I don't have any specific knowledge that
24 we did or didn't.
25     Q.   Did SolarWinds ever direct investors to

122

1 look to the trust center?
2     A.   I don't think so.
3     Q.   Did SolarWinds ever direct investors to
4 look to the security statement?
5     A.   No.
6     Q.   Turning your attention to Topic 7 of the
7 deposition notice, which is "SolarWind's
8 cybersecurity practices and policies during the
9 relevant period as they relate to the topics
10 discussed in the security statement, including,
11 but not limited to" and there are five
12 subcategories.
13           First, I'll ask about Topic 7.a, which
14 is "whether and how SolarWinds followed the NIST
15 cybersecurity framework."
16           First, I'll direct your attention to the
17 security statement, number 5 under page 1,
18 "Organizational Security," and to the second
19 paragraph, first sentence, with the statement:
20 "SolarWinds follows the NIST cybersecurity
21 framework with layered security controls to help
22 identify, prevent, detect and respond to security
23 incidents."
24           Was this statement accurate for the 2018
25 to 2020 time frame insofar as SolarWinds is aware?

123

1     A.   Yes.
2     Q.   I think your previous answers might have
3 touched on this, but did SolarWinds follow the
4 NIST cybersecurity framework throughout the
5 relevant period?
6     A.   Yes.
7     Q.   What criteria did SolarWinds use to
8 determine whether it was following the NIST
9 cybersecurity framework?
10           MR. TURNER:  Objection to
11     form.
12     A.   So the framework is available for a team
13 to identify and manage and assess its
14 cybersecurity program and there are communications
15 and documents and artifacts like the security
16 scorecards that evidence that.
17     Q.   Okay.  Did SolarWinds ever apply NIST
18 800-53 as criteria to use in determining whether
19 it was following the NIST cybersecurity
20 framework?
21           MR. TURNER:  Object to form.
22     A.   I don't think I understand the question
23 there.
24     Q.   Did SolarWinds refer to the NIST 800-53
25 criteria to determine whether its cybersecurity

124

1 controls were sufficiently mature?
2          MR. TURNER:  Object to form.
3     **A.**  Not the way you're saying it, no.
4     **Q.**  How did SolarWinds refer to the NIST
5 800-53 criteria?
6     **A.**  So we would -- 800-53 is different from
7 the cybersecurity framework in that the framework
8 is exactly that.  It's a framework that's
9 utilized to identify SaaS and manage.  There isn't
10 like a one-size-fits-all solution, but it's meant
11 for companies to utilize to continuously improve
12 their program and to make sure that they're
13 allocating resources appropriately.
14          800-53 is a set of specific controls
15 that, as I know, are for heightened standards that
16 are prescribed that you could go one by one to
17 assess where you stand against those.  They are
18 not required and it is certainly not the intent of
19 800-53 for someone to meet all of those controls.
20 But they are used as an informative reference for
21 companies to utilize as another type of assessment
22 on the cybersecurity programs.
23     **Q.**  I direct your attention to Topic 7.b in
24 the notice, which is "SolarWinds' access control
25 practices and policies, including, but not limited

125

1 to, its 'least privilege necessary basis'
2 practices and policies and virtual private network
3 practices and policies."
4          And I'll turn your attention in the
5 security statement to page 3, to the heading
6 "Access Controls."  I'll first ask you to review
7 the paragraph for "Role Based Access."  Let me know
8 when you're ready.
9     **A.**  I'm ready.
10     **Q.**  Okay.  And I direct your attention to
11 the third sentence where it states "Access
12 controls to sensitive data in our databases,
13 systems, and environments are set on a
14 need-to-know/least privilege necessary basis."
15          To SolarWinds' knowledge, was this
16 statement accurate for the relevant period,
17 roughly 2018 through 2020?
18     **A.**  It was.
19     **Q.**  What -- how did SolarWinds determine
20 that that statement was accurate for this time
21 period?
22          MR. TURNER:  Objection to
23      form.
24     **A.**  So there were multiple processes during
25 the relevant period that related to access

126

1 controls and ensuring that those were implemented
2 on a least privilege basis.
3     **Q.**  What were the "multiple processes" you
4 were referring to in your previous answer?
5     **A.**  We had a process that utilized what's
6 called a SARF, S-A-R-F, form that would establish
7 access rights for individuals based on their role
8 as they were both onboarded, as they changed
9 roles within the company, as they were offboarded.
10 That would be reviewed by the appropriate
11 personnel.
12          We also bootstrapped that with user
13 access reviews that were done on a quarterly
14 basis to make sure that these access rights were
15 being implemented appropriately.  And the InfoSec
16 team had a solution or tool they used that would
17 notify them if access rights changed in certain
18 ways.
19     **Q.**  Okay.  Were -- in the 2018 to 2020 time
20 frame, were there any instances in which users had
21 privileges that were set higher than they needed
22 to be in terms of the least privilege necessary
23 basis access policy?
24          MR. TURNER:  Objection to
25      form, foundation, scope.

127

1     **A.**  Is your question were there rights
2 granted to anyone beyond -- in this company beyond
3 what was ideally prescribed?
4     **Q.**  So it's -- was -- were there instances
5 in which users had access that was broader than
6 the policy stated they ought to have had?
7     **A.**  I would -- I don't -- can't think of
8 something specific right now, but I would say
9 very likely there were isolated events of that.
10 I'd be shocked if there were not isolated events
11 of that.
12     **Q.**  Was there ever a contemplation of
13 changing the security statement in light of there
14 having been incidents of that nature?
15     **A.**  No, because it's simply saying that
16 these access controls are set in a least privilege
17 basis, which is what we had procedures in place to
18 do.  The fact that an isolated event might occur
19 where somebody might have rights beyond what they
20 should that would have been captured by user
21 access reviews, is certainly not a significant
22 thing to change that statement.
23     **Q.**  What was your basis for the use of the
24 word "isolated" in that answer?
25     **A.**  So there are millions of rights that

128

1 products and the Orion improvement program."
2     And I direct your attention back to the
3 security statement to the "Access Controls
4 Authentication and Authorization" section.  Oh,
5 I'm sorry, this is the SDL section --
6     A.  Okay.
7     Q.  -- the "Software Development Life Cycle"
8 section.  Sorry about that.  And I guess
9 familiarize yourself and let me know when you're
10 ready to discuss that section.
11     A.  Okay.  I'm ready.
12     Q.  Okay.  And I'll ask you about the
13 statement in the third section.  The third
14 paragraph of the first -- third sentence of the
15 first paragraph states "Security and security
16 testing are implemented throughout the entire
17 software development methodology."
18     To SolarWinds' knowledge, is this
19 statement accurate for the 2018 to 2020 time
20 frame?
21     A.  Yes.
22     Q.  Okay.  How did SolarWinds determine
23 that?
24     A.  I'd refer you to Joe Kim and Steven
25 Colquitt's testimony on this.

133

1     Q.  Do you have anything to add to their
2 testimony on this point?
3     A.  I thought their testimony was more
4 detailed than I'm going to be able to provide, but
5 that is part of the agile methodology and the QA
6 testing that's involved in that; that it's
7 iterative and implemented throughout the software
8 development life cycle.
9     Q.  And I'll direct your attention to the
10 first sentence of the second paragraph under
11 "Software Development Life Cycle."  It states "Our
12 secure development life cycle follows standard
13 security practices including vulnerability
14 testing, regression testing, penetration testing,
15 and product security assessments."
16     To SolarWinds' knowledge, was this
17 statement accurate for the 2018 to 2020 time
18 frame?
19     A.  It was accurate.
20     Q.  What's the basis for concluding that it
21 was accurate?
22     A.  I'd refer you to Joe Kim and Steven
23 Colquitt's testimony on this, but there are
24 artifacts that we have on vulnerability testing
25 and regression testing and penetration testing and

134

1 product security assessments during that period
2 for the products.
3     Q.  Were there any changes to the secure
4 development life cycle policies in the 2018 to
5 2020 life cycle in terms of making them more
6 formalized?
7     A.  There was an initiative that Steven
8 Colquitt was running that was aimed at improving
9 and utilizing new methods or new technologies, the
10 overall development life cycle in that two-year
11 period, yes.
12     Q.  Okay.  Was there any consideration of
13 changing the statements in the security statement
14 as they relate to the software development life
15 cycle in light of that initiative?
16     A.  No.  What he was proposing would have
17 been in addition to what's stated here and beyond
18 what the security statement is saying.
19     Q.  In your previous answer on whether the
20 raw statement was accurate, you -- you stated "I'd
21 refer you to Joe Kim and Steven Colquitt's
22 testimony on this, but" it looks like you said
23 "there are artifacts" or they are artifacts "that
24 we have on vulnerability testing and regression
25 testing and penetration testing and product

135

1 security assessments during that period for the
2 products."
3     What did you mean by "artifacts"?
4     A.  I meant there are documents, like
5 penetration testing results, there are regression
6 testing notes and results and vulnerability
7 testing results that are in -- mostly in
8 confluence within our environment with things that
9 existed during this period of time that reflect
10 that the development team was conducting these
11 activities.
12     Q.  Okay.  Is "artifacts" like a -- a term
13 with a specific meaning within SolarWinds?
14     A.  No.  It's a term that I use every now
15 and then to just describe something that exists.
16 You can replace it with "things" if you'd like.
17     Q.  Okay.  I had visions of digging up
18 things.
19     A.  Sorry.  Didn't mean to get us on a
20 tangent.
21     Q.  Just trying to understand.
22     Turn your attention back to the response
23 to the request for admission, please.  I direct
24 your attention to Request 41 on page 15.  And you
25 can take a look at it and familiarize yourself and

136

1 the user IDs and passwords sections of that user
2 access process narrative document we've just been
3 looking at?
4    **A.**  So I think I said this earlier.  That
5 sentence in the security statement is basically
6 just saying we have password policies that apply
7 to our systems.  That is not what the user access
8 process narrative is saying.  This is a more
9 specific statement with respect to certain
10 systems.
11    And so I don't -- I don't think -- and I
12 think I said this.  I don't think those two things
13 are synonymous, is where I'm getting to.
14    **Q.**  Okay.  What is the nature of the
15 difference in terms of what is meant by password
16 policy in the security statement as opposed to
17 this "User IDs and Passwords" section of the user
18 access process narrative?
19    **A.**  Again, I think this is just more
20 specific about certain systems.  I don't see that
21 security statement representation there saying the
22 same thing as this.  Just because it uses the word
23 "password" and "policy" doesn't make them the
24 same.
25    **Q.**  Looking through here on the user access

181

1 process narrative document, are there references
2 or descriptions of the encryption requirements for
3 the passwords?
4    (Pause)
5    **A.**  I don't see any.
6    **Q.**  Okay.  So in -- in the security
7 statement, there's the statement that passwords
8 are "individually salted and hashed."
9    **A.**  Correct.
10    **Q.**  Is there some document that sets that
11 forth as an internal policy apart from the
12 security statement itself?
13    **A.**  Again, as I mentioned earlier, the first
14 sentence talks about unique account IDs, mostly.
15 We're talking about Active Directory, this
16 paragraph, right, our internal management system.
17 And in Active Directory, those passwords are
18 individually salted and hashed.
19    So is there a written policy on that?
20 I'm not aware of one.  Is there a policy on that?
21 Yes, in Active Directory.
22    **Q.**  Okay.  Was there a password policy
23 for some -- apart from user ID password
24 requirements for maintaining passwords of an
25 encrypted state?

182

1    MR. TURNER:  Objection to
2    form.  You mean act -- Active Directory?
3    You said "apart from user ID."
4    MR. TODOR:  Yeah.
5 BY MR. TODOR:
6    **Q.**  So looking back to the "Authentication
7 and Authorization" statement of the security
8 statement stating passwords are "individually
9 salted and hashed," is that statement relating
10 solely to Active Directory or is it referring to
11 something else?
12    **A.**  Well, I -- I believe that's referring to
13 Active Directory because -- take an example.  I
14 can't force Westlaw to implement salting and
15 hashing on the password that I set up on my user
16 ID account.  I only have control to the
17 SolarWinds' accounts.
18    So that statement is nonsensical as it
19 applies to systems that are third party outside of
20 our control.  It is very reasonable to think that
21 is about our Active Directory accounts which
22 SolarWinds controlled.
23    **Q.**  Mm-hmm.  About ready for our next
24 topic.  The Topic 8.a in our deposition notice,
25 please.  And Topic 8 is "SolarWinds' internal

183

1 evaluations of its cybersecurity practices,
2 including, but not limited to," and seven
3 subparts, the first of which is "SolarWinds' NIST
4 800-53/FedRAMP assessments, including, but not
5 limited to, the June 2019, August 2019, and
6 September 2019 assessments as reflected in
7 documents" with Bates numbers that are listed
8 there.
9    So, first, generally, are you familiar
10 with SolarWinds's performance of NIST
11 800-53/FedRAMP assessments?
12    MR. TURNER:  Objection to
13    form.
14    **A.**  I am familiar with an assessment.  I'm
15 not sure specifically if it's these without seeing
16 them.
17    **Q.**  What -- okay.
18    Why were the assessments that you're
19 aware of performed?
20    **A.**  So back to our conversation on business
21 units.  Core-IT, which was the flagship business
22 unit and represented a majority of our business
23 that had been with us since the beginning, had the
24 Orion product, NPM, NCM, et cetera -- capital NPM,
25 capital NCM, et cetera -- that had government

184

1  customers, both use U.S. federal and international
2  government customers.
3          (Record notes Annie Gravelle is
4      now present on Zoom.)
5      A.  We acquired companies over time.  And so
6  I mentioned we acquired a couple of companies to
7  create the MSP business unit.
8          In around 2015, we acquired a few small
9  companies to jump start us with technology to
10  deliver services in a SaaS deployment.  S-a-a-S.
11  That was our application management grouping or
12  cloud grouping of products.  Those products had a
13  small number of customers and I don't recall there
14  being government customers.
15          So with any acquisition, we would look
16  to the product and say can we cross-sell that
17  product to our customer base in Core-IT? which was
18  a large, loyal customer base.  And as we looked at
19  the cloud products, the question became, what do
20  we need to sell those products to our customer
21  base of which some of that was government
22  customers?
23          And the comment was, look, to sell a
24  SaaS product to government, you'll need to invest
25  in FedRAMP.  And we understood FedRAMP was a long,

185

1  arduous, expensive initiative.
2          So we wanted a quick, cursory,
3  preliminary review as to how much do we think this
4  is going to cost us?  How much effort needs to go
5  into this?  And we tasked that to our team that
6  deals with SOC-2 and those types of
7  certifications.
8          So this ended up with Kellie, who's a
9  nontechnical person, more or less spitballing with
10  what she knew about documents through SOC-2 and
11  trying to understand what's the scope of
12  activities we would need to do to obtain FedRAMP
13  compliance with our cloud properties and how long
14  would that roughly take.
15      Q.  So let me take you back in your answer.
16  I think you said you would task it "to our team
17  that deals with SOC-2 and those types of
18  certifications."
19          Who was on that team?
20      A.  At that time -- again, SOC-2 is a very
21  collaborative effort, but the program manager, who
22  would make sure the trains of this was running on
23  time, was Kellie.  And the information in a SOC-2
24  audit would have to come from different resources
25  in the organization.

186

1      Q.  What is your understanding of what SOC-2
2  is?
3      A.  SOC-2 is a certification for SaaS
4  products that certain operational procedures and
5  the product itself could do certain things.
6      Q.  Okay.  And you said that Ms. Pierce was
7  tasked with making the trains run on time.
8          With whom was she working on the
9  project?
10      A.  The FedRAMP --
11      Q.  Yes.
12      A.  -- assessment?
13      Q.  Yes.
14      A.  I'm not aware of her working with
15  anyone, and I would defer to her testimony on
16  that, because we didn't want this to be a large,
17  distracting project.  We wanted it to be a
18  cursory, back-of-the-envelope, how far are we?
19      Q.  Did you think there was a serious
20  possibility you were going to try to get FedRAMP
21  certification at the time that this assessment was
22  done?
23      A.  The request would have been more from
24  the business side.  So, like, the sales side,
25  because they want to sell more.  And this is going

187

1  to help them in that effort.  I believe there was
2  a bias on the general and administrative team that
3  this was a big effort and was going to be very
4  distracting and we were not ready to engage on
5  that.
6      Q.  Why did you go through doing the
7  assessment at all if the bias was against doing
8  it?
9      A.  We -- we wanted to understand, you know,
10  how much work it would take.  Even though we're
11  biased doesn't mean you don't do it.
12      Q.  Mm-hmm.  Did you -- or did SolarWinds
13  take any action as a result of the results of the
14  FedRAMP assessment in terms of changing its
15  internal cybersecurity practices?
16      A.  Not that I recall.
17      Q.  Was there any assessment based on the
18  results of the FedRAMP assessment as to whether
19  SolarWinds's cybersecurity practices were
20  deficient in some way?
21          MR. TURNER:  Objection to
22      form.
23      A.  No.  This -- again, this was not a
24  technical person reviewing our cybersecurity
25  program, fact-finding and assessing the program.

188

1    **Q.**  As -- prior to, like, March of 2018, was
2  there a written secure development life cycle
3  policy document at SolarWinds?
4              MR. TURNER:  Objection to form
5         and scope.
6    **A.**  I don't know what you mean by "policy
7  document," if it -- if it's this document
8  itself.  I don't even know if this describes full
9  secure development or software development life
10 cycle or if this was Steven Colquitt's program
11 that was augmenting and evolving what we were
12 already doing.  But there are items in Confluence,
13 for instance, prior to March of 2018 that
14 illustrate software development life cycle
15 activities, yes.
16   **Q.**  I'm referring to secure development life
17 cycle in particular as opposed to software
18 development life cycle more generally.
19        And my question was as -- prior to March
20 of 2018, was there a written secure development
21 life cycle policy at SolarWinds as a document?
22             MR. TURNER:  I object to form
23        and scope.
24   **A.**  There were items within Confluence,
25 which is a wiki, W-I-K-I, that had procedures for

205

1  software development that would include certain of
2  these activities, like code scanning.
3    **Q.**  As you sit here today, there -- there
4  seem to be a number of bullets under "Secure
5  Development Life Cycle."
6         Are you aware of which, if any, of these
7  were set forth in some SolarWinds internal
8  document as a procedure prior to March of 2018?
9              MR. TURNER:  Objection to form.
10        And I'd just note we've produced the
11        documents.  You can read them yourself.
12        The witness is not -- can't be expected
13        to memorize everything he's seen.
14   **A.**  Without seeing the documents, no.  I
15 don't have all that in my mind.
16   **Q.**  So specifically with respect to security
17 training, were there specified security training
18 procedures within SolarWinds for -- with respect
19 to a secure development life cycle prior to March
20 of 2018?
21             MR. TURNER:  Objection to form
22        and scope.
23   **A.**  I don't know the content of this
24 document and what that's saying about security
25 training, but I'd defer to Steven Colquitt's

206

1  testimony on what training was going on and Joe
2  Kim's testimony on that.
3    **Q.**  Okay.  Turning your attention back to
4  the cover email on the document, there's a
5  statement from Ms. Pierce to Mr. Brown,
6  Ms. Thornton, and I guess Phillips Akogun:  "We
7  have collected and redacted several security
8  artifacts that would assist with customer
9  questionnaires.  We would like to review them with
10 you before reviewing with legal."
11        Do you understand the purpose for which
12 this document was being prepared as having
13 something to do with customer questionnaires?
14             MR. TURNER:  Objection to
15        foundation and scope.
16   **A.**  I don't specifically know without seeing
17 the documents.  But, again, in this time period, I
18 hope we recognize we were getting a lot of
19 questions from customers and we were trying to
20 make sure that we were answering those questions
21 appropriately, and this seems like a small part of
22 that overall admission.
23   **Q.**  Okay.  What's a checkmarks report?
24   **A.**  Checkmarks is a tool that I'll again
25 defer to the technical resources and their

207

1  testimony precisely what it does, but part what
2  have it does is code scanning.
3    **Q.**  Okay.  What's "BCP-DR"?
4    **A.**  Where are you?
5    **Q.**  The fourth -- the third bullet point.
6  It says "BCP-DR is included in the policy table of
7  contents."
8         What does BCP-DR mean?
9              MR. TURNER:  Objection to scope
10        and foundation.
11   **A.**  I suspect that's business continuity
12 plan and disaster recovery.
13   **Q.**  Okay.  It says "Pen test attestations
14 have already been redacted and/or are shareable."
15        What's a pen test attestation?
16             MR. TURNER:  Same objection.
17   **A.**  I know what a penetration test is.  I'm
18 not sure precisely what the attestation is
19 referred to here.
20   **Q.**  Is it possible that in an NDA response
21 to a questionnaire, a customer might ask to see
22 your records of pen testing on some product and
23 this would have something to do with that?
24   **A.**  The first part is possible, that they
25 would ask for a pen test of a product.  The second

208

1  weren't written down at that point?
2      A.  Certainly there were documentation that
3  we were improving/enhancing prior to this as we
4  were approaching -- you know, as we got through
5  the GDPR process, for instance, as we were
6  approaching being a public company.  So there were
7  lots of initiatives that were creating a need for
8  documenting a lot of the activities that were
9  going on through, you know, a couple-year period
10  there.
11      Q.  Okay.  There are no specific policies
12  you're aware of as you're sitting here based on
13  your preparation that were being referred to as
14  "needs improvement"?
15      A.  No, I don't -- I don't know of a
16  specific policy that would need improvement.  No.
17      Q.  Do you have any other further knowledge
18  as to what projects had or had not been done for
19  the items that were coded yellow?
20      A.  Knowledge as to what had been done for
21  those that are yellow?
22      Q.  Yeah.  What -- so yellow seems to imply
23  somewhere between limited or nonexistent and
24  strong program.
25          So do you have an understanding as to

213

1  what steps had been taken on the yellow as opposed
2  to what had not yet been taken?
3      A.  Not precisely, no.
4      Q.  Okay.
5          MR. TODOR:  New document.
6          (Whereupon, exhibit is received
7      and marked Bliss Deposition Exhibit 13
8      for identification.)
9          THE REPORTER:  Bliss 13 for
10      identification.
11  BY MR. TODOR:
12      Q.  Okay.  And you've been presented with a
13  document marked Bliss Exhibit 13.  It has Bates
14  SW-SEC00313351 through 3362.  It appears to be a
15  PowerPoint titled "Information Security - Risk
16  Review October 2018."
17          Did you review this document in
18  preparation for your deposition?
19      A.  I did not.
20      Q.  What was the function of a risk review
21  in information security reportingwise within
22  SolarWinds?
23      A.  Again, I'm not sure -- similar to the
24  one previously -- what the audience was for this
25  presentation.

214

1      Q.  Okay.  Would you turn your attention to
2  the last four pages of the document starting with
3  Bates 3359?
4      A.  Mm-hmm.
5      Q.  And first slide states "A proactive
6  security model - original plan and request from
7  August 2017."
8          Are you with me there?
9      A.  Mm-hmm.
10      Q.  Do you understand this to be Mr. Brown's
11  original plan and request from August 2017 for a
12  proactive security model?
13      A.  I'd defer to his testimony on that.
14      Q.  Okay.  Turning your attention to Bates
15  3361, there is a slide titled "Proactive security
16  model - updated October 2018 with status."
17          Are you there?
18      A.  Mm-hmm.
19      Q.  And, again, there's some color coding in
20  red, yellow, and green.
21          Do you know what the red, yellow, and
22  green -- or does SolarWinds know what the red,
23  yellow, and green are referring to here?
24      A.  I do not without a legend.
25      Q.  Okay.  Is it reasonable to conclude that

215

1  it would be similar to what the red, yellow, and
2  green meant in the information security incident
3  review for September 2018 that we just looked
4  at?
5      A.  I'd probably defer to what Tim or Rani
6  said about that.
7      Q.  For the items under "Risk of
8  Noninvestment," the first item -- and you can
9  probably look to the one two pages before it if
10  you want to see it in the black lettering.  First
11  bullet under "Risk of Noninvestment" coded in
12  yellow states "Current state of security leaves us
13  in a very vulnerable state for our critical
14  assets.  A compromise of those assets would damage
15  our reputation and financially."
16      A.  Mm-hmm.
17      Q.  What is SolarWinds's understanding as to
18  why this is coded yellow here?
19      A.  Sorry.
20          My understanding of that statement,
21  first, is that it was attached originally to a
22  budget request being made.  So as with any budget
23  request, there's a certain amount of hyperbole
24  that's introduced, but it's also identifying a
25  risk, not a factual finding, of, look, if we're

216

1  investing, the static state today is going to
2  leave us in a vulnerable state. And I hope every
3  cyber person thinks that because if you stand
4  still, you will be in a vulnerable state years
5  from now as the macro is changing.
6      And I think that's -- the risk here that
7  he's identifying is the macro's changing
8  dramatically and we need to be investing in that.
9      Q.  What is SolarWinds' understanding as to
10 whether Mr. Brown was using hyperbole in this
11 statement?
12     A.  I would -- I would think he is using
13 hyperbole in this statement.
14     Q.  What's SolarWinds' basis for that
15 conclusion?
16     A.  It's natural human nature when you're in
17 a budget request to be -- particularly in cyber,
18 to be stating things of why you need budget. But,
19 again, this isn't a fact of which he's being
20 hyper -- hyperbolic about. This is a risk he's
21 identifying.
22     Q.  I direct your attention down to the
23 fifth bullet. There's a statement: "Without
24 training our employees will continue to be one of
25 our biggest risks," which is coded in red.

217

1      What is SolarWinds' understanding as to
2  why that's coded in red?
3      A.  I don't have recollections as to why
4  this is a red.
5      Q.  What was the status of SolarWinds'
6  security training initiatives in October 2018 as
7  they related to secure development training?
8          MR. TURNER: Objection to
9      form and scope and foundation.
10     A.  As it related to the Colquitt
11 initiative?
12     Q.  So I'm referring specifically -- there's
13 a budget request slide here --
14     A.  Mm-hmm.
15     Q.  -- on the right that says "Secure
16 Development Training, $30,000," and that is coded
17 in red.
18     A.  Mm-hmm.
19     Q.  So what is SolarWinds' understanding as
20 to why that is coded in red?
21     A.  I don't have a specific recollection as
22 to why that is coded in red, but as a reminder,
23 Steven Colquitt had a program that he was
24 introducing to up-level the secure development
25 within the company. And as with a program that

218

1  big, it takes time to implement. And as you talk
2  about training people, you're training people not
3  just on the programs and the workflows, but on new
4  tools you're introducing, for instance, and
5  operationalizing that.
6      So you're doing that on a regular
7  cadence. So when you bring in new developers or
8  you acquire companies and you bring in developers
9  en masse from acquisitions, you can get them to
10 scale up the learning curve and standardize with
11 the procedures he was recommending to augment our
12 activities.
13     Q.  Was this secure development training a
14 budget request for an additional $30,000 approved?
15     A.  I don't recall what the request was for
16 or what was funded and whether it wasn't needed to
17 be funded because, for instance, he might have
18 been thinking about a tool, but we just
19 encompassed it into our broader training tool, for
20 instance, but I don't know the answer to that.
21     Q.  You said in an earlier answer that
22 this -- that these risks of noninvestment were not
23 factual findings.
24     Is that what you said?
25     A.  That first one in particular, yeah.

219

1  That's an identified risk of in Tim's mind what a
2  risk would be, much like we would say in risk
3  factors, if we stayed still.
4      Q.  So is the statement "Current state of
5  security leaves us in a very vulnerable state for
6  our critical assets" not a factual finding?
7      A.  I do not think it is a factual
8  finding.
9      Q.  Why not?
10     A.  I don't think that they believed there
11 was any material issue with their cybersecurity
12 program at this time.
13     Q.  Why is saying "a very vulnerable state"
14 not saying that there was a material issue with
15 the cybersecurity program?
16         MR. TURNER: Okay. Object.
17     You're asking him about Tim's state of
18     mind. Tim has already testified that
19     this was not a factual finding. You're
20     asking about the company's position.
21     He's told you the company's position.
22         Beyond that I'm -- I'm not sure
23     what other information this witness has
24     to provide.
25         MR. TODOR: That's what I'm

220

1    trying to find out.
2        A.   I'd just go back to my hyperbole
3    comments and he's identifying a risk and this is
4    not a factual finding.  And I'd defer to his
5    testimony with respect to that as well.
6        Q.   Turning your attention to the third
7    bullet on 3361 under "Risk of Noninvestment."
8    There's a statement: "We have had 22 reported
9    security incidents this year.  Reactive responses
10   costs significantly more than being proactive."
11   It appears to be coded red.
12       What's SolarWinds' understanding as to
13   why that's coded red?
14            MR. TURNER:  Objection to
15       scope.
16       A.   I don't recollect the reason for why
17   that's red.
18       Q.   I direct your attention --
19       A.   I defer -- I defer to Tim's testimony.
20       Q.   Okay.  I direct your attention to the
21   "Overall Budget Request" section to the section on
22   "internal/external pen test."  And there are
23   figures that are coded yellow.
24       What's SolarWinds' understanding as to
25   why that's coded yellow?

                        221

1        A.   Again, I'd defer to Tim's testimony on
2    why that's yellow.
3        Q.   Did SolarWinds make a decision to
4    prioritize internal as opposed to external pen
5    testing at this time?
6            MR. TURNER:  Objection to
7        form, foundation, and scope.
8        A.   I would defer to Tim if he testified on
9    that, but I don't know.
10       Q.   Okay.
11           MR. TODOR:  Next document.
12           (Whereupon, exhibit is received
13       and marked Bliss Deposition Exhibit 14
14       for identification.)
15           THE REPORTER:  Bliss 14 for
16       identification.
17           THE WITNESS:  Thanks.
18   BY MR. TODOR:
19       Q.   And you've been presented with a
20   document marked as Bliss Exhibit 14 marked with
21   Bates SW-SEC00001635 through 1652.  Appears to be
22   a PowerPoint, "SolarWinds Security and Compliance
23   Program Quarterly, May 17, 2019."
24       So what was the purpose of security and
25   compliance program quarterly documents within

                        222

1    SolarWinds?
2        A.   I'd have to be reminded on the audience
3    for this particular one.
4        Q.   What is your understanding of who the
5    audience was?
6        A.   So -- so there are various reports of
7    security compliance programs that would be perhaps
8    more detailed within the IT organization that
9    would get summarized as -- as we went to report to
10   the executives, for instance.  I'm not sure which
11   one this exactly is.  It looks to me like it's for
12   presentation to the IT organization given the
13   cover, but I didn't want to presume that without
14   knowing.
15       Q.   If you look at the second page, it looks
16   like there are security and compliance initiatives
17   as "legal, financial, product, federal, security,
18   and information technology."
19       Does that suggest anything to you about
20   who the audience would be?
21       A.   No, not this slide.  No.
22       Q.   Okay.  Is it likely it's someone fairly
23   senior?
24       A.   I don't know.
25       Q.   Do you have any knowledge -- and you can

                        223

1    look at the page 1641 for security compliance
2    initiatives listed for security.
3        Do you have any knowledge of the
4    technical input that went into these?
5        A.   Are you asking if I have knowledge as to
6    the kind of diligence underneath these?
7        Q.   Yeah.  So, like,what would be the -- the
8    workflow for coming up with that first item,
9    "Secure Development Life Cycle, working with the
10   engineering and development teams to continue to
11   mature and adopt the SDL"?
12       How was that statement generated?
13       A.   I don't know who authored it or
14   generated it.
15       Q.   Okay.  Would it be a typical practice
16   for the information security group to take the
17   lead on developing the security and compliance
18   initiatives for security?
19           MR. TURNER:  Object to form.
20       A.   Can you say that maybe slightly
21   differently?
22       Q.   Okay.  So the secure development life
23   cycle says "Working with the engineering and
24   development teams..."
25       Who is working with the engineering and

                        224

1  "Moving towards zero trust model (where we
2  loosely protect all and strongly protect those
3  that can do material harm).  Less requirements on
4  VPN."
5        What is SolarWinds' understanding as to
6  what the status of progress was towards zero trust
7  model as of the date of this presentation in
8  August 16th, 2019?
9     A.  We -- we're always looking to improve
10 and zero trust is another model that was around
11 that we were looking to make sure that as we
12 provisioned and monitored, we were doing it
13 according to that model.  So it's -- it's just
14 simply an improvement upon the least privilege
15 model that we were implementing at this time.
16    Q.  Why does it say "Less requirements on
17 VPN"?
18    A.  I'm not sure and I'd have to defer to
19 any testimony that discussed that.  It's probably
20 more of a technical issue than I know.
21    Q.  I direct your attention to the "Security
22 Category" section and to the last row there.  It
23 states "Authentication, Authorization and Identity
24 Management," and the objective is "user identity,
25 authentication and authorization are in place and

233

1  actively monitored across the company."  And it
2  says NIST maturity level is 1.
3        What is SolarWinds' understanding as to
4  why the NIST maturity level was 1 for that item?
5     A.  So, again, subjective determination.
6  Generated a conversation in this venue in
7  particular of ongoing activities.  I mentioned
8  Azure, A-Z-U-R-E, as one of those activities.  And
9  it refers again to standardization of the identity
10 management across all of SolarWinds and its
11 properties.
12    Q.  What was SolarWinds' understanding of
13 what steps needed to be taken to improve the NIST
14 maturity level from 1 to a higher level as of this
15 point?
16    A.  The completion of a -- of projects that
17 were in place, in particular Azure AD, and the
18 rolling out of that tool and training behind that
19 tool to the full organization is an example.
20    Q.  Any other examples that you're aware
21 of?
22    A.  I'm not aware of this determination
23 referring to more than that, but I would defer to
24 any testimony that might highlight anything.
25    Q.  I turn your attention to Bates 1523

234

1  within the document.  And this is a slide marked
2  "Financial:  Enterprise Access Management (SOX
3  compliance)."
4        What was the role for, I guess, the --
5  the financial review for enterprise access
6  management at SolarWinds?
7           MR. TURNER:  Objection to
8        form.
9     A.  What -- what do you mean by the
10 process?
11    Q.  So was it something that would be part
12 of the SOX compliance audit?
13           MR. TURNER:  Would -- would
14        what be part of the --
15           MR. TODOR:  Enterprise access
16        management.
17    A.  It would be part of the Sarbanes-Oxley
18 initiative, yes.
19    Q.  Okay.  And I direct your attention to
20 the description that states "Access management
21 describes the management of individual identities,
22 their authentication, authorization, roles, and
23 privileges within the enterprise in order to
24 minimize security risks associated the use of
25 privileged and nonprivileged access."  It

235

1  looks like there probably should have been a
2  "with."
3        Was that an initiative at SolarWinds to
4  improve on access management in the -- on around
5  August 2019?
6           MR. TURNER:  Object to form.
7     A.  I think this was an attempt to describe
8  what this project is.
9     Q.  Okay.
10    A.  Probably imperfect.
11    Q.  Okay.  And looking at the "Issues, Risks
12 and Dependencies," category 1.1, it says "Concept
13 of least privilege not followed as a best
14 practice."
15        What was SolarWinds' basis for
16 describing that as an issue, risk, or
17 dependency?
18    A.  I believe that's an identified risk.
19 That could be the case, but I don't know -- I
20 don't agree that least privilege was not followed,
21 if that's your question, at this time period
22 because there's ample evidence that it was.
23    Q.  Okay.  There are some timelines here,
24 key milestones.
25        Do these relate to progress on the

236

1 concept of least privilege being followed as a
2 best practice?
3    A.  You -- you mean the key milestones --
4    Q.  Yes.
5    A.  -- status case?
6    Q.  Yes.
7    A.  So this is kind of a project template
8 and the issues, risks, dependencies are kind of
9 the risks or identified issues, but the least
10 privilege one's a risk that this project is hoping
11 to address.  Right?  So some of these milestones
12 over here may or may not pertain directly to that
13 identified category.
14    Q.  So if I look at Phase 7 down there, it
15 says "Finalize access SARF, implement SARF
16 changes/exceptions."
17    A.  Right.
18    Q.  I think you might have spoken to this
19 earlier.
20       What's SARF?
21    A.  SARF is system access request form.  So
22 the SARF process predated the relevant period and
23 it had evolved over time.  So it was a somewhat
24 manual process of distributing a form around to
25 stakeholders that would have input as to what

237

1 access rights an individual -- an employee, for
2 instance, being onboarded -- would need.  And they
3 would describe least privileged systems that they
4 need access to.  And they would require an
5 approval process if there is a need for that
6 role to have access to systems beyond what's
7 described.
8    Q.  Mm-hmm.
9    A.  The changes we've made over time were
10 to -- mostly to automate that more and more, and
11 it roughly lines up with this time period when we
12 were looking at doing more automated procedures
13 around the SARF.
14    Q.  Was there any finding within SolarWinds
15 that SolarWinds' SARF processes presented a SOX
16 compliance problem?
17    A.  Nothing significant, but a SARF -- a
18 manual process, whatever it is, and SARF included,
19 had prone to isolated incidents such as a form not
20 being filled out accurately or the access rights
21 not being provisioned on a perfectly timely basis,
22 but those were very isolated.  The more you could
23 automate that, the thought was you could reduce
24 those isolated exceptions.
25    Q.  Okay.  And looking at the timeline for

238

1 this finalizing access SARF and "implement SARF
2 changes/exceptions," it has a start of 12/2019 and
3 finish of 2/2019.  I'm guessing that might have
4 meant 12/2018.
5       What was SolarWinds doing during that
6 phase of the process if you know?
7    A.  I don't recall specifically what was
8 being done.  I do know that the SARF form changed
9 at some point roughly around this time period to
10 reflect a more automated procedure.
11    Q.  Okay.  And then the eighth step there
12 says "Internal audit, Holtzman audit, audit
13 remediation."
14       What activities is that referring to
15 with respect to "Enterprise access management (SOX
16 compliance)"?
17    A.  I don't recollect exactly what that's
18 referring to.
19    Q.  What would -- would audit remediation
20 imply that there was some finding of a
21 deficiency in the audit that needed to be
22 corrected somehow?
23    A.  A deficiency in the actual audit
24 procedures?
25    Q.  In the -- the audit found some

239

1 deficiency with respect to enterprise access
2 management that had to be remediated somehow.
3    A.  Not necessarily.
4    Q.  Okay.  Why?  What else might it mean?
5    A.  It could mean to the point there are
6 events that were highlighted in user access
7 reviews, for instance, that we would go remediate,
8 as you suggested.  It could also mean that the
9 audit procedures, for instance, were pulling
10 things from -- from, you know, wrong time periods,
11 for instance.  I don't know.  But we were doing
12 user access reviews, which is part of the audit
13 procedures, identifying any user access
14 exceptions and remediating those.  So it could
15 mean that.
16    Q.  Okay.
17       MR. TODOR:  Next.
18       (Whereupon, exhibit is received
19    and marked Bliss Deposition Exhibit 16
20    for identification.)
21       THE REPORTER:  Bliss 16 for
22    identification.
23 BY MR. TODOR:
24    Q.  You've been presented with a document
25 marked as Exhibit 16.  It appears to be -- has

240

1  confirm that without source.
2     Q.  Okay.  And I'll refer your attention to
3  Bates 1587, the one that marked as the "SolarWinds
4  scorecard."
5     And was SolarWinds's understanding as to
6  the progress, if any, made with respect to the
7  second half of 2020 improvement plan items that
8  are listed first for "Identify" for "Increase SDL
9  awareness and adoption" compared to the previous
10  QRR that we reviewed?
11     A.  That was Exhibit...
12     Q.  This one was 18.  Would have been --
13  this one is 20.  It would have been 18.
14     A.  Okay.  So the key risks are the same,
15  which is what I would expect.  The improvement
16  plan has some changes on it.
17     Q.  And what -- was there any -- what --
18  what was the state of progress on those
19  improvement plans according to SolarWinds'
20  knowledge of this review compared to the prior
21  ones we looked at?
22     MR. TURNER:  I would just
23     note there -- there are two prior pages
24     that seem to go into greater detail on
25     this.  There are also a number of

261

1     second-half updates after the -- this
2     slide as well.
3  BY MR. TODOR:
4     Q.  I guess -- let me ask this way.
5     Do you have any reason -- does
6  SolarWinds have any reason to believe that the
7  descriptions of the projects and their update
8  status as listed in this slide deck are
9  inaccurate?
10     A.  I'm not sure if they accurately or
11  inaccurately project activities going on.  You
12  know, one obvious observation is the world pretty
13  much blew up in this time right now, right?  So
14  this was COVID and our entire employee workforce
15  was now at home.  So, you know, this wasn't
16  predicted earlier in 2020.  And as any good team
17  does, they would have to shift priorities to
18  addressing that which was an impressive effort.
19     So I think that context is super
20  critical to this entire assessment of 2020 and I
21  trust there were some advances.
22     Q.  Mm-hmm.
23     (Whereupon, exhibit is received
24     and marked Bliss Deposition Exhibit 21
25     for identification.)

262

1     THE REPORTER:  Bliss 21 for
2     identification.
3  BY MR. TODOR:
4     Q.  Okay.  You've been marked -- presented a
5  document marked Bliss 21.  It has Bates
6  SW-SEC00006628 through 664 -- 6628 through 6648.
7  Appears to be a PowerPoint marked "SolarWinds PM
8  Security Vulnerability and Incident Review, July
9  10, 2020."
10     What was the function of this document
11  within SolarWinds?
12     MR. TURNER:  Object to scope
13     and foundation.
14     A.  I'd have to defer to the testimony of
15  Tim.
16     Q.  Okay.  Is -- to your understanding, is
17  this a document Mr. Brown would have prepared?
18     MR. TURNER:  Same objection.
19     A.  I am not sure if Tim would prepare this,
20  contribute to it, or not.
21     Q.  I turn your attention to Bates 6635, and
22  this is a slide marked "ITOM Core Highlights and
23  Asks."
24     What does ITOM mean?
25     A.  ITOM here refers to the business unit

263

1  that I previously referred to called Core-IT.  It
2  had a different nomenclature, but ITOM was this
3  kind of preceding this.
4     Q.  I direct your attention to under
5  "Highlights."  The fourth bullet there states:
6  "Inconsistent internal security testing as part of
7  product final security reviews don't always
8  include web application testing before release."
9     What is SolarWinds' understanding as to
10  the basis for that statement?
11     A.  I'd have to defer to the testimony of
12  somebody like Tim on this, but it's under
13  "Highlights" with both Whitesource and checkmarks
14  with green checkmarks next to them --
15     Q.  Mm-hmm.
16     A.  -- which my interpretation of this is
17  this is an improvement on the overall program that
18  you're looking at.
19     Q.  Okay.  And what are Whitesource --
20  what's Whitesource?
21     A.  It's a -- it's a tool in the development
22  life cycle.  What precisely it does, I'd have to
23  defer to Tim's testimony on.
24     Q.  Okay.  And I think you discussed
25  checkmarks previously.

264

1    Is that --
2    **A.**  I did.
3    **Q.**  -- the same understanding as to what
4  function it would have with respect to internal
5  security testing as in your prior answer?
6    **A.**  Yes.
7    **Q.**  There's a -- the first bullet states
8  "Customers continue to actively engage third-party
9  penetration testers as part of their compliance
10  efforts."
11    Does that -- what is SolarWinds'
12  understanding as to why the customers would be
13  engaging third-party penetration testers?
14    **A.**  The industry at large was evolving
15  around this time.  And just like we were getting
16  more questions, people were now engaging with
17  penetration testers that they preferred or liked
18  and we rely on those.
19    **Q.**  Okay.  Was this a statement that
20  SolarWinds's penetration testing was inadequate?
21    **A.**  No.
22    **Q.**  What's the basis for that statement or
23  that response?
24    **A.**  My general experience with these
25  customer inquiries is there are a number of

265

1  penetration tools that were out there and we used
2  some of them and they were good.  Customers would
3  sometimes use a different tool and would not
4  necessarily rely on what the company had done with
5  their tool.
6    So that just created potential friction
7  and, thus, create a risk in the sales process.
8    **Q.**  Okay.
9    MR. TURNER:  Jason, I think the
10    question was, was the fact that customers
11    were doing pen tests at all an indication
12    SolarWinds' pen testing was inadequate?
13    THE WITNESS:  The -- the answer
14    to that is no, and it was more just this
15    is part of customer activity of doing pen
16    tests themselves just like we would on
17    vendors.
18  BY MR. TODOR:
19    **Q.**  Do you have any other understanding as
20  to why that was listed as a -- a highlight in
21  that section beyond what you've testified to so
22  far?
23    **A.**  No.
24    MR. TODOR:  We are getting to
25    Topic 8.d.  We can either press on or

266

1  if you need to take a break, we can do
2  that.
3    MR. TURNER:  Up to you, Jason.
4    THE WITNESS:  Let's take a
5  quick break before my bladder blows up.
6    THE VIDEOGRAPHER:  The time
7  right now is 6:28 p.m. and we are off the
8  record.
9    (Whereupon, a recess is taken.)
10    THE VIDEOGRAPHER:  The time
11  right now is 6:44 p.m. and we're back on
12  the record.
13  BY MR. TODOR:
14    **Q.**  Hello again, Mr. Bliss.  I direct your
15  attention to Topic 8.d of the deposition notice,
16  which is "Internal audits relating to
17  cybersecurity practices, including, but not
18  limited to, audits of IT general controls,
19  Sarbanes-Oxley audits, SOC Type 2 audits, and ISO
20  27001 audits," and then some Bates numbers.
21    We discussed SOX audits earlier.
22    Are you aware -- is SolarWinds aware of
23  any other findings in SOX audits with respect to a
24  deficiency with respect to access controls other
25  than the one that we discussed in the March 2020

267

1  email and in the QRR?
2    **A.**  I don't --
3    MR. TURNER:  Objection to
4    scope.
5    **A.**  I don't recall any other than those
6  isolated events that we looked at.
7    **Q.**  Okay.  And in audits of IT general
8  controls, were there any findings of
9  deficiencies with respect to access controls
10  at SolarWinds --
11    MR. TURNER:  Same objection.
12    **Q.**  -- in the relevant time period?
13    **A.**  I don't -- I mean, you the word
14  "deficiency."  I'd say there were exceptions to
15  the overall access rights that were identified and
16  remediated, none of which rose to the level of a
17  significant deficiency, much less a material
18  weakness, for instance.
19    So I hesitate to call it deficiency
20  because it relates to an accounting term.
21    **Q.**  Okay.  With respect to SOC Type 2
22  audits, were there any findings of deficiencies
23  with respect to access controls in the relevant
24  time period?
25    **A.**  I don't recall.  Obviously, a SOC-2

268

1  majority products," I'm guessing it could be "of
2  products."
3      What is SolarWinds' understanding for
4  the basis for that statement?
5      A.  I don't have any basis for that
6  statement.
7      Q.  Okay.  The second sentence states "In
8  addition, there is no governance in place to help
9  provide consistency."
10      What is SolarWinds' understanding of the
11  basis for that statement?
12      A.  I -- SolarWinds doesn't believe there is
13  a basis for this statement.  We just pored through
14  a number of large documents that suggest
15  otherwise.
16      Q.  And with respect in particular to the
17  RMM and central and backup documents that are
18  being referred to as "key MSP products" on the
19  previous page, what is SolarWinds' understanding
20  as to the design documentation for those products
21  as relates to the issues discussed here?
22      MR. TURNER:  Objection to form
23      and scope.
24      A.  I don't think that SolarWinds
25  understands these authors and what they're trying

273

1  to communicate with this statement.
2      Q.  Okay.
3      A.  Because it -- the fact that design
4  documentation is lacking, we know there's design
5  documentation for products, so I don't know if
6  he's -- what he's expecting.  And I'm not sure he
7  had a firm basis for that or not.
8      Q.  Does SolarWinds have an understanding
9  of what the governance that is being referred to
10  in the -- the second sentence would be referring
11  to?
12      A.  No.
13      Q.  Turn to the third sentence there.
14  There's a statement "These are crucial for
15  threat modeling and other security activities in
16  SSDLC."
17      What is SolarWinds' understanding as to
18  the basis for that statement?
19      A.  I'm not sure of the precise basis of the
20  statement.  Again, we were doing threat modeling,
21  so I'm not sure where he's getting his information
22  to come to these conclusions.
23      Q.  Was -- is it SolarWinds' understanding
24  that SSDLC is referring to secure software
25  development life cycle?

274

1      A.  I'm not sure if Stas was referring to
2  that specifically or the program.  It's kind of
3  unclear.
4      Q.  Next statement is "This should be
5  covered by architecture, as part of the SSDLC
6  process being formed."
7      What is SolarWinds understanding as to
8  the basis for that statement?
9      A.  I don't understand the basis for the
10  statement or what he's referring to when he's
11  precisely saying "the SSDLC process" in the
12  statement.
13      Q.  As of July 2019, was there a secure
14  development life cycle process being formed for
15  MSP products separate from that for the Core-IT?
16      A.  I'm not aware of one.
17      Q.  By "architecture," which group at
18  SolarWinds is being referred to there to
19  SolarWinds' knowledge?
20      A.  Not -- I don't understand precisely
21  which team he's referring to, but there is a group
22  that's considered architects in engineering.
23      Q.  I turn your attention to the next page
24  of the document, Bates 6794.  And I'll turn your
25  attention to the heading "Risk assessment

275

1  (Identify)," and would ask you to look first at
2  the first subheading there.  Let me know when
3  you're ready to discuss.
4      A.  Okay.
5      Q.  And the first subheading is "Asset
6  vulnerabilities are identified and documented."
7  The statement is "Each product seems to have its
8  own ways of marking security issues that do not
9  follow recently established SW standards."
10      What is SolarWinds' understanding for
11  the basis for that statement?
12      A.  I don't think we understand the basis of
13  the statement and I'm not sure I understand what
14  the statement is really saying.
15      Q.  Next -- I'd ask you to read the next
16  subheading and statement and let me know when
17  you're ready to discuss.
18      A.  Okay.
19      Q.  And the statement "Currently, there is
20  no formal process in place for reporting" --
21  the -- the heading is "Threat and vulnerability
22  information is received from external sources."
23  The first statement is "Currently, there is
24  no formal process in place for reporting
25  purposes."

276

1    What is SolarWinds' understanding for
2  the basis for that statement?
3    **A.**  I have no understanding for the basis of
4  that statement because there was a process in
5  place for reporting purposes.
6    **Q.**  I direct your attention to the last
7  sentence in that section.  There's a statement, "A
8  pre-requirement to have a policy to maintain
9  proper third-party asset list, OS versions
10 utilized, et cetera, to have data to work with."
11    What is SolarWinds' understanding for
12 the basis for that statement?
13    **A.**  SolarWinds doesn't understand what that
14 statement is saying.  It -- my guess is this may
15 be an English-as-a-second-language author --
16    **Q.**  Mm-hmm.
17    **A.**  -- and I'm not sure I would apply such
18 precision to much of these words, but I don't
19 understand that last sentence.
20    **Q.**  Okay.  I direct your attention to the
21 third subheading and ask you to review that and
22 let me know when you're ready to discuss.
23    **A.**  Okay.
24    **Q.**  And the first statement, "No" -- the
25 subheading is "Threats internal and external are

277

1  identified and documented."  The statement "No
2  threat modeling nor analysis is performed as part
3  of any process (except MSP backup engineering)."
4    What is SolarWinds' understanding for
5  the basis for that statement?
6    **A.**  We have no knowledge of the basis for
7  that statement, as we know threat modeling was
8  done and analysis was being performed.
9    **Q.**  Okay.  Turn your attention to the fifth
10 subheading.  I'd ask you to help read that with
11 you.  Statement is "Threats, vulnerabilities,
12 likelihoods and impacts are used to determine
13 risk."  The statement is "No coverage due to
14 missing pre-requirements."
15    What is SolarWinds' understanding for
16 the basis for that statement?
17    **A.**  Again, I'm not sure SolarWinds
18 understands what that statement is even saying,
19 much less what the basis of that statement is.
20    **Q.**  Does SolarWinds have an understanding
21 as to whether threats, vulnerabilities,
22 likelihoods, and impacts are used -- were used to
23 determine risk for its MSP products as of July
24 2019?
25    MR. TURNER:  Object to form.

278

1    **A.**  I admit I'm not sure what likelihoods
2  and impacts are here, but if it was identifying
3  threats and identifying vulnerabilities and
4  determining risk, yes, we were doing that.
5    **Q.**  Okay.  I turn your attention to Bates
6  6796 within the document and direct your attention
7  to the I guess first main heading "Awareness and
8  Training (protect)," and ask you to read that
9  section and let me know when you're ready to
10 discuss.
11    **A.**  Just the "All users are informed and
12 trained" part?
13    **Q.**  Yes.
14    **A.**  Okay.  Okay.
15    **Q.**  And the statement is -- the subheading
16 is "All users are informed and trained."  The
17 statement is "There is no security awareness
18 training as well there is no security training
19 during the onboarding process."
20    What is SolarWinds' understanding for
21 the basis of that statement?
22    **A.**  Again, I do not know what the basis for
23 that statement was as there was security training
24 being done.
25    **Q.**  There were a lot of I guess what would

279

1  appear to be alarming statements in here as to the
2  types of security practices.
3    Did SolarWinds take any action in
4  response to this document?
5    MR. TURNER:  Object to the
6    characterization.
7    **A.**  I'm not sure whether there were
8  specific actions taken, but the fact that I don't
9  know these gentlemen's names suggests to me they
10 were likely very junior members of the team that
11 may not have full context or information as to
12 what was going on and perhaps was putting
13 together a document with very bad English that
14 maybe they needed to deliver.  But -- and as
15 part of a smaller business unit of the company, I
16 am not going to be alarmed by simply looking at
17 this.
18    **Q.**  Okay.  Does SolarWinds know to whom this
19 document was sent?
20    **A.**  No.
21    **Q.**  Does SolarWinds know whether any
22 specific action items were taken as a result of
23 any of the statements in the document?
24    **A.**  No.
25    **Q.**  Turning to Topic 8.f in the deposition

280

1    **A.**  Well, there are many questions outside
2  of what's here in the knowledge base.  So legal
3  would have a level of technical that I explained,
4  but not necessarily to a depth of perhaps somebody
5  in the Dev-Ops team, for instance, and would ask
6  questions -- and that person might have answered
7  the question to begin with -- but asked questions
8  about the veracity of the information.
9           MR. TODOR:  No further
10      questions at this time.
11          MR. TURNER:  Just briefly.
12  RECROSS-EXAMINATION
13  BY MR. TURNER:
14    **Q.**  We talked about vetting these
15  statements.  This a password statement, okay, is a
16  statement simply that complex passwords are
17  required that use alpha and numeric characters.
18          Was that done at SolarWinds?
19    **A.**  Yes.
20    **Q.**  It was done through Active Directory.
21  That's your testimony, right?
22    **A.**  Yes.
23    **Q.**  Would Eric Quitugua needed to have spent
24  significant time to vet that information?
25    **A.**  No.

313

1    **Q.**  Why?
2    **A.**  Because it was obvious.
3    **Q.**  Thank you.
4           MR. TURNER:  No further
5       questions.
6           MR. TODOR:  No further
7       questions at this time.
8           THE VIDEOGRAPHER:  The time
9       right now is 7:47 p.m. and we're off the
10      record.
11          (Whereupon, the deposition was
12      concluded at 7:47 p.m.)

314

1  STATE OF NEW YORK.    )
2                        ) ss:
3  COUNTY OF NEW YORK    )
4           I hereby certify that the
5  witness in the foregoing deposition, JASON WALLACE
6  BLISS, was by me duly sworn to testify to the
7  truth, the whole truth and nothing but the truth,
8  in the within-entitled cause; that said deposition
9  was taken at the time and place herein named; and
10  that the deposition is a true record of the
11  witness's testimony as reported by me, a duly
12  certified shorthand reporter and a disinterested
13  person, and was thereafter transcribed into
14  typewriting by computer.
15          I further certify that I am not
16  interested in the outcome of the said action, nor
17  connected with nor related to any of the parties
18  in said action, nor to their respective counsel.
19          IN WITNESS WHEREOF, I have hereunto
20  set my hand this 29th day of October 2014.
21     Reading and Signing was:
22  ___ requested   ___ waived   _X_ not discussed
23
24      _____
25          BRIDGET LOMBARDOZZI, CSR, RMR, CRR

315

1           CERTIFICATE OF WITNESS
2
3    I, JASON WALLACE BLISS, do hereby declare under
4    penalty of perjury that I have read the entire
5    foregoing transcript of my deposition testimony,
6    or the same has been read to me, and certify that
7    it is a true, correct and complete transcript of
8    my testimony given on October 16, 2024, save and
9    except for changes and/or corrections, if any, as
10   indicated by me on the attached Errata Sheet, with
11   the understanding that I offer these changes and/or
12   corrections as if still under oath.
13     _____ I have made corrections to my deposition.
14     _____ I have NOT made any changes to my deposition.
15
16   Signed: _____
17         JASON WALLACE BLISS 30(b)(6)
18
19   Dated this _____ day of _____ of 20_____.
20
21
22
23
24
25

316

```
 1            ERRATA SHEET
 2   30(b)(6) Deposition of: JASON WALLACE BLISS
     Date taken: OCTOBER 16, 2024
 3   Case:  SEC v. SOLARWINDS CORP., et al.
 4   PAGE  LINE
             _____CHANGE: _____
 5   _____ REASON: _____
 6   _____      CHANGE: _____
             REASON: _____
 7
             _____CHANGE: _____
 8   _____ REASON: _____
 9   _____      CHANGE: _____
             REASON: _____
10
             _____CHANGE: _____
11   _____ REASON: _____
12   _____      CHANGE: _____
             REASON: _____
13
             _____CHANGE: _____
14   _____ REASON: _____
15   _____      CHANGE: _____
             REASON: _____
16
             _____CHANGE: _____
17   _____ REASON: _____
18   _____      CHANGE: _____
             REASON: _____
19
             _____CHANGE: _____
20   _____ REASON: _____
21   _____      CHANGE: _____
             REASON: _____
22
             _____CHANGE: _____
23   _____ REASON: _____
24   Signed_____
25   Dated_____

                    317
```

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:23-cv-09518-PAE |
| ) | |
| SOLARWINDS CORP. and TIMOTHY G. ) | |
| BROWN, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**<u>Notice of Errata – Deposition of Jason Bliss</u>**
**<u>(October 16, 2024)</u>**

I, the undersigned, do hereby declare that I have read the deposition transcript of Jason Bliss dated October 16, 2024 and that to the best of my knowledge, said testimony is true and accurate, with the exception of the following changes listed below:

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | **From** | **To** | |
| 36:12 | "externally, it was the initial" | "externally, the initial" | Clarification |
| 36:14–15 | "come in directly to information security group, but they would bring those" | "come in directly to the information security group, and they would bring those" | Clarification |
| 38:14 | MSP | MSPs | Typographical error |
| 38:23 | "refer to them as" | "refer to as" | Clarification |
| 46:23–24 | "VP security and architecture" | "VP of security and architecture" | Typographical error |
| 60:11 | "changes is kind of the answer" | "changes kind of the answer" | Typographical error |

1

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | From | To | |
| 64:9 | log | blog | Typographical error |
| 83:6 | "between legal" | "and between legal" | Clarification |
| 89:7–9 | "but anything in this security statement with role-based access and authentication authorization is a very high level things" | "but anything in this security statement, with role-based access and authorization, are very high level things" | Clarification |
| 94:23 | "voice upon" | "voice on" | Clarification |
| 99:13 | responsible | responsibility | Typographical error |
| 106:20–21 | "I think it makes sense these are related exercise." | "I think it makes sense. These are related exercises." | Clarification |
| 116:4 | team | Tim | Typographical error |
| 125:15 | "as I know" | "as far as I know" | Typographical error |
| 137:24 | "That was" | "There was" | Clarification |
| 179:11 | "material of" | "material or" | Typographical error |
| 208:2 | "have it does" | "it does" | Typographical error |
| 238:19 | "had prone to isolated" | "is prone to isolated" | Clarification |
| 289:4 | "sparked in any of our minds" | "sparked concern in any of our minds" | Clarification |

| Pages and Line(s) | Change | | Reason |
|---|---|---|---|
| | **From** | **To** | |
| 297:21 | "August of '24 (sic)" | "August of '18" | Clarification |

I declare under penalty of perjury that the foregoing is true and correct.


Date:   December _4.00_, 2024        Signed: _____

Jason Bliss