# EXHIBIT 46

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE   )
     COMMISSION,               )
 5                             )
         Plaintiff,            )
 6                             ) Case No.
      vs.                      ) 23-cv-9518-PAE
 7                             )
     SOLARWINDS CORP. and      )
 8   TIMOTHY G. BROWN,         )
                               )
 9       Defendants.           )
     _____)
10
11
12
13
14           VIDEOTAPED DEPOSITION OF
15              TIMOTHY G. BROWN
16               OCTOBER 3, 2024
17
18      Videotaped Deposition of Timothy G. Brown, produced
     as a witness at the instance of the Plaintiff, and duly
19   sworn, was taken in the above-styled and numbered cause
     on the 3rd day of October, 2024, from 9:13 a.m. to 7:43
20   p.m. (CST), before Camille A. Bruess, CSR, RPR, in and
     for the State of Texas, reported by stenographic method
21   with the witness appearing at the law firm of Latham &
     Watkins, LLP located at 300 Colorado Street, Suite 2400,
22   Austin, Travis County, 78701, pursuant to notice and in
     accordance with the Federal Rules of Civil Procedure and
23   the provisions stated on the record or attached hereto.
24
25   JOB No. 241003COR
```

                               1

```
 1              A P P E A R A N C E S
 2
 3   COUNSEL FOR THE PLAINTIFF:
 4       Mr. Christopher M. Bruckmann
         Mr. Benjamin Brutlag (by Zoom)
 5       Mr. Christopher J. Carney
         Ms. Lory Stone (by Zoom)
 6       Mr. John J. Todor
         Supervisory Trial Counsel
 7       Division of Enforcement
         U.S. SECURITIES AND EXCHANGE COMMISSION
 8       100 F Street Northeast
         Washington, D.C. 20549
 9       Phone:  202-551-5986
         Email:  bruckmannc@sec.gov
10       Email:  brutlagb@sec.gov
         Email:  carneyc@sec.gov
11       Email:  stonel@sec.gov
         Email:  todorj@sec.gov
12
13   COUNSEL FOR THE DEFENDANTS:
14       Mr. Sean M. Berkowitz
         Ms. Kristen C. Lee
15       Attorneys at Law
         LATHAM & WATKINS, LLP
16       330 N. Wabash Avenue, Suite 2800
         Chicago, Illinois 60611
17       Phone:  312-777-7016
         Phone:  312-777-7281
18       Email:  sean.berkowitz@lw.com
         Email:  kirsten.lee@lw.com
19
              -and-
20
         Mr. Serrin Turner
21       Partner
         Attorney at Law
22       LATHAM & WATKINS, LLP
         1271 Avenue of the Americas
23       New York, New York 10020-1300
         Phone:  212-906-1200
24       Email:  serrin.turner@lw.com
25
```

                               2

```
 1              A P P E A R A N C E S (Cont'd.)
 2
 3   COUNSEL FOR THE DEFENDANT, TIMOTHY B. BROWN:
 4       Mr. Michael J. Biles
         Attorney at Law
 5       KING & SPALDING, LLP
         200 W. 2nd Street, Suite 1800
 6       Austin, Texas 78701
         Phone:  512-457-2051
 7       Email:  mbiles@kslaw.com
 8            -and-
 9       Mr. Alec Koch
         Attorney at Law
10       KING & SPALDING, LLP
         1700 Pennsylvania Avenue NW, Suite 900
11       Washington, D.C. 20006
         Phone:  202-626-8982
12       Email:  akoch@kslaw.com
13
     ALSO PRESENT:
14
         Mr. Jason Bliss (by Zoom)
15       Executive VP/Chief Administrative Officer
         SolarWinds Corp.
16
         Ms. Annie Gravelle (by Zoom)
17       Inhouse Counsel
         SolarWinds Corp.
18
         Ms. Becky Melton (by Zoom)
19       Inhouse Counsel
         SolarWinds Corp.
20
         Mr. Timothy Desadier
21       Videographer
         Legal Video of Texas
22
23
24
25          *  *  *  *  *  *  *  *  *  *  *  *
```

                               3

```
 1                    INDEX
 2                                              PAGE
     Appearances................................ 2
 3
     Proceedings/Introductions.................. 9-10
 4
     Stipulations............................... 10
 5                                              297
     WITNESS:  TIMOTHY G. BROWN
 6       Examination by Mr. Todor...............  10
         Examination by Mr. Turner.............. 273
 7       Examination by Mr. Todor............... 283
         Examination by Mr. Turner.............. 291
 8       Examination by Mr. Todor............... 293
         Examination by Mr. Turner.............. 295
 9       Examination by Mr. Todor............... 296
         Examination by Mr. Turner.............. 297
10
     Deposition concluded/Signature waived...... 298
11
     Reporter's Certificate..................... 299
12
13
14
15                 EXHIBIT INDEX
     BROWN                                     PAGE
16   NUMBER    DESCRIPTION                    MARKED
     Exhibit 1  Copy of a Condensed Transcript of the  46
17      Oral Deposition of Timothy G. Brown,
        Volume 1 taken on 3/8/22 via WebEx in
18      the case:  File No. C-08755-A, In the
        Matter of SolarWinds, The United
19      States Securities and Exchange
        Commission (79 pgs.)
20
     Exhibit 2  Copy of a Condensed Transcript of the  46
21      Oral Deposition of Timothy G. Brown,   47*(R)
        Volume 2 taken on 3/9/22 via WebEx in
22      the case:  File No. C-08755-A, In the
        Matter of SolarWinds, The United
23      States Securities and Exchange
        Commission (69 pgs.)
24
25   *(R) = Referenced
```

                               4

```
 1   consolidated upon.
 2       Q. You just --
 3           MR. KOCH: Sorry to interrupt, but maybe
 4   just to help Camille, could you spell some of the terms
 5   that you're using?
 6           MR. TODOR: Yeah, I was going to ask.
 7           THE WITNESS: I'm sorry.
 8           MR. TODOR: You used a number of terms
 9   there --
10           THE WITNESS: I know. Sorry. Sorry.
11           MR. TODOR: -- that, uh, would probably be
12   helpful for the record --
13           THE WITNESS: Yes, I'm sorry.
14           MR. TODOR: -- for you to, uh, say what
15   those were.
16           THE WITNESS: I will catch up, yeah.
17           MR. TODOR: Or if our court reporter has
18   questions about what the terms were --
19           THE WITNESS: Please.
20           MR. TODOR: -- maybe that would be the
21   most efficient way --
22           THE WITNESS: Yes.
23           MR. TURNER: -- either now or off the
24   record on a break.
25           MR. TODOR: Or -- or would that be easier
                              113
```

```
 1       Q. I'll direct your attention to page three of the
 2   document again and to the heading "Authentication and
 3   Authorization." And you can familiarize yourself with
 4   those two paragraphs as you need to, sir --
 5       A. Yeah.
 6       Q. -- and let me know when you're ready.
 7       A. (Reading) I'm ready.
 8       Q. And to your knowledge, is -- are the statements
 9   in these two paragraphs, uh, an accurate representation
10   of SolarWinds' cybersecurity practices as they related
11   to authentication and authorization as of January, 2018?
12       A. Yes, they are.
13       Q. What, if any, process did you go to -- go
14   through to determine whether these statements were
15   accurate?
16           MR. TURNER: Objection. Are you talking
17   about like in connection with the publication of the
18   security statement or just how does he know they're
19   accurate now?
20       Q. At the time you were going through the process
21   of getting ready to publish the security statement,
22   what, if any, efforts did you make to determine whether
23   the statements here under "Authentication and
24   Authorization" were accurate?
25       A. So consulted with the, uh, IT team, consulted
                              115
```

```
 1   on the break, ma'am?
 2           THE REPORTER: On a break would be better.
 3           MR. TODOR: Okay. On the break.
 4   Apparently on the break would be better, okay, uh,
 5   without asking you about the specifics.
 6           THE WITNESS: Yeah, specific terms.
 7           MR. TURNER: All right. Thank you, Kris.
 8           THE WITNESS: I'm glad you kind of got it
 9   situated.
10           MR. TODOR: All right. Well, I've just --
11   I've been informed that there's food here for those who
12   get it. Would this be a -- a good time to take lunch?
13           MR. TURNER: Sure. Yeah.
14           THE VIDEOGRAPHER: Going off the record,
15   the time is 12:30.
16           (Lunch recess)
17           THE VIDEOGRAPHER: Back on the record.
18   The time is 1:36.
19       Q. (By Mr. Todor) Welcome back, Mr. Brown.
20       A. Thank you.
21       Q. Before the break, we were discussing the
22   Security Statement document which I believe was Brown
23   Exhibit 8. Do you still have that document in front of
24   you, sir?
25       A. I do.
                              114
```

```
 1   with Mr. Quitugua on, uh -- so each one of these
 2   statements are a little bit different from the, uh,
 3   verification process. So I think we'd -- we would need
 4   to look at each one of the -- the lines separately.
 5       Q. Do you know how Mr. Quitugua would have come up
 6   with the original information for these two paragraphs?
 7           MR. TURNER: Objection, asked and
 8   answered.
 9       A. Uh, so he would -- he would, uh, talk to
10   essentially the person in charge. So for example,
11   authorized users can -- users be provisioned with the
12   unique IDs. And, uh, password policies were the
13   policies that were set and in our active directory
14   system was the password policies. Uh, we require
15   complex passwords that include both alpha and numeric
16   characters which are deployed to protect against
17   unauthorized use of passwords, uh, passwords being
18   individually salted and hashed.
19           THE REPORTER: I'm sorry, I can't hear
20   you.
21           THE WITNESS: Sorry, I was just reading
22   the statement.
23           THE REPORTER: I can't hear you.
24           THE WITNESS: Oh, I'm sorry.
25           (Reporter's clarification)
                              116
```

**page 117**

A. Our password best practices enforce the use of complex passwords that include both alpha and numeric characters which are deployed to protect against unauthorized use of passwords. Passwords are individually salted and hashed. So that statement would have been, uh, directly related to both policies, right, our best practices, our password policy, and also, uh, enforcement from our active directory or eventually Azure systems so that when you logged into your computer, you would be logging into your active directory account.

That forced password changes. That has the password complexity enforced. That is a source of truth for many different applications that support integration with active directory. And then a policy says that if we're creating passwords outside of that system, they should follow these best practice guidelines.

Q. Let's see if I can unpack that a little bit. You made reference to Azure. Is that Microsoft Azure Active Directory that you're referring to there?

A. So Active Directory was an on-premise model. Azure is a Cloud model for Active Directory. So over that time period, we shifted from an on-premise Active Directory to the Azure Active Directory, the Cloud-based

**page 118**

model.

Q. When you say over that time period, are you referring from the period from January 18th, 2018 through December, 2020?

A. Correct.

Q. About when did that change occur?

A. Uh, I would need to look back for exact dates, but somewhere in that timeframe.

Q. Did your password best practices change at some point between January of '18 and '20 -- December of 2020?

A. No.

MR. TURNER: Objection to form.

A. The -- the password policy stayed the same throughout that process or throughout that time period.

Q. And was that password policy in effect when the security statement was posted to the SolarWinds' public facing website?

A. Yes.

Q. Was there any significant change to the default permissions that SolarWinds' employees were granted between January of '18 and December of 2020?

MR. TURNER: Objection, foundation.

Q. I'm directing your attention to the second paragraph under "Authentication and Authorization."

**page 119**

A. (Reading) So no -- no changes between 2018 and 2020 except maybe specific systems being added, uh, or different technology being potentially used to support those systems. The statement that says, "SolarWinds employees are granted a limited set of default permissions to access company resources, such as their email, and ..." their "corporate Intranet" -- I'm sorry, I'll speak up. "Employees are granted access to certain additional resources based on their specific job function." During that time period between, uh, when I joined to 2020, we had processes in place to onboard employees to give them access to what they needed to have access to, uh, to audit that access and if they changed jobs, to grant them those privileges, and then additional processes in place to give them special access beyond just access that general employees had.

Q. You've discussed a number of changes to your policies or tools around access controls from January of '18 to December of '20 in your previous answers. Did you ever consider revising the access controls section of the security statement as a result of those changes?

A. The changes were to implement new technology such as Azure directory versus the Cloud directory service. That did not change the practice of granting privileges to employees as they joined. That practice

**page 120**

stayed fairly consistent through the process or through those years or stayed consistent through those years. The technology that was utilized behind may have been, uh, may have been adapted or changed, but still the meaning of this statement was -- is still -- still accurate.

Q. Did you learn anything after the publication of the security statement to the public facing website that caused you to think that perhaps some statement in here with respect to access controls was not accurate when it was posted?

A. No. No, I didn't. The -- the statements here are again created in a generic form not mentioning technology. I'm not saying that, you know, the password policy was followed a hundred percent of the time.

The, uh -- that our -- we don't say that the access control was perfect. So during audits, we would potentially discover that someone, uh, may have not gotten grants removed when they switched their job discovered in an audit and we would take care of it, but the statements here don't say that a hundred percent of the time, we're completely accurate or we're completely foolproof. So there was no reason to change the statement.

Q. I'll direct your attention to the next

**Page 125**

1  processes that get followed.
2  **Q.** And that would be sprints and scrums and --
3  **A.** Sprints and scrums --
4  **Q.** -- rapid releases and --
5  **A.** -- and rapid releases --
6  **Q.** -- (inaudible).
7  **A.** -- and requirements, yes.
8  **Q.** I'm sorry, I think we were talking --
9  **A.** I'm sorry.
10 **Q.** --- over each other.
11 **A.** Yes.
12 **Q.** So again would Agile involve a system of sprints
13 and scrums and rapid iterative releases?
14 **A.** Correct.
15 **Q.** Would those rapid iterative releases introduce
16 security risks?
17 **A.** Not if done well.
18 **Q.** How would you ensure that they are done well so
19 as not to introduce security risks?
20 **A.** So we had implemented or, uh, as part of our
21 Agile process, we also had an architecture team, uh,
22 that was very senior engineers that were part of that
23 process. So part of the design reviews that went on
24 were a big part of ensuring that things were developed
25 appropriately, defined appropriately. As part of the

**Page 126**

1  Agile process, we had both, uh, automated testing that
2  was done as well as some ad hoc testing that was done.
3  So both of those were in place. As part
4  of the release process, we had a standardized release
5  process during this timeframe with a centralized release
6  process team. So each of those go into checking the
7  whole process as things go through. In addition to
8  that, we had models to be able to if a vulnerability did
9  occur in a product, we had the ability for customers and
10 others in our test facilities, in our test products to
11 be able to, you know, determine that there's an issue
12 and a process to be able to resolve those.
13 **Q.** In your previous answer you made a reference to
14 ad hoc testing.
15 **A.** Yeah.
16 **Q.** Does that mean that there was not a single
17 standardized approach for when and what kind of testing
18 would be done at each stage of software development at
19 SolarWinds as of the posting of the security statement
20 on the public facing website?
21 **A.** No, it does not mean that.
22 **Q.** What did you mean by there being ad hoc testing
23 if it doesn't mean that there was no one single defined
24 methodology for when and how you do testing?
25 **A.** What -- what I meant by ad hoc was that we have

**Page 127**

1  a standard set of tests that are run for a product that
2  those tests are rerun from a regression testing
3  perspective to test our major flagship product that is
4  two days worth of tests that are run in an automatic
5  fashion. But if I've added an additional feature, then
6  that new feature may not be tested at the same from a
7  regression because it's new. So, therefore, ad hoc
8  testing would be done for that feature that would then
9  be added to the regression test to be done in the
10 future.
11 **Q.** Was it your understanding that Mr. Colquitt's
12 initiative was meant to increase the amount of
13 standardization involved in SolarWinds' software
14 development lifecycle process with respect to security?
15 **A.** It had Steven's -- Steven's training meant to a
16 couple of different things. One was to train every
17 developer on development practices and make them aware
18 of additional resources for secure development. If
19 you -- what we found is that if you had a person that
20 was working on a UI component, they were simply building
21 a screen for a product.
22 They didn't realize some of the security,
23 uh, requirements or security -- the bigger picture of
24 the product. So Steven's training was to level set
25 across (indicating) an organization. We also had at

**Page 128**

1  that period of time acquired a number of different
2  solutions and a number of different companies, and those
3  companies came in with their own practices. So
4  standardizing knowledge across the organization was part
5  of that goal.
6  **Q.** So I'll direct you to the third sentence in the
7  first paragraph under "Software Development Lifecycle."
8  There's a statement, "Security and security testing are
9  implemented throughout the entire software development
10 methodology." You see that?
11 **A.** Yes.
12 **Q.** I believe you just discussed there being a
13 number of acquisitions of different companies.
14 **A.** Uh-huh.
15 **Q.** Is it fair to say that those companies products
16 were not developed pursuant to the same software
17 development methodology that the products developed
18 within SolarWinds were developed?
19        MR. TURNER: Object to form.
20 **A.** So security and security testing are implemented
21 through the entire software development methodology is
22 what the statement says.
23 **Q.** Uh-huh.
24 **A.** And if you -- it would be extremely rare to find
25 anyone that was developing software without doing

**Page 129**

security testing throughout the development lifecycle. So I would not say that the products that we acquired didn't follow that statement.

**Q.** But did you do anything to go back and vouch that each individual product was -- there was security testing of the engineers or there's security testing of the product, uh, throughout the software development methodology for those products?

**A.** So during the acquisition of a product, uh, a great deal of evaluation is done of both the product and their -- their engineering practices and their lifecycle before we determine to acquire those solutions. So evaluation of their practices would have been done at that point in time. I am not privy to the documentation that was there and that was done, but this --

**Q.** So your --

**A.** Go ahead.

**Q.** Are you finished with your answer, sir?

**A.** Yes.

**Q.** I'll turn your attention to the second paragraph there under "Software Development Lifecycle." There's a statement, "Our secure development lifecycle follows standard security practices including vulnerability testing, regression testing, penetration testing, and product security assessments." Do you see that?

**Page 130**

**A.** I do.

**Q.** What is your understanding of the term secure development lifecycle as it is used in the context of this statement?

**A.** It refers to the described software development lifecycle in the period that private -- prior, uh, paragraph.

**Q.** Is there any difference between secure development lifecycle as it is used here and the term software development lifecycle as it is used in the heading in your mind?

**A.** No.

**Q.** Do you understand that Mr. Colquitt's initiative in 2018 was titled secure development lifecycle?

**A.** I am.

**Q.** So -- and that initiative was not put into place until sometime after SolarWinds' security statement was posted to its public facing website, correct?

**A.** Correct.

**Q.** So is it inaccurate to say that SolarWinds had a secure development lifecycle when Mr. Colquitt's secure development lifecycle initiative had not gone into effect at the time that the security statement was posted to SolarWinds' public facing website?

**A.** No, not at all. What it means here is that our

**Page 131**

Secure Software Development Lifecycle refers to the paragraph above, and in context of this, the readers of this -- the statement would have no context of that being anything different. The Secure Software Development Lifecycle model that Steven referred to is an internal project. Yes, the names could be confusing in the context of you have knowledge of our internal practice that we were implementing later, but, no, this secure development lifecycle refers to the paragraph above.

**Q.** I'll direct your attention later in that first sentence of the second paragraph. There's a statement that follows, "Our secure development lifecycle follows standard security practices including vulnerability testing, regression testing, penetration testing, and product security assessments." What, if any, effort did you take to determine what would be standard security practices for a secure development lifecycle leading up to the publication of this security statement?

MR. TURNER: Object to form.

**A.** So the practices for building include vulnerability testing, regression testing, penetration testing, and product security assessments. Uh, I'm aware of that. I sat on the architecture board -- architecture committee for the -- in Joe Kim's

**Page 132**

organization.

So I was aware of how they built. I wasn't aware of all the details. I didn't run a product development group, but I was aware of the way that in which we developed software.

**Q.** Okay. Are you saying here that these are standard within SolarWinds or these follow some industry standard?

**A.** Uh, I -- I would say both in many ways, that these -- as a engineer and in prior life a manager of engineering teams, I would include these as standard practices for development of software.

**Q.** What would be your basis for determining whether it's an industry standard?

**A.** I built products for 20 years. So, uh, I guess that's my basis of knowledge.

**Q.** How, if at all, did you check in the drafting of the security statement whether and what kind of vulnerability testing was done in the software development lifecycle?

MR. TURNER: Object to form.

**A.** So I was aware of the tools that we had acquired for vulnerability testing and the tools that were, uh, implemented by the product team. We had, uh, vulnerability testing as far as static and dynamic code

**Page 133**

1  analysis, uh, tools in place that were run, tools in
2  place that created, uh, Jira tickets, which is a way
3  that we track security issues. So I was aware when
4  security -- one of the monitoring components of the
5  security team was to, uh, have access to the Jira of the
6  development, Jira meaning what they worked on. And part
7  of them would be coming from tools that were
8  vulnerability, uh, testing tools.
9      Q. How, if at all, did you check in the drafting of
10 the security statement whether and what kind of
11 penetration testing was done in the software development
12 lifecycle?
13         MR. TURNER: I'm going to object to form.
14 He hasn't testified that he drafted the security
15 statement. He hasn't testi -- he hasn't testified that
16 he checked whether everything in the security statement
17 was true. So these are compound questions that are
18 assuming facts not in evidence.
19     Q. Do you understand the question, sir?
20     A. Uh, please repeat it.
21     Q. How, if at all, did you check in the drafting of
22 the security statement whether and what kind of
23 penetration testing was done in the software development
24 lifecycle?
25         MR. TURNER: Same objection.

**Page 134**

1      A. So the, uh, again, security statement was
2  crafted from existing language.
3      Q. Uh-huh.
4      A. So that language in many cases pre-existed me.
5  So was I aware that penetration tests were performed on
6  products? Yes. Was I aware that tools were utilized
7  for penetration testing? Yes. And that was often
8  through my role on the -- from a product architecture
9  perspective that I could see that they were done.
10     Q. At the time that the security statement was
11 posted at SolarWinds' website were you aware of any
12 instances where penetration was not done as part of the
13 software development lifecycle?
14     A. So --
15     Q. The transcript says penetration. I meant to say
16 penetration testing if I misspoke.
17     A. So I cannot guarantee that it was done
18 everywhere. I didn't do an exhaustive audit of
19 everywhere, but penetration testing was definitely done
20 from an internal perspective and in some cases an
21 external perspective for -- but I cannot say that it was
22 done a hundred percent of the time.
23     Q. At any point in the January '18 to December,
24 2020 timeframe, did you consider revising the software
25 development lifecycle section of the security statement?

**Page 135**

1      A. Uh, no.
2      Q. At any point after the posting of the public
3  facing security statement did you become aware of any
4  information that would cause you to conclude that the
5  software development lifecycle section here was not
6  accurate when it was posted?
7      A. No.
8      Q. Did you think it was confusing that Mr.
9  Colquitt's initiative was called soft -- Secure
10 Development Lifecycle and you're using lower case secure
11 development lifecycle here in the security statement?
12     A. So two very different purposes, uh, two very
13 different documents. At one point we called it and
14 you'll see it referenced as SSDL, Secure Software
15 Development Lifecycle. You'll see it referenced in
16 different ways. So was it a reused acronym?
17 Absolutely.
18     Q. But you were not intending to claim that you
19 were following Mr. Colquitt's methodology when you say
20 secure development lifecycle here in the security
21 statement. Is that what you're saying?
22         MR. TURNER: Object. Object --
23     A. Correct.
24         MR. TURNER: -- to form. Go ahead.
25     A. Correct. That this is a standalone paragraph,

**Page 136**

1  that -- or two paragraphs and secure development
2  lifecycle refers to the paragraph above or the heading.
3      Q. Turning away from this document for the moment,
4  but you can keep it by you, if necessary, starting when
5  you joined SolarWinds in 2017, did SolarWinds perform
6  internal cybersecurity assessments?
7      A. That -- so the term internal cybersecurity
8  assessments has many different meanings and in many
9  different contexts. So could you be more specific?
10     Q. Did you do some kind of analysis of SolarWinds'
11 overall cybersecurity posture when you started on the
12 job?
13     A. So as we talked about prior, uh, you know, we
14 had a on-boarding process. And I believe I produced a
15 document after a period of time with my initial
16 thoughts.
17         (Brown Exhibit 9 was marked.)
18     Q. Mr. Brown, you've been presented with a document
19 marked as Brown Exhibit 9. It has Bates SW-SEC00350067.
20 It appears to be an email from Mr. Quitugua to you dated
21 August 9th, 2017, Subject: "SWI Security Program
22 Assessment." Do you see that?
23     A. I do.
24     Q. Is this a document you received in the course of
25 your business at SolarWinds?

**Page 141**

1  descriptions here in the Legend for the various zero
2  through five comport with your understanding of the NIST
3  maturity levels based on your knowledge in the NIST
4  Cybersecurity Framework?
5      **A.** Let me state that differently, that the NIST
6  Cybersecurity Framework has a standard set of functions,
7  a standard set of category, and a standard legend.  That
8  is a standard.  If I look up NIST anywhere, it would
9  show this exact same thing, whether it was our
10  evaluation or any other.
11      **Q.** Do you have an understanding as to how Mr.
12  Quitugua came up with these maturity level assessments
13  in this document?
14      **A.** Not at this time, no, not in 2017.
15      **Q.** Did you discuss them with Mr. Quitugua at the
16  time?
17      **A.** I see that he is -- in this email I see that he
18  is providing information to me.  Back again, 2017, a
19  month after I joined, you would need to ask him how he
20  arrived at these -- these -- this information at that
21  period of time.
22          MR. TURNER:  So the question is whether
23  you remember discussing this with Mr. Quitugua.  Do you
24  remember?
25          THE WITNESS:  No, I do not.

**Page 142**

1      **Q.** And did these assessments from Mr. Quitugua play
2  any role in your, uh, drafting or review of the security
3  statement before it was published on the SolarWinds'
4  website?
5      **A.** I don't see the relationship between this
6  document and the publish of the security statement that
7  happened nine months later or whenever it was.
8      **Q.** All right.  So the date of this one is --
9      **A.** August.
10      **Q.** -- August of 2017.  So that's about, what, five
11  months before publication, correct?  Are you aware of
12  any significant changes in SolarWinds' cybersecurity
13  posture between August of 2017 and January of 2018?
14          MR. TURNER:  Object to form.
15      **A.** So after a month being at the company, Eric
16  produced this document.  Uh, I don't have context of
17  what -- what his -- his ratings were.  The security
18  statement, I still believe that was accurate in 2017.
19          It was accurate today.  It was accurate
20  throughout the process.  So I don't see this as an
21  indicator that anything was inaccurate in the security
22  statement.
23      **Q.** So for example, under Awareness and Training
24  under Protect, it looks like there's one for CoreIt and
25  MSP and a zero for Monitoring Cloud.  Do you see that?

**Page 143**

1      **A.** I do.
2      **Q.** If those ratings are accurate, was that the
3  intention with the statements in the security statement
4  regarding training?
5          MR. TURNER:  First of all, I'm -- I'm just
6  going to object.  In terms of the Cloud monitoring, this
7  is just being pulled out of context when the email
8  itself --
9          THE REPORTER:  I'm sorry, I can't hear
10  you.
11          MR. TURNER:  The -- the cover email itself
12  indicates that he did not complete a controls workbook
13  on monitoring Cloud.  So ...
14          MR. TODOR:  Counsel, uh, the witness is
15  testifying.
16          MR. TURNER:  No, I -- but you keep on
17  asking about a zero for Cloud monitoring when the cover
18  email speaks directly to that.  So in terms of not
19  taking something out of context for the rest of the
20  document, that's -- that -- that is why I would object
21  to the form of the question.
22      **Q.** And I'm referring back to the line for Awareness
23  and Training and to Protect.  If these ratings of one,
24  one, and zero are accurate, was that the intention with
25  the statements in the security statement as they

**Page 144**

1  pertained to Awareness and Training?
2      **A.** (Reading)  I'm sorry, I'm trying to go back and
3  find the Awareness and Training section that's listed on
4  the security statement and I -- uh, that's the one I'm
5  looking for if it's here.
6      **Q.** Would you consider security training to be part
7  of having a secure development lifecycle?
8          MR. TURNER:  Tim, if you want to look
9  under personnel security?
10          THE WITNESS:  Oh, okay.
11      **A.** (Reading)  So the security statement is
12  absolutely correct as far as training.  So I don't know
13  what Eric's assessment says.  I know as a new employee,
14  I went through security training.
15          Employee, sorry, provided with security
16  training as a part of new hire orientation and each --
17  in addition, each SolarWinds' employees will try to
18  read, understand, and take a training course on the
19  company's code of conduct.  I did both of those the day
20  that I was hired or the week that I was hired.  So, uh,
21  so, absolutely, you're -- you're -- absolutely, I see no
22  correlation of Eric's assessment to this statement in
23  the security statement.
24      **Q.** And I'm not referring to new hire orientation.
25  I'm referring specifically to a secure development

**Page 153**

okay. Here's another. It looks like it's multiple -- multiple PowerPoints.

**Q.** All right. So just turning your attention here to the -- the slide with Bates 2743, there's a heading, "A proactive security model." Do you have an understanding of what that means?

**A.** If I recollect correctly, it was a way to describe our -- the, uh, things that I wanted to do in the future. This is to say we have a proactive security model.

THE REPORTER: I'm sorry, I couldn't hear you.

**A.** Oh, I'm sorry. I said a proactive security model, uh, most likely, was just a header for this slide that explained kind of what -- what I would like to do. And it looks like investments that I would like to have made into the program.

**Q.** Did you have an understanding as of the time that you completed your 90-day review here in December, 2017 as to whether SolarWinds had a reactive as opposed to a proactive security model?

MR. TURNER: Objection to form.

**A.** I can't -- I can't link these documents together. So we can't assume this was from that same deck.

**Page 154**

**Q.** Okay. I'm just asking generally. You completed a security review. At the conclusion of that review, did you have an understanding as to whether SolarWinds had a proactive as opposed to a reactive security model?

MR. TURNER: Object to form.

**A.** A -- in my words so proactive is simply a statement on this slide as a title. So I guess, uh, that I -- I could not say that unless I looked through this, all of the pages of this document that were my 90-day review, and then I could tell you if that was the case. Right? So let me look through everything.

**Q.** Okay. Well, my -- my question was just based upon your understanding, not what the document itself would say on a particular line. So if that's all the understanding you have, I can -- I can move on. I'm just trying to understand --

**A.** Okay. Yeah.

**Q.** -- what your understanding was.

**A.** So I don't put a lot of -- the definition between reactive and proactive security model could mean so many different things, uh, it's hard to answer that in an affirmative do I believe that it was reactive instead of proactive.

**Q.** I'll direct your attention back to the 2743 slide.

**Page 155**

**A.** Yep.

**Q.** And there is a list of budget requests there --

**A.** Yep.

**Q.** -- in the lower left-hand quadrant of the slide. Are those budget requests that you made?

**A.** Yes.

**Q.** Why did you make those requests?

**A.** (Reading) Because in the -- the area of constant improvement, uh, which is what a security team does, these are the things that I needed to essentially accelerate that program.

**Q.** I'll direct your attention to the fourth item there, "Internal/External PEN test" with the it looks like a budget request of a hundred thousand dollars. What was that for?

**A.** That was for additional external pen tests and, uh, and more often pen tests.

**Q.** Pen tests of what?

**A.** Pen tests for products.

**Q.** Products. Did you believe as of December, 2017 that SolarWinds needed to increase the amount of penetration testing for its products?

**A.** We --

MR. TURNER: Objection to form.

**A.** We were going through additional audits, so SOC2

**Page 156**

audits for our Cloud solution. Those SOC2 audits require external pen testing, not just internal pen testing. So that was one of the reasons to have additional external pen tests.

**Q.** Was there any external pen testing prior to December, 2017 on the SolarWinds' products to your knowledge?

**A.** Yes.

**Q.** Okay. Why did you then make a request for additional funding for an external/internal pen test?

MR. TURNER: Objection, asked and answered.

**A.** We were going through additional external audits. SOC2 was an audit that is performed on a Cloud solution through an external auditor. Part of that SOC2 audit requires external pen tests for those products that are going through the audit.

**Q.** Okay. So was it a pen test specifically for the purpose of the audit?

**A.** Specifically as a requirement to meet for those SOC2 audits.

**Q.** I'll direct your attention to the, uh, lower right quadrant of that slide with the "Risk of Non-Investment." And there are some sub-bullets under there. The first question, did you write these?

**Page 157**

A. Uh, most likely.
Q. I'll direct your attention to the first bullet. It states the "Current state of security leaves us in a very vulnerable state for our critical assets. A compromise of these assets would damage our reputation and financially." What was your basis for that statement?
   MR. TURNER: Objection to form.
A. So I'm attempting to support my budget request saying that I need additional people. And, uh, I guess from a -- a legal term you may call that puffery to support my request for additional -- my additional, uh, budget request. So I'm trying to say, hey, I need budget. And again, we don't have a linkage of the date of this -- this slide. So I can't say that it was 2017.
Q. Who is this slide being sent to?
A. So this was being sent to, uh, probably Joe Kim. Joe managed the budget for IT and for security. So to probably Rani and Joe Kim.
Q. Just to clarify, in the earlier answer, uh, was the statement "Current state of security leaves us in a very vulnerable state for our critical assets" accurate in your mind when you made it?
A. I don't recall the reason I put that statement in there. Again, it's slide 26 out of some other deck.

**Page 158**

So I don't know where this slide was in context of other slides, whether it was a whole budget deck or what it was. So in -- back again, you're saying in 2017. I don't know when this slide was.
Q. Well, are you saying you would tell Joe Kim that the "Current state of security leaves us in a very vulnerable state for our critical assets" without knowing whether that statement was accurate?
A. I'm saying I don't remember the context where that statement was written.
Q. How did you go about coming up with these bullet points here under "Risk of Non-Investment"?
A. Once again, you don't have the complete document. You're showing me 1 slide out of at least 26.
Q. I'm showing you a document that your counsel produced to us --
A. I can't help that.
Q. -- marked as an email that you sent.
A. Right. I can't help that. The document is not complete. So I don't have enough context to understand where this -- this was.
Q. What additional context would you need to say why you said the "Current state of security leaves us in a very vulnerable state for our critical assets"?
A. I -- many reasons. There could be a document

**Page 159**

that shows critical assets and their vulnerabilities. There could be other information here. Without that context, it's difficult to say why that statement was put there.
   So it just doesn't provide enough context. And we don't even know the timeframe. We don't know a date.
Q. So as of December, 2017, was it your understanding, based upon your knowledge of SolarWinds' business as VP of Security and Architecture, that the critical -- the current state of SolarWinds' security leaves SolarWinds in a very vulnerable state for its critical assets?
A. I would -- I would say that in 2017 I believed improvements needed to be made. And in security awareness we're in a business of constant improvement, and I was looking for budget to do those improvements.
Q. You said that improvements needed to be made. What improvements were you referring to in that answer?
A. Again, 2017 we would need to look back. If I look at the 90-day plan, I'm sure I had improvements that were outlined that I wanted to do.
Q. I'll direct your attention to the second bullet. It states, "Lack of cyber hygiene leaves us open to being a target of opportunity and a compromise will

**Page 160**

create downtime and lost revenue." What did you mean by that?
A. Uh, I don't -- I don't recall. Again, this is a document that was probably part of a presentation. It doesn't mean that each statement or each word on every document was audited or checked. It was opportunity to discuss and -- and have context put around things.
Q. Did you feel it was important to be truthful in telling your bosses what SolarWinds' cybersecurity needs were in making a budget request?
A. So I do think that it's important to be truthful, yes.
Q. Were you trying to be truthful when you wrote these bullet points?
A. So again, you don't have context of these bullet proof -- points. You don't know if I have explained these bullet points in detail in the 25 slides before here. So I don't think you have enough context to insinuate that.
Q. I'm not insinuating, sir. I'm trying to ask, were you trying to be truthful when you wrote these bullet points?
A. I -- and as I've stated, I don't recall the details of these statements that were made eight years ago.

**Page 161**

1  Q. I'll direct your attention to the fourth bullet
2  point.
3  A. Once again, same answer, I don't recall the
4  details of these statements.
5  Q. I'll ask my question and then you can give your
6  answer, sir. The statement "We have lost a renewal of
7  DPA for Accenture (192K) due to utilizing free code
8  scanning tools that did not find all vulnerabilities,"
9  do you see that?
10  A. Yes.
11  Q. What does DPA mean?
12  A. DPA is a product.
13  Q. Okay. Do you have a recollection of SolarWinds
14  losing a renewal of DPA for Accenture on or around
15  December of 2017?
16  A. Uh, I actually do, yes.
17  Q. Okay. Did SolarWinds lose a renewal for
18  Accenture around this time due to utilizing free code
19  scanning tools that did not find all vulnerabilities?
20  A. Yes.
21  Q. I'll turn your attention to the fifth bullet.
22  A. Uh-huh.
23  Q. There's a statement "Without training our
24  employees will continue to be one of our biggest risks."
25  What was your basis for that statement?

**Page 162**

1  A. Again, 20 -- 2017, but I see that this -- on
2  this specific slide it accompanies a request for
3  additional companywide security training. Again, I know
4  that we had training when I on-boarded. So there was
5  on-boarding training. As described in the security
6  statement, this is for additional cybersecurity training
7  investment in a tool associated with training.
8  Q. Where does it refer to a tool here for training?
9  A. It doesn't, but that -- that's the context that
10  I remember. It says, security training 30K.
11  Companywide security training was an indication of a
12  tool. It does not say tool.
13  Q. I'll turn your attention to the last bullet in
14  the slide. There's a statement, "Appropriate security
15  policies, procedures, training, pen testing are required
16  by our commercial customers and asked for in qualifying
17  questionnaires. Without appropriate answers we will
18  lose business."
19  What was your basis for that statement?
20  A. I think it's a -- a statement of -- of fact.
21  That's all.
22  Q. Did you have an understanding as of December,
23  2017 whether your qualifying questionnaires were not
24  giving customers the answers they needed?
25  A. No, but again, we talked about pen testing a few

**Page 163**

1  minutes ago being for our Cloud solution. So I'll refer
2  back to that, that external pen testing was going to be
3  required. If we didn't have external pen testing, we
4  wouldn't have our SOC2 compliance and we would lose
5  business for our Cloud solutions.
6  Q. That's all on that document, sir.
7      (Brown Exhibit 11 was marked.)
8  Q. Mr. Brown, you've been presented with a document
9  that's been marked as Brown Exhibit 11. It has Bates
10  No. SW-SEC00313350. It appears to be an email from you
11  to Rani Johnson dated October 29th, 2018, Subject:
12  SolarWinds state of security operations.
13      Do you see that, sir?
14  A. Yes.
15  Q. Do you recognize this document?
16  A. (Flipping pages.) I'm re-familiarizing myself.
17  (Reading) Yes, all set.
18  Q. And, uh, do you recognize this document, sir?
19  A. Uh, now, yes.
20  Q. Okay. And do you recognize this is an email and
21  an attachment you sent in the course of your work at
22  SolarWinds?
23  A. Yes.
24  Q. And I'll turn your attention to the second page
25  of the document. It appears to be a PowerPoint

**Page 164**

1  presentation marked "INFORMATION SECURITY - Risk review
2  October 2018." Did you conduct this review, sir?
3      MR. TURNER: Objection to form.
4  A. I don't believe it was a risk review. I would
5  say it was more of a status of -- status of information
6  from October, 2018.
7  Q. Okay. I was just reading the title of the --
8  the slide --
9  A. Right.
10  Q. -- sir.
11  A. Yeah, the title -- so -- but it wasn't a audit
12  or anything like that.
13  Q. I'm not asking about the specific content on the
14  individual slides, but, uh, was it a routine practice of
15  yours to provide Rani Johnson with updates on the state
16  of SolarWinds' security operations?
17  A. Yes.
18  Q. And was this PowerPoint presentation part of
19  that effort?
20  A. Uh, (reading) yeah, so this is highlights and,
21  uh, a -- so, yeah, it's essentially a time period. It's
22  essentially a review of what happened during January 8,
23  2018 to October 23rd, 2018.
24  Q. And turning back to the email at the -- the
25  first page of the document, 3350 --

**Page 165**

1  A. Yeah.
2  Q. -- it looks like you say, "This PowerPoint
3  contains the current state of security slides updated
4  for October. A review of what we asked for last August
5  and a red yellow green status showing how we have done
6  on our initiatives." Do you see that?
7  A. Yes.
8  Q. And it says, "A 2019 plan and ask for security."
9  Do you see that?
10 A. Yes.
11 Q. And then it says, "We can review in tomorrow but
12 it's a reasonable place to start. Tim." So did I read
13 that correctly?
14 A. Yep, that's exactly what it reads.
15 Q. And turn back to Bates, uh, 3359, please. It
16 looks like you can probably review 59, 60, 61, and 62.
17 Do these four slides appear to be the "... review of
18 what we asked for last August and a red yellow green
19 status showing how we have done on our initiatives" that
20 you're referring to in your cover email?
21 A. I believe so.
22 Q. And if I could direct your attention to the
23 Bates 3359 slide, please.
24 A. Yes.
25 Q. And the headline slide appears to be

**Page 166**

1  "A Proactive Security Model - Original plan and request
2  from August 2017." Do you see that?
3  A. Yes.
4  Q. Other than the -- there's one redacted line, but
5  other than that, does this appear to be the same budget
6  request and action items that we were discussing with
7  respect to the, uh, previous document?
8  A. Yes.
9  Q. And these risks of non-investment that you
10 identify in the lower right corner quadrant of the
11 document, do those appear to be the same risks that we
12 discussed in the previous document?
13 A. Correct. This is a year later. So the document
14 was a reference to what was there.
15 Q. Okay. And I'd direct your attention to the 3361
16 document, please, Bates. Are you there, sir?
17 A. Yes.
18 Q. It says that the title of the slide, "A
19 Proactive Security Model - Updated October 2018 with
20 status." Do you have that?
21 A. Yes.
22 Q. In looking at the -- the left half of the slide,
23 which is headed Risks of -- "Risk of Non-Investment," do
24 these appear to be the same bullet points that you had
25 in the August, 2017 version of the slide, but with some

**Page 167**

1  color coded?
2  A. Uh, correct.
3  Q. I'll direct your attention to the first bullet.
4  And again, the statement was, "Current state of security
5  leaves us in a very vulnerable state for our critical
6  assets. A compromise of these assets would damage our
7  reputation and financially."
8  Did you still understand that to be a risk
9  of non-investment as of October, 2018 at SolarWinds?
10 A. So, yellow indicates that some of it was done
11 and we could do more, right? Green indicates that it
12 was completed. Uh, red indicates that, uh, it wasn't
13 done or there's more work to be done.
14 Q. Is there anywhere on the document where it says
15 what red, yellow, and green means?
16 A. No. Again, a slide deck is used for context,
17 and it was used in a presentation. So that information
18 would have been conveyed verbally in a presentation.
19 Q. And the -- so by -- what did you mean by putting
20 "Current state of security ..." bullet in yellow on this
21 slide?
22 A. Uh, again, 2018 I don't recall the details.
23 Q. Do you have a recollection, as you sit here, as
24 to what, if any, work needed to be done with respect to
25 that first bullet as of October, 2018?

**Page 168**

1  A. What I can read from the presentation is that if
2  nothing had been done, it would have been a red. But
3  certain improvements had been done and there were still
4  more to do. That's all I could remember or all I could
5  surmise from this.
6  Q. And you can look at the rest of the deck for
7  context, if you need. I'm just wondering if you can
8  tell me your understanding as to what had been and what
9  had not been done with respect to that bullet as of
10 October, 2018.
11 A. No, I -- I could not.
12 Q. I'll direct your attention down to the third
13 bullet.
14 A. Yep.
15 Q. It says, "We have had 22 reported security
16 incidents this year. Reactive responses costs
17 significantly more than being proactive." Why is that
18 in red?
19 A. Again, I can't give you context to this specific
20 thing of 2018, but in general, if you find an issue
21 before in a product before a customer finds that issue,
22 costing to fix that issue is much less expensive. So
23 that's what I would put into the context. We had 22
24 reported security incidents this year. That means for
25 products.

**Page 169**

If we can do a better job in our development, find issues quicker, we will have, uh, less issues that will be less costly for us to improve. That's the way that I would read that statement, yes. It would just be a fact for any product.

Q. Looking down to the fifth bullet there, there's that statement "Without training our employees will continue to be one of our biggest risks." Why is that in red?

A. On the other side of the statement here, (pointing) companywide security training of 30K is still in red, meaning that I didn't fund, that the product as far as training was not funded. So we were still doing training by ourselves. Uh, we still had training for on-boarding, but we were looking for additional budget to train more.

Q. And it looks like there's a line item for "Secure development training" for 30K. Why is that in red?

A. Uh, again, the, uh -- there's some tools and technologies that you can go beyond what Steven trained with. And we were looking for budget there. And that from a red says that budget was not accepted.

Q. In looking up to the top for the Budget Request there's a listing for "Security Program Manager," 160.

**Page 170**

Would that be like 160,000 you were asking for to hire a new person?

A. Correct.

Q. And by it being in red, does that mean that you are not permitted to hire another person?

A. Uh, that means that at this stage in October of 2018 we had not hired someone. I believe at the beginning of 2018 -- 2019 we hired Kellie Pierce as our program manager, but in October we -- it -- that would indi- -- that would indicate to me that it had not been done yet.

Q. For the second line "Security Architect," you had another 160 requests, uh, which is in red. Did you ever hire a person for that position?

A. Yeah, we hired Josh Vanhoose. And I don't remember the dates that he was hired.

Q. Sometime after October of 2018, I'm gathering?

A. Probably, yeah.

(Brown Exhibit 12 was marked.)

Q. Mr. Brown, you've been handed a document that's marked as Brown Exhibit 12. It is labeled as a Bates No. SW-SEC00638663. It appears to be a PowerPoint marked "SECURITY OPERATIONS SUMMARY, December, 2018." Please familiarize yourself with the document and let me know if you recognize it.

**Page 171**

A. Thank you. (Reading) (Pause) All set.

Q. Do you recognize this document, sir?

A. Uh, (reading) so, yes.

Q. Would this be a document that you would have prepared?

A. Uh, the content of the slides for incident response would come from the incident response team. So these were from a tool that we were using to be able to show incidents. So I don't recall if I pulled this slide deck together or Eric may have pulled this slide deck together, but I know that these slides would have been automatically generated by Eric's team associated with the incident response.

Q. Do you know to whom this presentation would have been made?

A. Uh, (reading) I don't recall who it was made to. I don't get an indication of who it was made to.

Q. I'll turn your attention to the Bates 8674, please.

A. Yeah.

Q. Let me know when you're there, please.

A. Yes.

Q. Uh, this appears to be a slide titled "SECURITY PROJECTS, KEY AREAS TO ADDRESS GAPS IN INFORMATION SECURITY." Do you see that?

**Page 172**

A. Uh-huh.

Q. Do you recall how this was prepared?

A. I do not.

Q. Do you know who prepared it?

A. I do not.

Q. Would you have reviewed it in the course of it being prepared?

A. I don't know.

Q. Would it be likely it would be either you or Mr. Quitugua?

A. Uh, (reading) yeah, sorry, I don't have enough -- enough context here of -- it doesn't seem like a complete status or update that I would have had to Rani or others. It's a mix of things. So maybe it's a draft of something that went into another document. Uh, it just doesn't seem like it has the context to be a full update to, uh, Rani or Joe or exec. team agenda. Okay. Incident response summary highlights and actions.

    THE REPORTER: I'm sorry?

    MR. TURNER: Please read it to yourself, Tim.

    THE WITNESS: Yep. Sorry.

Q. Let me, uh, ask you questions about a couple of the items on this and see if they refresh your memory.

A. Yep.

**Page 201**

1  aware" -- aware "of an utilize a secure software
2  development lifecycle in their day to day activities."
3     Q. I'll direct you to the next slide with Bates
4  1507 marked "PROTECT" at the top.
5     A. Yes.
6     Q. And first I'm going to direct your attention to
7  the, uh, "Highlights" section with some sub-bullets
8  underneath. And I'd like to ask you to familiarize
9  yourself with the slides if you need to and let me know
10 when you're ready.
11    A. (Reading) Yes.
12    Q. Who prepared these bullets?
13    A. So again, the -- the deck was prepared by
14 myself, Rani Johnson, Kellie Pierce. I don't know who
15 wrote the actual bullets.
16    Q. Fair to say you didn't raise any objection to
17 any of the content in this slide before it was included
18 in the deck?
19       MR. TURNER: Object to form.
20    A. So I can't say that -- so it (reading) -- the --
21 the most important part of the -- the deck is the scores
22 here. "Highlights" are simply highlights of, you know,
23 potentially where we are.
24    Q. Would you have been in a meeting with Ms.
25 Johnson and Ms. Pierce where you would go over the

**Page 202**

1  content of the slide, including the highlights and the
2  security categories and the objectives and the scores?
3     A. Yeah, once again, that -- the slide was meant as
4  a conversation inside of a presentation. So are all of
5  the words on this audited and absolutely correct or the
6  correct verbiage being here?
7     Q. Okay. I'm not asking about opinions on verbiage
8  in this question. All I'm asking is, were you in a
9  meeting with Ms. Johnson and Ms. Pierce where you would
10 go over the content of the slide, including the
11 highlights, the security categories, the objectives, and
12 the scores before it was included in the deck?
13    A. We would review and create the document
14 together.
15    Q. And I'll direct your attention to the
16 "Highlights" section. And the first bullet in the
17 "Highlights" section says, "Access and privilege to
18 critical systems/data is inappropriate. Need to improve
19 internal processes/procedures."
20       What is the basis for that statement?
21       MR. TURNER: Object to form.
22       THE REPORTER: I'm sorry?
23       MR. TURNER: Object to form.
24    A. I don't recall that specific statement or what
25 it was in reference to.

**Page 203**

1     Q. Do you have any reason to believe that statement
2  is inaccurate?
3        MR. TURNER: Object to form.
4     A. I don't have enough detail to say whether as
5  written that broadly is accurate or how broadly that was
6  or how big of a risk that was. That single statement
7  just could be a example of an outlier that happened
8  during this -- during this cycle that somebody decided
9  to put in here as a highlight. So I don't know if this
10 document was a final or whether -- whether it was a
11 review document.
12       What I can say is that we had processes in
13 place to grant people access to systems in an
14 appropriate way. It was a defined process. That
15 process was audited.
16       It wasn't a hundred percent perfect. An
17 audit may show something that somebody had access that
18 shouldn't have been there. The process, uh, corrected
19 itself and we had a process flow to -- to change that.
20 So, uh, that statement as written I don't agree with.
21    Q. If you don't agree with the statement, why did
22 you participate in a meeting and then not raise an
23 objection before it goes into the slide deck?
24    A. The second part of the statement, "Need to
25 improve internal processes and procedures," yes, we were

**Page 204**

1  not automated in our processes to onboard people. So
2  they were more error prone. Again, the document is a
3  presentation document.
4        It's not an audit. It's not a finding.
5  It's simply a statement within a document.
6     Q. So as you sit here, do you know what critical
7  systems/data are being referred to in that bullet?
8     A. Not at all.
9     Q. Do you know what access and privilege are being
10 referred to?
11    A. Not at all.
12    Q. Do you know what processes or procedures are
13 being referred to?
14    A. Yes.
15    Q. What processes and procedures are being referred
16 to?
17    A. That we had a very -- a -- we had a manual
18 process to onboard people called SARF.
19       THE REPORTER: I'm sorry?
20       THE WITNESS: SARF. Sorry.
21    A. We had a manual process to onboard and give
22 appropriate access rights to people called S-A-R-F. And
23 what that process was, was a process where somebody
24 joined a company, went to HR. HR would send an email to
25 IT with an appropriate rule and then those rules would

**Page 205**

1  say onboard this person in this way.  Then if they
2  needed additional privileges, they went through another
3  process to be able to be granted additional privileges.
4         All of that was audited.  All of that was
5  as background.  All of that has plenty of proof that we
6  went through those processes to grant people appropriate
7  privilege.
8      Q.  Directing your attention down to the, uh,
9  security categories --
10     A.  Yes.
11         THE REPORTER:  (Coughing)
12         MR. TURNER:  Do you need some water?
13         THE REPORTER:  (Coughing) Sorry.
14         MR. TODOR:  No, take your time.
15         THE WITNESS:  Water break now?
16         MR. TODOR:  Just let us know when you're
17  ready, ma'am, please.
18         THE REPORTER:  (Coughing) I think I'm
19  okay.
20         MR. BRUCKMANN:  Why don't we go off the
21  record for about 15 minutes.
22         THE REPORTER:  Yeah, it's okay.
23         MR. TURNER:  Are you sure?
24         MR. TODOR:  We can take a break, ma'am.
25         MR. TURNER:  Yes.

**Page 206**

1         MR. TODOR:  Why don't we take -- take a
2  break, counsel?
3         MR. TURNER:  Sure.
4         THE VIDEOGRAPHER:  Going off the record,
5  the time is 4:49.
6         (Short recess)
7         THE VIDEOGRAPHER:  Back on the record.
8  The time is 5:01.
9      Q.  (By Mr. Todor) Welcome back, Mr. Brown.
10     A.  Thank you.
11     Q.  Before our break, we were discussing, uh, the
12  slide with Bates 1507.  Are you on that slide currently?
13     A.  Yes.
14     Q.  And I'll direct your attention to the "Security
15  Category" listing and ask you which, if any, of these
16  would fall within the responsibility of the Infosec
17  group that you were the head of.
18     A.  Uh, "Endpoint Protection and Encryption" is one
19  that, uh -- well, so Endpoint protection, not encryption
20  would fall within the security group.  That would be our
21  Symantec antivirus.  Encryption would actually be
22  Microsoft encryption installed on the desktop that was
23  IT.
24         "Data Leakage Protection," uh, that was
25  Netskope that my team ran.  So that would fall under

**Page 207**

1  us.  Email protection was under the IT team.
2  "Authentication, Authorization, and Identity Management"
3  was, uh, primarily through active directory or
4  conditional access which were run by the IT team.
5      Q.  What, if any, involvement did the Infosec group
6  have with respect to the "Authentication, Authorization
7  and Identity Management" category?
8      A.  So the security team again from a monitoring
9  perspective, we monitored information about people
10  authenticating to assets.  We did not run active
11  directory or run the processes for on-boarding and
12  off-boarding employees or run the processes for granting
13  privileged access through Thycotk.  Uh, that was the IT
14  group that ran those processes.
15     Q.  And -- and I'll direct your attention to the
16  "Objective" description next to "Authentication,
17  Authorization and Identity Management."  It reads, "User
18  identity, authentication and authorization are in place
19  and actively monitored across the company."  What, if
20  any, role did you have in coming up with the language
21  for the "Objective"?
22     A.  Uh, I don't recall who came up with that exact
23  language.
24     Q.  Would -- would all of these objectives be part
25  of the meetings you were discussing between Ms. Johnson,

**Page 208**

1  Ms. Pierce, and yourself?
2      A.  Correct.
3      Q.  Directing your attention to the "NIST Maturity
4  Level" for "Authentication, Authorization and Identity
5  Management," it has a NIST maturity level of one.  What
6  is your understanding as to why the level was one in
7  this slide?
8      A.  So we had again manual processes for on-boarding
9  employees and giving them rights to certain, uh, certain
10  systems or certain applications.  And that process
11  worked, uh, but we had not automated that process with a
12  tool.  We were going through and, uh, consolidating --
13  we still had a Google directory service and a Azure
14  directory service.  We were consolidating to Azure.  We
15  were, uh, rolling out conditional access to many
16  different applications.
17         At this point in time I believe we had
18  Office 365 implemented, and that would give us
19  SharePoint, but there were many more app applications to
20  get under that umbrella.  So a one means that we have,
21  uh, significant projects that we would like to fund in
22  this area.  And these projects will take a long time,
23  multiple years, multiple times of investment, multiple
24  ways to mature our identity -- our identity model or our
25  "Authentication, Authorization and Identity Management"

**Page 209**

    model.  So that's what I would believe is the impression
    here of why a one.
        Q.  I'll direct your attention back to the bullets
    up at the top of the page.  I was going to direct your
    attention to the sixth bullet.  It would be the second
    one up from the first -- the second one up from the
    bottom.
        A.  Yeah.
        Q.  There's a statement, "Movement to make Azure AD
    authoritative source of identity.  Plan to enable
    federation for all critical assets."  Do you see that?
        A.  Correct.
        Q.  Did you believe that statement to be accurate at
    the time it was made?
        A.  Yes.
            MR. TURNER:  Object -- objection, form.
    It's not a statement.  It's a truth value in any event,
    but go ahead.
        A.  So that's exactly what I described a moment ago,
    that movement to make Azure Active Directory the
    authoritative only source.  At that point in time we had
    Google and Azure.  So consolidating those to make Azure
    our -- our source.  And planned to enable federation
    across critical assets means Next Generation conditional
    access being across our federated environment.  You'll

**Page 210**

    often hear that called Zero Trust.
            THE REPORTER:  Called what?
            THE WITNESS:  Zero Trust.
        Q.  What is your understanding of what was meant by
    critical assets in that bullet?
        A.  So in SolarWinds we have mission and business
    critical assets defined.  That's an asset list
    maintained by the IT department.  So critical assets
    I -- I don't recall the exact number, but critical
    assets would be those assets that were defined to be
    mission or business critical assets.
        Q.  So when we were looking at the earlier slides
    with the -- the risk of non-investment -- and you can
    look at the document if you need to -- but I believe
    there was a reference to critical assets in that
    document.  Are those the same critical assets that are
    being referred to here?
        A.  I don't believe the words correlate everywhere.
    So we could be using critical assets in many different
    contexts.
        Q.  What was your understanding as of August 19th of
    any other needs other than the movement to Azure AD that
    would be necessary to move the maturity level for
    authentication, authorization and identity management
    higher than a one?

**Page 211**

        A.  So, uh, more movement towards Zero Trust.  So
    modern Zero Trust models so as it states here.  Enabling
    federation means that you can now use more assets to the
    Cloud.  So that would be one.  The, uh, the
    implementation for or consolidation on, uh, the
    privilege user management solution Thycotk, which we had
    in place, uh, but more across the -- across the board on
    that.
            The big one again is moving up from a one
    means that you have a single source of treatment for
    identity.  You have automated processes that go through
    and make sure that everybody is given the correct
    access.  You still have audits, uh, but you -- when you
    automate the processes, you can have less errors within
    the -- within those processes.  So if we do those, it
    continues to move up.
        Q.  If you have the security statement --
        A.  Yes.
        Q.  -- next to you, I'd like to refer you back to
    the security statement to page three to the section
    under "Access Controls" marked "Authentication and
    Authorization."
        A.  Yeah.
        Q.  Could you, please, let me know if you're there,
    sir?

**Page 212**

        A.  I am there.
        Q.  Did you perceive there to be any tension between
    having a NIST maturity level of 1 as of August, 2019 and
    this slide deck and your representations in the security
    statement regarding authentication and authorization?
        A.  No, I don't see any conflict in those
    statements.
        Q.  Why not?
        A.  Because we have processes in place that required
    authorized users to be provisioned with unique IDs.
    They were.  SolarWinds' employees are granted a limited
    set of default position -- permissions to access company
    resources.  They were, such as email in the corporate
    intranet.
            Employees are granted certain additional
    resources based on their specific job function.  We had
    separate processes in place that managed additional
    privileges and had approvals of those additional
    privileges.  "Requests for additional access follow a
    formal process that involves a request and an approval
    from a data or system owner," or "manager, or other
    executives, as defined by our security guidelines."  The
    "Approvals are managed by workflow tools that maintain
    audit" --
            MR. TURNER:  Tim, you've got to slow down

**Page 233**

1 March 3rd, 2020.
2       Would you, please, let me know if you
3 recognize this document?
4    A. Yes.
5    Q. What, if any, role did you play in preparation
6 of the quarterly risk reviews?
7    A. So same as previously answered.  Do -- do I need
8 to say it again?
9    Q. Uh, I guess my question would be -- all right.
10 So the previous document was called "Security &
11 Compliance Program Quarterly Overview."  This document
12 is called Quarterly Risk Review.  Is there a difference
13 in, uh, the process that would go into the security
14 compliance portion of the Quarterly Risk Review as
15 opposed to the Security & Compliance Program Overview?
16       So for example, Quarterly Risk Review,
17 front page, it says, "SECURITY & COMPLIANCE PROGRAM
18 OFFICE ... +LEGAL+FINANCE."  So my question is, for the
19 portion of it that is Security & Compliance Program
20 Office, was your role --
21    A. The same.
22    Q. -- similar to that one than it was for the
23 previous document that was called Security & Compliance
24 Program Quarterly Overview?
25    A. Yes, you're correct.

**Page 234**

1    Q. Okay.  Turning your attention to the second page
2 of the item, a document marked "Agenda," and the first
3 section is marked "Security," and then it has three
4 bullet points.  You see that?
5    A. Yes.
6    Q. Who determined the agenda?
7    A. Many of these are outside of my control.  So I
8 would say that Rani built the agenda.
9    Q. Okay.  Turning your attention to the third page
10 of the document marked "Security" --
11    A. Uh-huh.
12    Q. -- there were -- there are three bullets there,
13 uh, "Risk Scorecard & 2020 Target Tactics; Incident
14 Response Status Report & Process Improvements;" and
15 "Security & Compliance Improvement Plans ..."  Do you
16 see that?
17    A. Yes.
18    Q. Did your -- did you provide input in all three
19 of those?
20    A. Uh, yes.
21    Q. Turning your attention to the next page of the
22 document, uh, marked with Bates 1611, the title is
23 "SolarWinds Scorecard, NIST Maturity Level."
24    A. Yes.
25    Q. Okay.  Was your role in preparation of this

**Page 235**

1 scorecard similar to that for the scorecards in the
2 November '19 and August '19 documents that we looked at
3 previously?
4    A. Yes.  Correct.
5    Q. And in looking at the chart, it looks like there
6 is a new, uh, column there for "2020 Target."  How was
7 that set?
8    A. So this was in March of 2020.  So our target is
9 to get to an improvement level for each one of these
10 scores by the end of 2020.
11    Q. In looking at the -- the columns here, uh, for
12 2020, you've got, for example, Identify there's a 3.3
13 with an up arrow.  What does the up arrow mean?
14    A. Up arrow would indicate that the score was going
15 up.
16    Q. Is that a target for where you want to be at the
17 end of the year or an indication of where you felt you
18 were at that point in time?
19    A. That is a target.
20    Q. Was it a target for the end of the year?
21    A. Yes.
22    Q. I'll turn your attention to the "Key Risks"
23 column.  How were those bullets drafted?
24    A. Uh, I expect it would be the same process as
25 before as we were pulling these together in a room with,

**Page 236**

1 uh, Kellie and Rani.  Kellie probably kept notes and
2 highlighted the risks that she heard everybody talk
3 about.
4    Q. And were you aware of the language that was
5 going into this "Key Risks" column at the time --
6    A. No.
7    Q. -- it was being formulated?
8    A. Yeah, so I'm not aware of how the exact language
9 came out.  Simply that we had a target to improve and
10 the, uh, "Key Improvements" to -- that would reach us to
11 those higher scores.
12    Q. Turning your attention to "Identify" under "Key
13 Improvements," it has two bullets.  One is "Increase SDL
14 adoption."  The second is "Expand product
15 certifications."
16       Do you see that?
17    A. Yes.
18    Q. Are those improvements that are anticipated
19 you'll need to do in order to reach your 2020 target?
20    A. I don't know if those are the only improvements
21 or a full list of improvements that we need to do.  They
22 are key improvements, examples I guess of improvements
23 that could help us along that path.
24    Q. Are they meant to describe prospective
25 improvements or retrospective?

**Page 237**

MR. TURNER: Do you understand the question, Tim? Are these improvements that had already been made or are these improvements that were planned?
A. Key improvements for the future, I believe.
Q. Okay. Turning your attention to the second line for "Protect," uh, there's a key risk identified of "Significant deficiencies in user access management." Do you see that?
A. Yes.
Q. Why is that language there?
A. Uh, again, I don't have enough context with one bullet.
Q. Were you in a meeting when it was decided what the content in this slide would be?
A. Uh, I assume that we did, but I cannot recollect that from '20 -- whatever this was, 2020.
Q. Did you raise any objection to this slide saying, "Significant deficiencies in user access management"?
MR. TURNER: Object to form.
A. Again, the content was for a presentation, uh, and to talk through that presentation. We were -- this isn't a finding. This is simply a statement. So I don't know what significant deficiencies is referred to.
Q. And I just want to make sure our question and

**Page 238**

answer are meeting. I asked, did you raise any objection to this slide saying "Significant deficiencies in user access management"? Your answer went through "... I don't know what significant deficiencies is referred to."
I just want to make sure is it fair to say that you did not raise an objection to the language on this slide prior to this meeting?
MR. TURNER: Objection to form.
A. It's fair to say that I don't recall this meeting. And whether I did or did not raise an objection, I'd be guessing again.
Q. I'm turning your attention to the "Key Improvements" column to the statement "AD Authentication for critical systems." Is it consistent with your understanding that as of March 3rd, 2020, that AD Authentication for critical systems was an effort that was ongoing in the future in pursuit of increasing the maturity level to the target levels stated in this slide?
A. So in this slide it states we're going a 3.2, which is very good, to a 3.3, which is very good plus a little bit. So it's not a major improvement that we're looking at. It is a point one improvement.
Q. Is your understanding the "AD Authentication for

**Page 239**

critical systems" would be the item that is being looked at to move from the 3.2 to the 3.3?
A. Again, I don't recall the meeting. I don't recall the details. Again, it's a point one improvement. So it's not saying that we didn't have "AD Authentication for critical systems." It's saying that there's an area of improvement of a point one.
Q. Do you have an understanding as to what the improvement in the "AD Authentication for critical systems" that is being referred to in this slide would be?
A. No.
Q. Under Detect there's a key risk identified as "Inconsistent security scanning." Do you see that?
A. Yes.
Q. What is your understanding as to why that was identified as a key risk?
A. Uh, back again, I don't recall the details of this, but it's saying that we're staying from a 3.4 to a 3.4. So we're not doing any major improvements planned.
Q. The "Key Improvements" column says, "Expand and standardize VAT, Pen OpenSource, and code analysis." Do you see that?
A. Yes.
Q. What does VAT mean in this context?

**Page 240**

A. I don't know.
Q. What does Pen OpenSource mean in this context?
A. Uh, again, I don't know.
Q. What does code analysis mean in this context?
A. Uh, code analysis could be Checkmarx, Whitesource. It could -- could be implementing tools across the platform. But again, we're staying consistent from a 3.4 to a 3.4.
Q. I'll direct your attention to the next slide marked "2020 YTD Security Incident Summary," please.
A. Uh-huh.
Q. And what, if any, involvement did you have in preparation of the content for this slide?
A. So this content was devised -- derived from our incident response process, one of the subteams under Eric Quitugua.
THE REPORTER: I'm sorry?
THE WITNESS: Eric -- under Eric Quitugua.
A. So in -- in our context an incident is a vulnerability within our products that was reported by someone and managed through the process. That's part of the incident response process. So this slide is a export from our incident response system that tracked -- tracked incidents for each different products.
Q. Why were you reporting to senior management on

**Page 297**

```
 1  personal knowledge of the processes that was followed to
 2  verify the statements in the security statement if they
 3  occurred before you joined the company?
 4       A.  Correct.
 5           MR. TODOR:  No further questions at this
 6  time.
 7           MR. TURNER:  I'll keep going.
 8               EXAMINATION
 9  BY MR. TURNER:
10       Q.  Mr. Brown, you just stated earlier that if a new
11  question came in, it would be referred to the
12  appropriate subject matter expert --
13       A.  Correct.
14       Q.  -- who would vet the answer.
15       A.  Correct.
16       Q.  Do you have any reason to believe that any
17  different process was followed before you arrived with
18  SolarWinds?
19       A.  No reason to believe that that -- that a
20  different process was being followed.
21           MR. TURNER:  No further questions.
22           MR. TODOR:  I have no further questions.
23           THE REPORTER:  Are there any stipulations
24  counsel would like to put on the record before it
25  concludes?
```

**Page 298**

```
 1           MR. TODOR:  That it's getting dark.
 2           MR. TURNER:  We'll just take our usual
 3  order.
 4           MR. TODOR:  And we believe we have a
 5  standing order with Gradillas for receipt of the
 6  transcript.
 7           THE VIDEOGRAPHER:  This concludes today's
 8  testimony of Timothy Brown.  Going off the record, the
 9  time is 7:43.
10           (Deposition concluded at 7:43 p.m.)
11           (Signature waived.)
```

**Page 299**

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2
 3  SECURITIES AND EXCHANGE   )
    COMMISSION,               )
 4        Plaintiff,          )
                              ) Case No.
 5  vs.                       ) 23-cv-9518-PAE
    SOLARWINDS CORP. and      )
 6  TIMOTHY G. BROWN,         )
          Defendants.         )
 7  _____ )
 8           REPORTER'S CERTIFICATION
 9           VIDEOTAPED DEPOSITION
10                   OF
11           TIMOTHY G. BROWN
12           OCTOBER 3, 2024
13           VOLUME 1 OF 1
14       I, Camille A. Bruess, Certified Shorthand
15  Reporter in and for the State of Texas and Registered
16  Professional Reporter, hereby certify to the following:
17       That the witness, TIMOTHY G. BROWN, was duly
18  sworn by the officer and that the transcript of the
19  videotaped deposition is a true record of the testimony
20  given by the witness to the best of my ability;
21       That examination and signature of the witness
22  to the deposition transcript was waived by the
23  witness and agreement of the parties at the time of
24  the deposition;
25       That the original deposition was delivered to
```

**Page 300**

```
 1  counsel for Plaintiff;
 2
 3       That the amount of time used by each party at
 4  the deposition is as follows:
 5       Mr. Bruckmann     0 hours, 0 minutes
 6       Mr. Brutlag       0 hours, 0 minutes
 7       Mr. Carney        0 hours, 0 minutes
 8       Ms. Stone         0 hours, 0 minutes
 9       Mr. Todor         7 hours, 4 minutes
10       Mr. Berkowitz     0 hours, 0 minutes
11       Ms. Lee           0 hours, 0 minutes
12       Mr. Turner        0 hours, 13 minutes
13       Mr. Biles         0 hours, 0 minutes
14       Mr. Koch          0 hours, 0 minutes
15
16       I further certify that I am neither attorney nor
17  counsel for, related to, nor employed by any of the
18  parties in the action in which this testimony was taken.
19       Further, I am not a relative or employee of any
20  attorney of record in this cause, nor am I financially
21  or otherwise interested in the outcome of the action.
```

```
 1      Subscribed and sworn to on this 17th day of
 2   October, 2024.
 3
 4
 5      _____
        CAMILLE A. BRUESS, RPR, Texas CSR #3824
 6      Expiration Date:  4/30/25
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                          301
```