# EXHIBIT 48

Page 312

UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of                    )

                                    ) File No. C-08755-A

SOLARWINDS                          )


WITNESS:   Timothy Gordon Brown

PAGES:     312 through 584

PLACE:     Securities and Exchange Commission

           175 W. Jackson Blvd

           Chicago, Illinois

DATE:      Wednesday, March 9, 2022


        The above-entitled matter came on for hearing, via

WebEx, pursuant to notice, at 9:27 a.m.




Diversified Reporting Services, Inc.

(202)467-9200

Page 313

```
 1   APPEARANCES
 2      On behalf of the Securities and Exchange Commission:
 3      LORY STONE, ESQ.
 4      WILLIAM BRAD NEY, ESQ.
 5      BENJAMIN BRUTLAG
 6      KENNETH ZAVOS
 7      MARGARET VIZZI, IT Forensic Staff
 8      ERA CALHOUN, Paralegal
 9      U.S. Securities and Exchange Commission
10      100 F Street, NE
11      Washington, D.C. 20549
12      (202)551-4500
13
14
15
16   On behalf of the Witness:
17      JULIE RIEWE, ESQ.
18      ANNA MOODY, ESQ.
19      JONATHAN DEMARS, ESQ.
20      Debevoise & Plimpton
21      801 Pennsylvania Avenue NW
22      Washington DC 20004
23      (202) 383-8000
24
25
```

Page 315

```
 1            C O N T E N T S(CONT.)
 2
 3   EXHIBITS   DESCRIPTION         IDENTIFIED
 4   178    12-12-2020 email from Confluence   505
 5          SW-SEC-00332058
 6   179    11-27-2020 email from Harry        536
 7          Griffiths, SW-SEC-00236586
 8   180    12-11-2020 email, Timothy Brown    543
 9          To Timothy Brown, "test attachment"
10   181    1-7-2021 email, "ITOM open and     546
11          Open Pending security incident
12          summary"
13   183    Email, Kellie Pierce to Timothy    555
14          Brown, SW-SEC-00185450
15   184    7-10-2020 email, Chris Erway to    565
16          Timothy Brown, SW -SEC-00352519
17   185    9-6-2019 CRN article               569
18
19
20
21
22
23
24
25
```

Page 314

```
 1            C O N T E N T S
 2   WITNESS                   EXAMINATION
 3   Timothy Gordon Brown            316
 4
```

```
 5   EXHIBITS:   DESCRIPTION       IDENTIFIED
 6   164    4-16-2019 email from Timothy    322
 7          Brown to Karlo Zatyini,
 8          SW-SEC-00292763, Security
 9          Statement
10   165    8-29-2019 email, FIPS Pre-Meeting  346
11          SW-SEC-00024111
12   166    7-22-2020 email from Confluence   377
13          To Timothy Brown SW-SEC-00001139
14   168    6-24-2020 email SW-SEC00000673    374
15          SDL and Orion Improvement Program
16   169    Email from Timothy Brown         407
17          SDL and Orion Improvement Program
18          SW-SEC-00273519
19   172    23-30-2020 email from Tony       429
20          Johnson, SW-SEC-00356078
21   173    10-16-2020 email SW -SEC-00236593  448
22   175    11-30-2020 email, Matt Mellen,   474
23          Palo Alto, PAN-00000393
24   176    11-18-2020 IM thread             493
25          SW -SEC-00236713
```

Page 316

```
 1            P R O C E E D I N G S
 2      MS. STONE:  So we'll go ahead and go back on the
 3   record at 9:27 a.m. on March 9th, 2020.  I am Lory Stone
 4   and with me from the Commission are Brad Ney, Benjamin Brutlag,
 5   Margaret Vizzi, Ken Zavos and Era Calhoun.  We are officers
 6   of the Commission for the purposes of this proceeding.
 7      We are today resuming the testimony of Tim Brown
 8   in the matter of SolarWinds, Inc., C-08755.  Would counsel
 9   for the witness please identify themselves for the record?
10      MS. RIEWE:  Julie Riewe, Anna Moody and Jon
11   DeMars from Debevoise & Plimpton and Jason Bliss and Becky
12   Melton from SolarWinds.
13      MS. STONE:  This testimony is pursuant to a
14   Commission subpoena which has been previously marked as
15   Exhibit 144.
16          (SEC Exhibit No. 144 was
17          previously marked.)
18      MS. STONE:  Mr. Brown, do you understand that you
19   remain under oath?
20      THE WITNESS:  Yes.
21   Whereupon,
22          TIMOTHY GORDON BROWN
23   was re-called as a witness and, having been previously duly
24   sworn, was examined and testified further as follows:
25      MS. STONE:  And let the record reflect that a
```

## Page 377

1    I'm sorry, Exhibit 166 because I believe this is
2  Confluence -- a Confluence report.
3            (SEC Exhibit No. 166 was
4            marked for identification.)
5    Q  So Exhibit 166 is an email from Confluence to
6  Timothy Brown dated July 22nd, 2020.  Its first Bates is SW-
7  SEC-00001139.
8    Mr. Brown, do you recognize Exhibit 166?
9    A  Let me read this.
10           (Brief pause.)
11   A  Yeah.
12   Q  What is it?
13   A  I believe this is the -- a snip from the
14  Confluence page associated with this incident with the notes
15  of internal investigation and timelines and other things
16  that went on.
17   Q  And is this -- oh, I'm sorry, what were you
18  saying?
19   A  Oh, just in details associated with that
20  incident.
21   Q  Okay.  And did you say that this -- did you
22  confirm that this is related to the DOJ incident?
23   A  Yes.
24   Q  All right.  I showed you the other exhibit first
25  because I actually don't see -- oh, well, I don't see a date

## Page 378

1  here as to when SolarWinds was alerted.  It looks like in
2  the summary on the first page of this exhibit it talks about
3  when the Department of Justice was first alerted.  Do you
4  see that?  It says "May 28th, 2020?"
5    A  Yeah.  They first got alerted on 28th of May 2020
6  so I don't know when they alerted us.  I would think it
7  would be soon after that.
8    Q  Okay.  Can you just tell me a little bit about
9  this Confluence report?  It says at the top "Harry Griffiths
10  created a page."  How did this come into being?
11   MS. RIEWE:  I think maybe, did you say this is a
12  snip from the --
13   THE WITNESS:  I believe this is a copy of the
14  Confluence page.  Confluence is a -- yeah, basically a tool
15  we use to store information, data.  This looks like this was
16  a snip from our Confluence page.
17   BY MS. STONE:
18   Q  And it's being emailed from Confluence to you.
19  How frequently does that happen?  Is that -- for the DOJ
20  incident, would that -- it looks like it has an ITOM number.
21  Would you get an email every time there's a change to the
22  ITOM -- the associated text?  Or how does it work?  How do
23  the emails, the ITOM emails work?
24   A  Yeah, basically in Confluence you can up -- you
25  can request that you get change requests and you can get

## Page 379

1  informed when changes occur in certain areas.  So I don't
2  know why this one specifically came through to me but it's
3  common to get notified.
4    Q  Okay.  And is it correct that Harry Griffiths
5  created this page?  It says that at the top.
6    A  Yeah, that's what it says.
7    Q  Does that mean he's responsible for the content?
8    A  Not all of the content.  That means he is -- he
9  created the page.
10   Q  Where would he get the content?
11   A  So a number of this could have -- again, it
12  doesn't tell us where the incident was reported through.
13  This doesn't have those details.  This has details of what
14  they told us but it doesn't have details of where it came
15  in.  So it could have come in through support, it could be a
16  support ticket so some of the information could be from the
17  support ticket.  Some of the information -- so the
18  information could be gathered from DOJ, from -- you know,
19  entered from an email from DOJ.  So I can't say that all
20  this content is created by Harry.
21   Q  Okay.  All right.  So I'm just going to direct
22  your attention to some specific entries in Exhibit 166 and
23  just see if you can tell me about them.
24   So let's go first to the page ending in 1141.
25           (Brief pause.)

## Page 380

1    Q  So I think the fifth bullet down from the top
2  under notes says, "this is a sophisticated attack on the
3  DOJ.  It mimics the behavior of our software with how we
4  communicate the website structure and use XML files similar
5  to how we communicate."  And then there's two different
6  iterations of something.
7    And then down below it says, "SolarWinds internal
8  investigation," and there's some information there.  And
9  there's a bullet about halfway down the page that starts,
10  "what we are seeing."  Do you see that?
11   A  Yes.
12   Q  "What we are seeing is traffic going to this
13  malicious site then doing a GIT to pull down something
14  called Apollo from this" and it looks like an API website.
15  And then it's followed by website "theme.com."
16   Do you know who conducted the SolarWinds internal
17  investigation as it's described here?
18   A  Yeah.  So first off this was -- and somewhere in
19  here I'm sure you see that this was a unique instance.  This
20  was a concerning incident because what our belief was is
21  that -- so the OIP server that's talked about is our
22  internally-hosted server, right?  That's what OIP is.  It's
23  not -- it's something inside of our environment.  It's not a
24  product we sell, it's not a solution that is, you know,
25  offered to customers or anything like that.  The OIP server

Page 381

1  sits inside of our environment and it takes information from
2  clients to essentially improve their product. But it's a
3  separate application, not something that's commercial. It's
4  something that's inside of our environment to talk to.
5      What was the unique component of DOJ which got us
6  concerned is that the traffic going to that environment
7  looked like a piece of, you know, additional software that
8  was installed on the machine that was targeting SolarWinds.
9  It was targeting our back-end environment by doing this.
10 So a lot of context around this is looking at, hey, did we
11 harden the OIP server? Is it suspect to attack, is somebody
12 trying to get into the SolarWinds back-end through this? So
13 a lot of the traffic you'll see is what were they trying to
14 do with this? They were mimicking our protocol which is
15 very interesting. That means the threat actor did work in
16 order to, you know, mimic our protocol and to try to make it
17 look like OIP traffic.
18     So our theory with this is that somebody had --
19 again, we don't control the box that Orion is installed upon
20 so our theory here is that, at this point in time was that
21 somebody had either the box that they installed on was a
22 dirty box and had this here, or that, you know, the box
23 itself had been compromised without us and that that
24 installed component was attacking SolarWinds with that OIP
25 layer. So that's why you'll see a lot of hardening on OIP.

Page 382

1      Q   So thank you for that background. I just want to
2  ask a couple of additional questions.
3      A   Yeah.
4      Q   Did you in fact determine whether the OIP server
5  had been hardened?
6      A   So we saw no signs of it being targeted, we saw
7  no signs of our database being corrupted. We essentially
8  brought in everybody to look at this traffic and this
9  incident. So we brought over architects from other
10 products. You'll see Chris Erway mentioned there, normally
11 a Cloud architect but very good, strong technical mind. We
12 had Tim Danner, the host of the -- you know, one of the
13 architects who really built Orion from the back-end. So
14 this -- but the fact that somebody was mimicking our traffic
15 was a major sign that someone did research on us. That's
16 why you'll see us calling out in other documents that, you
17 know, people are doing reconnaissance on us. That means
18 they were studying us, they were studying what our products
19 did hence to be able to mimic that traffic. That's why this
20 was such a memorable and different and unique incident that
21 we'd never seen anything like this type of thing before.
22     Q   So if you were -- if you were concerned that
23 someone was doing research on SolarWinds that makes me think
24 that you were concerned this was broader than just the DOJ,
25 is that correct?

Page 383

1      A   Well, the fact was that someone was doing
2  research. It wasn't a concern, it was a fact. In order to
3  mimic our protocol you had to do research. You had to
4  install product, you had to be able to test the product, you
5  had to be able to find out what our protocol looks like. So
6  it was a fact that they were -- that someone was doing
7  research.
8      But in the case of DOJ, it was the only time we'd
9  ever seen this. Remember, we had -- have, you know,
10 thousands of downloads of these products and this was the
11 only time we ever saw traffic like this at all, anywhere.
12 So when we say is it unique to that environment? You know,
13 from our point of view at that time, yeah, it was very
14 unique to that environment because we had never seen
15 anything like this before.
16     Q   Okay. But just so I'm clear --
17     A   Yeah.
18     Q   -- it wasn't specific to DOJ, it was about
19 mimicking SolarWinds?
20     A   So just because it was at DOJ didn't matter,
21 right? DOJ as a customer was not as much of a concern as
22 our traffic being mimicked from the outside. If we had
23 seen that at anybody it would have been a concern. But DOJ
24 as a customer was not as a a -- yeah, it was not as much of a
25 factor as the uniqueness of the -- what was found.

Page 384

1      Q   I guess my point though is if there's a -- if
2  there's a threat actor that's doing research on SolarWinds,
3  were you concerned that this could impact other customers?
4      A   Yeah, of course. That's why it was treated so
5  greatly, right?
6      Q   Tell me again about the treatment. I think you
7  said you brought in -- you brought in everyone to look at
8  it. Tell me about that process.
9      A   So very, very high priority. We're looking at
10 all the details of it, we're looking at every aspect of our
11 back-end OIP service to see whether it got corrupted,
12 whether there were any issues in the OIP service. The OIP
13 service, again not something we ship to clients, not
14 something we ship to customers. But very -- something that
15 we had to look at. So we looked at there, then we looked at
16 the protocol, we looked at what was being used. We were
17 actually able to determine the protocol didn't match the
18 version of Orion that was there. The protocol was from an
19 older version. So very different from a -- approach.
20     So what our concern was that we were being
21 attacked by a threat actor, that SolarWinds was under attack
22 in this way.
23     Q   What did you make of the fact that the protocol
24 didn't match Orion? Actually I wanted to --
25     A   Yeah.

Page 385

1    Q    -- talk about this X Trace header that's in --
2    A    Yeah.
3    Q    -- that's in the same exhibit, Exhibit 166.  Is
4    that what you're referencing when you say protocol?
5    A    Right, correct.  In the entire protocol.  But
6    that, the X Trace header was from a different version of
7    Orion than what was present.  That's why, it targeted us to
8    think that, okay, this must be a piece of malware that was
9    created based on an old version of malware that got inserted
10   into this server.  So a separate complete component was
11   inserted into the server.
12   Q    Can you draw any conclusions from that about the
13   capabilities of the threat actor?
14   A    Just that the -- they had -- again, so our
15   products are not -- don't require consulting.  Our products
16   don't require somebody to contact the sales person.  Our
17   products don't require a lot of heavy lifting to be able to
18   test, right?  We pride ourselves on simple, powerful and
19   affordable products.  People can download, try and buy them.
20   So when you look at that aspect from what does it take to
21   get one of our products and do reconnaissance on it, it
22   takes, you know, an email address which is very good for
23   what we do.  It is, you know, what we do from a high volume
24   sales product.  Nothing wrong with it, it simply is -- takes
25   a barrier away.

Page 386

1    So a threat actor can do reconnaissance.  So what
2    this showed is that somebody did reconnaissance, somebody
3    was doing investigation of a product, they were able to
4    mimic a certain level of protocol from a certain version of
5    Orion.  And then they were able to utilize that OIP traffic
6    and regenerate that OIP traffic going to again attack
7    SolarWinds.
8    Q    Okay.  So you told me -- we started down this
9    road but I think we got sidetracked a little bit.
10   You told me you brought people to -- you told me
11   SolarWinds brought people together to look into the issue.
12   A    Yep.
13   Q    Was there anything else that was done?
14   A    So we mobilized the architecture team, we
15   informed people across -- you know, across the organization.
16   We treated this as a, you know, very serious incident.  We
17   investigated the farest points that we could to get
18   information from DOJ.  We never got a server, we requested a
19   server from them or a copy of the server.  That would have
20   helped us identify even more.  But we followed our process
21   but then we also did extra levels of investigation in the
22   investigation stage, you know, by bringing people across the
23   organization together.  So we pulled off our Cloud
24   architect, for example, Chris Erway, and brought him to look
25   at the communications and the protocols and understand that.

Page 387

1    So we really did mobilize a lot of different people in
2    order to do that, in order to do the investigation
3    associated with it.
4    Then it followed the normal process of incident
5    response attempting to gather additional information,
6    additional intel, you know, to determine what went on and
7    how things happened.  And then if I recall correctly, the
8    DOJ just essentially went dark on us so they didn't respond
9    to us any longer from requests.
10   Q    All right.  So you investigated internally using
11   individuals from across the enterprise.  Did you hire any
12   third parties to review or --
13   A    No.  It was so specific to our environment that a
14   third party would not help us with that.
15   Q    Okay.  Anything else that you did to investigate
16   beyond what you've told me?
17   A    We hardened the -- hardened the OIP server, again
18   that --
19   Q    What does that mean?
20   A    It's our internal OIP server, right?  It's not
21   something we sell again but it's what we use.  And that was
22   --
23   Q    When you say hardened -- sorry --
24   A    Yeah.
25   Q    -- when you say hardened, what does that mean?

Page 388

1    A    Yeah, that means we look at it, we look to see if
2    there's anything in play that we could do to, you know, make
3    it more resilient to attack.  I believe we did network
4    controls around the outside with our F5's to be able to stop
5    unknown traffic to it.  We looked at the code associated
6    with it, I believe we had some -- so different teams build
7    services like a business service in our -- and build
8    products.  So when we build a product for sale it goes
9    through a number of the processes that we talked about
10   before.  But when you build a product for internal use, not
11   a product but a service that you're going to use
12   internally,, that doesn't necessarily follow the same
13   processes that when we build the products from the outside.
14   But we implemented a number of those processes
15   around the OIP server and investigated the server itself and
16   then, you know, made some changes to the OIP server to make
17   sure that -- you know, that it was hardened against attacks.
18   Although we couldn't tell what the attack was from the data
19   we had, essentially looked everywhere we could and put as
20   many safeguards in place on the OIP server so it wouldn't
21   affect us.
22   Q    Okay.  And why did you have to harden it?  Why
23   wouldn't -- why did those controls such as the network
24   controls to stop unknown traffic, were they not in place
25   before?

Page 389

1    A    You know, the hardest server is the server that's
2    under the ocean that has no connectivity to anything.
3    That's the ultimate hardened server, right?  Then you start
4    saying, well, I need to have the server talk to somebody.
5    Okay, now you're vulnerable, right?  So how do you make sure
6    that it is as hardened as possible?  Again, it's our own
7    internal server, right?  It's our own internal model to
8    collect data from customers but not something we -- not
9    something that we, again, sell or do anything like that to.
10       So yeah, there's levels of hardening that you can
11   do and, you know, if the server functioned fine, the server
12   worked fine, nobody would attack our OIP server for any
13   reason that we could think of.  It doesn't -- you know, it
14   simply has some data in it from customers to help them.  So
15   it's really a helping server.  Not like it has financial
16   data, it's not like it has, you know, sensitive customer
17   data, it's behind our DMC so it's not connected to anything.
18   Can't use it as a jump-off point.  So it becomes -- it's a
19   interesting server but it's not an attack server.  It's not
20   something somebody's going to target for attack therefore we
21   didn't believe it would be targeted for attack.  Therefore
22   that's why we had to go back and harden it after the fact.
23       Q    Okay.  And you said that your investigation
24   didn't reveal evidence of an attack, is that right?
25       A    The investigation didn't show any compromise of

Page 390

1    the OIP server or the database associated with the OIP
2    server.  But the investigation did show that we could, you
3    know, do some things to harden those interfaces in case the,
4    you know, attacker was trying something that we didn't see.
5    So this is all during that incident time, it's not post-
6    incident.
7        Q    I'm sorry, you cut out at the end.  It's not --
8        A    It is not post-incident, it's not what we know
9    now.
10       Q    Post-incident, okay.  Yes.
11       A    Right.  It is the --
12       Q    Understood, yes.
13       A    -- point -- (garbled audio).
14       Q    We're speaking as of summer of 2020?
15       A    Correct.
16       Q    Okay.  You said the DOJ went dark on you.  Who
17   was communicating with the DOJ?
18       a    I don't recall exactly who was doing emails and
19   other things with the DOJ.  It could have been Harry, it
20   could have been one of the other incident response teams, it
21   could have been support.  But we were requesting information
22   as we went through our investigation, we were requesting
23   additional information to be able to do that.  I'm not sure
24   exactly the person who requested that information was.
25       Q    Any idea why -- I assume when you say they went

Page 391

1    dark on you, they just stopped responding.  Is that
2    accurate?
3        A    Correct.
4        Q    Any idea why?
5        A    So often in these scenarios it can happen, right,
6    where it's a priority for us because we think somebody's
7    attacking our back-end.  For them it's just another project,
8    right?  They stood up a server, okay, now let's go on.  You
9    know, we didn't get signs that they thought of this as
10   serious.  I believe we closed a deal with them the next
11   month, that they bought more Orion.  So yeah, for them it
12   didn't -- was not as big of a deal as it was for us.
13       Q    Are you speculating or do you know that?
14       A    Don't know that, right?  But again, they -- for
15   us it was super important, for them, the amount of
16   information that they shared with us was reasonable to start
17   with.  But going dark says it wasn't as -- for us it was
18   critical, for them it didn't seem to be critical.  And
19   again, they did close a deal with us post-the-incident,
20   bought more of Orion.  Therefore, my summation that it
21   wasn't as critical for them as what we thought for us.
22       Q    Okay.  I want to ask one more question before we
23   move off from Exhibit 166.  I'm still looking at 141.
24       There's a reference to website "theme.com" in a
25   couple of different places.  It says "connect" close towards

Page 392

1    the middle.  And then the sentence I read about, "we are
2    seeing traffic going to this malicious site."  Do you see
3    the website theme.com address there?
4        A    Yeah, website theme.com.
5        Q    Are you familiar with that website?
6        A    No.  So I don't know the details of this.  I know
7    API.SolarWinds.com/swift is our OIP server but I don't know
8    what the specific web theme is.
9        Q    You don't recall having seen it before?
10       A    I don't think it was relative to -- yeah, the
11   details were -- yeah, somebody was trying to mimic our
12   traffic.  It wasn't -- details of exactly what didn't
13   matter.
14       Q    Okay.  All right.  So let's turn back to Exhibit
15   168 that we looked at briefly a few minutes ago.
16       And this is the exchange where it begins with
17   Thomas Vrabel --
18       A    Yeah.
19       Q    -- sending a summary email, a background summary
20   email.  Just checking to see if we've talked about Mr.
21   Vrabel before.  I don't think so.  Can you tell who Mr.
22   Vrabel is?
23       A    Yeah.  Thomas is on our engineering team for
24   Orion.  He was one of the people that were involved in
25   looking at this along with a few -- the people that are also

Page 393

1  on this list.
2      Q    Okay.  And he's sending the email to Paul Gray
3  who we've discussed.  Who is Chandrasekhara Yerasi?
4      A    Chandra is also on our engineering team.  I
5  believe he is one of the architects, I'm not sure exactly
6  for what.
7              (Brief pause.)
8      A    Oh, okay.  Chandra moved to MSP.  Okay.  So
9  Chandra may have been in a different organization so I'm not
10  sure exactly.
11      Q    Do you know if Chandra was in MSP as of the date
12  of this email, so as of --
13      A    I don't recall.
14      Q    -- June 2020?  Okay.
15          All right.  So we've already discussed the
16  background with Mr. Vrabel and you've confirmed that that
17  was the DOJ incident we've been discussing.
18          In that same email Mr. Vrabel writes -- hold on
19  just a second.  Okay.  Then he writes, "as part of the
20  background we're now dealing with the customer."  We've
21  already got that part.
22          The next paragraph he writes, "however during our
23  analysis I found out that OIP server is using vulnerable
24  library" followed by DLL site in version -- followed by a
25  version number.  There is a public CBE and he links a NIST

Page 394

1  web address.
2      A    Yep.
3      Q    And then he writes, "this raised strong suspicion
4  that OIP server is not under SDL."  Is SDL a reference to
5  the secure development lifecycle that we discussed
6  yesterday?
7      A    Yes.
8      Q    What does that mean?  What does Mr. Vrabel mean
9  when he says "this raises a strong suspicion" --
10      A    Right.
11      Q    -- "that OIP server is not under SDL?"
12      A    Yeah.  So as I said before, that products are
13  generally under SDL, right, the products that we build, the
14  products that we sell to customers are under that process.
15      Q    Uh-huh.
16      A    And some of the other components that are built
17  through our Bizapps team, so not by necessarily the
18  engineering team but the IT function, we're not going
19  through that SDL process.
20      Q    Say that -- say that again for me.  You said
21  products are generally under SDL but some products by
22  engineering are not?
23      A    So, no.  Products are under SDL, products that we
24  ship are under SDL.  Products that customers get are under
25  SDL.  We have a number of internally built solutions, we'll

Page 395

1  call them solution, that do things like support our billing,
2  that help us manage our customers, that help us generate
3  lists of customers to send emails to.  So these are called
4  Bizapps, business applications.  One of those business
5  applications is OIP.  That business application was built
6  internally for the specific purpose of collecting
7  information and helping customers with their deployment.  So
8  it doesn't -- that system is what Thomas is pointing out is
9  -- as an engineer he's saying, I don't believe that this was
10  under the secure development lifecycle --
11      Q    Okay.
12      A    -- therefore we should put it under that.
13      Q    Is there a clear line, all products that go to
14  customers are under SDL, all Bizapps are not?
15      A    Not that clear of a line, right?  We've been
16  working to get all of the products that are built by Bizapps
17  under SDL, they're just different.  A number of the products
18  built under Bizapps are built with salesforce.com, right?
19  We build custom applications with salesforce.com.  This one
20  isn't but they have a different set of testing, different
21  set of requirements around the outside of it.  But at this
22  point in time this was not under SDL.  Therefore what we did
23  was do evaluation on it and bring it under SDL.
24      Q    Okay.  And you said, "we are working to get all
25  products in Bizapps under SDL."  Why do you want all

Page 396

1  products in Bizapps under SDL?
2      A    Just to -- as a good practice, right?  So the
3  products that are behind the scenes are -- we're protecting
4  SolarWinds, right, for those products.  We're making sure
5  that SolarWinds products, SolarWinds Bizapps, business
6  applications are as resilient as possible by using the same
7  best practices we're using on products, we're using with our
8  internally-developed applications that we use for internal
9  purposes.
10      Q    Okay.  When did the work begin to move all
11  products in Bizapps under SDL?
12      A    Ongoing, right.  It was part of it.  It was just
13  primarily to start with the prioritized products first and
14  then move towards doing more and more of it with Bizapps,
15  business applications.
16      Q    Do you recall generally when you started doing
17  more with the business applications?
18      A    I'd have to go back.  I think we introduced SDL
19  in 2018, I believe we said, so probably 20 -- yeah, 2019,
20  2018, 2019, somewhere in that range, but we'd have to look
21  at data.
22      Q    What does it mean if -- you've given me general
23  responses but if you could be a little bit more specific.
24  What does it mean if SDL is not enforced for OIP?
25      A    What does it mean from what perspective?

## Page 581

1 companies.

2 So there's plenty of literature based on the SVR

3 models that have been utilized.

4 MR. NEY: And would you agree that good cyber

5 hygiene helps avoid being -- or helps companies avoid being

6 impacted by those types of cyber attacks?

7 THE WITNESS: Yeah. This was not a cyber hygiene

8 attack. This was a sophisticated attack that was extremely

9 well planned, well thought and well executed. And you know,

10 that's what a lot of the research has shown for this attack.

11 So I don't consider this a hygiene attack.

12 MR. NEY: Okay. No other questions.

13 MS. STONE: All right. Why don't we take -- go

14 off the record, take five minutes, and then we'll come back

15 and wrap up.

16 So off the record at 5:22 p.m.

17 (Off the record.)

18 MS. STONE: We're back on the record at 5:29 p.m.

19 Mr. Brown, if you could just confirm there were

20 no substantive conversations between yourself and SEC staff

21 during the break?

22 THE WITNESS: Yep, confirmed.

23 MS. STONE: Okay. SEC colleagues, any further

24 questions?

25 (No audible response.)

## Page 582

1 MS. STONE: All right. Mr. Brown, we have no

2 further questions at this time. We may however call you

3 again to testify in this investigation. Should it be

4 necessary we will contact your counsel.

5 Before we close the record do you wish to clarify

6 anything or add anything else to the statements you have

7 made yesterday or today?

8 THE WITNESS: No. No.

9 MS. STONE: Counsel, do you wish to add -- wish

10 to ask any clarifying questions at this time?

11 MS. RIEWE: No.

12 MS. STONE: All right. We are off the record at

13 5:30 p.m. on March 9th, 2022.

14 (Whereupon, at 5:30 p.m., the examination was

15 concluded.)

16 * * * * *

17

18

19

20

21

22

23

24

25

## Page 583

1 PROOFREADER'S CERTIFICATE

2

3 In the Matter of: SOLARWINDS

4 Witness: Timothy Brown

5 File Number: C-08755-A

6 Date: Wednesday, March 9, 2022

7 Location: Chicago, Illinois

8

9 This is to certify that I, Christine Boyce,

10 (the undersigned), do hereby certify that the foregoing

11 transcript is a complete, true and accurate transcription of

12 all matters contained on the recorded proceedings of the

13 investigative testimony.

14

15

16 _____      _____

17 (Proofreader's Name)      3-22-2022

18

19

20

21

22

23

24

25

## Page 584

1 REPORTER'S CERTIFICATE

2

3 I, Jemima Nobleza Euell, reporter, hereby certify that the

4 foregoing transcript is a complete, true and accurate

5 transcript of the meeting indicated, held on

6 3-9-22, at Chicago, Illinois, in the matter of:

7 SOLAR WINDS.

8

9 I further certify that this proceeding was recorded by me,

10 and that the foregoing transcript has been prepared under my

11 direction.

12 3-22-2022

13

14

15

16

17

18

19

20

21

22

23

24

25