# EXHIBIT 50

1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF NEW YORK
3
4   SECURITIES AND EXCHANGE   )
    COMMISSION,               )
5                             )
            Plaintiff,        )
6                             )
        v.                    ) Case No.
7                             ) 23-cv-09518-PAE
    SOLARWINDS CORP. and      )
8   TIMOTHY G. BROWN,         )
                              )
9           Defendants.   )
    _____)
10
11
12
13
14          VIDEOTAPED DEPOSITION OF MARK GRAFF, taken by
15   the Defendant, pursuant to Notice, held at the law firm
16   of Latham & Watkins LLP, 1271 Avenue of the Americas,
17   33rd Floor, New York, New York 10020, on February 14,
18   2025, at 9:45 a.m., before a Notary Public of the State
19   of New York.
20
21
22
23
24   Reported by:
    BROOKE E. PERRY
25   JOB No. 250214BPE

2

1   A P P E A R A N C E S:
2   ON BEHALF OF THE PLAINTIFF:
3   SECURITIES AND EXCHANGE COMMISSION
        100 F Street NE
4       Washington, DC 20549
5   BY:   CHRISTOPHER J. CARNEY, ESQ.
        carneyc@sec.gov
6       CHRISTOPHER BRUCKMANN, ESQ.
7
8   ATTORNEYS FOR DEFENDANTS:
9   LATHAM & WATKINS LLP
        1271 Avenue of the Americas
10       New York, NY 10020
11   BY:   SERRIN TURNER, ESQ.
        serrin.turner@lw.com
12       MATTHEW VALENTI, ESQ.
        JOSH KATZ, ESQ.
13
14
    ALSO PRESENT:
15
    GREGORY RATTRAY- Expert Witness for SolarWinds
16
    JONATHAN JUAREZ-Videographer
17
18
19
20
21
22
23
24
25

2

1                    INDEX
2   WITNESS           EXAMINATION BY        PAGE
    Mark Graff        Serrin Turner    6
3
4                    EXHIBITS
    GRAFF      DESCRIPTION                  PAGE
5   Exhibit 1   Expert Report of Mark G. Graff    20
6   Exhibit 2   Rebuttal Expert Report of Mark    20
                G. Graff
7   Exhibit 3   SolarWinds Security Statement    63
8   Exhibit 4   Testimony of Mark Graff Vice     77
                President, NASDAQ Omx Group
9               Before the House Financial
                Services Committee Subcommittee
10              on Capital Markets
11  Exhibit 5   NASDAQ Omx Provides Updates on   85
                Events of August 22, 2013
    Exhibit 6   Statement on NASDAQ Trading      94
12              Interruption
    Exhibit 7   News Article Entitled NASDAQ:    96
13              'Connectivity Issue' Led to
                Three-Hour Shutdown
14  Exhibit 8   NIST Cybersecurity Framework    107
                2.0: Small Business Quick-Start
15              Guide
    Exhibit 9   Expert Report of Gregory Rattray 120
16
    Exhibit 10  Sw-Sec-Sdny_00048050-095        133
17
    Exhibit 11  Sw-Sec-Sdny_00254254-266        160
18
    Exhibit 12  7.13.2020 Review                165
19
    Exhibit 13  Spreadsheet                     166
20
    Exhibit 14  Sw-Sec00631418-427              174
21
    Exhibit 15  Sw-Sec-Sdny_00050922            188
22
    Exhibit 16  Nigel King's LinkedIn Profile   191
23
    Exhibit 17  Sw-Sec00012266-275              194
24
    Exhibit 18  Transcript Excerpt of Eric      197
25              Quitugua

3

1              INDEX (CONTINUED)
2   GRAFF        DESCRIPTION               PAGE
3   Exhibit 19   Sw-Sec00043620-630        205
4   Exhibit 20   Sw-Sec00386134-143        209
5   Exhibit 21   Sw-Sec00001497-550        215
6   Exhibit 22   Moderate Summary Kp Spreadsheet   231
7   Exhibit 23   Sw-Sec-Sdny_00055077      248
8
9            (Exhibits retained by Reporter.)
10           (EXHIBITS BOUND SEPARATELY.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1    THE VIDEOGRAPHER:  Stand by, please.
2  We are now on the record.
3    My name is Jonathan Juarez.  I am a
4  legal videographer for Gradillas Reporting.
5  Today's date is February 14, 2025, and the time
6  is 9:45 a.m.
7    This deposition is taking place at
8  1271 6th Avenue, New York, New York, in the
9  matter of Securities and Exchange Commission
10  versus SolarWinds Corp., et al.  The deponent
11  is Mark Graff.
12    Counsel, please identify yourselves for
13  the record.
14    MR. TURNER:  Serrin Turner for
15  SolarWinds and Mr. Brown.
16    MS. MELTON:  Becky Melton for
17  SolarWinds.
18    MR. VALENTI:  Matthew Valenti, Latham &
19  Watkins for SolarWinds.
20    MR. KATZ:  Josh Katz, Latham & Watkins
21  for SolarWinds and Mr. Brown.
22    MR. CARNEY:  Christopher Carney for the
23  SEC.
24    MR. BRUCKMANN:  Christopher Bruckmann for
25  the SEC.

5

1    THE VIDEOGRAPHER:  The court reporter
2  is Brooke Perry and will now swear in the
3  witness.
4  M A R K   G R A F F,  the witness herein, having been
5  first duly sworn by a Notary Public of the State of New
6  York, was examined and testified as follows:
7    THE REPORTER:  Please state your name
8  for the record.
9    THE WITNESS:  Mark Gregory Graff.
10    THE REPORTER:  Please state your
11  address for the record.
12    THE WITNESS:  415 North Washington
13  Avenue, Fayetteville, Arkansas 72701.
14  EXAMINATION BY
15  MR. TURNER:
16  Q.    Good morning, Mr. Graff.
17  A.    Hi.
18  Q.    So you understand you're testifying under oath
19  today, right?
20  A.    Yes, mm-hmm.
21  Q.    So you have an obligation to be truthful just
22  as much as you would if you were testifying in court.
23  You have to answer yes or no.  It's for the court
24  record.
25  A.    I understand.

6

1  Q.    Let me ask you first about your current
2  business.  You have a business called Tellagraff, LLC;
3  is that right?
4  A.    Yes, that's right.
5  Q.    And can you just tell me what services you
6  provide to clients in that business?
7  A.    Well, I'm doing expert business work.  I've
8  done some consulting, cybersecurity consulting for small
9  businesses, and under that rubric also, I'm a
10  professor -- an adjunct professor at the University of
11  Arkansas Little Rock.
12  Q.    When you say you've done some consulting for
13  small businesses, what sort of small businesses are we
14  talking about?
15  A.    Oh, there was a shop that had -- made metal
16  disks, right.  A little shop of a few people.  There are
17  folks that operate cafes, you know, catering businesses,
18  that sort of thing.
19  Q.    Are these local businesses in Arkansas?
20  A.    Well, I just moved to Arkansas recently.  Most
21  of that was actually -- some of that was in
22  Philadelphia, Pennsylvania, some of it was in New York,
23  and a little bit of Arkansas.
24  Q.    But they were local businesses in those
25  locations?

7

1  A.    Well, when I was living in New York, I did some
2  work for some folks in -- near Philadelphia, but
3  generally speaking, it's been local, people I know
4  usually.
5  Q.    How many clients has Tellagraff, LLC had over
6  the period of time it's been in operation?
7  A.    Oh, probably half a dozen all together, maybe
8  even fewer.
9  Q.    It's been in business since 2015?
10  A.    That's right.  I started just as I left NASDAQ.
11  Q.    So about six clients every eight years?
12  A.    Something like that.
13  Q.    And what have you done for them exactly?
14  A.    Well, I mean, I've also written another book.
15  As I said, I've done -- I'm working as an adjunct
16  professor at University --
17  Q.    I'll just interrupt you because I'm just asking
18  what did you do for these half dozen clients.
19  A.    Okay.  And I'll just finish my sentence.
20    I was doing some consulting work but also doing
21  the professorial work, so I count that as part of the
22  company.
23    Mostly it's a matter of -- I had -- they also
24  did a radio show for a few years.  So the idea is
25  talking to people who run small business, finding out,

8

**Page 9**

1  you know, I ask them how many computers they have, what
2  they use, and I give them some general advice about how
3  to protect themselves and their systems, their data.
4  Q.    And these companies, you said they're small
5  businesses, so what does that mean, like 10 employees,
6  20 employees, that general range?
7  A.    Sure. Even smaller sometimes.
8  Q.    Have you ever done any cybersecurity
9  assessments under any industry frameworks for these
10  businesses?
11        MR. CARNEY: Objection. Vague.
12  Q.    You still have to answer.
13  A.    Sure. Thank you.
14        One or two of the clients I did cybersecurity
15  assessments, mostly informal.
16  Q.    Mostly informal. Can you explain what you mean
17  by that?
18  A.    Sure. There are different levels of
19  formalities you can use when you do cybersecurity
20  assessments. You could use the NIST frameworks and the
21  NIST instruments. You could use -- some of the
22  recommendations from the Federal Trade Commission are
23  very useful in terms of guidance for small business.
24  There's the CISA, Cybersecurity Infrastructure Security
25  Agency. They have a set of recommendations.

**Page 10**

1        So it depends. You have to fit the instrument
2  you're going to use and the methodology you're going to
3  use with the personalities and the nature of the
4  business. A lot of these small businesses people don't
5  really want to see a big formal analysis with big
6  spreadsheets. They want to talk to you about what
7  they're doing and what their problems might be.
8  Q.    So did you use any of the frameworks you just
9  mentioned in conducting your assessments? Or was it --
10  let me just finish my question.
11        Or was it more informal in the sense, like, are
12  you, you know, running antivirus, it would be a good
13  idea to run antivirus, sort of that level of
14  informality?
15        MR. CARNEY: Objection to form.
16  A.    Generally speaking, these small business
17  assessments have been informal. Along the lines you
18  have mentioned, I talk to them about their computers,
19  what they use the business for, what did they do, how
20  many employees do they have, who has accounts on them,
21  how do they manage their accounts. Preponderance of the
22  small business.
23        And, of course, I did -- as I said, I did the
24  radio show, so I did informal assessments over the air,
25  just, you know, just 5 or 10, 15 minutes giving them

**Page 11**

1  some thoughts about cybersecurity.
2  Q.    You did informal cybersecurity assessments over
3  the air?
4  A.    I did, yeah.
5  Q.    Did have people calling in asking for
6  cybersecurity assessments?
7  A.    Yes, that's one of the ways we did it.
8  Q.    What's some examples of the sorts of questions
9  they'd ask?
10  A.    Oh, gosh. Well, some of the questions were
11  what kind of antivirus software should I be running? Do
12  I have to worry about ransomware? We talked a lot of
13  about ransomware and that sort of thing. So they were
14  mostly interested in what could go wrong, where the
15  attacks might come from, what kind of losses we might
16  incur. We talked sometimes about cybersecurity
17  insurance and so forth. I never endorsed particular
18  products, but I would give them general guidance about
19  what they could do.
20  Q.    Okay. But is it fair to say those weren't
21  really cybersecurity assessments; those were just
22  answering one-off calls from listeners about their
23  questions they have --
24  A.    Well --
25  Q.    If you could just let me finish my question

**Page 12**

1  before you answer. But go ahead.
2        MR. CARNEY: Objection to form.
3        THE REPORTER: I think you want to
4  repeat the question.
5        MR. TURNER: Sure.
6  Q.    So fair to say that when you are talking on the
7  radio, you're not doing what would be considered in the
8  industry as cybersecurity assessments, but you're really
9  just responding to listener questions about
10  cybersecurity?
11        MR. CARNEY: Objection. Compound.
12  A.    Sure. It's an informal assessment, a
13  conversation really at that level.
14  Q.    Okay. And so fair to say, in terms of the
15  business you've done at Tellagraff, that you have not
16  done cybersecurity assessments under recognized industry
17  framework like NIST or CISA, but instead you've done
18  more informal assessments as you described earlier?
19        MR. CARNEY: Objection to form.
20  A.    Yes. Since leaving NASDAQ, I think that's the
21  case that they've all been relatively informal
22  assessments. I don't recall doing a big formal
23  assessment using those instruments since I left NASDAQ.
24  Q.    And you said you teach currently?
25  A.    Yes.

1 **Q.**   Let's take a look at paragraph 47, if we can.
2 **A.**   Sure.
3 **Q.**   You say, in 47:
4       "It is also important to observe that
5   many of the assertions in the Security
6   Statement were categorical and unqualified."
7 **A.**   Mm -- hmm.
8 **Q.**   (READING):
9       "The Security Statement contained
10  little qualifying language indicating the
11  assertions of the Security Statement might not
12  be consistently followed.  For example, while
13  the Security Statement noted that 'SolarWinds
14  strives to apply the'" least -- "'the latest
15  security patches and updates,' it did not use
16  similar language (such as 'strives') with
17  respect to other assertions.  In fact, many
18  sentences explicitly used language indicating
19  categorical assertions, such as 'By default,
20  all accesses is denied,' 'Our password policy
21  covers all applicable information systems,' and
22  'Quality Assurance is involved at each phase of
23  the lifecycle, and security best practices are
24  a mandated aspect of all development
25  activities.'"

25

1       And then you say:
2       "Based on my experience with security
3   statements and how organizations discuss
4   cybersecurity practices, when organizations
5   make such categorical and unqualified
6   assertions about their cybersecurity practices,
7   I interpret this to mean that such practice are
8   consistently followed."
9       Here's what I want to focus on:  That last
10  statement, are you saying that when you see categorical
11  language, you interpret it to mean that the practices
12  are categorically followed, meaning without exception?
13      MR. CARNEY:  Objection.  Misstates the
14  report.
15      MR. TURNER:  You may answer.
16 **A.**   Well that's not -- that's not the way I use the
17  word "categorical," but I also want to point out that
18  when you read that paragraph, you did leave out one
19  word.  I think -- because I said covers all -- what I am
20  saying password policy covers all applicable information
21  systems.
22      But going back to your question about
23  categorical, I use that word when I'm talking about if
24  there are assertions in the security statement that are
25  not qualified as to the extent those assertions apply.

26

1       I'm not talking about the practices as being
2   categorical or unqualified; that wouldn't make any
3   sense.  So I'm talking about the assertions in the
4   security statement, did they have qualifications or as I
5   show, does it say something like all access is denied.
6   That's what I mean by categorical and unqualified.
7 **Q.**   I'm asking you, sir, what you understand the
8   implication of the categorical language to mean.  Do you
9   mean it to imply that SolarWinds is representing that it
10  always does these things?
11 **A.**   No.  When they make a categorical statement, it
12  doesn't necessarily imply that they do it 100 percent of
13  the time, as I say in the report, I'm sure in the
14  paragraph right nearby.
15 **Q.**   So then why does it matter whether the language
16  is categorical or not?
17 **A.**   If they say that they -- by default all access
18  is denied, they're making an assertion that all access
19  is denied.
20 **Q.**   Without exception?
21 **A.**   They're making an assertion that all access is
22  denied.  Now, of course, and I have -- I carefully
23  described this is in my report and we can find it, I'm
24  not talking about perfect security, I'm not talking
25  about something being done 100 percent of the time.

27

1       What I'm looking for is are the assertions in the
2   security statement consistent with the practices that
3   they actually on the ground did, as expressed in the
4   e-mails and the reports and the presentations and the
5   other internal evidence.
6 **Q.**   Sir, you put a lot of emphasis on what you call
7   "categorical language."  I'm just trying to understand
8   why do you think that is significant.  You say you don't
9   construe categorical language to mean that SolarWinds
10  does something 100 percent of the time; is that right?
11      MR. CARNEY:  Objection to form.
12 **A.**   I think what I'd like to do is --
13 **Q.**   Can you just answer my question, sir.
14 **A.**   I certainly will.  And let me see if I can find
15  quickly the exact way I expressed this.  Because I was
16  very careful in that language.  So in paragraph 48, for
17  example, I said:
18      "I am of the opinion that the state of
19  cybersecurity depicted in SolarWinds' internal
20  discussions did not match several of the very
21  broad, categorical and unqualified assertions."
22      So what I said in that paragraph is several of
23  the cybersecurity issues raised in the internal
24  documents and these internal documents indicate that
25  SolarWinds failed to consistently apply the

28

1  cybersecurity practices described in the security
2  statements.
3       So you see what I'm saying is that when they
4  make unqualified statements, assertions in the security
5  statement, and then I compare that to what they actually
6  did on the ground, what actually happened, I find that
7  they didn't consistently apply those practices.
8  **Q.**  I'm just trying to understand what you mean by
9  the words you're using.  So consistently, what does
10  consistently mean?  Does that mean 100 percent of the
11  time?
12       MR. CARNEY:  Objection to form.
13  **A.**  If they do it consistently means they do it
14  with consistency.  They do it as a -- as a regular
15  practice.  They do it, not 100 percent of the time, but,
16  you know, there are so many examples that I give in this
17  report of major oversights, major areas, significant
18  areas where they deviated from what they said they were
19  doing.  It's those significant deviations that I find
20  were not consistent with their assertions.
21  **Q.**  A couple of things that I want to unpack there.
22  So you say by "consistently" you mean do something as a
23  regular practice, fair?
24  **A.**  I don't know that I would define it quite that
25  way, but that --

29

1  **Q.**  Mr. -- I'm just repeating the exact words.  I
2  can read them back, if you'd like.  But you said -- I
3  asked you, "Does it mean 100 percent of the time?"  You
4  said, "No, I don't mean that.  I mean as a regular
5  practice."  I just want to get a clear answer for the
6  record.
7       When you say "consistently," are you referring
8  to doing something as a regular practice?
9  **A.**  I wouldn't say that's a precise definition of
10  the word "consistently."
11  **Q.**  Well, then what does it mean, Mr. Graff?
12  **A.**  Okay.  You're asking me what the word
13  "consistently" means as I use it.
14  **Q.**  Yes.
15  **A.**  When I look at the evidence, I see that there
16  were significant deviations, significant variations from
17  what they said they were going to do, what they said
18  they did, and so when there are significant deviations
19  in the evidence, to me, that means that what they were
20  doing wasn't consistent with their assertion in the
21  security statement.
22  **Q.**  Meaning you concluded from these supposed
23  deviations that SolarWinds did not do these things as a
24  regular practice?
25  **A.**  I'm not quite sure I would say that as an exact

30

1  definition.  That's certainly one of the ways in which
2  you can be consistent and to do something as a regular
3  practice.
4  **Q.**  I'm asking you what you meant by it.  I'm
5  trying to understand what your conclusions are,
6  Mr. Graff, because you repeat this phrase repeatedly in
7  your report, that SolarWinds didn't do things
8  consistently.  And I want to understand what it means.
9       Is your opinion, for example, that SolarWinds
10  did not have a regular practice of having role-based
11  access controls?
12       MR. CARNEY:  Objection to form.
13  **A.**  I found in the evidence many indications that
14  they had not performed access control as they said they
15  did and as they said they were doing it.
16  **Q.**  And we'll talk about the evidence that you rely
17  on, but I want to understand your conclusion, because
18  when you say SolarWinds didn't do this consistently, are
19  you saying that they did not do it as a regular
20  practice?  Is that what "consistently" means?
21  **A.**  Gee, I don't know that I can define it as quite
22  being equivalent to -- to that phrase.  It's certainly
23  something -- if you do consistently and you do as a
24  matter of regular practice, that's one of the ways you
25  can do it consistently, but there are many other ways

31

1  you can do it consistently too.
2  **Q.**  So can you not define for me what you mean and
3  the terms that you use for your conclusions?
4       MR. CARNEY:  Objection.  Argumentative,
5       asked and answered.
6  **A.**  The best answer I can give you is that when I
7  looked at the evidence, that I find that when there --
8  as as many significant exceptions and variations and
9  mistakes as I see, then I conclude that they weren't
10  doing it consistently.
11  **Q.**  So it's based on there being many instances of
12  noncompliance; is that what you're finding when you say
13  they didn't do something consistently?
14       MR. CARNEY:  Objection to form.
15  **A.**  When I look at the many instances of problems
16  and the reports internally of things that went wrong
17  with regard to access control, user authentication, and
18  so forth, I conclude that they weren't consistently
19  performing in a manner that aligns with the categorical
20  and unqualified assertions in the security statement.
21  **Q.**  And I just want to be clear, basically you're
22  saying you found many examples of noncompliance, and
23  based on that, your conclusion is that these practices
24  weren't consistently followed?
25       MR. CARNEY:  Objection.  Vague.

32

1 **Q.** I just want to understand, is the "many" a part
2 of it? Does your finding depend -- does your conclusion
3 depend on your finding that there were many examples of
4 noncompliance?
5 **A.** I wouldn't say my conclusion depends on my
6 finding. There were -- there were so many examples in
7 the evidence I examined where SolarWinds employees, some
8 of them directly responsible for the cybersecurity at
9 the company, said that they weren't doing access control
10 correctly or they weren't consistent with passwords and
11 they had problems in putting passwords in configuration
12 files. They had -- they had inappropriate access
13 between their system and customer systems.
14 So these employees were pointing out these
15 problems, and because of that evidence and other, I
16 concluded that with regard to those areas I'm talking
17 about, the performance at SolarWinds was not consistent
18 with the statements that were unqualified, that talk
19 about something being mandated, something happening all
20 the time.
21 So with regard to those unqualified assertions
22 in the security statement, I found that the reports
23 where the employees showed the problems, the employees
24 talked about their lack of consistency in access control
25 and so forth, that leads me to conclude that these

33

1 categorical statements that I call out in the report
2 were not consistent with what was actually happening on
3 the ground.
4 **Q.** Okay. Let's talk about the evidence that you
5 looked at and the next step in your analysis.
6 **A.** Mm-hmm.
7 **Q.** In terms of -- let me actually back up, because
8 the second step in your analysis, and we can go back to
9 paragraph 45, is that you say you evaluated whether:
10 "The practices described in the
11 verifiable/falsifiable assertions were
12 consistent with widely accepted norms."
13 Now, why did that matter to your analysis? As
14 I understand it, you were trying to find out whether
15 SolarWinds did these things, not whether they conformed
16 to widely accepted norms. So I'm curious why you
17 factored this into your analysis.
18 MR. CARNEY: Objection to form.
19 **A.** To answer that question I have to go back to my
20 assignment because, as part of that, I can explain why I
21 took that approach.
22 **Q.** So your assignment is to determine -- as you
23 put it, to compare the state of security depicted in the
24 security statement to SolarWinds' internal assessments,
25 presentations, and communications.

34

1 So if the state of cybersecurity was consistent
2 with SolarWinds' internal assessments, why would it
3 matter whether they were also consistent with industry
4 norms?
5 MR. CARNEY: Objection to form.
6 **A.** I'll answer that question. Let me begin by
7 reading the paragraph 17 --
8 **Q.** We've already read it, Mr. Graff, so if you
9 could just answer my question.
10 **A.** We have, but you paraphrased it, so I am going
11 to give you the precise wording here. It says that what
12 I was supposed to do, to continue:
13 "Is a technical comparison between the
14 state of cybersecurity depicted in the security
15 statement and communications" and so forth,
16 "regarding the state of cybersecurity during
17 that same timeframe with respect to these five
18 areas."
19 I won't read all five areas -- but you notice
20 that the fifth area that I was given in the original
21 assignment was adherence to the NIST cybersecurity
22 framework.
23 Well, as I discuss in my report, I wasn't able
24 to tackle that head-on because of the nature of the NIST
25 cybersecurity framework. And I think, yes, in paragraph

35

1 21 and so forth, I talk about the NIST cybersecurity
2 framework. Because the NIST cybersecurity framework is
3 not precisely a standard, it wasn't -- I wasn't able to
4 evaluate directly the assertion in the security
5 statement that they followed, and that was the word in
6 the security statement, the cybersecurity framework.
7 So what I decided to do was -- and I talk in paragraph
8 21 and so forth about the cybersecurity framework in
9 some length. But what I say in 22 is -- and here we go
10 -- here's the response to your question:
11 "Because I consider the assertion that,
12 'SolarWinds follows the NIST Cybersecurity
13 Framework' not to be verifiable or falsifiable,
14 I did not undertake a separate analysis
15 regarding SolarWinds' adherence to the NIST
16 Cybersecurity Framework. Instead, I considered
17 whether SolarWinds followed cybersecurity norms
18 and best practices in my analysis of the other
19 four areas."
20 So to answer your question, the reason that I
21 considered these norms relevant to this -- to this
22 report is because I couldn't directly evaluate that
23 phrase that says they followed the cybersecurity
24 framework. But since the cybersecurity framework is one
25 of the strongest expressions of norms in cybersecurity,

36

1 then I was able to say, well, let me compare it to --
2 compare these statements and their performance to
3 industry norms and best practices.  Of course, in the
4 security statement they do refer to best practices,
5 industry practices, industry standards and so forth.  So
6 I felt that that was the best way to tackle this part of
7 my assignment.
8 Q.    Okay.  We're going to come back to the NIST
9 cybersecurity framework later, so let's bracket that.
10       Let's move on to the third step in your
11 analysis, which is your actual evaluation.  You say in
12 paragraph 45(C) that you:
13       "Created a set of keywords and terms
14       that, based on my experience, I considered to
15       relate to each of the four areas I have been
16       assigned to investigate.  I asked my team to
17       search the production documents for these
18       terms."
19       What were the keywords you selected to search
20 through the production documents?
21 A.    I can give you some examples.  I don't have a
22 precise list of them because it was an iterative
23 process.  I'll be glad to describe the process in more
24 detail.  But we looked for -- for example, if I'm trying
25 to understand SolarWinds' practices with regard to

37

1 access controls, we looked for the words "access
2 controls" in these documents.  We looked for the words
3 "user identification," we looked for the words
4 "passwords."
5       So I gave them a set of keywords that were
6 directly related to the assignment as a start, and then,
7 as we began to get more and more information from the
8 documents that we -- were located but also the documents
9 that were supplied to me in regard to the -- I'm sure
10 we'll talk about the so-called SARFs, the forms, the
11 S-A-R-Fs, and the risk acceptance forms and the other
12 documents.  As I began to examine those, I found other
13 areas I wanted to explore, and so I gave them additional
14 keywords.  We did searches on the SARF, we did searches
15 on -- we talked about -- we referred to Tim Brown or
16 Mr. Colquitt, Mr. Quitugua, and so forth, when we began
17 looking at documents, what they had discussed things.
18 We looked at those names, we looked at -- for policies
19 and so forth.
20 Q.    Okay.  And your team, who is your team that you
21 are referring to here?
22 A.    There was a team that was assisting me.  They
23 are from a company called the Analysis Group, which is
24 an economic and litigation support company.
25 Q.    And are they the ones that are doing the

38

1 reviews of the documents after you're searching for
2 them?
3       MR. CARNEY:  Objection.  Vague.
4 A.    They had access to -- there was a repository of
5 SEC documents.  They are the ones that actually did the
6 searches, producing documents.  They did not review the
7 documents.  I was reviewing the documents.  But they
8 performed the literal searches in most cases.
9 Q.    So they would just run the search terms and
10 then give you documents in bulk to review yourself?
11 A.    Well, I had lots of documents to review, of
12 course, and some of them were given to me directly, so
13 there were documents that didn't require any searches.
14 But there are others that were the results of the
15 keyword searches that Analysis Group did at my
16 direction, and they relayed those documents to me.
17 Q.    Basically, what I'm trying to get at, sir, if
18 you said search for access controls, for example, did
19 they pull up all documents related to access --
20 referencing access controls and then you would yourself
21 review those and pick the ones that were relevant, or
22 were they filtered for you somehow before you reviewed
23 them?
24 A.    Well, I gave them direction as to, not only the
25 terms, but, I mean, if somebody had a document that

39

1 said, Gee, we really ought to talk about access
2 controls, and they happen to have those two words, or
3 they talked about passwords, a lot of people talked
4 about passwords.  Maybe there was a document that
5 referred to passwords, but just in passing, I didn't, as
6 a rule, want to see those.  They showed me a whole lot
7 of them, but I did direct them that if there were
8 incidental references in a file, that I didn't
9 necessarily see every file.  I may have seen every file
10 that had the word "password" in it, I think there were
11 an awful lot of them.
12 Q.    Did you give them any guidance in terms of
13 looking for, let's say, issues of noncompliance or were
14 you looking for anything relating to passwords so that
15 you also saw examples of compliance?
16       MR. CARNEY:  Objection.  Compound.
17 A.    I didn't give them any direction with regard to
18 that kind of substantive issue of noncompliance or
19 compliance.
20 Q.    So anything related to access controls, for
21 example, documentation showing there's access controls
22 being followed on a day-to-day basis, you would have
23 gotten information about that just as much as you would
24 have an example of access controls being flagged as a
25 problem?

40

1    MR. CARNEY:  Objection.  Form.
2  **Q.**   You can tell me if I need to restate my
3  question.
4  **A.**   Well, I certainly didn't give any direction
5  regarding how they should filter -- only look for
6  negative stuff.  Absolutely not.  I mean, what I was
7  trying to do was form an accurate picture of what the
8  SolarWinds' documents reflected about these areas I was
9  investigating.
10 **Q.**   And I think you said in your assignment you
11 were given, going back to paragraph 17, that you were
12 supposed to look at internal assessments, presentations,
13 and communications regarding the state of cybersecurity?
14 **A.**   Yeah, that's right.  That's what it says.
15 **Q.**   So are those the only documents you looked at,
16 internal communications, presentations, and
17 communications?
18 **A.**   No.  There were plenty others.  As I said, I
19 didn't know at the time that I started that I would be
20 looking at dozens of -- I think they are SARFs -- I
21 think that's System Access Request Form -- I didn't know
22 I was going to be looking at all those.  I looked at
23 quite a few of those.  I looked at risk acceptance
24 forms.  So there were things other than e-mails.  There
25 were also a lot of forms and then reports and so forth.

41

1  **Q.**   So why were you looking at those documents if
2  that's not part of your assignment?
3  **A.**   My assignment was to look at the assertions --
4  look at the security statement, analyze the assertions,
5  and compare that with the state of cybersecurity as
6  revealed in the internal documents.
7  **Q.**   Okay.  So it -- it doesn't matter whether the
8  internal document is a communication like an e-mail or
9  something like a SARF, right?  All of those documents
10 are potentially relevant to whether SolarWinds did the
11 things in the security statement?
12 **A.**   I wouldn't say it didn't matter what they were,
13 but certainly there were things I wanted to consider.  I
14 wanted to consider all of the reports, any document that
15 would indicate to me how they actually performed in
16 these areas that I was asked to look at.
17 **Q.**   Right.  You would want to consider anything
18 relevant to whether SolarWinds did what was said in the
19 security statement regardless of whether there was an
20 internal communication, presentation, or assessment,
21 fair?
22 **A.**   Well, I -- I knew I couldn't look at absolutely
23 everything because there were hundreds of thousands of
24 documents or more, but what I was looking for was the
25 best picture I could find of what actually was happening

42

1  with regard to the cybersecurity in this area.
2  **Q.**   And you would want any relevant evidence
3  regardless of whether it was a communication,
4  assessment, or presentation, right?
5  **A.**   I didn't limit myself to those three things.
6  **Q.**   Okay.  So you mentioned in paragraph 45(C) that
7  "Counsel provided me with risk acceptance forms."
8      So that's one type of document you asked for?
9  **A.**   Well, after I knew that they existed, I asked
10 to see many of them, yes.
11 **Q.**   And you knew they existed from testimony,
12 right?
13 **A.**   That sounds right, yes.
14 **Q.**   You reviewed all the testimony in the case, I
15 assume?
16     MR. CARNEY:  Objection.  Vague.
17 Deposition testimony?
18     MR. TURNER:  All the deposition
19 testimony in the case.
20 **A.**   I think I did.  There may have been one or two
21 that I missed, but I certainly reviewed quite a few
22 depositions.
23 **Q.**   So when you see a reference to risk acceptance
24 forms in the testimony, you wanted to see those
25 documents.  Is that what happened?

43

1  **A.**   When I learned that there were risk assessment
2  forms, and I don't remember exactly how I learned, but
3  when I did, I certainly said, Let's see some of those,
4  let's see those, and we -- I looked at a lot of them.
5  **Q.**   And why did you think risk acceptance forms
6  were relevant?  What did they have to do with the
7  security statement?
8  **A.**   Well, there's two or three different ways that
9  they're relevant.  For one thing, a risk assessment form
10 is part of software development life cycle.  I'm sure
11 we'll talk more about the so-called SDL.  So the risk
12 assessment forms are a way of an executive accepting
13 risk on behalf of the company after it's been described
14 in one of these forms.  So that's one way.  It was very
15 important to understand that.  But another -- as it
16 relates to the SDLC.
17     But another important factor, reason to look at
18 the risk acceptance forms, RAF, is because it shows me
19 -- gives me pictures, a depiction of the problems they
20 identified internally with regard to access controls or
21 passwords.  And so if they -- the internal engineers,
22 the software developers, or the security people found a
23 problem with access control, and they did, one of the
24 ways they would respond to that was to put together a
25 risk acceptance form.

44

1  such-and-such a time."
2      So that indicates to me that, in many cases,
3  they followed a process of filing a request form,
4  passing it along, somebody else saw it, acted upon it,
5  acknowledged it, made a record, passed it back. That's
6  good. When they did that, that's good, and that's a
7  process that I've seen before.
8      The problem is, and what I found in the report
9  and what I called out as an inconsistency, is that the
10  mere fact that these forms were being filled out, moved
11  around, in many cases acted upon and acted upon
12  successfully in many cases; that, by itself, does not,
13  in my opinion, based on my experience and my reading of
14  all this, that by itself does not mean that they
15  consistently adhered to the assertions in the security
16  statement about access control.
17      MR. TURNER: Okay. I have a few more
18  question about this, and then we'll break.
19  A.   And authentication.
20  Q.   When you're saying that the forms reflected
21  that in many cases things were done successfully, what
22  was being done exactly is having an employee get access
23  to systems based on their role, right? That was the
24  purpose of the form. So you're saying the forms
25  demonstrated in many cases that was successfully done?

53

1      MR. CARNEY: Objection to form.
2  A.   I saw several forms that seemed to indicate
3  that somebody, maybe a hiring manager, asked for an
4  account to be created for a person coming onboard and
5  explained what systems or what data they were to be
6  given access to. I saw -- then, sometimes I saw a few
7  forms that said, "Yes, I did it. Here's the stuff I
8  gave them access to."
9      I did see some forms like that, and I think
10  probably there were cases when the system worked that
11  way and worked successfully.
12  Q.   Right. And what I'm just trying to get clear
13  on, Mr. Graff, is I think what you're saying -- correct
14  me if I'm wrong -- but I think what you're saying is,
15  even if you saw many instances like that, you considered
16  it to be outweighed by the specific examples you cite in
17  your report of what you considered to be major issues?
18      MR. CARNEY: Objection. Vague.
19  A.   Yes, if we're talking about, for example,
20  access control, if somebody -- if I see a form or I see
21  another form or I see a dozen forms where somebody asked
22  for an account to be created and specified the data that
23  that they should have access to, that's a good thing.
24  But it doesn't begin to compensate for the remarkable
25  problems that were described by SolarWinds's employees.

54

1  For example, relating to the MSP product line where they
2  had -- talk about access control. They had -- they said
3  in their e-mails and reports that there were SolarWinds
4  employees who had inappropriate access to customer data.
5  Q.   Right.
6  A.   That was a very, very, serious problem and to
7  me -- to my mind, yes, in some of these cases that
8  reflects systemic issues.
9      MR. TURNER: Okay. We can stop there.
10      MR. CARNEY: All right, thanks.
11      THE VIDEOGRAPHER: The time right now
12  is 10:53 a.m., and we are off the record.
13      (Whereupon, a short break was taken.)
14      THE VIDEOGRAPHER: Stand by, please.
15  The time right now is 11:11 a.m., and we're
16  back on the record.
17  Q.   Mr. Graff, could you turn to your rebuttal
18  report at page 7, paragraph 15.
19  A.   I'm there.
20  Q.   Okay. And you say in -- toward the bottom of
21  this paragraph, second to last sentence:
22      "My opening report never stated
23      anything about the frequency of an issue. As I
24      explained in my opening report, the types of
25      major issues that slipped through SolarWinds'

55

1      internal controls need not materialize many
2      times for them to indicate a systemic problem."
3      So you are not making a claim about the
4  frequency with which SolarWinds followed the practices
5  in the security statement; is that right?
6      MR. CARNEY: Objection to form.
7  A.   Could you say that a different way for me?
8  Q.   You say in the opening report -- excuse me --
9  you say here in the rebuttal report --
10  A.   Yeah.
11  Q.   -- that "My opening report never stated
12  anything about the frequency of an issue."
13      So, for example, with respect to role-based
14  access controls, you weren't asserting anything about
15  the frequency with which SolarWinds implemented
16  role-based access controls in the manner described in
17  the security statement?
18      MR. CARNEY: Objection to form.
19  A.   Yeah, I think that's right.
20  Q.   I think as you -- I think this basically gets
21  back to what we were discussing before the break. You
22  instead were looking for whether there were major issues
23  that you considered to be major departures from what was
24  described in the security statement; is that right?
25      MR. CARNEY: Objection -- objection to

56

1    form.
2  A.    Well, that's one of the things.  I mean, what I
3  was looking for.  I was looking for information to help
4  me evaluate whether or not the performance in the areas
5  we talked about was consistent with the security
6  statements.  That's what I was looking for.  But in
7  terms of frequency, yes, I wasn't particularly
8  interested in or searching for any kind of frequency.
9  My feeling was that if there were significant -- my
10  opinion, there's significant issues, very, very,
11  important issues that identified by the SolarWinds
12  employees themselves as being major security issues and
13  so forth, there were a great many of those.  And so that
14  was sufficient for me to draw a conclusion about there
15  being significant issues or significant deviations.
16  Q.    So I want to be really clear, though.  You just
17  mentioned "many."  You're not saying anything about the
18  frequency of problems that arose at SolarWinds; you're
19  basically saying you identified a number of issues in
20  the report that you considered to be major deviations
21  from those practices.  And based on those, it's not
22  important to you how frequently they complied with these
23  practices, given the seriousness of the deviations that
24  you saw?
25        MR. CARNEY:  Objection.  Compound.

                          57

1  Q.    Is that a fair characterization of your
2  opinion?
3  A.    No, I wouldn't put it quite that way.  But I
4  will say that, as I said before, there are several
5  indications from these SARFs, these forms, that there
6  was a practice in place, and they did it correctly many
7  times, so I -- so I wasn't making an assertion about how
8  frequently they failed to do it, but, rather, that there
9  were significant occurrences that were flaws and
10  mistakes and that these very significant things pointed
11  out -- by the way, it wasn't that I found them, the
12  SolarWinds employees found them and pointed them out.
13  Q.    I'm sorry.  I missed that.  Who pointed them
14  out?
15  A.    It was the SolarWinds employees that -- and
16  consultants and I think there were also some external
17  researchers that pointed out problems, too.  But it
18  wasn't me finding the problems.  I found the discussions
19  in the internal documentation.
20  Q.    Okay.  So let's go back to that last sentence
21  in paragraph 15.
22  A.    Mm-hmm.
23  Q.    You say:
24        "The types of major issue that is
25        slipped through SolarWinds' internal controls

                          58

1    need not materialize many times for them to
2    indicate a systemic problem."
3    I want to focus on the word "systemic," because
4  my understanding from what you're saying here, by
5  "systemic," you don't mean frequent, right?  You're not
6  saying anything about the frequency of the problem.
7        MR. CARNEY:  Objection to form.
8        Compound.
9  A.    It's a little more complicated than that.
10  There were security issues that were identified as very
11  serious that persisted for a very long time, for months
12  or for years without being remediated.  So you can look
13  at that -- you can say that that's only one instance and
14  it went on for years, so maybe you only count that once,
15  maybe you could count it as being a problem every day,
16  but I wasn't talking about the number of times something
17  happened.  I'm not trying to count those up and
18  calculate a percentage or some kind of failure rate.
19        What I was saying is that these problems, many
20  of which persisted for years, showed a systemic issue in
21  the way they were approaching the problems.
22  Q.    What specific issue persisted for years,
23  Mr. Graff?  Let's take the MSP example.  Are you
24  alleging that persisted for years?
25        MR. CARNEY:  Objection.  Compound.

                          59

1  Q.    Once it was identified?
2  A.    There's more than one MSP problem, but what I
3  had in mind there, was I think it was reported it was
4  remediated in five months.  But if you look at the --
5  what I think is a very serious problem, which is the
6  fact that there was a connection between the software
7  development environment and the production environment,
8  that was reported by -- I think maybe it was Chris Day
9  who said that it had been going for years.
10  Q.    Okay.  So let me go back to another statement
11  you made and you referred to earlier that perfection
12  isn't the standard here, right?  Issues arise from time
13  to time in any cybersecurity program?
14  A.    I agree that.
15  Q.    But basically, are you say if a major issue
16  arises from time to time, then you would consider that
17  to be, I think as you put it, an indication of a
18  systemic problem?
19  A.    Well, that's kind of a hypothetical.  It would
20  depend on how it occurred and how big a problem it was
21  and whether there was a policy against it and did
22  somebody mess up in a simple technical way or was there
23  a design problem, which I've seen some of here.
24  Q.    Sir, I'm trying to -- just before we get into
25  the details of the evidence, I want to understand your

                          60

```
 1  methodology.
 2        So again, issues can arise from time to time.
 3  That doesn't indicate a lack of controls, right?
 4  A.    Well, it could indicate a lack of controls.
 5  But there -- but perfection is not the standard I was
 6  applying.
 7  Q.    We can just be specific.  If you want to look
 8  back at your initial report, paragraph 50.
 9  A.    5-0?
10  Q.    5-0.  It's on page 25.
11  A.    All right, I see it.
12  Q.    You say:
13        "My decades of experience have taught
14        me that no organization has perfect security
15        and that any organization diligently assessing
16        its cybersecurity will uncover, from time to
17        time, some issues needing to be addressed."
18        Right?
19  A.    Yes.
20  Q.    So that means that if issues arise from time to
21  time, that doesn't mean there's a pervasive failure to
22  implement controls?
23  A.    The mere fact that occasionally a problem
24  occurs, that doesn't by itself indicate that there's a
25  systemic issue.  There are other ways we can identify a
```

                                61

```
 1  potential systemic issue.
 2  Q.    But it's your position that if -- what you deem
 3  a major issue arises, then that does indicate the lack
 4  of controls?
 5  A.    A significant issue or potentially catastrophic
 6  incident, some of the ones we've talked about here, no,
 7  it can indicate a systemic issue.  The way I looked at
 8  these reports of so many problems, I did develop the
 9  opinion that in some cases, they represented systemic
10  issues.
11  Q.    You keep on saying "so many," and I hate to
12  harp on this, Mr. Graff, but you've already said you're
13  not making a finding about the frequency of an issue.
14  So let's put the "many" aside, because you've said that
15  what really matters is the significance of the incidents
16  you're looking at.
17        So what I'm asking, sir, is if an organization
18  can have controls in place and issues arise from time to
19  time, I think there's no contradiction in that.  I'm
20  trying to understand what standard you're ultimately
21  applying to determine that SolarWinds did lack the
22  controls in the security statement, and what I hear you
23  to be saying is that the basis for your opinion that it
24  lacked the controls in the security statement is that
25  there were major lapses in those controls.
```

                                62

```
 1        Is that essentially your finding?
 2        MR. CARNEY:  Objection to form.
 3  A.    Well, no, I didn't say that they lacked the
 4  security controls.  What I said was that if you look at
 5  the categorical statements they make about "We apply
 6  this to all software we develop," and so forth -- I can
 7  find the exact quote for you -- when they say that, if
 8  they say they do it for all and you find that the
 9  employees themselves are pointing out one instance after
10  another when they don't do it, then that can be an
11  indication of a significant discrepancy between what
12  they're doing and what they say they're doing.
13  Q.    So let's try to be specific.  Let's take access
14  controls.
15        (Discussion off the record.)
16        (Whereupon, SolarWinds Security
17        Statement was marked as Graff Exhibit 3, for
18        identification, as of this date.)
19  Q.    So if you turn to page 4 of this document,
20  under access controls.
21  A.    Yes, I see it.
22  Q.    It says:  "Role-based access controls are
23  implemented for access to information systems."
24        Let's just stick with that for a minute.  Is
25  that a categorical statement, in your view?
```

                                63

```
 1  A.    It says they're implemented, so sure, to that
 2  extent, they're implying that it's done, yeah.
 3  Q.    What categorical language do you see in that
 4  statement?
 5  A.    "Are implemented," but it's a pretty ordinary
 6  statement.  They're telling us that they have role-based
 7  access controls for accessed information systems.
 8  Q.    Yeah.  It doesn't say "all information
 9  systems," right?
10  A.    It doesn't.
11  Q.    It doesn't say "always"?  None of those words
12  that you pointed to earlier, it doesn't contain those
13  words, does it?
14        MR. CARNEY:  Objection.  Compound.
15  A.    The word "all" doesn't appear here, and it
16  doesn't say "always."  It just says it's done.
17  Q.    Okay.  Let me just go back.
18        Is this what you consider a categorical
19  statement or not?
20        MR. CARNEY:  Objection.  Vague.
21  A.    Yeah, there are no qualifications in it.  Yeah,
22  it says that they do it.  It says they are implemented.
23  Q.    And, again, perfection is not the standard,
24  right?  So if role-based access controls are implemented
25  for access information systems generally, but issues
```

                                64

1  arise from time to time, it still means that you would
2  agree with that statement?
3  A.    Well, they say role-based access controls are
4  implemented, and there are processes in place to address
5  employees and so forth, there are -- it talks in the
6  second sentence about processes or procedures in place
7  to address employees who are voluntarily or
8  involuntarily terminated, the internal reports show
9  that, in fact, there are problems there.
10  Q.    Well, Mr. Graff, if you could just stick with
11  my question.
12  A.    Sure.
13  Q.    Okay.  My question is:  If the company had a
14  general practice of implementing role-based access
15  controls to information systems but issues arose from
16  time to time, they weren't perfect, right?  You would
17  agree that that statement would still be true?
18  A.    I saw in the --
19  Q.    I'm not asking you what you saw, sir.  I'm
20  asking you to assume that role-based access controls
21  were implemented for access to information systems, but
22  issues arose from time to time.
23         Would you still agree that the statement is
24  true?
25             MR. CARNEY:  Objection.  Vague as to

65

1       "issues."
2  A.    This asserts that they have access controls are
3  implemented on the basis of roles.  I saw some
4  indications that they did that.  I also saw some
5  indications that they hadn't done that.
6  Q.    So what I'm trying to get at -- I don't care
7  what you saw at this point.  I am asking -- I am trying
8  to get clear on the standard you're applying.
9         So assume, again, that the evidence shows that
10  role-based access controls were generally implemented,
11  but there were issues identified from time to time, you
12  would agree that the fact that there were issues
13  identified from time to time does not by itself render
14  that statement false?
15             MR. CARNEY:  Objection.  Vague.
16  A.    It's going to matter what the issues are and
17  how pervasive they were.
18  Q.    How pervasive they were?  Meaning how
19  widespread they were?
20  A.    Yes.  For example, role-based access controls
21  were violated -- that principle was violated -- one
22  example that come to mind is the problem with the MSP
23  product line, and so forth, so that was a failure of
24  access controls, among other kinds of controls.
25  Q.    I just asked, Mr. Graff, whether you were

66

1  looking at how widespread; in other words, how frequent
2  they were?
3  A.    Well, there's a different between widespread
4  and frequent.  If it's across all of their systems, if
5  there's a problem across all of their systems, it's a
6  problem that affects all of their data, that's one of
7  the ways I would think it could be widespread.  I'm not
8  talking about necessarily the frequency of which it
9  occurs or how often it is, but does it affect all of
10  their systems, does it affect all of their data or much
11  of the customer data?  That would make it widespread.
12  Q.    Again, I just want to get clear.  So
13  essentially, if they had issues arise from time to time
14  by itself, that wouldn't make the statement false, but
15  if there were a major issue in -- if it were an issue
16  you considered major, that would render the statement
17  false; is that the standard you're applying?
18             MR. CARNEY:  Objection.  Objection.
19         Vague and compound.
20  Q.    Whether there was a major issue that you
21  identified in the control being looked at?
22  A.    Well, I've use the word "major."  I'm not going
23  to restrict myself to that, because I also mentioned
24  that there -- I considered whether or not there were
25  significant exceptions or, as I said, potentially

67

1  catastrophic exceptions.  So in order to evaluate
2  whether or not role-based access controls were in place
3  in a manner that was consistent with this security
4  statement, I took a look at what I could find out about,
5  how often, yes, they did it, and I think they created
6  the accounts with these SARFs, they did that often, they
7  did it correctly.
8  Q.    They complied, in other words, often correctly?
9  A.    Many times with the SARFs.  They did that many
10  times with account creation.  Now, mind you, they also
11  violated many times when it comes -- when we talked
12  about shared access to account IDs and so forth, right.
13         So there's violations there also, but in terms
14  of role-based access control, they clearly had a system
15  in place where somebody would request it.  Whether it
16  was implemented correctly, I can't know, but I think
17  they did very often, they would have complied with the
18  role-based access controls in terms of account creation.
19  There were many problems in other areas as it relates to
20  access controls, and they were significant.  We can use
21  the word "major."  They were very important.
22  Q.    Let me stop you there, Mr. Graff --
23  A.    Yeah, sure.
24  Q.    -- because -- and, look, the day will go much
25  quicker if you just stick to answering the specific

68

1  question I'm asking you, okay?
2      So you used several words in that last answer.
3  You said "major," you said "significant," you said
4  "catastrophic."  I'm trying to understand what your
5  threshold is.  Is the idea that if there's a significant
6  problem that SolarWinds identifies in its access
7  controls at some point then that renders this statement
8  false, or is it if they identify a major problem or a
9  catastrophic problem?  What is the standard you're
10  applying?
11      MR. CARNEY:  Objection.  Vague and
12  compound.
13  A.    It's going to vary from case to case.  One of
14  the things I'm referring to is the problems that were
15  identified with role-based access control in some of the
16  testimony and some of the documentation as well where
17  the SolarWinds' employees talked about problems with
18  role-based access control.
19  Q.    I understand the facts may vary from case to
20  case, but are you applying a different standard from
21  case to case?
22      What are you looking for in order to determine
23  whether this statement is true, role-based access
24  controls are implemented for access to information
25  systems.  You've repeatedly said the company had a

69

1  general process for provisioning access, you've claimed
2  that there was either a significant problem or a major
3  problem or a catastrophic problem and that is at the
4  root of your opinion.
5      So what is the standard that you're applying to
6  determine that this statement was false?
7      MR. CARNEY:  Objection.  Compound.
8  Q.    Let me just ask you to clarify, is your opinion
9  that this statement was false, role-based access
10  controls are implemented for access to information
11  systems?
12      MR. CARNEY:  Objection.  Compound.
13  A.    I'm going to refer to my statement here -- to
14  my report.  What I've said is that what's described in
15  the internal documents is not consistent with that
16  security statement as it relates to role-based access
17  control.
18  Q.    Meaning that you think this is untrue,
19  role-based access controls are implemented for access to
20  information systems; you think that statement is untrue?
21  A.    Well, I point out in the report that there were
22  several cases when it wasn't done.
23  Q.    That's not what I'm asking, sir.  Do you have
24  an opinion in this case as to whether or not SolarWinds
25  implemented role-based access controls for access to its

70

1  information systems?
2      MR. CARNEY:  Objection.  Asked and
3  answered.
4  A.    I do have an opinion, and in order to
5  understand my opinion, it's going to be necessary to
6  look at a little broader segment than those two
7  sentences.
8  Q.    Do -- do you have an opinion as to whether it's
9  true or false --
10      MR. CARNEY:  Objection --
11  Q.    It calls for a true-or-false answer.  What --
12  which is it?  Do you believe that it's true or do you
13  believe that it's false?
14      MR. CARNEY:  Objection.  Vague as to
15  "it."
16  Q.    The sentence:  "Role-based access controls are
17  implemented for access to information systems," do you
18  have any opinion as to whether that statement was true
19  during the time of the relevant period, and I'm asking
20  you just for either true or false?
21  A.    It's inconsistent with what actually happened
22  in their actual practices.
23  Q.    I'm trying to understand what that means, okay?
24  I understand you found certain issues or instances where
25  you believe SolarWinds deviated from access control best

71

1  practices.
2      Based on those instances, do you have an
3  opinion as to whether this statement is true?
4  A.    Well, you keep saying I found certain issues.
5  I -- it was the SolarWinds people and the customers and
6  the external security researchers that found the issues.
7  I'm just summarizing them in my report, right, so I
8  didn't find them.  Let me be clear about that.  I didn't
9  have access to that information.  I couldn't have found
10  it.
11  Q.    I understand that, sir, that's obvious.  What
12  you said, again, before, is that it's understandable
13  that companies from time to time identify issues in
14  their cybersecurity controls, right?
15  A.    Yes.  It happens from time to time.
16  Q.    So what you saw is SolarWinds identifying
17  issues related to its controls.  So I'm trying to
18  understand what the implication of that is for your
19  opinion.  Based on the issues that you saw, do you
20  believe it was false for SolarWinds to say role-based
21  access controls are implemented for access for
22  information systems?  It's a yes-or-no question.
23  A.    I understand it's a yes-or-no question, but the
24  paradigm there I'm saying it's inconsistent.  I don't --
25  whether it's true or false is a judgment that I didn't

72

1  **A.**    Well, when I was at NASDAQ defending the stock
2  market there, I held them to an extremely high standard,
3  and if I found that they -- what they did didn't match
4  what they told me, I took action.
5  **Q.**    Well let's talk about your time at NASDAQ.  So
6  you were with NASDAQ from 2012 to 2015, right?
7  **A.**    Yes, that's right.
8  **Q.**    And NASDAQ had security policies in place while
9  you were there?
10 **A.**    In more than one sense, yes.
11 **Q.**    And you made public statements about those
12 security policies from time to time?
13 **A.**    I made public statements.  I don't know if I
14 exactly made statements about our policies.  I would
15 have to have my memory refreshed, but it could well be.
16 **Q.**    Do you remember giving testimony before
17 Congress in June 2012?
18 **A.**    Yes, I do.
19          MR. TURNER:  Let's take a look at that
20     one.
21          (Whereupon, Testimony of Mark Graff
22     Vice President, NASDAQ OMX Group Before the
23     House Financial Services Committee Subcommittee
24     on Capital Markets was marked as Graff Exhibit
25     4, for identification, as of this date.)

77

1  **Q.**    You can take time to thumb through this
2  document, Mr. Graff, but you're being shown what's been
3  marked as Graff Exhibit 4.
4          Do you recognize this as a copy of the
5  testimony you gave to Congress on June 1st, 2012?
6  **A.**    Yes, this looks right.
7  **Q.**    And if you could turn to the second page for
8  me.  In the first full paragraph of the second page, you
9  give a general overview of the security program that
10 NASDAQ had in place.
11         Do you see that?
12 **A.**    Well, I'm not sure I would say it was a general
13 overview, but I certainly discuss our defenses.
14 **Q.**    Right.  Defenses including:
15         "Implementation of physical safeguards
16     around data centers and work spaces, a
17     consolidated network with multiple connectivity
18     options, a disaster recovery plan for our
19     infrastructure, capacity management and
20     testing, and business continuity and crisis
21     management plans."
22         Those are all components of NASDAQ's security
23 program, right?
24 **A.**    Yes.
25 **Q.**    And then a bit below that, you provide:

78

1          "A summary of processes, policies, and
2      procedures that NASDAQ OMX generally follows in
3      connection with information security."
4      Right?
5  **A.**    Yes.
6  **Q.**    Similar to what you'd see in the security
7  statement is the summary of the various policies that
8  NASDAQ followed.
9          MR. CARNEY:  Objection.  Vague.
10 **Q.**    And there's a bulleted list under there that
11 includes things like, and I'll just quote:
12         "Business continuity plans are robust
13     in taking into consideration real-time
14     failovers of our market trading platforms and
15     protects against intentional and malicious
16     attempts to disrupt our business."
17         Do you see that one?
18 **A.**    Yes.
19 **Q.**    And there are several bullet like that under
20 it?
21 **A.**    Yes.
22 **Q.**    And all the statements in this testimony were
23 true, right?
24 **A.**    Yes.
25 **Q.**    In fact, this was sworn testimony, so it was

79

1  given under oath?
2  **A.**    It was.
3  **Q.**    For example, it was true that NASDAQ had:
4  "Robust business continuity plans in place"?
5  **A.**    Yes.
6  **Q.**    And they took into considerations real-time
7  failovers of market trading platforms?
8  **A.**    Yes.  And by the way, I can answer some
9  questions about NASDAQ security operations, and others I
10 won't be able to answer for you, but I'll do my best.
11 **Q.**    Sure.  Now, business continuity plans are plans
12 that allow an organization to continue operating after
13 technical disruption, right?
14 **A.**    Well, that's the general sense of it.  That
15 probably isn't exactly right, but that's the general
16 sense, sure.
17 **Q.**    And so what this is saying if you had robust
18 plans in place to make sure NASDAQ could keep its
19 platforms operating in the event of something like a
20 technical glitch?
21 **A.**    Well, I don't want to get into what a technical
22 glitch is, but we definitely had business continuity
23 plans that were in place to help the system recover,
24 defend against attack, or recover from a -- partially or
25 completely successful attack.  We had plans in place.

80

1  **Q.**    It could be an attack or it could be an
2  accident or a glitch, or anything; you had robust plans
3  in place to make sure the platform stayed operational?
4  **A.**    We did have -- I can agree with that last part.
5  We did have robust plans in place to make sure that the
6  platforms remain operational.
7  **Q.**    And failovers, that's when computers
8  automatically switch to backup systems when a main
9  system fails, right?
10  **A.**    Yes.
11  **Q.**    So NASDAQ had systems designed to failover at a
12  backup systems in real time?
13  **A.**    Yes.
14  **Q.**    And that's part of how you made sure that the
15  trading platform stayed operational and current?
16  **A.**    That's one of the -- that is one of the
17  techniques we used.  There were several others.
18  **Q.**    Now, even though NASDAQ had these policies, it
19  was also true that NASDAQ had gaps in these policies
20  that arose from time to time, right?
21       MR. CARNEY:  Objection.  Vague.
22  **A.**    I'm having a little trouble with -- with
23  describing all these things as policies.
24  **Q.**    Whatever; practices, policies, there were gaps
25  from time to time, correct?

81

1       MR. CARNEY:  Objection.  Vague.
2  **A.**    Well, I'm trying to think.  We had -- we were
3  very, very successful.  Are you asking about gaps that
4  affected operations?
5  **Q.**    I'm asking about any gaps.  Every cybersecurity
6  program have gaps in their controls from time to time,
7  right?
8  **A.**    Well, gaps, lapses, maybe.  I'm trying to
9  figure out what you mean.  We -- we had marvelous
10  results, and I'm trying to think if there were any
11  operational issues.
12  **Q.**    I'm not even talking necessarily about
13  operational issues, but risks that were identified from
14  time to time that you needed to address, right?  Every
15  cybersecurity program has that?
16  **A.**    Well, there were certainly risks, depending on
17  how we're going to define the word.  I teach a class on
18  this.  And I spend -- I'm not going to do it -- I spend
19  all day talking about what the word "risk" means.  So --
20  but, yes, we had risks in an ordinary sense, absolutely.
21  We had targeted attacks too.
22  **Q.**    Yeah, Mr. Graff, I'm just going back to your
23  point that no organization has perfect cybersecurity,
24  and every organization will uncover from time to time
25  some issues that need to be addressed.

82

1       So isn't it true that NASDAQ had issues that
2  arose from time to time with respect to, for example,
3  business continuity systems?
4  **A.**    Oh I don't think we had any issues relating to
5  our business continuity issues, but one of the points I
6  --
7  **Q.**    Mr. Graff --
8  **A.**    -- let me --
9  **Q.**    Let me just go into the next question, please.
10  **A.**    I am going to finish my answer.
11       MR. CARNEY:  Yes, Serrin, please let
12  him finish.
13       MR. TURNER:  I don't need to go off in
14  a different tangent because it's not really
15  relevant in our question.
16       MR. CARNEY:  Yeah, but, Serrin, you got
17  to let him finish --
18       MR. TURNER:  That's fine.  Go ahead and
19  then I'll move to strike as nonresponsive.  Go
20  ahead.
21  **A.**    We had -- as I said in my statement before
22  Congress, we had multiple layers of defense.  So when
23  you are talking about gaps, I mean, our defenses nestled
24  together to protect the stock market, and we had an
25  extraordinary record of response to attacks.  And let me

83

1  distinguish.  Of course, we were attacked.  We were
2  never successfully attacked, okay.  So when you talk
3  about gaps in cybersecurity, we didn't have any gaps in
4  the way we operated our systems and the way we protected
5  the stock market and its data.
6  **Q.**    Let me just ask it a little bit of a different
7  way, Mr. Graff.  If there were occasional gaps that
8  arose in your business continuity policies, still
9  wouldn't change the fact that you had robust business
10  continuity programs in place, right?
11       MR. CARNEY:  Objection.  Vague as to
12  gaps and policies.
13  **A.**    Yeah, I'm afraid --
14  **Q.**    Okay.  I'll withdraw the question.
15       How about this:  There were major gaps in your
16  business continuity plans at NASDAQ, weren't there,
17  Mr. Graff?  Do you remember those?
18       MR. CARNEY:  Objection.  Vague.
19  **A.**    I -- I need to understand more about what you
20  mean about the gaps, and you are talking about business
21  continuity policies, and there's differences between
22  policies and practices.  So I'm afraid I'd like to ask
23  you to be a little more clear in what you're saying.
24  **Q.**    Do you remember, in August 2013, NASDAQ
25  suffered what became known as the flash freeze incident?

84

1  Do you remember that?
2  **A.**   I think you're talking about the IPO with
3  Facebook.
4  **Q.**   No.  That's a different one.  That's in 2012.
5  I'm talking about 2013.  You don't remember the flash
6  freeze?
7  **A.**   You'd have to refresh my memory on that.
8  Am I going to get a copy of that?
9        MR. TURNER:  Yes, once it's marked.
10       (Whereupon, NASDAQ OMX Provides Updates
11  on Events of August 22, 2013 was marked as
12  Graff Exhibit 5, for identification, as of this
13  date.)
14       THE WITNESS:  All right.  I have it.
15  **Q.**   Take a minute to review if you'd like, but this
16  is a NASDAQ statement from -- published looks like
17  August 29, 2013, titled:  "NASDAQ OMX Provides Updates
18  on Events of August 22, 2013."
19       Does this refresh your recollection at all
20  about this event?
21  **A.**   I'll need another minute to look.
22  **Q.**   Sure.
23  **A.**   All right.  I've reviewed the document.
24  **Q.**   Does this refresh your recollection about the
25  incident?  Do you remember that trading stopped on

85

1  NASDAQ for more than three hours?
2  **A.**   I wouldn't have been able to tell you that.  I
3  see it says that here.
4  **Q.**   And according to this document, the cause was a
5  spike in trading messages at the NASDAQ that exceeded
6  its capacity to process.
7        Does that sound right to you?
8  **A.**   Yeah.
9  **Q.**   And that should have caused a failover to a
10  backup system, I believe it says, but there was a flaw
11  in NASDAQ's code that prevented the failover from
12  happening cleanly?
13       MR. CARNEY:  Can you direct us --
14       MR. TURNER:  Yes, one moment.
15       MR. CARNEY:  Thanks.
16  **Q.**   Directing your attention to the middle of
17  page 2, starting with:
18       "The confluence of these events vastly
19       exceeded the SIP's planned capacity, which
20       caused its failure and then revealed a latent
21       flaw in the SIP's software code.  This latent
22       flaw prevented the system's built-in redundancy
23       capabilities from failing over cleanly, and
24       delayed the return of system messages."
25       Do you see that?

86

1  **A.**   I do see that.
2  **Q.**   And that's what led to the freeze here.  Is
3  that your understanding?
4  **A.**   I don't know.  I really didn't get involved in
5  this because it wasn't a cybersecurity incident, and I
6  had no responsibility for the failover of the
7  processors.  So I didn't get involved in this.
8  **Q.**   Does cybersecurity -- have you ever heard of
9  the abbreviation "CIA" in cybersecurity?
10  **A.**   Sure.
11  **Q.**   Confidentiality, integrity, and availability?
12  **A.**   Mm-hmm, yes.
13  **Q.**   And cybersecurity protects all three aspects of
14  data, right?
15  **A.**   Well, I lecture on this too.  Cybersecurity
16  helps to ensure availability of systems against attack
17  or malfeasance or mistakes.  But this wasn't a
18  cybersecurity incident, and I didn't have the
19  responsibility for the uptime of the entire stock
20  market.
21  **Q.**   You said malfeasance or mistakes?
22  **A.**   Uh-huh.
23  **Q.**   Isn't a mistake if there's a flaw in the code
24  that causes the exchange to go down?
25  **A.**   I suppose there was a mistake.  I wasn't

87

1  responsible for the operation of the stock market as
2  such.  I was responsible for protecting them against
3  cybersecurity incidents.  This wasn't one.
4  **Q.**   Business continuity plans, you were in charge
5  of those, correct?  That's part of the cybersecurity
6  program?
7  **A.**   We had some business continuity plans.  That
8  wasn't -- I didn't have responsibility for the business
9  continuity plans, that was a whole other department and
10  a whole other vice president.
11  **Q.**   You testified, however, that the NASDAQ had
12  robust business continuity plans.  Were you only
13  testifying that they were robust against attackers but
14  not robust against glitches?  Is that how Congress would
15  have understood your testimony?
16       MR. CARNEY:  Objection.  Vague.
17  Mischaracterizes testimony.  You can refer him
18  to the testimony itself on page 2.
19  **Q.**   Mr. Graff --
20  **A.**   I have a lot of pieces of paper in front of me.
21  Yes, go ahead.
22       MR. CARNEY:  I mean, I'm reading the
23  statement here:  "Below is a summary of the
24  process, policies, and procedures that NASDAQ
25  OMX generally follows in connection with

88

1     information security."
2          MR. TURNER:  Yes.
3  **Q.**    And part of having business continuity plans in
4  place, part of the purpose of having business continuity
5  plans is to ensure the continued availability of data?
6  **A.**    Yes, that's right.
7  **Q.**    Okay.  So this was a gap in the company's
8  business continuity processes, was it not?
9          MR. CARNEY:  Objection.  Vague as to
10  "this."
11  **A.**    The -- the incident you are talking about that
12  had happened in 2013, the so-called "SIP" problem, yes,
13  that would have been a -- there was an outage that
14  represents an issue with the provisions that NASDAQ made
15  at that time for business continuity.
16       (Court reporter clarification.)
17  **Q.**    Yeah.  And it stemmed from a problem, an issue,
18  with NASDAQ's business continuity plans or business
19  continuity processes?
20  **A.**    Well apparently there was a problem in the
21  software where there was a cascade of data coming, I
22  think coming from the New York Stock Exchange, and so
23  their system wasn't able to keep up with it, and it
24  resulted in an outage.  Absolutely.
25  **Q.**    And that's a gap, right?  It wasn't designed to

89

1  deal with that risk?
2          MR. CARNEY:  Objection.  Vague.
3  **A.**    Well, I wasn't -- I didn't ever see that
4  software.  I don't know what it was designed to do.
5  Clearly, the business continuity plan didn't operate the
6  way it should have.
7  **Q.**    And, in fact, there's a statement here -- hang
8  on one second.  One moment, please.  I'm sorry.  I was
9  looking at the wrong page.
10      Page 1.  Second paragraph, it says:
11       "A preliminary internal review has
12      identified a combined series of technology
13      events that caused the initial market problems
14      and extended the halt period.  A number of
15      these issues were clearly within the control of
16      NASDAQ OMX.  As a securities information
17      processor for NASDAQ stocks, we are responsible
18      for them, regret them and intend to take all
19      steps necessary to address them, to enhance
20      stability and functionality in the markets."
21      So there were issues that were under NASDAQ's
22  control related to its business processes that caused
23  the incident and that needed to be fixed after the
24  incident, right?
25  **A.**    Yes, that's what it says.  I agree.

90

1  **Q.**    Okay.
2  **A.**    And NASDAQ took responsibility for the issues.
3  **Q.**    Right.  And none of this doesn't mean -- excuse
4  me -- none of this means, sir, that your prior testimony
5  wasn't true, right?
6  **A.**    My testimony in front of Congress was accurate
7  and factual.
8  **Q.**    NASDAQ did have robust continuity plans in
9  place, which included systems designed to failover in
10  realtime?
11  **A.**    Yes.
12  **Q.**    As a general matter, it did?
13  **A.**    Yes.
14  **Q.**    But that doesn't mean its systems were perfect,
15  right?
16  **A.**    That's right.
17  **Q.**    In fact, it says, toward the end of this
18  statement here, on page 3, at the top, it says:
19       "NASDAQ OMX is deeply disappointed in
20      the events of August 22, and our performance is
21      unacceptable to our members, issuers and the
22      investing public.  While getting to 100 percent
23      performance in all of our activities, including
24      our technology is difficult, it's our
25      objective."

91

1      So in other words, while perfection is the
2  ideal, you can't expect it in practice; isn't that
3  basically what this statement is saying?
4  **A.**    Well, I don't know that I want to paraphrase
5  something that was written all these years ago.  But
6  certainly, I'll agree with the idea that perfection is
7  not achievable in every case.  There is -- as I said in
8  my report, there are -- a company is -- will not have
9  perfect cybersecurity and they will.  If they're
10  searching carefully, they will occasionally encounter an
11  issue.
12  **Q.**    Yeah.  And even if an issue occurs, it doesn't
13  mean they had a failure to have practices in place.
14  Just like in this case, there was an issue, but
15  nonetheless, as you've testified, there were, in fact,
16  robust business continuity practices in place?
17  **A.**    Are we talking now about the NASDAQ OMX
18  incident in 2013?
19  **Q.**    Yes.  Again, even though this issue arose, you
20  truthfully testified there were robust business
21  continuity procedures in place?  Those two things are
22  not incompatible, right?
23  **A.**    Well, first of all, my testimony was about a
24  year ahead of this incident.  And, in fact, my testimony
25  was prior to the Facebook problem I talked about, with

92

1 the Facebook IPO.
2      But what I said in front of Congress was true.
3 We did have the business continuity plans and some
4 provisions that I felt were robust. I was reporting, I
5 didn't have personal responsibilities or administrative
6 responsibilities for those plans, but I reported
7 truthfully that we did have business continuity plans.
8 And sometime later, both with the Facebook IPO in 2012,
9 not too long after I testified --
10 Q.     The Facebook IPO was in May 2012, sir, before
11 you testified.
12 A.     Was it May? And then before I testified?
13 Yeah, that's fine. I agree with you.
14 Q.     Let me make sure I understand what you agree
15 with me on. I just want to get a clear answer for the
16 record.
17 A.     The dates of the Facebook incident, that does
18 sounds more accurate, sure.
19 Q.     Okay. But look, you can have robust continuity
20 procedures in place, but nonetheless, issues can arise
21 from time to time, fair?
22 A.     Well, it depends what you mean by "issues." I
23 mean, of course, there are going to be imperfections.
24 But when we use the broad term "issues," that's a
25 different matter altogether.

93

1 Q.     Let me ask you, sir, this issue is fairly
2 described as a major one, correct?
3 A.     You're talking about the business outage at
4 NASDAQ in 2013?
5 Q.     Yes. Yes.
6 A.     Yes, I think we can call that a major incident.
7 Q.     In fact, the SEC itself put out a statement as
8 to this trading disruption.
9      (Whereupon, Statement on NASDAQ Trading
10      Interruption was marked as Graff Exhibit 6, for
11      identification, as of this date.)
12 Q.     So I'm showing you what's been marked as Graff
13 Exhibit 6. It's from August 22, 2013, Statement on
14 NASDAQ Trading Interruption by chief -- excuse me, Chair
15 Mary Jo White.
16      Do you see that?
17 A.     Oh, I see it, yes.
18 Q.     And it says:
19      "The continuous and orderly functioning
20      of the securities markets is critically
21      important to the health of our financial system
22      and the confidence of investors. Today's
23      interruption in trading, while resolved before
24      the end of the day, was nonetheless serious and
25      should reinforce our collective commitment to

94

1      addressing technological vulnerabilities of
2      exchanges and other market participants."
3 Q.     So you would agree that this was a major issue
4 that arose for NASDAQ?
5      MR. CARNEY: Objection. Vague.
6 Q.     It was a major issue in connection with
7 NASDAQ's business continuity controls?
8      MR. CARNEY: Are you saying
9      cybersecurity? Are you tying it to
10      cybersecurity? That's why it's vague.
11      MR. TURNER: I don't need the speaking
12      objection.
13      Go ahead, Mr. Graff.
14 A.     Well, this statement relates to an outage that
15 occurred on August 22, 2013, a disruption of trading
16 activities as a result of a technical flaw that was
17 described in the NASDAQ statement. It had nothing to do
18 with cybersecurity. The outage didn't have anything do
19 with cybersecurity, and it wasn't part of my
20 responsibilities, and I don't remember the incident very
21 well, to be honest.
22 Q.     Mr. Graff, I'm just asking you whether this
23 qualifies as a serious issue in connection with NASDAQ's
24 business continuity processes?
25      MR. CARNEY: Objection. Vague.

95

1      Outside the scope.
2 A.     Well, the disruption was certainly serious.
3 The flaw in design that NASDAQ identified was,
4 therefore, a serious flaw. You -- I guess, the other
5 thing that didn't go right was that the failover doesn't
6 seem to have happened as it should have. And so there's
7 a -- that's a serious issue as regards to the failovers,
8 too.
9 Q.     Okay. And there's -- this isn't just Mary Jo
10 White who had this reaction.
11      (Whereupon, news article entitled
12      NASDAQ: 'Connectivity issue' Led to Three-Hour
13      Shutdown was marked as Graff Exhibit 7, for
14      identification, as of this date.)
15 Q.     So I'm showing you what's been marked as Graff
16 Exhibit 7. It's a news article about the shutdown,
17 which quotes on page 3 a quote from former SEC Chairman
18 Harvey Pitt, saying it looked like NASDAQ was clueless
19 about how to deal with this emergency.
20      Again, I'm not doing this, Mr. Graff, to
21 suggest that you were. But my point is, NASDAQ wasn't
22 clueless, it did have business continuity plans in
23 place. It's just in this one respect, they failed,
24 right?
25 A.     Well, NASDAQ had robust defenses in -- both in

96

1 the cyber area and also in other areas, and although
2 this wasn't a cybersecurity incident by any stretch of
3 the imagination, there was an outage that lasted a few
4 hours. It was a serious problem, I agree, and it looks
5 to me, in retrospect, although I really don't remember
6 the incident very well, that the business continuity
7 plans should have handled it better than they did.
8 That's why they apologized.
9 Q.    Yeah. And so my only point in all this,
10 Mr. Graff, is just because a major issue arises, that
11 doesn't imply that there was any systemic failure to
12 implement controls, does it?
13          MR. CARNEY: Objection. Vague as to
14          "controls."
15 A.    Well, an outage like this -- this one,
16 apparently, according to the statement, came from a
17 design flaw. So we could talk about whether or not, you
18 know, design flaws sometimes indicate a systemic issue,
19 sometimes they don't. But that doesn't really relate to
20 the kinds of failures that I described in my report that
21 were identified by the SolarWinds employees and others,
22 as I've said.
23 Q.    Mr. Graff, you told Congress the business
24 continuity plans were robust and took into consideration
25 realtime failovers of market trading platforms. That

97

1 was true, right? You had robust continuity plans in
2 place. That does not imply that there might not be
3 serious issues that arise with respect to those
4 controls?
5          MR. CARNEY: Objection to form.
6 A.    Well, we -- yeah, I told Congress we had robust
7 business continuity plans. We did. And the system,
8 nevertheless, was overwhelmed and failed for a few hours
9 in 2013.
10 Q.    And that doesn't make your testimony false,
11 does it?
12 A.    Well, they're not related really. I talked
13 about what our plans were and what our processes were.
14 And I don't believe I said that we would be able to
15 resist any possible problem.
16 Q.    Yeah, you didn't say they would be perfect,
17 right?
18 A.    I didn't say that.
19 Q.    Right. They weren't perfect in this instance,
20 right?
21 A.    In the NASDAQ outage instance and the SIP
22 incident.
23 Q.    They were not perfect in that instance?
24 A.    They were not perfect, I agree.
25 Q.    And the consequences were major, right?

98

1 A.    Significant, you bet.
2 Q.    That doesn't mean NASDAQ didn't have business
3 continuity controls in place?
4 A.    Yeah, we had controls in place. The controls
5 seemed to have failed for a few hours, but yeah.
6          MR. TURNER: All right. We can take a
7          break now if you want.
8          THE VIDEOGRAPHER: The time right now
9          is 12:08 p.m. We're off the record.
10          (Whereupon, a short break was taken.)
11          THE VIDEOGRAPHER: Stand by, please.
12          The time right now is 1:02 p.m., and we're back
13          on the record.
14 Q.    Welcome back, Mr. Graff.
15 A.    Thank you.
16 Q.    So let's get more specific and talk about some
17 of the particular assertions in the security statement
18 that are at issue. I want to start with the statement
19 following NIST, the statement that SolarWinds follows
20 the NIST cybersecurity framework.
21          You say in paragraph 21 of your report -- you
22 say that this statement was too vague for you to
23 evaluate.
24          Do you remember that?
25 A.    I do remember.

99

1 Q.    So I just want to be clear. You did not try to
2 evaluate whether this assertion was true or false,
3 correct?
4 A.    What was that paragraph number? Is it 21, did
5 you say?
6 Q.    Paragraph 21 on page 8.
7 A.    I did not try to evaluate whether that
8 particular statement was, per se, true or false.
9 Q.    So you don't have the opinion that the
10 assertion was false?
11 A.    I found that it was not a clear enough
12 statement given the context of the cybersecurity
13 framework to evaluate whether or not they actually were
14 following it. Because it's not clear to me what they
15 mean by "follow" exactly, because it's not a standard.
16 Q.    All right. Fair enough. And when you say it's
17 not a standard, you mean it doesn't prescribe specific
18 practices that companies are supposed to follow?
19 A.    Well, that's not precisely what I mean. There
20 are cybersecurity standards. There's the ISO/IEC 27001,
21 which is, of course, the European. There are standards
22 in Europe, the GDPR and so forth, but the U.S. doesn't
23 have -- for unclassified systems -- doesn't have a
24 formal standard in cybersecurity. There are
25 recommendations, guidelines, frameworks, but there's not

100

1 appropriate to their cases.
2 Q.     Exactly.  It is a self-assessment framework,
3 right?  It can be used by small businesses and large
4 businesses alike.  They can go through and pick which
5 controls are appropriate to their situation.  It could
6 be very different for another company.
7            MR. CARNEY:  Objection.  Compound.
8 A.     Could you break that up for me a little bit?
9 Q.     And I right that this is a framework -- the
10 NIST CSF is a framework that is meant for businesses of
11 all sort to use, no matter how large or small?
12 A.     It can be useful for a great many companies, no
13 matter what their size.
14 Q.     And the reason for that is that it's flexible,
15 like you said; the companies can go through and see
16 which controls make sense for them and evaluate
17 themselves against those but ignore others?
18 A.     Right.  The job -- the framework provides a way
19 of looking at cybersecurity risks.  It suggests how they
20 can go about it, and it -- they offer -- especially,
21 there's different versions of the cybersecurity
22 framework.  There's version 1 and version 2.  During
23 this period we're talking about, they only had version
24 1.  But there are a great many controls and ideas that
25 they will select from.

                        105

1 Q.     They will select from but not necessarily meet?
2 A.     Well, there are hundreds of possible controls,
3 so they wouldn't be meeting all of them.  The idea is
4 for them to make a decision based on their assessment of
5 risks and threats and their business needs and many
6 other factors.
7 Q.     I think you refer to it as a "menu of
8 recommendations" that the organization can choose from?
9 A.     There are -- there are menus.  I'm not sure the
10 framework exactly is a menu.  It does provide menus.  It
11 refers to 853, for example, which I'll refer to a lot,
12 has got lots of these controls they can pick from.
13 Q.     Yeah.  It's an informative reference, right?
14 853 is an informative reference?  Are you familiar with
15 that NIST term?
16 A.     It doesn't ring a bell, but it is an
17 informative reference.
18 Q.     Yeah, meaning it can inform your application of
19 the framework, but you're not required to meet all of
20 those controls listed in 853?
21 A.     It's absolutely true that the -- that the
22 framework does not set up any kind of requirement for
23 them to adhere to all of the controls in 853.
24 Q.     Or any?
25 A.     Certainly, there is not a requirement that they

                        106

1 adhere to any particular one.
2 Q.     Okay.  So when someone says they're following
3 the NIST cybersecurity framework, you can't infer from
4 that that they meet any specific controls?
5 A.     I think it would -- yeah, I think you're right.
6 I think you don't -- from that statement alone, you
7 can't infer of the hundreds of potential controls which
8 ones they might be instituting.
9 Q.     I can show you this, if you want, but I'm just
10 reading a NIST publications -- well, I'll show it to
11 you.
12            (Whereupon, NIST Cybersecurity
13            Framework 2.0:  Small Business Quick-Start
14            Guide was marked as Graff Exhibit 8, for
15            identification, as of this date.)
16 Q.     This happens to be a NIST publication for small
17 businesses, but on the second page, middle paragraph, it
18 says:
19            "The NIST cybersecurity framework is
20            voluntary guidance that helps organizations,
21            regardless of size, sector or maturity, better
22            understand, assess, prioritize and communicate
23            their cybersecurity efforts."
24            That's an accurate statement, right?
25 A.     Yes.

                        107

1 Q.     And you don't contest that SolarWinds did use
2 NIST CSF as a guide to help it better understand,
3 assess, prioritize and communicate their cybersecurity
4 efforts, do you?
5 A.     Well, I actually haven't seen, that I recall,
6 any evidence that they used it to -- as a framework for
7 their cybersecurity designing or cybersecurity program.
8 I don't think I was really looking at that.  I mean,
9 I -- it's -- they -- I wouldn't be at all surprised if
10 they consulted it, but I don't know of any evidence that
11 they based their program on it.
12 Q.     You don't recall seeing NIST scorecards among
13 the evidence that you looked at?
14 A.     I did see a NIST scorecard.  That's a lot
15 different than basing a program on it or even basing
16 your selection of controls.
17 Q.     Did you remember the NIST -- excuse me -- the
18 self-assessments that Mr. Quitugua did that were mapped
19 to NIST CSF --
20 A.     I do recall seeing some of that, mm-hmm.
21 Q.     Is that an example of using the NIST framework
22 to assess yourself?
23            MR. CARNEY:  Objection.
24 A.     When you say "using the NIST framework," are
25 you talking specifically about the cybersecurity

                        108

1  **A.**    Yes, I see it.
2  **Q.**    It describes how the company had a subscription
3  with Palo Alto that they used to globally watch --
4  excuse me -- Palo -- strike that.
5      Subscription was for a service that's provided
6  by Palo Alto where they were watching globally all of
7  their firewalls across all of their companies.  If they
8  saw something suspicious happening in one region, they'd
9  send out a heuristical imprint.
10     It goes on, and it talks about this is the
11 system they used to monitor their firewalls for
12 suspicious traffic.  Again, isn't that consistent with
13 what the security statement says, that high-availability
14 firewalls were monitored for the protection and
15 prevention of various network security threats?
16 **A.**    Well, I'm looking at the quote from Mr. Cline,
17 and that, by itself, doesn't necessarily match what we
18 were -- what we were just talking about in terms of
19 network security.  If I look at Dr. Rattray's summary of
20 it, I see that he mentioned some of that, but I don't
21 see that in Mr. Cline's testimony.
22 **Q.**    Do you see in Mr. Cline's testimony that they
23 had Palo Alto firewalls in place?
24 **A.**    They may have had many different kinds of
25 firewalls.  I see that he describes they did have Palo

1  Alto firewalls and could have had many others in
2  different parts of the network.
3  **Q.**    Could you just answer my question, please.  My
4  question was:  Do you see in Mr. Cline's testimony that
5  describes that they had Palo Alto firewalls in place?
6  Do you see that?
7  **A.**    It says they have subscription with Palo Alto
8  with what was called Wildfire.
9  **Q.**    Mm-hmm.
10 **A.**    It doesn't actually exclusively say, but I'm --
11 they do have -- I'm sure they did have Palo Alto
12 firewalls.
13 **Q.**    And it describes the subservice that they had
14 through Palo Alto to monitor those firewalls for
15 threats?
16 **A.**    Yes, I see that in the second paragraph.
17 **Q.**    And then if you take a look at the next page,
18 there's testimony from Mr. Brown saying:
19     "One of the things the InfoSec team did
20     was look at all the events and alerts that came
21     through firewalls to say is there anything
22     suspect that I should look at here, anything
23     suspect here that I should review."
24     Again, is that not evidence that the firewalls
25 were monitored for threats?

1  **A.**    If that's what they did, it is evidence in
2  support of that contention, you bet.
3  **Q.**    And then, in addition, we have the monitoring
4  reports which show that reports were generated on a
5  daily basis about various types of traffic that might
6  indicate threats.  Would that also be evidence
7  suggesting that the company monitored its firewalls for
8  threats?
9  **A.**    Well, if he's -- if the reports were the kind
10 you showed me were generated and reviewed every day,
11 sure, that would be a good practice with regard to
12 network monitoring.  It wouldn't be, as I said,
13 everything you need to do.
14 **Q.**    So you don't have any basis to contest that
15 SolarWinds monitored its network for security threats?
16 **A.**    I really don't have enough information about
17 how well they were doing the monitoring --
18 **Q.**    That's not the question, sir.  I'm not asking
19 you about how well.
20 **A.**    Mm-hmm.
21 **Q.**    The question is:  You don't have any basis to
22 contest that SolarWinds monitored its network for
23 security threats regardless of how well you think it was
24 done?
25 **A.**    There was some network monitoring that was

1  being done, absolutely.  There was a lot of it, from the
2  appearances of it.
3  **Q.**    And yet you did not credit that evidence in
4  order to find that the statement in the security
5  statement about network monitoring was true, did you?
6      MR. CARNEY:  Objection.
7      Mischaracterizes testimony.
8  **A.**    I didn't reach a conclusion, for the reasons I
9  think I mentioned.
10 **Q.**    So where you see evidence of compliance with
11 something in the security statement, that's not
12 sufficient for you to conclude that the practice was
13 done, but when you see evidence for some problem, you
14 conclude from that that the practice was not followed.
15     Is that a fair summary of your methodology?
16     MR. CARNEY:  Objection.  Argumentative
17     and mischaracterizes the testimony.
18 **Q.**    So let me put this differently, then,
19 Mr. Graff.  If you have no basis to contest that network
20 monitoring was done, if you've seen evidence that it was
21 done, why are you not able to form an opinion as to
22 whether this statement in the security statement was
23 true?
24     MR. CARNEY:  Objection.  Vague as to
25     "this statement".

1  **A.**    Well, first of all, what I want to do right now
2  is go back to my final conclusion with regard to network
3  monitoring and explain that, and then I'll be as
4  responsive as I possibly can be to your question.
5          Summary of Opinions, page 8. If anybody can
6  help me find that specific reference to network
7  monitoring in my conclusion, I'd take the help.
8          MR. BRUCKMANN: I believe it's in
9  paragraph 24, Mark.
10          THE WITNESS: And I'm looking at 28,
11  but let me see paragraph 24.
12  **A.**    Yep. So I said here:
13          "I found insufficient evidence to
14          evaluate the network monitoring practices or to
15          evaluate whether they were aware of any
16          deficiencies."
17          Now, certainly, the Palo Alto network reports
18  that you showed me, and I know there were a great many
19  of them, if they were done daily and done well, that's
20  great. That would be an example of network monitoring.
21  If they've got a service from Palo Alto networks that
22  looks for anomalies, that's good, and that would
23  constitute some kind of network monitoring.
24  What I wasn't able to do was to -- what I didn't do as
25  part of this assignment was to evaluate the extent to

145

1  which what actually happened in terms of network
2  monitoring, and there was some being done, no question,
3  and some I'm pretty confident, it looks like. What I
4  didn't do is reach an opinion as to whether that matched
5  what was described in the security statement.
6  **Q.**    And, again, what it says in the security
7  statement is simply:
8          "Our firewalls are monitored for the
9          detection and prevention of various network
10          security threats."
11          MR. CARNEY: Objection.
12  Mischaracterizes the security statement.
13  **Q.**    I'll read it in full.
14          "Our infrastructure servers reside
15          behind high-availability firewalls and are
16          monitored for the detection and prevention of
17          various network security threats."
18          MR. CARNEY: There's an entire
19  paragraph -- or three paragraphs under network
20  security.
21          MR. TURNER: That's the sentence I'm
22  asking about.
23  **Q.**    Let me put it to you differently, Mr. Graff.
24  Are you aware that the SEC in this case has alleged,
25  quote:

146

1          "SolarWinds documented numerous issues
2          with network monitoring over the years and that
3          the documents reflected 'many critical network
4          monitoring failures.'"
5          Did you see any documentation like that in your
6  review?
7          MR. CARNEY: Objection. Vague.
8  **A.**    Did I see any documents that indicated --
9  **Q.**    That there were -- I'll read it to you again:
10          "SolarWinds documented numerous issues
11          with network monitoring over the years and the
12          documents reflected many critical networking
13          failures."
14          Did the SEC provide you with documentation like
15  that?
16  **A.**    That's a complicated question. I'm going to
17  take a moment to think about it.
18          One of the things that your question asks is --
19  or brings to my mind is how would you know if a document
20  showed a network monitoring problem? All right. So you
21  can look at logs that show the activity. How would you
22  determine whether or not there are deficiencies or
23  problems with network monitoring?
24  **Q.**    Mr. Graff, if you had been presented with
25  documents reflecting numerous issues with network

147

1  monitoring over the years, wouldn't you have said
2  something about that in your report?
3          Did you or did you not see documents reflecting
4  numerous issues with network monitoring over the years
5  in the evidence you reviewed?
6  **A.**    Well, I'm trying to -- I'm trying to figure out
7  what would constitute that kind of evidence and whether
8  I saw any of it.
9  **Q.**    Can I refer you back to paragraph 24 of your
10  report?
11  **A.**    Sure.
12  **Q.**    Where you say:
13          "Within the documents that I have
14          reviewed, I found insufficient evidence either
15          to evaluate SolarWinds' network monitoring
16          practices or to evaluate whether SolarWinds'
17          personnel were aware of any deficiencies in
18          this area," underscored, and says, "that
19          related assertions in the security statement."
20  **A.**    Right.
21  **Q.**    So can I get a plain answer to my question,
22  sir? Did you see any documents documenting many
23  critical network monitoring failures at SolarWinds? Yes
24  or no?
25  **A.**    Well, I didn't see any --

148

1  **Q.**    So the answer is no; is that right, sir?
2  **A.**    I'm going to make my best effort to answer you
3  as responsively as I can.
4        I didn't see any evidence about SolarWinds
5  being aware of deficiency in the area of network
6  monitoring.  I didn't see any convincing evidence, any
7  that was sufficient for me to form an opinion based on
8  SolarWinds' network monitoring practices.  I certainly
9  saw some evidence that there were, you know, firewalls
10 in place all or most of the time that they issued
11 reports.  That's not sufficient for me to evaluate the
12 network monitoring practices.
13 **Q.**    So the answer, sir, is no, you did not see any
14 documented -- I'll read it again:
15        "SolarWinds documented numerous issues
16        with network monitoring over the years."
17        You didn't see any evidence of SolarWinds
18 documenting numerous issues with network monitoring over
19 the years, did you?
20 **A.**    That's not my evidence -- my testimony is that
21 I found insufficient evidence.
22 **Q.**    That they were aware of?
23 **A.**    It said -- I said -- my twin conclusions were
24 that I found insufficient evidence to evaluate the
25 practices, and I found insufficient evidence to evaluate

149

1  whether they were aware of any deficiencies.
2  **Q.**    Whether they were aware of any deficiencies, if
3  they had documented numerous issues with network
4  monitoring over the years, wouldn't there be evidence
5  that they were aware of deficiencies in --
6  **A.**    Quite likely.
7  **Q.**    Okay.  Did you see any evidence like that, yes
8  or no?  If you say yes, I'm going to ask you to point me
9  to it.  So did you see any?
10 **A.**    I'm sorry.  Did I see any evidence that they
11 were aware of deficiencies in this area?
12 **Q.**    Yes.
13 **A.**    Not that I recall.
14        MR. BRUCKMANN:  Serrin, we've been going
15 for over an hour.  Is this a good time for a
16 break?
17        MR. TURNER:  That's fine.
18        THE VIDEOGRAPHER:  The time right now
19 is 2:15 p.m. and we're off the record.
20        (Whereupon, a short break was taken.)
21        THE VIDEOGRAPHER:  Stand by, please.
22 The time right now is 2:34 p.m., and we're back
23 on the record.
24 **Q.**    Okay.  Mr. Graff, I want to talk next about
25 access controls.  We've talked about the SARF forms.  Do

150

1  you remember that?
2  **A.**    Yes.
3  **Q.**    And the SARF forms were designed to provision
4  users with access based on their role when they arrived
5  at the company.  Is that your understanding?
6  **A.**    It was part of the processes of -- sure, of
7  provisioning, you bet.
8  **Q.**    Right.  But the purpose was to assign users
9  access based on their role.  That's what the SARFs were
10 for?
11 **A.**    Well that was part with the -- and they had a
12 section about what were their roles and what you get
13 access to and so forth.
14 **Q.**    Right.  If I was starting as a, whatever, IT
15 support person, there would be a set of accesses that I
16 would get based on that role, if the SARF process was
17 followed?
18 **A.**    That's right.
19 **Q.**    It sounds like you're not contesting that was
20 done at the company as a routine practice?
21 **A.**    Yeah, I think that's right.
22 **Q.**    And then when people left the company, sort of,
23 it would be followed in reverse, right?  There would be
24 a help desk ticket that would be generated that would
25 instruct that the person's access be removed and the IT

151

1  help desk would implement that removal of access.
2        Is that your understanding?
3  **A.**    That's the way it was supposed to work, and I
4  know it did work that way in a lot of cases.
5  **Q.**    Right.  So with that too, you're not contesting
6  that that was the routine practice of the company?
7  **A.**    No, I'm not contesting that.
8  **Q.**    And how about, did you read about the admin
9  access alerts that Mr. Cline and Mr. Quitugua testified
10 about?  I'm talking about the e-mail alerts that the
11 InfoSec team would get when somebody would be added to
12 an admin group.
13        Do you remember that testimony?
14 **A.**    I don't remember that.  I would have to see
15 that.
16 **Q.**    Take a look at Dr. Rattray's report, paragraph
17 47.
18 **A.**    47.  I see it.
19 **Q.**    Just take a look and read that paragraph, if
20 you will, most importantly, Mr. Cline's testimony and
21 the testimony cited in the footnote.
22 **A.**    You're asking me to read it to myself?
23 **Q.**    Yes, please.
24 **A.**    Okay.  You bet.
25        Okay.  I've read that.

152

1  Q.    So are you -- are you contesting that these
2  alerts were sent -- let me put it differently.
3        So is it your understanding, based on the
4  testimony you just reviewed, that SolarWinds had a SEM,
5  security event manager, that would automatically detect
6  whether a person was being added to an admin group?
7  A.    It does talk about the SEM.  Yes, I think --
8  I'm not sure quite how it worked, but they certainly
9  seemed to have a SEM that received alerts on this case.
10 Q.    And when someone was added to an administrator
11 group, the InfoSec team would be alerted?
12 A.    That's how Mr. Cline described it, you bet.
13 Q.    And the InfoSec team would check to see if the
14 grain of access was authorized and intentional?
15 A.    I don't know that part, but that's the
16 procedure he's talking about, yes.
17 Q.    And you're not contesting that that was done as
18 a routine practice at the company?
19 A.    As a routine practice, no.
20 Q.    And do you recall reviewing testimony and
21 evidence about the user access reviews that SolarWinds
22 performed?
23 A.    I saw some of that.
24 Q.    And these were reviews to make sure that
25 employees' user access rights were appropriately

153

1  assigned, right?
2  A.    That would be the purpose of those, uh-huh.
3  Q.    And you're not contesting that those user
4  access reviews were prepared as a regular practice at
5  the company?
6  A.    I don't know that I have any information about
7  how regularly it was done, but I know it was a process
8  that they laid out.
9  Q.    You've seen more than 50 user access reviews
10 that have been produced in litigation?
11 A.    I've seen several of them.
12 Q.    Have you seen the more than 50 that were --
13 A.    I don't recall what the numbers.
14 Q.    Have you reviewed testimony talking about how
15 these were done on a quarterly basis?
16 A.    I think I'd want to see that, but that does
17 sound familiar.
18 Q.    Okay.  So do you have any basis to contest that
19 SolarWinds regularly conducted user access reviews?
20       MR. CARNEY:  Objection.  Asked and
21 answered.
22 A.    I don't have any reason that I can think of to
23 doubt that they conducted them.  I don't know how
24 frequently and I don't know how often.
25 Q.    But as a regular practice?

154

1  A.    I don't think I have any -- I have no
2  recollection of anything that would contest that.
3  Q.    And you're aware that SolarWinds' systems for
4  provisioning access were repeatedly audited during the
5  relevant period?
6  A.    They were required to be audited in some ways
7  according to some standards.
8  Q.    In particular, there were SOCs audits done in
9  2019 and 2020?
10 A.    Yes, I think there were.
11 Q.    And those were done by PwC, right?
12 A.    That sounds right.
13 Q.    And PwC is a reputable auditor in the field,
14 right?
15 A.    Yes.
16 Q.    And PwC specifically looked at how user access
17 was provisioned on the active directory?  Are you aware
18 of that?
19 A.    That, I don't recall.  I wouldn't be surprised.
20 Q.    Can you give me a moment, sir.
21       Okay.  So did you work on audits, by the way,
22 when you were at NASDAQ?
23       MR. CARNEY:  Objection.  Vague.
24 Q.    Did you participate in audits in any way?
25       MR. CARNEY:  Objection.  Vague.

155

1  A.    Well, I was often audited.
2  Q.    And how would those audits work at a basic
3  level?  The auditors would interview the people who were
4  subject matter experts in the controls they were looking
5  at and then they looked for sample evidence to see that
6  the controls were in place?
7        Is that generally how the process works?
8  A.    Yes, and with a particular emphasis not only on
9  what we say, but also the policies we produce and,
10 furthermore, the evidence that we could bring to bare
11 that showed that the policies were being executed.
12 Q.    Right.  They wouldn't search company e-mails
13 typically, right?
14       MR. CARNEY:  Objection.  Form.
15 A.    Well, I'm not sure.  I think perhaps they did
16 in some cases, but I'm not sure.
17 Q.    So the audits that were done by PwC didn't find
18 any material weaknesses in the company's system for
19 provisioning access, did they?
20 A.    I don't know that I've actually seen the
21 reports from the PwC audit.  I do remember some
22 SolarWinds employees talking about SOC's faults, but as
23 to whether that actually showed up in the PwC report, I
24 don't think I have the information on that.
25 Q.    Did you not ask for those materials to review

156

1  before you put your report together?
2  A.    I didn't ask -- I don't recall asking for the
3  audit reports. Actually, at some point, I think I may
4  have asked for the audit reports, but I'm not sure.
5  Q.    So did you look at them or not?
6  A.    I don't recall seeing the audit reports. If
7  you show me one, I might be able to recognize it, but I
8  don't recall seeing it.
9  Q.    Well, wouldn't that be an important source of
10  information to look at? If you had a reputable auditor
11  in the field come and audit some of the very controls
12  that are at issue in the case, wouldn't you have wanted
13  to see what the audit results were?
14  A.    Well, that kind of goes with the answer I gave
15  earlier today that, you know, there are -- I'm sure
16  there are many, many documents I didn't look at, and
17  some of those probably would have done a good job of
18  representing that SolarWinds did what they said they
19  did. But my conclusion was that, even if I saw lots and
20  lots of additional reports, I would still not change my
21  opinion based on the egregious problems that I saw that
22  SolarWinds identified.
23  Q.    Right. So even if an auditor had confirmed
24  that role-based access controls were in place and had
25  interviewed the employees that were involved, had looked

157

1  at sample evidence of the controls in place, that
2  wouldn't matter because you had seen these egregious
3  violations, in your view?
4         MR. CARNEY:  Objection.
5         Mischaracterizes testimony.
6  A.    I don't know -- like I said, I don't recall
7  having seen the audit reports. There were several
8  violations that probably would have been shown up in
9  SOCs violation reports. I don't know whether the
10  auditors found them or not.
11  Q.    So it's your contention that -- I just want to
12  go back, though. Basically -- it sounds like your
13  position is after seeing these -- as you put it --
14  "egregious issues" that you identified in your report,
15  it wouldn't matter what other documents you saw because
16  those egregious issues by themselves implied to you that
17  SolarWinds' statements in their security statement were
18  not true?
19  A.    Well, I stated precisely in my report, but
20  that's the gist of it, that I saw enough in the examples
21  I cited to make a decision, to form an opinion.
22  Q.    Okay. So is it -- I just want to be clear.
23  Did you consider the auditors' conclusions and disregard
24  them because you thought the egregious issues you saw
25  were more important or did you just not consider them at

158

1  all when you prepared your report?
2         MR. CARNEY:  Objection. Asked and
3         answered. Compound.
4  A.    I'm not recalling seeing a SOCs audit report.
5  I may have. I don't recall. If I could see one, it
6  would refresh my memory.
7  Q.    Okay. But you don't contest that audits were
8  done under SOCs and the audits found that role-based
9  access controls were in place?
10  A.    Well, I don't -- I certainly don't contest that
11  the audits were done under SOCs as to what the results
12  were. As I said, I don't recall having seen any
13  reports. I could be mistaken. And there were other
14  role-based access problems. I don't know whether they
15  got into the reports or not.
16  Q.    The SEC alleges in its amended complaint that
17  SolarWinds "routinely and pervasively granted employees
18  unnecessary admin rights."
19         Have you seen evidence of that is true, that it
20  routinely and pervasively granted employees unnecessary
21  admin rights?
22  A.    Well, I've seen evidence that --
23  Q.    I don't want to hear about the egregious
24  examples of specific issues. I'm talking about
25  frequency here. You said you're not making any claim

159

1  about frequency, and so I'm asking you whether you've
2  seen any evidence that SolarWinds routinely and
3  pervasively granted employees unnecessary admin rights?
4  A.    I don't know -- I don't know that I would
5  characterize it as a routine failure. I certainly saw
6  several examples of failures in processes. But there's
7  a problem with the word "routinely" too, because there
8  were issues that lasted months and years, so do you
9  count that as one instance or more than one?
10  Q.    So here we're talking about, not particular
11  issues, we're talking about employees being granted
12  admin rights.
13         Did you see evidence that employees pervasively
14  at the company were granted admin rights?
15  A.    I saw evidence of some employees being given
16  superuser access rights that weren't related to their
17  roles, and it happened more than once, but whether that
18  would match the characterization of frequently or
19  routinely, I don't think so.
20  Q.    Let's take a look at that issue, the billing
21  system user, or the superuser access issue that you just
22  mentioned.
23         (Whereupon, SW-SEC-SDNY_00254254-266
24         was marked as Graff Exhibit 11, for
25         identification, as of this date.)

160

1  Q.     Do you recognize this e-mail chain, Mr. Graff?
2  A.     It's got several pages to it.  Just let me just
3  take a quick look.
4  Q.     Sure.
5  A.     Yes, I've seen this before.
6  Q.     And this is that superuser issue you were just
7  mentioning, right?
8  A.     I think there may have been more than one, but
9  this is certainly a superuser issue.
10  Q.     This issue concerned a group of developers in
11  Biz Apps who were working on a project to improve
12  SolarWinds' billing system?
13  A.     Yes.  It was the primary issue that was raised
14  initially.
15  Q.     And those developers needed access to billing
16  data in production to test the system they were working
17  on.
18       Is that your understanding?
19  A.     Well, I don't know they needed it.  The
20  developers thought they needed it, and they were given
21  it for that reason, the core practice.
22  Q.     So the developers thought they needed access to
23  the data --
24  A.     I think we know that -- I'm sorry, please
25  finish your question.

161

1  Q.     The developers thought they needed it, right?
2  A.     Either the developers or their manager.
3  Q.     And at the time, the only way to give them
4  access to the data was to give them superuser access to
5  the relevant API because there wasn't a read-only access
6  available?
7  A.     I don't think -- I can't agree that was the
8  only way to do it.  There are other methods they might
9  have considered.
10  Q.     Did you see anything in this e-mail chain that
11  indicate otherwise?  Wasn't that the issue, is that the
12  -- there was no read-only access available with respect
13  to the API at issue, so the proposal was to give them
14  superuser access so that they can utilize the data,
15  access the data?  If you want to take a look at page 2
16  of the document, the one Bates ending in 255.
17       I'll just note for the record that the Bates
18  stamp of this document is SWSEC00254254.
19  A.     So could I have the question again, please.
20  Q.     Do you want to familiarize yourself with the
21  page or --
22  A.     I'm on page 3.  It was on page 2?
23  Q.     On page 2, please.
24  A.     Yes, I see it.
25  Q.     Okay.  So after this whole e-mail chain, the

162

1  current situation was -- the solution that they came up
2  with was that Biz Apps would be granted superuser access
3  to the new API, which would unblock us, and we could
4  move forward with our backup for 365 billing project,
5  and the long-term solution was create a read-only role
6  that Biz Apps would use access production data for
7  backup billing and for backup of 365 billing.
8       So in other words, they were granted superuser
9  access at the time, that was the solution proposed,
10  because there was no read-only role that was available
11  at the time of this e-mail?
12  A.     That's the way they saw it.
13  Q.     And your contention is that this is an
14  egregious -- egregious what?  Violation of --
15  A.     I said in my report, actually, this arrangement
16  violates several principles.
17  Q.     And I don't want to -- right now, I just want
18  to focus on role-based access controls.  I'm not
19  concerned about separation of the production from the
20  development environment.
21       So if we could just talk about how this
22  document implies that anything the security statement
23  says about role-based access controls was false?
24  A.     I'd want to look at my report briefly to look
25  at this discussion.  And I found it.  Let's see.  I'll

163

1  be quick.  I'm looking for the section on the superuser
2  access, if anybody has a page number that would speed
3  this up.
4  Q.     I think it's on page 37.
5  A.     That was one area.
6  Q.     It comes up in a few places?
7  A.     It does come up in a few places.
8  Q.     So maybe we'll jump up to paragraph 155.
9       MR. CARNEY:  Paragraph 79 would be
10  another one.
11       THE WITNESS:  I'm going to put a finger
12  in 79 and 155.  I'm sure one of those is right.
13  Let's see.
14  Q.     Okay.  Yeah, that's fine. I'll focus on
15  paragraph 84.
16  A.     Okay.  All right.
17  Q.     Because you say:
18       "The existence of this incident is
19  indicative of a deeper issue than a one-off
20  error."
21       First of all, I want to understand what the
22  error is.  As you said, the developers wanted the access
23  in order to work on a billing project, right?
24  A.     That's my understanding.
25  Q.     So they thought they needed the access, and

164

1      And then if you see, on the left-hand side, Biz
2  Apps billing BV is the issue?
3            MR. CARNEY:  Yeah.
4  Q.     Okay.  So is it your contention, Mr. Graff,
5  because you say in that paragraph earlier, that we look
6  at in paragraph 84, the existence of this incident was
7  indicative of a deeper issue than a one-off error, are
8  you -- are you contending that this -- this incident
9  reflects some sort of pervasive failure to implement
10 role-based access controls or something different?
11 A.     This incident is indicative of several -- yes,
12 it's several pervasive issues among others having to do
13 with role-based access control.
14 Q.     Okay.  So are you -- are you asserting that
15 this incident shows that role-based access controls --
16 there was a pervasive failure to implement role-based
17 access controls?
18 A.     Not necessarily by itself, but to give you
19 one-sentence answer, they're granting write access to
20 developers in production of live data.  That's a
21 role-based access control problem that's very serious,
22 and there are other problems too.
23 Q.     Sir, I don't want to talk about the issue of
24 dividing production environment from development
25 environment.  Okay.  I just want to focus on the issue

169

1  of whether SolarWinds implemented role-based access
2  controls.
3            And in terms of how pervasive this issue was,
4  let's just start out as to whether it was an access
5  issue at all.  They needed this access -- the developers
6  needed this access in order to complete the project.
7  That was Mr. Brown's finding, right?
8  A.     I don't know that he found it that way.  He
9  said it -- he approved the risk assessment form.  And he
10 evaluated it as a low risk.  I think the risk was
11 misrepresented in this spreadsheet.
12 Q.     In Column D, under Benefits of Accepting This
13 Risk, Mr. Brown wrote:
14            "It allows Biz Apps dev to continue the
15       development work and not delay a major
16       projects."
17       And Mr. Brown, who was head of the InfoSec
18 team, determined that the developers needed this access
19 to continue the development work and not delay a major
20 project.  Isn't that a correct statement of the facts?
21 A.     Somebody concluded that they needed that access
22 to continue the development work.  I read the e-mail
23 chain.
24 Q.     I'll ask you to assume it was Mr. Brown who
25 made that determination.  I believe that's what you say

170

1  in your report.  So Mr. Brown determined that the
2  developers needed this access, so the developers were
3  getting access based on what they needed to do their
4  job, based on Mr. Brown's understanding, correct?
5  A.     Actually, he determined they needed access to
6  the data.  They were given read-write access to the
7  data, which is vastly different.  He can accept the risk
8  on that, but their need to have write access to the data
9  is not clear.
10 Q.     There was no read-only option at the time, so
11 in order to avoid delaying a major project, they needed
12 read and write access in order to complete their
13 project; isn't that right?
14 A.     A corporation, in fact, can determine that they
15 want to compromise that principle and accept the risk.
16 Q.     Compromise what principle?  The principle is
17 employees getting access based on what they need to do
18 for their role.  Here there was a determination made
19 that, in order to perform their role, they needed this
20 access at the time.  The company was entitled to make
21 that determination, was it not?
22 A.     Yes.
23 Q.     Now, in terms of the pervasiveness of this
24 issue, whatever you want to call it, this only related
25 to a single customer billing system, that's all we're

171

1  talking about here, right?  Superuser access to certain
2  APIs connected to a billing system?
3  A.     When I talk about a pervasive issue, I'm also
4  discussing the design problem that created this issue.
5  Q.     The design problem -- you're talking about the
6  lack of a read-only permission?
7  A.     Well, there are many design problems.  But that
8  was one of them.
9  Q.     Okay.  That is a design specific to this
10 billing system that we're talking about, right?  There's
11 no other system that is mentioned in any of these
12 communications in the e-mail chain we're looking at,
13 right?
14 A.     This is the only one mentioned in that e-mail
15 chain, that's right.
16 Q.     Right.  So you can't infer from this e-mail
17 that SolarWinds' systems were pervasively designed to
18 give everyone read and write access; you're not drawing
19 that conclusion, are you?
20 A.     No.  There are other conclusions I'm drawing
21 from it, but not that one.
22 Q.     And this chain is just about granting access to
23 a specific team of developers, the Biz App developers,
24 right?
25 A.     No.  I say it's about a lot more than that.

172

1  Q.    Well I'm talking about in terms of the scope of
2  the issue we're talking about.  You're concerned that --
3  about the grant of access to this API, and here we're
4  just talking about a specific group of developers
5  working on a specific project.  Those are the only
6  people that Mr. Brown is authorizing that access for,
7  correct?
8  A.    There was one specific group of people that
9  needed access, were declared to have needed access, and
10  they were given read-write access using shared log-ins
11  on live production data, so I'm not going to just talk
12  about just role-based access control problems.
13  Q.    Mr. Graff, just to be clear, Mr. Brown was not
14  authorizing them to share some account, talking about
15  that was what happened before that raised this issue up
16  to security in the first place.
17  A.    Yes.
18  Q.    But the solution was to give them each super
19  user credentials so that they could complete this
20  project.  So let's keep shared credentials out of it.
21        I'm just talking about right now the principle
22  of role-based access, assigning employees the access
23  they need to perform their role.  And am I right, that
24  in this case, we're talking about a single group of
25  developers getting access to a single system?

173

1  A.    Yes, and they needed read access for their
2  jobs, and not read/write access for their jobs.
3  Q.    But no read access was available as part of the
4  APIs, and so as a practical matter, they needed the
5  read/write access to do the task at hand; that was the
6  determination Mr. Brown made?
7  A.    The company is within its right to make that
8  exception to the role-based access roles.
9  Q.    Okay.  So this was a -- you're not contending
10  that this shows that SolarWinds just pervasively granted
11  everybody read/write access to all their systems; this
12  was a single exception related to a particular team and
13  a particular system?
14  A.    This particular incident, yes.
15  Q.    Okay.  Let me also ask you about the MSP
16  customer support access issue that you raised earlier.
17        (Whereupon, SW-SEC00631418-427 was
18        marked as Graff Exhibit 14, for identification,
19        as of this date.)
20  Q.    Sir, I'm showing you what's been marked as
21  Graff Exhibit 14, Bates stamped SW-SEC00631418.  It's a
22  deck or a draft deck titled "MSP Support Security
23  Improvement."
24        Do you see that?
25  A.    Yes, I do.

174

1  Q.    Now, you cite this document repeatedly in your
2  report, correct?
3  A.    Yes.
4  Q.    Now, first of all, would you agree, Mr. Graff,
5  this is a draft document, right?  There are a number of
6  pages here that are just incomplete or in draft form?
7  A.    Yeah, could be characterized as a draft report.
8  The reports I was quoting are in black and white.
9  Q.    Well, they are in black and white, but you
10  don't know whether these are just someone's initial
11  thoughts or final conclusions?
12  A.    I don't know that.
13  Q.    You don't know if anyone vetted what's in here
14  or approved what's in there?
15  A.    No, there are -- well, there are e-mails that
16  talk about it further.  So there's other discussions
17  about it, but yes.
18  Q.    But you don't know whether this particular
19  material was approved by anyone or vetted by anyone?
20  A.    I don't think so.
21  Q.    And no one testified about this deck during
22  deposition testimony in this case, as far as you're
23  aware of, right?
24  A.    Not that I recall.  I know they testified about
25  the problems, but I don't think they testified about

175

1  this deck.  I could be wrong.
2  Q.    No one testified about the issues raised in
3  this draft deck, as far as you're aware?
4  A.    I'd have to think about that a bit.  I know
5  I've seen a lot of material about it.
6  Q.    Well, if I represent to you there's no is
7  testimony about this slide deck, do you have any basis
8  to disagree with me?
9  A.    No.
10        MR. CARNEY:  Objection.  That's a
11        different question.
12  A.    That's a different question.  So what is the
13  question, so that I can agree to it.
14  Q.    So let's talk about the substance of what's on
15  page 2.  Mr. Graff, this appears to be about the systems
16  that SolarWinds MSP customer support staff could use to
17  assist customers of certain MSP products?
18  A.    Yes.
19  Q.    By the way, do you know how much -- do you know
20  whether the MSP side of SolarWinds' business was a large
21  or a relatively small portion of their business?
22  A.    I don't know.
23  Q.    And it appears from this deck that support
24  personnel had certain abilities to access customer
25  environments?

176

1  **A.**    Right.
2  **Q.**    And that's not necessarily unusual in the
3  industry, is it, for customer support to have some level
4  of access or remote login capability to provide customer
5  support?
6  **A.**    I agree with that.
7  **Q.**    But here, there was some concern that MSP
8  customer support personnel had more access than they
9  might need to customer environments?
10  **A.**    Yes, that was part of the problem.
11  **Q.**    And so the person who wrote this deck evidently
12  was thinking about ways to reduce that access?
13  **A.**    Yes, they were talking about security
14  improvements related to it.
15  **Q.**    And, again, this was an issue that related to
16  specific customer support systems used by specific
17  personnel within SolarWinds?
18  **A.**    Well, it's certainly referring to a specific
19  system, which is the MSP support portal.
20  **Q.**    Right. And that's a system that MSP customer
21  support would have access to, but you have no reason to
22  believe that people at the company had access to it
23  generally?
24  **A.**    I don't know if I recall any report of
25  inappropriate access other than the one described by the

1  other -- referenced to the support team.
2  **Q.**    Yeah, and it talks in here about a support
3  person having, you know, too much access. So we're
4  talking about customer support personnel would be the
5  ones using this system?
6  **A.**    That's the report, and again, I have to point
7  out, that's if everything works the way it's supposed
8  to. That's the way it would work.
9  **Q.**    Yeah, and you have no reason to believe that
10  things didn't work the way they were supposed to? You
11  have no reason to believe that anybody other than
12  customer support personnel had access to this system?
13  **A.**    That's right. I have no reason to believe that
14  others did have access to this portal, that I can
15  remember, at least. I'll look later in my report about
16  this.
17  **Q.**    So, again, I just want to be clear on what
18  we're talking about. You're not arguing from this
19  document that SolarWinds' employees generally had
20  excessive access; you just pointed to this as an
21  instance where a particular set of employees had more
22  access than they needed within a particular system?
23  **A.**    I think that's right. I would like to just
24  refer to my report briefly.
25  **Q.**    Sure.

1  **A.**    Let's see where that would be. I'm looking for
2  the section on MSP as it relates to access control.
3          MR. CARNEY: Maybe page 33. Paragraph
4  67.
5          THE WITNESS: Yes, that's the right
6  reference. Thank you.
7          Please continue.
8  **Q.**    And just to be clear, this document is not
9  about limiting employee access to SolarWinds'
10  environment, it's about limiting access to SolarWinds
11  customers' environments?
12  **A.**    Yes, that's right. That's what the expressed
13  concern was about.
14  **Q.**    And these customers -- the SolarWinds'
15  customers are obviously corporations, right, companies?
16  **A.**    Yes, that would be right.
17  **Q.**    And if a company had a concern about
18  SolarWinds' personnel being able to access their
19  environment, they could raise that with SolarWinds,
20  right?
21  **A.**    Sure, especially if they knew what kind of
22  access that SolarWinds had.
23  **Q.**    And it's not uncommon for companies to build in
24  contractual limitations about the sort of access that a
25  vendor might have to their environment?

1  **A.**    That's right.
2  **Q.**    So they could do that, too?
3  **A.**    Yes.
4  **Q.**    Now, this is another issue you characterize as
5  "major," right?
6  **A.**    Well, I have to look, but I think it probably
7  is.
8  **Q.**    In fact, you call it "potentially
9  catastrophic"?
10  **A.**    It's excessive, and I'd have to take your word
11  for it as potentially catastrophic, but that does sound
12  familiar. Do you have that reference?
13  **Q.**    Paragraph 73?
14  **A.**    That's right.
15  **Q.**    And that's because of the risk of an insider --
16  an insider threat?
17  **A.**    Yes, if we include in the idea of an insider
18  threat the idea of an attacker taking control of this,
19  so he becomes an insider. He becomes -- he poses as a
20  cybersecurity employee with valid access and then moves
21  onto the customer data. That's what I -- one of the
22  things I was talking about.
23  **Q.**    Right. So the attacker would have to get into
24  SolarWinds somehow, hack into a customer support staff's
25  account, learn how to use the software, and then use it

1  to compromise customers?
2  **A.**    There are other ways, but that's probably the
3  primary way.
4  **Q.**    Are you aware of either scenario ever happening
5  at SolarWinds up to the point of time in this slide?
6  **A.**    I know there was a discussion of the incidents
7  that already had occurred as a result of inappropriate
8  access.  I don't know what the details of the access
9  were.
10  **Q.**    Well, they weren't malicious, right?  There was
11  some accidental access but --
12  **A.**    I'd have to look that up.  I'm not sure I have
13  the details on the incidents.
14  **Q.**    Can you point to any malicious incident that
15  you're aware of sitting here today that occurred due to
16  this issue, before this slide?
17  **A.**    No.
18  **Q.**    So this was a risk, right?
19  **A.**    There was some incidents, but yes, I was mostly
20  focusing on the risk by -- entailed in this arrangement.
21  **Q.**    And just having a risk doesn't mean the risk is
22  likely to materialize?  It hadn't materialized by this
23  point?
24  **A.**    It's not -- it doesn't mean it's likely to
25  materialize.  I have no information about whether it

181

1  eventuated or not.
2  **Q.**    But SolarWinds here was proactively taking
3  action to mitigate this risk before something happened?
4  **A.**    Well, I'm not sure I would say it was proactive
5  since there was an internal report about the problem,
6  and then there -- so that's -- that's after the fact,
7  when it was instituted, and then they were also talking
8  about the fact that incidents had already taken, so I'm
9  not sure that's proactive either.
10  **Q.**    Let's be clear, Mr. Graff.
11  **A.**    Mm-hmm.
12  **Q.**    The incident that already happened was -- if
13  any incidents had happened before this, they were
14  accidental, not malicious, so there had been -- that had
15  led to the observation of the risk, and now there was
16  an effort to fix it before there was some sort of
17  malicious exploitation of the risk?
18            MR. CARNEY:  Objection.  Compound.
19  **Q.**    You understand the question?
20  **A.**    No.  I'd like to hear the question.
21  **Q.**    Okay.  So if you look -- and apologies if this
22  is so hard to read.  I had hoped we'd get better
23  slides -- but if you look on the slide it indicates:
24            "While testing release, the SolarWinds
25            engineering team copied a customer environment

182

1            and inadvertently created 400-plus tickets in a
2            customer's PSA."
3            I can represent to you that a PSA was part of
4  the product involved.  So that was obviously an
5  accident.  That accident brings this risk to the
6  company's attention, and they're trying to mitigate the
7  risk before there's some sort of insider threat incident
8  like you'd mentioned previously.  Is that a fair
9  assessment of what's going on here?
10  **A.**    That surely -- yes, that characterizes the
11  second bullet correctly.  I think the first bullet,
12  which talks about how they were diagnosing a user remote
13  session and so forth, so I'm not sure that would be
14  accidental because it triggered the defensive, you know,
15  notification on the client's side.  But it doesn't
16  certainly indicate any kind of maliciousness.
17  **Q.**    Okay.  That's all I'm getting at.
18            Now, just generally though, isn't this what a
19  good cybersecurity program is supposed to do, when risks
20  arise, take steps to mitigate them?
21  **A.**    Right.
22  **Q.**    And, again, the security statement doesn't say
23  anywhere that SolarWinds' access controls were perfect?
24  **A.**    That's true.
25  **Q.**    And did you ever hear the term "continuous

183

1  improvement"?
2  **A.**    Yes, I have heard that term.
3  **Q.**    And people in the industry generally understand
4  that cybersecurity is a process of continuous
5  improvement; wouldn't you say that's a commonly -- a
6  common notion in the industry?
7  **A.**    Yes.
8  **Q.**    And a company engaged in continuous improvement
9  will identify risks from time to time that need to be
10  addressed; that's what it involves, continue
11  improvement?
12  **A.**    Well, sometimes they identify it.  Sometimes,
13  as in these cases, a customer alerts them, or an
14  independent security researcher alerts them, and that
15  happened in these cases, but yes, that's part of the
16  process, is to find out about problems and then go fix
17  them and improve things.
18  **Q.**    And that process doesn't imply that you don't
19  have controls to begin with?
20  **A.**    Well, some of the incidents would, but the
21  process of finding out about it and fixing it by itself
22  doesn't indicate that you don't have controls.
23  **Q.**    And going back to the NASDAQ incident, right,
24  so a major incident like that happens, it doesn't mean
25  that the company didn't have business continuity

184

1  controls but it means there's an issue that needs to be
2  fixed.
3  A.    Yeah, there were flaws in the software and I
4  think in the business continuity controls at NASDAQ at
5  that time, absolutely.
6  Q.    And so here, you see SolarWinds kind of doing
7  the same thing.  It wasn't an incident that happened,
8  but it was a risk that had been observed, and the
9  company is taking action to mitigate that risk?
10 A.    Well, they classified that as an incident.
11 Q.    Where do you see that?
12 A.    I'm not sure I have that exact record, but I
13 will say that in my study of the policies relating to
14 their incident management, they did find -- they did
15 classify software issues that arose as incidents, and
16 that's what I was referring to.
17       MR. CARNEY:  If I could just direct you
18       to the slide you were showing him, it uses the
19       word "incident."
20       THE WITNESS:  Yeah, it does.
21 Q.    You're talking about the accidental -- the --
22 whatever, the ones under the second heading there?
23 A.    Yeah, the two bullets that talked about the
24 things that happened, yes, those are -- those are
25 referred to as incidents, and that was the way that

185

1  SolarWinds characterized, quite often, software issues.
2  Q.    Right.  Right.  But these weren't -- like you
3  said before, these weren't malicious incidents; these
4  were just incidents where something wrong had happened
5  that basically flagged a risk?
6  A.    Well, I see no evidence that it was malicious.
7  Q.    Right.  But you'd agree here -- what you see
8  here is consistent with the concept of continue
9  improvement?
10 A.    Well, the fact that they've identified a
11 problem and they're going to try to address it, that's
12 part of it.  The fact that the thing happened to begin
13 with and it existed, that's not an example of
14 improvement.
15 Q.    There's all sorts of risks that can be
16 identified from time to time; that's what happens in the
17 cybersecurity program, right?
18 A.    Sure, and there are incidents like this one
19 that happen that will trigger analysis and improvements.
20 Q.    Let me ask you about a different issue.  And
21 maybe you could tell me you don't really place much
22 weight on this issue.  But you mention in your report a
23 single SARF that you say shows an ad hoc process because
24 employees provided an account with a one-year expiration
25 date when they didn't know the termination date for the

186

1  employee.  Do you know what I'm referring to?
2  A.    I do remember that, yes.
3  Q.    I just first want to get clear, this is on page
4  54 of your report?
5  A.    Thank you.  Yes, I have it.  It's paragraph 98,
6  I think.
7  Q.    And so you say, this SARF document shows an ad
8  hoc process, and then you continue:
9              "As shown below, SolarWinds employees
10       discussed that because they do not know the
11       termination date of a temp, i.e., a temporary
12       worker, they decide to provide his account with
13       a one-year expiration date."
14       And then you quote a chat where they're
15 discussing what end date to put for the employee.
16       MR. CARNEY:  Object to the
17       characterization.
18 Q.    Is that a fair characterization?
19       MR. CARNEY:  The word "chat."
20       MR. TURNER:  I believe it's a chat, but
21       if you want to tell me it's something else, go
22       ahead.
23 A.    I remember the SARF in question, I remember
24 what I said about it, and just to be clear, when you
25 quoted there, in paragraph 98, it said, "This issue is

187

1  illustrated in a SARF document," and the issue I'm
2  talking about is described in paragraph 97 where
3  Ms. Ronnie Johnson talked about that SolarWinds and 18
4  individuals did access the systems after they left
5  SolarWinds, and there were other incidents we can talk
6  about that relate to that, too.  So that's what this is
7  an illustration of.
8  Q.    Well, I'm unclear how this is an illustration
9  of that.  Are you saying that what's described in
10 paragraph 98 shows that somebody's access was not
11 terminated in a timely fashion after they left the
12 company?
13 A.    What's illustrated in that form that I cited is
14 that there was a very casual -- in that instance, there
15 was a very casual ascertainment of how long access
16 should be retained.  And they said -- they'd make it --
17 I forget the exact wording, but it was something along
18 the lines of, well, we think it will be about a year,
19 something like that, and then we can terminate it later.
20       So I thought that was an indication of perhaps
21 poor training or an ad hoc process.  But I felt it was
22 related to the other issues that I identified about lack
23 of termination.
24              (Whereupon, SW-SEC-SDNY_00050922 was
25       marked as Graff Exhibit 15, for identification,

188

1  Q.    But, sir, you cited this as an example, when,
2  in fact, the person may not have needed an end date
3  because they were being hired to work at SolarWinds for
4  much longer than that?
5  A.    Good practice would have indicated that they
6  would give some idea of how long they were going to be
7  there.  If they knew they were going to be indefinitely,
8  then they should say that when they request.  That's the
9  norm.  When you request access for someone, you give an
10  idea of how long they are going to be there.  If you
11  think it's a very long assignment, you can say that.
12  You can have it for one period, a year, something
13  longer, but you should be specifying how long that
14  access is for and what they should have access to.
15  Q.    SolarWinds had a practice, I think we mentioned
16  earlier, of sending a separate ticket when a person was
17  actually terminated, right?  We talked about that
18  earlier.
19        Do you remember that?
20  A.    I do remember that.
21  Q.    And I think you said earlier you don't have any
22  reason to believe that didn't occur as a regular
23  practice.  Now, all the security statement says about
24  termination is it says:
25        "Processes and procedures are in place

193

1        to address employees who are voluntarily or
2        involuntarily terminated."
3        Would you agree that having a process or
4  procedure where tickets are sent to the help desk when
5  somebody is terminated to terminate their access,
6  there's a process and procedure to address employees who
7  are terminated?
8  A.    Yes.
9  Q.    So aside from these three -- strike that.
10        Let's look at a few other documents you cite
11  in relation to access controls.
12        You doing okay, Mr. Graff, or do you need a --
13  A.    I'm good, thank you.
14        (Whereupon, SW-SEC00012266-275 was
15        marked as Graff Exhibit 17, for identification,
16        as of this date.)
17  Q.    So I'm showing you what's been marked as Graff
18  Exhibit 17, and it's a slide deck titled "Major Project
19  Portfolio," bearing the date January 2018 with a Bates
20  stamp SW-SEC12266.
21        Do you see that?
22  A.    I see it.
23  Q.    And you cite the third page of this document.
24  And, particularly, you cite the notation on the
25  left-hand side of the slide that says: "Concept of

194

1  least privilege not followed as a best practice."
2        Do you see that?
3  A.    Yes.
4  Q.    Now, without more context, do you have any way
5  of knowing exactly what this notation refers to?
6  A.    Well, I understand what least privilege is.
7  And I understand several -- more than one example of
8  when the least privilege wasn't followed.  I don't know
9  precisely what examples they're talking about in this.
10  Q.    Yeah, I'm not asking you to define for me the
11  principle of least privilege.  I'm asking you to --
12  whether you understand the specific problem here related
13  to least privilege that this might relate to?
14  A.    I don't recall seeing any details that would
15  explain precisely what the problem is that -- what
16  incident or issue led to that notation.
17  Q.    Right.  So this is a sort of document, right,
18  where you need more context provided, for example, by
19  the person who prepared this slide to understand what
20  was meant today?
21  A.    You certainly can't understand precisely what
22  he was talking about.  And, now, I haven't studied the
23  entire document lately, so it may have more information
24  in there, but on that basis, I certainly can't tell
25  exactly what he might have been referring to.

195

1  Q.    Right.  And Mr. Quituga testified about this,
2  as you may recall, and he specifically testified, and
3  I'm quoting here this notation:  "Doesn't indicate that
4  it was a problem across the organization," instead, he
5  testified that:  "It may have been found that a
6  particular system wasn't following the concept of least
7  privilege."
8        Do you remember that?
9  A.    Yes.
10  Q.    So you don't have any basis to conclude that
11  this document relates to a problem across the
12  organization?
13  A.    Well, it is talking about enterprise access
14  management standards and audits, so that's what I can
15  tell from that.
16  Q.    So what are you saying?  That based on that
17  title, you're going to discredit Mr. Quituga's
18  testimony and conclude that this relates to a problem
19  across the organization?
20        MR. CARNEY:  Do you want to direct him
21  to where he said it in the report?
22  Q.    Can you answer the question, Mr. Graff?
23  A.    I'd need more information about this before I
24  can -- I mean I haven't seen it in a long time, so I
25  need a little help recollecting what this is about and

196

1      MR. CARNEY:  And both the footnotes to
2  the paragraph.
3      THE WITNESS:  Right.
4  A.    Yeah, I see Footnote 81, and it seems to
5  pertain to the document that you were referring to.
6  Q.    So here even in the text, Mr. Graff, you're
7  basically saying Mr. Quitugua said that not all systems
8  were following the concept of least privilege, which is
9  consistent with what we're saying here, that as part of
10  the assessment, it may have been found that a particular
11  system was not following the concept of least privilege.
12      Again, my only question, Mr. Graff, is that you
13  don't have any -- you're not contesting Mr. Quitugua's
14  testimony in any way?
15  A.    Well, I'm confused, because in Footnote 81, it
16  says -- he's saying -- the question was -- they're
17  talking about the security statement and the concept of
18  least privilege, and the question is:
19          "So what you're telling me is, at least
20      with respect some systems, that wasn't the
21      case."
22          And he answered, "For a subset of
23      systems that we identified that weren't, you
24      know, for whatever reason, we identified that
25      they weren't following the best practices we

1  described."
2      So -- so the particular presentation with that
3  slide that I cited, it's only part of a larger picture,
4  because we've got statements from Mr. Quitugua and
5  statements from Mr. Brown both that talk about this.
6  Q.    No.  This is all Mr. Quitugua -- this is all
7  Mr. Quitugua's testimony.  He was the author of this
8  slide.
9  A.    That's right.  I was talking about what
10  Mr. Brown said about it as well.
11  Q.    You don't quote Mr. Brown anywhere.  I think --
12  A.    Oh, Footnote 83 somewhere.  Yeah, that's right.
13  In that particular document, I don't think it provides
14  enough information for me to understand the context of,
15  you know, how did he come to make that statement, and
16  exactly which system is he talking about, I don't think
17  we can know.
18  Q.    And that's my only point, right, is that from
19  this one particular notation, you're not concluding
20  there was some enterprise-wide failure to implement the
21  principle of least privilege, you would just defer to
22  Mr. Quitugua's testimony.  There was some particular
23  system or set of systems that was found not to be --
24  A.    Well, no.  There were many other reasons why I
25  --

1  Q.    I'm just asking with respect to the meaning of
2  this document?
3  A.    Yes, with respect to the meaning of this
4  particular document, that was a statement that seemed to
5  indicate that there was some problem, at least with some
6  system, I don't know exactly which system it is, I'd
7  have to look at the document to be clear, but he
8  identified an issue and he raised it and there were
9  other reasons for that opinion as well.
10  Q.    And if you look at the title of the slide, this
11  is about an audit that was being done at the time,
12  right?  If you look at the milestones, it talks about
13  the milestones as part of a risk audit and risk
14  assessment?
15  A.    Well, I see the title says:  "Enterprise Access
16  Management Standards and Audit."
17  Q.    And do you see on the right-hand side under Key
18  Milestones/Status?
19  A.    "Conduct risk audit and risk assessment against
20  privileged and nonprivileged user accounts, and that's
21  complete as of the end of November 2017."
22  Q.    Right.  And the whole purpose of an audit,
23  right, is to identify, you know, systems that aren't in
24  compliance?
25  A.    Some auditors look at it that way, but

1  sometimes it's to find things that are going well too.
2  Q.    Sure.  It's to make sure everything is going
3  well and if there's things that are not going well to
4  identify them from mitigation?
5  A.    Sure.
6  Q.    And like you said, it indicates in the right
7  that some of this remediation work was already completed
8  by the end of 2017?
9  A.    Well, it says "Identify high-risk accounts" and
10  that's complete.  It doesn't say that they remediated
11  anything having to do with the high-risk accounts, and
12  the stuff under it says:
13          "Track mediation not started, document
14      results and establish repeatable security
15      assessment, and methodology not started."
16      That's in that column.
17  Q.    Correct.  But these were -- obviously, the
18  intent here is to flag issues for eventual remediation?
19  A.    Sure.
20  Q.    And whatever specific issue this slide was
21  referring to, certainly the issue could have been
22  resolved by October 2018, which is the start of the
23  relevant period here?
24  A.    I don't know.  It would depend on the issue,
25  the system, how hard it was to fix it, all sorts of

1 reasons.
2 **Q.** But you don't know. You have no reason to
3 believe it wasn't fixed by October 2018?
4 **A.** Right, I agree with that.
5          MR. TURNER: Okay. We've been going
6 for a while. Do you guys want to break, you
7 want to --
8          MR. CARNEY: We'll leave it up to the
9 witness.
10         THE WITNESS: I could use a break, a
11 short break.
12         THE VIDEOGRAPHER: The time right now
13 is 4:14 p.m., and we're off the record.
14 (Whereupon, a short break was taken.)
15         THE VIDEOGRAPHER: Stand by, please.
16 The time right now is 4:28 p.m. We're back on
17 the record.
18 BY MR. TURNER:
19 **Q.** Mr. Graff, let me show you another document you
20 cite in your report.
21         (Whereupon, SW-SEC00043620-630 was
22 marked as Graff Exhibit 19, for identification,
23 as of this date.)
24 **Q.** I'm showing you a slide deck titled "User
25 Access Management," bearing the date January 8, 2018,

205

1 Bates stamp SW-SEC43620. The title is -- excuse me.
2     Do you recognize this deck?
3 **A.** It will just take me a moment to leaf through
4 it.
5 **Q.** Mm-hmm.
6 **A.** It looks familiar. I don't remember precisely
7 what's in it.
8 **Q.** You cite the second page of this document where
9 it says:
10        "There is no organization-wide
11     standardized approach to access management that
12     includes provisioning, changing, and
13     de-provisioning users' access to systems that
14     contain personal information."
15 I think that's down at the bottom of the slide.
16 **A.** I see that quote. Could you help me by just
17 make reference to my report?
18 **Q.** Sure. It's in paragraph 78(a) of your report
19 on page 39.
20 **A.** I have it. Thank you.
21 **Q.** Okay. Now, in terms of what exactly this slide
22 deck concerned and what this language was intended to
23 convey, do you remember the witness testimony about this
24 slide deck?
25 **A.** Not off the top of my head.

206

1 **Q.** Do you see how the slide deck is titled "Tool
2 Evaluation and Recommendation"? That's part of the --
3 if you turn to the first page.
4 **A.** Yes, I see that.
5 **Q.** And then the third page is a tool analysis?
6 **A.** Yes.
7 **Q.** And multiple witnesses testified in the case
8 about how around this time -- around this time, the
9 company was looking for a standardized tool it could use
10 to automate the provisioning process.
11     Do you remember that?
12        MR. CARNEY: Objection. Foundation.
13 **A.** Yes.
14 **Q.** And the company moved to Azure AD or they
15 started to move to Azure AD.
16     Do you remember that testimony?
17 **A.** I remember testimony about Azure AD and they
18 were considering it and moving towards it, yes.
19 **Q.** And you can see in page 5, there was a proposed
20 recommendation about moving to Azure AD?
21 **A.** I'm sorry, where are -- I'm looking at the
22 page. Oh, there, it is, page 5.
23 **Q.** Proposed recommendation?
24 **A.** Yes, I see it.
25 **Q.** And you see it talks about Azure AD there

207

1 having a single sign-on and being pre-integrated with
2 custom and commercial applications?
3 **A.** Yes, I see that.
4 **Q.** And you're familiar with the concept of single
5 sign-on, right?
6 **A.** Yes.
7 **Q.** So this means basically that, if you're
8 provisioning a user with access, you don't have to
9 provision -- you don't have to configure a number of
10 different systems, you can just configure Azure AD and
11 then it's integrated with all the other applications
12 that they may need to use?
13 **A.** Yeah, when it works like it supposed to, you
14 don't need separate accounts in every system you are
15 going to use. You can use one sign-on and be connected
16 as you authenticate to the other systems.
17 **Q.** Right. If that's what this slide deck was
18 about, that there was a need for an organization-wide
19 system like that to automate that provisioning process,
20 again, that doesn't imply that there was any general
21 failure to implement role-based access controls at the
22 company?
23        MR. CARNEY: Objection to form.
24 **A.** I could imagine that customers would want to
25 move to an integrated single sign-on system for many

208

1 reasons, not necessarily because their role-based access
2 control has failed.
3 **Q.** Right. In fact, we talked about the SARFs
4 already, right? You could have like a manual process
5 where you get the SARF and then the IT people have to
6 provision the different systems separately.
7 You still have controls in place, they are just
8 more manual?
9 **A.** When it's done correctly, that can work; single
10 sign-on can simplify that.
11 **Q.** Okay. You also cite another document.
12 (Whereupon, SW-SEC00386134-143 was
13 marked as Graff Exhibit 20, for identification,
14 as of this date.)
15 **Q.** So I'm showing you what's been marked as Graff
16 Exhibit 20, and this is a slide deck titled "Information
17 Security Incident Review," bearing the date
18 September 2018 with a Bates stamp SW-SEC386134.
19 And in this deck you cite the last page of the
20 deck, and it says "Security program status." And then
21 specifically you cite the second to last bullet,
22 "Identity management role and privilege management," and
23 then it's in red, and I think you point to the text on
24 the other side of the slide, which indicates red means
25 limited or nonexistent?

209

1 **A.** Yes, I see it.
2 **Q.** All right.
3 **A.** And where was that referred to, by the way, in
4 my report, real briefly?
5 **Q.** 71, paragraph 71.
6 **A.** I'll look at that in a moment. Thank you.
7 **Q.** And you say:
8 "This is clearly inconsistent with the
9 assertion that role-based access controls are
10 implemented."
11 Now, again, as a -- this is a few words on the
12 slide deck, right? In order to understand what
13 specifically the issue was, you need to ask the person
14 who wrote the slide?
15 **A.** Well, I'm not sure I agree with that. I mean,
16 they're pointing out a problem on a status page, and I
17 have several examples of role and privilege management
18 problems.
19 **Q.** Okay. But in order to understand what was
20 signified by this particular bullet, how do you know?
21 **A.** Well, I don't know precisely what they mean by
22 this particular bullet. The language is clear, but as
23 to what particular incident among the ones that I knew
24 about that led to them putting that bullet together, I'd
25 have to look and see whether I can find it, but I don't

210

1 know that I have specific information on this particular
2 bullet.
3 **Q.** Well, you said the language is clear. But --
4 first of all, let me just ask you, do you even know if
5 this was, you know, a draft or whether it was a final
6 version of this deck?
7 **A.** Offhand, I don't see any notation that it was a
8 draft. I see it was marked as confidential.
9 **Q.** Right. But you don't have, one way or another
10 of knowing whether this was even a final version or not?
11 **A.** Based on what I can see in front of me, it
12 looks like it was a presentation, but I don't know
13 without -- I'd have to double-check my notes in the
14 report on the providence of it to give me a chance to
15 evaluate the import of this and the weight to give to
16 it.
17 You said that was paragraph 71?
18 **Q.** Mm-hmm, 71(d) -- or excuse me --
19 MR. CARNEY: 78, right?
20 **A.** 78 --
21 **Q.** 78(d), excuse me. No. 78 -- 71(b) is what I
22 have. That doesn't make sense either.
23 **A.** I don't think -- is there a B in 71?
24 MR. CARNEY: 78(b).
25 THE WITNESS: 78(b), as in boy.

211

1 MR. TURNER: I see.
2 MR. CARNEY: Yes, this is it.
3 **Q.** Okay. So now that you've looked at your notes,
4 you don't have any way of knowing whether this was a
5 draft that somebody prepared or whether this was a final
6 version?
7 **A.** Well, in the absence of a notation, I mean,
8 normally in my experience, if it's a draft, it'll say
9 "draft" on it, but it looks to be a finished
10 presentation.
11 **Q.** Okay. Now, again, just -- going back to the
12 meaning of this notation, all you have here is an
13 indication that red means "limited" or "nonexistent."
14 So, first of all, the meaning of this phrase
15 would depend on what "limited" means here, right?
16 **A.** Well, sure. The meaning of the phrase depends
17 on what the meanings of the words are. And if you take
18 that and compare that to what the security statement
19 says, as I have, they are discordant, right, they don't
20 agree.
21 **Q.** It depends on what's meant by "limited," sir.
22 What if "limited" means manual?
23 **A.** This says "limited" or "nonexistent."
24 **Q.** But it doesn't clarify in what respect it's
25 limited?

212

1 **A.** I don't think it does.

2 **Q.** And what if it's being highlighted in red

3 because the IT folks wanted to highlight for management

4 the need to make the transition to Azure AD?

5 **A.** Yeah, I can't speculate under --

6 **Q.** You don't know, right?

7 **A.** I know what it says, and that's all I know for

8 sure.

9 **Q.** You know what it says, but you don't know

10 exactly what it means or why it was put in there?

11 **A.** Well, I know what it means to me.

12 **Q.** You don't know exactly what this is referring

13 to or exactly why the person who wrote it put it in this

14 deck?

15 **A.** Yeah, I think -- yeah, I agree with you. I

16 think they were trying to say it was limited or

17 nonexistent. As to exactly what's meant by that, they

18 felt it was important enough to put it in the slide

19 deck, but you're right, I don't know their motives for

20 sure. They had the chance to say strong program or

21 needs improvement. They didn't say that. They said

22 "limited" or "nonexistent." If you think you just

23 needed improvement, they might have put it in yellow.

24 **Q.** And, sir, if it was limited in respect of being

25 a manual process -- scratch that.

213

1 We talked earlier about the SARFs and there

2 being many SARFs that you observed and the user access

3 reviews and, et cetera. If someone concluded that that

4 was -- strike that.

5 The security statement did not make any

6 representation as to whether SolarWinds' role-based

7 access controls were automated or manual or not, right?

8 **A.** I'd have to check, but I believe you're right.

9 Why don't you go ahead on the presumption that that's

10 correct.

11 **Q.** Okay. So, again, if what this was highlighting

12 was that the access controls were limited in that sense,

13 there was no contradiction with what the security

14 statement says?

15 MR. CARNEY: Objection. Vague and

16 foundation.

17 **A.** Yeah, I think that would be very speculative on

18 my part to agree with that. I mean, it seems to me that

19 the clear reading is that there was a problem they were

20 trying to point out.

21 **Q.** But you don't know exactly what it was?

22 **A.** Well, I can tell you --

23 MR. CARNEY: Objection. Asked and

24 answered.

25 THE WITNESS: Thank you.

214

1 **A.** Well, I can tell from other reports and other

2 e-mails and other presentations some of the problems

3 they might have been dealing with, but I don't know

4 which specifically they had in mind when they wrote

5 that.

6 **Q.** And what other e-mails were you referring to?

7 The ones we've looked through already?

8 **A.** The role-based access control problems.

9 **Q.** Uh-huh.

10 **A.** Well, then I'd have to go back to the report

11 and review the analysis of role-based access control.

12 But I've already I think reported on some issue, as I

13 opine, with role-based access controls. I don't know

14 which one of those they might be specifically referring

15 to in their presentation.

16 (Whereupon, SW-SEC00001497-550 was

17 marked as Graff Exhibit 21, for identification,

18 as of this date.)

19 THE WITNESS: And I did double-check

20 what you said about role-based access control.

21 It doesn't say anything about it being

22 automated.

23 MR. TURNER: Thank you.

24 **Q.** Okay. I'm showing you another slide deck, this

25 one titled "Security and Compliance Program Quarterly

215

1 Overview," bearing the date August 16, 2019, Bates stamp

2 SW-SEC1497. And this is something you cite in paragraph

3 78(c) of your report.

4 **A.** Yes, I see it. Thank you.

5 **Q.** Right. And you highlight that -- let me

6 actually turn to the right page. It's page 11 of the

7 document, but it's the one Bates stamped 1507.

8 **A.** I have 1507 here.

9 **Q.** Yeah, and in your report, you point to the fact

10 that it's -- in the table at the bottom of the slide,

11 for the category "Authentication authorization and

12 identity management," the NIST maturity level is labeled

13 a one, which corresponds to the key entry that says, "Ad

14 hoc inconsistent or reactive approach."

15 **A.** Yes, that's right.

16 **Q.** Now, again, is it possible that what this was

17 highlighting was the manual nature of the SARF process,

18 and the company wanted to progress to a more automated

19 system?

20 MR. CARNEY: Objection. Foundation.

21 **Q.** Let me ask it differently, Mr. Graff.

22 Is one way a company can mature its controls is

23 by making them more automated and more centralized?

24 **A.** Yes, and I think the cybersecurity vendors

25 would be happy if they did that, but, yes, that's often

216

1  a very good way to do it.
2  **Q.**   So is it possible this is indicating a desire
3  to mature it that way, from having a relatively manual
4  system to a more automated system?  And I'll refer you,
5  Mr. Graff, to the second to last bullet at the top,
6  which refers to, "Movement to make Azure AD
7  authoritative source of identity, plan to enable
8  Federation for all critical assets"?  Is it possible
9  that's what this is referring to?
10  **A.**   I don't think it's likely.  Look at the top
11  bullet.  It says:
12        "Access and privilege to critical
13     systems and data is inappropriate.  Need to
14     improve internal processes and procedures."
15     I don't read that as a reference to a need to
16  automate it.  It says that the access and privilege to
17  critical system is inappropriate.  There's other issues
18  raised in that, too.
19  **Q.**   And, again, do you know what specific issues
20  that bullet -- that top bullet is referring to?
21  **A.**   Well, I could give you a few examples of access
22  and privilege to critical systems and data that's
23  inappropriate.
24  **Q.**   Could it be that it was something like that,
25  that several instances that occurred where access was

217

1  inappropriate and that they're simply flagging a desire
2  to improve the system?
3         MR. CARNEY:  Objection.  Foundation.
4  **Q.**   To minimize error?
5  **A.**   I can interpret this and the words in front of
6  me based on my experience.  What they had in their minds
7  when the wrote it, I can't speculate, but I can see that
8  they are pointing out problems that need to be improved
9  in access, privilege, critical systems and
10  authentication and authorization and identity
11  management.
12  **Q.**   And if the witnesses in this case who
13  participated in putting this deck together testify that
14  what was intended by this slide was that the company --
15  there was a desire to automate access controls and
16  centralize access controls to minimize error, would you
17  have any reason to discredit that testimony?
18         MR. CARNEY:  Objection.  Foundation.
19  **A.**   Well, that's not what they said in their
20  presentation, but if you want to show me some testimony
21  where they discuss it, I'll take a look.
22  **Q.**   I'll represent to you that there was testimony
23  on this by Mr. Brown and Ms. Johnson.  I'm asking you
24  now to assume that's what the testimony was.
25     Do you have any basis to contest that that was

218

1  what they intended to convey, to discredit that
2  testimony?
3         MR. CARNEY:  Objection to form.
4  **A.**   Well, I've seen a lot of evidence that would
5  justify a rating of 1.  I don't think we'd go lower than
6  1.  You could go to a zero.  I've seen a lot of evidence
7  that would justify a rating of 1.  As to whether or not
8  they intended to make this a sales pitch for automation,
9  that's just not what's in the report.
10  **Q.**   Mr. Graff, you keep saying you've seen a lot of
11  evidence, a lot of evidence.  Take through what we're
12  talking about here.  We've seen some Biz App developers
13  temporarily get access to an internal billing system
14  that they need to do their job.  We've seen an effort to
15  limit customer support access to customer systems, and
16  then we've seen a bunch of documents where you say I'm
17  not sure exactly what this is referring to, but you've
18  said you're not assuming that it reflects any pervasive
19  failure to implement role-based access controls.
20     So what is this damning evidence that
21  SolarWinds supposedly failed to implement role-based
22  access control, if it that's even what you're claiming?
23         MR. CARNEY:  Objection.  Argumentative
24     and compound.
25  **A.**   Well, there's some examples you've asked me not

219

1  to get into, there's other areas of complication, but I
2  can give you a couple of other examples that relate
3  specifically to failures in role-based access control if
4  you'd like.
5  **Q.**   What are they, please?
6  **A.**   Sure.  Well the -- another failure of
7  role-based access control, and this also pertains to
8  practice of terminating employees -- Tim Brown has an
9  e-mail -- I'd have to find it -- where he complains that
10  a terminated employee, nevertheless, persists in having
11  access to some Google Docs, and he complains in this
12  e-mail, that says, you know, how could this happen --
13  And I'm paraphrasing, that he still has access to these
14  documents?  And he also -- as my memory serves -- he
15  also says that this is something that happens more
16  frequently than he'd like.  I'd have to find the exact
17  quote.
18     But that's an example of not only a termination
19  problem but also role-based access control, since he
20  shouldn't have access to the document based on his role
21  as a former employee.
22     Another example --
23  **Q.**   Can we stop there?
24  **A.**   Sure.
25  **Q.**   So SolarWinds had thousands of employees,

220

1  sort of audit done relating to the concept of least
2  privilege?
3  **A.**    It would seem to indicate that, yes.
4  **Q.**    And in fact, in your own report, sir, you cite
5  that several other audits, for example, paragraph 120,
6  you cite an April 2018 e-mail circulating the results of
7  an internal audit relating to -- relating to privileges
8  for certain accounts?
9  **A.**    I see paragraph 120, and I cite an internal
10 audit talking about shared SQL legacy login credentials.
11 **Q.**    That should have to do with the principle of
12 least privilege?
13 **A.**    Among other things.  It has to do with SDL
14 also.
15 **Q.**    And we've already talked about the user access
16 reviews that SolarWinds conducted?
17 **A.**    It'd have to do about the shared access problem
18 too.
19      Yes, we have talked about user access reviews.
20 **Q.**    Right.  And that -- those user access reviews
21 were designed to check whether user access privileges
22 were properly set?
23 **A.**    That would be the typical reason to do them.
24 And of course I don't know how exactly well they did
25 them, but that would be one of the reasons you do it,

237

1  access?
2          MR. CARNEY:  Objection to form.
3  **A.**    Well, the sentence you read to me does indicate
4  that there was periodic audits of user contents related
5  to financial systems, I think the phrase was, which was
6  also the level of -- set of systems that referred to in
7  that password policy document Mr. Bliss gave me.
8      So it's significant financial systems, I think
9  was the quote?
10 **Q.**    I think the more relevant words are including
11 active directory, which was the name identity store that
12 the company used to control its environment.  Right?
13 **A.**    Right.
14 **Q.**    So is it possible, Mr. Graff, that Ms. Pierce
15 wasn't an expert, didn't have a good understanding of
16 the controls at issue, maybe it was just wrong that
17 there was no audit in place that had ever been performed
18 relating to the principle of least privilege?
19 **A.**    She could have been misinformed and she
20 certainly could have made a mistake.  I think there's a
21 lot of indication that there were issues either with
22 audits taking place or with the audits missing things.
23 But on the other hand, there were certainly some
24 periodic audits of some systems.
25 **Q.**    Okay.  So if she's wrong about this notation

239

1  sure.
2  **Q.**    And you actually cite to a -- the results of
3  one of those audits in paragraph 97 and note 180.
4          MR. CARNEY:  The witness had asked for
5      a break a while ago.
6          THE WITNESS:  If now would be a good
7      time.  I could go for a few minutes longer, but
8      I certainly am looking forward to a break.
9          MR. TURNER:  Okay.  Just maybe three
10     more questions or so.
11 **Q.**    We talked about the PwC audits that were done.
12 Do you remember those?
13 **A.**    I remember you talking about them.  I don't
14 remember reading the audit reports.
15 **Q.**    And I can represent to you, sir, that one of
16 the controls PwC looked at, I'll just read it to you,
17 states:
18         "User access privileges are revalidated
19     on a quarterly basis to confirm that users
20     maintain appropriate access.  These validation
21     procedures are performed for all financially
22     significant application systems including
23     active directory."
24     So would that also indicate that SolarWinds had
25 the practice of conducting audits related to user

238

1  here, then you would withdraw your reliance on that
2  notation.  Am I right to assume that?
3  **A.**    If she was wrong about what?
4  **Q.**    That an audit relating to the concept of least
5  privilege had never been performed?
6  **A.**    Were we talking about --
7  **Q.**    Page 32.
8  **A.**    Page 32.  Let me just look at that again.
9  You've been moving me back and forth between several
10 documents.
11     Okay.  So it says:  An audit that this is in
12 place has never been performed.  She's talking about
13 least privilege.
14 **Q.**    So if she was wrong about that, you, of course,
15 would not rely on that notation for any conclusion of
16 yours?
17 **A.**    Well, I'd be curious to know if it did happen,
18 you know, why she said it didn't, but -- but if there
19 was a quarterly review of least privilege from PwC, that
20 would be good.
21         MR. TURNER:  Okay.  We can take a
22     break.
23         THE VIDEOGRAPHER:  The time right now
24     is 5:19 p.m. and we're off the record.
25     (Whereupon, a short break was taken.)

240

1      THE VIDEOGRAPHER:  Stand by, please.
2      The time now is 5:34 p.m. and we're back
3   on the record.
4   BY MR. TURNER:
5   Q.    Mr. Graff, before you mentioned that there were
6   a number of other access control categories in this Fed
7   Ramp assessment where Ms. Pierce indicated either there
8   was a program in place -- or excuse me, there may be a
9   program in place or that there wasn't a program in
10  place, to her knowledge.
11      Do you remember that?
12  A.    Yes, I do.
13  Q.    Now, a lot of these -- well -- strike that.
14      Are you -- do you have any familiarity with
15  Fed Ramp?
16  A.    Some.
17  Q.    Have you ever done any Fed Ramp certification?
18      MR. CARNEY:  Objection.  Vague.
19  Q.    Have you done a Fed Ramp assessment, been able
20  to certify a company or a product as --
21  A.    I've never been certified.  I've investigated
22  it some, but I've never been a certified Fed Ramp
23  participant.
24  Q.    And you're aware Fed Ramp is a pretty demanding
25  standard for companies to meet?

241

1   A.    Yes, I'd agree.
2   Q.    And it's -- the certification is for particular
3   cloud products, right, that's what Fed Ramp is for?  You
4   have to have that certification to sell a cloud product
5   to the federal government?
6   A.    Yes, that's right.
7   Q.    You mentioned those other categories, but a lot
8   of the other access control categories in this document
9   are about things that go above and beyond what's in the
10  security statement, right?
11  A.    I'd have to review that quickly.
12  Q.    Sure.  Take a look at the, let's say, the third
13  page of the document where it says page 25 of 209.
14  A.    I see it.
15  Q.    Okay.  So, for example, at the top, it says:
16  The organization employs automated mechanisms to support
17  the management of information system accounts.
18      You already mentioned earlier that the security
19  statement doesn't say anything about automation with
20  respect to rule-based access controls?
21  A.    It doesn't specifically talk about automation
22  in the security statement, that's right.  And that's not
23  the only way to do a good job on account management to
24  use automation.
25  Q.    And then the next one:  "The information system

242

1   automatically --" and then it says:  "Selection:
2   Removes, disables temporary and emergency accounts
3   after."  And then it says:  "Assignment, organization,
4   define time period for each type of account."
5       So this, again, is referring to some sort of
6   automation?
7   A.    Yes.
8   Q.    Which goes above and beyond what's in the
9   security statement, right?
10  A.    The security statement talks about access
11  control and account management.  It doesn't specifically
12  talk about automation.  It talks about account
13  management.
14  Q.    By the way, you see this term "information
15  system" that keeps popping up in the controls?
16  A.    Yes.
17  Q.    Do you know what that refers to?
18  A.    Yes.
19  Q.    What?
20  A.    It's a term of art.  It's defined in the NIST
21  documentation.  And it can have two meanings:  One is
22  this particular computer, and another is a set of
23  computers or even a network that perform a common
24  function.
25  Q.    And do you know what it means in the context of

243

1   a Fed Ramp assessment?
2   A.    It will depend a little bit on the context of
3   the particular Fed Ramp control they're talking about.
4   Q.    Is it possible that the controls used the term
5   "information system" to refer to the cloud product being
6   evaluated?
7       MR. CARNEY:  Objection.  Vague.
8   A.    Yeah, it would refer to the cloud product, but
9   it would also -- they're also very interested in -- Fed
10  Ramp in the systems on premises that interact with the
11  cloud.  So it wouldn't be necessarily just the cloud
12  system.
13  Q.    Take a look at page 38 of the document.
14  A.    Yes, I see it.
15  Q.    And it says:
16      "The information system:  Displays to
17  users assignment organization define system use
18  notification message or banner before granting
19  access to the system that provides privacy and
20  security notices consistent with applicable
21  laws, executive orders and directives,
22  policies, regulations, standards and guidance,
23  and states that:  One, users are accessing a
24  U.S. government information system."
25  I'll stop there.

244

1    So in other words, this is saying this is some
2 control that requires the information to display a
3 banner to users that they're accessing a U.S. government
4 information system.  Is that how you read it?
5    A.    Let me just read the whole thing and I'll let
6 you know.
7    Q.    Sure.
8    A.    Yeah, that's not quite right.  If I could take
9 a moment and just explain this notation, I think it
10 would be clear to everybody.
11    Q.    The red notation?  I'm talking about column F.
12    A.    Yes, but I'm talking about the language in
13 letter A.  This is -- in this document, I could explain
14 this in just 30 seconds, if I may.
15    Q.    Go ahead.
16    A.    In these NIST documents when they're talking
17 about control --
18    Q.    Why are we talking about NIST, by the way?
19    A.    This is -- Fed Ramp is controlled by NIST.  So
20 this is a federal document that comes under the aegis of
21 the National Institute of Standards and Technology,
22 which is responsible for setting standards for all
23 federal systems.
24    Q.    Uh-huh.
25    A.    So this is a convention used in these

245

1 documents.  And what they're trying to say is
2 assignment, and then it gives you this or that.  The
3 person filling out the form is forced to assign a value,
4 either this or that.
5          And so what this is telling you is that if --
6 in the case that it's a U.S. government system, they
7 need to supply that banner.  But if the assignment is a
8 different kind of organization, you might need an
9 organization-specific banner.
10    Q.    I don't think that's what it says, Mr. Graff.
11          The choice seems to be between a notification
12 message or a banner.
13    A.    Yes.
14    Q.    But the information system is required to
15 display to users that they're using an access -- that
16 users are accessing a U.S. government information
17 system.
18    A.    In the case of a Fed Ramp system, yes, that
19 sounds right.
20    Q.    Right.  So the information system being
21 referred to here would be the cloud product that is
22 being sold, which needs to inform users of that product
23 that they're accessing a U.S. government system?
24    A.    That's a -- that's a reasonable interpretation.
25 There are other systems that might apply to, but I agree

246

1 with your general characterization.
2    Q.    So it's possible that when you have a number of
3 controls in here to talk about what the information
4 system has to do, it's not talking about SolarWinds
5 network or the organization as a whole, but whatever
6 cloud product is being evaluated for Fed Ramp purposes?
7    A.    There's one of them that might well qualify
8 that way.
9    Q.    Let's talk about passwords.
10    A.    Okay.
11    Q.    And in particular, the representation that
12 security statement stating:
13          "Our password best practices enforce
14    the use of complex passwords that include both
15    Alpha and numeric characters."
16    You would agree with that?
17    A.    Yes.
18    Q.    Now, you would agree that SolarWinds enforced
19 the use of complex passwords on active directory?
20    A.    For most of their systems, they certainly could
21 have used active directory to do that.
22    Q.    And in fact, you've reviewed evidence, haven't
23 you, that the company did do that in active directory,
24 that it set password complexity to be activated on
25 active directory?

247

1    A.    I'm not recalling that on the top of my head,
2 but I think that's likely.
3    Q.    Would it help to see the document?
4    A.    It would help if we can do it quickly.  I don't
5 want to hold things up.
6    Q.    Okay.  Well, you tell me, Mr. Graff, are --
7 would you agree that SolarWinds enforced the complex --
8 the password complexity setting on active directory?
9    A.    I guess I'd like to see that.  And it would be
10 -- only would be a point in time, anyway, of course,
11 but --
12          (Whereupon, SW-SEC-SDNY_00055077 was
13    marked as Graff Exhibit 23, for identification,
14    as of this date.)
15          THE WITNESS:  Thank you.  I have this
16    document.
17    Q.    Okay.  So I'm showing you what's been marked as
18 Graff Exhibit 23.  It's Bates stamped SW-SEC-SDNY_55077.
19 And it's a screenshot of the active directory settings
20 as of 11/6/2017.
21          Do you see that up top?
22    A.    I see that.
23    Q.    And then under -- on the row:  "Password must
24 meet complexity requirements," the setting is enabled?
25    A.    That's right.

248

1 **Q.** So you would agree that as early as November 6,
2 2017, SolarWinds enforced password complexity in active
3 directory?
4 **A.** Well, yeah, the screenshot clearly shows that,
5 at least as of that time, but I have no reason to
6 believe that they didn't use this setting in active
7 directory. Mind you, it only controls a certain subset
8 of their systems, but -- active directory. But yes, it
9 appears to be set that way.
10 **Q.** It would control most of their systems, right,
11 that's how -- that was their primary identity store?
12 MR. CARNEY: Objection. Vague.
13 **A.** If you mean a numerical majority, I would think
14 so. You know, it's hard to know precisely what the
15 active directory domains -- that this is referred to.
16 Because they could have many domains. So it's the
17 default domain policy.
18 But certainly, this is an indication that they
19 used complex passwords on a set of systems that were
20 controlled by active directory.
21 **Q.** Which was their primary identity source?
22 **A.** I think it was.
23 **Q.** And are you aware that, again, PwC, audited
24 password complexity on financially significant systems
25 including active directory in their 2019 and 2020

249

1 **Q.** It was on an FTP account on a third-party
2 server at Akamai, right?
3 **A.** Right.
4 **Q.** And you don't know, do you, whether it was
5 possible to automatically enforce password complexity on
6 that system?
7 **A.** Well, when you say "enforce," do you mean
8 automatically enforce by software or do you mean
9 somebody actually taking control of the system and
10 ensuring that it was complex?
11 **Q.** Well, I'm first talking about automatically
12 enforcing it.
13 **A.** Yeah, I don't know for sure if you could
14 automatically enforce password complexity on an FTP
15 account.
16 **Q.** So you'd have to rely on human compliance with
17 the password policy?
18 **A.** Well, there are ways that you can automate the
19 checking of password complexity. So there's a
20 difference between regulating the setting of the
21 password like active directory does and being able to
22 check to see whether there is a complex password.
23 And there are ways to do that that don't have
24 anything to do with active directory. You can run a
25 special software that checks that.

251

1 audits?
2 **A.** I don't recall that, but it wouldn't surprise
3 me.
4 **Q.** Do you want to see that as well?
5 **A.** If you tell me that that's what it says, I'm
6 okay with that factoid.
7 **Q.** And they found no significant deficiencies with
8 respect to that control?
9 MR. CARNEY: Objection. Form.
10 **Q.** Do you agree with that?
11 **A.** Yeah, I guess I'd have to see that if you want
12 me to agree to their finding. But the systems that are
13 under the control of active directory would tend to have
14 complex passwords enforced.
15 **Q.** Okay. So you don't have any basis to contest
16 that password complexity was enforced on active
17 directory throughout the relevant period?
18 **A.** For the systems under the control of active
19 directory, I think that's right.
20 **Q.** Okay. And you've talked about the SolarWinds
21 123 password?
22 **A.** Mm-hmm.
23 **Q.** And that was not on an active directory
24 account, right?
25 **A.** Correct.

250

1 **Q.** Okay. Do you know whether there was some sort
2 of special way to automate the checking of it on this
3 FTP account on an Akamai server?
4 **A.** It would be highly likely given the importance
5 of doing that and the professionalism of Akamai, which
6 I've used. I think there probably is a way of doing it
7 and automating it. I don't know if they did it.
8 **Q.** What way would there be of automating checking
9 of the complexity of the password?
10 **A.** Briefly, you can -- there's software available
11 everywhere that checks for password complexity, and you
12 can easily set up, I've done it many times, a script
13 that run periodically and can check the password
14 complexity of a given account.
15 **Q.** Well, wouldn't you have to know what the
16 password is in order to check whether it's complex?
17 **A.** No. Oddly enough you don't.
18 **Q.** How would it know what password to check then?
19 **A.** Yeah, it's a -- I'll just do it quickly.
20 There's a system, a friend of my invented it, that --
21 there's a system called password cracking. And the way
22 it works is that you do it -- you construct what might
23 be a simple password, and then you check to see whether
24 when you encrypt that password you get the same result
25 as what you find in the encrypted password file.

252

**Mark Graff**
**2/14/2025**

1    And by doing that, you can do it hundreds of
2  thousands of times a second, it's possible to determine
3  whether or not it's a simple password or the complex
4  password.
5  Q.    I think what you're referring to, Mr. Graff, is
6  where you have a hash in a password and you're trying to
7  see if it's a complex password or a simple password that
8  could be hacked?
9  A.    That's one way to do it.
10 Q.    But that's if you have a hashed password to
11 start with.
12    If you just have a system that has an account
13 on it and you have no indication of what the password
14 is, hash or not, there's nothing to check, right?
15 A.    If you have control of the account, as the FTP
16 user would, it is possible to run software to determine
17 whether or not a password is easily guessed.
18 Q.    Yeah, if you have control of the account, if
19 you have the person who has control of the password.
20 Again, that's a manual element that you'd need to have,
21 right?  You'd need to have the person actually checking
22 the password.  And that's -- that requires manual
23 compliance.
24 A.    Well, I don't want to beat this to death.
25 There are, I think, ways to automate that check for

253

1  password complexity on an FTP server.
2  Q.    Well, sir, I'm not going to let it go.  But so
3  far all you've described -- I'm well aware of password
4  cracking software.
5    The password cracking software is going to take
6  a hash password and to see if you can come up with a
7  plain text match that generates the hash, right?
8    MR. CARNEY:  Are you talking about
9  Akamai having the password now?  It's not
10 clear, your question.  Objection, vague.
11    MR. TURNER:  Mr. Graff has referred to
12 an automated way of checking passwords.
13    MR. CARNEY:  And you've repeatedly said
14 you would have to have the password and it's
15 not clear who you're saying doesn't have the
16 password.
17    MR. TURNER:  Thanks for the speaking
18 objection, but let me continue.
19 Q.    You've talked about an automated way of
20 checking passwords, but what you've referred to is
21 password cracking software, right?
22 A.    That's certainly one way to do it, yeah.
23 Q.    And the way password cracking software works is
24 if you have a hash of a password, then the cracking
25 software determines if it can find the plain text that

254

1  matches that hash?
2  A.    That's one of the main ways it works.
3  Q.    Okay.  Here we're not talking about having a
4  hash of a password, we're just talking about someone at
5  SolarWinds set this password on the account.
6    Is there any way that someone else at
7  SolarWinds at InfoSec would be able to automatically
8  check that password in some centralized fashion?
9    MR. CARNEY:  Objection.  Vague.
10 A.    Well, when you say someone at SolarWinds, I'm
11 not quite sure who you're characterizing.  If there's
12 somebody who has the password for the FTP account and
13 there's a system administrator whose job it is to check
14 that, I think there would be a way to check it.
15 Q.    Okay.  And whenever the password was created,
16 you don't know of any way to have automatically required
17 the password to be complex?
18 A.    Yes, it -- I can imagine how it might happen,
19 but I certainly can't be sure that it would be
20 available.
21 Q.    Okay.  So for that part of the process, you'd
22 require the person who was creating the password to
23 manually make it complex; that's what you'd be depending
24 on?
25 A.    In other words, if you want to enforce password

255

1  complexity, you're saying you'd have to have the person
2  that created the password follow that guideline?
3  Q.    Right.
4  A.    Yes, that sounds right.
5  Q.    And human compliance is always subject to
6  error?
7  A.    I agree with that.
8  Q.    And this particular password, this would only
9  be one of many thousands of passwords that were used at
10 the company?
11 A.    Well, there were certainly thousands of
12 passwords used at the company.  There weren't thousands
13 of passwords being used for this FTP account.
14 Q.    And we'll get to what the FTP account was used
15 for in a minute.
16 A.    Okay.
17 Q.    But this is only one noncomplex password that
18 you were able to find out of the thousands that would
19 have been used at the company?
20 A.    Well, I wasn't looking for them.  I was
21 reporting what others had detailed.  And I do believe
22 there was another reference to the lack of password
23 complexity.  If we look at my report, we can probably
24 find it.
25    But I believe there's another set of concerns

256

1  about password complexity. I think maybe it was Eric
2  Quitugua that complained about it, but I'd have to
3  double check. But anyway, there's -- there will be an
4  annotation. It's a citation.
5  **Q.**  Well, let's not leave that hanging, Mr. Graff.
6  **A.**  Okay.
7  **Q.**  Is there some other evidence of a noncomplex
8  password you want to point me to?
9  **A.**  It seems to me there was a reference to that.
10  I could be mistaken, but I think in my main report I
11  believe I have a reference to password complexity
12  issues. Let's see.
13       So Section 62 begins the password section. It
14  seems to me there's a reference to a problem with
15  password complexity in one of the testimonies. I'll
16  have to look for it. Let's see. I'm around the
17  Footnote 214. Let's just see. It looks like we're
18  talking about unique account IDs. Let's see.
19          MR. CARNEY: You want to look at
20       paragraph 128?
21          THE WITNESS: I'm at 117. Let me see
22       128.
23          Yes, that's -- in 128 -- paragraph 128
24       does describe a problem with the login
25       credentials and plain text and so forth. But I

1  that the password policy was followed 100 percent of the
2  time?
3  **A.**  I agree, you're right.
4  **Q.**  So you have no evidence that it was a frequent
5  occurrence at SolarWinds to use noncomplex passwords?
6  **A.**  Frequent? I didn't really address frequency.
7  But -- see if I can agree with that.
8       I don't think I have evidence that shows it was
9  a frequent problem.
10  **Q.**  And you've characterized this as a major
11  incident, right?
12  **A.**  I don't remember if I used that word or not.
13  But it was certainly significant and a significant risk.
14  **Q.**  All right. Well, let's talk about how major it
15  was.
16  **A.**  Uh-huh.
17  **Q.**  You raised the possibility that if an attacker
18  had discovered this password on GitHub, they could have
19  used the password to upload a malicious file to
20  SolarWinds' download's website?
21  **A.**  Yes, that's my understanding of the issue that
22  Tim Brown raised in his e-mail.
23  **Q.**  You say at paragraph 87:
24          "Anyone on the internet could upload
25       malicious software into this repository.

1  was looking for a reference to password
2  complexity. It seems to me that there's
3  another reference to that.
4          MR. TURNER: Referring to Footnote 162
5       on page 50, Mr. Graff.
6          THE WITNESS: 162 --
7          MR. TURNER: Footnote 162 at page 50.
8          THE WITNESS: Thank you. I'm getting
9       closer. Let's see.
10          Yes, this is the reference I had in
11       mind. Quitugua, who says -- and question, was:
12       "Are you aware of this SolarWinds 123 being
13       used," so forth.
14          And he said: "There may have been a
15       possibility that in the lab environment's
16       password, such as, you know, weak passwords
17       were in use."
18  **Q.**  So he doesn't --
19  **A.**  And also Brown said: "I'm not saying that the
20  password policy was followed 100 percent of the time."
21       So those are the two quotes I was thinking of.
22  **Q.**  Okay. Those aren't actual instances of
23  noncomplex passwords. That's Mr. Quitugua saying
24  possible that a weak password might be in the lab
25  environment and Mr. Brown saying that he wasn't saying

1          SolarWinds customers would then download these
2       malicious files while thinking they were
3       downloading legitimate SolarWinds materials."
4          That's the theory?
5  **A.**  That's my paraphrase of what Tim Brown -- the
6  worry that Tim Brown reported, and I'm sure we can find
7  his quotations to that sense.
8  **Q.**  Okay. So the idea is that someone with this
9  password could upload a file -- a malicious file to the
10  SolarWinds website where files were available for
11  download, and then customers could mistakenly download
12  the files, thinking they were legitimate?
13  **A.**  Yeah, that's the scenario Tim Brown was
14  pointing out, and I think that was a risk.
15  **Q.**  And you say Mr. Brown was pointing it out.
16  You're citing the e-mail back and forth about this
17  issue, right?
18  **A.**  Yes.
19  **Q.**  You didn't cite any deposition testimony in the
20  case about it?
21  **A.**  Well, not that I recall. I don't know that he
22  was asked about that in deposition. I don't remember.
23  **Q.**  Yeah, none of the witnesses were ever asked
24  about this incident in depositions taken in this case.
25  Are you aware of that?

1  **A.**    Well, I'm not aware of all the questions they
2  were asked, and I would not know offhand whether they
3  were asked about it or not.
4  **Q.**    Yeah.  I can represent to you that no questions
5  were asked at depositions about the case -- in the case
6  about this incident.  And, you know, the SEC made a big
7  deal about this incident in their complaint.
8      Does it surprise you at all that they never
9  asked any questions about it at deposition?
10          MR. CARNEY:  Objection.  Argumentative.
11      And he's got citations to investigative
12      testimony right there in his report.
13          THE WITNESS:  Right.  Where is my
14      section that I talk about this, anybody?
15          MR. CARNEY:  You can look at paragraph
16      132.
17          THE WITNESS:  Yeah, I talk about this.
18  **A.**    And to respond to your question, I don't have
19  any control over the lawyers, and I'm not surprised when
20  they make a decision -- a legal decision of what to ask.
21  **Q.**    Okay.  What if I had told you -- what if I tell
22  you now that if they had deposed someone who actually
23  knew about the facts of this matter, the testimony would
24  be that this account did not have the ability to upload
25  files to the SolarWinds website, in other words, to

1  downloads.SolarWinds.com?
2          MR. CARNEY:  Objection.  Foundation.
3  **A.**    Yeah, that seems like -- I don't know, like a
4  double hypothetical.  I don't know what they would have
5  testified.
6  **Q.**    Well, I'm going to ask you to assume that's
7  what the testimony would be.  I'm going to ask you to
8  assume that this account could upload files to a staging
9  folder, an FTP folder, but the files would not be made
10  available on the download site as a result without
11  further action by SolarWinds personnel.
12      So if you assume that fact, does that change
13  your view of the magnitude of this incident?
14  **A.**    If Mr. Brown's assessment was incorrect and the
15  facts are as you suggest, then, sure, it would change my
16  assessment of the impact of the event.  It would still
17  be a serious problem.
18  **Q.**    And if I told you to assume that the account
19  did not have the ability to overwrite any files that
20  were already on the download site, so there was no way
21  of simply replacing files that were already there,
22  again, would that change your view of the magnitude of
23  the incident?
24          MR. CARNEY:  Objection.  Foundation.
25  **A.**    Well, that's quite an assumption.

1  **Q.**    Well, I can ask to you assume facts and then
2  ask you what your reaction is.  That's all I'm asking
3  you to do here.
4  **A.**    Okay.  It's hard to imagine that the
5  possibility of a file being overwritten can be ironclad.
6  There are many ways in which the permissions on a site
7  can be overridden.
8  **Q.**    I'm asking you to make quite an assumption
9  not have the ability to overwrite files that had already
10  been uploaded.  So given that, does that change your
11  view of the magnitude of the incident if you make that
12  assumption?
13          MR. CARNEY:  Objection.  Foundation.
14  **A.**    You're asking me to make quite an assumption
15  because there are a great many security problems that
16  could make such a change possible.  So you're asking me,
17  if I understand your question, to exclude all those
18  possibilities and accept the idea that the file
19  permissions would be effective in preventing that.
20  **Q.**    Correct.  I'm asking you to assume facts and
21  then asking you if those facts are true, would it change
22  your view of the severity of the incident.  So assume
23  that this account could not be used to overwrite some
24  SolarWinds file that was already available for download
25  to customers.

1      Does that change your view of the severity of
2  the incident?
3          MR. CARNEY:  Objection.  Foundation.
4  **A.**    It's really -- honestly, it's very difficult
5  for me to imagine a situation where that wouldn't be at
6  all possible.  Now, let me say, in answer to your
7  question, if, in fact, it wasn't possible, and all of my
8  experience indicates it might well have been possible,
9  no matter what the file permissions were, if, in fact,
10  it wasn't possible to modify the file, yes, that would
11  definitely affect my interpretation.
12  **Q.**    And even assuming that an attacker could use
13  the account somehow to post a malicious file on the
14  downloads.com -- or downloads.SolarWinds.com site, would
15  you agree that SolarWinds software would never install
16  that software as an update because it wouldn't be
17  digitally signed with SolarWinds' private key?
18          MR. CARNEY:  Objection.  Form.
19  **A.**    Would you please say that again?  Because I
20  want to make absolutely sure I know what you're asking.
21  **Q.**    Sure.  Well, let me ask you this:  Are familiar
22  with the role of digital signatures and validating
23  software updates?
24  **A.**    Yes, I am.
25  **Q.**    You want to explain what the digital signature

1  process does and how it works?
2  **A.**    Sure.  One way to validate software that is in
3  a repository or a software that has been patched and so
4  forth, is to compare what's called "a mathematical check
5  sum."  So the technique is, you take a file that's known
6  good, we run a mathematical algorithm over it that --
7  and there are many, many different types -- and that
8  produces a number, a special number, a very -- it's a
9  big number.  It's a hexadecimal number.  Very large.
10       And then what we do to check and see whether
11  the vendor will release that check sum and say this is
12  the number you ought to get when you run this check, and
13  then the customer, if they want to, can use the same
14  software and get a check sum, and then compare it to
15  what the vendor said the check sum should be.
16  **Q.**    And the algorithm that runs that calculation,
17  right, it draws on the vendor's public key in order to
18  make sure that the software was --
19  **A.**    Yes, quite often it does.
20  **Q.**    -- was digitally signed?
21  **A.**    So the vendor will sign it with their digital
22  key, and then we can check the digital signature using
23  software we have.
24  **Q.**    Okay.  And often vendors, if they have some
25  sort of automatic software update as part of their

265

1  software, that software is not going to install an
2  update unless the update mechanism confirms that the
3  software was digitally signed?
4  **A.**    There's -- it's often the case that vendors and
5  customers will use software to check the digital check
6  sum and compare it as a guard against tampering.
7  **Q.**    Right.  So in this case, if you have a
8  malicious file posted on the SolarWinds website, a
9  customer could manually check it to make sure it was
10  digitally signed, or a SolarWinds installer, whatever
11  software their customer is running, would check the
12  program to see whether it was digitally signed before it
13  ever gets installed on the customer's system?
14  **A.**    I saw in Mr. Brown's discussion of this where
15  he alluded to that possibility and either or not -- and
16  perhaps the idea that it would protect their customers
17  because they could use check sums, and also he referred
18  to a fellow in the company that was running check sums
19  and trying to validate whether or not those files had
20  been tampered with.
21       Now, let me say it as clearly as I can:  Those
22  methods, in my personal knowledge, are not full proof.
23  **Q.**    Right so --
24  **A.**    And it's possible to tamper with files and
25  still elude this method of detection.

266

1  **Q.**    Right.  They're not full proof, but it is a
2  form of compensated control that would help to minimize
3  the risk of the scenario you were alluding to before,
4  where you'd have lots of customers downloading malicious
5  software on their systems.
6  **A.**    It's a good step to take.  It's not full proof.
7  There are attackers who can defeat this method.
8  **Q.**    Okay.  So that also is a factor in assessing
9  the likelihood of this risk ever arising, is the
10  existence of compensating controls?
11  **A.**    Yes.  And one would also have to consider the
12  likelihood that a highly experienced attacker would
13  focus on this particular repository as a means of
14  delivering a tampered software.
15  **Q.**    And there's no evidence that any bad actor ever
16  did obtain or use this password in any way, let alone
17  for successfully distributing malware, is there?
18  **A.**    No, I don't believe there is any evidence that
19  it was done successfully, although as I say, it could
20  well have been done in a way that couldn't be detected.
21  **Q.**    You don't have any evidence that that occurred,
22  though?
23  **A.**    No, I don't.
24  **Q.**    Mr. Graff, let's talk about the software
25  development lifecycle section of the security statement.

267

1  **A.**    Sure.
2  **Q.**    And this may not take very long.  But I just
3  want to get clear on what you're contesting about that
4  section of the security statement, and specifically, I'd
5  like to follow on -- excuse me -- focus on the sentence
6  in the security statement that says:
7            "Our security development lifecycle
8       follows standard security practices including
9       vulnerability testing, regression testing,
10       penetration testing and product security
11       assessments."
12       Do you remember that sentence?  It looks like
13  you're looking it up.
14  **A.**    I am looking it up just to verify the wording,
15  but just give me a moment.
16       I have the paragraph.  Could I hear that again,
17  please?
18  **Q.**    Sure.  It's the sentence that reads:
19            "Our secure development life cycle
20       follows standard security practices including
21       vulnerability testing, regression testing,
22       penetration testing, and product security
23       assessments."
24            Do you see that sentence?
25  **A.**    Yes.

268

1   **Q.**    I know you've talked a lot about the OIP issue
2   in your report. We can get to that in a minute, but I'd
3   like to put it aside for now. Okay? I just want to
4   talk about the software development life cycle that the
5   company applied to its customer-facing products, okay?
6       Am I right that you're not contesting that
7   SolarWinds carried out vulnerability testing as part of
8   its software development lifecycle?
9   **A.**    Yes, I think they do vulnerability testing in
10  many cases, probably most cases, in terms of product
11  development.
12  **Q.**    And you're not contesting that SolarWinds
13  carried out penetration testing as part of its software
14  development lifecycle?
15  **A.**    They carried out penetration testing. I have
16  comments about the way they did it and whether or not it
17  matched what they said they were doing, but yes, I think
18  they were doing penetration testing in most cases when
19  they developed software for production.
20  **Q.**    The only thing I see in your report about
21  penetration testing is toward the very end of your
22  report, paragraph 188.
23  **A.**    I see it.
24  **Q.**    And you say:
25      "Mr. Brown testified that penetration

269

1   because Mr. Brown testified that it may not have been
2   done 100 percent of the time?
3   **A.**    Well, you connected those two things. They did
4   penetration testing I think most of the time. There
5   were issues with the penetration testing, as I point out
6   in the report, but they did it most of the time, I
7   think.
8       It's a little hard to tell because if you look
9   at the final security reviews, they are very
10  inconsistent when they talk about penetration testing
11  and whether it was, in fact, done.
12  **Q.**    Okay. But you're not -- you're not asserting
13  that there was any pervasive failure to do penetration
14  testing as part of the secured development lifecycle?
15  **A.**    I think they did penetration testing on
16  products quite often. There were, as I said, issues
17  with the way they did it and the effectiveness of it,
18  but yes, I think they did do penetration testing. It's
19  hard to tell precisely because of the way they reported
20  the tests that they did.
21  **Q.**    So let me ask you about -- you said you have
22  some concerns about the way they did it. And, again,
23  the only thing you say about that in your report is that
24  customers found vulnerabilities through pen testing of
25  their own that SolarWinds didn't find in its pen

271

1       testing may not have been done '100 percent of
2       the time.'"
3       So in other words, it wasn't perfect?
4   **A.**    Well, you're paraphrasing. I mean, he said it
5   wasn't done a hundred percent of the time, and so
6   perfection would have required a hundred percent of the
7   time, so it wasn't, in that sense, perfect. Absolutely
8   true.
9   **Q.**    But you're not suggesting that that makes the
10  security statement representation about pen testing
11  untrue?
12      MR. CARNEY: Objection. I'm just going
13  to note it's an entire paragraph. You read one
14  sentence.
15      MR. TURNER: I don't need the speaking
16  objection. I'm asking about penetration
17  testing.
18      MR. CARNEY: Right, which is what the
19  whole paragraph is about.
20  **Q.**    Mr. Graff --
21  **A.**    What's your question, please?
22  **Q.**    You're contention -- excuse me.
23      You're not suggesting that SolarWinds'
24  representation that it did penetration testing as part
25  of its software development lifecycle is untrue simply

270

1   testing.
2       And so you're basically asserting that this
3   means that SolarWinds could have done pen testing
4   better?
5   **A.**    Well, should I talk about my evaluation?
6   Should I talk about the pen testing a little bit?
7   Because you didn't ask a question. I'm sorry.
8   **Q.**    No. I'm trying to understand what the argument
9   is here. So basically, you're saying that customers
10  found vulnerabilities through their own pen testing that
11  SolarWinds didn't find in its pen testing. That's the
12  issue that you're pointing to in this paragraph, right?
13  **A.**    That's one of the issues, sure, that's the main
14  issue. Harry Griffiths talks about this, and I quote
15  him extensively, in his deposition, and he talks about
16  the fact that the SolarWinds customers -- there were
17  instances where the customers uncovered vulnerabilities
18  that SolarWinds had missed.
19  **Q.**    Right. That's the only issue that you referred
20  to in this paragraph besides the Mr. Brown remark,
21  right?
22  **A.**    Well, yeah, I think best practices would mean
23  that the company would modify the way it did pen testing
24  in order to do a better job of catching the
25  vulnerabilities that their customers were catching.

272

1  Q.    So it might or might not?  You don't know
2  without more detail?
3  A.    I can't evaluate the Facebook vulnerability
4  testing and penetration testing without more information
5  than you can give me.
6  Q.    And similarly, if SolarWinds' customers are
7  finding bugs that SolarWinds itself didn't find, could
8  mean lots of things.  Could mean they were using a
9  different pen testing tool, or they were looking at it
10  in some way that SolarWinds missed, but it doesn't
11  necessarily mean that SolarWinds had a bad penetration
12  testing program?
13        MR. CARNEY:  Objection.  Compound.
14  A.    What I say in the report, aside from the point
15  I do make about customers, it's not best practice if
16  your customers are finding bugs you missed.  That may
17  happen every once in a while.
18        My point in the report was that if that
19  happens, the company should modify their testing to
20  catch up with their customers, right?  Figure out what
21  the customers are doing that they're not doing and
22  modify their program to do that.
23  Q.    The SolarWinds' customers who pen tested
24  SolarWinds' software were doing a due diligence how
25  secure the software was, right?

277

1              MR. CARNEY:  Objection, foundation.
2  A.    You said they were doing due diligence to test?
3  Q.    They were doing it due diligence to test for
4  themselves how secure the software was, right?
5              MR. CARNEY:  Same objection.
6  A.    I'm not sure why they were doing it.  You would
7  think they were doing it to be careful.
8  Q.    If they weren't satisfied, they could have
9  taken their business elsewhere?
10  A.    That's a business -- I don't know enough about
11  SolarWinds' customers and what parts of the product line
12  they use and what the competition is to answer that
13  question.
14  Q.    You're aware that SolarWinds served nearly all
15  Fortune 500 companies during the relevant period?
16  A.    That sounds right.
17  Q.    And continues to do so today?
18  A.    That, I don't know.
19  Q.    Do you think all those companies would be using
20  the software if they thought that SolarWinds'
21  development process was insecure?
22              MR. CARNEY:  Objection.  Calls for
23        speculation.
24  A.    Yeah, that's -- I'm not a position to diagnose
25  the buying decisions of those companies in that

278

1  industry, exactly what they were looking for, what
2  features they needed, how much money they had, what
3  their budgets were, what their costs were.  I just can't
4  figure that out.
5  Q.    Okay.  But you're not aware of any instance
6  where a SolarWinds' customer pen tested software and
7  found bugs and concluded:
8        "Oh, we're not going to use your
9        software because the fact that we're finding
10        bugs that you didn't catch is just too much of
11        a red flag"?
12  A.    I do remember an e-mail but I don't know that
13  it made my report.  But since you ask, I do remember
14  seeing an e-mail sent to Tim Brown from a CEO from one
15  of their customers who complained about the
16  vulnerabilities that he was seeing and did threaten to
17  stop using the software if they didn't do a better job
18  of finding vulnerabilities.  That was somewhere in the
19  Tim Brown correspondence that I saw.
20  Q.    Nowhere cited in the report.
21  A.    I didn't cite it in the report.  But since you
22  brought it up.
23              MR. CARNEY:  Objection.  Vague as to
24        cited.  He's got an appendix of materials
25        attached to the report.

279

1              THE WITNESS:  Yeah, thank you.
2  Q.    All right.  The bottom line, Mr. Graff, you're
3  not contesting that pen testing was done most of the
4  time.  You're basically contending that you think they
5  could have done a better job qualitatively with it,
6  fair?
7  A.    I'm going to just double check, but I think
8  that's right.
9        My argument is, what I say in the opinion, that
10  since -- if customers often found vulnerabilities that
11  SolarWinds had missed before releasing its products,
12  this should have alerted SolarWinds leadership that its
13  own penetration testing was not following security best
14  practices as asserted in the security statement.
15        And then, as I say, they should have adjusted
16  their penetration testing.
17  Q.    Yeah.  And can I just get a clear answer to my
18  question?
19        Your assertion is not that they failed to do
20  penetration testing as a regular practice, you're just
21  criticizing the quality of the penetration testing that
22  was done?
23  A.    And most of the time I think they did do
24  penetration testing as it relates to products.
25  Q.    With respect to regression testing, you're not

280

1  contesting that SolarWinds conducted regression testing
2  as part of its software development lifecycle?
3  **A.**    It's hard to tell precisely from the final
4  security reviews that I looked at because they're not
5  very specific about that. I think it's probably the
6  case that they did do regression testing as part of
7  their ordinary production software development
8  lifecycle, but it's not clear to me how often they did
9  it, how well they did it.
10 **Q.**    Mr. Rattray cited that 2,000 JIRA tickets
11 reflecting regression testing being conducted.
12       Did you look at those at all?
13 **A.**    I did review a few.
14 **Q.**    Would you consider that to be evidence that
15 regression testing was done as a regular practice as
16 part of the secure development lifecycle?
17 **A.**    I think it's -- yes, I think that is evidence
18 that they conducted regression testing with some
19 regularity.
20 **Q.**    And you're not contesting that SolarWinds
21 conducted product security assessments as part of its
22 software development lifecycle? You referred to the
23 final security reviews earlier.
24       MR. CARNEY:  Objection to form.
25 **A.**    Yeah, I found that the -- and I think I

281

1  mentioned in either the original report or in my
2  rebuttal, I found the format of the FSRs and the way
3  they carried out that, the way they documented it, could
4  be problematical, and so I'm not sure I can agree with
5  that last assertion.
6  **Q.**    You found the way that carried out -- the way
7  they documented it to be problematical?
8  **A.**    Yeah.
9  **Q.**    Now, you know that these final security reviews
10 were printed out in a way that doesn't include all the
11 links to JIRA tickets that were related to the FSRs
12 because of a database change issue.
13       Are you aware of that?
14 **A.**    I noticed that the final security review
15 documents listed in some cases links to evidence that
16 would support their report of the review, but rarely
17 included substantive details about the review or its
18 results.
19 **Q.**    But you are aware that those linked documents
20 were produced by SolarWinds?
21 **A.**    Some of them were, for sure.
22 **Q.**    Did you review those documents?
23 **A.**    Many of them.
24       Let's, if we may, just review quickly what I
25 had to say about the FSRs, too. I know that I did

282

1  discuss that. It may have been more in the rebuttal
2  report than it was in the original report since I was
3  responding to Dr. Rattray's discussions of those.
4       MR. BRUCKMANN:  That might be pages 38
5  and 39 of the rebuttal report, Mark.
6       THE WITNESS:  Yeah, thank you. And do
7  I have the rebuttal report here?
8       MR. CARNEY:  Exhibit 2. I can hand you
9  my copy.
10       THE WITNESS:  I have two. What page?
11 Paragraph 38, did you say?
12       MR. CARNEY:  Page 38, paragraph 67.
13       THE WITNESS:  All right. Thank you.
14 Paragraph 67.
15       Okay, I've reviewed that. Thank you
16 for your patience.
17 **Q.**    So your criticism is that the documentation of
18 the reviews is not sufficiently clear?
19       MR. CARNEY:  Objection.
20       Mischaracterizes testimony.
21 **A.**    That's one of my concerns. But I think, you
22 know, I -- I took a look at the FSRs, and there were a
23 couple of problems that I noticed right away.
24       The first thing is that I didn't see a simple
25 explanation of exactly what was supposed to be in the

283

1  FSRs. I didn't see a description. I don't remember
2  reading one, at least, of what that process was supposed
3  to contain.
4       But more than that, having reviewed some dozens
5  of these FSR documents, I think I used the word
6  hodgepodge in my rebuttal in that there were so many
7  different ways it was organized and so many different
8  things that were referred to in these final security
9  reviews. Sometimes they would talk about the
10 penetration testing, sometimes they would talk about
11 regression testing, but many times they didn't supply or
12 even refer to the results.
13       So it was almost every FSR was in a different
14 format, had different paragraphs, different contents.
15 It was very -- they were very -- well, in a way
16 disorganized.
17 **Q.**    And does the security statement say anything
18 about the documentation that would be used for security
19 reviews being done in a uniformed fashion across teams?
20 **A.**    It doesn't. But it does talk about software
21 development, and it does talk about -- I'll have to find
22 the precise reading, but it's a reference to the best
23 practices or industry best practices. I'd have to find
24 my exact reference.
25       But it doesn't talk about the FSRs, but it does

284

1 talk about the reviews they did.
2 **Q.**     And again, Mr. Graff, I want to emphasize, the
3 FSRs would link to JIRA tickets that are often not
4 reflected in what were produced.
5     So did you look at the JIRA tickets that were
6 cross-referenced in the FSRs?
7 **A.**     I looked at several of them.
8 **Q.**     And did they reflect testing or analysis of
9 code and assessments of risks?
10 **A.**     Yes, many of them did.
11 **Q.**     And would you consider that reviewing the
12 security of a product as a matter of substance
13 regardless of the form?
14 **A.**     Well, review -- yes, it's a form of review.
15 The important thing about a final security review, as
16 described in the SDL, I mean, is -- I mean, there's
17 a -- a final security review is an element of a
18 well-managed SDL.
19     And there are a great many steps that should be
20 carried out in that review.  And so I didn't find in the
21 evidence about these reviews they were conducting that
22 they were doing it in an organized way and doing
23 it -- yes, security best practices are a mandated aspect
24 of all development activities, it says here.
25     And also, it says that they follow standard

1 security practices.  Well, these reviews are part of
2 standard security practices and part of best practices.
3 **Q.**     Let's talk about the OIP.
4 **A.**     The Orion Improvement Program.
5 **Q.**     Very good.
6 **A.**     Yeah.
7 **Q.**     The security statement says:
8     "We followed a fine methodology for
9     developing secure software that is designed to
10     increase the resiliency and trustworthiness of
11     our products."
12     Would you agree the term "products" typically
13 refers to the things that a company sells to its
14 customers?
15 **A.**     Yes.
16 **Q.**     And would you agree that's what's being
17 referred to here?
18 **A.**     In that sentence.
19     And in the sentence a couple lines later, it
20 says that these "security best practices are a mandated
21 aspect of all development activities."  And that's what
22 I pointed out in my report.
23     So that's not restricted-to products.
24 **Q.**     Would you agree that the OIP software app -- by
25 the way, let me back up there.

1     You're not a lawyer, are you, Mr. Graff?
2 **A.**     No.
3 **Q.**     You're not a linguist, right?
4         MR. CARNEY:  Objection.  Vague.
5 **A.**     No.
6 **Q.**     You haven't been engaged as a linguistics
7 expert or a legal expert by the SEC?
8 **A.**     That's right.
9 **Q.**     So in terms of understanding whether "our
10 products" modifies the rest of the paragraph or a
11 sentence, you don't have any more expertise than I do on
12 that issue?
13         MR. CARNEY:  Objection.  Calls for
14 speculation.
15 **A.**     My goal in reading this and reporting on it is
16 to, as I say, compare it to best practices and also to
17 deliver my understanding as a security expert of what
18 these representations are.
19 **Q.**     And as a security expert, you have some sort of
20 special knowledge that allows you to interpret whether
21 "our products" in the first sentence was meant to apply
22 to the rest of the paragraph versus just that sentence?
23 **A.**     My expertise and my experience are enough to
24 tell me that when it says it's a mandate aspect of all
25 development activities -- remember, I've managed

1 software development groups, so all development
2 activities to me is pretty clear.
3 **Q.**     All development activities in the context of a
4 paragraph that is about:
5     "The methodology for developing secure
6     software to increase the resiliency and
7     trustworthiness of our products."
8     What special expertise do you have that allows
9 you to opine that the sentence you were looking at
10 applies to something beyond "our products"?
11 Have you ever conducted a -- any sort of survey of how
12 people interpret security statements?
13 **A.**     No.
14 **Q.**     Is it possible that other people might
15 reasonably construe this language differently than you
16 do?
17 **A.**     Well, other people might construe it
18 differently.  I think I was pretty reasonable.  I'm not
19 sure if they disagreed with what would be reasonable.
20 That's kind of speculative.
21 **Q.**     Right, I'm the most reasonable person I know.
22     Now, would you agree that the OIP software
23 application was not a product that SolarWinds sold to
24 customers?
25 **A.**     Yes, that's my understanding.

1  Q.    It ran on a SolarWinds server?
2  A.    Yes.
3  Q.    It was not involved in running Orion or
4  delivering services to the Orion customer?
5  A.    My understanding is it intended to collect
6  information from Orion customers and therefore it was a
7  kind of a service.
8  Q.    It was designed to collect analytics from
9  SolarWinds customers?
10 A.    Mm-hmm.
11 Q.    But it wasn't used to actually deliver the
12 services that Orion provides?
13        MR. CARNEY:  Objection to form.
14 A.    Yes, I think that's right.  It was -- it wasn't
15 designed to deliver the services that Orion provides,
16 that's right.  And I have a note -- I think in a
17 footnote here I talk about exactly what kind of data
18 moved back and forth.
19 Q.    And you could have -- you know, by analogy, you
20 have a mobile app that uses Google Analytics to collect
21 analytics data from the app, right?  Are you familiar
22 with --
23 A.    Yes, I've had a little familiarity with that.
24 Q.    And if a company says it pen tests its mobile
25 app, that doesn't mean it's pen testing Google

289

1  Analytics?
2  A.    That's a little different case than the one
3  we're talking about.
4  Q.    Google Analytics is collecting the analytics
5  data, right?
6  A.    Mm-hmm.
7  Q.    Orion Improvement Program collects analytics
8  data.
9        The point is they're two separate things from
10 the application itself?
11 A.    Well, the OIP application was not a product.  I
12 agree with that.
13 Q.    Would you agree that if a company says it pen
14 tests its mobile app and it uses Google Analytics to
15 test -- excuse me, to collect analytics from its mobile
16 app, no one is going to assume that the company pen
17 tests Google Analytics?
18 A.    Well, this hypothetical company, does it
19 develop the Google Analytics software?
20 Q.    No.
21 A.    So it's the company -- I'm sorry.  Please
22 continue.
23 Q.    Can you pen test a vendor's product?
24 A.    Yes, you can.
25 Q.    So you could --

290

1  A.    In many cases.
2  Q.    -- pen test Google Analytics potentially?
3  A.    Well, I'd have to look at the details.  You
4  could certainly test some of it.
5  Q.    And you are aware that SolarWinds has a number
6  of other Biz Apps besides OIP?
7  A.    Yes.
8  Q.    Like billing applications or like Salesforce
9  extensions to create customer e-mail lists?
10 A.    Okay, I agree with that.
11 Q.    And you're not claiming SolarWinds should have
12 put those under its secure development lifecycle?
13 A.    Well, I'm not sure I'm making any claim at all.
14     But what the SolarWinds employees talked
15 about this in the e-mails that I saw, and I believe it
16 was at least Tim Brown, it may have been Chris Day, they
17 talked about OIP and its role in collecting data.
18     Tim Brown, as I recall, decided that OIP should
19 be under the SDL.  And I don't remember which employee
20 actually suggested that; it was either Mr. Quitugua or
21 Mr. Day.  But there were concerns about the security
22 risks associated with it, and they advocated -- I think
23 Mr. Brown decided or at least asked, that OIP be brought
24 under the SDL perhaps in response to some of the risks
25 that were pointed out.

291

1  Q.    So Mr. Graff, it's getting late, and I want to
2  get you out of here, so if you could just answer the
3  question I ask rather than the question you might want
4  me to ask.
5        I'm asking you:  Are you making any claim that
6  SolarWinds should have put any other application, any
7  other Biz App application besides OIP under its software
8  development lifecycle?
9  A.    No.
10 Q.    Okay.  So -- and again, you're not contesting
11 that SolarWinds generally applied its SDL to
12 customer-facing products?
13 A.    Well, I don't recall saying that, I'm afraid.
14     They had an SDL, what they described as an SDL,
15 and it had several parts.  Some of that was, you know,
16 the pen testing we talked about and the regression
17 testing we talked about.
18     There were other parts of it that I think
19 weren't consistently applied, as I discuss in my report.
20 Q.    Again, I want to get you out of here soon.
21     In terms of what was covered by the SDL, you've
22 pointed to OIP, but you're not making any claim that
23 customer-facing products were not covered under the SDL,
24 were not -- the SDL was not applied to customer-facing
25 products?

292

```
 1          MR. CARNEY:  Objection to form.
 2   A.    I'd have to check the -- I really would have to
 3   check that report for that precise detail.
 4          MR. TURNER:  Okay.  Let's take a
 5   10-minute break.
 6          THE WITNESS:  Is it okay if I make that
 7   check?
 8          MR. TURNER:  Sure.
 9          THE VIDEOGRAPHER:  The time right now
10   is 6:43 p.m. and we're off the record.
11   (Whereupon, a short break was taken.)
12          THE VIDEOGRAPHER:  Stand by, please.
13   The time right now is 6:50 p.m. and we're back
14   on the record.
15          MR. TURNER:  I have no further
16   questions.  Thank you, Mr. Graff.
17          MR. CARNEY:  All right.  Thanks.  And I
18   have no questions, but the witness will read
19   and sign.  Thank you.
20          THE VIDEOGRAPHER:  The time right now
21   is 6:51 and we are off the record.
22          (Time Noted:  6:51 p.m.)
23
24
25
                        293
```

```
 1   C E R T I F I C A T E
 2   STATE OF NEW YORK    )
 3                        ) ss.:
 4   COUNTY OF QUEENS )
 5
 6          I, BROOKE E. PERRY, a Notary Public
 7   within and for the State of New York, do hereby
 8   certify:
 9          That MARK GRAFF, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by such witness.
13          I further certify that I am not related
14   to any of the parties to this action by blood
15   or marriage; and that I am in no way interested
16   in the outcome of this matter.
17          IN WITNESS WHEREOF, I have hereunto set
18   my hand this 14th day of February, 2025.
19
20
     -----------------------
21   BROOKE E. PERRY
22
23
24
25
                        295
```

```
 1          CERTIFICATE OF WITNESS
 2
 3   I, MARK GRAFF, do hereby declare under
 4   penalty of perjury that I have read the entire
 5   foregoing transcript of my deposition testimony,
 6   or the same has been read to me, and certify that
 7   it is a true, correct and complete transcript of
 8   my testimony given on February 14, 2025, save and
 9   except for changes and/or corrections, if any, as
10   indicated by me on the attached Errata Sheet, with
11   the understanding that I offer these changes and/or
12   corrections as if still under oath.
13          _____ I have made corrections to my deposition.
14          _____ I have NOT made any changes to my deposition.
15
16   Signed: _____
            MARK GRAFF
17
18
19   Dated this _____ day of _____ of 20_____.
20
21
22
23
24
25
                        294
```

```
 1               ERRATA SHEET
 2   Deposition of: MARK GRAFF
     Date taken: FEBRUARY 14, 2025
 3   Case:  SEC v. SOLARWINDS CORP., et al.
 4   PAGE  LINE
     _____  CHANGE: _____
 5   _____
              REASON: _____
 6   _____  CHANGE: _____
              REASON: _____
 7
     _____  CHANGE: _____
 8   _____
              REASON: _____
 9   _____  CHANGE: _____
              REASON: _____
10
     _____  CHANGE: _____
11   _____
              REASON: _____
12   _____  CHANGE: _____
              REASON: _____
13
     _____  CHANGE: _____
14   _____
              REASON: _____
15   _____  CHANGE: _____
              REASON: _____
16
     _____  CHANGE: _____
17   _____
              REASON: _____
18   _____  CHANGE: _____
              REASON: _____
19
     _____  CHANGE: _____
20   _____
              REASON: _____
21   _____  CHANGE: _____
              REASON: _____
22
     _____  CHANGE: _____
23   _____
              REASON: _____
24   Signed_____
25   Dated_____
                        296
```

**Errata Sheet**

| Matter: | *SEC v. SolarWinds et al.* |
| | Case No. 23-cv-9518-PAE |

| Deposition Date: | February 14, 2025 |

| Deponent: | Mark Graff |

I have reviewed the transcript of my deposition taken in the above-referenced matter, which was supplied to counsel on March 3, 2025. I request that the following changes be entered upon the record for the reasons indicated. I authorize you to attach this Errata Sheet and the attached Acknowledgement of Deponent to the original transcript of my deposition.

| Page | Line No. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 8 | 11 | every eight years | over eight years | Typo |
| 11 | 5 | Did have people calling in | Did you have people calling in | Clarity |
| 11 | 12-13 | We talked a lot of about | We talked a lot about | Clarity |
| 13 | 11 | "system securities" | "System Security" | Typo |
| 14 | 6 | Well, any other other than the ones | Well, any other – other than the ones | Clarity |
| 14 | 16 | FCC | FTC | Typo |
| 16 | 9 | built | rebuilt | Typo |
| 17 | 13 | anything Sunburst or SolarWinds | anything about Sunburst or SolarWinds | Clarity |
| 23 | 3 | Use the SELC | Use of SDLC | Typo |
| 28 | 1 | is are | is: are | Clarity |
| 28 | 23 | issues raised | issues were raised | Clarity |
| 32 | 8 | as as many | are as many | Typo |
| 33 | 5 | depends on my | depends on that | Clarity |
| 33 | 10 | correctly or they weren't consistent with passwords and | correctly, or they weren't consistent with passwords, and | Clarity |
| 35 | 13 | "Is a | "A | Quote from exhibit |
| 35 | 17-18 | respect to these five areas." | respect to" these five areas. | Quote from exhibit |
| 36 | 11 | that, | that | Quote from exhibit |
| 40 | 9 | I may have seen every file | I may not have seen every file | Typo |
| 44 | 1 | risk assessment | risk acceptance | Typo |
| 44 | 9 | risk assessment | risk acceptance | Typo |
| 44 | 12 | assessment | acceptance | Typo |
| 51 | 19 | SolarWinds' employees reported to | SolarWinds employees and reported to | Clarity |
| 52 | 25 | account in | account on | Typo |
| 57 | 10 | there's significant issues | there are significant issues | Typo |

| 57 | 11 | that identified by | that were identified by | Clarity |
|---|---|---|---|---|
| 58 | 24-25 | issue that is slipped | issues that slipped | Typo |
| 60 | 14 | I agree that. | I agree with that. | Typo |
| 61 | 14 | security | cybersecurity | Quote from exhibit |
| 64 | 7 | accessed information | access to information | Typo |
| 64 | 25 | access information systems | access to information systems | Typo |
| 66 | 2 | access controls are | access controls that are | Clarity |
| 67 | 3 | different | difference | Typo |
| 68 | 6-7 | they did that often, they did it correctly. | they did that—often, they did it correctly. | Typo |
| 69 | 17 | SolarWinds' employees | SolarWinds employees | Typo |
| 79 | 13 | in taking | and take | Quote from exhibit |
| 79 | 15 | and | or | Quote from exhibit |
| 79 | 16 | business | businesses | Quote from exhibit |
| 83 | 5 | business continuity issues | business continuity systems | Typo |
| 88 | 24 | process | processes | Quote from exhibit |
| 90 | 20 | in the markets | of the markets | Quote from exhibit |
| 92 | 9 | and they will. If they're | and if they're | Clarity |
| 98 | 22 | incident. | incident? | Typo |
| 101 | 15, 20 | 853 | 800-53 | Typo |
| 102 | 2 | 853 | 800-53 | Typo |
| 104 | 6 | There's a National Institute of Standards of | The National Institute of Standards and | Typo |
| 109 | 9 | 800171 | 800-171 | Typo |
| 117 | 4 | entering | Including | Clarity |
| 118 | 14 | securities | security | Typo |
| 120 | 6 | referring to a specific technical standards | referring to specific technical standards | Typo |
| 133 | 9 | through the monitor | for the word "monitor" | Clarity |
| 138 | 25 | assist | systems | Quote from exhibit |
| 145 | 13 | evidence to | evidence either to | Quote from exhibit |
| 148 | 18 | that | the | Typo |
| 149 | 20 | not my evidence | not my testimony | Clarity |
| 149 | 23 | my twin conclusions | my two conclusions | Typo |
| 155 | 8 | SOCs | SOX | Typo |
| 156 | 10 | bare | bear | Typo |
| 163 | 4 | backup for 365 | Backup O365 | Typo |
| 163 | 6 | Biz Apps would use access | BizApps would use to access | Typo |
| 163 | 7 | backup billing and for backup of 365 | Backup billing and for Backup O365 | Typo |
| 167 | 11 | backup | Backup | Typo |
| 167 | 14 | right permissions | write permissions | Typo |
| 167 | 16 | And then Benefits of Accepting This Risk | And then under "Benefits of Accepting This Risk" | Clarity |
| 168 | 20-21 | access certain | access to certain | Clarity |
| 188 | 3 | Ronnie | Rani | Typo |

| 201 | 21 | case. | case? | Quote from exhibit |
|---|---|---|---|---|
| 201 | 23 | identified that weren't, you | identified, they weren't – you | Quote from exhibit |
| 203 | 20 | accounts, | accounts," | Typo |
| 203 | 21 | November 2017." | November 2017. | Typo |
| 204 | 13-15 | "Track mediation not started, document results and establish repeatable security assessment, and methodology not started." | "Track remediation" - "Not Started," "Document results and establish repeatable security assessment and methodology" - "Not Started." | Quote from exhibit |
| 209 | 22 | Identity management role and privilege | Identity Management – Role and Privilege | Quote from exhibit |
| 211 | 14 | providence | provenance | Typo |
| 218 | 7 | when the wrote | when they wrote | Typo |
| 221 | 6 | Ronnie | Rani | Typo |
| 222 | 16 | Ronnie | Rani | Typo |
| 223 | 14, 17 | SolarWinds 123 | solarwinds123 | Typo |
| 223 | 22 | Ronnie | Rani | Typo |
| 224 | 4 | Ronnie | Rani | Typo |
| 224 | 8-9 | SolarWinds 123 | solarwinds123 | Typo |
| 233 | 21 | omissions | missions | Typo |
| 234 | 5 | this is place | this is in place | Typo |
| 235 | 11 | this place has never been informed | whether this was in place has never been performed | Clarity and Typo |
| 235 | 22 | It as | It was | Typo |
| 239 | 11 | name | main | Typo |
| 242 | 20 | rule-based | role-based | Typo |
| 247 | 19, 21, 23, 25 | active directory | Active Directory | Typo |
| 248 | 8, 19 | active directory | Active Directory | Typo |
| 249 | 3, 6-7, 8, 15, 20, 25 | active directory | Active Directory | Typo |
| 250 | 13, 16-17, 18-19, 23 | active directory | Active Directory | Typo |
| 250 | 20-21 | SolarWinds 123 | solarwinds123 | Typo |
| 251 | 21, 24 | active directory | Active Directory | Typo |
| 252 | 20 | friend of my | friend of mine | Typo |
| 254 | 6 | a hash password | a hashed password | Typo |
| 257 | 13 | Section 62 | page 62 | Clarity |
| 258 | 12 | SolarWinds 123 | solarwinds123 | Quote from exhibit |
| 258 | 15 | environment's | environments | Quote from exhibit |
| 263 | 5 | possibility | impossibility | Typo |
| 264 | 21 | Are familiar | Are you familiar | Typo |
| 266 | 22 | full proof | foolproof | Typo |
| 267 | 1, 6 | full proof | foolproof | Typo |
| 268 | 7 | security | secure | Quote from exhibit |
| 271 | 14 | secured | secure | Typo |

| 278 | 24 | I'm not a position | I'm not in a position | Typo |
| 286 | 8 | a fine methodology | a defined methodology | Quote from exhibit |
| 286 | 23 | restricted-to | restricted to | Typo |
| 287 | 24 | mandate | mandated | Typo |

Mark Graff

April 1, 2025
Date