# EXHIBIT 51

```
 1        UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
            Plaintiff,            )
 6                                )
       v.                         ) Civil Action No.
 7                                ) 23-cv-9518-PAE
     SOLARWINDS CORP. and TIMOTHY G. )
 8   BROWN,                       )
                                  )
 9          Defendants.           )
     _____)
10
11
12
13
14           VIDEO DEPOSITION OF
15              MATTHEW HEDBERG
16           Friday, July 26, 2024
17                 8:37 a.m.
18
19
20
21
22
23
24   Reporter:
     Barbara J. Carey, RPR
25   JOB No. 240726ICR
                     1
```

```
 1 APPEARANCES:
 2
 3 ATTORNEY FOR PLAINTIFF:
 4      CHRISTOPHER BRUCKMANN (Via Zoom)
        KRISTEN M. WARDEN
 5      BENJAMIN BRUTLAG
        Attorneys at Law
 6      SECURITIES AND EXCHANGE COMMISSION
        100 F Street, N.E.
 7      Washington, D.C. 20549
        bruckmannC@sec.gov
 8      wardenK@sec.gov
        brutlagB@sec.gov
 9
10
   ATTORNEY FOR DEFENDANTS:
11
        SEAN BERKOWITZ
12      KIRSTEN C. LEE
        Attorneys at law
13      LATHAM & WATKINS, LLP
        330 North Wabash Avenue, Suite 2800
14      Chicago, Illinois 60611
        sean.berkowitz@lw.com
15      kirsten.lee@lw.com
16
        SERRIN TURNER (Via Zoom)
17      Attorney at Law
        LATHAM & WATKINS, LLP
18      1271 Avenue of the Americas
        New York, New York 10020
19      serrin.turner@lw.com
20
21
22
23
24
25
                   2
```

```
 1 APPEARANCES (Continuing):
 2
 3 ATTORNEY FOR THE WITNESS:
 4      MICHAEL ROWE
        Attorney at Law
 5      DORSEY WHITNEY LLP
        50 South Sixth Street, Suite 1500
 6      Minneapolis, Minnesota 55402-1498
        rowe.michael@dorsey.com
 7
 8 ALSO PRESENT:
 9      David Newman (Via Zoom)
        In-House Counsel
10      RBC Capital Markets
11
        Steve Smith, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                   3
```

```
 1             I N D E X
 2 EXAMINATION OF MATTHEW HEDBERG:           PAGE
 3   By Mr. Brutlag          8, 245
 4   By Mr. Berkowitz        164, 254
 5
 6 EXHIBITS:
 7 Number         Description          Page
 8 Exhibit 1........................... 13
      Matt Hedberg LinkedIn Profile
 9    (3 pages)
10 Exhibit 2........................... 38
      RBC Capital Markets - The 10-Minute
11    Take: Cyber Threat
      (8 pages)
12
   Exhibit 3........................... 60
13    Security Resources - SolarWinds
      Trust Center
14    (6 pages)
15 Exhibit 4........................... 66
      SolarWinds Security Statement
16    (4 pages)
17 Exhibit 5........................... 79
      RBC Capital Markets, 10/27/20,
18    SolarWinds Corporation, SMB Showing
      Signs of Improvement; Q3/20 Review
19    (12 pages)
20 Exhibit 6........................... 84
      RBC Capital Markets, 12/15/20,
21    SolarWinds Corporation, Fluid Situation;
      Initial Thoughts Around the SolarWinds
22    Cyber Attack
      (14 pages)
23
              (Continued...)
24
25
                   4
```

Matthew Hedberg
7/26/2024

very well may exist on other companies' websites, but a lot of times you'll see them, and it feels a little kind of obvious. Like, that's an obvious statement that every company is going to want to do.
   Q. All right. So because it's obvious, do you place any weight on it in connection with your analysis?
   A. Sorry --
   Q. You say because it's obvious.
      So do you place any weight on statements like these on a website in connection with your analysis?
   A. If I were to read this, this feels very boilerplate to me. If I was really interested, it would probably require more diligence.
   Q. It's boilerplate because it's just -- well, why do you say it's boilerplate?
   A. I mean, it looks pretty just like AI-generated to me. It looks like this is just standard.
      I mean, every company is going to want to protect data, protect access. It feels very -- there's no substance behind it in that particular statement. It's just -- it's hard to know if that's valid, I guess.
   Q. So if you click on that link, you'll go to another document.
      MR. BRUTLAG: So I've handed you a document that's been marked as Hedberg Exhibit 4. Again,

65

this is a web archive version from the same date which was archived on December 14, 2021, and this is titled, "SolarWinds Security Statement."
      (Whereupon, Exhibit 4 was marked.)
BY MR. BRUTLAG:
   Q. So take a moment to review this document. This gives more specifics. It says, for example, if we could just walk through it, under, "Organizational Security" on the first page, it says in the second paragraph, "SolarWinds follows the NIST Cybersecurity Framework with layered security controls."
      There's a section below that titled, "Asset Management," where it says, "SolarWinds' data and information system assets are comprised of customer and end-user assets as well as --
      THE REPORTER: Comprised of what?
BY MR. BRUTLAG:
   Q. -- "comprised of customer and end-user assets as well as corporate assets. These asset types are managed under our security policies and procedures."
      Then on the next page, this is labeled page 10. I should note the first eight pages were just links, so we removed those, and under, "Operational Security," halfway down, there's information regarding

66

SolarWinds' efforts with respect to change management, also auditing, and logging. On the bottom, it references network security.
      Saying that, "Our infrastructure servers reside behind high-availability firewalls and are monitored for the detection and prevention of various network security threats."
      On the next page, this is page 11, it states, "With respect to vulnerable management, security assessments are done to identify vulnerabilities and to determine the effectiveness of the patch management program."
      And you can see, again, other headings relating to access control, software development, lifecycle, and et cetera.
      So first question is, do you remember having ever reviewed this document titled, "The SolarWinds Security Statement"?
   A. Under what time frame?
   Q. At any point.
   A. I saw it earlier this week.
   Q. Okay. Separate from earlier this week?
   A. I don't know. Not prior to that.
   Q. Okay. You referenced The Trust Center documents, so that was Hedberg Exhibit Number 3, as being

67

general boilerplate?
   A. Yes.
   Q. What about the statements that we just reviewed in the SolarWinds Security Statement; would you review -- would you describe those in the same way?
      MR. BERKOWITZ: Object to the form.
      MR. ROWE: Join.
   A. That they're boilerplate?
BY MR. BRUTLAG:
   Q. Yes.
   A. I mean, there's more substance here. Like, they're actually, you know, stating specific things that are happening and doing. This feels much more granular.
   Q. Have you seen statements like these on other company websites that you cover?
   A. I believe so. You know, following a NIST strategy and framework is somewhat industry standard, so yeah, I mean, I've read things like this before on other websites.
   Q. So if you haven't seen this particular document on SolarWinds' website, would you expect SolarWinds' website to contain these types of statements?
      MR. BERKOWITZ: Object to form.
   A. Under what time frame? In general?

68

**Page 69**

BY MR. BRUTLAG:
Q. In general, yes.
A. Would I expect SolarWinds' website to have this stuff on their website?
Q. Yes.
A. And this is not before or after the incident.
Q. Just generally.
A. It's probably not uncommon to see something like this.
Q. And why do you say that?
A. Because a lot of this -- although it's not as boilerplate as the first -- as document 3, it's more granular, and a lot of the stuff that you referenced here is considered, you know, common industry practices for securing assets and data.
Q. All right. If we just go through it, are they -- which of the statements that identified are common industry practice?
MR. BERKOWITZ: Object to form.
A. Starting with what?
BY MR. BRUTLAG:
Q. All right. Let's start. Organizational security, it says -- this is on page 9, "SolarWinds follows the NIST Cybersecurity Framework with layered security controls."

**Page 70**

Is that a standard practice?
A. That is a standard practice.
Q. So you'd expect companies that you cover to follow, for example, the NIST Cybersecurity Framework?
A. Yeah, NIST is a widely regarded organization, I guess, yeah.
Q. So why is it standard practice, then, to use the NIST Cybersecurity Framework?
A. People recognize NIST in the industry, and they understand that it means something. It's not Matt Hedberg's security list; it's NIST, and so it carries a bit more weight.
Q. So what do -- what would your investors recognize, for example, if SolarWinds were to follow the NIST Cybersecurity Framework?
MR. BERKOWITZ: Object to form.
A. That there's a general adherence to industry best practices.
BY MR. BRUTLAG:
Q. And why is that important?
A. Because it conveys that, you know, companies, A, aware of NIST, but B, doing -- carrying out some industry standards from a cybersecurity perspective.
Q. So following the NIST Cybersecurity Framework

**Page 71**

is an industry best practice?
A. It's considered one of them.
Q. And how do you know that?
A. Just being around the industry for 20 years.
Q. If we go to the second page, under "Operational Security," if you go to the bottom under the heading, "Network Security," this is another line that we mentioned earlier?
A. Yep.
Q. It says, "Our infrastructure servers reside behind high-availability firewalls and are monitored for the detection and prevention of various network security threats."
Is that also considered an industry best practice?
A. Absolutely.
Q. Why do you say "absolutely"?
A. Firewalls are one of the core tenets of a cyber fabric, and having servers and data reside behind them is -- it's very, very common.
Q. So that's something that you would expect any company that you covered to do?
A. Absolutely.
Q. Next, "Vulnerability Management," on the next page. It says, "Security assessments are done to identify

**Page 72**

vulnerabilities and determine the effectiveness of the patch management program."
Is that also a standard industry best practice?
A. Yes.
MR. BERKOWITZ: Object to form.
BY MR. BRUTLAG:
Q. And why is that?
A. Scanning is -- I'd say it's like good hygiene. You should be scanning all the time to identify vulnerabilities.
Q. You used the term "hygiene."
What does that mean?
A. Like brushing your teeth. You should brush your teeth.
Q. I got it.
But in the cybersecurity arena, what does hygiene mean?
A. Industry standard. It's something that people -- companies should be scanning for vulnerabilities. It's something that just happens on a very frequent basis to eliminate the risk of threats, or cavities, if you're not brushing your teeth.
Q. Okay. In this case, when you say threats, you mean the cyber threats?

**Page 169**

1 their basic hygiene for cyber practices, but around the
2 IPO process, yes.
3     Q.  Do you remember what, specifically, you spoke
4 with people about related to their general cybersecurity
5 hygiene --
6     A.  Yeah, it was things like --
7     Q.  -- during the IPO process?
8     A.  -- NIST.  Are they following NIST practices,
9 are -- and again, this is testing my memory because it's
10 six, seven years ago, but generally, in these processes,
11 there is some discussion around IT practices, including
12 cybersecurity practices.  That would have been the most
13 extensive conversation I would have had is around that
14 time, 2017, 2018 time frame.
15     Q.  So is it fair to say that you don't recall any
16 specific discussions about topics that were covered in the
17 security statement other than you generally, as a matter
18 of practice, would ask about basic hygiene during an IPO
19 process?
20         MR. BRUTLAG:  Object to the form.
21     A.  Correct.  Generally, yeah.
22 BY MR. BERKOWITZ:
23     Q.  After the IPO process, do you remember ever
24 speaking -- after the IPO process and before the hack, do
25 you ever recall speaking with anyone at SolarWinds about

**Page 170**

1 passwords?
2     A.  No.
3     Q.  Do you recall, after the IPO process, ever
4 speaking with anyone at SolarWinds about access controls?
5     A.  No.
6     Q.  Do you recall ever speaking with anyone at
7 SolarWinds, after the IPO process, about software
8 development lifecycle?
9     A.  No.
10     Q.  Do you recall, after the IPO process, ever
11 speaking with anyone at SolarWinds about network security?
12     A.  Not that I recall.
13         MR. BRUTLAG:  Object to the form.
14     A.  There could have been, you know, in passing,
15 some conversations about new developments.  You know, we
16 will ask about, you know, generally starting of the year,
17 are there any new IT developments or practices that are
18 going in place for the upcoming year, and so it would be a
19 generic comp question, and then you would get answers
20 like, "We're expanding the number of servers or we're
21 doing this or that," but that's where a question like that
22 would have come in, but it would have been very topical,
23 high level.
24 BY MR. BERKOWITZ:
25     Q.  And do you have any specific recollection

**Page 171**

1 about any such conversations with SolarWinds?
2     A.  Around?
3     Q.  Around network security?
4         MR. BRUTLAG:  Objection.
5     A.  Not specifically.
6 BY MR. BERKOWITZ:
7     Q.  Not with any particular day or with anybody in
8 particular?
9     A.  No.
10     Q.  And you were on analyst calls, some of which
11 you attended, some of which people from your team
12 attended; right?
13     A.  Correct.
14     Q.  And do you recall ever asking, in any of those
15 analyst calls, about topics that were covered in
16 SolarWinds Security Statement?
17     A.  For preceding the cyber incident?
18     Q.  Correct?
19     A.  No.
20     Q.  And did you ever ask for information about
21 deficiencies in any of these areas?
22         MR. BRUTLAG:  Objection; form.
23     A.  Preceding?
24 BY MR. BERKOWITZ:
25     Q.  Preceding the hack?

**Page 172**

1     A.  Of any deficiencies in the statement?
2     Q.  Correct.
3     A.  Not that I recall, no.
4     Q.  And you don't have any personal knowledge, do
5 you, about any of the topics that were in the emails and
6 presentations shown to you today; correct?
7         MR. BRUTLAG:  Form.
8     A.  No, they were all internal.
9 BY MR. BERKOWITZ:
10     Q.  Now, focusing a bit on the things that --
11 you said you've covered 40 different companies; is
12 that right, approximately?
13     A.  Approximately.
14     Q.  How much time -- as a percentage -- prior to
15 the hack, did you spend of your time covering SolarWinds,
16 as opposed to other companies?
17     A.  I cover big companies, and I cover small
18 companies.  SolarWinds is a relatively small company, so
19 I would allocate just based on time management; less time
20 for me, more time for my general team -- to spend time on
21 a smaller company.
22         Said differently, I personally spend a lot
23 more time on service, now, than I do SolarWinds, just
24 based on economies of scale.
25     Q.  Can you quantify -- as a percentage of

**Page 201**

1  the security statement?
2  BY MR. BERKOWITZ:
3      Q.  Nothing inaccurate or materially misleading.
4          MR. BRUTLAG:  Objection; form.
5      A.  Yeah, it's an interesting statement.
6  BY MR. BERKOWITZ:
7      Q.  And do you know -- so it says, "I have been
8  working with Eric and Nelson on the SWICUS
9  self-assessment."
10         First of all, do you know who Eric and Nelson
11 are?
12     A.  I don't.
13     Q.  Do you know what SWICUS is?
14     A.  I don't.
15     Q.  Do you know whether that's a particular
16 product?
17     A.  I don't know.  I don't know.
18     Q.  Would it make a difference in your assessment
19 of the importance of the information in this document to
20 know if this related to one product versus a larger suite
21 of products?
22         MR. BRUTLAG:  Objection to form.
23     A.  Yes.
24 BY MR. BERKOWITZ:
25     Q.  Do you know whether the SWICUS product -- what

**Page 202**

1  market share that had at SolarWinds?
2          MR. BRUTLAG:  Objection.
3      A.  I don't.
4  BY MR. BERKOWITZ:
5      Q.  Would that be of importance or relevance to
6  you in determining the relevance of this information?
7          MR. BRUTLAG:  Objection to form.
8      A.  Yes.
9  BY MR. BERKOWITZ:
10     Q.  A smaller product that might have had some
11 issues might not have been as significant as a larger
12 product; is that correct?
13         MR. BRUTLAG:  Objection to form.
14     A.  That's interesting.  That would be helpful.
15 BY MR. BERKOWITZ:
16     Q.  That's the sort of information that you would
17 want to know in following up --
18         MR. BRUTLAG:  Objection to form.
19 BY MR. BERKOWITZ:
20     Q.  -- on an isolated email.
21         Do you know how many pages -- or how many
22 documents the SEC received from the company in this case?
23     A.  I don't.
24     Q.  If I were to tell you it was over 100,000,
25 would that be surprising?

**Page 203**

1          MR. BRUTLAG:  Objection.
2      A.  I was going to guess a million, but --
3  BY MR. BERKOWITZ:
4      Q.  And you didn't look at all of those documents;
5  correct?
6      A.  Correct.
7      Q.  You don't know whether there were documents
8  that were inconsistent with this one; correct?
9          MR. BRUTLAG:  Objection to form.
10     A.  Correct.
11 BY MR. BERKOWITZ:
12     Q.  And that's one of the reasons, perhaps, that
13 companies don't disclose everything going on in their
14 company, because one particular document taken out of
15 context may be misconstrued; correct?
16         MR. BRUTLAG:  Objection; form.
17     A.  Correct.
18 BY MR. BERKOWITZ:
19     Q.  And it's why companies, as a general matter,
20 only disclose what they believe to be material
21 information --
22         MR. BRUTLAG:  Objection to form.
23 BY MR. BERKOWITZ:
24     Q.  -- to investors; correct?
25     A.  Correct.

**Page 204**

1      Q.  And, while you like to know more information,
2  you're not saying you're legally entitled to it; correct?
3          MR. BRUTLAG:  Objection; foundation and
4  form.
5      A.  Correct.
6  BY MR. BERKOWITZ:
7      Q.  Let's take a look at Hedwig Number 8.
8          MR. BRUTLAG:  Hedberg.
9          MR. BERKOWITZ:  Hedberg, I'm sorry.
10 We were talking about Harry Potter's character earlier.
11         THE WITNESS:  I have not seen
12 Harry Potter.
13         MR. BERKOWITZ:  There's an owl named
14 Hedwig, so -- sorry about that.
15         THE WITNESS:  I'm probably the only one
16 on the planet who has not seen Harry Potter.
17         MR. BERKOWITZ:  I'm sorry.  You must not
18 have young girls.
19         THE WITNESS:  We have a 16-year-old, but
20 she must have missed that.
21 BY MR. BERKOWITZ:
22     Q.  Hedberg 8.  This is a "Q1 2020 Quarterly Risk
23 Review."
24         Do you see that?
25     A.  Yes.

**Page 209**

1  framework is not a 'one-size-fits-all' approach with
2  specific mandates or minimum requirements?  Your
3  understanding.
4         MR. BRUTLAG:  Same objection.
5      A.  That's my understanding.
6  BY MR. BERKOWITZ:
7      Q.  And they generally measured -- companies
8  following it will generally measure themselves on a score
9  of zero to five --
10         MR. BRUTLAG:  Objection to form.
11  BY MR. BERKOWITZ:
12      Q.  -- in various categories?
13      A.  That's my understanding.
14      Q.  Did you ever ask the company what its NIST
15  scores were in various areas?
16         MR. BRUTLAG:  Objection.
17      A.  Probably not, yeah.
18  BY MR. BERKOWITZ:
19      Q.  Okay.  And, so, this document -- just to be
20  clear -- page 4, appears to be an effort to follow the
21  NIST framework; correct?
22         MR. BRUTLAG:  Objection to form.
23      A.  Correct.
24  BY MR. BERKOWITZ:
25      Q.  And I think that you were focused on a

**Page 210**

1  score -- I'm sorry, of a "Key Risk" area, under
2  "Protect."
3         Do you see that?
4      A.  Yes.
5      Q.  And the score -- I mean, this is dated --
6  document's dated 2020, and the score in 2019 was 3.2;
7  correct?
8      A.  Yes.
9      Q.  And according to the legend -- if it's
10  accurate -- it says, "Documented, detailed approach.
11  Regularly measures its compliance"; correct?
12      A.  Yes.
13      Q.  Do you know, one way or the other, whether
14  that score is consistent with industry frameworks or
15  benchmarks?
16         MR. BRUTLAG:  Objection; form and
17  foundation.
18      A.  That score, I don't.
19  BY MR. BERKOWITZ:
20      Q.  Don't know one way or the other?
21         MR. BRUTLAG:  Objection.
22      A.  I don't.
23  BY MR. BERKOWITZ:
24      Q.  And you were focused on significant
25  deficiencies and user access management under "Key Risks";

**Page 211**

1  correct?
2      A.  Yes.  Yes.
3      Q.  Companies regularly, that you follow, identify
4  what key risks are in their own programs; correct?
5         MR. BRUTLAG:  Objection to form.
6      A.  Correct.
7  BY MR. BERKOWITZ:
8      Q.  That's something you would expect a company to
9  do; right?
10      A.  Correct.
11         MR. BRUTLAG:  Objection to form.
12  BY MR. BERKOWITZ:
13      Q.  And attempt to remediate it; right?
14         MR. BRUTLAG:  Objection to form.
15      A.  Correct.
16  BY MR. BERKOWITZ:
17      Q.  And, in fact, companies that you cover in this
18  industry regularly are analyzing their own cybersecurity
19  policies for holes or gaps; right?
20         MR. BRUTLAG:  Same objection.
21      A.  Correct.
22  BY MR. BERKOWITZ:
23      Q.  And that's a good practice?
24         MR. BRUTLAG:  Objection.
25      A.  Correct.

**Page 212**

1  BY MR. BERKOWITZ:
2      Q.  Because things are constantly evolving and
3  changing with respect to cybersecurity; right?
4         MR. BRUTLAG:  Objection to form.
5      A.  Right.
6  BY MR. BERKOWITZ:
7      Q.  And, in fact, we can look at it -- and we will
8  in a couple minutes -- but not just SolarWinds, but other
9  companies said the risk and level of sophistication of
10  attacks was increasing during this time period; right?
11         MR. BRUTLAG:  Objection to form.
12      A.  Correct.
13  BY MR. BERKOWITZ:
14      Q.  And, so, under, "Key Improvements" listed in
15  this document, it says, "AD Authentication for critical
16  systems"; right?
17      A.  Yes.
18      Q.  And that's what they're suggesting as a way to
19  fix or address the key risk?
20         MR. BRUTLAG:  Objection to form.
21      A.  Correct.
22  BY MR. BERKOWITZ:
23      Q.  Do you know whether they did that?
24         MR. BRUTLAG:  Objection.
25      A.  I have no idea.

**Page 257**

```
 1         THE VIDEOGRAPHER:  Time is 3:10 p.m.  We
 2   are going off the record.  This ends the deposition from
 3   Matt Hedberg.  Thank you very much, everyone.
 4         (The video deposition of Matthew Hedberg
 5          concluded at approximately 3:10 p.m.)
 6              * * * * *
```

**Page 258**

```
 1              CERTIFICATE
 2       I, Barbara J. Carey, Registered Professional
 3   Reporter and Certified Shorthand Reporter, do hereby
 4   certify that prior to the commencement of the examination,
 5   Matthew Hedberg was duly sworn by me to testify to the
 6   truth, the whole truth and nothing but the truth.
 7       I DO FURTHER CERTIFY that the foregoing is a
 8   verbatim transcript of the testimony as taken
 9   stenographically by me at the time, place and on the date
10   hereinbefore set forth, to the best of my ability.
11       I DO FURTHER CERTIFY that I am neither a
12   relative nor employee nor attorney nor counsel of any of
13   the parties to this action, and that I am neither a
14   relative nor employee of such attorney or counsel, and
15   that I am not financially interested in the action.

19   _____
20   BARBARA J. CAREY
21   Registered Professional Reporter
22   Certified Shorthand Reporter
23   Notary Public
24   Dated:  August 6, 2024
```

**Page 259**

```
 1           CERTIFICATE OF WITNESS
 2
 3       I, MATTHEW HEDBERG, do hereby declare under
 4   penalty of perjury that I have read the entire
 5   foregoing transcript of my deposition testimony,
 6   or the same has been read to me, and certify that
 7   it is a true, correct and complete transcript of
 8   my testimony given on July 26, 2024, save and
 9   except for changes and/or corrections, if any, as
10   indicated by me on the attached Errata Sheet, with
11   the understanding that I offer these changes and/or
12   corrections as if still under oath.
13       _____ I have made corrections to my deposition.
14       _____ I have NOT made any changes to my deposition.
15
16   Signed: _____
         MATTHEW HEDBERG
17
18   Dated this _____ day of _____ of 20____.
19
20
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS _____ DAY OF _____, 20____.
23   _____
24   (Notary Public)  My Commission Expires: _____
```

**Page 260**

```
 1              ERRATA SHEET
 2   Deposition of: MATTHEW HEDBERG
     Date taken: JULY 26, 2024
 3   Case:  SEC v. SOLARWINDS CORP., et al.
 4   PAGE  LINE
     _____ _____ CHANGE: _____
 5         REASON: _____
 6   _____ _____ CHANGE: _____
           REASON: _____
 7
     _____ _____ CHANGE: _____
 8         REASON: _____
 9   _____ _____ CHANGE: _____
           REASON: _____
10
     _____ _____ CHANGE: _____
11         REASON: _____
12   _____ _____ CHANGE: _____
           REASON: _____
13
     _____ _____ CHANGE: _____
14         REASON: _____
15   _____ _____ CHANGE: _____
           REASON: _____
16
     _____ _____ CHANGE: _____
17         REASON: _____
18   _____ _____ CHANGE: _____
           REASON: _____
19
     _____ _____ CHANGE: _____
20         REASON: _____
21   _____ _____ CHANGE: _____
           REASON: _____
22
     _____ _____ CHANGE: _____
23         REASON: _____
24   Signed_____
25   Dated_____
```

```
 1                    ERRATA SHEET

 2     Deposition of: MATTHEW HEDBERG
       Date taken: JULY 26, 2024
 3     Case:  SEC v. SOLARWINDS CORP., et al.

 4     PAGE   LINE
         8      5    CHANGE: "Mike Hedberg" to "Matt Hedberg"
 5                   REASON: wrong name

 6     ____  ____    CHANGE: _____
                     REASON: _____
 7
       ____  ____    CHANGE: _____
 8                   REASON: _____

 9     ____  ____    CHANGE: _____
                     REASON: _____
10
       ____  ____    CHANGE: _____
11                   REASON: _____

12     ____  ____    CHANGE: _____
                     REASON: _____
13
       ____  ____    CHANGE: _____
14                   REASON: _____

15     ____  ____    CHANGE: _____
                     REASON: _____
16
       ____  ____    CHANGE: _____
17                   REASON: _____

18     ____  ____    CHANGE: _____
                     REASON: _____
19
       ____  ____    CHANGE: _____
20                   REASON: _____

21     ____  ____    CHANGE: _____
                     REASON: _____
22
       ____  ____    CHANGE: _____
23                   REASON: _____

24                   Signed by: Matt Hedberg
                     Signed ____F58BABB3D894497..._____

25                   Dated  September 7, 2024
                                                              260
```

**GRADILLAS COURT REPORTERS**
(424) 239-2800