# EXHIBIT 52

**Page 1**

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
             PLAINTIFF,           )
 6                                ) Case No.
         vs.                      ) 23-cv-9518-PAE
 7                                )
     SOLARWINDS CORP. AND TIMOTHY )
 8   G. BROWN,                    )
                                  )
 9           DEFENDANTS.          )
     _____)
10
11
12
13           VIDEOTAPED DEPOSITION OF
14                 RANI JOHNSON
15           REPORTED REMOTELY VIA ZOOM
16             Tuesday, August 27, 2024
17
18
19
20
21
22
23   Reported By:
     KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
24   California CSR 10068, Nevada CCR 995, Texas CSR
     12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
25   JOB No. 240827KWI
```

**Page 2**

```
 1        VIDEOTAPED DEPOSITION OF RANI JOHNSON
 2           BE IT REMEMBERED that on Tuesday,
 3   August 27, 2024, commencing at the hour of 9:06 a.m.
 4   thereof, before me, Kathleen A. Maltbie,
 5   RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified
 6   Stenographic Shorthand Reporter, in and for the
 7   State of California, Nevada and Texas, personally
 8   appeared RANI JOHNSON, a witness in the
 9   above-entitled court and cause, who, being by me
10   first remotely duly sworn, was thereupon examined as
11   a witness in said action.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            APPEARANCES OF COUNSEL
 2   FOR THE PLAINTIFF:
 3     SECURITIES AND EXCHANGE COMMISSION
       100 F Street, N.E.
 4     Washington, D.C.  20549
       BY:  KRISTEN M. WARDEN, ESQ.
 5       CHRISTOPHER BRUCKMANN, ESQ. (ZOOM)
         LORY STONE, ESQ. (ZOOM)
 6     Telephone:  (202) 256-7941
       Email:  WardenK@sec.gov
 7             BruckmannC@sec.gov
               StoneL@sec.gov
 8
     FOR THE DEFENDANTS:
 9
       LATHAM & WATKINS, LLP
10     330 North Wabash Avenue, Suite 2800
       Chicago, Illinois  60611
11     BY:  KIRSTEN C. LEE, ESQ. (Zoom)
       Telephone:  (312) 777-7281
12     Email:  Kirsten.lee@lw.com
13     LATHAM & WATKINS, LLP
       1271 Avenue of the Americas
14     New York, New York  10020
       BY:  SERRIN TURNER, ESQ.
15         JOSH KATZ, ESQ.
       Telephone:  (212) 906-1330
16     Email:  Serrin.turner@lw.com
               Josh.Katz@lw.com
17
     FOR DEFENDANT TIMOTHY E. BROWN:
18
       KING & SPALDING, LLP
19     1700 Pennsylvania Avenue, NW
       Suite 900
20     Washington, D.C.  20006
       BY:  ALEC KOCH, ESQ. (ZOOM)
21     Telephone:  (202) 626-8982
       Email:  Akoch@kslaw.com
22
23
24
25
```

**Page 4**

```
 1       APPEARANCES OF COUNSEL (Continued)
 2   FOR THE WITNESS:
 3     WILSON SONSINI GOODRICH ROSATI
       650 Page Mill Road
 4     Palo Alto, California  94304-1050
       BY:  CAZ HESHEMI, ESQ.
 5     Telephone:  (650) 320-4827
       Email:  Chashemi@wsgr.com
 6
       ALSO PRESENT:
 7
       (Via Zoom Videoconference)
 8     Frank Quirarte, Videographer
       Becky Melton, Deputy General Counsel and Vice
 9        President, SolarWinds
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  BY MS. WARDEN:
2      Q.  Does that mean that the access controls to
3  sensitive data in our databases systems and
4  environments are set on a need to know/least
5  privilege basis, was that policy in place in
6  January 2018?
7      A.  Policy for me is the set of guidelines
8  that govern the company's practice.  That policy
9  documentation and the practice of it was in place in
10  January of 2018.
11      Q.  And does that mean that the policy was
12  followed in January of 2018?
13          MR. TURNER:  Objection to form.
14          THE WITNESS:  Policy is a set of guiding
15  principles that outline what the practice should
16  look like.  The practice was in -- in place in 2018.
17  BY MS. WARDEN:
18      Q.  Okay.  And how -- how well was it followed
19  in January 2018?
20          MR. TURNER:  Objection to form.
21          THE WITNESS:  My responsibility as the --
22  as the CIO was for IT systems.  I can speak to, with
23  reference, the practice in IT of access controls in
24  place.  I can speak to the programs that were put in
25  place to review the practice on a regular cadence

77

1  BY MS. WARDEN:
2      Q.  And were you informed of any user access
3  reviews that said that users had privileges set
4  higher than they needed to be?
5      A.  The practice of doing user access reviews
6  is to ensure that access is not just appropriate at
7  the time it was deployed, but was it -- does that
8  access remain appropriate.  It is customary that
9  user access reviews will find areas to address.
10  That is why the practice is in place.
11      Q.  Were you aware of any problems with
12  elevated privileges in January 2018?
13          MR. TURNER:  Objection to form.
14          THE WITNESS:  I -- I don't recall being --
15  I don't recall.
16  BY MS. WARDEN:
17      Q.  Was the statement that I just read, was
18  that also true in October 2018?
19      A.  That access controls to sensitive data are
20  set on a need to know basis?  That was the practice
21  in October of 2018.
22      Q.  Was that the practice -- was it true --
23  well, my question was whether or not that statement
24  is true in October 2018?
25      A.  Practice --

79

1  and to seek to improve the overall practice.
2  BY MS. WARDEN:
3      Q.  Okay.  You're not aware of whether access
4  controls being set on a need to know\least privilege
5  necessary basis was followed in January 2018?
6          MR. TURNER:  Objection to form.  She's
7  already answered the question that this practice was
8  followed at the time.  She's answered it three
9  times.
10          THE WITNESS:  I'll answer again the same
11  way.  The practice was in place in 2018.
12  BY MS. WARDEN:
13      Q.  Were you -- were there any users that had
14  privileges set higher than they needed to be?
15          MR. TURNER:  Objection to form.
16  BY MS. WARDEN:
17      Q.  In January 2018.
18          MR. TURNER:  You're asking the entire user
19  base was there any specific user who had more
20  privileges than there needed to be?
21          THE WITNESS:  The practice of role based
22  access was in place.  I personally did not audit
23  every user's access.  User access reviews were
24  conducted on a regular basis to determine whether or
25  not access was appropriate.

78

1          MR. TURNER:  Asked and answered.  Go
2  ahead.
3          THE WITNESS:  A practice is not a promise
4  of perfection.  It is a statement of practice and
5  sets a standard for how a company is intending to
6  operate.
7  BY MS. WARDEN:
8      Q.  Okay.  Was that practice true in mid-2019?
9      A.  The practice in general throughout my
10  tenure based on -- to the best of my knowledge, was
11  in place throughout my tenure.
12      Q.  Okay.  Was that practice true in
13  October 2020?
14      A.  The practice, based on the best of my
15  knowledge, was true from when I came to participate
16  in organizing the assessment in 2017 until when I
17  left in 2020, October of 2020.
18      Q.  Directing your attention to the sentence
19  right -- let's see where it is.  The second sentence
20  under role based access of Exhibit 4 (as read):
21              Processes and procedures are
22          in place to address employees who
23          are voluntarily or involuntarily
24          terminated.
25          Do you see that?

80

1   **A.**  Yes.
2   **Q.**  Was that statement true in January 2018?
3   **A.**  That processes and procedures are in place
4  to address employees who are terminated?  That was
5  true in 2018.
6   **Q.**  Was that -- what's the basis for you
7  saying that?
8   **A.**  The processes and procedures were in place
9  to address employee termination?
10   **Q.**  Mm-hmm.
11   **A.**  My experience, me observing my teams
12  participate in terminations.
13   **Q.**  Was it true in October 2018?
14   MR. TURNER:  Want to just save some time
15  and ask her whether it was true during her entire
16  tenure at the company --
17   MS. WARDEN:  Sure.
18   MR. TURNER:  -- so we don't have to rattle
19  off 15 different dates.
20   THE WITNESS:  It was true during the
21  entire tenure of my company that processes and
22  procedures were in place to address employee
23  termination.
24  BY MS. WARDEN:
25   **Q.**  Okay.  Let's look at the statement also

81

1  under role based access -- it's under the subheading
2  Authentication and Authorization.
3   Do you see that subheading?
4   **A.**  Yes.
5   **Q.**  Okay.  Directing your attention to the
6  sentence SolarWinds employees -- the second
7  paragraph (as read):
8   SolarWinds employees are
9   granted a limited set of default
10   permissions to access company
11   resources, such as their email in
12   the corporate intranet.
13   Was that statement true in January 2018?
14   Sorry.
15   **A.**  Yes.
16   **Q.**  Strike that.
17   **A.**  Throughout my tenure.
18   **Q.**  Hold on.  I have to restate.
19   Was that statement true throughout your
20  entire time at SolarWinds?
21   **A.**  Throughout my entire time at SolarWinds,
22  employees are granted a set of default permissions
23  to access company resources, yes.
24   **Q.**  And what -- what's the basis for you
25  saying that?

82

1   **A.**  Default permissions are provided as a
2  birthright to employees.  Email and corporate
3  intranet access are part of those birthrights.
4   **Q.**  Did you consider revising the access
5  control section of the security statement in
6  January 2018?
7   **A.**  I did not participate in revising the
8  security statement.
9   **Q.**  So, Ms. Johnson, the question was, did you
10  consider revising the access control section of the
11  security statement in January 2018?
12   **A.**  I, Rani Johnson, was not responsible for
13  the drafting of the security statement, so I would
14  not have been responsible for revising it.
15   **Q.**  And then did you have any discussion with
16  Tim Brown regarding revising the access control
17  section of the security statement?
18   **A.**  I do not recall a conversation with
19  Tim Brown about revising the security statement.
20   **Q.**  All right.  So let's -- I'm going to
21  direct your attention to further down in that
22  section titled Access Controls, and then
23  Authentication and Authorization, where we were.
24  There's a sentence (as read):
25   Our password policy covers all

83

1   applicable information systems,
2   applications and databases.  Our
3   password best practices enforces
4   the use of complex passwords that
5   include both alpha and numeric
6   characters, which are deployed to
7   protect against unauthorized use of
8   passwords.  Passwords are
9   individually salted and hashed.
10   Do you see that?
11   (Reporter clarification.)
12   MS. WARDEN:  I will.  I'm sorry.
13  BY MS. WARDEN:
14   **Q.**  Ms. Johnson, was this statement, "Our
15  password policy covers all applicable information
16  systems, applications and databases," was it true in
17  your entire time you were at SolarWinds?
18   MR. TURNER:  Objection to form.  It
19  doesn't even have truth value.  It's just stating
20  what the policy covers.
21   Answer if you want, or answer as best as
22  you can.
23   THE WITNESS:  The practice or stated
24  policy and guideline was in place and was the
25  practice throughout my tenure at SolarWinds.  The

84

1 practice and guideline is not a promise of
2 perfection.  It is the standard that's set within
3 the company and processes are in place to ensure or
4 to -- to promote compliance with the practice.
5 BY MS. WARDEN:
6    Q.   How well was this practice and policy
7 followed?
8        MR. TURNER:  Objection to form.
9        THE WITNESS:  In 2017, an internal audit
10 through a third party came in to assess the security
11 practice.  Following that, throughout my tenure,
12 annually there was an internal assessment to review
13 the stated -- and by the -- not using the security
14 statement, the security and access control
15 guidelines, an assessment against our cost of
16 security across the IT systems, and subsequently,
17 also major systems, including products.  That --
18 that audit process would have defined adherence with
19 the practice.
20 BY MS. WARDEN:
21    Q.   And were you apprised of that audit
22 process?
23    A.   The audit -- I'm going to -- let me -- let
24 me restate.
25        The practice was to do an assessment

85

1 following 2017 would have been the audit.  I
2 differentiate because an audit usually is a third
3 party.  An assessment internally is, frankly, a
4 review of the practice versus a third party auditing
5 it.
6        The -- there was an annual assessment of
7 core components of our IT infrastructure and product
8 reviews annually through me -- my tenure.
9    Q.   And did the annual assessment that you
10 reviewed, correct?
11    A.   I would review the IT component or that
12 assessment.
13    Q.   Okay.  Did the assessment inform you as to
14 how well this policy, the password policy covers all
15 applicable information, systems, application and
16 databases, how well that policy was followed?
17        MR. TURNER:  Objection to form.
18        THE WITNESS:  The assessment would have
19 revealed any deviation against the assessed criteria
20 and would have resulted in a risk being noted in our
21 risk register, which would require a treatment
22 ticket or an action on anyone who's the technical
23 owner of a service that did not meet the standard as
24 outlined.
25 //

86

1 BY MS. WARDEN:
2    Q.   Do the assessments have any deviation from
3 the criteria?
4        MR. TURNER:  Objection to form.
5        THE WITNESS:  I do not recall, given the
6 hundreds of assets that were being managed by
7 SolarWinds, if or which assets had any deviation
8 from practice.  And, again, the scope of my
9 responsibility was IT.  Those assessments were done
10 for products, but that would not have been in the
11 scope of my review.
12 BY MS. WARDEN:
13    Q.   Ms. Johnson, you mentioned a risk
14 register.
15        What's a risk register?
16    A.   A risk register would outline areas of
17 deviation from practice or areas where risk was
18 accepted because there were mitigating or
19 compensating controls that still allowed the service
20 to meet the security objective.
21    Q.   Did the risk register identify any
22 instances in which the password policies were not
23 being followed?
24        MR. TURNER:  Objection.  Form.
25 Foundation.

87

1        THE WITNESS:  I -- though members of my
2 team may have operated the technology, I did not
3 actually have access to the risk log in the risk
4 register that weren't in the scope of my
5 responsibility.
6 BY MS. WARDEN:
7    Q.   So what did you actually review with
8 respect to the risk register?
9    A.   Any risks that were inside the scope of IT
10 systems managed within my team.
11    Q.   Okay.  So among the risk register
12 information that you reviewed, did any of it
13 identify any policies with SolarWinds' password
14 policies?
15        MR. TURNER:  Objection to form.
16        THE WITNESS:  The -- would you like to
17 clarify your question?
18 BY MS. WARDEN:
19    Q.   You said that you reviewed the risk
20 register as it related to IT --
21    A.   Systems.
22    Q.   -- systems, okay?
23        Is that correct?
24    A.   That's correct.
25    Q.   Okay.  So did the risk register, as it

88

1 have meant making sure that the company's expenses
2 were in order such that the -- and that our SOX
3 control readiness would be in place in time for IPO.
4    **Q.** So is it fair to say IPO valuation related
5 to a goal to reduce certain costs?
6    **A.** IPO valuation, it's an imprecise
7 statement. It's preparing the company's IPO and
8 making sure that the company's valuation would be
9 appropriate because there were not huge expenses
10 that needed to be undertaken to -- that would
11 devalue the company in some way.
12       Again, at the time, I had never been the
13 CIO of a public company. I do not -- there was no
14 precision in those words. It's the ambition of a
15 young CIO talking to her boss in an informal manner.
16    **Q.** Let's look at the next page, so
17 SW-SEC00259618.
18       Do you see at the top where it says (as
19 read):
20          Identified the following
21       shortcomings that may affect IPO
22       valuation/readiness. Work is
23       underway to bolster by 2019?
24       And then it goes down. The first bullet
25 is "Identity and access management."

101

1       What does that mean?
2       MR. TURNER: Objection to form.
3       What do those four words mean, identity
4 and access management?
5 BY MS. WARDEN:
6    **Q.** What were the shortcomings that you
7 identified relating to identity and access
8 management?
9       MR. TURNER: Objection to the form.
10       THE WITNESS: These are broad and not
11 particularly meaningful statements in me creating
12 goals for myself for the future that aren't even
13 being asked of me by my leadership. There was
14 opportunity to -- the first bullet is referring to
15 the Azure AD proposal that my team wanted to
16 basically take AD from being an on-premise asset to
17 being a cloud asset, and to use Azure AD as the
18 authoritative source of identity across SolarWinds.
19 That is the name of the project that they wanted
20 to -- to launch.
21 BY MS. WARDEN:
22    **Q.** What was the shortcoming that that would
23 fix?
24       MR. TURNER: Objection to form.
25       THE WITNESS: The identity and access

102

1 management project would have centralized and
2 standardized a single authoritative source of
3 identity for the entire company versus having
4 separate identity stores that were on premise. The
5 Azure AD provides -- at the time, that was very new
6 technology, but Azure AD provided the ability to
7 have a single source of authentication across the
8 company.
9 BY MS. WARDEN:
10    **Q.** So did Azure ID [sic] try to address an
11 issue relating to access controls?
12       MR. TURNER: Objection to form. I believe
13 it's Azure AD.
14       THE WITNESS: Azure active directory
15 basically took the -- it was a replacement for an
16 older technology, active directory on prem that was
17 highly federated. The point of the identity and
18 access management project, which would put Azure AD
19 in the cloud, was a way to centralize identity
20 across all of the three different SolarWinds
21 business units.
22 BY MS. WARDEN:
23    **Q.** Why did you want to centralize identity
24 across all three SolarWinds business units?
25    **A.** Centralization allows for a single pane of

103

1 glass in management and allows for consistency in
2 practice so that there's not three ways of doing
3 authentication across the company. A centralized
4 method is -- gives you a single and common way to
5 handle identity.
6    **Q.** So, Ms. Johnson, it's -- it's still
7 unclear to me.
8       I had asked what was the shortcoming?
9    **A.** The shortcoming is that identity
10 authorization was not centralized in a single
11 authoritative source. It was federated across the
12 business departments.
13    **Q.** Did that create any problems?
14       MR. TURNER: Objection to form. And asked
15 and answered.
16       THE WITNESS: It created high operational
17 overhead.
18 BY MS. WARDEN:
19    **Q.** And what -- what is that?
20    **A.** It was more expensive to operate and to
21 standardize. All of -- at least the top four of
22 these things talked to consolidation. It really is
23 getting a single and standard practice to reduce the
24 cost of operating. High operating cost can affect
25 the valuation of a company.

104

Rani Johnson
8/27/2024

1    Q.  Did this -- did this identity and access
2  management include too many people having admin
3  privileges?
4        MR. TURNER:  Objection to form.
5        THE WITNESS:  No.  The entire project was
6  around centralizing and moving from on prem old AD
7  environments that were federated and operated by the
8  three departments into a single source of
9  authoritative -- single authoritative source of
10  identity and access management for the entire
11  company through Azure AD, which was in the cloud.
12  It was a modernization of the active directory
13  environment.
14  BY MS. WARDEN:
15    Q.  And one of the reasons that was a
16  shortcoming was because it would increase costs to
17  the company?
18    A.  There were shortcomings, meaning
19  opportunities for us to positively affect the IPO
20  valuation and IPO readiness by doing a set of
21  initiatives, one of them being implementing Azure AD
22  in the cloud.
23    Q.  Any reason to believe that -- that your
24  statement here (as read):
25        Identity and access management

105

1    Q.  Okay.  What were the specific security
2  standards shortcomings that you identified?
3        MR. TURNER:  Objection to form.
4        THE WITNESS:  I do not recall what I
5  specifically meant by security standards here.  I --
6  that one is vague.  The identity and access
7  management was a project, so I recognize that
8  project.
9  BY MS. WARDEN:
10    Q.  Do you recall whether the reference to
11  security standards related to cyber security?
12    A.  If forced to draw upon recollection, most
13  of the way my brain works is turning things into
14  projects.  The closest thing to security standards
15  would have been a security standards and audit
16  project.  But all of the rest of these are projects,
17  so I have to believe that that was a security
18  standards and audit project.
19    Q.  And do you recall what the security
20  standards and audit project was that was on your
21  mind that January 2018?
22    A.  Almost all of these are requesting to do
23  some work or proposing to do work.  I'm guessing
24  here, which I don't think --
25        MR. TURNER:  Don't guess.  Do you recall

107

1        is one of the identified
2        shortcoming that may affect IPO
3        valuation.
4        Any reason to believe that statement was
5  not accurate?
6        MR. TURNER:  Objection to form.
7        THE WITNESS:  I wrote it to have a
8  conversation with my boss about some cool
9  initiatives that we wanted to try.
10  BY MS. WARDEN:
11    Q.  So was the statement true?
12        MR. TURNER:  Objection to form.
13        THE WITNESS:  A shortcoming, in my words
14  here, were opportunities to optimize.  The
15  opportunity to optimize asset management was also
16  important to me.  It was important to me to
17  consolidate billing systems as well.  Those things
18  help reduce the operating cost and make running IT
19  more efficient.
20  BY MS. WARDEN:
21    Q.  So let's look at the last bullet.
22        What were the -- you identify security
23  standards.
24        Do you see that?
25    A.  Yes.

106

1  or not?
2        THE WITNESS:  I don't recall.
3  BY MS. WARDEN:
4    Q.  Okay.  Any reason to believe the reference
5  to security standards as an identified shortcoming
6  was not accurate?
7        MR. TURNER:  Objection to form.
8        THE WITNESS:  These appear to be projects.
9        MR. TURNER:  A new document?  Do you want
10  to take a break?
11        MS. WARDEN:  No.  Can you give me five
12  more minutes?
13        MR. TURNER:  Sure.
14  BY MS. WARDEN:
15    Q.  When you refer to again, "may affect IPO
16  valuation," do you see that, again, at the top of
17  this document Bates -9618, Ms. Johnson?
18    A.  Are we on the same page still?
19    Q.  Yeah.
20    A.  The same statement before?
21    Q.  Yeah.
22    A.  Okay.
23    Q.  Is it fair to say that that may affect
24  SolarWinds' stock price?
25        MR. TURNER:  Objection to form.

108

1      (Whereupon, Deposition Exhibit 7
2      was marked for identification.)
3      MS. WARDEN:  For the record, this is Bates
4  ending in -313350 through -62.
5      MR. TURNER:  Would you mind if we just
6  pause for 30 seconds.  I want to get my reading
7  glasses.
8      MS. WARDEN:  Sure.
9  BY MS. WARDEN:
10     Q.  So Ms. Johnson, this is an October 29,
11  2018 email from Tim Brown to you with the subject
12  line "SolarWinds state of security operations," and
13  then after the first page, starting in Bates ending
14  in -51, there's an attached slide.
15     Do you recognize this document?
16     A.  I recognize it now, yes.
17     Q.  Okay.  And Mr. Brown wrote on October 29,
18  2018 (as read):
19         This PowerPoint contains the
20         current state of security slides
21         updated for October.  A review of
22         what we asked for last August in a
23         red yellow green status showing how
24         we have done on our initiatives.  A
25         2019 plan and ask for security.  We

129

1  can review in tomorrow, but it's a
2  reasonable place to start.
3      Do you see that?
4      A.  I do.
5      Q.  All right.  So in the -- looking at just
6  the first sentence, this PowerPoint contains the
7  current state of security slides updated for
8  October, do you recall what you asked Tim Brown to
9  do?
10     MR. TURNER:  Object to form.
11     THE WITNESS:  I don't recall what I asked
12  him to do.
13  BY MS. WARDEN:
14     Q.  Was Mr. Brown the lead on this review of
15  SolarWinds security?
16     MR. TURNER:  Objection to form.
17     THE WITNESS:  My responsibility for -- in
18  working with Mr. Brown was to -- his people leader,
19  to review slides with him to make sure they were
20  ready for the appropriate audience, the final
21  audience.  This is -- a couple things stand out to
22  me.  This is the current state of slides, not
23  current status.  I often would help him with making
24  sure that his status was representative if it was
25  going to a senior audience.

130

1  BY MS. WARDEN:
2      Q.  Okay.  So you said one of your jobs was to
3  review slides prepared by Mr. Brown, right?
4      A.  As a people leader to Mr. Brown, I wanted
5  to make sure that his work -- he had the benefit of
6  my review on things that were appropriate for me to
7  review.
8      Q.  But -- but what did you tell Mr. Brown to
9  include in the slides?
10     MR. TURNER:  Objection to form.
11     THE WITNESS:  Tim, in preparation for
12  meetings with other leaders, may ask me to review
13  things with him.
14  BY MS. WARDEN:
15     Q.  Okay.  What we're looking at starting on
16  Bates -51 was one of the slides that Mr. Brown
17  prepared, correct?
18     A.  I assume Mr. Brown and Eric prepared this
19  slide deck.  It is not final.
20     Q.  When you say "Eric," you mean --
21     A.  Quitugua.
22     Q.  Eric Quitugua?
23     A.  Yes.
24     Q.  Why do you say you assume he contributed
25  to Exhibit 7?

131

1      A.  Because these appear to be security
2  incidents, and Eric ran the information system that
3  maintained security incident reporting.
4      Q.  So just, again, looking at the cover email
5  page ending in Bates -50, the second sentence (as
6  read):
7          A review of what we asked for
8          last August in a red yellow green
9          status showing how we have done on
10         our initiatives.
11         Ms. Johnson, what did you understand the
12  references to what was asked for last August?
13     A.  Did I -- I do not recall what was asked
14  for last August.
15     Q.  Okay.  Do you recall what you understand
16  the red status to mean?
17     A.  There are a few things that are
18  concerning.  We have a standard way of reporting.
19  This is not it.  And if I read in the backup slides,
20  what was asked for last August was the GDPR
21  investment request, which start on page ending
22  in -59.  And then on -60, this is, as Tim uses the
23  words, a starting point, but not a final document
24  for which I can form any conclusion because it's not
25  final.

132

1    Q.   Okay.  Do you -- do you see on, for
2  example, Bates ending in -61, do you see that
3  there's different colors?
4    A.   I see that there are different colors.
5    Q.   Okay.  And you see on Bates ending in -50
6  Mr. Brown is referring to a red yellow green status?
7         (Simultaneous speakers - inaudible.)
8  BY MS. WARDEN:
9    Q.   I guess my question is, do you know what
10 red status means?
11   A.   I do not know what Tim was intending when
12 he made red, yellow and green.  We have a formal way
13 of presenting status, and this is not it.
14   Q.   And is -- does a formal way of presenting
15 status involve colors red, yellow, green?
16   A.   Red, yellow and green are generally listed
17 under the KPIs for status, not in terms to a task or
18 tactic.  This is not the way we would formally
19 represent completion or risk.  It is likely why Tim
20 wanted to meet.
21   Q.   Okay.  And at the end of that sentence,
22 Mr. Brown says (as read):
23         Red yellow green status
24         showing how we have done on our
25         initiatives.

133

1  And he's writing this email to you.
2         So what do you understand initiatives to
3  refer to?
4    A.   I don't know what Tim was intending in
5  these words.  The DOIT organization presented
6  monthly status of all initiatives.  This is not the
7  format for the presentation of status of
8  initiatives.  I -- this is not an artifact that I
9  can respond to because it is not the way that we
10 capture status.  And so I would have worked with him
11 to finalize this in a consistent manner with our
12 artifacts.
13   Q.   You reference a monthly initiative.
14        What were the monthly initiatives?
15   MR. TURNER:  Objection to form.
16   THE WITNESS:  There were generally 50 to
17 90 initiatives that were being tracked in a monthly
18 DOIT portfolio review report that was produced
19 monthly for -- during my tenure.
20 BY MS. WARDEN:
21   Q.   And did you set the -- the initiatives?
22   MR. TURNER:  Objection to form.
23   THE WITNESS:  There was an intake process
24 to have the business departments request
25 initiatives.  Some were requested by the business

134

1  sponsors and others were -- others I sponsored or
2  Joe Kim sponsored.  The leadership team throughout
3  SolarWinds were the sponsor owners, and that list of
4  sponsored initiatives was published and status
5  reported on every month.  This is not the status
6  report of our work.
7  BY MS. WARDEN:
8    Q.   Okay.  Mr. Brown, at the end, says (as
9  read):
10        We can review it tomorrow, but
11        it's a reasonable place to start.
12        Do you recall a meeting with Mr. Brown
13 about this October 2018 PowerPoint?
14   A.   I don't recall meeting Mr. Brown on
15 October 29th, 2018.
16   Q.   Well, I'm not saying on that date, but do
17 you recall a meeting with Mr. Brown about Exhibit 7?
18   A.   I met with Mr. Brown at least weekly one
19 to one.
20   Q.   Do you recall discussing the PowerPoint
21 starting in Bates ending in -51?
22        Do you recall discussing that with
23 Mr. Brown?
24   A.   I -- I don't recall specifically
25 discussing this document with Mr. Brown.

135

1    Q.   Okay.  Let's look at -- do you rec- -- do
2  you recognize this presentation starting on
3  Bates -51, ending in -62?
4    A.   I don't recognize this presentation
5  because I would have rejected it.  It's not how we
6  present our work.
7    Q.   Well, I'll just ask if you're familiar
8  with some of these concepts, since he sent it to
9  you.  If you look at Bates ending in -61.
10        Do you see the title of the slide is "A
11 proactive security model updated October 2018 with
12 status"?
13   A.   Yes.
14   Q.   Are you familiar with this proactive
15 security model?
16   A.   I am familiar with the -- Tim's proactive
17 security model concept.
18   Q.   What is that?
19   A.   These refer to Tim's words, this is his
20 language around how we invest in the, I'll call it,
21 proactive component of security.
22   Q.   Okay.  Proactive security model is
23 Tim Brown's initiative; is that fair to say?
24   A.   Those were -- that's how Tim referred to
25 this particular area of investment.

136

1    Q.  Okay.  So on the left column, it says
2  "Risk of noninvestment."
3        What do you mean by "investment?"
4        Company's investment?
5    A.  Yes.
6    Q.  Okay.  So under the -- the slide "Risk of
7  noninvestment," do you see that?
8    A.  I do.
9    Q.  What does that mean?
10   A.  Tim's words should be referred to here.  I
11 can't presume to know what he intended when he typed
12 this, nor the color coding.
13   Q.  Okay.  You were familiar with the
14 proactive security model, though, right?
15       I mean, are you familiar with -- with risk
16 of noninvestment?
17       MR. TURNER:  Objection to form.
18       THE WITNESS:  The challenge with
19 responding to this document is he took something
20 that was a half year old, and for the purposes of
21 conversation, made color coded.  Those color codes
22 mean nothing to me today, and what's more, if he was
23 presenting it to leaders, we would have presented it
24 in the format that we present all of our major
25 initiatives, because these items became major

137

1  initiatives.  This was a conversational document.
2  It can't be relied upon to convey any status.  It's
3  color coding for -- for a conversation.
4  BY MS. WARDEN:
5    Q.  Was this document provided to Joe Kim?
6        MR. TURNER:  Objection.  Foundation.
7        THE WITNESS:  I do not recall.
8  BY MS. WARDEN:
9    Q.  Or any other -- was it provided to
10 Kevin Thompson?
11       MR. TURNER:  Objection.  Foundation.
12       THE WITNESS:  We have specific and
13 consistent communication vehicles for our
14 leadership.  This is not the format of that
15 communication.  The leaders received monthly updates
16 on the status of all the major initiatives.  This is
17 not the format of a monthly update.
18 BY MS. WARDEN:
19   Q.  Okay.  Looking at, again, this document
20 ending in -61, under "Risk of Noninvestment," the
21 first bullet is (as read):
22       Current state of security
23       leaves us in a very vulnerable
24       state for our critical assets.
25       Do you see that language?

138

1    A.  I see that language.
2    Q.  Are you aware of any reason that this
3  statement is not accurate?
4        MR. TURNER:  Objection to form.
5        THE WITNESS:  I don't know what Tim was
6  intending by these statements.  However, the purpose
7  of the 2017 document that was updated in 2018 with
8  Tim Brown's color coding was to make a business
9  case.  Business case justifications are generally
10 jargon or summarized nonprecise language to make a
11 point to make investment.
12 BY MS. WARDEN:
13   Q.  The purpose is to make a business
14 investment?
15   A.  The format on the document's ending on
16 page -59 and then updated and color coding on -60
17 are -- it's a format for which we were making the
18 GDPR budget requests.  It is a business case
19 document.  It's not intended to make a statement on
20 the status of security; it's to make a request to
21 invest.
22   Q.  Is the document ending in Bates -61 a
23 business case document?
24       MR. TURNER:  Objection to form.
25       THE WITNESS:  The document on page -61 is

139

1  a copy of the document on page -59 with some red,
2  yellow, green color coding updates from Tim to have
3  a conversation with me.
4  BY MS. WARDEN:
5    Q.  So you would describe this as a business
6  case document?
7        MR. TURNER:  Objection to form.
8        THE WITNESS:  The original document is a
9  business case document.  Tim is presenting it to me
10 to have a conversation.
11 BY MS. WARDEN:
12   Q.  Okay.  What was your reaction upon reading
13 this when Tim was presenting it to you, that the
14 current state of security leaves us in a very
15 vulnerable state for our critical assets?
16   A.  It's a business case document using
17 nonprecise terms to make the point to invest.
18   Q.  So, again, what -- what was your reaction,
19 though?
20       MR. TURNER:  To the extent you recall.
21       THE WITNESS:  To the extent that I recall,
22 is all of the 2017 requests of each of the business
23 departments and every function were rolled up and
24 the request for investment was made to the
25 senior-most leaders at SolarWinds and it was

140

1 approved.
2        So the reaction was let us -- we have made
3 a strong business case, let us request the money.
4 The money was granted, and the objectives then were
5 meant to be actioned.
6 BY MS. WARDEN:
7    **Q.**  Do you know whether anyone at SolarWinds
8 above you was aware of this statement, the current
9 state of security leaves us in a very vulnerable
10 state for our critical assets?
11       MR. TURNER:  Objection to form.
12       THE WITNESS:  That statement is imprecise
13 and not accurately reflecting -- it is a business
14 case justification, like, of a problem statement.
15 BY MS. WARDEN:
16    **Q.**  Do you recall asking Mr. Brown to revise
17 this statement in Bates ending in -61?
18    **A.**  The intention of this document, and there
19 were -- this -- this business case format was used
20 for other requests for investments, was not a
21 precise statement.  It was a justification for
22 investments.  No one was asking to qualify what
23 those words meant.  The request was made to invest,
24 the investment request was granted.
25    **Q.**  So you didn't ask Mr. Brown to delete this

1 statement from the slide deck?
2    **A.**  The statements he was making in a slide
3 deck to his boss and to make a business
4 justification weren't a statement of status or
5 qualified in any way.  It was merely meant to make a
6 business justification.  So I did not ask Tim Brown
7 to delete words that he was saying to me.
8    **Q.**  But you don't believe that statement is
9 accurate?
10    **A.**  It is not accurate.
11    **Q.**  And did you have a conversation with
12 Mr. Brown about how you thought that that statement
13 was not accurate?
14    **A.**  I didn't have a conversation with
15 Mr. Brown about how I thought this statement was not
16 accurate.
17    **Q.**  And do you know what he meant by the
18 yellow -- this is a yellow --
19       MR. BRUCKMANN:  Objection.  Asked and
20 answered.
21       THE WITNESS:  I do not know what Tim meant
22 by a red yellow green color coding system.  It was
23 not consistent with how we represented status.
24 BY MS. WARDEN:
25    **Q.**  And did you discuss with anyone else

1 this -- this sentence in Bates ending in -61, did
2 you discuss it with anyone else at SolarWinds?
3    **A.**  Tim Brown was having a meeting with his
4 boss in which he brought materials to have a
5 conversation around an investment request that we
6 advanced.  Tim -- there was no need to have another
7 conversation around Tim's document.
8    **Q.**  Are you saying that you were -- you got
9 the investment after the date of this document,
10 which was October 28th, 2018?
11    **A.**  I'm saying in 2017, as part of the GDPR
12 Compliance Point, GDPR review, a set of actions were
13 proposed to all of the different business
14 departments and functions.  The teams then sized and
15 estimated what do they need to take those actions
16 on.  Part of that was to outline what Tim wanted in
17 2017, which appears on the document ending in
18 page -59.  The whole of those requests for funding,
19 support or investment were made to leadership, and
20 the entire set of requests were funded by leadership
21 to prepare for GDPR.
22    **Q.**  Okay.  After you saw this PowerPoint
23 saying, "The current state of security leaves us in
24 a very vulnerable state for critical assets," do you
25 recall whether there were any next steps taken in

1 light of that statement?
2    **A.**  All of these initiatives were rolled up
3 into projects.  Those projects were reported on
4 monthly in the DOIT monthly portfolio.  This is why
5 I do not accept this is a status report because
6 there was an actual formal and finalized status
7 report of the work being done to create a proactive
8 security model.  That was reported on monthly
9 throughout my tenure.  This is not that artifact.
10    **Q.**  After you received this -- this
11 PowerPoint, did you consider whether the statements
12 in the security statement were still true?
13    **A.**  No.  What -- the words here are not
14 precise.  I knew them to be not precise at that
15 time.  It did not cause me to question whether or
16 not the security statement was true.
17    **Q.**  Okay.  You didn't consider revising the
18 security statement at all?
19    **A.**  I had no responsibility for the creation
20 or the revisions to the security statement, and no,
21 when I read this intentionally imprecise business
22 justification, it did not cause me to wish to revise
23 a security statement for which I didn't have
24 responsibility.
25    **Q.**  And who had responsibility for revisions

1 that became true in CCPA, the California Consumer
2 Protection Act. In preparation for a new
3 requirement, the business operators needed to know
4 what that meant for how they operated technology and
5 how they managed consumer data privacy. The entire
6 company was trained on how does that impact their
7 work.
8      That data privacy and security component,
9 because part of that data privacy was securing the
10 data, that was a retraining for the entire
11 organization. It was not a specific response to any
12 shortcoming. It was there is a new regulation and
13 the company needs to be prepared for that.
14 SolarWinds is not the only company that did that.
15 Every software company that is doing business out --
16 in the European Union has that responsibility.
17 BY MS. WARDEN:
18      Q.  So when Tim Brown wrote "Without training,
19 our employees will continue to be one of our biggest
20 risks," did you understand that training to be
21 limited to the GDPR training?
22      MR. TURNER:  Objection.  Form.
23 Foundation.
24      THE WITNESS:  Those words were written in
25 2017.  Those -- that collection of words is commonly

149

1 used to emphasize the importance of security
2 training.  It was not an uncommon collection of
3 words to be used.  That the business justification
4 that he used that document -- used those words on
5 was funded.
6 BY MS. WARDEN:
7      Q.  Did you ever consider whether the
8 statements in the security statement were still true
9 as -- as of October 2018?
10      A.  The statements in the security statement
11 were true when it was published.  It was true in
12 October 2018.  Tim Brown's business justification
13 did not nullify those statements.
14      Q.  Let me show you what I'm going to mark
15 Johnson 8.  It's SolarWinds SEC-305126 through
16 -5155.
17      (Whereupon, Deposition Exhibit 8
18      was marked for identification.)
19 BY MS. WARDEN:
20      Q.  It's a big document, so take your time
21 reviewing it.
22      A.  Where would you like me to focus?
23      Q.  Sure.
24      So do you recognize the document?
25      A.  I do.

150

1      Q.  What is it?
2      A.  This is a summary of multiple other
3 documents to review in my monthly one-on-one with
4 CEO Kevin Thompson.
5      Q.  Okay.  So let's go to document ending in
6 Bates -5138, please.
7      If you can look at -5138 to the end.
8      A.  To the end of the whole package?
9      Q.  Mm-hmm.
10      A.  Okay.
11      Q.  All right.  If you look at the first page
12 of this -- sorry.
13      Look at Bates ending in -5138.  Do you see
14 it has the title "Security and Compliance Program
15 Quarterly Overview," dated August 16, 2019?
16      Do you see that?
17      A.  I do.
18      Q.  Okay.  And this is when you've been at
19 SolarWinds for about two and a half years at this
20 point, right, in August 2019?
21      A.  Yes.
22      Q.  Okay.  Was this PowerPoint presentation
23 presented to you?
24      A.  No.
25      Q.  What do you recall about it?

151

1      A.  I organized its curation.  It wasn't
2 presented to me.
3      Q.  You created --
4      A.  I organized its curation.
5      Q.  What do you mean by "organized its
6 curation"?
7      A.  Different content comes from different
8 leaders.  This security and compliance review
9 includes areas of compliance, not just security.
10 And so we did not have a responsibility for
11 owning -- for -- under Tim and under Kellie, there
12 was program management that fell outside of the
13 scope of the IT responsibility, so we curated
14 content from different departments to aggregate this
15 quarterly meeting.
16      Q.  So who was the author of --
17      A.  There is no sole author of this document.
18      Q.  Okay.  Who contributed to this document?
19      A.  It depended on the agenda.  This
20 particular agenda had security compliance in SIPS in
21 it, also had -- when I look at compliance elements
22 in here, like the payment services directive and the
23 Sarbanes-Oxley, that would have also included
24 finance.  When I see the fedRAMP-related work in the
25 common criteria, this means that we are involving

152

BY MS. WARDEN:
1  BY MS. WARDEN:
2      **Q.**  So this PowerPoint was presented to your
3  boss, right, Joe Kim?
4      **A.**  Yes.
5      **Q.**  So did -- did you review it for accuracy
6  before it was presented to Joe Kim?
7      **A.**  I would have reviewed it, not specifically
8  for accuracy, but reviewed it for its content, for
9  its relevance, for its completeness.
10     **Q.**  Wasn't part of your job responsibilities
11 to make sure that the information in Exhibit 8 was
12 accurate?
13     **A.**  My responsibilities were to make sure, to
14 the best of my ability, that the information I was
15 presenting to my boss was comprehensive, complete
16 and generally accurate, but not to verify the
17 specific accuracy of every line item.
18     **Q.**  Okay.  Did it surprise you that SSDL got a
19 NIST maturity level of 2?
20     **A.**  I don't recall what my reaction or being
21 surprised or not.
22     **Q.**  Any discussions with anyone else at
23 SolarWinds about slide ending in -47 and SSDL
24 getting a NIST maturity level of 2?
25     **A.**  No discussions.  However, our -- the

173

1  intention of the security -- security and compliance
2  reviews was to take anything that could benefit from
3  concentrated improvement and create a security and
4  compliance improvement plan for that line item.
5      **Q.**  So could the score of 2 for SSDL, could it
6  have benefited from improvement?
7          MR. TURNER:  Objection to form and
8  foundation.
9  BY MS. WARDEN:
10     **A.**  The company would decide what the focus
11 areas would be based on the need for improvement.
12 It was not my scope of responsibility to determine
13 whether or not that item needed improvement.
14 However, we can look at the security improvement
15 plans to see what next steps happened or came about
16 from that.
17     **Q.**  But do -- do you recall next steps from
18 the SSDL being -- receiving a 2 rating?
19     **A.**  No.  But the -- we can look ahead in the
20 artifact and see if there was any.
21         There's nothing -- there's nothing in this
22 artifact that talks to the skip specifically for the
23 SDL.
24     **Q.**  Okay.  Let's turn to Bates ending in -48.
25         At the top, it says "Protect."

174

1          Do you see that?
2      **A.**  Yes.
3      **Q.**  All right.  Under Highlights, we've got
4  first bullet (as read):
5              Access and privilege to
6          critical systems/data is
7          inappropriate.  Need to improve
8          internal processes procedures.
9          Do you see that?
10     **A.**  I do.
11     **Q.**  Any reason to believe this information is
12 not accurate?
13         MR. TURNER:  Objection to form.
14         THE WITNESS:  This is a summarized
15 highlight pointing to the opportunity to leverage
16 technology called Thycotic Secret Server to mid --
17 to manage privileged access credentials in a secret
18 server.
19 BY MS. WARDEN:
20     **Q.**  Ms. Johnson, my question was, is there any
21 reason to believe that this statement, "Access and
22 privilege to critical systems/data is
23 inappropriate," is not accurate?
24         MR. TURNER:  Objection to form.
25         THE WITNESS:  On its face summarized, I

175

1  don't stand behind that statement.  The statement
2  was in reference to the opportunity to leverage a
3  centralized secret server to store privileged
4  credentials.
5  BY MS. WARDEN:
6      **Q.**  As written, you don't agree with this
7  statement?
8      **A.**  As written, it was part of a presentation
9  that was -- had significantly more context.
10         It was a project to deal with privileged
11 access management, and this was referring to the
12 opportunity to accelerate moving all privileged
13 credentials into Thycotic Secret Server.
14     **Q.**  Did Tim Brown draft this statement?
15     **A.**  I don't know who the original author is of
16 each bullet.  This is an aggregated summary of IT
17 business and product security leaders.
18     **Q.**  All right.  So it says (as read):
19             Access and privileged to
20         critical systems status is
21         inappropriate.
22         Which systems?
23         MR. TURNER:  Objection to form.
24         THE WITNESS:  SolarWinds had hundreds of
25 systems, critical systems.  I don't know how -- what

176

1  the count was at the particular time that this was
2  in place, but this is specifically talking about the
3  privileged access. And privileged access could be
4  managed in a centralized secret server versus
5  decentralized servers with different technologies
6  managing the credential. It is a summarized
7  industry jargon term that is meant to have impact,
8  but not to stand alone without context in
9  conversation.
10 BY MS. WARDEN:
11     Q.  But was it true?
12         MR. TURNER:  Objection to form. Asked and
13 answered.
14         THE WITNESS:  Privileged access management
15 could be improved by the use of a centralized secret
16 server where its credential was maintained in
17 Thycotic. The opportunity to improve that was what
18 was being presented here.
19 BY MS. WARDEN:
20     Q.  And it says that the access and privilege
21 is inappropriate.
22         What -- inappropriate how?
23         MR. TURNER:  Objection to form.
24         THE WITNESS:  I don't know how to answer
25 differently than I have.

177

1  BY MS. WARDEN:
2      Q.  What was your reaction upon learning this?
3          MR. TURNER:  Objection to form and
4  foundation.
5          THE WITNESS:  I'm not learning in --
6  this -- this is not a presentation --
7  BY MS. WARDEN:
8      Q.  You were emailed this presentation,
9  correct?
10     A.  No. I wasn't emailed this presentation.
11 I participated in putting in the content for the
12 presentation. The statements that were being made,
13 I had context and I understood what was being
14 proposed here. This is offering the opportunity to
15 invest in Thycotic Secret Servers for managing the
16 credentials of critical systems across the
17 enterprise. At the time, IT was the only team that
18 was leveraging -- I shouldn't say only. IT was the
19 team that managed the secret server, and not all
20 privileged credentials were being managed in this
21 newer technology. There was an opportunity to
22 invest in Thycotic and make sure that Thycotic had a
23 full business continuity plan so that all of the
24 different business departments could manage their
25 credentials out of Thycotic. That was the point of

178

1  that bullet to indicate we can do privileged access
2  management more effectively.
3      Q.  The second sentence, "need to improve
4  internal processes, procedures," what -- what
5  internal processes?
6      A.  The -- the process and procedure that was
7  referred to here, Thycotic required -- so much
8  detail. The way credentials were being managed in
9  IT, the business departments wanted their own
10 credential stores. For IT to be able to manage --
11 for IT to be able to be responsible for the
12 credential store for the company, there would --
13 needed to be business continuity and access set up
14 so they could do that work. This was a poorly
15 written statement that should not be relied upon
16 because what was in effect happening was the request
17 to leverage Thycotic as a centralized secret server
18 store so that privileged access could be maintained
19 in something that we had centralized and
20 standardized faith upon -- in.
21     Q.  Did you have -- so the sentence is need to
22 improve internal processes.
23         Did that occur?
24     A.  There was an initiative to -- around
25 privileged access management to leverage Thycotic as

179

1  a central store. The processes -- internal
2  processes had to change to enable to leverage a
3  centralized store.
4      Q.  And who was in charge of those efforts?
5      A.  The project was being program-managed by
6  Eric Quitugua and Kellie to centralize the
7  privileged access management in a single credential
8  store, but each business department had to
9  participate in changing their processes so that you
10 could leverage a store. So every business, the MSP,
11 the core and the cloud business departments all had
12 to participate in that project to get to centralized
13 credential management.
14     Q.  Did Mr. --
15     A.  Quitugua.
16     Q.  -- Quitugua report to Mr. Brown?
17     A.  He did.
18     Q.  All right. If you look at the last
19 security category, authentication, authorization and
20 identity management.
21         Do you see that?
22     A.  Yeah.
23     Q.  What does that mean?
24     A.  It's a collection of security objectives
25 in a category around identity and access management.

180

1    **Q.** And then under objective, it says (as
2  read):
3        User identity, authentication
4        authorization are in place and
5        actively monitored across the
6        company.
7        Do you see that?
8    **A.** I do.
9    **Q.** All right. And then next to it, there's a
10  NIST maturity level?
11    **A.** Yes.
12    **Q.** And the score was 1.
13        Do you see that?
14    **A.** I do.
15    **Q.** Any reason to -- to doubt the accuracy of
16  that score?
17        MR. TURNER: Objection to form.
18        THE WITNESS: I didn't participate in
19  calculations. However, this also points to, one,
20  the privilege access opportunity and the making
21  Azure AD the authoritative source of identity
22  because identity was centralized in multiple on-prem
23  ADs.
24  BY MS. WARDEN:
25    **Q.** Sorry, to go back to the objective, what

181

1  presentation, we made very cursory summaries and
2  very, frankly, crude descriptions to speak to why we
3  needed do something different.
4        The rationale at the time for why this was
5  a 1 is because there was an opportunity to make an
6  investment in Thycotic as a secret server for the
7  entire company, and two, to make the investment in
8  Azure AD as the authoritative source for identity
9  and authorization for the company. Those two
10  things, we needed an investment and we were making a
11  point in this presentation.
12    **Q.** So if the audience was not executive
13  management, would the score have been different?
14    **A.** The opportunity to centralize was still
15  real. User identity across three different
16  organizations, managing it separately, is really an
17  expensive endeavor and requires a lot of oversight.
18  The challenge is -- the opportunity to improve that
19  is a consistent theme across the organization.
20    **Q.** Did you intentionally give a falsely lower
21  score in order to get a bigger budget?
22    **A.** No.
23    **Q.** But did you intentionally provide
24  leadership with a lower score?
25    **A.** No. When you read the objectives as we're

183

1  is user identity?
2    **A.** I'm sorry, where do you see that?
3        Okay, user identity. So this is the
4  individual user of a -- an employee.
5    **Q.** And authentication is what?
6    **A.** I --
7    **Q.** Sorry, the next phrase, authentication.
8    **A.** So the identity is how you individually
9  understand what a -- who is the human actor trying
10  to get access. Authentication is the way that you
11  ensure that they have access. Authorization is the
12  determination that they should have the access and
13  making sure that all three are in place and
14  monitored across the company, is what this objective
15  is.
16    **Q.** Is a score of 1 a low score?
17        MR. TURNER: Objection to form.
18        Do you want to just ask her what her
19  understanding is as to why it was a 1?
20  BY MS. WARDEN:
21    **Q.** What is your understanding as to why the
22  score was 1?
23    **A.** I mentioned before, the -- there was
24  detailed summaries around how we get to maturity
25  levels. For the purpose of an executive

182

1  calling out, my point in making the statement around
2  how this user, loosely worded, the objective Palo
3  Alto fireworks -- firewalls, that is a specific
4  thing, us making a point that we have deployed Palo
5  Alto firewalls, next generation firewalls, across
6  the company. That is creating a clear note that the
7  perimeter protection was strong, but we called out
8  specifically the objective as Palo Alto firewalls.
9        This was calling out the opportunity more
10  clearly so we weren't in a generic statement. We
11  were specific to the executives around what we were
12  trying to accomplish by calling out the privilege
13  access and the Azure AD opportunity, but the reality
14  is the opportunity to centralize and standardize
15  security in a single authoritative source was an
16  important objective.
17    **Q.** Did you take any next steps in light of
18  the category of authentication, authorization and
19  identity management receiving a score of 1?
20    **A.** We authorized two projects. The privilege
21  access management project for Thycotic and the
22  Azure AD, what was called the identity and access
23  management project.
24    **Q.** And whose decision was it to authorize
25  those projects?

184

1    **A.**  The process of authorizing projects at
2    SolarWinds during my tenure was that we stack ranked
3    the projects based on their overall business impact.
4    We presented to all of the business leaders the
5    stacked ranked portfolio, and I met with
6    Kevin Thompson on a monthly basis to review
7    everything that was being authorized.
8        So the stack ranking prioritization was
9    the process to propose what should happen and to be
10   authorized and that was ratified by our CEO.  So
11   that authorized the project.
12       I also did that review in my one-on-ones
13   with Joe Kim.
14       **Q.**  In these one-on-ones with Joe Kim, did you
15   have a discussion about that authentication
16   authorization identity management received a score
17   of 1?
18       **A.**  Joe Kim understood the importance of the
19   project we were putting forward to improve the
20   centralization and standardization of identity and
21   access management, as well as the importance of
22   having a centralized secret server so that there was
23   one single pane of glass to understand how our
24   credentials were being -- so didn't need to talk to
25   him about a NIST rating score that we summarized an

185

1    objective around.  He was part of understanding that
2    we were advancing an important initiative that would
3    continue to improve security at SolarWinds.
4        **Q.**  And it's fair to say access controls have
5    been an issue at SolarWinds since before
6    October 2018?
7        MR. TURNER:  Objection to form.
8        THE WITNESS:  Requesting continuous
9    improvement does not mean that there is issue.  It
10   means there's opportunity to improve, there's
11   opportunity to standardize, there's opportunity to
12   centralize.
13       MS. WARDEN:  I'm handing you what I'm
14   marking Johnson 9.  It's SolarWinds SEC-45356
15   through -57.
16       (Whereupon, Deposition Exhibit 9
17        was marked for identification.)
18       MR. TURNER:  Sorry, what number?  9.
19       MS. WARDEN:  This is 9.
20   BY MS. WARDEN:
21       **Q.**  You may want to pull up the spreadsheet
22   that I sent your counsel, Caz.  That's what we'll be
23   going through while we wait.
24       Okay.  Ready, Ms. Johnson?
25       **A.**  I am, yes.

186

1        **Q.**  Okay.  So do you recognize this email?
2        **A.**  I recognize the email, yes.
3        **Q.**  And -- and what is it?
4        **A.**  This appears to be a request from Kellie
5    to -- I -- it looks like it's a request from Kellie
6    to dev ops, IT and product management to participate
7    in a level of effort estimate to ready the company
8    for 2021 fedRAMP readiness.
9        **Q.**  Okay.  And the subject says (as read):
10           FedRAMP security controls
11           baseline as of 6-28-2019.
12       **A.**  Yes.
13       **Q.**  And there's an attachment to this email.
14   Do you see that?
15       MS. WARDEN:  I'm going to mark the
16   attachment to this email 9A, and for the record,
17   it's Bates 45358.
18       (Whereupon, Deposition Exhibit 9A
19        was marked for identification.)
20       MS. WARDEN:  And Ms. Johnson has an
21   electronic version of it in front of her.
22   BY MS. WARDEN:
23       **Q.**  Okay, just a couple more questions about
24   the other people.
25       So you're -- you're on the "to" line,

187

1    right, Rani Johnson?
2        **A.**  Yes.
3        **Q.**  Okay.  Who is Keith Kuchler?
4        **A.**  Keith Kuchler was the head of product for
5    cloud business department.
6        **Q.**  And who is Chris Day?
7        **A.**  At the time, Chris Day was the head of dev
8    ops for the MSP business unit, now the CIO at
9    SolarWinds.
10       **Q.**  Who is Brad Cline?
11       **A.**  Brad Cline, in 2019, would have been a
12   director of network.  May have been a senior manager
13   at the time.  Not sure exactly.
14       **Q.**  Who was Ross Fujii?
15       **A.**  Ross Fujii was -- reported to Joe Kim, and
16   he had responsibility for some element of product
17   management.
18       **Q.**  Okay.  So the -- the subject line, Pierce
19   writes (as read):
20           We've been discussing in the
21           attached spreadsheet --
22   I'm sorry.  Let me take it from the tab.
23   (As read):
24           FedRAMP is once again an item
25           of discussion.  Denny S.,

188

1    engineering, scope the resources
2    needed for a fedRAMP certification
3    with 2020 being used for readiness
4    and 2021 for the actual
5    certification process. Keith
6    reached out for assistance in
7    sizing the effort at the control
8    level.
9    (Reporter clarification.)
10    MS. WARDEN:  Yes.  I'm sorry.  Okay.
11 BY MS. WARDEN:
12    Q.  Okay.  And then she says, Ms. Pierce says
13 (as read):
14    In the attached spreadsheet
15    green tabs, you will find that for
16    each of the 325 controls, a team or
17    teams have been identified.  The
18    team identified potentially will
19    play a part in the documentation,
20    implementation and/or testing of
21    the individual control.  In the
22    spreadsheet, you will also find a
23    second tab that includes a staffing
24    strawman to outline\identify what
25    resources are needed for a fedRAMP

189

1    effort.  Being a strawman, this is
2    a template that you are free to
3    use, adjust, revise, scrap.
4    Ms. Johnson, what do you understand
5 Ms. Pierce's reference to controls to mean?
6    325 controls, she says.
7    MR. TURNER:  Is that the reference?
8 There's many references to controls.
9 BY MS. WARDEN:
10    Q.  Let's take the sentence "In the attached
11 spreadsheet, you will find that for each of the 325
12 controls."
13    A.  She's -- may I take a look at the -- the
14 document here?
15    MR. TURNER:  I don't understand the
16 question.  Are you asking what is meant by the
17 reference to the controls in the spreadsheet of
18 controls that's attached to the email?
19 BY MS. WARDEN:
20    Q.  Let's look at the spreadsheet.  So open up
21 Attachment 9A, and if you go to the tab "Moderate
22 Baseline Controls."
23    A.  Okay.
24    Q.  Do you see that?
25    A.  I do.

190

1    Q.  All right.  If you go down -- so the left
2 column is count, so you're going to hear me refer to
3 everything with counts.  So if you go down to
4 Count 17, which is actually Row 19, but let's focus
5 on Count 17.
6    Do you see in Column E, it says, "Least
7 privilege authorize access to security functions"?
8    A.  Yes.
9    Q.  All right.  And then the next column says
10 (as read):
11    The organization explicitly
12    authorizes access to assignment,
13    organization defines security
14    functions deployed in hardware,
15    software, firmware and security
16    relevance information.
17    And then it says (as read):
18    Security functions include --
19    MR. TURNER:  Hang on a second.  Are you
20 able to find it?
21    THE WITNESS:  No, I found it.  Finish the
22 question so I can make sure.
23 BY MS. WARDEN:
24    Q.  Sorry.  Then it says (as read):
25    Security functions include,

191

1    for example, establishing system
2    accounts, configuring access,
3    authorizations, i.e. permissions,
4    privileges, setting events to be
5    audited and setting intrusion
6    detection parameters.
7    Ms. Johnson, how -- how important is the
8 concept of least privilege?
9    MR. TURNER:  Objection to form.
10    THE WITNESS:  I'm lost in the context of
11 this, 'cause Kellie's ask is to provide a summary of
12 level of effort to prepare for fedRAMP readiness
13 that is two years out.  It's not an assessment of
14 alignment with controls.  Kellie is not an auditor
15 and has no expertise in this particular area.  To
16 answer that question, but in the context of this
17 review that Kellie did to aggregate the level of
18 effort, it doesn't make sense.
19 BY MS. WARDEN:
20    Q.  So in the email, Ms. Pierce says (as
21 read):
22    You will find that for each of
23    the 325 controls, a team or teams
24    have been identified.  The team
25    identified potentially will play a

192

1    part in the documentation
2    implementation and/or testing of
3    the individual controls.
4        And she attaches a spreadsheet, which is
5  what we were looking at, Exhibit 9A.
6        **A.** She says being a strawman.
7        MR. TURNER: Wait for the question.
8  BY MS. WARDEN:
9        **Q.** So why don't we -- if you look at the
10 column to the right, so -- so this may help orient
11 you.
12       If you go to the top of that column that I
13 was looking at, Column F, do you see it says, "NIST
14 control description from NIST SP 800"?
15       **A.** Yes.
16       **Q.** Okay. So that's the title of that. And
17 then we're going to be looking at Column S.
18       Do you see that's titled "Kellie's
19 comments, notes"?
20       **A.** Yes.
21       **Q.** All right. So we're going to look at
22 control, and then Kellie's comments column.
23       So let's go back to Count 17. And I read
24 you the control. Won't do that again. Then
25 Kellie's comment, do you see it's in red, says --

1  I'll let you get there in Column S, KP627, she
2  writes (as read):
3        We have no explicit
4        authorization policy, nor is this
5        documented that I am aware of for
6        the company or individual products.
7        Are you aware of any reason this
8  assessment was not accurate?
9        MR. TURNER: Objection to form.
10       THE WITNESS: This was not an assessment.
11 BY MS. WARDEN:
12       **Q.** Okay. What -- how would you describe it?
13       **A.** This was a preliminary reaction to a
14 request to make an investment in fedRAMP readiness
15 for products that did not have a strong business
16 justification. What Denny and I asked her to do was
17 perform a level of assessment -- level-of-effort
18 assessment on what it would cost the company to
19 prepare for fedRAMP readiness. It was a very
20 cursory collection of data across a number of
21 leaders to say this is going to take this much
22 effort because the formality and the requirement of
23 leveraging a third-party assessment organization or
24 a 3PAO for fedRAMP is very expensive and you have to
25 create years -- at least a year of reporting

1  documentation. And that's why she speaks to the
2  being -- doing the work in 2020 with readiness in
3  2021.
4        The ask here is truly to do a
5  level-of-effort estimate around how much work we
6  need to prepare to create the reporting
7  documentation to ready those assets for fedRAMP so
8  we can -- say, if this cost 2 million, how much in
9  sales is there to potentially justify this
10 investment.
11       Kellie is not -- Kellie nor myself would
12 be equipped to answer the company's process
13 readiness without having the specific asset owner of
14 each one of those assets answer in response to each
15 line item. The fact that Kellie writes her own
16 letters and dates on this shows that this is her
17 reaction.
18       What's more, the -- there was intended,
19 like a hypothesis on Kellie's part and certainly
20 mine because she and I have run programs before to
21 prepare companies for product certifications. The
22 reality that these products don't have the
23 U.S.-based staffing infrastructure means that we
24 knew that we would -- this would be too inexpensive
25 of an effort. So this was a very cursory, very

1  preliminary swag at this is gonna cost too much and
2  not going to be worth the effort in this time frame.
3        **Q.** Are you aware of Ms. Pierce ever providing
4  a final assessment?
5        MR. TURNER: Objection.
6  BY MS. WARDEN:
7        **Q.** Of the 325 controls.
8        MR. TURNER: Objection to form.
9        THE WITNESS: During my tenure, I'm not
10 aware of a final assessment. However, there -- this
11 work product during my tenure was not an assessment;
12 it was a preliminary review to determine through
13 swag that this level of effort doesn't warrant the
14 investment.
15 BY MS. WARDEN:
16       **Q.** Are you aware if whether this preliminary
17 review was ever updated?
18       **A.** Not in my tenure.
19       **Q.** And are you aware of whether this
20 preliminary review was ever finalized?
21       **A.** Not in my tenure. The time frame that
22 this would have happened would be outside the scope
23 of my tenure.
24       **Q.** So -- okay. Let's look back at the
25 control description in Count 17, please.

1  (As read):
2      The organization explicitly
3  authorizes access to assignment,
4  organization defined security
5  functions deployed in hardware,
6  software and firmware and security
7  relevant information.
8      Do you see that?
9  **A.**  Yes.
10  **Q.**  The control.
11      Are you aware of whether there was an
12  explicit authorization policy at SolarWinds?
13      MR. TURNER:  Objection to form.
14      THE WITNESS:  Like Kellie, I am not an
15  expert in what is intended in the language of
16  fedRAMP.  I do not know specifically how fedRAMP
17  outlines explicit authorization.
18  BY MS. WARDEN:
19  **Q.**  My question is whether you're aware of an
20  explicit authorization policy --
21      MR. TURNER:  Objection to form.  What is
22  the meaning of those terms?
23      THE WITNESS:  I'm not equipped to answer
24  something if I don't know what the definition of
25  "explicit" means in terms of fedRAMP.

197

1  BY MS. WARDEN:
2  **Q.**  How about in terms of how it's defined in
3  this control?
4  **A.**  Security and supplemental guidance is what
5  I'll read.  For example, establishing system
6  accounts, configuring access authorization, setting
7  events to be audited and setting intrusion detection
8  parameters.  Security relevant systems include
9  filtering, routers and firewalls --
10      MR. TURNER:  You want to read to yourself.
11  Can I get a readback of the question, please.
12      (Record read by the reporter
13      as follows:
14      QUESTION:  How about in terms
15      of how it's defined in this
16      control?)
17      MR. TURNER:  Objection to form.
18      THE WITNESS:  It's part of SolarWinds'
19  practice in our security and access control
20  guidelines.  The establishing accounts, configuring
21  access authorization, event logging, intrusion
22  detection, was in place, firewall rules were set,
23  there was cryp- -- I can't say that word --
24  cryptographic key management and there were
25  configuration parameters for security services.

198

1  That said, it's my understanding that a fedRAMP
2  moderate has specific meaning to the word
3  "explicitly authorized" and requires specific
4  reporting on a routine basis in a specific format to
5  meet the audit requirement for fedRAMP moderate.
6  BY MS. WARDEN:
7  **Q.**  So if you take a look at Kellie's words,
8  when she says, "We have no explicit authorization
9  policy," do -- was that not accurate?
10      MR. TURNER:  Objection to form and
11  foundation.
12      Do you know what Kellie meant by that
13  remark?
14      THE WITNESS:  I don't know what Kellie
15  meant, but it's worth --
16      MS. WARDEN:  I object to --
17      (Simultaneous speakers - inaudible.)
18      THE WITNESS:  -- pointing out she says
19  that -- she is not aware of.  She clearly calls out
20  that she is not aware of.  And Kellie is, nor
21  myself, are experts in fedRAMP moderate
22  requirements.  This was a cursory review, and there
23  are no notes from anyone else on here, so it didn't
24  get another review before it's closed at the time
25  that this -- at this point in time.

199

1  BY MS. WARDEN:
2  **Q.**  Okay.
3  **A.**  This was not meant to be a statement of
4  fact for SolarWinds.  It was meant to show the level
5  of effort required to ready these four products for
6  fedRAMP moderate readiness.
7  **Q.**  So Ms. Pierce emails you this on
8  August 28, 2019.
9      Did you -- and with respect to Count 17,
10  you don't agree with her -- her analysis, correct?
11      MR. TURNER:  Objection to form.
12      THE WITNESS:  This was not an analysis.
13  This is a reaction, cursory response to a request
14  that we had strong hypothesis around based on
15  experience of preparing a company for fedRAMP --
16  preparing a set of products for readiness.
17  BY MS. WARDEN:
18  **Q.**  Is it fair to say you don't agree with the
19  words that are in Column S for Count 17?
20      MR. TURNER:  Objection to form.
21      THE WITNESS:  I don't -- they -- I don't
22  agree with -- no, I'm not going to -- these words
23  say she's not aware of.  She is -- I believe her
24  when she says she's not aware of, but the words
25  don't say it doesn't exist.

200

BY MS. WARDEN:
    **Q.**  The words say, "We have no explicit authorization policy."
    **A.**  That nor this, that I am aware of.
    **Q.**  Okay.
    MR. TURNER:  The witness has already testified that she doesn't understand what was meant.  How can she testify whether she agrees with something when she doesn't understand what was meant -- what was meant by it.
BY MS. WARDEN:
    **Q.**  Well, you testified that you thought SolarWinds did have an explicit authorization policy, correct?
    **A.**  I do not.  No, I did not.  I'm saying I don't understand the word "explicit" in terms of fedRAMP.  I do not want to presume I know what is meant.  Those words are specific industry terms.  I am not familiar with explicit authorization.
    When reading the examples that were given, the supplemental guidance, I can answer to those things, but, again, explicit authorization, I would presume, is a specific term, and not knowing it, I do not feel fit or equipped, nor am I and expert enough to answer that specifically.

201

    **Q.**  Did you have any conversation with Ms. Pierce about her comments in the spreadsheet she attached to you with respect to Count 17?
    **A.**  Not with respect to Count 17.  With respect to the entire response and reaction to and how much effort she should spend on producing this level of effort.
    **Q.**  I'm sorry, did -- I didn't understand that.
    Did -- did you have any conversation with Kellie Pierce about Exhibit 9A?
    **A.**  When Kellie initiated this collection or aggregation of responses, I asked her to time box this because we presumed the answer is the company is not ready to make this investment because of the level of effort it would take to get there and the return on that effort would not be warranted.
    So my conversations with her were about how much effort to spend because we had a hypothesis that the answer would be the company would not make this investment.
    **Q.**  Why do you say you "had a hypothesis the company would not make this investment"?
    **A.**  Both Kellie and I have historically led programs to ready a company for ISO or SoC 2 or

202

other types of product certifications.  These products had employees who were not U.S.-based citizens, and that's one of the very foundational components of fedRAMP readiness, is that the access to the information systems that are being provided to the U.S. federal government require U.S.-based -- U.S.-based and U.S. citizens' participation.  There are many reasons that there was a high burden to overcome for this group to be fedRAMP ready.
    **Q.**  Did you have conversations with Joe Kim regarding investment to be fedRAMP ready?
    **A.**  Joe Kim's teams would be the ones that would have needed the investment, and that's why they were solicited to provide that level of effort estimate.  So yes, I've had conversations with him.  The sales teams did not report into Joe Kim.  The sales teams were the ones requesting us to make the investment and product and IT to do the work.  This -- we knew this work would not equal any significant increase in sales on their side.
    **Q.**  And what did Joe Kim say about the investment in fedRAMP ready?
    **A.**  I do not recall what Joe Kim said.  I don't recall now.
    MS. WARDEN:  Can we go off the record for

203

two minutes?
    THE VIDEOGRAPHER:  Going off the record, Time is 3:00 p.m.
    (Whereupon, a recess was taken from
       3:00 p.m. to 3:08 p.m.)
    THE VIDEOGRAPHER:  We are back on the record.  The time is 3:08 p.m.
BY MS. WARDEN:
    **Q.**  Ms. Johnson, can you go to Count 94 of Exhibit 9A, please?
    **A.**  I'm there.
    **Q.**  Do you see in Column E, it says (as read):
       Access restrictions for
      change, limit production,
      operational privileges?
    **A.**  I do.
    **Q.**  All right.  And then in Column F, where it -- the header is "Control," it says (as read):
       The organization, A, limits
      privileges to change information
      system components and
      system-related information within a
      production or operational
      environment, and B, reviews and
      reevaluates privileges assignment

204

1    THE WITNESS:  It was not my role to assess
2  SDL because software development was not in the
3  scope of my responsibility.  It is important to
4  focus on continuous improvement, and the key
5  improvements here are highlighting areas for
6  continuous improvement across these security
7  categories.
8  BY MS. WARDEN:
9    Q.  Well, you were alerting Joe Kim to -- that
10 a key improvement would be to increase SDL adoption,
11 correct?
12    MR. TURNER:  Objection to form.
13    THE WITNESS:  This vehicle was not to
14 alert Joe Kim.  Joe Kim was in the room because he
15 is the CTO, but I would not use a quarterly vehicle
16 to alert my boss to a concern.
17 BY MS. WARDEN:
18    Q.  What would you describe as the security
19 gaps as of March 2020?
20    MR. TURNER:  Objection.  Form.
21 Foundation.
22    THE WITNESS:  There are documents, this
23 may be one of them, that would highlight areas of
24 improvement or concern.  Things outside of the scope
25 of my responsibility I'd ask you to speak to the

1  owner.
2  BY MS. WARDEN:
3    Q.  Okay.  Ask you another question.
4    All right.  Under key risks, it says (as
5  read):
6        Significant deficiencies in
7        user access management.
8    Do you see that?
9    A.  I do.
10    Q.  What does that mean?
11    A.  That was specifically in response to a
12 user access review that the responsible -- so in
13 user access reviews under SOX controls, you are to
14 define quarterly what the user community that needs
15 to be audited for, whether or not the access is
16 appropriate and that access has been terminated for
17 people who no longer have acquired that access.
18    The leader who pulled the user access
19 review did not use the appropriate window to do the
20 access review, and so I required that he rerun the
21 access review.
22    Internal audit caught that he didn't have
23 the right window of access, and before external
24 audit did their user access review, that was
25 corrected.

1    What I was calling out, and I think it may
2  be more details later, is that our user access
3  reviewer didn't understand the -- how to define the
4  user access review period properly and could have
5  caused us to have -- find a finding, if you will, in
6  our external access review.  That was caught before
7  external auditors reviewed and the internal audit
8  was rerun.  So there was deficiency in user access
9  population that was used to do the user access
10 review.
11    Q.  Is it fair to say your understanding of
12 significant deficiencies in user access management
13 is that it was limited to an internal user access
14 audit?
15    A.  I specifically performance-managed this
16 employee and -- and that employee's manager and
17 wrote a very detailed report around what happened
18 and how much work was involved in rerunning that
19 audit.  So I'm -- I do know what I specifically
20 meant around that user access review.
21    Q.  Is that a "yes"?
22    A.  Yes.
23    Q.  And there's no other deficiencies in user
24 access management that you believe that that refers
25 to?

1    A.  The word I'm using around suff- --
2  significant deficiency was a SOX terminology
3  specific to user access management.
4    Q.  Is access management essentially the same
5  thing as access controls?
6    MR. TURNER:  Objection to form and
7  foundation.
8    THE WITNESS:  Can you help me understand
9  the spirit of your question, because I'm not great
10 at defining terms?
11 BY MS. WARDEN:
12    Q.  This document ending in dates --
13 Bates -1611 is referring to user management, but I'm
14 wondering, is that a synonym for access controls?
15    MR. TURNER:  Just to correct the record,
16 user access management.
17    MS. WARDEN:  Correct.
18    THE WITNESS:  What I am referring to here
19 was a SOX terminology around significant deficient
20 and user access management is not equal controls.
21 User access management is what we failed to do
22 properly and then spent a significant amount of time
23 to rerun all of our user access reviews for the
24 entire company because this one individual pulled
25 the wrong window of -- of excluding a community of a

1  few hundred people that needed to be part of the
2  user access review.
3       Then everybody who participated in a user
4  access review had to rerun their reviews.  We failed
5  to -- fortunately, caught it on time.  We failed to
6  provide the right population to test.  And as a
7  result, we had an internal -- not even a stated
8  deficiency -- an internal deficiency in our user
9  access management, has nothing to do with actual
10 access management.  It was around how we prepared
11 the user access review.
12 BY MS. WARDEN:
13      Q.  And you mentioned you personally were
14 involved in --
15      A.  Performance management?
16      Q.  Well, identify -- remedying this problem
17 of an internal user access audit, correct?
18      A.  Yes.
19      Q.  What time frame was that, would that be,
20 did that happen?
21      A.  I -- it was likely close to the time frame
22 of this quarter.
23      Q.  So this -- this Exhibit 10 is March 2020.
24      So did -- did -- were you aware of this
25 issue with an internal user access audit prior to

225

1  Exhibit 10?
2       MR. TURNER:  Objection to form.
3       THE WITNESS:  I -- I would need to look at
4  my documentation, but the deficiency that I caught
5  in user access management meant that we probably
6  spent two to three months remediating the situation.
7  I -- I personally wrote an RCA, root cause analysis
8  document, detailing it.
9  BY MS. WARDEN:
10      Q.  Okay.  And after the two to three months,
11 was the issue remediated?
12      A.  The issue was remediated once detected,
13 the -- all of the teams had to rerun their user
14 access reviews.  It was remediated before the
15 external audit, so yes.
16      Q.  The column to the right, key improvements,
17 do you see next to it says, "AD authentication for
18 critical systems"?
19      Do you see that?
20      A.  Yes.
21      Q.  What does that mean?
22      A.  That refers to the Azure active directory
23 environment that we initiated a project on.
24      Q.  The same Azure AD that was in your
25 January 2018 self-assessment?

226

1       A.  That's correct.
2       Q.  Okay.  And so now we're at
3  two-and-three-quarter years after that
4  self-assessment, right?
5       MR. TURNER:  Object -- go ahead.
6       THE WITNESS:  By count, that seems
7  accurate.
8  BY MS. WARDEN:
9       Q.  Okay.  So that's when the Azure AD was --
10 was put into place?
11      How would you describe that?
12      A.  Active directory environments are very
13 complex.  Every system that provides authenticated
14 access leverages this environment to provide users
15 access.
16      When there are multiple active
17 directories, it means that a new service has to be
18 stood up and every piece of software that
19 authenticates off of that has to be reintegrated.
20 That reintegration time period and retesting time
21 period is not a short window.  It's an extensive
22 project.
23      (Reporter clarification.)
24      THE WITNESS:  I think someone is sneezing.
25 //

227

1       (Whereupon, Deposition Exhibit 11
2       was marked for identification.)
3  BY MS. WARDEN:
4       Q.  I'm going to hand you a new exhibit.  I'm
5  handing you what's been marked Johnson 11.
6       A.  Was there a 10?
7       Q.  We just did 10.
8       A.  Oh, 10 was this.  Okay.  Oh, this.
9       Q.  Take your time.  It's big.
10      So let me just --
11      MS. WARDEN:  For the record, this is
12 SW-SEC-1582 through -1601.
13 BY MS. WARDEN:
14      Q.  And Ms. Johnson, let me represent to you,
15 you left SolarWinds the day before --
16      A.  Yeah.
17      Q.  -- this is dated, October 26th, 2020.
18 So I understand that, but we -- we just wanted to
19 ask you a couple questions about how the state of
20 things as of the date -- as of the date you left,
21 which was the day before Exhibit 11, if that makes
22 sense.
23      A.  It's probably worth noting I provided
24 almost three months' notice to leadership that I was
25 planning on leaving.  So, at some point, I would not

228

1    MR. TURNER:  Time frame.
2  BY MS. WARDEN:
3    Q.  As of August 28th, 2019.
4    A.  I was not aware of deviations from the
5  password policy in the scope of my responsibility of
6  IT.  I would not have been privy to deviations from
7  policy in the scope of product management because
8  they would be inappropriate for me to understand --
9  or to have access to product vulnerability
10  information or product deviation information.
11    Q.  Can you take a look at Column S of 149.
12    A.  Of 149?
13    Q.  Yeah.  The same count.  If you go over to
14  Column S, please.
15      (Reporter clarification.)
16      THE WITNESS:  I've moved my mic a little
17  bit closer to my face too.  Is this better?
18      I'm looking at Column S on 149.
19  BY MS. WARDEN:
20    Q.  Sure.
21      Do you see it says, "628KP no known
22  automated tools for password authentication"?
23    A.  They are referring --
24      MR. TURNER:  Just answer the question.
25  //

245

1  BY MS. WARDEN:
2    Q.  This is in the column entitled "Kellie's
3  Comments."
4    A.  Yes.
5    Q.  Okay.  So do you see that?
6    A.  Yes.
7    Q.  Okay.  And any reason -- are you aware of
8  any reason that this is not accurate?
9      MR. TURNER:  Objection to form.  Asked and
10  answered.
11      THE WITNESS:  In Columns K, L, M and N and
12  then other comments in Column O and P, they are
13  speaking to the product's ability to provide
14  password complexity control, not the company's
15  ability to provide password complexity control.
16  BY MS. WARDEN:
17    Q.  You -- do you think Kellie's remarks in
18  Column S in Count 149 are not accurate?
19    A.  I actually --
20      MR. TURNER:  Objection to form and
21  foundation.
22      Without establishing whether she
23  understands what the reference means, it's not a
24  fair question to ask her whether she agrees with it.
25  //

246

1  BY MS. WARDEN:
2    Q.  Okay.  Ms. Johnson, do you understand what
3  the words are in Column S in Count 149?
4    A.  I can read Column S.  What's more, I can
5  read Column J where Kellie outlines whether or not
6  she's assessing this at the product or process
7  level.  She indicates that this is a process -- a
8  product-level control in Column J, and then in
9  Column K, L, M and N, those are filled out.  This is
10  a product-level response to whether or not the
11  product themselves can enforce password complexity
12  control.  Those products are not part of the IT
13  infrastructure for password management.
14    Q.  Do you recall any conversations with
15  Kellie Pierce regarding password authentication?
16    A.  Not in regards to this artifact, no.
17    Q.  Do you recall any conversations with
18  Kellie Pierce about password authentication?
19      MR. TURNER:  Ever?
20  BY MS. WARDEN:
21    Q.  In the three and a half years you were at
22  SolarWinds.
23    A.  The -- password authentication is not the
24  same thing as password complexity control.  When --
25  when reviewing annually the security and access

247

1  control guidelines, we would have looked at what the
2  guidelines said, so I would have had a conversation
3  with her about password complexity and
4  authentication because those are parts of the
5  security and access control guideline.
6      This is not specific to those guidelines.
7  This is specific to, do these four products provide
8  that complexity control in the product.
9    Q.  Handing you what I marked Johnson 13.
10      Oh, do we want to take a break?
11      MR. TURNER:  Up to you, do you want to
12  take a break?
13      THE WITNESS:  Yes.
14      THE VIDEOGRAPHER:  Off the record.  The
15  time is 4:14 p.m.
16      (Whereupon, a recess was taken from
17      4:14 p.m. to 4:27 p.m.)
18      THE VIDEOGRAPHER:  We're back on the
19  record.  The time is 4:27 p.m.
20  BY MS. WARDEN:
21    Q.  Ms. Johnson, I handed you what I marked
22  Johnson 13, which is SW-SEC388330 through -31.  And
23  we'll mark the attachment 12A -- 13A.
24      (Whereupon, Deposition Exhibit 13 and
25      Exhibit 13A were marked for

248

**Rani Johnson**
**8/27/2024**

## CERTIFICATE OF WITNESS

1

2

3    I, RANI JOHNSON, do hereby declare under

4    penalty of perjury that I have read the entire

5    foregoing transcript of my deposition testimony,

6    or the same has been read to me, and certify that

7    it is a true, correct and complete transcript of

8    my testimony given on August 27, 2024, save and

9    except for changes and/or corrections, if any, as

10   indicated by me on the attached Errata Sheet, with

11   the understanding that I offer these changes and/or

12   corrections as if still under oath.

13        _____ I have made corrections to my deposition.

14        _____ I have NOT made any changes to my deposition.

15

16   Signed: _____
            RANI JOHNSON

17

18

19   Dated this _____ day of _____ of 20____.

20

21

22

23

24

25

293

---

ERRATA SHEET

1

2    Deposition of: RANI JOHNSON
     Date taken: AUGUST 27, 2024

3    Case:  SEC v. SOLARWINDS CORP., et al.

4    PAGE  LINE
               CHANGE: _____

5          REASON: _____

6               CHANGE: _____
           REASON: _____

7
                CHANGE: _____

8          REASON: _____

9               CHANGE: _____
           REASON: _____

10
                CHANGE: _____

11         REASON: _____

12              CHANGE: _____
           REASON: _____

13
                CHANGE: _____

14         REASON: _____

15              CHANGE: _____
           REASON: _____

16
                CHANGE: _____

17         REASON: _____

18              CHANGE: _____
           REASON: _____

19
                CHANGE: _____

20         REASON: _____

21              CHANGE: _____
           REASON: _____

22
                CHANGE: _____

23         REASON: _____

24   Signed_____

25   Dated_____

295

---

## CERTIFICATE OF REPORTER

1

2        I, Kathleen A. Maltbie, Certified

3    Shorthand Reporter licensed in the State of

4    California, License No. 10068, the State of Nevada,

5    CCR 995, and the State of Texas, CSR 12212, hereby

6    certify that deponent was by me first duly sworn,

7    and the foregoing testimony was reported by me and

8    was thereafter transcribed with computer-aided

9    transcription; that the foregoing is a full,

10   complete, and true record of proceedings.

11        I further certify that I am not of counsel

12   or attorney for either or any of the parties in the

13   foregoing proceeding and caption named or in any way

14   interested in the outcome of the cause in said

15   caption.

16        The dismantling, unsealing, or unbinding

17   of the original transcript will render the

18   reporter's certificates null and void.

19        In witness whereof, I have hereunto set my

20   hand this day:

21   _____ Reading and Signing was requested.
         _____ Reading and Signing was waived.

22   ___x____ Reading and Signing was not requested.

23   _____
         KATHLEEN A. MALTBIE

24   RPR-RMR-CRR-CCRR-CLR-CRC-RDR
         California CSR 10068, Nevada CCR 995

25   Texas CSR 12212

294

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:23-cv-09518-PAE |
| ) | |
| SOLARWINDS CORP. and TIMOTHY G. ) | |
| BROWN, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

### Notice of Errata – Deposition of Rani Johnson
### (August 27, 2024)

I, the undersigned, do hereby declare that I have read the deposition transcript of Rani
Johnson dated  August 27, 2024 and that to the best of my knowledge, said testimony is true and
accurate, with the exception of the following changes listed below:

| Page | Line(s) | Change | | Reason |
|---|---|---|---|---|
| | | **From** | **To** | |
| 36 | 10 | "General data protection regulation" | "General Data Protection Regulation" | Transcription Error |
| 36 | 12 | "European union's regulation" | "European Union's regulation" | Transcription Error |
| 57 | 1 | "presume that's privilege." | "presume that's privileged." | Transcription Error |
| 58 | 11-12 | "I'm waiving any right to" | "I'm not waiving any right to" | Transcription Error |
| 63 | 18 | "security and access review guidelines" | "security and access review guidelines'" | Transcription Error |
| 100 | 11 | "there are some other opportunity" | "there are some other opportunities" | Transcription Error |

| Page | Line(s) | Change | | Reason |
|------|---------|--------|--------|--------|
| | | **From** | **To** | |
| 115 | 13-14 | "improve security pasture" | "improve security posture" | Transcription Error |
| 116 | 14 | "THE COURT" | "MR. HASHEMI" | Transcription Error |
| 142 | 19 | "MR. BRUCKMAN" | "MR. HASHEMI" | Transcription Error |
| 163 | 9 | "Point security assessments" | "Point security assessment" | Transcription Error |
| 206 | 6 | "MR. BRUCKMAN" | "MR. HASHEMI" | Transcription Error |
| 208 | 17 | "mark it as read and keep going" | "mark it as red and keep going" | Transcription Error |
| 216 | 7 | "The fact that it has a 33" | "The fact that it has a 3.3" | Transcription Error |
| 224 | 20 | "user access management is not equal controls." | "user access management does not equal access controls" | Transcription Error/Clarification |
| 240 | 16 | "MR. HESHEMI" | "MR. HASHEMI" | Transcription Error |
| 240 | 19 | "MR. HESHEMI" | "MR. HASHEMI" | Transcription Error |
| 248 | 5 | "security and access control guideline" | "security and access control guidelines" | Transcription Error |
| 271 | 9 | "was not the scope" | "was not within the scope" | Clarification |
| 291 | 19 | "Mr. Heshemi" | "Mr. Hashemi" | Transcription Error |
| 291 | 23 | "MR. HESHEMI" | "MR. HASHEMI" | Transcription Error |

I declare under penalty of perjury that the foregoing is true and correct.


Date: October 6, 2024 _____          Signed: RANI JOHNSON ____