# EXHIBIT 54

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
           Plaintiff,           )
 6                              ) Case No.
       vs.                      ) 23-cv-9518-PAE
 7                              )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9         Defendants.          )
     _____)
10
11
12
13           VIDEOTAPED DEPOSITION OF
14                ERIC QUITUGUA
15                 Austin, Texas
16          Tuesday, September 17, 2024
17
18
19
20
21
22
23
24   Reported by:
     Micheal A. Johnson, RDR, CRR
25   Job No. 240917MJ
```

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
           Plaintiff,           )
 6                              ) Case No.
       vs.                      ) 23-cv-9518-PAE
 7                              )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9         Defendants.          )
     _____)
10
11
12
13
14       Videotaped Deposition of ERIC QUITUGUA,
15   taken on behalf of Plaintiff, at Latham & Watkins,
16   LLP, 300 Colorado Street, Suite 2400, Austin, Texas,
17   beginning at 9:08 a.m. and ending at 7:16 p.m. on
18   September 17, 2024, before Micheal A. Johnson, a
19   Registered Diplomate Reporter, Certified Realtime
20   Reporter, and Notary Public of the State of Texas.
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF PLAINTIFF:
 3       U.S. SECURITIES AND EXCHANGE COMMISSION
         BY:  John J. Todor
 4            Kristen M. Warden
              Christopher J. Carney
 5            Lory C. Stone (Via Zoom)
              Christopher M. Bruckmann (Via Zoom)
 6       100 F Street, NE
         Washington, D.C. 20549
 7       (202) 256-7941
         todorj@sec.gov
 8       wardenk@sec.gov
         carneyc@sec.gov
 9       stonel@sec.gov
         bruckmannc@sec.gov
10
11   ON BEHALF OF DEFENDANTS
     SOLAR WINDS CORP. AND TIMOTHY G. BROWN:
12
         LATHAM & WATKINS LLP
13       BY:  Serrin Turner
              Nicolas Luongo
14       1271 Avenue of the Americas
         New York, New York 10020
15       (212) 906-1330
         serrin.turner@lw.com
16       nicolas.luongo@lw.com
17
     ON BEHALF OF DEFENDANT
18   TIMOTHY G. BROWN:
19       KING & SPALDING LLP
         BY:  Michael J. Biles (Via Zoom)
20       500 West 2nd Street, Suite 1800
         Austin, Texas 78701
21       (512) 457-2051
         mbiles@kslaw.com
22
23
24
25
```

Page 3

```
 1   APPEARANCES (CONTINUED):
 2   ALSO PRESENT:
 3       Becky Melton
         Laurie Hakes
 4
 5   VIDEOGRAPHER:
 6       Timothy Desadier
 7
 8
 9
10
...
25
```

Page 4

Eric Quitugua
9/17/2024

### Page 153

1   MR. TODOR: Yeah. Appear to be two
2  attachments. One is labeled SolarWinds SPA backup
3  rev 4, and then the other one is SolarWinds security
4  statement. It appears that the second attachment
5  looks similar to the draft of the public-facing
6  attachment from Mr. Quitugua's October 6th e-mail.
7  BY MR. TODOR:
8     Q.  Mr. Quitugua, I'm just asking, does this
9  appear to be an iteration of the security statement
10 that's being circulated to other employees at
11 SolarWinds as of November 7, 2017?
12    A.  I --
13    MR. TURNER: Wait. You see -- he
14 doesn't have the right attachment in front of him.
15 Do you see which one he's referring to?
16    THE WITNESS: There's two of them on
17 here.
18 BY MR. TODOR:
19    Q.  The one at the back.
20    MR. TURNER: He's saying -- the one
21 with the blue heading, this --
22    THE WITNESS: Yeah.
23    MR. TURNER: -- is an iteration of
24 the draft we saw before, right? If you want to take
25 a minute, you can compare the two.

### Page 154

1     A.  Can you give me a minute, please, just to
2  kind of look through there?
3  BY MR. TODOR:
4     Q.  Please.
5        (Witness reviews document.)
6  BY MR. TODOR:
7     Q.  Having reviewed the document, does that
8  appear to be an iteration of the --
9     A.  It appears to be similar to the previous
10 exhibit for the security statement.
11    MR. TODOR: Next document.
12       (Deposition Exhibit 8 marked for
13 identification.)
14 BY MR. TODOR:
15    Q.  Mr. Quitugua, you've been handed a
16 document that's been marked as Quitugua Exhibit 8.
17 It's an e-mail Bates SW-SEC00337101 through 109.
18 Appears to be an e-mail from Tim Brown dated
19 November 7, 2017, to a Louise Butler and Tim Drury,
20 subject, re: Hosting Environment.
21       Doesn't appear that your name is on this
22 one, Mr. Quitugua. Let me see if you're later in
23 the chain here.
24       I guess similar to the last question, if
25 you look to the attachment starting at 105, does

### Page 155

1  this appear to be another iteration of the
2  public-facing security statement being circulated?
3        (Witness reviews document.)
4     A.  Yes, it does appear to be the same.
5  BY MR. TODOR:
6     Q.  In looking at the body of the e-mail,
7  there's a statement: This is a SolarWinds security
8  statement that has been approved by legal and is in
9  the process of being made available via the website.
10       Do you see that?
11    A.  I do.
12    Q.  As of this November 2017 time frame, did
13 you have an understanding of whether the SolarWinds
14 security statement was undergoing approval by the
15 SolarWinds legal department?
16    A.  It could very well have been. I don't
17 recall exactly the details around the review.
18    Q.  Do you know of anyone else it would have
19 been reviewed by other than Mr. Brown and the legal
20 department?
21    A.  My only recollection is that I
22 collaborated with Tim on the content that I provided
23 to him for the security statement. That's --
24    Q.  For review beyond Mr. Brown, did you deal
25 directly with anyone who was doing review of the

### Page 156

1  document other than Mr. Brown?
2     A.  Not that I can recall, no.
3     Q.  When you were dealing with Mr. Brown, did
4  he have questions for you about the content in the
5  security statement?
6     A.  Again, I -- it's been a while. He may
7  have, but I don't remember.
8     Q.  For example -- okay. For example, did
9  Mr. Brown ask you to give more clarity on a certain
10 statement in the security statement in a next draft?
11    A.  He -- again, it's been so long. I know
12 we went through a couple of iterations of it via
13 chat or, you know, in person or e-mail, but I don't
14 recall any specifics.
15    Q.  Do you recall the kinds of issues that
16 Mr. Brown would focus on in the review of the drafts
17 of the security statement?
18    A.  No.
19    Q.  Was he -- did he push back on any of the
20 representations in the security statement as to what
21 kinds of things SolarWinds was doing?
22    MR. TURNER: Objection to form.
23    A.  I don't recall. I don't recall if he did
24 or not.
25

## Page 157

BY MR. TODOR:
    Q.  Did you verify all of the information in the draft security statement by going back and checking beyond, say, the previous customer responses before sending it to Mr. Brown?
    A.  I did my best to answer -- or, I'm sorry, to add content that was what the organization was practicing at the time, right. And that again was based off of previous responses that we had given which were vetted, previously vetted, or if we didn't have previous or canned responses, again, reach out to the subject matter experts to ask.
    Q.  Did you tell Mr. Brown, when you gave him the security statement draft, which statements were based on previous responses and which ones were based on information you had gone out and gotten from somebody else?
    A.  I don't recall if I did or not.
    Q.  Did you verify all of the information in the security statement before you gave it to Mr. Brown?
    MR. TURNER: Objection, asked and answered. Also object to the form. "Verify."
    A.  I did my best to ensure that the content in the security statement addressed most of

## Page 158

the -- again, because the intent of the security statement was to kind of answer some of those customer questionnaires. I focused more on ensuring that what we put on the security statement was a true representation of what we were practicing at the time.
BY MR. TODOR:
    Q.  But for instances where you didn't have a pre-existing response to a customer questionnaire, did you have personal knowledge sufficient to tell whether the information that you were getting from wherever you were getting it from was correct before you passed it up to Mr. Brown?
    MR. TURNER: Objection to form.
    A.  As I described earlier, if we did not have a precanned response, right, I reached out, had those conversations and then leaned on the subject matter experts to give me the response. I had no reason to believe that those were inaccurate.
BY MR. TODOR:
    Q.  Did Mr. Brown ever tell you that anything -- he thought that anything in the draft security statement you sent him was wrong?
    A.  Again, I don't recall. It's been so long.

## Page 159

    Q.  Did he ever say anything like, No, we don't really do that, you have to change that, anything along those lines?
    A.  I don't distinctly remember him or I having that conversation. I don't.
    (Deposition Exhibit 9 marked for identification.)
BY MR. TODOR:
    Q.  Mr. Quitugua, you've been presented with a document marked as Quitugua 9. Appears to be an e-mail Bates SW-SEC00466120 through 142. Appears to be an e-mail from you dated December 27th, 2017, to Lashanna Martin-Wood. Subject, re: Personal security statement for SolarWinds website.
    Security statement for SolarWinds website.
    Do you recognize this e-mail, sir?
    A.  Give me a few seconds or a minute to read the content.
    Q.  Please familiarize yourself with the document and tell me.
    (Witness reviews document.)
    A.  Okay.
BY MR. TODOR:
    Q.  Do you recognize the document, sir?

## Page 160

    A.  I do recognize the document, yes.
    Q.  Do you recognize this as an e-mail that you sent in the course of your duties at SolarWinds?
    A.  Yes.
    Q.  Why were you sending this e-mail?
    A.  We were at the tail end of the process to get the actual security statement published to the website and this was work that I was doing with the team responsible for getting the content posted since we were not allowed to make those posts ourselves, to ensure that everything -- all the processes were followed before it gets pushed -- the final published version gets posted to the website.
    Q.  Who made the last call on what the language in the security statement was going to be?
    MR. TURNER: Objection, foundation.
    A.  Could you repeat the question, please?
BY MR. TODOR:
    Q.  Who made the last call on what the language in the security statement was going to be?
    A.  As I described earlier, I think it was a collaboration -- it was a collaborative effort, right. I drafted it, I worked with the stakeholders and subject matter experts. It was reviewed -- peer reviewed, was reviewed by multiple and then, you

## Page 201

Updated slides.

Mr. Quitugua, I'd ask you to turn to the second page, appears to be a PowerPoint slide titled Major Project Portfolio.

Did you play any role at SolarWinds in the collection of information for a major project portfolio presentation around this time?

A. There may be security-specific slides in this presentation, but I'd have to -- you have to give me a few minutes to review.

Q. Well, maybe I can help you. Can you turn to the one with Bates 42906. And this appears to be a slide titled Security Assessment and Remediation of the top -- appears to say DOIT lead, you; is that correct?

A. Uh-huh.

Q. Does that fresh your recollection as to whether you played any role in preparing this slide or something like it for this particular presentation?

A. For this particular slide, yes.

Q. What was your role?

A. Again, let me look at the time frame. 2018. If I recall, we were working through GDPR readiness and one of the tasks was to conduct a

## Page 202

security assessment and remediation.

Q. Had you done any security assessments or remediations outside of GDPR readiness at this time?

MR. TURNER: Objection to form.

A. You mean as part of the actual portfolio work that is in this exhibit?

BY MR. TODOR:

Q. As part of your job outside of this exhibit.

A. Other than what we already had talked about earlier, this was -- this was the only other one I could think of.

Q. Look at the description for the slide. It states: Conduct an enterprisewide security assessment of access control and security standards and guidelines using the NIST cybersecurity framework.

Do you see that?

A. (Nods head.)

Q. Why were you doing that?

A. First, yes, I do see that.

Second, it was a -- this was a task that was generated, again, I don't recall who generated it, either Rani and/or Tim, but it was assigned to me as the lead to ensure that I followed through.

## Page 203

Q. You're saying it's either Rani Johnson or Tim Brown who decided that this was going to be the task and it got assigned to you?

A. Yes.

Q. Do you know why it was being assigned -- or why this was a task that SolarWinds was doing at this time?

A. Again, what I can recall is that we were working through GDPR readiness. That's what I can recollect.

Q. Do you know whether it was specifically tied to GDPR or was it a more general initiative?

MR. TURNER: Objection, asked and answered.

A. Again, my recollection is that we were in the middle -- or in the process of assessing our readiness for GDPR.

BY MR. TODOR:

Q. Next sentence says: Develop a risk register and provide security guidance as part of remediation efforts to prevent, detect and respond to cybersecurity attacks and comply with applicable regulations.

Do you see that?

A. I do see that.

## Page 204

Q. And was this, again, an objective that was come up with above you and was assigned to you to work on?

A. Again, I don't recall the specifics around, you know, the scope of the actual task of the work. I took all my guidance for direct work from Tim Brown and Rani Johnson.

Q. There's a budget figure of zero dollars listed for this.

Is that consistent with your recollection?

MR. TURNER: Objection to form.

A. It does state zero across the columns there.

BY MR. TODOR:

Q. Did you get any funding to conduct an enterprisewide security assessment of access control and security standards and guidelines using the NIST cybersecurity frameworking?

MR. TURNER: Object to form.

A. I don't recall if we ever even needed funding to do the internal security -- or the assessment to accomplish this work.

BY MR. TODOR:

Q. Did you perform such an assessment in

privileged and nonprivileged access. Probably
needed to end there.
    Does that description sound accurate to
you?
        MR. TURNER: Object to form.
    A.  As written in the description for the
actual project task itself?
BY MR. TODOR:
    Q.  Yes.
    A.  Right. I mean, that's what I understand
it to be.
    Q.  Does that match your understanding of
what the scope of your assignment was in terms of
the issue you were addressing?
    A.  It described the scope.
    Q.  Again, she seems to list a budget of zero
dollars.
        Is that consistent with your
recollection?
        MR. TURNER: Object to form.
    A.  Again, during this time period it may
not -- we would have done the assessment and if it
didn't cost external dollars to conduct it, like we
were going to do it ourselves, that's what we would
have put.

217

BY MR. TODOR:
    Q.  What resources would you have available
to assess your access management if you're not
spending additional dollars?
    A.  This really referenced external spending,
right. It didn't really address -- there was
no -- it was assigned to the security team, but they
didn't tie dollars to the internal security team
doing this work. This was intended to track
external budget --
    Q.  Supply a new security tool, something
like that?
    A.  Hire a contractor or, right, a vendor.
That would have been reflected under the budget.
    Q.  This would be just if you're adding it to
your own internal to-do list, there wouldn't be an
extra external budget figure attached to it; is that
correct?
    A.  Right.
    Q.  Turn down to the issues, risks and
dependencies. Click the first one, it says:
Concept of least privilege not followed as a best
practice.
        Do you see that?
    A.  I do.

218

    Q.  Do you have an understanding as to why
that's there?
    A.  Again, since this was a kind of a point
in time, that could have very well been raised as a
concern. I would expect that in phase 1 where it is
marked as complete, that there's a correlation
between that body of work and any addressing of the
issues, risks and dependencies. I can't sit here
today and tell you that that was a risk and concern
at that point in time because, again, there was work
to be done here before the next presentation.
    Q.  So I'm just talking about March 16, 2018.
    A.  Uh-huh.
    Q.  Was it considered to be an issue, risk
and dependency that the concept of least privilege
was not followed as a best practice within
SolarWinds?
        MR. TURNER: Objection to form and
foundation.
    A.  The issue, risk and dependencies listed
here, doesn't indicate that it was a problem across
the organization. As part of the assessment, it may
have been found that a particular system wasn't
following the concept of least privilege.

219

BY MR. TODOR:
    Q.  As we're sitting here today, do you
recall any particular instances within SolarWinds
that the concept of least privilege was not being
followed as a best practice as of this March 2018
time frame?
    A.  Not that I can distinctly recall. But
like I described earlier, we do have those kind of
defined steps to go through to identify, take in the
reports and then address and fix.
    Q.  Turning to the Action Required column,
appears to state: ID existing permission levels
within the enterprise.
        Do you see that?
    A.  Uh-huh. Yes.
    Q.  Is that an action that you were in charge
of as of March 2018?
    A.  It would have been an action that we
worked collectively as a group in order to
accomplish this particular project task.
    Q.  And were you the lead on that particular
aspect of the task?
    A.  For that particular issue, risk and
dependencies, I don't recall if I was or not.
    Q.  Turn to the second description.

220

1  Statement: Use of shared accounts throughout
2  internal and external applications.
3      Do you see that? What's your
4  understanding of what that issue is?
5      A.  I'm trying to recall. I don't have a
6  recollection of what shared accounts in that
7  particular context meant.
8      Q.  What is a shared account, based on your
9  knowledge, generally?
10     A.  Generally it's an account that's shared.
11     Q.  By more than one user within the
12 organization?
13     A.  Not necessarily.
14     Q.  Who would be sharing it?
15     A.  A computer.
16     Q.  Could you please explain what you mean by
17 that?
18     A.  Yeah. So sometimes an account different
19 from a human account can be used by a computer to
20 perform its function. And that same service
21 account -- or account could be used in a different
22 computer, again, doing the same function to do its
23 job as well.
24         MR. TURNER: Hey, JJ, just flagging
25 that we're past the hour mark, so whenever you have

221

1  process.
2  BY MR. TODOR:
3      Q.  Turn to the second action required.
4  There's a statement: Work with teams to
5  decommission use of shared accounts.
6          Do you know what that means?
7      A.  I mean, looking at the document again, it
8  says to work with teams to decommission accounts.
9      Q.  What does decommission use of shared
10 accounts mean?
11     A.  To basically disable the account or
12 separate the use of that account by multiple systems
13 or multiple people.
14     Q.  And were you tasked with making sure that
15 happened?
16     A.  Again, I was tasked to ensure that I
17 delivered the project. I worked with multiple
18 people. There could have been others on the team or
19 within the IT groups that were responsible for doing
20 that.
21     Q.  Okay.
22         MR. TODOR: Counsel, we can take a
23 break now if you'd like.
24         MR. TURNER: Sure. Thank you.
25         THE VIDEOGRAPHER: Going off the

223

1  a break coming up soon.
2         MR. TODOR: Sure.
3  BY MR. TODOR:
4      Q.  To your knowledge, with respect to the
5  previous issue, who at SolarWinds would know whether
6  a particular system was not following a concept of
7  least privilege?
8          MR. TURNER: Objection to form.
9      A.  Are you asking if there was one
10 individual that would -- I don't know if I -- I
11 don't understand the question. Could you please...
12 BY MR. TODOR:
13     Q.  So who would be responsible for
14 identifying whether a particular system was
15 following a concept of least privilege?
16         MR. TURNER: Objection to form.
17     A.  There would be multiple ways in which we
18 would identify or get -- get reports of, you know,
19 systems or applications or users not following.
20 BY MR. TODOR:
21     Q.  Would Mr. Brown be in charge of that?
22         MR. TURNER: Objection to form and
23 asked and answered.
24     A.  Again, there are multiple ways that we
25 would get it and we would follow the standardized

222

1  record. Time is 3:18.
2          (Recess taken from 3:18 p.m. to
3  3:39 p.m.)
4          THE VIDEOGRAPHER: Back on the
5  record. Time is 3:39.
6  BY MR. TODOR:
7      Q.  Welcome back, Mr. Quitugua. I believe we
8  were discussing the page with Bates 42907 in the
9  lower right. Are you still there?
10     A.  Yes.
11     Q.  Okay. I'll just draw your attention to
12 the key milestones and status list there, and just
13 ask, do you have an understanding as to how those
14 milestones were generated and...
15     A.  I don't know if I understand the
16 question. Just kind of how were they laid out?
17     Q.  Yeah. How was it decided that those
18 would be the milestones?
19     A.  As part of all the project kickoffs,
20 there's, like, a discovery phase and then in the
21 discovery phase each of the different key dates or
22 milestones would be described, and then there was
23 some discussion on timing, right. So that's where
24 you see the start-to-finish dates in there.
25     Q.  What role, if any, did you play in

224

**Page 321**

1  time frame? You're pointing to a document that's
2  from November 30th, 2020, and SUNBURST was not
3  discovered until December 2020.
4      MR. TODOR: I wasn't asking about the
5  document at all.
6      MR. TURNER: I know. But he's
7  pointing to the document. It's not clear for the
8  record.
9  BY MR. TODOR:
10   Q. I don't want to confuse you with my
11 question.
12   A. Yes.
13   Q. Apart from the document, you said you
14 played a role in dealing with the incident response
15 for SUNBURST.
16   A. Uh-huh.
17   Q. Based on what you've learned from working
18 on that incident response, do you have an
19 understanding as to whether the vulnerability
20 utilized by the SUNBURST intruders related to
21 SolarWinds' access controls?
22     MR. TURNER: Objection to form.
23   A. During this time frame we would not have
24 known that as part of the security investigation.
25

**Page 322**

1  BY MR. TODOR:
2    Q. After you did the security investigation,
3  did you get an understanding as to whether the
4  vulnerability utilized by the SUNBURST intruders
5  related to SolarWinds' access controls?
6      MR. TURNER: Same objection.
7    A. I don't recall whether or not we came to
8  that conclusion.
9  BY MR. TODOR:
10   Q. After you did the security investigation,
11 did you get an understanding as to whether the
12 vulnerability utilized by the SUNBURST intruders
13 related to SolarWinds' administrative rights
14 practices?
15     MR. TURNER: Objection to form.
16   A. Again, to the extent of my responsibility
17 and my team's responsibility, all we did was
18 facilitate the security incident from start to
19 finish.
20 BY MR. TODOR:
21   Q. Turning back to these quarterly risk
22 review meetings. Do you know what the purpose
23 generally within the organization of having those
24 was?
25   A. I'm sorry, which ones?

**Page 323**

1    Q. The quarterly risk reviews that we looked
2  at a couple of those documents. I think it was the
3  last -- the first one after the break here. Do you
4  know, like, why they were being prepared within the
5  organization?
6    A. I can only speak to what I contributed to
7  for preparing the presentations.
8    Q. Do you know who in the organization would
9  have been the audience for those?
10   A. I don't have direct firsthand knowledge
11 of who all participated in the -- you know, the
12 higher level.
13   Q. Did you present at any of them?
14   A. During this time period?
15   Q. During the 2018 to 2020 time period.
16   A. I don't recall that I did.
17   Q. And after that -- you know, between 2020
18 and now, have you presented at any of those?
19   A. I do now in some cases.
20     MR. TODOR: Those are all the
21 questions I have for now.
22     MR. TURNER: Thank you.
23     EXAMINATION
24 BY MR. TURNER:
25   Q. Mr. Quitugua, I have a few questions for

**Page 324**

1  you. So the security statement, Exhibit 10, it went
2  live around January 2018.
3      Does that sound right?
4    A. I'm sorry, say that again.
5    Q. The security statement, Exhibit 10, do
6  you remember approximately when it was published on
7  SolarWinds' website?
8    A. It would have been around that same time
9  frame, yes.
10   Q. Early -- January 1, 2018?
11   A. It would have been, yes.
12   Q. Do you know whether -- well, the -- you
13 were asked some questions about the access control
14 section of the document. Remember that?
15   A. Yes.
16   Q. And the document talks about role-based
17 access controls, right?
18   A. I do recall.
19   Q. And is that right? The document talks
20 about role-based access controls; is that right?
21   A. That's right.
22   Q. And it also talks about the principle of
23 least privilege?
24   A. Yes, it does.
25   Q. So do you know whether role-based access

**Page 325**

1  controls were implemented at SolarWinds as of
2  January 2018?
3      A.  Yes, they were.
4      Q.  Do you know whether they were in place
5  when you were initially hired?
6      A.  Yes, they were.
7      Q.  Do you know whether they've been in place
8  throughout your tenure?
9      A.  They are.
10     Q.  They have been?
11     A.  They have been.
12     Q.  As of January 2018, how were role-based
13 access controls implemented at SolarWinds?
14     A.  They were implemented through user access
15 lists.
16     Q.  What do you mean?
17     A.  Active directory was the primary means of
18 which the user access lists were created.
19     Q.  And I want to see if you can break it
20 down for us at a nontechnical level.  Okay.  So if I
21 was a starting employee in January 2018, how would
22 SolarWinds have ensured that the access granted to
23 me was based on my role and was set on a least
24 privilege basis?
25         MR. TODOR:  Objection to form,

**Page 326**

1  compound, vague.
2  BY MR. TURNER:
3      Q.  You can answer.
4      A.  A new hire -- or, yeah, when somebody's
5  hired to the company, that kicked off a SARF
6  process.  That process defined what level of access
7  is granted to that new hire.
8      Q.  And I want you to break it down step by
9  step what would have happened.  I join the company.
10 What happens?  How is it determined how much access
11 I need and how is that access provisioned?
12     A.  You would be hired.  That would trigger a
13 SARF request.  That request would be approved by the
14 hiring manager.  The hiring manager would send that
15 request to the IT team.
16     Q.  What would the request say about what
17 level of access I needed?
18         MR. TODOR:  Objection, form.
19     A.  The SARF form described exactly what
20 level of access your job required of you.  That
21 form -- the request then gets to the IT team, who is
22 responsible for creating the accounts and adding it
23 to the user access lists that were made -- or
24 managed through active directory.
25

**Page 327**

1  BY MR. TURNER:
2      Q.  So who would make the request for the
3  level of access I needed?
4      A.  It would be the hiring manager.
5      Q.  And who would receive the request?
6      A.  The IT team would receive that request.
7      Q.  And at a technical level, how would the
8  request be processed?
9      A.  That request would be processed through
10 active directory group policy and group memberships.
11     Q.  And what do you mean when you talk about
12 user access list or groups?
13         MR. TODOR:  Objection, vague.
14     A.  Could you repeat the question one more
15 time, please?
16 BY MR. TURNER:
17     Q.  Yeah.  You mentioned user access or
18 access control lists I think is the term you used.
19 What does that have to do with this process?
20     A.  So say you were hired as a finance team
21 member, your account based on your hiring -- the
22 hiring manager's request for access would be added
23 to a very specific group for finance.  If you were
24 in HR, you would be added to an HR group.  And what
25 that did -- or does is it only grants you the least

**Page 328**

1  level of privilege that's required for you to do
2  your work.
3      Q.  So you were shown earlier a couple of
4  e-mail chains involving a proposal from Robert
5  Krajcir.
6         Do you remember that?
7      A.  Yes.
8      Q.  Now, were you actively involved in
9  analyzing that proposal or is that something you
10 understood was analyzed by others?
11         MR. TODOR:  Objection, leading.
12     A.  Received the e-mail and really it wasn't
13 something that we actively worked ourselves.
14 BY MR. TURNER:
15     Q.  Who is "we"?
16     A.  The security team.
17     Q.  Who did, if anyone, work it as far as you
18 understood?
19     A.  It would have been under Brad Cline's
20 organization.
21     Q.  So given that, do you remember much about
22 the details of the proposal?
23     A.  Other than what was in the e-mail that
24 Robert sent, no.
25     Q.  Do you remember analyzing whether the

Eric Quitugua
9/17/2024

---

**Page 333**

1 SolarWinds sometime after January 2020; is that
2 right?
3   A.   I do recall saying that, yes.
4   Q.   If the SEC were to assert in this case
5 that based on the fact that NAC was implemented
6 after January 2020, that SolarWinds lacked
7 role-based access controls before that time, would
8 that assertion be correct or incorrect?
9        MR. TODOR:  Objection, form, leading,
10 calls for legal conclusion.
11   A.   That would be incorrect.
12 BY MR. TURNER:
13   Q.   If the SEC were to assert based on the
14 fact that NAC was implemented after January 2020, if
15 SolarWinds didn't follow the principle of least
16 privileged before that time, would that be correct
17 or incorrect, in your view?
18        MR. TODOR:  Same objections.
19   A.   In my view it would be incorrect.
20 BY MR. TURNER:
21   Q.   The security statement also talks about
22 SolarWinds' best practices enforcing complex
23 passwords.
24        Remember that?
25   A.   Yes.

---

**Page 334**

1   Q.   At the time the security statement was
2 published, did SolarWinds enforce complex passwords
3 on its IT network?
4        MR. TODOR:  Objection, form.
5   A.   It did enforce the password policy.
6 BY MR. TURNER:
7   Q.   Has that been true throughout your tenure
8 at SolarWinds?
9   A.   It has been.
10   Q.   And at the time of January 2018, how did
11 SolarWinds enforce complex passwords on its IT
12 network?
13   A.   It was enforced through active directory
14 group policy.
15   Q.   And what do you mean exactly?  How did
16 that work?
17   A.   That basically -- that technical policy
18 basically states that if you were to type in a
19 password that didn't meet its complexity and length
20 requirements, that you would not be allowed to
21 create that password.
22   Q.   You were shown a lot of notations in
23 slide decks and other documents today.
24        You remember that?
25   A.   Yes.

---

**Page 335**

1   Q.   How long ago were these documents from,
2 generally?
3        MR. TODOR:  Objection, form, vague.
4   A.   Several years.  It's a lot of documents,
5 a lot of content.
6 BY MR. TURNER:
7   Q.   You were shown a number from 2017, right?
8   A.   Yes.
9   Q.   2018?
10   A.   Yes.
11   Q.   2019?
12   A.   Uh-huh.  Yes.
13   Q.   Five or more years ago?
14   A.   Yes.
15   Q.   How good is your memory of all the
16 details of various documents that you were sent five
17 years ago or more?
18        MR. TODOR:  Objection, form, leading.
19   A.   I mean, I participated in multiple
20 meetings, chats, presentations.  I can't remember it
21 all.  I'm trying to do my best, but I know I don't.
22 BY MR. TURNER:
23   Q.   And the various notations you were shown,
24 did you write all those notations?
25   A.   Not to my recollection, no.

---

**Page 336**

1   Q.   Do you specifically remember reading them
2 at the time?
3   A.   I do not.
4   Q.   Do you remember all the context relating
5 to those notations sitting here today?
6   A.   No.
7   Q.   Do you remember, however, whether
8 SolarWinds had role-based access control throughout
9 the time of your employment at SolarWinds?
10        MR. TODOR:  Objection, form, asked
11 and answered.
12   A.   Yes, they were in place.
13 BY MR. TURNER:
14   Q.   And do you remember whether SolarWinds
15 followed the principle of least privilege?
16   A.   Yes, they did follow the concept of least
17 privilege.
18        MR. TURNER:  No further questions.
19        FURTHER EXAMINATION
20 BY MR. TODOR:
21   Q.   One item.  Mr. Quitugua, in your direct
22 examination you used a term "SARF."  What does
23 "SARF" mean?
24   A.   I don't recall exactly what the acronym
25 stands for, but it's basically a request form

---

**Page 337**

1 submitted to kick off the account provisioning
2 process.
3   Q.  To whom was the form submitted?
4   A.  It was submitted -- IT eventually got the
5 form to process and created the accounts and set up
6 the level of access and level of permission.
7   Q.  And was that Mr. Cline's group?
8   A.  Yes, that would have been Mr. Cline's
9 group.
10   Q.  Did the InfoSec group have any role with
11 respect to the setting of user privilege levels in
12 response to a SARF?
13   A.  No, I don't recall that we had direct --
14 a direct responsibility for, you know, adding that
15 content.  What I can say is if there were -- if
16 there was an access that didn't meet the existing
17 roles that were defined, my team would have been
18 advised or consulted and said, you know, There's a
19 business justification for this, you know, could we
20 go ahead and document this access request.  And
21 that's the extent of our involvement.
22   Q.  Forgive me if I'm misremembering, but I
23 thought during my original examination of you I had
24 asked about when someone applies and then there'd be
25 permission levels set by an individual manager at

**Page 338**

1 SolarWinds.
2       Is that different from what you're
3 describing here with this SARF process?
4   A.  Individual levels ascribed by the
5 manager?  If I recall what we were talking about
6 previously, the hiring manager defined what roles
7 the new employee or their direct report needed
8 access to or, you know, what resources.
9       That determined what groups -- what user
10 access lists that new employee would be -- become a
11 member of.
12   Q.  And then was that information sent to the
13 IT group for setting of the user privilege level or
14 nonprivilege level for that particular employee in
15 response to a SARF?
16   A.  It would be sent to the IT to configure
17 the settings or add that account to the respective
18 groups that were already set in active directory.
19   Q.  Did that process vary from group to group
20 within SolarWinds?
21   A.  Could you describe -- I don't understand.
22   Q.  From the 2018 to 2020 time frame, would
23 the process of a manager determining the privilege
24 level to be given to a given employee and sending it
25 to IT for them to set the privileges, was that

**Page 339**

1 uniform companywide or was there some variation?
2   A.  I don't recall if there were a separate
3 process for that.
4   Q.  Did some managers decide that some
5 employees would need more access than a manager in
6 another section might decide that an employee with
7 similar job duties might need?
8       MR. TURNER:  Objection to form and
9 foundation.
10   A.  The user access lists were already
11 predefined based on the user's role and job within
12 the organization.  As I described earlier, if a
13 manager or individual requested additional levels of
14 access, that followed a very similar process where
15 the access would be reviewed, there was a business
16 justification, and once those were in place, then
17 the IT team would go ahead and, you know, create
18 that user privilege or user access.
19 BY MR. TODOR:
20   Q.  You were asked some questions about the
21 e-mail from Mr. Krajcir in August of '18 and I
22 believe during your direct examination you were
23 asked questions with respect to his issue he raised
24 regarding full admin rights for users to have at
25 SolarWinds.

**Page 340**

1       Do you remember that testimony?
2   A.  Yes.
3   Q.  Were you concerned when Mr. Krajcir
4 raised that issue?
5   A.  I don't recall during that time period
6 whether what he said raised to a level that would
7 warrant us to track it as a security incident.
8   Q.  If you don't recall that time period,
9 whether what he said raised to a level that would
10 warrant you to track it as a security incident, why
11 did you go back to Mr. Brown in January of 2020 and
12 ask him to look at it again?
13   A.  I was just doing my part.  I was doing my
14 part to say, Hey, look, is it something that you
15 want me -- you want us to dig deeper in?  And that's
16 really what the intent was.
17   Q.  You were asked some questions about use
18 of active directory with respect to the password
19 policy during your direct.  To your knowledge, was
20 there -- starting in the 2018 to 2020 time frame,
21 was there any audit done to see whether active
22 directory was being properly implemented at
23 SolarWinds?
24       MR. TURNER:  Object to form.
25   A.  I don't recall if there were any audits

```
 1  or team, you know, triggered this alert and we would
 2  dig in and find out the reason why.
 3      Q.   And when you say "we," what's that a
 4  reference to?
 5      A.   That is a reference to the security team.
 6      Q.   Okay.  And did that happen during the
 7  2018 to '20 time frame?
 8      A.   Yes.
 9      Q.   And what was the purpose of having those
10  alerts in place?
11      A.   So that we could detect any, you know,
12  triggers or issues that may arise --
13      Q.   More specifically, what was the purpose
14  of getting an alert about somebody getting more
15  privileges added to their account?
16           MR. TODOR:  Objection, form.
17      A.   So that we can --
18           MR. TURNER:  Leading.
19      A.   So we could detect whether or not, you
20  know, the controls that were in place were
21  effective.
22           MR. TURNER:  No further questions.
23           FURTHER EXAMINATION
24  BY MR. TODOR:
25      Q.   Probably just have one more.  You used
```
345

```
 1  the term "user access reviews."  Who would do those
 2  at SolarWinds?
 3      A.   I do know that it wasn't primarily done
 4  by the security team.  It was done by somebody in
 5  Brad Cline's organization.
 6      Q.   Do you know why they would do those?
 7      A.   They would do it to review, again, like I
 8  described earlier, whether or not the access that
 9  was granted was still legitimate.
10           MR. TODOR:  I have no further
11  questions.
12           MR. TURNER:  Okay.  Thanks.  No
13  further questions from me.
14           THE VIDEOGRAPHER:  This concludes
15  today's testimony of Eric Quitugua.  Going off the
16  record.  Time is 7:16.
17           (Deposition concluded at 7:16 p.m.)
```
346

```
 1           REPORTER'S CERTIFICATION
 2      I, Micheal A. Johnson, Registered Diplomate
 3  Reporter and Notary Public in and for the State of
 4  Texas, certify that on the 17th day of
 5  September, 2024 I reported the Videotaped Deposition
 6  of ERIC QUITUGUA, after the witness had first been
 7  duly cautioned and sworn to testify under oath; said
 8  deposition was subsequently transcribed by me and
 9  under my supervision and contains a full, true and
10  complete transcription of the proceedings had at
11  said time and place; and that reading and signing
12  was not requested.
13      I further certify that I am neither counsel
14  for nor related to any party in this cause and am
15  not financially interested in its outcome.
16      GIVEN UNDER MY HAND AND SEAL of office on
17  this 23rd day of September, 2024.
18
19           _____
             MICHEAL A. JOHNSON, RDR, CRR
20           NCRA Registered Diplomate Reporter
             NCRA Certified Realtime Reporter
21
             Notary Public in and for the
22           State of Texas
             My Commission Expires:  8/8/2028
23
24
25
```
347

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**