# EXHIBIT 55

Page 226

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )  File No. C-08755-A
SOLARWINDS CORPORATION     )
                           )

WITNESS:  Eric Quitugua

PAGES:    226 through 427

PLACE:    Securities and Exchange Commission

          175 West Jackson Blvd.

          Chicago, Illinois

DATE:     Wednesday, September 1, 2021


     The above-entitled matter came on for hearing, via WebEx, pursuant to notice, at 9:32 a.m.




Diversified Reporting Services, Inc.

(202) 467-9200

Page 227

1   APPEARANCES:
2
3   On behalf of the Securities and Exchange Commission:
4       WILLIAM NEY, ESQ., Senior Counsel
5       LORY STONE, ESQ., Senior Counsel
6       BENJAMIN BRUTLAG, ESQ., Senior Counsel
7       MICHAEL BAKER, ESQ., Senior Counsel
8       KENNETH ZAVOS, IT Forensics Specialist
9       Securities and Exchange Commission
10      Division of Enforcement
11      175 West Jackson Blvd.
12      Chicago, Illinois
13      (202) 551-7612
14
15  On behalf of the Witness:
16      JULIE RIEWE, ESQ.
17      ANNA MOODY, ESQ.
18      JONATHAN DEMARS, ESQ.
19      Debevoise & Plimpton
20      801 Pennsylvania Avenue N.W.
21      Washington, D.C. 20004
22      (202) 383-8070

Page 228

1   APPEARANCES(CONT.):
2
3   Also Present:
4
5       Jason Winds, SolarWinds EVP and Chief
6       Administrative Officer
7       Becky Melton, SolarWinds, VP of Legal
8       Era Calhoun, Paralegal

Page 229

1               C O N T E N T S
2
3   WITNESS                           EXAMINATION
4   Eric Quitugua                         230
5   EXHIBITS:    DESCRIPTION          IDENTIFIED
6   1     Formal Order                    231
7   6     Incident Improvement Plan 6/22/20    282
8   18    Security Compliance 5/17/19        310
9   19    Quarterly Overview 8/16/19         326
10  23    Pierce Email 1/11/18               336
11  25    Q1 2020 QRR 3/3/20                 319
12  31    8/18/21 Subpoena                   231
13  36    Brown Email 11/19/19               264
14  37    PSIRT Email 11/19/19               356
15  39    Trump Email 4/25/17                366
16  40    Security Team Email 11/6/20        370
17  41    WhiteSource Email 9/8/20           386
18  42    Pierce Email 6/13/18               394
19  43    Esquitin Email 6/5/20              398
20  44    Kanalyanee Email 9/18/20           403
21  46    Confluence RAF 9/3/20              409
22  47    ITOM DOJ Malware Issues            414
23  48    Security Review 6/24/20            423
24  49    Brown-Nels Messaging 12/7/20       420

Page 230

1               P R O C E E D I N G S
2           MR. NEY: We are on the record at 9:32 a.m. on
3   September 1st, 2021. Present for the Commission are
4   Brad Ney, Era Calhoun, Lory Stone, Mike Baker, Ken
5   Zavos, and Benjamin Brutlag, who are all officers of the
6   Commission for purposes of this proceeding.
7           The witness, Eric Quitugua is here. Mr.
8   Quitugua, I'll ask you to raise your right hand so I can
9   administer the oath.
10          Do you swear to tell the truth, the whole
11  truth, and nothing but the truth?
12          MR. QUITUGUA: Yes, I do.
13  Whereupon,
14              ERIC QUITUGUA
15  was re-called as a witness and, having been previously
16  duly sworn, was examined and testified further as
17  follows:
18          MR. NEY: Thank you.
19          Could counsel please go ahead -- counsel for
20  Mr. Quitugua go ahead and introduce themselves for the
21  record.
22          MS. RIEWE: Sure. From Debevoise & Plimpton,
23  Julie Riewe, Anna Moody, and Jonathan DeMars, and from
24  SolarWinds, Jason Bliss and Becky Melton.
25          MR. NEY: Great. Thank you. So we're

2 (Pages 227 to 230)

Page 287

1  way to -- to remediate the fact that they're not using
2  the concept of least privileged, though, other than
3  making them -- putting those systems on the domain?
4      A   Yeah, I mean, we -- we first look at business
5  justification, right.  Our processes say, look, all
6  systems that are on the network, the managed network,
7  must be or should be on the domain, right.  And so the
8  first question we ask is, well, what is -- why is it not
9  joined to any domain?  What is the business
10 justification?  And if they -- if one can't be given,
11 then we work with the system owner to put it on the
12 domain so it does get the domain policies.
13     Q   Okay.  Then so the only way to make sure that
14 the domain policies are being followed is if you
15 actually add those workstations to one of the existing
16 domains?
17     A   It gives the IT groups the ability to control
18 what policies get enforced, yes.
19     Q   Okay.  And if it's not -- if it's not on one
20 of the domains, you don't have the ability to enforce
21 that?
22     A   We have the ability to reach out and find who
23 -- you know, who owns it and then have those subsequent
24 conversations about, you know, why isn't it on the
25 domain, those types of things.

Page 288

1      Q   Yes.  But you can't apply the rules to it if
2  it's not --
3      A   You can't apply the domain rules, yes.
4      Q   Okay.  Looking again at the slide that's in
5  12273 in Exhibit 36, it's the same slide we had been
6  looking at before we went to the org chart, there's a
7  second issue that's identified and says, "The use of
8  shared accounts throughout internal and external
9  applications."  Can you tell me what that issue refers
10 to?
11     A   That was specifically addressing service
12 accounts that were being shared.
13     Q   Is there a security issue relating to the use
14 of those shared accounts?
15     A   Yes, we talked a little bit about that
16 yesterday and some of the risks associated with that.
17 There's no way for -- for teams to identify, you know,
18 who was the individual using that shared credential.
19     Q   And so that would -- so would that be access
20 control or an access management issue?
21     A   It would be an item, yes, that needs to be
22 remediated, yes.
23     Q   Okay.  So we had talked -- we had talked about
24 access -- access control.  Let me ask this first.  This
25 slide entitled "Enterprise Access Management," is that

Page 289

1  the same as what you referred to yesterday as access
2  control?
3      A   I'm not sure I understand the question.  Could
4  you repeat?
5      Q   The top of this slide is entitled "Enterprise
6  Access Management."  Yesterday we looked at a policy or
7  a guideline that related to access control.  Are those
8  the same thing?
9      A   Yeah, I would say they are, yes.
10     Q   Access management and access control, in your
11 -- in your mind, those are referring to the same thing?
12     A   In the context of the project, yes.  The
13 access management project dealt with how we improve
14 access controls as defined in our guidelines.
15     Q   Okay.  In the -- so in this early 2018 time
16 period, why was it that shared accounts were being used
17 throughout the internal and external applications?
18     A   I'm not sure I understand.  Can you repeat one
19 more time, please?
20     Q   Yeah.  So early 2018, and you were saying that
21 the use of shared accounts was an issue that you
22 identified in this presentation.  I'm just wondering why
23 was it that shared accounts were being used in time
24 period?
25     A   So shared accounts, service accounts that were

Page 290

1  being used at the time were used to run automated
2  scripting processes within the business applications.
3  This is a good business use case for the use of service
4  accounts.  What we found was that these service
5  accounts, which were purpose built to run processes,
6  were also being used by, you know, users, and they also
7  knew the credentials, right.  So that case, we
8  considered those accounts shared accounts, accounts that
9  users should not have access to had access to
10 credentials.
11         So although there was a legitimate business
12 use case for the use of the service account, multiple
13 people had access to that service account which then
14 made it a shared account, and so we identified which
15 accounts were being used.  Again, interviewed the -- the
16 application owner,; determined the business
17 justification; and said, look, if it's a purpose built
18 service account, it should be the only -- nobody should
19 have access to it or whoever does should have, you know,
20 documentation.  So, yeah, in that context, that's, you
21 know, what we were calling shared accounts.
22     Q   And the purpose -- and you said the purpose
23 built -- what was the phrase you used?
24     A   Purpose built service account.
25     Q   Yeah.  So the purpose built service accounts,

17 (Pages 287 to 290)

Page 291

1  what was the -- what was the proper business use for
2  those to be used for?
3      A  So things like, you know, processing data,
4  moving data between the web frontend into the database,
5  right. In order to authenticate into the database, a
6  service account would be used to authenticate to the
7  database a trusted account used to authenticate to the
8  database. That's one business use case specific like to
9  business applications.
10     Q  Okay. And so that would be for a person who's
11 working on that business application as opposed to a
12 user of that business application; is that -- is that a
13 way to say it?
14     A  Not necessarily. So the service account is a
15 specific account used as part of the functioning of the
16 application, right. If -- I'll just use this as an
17 example. If I used my account to authenticate to the
18 database, every connection to the database you would see
19 coming from myself. So in order for -- for my account
20 not to get tied to that, a service account is purpose
21 built; given, you know, credentials and authorized to
22 access -- to act as that proxy to push the data from the
23 frontend of the database -- or I'm sorry -- the web
24 application to the database in that case.
25     Q  And you're distinguishing between -- you made

Page 292

1  a statement that users were using the service account.
2  Who are you referring to when you say "users"?
3      A  So the administrators of the application,
4  right, if you're developing the application, they may
5  have had access to that same service account, and using
6  that account for whatever business use. So we would
7  say, okay, well, this service account is being used by
8  multiple people, that shouldn't be the case, and that's
9  what we -- that's what the intent of this project was to
10 correct.
11     Q  Okay. And so the actions required that was
12 identified was to work with teams to decommission the
13 use of those shared accounts.
14     A  Yes.
15     Q  What does that entail, decommissioning the use
16 of the shared accounts?
17     A  The first -- the first portion of that was to
18 identify and confirm the business justification for
19 having them enabled. The second was to rotate the
20 credentials for any service accounts that were being
21 shared and then to enforce, you know, password
22 complexity requirements that we talked about.
23     Q  Okay. And so the idea was -- so the service
24 account would still exist and would still be used, but
25 you were trying to make sure that they couldn't -- that

Page 293

1  they couldn't be used as shared --
2      A  Shared accounts, yes.
3      Q  Okay. Down below, there's a October 16th,
4  2017 update in the notes. Understanding you may not
5  have drafted this, so I just want you to answer if you
6  are able to out of your own recollection, the first
7  sentence of that says, "Identity management continues to
8  be a concern." And the next sentence says, "Appropriate
9  checks are in place to grant access, but auditive access
10 is not consistently implemented." Do you recall that
11 being an issue that you were dealing with in this late
12 2017, early 2018 time period?
13     A  I don't recall. Again, I don't -- I don't
14 know -- I don't recall having made this note because it
15 doesn't even apply to the project. So I'm not sure if
16 it was a copy and paste from a different slide.
17     Q  Okay. But identity management does have to do
18 with the enterprise access management, correct?
19     A  Identification as part of access management is
20 a subset, yes.
21     Q  Okay. The last sentence of that says,
22 "Multifactor authentication should also be utilized in
23 more environments. A risk assessment will be completed
24 by 12/31." Do you recall having a recollection in the
25 late 2017, early 2018 time period of thinking that

Page 294

1  multifactor authentication should be utilized in more
2  environments at SolarWinds?
3          MS. RIEWE: Just to clarify, are you asking
4  him if he recalls whether he thought that at the end of
5  2017, early 2018?
6          MR. NEY: Yes.
7          THE WITNESS: Yeah, I don't recall. I know
8  during this time we -- the IT groups were exploring how
9  to leverage multifactor. I don't know what state that
10 was in. I wasn't involved in that project.
11         BY MR. NEY:
12     Q  Which groups were involved in that project,
13 exploring the use of multifactor authentication?
14     A  It would have been -- I describe them as the
15 systems engineering groups, but I don't -- I'm not sure
16 the org chart. In the org chart that we looked at
17 earlier before the break, it was Jonathan Henry.
18     Q  Okay. Do you know in the 2018 time period
19 what all -- what all SolarWinds' network environment
20 multifactor authentication was utilized in?
21     A  I don't specifically recall. If you're
22 asking, you know, which environments had it and did not
23 have it, I don't recall which did and didn't.
24     Q  Okay. Do you recall any that did not in that
25 time period?

18 (Pages 291 to 294)

Page 423

1   Q   I'm going to show you just one more -- one
2   more document.  If I can refer you to Exhibit 48.
3           (SEC Exhibit No. 48 was marked for
4           identification.)
5       BY MR. NEY:
6   Q   Exhibit 48 is an exhibit that's
7   architecture/engineering security vulnerability and
8   incident review dated June 24th, 2020.  If you flip
9   through it, you'll see some of the same -- same
10  dashboards or same type of dashboards that we looked at
11  previously.  First, let me ask:  Are you familiar with
12  these architecture/engineering security vulnerability
13  and incident reviews?
14  A   Yes, I am familiar with it.
15  Q   Okay.  And is this -- were these used in
16  meetings that you would attend?
17  A   No, I don't believe these were meetings that I
18  would have attended.
19  Q   Okay.  How are you familiar with these
20  reports?
21  A   I would have been asked to provide the BI
22  reports that are shown in the exhibit.
23  Q   Okay.  I just want to ask about one very small
24  item in here.  If you flip to the Bates page ending in
25  6872, there's a year-to-date ITOM product review

Page 424

1   relating to security.  Do you see that?
2   A   Yes.
3   Q   At the bottom of that page, there is an
4   incident number, ITOM 2020570, and the description and
5   the title says that SolarWinds Papertrail customer
6   claims there's an attacker inside SolarWinds.  Do you
7   see that?
8   A   Yes.
9   Q   Do you have a recollection of that incident --
10  that incident in -- what came of that incident?
11  A   I don't recall the details around that
12  incident.  Again, we can always reference back to the
13  incident number in Confluence to get the details, but I
14  don't -- I don't recall the details around it.
15  Q   Okay.  And so with that incident number, then
16  you could -- you could find that and see what you-all
17  did and what you determined?
18  A   We would -- we would be able to look at the
19  logs and see what types of investigative steps were
20  taken.
21      MR. NEY:  Give me just a moment.  I'm just
22  going to see if there's any additional things.  Let me
23  just go ahead and ask that:  Is there -- are there any
24  additional questions that members of SEC team wanted to
25  ask at this point?

Page 425

1       MR. BAKER:  This is Mike, not from me.  Thank
2   you.
3       MS. STONE:  Not from me either, Brad.  Thanks.
4       MR. BRUTLAG:  Not from me.  Thank you.
5       MR. NEY:  Ken, any additional questions?
6       MR. ZAVOS:  I didn't have anything else.
7       MR. NEY:  Okay.  Great.  I think we are going
8   to go ahead and wrap up for today.  Mr. Quitugua, we
9   have no further questions for you at this time.  We may,
10  however, call you to testify again in this
11  investigation, and should that be necessary, we'll
12  contact you through your counsel again.
13          Before we close the record, do you wish to
14  clarify anything with respect to the statements that
15  you've made over the last two days?
16      THE WITNESS:  No.
17      MR. NEY:  Counsel, do you have any clarifying
18  questions that you'd like to ask before we close for the
19  day?
20      MS. RIEWE:  We do not.
21      MR. NEY:  We are off the record at 4:10 p.m.
22  on September 1st, 2021.
23          (Whereupon, at 4:10 p.m., the examination was
24  concluded.)
25              * * * * *

Page 426

1                PROOFREADER'S CERTIFICATE
2
3   In the Matter of:  SOLARWINDS, INC.
4   Witness:       Eric Quitugua
5   File No:       C-08755-A
6   Date:          Wednesday, September 1, 2021
7   Location:      Chicago, Illinois
8
9       This is to certify that I, Christine Boyce,
10  (the undersigned) do hereby certify that the foregoing
11  transcript is a complete, true and accurate
12  transcription of all matters contained on the recorded
13  proceedings of the investigative testimony.
14
15
16
17
18
19  _____   9-13-2021
20
21
22
23
24
25

```
                              Page 427
 1              REPORTER'S CERTIFICATE
 2
 3    I, Kevin Carr, reporter, hereby certify that the
 4    foregoing transcript is a complete, true and accurate
 5    transcript of the testimony indicated, held on 9-1-21,
 6    at Chicago, IL in the matter of:
 7    SOLARWINDS, INC.
 8
 9    I further certify that this proceeding was recorded by
10    me, and that the foregoing transcript has been prepared
11    under my direction.
12
13
14
15    9-13-2021
16
17
18
19
20
21
22
23
24
25
```

52 (Page 427)