# EXHIBIT 56

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE   )
     COMMISSION,               )
 5                             )
            Plaintiff,         )
 6                             ) Civil Action No.
        v.                     ) 23-cv-9518-PAE
 7                             )
     SOLARWINDS CORP. and      )
 8   TIMOTHY G. BROWN,         )
                               )
 9          Defendants.        )
     _____)
10
11
12
13
14
15      VIDEOTAPED DEPOSITION OF KELLIE JAIE PIERCE
16                    Plano, Texas
17              Wednesday, July 24, 2024
18
19
20
21
22   Reported by
23   April R. Brunson
24   Texas CSR No. 7495
25   Job No. 240724SREP
```
                                  1

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE   )
     COMMISSION,               )
 5                             )
            Plaintiff,         )
 6                             ) Civil Action No.
        v.                     ) 23-cv-9518-PAE
 7                             )
     SOLARWINDS CORP. and      )
 8   TIMOTHY G. BROWN,         )
                               )
 9          Defendants.        )
     _____)
10
11
12
13
14       VIDEOTAPED DEPOSITION OF KELLIE JAIE PIERCE, taken
15   on behalf of the Plaintiff, at the Law Offices of
16   Spencer Fane located at 5700 Granite Parkway, Suite 650,
17   Plano, Texas, beginning at 9:30 a.m. and ending at
18   3:10 p.m. on Wednesday, July 24, 2024, before April R.
19   Brunson, Certified Shorthand Reporter Number 7495.
20
21
22
23
24
25
```
                                  2

```
 1  APPEARANCES:
 2
 3  For the Plaintiff:
 4    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
      BY:  MR. CHRISTOPHER J. CARNEY
 5         MS. KRISTEN M. WARDEN
           MR. CHRISTOPHER M. BRUCKMANN
 6         (Via Videoconference)
           MR. BENJAMIN BRUTLAG
 7         (Via Videoconference)
      100 F Street NE
 8    Washington, D.C.  20549
      202.551.5986
 9    carneyc@sec.gov
      wardenk@sec.gov
10    brutlagb@sec.gov
      bruckmannc@sec.gov
11
12
    For Defendant Solarwinds Corp. and for the Witness:
13
      LATHAM & WATKINS, L.L.P.
14    BY:  MR. SERRIN TURNER
      BY:  MR. NICOLAS LUONGO
15    1271 Avenue of the Americas
      New York, New York  10020
16    212.906.1207
      serrin.turner@lw.com
17    nicolas.luongo@lw.com
18       - and -
19    SPENCER FANE
      BY:  MR. JAMES T. DRAKELEY
20    5700 Granite Parkway
      Suite 650
21    Plano, Texas  75024-6622
      972.324.0350
22    972.324.0301  (Fax)
      jdrakeley@spencerfane.com
23
24
25
```
                                  3

```
 1  APPEARANCES (CONTINUED):
 2
    FOR THE DEFENDANT TIMOTHY G. BROWN:
 3
      KING & SPALDING, L.L.P.
 4    BY:  MR. ALEC KOCH
           (Via Videoconference)
 5    1700 Pennsylvania Avenue, NW
      Suite 900
 6    Washington, D.C.  20006
      202.737.0500
 7    akoch@kslaw.com
 8
 9  Also Present:
10    JASON BLISS, SolarWinds Corporate Representative
11
12  The Videographer:
13    JOHN HINES
14
15  Certified Shorthand Reporter:
16    APRIL R. BRUNSON, TEXAS CSR NO. 7495
17
18
19
20
21
22
23
24
25
```
                                  4

17

1  BY MR. CARNEY:
2      Q.  Okay.  Ms. Pierce, I've handed you what's been
3  marked as Pierce Exhibit 1.  And I'll just represent
4  that this is just a printout of your LinkedIn profile,
5  and I thought it would sort of help facilitate our
6  discussion today.
7           Do you recognize this as your LinkedIn
8  profile?
9      A.  Yes.
10     Q.  Okay.  And did you prepare this LinkedIn
11 profile?  It sounds like a silly question, but...
12     A.  Yes.  I...
13     Q.  And is -- you know, just looking it over
14 quickly but knowing that you prepared it, is this an
15 accurate depiction of your employment history?
16     A.  Yes.
17     Q.  Okay.  And I promise you I'm not going to --
18 I'm not going to go through the whole profile, so I just
19 want to focus on your time at SolarWinds, so I think
20 that's the third page of the document, and I just want
21 to ask you some questions about that.
22          And you see that it says:  Security,
23 privacy and compliance director from February 2019 to
24 June 2021.
25          Is that accurate?

18

1      A.  Yes.
2      Q.  I mean, let me clarify.  It says that on the
3  document, but is that an accurate time frame?
4      A.  Yes.
5      Q.  Okay.  And so let me -- let me just ask you
6  about the first part of it here.  It says:  Establish
7  security, privacy and compliance programs for
8  SolarWinds.
9           Why don't we just stop right there.  What
10 does that mean that you established the security,
11 privacy and compliance programs for SolarWinds?
12     A.  I worked at SolarWinds to -- on various
13 programs, so the privacy program, compliance programs
14 and sat within the security program of SolarWinds and
15 helped to establish, like, for example their SOC 2
16 program or GDPR program.
17     Q.  Okay.  I think I might have missed a word at
18 the start.  You worked to do what on the various
19 programs?
20     A.  To establish, to bring in, like, SOC 2.
21     Q.  Okay.
22     A.  Also as a consultant, I helped establish or do
23 a lot of the coordination work that was required across
24 the company for the privacy -- or the data privacy GDPR
25 program.

19

1      Q.  And so you used the word "establish" in your
2  answer, too, so what was your specific role in
3  establishing -- let's start with the security program?
4      A.  I -- I did not, you know, do anything -- I
5  can't recall anything specifically that I did to
6  establish the security program.
7           I sat in the security team or in that --
8  under Tim, Tim's umbrella, so I sat in the security
9  area.  But I didn't do -- I can't point to anything
10 specific that I did to establish the security program.
11     Q.  And you mentioned Tim.  Are you referring to
12 Tim Brown?
13     A.  Tim Brown, yes.
14     Q.  And was Mr. Brown your sort of direct
15 supervisor the entire time you were a salaried employee
16 at SolarWinds?
17     A.  Yes.
18     Q.  Okay.  And you said that you can't recall
19 anything specifically that you did to establish the
20 security program.  Do you know who or what individual or
21 individuals established the security program while you
22 were there?
23     A.  No, not specifically established the security
24 program, no.
25     Q.  And how about the -- in that first sentence,

20

1  it also talks about how you established the compliance
2  program for SolarWinds.  Can you tell me what efforts
3  you made to establish the compliance program at
4  SolarWinds?
5      A.  From -- again, I worked on the SOC 2 aspects
6  of compliance within SolarWinds.  It's not all
7  encompassing of everything of compliance at SolarWinds.
8  Just the SOC 2s and ISO 27001 certifications.
9      Q.  Okay.  So when you use the term "compliance,"
10 it's referring to the SOC 2s and the ISO 27001?
11     A.  Correct.
12     Q.  I'll just move on to the next part.  And it
13 says that you were involved in coordinating and
14 communicating compliance-related project status,
15 establishing common policies and practices.  And in
16 parentheses, it says:  Security, vendor/asset reviews,
17 data retention, data privacy, vulnerability, pen testing
18 and security training.
19          So I want -- I just want to break that up
20 and walk through a couple of those items.  So let's
21 start with the vulnerability.  Can you talk to me about
22 the common policies and practices that you established
23 relating to vulnerability?
24          MR. TURNER:  Objection, form.
25     A.  No, I can't.

Kellie Pierce
7/24/2024

**Page 21**

BY MR. CARNEY:
 Q. And just with -- the same question with respect to pen testing, can you tell me about the common policies and practices you established relating to pen testing?
 A. I would coordinate with the vendors -- pen test vendors, make sure we have the contract in place and then work with the product teams to perform the tests which was a requirement of the SOC 2s.
 Q. And in the context of the work that you did at SolarWinds, what does pen testing mean?
 A. I don't know.
 Q. More generally, do you know what pen testing refers to?
 A. We would -- the vendors would test -- test the product. How they conducted the test or what exactly they tested, I'm not -- I'm not exactly sure. I'm not a technical person.
 Q. Okay. And is "pen" short for "penetration"?
 A. I believe, yes.
 Q. Okay. All right. Let me ask you then about the -- you mentioned security training. What -- what was your involvement in establishing common policies and practices related to security training?
 A. As it relates to the SOC 2 or the ISO 27001, I

**Page 22**

would work with -- in order to obtain records to show that people had completed their security training.
 I also coordinated like a training presentation between Tim Brown and our legal team to -- for some of the training over my tenure there.
 Q. Was this one training presentation?
 A. Correct.
 Q. And what was that training presentation related to?
 A. I do not remember.
 Q. And so when you say you coordinated training presentation between Tim Brown and the legal team, was it a training for them or with Tim Brown and the legal team reviewing the training to give to other people?
 A. I don't remember exactly how the -- how the training was rolled out or if it was rolled out.
 Q. Okay. And I think you mentioned a minute ago that -- you said something along the line -- and correct me if I'm wrong -- that you don't have sort of a technical background; is that right?
 A. That's correct.
 Q. So I'm just going to ask you some -- some questions, and it might seem silly given what you just said, but I just want to establish for the record.
 With respect to security training, did you

**Page 23**

offer any technical input to that program?
 A. No.
 Q. And how about with respect to pen testing? Did you offer any technical input?
 A. No.
 Q. Did you have any technical responsibility for network monitoring for security vulnerabilities?
 A. No.
 Q. All right. Putting aside the technical responsibility for that, did you have any administrative responsibility for network monitoring?
    MR. TURNER: Objection to form.
 A. No.
BY MR. CARNEY:
 Q. Did you have any technical responsibility for the company's password policy?
 A. No.
 Q. Did you have any sort of nontechnical administrative responsibility for the company's password policy?
    MR. TURNER: Objection to form.
 A. Could you repeat that?
BY MR. CARNEY:
 Q. Sure.
    I was wondering, putting aside -- you just

**Page 24**

said you don't have any technical responsibility for the password policy. Do you have any -- did you have any nontechnical sort of administrative responsibility for SolarWinds' password policy?
    MR. TURNER: Same objection.
 A. For the -- for the policies, my role was really just to coordinate against -- with the technical people, with Tim on any of the policies including the password policy, just to make -- we had an annual review requirement.
BY MR. CARNEY:
 Q. Okay.
 A. So it was more on the coordination.
 Q. And you said "any of the policies." So besides the password policy, what other policies are you referring to?
 A. I don't recall all of them. I just -- I know the password policy. I remember the password policy since we're talking about it.
 Q. Were the IT access controls one of the policies?
 A. Yes.
 Q. And so you would have had responsibility for coordinating the review of that policy?
 A. Correct.

### Page 25

1   **Q.**  And what do you understand IT access controls
2  to refer to?
3     **A.**  The controls around the IT systems regarding
4  access.
5     **Q.**  And just to follow up, you mentioned
6  coordinating with Mr. Brown and the legal team regarding
7  the security training.  What -- what was your sort of --
8  how would you describe your role as it related to the
9  security training?
10    **A.**  Just a coordinator, so putting together the
11 presentation or -- and then circulating it to the right
12 people for their inputs and then getting that reviewed
13 by a leader for -- as a final document.
14    **Q.**  Okay.  So if I -- and you can always feel free
15 to correct me if I'm wrong, but as I understand, someone
16 else would put together a draft of the presentation, and
17 then you would coordinate getting that to the
18 appropriate people?
19    **A.**  I don't recall exactly how it was done.  It
20 may have been a draft started with various policy
21 details, but at the end, the -- what was presented or
22 what they wanted to cover was covered by both Tim and
23 the -- and the legal team.
24    **Q.**  Are you familiar with something called the
25 Secure Development Life Cycle?

### Page 26

1     **A.**  Yes.
2     **Q.**  What's that?
3     **A.**  At a high level, a document that provides the
4  engineering teams with a guideline of how they develop
5  software.
6     **Q.**  And what did you understand the purpose of the
7  guidelines to be?
8     **A.**  As a -- to establish a guide, a common
9  practice.
10    **Q.**  Okay.  And obviously the word "secure" appears
11 in the term "Security Development Life Cycle," but was
12 there -- do you have an understanding as to what's meant
13 by "secure" in that context?
14    **A.**  No, I don't.  I don't know -- understand the
15 details of the SDLC or Secure Development Life Cycle.
16    **Q.**  Okay.  And I'm going to turn you back to
17 Exhibit 1, page 3, your LinkedIn profile.  After the
18 part that I just read, it says:  Measuring companywide
19 security-related risk using NIST -- and that's all
20 capitals, N-I-S-T -- framework and reporting overall
21 program status to executive management on a quarterly
22 basis.
23          So first of all, NIST there, is that a
24 reference to the National Institute of Standards and
25 Technology cybersecurity framework?

### Page 27

1          MR. TURNER:  Objection, foundation.
2     **A.**  NIST has many different frameworks so not
3  necessarily.
4  BY MR. CARNEY:
5     **Q.**  Okay.  And so -- that's fair enough.  So I'm
6  trying to understand when you use the term "NIST
7  framework" in your LinkedIn profile here, which NIST
8  framework were you referring to?
9     **A.**  Just in general NIST, not any specific.  Just
10 NIST as a framework.
11    **Q.**  And what is your understanding as to the
12 purpose of that framework?
13    **A.**  NIST provides common controls and a framework
14 for -- for companies to leverage as a guide.
15    **Q.**  And do you recall whether they -- they have a
16 specific cybersecurity framework?
17         MR. TURNER:  Objection to form.
18    **A.**  I don't know.
19 BY MR. CARNEY:
20    **Q.**  Do you have an understanding of whether
21 SolarWinds followed the NIST framework when you worked
22 there?
23         MR. TURNER:  Objection to form.
24    **A.**  I don't know.  I don't have any reason to
25 believe they wouldn't.

### Page 28

1  BY MR. CARNEY:
2     **Q.**  So just looking at your description in the --
3  in your LinkedIn profile, how did you measure the
4  companywide security-related risk using the NIST
5  framework?
6     **A.**  I, in this role, would often look at different
7  NIST or compliance efforts like FedRAMP and evaluate
8  based on, you know, my -- my view, my limited knowledge
9  and policies that we had or -- or things I had seen in
10 actual audits to evaluate various frameworks that I was
11 requested to -- to evaluate or certifications that we
12 may look at going after.
13    **Q.**  Okay.  And so let me -- let me just break that
14 down a little.  You talked about that you would evaluate
15 based on your limited knowledge.  So can you just
16 explain how -- how you would evaluate if you had limited
17 knowledge?
18    **A.**  As I stated before, I'm not a technical
19 person, so most of these, you know, I would -- I could
20 coordinate.  I could find the NIST framework, put it in
21 a document and often work with others to -- for input
22 and then make my -- my best guess, not as a technical
23 person and not as an auditor, to evaluate, you know,
24 where I felt the -- if we were meeting or, like, able to
25 achieve that particular control.

**Page 29**

Q. All right. And so how -- if you didn't have the sort of technical background, how were you able to make that best guess whether you were meeting the criteria or not?
A. Often I would have a third-party auditor. We would have external people look at things. Or I would solicit information from product managers or leadership.
Q. So were you -- when you talk about making your best guess, were you flagging things that you thought other folks should look at? Was that the role?
A. Correct.
Q. Are you familiar with NIST scorecards?
    MR. TURNER: Object to form.
A. Yes.
BY MR. CARNEY:
Q. And what's a NIST scorecard?
A. Within SolarWinds, the scorecard that we used -- or that we -- that was created graded different criteria.
Q. And what kind of different criteria?
    MR. TURNER: Objection, foundation.
BY MR. CARNEY:
Q. If you know.
A. I don't know.
Q. A little while ago when you talked about, you

**Page 30**

know, your role in sort of assessing in the first instance whether particular criteria were met, you said you were looking to see if we were meeting or able to achieve that particular control. What do you mean by "control"? What's a control?
A. Usually with the SOC 2 or ISO or NIST, there's standard language around various criteria, so the criteria is like the control -- is the control.
Q. So the technical criteria that has to be met is the control?
A. Correct.
Q. And just back to the NIST scorecard for a second, did you have any role in preparing NIST scorecards?
A. A coordination role.
Q. And what was that coordination role?
A. Just on a -- on the cadence that they needed it, input from Rani Johnson or Tim Brown or others, maybe Eric Quitugua to put together the -- just the packet, the PowerPoint presentation.
Q. So what type of information were Mr. Brown or Ms. Johnson giving you to input?
A. They would provide the highlights, and they would determine the -- the score.
Q. Okay. And do you have any understanding of

**Page 31**

how they determined the score?
A. No, I don't know.
Q. And do you know whether when they were determining the score, whether they were receiving input from, for instance, engineers?
A. I don't know.
Q. Back on Exhibit 1, page 3, that same sentence we looked at, it mentioned that your report overall program status to executive management on a quarterly basis.
    What form did those reports that you refer to there take?
A. PowerPoint.
Q. PowerPoints? Okay. And forgive me if you've already described this, but what was your role in those PowerPoints in those reports?
A. Again, a coordination role.
Q. And did you have any responsibility to ensure that those PowerPoints were accurate?
A. No.
Q. Who, to your understanding, had a responsibility to ensure that those PowerPoints were accurate?
A. Rani -- Tim or Rani would have more -- more responsibility.

**Page 32**

Q. Did you have an understanding as to -- I'll use the expression, like, the buck stopped here, if there was, like, one person that had the responsibility to make sure that the final report that was going to executive management was accurate?
A. To me, it would be Rani. She would -- she would usually present those.
Q. And when you use the term "executive management" in your profile here, who are you referring to?
A. I'm not -- I was not part of those meetings so I'm not exactly sure who Rani presented it to, but I know she would present it to executive management.
    MR. TURNER: Just a note for the court reporter, it's R-A-N-I.
    THE REPORTER: Thanks.
    MR. CARNEY: Thank you, sir.
BY MR. CARNEY:
Q. Okay. Later on -- and this is -- maybe this is -- it looks like maybe the last sentence of that, your SolarWinds description.
    It says: Enable security adoption through quarterly security improvement plans for various departments such as engineering (architecture, dev, SRE/DevOps) customer support, marketing and sales.

**Page 45**

Development Life Cycle was accurate?
            MR. DRAKELEY: Object to form.
     A. No.
BY MR. CARNEY:
     Q. Okay. Let me ask you more generally then.
While you were at SolarWinds, did anyone ever express concern to you that the publicly posted security statement on the website was not accurate?
     A. No.
     Q. Did anyone ever express concerns to you that any particular individual items on the publicly posted security statement were not accurate?
     A. Not that I recall.
     Q. When we were going over your LinkedIn profile earlier -- I'm not going to show you that again -- we talked about the NIST framework. Do you recall that?
     A. Yes.
     Q. Okay. Are you familiar with the NIST 800-53 document?
            MR. TURNER: Object to form.
BY MR. CARNEY:
     Q. And to be more specific, that's the NIST Special Publication 800-53 Security and Privacy Controls for Federal Information Systems and Organizations.
     A. I am aware of the NIST framework, but I would

**Page 46**

need to see the details to confirm.
     Q. Is -- is NIST 800-53 something that you've -- a term that you've used?
     A. It's possible.
     Q. All right. Let me show you a document.
            (Exhibit 4 was marked for identification.)
BY MR. CARNEY:
     Q. And before we get into this, let me ask you, we've been going an hour. Would you like a break or you want to keep going?
     A. If I can have a break, that would be amazing.
     Q. Sure, sure.
            THE VIDEOGRAPHER: We're off record at 10:34 a.m.
            (Break was taken.)
            THE VIDEOGRAPHER: We're back on record at 10:45 a.m.
BY MR. CARNEY:
     Q. Okay. Ms. Pierce, before we broke, I'd handed you what has been marked as Exhibit 4. And for the record, the first Bates stamp of this document is SW-SEC00151673.
            First of all, do you recognize this document?
     A. Yes.

**Page 47**

     Q. And what is it?
            MR. TURNER: Sorry. The e-mail or the attachments?
BY MR. CARNEY:
     Q. Let's start with the e-mail. What is the e-mail?
     A. This is an e-mail summary of the FedRAMP moderate controls.
     Q. And what are the FedRAMP moderate controls?
     A. The FedRAMP program provides a list of controls. You can have low, moderate or high. So this Excel spreadsheet that you provided is the moderate FedRAMP controls.
     Q. And what's the difference between a low, moderate or high control?
     A. I'm also not a FedRAMP expert. So I'm not 100 percent sure.
     Q. And what was your involvement in the -- assessing FedRAMP moderate controls, if any?
     A. Again, a coordination role, working with product managers to review this large list of controls and then provide, based on my -- you know, my limited experience with both FedRAMP and these specific controls, if we were -- if I'd seen documents in place, if I -- if we might have something in place or there

**Page 48**

wasn't anything in place, to my knowledge, to -- to score, this was the requested compliance initiative to see -- this is a preliminary, very beginning, like, quick and dirty-type evaluation to see if the company wanted to invest in FedRAMP certification.
     Q. And so let me ask you, what would be the benefit, as you understood it, of a FedRAMP certification?
     A. It is -- it was my understanding that you needed to get FedRAMP certified in order to sell to the federal government.
     Q. Is the federal government a customer of SolarWinds, as you understand it?
     A. I don't know.
     Q. And you mentioned when you talked about your coordination role that you worked with product managers to review this large list of controls. So can you just give me a little more detail, please, of when you say "coordinate," like, what exactly were you doing with the product managers?
     A. Yeah. So I downloaded this on the Excel document, the FedRAMP criteria, I guess, controls and circulated that with the product managers for -- I think this audit -- or this assessment -- preliminary assessment was just for the SaaS products.

Kellie Pierce
7/24/2024

**Page 49**

```
 1      Q.  Okay.
 2      A.  So had them -- they -- the product managers
 3  have the technical -- more technical expertise than I
 4  would on if their product would meet this -- meet the
 5  control or -- and so circulated with them and then
 6  compiled the information and just scored it with a red,
 7  yellow or green.
 8      Q.  And once again, correct me if my understanding
 9  is wrong, but -- so you would send out this criteria to
10  the appropriate product managers, and they would do the
11  initial assessment of whether a particular control was
12  met or not; is that fair?
13      A.  They would, you know, take their best guess on
14  understanding the control.  FedRAMP is -- the controls
15  are pretty lengthy.  So they would, you know, take their
16  best guess and identify if they knew that their product
17  could do -- that met -- met the control or not.
18      Q.  And then as I understood it, you would take
19  their responses and then score it either green, yellow
20  or red based on whether it was met or not?
21          MR. TURNER:  Objection to form.
22      A.  I would score red, yellow, green based on,
23  again, my limited knowledge, what I had seen in other
24  audits and also in taking input from the product
25  managers.
```

**Page 50**

```
 1  BY MR. CARNEY:
 2      Q.  And then -- and I'm just trying to follow us
 3  through chain of command here.  After you would do your
 4  scoring based on what you described as your limited
 5  knowledge, who would you send it to next?
 6      A.  I don't recall.  This e-mail went to several
 7  people, but I don't recall the review process.
 8      Q.  So do you recall if there was a person or
 9  persons who had a responsibility to ensure the final
10  sort of accuracy of this assessment?
11      A.  Yeah, there -- not that I'm aware of.  This
12  is, again, a preliminary review without in-depth
13  knowledge of FedRAMP across several products, so I
14  don't -- I don't know of anyone that would be ultimately
15  responsible.  This was just a request of leadership to
16  just do a preliminary review of where we were at against
17  the FedRAMP controls across four SaaS products.
18      Q.  And so when you would get input from the
19  product managers, what form would that input take?
20  Would it be an e-mail?  Would it be some kind of
21  scorecard?
22      A.  I believe they -- they would work within Excel
23  in the same Excel document.
24      Q.  So you would share the Excel document with
25  them, and then they would put inputs into that document?
```

**Page 51**

```
 1      A.  Correct.
 2      Q.  And putting -- putting aside -- and I know you
 3  mentioned that you have limited technical knowledge.
 4  Did you take any steps to make sure that the Excel
 5  document itself accurately captured the information that
 6  you were being provided by the product managers?
 7          MR. TURNER:  Objection to form.
 8          Can I help here?
 9          MR. CARNEY:  Sure.
10          MR. TURNER:  I think she's saying it's
11  input into this spreadsheet.
12          MR. CARNEY:  Right.
13          MR. TURNER:  Yeah.
14          MR. CARNEY:  Yes.
15          MR. TURNER:  Okay.  I mean, she said she
16  circulated the spreadsheet around.
17          THE WITNESS:  Yeah.  Thank you.
18          MR. CARNEY:  Okay.  Right.
19      A.  Sorry.  If you wouldn't mind -- if you have
20  another question.
21  BY MR. CARNEY:
22      Q.  Sure.
23          So I think Mr. Turner's clarification is
24  that the spreadsheet we're talking about -- and we can
25  pull it up in its native form in a little bit -- is the
```

**Page 52**

```
 1  one that's attached to this e-mail, right?
 2      A.  Correct.
 3      Q.  And you would share that spreadsheet with the
 4  product managers, and they would go in directly and
 5  input their information?
 6      A.  Correct.
 7      Q.  And then based on the information that they
 8  input, you would do a score of green, yellow or red; is
 9  that right?
10      A.  Correct.
11      Q.  Okay.  And then -- and we'll look at this in a
12  little bit.  You would also add some comments; is that
13  right?
14      A.  Correct.
15      Q.  Okay.  And we'll look at some specifics in a
16  little bit, but what -- when you were adding your
17  comments, what was that?  What were those generally
18  based on?
19      A.  They would be based on my knowledge of audits,
20  SOC 2, ISO 27001 audits, predominantly.
21      Q.  And I guess what I was getting at earlier, is
22  it your understanding that this Excel spreadsheet would
23  accurately reflect the assessments that you were
24  receiving from the product managers?
25          MR. TURNER:  Objection to form.
```

**Page 53**

1    A.   This is just a preliminary yes, yes, no, maybe
2  kind of exercise in order to determine if we wanted to
3  make the investment to get a third-party auditor which
4  would do a lot of the digging and confirming that
5  everything, you know, that we were meeting.  There
6  was -- you know, it really wasn't any -- any more in
7  depth than that.
8  BY MR. CARNEY:
9    Q.   Got it.  And to be fair -- that's a fair
10 point.  So I guess what I'm trying to understand, like a
11 more basic level, let's say, like, Bob the engineer
12 accidentally put his score into the wrong row.  Was
13 there any, like, quality check to make sure that --
14   A.   No --
15   Q.   -- the spreadsheet was accurate?
16   A.   No.
17   Q.   Okay.  So if we look at the cover e-mail here,
18 it's -- you're sending it to Ikong Fu and Ross Fujii.
19 So first of all, who is Ikong Fu?
20   A.   I don't recall who Ikong Fu is.
21   Q.   Do you know who Ross Fujii is?
22   A.   Ross Fujii, I do -- I do know him, but I don't
23 remember his role.
24   Q.   And then you copy on the e-mail Jim Hansen.
25 Who is Jim Hansen?

**Page 54**

1    A.   Jim Hansen was in the product management
2  group.
3    Q.   Okay.  And then you also copied Mr. Brown and
4  Ms. Johnson, right?
5    A.   Correct.
6    Q.   Okay.  And I know you said you don't recall
7  exactly the roles of Ikong Fu and Ross Fujii, but do you
8  have an understanding of why you would have been sending
9  this group that document?
10   A.   I don't remember.
11   Q.   Okay.  And in the text of the e-mail
12 underneath "Good afternoon," it says:  I've performed a
13 preliminary review of the 325 FedRAMP moderate controls.
14 My takeaway is that 94 percent (304) of the controls
15 will require moderate to significant level of effort to
16 implement.
17      So first of all, how did you perform that
18 preliminary review?
19      MR. TURNER:  Objection, asked and
20 answered.
21   A.   Again, I would take the input of the product
22 managers and leverage my knowledge around SOC 2 and ISO
23 27001 and then score.  Because there are so many
24 controls -- this is just a summary of the various types,
25 and I tried to quantify it for leadership to have a

**Page 55**

1  quick red-yellow-green approach to review it.
2  BY MR. CARNEY:
3    Q.   Okay.  And this might be an obvious question,
4  but how did you conclude that 94 percent, 304 of the
5  controls will require a moderate to significant level of
6  effort to implement?
7    A.   Again, this was a very preliminary, you know,
8  just a request that we -- that we got to do turnaround
9  pretty quickly, so I made my best guess based on what --
10 what I had seen in the SOC 2 or the ISO 27001 audits.
11   Q.   And is the 304 just a combination of the 106
12 yellow and 198 red?
13   A.   Yes.
14   Q.   And just -- and this might be what you just
15 described, but I just want to ask you specifically and
16 just use one example.  So for access controls, it says
17 in your e-mail that out of 43 controls, 23 had no
18 program practice in place.  So how did you determine
19 that?  Is it similar to what you just described?
20   A.   Yes, similar to -- it's the process that I
21 used for the whole document, regardless of the type of
22 control, but I, again, used my limited knowledge.  I
23 didn't look at everything in the company.  We were just
24 looking at four individual SaaS products based on
25 product management input and my experience with ISO and

**Page 56**

1  SOC 2.
2    Q.   Okay.  I'm going to try and show you a native
3  version of this spreadsheet because I think it will make
4  it easier if your eyes are anything like mine.
5       Okay.  So the spreadsheet should be up on
6  your screen.  Do you see that?
7    A.   Yes, I do.  Thank you.
8    Q.   And this is an electronic copy of the paper
9  copy document that's attached to your exhibit.  So --
10      MR. TURNER:  Forgive me.  Is there just a
11 way of brightening this a bit?  Do you have any idea?
12      MR. CARNEY:  Sure.  Let me see if I can
13 do that, brighten it.  Oh, brighten your screen?
14      MR. TURNER:  Yeah.
15      MR. CARNEY:  That might be beyond me.
16      MR. DRAKELEY:  We may be able to turn the
17 blinds down.  We can do that.  Yeah, if you can sort of
18 close -- well, that will make it -- yeah, there you go.
19      THE VIDEOGRAPHER:  Is that a little bit
20 better?
21      MR. TURNER:  And maybe that one, too.
22      (Momentary off-the-record discussion.)
23 BY MR. CARNEY:
24   Q.   All right.  So, Ms. Pierce, I'm just going to
25 ask you, for this one, I'll just give you one example.

**Page 57**

1 But first, let me -- I'm going to scroll over. I'm
2 going to go into the moderate baseline controls tab
3 here. And you'll see there's a bunch of columns, but if
4 you scroll over to the right, it's Column S, and it
5 says: Kellie's comments and notes.
6     And those are your comments and notes,
7 right?
8   **A.** Correct.
9   **Q.** And you talked about this a little bit, but --
10 so let me give you an example then. I'm going to go
11 down to Row -- let's say Row 19, which is Entry 17.
12 Let's see. Make sure I got the right one.
13     All right. So this is Entry 17. And just
14 for the record, it says it's access control and then
15 lease privilege, authorize access to security functions.
16     Do you see that?
17   **A.** Yes.
18   **Q.** Okay. And then -- so first of all, if you
19 look at Column J, do you see where it says the word
20 "process"?
21   **A.** Yes.
22   **Q.** Okay. And if I just scroll back up to the top
23 for a second, it says -- the name of the column says:
24 Process or product or people.
25     What is the difference between process or

**Page 58**

1 product or people?
2   **A.** I don't know.
3   **Q.** Okay. So do you know -- so for instance, in
4 this spreadsheet, who would have populated that column
5 with either the word "process," "product" or "people"?
6   **A.** It could have been the product managers.
7   **Q.** Okay. All right. So I'm going to go back to
8 where I was before, Row 19, Entry 17. And if we scroll
9 all the way over to the right, it says -- your comment
10 says you have -- it says: KP 6/27, you have no explicit
11 authorization policy, nor is this document, that I am
12 aware of, for the company or individual products.
13     So you described a little bit before how
14 you went about doing comments generally, but for
15 something like this specifically, how would you have
16 reached the conclusion that there was no explicit
17 authorization policy?
18   **A.** Again, that preliminary assessment pretty
19 quickly done for several controls, so I would take my
20 best guess. I hadn't seen this specific language in any
21 of our policies.
22   **Q.** When you say "this specific language," what do
23 you mean?
24   **A.** Like this control explicitly authorizes access
25 to, like, the details of that control, I hadn't seen

**Page 59**

1 that specifically. This was not intended to -- you
2 know, it may have existed. I just didn't know about it.
3 But I didn't see it in my experience in doing a
4 red/yellow/green.
5   **Q.** And what steps would you have taken to -- to
6 see whether there was such a policy or not?
7   **A.** I would have really just used my best guess.
8 There wasn't a significant amount of diligence or
9 research put into this.
10   **Q.** Okay. And when you say your best guess, would
11 you be relying just on your own prior knowledge?
12   **A.** Correct.
13   **Q.** Okay. And were there ever circumstances where
14 you relied on that -- that knowledge of yours and
15 someone said, no, hold on, we do have that policy?
16     MR. TURNER: Objection, form.
17   **A.** Is that question in relation to this
18 particular document?
19 BY MR. CARNEY:
20   **Q.** Just -- just generally for anything in this
21 spreadsheet where you maybe concluded that there was no
22 policy.
23   **A.** Within this exercise and this spreadsheet, no,
24 not that I'm aware of or that I remember.
25   **Q.** And when you would make a comment like that

**Page 60**

1 where you say: We have no explicit authorization
2 policy, nor is this document, that I am aware of, for
3 the company or individual products, would someone else
4 have an opportunity to review your comment and say, yes,
5 we do?
6   **A.** Absolutely.
7   **Q.** And who would that be?
8   **A.** Any -- anyone I sent the e-mail to could
9 definitely provide a comment, but it was open to review.
10   **Q.** And so I'm not going to go through all these
11 entries, but for -- specifically for the columns that
12 you -- or the entries that you coded in red, would there
13 have been any steps after that to take corrective action
14 in response to it being coded in red?
15     MR. TURNER: Objection to form and
16 foundation.
17   **A.** This is a preliminary assessment without any
18 technical reviews, so these are not findings. These are
19 basically my best guess.
20 BY MR. CARNEY:
21   **Q.** And so when was -- was there a point in time
22 when the technical reviews would have taken place?
23   **A.** If the company had decided to move forward
24 with a FedRAMP investment, at that point we would have
25 got a third-party auditor and we would have done a lot

**Page 61**

1  of the steps that I went over with SOC 2, reviewing the
2  controls, making sure the engineers understood the
3  controls, collecting evidence and then having that third
4  party attest that we met those controls.
5        But this is just the very basic, like,
6  Level 1. It's a discussion for investment. So I
7  actually don't know what happened after, you know, once
8  this was submitted.
9      Q. And you mentioned if the company had decided
10 to move forward with the FedRAMP investment. Do you
11 know whether the company decided to do that?
12     A. I don't know.
13     Q. Is that you don't know one way or the other?
14     A. No, I don't.
15     Q. Okay. And as I understood earlier, you had
16 said that the FedRAMP certification was needed to sell
17 to the federal government; is that right?
18     A. That was --
19         MR. TURNER: Objection to form.
20     A. That was my understanding.
21 BY MR. CARNEY:
22     Q. Okay. And it's also your understanding
23 SolarWinds did have federal government customers?
24         MR. DRAKELEY: Object to form.
25     A. I don't know.

**Page 62**

1  BY MR. CARNEY:
2     Q. Okay. All right. And if we look at the third
3  tab from the left, I'll just pull that up on the screen
4  right now. It says: Moderate KP metrics.
5        So first of all, "KP" refers to you; is
6  that right?
7     A. Where do you see that?
8     Q. So that's the name of the tab.
9     A. Oh, the tab. Yes.
10    Q. And you don't have to cross-check all the
11 numbers in here, but does this appear to be the same
12 chart that you included in your e-mail?
13    A. Yes.
14    Q. All right. You may put that one aside,
15 please.
16        (Exhibit 5 was marked for identification.)
17 BY MR. CARNEY:
18    Q. Okay. Ms. Pierce, once again, take your time,
19 please. I've handed you what's been marked as
20 Exhibit 5; and for the record, it has on the first page
21 Bates stamp of SW-SEC00045356.
22        Do you recognize this document?
23    A. I don't recall this specific -- this
24 document -- or this e-mail chain.
25    Q. Okay. But the previous one, Exhibit 4, you do

**Page 63**

1  recall that e-mail chain?
2     A. I do, yes.
3     Q. Okay. So just back to Exhibit 4 for a second,
4  when was the last time you think you saw Exhibit 4?
5         MR. TURNER: I'll object to the extent it
6  calls for work product, the documents shown during prep
7  sessions.
8         You don't have to answer.
9         THE WITNESS: Thank you.
10 BY MR. CARNEY:
11    Q. All right. So focusing on Exhibit 5 for a
12 second, is this an e-mail that you sent on August 28th,
13 2019?
14    A. Yes.
15    Q. And I'm just going to ask you about some of
16 the names up at the top that you're sending it to. So
17 who is Keith Kuchler? And that's K-U-C-H-L-E-R.
18    A. Keith was one of the leaders in the
19 engineering group.
20    Q. And what would his role have been in this
21 FedRAMP certification assessment?
22    A. I don't -- I don't recall.
23    Q. Okay. And do you know Chris Day?
24    A. I do.
25    Q. And who is Chris Day?

**Page 64**

1     A. Chris Day is currently the CIO of SolarWinds.
2     Q. Okay. And do you know what his position was
3  at -- at that time?
4     A. I don't know in 2019.
5     Q. And do you know Brad Cline?
6     A. I do.
7     Q. And it's C-L-I-N-E. Who was Brad Cline?
8     A. He was on the IT team.
9     Q. And if you look at the attached spreadsheet --
10 and I'm going to show you the native one in a second,
11 but does this appear to be a similar spreadsheet to the
12 one that we just looked at in Exhibit 4?
13    A. Yes, it looks similar.
14    Q. Okay. And I know you said you don't recall
15 this e-mail, but do you recall what the purpose of this
16 August iteration of the controls baseline spreadsheet
17 would have been?
18    A. No, I don't remember.
19    Q. All right. In the cover e-mail, if you look
20 at the second paragraph starting with the words "in the
21 attached spreadsheet," you'll see there's a reference in
22 that paragraph to a staffing strawman. Do you see that?
23    A. Okay. Yeah. Yes.
24    Q. What did you mean by a "staffing strawman"?
25    A. Normally when I use "strawman," it's a -- like

Kellie Pierce
7/24/2024

```
 1  for mobile devices"?
 2     A.  I had not seen any documentation around the
 3  access control for mobile devices, so that's what I
 4  meant.
 5     Q.  And that -- and that was based on your sort
 6  of -- you're basing that on your own sort of personal
 7  knowledge?
 8     A.  Yes.
 9     Q.  And putting that aside, do you have an
10  understanding of what an access control for mobile
11  devices would mean?
12     A.  Just the rules around how access would be set
13  up or maintained or used for mobile devices, is my
14  understanding.  I'm not sure how technically that would
15  be implemented.
16     Q.  So would -- and just using this one as an
17  example, would you have -- once you marked that red,
18  would you have alerted anyone to the fact that, hey, we
19  don't have a access control for mobile devices?
20         MR. TURNER:  Objection to form.
21     A.  I -- I don't recall.
22  BY MR. CARNEY:
23     Q.  Do you have an understanding as to why it
24  would be important to have access control for mobile
25  devices?
                          73
```

```
 1          MR. TURNER:  Objection to form.
 2     A.  No, I don't know.
 3  BY MR. CARNEY:
 4     Q.  All right.  Just one more.  I promise.
 5     A.  Okay.
 6     Q.  Let's go to Row 44, Entry 42.  In Column C it
 7  says "Access Control."  Column E, "Information Sharing."
 8  And if I scroll over, you see this one also says
 9  "Process," right?
10     A.  I do, yes.
11     Q.  And then if we look at Column S, it says:
12  6/27 KP, authorized versus unauthorized users has not
13  been defined and policies are not fully comprehensive to
14  meet this control.
15         Can you tell me what -- what you meant by
16  that statement?
17     A.  That we would need additional definition
18  within an existing policy if we were to move forward
19  with this FedRAMP certification.
20     Q.  And when you say that the policies are not
21  fully comprehensive to meet this control, what do you --
22  what does that mean?
23     A.  The -- again, the wording in the control was
24  not specific in our policies, so that's, you know, my
25  opinion.  We would need to look at that -- our -- at
                          74
```

```
 1  that policy to confirm that those controls would be met
 2  by these four products for this particular
 3  certification.
 4     Q.  And so ask me if this is a fair statement --
 5  or let me know if this is a fair statement:  In contrast
 6  to the ones where you said the company does not have a
 7  policy, is this one where the company had a policy but
 8  you thought it wasn't comprehensive enough?
 9     A.  I would say it had a -- we had a policy, but
10  we might need to further define based on the criteria in
11  FedRAMP.
12     Q.  Okay.  And do you have an understanding why
13  you would have marked this one red in that case if there
14  was a policy?
15     A.  I just -- my best guess and flagging that
16  additional work would be needed potentially.
17     Q.  All right.  I think I just -- all right.  I
18  think I just have one more of these for you.
19         (Exhibit 6 was marked for identification.)
20  BY MR. CARNEY:
21     Q.  Okay.  Ms. Pierce, once again, take as much
22  time as you need.  But what you've been handed that's
23  been marked as Exhibit 6 is a document with -- the first
24  page has a Bates stamp of SW-SEC00218068, and it appears
25  to be a September 25th, 2019 e-mail from Ms. Pierce.
                          75
```

```
 1         Do you recognize this document?
 2     A.  Yes.
 3     Q.  Okay.  And what is this document?
 4     A.  This is the -- like, a quantified estimate for
 5  the amount of budget we would need if we wanted to move
 6  forward with the FedRAMP certification.
 7     Q.  So you're detailing how much it would cost the
 8  company to obtain the FedRAMP certification?
 9     A.  Estimating for a budget request as to, you
10  know, how -- what the initial cost would be for -- for
11  the AppMan products.
12     Q.  And if you -- if you flip through past the
13  budget, the spreadsheets after this, does this appear to
14  be -- and I'll represent I think -- and I can show it to
15  you on the screen if you want, but that some of the
16  columns have been hidden just to make the printout
17  easier.  But does this -- this appear to be a updated
18  version of the spreadsheets that we were just looking
19  at?
20         MR. DRAKELEY:  Object to form.
21     A.  This appears to be the same as in Exhibit 4
22  with just the columns hidden.
23  BY MR. CARNEY:
24     Q.  Okay.  And in your e-mail, you say that we've
25  updated the spreadsheet with the latest figures.  Do you
                          76
```

**Page 77**

1  see that?
2  **A.** I do.
3  **Q.** And it says -- I'm sorry. Let me strike that.
4      It says: Hello, guys. I've updated the
5  spreadsheet with the latest figures.
6      So were you -- were you the one that
7  was making the updates to the spreadsheet that's
8  attached?
9  **A.** I'm not sure.
10 **Q.** And you mention in here -- well, let me back
11 up a sec.
12     Would that have been something that you
13 would have done, made updates to a spreadsheet like
14 that?
15 **A.** More than, you know, pulling in cost estimates
16 or resource numbers from various team members to
17 create -- to create the spreadsheet.
18 **Q.** Okay. And what about the -- the -- putting
19 aside the budget spreadsheet, the controls spreadsheet
20 that we've looked at a few times, would you have made
21 updates to that spreadsheet?
22     MR. TURNER: Objection to form. Which
23 spreadsheet?
24     MR. CARNEY: So if you look beyond the
25 first page --

**Page 78**

1      MR. TURNER: Oh, okay.
2      MR. CARNEY: -- there is the budget. But
3  then after that, Ms. Pierce said that this is an updated
4  version of the previous spreadsheet we looked at in
5  Exhibit 4 but with some of the columns hidden.
6  BY MR. CARNEY:
7  **Q.** And I'm asking whether you would have been
8  involved in updating that spreadsheet as well?
9  **A.** I -- the only update I see to the spreadsheet
10 is just the columns are hidden. I don't -- I don't know
11 if the -- if there were updates made between these two
12 e-mails.
13 **Q.** Okay.
14 **A.** But I would be involved as the coordinator if
15 I had heard -- you know, received new information or --
16 but I don't see any changes.
17 **Q.** Okay. And you say in your e-mail that you
18 plan to share this with Cillian on Friday. Do you know
19 who that is?
20 **A.** Cillian was in the budget.
21 **Q.** Okay. And do you know Cillian's last name?
22 **A.** No, I'm sorry, I don't.
23 **Q.** Okay. Do you know what Cillian's role was in
24 the budget office?
25 **A.** I don't remember.

**Page 79**

1  **Q.** All right.
2      (Exhibit 7 was marked for identification.)
3  BY MR. CARNEY:
4  **Q.** Okay. Ms. Pierce, I've handed you what's been
5  marked as Exhibit 7; and just for the record, this is a
6  document Bates-stamped SW-SEC00061296. And it's a
7  January 27th, 2020 e-mail from Ms. Pierce to
8  Mr. Quitugua. Sorry if I'm mispronouncing that.
9      Do you recognize this document?
10 **A.** Yes.
11 **Q.** And what is it?
12 **A.** This is a security scorecard, risk scorecard.
13 **Q.** And who is Mr. Quitugua?
14 **A.** Eric Quitugua is -- he works in the SecOps
15 section.
16 **Q.** What is the SecOps section?
17 **A.** Security operations.
18 **Q.** And do you know what he did in that section?
19 **A.** He was the manager of the SecOps group.
20 **Q.** All right. And so the risk scorecard matrix
21 that you're sending him, did you put that together, that
22 scorecard?
23     MR. TURNER: Objection to form.
24 **A.** I don't remember how it came together exactly,
25 but I would be, again, coordinating the PowerPoint

**Page 80**

1  across various people.
2  BY MR. CARNEY:
3  **Q.** All right. And with respect to the risk
4  scorecards, though, what was your role in coordinating?
5  **A.** Putting together the PowerPoint and
6  circulating for input for the highlights and working
7  with Eric or Tim or Rani on the -- on capturing the
8  details, like a -- basically somewhat like a scribe.
9  **Q.** And so the document that's -- that's attached,
10 though, that's a -- does that look like a spreadsheet,
11 though?
12 **A.** It may have been a spreadsheet. It could have
13 been a PowerPoint as well. I don't know.
14 **Q.** And if you look at the -- on the front page of
15 the e-mail, the attachment.
16 **A.** It is Excel, okay.
17 **Q.** Do you see that where it says --
18 **A.** I do, yeah.
19 **Q.** Does that indicate that it's an Excel
20 spreadsheet?
21 **A.** Yes, it does.
22 **Q.** Okay. And would you have been involved in
23 putting together this Excel spreadsheet?
24 **A.** Yes.
25 **Q.** And so what would have been your role in


## Page 85

1  Q. Did anyone express to you an opinion about
2  whether adding 61 percent of the controls with no
3  program or practice in place was problematic?
4  A. No.
5     MR. TURNER: Object to form.
6  A. Not that I recall.
7     (Sotto voce conversation.)
8     MR. TURNER: Do you have copies?
9     THE REPORTER: It's not --
10    MR. CARNEY: Yeah, moving on to a new
11 one.
12    MR. TURNER: Oh, is this one you already
13 provided?
14    MR. CARNEY: Yeah, we already asked. I
15 just wanted to make sure I had the right exhibit.
16    (Exhibit 8 was marked for identification.)
17 BY MR. CARNEY:
18  Q. Okay. Ms. Pierce, I've handed you what's been
19 marked as Exhibit 8; and for the record, the first Bates
20 stamp in this document is SW-SEC00149897. And this is a
21 January 23rd, 2020 e-mail from you to a number of
22 individuals.
23     Do you recognize this, this document?
24  A. I don't remember this specific e-mail.
25  Q. Okay. If you look at the subject line of this

## Page 86

1  document, it says: A possible mad experiment.
2     After looking over the e-mail that you
3  sent and the attachment, do you know why you would
4  referred to this as a possible mad experiment?
5  A. No, I don't know. I don't remember.
6  Q. And having reviewed this document, you're
7  sending this to -- to Tim Brown and to Rani Johnson.
8  Can you explain what you're asking them to do here?
9  A. I was asking them to score the risk assessment
10 or the risk scorecard independently.
11  Q. And when you say "independently," what do you
12 mean?
13  A. Each had a file, so for each of them to fill
14 it out on their own.
15  Q. And when you say "each of them," are you
16 referring to Mr. Brown and Ms. Johnson?
17  A. Correct.
18  Q. And how is this different than what you had
19 previously done?
20  A. I don't remember how it was done every single
21 time, but based on this e-mail, this was just having
22 them each complete a scorecard.
23  Q. And there's a reference in the first sentence
24 to the security and compliance QBR. What's the security
25 and compliance QBR?

## Page 87

1  A. I don't recall. QBR stands for quarterly
2  business review, but I don't recall the security and
3  compliance QBR.
4  Q. You don't -- I'm sorry. So you don't recall
5  there being a security and compliance QBR?
6  A. I don't -- I don't remember exactly what the
7  security and compliance QBR would have covered.
8  Q. Do you remember what your role would have been
9  with respect to the security and compliance QBR?
10  A. Similar to pretty much my entire role at
11 SolarWinds. It would have been a coordination role.
12 But I just don't remember that, what that meeting or
13 what that event was.
14  Q. And you see in your -- in your e-mail, you
15 reference the historical information for 2017, 2018 and
16 all of the 2019 detailed info. Do you see that?
17  A. I do, yes.
18  Q. And before lunch, you talked about how you
19 would have gone about gathering historical information
20 on these scores. Would you have done the same thing
21 here? So how would you have gathered that historical
22 information in this -- in this context?
23  A. Yeah, looked at previous presentations or in
24 our SharePoint.
25  Q. I think we can put that one aside.

## Page 88

1     (Exhibit 9 was marked for identification.)
2  BY MR. CARNEY:
3  Q. So, Ms. Pierce, I've handed you what's been
4  marked as Exhibit 9, and the first page of this has the
5  Bates stamp SW-SEC00015235. And the top e-mail on here
6  is a September 19th, 2019 e-mail from Kellie Pierce to
7  Eric Quitugua.
8     Do you recognize this document?
9  A. Yes.
10  Q. And what is this? What is this document?
11    MR. TURNER: The attachment or the
12 e-mail?
13    MR. CARNEY: Let's start with the e-mail.
14 BY MR. CARNEY:
15  Q. What's -- what's the e-mail?
16  A. The e-mail is to Eric providing him the
17 summary of the week self-assessment.
18  Q. And you'll notice there's an e-mail below that
19 September 18th to -- from you to Rani Johnson and Tim
20 Brown, subject: SWICUS security risk assessment.
21    Can you tell me what the purpose of that
22 e-mail to Mr. Brown and Ms. Johnson was?
23  A. To provide -- to let them know I was working
24 with Eric and Nelson on the SWICUS self-assessment and
25 identifying some of the areas that were marked red by

**Page 121**

1    Q. Do you know what that refers to?
2    A. No, I don't remember.
3    Q. Okay. And then at the bottom there, you ask
4 Mr. Fujii and Ms. Gallegos: Is there a plan in 2020 to
5 go for CC-PP?
6       Do you know what you were asking?
7    A. If they were going to go for the CC-PP
8 certification in 2020.
9    Q. And why would that have been important, if at
10 all?
11       MR. TURNER: Objection, foundation.
12    A. I don't -- I don't recall.
13 BY MR. CARNEY:
14    Q. Do you know why you would have been asking
15 them whether there was a plan to do that?
16    A. No, I don't remember.
17    Q. And then if you look at her -- Ms. Gallegos's
18 response at the top of that same page which carries over
19 from the first page that just has the sort of header
20 information, she says -- well, first of all, do you have
21 an understanding of what her response means -- her
22 response to you there?
23    A. No. I'm not -- I'm not familiar with the
24 common control or common criteria rankings. So it looks
25 like she's telling me that the product ARM, A-R-M, will

**Page 122**

1 be -- is in progress and will complete in early 2020 and
2 that they won't move forward with the CCPP in 2020.
3    Q. And does this CCPP relate at all to security?
4    A. I don't know.
5    Q. Okay. All right. And then just one more
6 question. On the -- on the first page, the top e-mail
7 from Ms. Gallegos, she says in sort of the third-to-last
8 sentence: While we don't currently have pressure from
9 our fed customers to adopt the PP, that could come any
10 time as the PP is not new.
11       Do you know what she's talking about,
12 pressure from fed customers there?
13    A. No, I don't. I don't have any idea.
14    Q. In your work at SolarWinds, did you have any
15 interaction with securities analysts who followed
16 SolarWinds' stock?
17    A. No.
18    Q. Did you have any responsibility for dealing
19 with the media when you were at SolarWinds?
20    A. No.
21    Q. Did you have any responsibility for responding
22 to press inquiries?
23    A. No.
24       MR. CARNEY: If I could just have a
25 minute? Thank you.

**Page 123**

1       THE VIDEOGRAPHER: We're off record at
2 2:55 p.m.
3       (Break was taken.)
4       THE VIDEOGRAPHER: We're back on record
5 at 2:56 p.m.
6 BY MR. CARNEY:
7    Q. I think probably just one more question,
8 Ms. Pierce. When you were at SolarWinds, were you aware
9 of any systemic security problems at the company?
10    A. No.
11       MR. CARNEY: All right. That's all I
12 have for now. Thank you very much for your time today.
13 I appreciate it.
14       MR. TURNER: Okay. I just have some -- a
15 little bit of redirect.
16       MR. CARNEY: Okay.
17       EXAMINATION
18 BY MR. TURNER:
19    Q. Good afternoon, Ms. Pierce.
20    A. Hello.
21    Q. So you testified earlier that FedRAMP
22 certification was needed to sell to the federal
23 government based on your understanding.
24    A. Correct.
25    Q. Sell what exactly?

**Page 124**

1    A. FedRAMP is focused on SaaS products or
2 cloud-hosted products.
3    Q. As distinguished from what?
4    A. On-prem products.
5    Q. So do you know whether SolarWinds ever sold
6 any SaaS products to the federal government during your
7 time at the company?
8    A. I don't know.
9    Q. Was SolarWinds required to meet FedRAMP
10 standards if it wasn't selling SaaS products to the
11 federal government, based on your understanding?
12    A. No.
13    Q. So we looked earlier at Exhibit 4, the
14 preliminary FedRAMP assessment that you prepared.
15    A. Yes.
16    Q. Remember that?
17    A. I do.
18    Q. And it attaches a spreadsheet --
19    A. Yes.
20    Q. -- that has a column with your notes in it?
21    A. Yes.
22    Q. How many hours, would you say, you spent
23 filling out those notes in the preliminary FedRAMP
24 assessment?
25    A. I would have spent no more than six hours on

**Page 125**

1  this particular assessment.
2    Q.  And that's for 325 controls?
3    A.  Correct.
4    Q.  So that's would you say like a few minutes per
5  control?
6    A.  Correct.
7    Q.  Did you conduct any detailed review of
8  SolarWinds' policies while you were filling out the
9  notes?
10   A.  No, I did not.
11   Q.  Did you rely on anything other than your
12 memory of those policies based on your limited
13 experience coordinating SOC 2 and ISO audits?
14   A.  No, I did not.
15   Q.  And what exactly were you comparing against
16 your memory of those policies?
17   A.  The -- the policies that I was aware of
18 compared to the language in the controls.
19   Q.  Did you have a good technical understanding of
20 what that language in the technical controls actually
21 meant?
22   A.  No.  We would need a third-party auditor to
23 really dig into that.
24   Q.  Then you were later showed Exhibit 6 which is
25 another iteration of the spreadsheet from a few months

**Page 126**

1  later.  Remember that?
2    A.  Yes.
3    Q.  And it has a column that's color coded with
4  your notes in it again.
5    A.  Yes.
6    Q.  And the dates in those notes appear to be the
7  same as before, 6/27, 6/28.
8    A.  Correct.
9    Q.  So would you have further updated your notes
10 by this point?
11   A.  No.  There would be no reason to do so.
12   Q.  Would you have done any further review of
13 SolarWinds' policies in connection with this spreadsheet
14 by this point?
15   A.  No.
16   Q.  You've referred to the -- this assessment as
17 a, quote, preliminary assessment; is that right?
18   A.  Correct.
19   Q.  Did it ever become final or formal or was it
20 always a preliminary assessment?
21   A.  Always a preliminary assessment.
22   Q.  And why is that?  What would have been the
23 next step if the company wanted to go beyond the
24 preliminary assessment due date?
25   A.  If the company wanted to move forward and make

**Page 127**

1  the investment -- the projected investment that we
2  identified, we would have secured a third-party auditor
3  who would have then done the technical audit against
4  those controls and provided a report for us to, you
5  know, work with.
6    Q.  And did the company ever do that, as far as
7  you're aware?  Did it ever obtain or seek FedRAMP
8  compliance while you were at the company?
9    A.  Not -- not that I'm aware of.
10   Q.  You testified that the people you sent the
11 preliminary assessment to had had the opportunity to
12 review your notes and make any changes to the document
13 if they felt anything was incorrect.  What did you mean
14 by that when you said that earlier?
15   A.  This Excel was not password protected.  It
16 had -- so anybody that it was sent to could have
17 reviewed the notes or made updates as -- as they saw fit
18 or let me know and I would have made the update.
19   Q.  Given the assessment was never formalized, do
20 you have any reason to believe that anyone actually
21 reviewed your notes for accuracy?
22   A.  I don't know if they did.
23   Q.  Would you have expected anyone to do that?
24   A.  No.
25   Q.  Have you reviewed the security statement in

**Page 128**

1  advance of this deposition?
2    A.  Yes, sir.
3    Q.  The online security statement published on the
4  website?
5    A.  Yes.
6    Q.  Is there anything --
7         MR. CARNEY:  Objection, vague as to time.
8  BY MR. TURNER:
9    Q.  Is there anything in the security statement
10 that you have any reason to believe was inaccurate
11 during your tenure at SolarWinds?
12   A.  No.
13   Q.  Is there anything in the preliminary FedRAMP
14 assessments you prepared that gives you any reason to
15 believe the security statement was inaccurate in any
16 way?
17        MR. CARNEY:  Objection, foundation.
18   A.  No.
19 BY MR. TURNER:
20   Q.  If we go back to Exhibit 12 for a minute -- I
21 just had it in front of me.  Here it is.
22        You were asked about this e-mail where you
23 said, in part:  We have a systemic issue around lack of
24 awareness for security/compliance requirements with most
25 if not all DOIT projects.

```
 1      DEPONENT'S DECLARATION UNDER PENALTY OF PERJURY
 2
 3        I, KELLIE JAIE PIERCE, do hereby declare under
 4   penalty of perjury that I have read the entire foregoing
 5   transcript of my deposition testimony, or the same has
 6   been read to me, and certify that it is a true, correct
 7   and complete transcript of my testimony given on
 8   July 24, 2024, save and except for changes and/or
 9   corrections, if any, as indicated by me on the attached
10   Errata Sheet, with the understanding that I offer these
11   changes and/or corrections as if still under oath.
12   ____ I have made corrections to my deposition.
13   ____ I have NOT made any changes to my deposition.
14
15   Signed: _____
              KELLIE JAIE PIERCE
16
17   Dated this _____ day of _____, 20____.
18
19
20
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS _____ DAY OF _____, 20____.
23   _____
24   (Notary Public)  My Commission Expires: _____
25
                              137
```

```
 1                    ERRATA SHEET
 2   Deposition of: KELLIE JAIE PIERCE
     Date taken:   JULY 24, 2024
 3   Case:    SEC VS. SOLARWINDS CORP., ET AL.
 4   PAGE LINE
 5   ____ ____ CHANGE:_____
 6          REASON:_____
 7   ____ ____ CHANGE:_____
 8          REASON:_____
 9   ____ ____ CHANGE:_____
10          REASON:_____
11   ____ ____ CHANGE:_____
12          REASON:_____
13   ____ ____ CHANGE:_____
14          REASON:_____
15   ____ ____ CHANGE:_____
16          REASON:_____
17   ____ ____ CHANGE:_____
18          REASON:_____
19   ____ ____ CHANGE:_____
20          REASON:_____
21   ____ ____ CHANGE:_____
22          REASON:_____
23
       Signed_____
24
25   Dated _____
                              138
```

```
 1            CERTIFICATE OF SHORTHAND REPORTER
 2
 3      I, April Brunson, Certified Shorthand
 4   Reporter in and for the State of Texas, do
 5   hereby certify:
 6
 7      That the foregoing proceedings were
 8   taken before me at the time and place herein
 9   set forth; that any witnesses in the foregoing
10   proceedings, prior to testifying, were duly
11   sworn by me; that a verbatim record of the
12   proceedings was made by me using machine
13   shorthand to the best of my ability, which was
14   thereafter transcribed under my direction; that
15   the foregoing transcript is a true record of the
16   testimony given.
17
18      Further, that if the foregoing pertains
19   to the original transcript of a deposition in
20   a Federal Case, before completion of the
21   proceedings, review of the transcript
22   _X___was/____was not requested and reserved.
23
24      I further certify I am neither financially
25   interested in the action nor a relative or employee
                              139
```

```
 1   of any attorney of a party to this action.
 2
 3       IN WITNESS WHEREOF, I have this date
 4   subscribed my name :  August 5, 2024.
 5
 6                _____
 7                April R. Brunson
 8                Texas CSR No. 7495
 9                Expiration Date:  4/30/2026
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                              140
```