# EXHIBIT 58

## Page 1

```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE       )
COMMISSION,                   )
                              )
        PLAINTIFF,            )
                              ) Case No.
    vs.                       ) 23-cv-9518-PAE
                              )
SOLARWINDS CORP. AND TIMOTHY  )
G. BROWN,                     )
                              )
        DEFENDANTS.           )
_____)


              VIDEOTAPED DEPOSITION OF
                    BRENT THILL
              Wednesday, August 28, 2024
                San Francisco, California










Reported By:
KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
California CSR 10068, Nevada CCR 995, Texas CSR
12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
JOB No. 240828KWI
```

## Page 2

```
       VIDEOTAPED DEPOSITION OF BRENT THILL
         BE IT REMEMBERED that on Wednesday,
August 28, 2024, commencing at the hour of 9:06 a.m.
thereof, before me, Kathleen A. Maltbie,
RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified
Stenographic Shorthand Reporter, in and for the
State of California, Nevada and Texas, personally
appeared BRENT THILL, a witness in the
above-entitled court and cause, who, being by me
first duly sworn, was thereupon examined as a
witness in said action.
```

## Page 3

```
              APPEARANCES OF COUNSEL
FOR THE PLAINTIFF:
    SECURITIES AND EXCHANGE COMMISSION
    100 F Street, N.E.
    Washington, D.C. 20549
    BY: CHRISTOPHER BRUCKMANN, ESQ.
        BENJAMIN BRUTLAG, ESQ.
    Telephone: (202) 256-7941
    Email: BruckmannC@sec.gov
           brutlagb@sec.gov

FOR THE DEFENDANTS:

    LATHAM & WATKINS, LLP
    1271 Avenue of the Americas
    New York, New York 10020
    BY: SERRIN TURNER, ESQ.
        JOSH KATZ, ESQ.
    Telephone: (212) 906-1330
    Email: Serrin.turner@lw.com
           Josh.Katz@lw.com
    LATHAM & WATKINS, LLP
    330 North Wabash Avenue, Suite 2800
    Chicago, Illinois 60611
    BY: KIRSTEN C. LEE, ESQ. (Zoom)
    Telephone: (312) 777-7281
    Email: Kirsten.lee@lw.com

FOR JEFFERIES AND THE WITNESS:

    WILMERHALE
    1 Front Street, Suite 3500
    San Francisco, California 94111
    BY: MICHAEL MUGMOM, ESQ.
    Telephone: (628) 235-1006
    Email: Michael.mugmon@wilmerhale.com
    WILMERHALE
    60 State Street
    Boston, Massachusetts 02109
    BY: JESSICA NOTEBAERT, ESQ.
    Telephone: (617) 526-6721
    Email: Jessica.notebaert@wilmerhale.com
```

## Page 4

```
              APPEARANCES (Continued)

        ALSO PRESENT:

           Frank Quirarte, Videographer
           Greg Rose, Jefferies (Zoom)
```

**Page 129**

1   MR. BRUCKMANN: Yes. For the record, I
2 have no more questions for Mr. Thill, so I'm passing
3 the witness to Mr. Turner.
4   MR. TURNER: Thanks.
5     EXAMINATION BY MR. TURNER
6 BY MR. TURNER:
7   Q. Good afternoon, Mr. Thill.
8   A. Good afternoon.
9   Q. I'll try to be efficient in my questions.
10 I know you're busy.
11   Let me start by asking you, as an analyst,
12 you research issues that you -- you think will be
13 important to your investor clients, right?
14   A. Right.
15   Q. And -- and I think you testified you can
16 do that lots of different ways.
17   You talk to customers; yes?
18   A. Yes.
19   Q. And experts?
20   A. Yes.
21   Q. You read the company's SEC filings?
22   A. (Nods head.)
23   Q. "Yes"?
24   A. Yes.
25   Q. You have to answer yes or no.

**Page 130**

1   A. Yes.
2   Q. You read relevant material in the
3 company's website?
4   A. Yes.
5   Q. Talk -- you can talk to the management
6 team?
7   A. Yes.
8   Q. I think you've said you also sometimes
9 talk to product managers?
10   A. Yes.
11   Q. Which are below the management team,
12 right?
13   A. Yes.
14   Q. You can ask questions on earnings calls?
15   A. Yes.
16   Q. And I think you said you research
17 everything that would go into an investor's decision
18 to buy stock or not?
19   A. Yes.
20   Q. You don't assume the company is going to
21 turn a profit?
22   One of the things you would research?
23   A. Yes.
24   Q. You don't assume companies' products are
25 as good as the companies say they are?

**Page 131**

1   A. Yes.
2   Q. You don't assume the competition is as
3 weak as the company may think it is?
4   A. Yes.
5   Q. You try to research all those issues the
6 best you can so you can draw your own conclusions?
7   A. Correct.
8   Q. Now, you testified that cyber security is
9 incredibly important, you said several times. And I
10 just want to zero in on what you mean by that.
11   I gather what you mean is that cyber
12 incidents can have a damaging effect on a company's
13 business?
14   A. Correct.
15   Q. You mentioned the delta incident, for
16 example?
17   A. Correct.
18   Q. But you don't mean, do you, that a
19 company's internal cyber security practices are an
20 incredibly important factor that you yourself
21 research when you analyze a company?
22   MR. BRUCKMANN: Objection.
23   THE WITNESS: We don't research it because
24 we assume that companies are following a process and
25 procedure. So we don't spend a lot of time on that

**Page 132**

1 topic because it's not -- it's important to our
2 clients because there are other factors that are
3 more important that are -- that are on the top of
4 their radar.
5 BY MR. TURNER:
6   Q. I'll come back to the assumption in a
7 minute, but I just want to confirm, this is not an
8 incredibly important issue that you research as part
9 of your work as an analyst?
10   A. We don't research it specifically in depth
11 because we don't -- we don't do that because we are
12 assuming that companies are -- are handling it in
13 the best way that they can.
14   Q. I get the assumption.
15   A. Yes.
16   Q. I'd just like an answer to my question,
17 which is, it's not an incredibly important research
18 topic that you yourself research or your team?
19   A. We do not research it, but it is
20 important.
21   Q. It's important in the sense that cyber
22 security, if you have a cyber security failure --
23   A. Right.
24   Q. -- can damage a business?
25   A. If we want --

**Page 133**

1    Q.  Let me finish.
2        But it's not something that when you're
3    doing your research, it's incredibly important for
4    you to research yourself?
5    A.  It's not part of our research process
6    where we go in with a microscope on cyber security
7    in any report we've ever published.
8    Q.  It's not just going in with a microscope,
9    Mr. Thill.  You didn't even look at the security
10   statement that just posted publicly on the company's
11   website, right?
12       I mean, you don't even do that level of
13   research?
14   A.  We have seen the statement, but it's a
15   generic statement.  It's a statement that's on
16   virtually every company's website.
17   Q.  Just to be clear, you -- you did not even
18   see this statement at the time that you were looking
19   into SolarWinds?
20   A.  Not that I recall.
21   Q.  You haven't seen the security statement
22   before this litigation?
23   A.  Not that I recall.
24   Q.  So, again, even that surface-level
25   information is not information that you or your team

**Page 134**

1    seek out when you're doing research on a company?
2    A.  No.  Because it's a given that we believe
3    that these processes and procedures are in place.
4    Q.  Right.
5        And I promise I'm going to get to the
6    assumption later on, but I just want a clear answer
7    to my question.
8    A.  No.
9    Q.  Thank you.
10       And just to be clear, it was material that
11   you could have looked up at the time, but did not?
12   A.  I don't -- I don't think there's anything
13   material about -- about it.  In -- in most
14   situations, what happens is, when we sit down with
15   the team, a management team, we have an
16   understanding who they are.  We'll ask them, hey, is
17   there -- are there any big issues, any big concerns.
18   And given that I knew your CEO from his red hat
19   days, I viewed him as credible and a thoughtful
20   individual that did the right thing for his -- his
21   customers and shareholders.  So it never really came
22   up in the questioning.
23   Q.  Just to be clear, I'm not suggesting there
24   was anything wrong with you not looking into this.
25   I just want to get the facts.

**Page 135**

1        So you said, I think earlier, that --
2    A.  It's --
3    Q.  Let me just finish my question.  Sorry.
4        When you're looking at a company, often
5    you look at the website for information about
6    products, for information about events, all sorts of
7    information.  But you never sought out SolarWinds'
8    security statement from its website when you were
9    doing research on the company; is that correct?
10   A.  At the time, correct.  Going forward, it's
11   become more part of the checklist because of the
12   magnitude of some of these breaches that we've been
13   seeing, so --
14   Q.  Just to be clear, I'm talking about the
15   time frame --
16   A.  Was not --
17   Q.  -- 2018 to --
18   A.  It was not.
19   Q.  You wouldn't --
20   A.  It was not -- it was not part of the
21   process.  Right or wrong, it was not part of the
22   process.
23   Q.  Sure.
24       And you mentioned you could talk to
25   Kevin Thompson or members of the management team.

**Page 136**

1    You never asked them to supply information about the
2    company's internal cyber security procedures?
3    A.  No.
4    Q.  And you mentioned product managers.
5        You never asked to speak with product
6    managers about their view of the company's security
7    practices?
8    A.  No.
9    Q.  And just to be clear, you -- you spoke
10   with the CEO, and I think you said the CFO?
11   A.  CEO, CFO, investor relations are our
12   primary contacts across the majority of our
13   companies.
14   Q.  Okay.  And the company also has a chief
15   technology officer and a chief information officer,
16   but you never asked to speak to them, as far as you
17   can recall?
18   A.  Unclear.  And I'm sure at analyst days or
19   events, we -- we've had interaction, but we never
20   sought out anyone to -- to cover those topics at
21   that point.
22   Q.  To "cover those topics," meaning the
23   company's internal cyber security practices?
24   A.  Correct.
25   Q.  And I assume that's your general practice.

**Page 137**

1 It's not just SolarWinds, in researching the
2 companies you follow, you just don't study the
3 internal cyber security practices of those
4 companies?
5     A.  No.  And neither do our buy side clients.
6 So I can say, after 25 years, I've never been asked
7 by a buy sider, how would you grade their cyber
8 hygiene.  We've never -- we've never been asked that
9 by our clients.  Again, not -- not saying it's not
10 something you should be -- but it's not -- not been
11 at the top of their list.
12     Q.  And I assume for the same reasons, in the
13 reports that you issued about SolarWinds, you never
14 mentioned anything about their internal cyber
15 security controls?
16     A.  No.
17     Q.  And I -- I assume your general practice,
18 can you recall any investor report you've put out
19 that is focused on a company's internal cyber
20 security controls?
21     A.  No.  Only if there was a material issue,
22 we would comment about it if there was a -- a breach
23 that was publicly made available by the company.
24     Q.  Right.
25         And I think you said before, that's really

**Page 138**

1 what you're concerned about.  It's not so much
2 whether every check box has been checked internally,
3 but it's more about has a damaging breach occurred?
4     A.  Correct.
5     Q.  Now, you've repeatedly said that you
6 assume that every company has good cyber security
7 practices in place, and just like you assume the
8 water you drink is safe.
9         Do you remembering that testimony?
10     A.  Yes.
11     Q.  I just want to push on that a little bit
12 because, honestly, I'm not sure that's exactly what
13 you mean.
14         You testified today that many companies,
15 including tech companies, have suffered cyber
16 security incidents?
17     A.  Yes.
18     Q.  You mentioned Adobe?
19     A.  Yes.
20     Q.  Microsoft?
21     A.  Yes.
22     Q.  These are major tech companies, right?
23         MR. MUGMON:  And you can let him ask a
24 question before you -- you answer.  I'm not sure
25 these were specific questions.

**Page 139**

1         MR. TURNER:  They were meant to be.
2 That's fine.  I'll let you know if you need to hold
3 off.
4         THE WITNESS:  He scolded me already.
5 BY MR. TURNER:
6     Q.  These are major tech companies, right?
7     A.  Yes.
8     Q.  I think even CrowdStrike you mentioned, a
9 cyber security company, recently they had a major
10 cyber security incident?
11     A.  Yes.
12     Q.  I think you said specifically every major
13 software company has been hacked; yes?
14     A.  Yes.
15     Q.  Everyone is going through this across the
16 industry?
17     A.  Correct.
18     Q.  It's fair to say, right, this is not even
19 limited to companies, but even the most
20 sophisticated government agencies, like the NSA,
21 have repeatedly been hacked?
22     A.  Yes.
23     Q.  And dare I say, even the SEC itself has
24 been hacked on multiple occasions?
25     A.  I'm unaware of that, but ...

**Page 140**

1     Q.  You haven't heard of their Edgar system
2 being hacked?
3     A.  I have not.
4     Q.  You haven't heard of their Twitter account
5 being hacked?
6     A.  I have not.
7     Q.  Check the -- the news when you have a
8 minute.
9         But fair to say, you -- you don't really
10 assume that every software company out there is
11 safe.
12         The evidence is clear that they're not?
13     A.  The bad guys are getting more
14 sophisticated.
15     Q.  And as a result, they're getting into
16 companies?
17     A.  Correct.
18     Q.  So, again, you don't really assume that
19 every company out there is safe?
20     A.  We assume that they're doing the best that
21 they can to protect themselves against threats.  I'm
22 not by default saying that they're all safe.
23     Q.  I think, is it fair to say, what you mean
24 is that you assume companies have reasonable cyber
25 security practices in place because you don't have

**Page 141**

```
 1  the expertise to analyze that issue, so it's not an
 2  issue that you look at?
 3      A.  It's not -- it's -- I'm not a security
 4  expert.
 5      Q.  Yeah.  So it's not something you look at?
 6      A.  I'm a financial analyst.
 7      Q.  Exactly.
 8          So it's not something you look at
 9  specifically in your research, but you're not really
10  assuming, oh, yeah, they're never going to be
11  attacked?
12      A.  We don't make -- no.  We -- we -- we -- I
13  think the assumption that, based on what we've seen,
14  that everyone is going to have an incident.  When
15  the number one security company, CrowdStrike, brings
16  down an entire airline, the only thing you can do
17  is, by default, someone is going to get attacked,
18  and -- and there's going to be -- there's going to
19  be issues.  It's a question of what do they do with
20  the issue.
21      Q.  Yeah.
22      A.  How do you deal with the issue.
23      Q.  Have you ever heard the -- the saying,
24  with -- with relation to cyber security that it's
25  not a question of if, but when?
```

**Page 142**

```
 1      A.  Correct.  Yes.  We've --
 2      Q.  So it sounds like you really assume that
 3  companies are unsafe, but it's just not an issue
 4  that you have the ability to look into, so you just
 5  put it to the side when you're doing your research
 6  and don't look -- look into it yourself?
 7      A.  It's back burner, but we are aware of and
 8  want to understand -- we want to understand more
 9  about it, but it's not an area where, again, I've --
10  I've spent a lot of time going in to make the
11  assessment to our clients.
12      Q.  And I just want to focus, again, on the,
13  you know, 2018 to '21 period.
14          During that period, you weren't asking for
15  information about it?
16      A.  No.
17      Q.  All right.
18      A.  We weren't being asked by our clients for
19  it either.
20      Q.  And you weren't assuming companies were
21  safe back then, again, you were just assuming it was
22  not an issue you could really look into yourself
23  and, therefore, you were bracketing it in your
24  analysis --
25      A.  Yes.
```

**Page 143**

```
 1      Q.  -- fair?
 2          Now, the SEC showed you a series of
 3  internal SolarWinds documents, right?
 4      A.  Yes.
 5      Q.  These sort of documents are not the type
 6  of documents that you would generally analyze or be
 7  asked to analyze?
 8      A.  No.
 9      Q.  And before disclosing information to
10  investors in SEC filings or earnings calls, like,
11  companies usually have procedures to vet the
12  information to make sure it's accurate, right?
13      A.  Correct.
14      Q.  Companies just don't, you know, dump a
15  bunch of internal emails or -- or PowerPoint decks
16  or spreadsheets on investors and -- and ask them to
17  figure out the facts themselves?
18      A.  No, they don't.
19      Q.  That would be confusing, wouldn't it?
20      A.  It's -- yeah.  It's confusing, just takes
21  time to process and you have to build context behind
22  it.
23      Q.  Yeah.
24          Relying on documents like that would be
25  risky if you don't have all the relevant context?
```

**Page 144**

```
 1      A.  Correct.
 2      Q.  So if -- if one of the documents that you
 3  were shown here today somehow was magically dropped
 4  in your lap, you would want to make sure you had all
 5  the relevant context before you relied on it in
 6  advising your investors, right?
 7      A.  Yes.
 8      Q.  You need more context to understand what
 9  the purpose of the document was?
10      A.  Yes.
11      Q.  About the issue being discussed?
12      A.  Yes.
13      Q.  What was meant by certain remarks?
14      A.  Yes.
15      Q.  Whether the person who made the remark had
16  all the relevant facts themselves?
17      A.  Yes.
18      Q.  And you don't know, do you, whether you
19  have all the context that you need to accurately
20  understand the internal documents that have been
21  shown to you here today?
22      A.  I don't.
23      Q.  Let me show you one of the documents,
24  Exhibit 7.
25          We'll turn back to the page Bates stamped
```

### Page 145

1 ending in -11.
2     And I believe you were pointed to a
3 specific bullet point at the top, and then the
4 number 1 in the chart below, right?
5     **A.** Yes.
6     **Q.** Again, if -- if this landed in your lap,
7 you would not run out and tell investors to sell
8 SolarWinds stock?
9     **A.** No. It doesn't have an impact on -- on my
10 recommendation on -- on its own.
11     **Q.** Yeah, you would want to talk to the person
12 who prepared the document, if you could, to find out
13 what was meant by this?
14     **A.** Correct.
15     **Q.** I can represent to you that the company's
16 CIO, chief information officer, Rani Johnson,
17 testified in the case yesterday. Deposition
18 Mr. Bruckmann was present at, and she testified that
19 she participated in preparing this document.
20     I want to ask you, would it change your
21 view of the significance of this statement -- let me
22 put it differently.
23     Would you want to know that Ms. Johnson
24 testified that this remark and this number were not
25 about any lack of access controls, but instead were

### Page 146

1 about a really shorthand reference to an ongoing
2 project to standardize how access was being managed
3 at the company?
4     Would that be important to you --
5     MR. MUGMON: Objection. Calls for
6 speculation.
7 BY MR. TURNER:
8     **Q.** -- to know?
9     **A.** We -- we'd want more -- we would want more
10 details behind it and be helpful to hear both sides
11 rather than just seeing the doc, hearing your
12 perspective.
13     **Q.** Most importantly, the perspective of the
14 person who actually wrote the words, right?
15     **A.** We'd like -- yeah. We'd like to hear from
16 that person.
17     **Q.** Yeah. If that person testified that this
18 was not about a lack of access controls, but instead
19 about making the company's access management
20 technology consistent across the company's business
21 lines, that would be significant context you'd want
22 to know?
23     MR. MUGMON: Objection. Calls for
24 speculation.
25     THE WITNESS: It would be helpful, but I'd

### Page 147

1 want to hear more from her about it.
2 BY MR. TURNER:
3     **Q.** Sure.
4     And I'll show you Exhibit 10 here.
5 Turning to page Bates stamped -1611.
6     MR. MUGMON: I'm sorry, which page was it?
7     MR. TURNER: -1611.
8     MR. MUGMON: Thank you.
9 BY MR. TURNER:
10     **Q.** You were pointed to this very short remark
11 in here saying significant deficiencies in user
12 access management.
13     Remember that?
14     **A.** Yes.
15     **Q.** Again, would it be helpful context for you
16 to know that Miss Rani -- excuse me -- Ms. Johnson
17 testified yesterday that, again, this statement had
18 nothing to do with the quality of SolarWinds' access
19 controls?
20     MR. BRUCKMANN: Objection.
21 BY MR. TURNER:
22     **Q.** Would that be significant context for you
23 to know?
24     **A.** Yeah. It would be great to hear more
25 about what's behind the slide.

### Page 148

1     **Q.** Would it be --
2     **A.** It's a statement on a slide, so we'd want
3 to hear everyone's perspective on it.
4     **Q.** Would it be helpful to know that
5 Ms. Johnson testified this statement was about
6 deficiencies in the way that user access was audited
7 for SOX purposes on a single occasion?
8     **A.** Yes. Love to hear that context.
9     **Q.** And the audit was re-done using the proper
10 procedures after the issue was discovered.
11     Would that be helpful context to know?
12     **A.** Yes.
13     **Q.** I think you said in your testimony you saw
14 a trend line in some of the documents you saw today?
15     **A.** Yes.
16     **Q.** And I gather what you meant, you saw the
17 same numbers showing up in certain documents that
18 the SEC put in front of you?
19     **A.** That, and then there's a trend line here.
20 It seems like the overall category score is going
21 higher, which is a good thing to see.
22     **Q.** Right.
23     You're -- you're pointing to the up --
24     **A.** Overall.
25     **Q.** -- in -1611.

Brent Thill
8/28/2024

But in terms of the -- the number 1s that you were pointed to on access controls or related to access controls, at least that's the way it was presented to you, you don't know if those notations referred to the same issue or not?
A. No idea.
Q. You don't know exactly what the issue was underlying any particular notation?
A. No.
Q. So you don't have any reliable basis to conclude that there was any specific trend at the company related to access controls?
A. No. Other than the word "access control" was used many places and the score was low.
Q. I want to go back to the security statement.
We don't need to look at it.
You stated that you would assume that SolarWinds had practices like these in place, right?
A. Every company has that in place, I would believe.
Q. Pretty basic policies?
A. Yeah.
Q. But I -- I also -- is it fair to say you would not assume that these policies were perfectly

149

implemented all the time?
A. I wouldn't expect them to be perfect.
Q. Yeah.
I think you even said that none of these companies are perfect?
A. Right.
Q. Meaning, none -- no company gets security right all the time?
A. Correct.
Q. What's most important is that a company had these policies generally in place, but was always looking for gaps and finding -- and fixing any that it found?
A. Yes.
Q. That's what a good cyber security program does?
A. Yes.
Q. And anyone who's knowledgeable about the industry would understand that when they read the security statement, right?
A. Yes. No one would score perfect across the whole board.
Q. Going back to the -- what we discussed earlier, that the biggest issue for you is not so much whether every check box is checked, but whether

150

a material breach has occurred at the company.
SolarWinds advised investors that it was at risk of a cyber security incident.
Are you -- are you aware of that?
A. No.
Q. You read SolarWinds' investor filings, though, right?
A. Yes.
Q. Including its risk disclosures?
A. I don't -- I don't read every risk disclosure perfectly, but I'll -- generally, it's part of -- part of every -- every one of your documents.
MR. TURNER: Let me mark this, I forget where we are in the chain.
THE REPORTER: 13.
MR. TURNER: Let me mark this as 13, please.
(Whereupon, Deposition Exhibit 13 was marked for identification.)
BY MR. TURNER:
Q. So do you recognize that this is an excerpt from the company's risk disclosures?
Is that what it appears to you?
A. Yes.

151

Q. This is from 2019.
So turning to the -- let's see here -- third page of the exhibit, do you see under the -- the first bolded heading, here it's talking about cyber attacks, the risk of cyber attacks?
A. Yes. Yes.
Q. And in the second sentence, it says (as read):
　　Our systems and those of our
　　third party service providers are
　　vulnerable to, among other things,
　　traditional computer hackers,
　　malicious code, denial of service
　　attacks, sophisticated nation state
　　and nation state supported actors.
All of those are risks that were disclosed to investors?
A. Yes.
Q. And then in the fourth paragraph in the second sentence, it says (as read):
　　Despite our security measures,
　　unauthorized access to or security
　　breaches of our software or systems
　　could result in the loss,
　　compromise or corruption of data,

152

## Page 157

investment -- investing public and expect them to -- to figure out whether there's a material weakness or not?

**A.** Yes. And that, I think, is important to highlight, which is there are a lot of -- there's a lot that takes to run a company. Some of it isn't necessarily get -- should get to our level because it becomes data that isn't material to how we would look at a company. So I think that line has to be determined by your own internal legal team and your CIO and CICO -- to make that determination.

**Q.** And you haven't seen any evidence of such a determination was made in any of the documents you've seen today?

**A.** None.

MR. TURNER: No further questions.

MR. BRUCKMANN: Nothing further from the SEC. I think we are done for today.

THE REPORTER: Could I just ask if anyone needs a transcript or a rough?

MR. TURNER: Yes, I'd like a rough, please.

MR. BRUCKMANN: We'll take the rough, yeah.

MR. BRUTLAG: I want to make sure, the

## Page 158

Latham & Watkins attorney, Christine Lee, joined as well, so you might want to include her on the attendees.

THE REPORTER: Thank you.

THE VIDEOGRAPHER: This concludes today's deposition of Brent Thill. Master media of today's deposition will remain in the custody of Gradillas Court Reporters. The time is 1:56 p.m. We are now off the record.

(Whereupon, the deposition concluded at 1:56 p.m.)

## Page 159

CERTIFICATE OF WITNESS

I, BRENT THILL, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on August 28, 2024, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

\_\_\_\_\_ I have made corrections to my deposition.
\_\_\_\_\_ I have NOT made any changes to my deposition.

Signed: _____
        BRENT THILL

Dated this _____ day of _____ of 20\_\_\_\_.

## Page 160

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____ Reading and Signing was requested.
_____ Reading and Signing was waived.
\_\_\_x\_\_\_ Reading and Signing was not requested.

_____
KATHLEEN A. MALTBIE
RPR-RMR-CRR-CCRR-CLR-CRC-RDR
California CSR 10068, Nevada CCR 995
Texas CSR 12212