**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 1:23-cv-09518-PAE |
| v. | ) ) | |
| SOLARWINDS CORP. and TIMOTHY G. BROWN, | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) ) ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION TO EXCLUDE OR LIMIT THE TESTIMONY
AND OPINIONS OF GREGORY RATTRAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND .......................................................................................................................... 1

    A.    Dr. Rattray's Qualifications ............................................................................... 1

    B.    Dr. Rattray's Assignment in This Case ............................................................. 3

LEGAL STANDARD ................................................................................................................... 5

ARGUMENT ................................................................................................................................ 5

I.    Dr. Rattray's Testimony Does Not Constitute Improper Factual Narrative ....................... 6

    A.    The Narration Rule Prohibits Storytelling, but Does Not Bar Experts from
Explaining the Foundations for Their Opinions as Dr. Rattray Does ...................... 6

    B.    Dr. Rattray Was Not Required to Flyspeck the Documents He Reviewed,
and His Discussion of Them Does Not Constitute Improper Narrative ............... 10

    C.    Dr. Rattray's Review of Sample Documents Is Unobjectionable and Does
Not Constitute Improper Narrative ....................................................................... 13

    D.    Dr. Rattray's Discussion of Witness Testimony Does Not Constitute
Improper Narrative or Bolstering........................................................................... 16

II.    Dr. Rattray Is Eminently Qualified to Offer His Opinions ................................................ 18

CONCLUSION............................................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

### CASES

*AU New Haven, LLC v. YKK Corp.*,
    2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ...................................................................... 15

*Baker v. Saint-Gobain Performance Plastics Corp.*,
    2024 WL 4189385 (N.D.N.Y. Sept. 12, 2024) ...................................................................... 9

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
    666 F. Supp. 3d 328 (S.D.N.Y. 2023) ........................................................................... 12, 15

*Chill v. Calamos Advisors LLC*,
    417 F. Supp. 3d 208 (S.D.N.Y. 2019) ............................................................................... 9

*Ctr. for Indep. of Disabled v. Metro. Transp. Auth.*,
    2023 WL 5744408 (S.D.N.Y. Sept. 6, 2023) ................................................................... 10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................................................... 13

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    74 F. Supp. 3d 639 (S.D.N.Y. 2015) ............................................................................... 13

*Highland Cap. Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ............................................................................... 7

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ................................................................... 19

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ..................................................................................... 6, 7

*In re Arris Cable Modem Consumer Litig.*,
    327 F.R.D. 334 (N.D. Cal. 2018) ............................................................................... 15, 16

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ..................................................................... 16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    638 F. Supp. 3d 227 (E.D.N.Y. 2022) .......................................................................... 7, 17

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................................... 6

*In re Xerox Corp. Sec. Litig.*,
    746 F. Supp. 2d 402 (D. Conn. 2010) ............................................................................. 10

*Island Intell. Prop. LLC v. Deutsche Bank AG*,
    2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) .......................................................... 6

*LoanCare, LLC v. Dimont & Assocs.*,
    2025 WL 951585 (S.D.N.Y. Mar. 28, 2025) ........................................................ 17

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015) ................................................................... 7

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ........................................................................ 10, 17

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005) .............................................................................. 17

*Novartis Pharma AG v. Incyte Corp.*,
    2024 WL 3608338 (S.D.N.Y. July 29, 2024) .................................................... 17

*Orbital Eng'g, Inc. v. Buchko*,
    578 F. Supp. 3d 736 (W.D. Pa. 2022) ............................................................... 16

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010) ............................................................... 16

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) ................................................................................ 13

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ................................................................. 7

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ............................................................. 6, 7, 9, 13

*SEC v. Terraform Labs Pte. Ltd.*,
    708 F. Supp. 3d 450 (S.D.N.Y. 2023) ................................................................. 6

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................... 7, 19

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    528 F. Supp. 3d 219 (S.D.N.Y. 2021) ............................................................... 13

*SourceOne Dental, Inc. v. Patterson Cos.*,
    2018 WL 2172667 (E.D.N.Y. May 10, 2018) .................................................... 16

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004) .......................................................... 16, 17

*United States v. Cruz*,
   981 F.2d 659 (2d Cir. 1992) ................................................................................. 17

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ................................................................................... 17

*United States v. Jones*,
   2018 WL 1115778 (S.D.N.Y. Feb. 27, 2018) ...................................................... 17

*United States v. Joseph*,
   542 F.3d 13 (2d Cir. 2008) ................................................................................... 15

*United States v. Ray*,
   2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ........................................................ 18

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) ................................................................................. 17

**RULES**

Federal Rule of Evidence 702 ..................................................................................... 5, 8

Federal Rule of Evidence 703 ................................................................................... 5, 10

## PRELIMINARY STATEMENT

The SEC's motion to exclude testimony from Defendant's expert, Dr. Gregory Rattray, is worse than meritless: it is pointless. The SEC has already stipulated that SolarWinds implemented the Subject Policies[1] as a routine practice—which is precisely Dr. Rattray's conclusion. So why try to exclude it? As with the continued prosecution of the case overall, the SEC is spinning its wheels here—objecting for the sake of objecting, rather than raising any genuine, material dispute.

None of the SEC's objections to Dr. Rattray's testimony has any valid legal basis. The SEC makes scattered complaints under the umbrella argument that Dr. Rattray's testimony constitutes impermissible "narrative." But Dr. Rattray does not merely "narrate" the facts. He instead *assesses* the facts in opining whether the Subject Policies were in place during the Relevant Period—similar to what an expert would do outside the litigation context if asked to assess SolarWinds against certain cybersecurity controls (and similar to what outside auditors *did* do during the Relevant Period). Dr. Rattray is indisputably qualified to conduct such an assessment, and he of course reviewed witness testimony and documentary evidence in doing so here—as that is where the relevant facts reside.

## BACKGROUND

### A.    Dr. Rattray's Qualifications

Dr. Rattray is one of our nation's preeminent cybersecurity experts. *See* Expert Report of Gregory Rattray ("Rattray Rep.") ¶¶ 5-11, ECF No. 180-1; App'x A to Rattray Rep. ("Rattray CV"), ECF No. 172-4. With more than 30 years' experience in cybersecurity, he began his career in the military, where he eventually led cybersecurity defense for the U.S. Air Force and served as Director for Cybersecurity on the National Security Council. *Id.* In that latter role, Dr. Rattray was

---

[1] Capitalized terms have the same meaning here as in Defendants' Motion for Summary Judgment.

a principal author of the *National Strategy to Secure Cyberspace*, a report signed by President George W. Bush in 2003, which helped define the nation's cybersecurity strategy at the time. Rattray Rep. ¶ 9. After retiring from the Air Force as a Colonel in 2007, Dr. Rattray served as Chief Security Advisor for the Internet Corporation for Assigned Names & Numbers (ICANN), Rattray CV at A-2, a global organization that forms part of the backbone of the internet. Dr. Rattray also founded a cybersecurity consulting firm in 2007 that provided cybersecurity assessments and advice to Fortune 500 companies, the Department of Defense and Department of Homeland Security, and foreign governments. Rattray Rep. ¶ 6; Rattray CV at A-2. In 2014, Dr. Rattray joined JPMorgan Chase, where he held the roles of Chief Information Security Officer and Head of Global Cyber Partnerships during his tenure. Rattray Rep. ¶¶ 5, 8; Rattray CV at A-2.

In 2019, he left JPMorgan Chase and founded his current consulting firm, Next Peak, where he works with a range of commercial clients to scrutinize their cybersecurity programs and help improve their cybersecurity posture. Rattray Rep. ¶ 6. These engagements typically include assessments that draw on well-established industry frameworks, such as the NIST Cybersecurity Framework (CSF). *Id.* Dr. Rattray also currently serves as the Chief Strategy and Risk Officer for an early-stage company focused on the improvement of cybersecurity operations through advanced data science and artificial intelligence. *Id.* ¶ 7. And he is the Executive Director of the Cyber Defense Assistance Collaborative, an initiative to coordinate voluntary support of over twenty leading technology companies to provide cybersecurity assistance to the Ukrainian government and critical infrastructure. *Id.*

Finally, Dr. Rattray is an adjunct senior research professor at Columbia University's School of International and Public Affairs, where he co-teaches a course on the fundamentals of cyber conflict and oversees various academic initiatives related to cybersecurity. *Id.* He holds a

bachelor's degree from the United States Air Force Academy, a masters from Harvard's Kennedy School, and a doctorate from Tufts' Fletcher School of Law and Diplomacy. *Id.* ¶ 10. Among other academic works, his doctoral dissertation was published by MIT Press as *Strategic Warfare in Cyberspace* (2001). *Id.*; Rattray CV at A-4-5.

### B.    Dr. Rattray's Assignment in This Case

Dr. Rattray was tasked with assessing whether the Subject Policies were in place at SolarWinds during the Relevant Period—in a similar manner as he would conduct a cybersecurity assessment in the field. Rattray Rep. ¶¶ 1-3. As Dr. Rattray explained, based on his years of experience conducting cybersecurity assessments: "An outside expert assessing whether a company has certain controls in place gathers information from people in the company who are knowledgeable about the controls in order to understand how they are designed, and looks for artifacts generated from the operation of those controls to ensure that they were implemented." *Id.* ¶ 2. Dr. Rattray applied a similar approach here. *Id.* ¶¶ 17-22. The "controls" at issue are the Subject Policies, which Dr. Rattray interpreted in light of his industry experience. *Id.* To determine whether the controls were met, Dr. Rattray reviewed the evidence of SolarWinds' actual practices to determine whether they aligned with those controls. *Id.* Specifically, he reviewed deposition testimony about SolarWinds' actual practices—similar to the sort of information he would ordinarily obtain through employee interviews. *Id.* And he reviewed documentary evidence of SolarWinds' actual practices, in the form of internal policy documentation and artifacts from the day-to-day implementation of those practices—the same sort of documentation he would ordinarily evaluate in a cybersecurity assessment. *Id.* "This approach," Dr. Rattray explained, "reasonably approximates a standard external cybersecurity assessment that I might perform as an expert in the field, and it provided me with facts that were more than sufficient for me to form opinions about the accuracy of the representations in the Security Statement at issue." *Id.* ¶ 22.

Based on this industry-standard methodology, Dr. Rattray concluded that the Subject Policies "accurately describe SolarWinds' practices during the Relevant Period." *Id.* ¶ 25; *see also id.* ¶¶ 30, 41, 59, 72, 84 (setting forth his conclusions as to each of the Subject Policies). Dr. Rattray noted that in drawing this conclusion he did not mean to imply that SolarWinds invariably adhered to the Subject Policies. As he explained: "Occasional wrinkles or lapses in implementing these controls are expected and do not undermine the broad representations in the Security Statement— which, in my opinion, should not and would not be interpreted as a guarantee[]." *Id.* ¶ 99. Rather, Dr. Rattray's conclusion was that the Subject Policies were accurate because the evidence showed that SolarWinds implemented them as a "regular practice"—which, based on his experience, is all someone in the industry would expect from reading the Security Statement. *See, e.g.*, *id.* ¶¶ 44-45, 53 (concluding that processes designed to assign access based on role were implemented "as a regular practice" at SolarWinds); *id.* ¶ 97 (finding that security testing was "a regularly conducted part of SolarWinds' software development lifecycle"); *id.* ¶ 112 (concluding that SolarWinds "regularly self-assessed its cybersecurity posture and used the NIST CSF as a guide in doing so"); *see also* Rattray Dep. Tr. 188:19-190:13, ECF No. 172-3 (explaining that readers of the Security Statement would understand it to describe the policies the company "generally" follows, "because no one's holding this to a bar of perfection").

Dr. Rattray's conclusion accords with the admissions of the SEC's own expert, Mark Graff, who acknowledged—based on the same types of evidence Dr. Rattray cites in his report—that SolarWinds regularly implemented the processes described in the Subject Policies. *See* Defs.' Mem. ISO Mot. Summ. J. 6-19 & nn.4-5, 8-9, 11, ECF No. 184. Dr. Rattray's conclusion also accords with the admissions made by the SEC itself in the parties' Joint Statement of Undisputed Material Facts, which recites much of the same evidence Dr. Rattray cites in his report and

acknowledges that SolarWinds implemented the processes described in the Subject Policies "as a routine practice." *See* Parties' Joint Statement of Undisputed Material Facts ("JSUMF") ¶¶ 75, 86, 89, 90-92, 94-95, 97, 114, 117, 129, 137, 144, 146, 148, 150, ECF No. 166.

## LEGAL STANDARD

Federal Rule of Evidence 702 permits testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In addition, Federal Rule of Evidence 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

## ARGUMENT

The SEC does not argue that Dr. Rattray is unqualified to offer his opinions, that he lacks helpful specialized knowledge, that his testimony rests on insufficient facts or unreliable methods, or that he failed to apply his methods reliably. *See* SEC's Mem. ISO Mot. to Exclude or Limit Test. & Ops. ("Mot."), ECF No. 172. In fact, the SEC concedes the admissibility of the latter half of Dr. Rattray's report, Mot. 21, where he explains how the SEC's putative expert applied no reliable or even recognizable methodology, Rattray Rep. ¶¶ 98-216. The SEC nevertheless claims that "the entire first half of [Dr. Rattray's] report" should be excluded because it supposedly constitutes "narration" and "simply regurgitates the statements made by SolarWinds' witnesses at

their depositions." Mot. 7. The SEC also accuses Dr. Rattray of "attempt[ing] to bolster" witness testimony "by pointing to 'samples' of documents supposedly showing SolarWinds following the cybersecurity practice at issue." *Id.* The objections are meritless.

## I.     Dr. Rattray's Testimony Does Not Constitute Improper Factual Narrative

The SEC asserts, in a nutshell, that Dr. Rattray cannot discuss documents or testimony in the case, even though that evidence is the subject of his assessment. It should go without saying, however, that the rule against expert narration does not bar experts from basing their opinions on evidence in the record, and that Dr. Rattray does not become a narrator simply because he considers facts the SEC would rather ignore. An expert's testimony about the evidence supporting his opinions "does not provide a mere factual narrative," *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 30 (S.D.N.Y. 2020) (Engelmayer, J.)—for, in order to render an opinion, an expert "must lay a foundation that necessarily requires restating facts in evidence," *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016).

### A.     The Narration Rule Prohibits Storytelling, but Does Not Bar Experts from Explaining the Foundations for Their Opinions as Dr. Rattray Does

As the SEC's own cases show, courts exclude expert testimony as improper narrative where its "purpose … is simply to 'provide an historical commentary of what happened.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding "a narrative reciting selected regulatory events" concerning drug at issue); *see SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 470-71 (S.D.N.Y. 2023) (excluding expert as "narrator" who merely recited claims defendant made in marketing materials about design of crypto assets); *Island Intell. Prop. LLC v. Deutsche Bank AG*, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (excluding "a narrative of the numerous documents produced during discovery or, for instance, a timeline of the patent prosecution events"); *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 180,

6

183 (S.D.N.Y. 2008) (excluding "factual narrative of events giving rise to this action"). Such testimony offers "merely a narrative of the case which a trier of fact is equally capable of constructing," *Aluminum Warehousing*, 336 F.R.D. at 30, and "does not convey opinions based on an expert's knowledge and expertise," *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013).

Courts recognize a clear distinction, however, between "solely constructing a factual narrative" versus "using the evidence in the record" to form opinions—which is exactly what experts are supposed to do. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 311 (E.D.N.Y. 2022). An expert can "lay a foundation" for their opinions even if that "requires restating facts in evidence." *Scott*, 315 F.R.D. at 46; *see Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013) (rejecting "narrative" objection because "the factual assertions contained in [the expert]'s report simply provide the foundation for [his] opinion"). Likewise, "[e]xpert testimony is … admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'" *Scott*, 315 F.R.D. at 45 (quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015)).

Judged by these standards, Dr. Rattray's testimony goes "well beyond the mere recitation of facts" and "does not provide a mere factual narrative." *Aluminum Warehousing*, 336 F.R.D. at 30-31. Dr. Rattray lays the initial foundation for his testimony by explaining how he believes the Subject Policies "would be understood in the industry," based on his experience and industry knowledge. Rattray Rep. ¶ 21(d). That is part of the foundation for his opinion, because it informs his understanding of "the representations" that "are essentially the 'controls' that [he] undertook to 'assess.'" *Id.* ¶ 21(a); *see id.* ¶¶ 24-25. Then, with respect to each of the Subject Policies, Dr.

Rattray reviews testimony and documentation concerning SolarWinds' routine practices, to determine whether those practices conform to the policy. That evidence is part of the foundation for his opinion, as it forms "the facts of the case" that Dr. Rattray assessed against the controls at issue. Fed. R. Evid. 702(d).

For instance, in connection with the Security Statement's representation that SolarWinds "follows the NIST Cybersecurity Framework," Dr. Rattray, who regularly conducts assessments using the NIST CSF, unpacks what the NIST CSF is, explaining that it is a framework for self-evaluation rather than a standard that requires meeting specific cybersecurity requirements. Rattray Rep. ¶¶ 31-37. He then reviews the evidence reflecting that SolarWinds in fact "used the NIST CSF on a recurring basis as a tool for self-evaluation, in order to identify opportunities for improvement, guide decisions about how to allocate resources, and communicate information about cybersecurity risk to stakeholders"—which, he explains, "is what the NIST CSF was designed for, and … what 'following' the NIST CSF entails." *Id.* ¶ 39. This allows him to opine: "I therefore have no difficulty in concluding that SolarWinds followed the NIST CSF." *Id.* Likewise, with respect to the Security Statement's representation that SolarWinds' best practices "enforce the use of complex passwords," Dr. Rattray explains how, based on his knowledge and experience, he believes this statement would be understood in the industry—as a representation that "SolarWinds automatically enforced password complexity through technical measures where it was feasible to do so." *Id.* ¶¶ 64-65. Dr. Rattray then reviews evidence that SolarWinds in fact "automatically enforced complex passwords where it was feasible to do so," from which he concludes that "the Security Statement accurately described SolarWinds' practices with respect to passwords," *id.* ¶ 70. And so on for the other Subject Policies: Dr. Rattray explains the concepts

relevant to each one (e.g., what role-based access controls are, what penetration testing is, etc.), and then applies those concepts to the facts of the case.

This is paradigmatic expert testimony—well within the boundaries outlined in *Scott*, for example, where the court held that a "permissible purpose" of expert testimony is "to identify [defendant]'s practices and structures and place them within a larger context of industry norms," which "necessarily requires" the expert to "lay a foundation" by "restating facts in evidence." 315 F.R.D. at 46 (expert properly "cite[d] to deposition transcripts and documents to explain [defendant]'s … standardized[] and structured business operation"). Dr. Rattray's "application of his experience to the facts of this case" does not "render his opinions mere 'factual narratives,'" because "[i]t is axiomatic that 'an expert might draw a conclusion from a set of observations based on extensive and specialized experience.'" *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 246 (S.D.N.Y. 2019). Dr. Rattray's testimony also permissibly "'synthesizes' or 'summarizes' data in a manner that 'streamlines the presentation of that data to the jury,'" by organizing various sets of evidence under each of the Subject Policies and explaining how they demonstrate each policy was implemented. *Scott*, 315 F.R.D. at 45; *see also Baker v. Saint-Gobain Performance Plastics Corp.*, 2024 WL 4189385, at *3 (N.D.N.Y. Sept. 12, 2024) (rejecting "narration" objection for similar reasons).

Moreover, Dr. Rattray's review of the evidence is proper expert testimony because it reflects the same sort of methodology that experts follow in the field in conducting cybersecurity assessments. As Dr. Rattray explained, cybersecurity assessments are typically done by reviewing a given set of controls against statements from "key employees and management with knowledge of the controls and how they are implemented," as well as "documentation concerning how these controls are implemented on a day-to-day basis, including both written policies as well as artifacts

9

that are generated in practice through the operation of the controls." Rattray Rep. ¶ 18. Indeed, such assessments were done by outside experts at SolarWinds during the Relevant Period, as part of SOX audits and SOC-2 audits, which followed this very methodology. *See id.* ¶ 55 (explaining that SOX audit work papers reflect review of sample documentation from implementation of role-based access controls); JSUMF ¶ 107 (excerpt from SOC-2 audit reflecting review of sample documentation from implementation of role-based access controls). An expert is entitled to employ the "methodology routinely relied upon by professionals in his field," *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 418 (D. Conn. 2010), and that is precisely what Dr. Rattray did here. *See* Rattray Rep. ¶ 57 (opining that "[t]here is an abundance of artifacts evidencing that the described processes and procedures were in place—the same sorts of artifacts that I would look for had I been hired as an outside consultant to do an assessment of SolarWinds' controls").[2]

### B. Dr. Rattray Was Not Required to Flyspeck the Documents He Reviewed, and His Discussion of Them Does Not Constitute Improper Narrative

Equally meritless are the SEC's claims that Dr. Rattray offers insufficient "analysis" of the evidence supporting his opinions. *See, e.g.*, Mot. 11. For example, the SEC complains that, in opining whether SolarWinds had role-based access controls in place, Dr. Rattray "simply noted the existence" of certain documentation—like the System Access Request Forms (SARFs) used to assign employees access rights—rather than "evaluate the content" of the documents by somehow

---

[2] The SEC's passing objection to Dr. Rattray's citation to "hearsay" reports of external auditors, Mot. 12, is meritless for related reasons. Dr. Rattray explained that it is "standard practice" in conducting a cybersecurity assessment to "[l]everage the results of any relevant outside cybersecurity audits." Rattray Rep. ¶ 18. Thus, under Rule 703, Dr. Rattray can use those audit reports, hearsay or not, as one of the various bases for his opinions. *See, e.g., Ctr. for Indep. of Disabled v. Metro. Transp. Auth.*, 2023 WL 5744408, at *5 (S.D.N.Y. Sept. 6, 2023) ("[A]n expert witness may testify to opinions based on hearsay or other inadmissible evidence where experts in that field reasonably rely on such evidence in forming their opinions."); *cf. Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (excluding historian expert witnesses "who d[id] not bring their expertise to bear in any … way" and merely repeated hearsay statements made by "freelance artists" about plaintiff's intellectual-property practices) (cited by SEC, Mot. 12).

checking whether they were accurately filled out or correctly implemented by IT staff. Mot. 10. This objection misses the point of what Dr. Rattray was assigned to do, and what a cybersecurity assessment is meant to accomplish.

Dr. Rattray's assignment was to determine whether SolarWinds had general processes in place that aligned with what the Subject Policies said. The approach he followed was to analyze SolarWinds' processes to determine whether they were (a) designed to effectuate the Subject Policies and (b) implemented in practice, rather than just existing on paper. That is what a typical cybersecurity assessment would do. Again, as Dr. Rattray stated: "An outside expert assessing whether a company has certain controls in place gathers information from people in the company who are knowledgeable about the controls in order to understand how they are designed, and looks for artifacts generated from the operation of those controls to ensure that they were implemented." Rattray Rep. ¶ 2. Dr. Rattray's assignment was *not* to evaluate every instance of SolarWinds' implementation of the Subject Policies to ensure no mistakes were ever made—which would be not only impossible as a practical matter, but unnecessary for him to reach his conclusion that the Subject Policies were in place.

So, for example, in analyzing whether SolarWinds had role-based access controls in place, Dr. Rattray analyzed the SARFs as evidence of the processes the Company used to implement role-based access controls. Contrary to the SEC's characterization, Mot. 10, Dr. Rattray did not merely "note the existence" of these documents, but rather he *did* "evaluate the content" of them— by analyzing whether the forms were reasonably designed to assign users access rights based on their roles. *See* Rattray Rep. ¶ 44 (analyzing elements of the forms in detail). And he properly answered that question in the affirmative, because the forms were designed to collect information about each employee's role and match it to one of dozens of defined roles at the Company, each

with a specific set of access rights designated for it. *Id.* Moreover, Dr. Rattray found that the SARF process not only existed on paper but was actually implemented on a day-to-day basis, as evidenced by the *thousands* of SARFs filled out during the Relevant Period and the *thousands* of help-desk tickets generated by IT staff in the course of executing them. *Id.* ¶¶ 44-45, 49-50.

Dr. Rattray did not seek to investigate whether individual SARFs were filled out and executed "correct[ly]," Mot. 10—e.g., whether a particular employee's role was accurately listed on a particular form, or whether IT staff correctly configured the access designated for that role—because such microscopic scrutiny, aside from being impractical, would lose sight of the relevant, macroscopic question he was trying to answer: whether SolarWinds had a general practice in place designed to implement role-based access controls. Nothing required Dr. Rattray to go beyond these documents and demand proof of the proof, as if the thousands of SARFs in the evidentiary record were part of some giant charade. To the extent the documents might contain occasional mistakes, Dr. Rattray explained that such errors are to be expected and would not imply that a policy was not being implemented overall. Rattray Rep. ¶ 99.[3]

In any event, the SEC's assertion that Dr. Rattray should have checked documents for errors has nothing to do with "narration." If anything, those complaints "go to the weight and not the admissibility" of the testimony. *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (rejecting complaint that expert "should have looked at … actual data rather than obtaining information from interviewing employees"); *see Raskin v. Wyatt Co.*, 125

---

[3] By comparison, if a company's physical security policies were audited, and the auditor sought evidence that the company had a control in place to restrict building entry to authorized visitors, the company might provide the prior year's visitor logs from the front desk, showing thousands of entry times recorded, and the names of each visitor, along with the employee who authorized their visit. That evidence itself would demonstrate the control. The auditor could not be accused of failing to "analyze" the evidence if the auditor did not, in addition, insist on seeing security camera footage to confirm each visit time listed in the logs, or on interviewing the authorizing employees listed in each row to confirm that they did in fact authorize the visit.

F.3d 55, 66 (2d Cir. 1997) ("[D]isputes as to the validity of ... underlying data go to the weight of the evidence."); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 657 (S.D.N.Y. 2015) (finding that the asserted "presence or likelihood of errors" in documents on which expert relied goes to "the testimony's weight, not its admissibility"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 528 F. Supp. 3d 219, 231 (S.D.N.Y. 2021) (similar). If the SEC wants to press such arguments, it can do so through "cross-examination" and "presentation of contrary evidence," not exclusion. *Scott*, 315 F.R.D. at 43 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

### C.    Dr. Rattray's Review of Sample Documents Is Unobjectionable and Does Not Constitute Improper Narrative

For similar reasons, there is no substance to the SEC's repeated complaints that Dr. Rattray cited to "samples" of documents supporting his conclusions, without following "any statistical sampling methodology," Mot. 10, 13.

First of all, the SEC is in no position to argue that the sample documents reviewed by Dr. Rattray were unrepresentative of SolarWinds' practices—because *the SEC itself agrees* that SolarWinds' "routine practices" were just as Dr. Rattray describes, based on the documents he reviewed. For example, Dr. Rattray's report closely examines two sample SARFs, Rattray Rep. ¶ 44; *id.* Exs. A-1 & A-2, ECF No. 180-1 at 123-29, on which he relies in part to conclude that "SolarWinds had processes and procedures … designed to ensure that employees' access privileges were tailored to their roles," *id.* ¶ 42. Similarly, the parties' Joint Statement of Undisputed Material Facts discusses the *exact same* sample SARFs, pointing to the *exact same* features of the forms discussed by Dr. Rattray, *see* JSUMF ¶¶ 77-88; *id.* Ex. B, ECF No. 166-2; *id.* Ex. C, ECF No. 166-3, and, like Dr. Rattray, states that "SolarWinds had a process in place designed to provision users with access based on what they needed for their role, referred to

13

internally by the company as the 'SARF process,'" *id.* ¶ 74, which "was followed as a routine practice by SolarWinds during the Relevant Period," *id.* ¶ 92. The same goes for other conclusions Dr. Rattray reaches about SolarWinds' routine practices processes based on sample documents: The SEC admits to the same conclusions in the Joint Statement of Undisputed Material Facts.[4] So what is the point of fussing over how the sample documents underlying those conclusions were selected?

Besides, the SEC does not meaningfully challenge the manner in which Dr. Rattray pulled samples from the document sets he received, but merely sprinkles vaguely statistical cavil throughout its brief. For example, the SEC acknowledges that Dr. Rattray reviewed scores of sample SARFs, which he selected from across the Relevant Period, as well as across SolarWinds' different business units and geographic locations. Mot. 10; *see* Rattray Rep. ¶ 44 & n.28; Rattray

---

[4] *Compare, e.g.*, Rattray Rep. ¶ 53 (discussing sample user access reviews and concluding that they "appear to go through all of the active accounts on various systems used by the team being reviewed, in order to confirm that each account was still needed by an active employee and to identify any accounts for former employees that may have been missed during the deprovisioning process"), *with* JSUMF ¶ 97 ("User Access Reviews were completed as a routine practice on a quarterly basis by SolarWinds' IT team, which would inventory user access control lists on key systems to confirm that access privileges were appropriately assigned—and to catch any potential errors that might have been made in the provisioning or de-provisioning process."); Rattray Rep. ¶ 78 (discussing sample network monitoring reports and concluding that "SolarWinds configured systems on its network to be logged and monitored using its SEM [Security Event Manager] solution"), *with* JSUMF ¶ 133 ("Throughout the Relevant Period, SolarWinds generally configured network components, workstations, applications, and monitoring tools to transmit logs of user activity to Security Event Manager so the activity could be audited or monitored in real time for anomalous events."); Rattray Rep. ¶ 95 (discussing sample "Final Security Reviews" and observing "they contain numerous artifacts of security testing," including "links to JIRA tickets concerning resolution of potential security vulnerabilities that had been identified during development"), *with* JSUMF ¶¶ 153-55 (stating that "SolarWinds' development teams … often prepared product security assessments during the Relevant Period in the form of 'Final Security Reviews'" that were "designed to collect in one place artifacts of security testing conducted during the development of a software release," including "links to JIRA tickets containing assessments of potential code vulnerabilities that had been identified during development and information about how they had been mitigated or resolved").

Dep. Tr. 126:6-19. Nevertheless, the SEC quibbles that Dr. Rattray received more than a thousand SARFs "from defense counsel" and did not use a "statistical sampling methodology to identify the appropriate number of SARFs to analyze or pick the '50 to 70' SARFs he looked at." Mot. 10. The SEC makes similar gripes about other sample sets Dr. Rattray reviewed. *Id.* at 11, 15, 17-18.

These half-baked criticisms have no merit, because "expert testimony need not be based on statistical analysis in order to be probative." *United States v. Joseph*, 542 F.3d 13, 21 (2d Cir. 2008). Dr. Rattray's task was not to employ some kind of complex statistical analysis or controlled laboratory experiment with "the exactness of hard science methodologies." *Id.* His task was simply to determine whether SolarWinds had certain controls in place, in a fashion similar to how assessments are ordinarily done in the cybersecurity field. The SEC's statistical critiques are "not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology … behind it." *Id.*; *see also AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *26 (S.D.N.Y. Mar. 19, 2019) ("Unless the movant can show a reason that the assumption of representativeness is unsound, courts routinely allow experts to extrapolate from a nonrandom sample."); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018) (rejecting "disingenuous" argument that expert based opinions on documents "highlighted" by counsel, noting "no authority for the proposition that an expert must independently sort through all of the discovery in a case in order to determine the relevant evidence").

And again, none of this has anything to do with whether Dr. Rattray's testimony constitutes improper narrative. Any issues the SEC purports to have with the samples Dr. Rattray relies on would go only to weight, not admissibility. *Better Holdco*, 666 F. Supp. 3d at 355. If the SEC wants to argue that Dr. Rattray "failed to consider relevant evidence of record," it would be "free

to cross-examine [him] at trial on the foundation for his opinions." *Arris*, 327 F.R.D. at 364; *see R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (similar).

### D.    Dr. Rattray's Discussion of Witness Testimony Does Not Constitute Improper Narrative or Bolstering

The SEC also complains that Dr. Rattray "simply repeats what fact witnesses described" without providing any "analysis" of their testimony, and that he "attempts to bolster" their testimony by citing to evidence corroborating it. *See, e.g.*, Mot. 9-10, 14. The arguments are more of the same, and equally baseless.

It is entirely permissible for Dr. Rattray to rely on witness testimony as part of the factual record of SolarWinds' practices during the Relevant Period. Dr. Rattray does not "simply repeat" the testimony: He analyzes it, by applying his knowledge and expertise in opining whether the practices that witnesses described conform to the Subject Policies. Just as with the documentary evidence Dr. Rattray reviewed, witness testimony was fair game for him to consider. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *9 (S.D.N.Y. Jan. 30, 2025) (admitting expert opinion based on "case-specific deposition and discovery material produced in this case"); *SourceOne Dental, Inc. v. Patterson Cos.*, 2018 WL 2172667, at *8 (E.D.N.Y. May 10, 2018) (expert permissibly "reviewed 15 deposition transcripts and 60 normal-course-of-business documents" as "facts to which the expert then applies his expertise"); *Louis Vuitton*, 97 F. Supp. 3d at 505 ("deposition testimony" is "clearly within the universe of [sources] on which [an expert] could permissibly rely"); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 237 (S.D.N.Y. 2004) (expert permitted to "rely heavily" on deposition testimony "to provide a background for the case" and "in order to reach [the expert's] ultimate conclusions"); *see also Orbital Eng'g, Inc. v. Buchko*, 578 F. Supp. 3d 736, 741 (W.D. Pa. 2022) (cybersecurity expert properly relied on deposition testimony).

Nor does Dr. Rattray engage in any "bolstering of witness credibility." Mot. 1. The rule against bolstering credibility prevents experts from offering "their personal assessment of the credibility of another witness's testimony." *United States v. Jones*, 2018 WL 1115778, at *7 (S.D.N.Y. Feb. 27, 2018) (quoting *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988); *see Payment Card*, 638 F. Supp. 3d at 313 (explaining that the rule "means that 'the Federal Rules of Evidence do not allow one party to call an expert to opine about the tendencies or incentives of the other party's fact witnesses to lie or not to lie'"); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (applying rule similarly); *see also U.S. Info. Sys.*, 313 F. Supp. 2d at 226 ("Expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others."). Dr. Rattray does not assess or vouch for any witness' credibility, so the rule, and the SEC's authority, is inapposite. *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (expert "stated that he 'rejected' the possibility that [witnesses] had lied, and explained various reasons why police officers have no incentive to give false statements").[5]

While Dr. Rattray of course *cites* to the testimony of witnesses, "[s]imply referencing" witness testimony "does not itself 'amount to improper bolstering.'" *Novartis Pharma AG v. Incyte Corp.*, 2024 WL 3608338, at *17 n.24 (S.D.N.Y. July 29, 2024); *see also LoanCare, LLC v. Dimont & Assocs.*, 2025 WL 951585, at *18 (S.D.N.Y. Mar. 28, 2025) (expert did not impermissibly narrate by "quoting … the deposition testimony of other witnesses" because "these are exactly the kinds of facts that must be stated—without reference to their relative credibility—to provide context for the reader of the report"). Dr. Rattray also properly cites documentary

---

[5] The SEC's other two cited cases concern distinct problems that arise when a law-enforcement agent testifies in a criminal trial as both expert and fact witness, *see United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2003); *United States v. Cruz*, 981 F.2d 659, 659, 663 (2d Cir. 1992). Neither offers support for the SEC's attempt to prohibit Dr. Rattray from relying on deposition testimony to reach conclusions in an expert report in a civil case.

evidence consistent with the witness testimony—not to assess the witnesses' credibility, but to illustrate how the processes the witnesses described were implemented in practice. That evidence may incidentally make the witnesses' testimony more credible, but only because it is relevant and corroborative, not because it amounts to impermissible bolstering. *See United States v. Ray*, 2022 WL 101911, at *12 (S.D.N.Y. Jan. 11, 2022) ("[T]here is nothing wrong with [expert] testimony that corroborates the testimony of a party's fact witnesses and thereby makes that testimony more credible or believable to the jury. That is a necessary condition of all admissible evidence—it has the 'tendency to make a fact more or less probable than it would be without the evidence.'").

Finally, the SEC's complaints about "bolstering" are all beside the point, because it does not even contest the credibility of any testimony that Dr. Rattray cites. As with sample documents, the witness testimony Dr. Rattray cites in the first half of his report is fully consistent with what *the SEC itself has agreed to* in the parties' Joint Statement of Undisputed Material Facts. *Compare, e.g.*, Rattray Rep. ¶ 43 (citing testimony from various witnesses describing the SARF process), *with* JSUMF ¶ 75 (describing the process similarly); Rattray Rep. ¶ 47 (citing testimony describing monitoring of network for users being added to admin groups), *with* JSUMF ¶ 95 (describing the practice similarly); Rattray Rep. ¶ 80 (citing testimony describing use of firewalls to monitor network traffic for malicious threats), *with* JSUMF ¶¶ 137-38 (describing the practice similarly). Once again, the engine is idling here: There is no reason for the SEC to complain about supposed bolstering of testimony that it does not dispute in the first place.

## II.    Dr. Rattray Is Eminently Qualified to Offer His Opinions

Even the SEC could not bring itself to deny that Dr. Rattray is qualified to opine as a cybersecurity expert. Regrettably, however, the SEC uses its motion to mischaracterize Dr. Rattray's experience and question his integrity. That behavior calls for a brief response.

First, the SEC devotes much of its factual background section to puffing up its own expert's qualifications and characterizing them as superior to those of Dr. Rattray. Striving to make the comparison relevant (because it does not actually challenge the sufficiency of Dr. Rattray's qualifications), the SEC asserts that "the stark difference in their qualifications serves to highlight the 'narrator' role" the SEC ascribes to Dr. Rattray. Mot. 2. That is a head-scratching inference. But, illogic aside, having decided to contrast its expert with Dr. Rattray, one would expect the SEC's account of Dr. Rattray's qualifications to be at least *somewhat* forthright. It is not. The SEC discloses nothing but the titles of Dr. Rattray's degrees, dismissively stating that he has "no courses in computer science." Mot. 4. The SEC must have known that other facts—such as Dr. Rattray's thirty years of professional experience in cybersecurity, including at the highest levels of government—would be relevant to the Court's consideration of whatever point it was trying to make. Yet the SEC chose to omit any reference, even in a general manner, to Dr. Rattray's extensive qualifications.[6]

Second, the SEC takes a final unfair jab at Dr. Rattray at the end of its motion, claiming he "unreliabl[y] narrat[ed]" his experience as CISO and Head of Global Cyber Partnerships at JPMorgan Chase. Mot. 19. The accusation rests on nothing more than a common space-saving convention: Dr. Rattray listing two positions he held at the company on one line of his resume. *See* Rattray CV at A-2.[7] As Dr. Rattray explained at his deposition, the bullets listed in that part of

---

[6] Though by no means a contest, it bears mentioning—since the SEC invites comparison—that the top line on Mr. Graff's resume is his service as an expert *in this very case*. *See* App'x A-1 to Expert Report of Mark G. Graff, ECF No. 172-1 at 116 ("Expert witness for major federal agency on groundbreaking litigation (2023-2024)"). That is hardly the stuff of genuine expertise. *See IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *13 (S.D.N.Y. Oct. 29, 2013) (noting that "expertise [in] being an expert in plaintiffs' securities cases ... is not sufficient to qualify" under *Daubert*); *SEC v. Tourre*, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013) (similar).

[7] Dr. Rattray's resume employs the same convention for his positions at the U.S. Air Force Academy as Assistant Professor of Political Science and Deputy Director of the Air Force Institute for National Security Studies. *See* Rattray CV at A-3.

his resume all accurately describe initiatives and responsibilities that he had during his tenure there. Rattray Dep. Tr. 83:7-90:2. How long Dr. Rattray was the CISO versus the Head of Global Cyber Partnerships is immaterial, especially given that Dr. Rattray's stint at JPMorgan Chase overall is only one chapter in a lengthy and distinguished career, and the SEC does not even attempt to argue that Dr. Rattray's testimony should be excluded based on any lack of sufficient time in a particular role. Nonetheless, the SEC devotes three pages of its brief to dawdle on this non-issue, stooping to accuse a leader in the cybersecurity field and a decorated military veteran of misrepresenting the dates he held a particular title. That the SEC would make that accusation so breezily—while no longer surprising given all the other reckless allegations it has made in this case—ill-befits an agency of the United States Government.

## CONCLUSION

For the foregoing reasons, the SEC's motion should be denied.

Dated: June 12, 2025                Respectfully submitted,

*/s/ Serrin Turner*
Serrin Turner
Matthew Valenti
Nicolas Luongo
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
serrin.turner@lw.com
matthew.valenti@lw.com
nicolas.luongo@lw.com

Sean M. Berkowitz (*pro hac vice*)
**LATHAM & WATKINS LLP**
330 N. Wabash, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (617) 993-9767
sean.berkowitz@lw.com

*Counsel for Defendants SolarWinds Corp. and Timothy G. Brown*

21

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2025, I electronically filed the foregoing document with the Court via CM/ECF, which will automatically send notice and a copy of same to counsel of record via email.

*/s/ Serrin Turner*
Serrin Turner