# EXHIBIT A

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE  )
     COMMISSION,            )
 5                          )
        Plaintiff,          )
 6                          )  Civil Action No.
     v.              )  23-cv-9518-PAE
 7                          )
     SOLARWINDS CORP. and    )
 8   TIMOTHY G. BROWN,      )
                          )
 9        Defendants.      )
     _____)
10
11
12
13
14        VIDEO RECORDED EXAMINATION OF
15            GREGORY RATTRAY
16        WEDNESDAY, FEBRUARY 12, 2025
17            NEW YORK, NEW YORK
18
19
20
21
22
     CERTIFIED STENOGRAPHER:
23   JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
     CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24   CCR-WA (No. 21007264), CSR-CA (No. 14420),
     REALTIME SYSTEMS ADMINISTRATOR
25   JOB NO. 250212JWAA
```

1

```
 1
 2
 3        VIDEO RECORDED EXAMINATION of
 4   GREGORY RATTRAY, taken before
 5   JESSICA R. WAACK, Registered Professional
 6   Reporter, Registered Merit Reporter,
 7   Certified Realtime Reporter, Registered
 8   Diplomate Reporter, California Certified
 9   Realtime Reporter, New Jersey Certified Court
10   Reporter (License No. 30XI008238700); Texas
11   Certified Shorthand Reporter (License No.
12   11958); Washington State Certified Court
13   Reporter (License No. 21007264); California
14   Certified Shorthand Reporter (License No.
15   14420); New York Association Certified
16   Reporter, New York Realtime Court Reporter
17   and Notary Public of Washington, D.C. and the
18   States of New York, Pennsylvania, Delaware,
19   Maryland and Virginia, at Latham & Watkins,
20   1271 Avenue of the Americas, New York, New
21   York, on Wednesday, February 12, 2025,
22   commencing at 9:41 a.m. and concluding at
23   6:46 p.m.
24
25
```

2

```
 1             A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       SECURITIES AND EXCHANGE COMMISSION
 5       BY:  CHRISTOPHER CARNEY, ESQ.
 6       BY:  JOHN TODOR, ESQ.
 7       BY:  CHRISTOPHER BRUCKMANN, ESQ.
 8       BY:  KRISTEN WARDEN, ESQ. (Remote)
 9       BY:  LORY STONE, ESQ. (Remote)
10       100 F Street, N.E.
11       Washington, D.C.  20549
12       PHONE:  800-732-0330
13       EMAIL:  Carneyc@sec.gov
14
15   ON BEHALF OF THE DEFENDANTS:
16       LATHAM & WATKINS LLP
17       BY:  SERRIN TURNER, ESQ.
18       BY:  MATTHEW VALENTI, ESQ. (Remote)
19       1271 Avenue of the Americas
20       New York, New York  10020
21       PHONE:  212-906-1330
22       EMAIL:  Serrin.turner@lw.com
23
24
25
```

3

```
 1             A P P E A R A N C E S
 2
 3   ON BEHALF OF THE DEFENDANTS:
 4       LATHAM & WATKINS LLP
 5       BY:  SEAN M. BERKOWITZ, ESQ.
 6       BY:  MAURICE BAYNARD, ESQ.
 7       330 North Wabash Avenue, Suite 2800
 8       Chicago, Illinois  60611
 9       PHONE:  312-777-7016
10       EMAIL:  Sean.berkowitz@lw.com
11
12        A L S O   P R E S E N T
13            (REMOTE)
14   ANNIE GRAVELLE
15   BECKY MELTON
16
17        A L S O   P R E S E N T
18
19   DANNY ORTEGA, videographer
20   ERIC COLE
21   ROZALIA (ROZI) KEPES
22
23            --o0o--
24
25
```

4

1  really, you know, got to the point that:  A, they
2  were using Agile, and, B, the security testing
3  process was part of how they did Agile.  You know,
4  it was the best illustration of that.
5      Q.   And if we turn to the third page of
6  this document --
7      A.   Uh-huh.
8      Q.   -- ending in 276, do you see there's
9  a -- there's an agenda on there?
10     A.   Are we talking about the contents
11 page?
12     Q.   Yeah, the contents page.
13     A.   Right.
14     Q.   Exactly.
15     A.   Yeah.
16     Q.   With time allotments --
17     A.   Uh-huh.
18     Q.   -- including for a break?
19     A.   Right.
20     Q.   Is it your understanding that this was
21 part of a presentation?
22     A.   You know, I don't -- it does appear to
23 be part of a presentation -- or not part of a
24 presentation.  It looks like a deck that is meant
25 to be presented --

201

1      Q.   Okay.
2      A.   -- you know, which is maybe a
3  different answer.
4      Q.   And do you know who it was presented
5  to?
6      A.   You know, this is, you know, pretty
7  clearly a deck that is meant to be presented to
8  technologists related to the development process.
9      Q.   And so would you agree that in some
10 instances, it's appropriate to review slide decks
11 to gain an understanding of the cybersecurity
12 practices that a company is following?
13         MR. TURNER:  Objection to form.
14         THE WITNESS:  You know, there -- you
15 know, this slide deck, you know, was used to
16 evidence that SolarWinds had, you know, moved to
17 the Agile process and that security was present.
18         It was, you know, it was part of the
19 full set of evidence along with Mr. Colquitt's
20 depositions and other technology leaders about how
21 they implemented the Agile process and the
22 security processes associated with it.
23         You know, it's an element of the
24 evidence I examined.
25 ///

202

1  BY MR. CARNEY:
2      Q.   Okay.  In paragraph 94 on page 52,
3  you -- I'll let you get to that.
4      A.   Okay.  Yes.  I'm going to read the
5  paragraph about the final security reviews.
6         (Pause for reading/reviewing.)
7      A.   Okay.  Yeah.
8      Q.   Okay.  In that paragraph 94, you
9  describe final security reviews or FSRs as "the
10 most significant artifacts I've reviewed from
11 SolarWinds's software development process."
12         So let me ask you:  Why are these the
13 most significant artifacts?
14     A.   Well, you know, again -- or this is in
15 the context of the more general discussion of, you
16 know, the software development lifecycle and the
17 security aspects of it.
18         So, you know, the most significant,
19 you know, related to the fact that, you know,
20 these were -- these final security reviews
21 demonstrated, you know, both, you know, deep
22 process related to, you know, how they approached,
23 you know, secure development.
24         As -- you know, as well as, you know,
25 lots of -- lots of the supporting evidence for

203

1  other elements of the -- you know, the
2  implementation of evidence in addition to the
3  other sources of evidence that exist for the
4  implementation of things like testing processes.
5      Q.   Okay.  In paragraph 95, you talked
6  about -- that you reviewed a sample from
7  approximately 100 FSRs you received.
8         Do you see that?
9      A.   That's right.
10     Q.   And who selected the samples that you
11 looked at?
12     A.   You know, it was similar to the
13 other -- I call these evidence tranches.  I may
14 have said that before.  I think we were talking
15 about the SARFs, but maybe others as well.
16         I requested, you know, evidence from
17 the Latham team of, you know, implementation --
18 you know, implementation including things like,
19 you know, the outputs of implementation processes
20 like final security reviews.
21         So they selected -- they selected the
22 hundred.
23     Q.   And then you selected the -- I'm going
24 to -- I think I counted 14-or-so samples that are
25 identified in Footnote 120?

204

1    **A.**  Right.  Similar process.  I looked --
2  in this case, I know I looked at more than 50,
3  but, again, that 50 to 70 in this case as well.
4        And then I selected the subset that
5  I've cited in the report.
6        (Whereupon, Exhibit 12 is marked for
7        identification.)
8  BY MR. CARNEY:
9    **Q.**  Okay.  Dr. Rattray, I've handed you
10  what's been marked as Exhibit 12.  And, for the
11  record, this is just the first sample that you
12  identify in Footnote 120 of the FSR, and it starts
13  with the Bates stamp SW-SEC-SDNY_00055119.
14        And could you just help me, just walk
15  me through this FSR, tell me what it shows.
16    **A.**  I'm gonna just read it through myself
17  real quick --
18    **Q.**  Sure.
19    **A.**  -- and then, you know, I'll walk you
20  through it.
21    **Q.**  Thank you.
22        (Pause for reading/reviewing.)
23    **A.**  I looked through it.
24        How should we proceed?  Do you want to
25  ask the question again and, you know, give me some

205

1  parameters for the walkthrough?
2    **Q.**  Yeah.  How about I'll just ask you, to
3  speed things up.
4        Can you just tell me how documents
5  like this FSR establish to you that, if it does
6  establish that to you, that SolarWinds followed
7  all aspects of the SDL in its securities
8  statement?
9    **A.**  Again, the FSRs were an element of the
10  determinations I made around, you know,
11  SolarWinds's, you know, software development and,
12  you know, the statements made in the securities
13  statement.
14        You know, the presence of this review
15  as process and the type of, you know,
16  implementation that we see in these reviews, you
17  know, is a pretty strong, you know -- you know,
18  not pretty.
19        It's a very strong, you know, capstone
20  on a -- on a set of the processes outlined in the
21  securities statement.
22        You know, it includes things like
23  requirements analysis, back to our -- you know,
24  its phase, there's a template, there's a series of
25  things with structure that guide the -- the

206

1  development process from a security perspective,
2  you know, so that the teams that are, you know,
3  working on a given product or application, you
4  know, are guided -- you know, guided in this
5  fashion.
6        So, again, it has requirements
7  analysis.  Again, as we talked about things like
8  threat -- threat modeling, you know, understanding
9  security requirements are part of the element of
10  things like threat modeling.
11        It talks to the type of testing
12  outlined in the security statement.  It even
13  requires scheduling of testing early.  Shows
14  test -- testing results of a variety of sorts, you
15  know, all the phases outlined in the security
16  statement, you know, mapped here including to the
17  sort of product security review.
18        You know, this is the -- this is a --
19  a process that constitutes product security
20  review, you know, shows -- shows that the
21  appropriate players were involved in the -- you
22  know, the review -- an approval phase, phase 4.
23    **Q.**  So you mentioned that it shows testing
24  results of a variety of sorts.
25        Is it -- does this Exhibit 12 do that?

207

1  Does it show test results?
2    **A.**  I see checkmarks reports specifically
3  as test results.
4    **Q.**  What page are you on?
5    **A.**  I'm on the second page.
6        MR. TURNER:  For the record, it's on
7  all four pages.
8        THE WITNESS:  Oh, yeah.  Fair enough.
9  Second page, third page --
10        MR. TURNER:  From the first as well.
11        THE WITNESS:  -- and the last page.
12  Yeah, yeah, bottom of the first page.
13  BY MR. CARNEY:
14    **Q.**  And there are -- so are you saying
15  that there are test results in this document, or
16  that it links to other documents that purport to
17  contain test results?
18    **A.**  No.  There's test results in this
19  document.  The checkmark report and the data
20  there, you know, high, medium, low, you know, as
21  stated in basically all pages are test results.
22    **Q.**  So just for the record, the results
23  themselves are in this document?
24        MR. TURNER:  Just object to form.
25        Go ahead.

208