# EXHIBIT B

```
 1          UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE   )
     COMMISSION,               )
 5                             )
          Plaintiff,           )
 6                             )
       v.                      ) Case No.
 7                             ) 23-cv-09518-PAE
     SOLARWINDS CORP. and      )
 8   TIMOTHY G. BROWN,         )
                               )
 9        Defendants.          )
     _____)
10
11
12
13
14       VIDEOTAPED DEPOSITION OF MARK GRAFF, taken by
15   the Defendant, pursuant to Notice, held at the law firm
16   of Latham & Watkins LLP, 1271 Avenue of the Americas,
17   33rd Floor, New York, New York 10020, on February 14,
18   2025, at 9:45 a.m., before a Notary Public of the State
19   of New York.
20
21
22
23
24   Reported by:
     BROOKE E. PERRY
25   JOB No. 250214BPE
                              2
```

```
 1   A P P E A R A N C E S:
 2   ON BEHALF OF THE PLAINTIFF:
 3   SECURITIES AND EXCHANGE COMMISSION
        100 F Street NE
 4      Washington, DC 20549
 5   BY:   CHRISTOPHER J. CARNEY, ESQ.
           carneyc@sec.gov
 6         CHRISTOPHER BRUCKMANN, ESQ.
 7
 8   ATTORNEYS FOR DEFENDANTS:
 9   LATHAM & WATKINS LLP
        1271 Avenue of the Americas
10      New York, NY 10020
11   BY:   SERRIN TURNER, ESQ.
           serrin.turner@lw.com
12         MATTHEW VALENTI, ESQ.
           JOSH KATZ, ESQ.
13
14
     ALSO PRESENT:
15
     GREGORY RATTRAY- Expert Witness for SolarWinds
16
     JONATHAN JUAREZ-Videographer
17
18
19
20
21
22
23
24
25
                              2
```

```
 1                    INDEX
 2   WITNESS         EXAMINATION BY         PAGE
     Mark Graff      Serrin Turner           6
 3
 4                   EXHIBITS
     GRAFF    DESCRIPTION                          PAGE
 5   Exhibit 1  Expert Report of Mark G. Graff      20
 6   Exhibit 2  Rebuttal Expert Report of Mark      20
                G. Graff
 7   Exhibit 3  SolarWinds Security Statement       63
 8   Exhibit 4  Testimony of Mark Graff Vice        77
                President, NASDAQ Omx Group
 9              Before the House Financial
                Services Committee Subcommittee
10              on Capital Markets
     Exhibit 5  NASDAQ Omx Provides Updates on      85
11              Events of August 22, 2013
     Exhibit 6  Statement on NASDAQ Trading         94
12              Interruption
     Exhibit 7  News Article Entitled NASDAQ:       96
13              'Connectivity Issue' Led to
                Three-Hour Shutdown
14   Exhibit 8  NIST Cybersecurity Framework       107
                2.0: Small Business Quick-Start
15              Guide
     Exhibit 9  Expert Report of Gregory Rattray   120
16
     Exhibit 10  Sw-Sec-Sdny_00048050-095          133
17
     Exhibit 11  Sw-Sec-Sdny_00254254-266          160
18
     Exhibit 12  7.13.2020 Review                  165
19
     Exhibit 13  Spreadsheet                       166
20
     Exhibit 14  Sw-Sec00631418-427                174
21
     Exhibit 15  Sw-Sec-Sdny_00050922              188
22
     Exhibit 16  Nigel King's LinkedIn Profile     191
23
     Exhibit 17  Sw-Sec00012266-275                194
24
     Exhibit 18  Transcript Excerpt of Eric        197
25              Quitugua
                              3
```

```
 1              INDEX (CONTINUED)
 2   GRAFF       DESCRIPTION                        PAGE
 3   Exhibit 19  Sw-Sec00043620-630                  205
 4   Exhibit 20  Sw-Sec00386134-143                  209
 5   Exhibit 21  Sw-Sec00001497-550                  215
 6   Exhibit 22  Moderate Summary Kp Spreadsheet    231
 7   Exhibit 23  Sw-Sec-Sdny_00055077               248
 8
 9        (Exhibits retained by Reporter.)
10        (EXHIBITS BOUND SEPARATELY.)
                              4
```

Mark Graff
2/14/2025

```
 1  Do you remember that?
 2  A.    I think you're talking about the IPO with
 3  Facebook.
 4  Q.    No. That's a different one. That's in 2012.
 5  I'm talking about 2013. You don't remember the flash
 6  freeze?
 7  A.    You'd have to refresh my memory on that.
 8        Am I going to get a copy of that?
 9             MR. TURNER: Yes, once it's marked.
10             (Whereupon, NASDAQ OMX Provides Updates
11        on Events of August 22, 2013 was marked as
12        Graff Exhibit 5, for identification, as of this
13        date.)
14             THE WITNESS: All right. I have it.
15  Q.    Take a minute to review if you'd like, but this
16  is a NASDAQ statement from -- published looks like
17  August 29, 2013, titled: "NASDAQ OMX Provides Updates
18  on Events of August 22, 2013."
19        Does this refresh your recollection at all
20  about this event?
21  A.    I'll need another minute to look.
22  Q.    Sure.
23  A.    All right. I've reviewed the document.
24  Q.    Does this refresh your recollection about the
25  incident? Do you remember that trading stopped on
```
85

```
 1  NASDAQ for more than three hours?
 2  A.    I wouldn't have been able to tell you that. I
 3  see it says that here.
 4  Q.    And according to this document, the cause was a
 5  spike in trading messages at the NASDAQ that exceeded
 6  its capacity to process.
 7        Does that sound right to you?
 8  A.    Yeah.
 9  Q.    And that should have caused a failover to a
10  backup system, I believe it says, but there was a flaw
11  in NASDAQ's code that prevented the failover from
12  happening cleanly?
13             MR. CARNEY: Can you direct us --
14             MR. TURNER: Yes, one moment.
15             MR. CARNEY: Thanks.
16  Q.    Directing your attention to the middle of
17  page 2, starting with:
18             "The confluence of these events vastly
19        exceeded the SIP's planned capacity, which
20        caused its failure and then revealed a latent
21        flaw in the SIP's software code. This latent
22        flaw prevented the system's built-in redundancy
23        capabilities from failing over cleanly, and
24        delayed the return of system messages."
25        Do you see that?
```
86

```
 1  A.    I do see that.
 2  Q.    And that's what led to the freeze here. Is
 3  that your understanding?
 4  A.    I don't know. I really didn't get involved in
 5  this because it wasn't a cybersecurity incident, and I
 6  had no responsibility for the failover of the
 7  processors. So I didn't get involved in this.
 8  Q.    Does cybersecurity -- have you ever heard of
 9  the abbreviation "CIA" in cybersecurity?
10  A.    Sure.
11  Q.    Confidentiality, integrity, and availability?
12  A.    Mm-hmm, yes.
13  Q.    And cybersecurity protects all three aspects of
14  data, right?
15  A.    Well, I lecture on this too. Cybersecurity
16  helps to ensure availability of systems against attack
17  or malfeasance or mistakes. But this wasn't a
18  cybersecurity incident, and I didn't have the
19  responsibility for the uptime of the entire stock
20  market.
21  Q.    You said malfeasance or mistakes?
22  A.    Uh-huh.
23  Q.    Isn't a mistake if there's a flaw in the code
24  that causes the exchange to go down?
25  A.    I suppose there was a mistake. I wasn't
```
87

```
 1  responsible for the operation of the stock market as
 2  such. I was responsible for protecting them against
 3  cybersecurity incidents. This wasn't one.
 4  Q.    Business continuity plans, you were in charge
 5  of those, correct? That's part of the cybersecurity
 6  program?
 7  A.    We had some business continuity plans. That
 8  wasn't -- I didn't have responsibility for the business
 9  continuity plans, that was a whole other department and
10  a whole other vice president.
11  Q.    You testified, however, that the NASDAQ had
12  robust business continuity plans. Were you only
13  testifying that they were robust against attackers but
14  not robust against glitches? Is that how Congress would
15  have understood your testimony?
16             MR. CARNEY: Objection. Vague.
17        Mischaracterizes testimony. You can refer him
18        to the testimony itself on page 2.
19  Q.    Mr. Graff --
20  A.    I have a lot of pieces of paper in front of me.
21        Yes, go ahead.
22             MR. CARNEY: I mean, I'm reading the
23        statement here: "Below is a summary of the
24        process, policies, and procedures that NASDAQ
25        OMX generally follows in connection with
```
88

**Mark Graff**
**2/14/2025**

### Page 89

1  information security."
2      MR. TURNER: Yes.
3  Q. And part of having business continuity plans in
4  place, part of the purpose of having business continuity
5  plans is to ensure the continued availability of data?
6  A. Yes, that's right.
7  Q. Okay. So this was a gap in the company's
8  business continuity processes, was it not?
9      MR. CARNEY: Objection. Vague as to
10     "this."
11 A. The -- the incident you are talking about that
12 had happened in 2013, the so-called "SIP" problem, yes,
13 that would have been a -- there was an outage that
14 represents an issue with the provisions that NASDAQ made
15 at that time for business continuity.
16     (Court reporter clarification.)
17 Q. Yeah. And it stemmed from a problem, an issue,
18 with NASDAQ's business continuity plans or business
19 continuity processes?
20 A. Well apparently there was a problem in the
21 software where there was a cascade of data coming, I
22 think coming from the New York Stock Exchange, and so
23 their system wasn't able to keep up with it, and it
24 resulted in an outage. Absolutely.
25 Q. And that's a gap, right? It wasn't designed to

### Page 90

1  deal with that risk?
2      MR. CARNEY: Objection. Vague.
3  A. Well, I wasn't -- I didn't ever see that
4  software. I don't know what it was designed to do.
5  Clearly, the business continuity plan didn't operate the
6  way it should have.
7  Q. And, in fact, there's a statement here -- hang
8  on one second. One moment, please. I'm sorry. I was
9  looking at the wrong page.
10     Page 1. Second paragraph, it says:
11     "A preliminary internal review has
12     identified a combined series of technology
13     events that caused the initial market problems
14     and extended the halt period. A number of
15     these issues were clearly within the control of
16     NASDAQ OMX. As a securities information
17     processor for NASDAQ stocks, we are responsible
18     for them, regret them and intend to take all
19     steps necessary to address them, to enhance
20     stability and functionality in the markets."
21     So there were issues that were under NASDAQ's
22 control related to its business processes that caused
23 the incident and that needed to be fixed after the
24 incident, right?
25 A. Yes, that's what it says. I agree.

### Page 91

1  Q. Okay.
2  A. And NASDAQ took responsibility for the issues.
3  Q. Right. And none of this doesn't mean -- excuse
4  me -- none of this means, sir, that your prior testimony
5  wasn't true, right?
6  A. My testimony in front of Congress was accurate
7  and factual.
8  Q. NASDAQ did have robust continuity plans in
9  place, which included systems designed to failover in
10 realtime?
11 A. Yes.
12 Q. As a general matter, it did?
13 A. Yes.
14 Q. But that doesn't mean its systems were perfect,
15 right?
16 A. That's right.
17 Q. In fact, it says, toward the end of this
18 statement here, on page 3, at the top, it says:
19     "NASDAQ OMX is deeply disappointed in
20     the events of August 22, and our performance is
21     unacceptable to our members, issuers and the
22     investing public. While getting to 100 percent
23     performance in all of our activities, including
24     our technology is difficult, it's our
25     objective."

### Page 92

1      So in other words, while perfection is the
2  ideal, you can't expect it in practice; isn't that
3  basically what this statement is saying?
4  A. Well, I don't know that I want to paraphrase
5  something that was written all these years ago. But
6  certainly, I'll agree with the idea that perfection is
7  not achievable in every case. There is -- as I said in
8  my report, there are -- a company is -- will not have
9  perfect cybersecurity and they will. If they're
10 searching carefully, they will occasionally encounter an
11 issue.
12 Q. Yeah. And even if an issue occurs, it doesn't
13 mean they had a failure to have practices in place.
14 Just like in this case, there was an issue, but
15 nonetheless, as you've testified, there were, in fact,
16 robust business continuity practices in place?
17 A. Are we talking now about the NASDAQ OMX
18 incident in 2013?
19 Q. Yes. Again, even though this issue arose, you
20 truthfully testified there were robust business
21 continuity procedures in place? Those two things are
22 not incompatible, right?
23 A. Well, first of all, my testimony was about a
24 year ahead of this incident. And, in fact, my testimony
25 was prior to the Facebook problem I talked about, with

**Page 93**

1 the Facebook IPO.
2     But what I said in front of Congress was true.
3 We did have the business continuity plans and some
4 provisions that I felt were robust. I was reporting, I
5 didn't have personal responsibilities or administrative
6 responsibilities for those plans, but I reported
7 truthfully that we did have business continuity plans.
8 And sometime later, both with the Facebook IPO in 2012,
9 not too long after I testified --
10 **Q.**   The Facebook IPO was in May 2012, sir, before
11 you testified.
12 **A.**   Was it May? And then before I testified?
13 Yeah, that's fine. I agree with you.
14 **Q.**   Let me make sure I understand what you agree
15 with me on. I just want to get a clear answer for the
16 record.
17 **A.**   The dates of the Facebook incident, that does
18 sounds more accurate, sure.
19 **Q.**   Okay. But look, you can have robust continuity
20 procedures in place, but nonetheless, issues can arise
21 from time to time, fair?
22 **A.**   Well, it depends what you mean by "issues." I
23 mean, of course, there are going to be imperfections.
24 But when we use the broad term "issues," that's a
25 different matter altogether.

**Page 94**

1 **Q.**   Let me ask you, sir, this issue is fairly
2 described as a major one, correct?
3 **A.**   You're talking about the business outage at
4 NASDAQ in 2013?
5 **Q.**   Yes. Yes.
6 **A.**   Yes, I think we can call that a major incident.
7 **Q.**   In fact, the SEC itself put out a statement as
8 to this trading disruption.
9     (Whereupon, Statement on NASDAQ Trading
10     Interruption was marked as Graff Exhibit 6, for
11     identification, as of this date.)
12 **Q.**   So I'm showing you what's been marked as Graff
13 Exhibit 6. It's from August 22, 2013, Statement on
14 NASDAQ Trading Interruption by chief -- excuse me, Chair
15 Mary Jo White.
16     Do you see that?
17 **A.**   Oh, I see it, yes.
18 **Q.**   And it says:
19     "The continuous and orderly functioning
20     of the securities markets is critically
21     important to the health of our financial system
22     and the confidence of investors. Today's
23     interruption in trading, while resolved before
24     the end of the day, was nonetheless serious and
25     should reinforce our collective commitment to

**Page 95**

1     addressing technological vulnerabilities of
2     exchanges and other market participants."
3     So you would agree that this was a major issue
4 that arose for NASDAQ?
5     MR. CARNEY: Objection. Vague.
6 **Q.**   It was a major issue in connection with
7 NASDAQ's business continuity controls?
8     MR. CARNEY: Are you saying
9     cybersecurity? Are you tying it to
10     cybersecurity? That's why it's vague.
11     MR. TURNER: I don't need the speaking
12     objection.
13     Go ahead, Mr. Graff.
14 **A.**   Well, this statement relates to an outage that
15 occurred on August 22, 2013, a disruption of trading
16 activities as a result of a technical flaw that was
17 described in the NASDAQ statement. It had nothing to do
18 with cybersecurity. The outage didn't have anything do
19 with cybersecurity, and it wasn't part of my
20 responsibilities, and I don't remember the incident very
21 well, to be honest.
22 **Q.**   Mr. Graff, I'm just asking you whether this
23 qualifies as a serious issue in connection with NASDAQ's
24 business continuity processes?
25     MR. CARNEY: Objection. Vague.

**Page 96**

1     Outside the scope.
2 **A.**   Well, the disruption was certainly serious.
3 The flaw in design that NASDAQ identified was,
4 therefore, a serious flaw. You -- I guess, the other
5 thing that didn't go right was that the failover doesn't
6 seem to have happened as it should have. And so there's
7 a -- that's a serious issue as regards to the failovers,
8 too.
9 **Q.**   Okay. And there's -- this isn't just Mary Jo
10 White who had this reaction.
11     (Whereupon, news article entitled
12     NASDAQ: 'Connectivity issue' Led to Three-Hour
13     Shutdown was marked as Graff Exhibit 7, for
14     identification, as of this date.)
15 **Q.**   So I'm showing you what's been marked as Graff
16 Exhibit 7. It's a news article about the shutdown,
17 which quotes on page 3 a quote from former SEC Chairman
18 Harvey Pitt, saying it looked like NASDAQ was clueless
19 about how to deal with this emergency.
20     Again, I'm not doing this, Mr. Graff, to
21 suggest that you were. But my point is, NASDAQ wasn't
22 clueless, it did have business continuity plans in
23 place. It's just in this one respect, they failed,
24 right?
25 **A.**   Well, NASDAQ had robust defenses in -- both in

**Page 97**

1  the cyber area and also in other areas, and although
2  this wasn't a cybersecurity incident by any stretch of
3  the imagination, there was an outage that lasted a few
4  hours. It was a serious problem, I agree, and it looks
5  to me, in retrospect, although I really don't remember
6  the incident very well, that the business continuity
7  plans should have handled it better than they did.
8  That's why they apologized.
9  Q. Yeah. And so my only point in all this,
10 Mr. Graff, is just because a major issue arises, that
11 doesn't imply that there was any systemic failure to
12 implement controls, does it?
13        MR. CARNEY: Objection. Vague as to
14    "controls."
15 A. Well, an outage like this -- this one,
16 apparently, according to the statement, came from a
17 design flaw. So we could talk about whether or not, you
18 know, design flaws sometimes indicate a systemic issue,
19 sometimes they don't. But that doesn't really relate to
20 the kinds of failures that I described in my report that
21 were identified by the SolarWinds employees and others,
22 as I've said.
23 Q. Mr. Graff, you told Congress the business
24 continuity plans were robust and took into consideration
25 realtime failovers of market trading platforms. That

**Page 98**

1  was true, right? You had robust continuity plans in
2  place. That does not imply that there might not be
3  serious issues that arise with respect to those
4  controls?
5        MR. CARNEY: Objection to form.
6  A. Well, we -- yeah, I told Congress we had robust
7  business continuity plans. We did. And the system,
8  nevertheless, was overwhelmed and failed for a few hours
9  in 2013.
10 Q. And that doesn't make your testimony false,
11 does it?
12 A. Well, they're not related really. I talked
13 about what our plans were and what our processes were.
14 And I don't believe I said that we would be able to
15 resist any possible problem.
16 Q. Yeah, you didn't say they would be perfect,
17 right?
18 A. I didn't say that.
19 Q. Right. They weren't perfect in this instance,
20 right?
21 A. In the NASDAQ outage instance and the SIP
22 incident.
23 Q. They were not perfect in that instance?
24 A. They were not perfect, I agree.
25 Q. And the consequences were major, right?

**Page 99**

1  A. Significant, you bet.
2  Q. That doesn't mean NASDAQ didn't have business
3  continuity controls in place?
4  A. Yeah, we had controls in place. The controls
5  seemed to have failed for a few hours, but yeah.
6        MR. TURNER: All right. We can take a
7     break now if you want.
8        THE VIDEOGRAPHER: The time right now
9     is 12:08 p.m. We're off the record.
10    (Whereupon, a short break was taken.)
11       THE VIDEOGRAPHER: Stand by, please.
12    The time right now is 1:02 p.m., and we're back
13    on the record.
14 Q. Welcome back, Mr. Graff.
15 A. Thank you.
16 Q. So let's get more specific and talk about some
17 of the particular assertions in the security statement
18 that are at issue. I want to start with the statement
19 following NIST, the statement that SolarWinds follows
20 the NIST cybersecurity framework.
21    You say in paragraph 21 of your report -- you
22 say that this statement was too vague for you to
23 evaluate.
24    Do you remember that?
25 A. I do remember.

**Page 100**

1  Q. So I just want to be clear. You did not try to
2  evaluate whether this assertion was true or false,
3  correct?
4  A. What was that paragraph number? Is it 21, did
5  you say?
6  Q. Paragraph 21 on page 8.
7  A. I did not try to evaluate whether that
8  particular statement was, per se, true or false.
9  Q. So you don't have the opinion that the
10 assertion was false?
11 A. I found that it was not a clear enough
12 statement given the context of the cybersecurity
13 framework to evaluate whether or not they actually were
14 following it. Because it's not clear to me what they
15 mean by "follow" exactly, because it's not a standard.
16 Q. All right. Fair enough. And when you say it's
17 not a standard, you mean it doesn't prescribe specific
18 practices that companies are supposed to follow?
19 A. Well, that's not precisely what I mean. There
20 are cybersecurity standards. There's the ISO/IEC 27001,
21 which is, of course, the European. There are standards
22 in Europe, the GDPR and so forth, but the U.S. doesn't
23 have -- for unclassified systems -- doesn't have a
24 formal standard in cybersecurity. There are
25 recommendations, guidelines, frameworks, but there's not