# Exhibit 2

**Excerpts of Timothy Brown
Deposition Transcripts**

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE   )
    COMMISSION,           )
 5                        )
       Plaintiff,   )
 6                        ) Case No.
    vs.                   ) 23-cv-9518-PAE
 7                        )
    SOLARWINDS CORP. and      )
 8  TIMOTHY G. BROWN,        )
                          )
 9      Defendants.  )
    _____)
10
11
12
13
14       VIDEOTAPED DEPOSITION OF
15          TIMOTHY G. BROWN
16           OCTOBER 3, 2024
17
18      Videotaped Deposition of Timothy G. Brown, produced
    as a witness at the instance of the Plaintiff, and duly
19  sworn, was taken in the above-styled and numbered cause
    on the 3rd day of October, 2024, from 9:13 a.m. to 7:43
20  p.m. (CST), before Camille A. Bruess, CSR, RPR, in and
    for the State of Texas, reported by stenographic method
21  with the witness appearing at the law firm of Latham &
    Watkins, LLP located at 300 Colorado Street, Suite 2400,
22  Austin, Travis County, 78701, pursuant to notice and in
    accordance with the Federal Rules of Civil Procedure and
23  the provisions stated on the record or attached hereto.
24
25  JOB No. 241003COR
```

**Page 2**

```
 1        A P P E A R A N C E S
 2
 3  COUNSEL FOR THE PLAINTIFF:
 4      Mr. Christopher M. Bruckmann
        Mr. Benjamin Brutlag (by Zoom)
 5      Mr. Christopher J. Carney
        Ms. Lory Stone (by Zoom)
 6      Mr. John J. Todor
        Supervisory Trial Counsel
 7      Division of Enforcement
        U.S. SECURITIES AND EXCHANGE COMMISSION
 8      100 F Street Northeast
        Washington, D.C. 20549
 9      Phone:   202-551-5986
        Email:   bruckmannc@sec.gov
10      Email:   brutlagb@sec.gov
        Email:   carneyc@sec.gov
11      Email:   stonel@sec.gov
        Email:   todorj@sec.gov
12
13  COUNSEL FOR THE DEFENDANTS:
14      Mr. Sean M. Berkowitz
        Ms. Kristen C. Lee
15      Attorneys at Law
        LATHAM & WATKINS, LLP
16      330 N. Wabash Avenue, Suite 2800
        Chicago, Illinois 60611
17      Phone:   312-777-7016
        Phone:   312-777-7281
18      Email:   sean.berkowitz@lw.com
        Email:   kirsten.lee@lw.com
19
            -and-
20
        Mr. Serrin Turner
21      Partner
        Attorney at Law
22      LATHAM & WATKINS, LLP
        1271 Avenue of the Americas
23      New York, New York 10020-1300
        Phone:   212-906-1200
24      Email:   serrin.turner@lw.com
25
```

**Page 3**

```
 1      A P P E A R A N C E S (Cont'd.)
 2
 3  COUNSEL FOR THE DEFENDANT, TIMOTHY B. BROWN:
 4      Mr. Michael J. Biles
        Attorney at Law
 5      KING & SPALDING, LLP
        200 W. 2nd Street, Suite 1800
 6      Austin, Texas 78701
        Phone:   512-457-2051
 7      Email:   mbiles@kslaw.com
            -and-
 8
 9      Mr. Alec Koch
        Attorney at Law
10      KING & SPALDING, LLP
        1700 Pennsylvania Avenue NW, Suite 900
11      Washington, D.C. 20006
        Phone:   202-626-8982
12      Email:   akoch@kslaw.com
13
14  ALSO PRESENT:
15      Mr. Jason Bliss (by Zoom)
        Executive VP/Chief Administrative Officer
16      SolarWinds Corp.
17      Ms. Annie Gravelle (by Zoom)
        Inhouse Counsel
18      SolarWinds Corp.
19      Ms. Becky Melton (by Zoom)
        Inhouse Counsel
20      SolarWinds Corp.
21      Mr. Timothy Desadier
        Videographer
22      Legal Video of Texas
23
24
25      *  *  *  *  *  *  *  *  *  *  *  *  *
```

**Page 4**

```
 1              INDEX
 2                        PAGE
    Appearances.................................  2
 3
    Proceedings/Introductions....................  9-10
 4
    Stipulations...............................  10
 5                                   297
    WITNESS:  TIMOTHY G. BROWN
 6      Examination by Mr. Todor................  10
        Examination by Mr. Turner..............  273
 7      Examination by Mr. Todor...............  283
        Examination by Mr. Turner..............  291
 8      Examination by Mr. Todor...............  293
        Examination by Mr. Turner..............  295
 9      Examination by Mr. Todor...............  296
        Examination by Mr. Todor...............  297
10
    Deposition concluded/Signature waived........  298
11
    Reporter's Certificate......................  299
12
13
14            EXHIBIT INDEX
15  BROWN                           PAGE
    NUMBER     DESCRIPTION          MARKED
16  Exhibit 1  Copy of a Condensed Transcript of the   46
               Oral Deposition of Timothy G. Brown,
17             Volume 1 taken on 3/8/22 via WebEx in
               the case:  File No. C-08755-A, In the
18             Matter of SolarWinds, The United
               States Securities and Exchange
19             Commission (79 pgs.)
20
    Exhibit 2  Copy of a Condensed Transcript of the   46
21             Oral Deposition of Timothy G. Brown,    47*(R)
               Volume 2 taken on 3/9/22 via WebEx in
22             the case:  File No. C-08755-A, In the
               Matter of SolarWinds, The United
23             States Securities and Exchange
               Commission (69 pgs.)
24
25  *(R) = Referenced
```

EXHIBIT INDEX (Cont'd.)

BROWN                                          PAGE
NUMBER        DESCRIPTION              MARKED

Exhibit 3  Copy of a Condensed Transcript of the    46
           Oral Deposition of Timothy G. Brown,    47  (R)
           Volume 3 taken on 6/15/22 via WebEx    48  (R)
           in the case:  File No. C-08755-A, In
           the Matter of SolarWinds, The United
           States Securities and Exchange
           Commission (79 pgs.)

Exhibit 4  (Marked FOIA Confidential Treatment    59
           Requested by SolarWinds) Email dated
           10/5/17 to Mr. Brown from Mr.
           Quitugua, Subject: Security-NDA Ver-
           sion; SolarWinds Security Statement
           (NDA), Version 1, October 4, 2017,
           Bates SW-SEC00347724-37

Exhibit 5  (Marked FOIA Confidential Treatment    61
           Requested by SolarWinds) Email on
           draft of NDA version dated 10/5/17
           to Mr. Brown from Mr. Quitugua, Sub-
           ject: Security Statement-NDA Version;
           Email on updates dated 10/6/17 to Mr.
           Brown from Mr. Quitugua, Subject: RE:
           Security Statement-Public facing and
           NDA Version; Security Statement,
           Bates SW-SEC00348206-224

Exhibit 6  (Marked FOIA Confidential Treatment    64
           Requested by SolarWinds) Email dated    75  (R)
           11/2/17 to Raixa Zayas from Mr.
           Brown, Subject: Security documents;
           SolarWinds Security Statement, Bates
           SW-SEC00337018-26

Exhibit 7  (Marked FOIA Confidential Treatment    66
           Requested by SolarWinds) Email to Mr.    70  (R)
           10/30/17 to Mr Brown, copy to Mr.
           Mackie from Kris Hansen, Subject:
           Solarwinds MSP: RMM Security Documen-
           tation; Reply email dated 11/7/17 to
           Kris Hansen from Mr. Brown with
           Original Appointment agenda email
           dated 10/31/17 to Kris Hansen,
           Timothy, Barnett, and Shari; Brochure

5

EXHIBIT INDEX (Cont'd.)

BROWN                                          PAGE
NUMBER        DESCRIPTION              MARKED

Exhibit 7   titled SolarWinds Backup: Security,    66
(cont'd.)   Privacy, and Architecture, Bates    70  (R)
            SW-SEC00337086-95

Exhibit 8  SolarWinds Security Statement from    76
           web.archive.org (4 pgs.)    80  (R)
                                        86  (R)
                                       113  (R)

Exhibit 9  (Marked FOIA Confidential Treatment   136
           Requested by SolarWinds) Email
           follow up dated 8/9/17 to Mr. Brown
           from Mr. Quitugua, Subject: SWI
           Security Program Assessment; Docu-
           ment Produced in Native Format page;
           Brochure titled Critical Security
           Controls Initial Assessment Tool
           (v6.0a) by AuditScripts/Security
           Enclave (33 pgs.)

Exhibit 10  (Marked FOIA Confidential Treatment   150
            Requested by SolarWinds) Original
            Appointment email dated 11/20/17 to
            Mr. Kemmerer, Mr. Brown and Mr.
            Mills from Rani Johnson, Subject:
            Biz Apps 2018 Roadmap Overview/Team
            Goals Review; Email dated 12/14/17
            to/from same recipients, Subject:
            2018 Roadmap Overview/Team Goals
            Review; Reply email dated 12/14/17
            from Mr. Brown; Brochure titled
            Security 90 Day Review from
            SolarWinds by Tim Brown, Bates
            SW-SEC00262716-43

Exhibit 11  (Marked FOIA Confidential Treatment   163
            Requested by SolarWinds) Email    276  (R)
            dated 10/29/18 to Rani Johnson from    287  (R)
            Mr. Brown, Subject: Solarwinds    289  (R)
            state of security operations; Bro-
            chure titled Information Security -
            Risk review dated October 2018,
            Bates SW-SEC00313350-62

6

EXHIBIT INDEX (Cont'd.)

BROWN                                          PAGE
NUMBER        DESCRIPTION              MARKED

Exhibit 12 (Marked FOIA Confidential Treatment   170
           Requested by SolarWinds) Slides
           titled Security Operations Summary,
           Development, Operations & Information
           Technology (DOIT) dated December
           2016, Bates SW-SEC00638663-677

Exhibit 13  (Marked FOIA Confidential Treatment   177
            Requested by SolarWinds) Slides
            titled Security & Compliance Program
            Quarterly - Overview & Status -
            Development, Operations & Information
            Technology (DOIT) dated 5/17/19,
            Bates SW-SEC00001635-51

Exhibit 14  (Marked FOIA Confidential Treatment   183
            Requested by SolarWinds) Slides    281  (R)
            titled Security & Compliance Program
            Quarterly Overview dated 8/16/19,
            Bates SW-SEC00001497-1550

Exhibit 15  (Marked FOIA Confidential Treatment   222
            Requested by SolarWinds) Slides
            titled Security & Compliance Program
            Quarterly - Development, Operations
            & Information Technology (DOIT)
            dated 11/15/19, Bates SW-SEC00001551-
            1581

Exhibit 16  (Marked FOIA Confidential Treatment   232
            Requested by SolarWinds) Slides
            titled Q1 2020 Quarterly Risk Review
            (QRR) - Security & Compliance Program
            Office (Dev Ops + IT) + Legal +
            Finance dated 3/3/2020, Bates
            SW-SEC00001606-1634

Exhibit 17 (Marked FOIA Confidential Treatment   246
           Requested by SolarWinds) Slides
           titled Q4 2020 Quarterly Risk Review
           (QRR) DO + IT Legal Finance dated
           10/27/2020, Bates SW-SEC00001582-1601

7

EXHIBIT INDEX (Cont'd.)

BROWN                                          PAGE
NUMBER        DESCRIPTION              MARKED

Exhibit 18  (Marked FOIA Confidential Treatment   257
            Requested by SolarWinds) Emails (10),
            Phone messages (4) dated 3/30/2020,
            4/8/2020, 4/13/2020, 4/20/2020, and
            4/21/2020, Subject: Risk Acceptance
            Form for 2018-036, between Mr. Sejna,
            Mr. Cutler, Mr. Kuchler, Mr. Hansen,
            Ms. Pierce, SolarWinds InfoSec, and
            Mr. Choi, Bates SW-SEC00057859-66

Exhibit 19  (Marked FOIA Confidential Treatment   264
            Requested by SolarWinds) Agenda email
            to Ms. Pierce, Mr. Brown, Mr.
            Quitugua, and Ashley Thornton for
            7/13/2020 with attachment Risk
            Monthly Review 7.13.2020 (10 pgs.)

8

1    P R O C E E D I N G S
2        INTRODUCTIONS
3        THE VIDEOGRAPHER:  Here begins the
4   Deposition of Timothy Brown taking place at Latham &
5   Watkins at 300 Colorado Street, Austin, Texas in the
6   matter of Securities and Exchange Commission versus
7   SolarWinds Corporation, et al.  The case number is
8   23-cv-9518-PAE.  Today's date is October 3rd, 2024.  The
9   time on video is 9:13 a.m.  The videographer is Timothy
10  Desadier and the court reporter is Camille Bruess.
11       Counsel, please identify yourselves and
12  state whom you represent.
13       MR. TODOR:  John Todor for plaintiff,
14  Securities and Exchange Commission.
15       MR. CARNEY:  Christopher Carney with the
16  SEC.
17       MR. BRUCKMANN:  Christopher Bruckmann with
18  the SEC.
19       MR. TURNER:  Serrin Turner, Latham Watkins
20  for SolarWinds and Mr. Brown.
21       MR. KOCH:  Alec Koch with King & Spalding
22  for Mr. Brown.
23       MR. BILES:  Mike Biles, King & Spalding
24  for Mr. Brown.
25       MR. BERKOWITZ:  Sean Berkowitz from

9

1   Latham & Watkins for SolarWinds and Mr. Brown.
2        MS. LEE:  Kirsten Lee from Latham &
3   Watkins for SolarWinds and Mr. Brown.
4        MR. BLISS:  Jason Bliss with SolarWinds.
5        THE REPORTER:  Does counsel have any
6   stipulations they would to put on the record at this
7   time?
8        MR. TODOR:  I think we had agreed that an
9   objection by counsel for either Mr. Brown or for
10  SolarWinds and Mr. Brown would count as an objection for
11  all parties.
12       MR. TURNER:  Agreed.
13       THE REPORTER:  With that, I'll swear the
14  witness in.  If you'll, please, raise your right hand,
15  sir.
16       TIMOTHY G. BROWN,
17  having been first duly sworn, testified by videotape as
18  follows:
19       EXAMINATION
20  BY MR. TODOR:
21       Q.  Good morning.  Could you, please, state your
22  full name and spell it for the record?
23       A.  Sure.  Timothy Gordon Brown.  It's
24  T-i-m-o-t-h-y, G-o-r-d-o-n, B-r-o-w-n.
25       MR. KOCH:  Hey, Tim, I think they're going

10

1   to need you to put on the mike.
2        MR. TURNER:  Oh, yeah, mike up.
3        (Mike adjustment)
4        Q.  Good morning.  My name is J. J. Todor and I'm an
5   attorney with the Securities and Exchange Commission,
6   the plaintiff in this action.  I will be asking you a
7   series of questions today.  And do you understand that
8   the oath you just took was to provide truthful and
9   complete answers?
10       A.  Yes.
11       Q.  Everything you say today is being transcribed by
12  our court reporter and taken by our videographer, but
13  for purposes of clarity of the record, I would ask that
14  you give an audible answer to each question.  Do you
15  understand?
16       A.  Yes.
17       Q.  Also, for clarity of the record, I would ask
18  that you wait until I finish my question before
19  providing your response and that I will ask -- wait
20  until you provide -- complete your answer to, uh, start
21  my next question.  Is that understood?
22       A.  Yes.
23       Q.  If you don't understand a question, please ask
24  me to clarify.  Is that understood?
25       A.  Yes.

11

1        Q.  If you need a break for any reason, please let
2   us know and we'll try to accommodate that, uh, as long
3   as no question is pending for any purpose other than to
4   confer with your counsel regarding whether there's a
5   privilege issue.  Is that understood?
6        A.  Yes.
7        Q.  Are you represented by counsel today?
8        A.  Yes.
9        Q.  Who is representing you?
10       A.  Uh, Latham & Watkins and King & Spalding.  Do
11  you need names?
12       Q.  Uh, no, I think they --
13       MR. TURNER:  They know us already.
14       Q.  We've been introduced.
15       A.  Okay.
16       Q.  Is SolarWinds paying for your counsel?
17       A.  Yes, they are.
18       Q.  Your counsel might have objections during the
19  deposition.  This is to preserve the record.  Unless
20  your counsel instructs you not to answer a question, you
21  can go ahead and answer after the objection is stated,
22  but would wait until counsel has placed his objection on
23  the record and I've made any response that I feel is
24  necessary before doing so.  Is that understood?
25       A.  Yes.

12

**Timothy Brown**
**10/3/2024**

1    Q.  And what is Mr. Quitugua's role currently?
2    A.  He runs the security operations side of my -- my
3  team.
4    Q.  So there's, approximately, 25 people you said
5  run that side report to Mr. Quitugua and Mr. Quitugua
6  reports to you; is that correct?
7    A.  That is correct.
8    Q.  Who is the head of the Governance Risk and
9  Compliance side?
10    A.  Uh, Rajesh Akella.
11    Q.  And the subteams within Security Operations are
12  there separate personnel in each of those sections or
13  does some people work in more than one separate subteam?
14    A.  Uh, their primary job is within the subteam.
15  They -- they help in other areas as well.
16    Q.  Do you have an understanding as to why the --
17  okay, was the position the Chief Information Security
18  Officer newly created at SolarWinds when you assumed
19  that position?
20    A.  Yes, it was.
21    Q.  Do you have an understanding as to why that
22  position was created?
23    A.  The, uh -- post the Sunburst incident in, uh,
24  December of 2020, the -- prior to the -- that incident,
25  I was Vice-president of Security and Architecture.  And

21

1  the CISO position was created as a, uh -- really as to
2  kind of have industry standards to be able to, you know,
3  talk to other security professionals, uh, about
4  security.
5    Q.  Were you able to talk to other industry
6  professionals about security in your position as VP of
7  Security and Architecture?
8    A.  We were able to talk to them, but it became --
9  the CISO standard of having a CISO, that title was
10  industry kind of standard.  So, uh, we happened to not
11  have one.  So I took on that position and it just made
12  the process of understanding or process of, uh, you
13  know, talking to individuals about the Sunburst incident
14  much easier than explaining the fact that I was
15  Vice-president of Security and Architecture.
16    Q.  Along with assuming the title of --
17    A.  Yeah.
18    Q.  -- Chief Information Security Officer, did
19  SolarWinds increase the number of personnel and
20  functions under you compared to your position as VP of
21  Security and Architecture?
22    A.  So we made a number -- number of investments
23  that increased the number of people post the Sunburst
24  incident.
25    Q.  Do you have an understanding as to why

22

1  SolarWinds made investments and increased the number of
2  people post the Sunburst incident?
3    A.  So after an incident, it's very important that
4  you're not, uh, not just good enough, don't have
5  security at the same level as the common peers.  It's
6  important that you go above and beyond that, uh, that
7  kind of standard model.  Hence, the investment to
8  have -- really to be exemplary in the security industry.
9    Q.  I believe you made a reference to common peers
10  in your previous answer.  Were there any companies that
11  you considered to be common peers of SolarWinds in the
12  2018 to 2020 timeframe?
13    A.  So, uh, not necessarily by name, but software
14  companies of our size and our shape were, uh, kind of
15  equivalent peers, right, that -- that were there.  Some
16  were larger, some were smaller, but they were in the
17  same industry as our industry.
18    Q.  Are there any particular companies you had in
19  mind as examples in that answer?
20    A.  Uh, I'd have to do some looking.  The -- so if
21  you look at, uh, you know, the -- so pure software
22  companies at that point in time, uh -- we're not a --
23  not -- we're not a security company and so it would be
24  pure utility software.  So, uh, I would have to look up
25  some names.  Nothing comes to mind at this moment,

23

1  but ...
2    Q.  So you made a reference to common peers having a
3  CISO position.  Well, did companies you considered to be
4  common peers have a CISO position in the 2018 to 2020
5  timeframe?
6    MR. KOCH:  Object to form.
7    A.  So CISOs were more common at very -- CISOs were
8  very common at financial institutions.  They were common
9  in the earlier timeframes.  And they have become more
10  common in the last four years than what they were
11  before.
12    So much more common than what they were in
13  the years before.  Financial services, uh, insurance
14  companies, uh, large retailers have had CISOs for many
15  years, but now they're becoming common at smaller
16  institutions, at state and local government, at retail
17  institutions.  So they've become a much common -- more
18  common position to have throughout the industry.
19    Q.  Did you in your job look at what other companies
20  in the software space were doing in terms of security
21  compared to what SolarWinds was doing?
22    MR. TURNER:  Object to form.
23    A.  So we're always looking to improve through a
24  number of different forums.  Like I -- I would not say I
25  did an exhaustive look at what industries or at what

24

1    A. So when you're hired, you only know what you
2    have from an interview. So, uh, so I did not have a
3    sense of, you know, where we were when I was hired.
4    Q. What did you do to get a sense of where you were
5    security wise after you were hired?
6    A. Yeah. So, uh, we have a, uh, 60/90-day
7    on-boarding program where, uh -- that we run throughout
8    the company to be able to learn, to be able to listen,
9    to be able to understand where things are. And that
10   went on with me as well as other people. And during
11   that process it was to say, okay -- it was to be able to
12   indicate what we should focus on, where we should start.
13   Q. You said we in the prior answer. Who are the --
14   the "we" you were referring to?
15   A. Uh, the -- the teams that I worked for. So the
16   CTO and the CIO. When those (indicating) -- when
17   someone came into those organizations, uh, we were given
18   time to be able to not be actively implementing things,
19   but learning environments and learning what we should be
20   sponsoring from a program perspective.
21   Q. So when in '17 did you join SolarWinds?
22   A. July.
23   Q. So roughly the next 90 days you were in an
24   evaluation mode and then you made some recommendations
25   and then started taking action after that? Is that

29

1    roughly accurate?
2    A. Roughly accurate.
3    Q. And the VP -- the secure -- you were VP of
4    Security and Architecture. Who reported to you under --
5    in that position?
6    A. Yeah. So Eric Quitugua reported to me in that
7    position.
8    Q. And how many people reported to him as in the
9    time that you were VP of Security and Architecture?
10   A. Uh, Eric had, uh -- we had six or so people that
11   went up to, uh, I think ten direct reports.
12   Q. So, you said is it -- how -- how do you have six
13   people and ten direct reports?
14   A. Oh, sorry.
15   Q. Am I under- -- misunderstanding?
16   A. Yeah. So, uh, when I first got there, we had
17   six people and then through the first few years, we went
18   up to ten direct reports.
19   Q. So starting July '17 you had, approximately, 6
20   people reporting to you; is that correct?
21   A. Directly, yes.
22   Q. And then if we go up to say December of 2020,
23   you think it was around 10? Is that accurate?
24   A. Direct reports, yes.
25   Q. Okay. And you said in your current position as

30

1    CISO, you have about 38 people reporting to you.
2    A. Correct.
3    Q. Was there a difference in the range of
4    capabilities that you had security wise from your time
5    as VP of Security and Architecture compared to what you
6    have now as CISO?
7                MR. TURNER: Object to form.
8    A. So a number of different technologies were
9    implemented, uh, post becoming the CISO. So a, uh --
10   the GRC function was formally created. So that team
11   was, uh -- didn't exist prior to that. So that -- that
12   was a new function.
13           The Red Team was being done part time. So
14   we hired full-time Red Team people. The SOC -- we moved
15   away from an internally run SOC to a external service
16   providing SOC services. So a number of changes occurred
17   post Sunburst.
18   Q. Do you have a sense of your annual budget in the
19   time that you were VP of Security and Architecture for
20   your group?
21   A. Uh, I don't have our numbers with me.
22   Q. Did the budget increase when you were a CISO
23   compared to when you were VP of Security and
24   Architecture?
25   A. Uh, yes.

31

1    Q. Do you have a ballpark sense of how much the
2    budget increased for what you have as CISO compared to
3    when you were VP of Security and Architecture?
4    A. Uh, more people were added in different regions
5    of the world, uh, but I can't give you a -- a number
6    without looking it up.
7    Q. And did you have access to more technology
8    resources now as CISO compared to what you had as VP of
9    Security and Architecture?
10               MR. TURNER: Object to form.
11   A. So, uh, the -- one of the changes that we made
12   was prior -- prior to -- prior to being CISO, my
13   indirect reports were -- we brought some things directly
14   as opposed to indirectly. So that's one of the things
15   that changed. So indirect reports would be, uh,
16   security champions within the product team.
17           There would be, uh, security architects
18   within the product team. There would be, uh, firewall
19   teams that existed in IT. Some of those functions moved
20   over -- over to me post, but then there was investment
21   in other areas.
22   Q. Was the group you oversaw as VP of Security and
23   Architecture known as the Infosec group within
24   SolarWinds?
25   A. Yes.

32

1  someone else?
2      **A.** Uh, I think approval may be --
3          MR. TURNER: Objection to form.
4      **A.** I think approval may be too strong. We said
5  would this streamline the process? Would it make the
6  process better? It would save time for both us and our
7  customers. So, uh, I don't recall an official approval
8  of -- of it.
9      **Q.** Okay. Are you familiar with the term owner as
10  it is used in connection with projects at SolarWinds?
11          MR. TURNER: Objection to form.
12      **A.** Yeah. Owner can be a facilitator. Owner can
13  be -- there may be -- there's a lot of different
14  variations on owner.
15      **Q.** Were you designated as the owner at SolarWinds
16  for the purposes of preparing the security statement?
17      **A.** Uh, I would have to look at documentation of
18  some sort.
19      **Q.** What was your role in the process of creating
20  the security statement as you recall?
21      **A.** So I definitely was a proponent and sponsor
22  saying we could do this more efficiently.
23      **Q.** So did Mr. Quitugua prepare some language to be
24  proposed for the security statement?
25      **A.** Uh, I believe -- I believe so.

57

1      **Q.** And what would be your role after Mr. Quitugua
2  prepared language?
3      **A.** Uh, to review form, review function, probably
4  ask some questions about, you know, where did this
5  information, you know, potentially come from, uh, or,
6  you know, highlight -- highlight. Yeah, basically
7  review.
8      **Q.** And by review did you have the ability to make
9  changes if you felt changes were necessary?
10      **A.** So I would probably -- if -- if we had changes
11  to be made, I would probably ask Eric or, you know,
12  we -- we, as a group, if anybody had changes, they would
13  request changes. So that would be anybody that would be
14  reviewing.
15      **Q.** Who else other than you would have been
16  reviewing?
17      **A.** Uh, most likely, definitely Jenny Zador from
18  legal, Rani from IT. Probably Joe Kim took a look at
19  it, uh, and potentially others, definitely the marketing
20  team as well.
21      **Q.** Did you have to sign off on some draft of it
22  before it went to legal?
23      **A.** No.
24      **Q.** Was the review by you and legal going on
25  simultaneously?

58

1      **A.** Uh, potentially.
2      **Q.** Do you recall as you are sitting here?
3      **A.** Uh, no.
4          (Brown Exhibit 4 was marked.)
5      **Q.** And, Mr. Brown, you've been presented with a
6  document marked as Brown Exhibit 4. It has the Bates
7  No. SW-SEC00347724. It appears to believe an email from
8  Mr. Quitugua to you dated October 5th, 2017, Subject:
9  Security Statement - NDA Version with an attachment.
10          Do you recognize this document, sir?
11      **A.** Uh, yes, I do.
12      **Q.** What is it?
13      **A.** It is a draft version that Eric created of the
14  NDA version of the security statement.
15      **Q.** By NDA do you mean nondisclosure agreement?
16      **A.** Yes, correct.
17      **Q.** Was it a practice of SolarWinds to acquire a
18  nondisclosure agreement to provide, uh, a more detailed
19  version of the security statement to customers than what
20  would be provided on the public facing website?
21      **A.** Yes, correct.
22      **Q.** And why is that?
23      **A.** Uh, the -- the public statement didn't go into
24  as many details as the NDA version. And I'm sure it was
25  a recommendation from the legal team that said, well,

59

1  these things we can't discuss with a -- with a customer
2  without an NDA in place.
3      **Q.** Did you ask Mr. Quitugua to prepare this?
4      **A.** Uh, I don't recall.
5      **Q.** Did you make the first draft of any section of
6  this document?
7      **A.** Uh, I don't recall.
8      **Q.** Do you know what the source information was for
9  the descriptions of the various security practices in
10  the document?
11      **A.** We talked before about a big spreadsheet that
12  had questions and answers. Uh, I expect that big
13  spreadsheet was the source to much of this language.
14      **Q.** Did there end up being an NDA version and a
15  public facing version of the security statement after
16  the process of creating the statements was concluded?
17      **A.** Uh, yes, I believe so.
18      **Q.** Would you have any role after they were
19  completed with when a customer wants the NDA version,
20  would you have any role in approving whether to send the
21  customer the NDA version or would that just be done by
22  marketing after they had signed the NDA?
23      **A.** So that would be done in process by, you know,
24  by Eric's team. If somebody requested information, that
25  may have been covered in the NDA version of the

60

1  statement.  He would have to check with legal whether an
2  NDA was in place for this customer and then they could
3  send that NDA version to the customer.
4          (Brown Exhibit 5 was marked.)
5      Q.  All right.  Mr. Brown, you've been presented
6  with a document marked as Brown Exhibit 5.  It has Bates
7  No. SW-SEC00348206.  It appears to be an email from Eric
8  Quitugua to you dated October 6, 2017, Subject, RE:
9  Security Statement - Public Facing and NDA Version.
10         Do you recognize this document, sir?
11     A.  Uh, yes.
12     Q.  What is it?
13     A.  Uh, basically an updated -- update from Eric
14  saying that he did some cleanup on the NDA version and
15  he drafted a public facing statement which would be, uh,
16  the -- the non-NDA version.
17     Q.  Had you requested that Mr. Quitugua prepare both
18  an NDA and a public facing version?
19     A.  I -- I don't specifically remember.  This was a
20  long time ago in 2017, but, uh, we can assume that Eric
21  was asked to do this.
22     Q.  And I'll turn your attention to (flipping pages)
23  the -- one that is marked as the public version, which I
24  believe (flipping pages) it would be the first
25  attachment at, uh, Bates 8207.  Did you prepare any of

61

1      Q.  Did you have track changes that you could make?
2      A.  Uh, I don't -- don't recall in 2017.  So I'm not
3  sure how we did reviews then.
4      Q.  Did you have a red pen you could use or --
5      A.  Yeah --
6      Q.  -- something like that?
7      A.  -- maybe or -- yeah, I -- I don't, uh -- or we
8  could have sat in a room.  He sat next to me.
9      Q.  Uh-huh.  Do you recall going through drafts of
10  this public statement, and were there any changes that
11  you recall that you felt needed to be made during the
12  process of review?
13     A.  I don't recall exact meetings, but I -- I -- I
14  believe I remember meetings where again the legal team,
15  us, and -- and, uh, so Jenny, Eric, potentially Rani
16  were -- were reviewing something together, but that --
17  that's a recollect -- that's something I remember from
18  2017.  So many, many years ago.
19     Q.  And again, I'm not asking you about any
20  conversations that you would have had with legal counsel
21  for legal advice.
22     A.  Yeah.
23     Q.  From your personal review of drafts of this
24  statement do you recall any instances where you
25  identified something that you felt was wrong from a

63

1  the content of the first draft for -- for this draft?
2      A.  Uh, from -- from this email it appears Eric
3  drafted -- drafted this version.
4      Q.  Okay.  Do you know what information he was
5  looking at to prepare this?
6          MR. TURNER:  Objection, asked and
7  answered.
8      A.  The, uh, the large spreadsheet that we had had
9  many of these similar (indicating) function -- or the
10  similar categories.  I haven't done a one-to-one match
11  to the spreadsheet to these (indicating), but I know
12  that much of the language was, uh -- came from that
13  large spreadsheet.
14     Q.  Did you give Mr. Quitugua any direction as to
15  which would be in the public facing as opposed to the
16  NDA version in terms of detail?
17     A.  I believe that that came from legal.
18     Q.  What was -- what, if any, role did you have in
19  the review of the drafts of the public facing security
20  statement starting here on October 6th, 2017?
21     A.  Uh, I would have reviewed it.  I would have read
22  it.  I would have looked at it and sought whether, uh,
23  whether I thought the statements were correct.  If -- if
24  not, I would have given Eric feedback on, you know, what
25  could be correct.

62

1  technical perspective that needed to be corrected?
2      A.  Uh, I don't recall the draft (indicating) and
3  what changes.  I just -- I know that what we have put on
4  the website, what ended up being final that was on the
5  website, I agree with the content there.  I think the
6  content is accurate.
7          (Brown Exhibit 6 was marked.)
8      Q.  Mr. Brown, you've been presented with a document
9  marked as Brown Exhibit 6.  It has Bates No.
10  SW-SEC00337018.  It appears to be an email from you to a
11  Raixa Zayas, Z-a-y-a-s, Raixa, R-a-i-x-a, sent November
12  2nd, 2017, Subject:  Security documents.
13         Do you recognize this document, sir?
14     A.  No, actually.
15     Q.  Do you know who Raixa Zayas is?
16     A.  Uh, I don't actually recall her name at all or
17  his name.  I don't know what -- I'd need to see the
18  first email of this chain (pointing) to get context.
19     Q.  Uh, well, this was as was I guess sent to us by
20  SolarWinds' counsel in discovery.
21     A.  Right.
22     Q.  So this is what we have.
23     A.  Yeah, I --
24     Q.  There doesn't appear to be any other emails in
25  this string.  So --

64

1  separate audit team which is completely outside of
2  my -- my team. So that compliance word makes me think
3  about saying, well, would I consider our SOC audit team?
4  They actually do an audit and are looking at compliance
5  outside of my team, but what this is referring to is the
6  security team being my team is responsible for these
7  things.
8      Q. Looking to the next sentence there --
9      A. Yeah.
10     Q. -- it says, "The security team receives
11 information ... security" -- "information systems
12 security notifications on a regular basis and
13 distributes security alert and advisory information to
14 the organization on a routine basis after assessing the
15 risk and impact as appropriate." To your knowledge, is
16 this an accurate statement as to the -- one of the
17 functions of your team at SolarWinds as of the time of
18 the publication of the security statement?
19     A. Yes.
20     Q. Who would be responsible for that within your
21 team?
22     A. That would be the SOC team sitting under Eric.
23     Q. And you made reference to the SOC team. Is that
24 the same as the Infosec group focusing on this 2018 to
25 2020 timeframe?

89

1      A. Yep. That's a member of one of the subteams
2  under the information security group, yes.
3      Q. All right. The next paragraph states,
4  "SolarWinds follows the NIST Cybersecurity Framework
5  with layered security controls to help identify,
6  prevent, detect, and respond to security incidents."
7  Do you see that?
8      A. Yes, I do.
9      Q. What is the NIST Cybersecurity Framework?
10     A. So the NIST Cybersecurity Framework is a
11 framework defined by NIST. Probably -- I really don't
12 know. Uh, it's been around for a long time, maybe 10
13 years, maybe -- maybe something less, but cybersecurity
14 framework is a framework that allows companies, uh,
15 flexibility in how they measure their security programs,
16 and it's meant to be a measurement to allow you to look
17 at where you are from the program perspective and then
18 improve upon it. It's one of the, uh, things that we
19 read out to and have read out to the executive team as
20 far as our NIST CSF status.
21     Q. What are layered security controls?
22     A. Layered security controls. So NIST is split up
23 into a number of different categories: Identify,
24 protect, detect, respond, and recover. That's what
25 that's describing.

90

1      Q. Is there a reason it doesn't have recover in
2  this sentence?
3      A. Uh, I don't know.
4      Q. So to your knowledge, does layered security
5  controls just refer to the identify, prevent [sic],
6  detect, respond, and recover?
7      A. Yes, to my knowledge, that's what it would
8  represent.
9      Q. When you joined SolarWinds July, 2017, was
10 SolarWinds following the NIST Cybersecurity Framework?
11     A. Uh, I don't recall when we started reporting on
12 it. There were some measurements done when I -- when I
13 joined or that I saw from 2017, uh, looking at a number
14 of different control frameworks. I don't know if it was
15 reported formally until I got there.
16     Q. When, to your knowledge, did you make the --
17 when's the first formal report that you're aware of
18 NIST Cybersecurity Framework within SolarWinds?
19     A. We'd have to look back at the quarterly risk
20 reviews. I don't remember when it -- when the first one
21 showed up with NIST CSF there.
22     Q. Do you know whether it was before or after the
23 publication of the security statement on the public
24 facing website on or about January, 2018.
25     A. It was probably at that same time or earlier

91

1  that NIST CSF would have been -- their data would have
2  been collected to be able to present.
3      Q. You said the data collected to be able to
4  present. Uh, to whom it would -- would it be presented?
5      A. So I know that formally it was presented to the
6  quarterly risk reviews. In order to present it to the
7  quarterly risk reviews, we would have had to start
8  collecting data about it earlier to be able to present.
9      Q. Did you also have something called a Security
10 and Compliance Quarterly Review?
11     A. That's what I meant.
12     Q. Is that different from a quarterly risk review?
13     A. Uh, back again to terminology in this timeframe,
14 I -- I don't recall.
15     Q. I'll turn your attention to the second sentence
16 in this paragraph --
17     A. Yeah.
18     Q. -- this statement, "The information security
19 manager is also responsible for tracking incidents,
20 vulnerability assessments, threat mitigation, and risk
21 management." Was the information security manager you?
22     A. Uh, in -- in this context I would look at it
23 from a, uh -- my -- my title was never information
24 security manager. Eric's title was information security
25 manager. So his -- one of his teams was the Incident

92

Timothy Brown
10/3/2024

1  across some kind of physical space to --
2     **A.**  Right.
3     **Q.**  -- to plug it in.
4     **A.**  So we had, uh, we had back then I believe 44
5  pairs of Palo Alto Nextgen firewalls that were
6  configured in that way.  There were some physical
7  cabling.  I know that some physical cabling was present
8  to be able to have -- have different networks.  I don't
9  know if it was completely air gap.
10     **Q.**  Was it done by virtual machines or just by
11  separate servers?  How -- how would that be done to your
12  knowledge?
13         MR. TURNER:  Objection to form.
14     **A.**  Yeah, not -- not my area of expertise for what
15  they had.
16     **Q.**  You made a reference to there being the Infosec
17  group having a monitoring function with respect to the
18  development and production environments.  Did there ever
19  come a time when you had to make some kind of risk
20  acceptance determination with respect to the development
21  and production environments?
22     **A.**  Uh --
23         MR. TURNER:  Object to form.
24     **A.**  -- I'd -- I'd -- I'd need to see examples, but
25  potentially somebody may ask for something that required

1  risk acceptance.
2     **Q.**  Could you explain your role in the risk
3  acceptance process at SolarWinds in this 2018 to 2020
4  timeframe?
5     **A.**  So there was a process for, uh, risk
6  exception -- acceptance reviews.  Uh, I believe at that
7  time a, uh, a risk acceptance request would be put in
8  through to the, uh -- by a vice-president associated
9  with a certain group.  And then I was one of the
10  reviewers on that risk acceptance.
11     **Q.**  Why was there a risk acceptance process to your
12  knowledge?
13     **A.**  A risk acceptance practice is very common to
14  have.  Uh, what it says is that -- I'll give you a
15  concrete example.  So a team is working on a
16  vulnerability.
17        Our standard process says that the
18  vulnerability should be fixed within 90 days or
19  whatever.  Somebody says, Well, I need -- I'm going to
20  need to go outside of that window because I don't have a
21  release process that will enable me to release for 120
22  days.  I'd like to file a risk acceptance for that
23  because for that 30 days, we'll -- it's outside of our
24  SLA.
25     **Q.**  Why was it important at SolarWinds to have a

1  risk acceptance process?
2     **A.**  I think it's important for anybody to have a
3  risk acceptance process.
4     **Q.**  Why is that?
5     **A.**  Because not all -- not all risks can be, uh,
6  resolved in -- not all risks can be resolved or not all
7  risks can be, uh, completed within in my example
8  timelines associated with things.
9     **Q.**  So breaking that apart, were there some risks
10  that you determined could not be resolved and you
11  decided that the organization could nevertheless accept
12  the risk and go forward without fixing it?
13     **A.**  There are risks that cannot be fixed or have
14  been determined that they're low enough risks that can
15  be moved forward without accepting it.
16     **Q.**  How would you go about determining whether that
17  was the case?
18     **A.**  So many different methods.  Do you have a
19  specific question?
20     **Q.**  I was just asking your understanding of the
21  process of how you determined whether a risk could be
22  accepted without being resolved.
23     **A.**  So, for example, a machine that has a CVSS score
24  vulnerability of two, we may accept that and say that
25  that does not present risk.  The compensating controls

1  that are in place are effective so that risk would never
2  materialize.
3     **Q.**  What did you mean by compensating controls in
4  that answer?
5     **A.**  Yeah, compensating controls are -- come in many
6  different forms.  So within -- within that answer, uh, I
7  have a machine that's sitting at the bottom of the ocean
8  not connected to anything.  It's a Windows '95 riddled
9  with vulnerabilities.
10        Does it really matter?  The compensating
11  control says it's not connected to the internet, not
12  affected by that.  It will run its processes forever.
13  So it has enough compensating controls that it can run
14  with limited risks.
15     **Q.**  As you're sitting here, are you aware of any
16  vulnerability that you became aware of that SolarWinds
17  in this 2018 to 2020 timeframe, uh, that should have
18  been documented via a risk assessment form but wasn't?
19     **A.**  I'm sure there were some.  I'm sure that there
20  were some.
21     **Q.**  Do you have any examples in your mind as you --
22  as you sit here?
23     **A.**  No, I don't.
24     **Q.**  Are you aware of any incidents or any cases of
25  there being a high CVSS score that no action was taken

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

1    consolidated upon.
2        Q.  You just --
3            MR. KOCH:  Sorry to interrupt, but maybe
4    just to help Camille, could you spell some of the terms
5    that you're using?
6            MR. TODOR:  Yeah, I was going to ask.
7            THE WITNESS:  I'm sorry.
8            MR. TODOR:  You used a number of terms
9    there --
10           THE WITNESS:  I know.  Sorry.  Sorry.
11           MR. TODOR:  -- that, uh, would probably be
12   helpful for the record --
13           THE WITNESS:  Yes, I'm sorry.
14           MR. TODOR:  -- for you to, uh, say what
15   those were.
16           THE WITNESS:  I will catch up, yeah.
17           MR. TODOR:  Or if our court reporter has
18   questions about what the terms were --
19           THE WITNESS:  Please.
20           MR. TODOR:  -- maybe that would be the
21   most efficient way --
22           THE WITNESS:  Yes.
23           MR. TURNER:  -- either now or off the
24   record on a break.
25           MR. TODOR:  Or -- or would that be easier

                    113

1    on the break, ma'am?
2            THE REPORTER:  On a break would be better.
3            MR. TODOR:  Okay.  On the break.
4    Apparently on the break would be better, okay, uh,
5    without asking you about the specifics.
6            THE WITNESS:  Yeah, specific terms.
7            MR. TURNER:  All right.  Thank you, Kris.
8            THE WITNESS:  I'm glad you kind of got it
9    situated.
10           MR. TODOR:  All right.  Well, I've just --
11   I've been informed that there's food here for those who
12   get it.  Would this be a -- a good time to take lunch?
13           MR. TURNER:  Sure.  Yeah.
14           THE VIDEOGRAPHER:  Going off the record,
15   the time is 12:30.
16           (Lunch recess)
17           THE VIDEOGRAPHER:  Back on the record.
18   The time is 1:36.
19       Q.  (By Mr. Todor)  Welcome back, Mr. Brown.
20       A.  Thank you.
21       Q.  Before the break, we were discussing the
22   Security Statement document which I believe was Brown
23   Exhibit 8.  Do you still have that document in front of
24   you, sir?
25       A.  I do.

                    114

1        Q.  I'll direct your attention to page three of the
2    document again and to the heading "Authentication and
3    Authorization."  And you can familiarize yourself with
4    those two paragraphs as you need to, sir --
5        A.  Yeah.
6        Q.  -- and let me know when you're ready.
7        A.  (Reading) I'm ready.
8        Q.  And to your knowledge, is -- are the statements
9    in these two paragraphs, uh, an accurate representation
10   of SolarWinds' cybersecurity practices as they related
11   to authentication and authorization as of January, 2018?
12       A.  Yes, they are.
13       Q.  What, if any, process did you go to -- go
14   through to determine whether these statements were
15   accurate?
16           MR. TURNER:  Objection.  Are you talking
17   about like in connection with the publication of the
18   security statement or just how does he know they're
19   accurate now?
20       Q.  At the time you were going through the process
21   of getting ready to publish the security statement,
22   what, if any, efforts did you make to determine whether
23   the statements here under "Authentication and
24   Authorization" were accurate?
25       A.  So consulted with the, uh, IT team, consulted

                    115

1    with Mr. Quitugua on, uh -- so each one of these
2    statements are a little bit different from the, uh,
3    verification process.  So I think we'd -- we would need
4    to look at each one of the -- the lines separately.
5        Q.  Do you know how Mr. Quitugua would have come up
6    with the original information for these two paragraphs?
7            MR. TURNER:  Objection, asked and
8    answered.
9        A.  Uh, so he would -- he would, uh, talk to
10   essentially the person in charge.  So for example,
11   authorized users can -- users are provisioned with the
12   unique IDs.  And, uh, password policies were the
13   policies that were set and in our active directory
14   system was the password policies.  Uh, we require
15   complex passwords that include both alpha and numeric
16   characters which are deployed to protect against
17   unauthorized use of passwords, uh, passwords being
18   individually salted and hashed.
19           THE REPORTER:  I'm sorry, I can't hear
20   you.
21           THE WITNESS:  Sorry, I was just reading
22   the statement.
23           THE REPORTER:  I can't hear you.
24           THE WITNESS:  Oh, I'm sorry.
25           (Reporter's clarification)

                    116

1    **A.** Our password best practices enforce the use of
2    complex passwords that include both alpha and numeric
3    characters which are deployed to protect against
4    unauthorized use of passwords.  Passwords are
5    individually salted and hashed.  So that statement would
6    have been, uh, directly related to both policies, right,
7    our best practices, our password policy, and also, uh,
8    enforcement from our active directory or eventually
9    Azure systems so that when you logged into your
10   computer, you would be logging into your active
11   directory account.
12          That forced password changes.  That has
13   the password complexity enforced.  That is a source of
14   truth for many different applications that support
15   integration with active directory.  And then a policy
16   says that if we're creating passwords outside of that
17   system, they should follow these best practice
18   guidelines.
19   **Q.** Let's see if I can unpack that a little bit.
20   You made reference to Azure.  Is that Microsoft Azure
21   Active Directory that you're referring to there?
22   **A.** So Active Directory was an on-premise model.
23   Azure is a Cloud model for Active Directory.  So over
24   that time period, we shifted from an on-premise Active
25   Directory to the Azure Active Directory, the Cloud-based

117

1    model.
2    **Q.** When you say over that time period, are you
3    referring from the period from January 18th, 2018
4    through December, 2020?
5    **A.** Correct.
6    **Q.** About when did that change occur?
7    **A.** Uh, I would need to look back for exact dates,
8    but somewhere in that timeframe.
9    **Q.** Did your password best practices change at some
10   point between January of '18 and '20 -- December of
11   2020?
12   **A.** No.
13          MR. TURNER:  Objection to form.
14   **A.** The -- the password policy stayed the same
15   throughout that process or throughout that time period.
16   **Q.** And was that password policy in effect when the
17   security statement was posted to the SolarWinds' public
18   facing website?
19   **A.** Yes.
20   **Q.** Was there any significant change to the default
21   permissions that SolarWinds' employees were granted
22   between January of '18 and December of 2020?
23          MR. TURNER:  Objection, foundation.
24   **Q.** I'm directing your attention to the second
25   paragraph under "Authentication and Authorization."

118

1    **A.** (Reading) So no -- no changes between 2018 and
2    2020 except maybe specific systems being added, uh, or
3    different technology being potentially used to support
4    those systems.  The statement that says, "SolarWinds
5    employees are granted a limited set of default
6    permissions to access company resources, such as their
7    email, and ..." their "corporate Intranet" -- I'm sorry,
8    I'll speak up.  "Employees are granted access to certain
9    additional resources based on their specific job
10   function."  During that time period between, uh, when I
11   joined to 2020, we had processes in place to onboard
12   employees to give them access to what they needed to
13   have access to, uh, to audit that access and if they
14   changed jobs, to grant them those privileges, and then
15   additional processes in place to give them special
16   access beyond just access that general employees had.
17   **Q.** You've discussed a number of changes to your
18   policies or tools around access controls from January of
19   '18 to December of '20 in your previous answers.  Did
20   you ever consider revising the access controls section
21   of the security statement as a result of those changes?
22   **A.** The changes were to implement new technology
23   such as Azure directory versus the Cloud directory
24   service.  That did not change the practice of granting
25   privileges to employees as they joined.  That practice

119

1    stayed fairly consistent through the process or through
2    those years or stayed consistent through those years.
3    The technology that was utilized behind may have been,
4    uh, may have been adapted or changed, but still the
5    meaning of this statement was -- is still -- still
6    accurate.
7    **Q.** Did you learn anything after the publication of
8    the security statement to the public facing website that
9    caused you to think that perhaps some statement in here
10   with respect to access controls was not accurate when it
11   was posted?
12   **A.** No.  No, I didn't.  The -- the statements here
13   are again created in a generic form not mentioning
14   technology.  I'm not saying that, you know, the password
15   policy was followed a hundred percent of the time.
16          The, uh -- that our -- we don't say that
17   the access control was perfect.  So during audits, we
18   would potentially discover that someone, uh, may have
19   not gotten grants removed when they switched their job
20   discovered in an audit and we would take care of it, but
21   the statements here don't say that a hundred percent of
22   the time, we're completely accurate or we're completely
23   foolproof.  So there was no reason to change the
24   statement.
25   **Q.** I'll direct your attention to the next

120

1    A. I'm sorry --
2    Q. Do you see that, sir?
3    A. -- what -- what reference?
4    Q. Uh, it is item PR.DS-7.
5    A. (Reading)
6    Q. Under the "Data Security" --
7    A. Got it.
8    Q. -- subsection under "Protect."
9    A. Yeah, development and testing environments are
10  separate from the production environment.
11    Q. Is that the same concept that was being
12  discussed when we were looking at, uh, the security
13  statement for network security where the security
14  statement says, "SolarWinds maintains separate
15  development and production environments"?
16       MR. TURNER: Object to form and
17  foundation.
18    A. There's -- there's no direct correlation between
19  this and the security statement, but we did maintain
20  separate development testing and production environments
21  within SolarWinds.
22       MR. TURNER: We've been going about an
23  hour, J.J. I don't know if you're transitioning into a
24  new document.
25       MR. TODOR: We will be. So we can take a

149

1  break.
2       MR. TURNER: Sure.
3       THE VIDEOGRAPHER: Going off the record,
4  the time is 2:32.
5       (Short recess)
6       (Brown Exhibit 10 was marked.)
7       THE VIDEOGRAPHER: Back on the record.
8  The time is 2:55.
9    Q. (By Mr. Todor) Welcome back, Mr. Brown.
10    A. Thank you.
11    Q. You've been presented with a document marked as
12  Brown Exhibit 10. Its Bates No. SW-SEC00262716. It
13  appears to be an email from you to Rani Johnson dated
14  December 14th, 2017, Subject: RE: 2018 Roadmap
15  Overview/Team Goals Review.
16       Do you recognize this document, sir?
17    A. Uh, so I've just been reviewing it. Uh, I -- I
18  recognize it as a document I produced probably for Joe.
19  I haven't seen it -- or for Rani. But I haven't
20  actually looked through it all yet again.
21    Q. And we discussed earlier, I believe you said you
22  were doing a 90-day review for SolarWinds' security.
23  There's the attachment here. As we look at Bates 2718,
24  there's a PowerPoint marked "SECURITY 90 DAY REVIEW, TIM
25  BROWN." Did you prepare this?

150

1    A. So, yes, I would assume so.
2    Q. And what was your understanding of the purpose
3  of preparing this PowerPoint?
4    A. Uh, the -- as I said before, SolarWinds operated
5  a -- when somebody new came in to a team, it was
6  expected that you provided information after a 90-day
7  review. In most cases you weren't expected to act upon
8  those things, but take that time to learn different
9  things and then present it back to, you know, basically
10  your findings to your supervisors.
11    Q. And to whom were you presenting your findings
12  here?
13    A. Definitely Rani, uh, probably went to Joe as
14  well.
15    Q. Do you recall what, if any, action was taken as
16  a result of this presentation?
17    A. Uh, I need to review the presentation
18  (indicating) to -- to see.
19    Q. Okay. We'll see if maybe we can focus a bit.
20  If you'd just turn to the last page of the -- the
21  document.
22    A. Sure.
23    Q. It's Bates 2743.
24    A. (Flipping pages.) Yeah.
25    Q. And, uh, the title -- did you prepare this

151

1  slide?
2    A. (Reading) I assume it was part of the 90-day
3  review. Uh, it looks like it was after the -- after the
4  slide deck itself. So there may be an appendix.
5    Q. Do you recall whether you prepared this?
6    A. Uh, 2017 was a long time ago. So, uh, I assume
7  from the context I did present -- I did create it.
8       MR. TURNER: J.J., sorry to interrupt, but
9  do you know? Like this looks like it's sort of a new
10  slide deck. Were there two attachments to this? Or is
11  it one -- one attachment?
12       MR. TODOR: Uh, the email just makes a
13  reference to there being one attachment file. So to my
14  understanding, there's just the one PowerPoint, but I
15  see it does go into FY-18 goals --
16       THE WITNESS: Yeah.
17       MR. TODOR: -- starting with Bates 2737.
18  It's a draft, but --
19       MR. BRUCKMANN: It also has the number
20  26 --
21       THE WITNESS: 26.
22       MR. BRUCKMANN: -- in the lower right-hand
23  corner.
24       THE WITNESS: Which the other ones don't
25  have numbers on. So it probably was not the same. Oh,

152

1  okay.  Here's another.  It looks like it's multiple --
2  multiple PowerPoints.
3  **Q.**  All right.  So just turning your attention here
4  to the -- slide with Bates 2743, there's a heading,
5  "A proactive security model."  Do you have an
6  understanding of what that means?
7  **A.**  If I recollect correctly, it was a way to
8  describe our -- the, uh, things that I wanted to do in
9  the future.  This is to say we have a proactive security
10  model.
11  THE REPORTER:  I'm sorry, I couldn't hear
12  you.
13  **A.**  Oh, I'm sorry.  I said a proactive security
14  model, uh, most likely, was just a header for this slide
15  that explained kind of what -- what I would like to do.
16  And it looks like investments that I would like to have
17  made into the program.
18  **Q.**  Did you have an understanding as of the time
19  that you completed your 90-day review here in December,
20  2017 as to whether SolarWinds had a reactive as opposed
21  to a proactive security model?
22  MR. TURNER:  Objection to form.
23  **A.**  I can't -- I can't link these documents
24  together.  So we can't assume this was from that same
25  deck.

153

1  **Q.**  Okay.  I'm just asking generally.  You completed
2  a security review.  At the conclusion of that review,
3  did you have an understanding as to whether SolarWinds
4  had a proactive as opposed to a reactive security model?
5  MR. TURNER:  Object to form.
6  **A.**  A -- in my words so proactive is simply a
7  statement on this slide as a title.  So I guess, uh,
8  that I -- I could not say that unless I looked through
9  this, all of the pages of this document that were my
10  90-day review, and then I could tell you if that was the
11  case.  Right?  So let me look through everything.
12  **Q.**  Okay.  Well, my -- my question was just based
13  upon your understanding, not what the document itself
14  would say on a particular line.  So if that's all the
15  understanding you have, I can -- I can move on.  I'm
16  just trying to understand --
17  **A.**  Okay.  Yeah.
18  **Q.**  -- what your understanding was.
19  **A.**  So I don't put a lot of -- the definition
20  between reactive and proactive security model could mean
21  so many different things, uh, it's hard to answer that
22  in an affirmative do I believe that it was reactive
23  instead of proactive.
24  **Q.**  I'll direct your attention back to the 2743
25  slide.

154

1  **A.**  Yep.
2  **Q.**  And there is a list of budget requests there --
3  **A.**  Yep.
4  **Q.**  -- in the lower left-hand quadrant of the slide.
5  Are those budget requests that you made?
6  **A.**  Yes.
7  **Q.**  Why did you make those requests?
8  **A.**  (Reading) Because in the -- the area of constant
9  improvement, uh, which is what a security team does,
10  these are the things that I needed to essentially
11  accelerate that program.
12  **Q.**  I'll direct your attention to the fourth item
13  there, "Internal/External PEN test" with the it looks
14  like a budget request of a hundred thousand dollars.
15  What was that for?
16  **A.**  That was for additional external pen tests and,
17  uh, and more often pen tests.
18  **Q.**  Pen tests of what?
19  **A.**  Pen tests for products.
20  **Q.**  Products.  Did you believe as of December, 2017
21  that SolarWinds needed to increase the amount of
22  penetration testing for its products?
23  **A.**  We --
24  MR. TURNER:  Objection to form.
25  **A.**  We were going through additional audits, so SOC2

155

1  audits for our Cloud solution.  Those SOC2 audits
2  require external pen testing, not just internal pen
3  testing.  So that was one of the reasons to have
4  additional external pen tests.
5  **Q.**  Was there any external pen testing prior to
6  December, 2017 on the SolarWinds' products to your
7  knowledge?
8  **A.**  Yes.
9  **Q.**  Okay.  Why did you then make a request for
10  additional funding for an external/internal pen test?
11  MR. TURNER:  Objection, asked and
12  answered.
13  **A.**  We were going through additional external
14  audits.  SOC2 was an audit that is performed on a Cloud
15  solution through an external auditor.  Part of that SOC2
16  audit requires external pen tests for those products
17  that are going through the audit.
18  **Q.**  So was it a pen test specifically for the
19  purpose of the audit?
20  **A.**  Specifically as a requirement to meet for those
21  SOC2 audits.
22  **Q.**  I'll direct your attention to the, uh, lower
23  right quadrant of that slide with the "Risk of
24  Non-Investment."  And there are some sub-bullets under
25  there.  The first question, did you write these?

156

**A.** Uh, most likely.
**Q.** I'll direct your attention to the first bullet. It states the "Current state of security leaves us in a very vulnerable state for our critical assets. A compromise of these assets would damage our reputation and financially." What was your basis for that statement?
MR. TURNER: Objection to form.
**A.** So I'm attempting to support my budget request saying that I need additional people. And, uh, I guess from a -- a legal term you may call that puffery to support my request for additional -- my additional, uh, budget request. So I'm trying to say, hey, I need budget. And again, we don't have a linkage of the date of this -- this slide. So I can't say that it was 2017.
**Q.** Who is this slide being sent to?
**A.** So this was being sent to, uh, probably Joe Kim. Joe managed the budget for IT and for security. So to probably Rani and Joe Kim.
**Q.** Just to clarify, in the earlier answer, uh, was the statement "Current state of security leaves us in a very vulnerable state for our critical assets" accurate in your mind when you made it?
**A.** I don't recall the reason I put that statement in there. Again, it's slide 26 out of some other deck.

So I don't know where this slide was in context of other slides, whether it was a whole budget deck or what it was. So in -- back again, you're saying in 2017. I don't know when this slide was.
**Q.** Well, are you saying you would tell Joe Kim that the "Current state of security leaves us in a very vulnerable state for our critical assets" without knowing whether that statement was accurate?
**A.** I'm saying I don't remember the context where that statement was written.
**Q.** How did you go about coming up with these bullet points here under "Risk of Non-Investment"?
**A.** Once again, you don't have the complete document. You're showing me 1 slide out of at least 26.
**Q.** I'm showing you a document that your counsel produced to us --
**A.** I can't help that.
**Q.** -- marked as an email that you sent.
**A.** Right. I can't help that. The document is not complete. So I don't have enough context to understand where this -- this was.
**Q.** What additional context would you need to say why you said the "Current state of security leaves us in a very vulnerable state for our critical assets"?
**A.** I -- many reasons. There could be a document

that shows critical assets and their vulnerabilities. There could be other information here. Without that context, it's difficult to say why that statement was put there.
So it just doesn't provide enough context. And we don't even know the timeframe. We don't know a date.
**Q.** So as of December, 2017, was it your understanding, based upon your knowledge of SolarWinds' business as VP of Security and Architecture, that the critical -- the current state of SolarWinds' security leaves SolarWinds in a very vulnerable state for its critical assets?
**A.** I would -- I would say that in 2017 I believed improvements needed to be made. And in security awareness we're in a business of constant improvement, and I was looking for budget to do those improvements.
**Q.** You said that improvements needed to be made. What improvements were you referring to in that answer?
**A.** Again, 2017 we would need to look back. If I look at the 90-day plan, I'm sure I had improvements that were outlined that I wanted to do.
**Q.** I'll direct your attention to the second bullet. It states, "Lack of cyber hygiene leaves us open to being a target of opportunity and a compromise will

create downtime and lost revenue." What did you mean by that?
**A.** Uh, I don't -- I don't recall. Again, this is a document that was probably part of a presentation. It doesn't mean that each statement or each word on every document was audited or checked. It was opportunity to discuss and -- and have context put around things.
**Q.** Did you feel it was important to be truthful in telling your bosses what SolarWinds' cybersecurity needs were in making a budget request?
**A.** So I do think that it's important to be truthful, yes.
**Q.** Were you trying to be truthful when you wrote these bullet points?
**A.** So again, you don't have context of these bullet proof -- points. You don't know if I have explained these bullet points in detail in the 25 slides before here. So I don't think you have enough context to insinuate that.
**Q.** I'm not insinuating, sir. I'm trying to ask, were you trying to be truthful when you wrote these bullet points?
**A.** I -- and as I've stated, I don't recall the details of these statements that were made eight years ago.

1    Q.  I'll direct your attention to the fourth bullet
2    point.
3    A.  Once again, same answer, I don't recall the
4    details of these statements.
5    Q.  I'll ask my question and then you can give your
6    answer, sir.  The statement "We have lost a renewal of
7    DPA for Accenture (192K) due to utilizing free code
8    scanning tools that did not find all vulnerabilities,"
9    do you see that?
10   A.  Yes.
11   Q.  What does DPA mean?
12   A.  DPA is a product.
13   Q.  Okay.  Do you have a recollection of SolarWinds
14   losing a renewal of DPA for Accenture on or around
15   December of 2017?
16   A.  Uh, I actually do, yes.
17   Q.  Okay.  Did SolarWinds lose a renewal for
18   Accenture around this time due to utilizing free code
19   scanning tools that did not find all vulnerabilities?
20   A.  Yes.
21   Q.  I'll turn your attention to the fifth bullet.
22   A.  Uh-huh.
23   Q.  There's a statement "Without training our
24   employees will continue to be one of our biggest risks."
25   What was your basis for that statement?

161

1    A.  Again, 20 -- 2017, but I see that this -- on
2    this specific slide it accompanies a request for
3    additional companywide security training.  Again, I know
4    that we had training when I on-boarded.  So there was
5    on-boarding training.  As described in the security
6    statement, this is for additional cybersecurity training
7    investment in a tool associated with training.
8    Q.  Where does it refer to a tool here for training?
9    A.  It doesn't, but that -- that's the context that
10   I remember.  It says, security training 30K.
11   Companywide security training was an indication of a
12   tool.  It does not say tool.
13   Q.  I'll turn your attention to the last bullet in
14   the slide.  There's a statement, "Appropriate security
15   policies, procedures, training, pen testing are required
16   by our commercial customers and asked for in qualifying
17   questionnaires.  Without appropriate answers we will
18   lose business."
19        What was your basis for that statement?
20   A.  I think it's a -- a statement of -- of fact.
21   That's all.
22   Q.  Did you have an understanding as of December,
23   2017 whether your qualifying questionnaires were not
24   giving customers the answers they needed?
25   A.  No, but again, we talked about pen testing a few

162

1    minutes ago being for our Cloud solution.  So I'll refer
2    back to that, that external pen testing was going to be
3    required.  If we didn't have external pen testing, we
4    wouldn't have our SOC2 compliance and we would lose
5    business for our Cloud solutions.
6    Q.  That's all on that document, sir.
7        (Brown Exhibit 11 was marked.)
8    Q.  Mr. Brown, you've been presented with a document
9    that's been marked as Brown Exhibit 11.  It has Bates
10   No. SW-SEC00313350.  It appears to be an email from you
11   to Rani Johnson dated October 29th, 2018, Subject:
12   SolarWinds state of security operations.
13        Do you see that, sir?
14   A.  Yes.
15   Q.  Do you recognize this document?
16   A.  (Flipping pages.)  I'm re-familiarizing myself.
17   (Reading)  Yes, all set.
18   Q.  And, uh, do you recognize this document, sir?
19   A.  Uh, now, yes.
20   Q.  Okay.  And do you recognize this is an email and
21   an attachment you sent in the course of your work at
22   SolarWinds?
23   A.  Yes.
24   Q.  And I'll turn your attention to the second page
25   of the document.  It appears to be a PowerPoint

163

1    presentation marked "INFORMATION SECURITY - Risk review
2    October 2018."  Did you conduct this review, sir?
3        MR. TURNER:  Objection to form.
4    A.  I don't believe it was a risk review.  I would
5    say it was more of a status of -- status of information
6    from October, 2018.
7    Q.  Okay.  I was just reading the title of the --
8    the slide --
9    A.  Right.
10   Q.  -- sir.
11   A.  Yeah, the title -- so -- but it wasn't a audit
12   or anything like that.
13   Q.  I'm not asking about the specific content on the
14   individual slides, but, uh, was it a routine practice of
15   yours to provide Rani Johnson with updates on the state
16   of SolarWinds' security operations?
17   A.  Yes.
18   Q.  And was this PowerPoint presentation part of
19   that effort?
20   A.  Uh, (reading) yeah, so this is highlights and,
21   uh, a -- so, yeah, it's essentially a time period.  It's
22   essentially a review of what happened during January 8,
23   2018 to October 23rd, 2018.
24   Q.  And turning back to the email at the -- the
25   first page of the document, 3350 --

164

1    **A.** Yeah.
2    **Q.** -- it looks like you say, "This PowerPoint
3    contains the current state of security slides updated
4    for October. A review of what we asked for last August
5    and a red yellow green status showing how we have done
6    on our initiatives." Do you see that?
7    **A.** Yes.
8    **Q.** And it says, "A 2019 plan and ask for security."
9    Do you see that?
10   **A.** Yes.
11   **Q.** And then it says, "We can review in tomorrow but
12   it's a reasonable place to start. Tim." So did I read
13   that correctly?
14   **A.** Yep, that's exactly what it reads.
15   **Q.** And turn back to Bates, uh, 3359, please. It
16   looks like you can probably review 59, 60, 61, and 62.
17   Do these four slides appear to be the "... review of
18   what we asked for last August and a red yellow green
19   status showing how we have done on our initiatives" that
20   you're referring to in your cover email?
21   **A.** I believe so.
22   **Q.** And if I could direct your attention to the
23   Bates 3359 slide, please.
24   **A.** Yes.
25   **Q.** And the headline slide appears to be

165

1    "A Proactive Security Model - Original plan and request
2    from August 2017." Do you see that?
3    **A.** Yes.
4    **Q.** Other than the -- there's one redacted line, but
5    other than that, does this appear to be the same budget
6    request and action items that we were discussing with
7    respect to the, uh, previous document?
8    **A.** Yes.
9    **Q.** And these risks of non-investment that you
10   identify in the lower right corner quadrant of the
11   document, do those appear to be the same risks that we
12   discussed in the previous document?
13   **A.** Correct. This is a year later. So the document
14   was a reference to what was there.
15   **Q.** Okay. And I'd direct your attention to the 3361
16   document, please, Bates. Are you there, sir?
17   **A.** Yes.
18   **Q.** It says that the title of the slide, "A
19   Proactive Security Model - Updated October 2018 with
20   status." Do you have that?
21   **A.** Yes.
22   **Q.** In looking at the -- the left half of the slide,
23   which is headed Risks of -- "Risk of Non-Investment," do
24   these appear to be the same bullet points that you had
25   in the August, 2017 version of the slide, but with some

166

1    color coded?
2    **A.** Uh, correct.
3    **Q.** I'll direct your attention to the first bullet.
4    And again, the statement was, "Current state of security
5    leaves us in a more vulnerable state for our critical
6    assets. A compromise of these assets would damage our
7    reputation and financially."
8            Did you still understand that to be a risk
9    of non-investment as of October, 2018 at SolarWinds?
10   **A.** So, yellow indicates that some of it was done
11   and we could do more, right? Green indicates that it
12   was completed. Uh, red indicates that, uh, it wasn't
13   done or there's more work to be done.
14   **Q.** Is there anywhere on the document where it says
15   what red, yellow, and green means?
16   **A.** No. Again, a slide deck is used for context,
17   and it was used in a presentation. So that information
18   would have been conveyed verbally in a presentation.
19   **Q.** And the -- so by -- what did you mean by putting
20   "Current state of security ..." bullet in yellow on this
21   slide?
22   **A.** Uh, again, 2018 I don't recall the details.
23   **Q.** Do you have a recollection, as you sit here, as
24   to what, if any, work needed to be done with respect to
25   that first bullet as of October, 2018?

167

1    **A.** What I can read from the presentation is that if
2    nothing had been done, it would have been a red. But
3    certain improvements had been done and there were still
4    more to do. That's all I could remember or all I could
5    surmise from this.
6    **Q.** And you can look at the rest of the deck for
7    context, if you need. I'm just wondering if you can
8    tell me your understanding as to what had been and what
9    had not been done with respect to that bullet as of
10   October, 2018.
11   **A.** No, I -- I could not.
12   **Q.** I'll direct your attention down to the third
13   bullet.
14   **A.** Yep.
15   **Q.** It says, "We have had 22 reported security
16   incidents this year. Reactive responses costs
17   significantly more than being proactive." Why is that
18   in red?
19   **A.** Again, I can't give you context to this specific
20   thing of 2018, but in general, if you find an issue
21   before in a product before a customer finds that issue,
22   costing to fix that issue is much less expensive. So
23   that's what I would put into the context. We had 22
24   reported security incidents this year. That means for
25   products.

168

1  basically from April to May, we were monitoring progress
2  and then forward we were addressing concerns.  So it was
3  a program to how do we mature and improve our security
4  across different organizations?
5      Q.  In looking at the "Description" of the project
6  in the slide --
7      A.  Yep.
8      Q.  -- there's a statement, "Project to
9  operationalize and improve overall security for
10  SolarWinds.  This effort includes training (security and
11  SDL), department plans for addressing security, KPIs and
12  an annual audit to measure the effectiveness of security
13  practices within SolarWinds."  First question, what's a
14  KPI?
15      A.  A key performance indicator.
16      Q.  What was your understanding of the status of
17  this project as of May, 2019 --
18      A.  Well --
19      Q.  -- as in what had been done, what was left to be
20  done?
21      A.  -- on the slide itself, it shows a status.  That
22  status shows complete for the project that kicked off in
23  the executive briefing, meaning that people were briefed
24  on the project.  "Audit Incidents/Build Corrective
25  Action Plan."  So there was a corrective action plan

181

1  completed and we were now into the monitoring and
2  addressing concerns and operationalizing to report the
3  KPIs and remediate issues.  That would have happened
4  next.
5      Q.  So --
6      A.  So that's the stage we were at.
7      Q.  -- it says you built the corrective action plan.
8  What was your understanding of what needed to be
9  corrected?
10      A.  There's a document somewhere that describes each
11  of the SIIP plan.
12      THE WITNESS:  (To reporter) I'm sorry,
13  SIIP, S-I-I-P.
14      Q.  Did any of those items that needed correction
15  involve changes to SolarWinds' access control policies?
16      A.  Not as defined by the security statement.
17      Q.  Did they involve access controls in any way?
18      A.  I would need to look at the plans.
19      Q.  Did any of the items in the correction plan --
20  corrective action plan involve SolarWinds' software
21  development lifecycle policies?
22      A.  No.
23      Q.  Okay.  I think --
24      MR. TURNER:  We've been going for another
25  hour.  I don't know if you have a long document in front

182

1  of you.
2      MR. TODOR:  Now a good time, good enough
3  time?
4      MR. TURNER:  Sure.
5      THE VIDEOGRAPHER:  Going off the record,
6  the time is 3:53.
7      (Short recess)
8      (Brown Exhibit 14 was marked.)
9      THE VIDEOGRAPHER:  Back on the record.
10  The time is 4:16.
11      Q.  (By Mr. Todor) Welcome back, Mr. Brown.
12      A.  Thank you.
13      Q.  You've been presented with a document marked as
14  Brown Exhibit 14.  It has Bates No. SW-SEC00001497.  It
15  appears to be a PowerPoint marked "solarwinds" SECURE
16  & -- "SECURITY & COMPLIANCE PROGRAM QUARTERLY OVERVIEW,
17  August 16th, 2019."
18      Do you recognize this document?
19      A.  (Flipping pages.)  (Pause)  (Sotto voce)
20  Multiple documents.  So, yes.
21      Q.  Okay.
22      A.  There are multiple documents here though.
23  So ...
24      Q.  I'll direct your attention to the document with
25  Bates 1503, please.

183

1      A.  1583 [sic].  Okay.  (Flipping pages.)
2      Q.  It's about the, uh --
3      A.  I'm sorry, eight three?
4      Q.  -- seventh page or so.
5      MR. TURNER:  Yeah, 1503.
6      Q.  1503, sir.
7      A.  Oh, I'm sorry.
8      MR. TURNER:  Towards the front.
9      Q.  It's toward the front of the document.
10      A.  Oh, thank you.  1503.  Okay.  I'm sorry, I
11  thought you said eight.  (Flipping pages.)  Yes, I'm
12  there.
13      Q.  And there is a set of three initiatives listed
14  under "Important Highlights" under "SECURITY."  Do you
15  see those?
16      A.  Yes.
17      Q.  Would you have provided any content for the
18  status of these three initiatives?
19      A.  Uh, (reading) so potentially, uh, but some of
20  these updates were not under my purview.
21      Q.  Do you have any reason to believe that the
22  description of the initiatives or the status listed here
23  are inaccurate?
24      MR. TURNER:  Objection, foundation.
25      A.  Uh, again, these were not my necessarily

184

1  initiatives.  They were Rani Johnson's.  So she would be
2  a better speaker to these than -- than I -- I would be.
3  Uh, the status looks reasonable, I guess, uh, but I have
4  no context or not enough information.
5      Q.  I'll direct your attention to the next page,
6  please, with Bates 1504.
7      A.  Yeah.
8      Q.  It appears to be a slide marked "SolarWinds
9  Security Program" and then the subheading says,
10  "SECURITY CONTROLS BASED ON NIST CONTROLS."  Do you see
11  that?
12      A.  Yes.
13      Q.  Was it your understanding that as of August,
14  2019 the SolarWinds' security program used security
15  controls based on NIST controls?
16      A.  NIST CSF to be specific.
17      Q.  And specifically are you talking about the NIST
18  Cybersecurity Framework in that answer?
19      A.  Yes.
20      Q.  And there are five headings of "Protect,
21  Respond, Identify, Detect," and "Recover."  Do you see
22  those?
23      A.  Yes.
24      Q.  And there are some sub-bullets under each of
25  those?

185

1      A.  Correct.
2      Q.  Do those correspond to criteria SolarWinds would
3  use to evaluate its maturity levels with respect to
4  those five categories under the NIST Cybersecurity
5  Framework as of this time?
6      A.  No.
7          MR. TURNER:  Object to form.
8      A.  No, they're -- they're not criteria.  They're --
9  they're status.  So under "Protect," do you see that we
10  have Next Generation Firewalls deployed?
11          THE REPORTER:  That we have Next
12  Generation ...
13          THE WITNESS:  Firewalls deployed.
14      A.  We have "Endpoint Protection and Encryption."
15  We have "Data Leakage Protection."  We have spam and
16  anti-phishing response.  So these are essentially a
17  description of the technologies that are deployed under
18  each one of these, uh, or the processes that we have in
19  place for each -- for the sub-bullets here.
20      Q.  Did you provide, uh, content for this slide?
21      A.  Yes.
22      Q.  What content did you provide?
23      A.  Uh ... the -- the -- so on -- on this slide this
24  would be -- I don't know who provided the actual each
25  one of these items that are underneath here or who wrote

186

1  this slide.  I don't recall that, but at this point in
2  time I can tell you that these were the processes or
3  software or things that we were doing in each one of
4  these areas.
5      Q.  Did you provide content to identify the things
6  you were doing in each of these areas as of August,
7  2019 --
8          MR. TURNER:  Object to form.
9      Q.  -- in connection with this slide?
10      A.  So the -- so the NIST scorecard is part of this
11  entire process when I look at this deck in a whole.
12  The, uh -- this was something that, uh, Rani, myself --
13  uh, Kellie Pierce helped us.  Uh, we put together this
14  program around the NIST CSF and the assessments that we
15  did in each one of these areas.
16          So as part of that, we, most likely,
17  worked together to be able to build the list of
18  technologies that was there somewhere under my control.
19  Uh, like the Next Generation Firewall was under Rani's
20  control.  So she would have put that there under
21  "Protect."
22      Q.  Was there someone who was assigned to pull all
23  of the content together and decide what would be in the
24  slide?
25      A.  Uh, again not this specific slide, but the

187

1  entire deck associated with NIST CSF was again Rani,
2  myself, Kellie, uh, for both content and -- content and,
3  uh -- I guess content.
4      Q.  I'll direct your attention to the -- the next
5  page --
6      A.  Yeah.
7      Q.  -- of the deck, the Bates 1505.  It is marked
8  "SolarWinds Scorecard NIST Maturity Level."
9      A.  Uh-huh.
10      Q.  Did you provide content for this slide?
11      A.  So this -- this slide essentially represents the
12  math of the summation between the following slides.  So
13  this (indicating) -- this is not con- -- this was
14  generated content based on the next slide.
15      Q.  Okay.  I'll direct your attention back to I
16  guess starting on -- keeping on this page.  There are
17  security categories of "Identify, Protect, Detect,
18  Respond," and Recover."
19      A.  Correct.
20      Q.  And those correspond to the five I guess
21  subcomponents under NIST CSF, correct?
22      A.  Correct.
23      Q.  You have a set of ratings for 2017, 2018, and
24  2019 there, correct?
25      A.  Correct.

188

1    Q.  How did you go about coming up with the numbers?
2    A.  So these numbers (pointing) were the additive
3  numbers on the next slides.
4    Q.  Okay.  What do you mean by additive numbers,
5  sir?
6    A.  So if you look at, uh, "Identify" as a three dot
7  O, you look at the "Identify" columns -- well, it
8  actually should have been 3 dot 2 or maybe this was --
9  so it would have been an additive number associated with
10  each -- an average number of each one of these things
11  made up the number on the front.
12    Q.  So looking at the next say five pages, it looks
13  like you've got "Identify, Protect, Detect, Respond,
14  Recover" --
15    A.  Correct.
16    Q.  -- with some numbers.  It appears to me that
17  these, except for as you noted, the NIST maturity level
18  for "Identify" a 3.2 instead of 3.0 for 2019 would
19  correspond to the 2019 figures on, uh, slide 1505.
20  Is that correct?
21    A.  I'm sorry, your question of the ...
22    Q.  Okay.  So for example, if you look at slide
23  1507 --
24    A.  Yep.
25    Q.  -- you have a --

189

1    A.  3.2.
2    Q.  -- it has a 3.2 and there's a 3.2 for "Protect"
3  on 1505 for "Protect," right?
4    A.  Correct.
5    Q.  And then on 1508 you have a 3.6 for "Detect" and
6  you've got a 3.6 for "Detect" for 2019 on 1505, correct?
7    A.  Correct.
8    Q.  Same story for "Respond" --
9    A.  Respond.
10    Q.  -- on 1509, right?
11    A.  Correct.
12    Q.  And the same story for "Recover" on 1510,
13  correct?
14    A.  Correct.  And "Identify" for some reason is not
15  matching.
16      THE REPORTER:  Is not what?
17      THE WITNESS:  Is not matching.
18    Q.  And to determine the NIST maturity level did you
19  just take the arithmetic average of each of the
20  subcomponents that were set forth on the slides from
21  1506 through 1510 for each subpart?
22    A.  Correct.
23    Q.  Why did you just use an arithmetic average?
24    A.  Because that was the representation that was
25  determined to be a reasonable representation.

190

1    Q.  How was it determined that an arithmetic average
2  was a reasonable representation?
3    A.  Uh, what this was was a represation --
4  representation of maturity for each one of these things,
5  a representation of where we believed we were.  Uh, this
6  wasn't an audit or scientific or exercise to get here.
7  It was a point in time to see that if we've sponsored
8  projects in each one of these areas, have the projects
9  completed?  Have they gotten better?
10      NIST CSF is defined as a model that allows
11  you to do that.  There's no fixed criteria for how you
12  progress through that model.  Uh, that's one of the
13  beauties.
14    Q.  Does NIST CSF say that you should just use an
15  arithmetic average for the various security categories
16  to come up with the overall rating for Identify,
17  Protect, Detect, Respond, and Recover?
18    A.  I believe what it says is that you should use
19  this as a maturity model.  And how you grade yourself is
20  up to you.  There's not a direct tie to any specific
21  model to be used.
22    Q.  Who is the audience for the scorecard?
23    A.  Uh, so this -- the scorecards ended up in our
24  quarterly risk reviews eventually.  So this is a program
25  review, uh, but the maturity scorecard went to our

191

1  quarterly risk review with our executive team
2  eventually.  So maybe not this specific deck, but the
3  quarter -- the scorecard did get brought up to our
4  quarterly risk review.
5    Q.  So when we looked at the May '19, uh, Security &
6  Compliance Program Quarterly Overview, it didn't look
7  like it had one of these scorecards.  Is this the first
8  one of these scorecards that you recall being generated?
9    A.  Uh, I believe (flipping pages) the -- inside the
10  agenda ...
11    Q.  Are you looking at a page of this deck, sir?
12    A.  1498.
13    Q.  Okay.  And --
14    A.  ... it says, "Introduce ... Score Card."
15    Q.  Okay.  So is this the first time there was a
16  scorecard for NIST maturity level for SolarWinds for
17  purposes of, uh, security and compliance overview to
18  your knowledge?
19    A.  So it was the first time it was presented in
20  this fashion and the first time it was going to be fed
21  into the quarterly risk reports.
22    Q.  Okay.  So we went through the -- where you got
23  the numbers for 2019 focusing on Bates 1505.  There are
24  also numbers for 2017 and 2018.  How did you come up
25  with those?

192

1    **A.** A similar fashion with a similar set of
2    subcategories, and an average of those subcategories go
3    into the overall score.
4    **Q.** So I didn't see like numbers for '17 and '18
5    in -- in this deck.
6    **A.** Right.
7    **Q.** Was there some other document where there was
8    kept like where the subscores for '17 and '18 would have
9    come from?
10    **A.** Uh, potentially. I -- I don't recall '17 and
11    18, again a long time ago.
12    **Q.** So were the numbers for '17 and '18 generated
13    retroactively for purposes of creating this scorecard
14    for this August of '19 scorecard?
15    **A.** Uh, I -- I don't recall. I don't recall whether
16    we had -- had the same formulas in 2018.
17    **Q.** Do you know whether these scores for '17 and '18
18    that are set forth here on, you know, this page of the
19    August '19 presentation were prepared for purposes of
20    inclusion in the August of '19 presentation or had they
21    been prepared at some prior time period and just dropped
22    in here?
23    **A.** Uh, I don't recall. Right. I don't recall.
24    **Q.** Do you have an understanding as to what point in
25    time in 2017 the, uh, rating for 2017 would apply to?

<center>193</center>

1    Would it be January, December, June, some other time?
2        MR. TURNER: Objection to form.
3    **A.** Uh, I -- I don't recall what the date of those
4    were the -- or how often, whether these were updated
5    every -- when these were updated. I'd have to look back
6    to see when they were updated.
7    **Q.** Do you recall when the scorecard for 2017 would
8    have been created?
9    **A.** No.
10        MR. TURNER: Sorry, objection. Scorecard
11    for 2017? Now, this deck -- considerably this was the
12    first scorecard. So are you talking about this
13    scorecard or (pointing) ...?
14    **Q.** Yeah, the -- the subscores for 2017, when were
15    they created?
16        MR. TURNER: Object to form.
17    **A.** Yeah, uh, I don't recall whether -- where those
18    scores came from, whether they were generated when we
19    generated this document or whether they were generated,
20    uh, prior to.
21    **Q.** Would it be the same story for 2018?
22    **A.** Yes.
23    **Q.** I'll direct your attention to, uh, slide 1506.
24    And the title of the slide I think should be Identify.
25    It says, "INDENTIFY," uh, but it is at the left line,

<center>194</center>

1    actually. So it's not indented.
2        Do you see -- do you see the title there?
3    **A.** Yeah. Identify.
4    **Q.** Yes. I'll just direct your attention under the
5    security categories.
6    **A.** Yeah.
7    **Q.** The second category, "Secure Software
8    Development Lifecycle," do you see that?
9    **A.** Yes.
10    **Q.** And there's a statement, "Objective: Employees
11    are aware of an" -- maybe and -- "utilize a secure
12    software development lifecycle in their day to day
13    activities." Do you see that?
14    **A.** Yes.
15    **Q.** There's a NIST maturity rating of two assigned
16    to that.
17    **A.** Uh-huh.
18    **Q.** Do you see that? And you can look at the
19    previous page where there's a description of what a two
20    means for the NIST maturity level. It states on 1505, 2
21    means "The organization has a consistent overall
22    approach to meeting the security control objectives, but
23    it is still mostly reactive and undocumented. The
24    organization does not routinely measure or enforce
25    policy compliance."

<center>195</center>

1        Did I read that part correctly?
2    **A.** You read that correct. And that's a standard
3    definition for the CSF levels.
4    **Q.** And does that NIST maturity level of 2
5    correspond to your understanding of the status maturity
6    level with respect to Secure Software Development
7    Lifecycle at SolarWinds as of August, 2019?
8    **A.** So the -- the words on the categorizations don't
9    necessarily make sense in each one of the -- of the, uh,
10    each one of these categories. The words are very
11    generic in nature. So if I would say that a two is --
12    you're pretty good. You're -- you're getting -- yeah,
13    you -- you not only, uh, have a process, you have a
14    process that's being followed. Are you everywhere? Are
15    you a green three? No, you're -- you're a two.
16        So I would not consider these fixed
17    audible language that's associated with each one of
18    these items, more of a maturity level associated with
19    each one of these. And again, NIST CSF, as defined by
20    NIST, is a way to measure your -- your, uh -- measure
21    your maturity and then improve your maturity over time.
22    That's the purpose. So you're trying to put very fixed
23    definitions which don't -- are simply sample definitions
24    from the NIST CSF.
25    **Q.** Did you determine that the NIST maturity level

<center>196</center>

1  should be two for "Secure Software Development
2  Lifecycle" for this presentation?
3      **A.** So the security level of two would say that,
4  uh -- let's see, do we have any notes?
5      **Q.** And, Mr. Brown, I'm just asking what was your
6  personal involvement in deciding on the number for
7  purposes of this question?
8      **A.** Uh, so, you know, essentially what we would do
9  is a subjective measure to look at this. So, uh, if I
10 recall correctly, Rani, myself, and Kellie would, uh, be
11 in a room together and we would be reviewing each one of
12 these and we would say, Where are we on our programs?
13 How far along are we with our programs? So less
14 scientific model to be able to do ratings.
15          Once we got to a high level, did something
16 change that would make it lower? Or if we were at a low
17 level, we would have programs in place to move that
18 level up. If those programs were being complete, we
19 would move that maturity level up.
20     **Q.** So as of August '19 what was your understanding
21 as to what needed to be done to bring the level of 2
22 upward?
23     **A.** Okay. So in for "Secure Software Development
24 Lifecycle," again not what's referred to in the security
25 statement, but Steven's program that he started in 2018

197

1  to educate everybody across the company to have
2  consistent models, uh, was, did it get to consistency
3  everywhere? Did we just acquire a couple companies?
4  Which we did at this point in time that we would need to
5  train. So hence, a two is probably appropriate for this
6  timeframe.
7      **Q.** And so we're looking at August, 2019 as the date
8  of this document?
9      **A.** Yeah.
10     **Q.** I believe you testified Mr. Colquitt's
11 initiative started around January of 2018.
12     **A.** Correct.
13     **Q.** So why are you still at a 2 in August '19 if
14 that initiative had started in January of '18?
15     **A.** Because we've implemented new technology under
16 that program. So we've, uh, acquired a product called
17 Checkmarx that we expect to be run on every program,
18 every product. We've acquired a product called
19 Whitesource that does OpenSource scanning. So we expect
20 that to be deployed everywhere.
21          We've acquired companies that may or may
22 not have that same level of maturity. So hence, a two
23 is an appropriate. It's not at the level three of
24 perfect. We still have programs to be run inside of
25 software development lifecycle.

198

1      **Q.** I will direct your attention back to the
2  objective in the --
3      **A.** Yeah.
4      **Q.** -- "Secure Software Development Lifecycle"
5  section. And it just states, "Employees are aware of an
6  utilize a security software development lifecycle in
7  their day to day activities." Do you have any basis to
8  conclude whether that is referring specifically to Mr.
9  Colquitt's initiative or to a Secure Software
10 Development Lifecycle meant more generally?
11     **A.** So I think the word objective is -- so this
12 is -- these are statements. "Employees are aware of"
13 a -- aware of "an utilize a secure software development
14 lifecycle in their day to day activities." So that's
15 saying that's not necessarily the objective, right?
16          That's a fact. That's a status. If you
17 look at the one above (pointing), "Internally and
18 externally facing assets are identified and actively
19 managed," uh, "Open source code is" used and -- "scanned
20 and remediated as needed." So those are statements of
21 status versus statements of future objective.
22     **Q.** You can refer to the security statement if you
23 need to. I'm just going to read --
24     **A.** Yeah.
25     **Q.** -- a section of the security statement that I

199

1  wanted to ask about. And there's a statement under
2  software development lifecycle in the security statement
3  that states, "Our secure development lifecycle follows
4  standard security practices including vulnerability
5  testing, regression testing, penetration testing, and
6  product security assessments."
7      **A.** Yes.
8      **Q.** Can you -- is there a way to tell from looking
9  at this objective under Identify on Bates 1506 whether
10 it's talking about a secure development lifecycle in the
11 sense it's meant in the security statement as opposed to
12 Mr. Colquitt's initiative?
13          MR. TURNER: Objection to form.
14     **A.** So with the words on this -- this thing there,
15 you can't determine linkage between the two, uh, but
16 still a two means that people are -- are utilizing. The
17 statement says, "Employees are aware of an utilize a
18 secure software development lifecycle in their day to
19 day activities."
20          THE REPORTER: I can't hear you.
21          THE WITNESS: Oh, sorry.
22          THE REPORTER: Are aware of utilizing ...
23          THE WITNESS: Yeah, sorry.
24     **A.** Inside of that -- inside of the objective,
25 there's a statement that says, "Employees are

200

1  aware" -- aware "of an utilize a secure software
2  development lifecycle in their day to day activities."
3     Q.  I'll direct you to the next slide with Bates
4  1507 marked "PROTECT" at the top.
5     A.  Yes.
6     Q.  And first I'm going to direct your attention to
7  the, uh, "Highlights" section with some sub-bullets
8  underneath.  And I'd like to ask you to familiarize
9  yourself with the slides if you need to and let me know
10  when you're ready.
11     A.  (Reading)  Yes.
12     Q.  Who prepared these bullets?
13     A.  So again, the -- the deck was prepared by
14  myself, Rani Johnson, Kellie Pierce.  I don't know who
15  wrote the actual bullets.
16     Q.  Fair to say you didn't raise any objection to
17  any of the content in this slide before it was included
18  in the deck?
19         MR. TURNER:  Object to form.
20     A.  So I can't say that -- so it (reading) -- the --
21  the most important part of the -- the deck is the scores
22  here.  "Highlights" are simply highlights of, you know,
23  potentially where we are.
24     Q.  Would you have been in a meeting with Ms.
25  Johnson and Ms. Pierce where you would go over the

201

1  content of the slide, including the highlights and the
2  security categories and the objectives and the scores?
3     A.  Yeah, once again, that -- the slide was meant as
4  a conversation inside of a presentation.  So are all of
5  the words on this audited and absolutely correct or the
6  correct verbiage being here?
7     Q.  Okay.  I'm not asking about opinions on verbiage
8  in this question.  All I'm asking is, were you in a
9  meeting with Ms. Johnson and Ms. Pierce where you would
10  go over the content of the slide, including the
11  highlights, the security categories, the objectives, and
12  the scores before it was included in the deck?
13     A.  We would review and create the document
14  together.
15     Q.  And I'll direct your attention to the
16  "Highlights" section.  And the first bullet in the
17  "Highlights" section says, "Access and privilege to
18  critical systems/data is inappropriate.  Need to improve
19  internal processes/procedures."
20         What is the basis for that statement?
21     MR. TURNER:  Object to form.
22     THE REPORTER:  I'm sorry?
23     MR. TURNER:  Object to form.
24     A.  I don't recall that specific statement or what
25  it was in reference to.

202

1     Q.  Do you have any reason to believe that statement
2  is inaccurate?
3         MR. TURNER:  Object to form.
4     A.  I don't have enough detail to say whether as
5  written that broadly is accurate or how broadly that was
6  or how big of a risk that was.  That single statement
7  just could be a example of an outlier that happened
8  during this -- during this cycle that somebody decided
9  to put in here as a highlight.  So I don't know if this
10  document was a final or whether -- whether it was a
11  review document.
12         What I can say is that we had processes in
13  place to grant people access to systems in an
14  appropriate way.  It was a defined process.  That
15  process was audited.
16         It wasn't a hundred percent perfect.  An
17  audit may show something that somebody had access that
18  shouldn't have been there.  The process, uh, corrected
19  itself and we had a process flow to -- to change that.
20  So, uh, that statement as written I don't agree with.
21     Q.  If you don't agree with the statement, why did
22  you participate in a meeting and then not raise an
23  objection before it goes into the slide deck?
24     A.  The second part of the statement, "Need to
25  improve internal processes and procedures," yes, we were

203

1  not automated in our processes to onboard people.  So
2  they were more error prone.  Again, the document is a
3  presentation document.
4         It's not an audit.  It's not a finding.
5  It's simply a statement within a document.
6     Q.  So as you sit here, do you know what critical
7  systems/data are being referred to in that bullet?
8     A.  Not at all.
9     Q.  Do you know what access and privilege are being
10  referred to?
11     A.  Not at all.
12     Q.  Do you know what processes or procedures are
13  being referred to?
14     A.  Yes.
15     Q.  What processes and procedures are being referred
16  to?
17     A.  That we had a very -- a -- we had a manual
18  process to onboard people called SARF?
19     THE REPORTER:  I'm sorry?
20     THE WITNESS:  SARF.  Sorry.
21     A.  We had a manual process to onboard and give
22  appropriate access rights to people called S-A-R-F.  And
23  what that process was, was a process where somebody
24  joined a company, went to HR.  HR would send an email to
25  IT with an appropriate rule and then those rules would

204

1  say onboard this person in this way. Then if they
2  needed additional privileges, they went through another
3  process to be able to be granted additional privileges.
4       All of that was audited. All of that was
5  as background. All of that has plenty of proof that we
6  went through those processes to grant people appropriate
7  privilege.
8       Q. Directing your attention down to the, uh,
9  security categories --
10      A. Yes.
11           THE REPORTER: (Coughing)
12           MR. TURNER: Do you need some water?
13           THE REPORTER: (Coughing) Sorry.
14           MR. TODOR: No, take your time.
15           THE WITNESS: Water break now?
16           MR. TODOR: Just let us know when you're
17  ready, ma'am, please.
18           THE REPORTER: (Coughing) I think I'm
19  okay.
20           MR. BRUCKMANN: Why don't we go off the
21  record for about 15 minutes.
22           THE REPORTER: Yeah, it's okay.
23           MR. TURNER: Are you sure?
24           MR. TODOR: We can take a break, ma'am.
25           MR. TURNER: Yes.

205

1           MR. TODOR: Why don't we take -- take a
2  break, counsel?
3           MR. TURNER: Sure.
4           THE VIDEOGRAPHER: Going off the record,
5  the time is 4:49.
6           (Short recess)
7           THE VIDEOGRAPHER: Back on the record.
8  The time is 5:01.
9       Q. (By Mr. Todor) Welcome back, Mr. Brown.
10      A. Thank you.
11      Q. Before our break, we were discussing, uh, the
12  slide with Bates 1507. Are you on that slide currently?
13      A. Yes.
14      Q. And I'll direct your attention to the "Security
15  Category" listing and ask you which, if any, of these
16  would fall within the responsibility of the Infosec
17  group that you were the head of.
18      A. Uh, "Endpoint Protection and Encryption" is one
19  that, uh -- well, so Endpoint protection, not encryption
20  would fall within the security group. That would be our
21  Symantec antivirus. Encryption would actually be
22  Microsoft encryption installed on the desktop that was
23  IT.
24           "Data Leakage Protection," uh, that was
25  Netskope that my team ran. So that would fall under

206

1  us. Email protection was under the IT team.
2  "Authentication, Authorization, and Identity Management"
3  was, uh, primarily through active directory or
4  conditional access which were run by the IT team.
5       Q. What, if any, involvement did the Infosec group
6  have with respect to the "Authentication, Authorization
7  and Identity Management" category?
8       A. So the security team again from a monitoring
9  perspective, we monitored information about people
10  authenticating to assets. We did not run active
11  directory or run the processes for on-boarding and
12  off-boarding employees or run the processes for granting
13  privileged access through Thycotk. Uh, that was the IT
14  group that ran those processes.
15      Q. And -- and I'll direct your attention to the
16  "Objective" description next to "Authentication,
17  Authorization and Identity Management." It reads, "User
18  identity, authentication and authorization are in place
19  and actively monitored across the company." What, if
20  any, role did you have in coming up with the language
21  for the "Objective"?
22      A. Uh, I don't recall who came up with that exact
23  language.
24      Q. Would -- would all of these objectives be part
25  of the meetings you were discussing between Ms. Johnson,

207

1  Ms. Pierce, and yourself?
2       A. Correct.
3       Q. Directing your attention to the "NIST Maturity
4  Level" for "Authentication, Authorization and Identity
5  Management," it has a NIST maturity level of one. What
6  is your understanding as to why the level was one in
7  this slide?
8       A. So we had again manual processes for on-boarding
9  employees and giving them rights to certain, uh, certain
10  systems or certain applications. And that process
11  worked, uh, but we had not automated that process with a
12  tool. We were going through and, uh, consolidating --
13  we still had a Google directory service and a Azure
14  directory service. We were consolidating to Azure. We
15  were, uh, rolling out conditional access to many
16  different applications.
17           At this point in time I believe we had
18  Office 365 implemented, and that would give us
19  SharePoint, but there were many more app applications to
20  get under that umbrella. So a one means that we have,
21  uh, significant projects that we would like to fund in
22  this area. And these projects will take a long time,
23  multiple years, multiple times of investment, multiple
24  ways to mature our identity -- our identity model or our
25  "Authentication, Authorization and Identity Management"

208

Timothy Brown
10/3/2024

1  model.  So that's what I would believe is the impression
2  here of why a one.
3      Q.  I'll direct your attention back to the bullets
4  up at the top of the page.  I was going to direct your
5  attention to the sixth bullet.  It would be the second
6  one up from the first -- the second one up from the
7  bottom.
8      A.  Yeah.
9      Q.  There's a statement, "Movement to make Azure AD
10  authoritative source of identity.  Plan to enable
11  federation for all critical assets."  Do you see that?
12      A.  Correct.
13      Q.  Did you believe that statement to be accurate at
14  the time it was made?
15      A.  Yes.
16          MR. TURNER:  Object -- objection, form.
17  It's not a statement.  It's a truth value in any event,
18  but go ahead.
19      A.  So that's exactly what I described a moment ago,
20  that movement to make Azure Active Directory the
21  authoritative only source.  At that point in time we had
22  Google and Azure.  So consolidating those to make Azure
23  our -- our source.  And planned to enable federation
24  across critical assets means Next Generation conditional
25  access being across our federated environment.  You'll

209

1      A.  So, uh, more movement towards Zero Trust.  So
2  modern Zero Trust models so as it states here.  Enabling
3  federation means that you can now use more assets to the
4  Cloud.  So that would be one.  The, uh, the
5  implementation for or consolidation on, uh, the
6  privilege user management solution Thycotk, which we had
7  in place, uh, but more across the -- across the board on
8  that.
9          The big one again is moving up from a one
10  means that you have a single source of treatment for
11  identity.  You have automated processes that go through
12  and make sure that everybody is given the correct
13  access.  You still have audits, uh, but you -- when you
14  automate the processes, you can have less errors within
15  the -- within those processes.  So if we do those, it
16  continues to move up.
17      Q.  If you have the security statement --
18      A.  Yes.
19      Q.  -- next to you, I'd like to refer you back to
20  the security statement to page three to the section
21  under "Access Controls" marked "Authentication and
22  Authorization."
23      A.  Yeah.
24      Q.  Could you, please, let me know if you're there,
25  sir?

211

1  often hear that called Zero Trust.
2          THE REPORTER:  Called what?
3          THE WITNESS:  Zero Trust.
4      Q.  What is your understanding of what was meant by
5  critical assets in that bullet?
6      A.  So in SolarWinds we have mission and business
7  critical assets defined.  That's an asset list
8  maintained by the IT department.  So critical assets
9  I -- I don't recall the exact number, but critical
10  assets would be those assets that were defined to be
11  mission or business critical assets.
12      Q.  So when we were looking at the earlier slides
13  with the -- the risk of non-investment -- and you can
14  look at the document if you need to -- but I believe
15  there was a reference to critical assets in that
16  document.  Are those the same critical assets that are
17  being referred to here?
18      A.  I don't believe the words correlate everywhere.
19  So we could be using critical assets in many different
20  contexts.
21      Q.  What was your understanding as of August 19th of
22  any other needs other than the movement to Azure AD that
23  would be necessary to move the maturity level for
24  authentication, authorization and identity management
25  higher than a one?

210

1      A.  I am there.
2      Q.  Did you perceive there to be any tension between
3  having a NIST maturity level of 1 as of August, 2019 and
4  this slide deck and your representations in the security
5  statement regarding authentication and authorization?
6      A.  No, I don't see any conflict in those
7  statements.
8      Q.  Why not?
9      A.  Because we have processes in place that required
10  authorized users to be provisioned with unique IDs.
11  They were.  SolarWinds' employees are granted a limited
12  set of default position -- permissions to access company
13  resources.  They were, such as email in the corporate
14  intranet.
15          Employees are granted certain additional
16  resources based on their specific job function.  We had
17  separate processes in place that managed additional
18  privileges and had approvals of those additional
19  privileges.  "Requests for additional access follow a
20  formal process that involves a request and an approval
21  from a data or system owner," or "manager, or other
22  executives, as defined by our security guidelines."  The
23  "Approvals are managed by workflow tools that maintain
24  audit" --
25          MR. TURNER:  Tim, you've got to slow down

212

1  for the court reporter.
2        THE WITNESS:  I'm sorry.
3        THE REPORTER:  I can't hear you either,
4  I'm sorry.
5        THE WITNESS:  I'm sorry.
6    A.  I am just reading each -- that -- that full
7  statement and saying that I agree with that full
8  statement that's in the access control section of this.
9    Q.  What would it have taken for you to conclude
10 that based on something you learned later, that the
11 representations regarding authentication and
12 authorization were incorrect?
13   A.  Uh, that the process didn't exist to onboard
14 employees.
15   Q.  So like the process was -- you know, there was a
16 piece of paper that had written down what permissions
17 every employee would get and you'd just take a pencil
18 and erase and mark down in pencil what the permissions
19 for each employee would be?  Would that be consistent
20 with the statement here that SolarWinds' employees are
21 granted a limited set of default permissions to access
22 company resources?
23       MR. TURNER:  Object to form.
24   A.  So SolarWinds didn't have a piece of paper
25 process.  It had a very structured process.  It had a

213

1  process that went through work flows, a process that is
2  audited, a process that we have, uh, gobs of evidence
3  that shows a process of people getting rights when they
4  needed to get rights and removed rights when they needed
5  to have rights.
6        And this is very, very well documented in
7  our help desk system.  If we were a company of five
8  people, then a paper process would have been sufficient
9  to meet this statement.  That's why the statements
10 themselves are basic statements that could be met in
11 many different -- many, many different ways.
12   Q.  There was a statement in the second, uh,
13 paragraph of the security statement in the third
14 sentence there, "Requests for additional access follow a
15 formal process that involves a request and" approval --
16 and "an approval from a data or system owner, manager,
17 or other executives, as defined by our security
18 guidelines."  Do you see that?
19   A.  Yes.
20   Q.  Now, is it fair to say that when you're talking
21 about this change to Azure AD, there would be a change
22 in the formal process that's involved?
23   A.  No.
24   Q.  Why are you saying there's no change because
25 when you're going to a completely different piece of

214

1  software?
2    A.  The formal process doesn't dictate the
3  technology that is being utilized underneath to grant
4  those roles.  The formal process says that I, as the VP
5  of Security, I get a new employee.  I grant them rights
6  to the security tools.
7        That process stays the same.  What happens
8  is a record shows up in Azure Active Directory that says
9  Josh Vanhoose has a role of security that gives him
10 rights to things.  So the underlying technology may
11 change, but the statement (pointing) and the process
12 stays the same.
13   Q.  How much change would have been necessary for
14 you to decide we should tweak the security statement
15 description of the process?
16       MR. TURNER:  Object to form.
17   A.  The statements here are very accurate for, most
18 likely, any technology company that operates a model
19 where people have access to certain systems and not
20 certain systems.  There would be very little reason to
21 update this based on a technology change.  So if
22 something wasn't possible with these statements which we
23 would never have implemented.  So, uh, we could have
24 changed this as -- and made it more specific, but the
25 idea was not to be more specific.

215

1    Q.  Other than the change in technology that you
2  referred to with Azure, did you -- in this maturity --
3  NIST maturity level of one was there any aspect of that
4  that dealt with whether people at SolarWinds had too
5  many people who had administrative rights?
6        MR. TURNER:  Object to form.
7    A.  So administrative rights to systems, databases
8  application was controlled by -- by this process.
9  Administrative rights to their local desktop, laptop
10 were granted, uh, for essentially everyone at this
11 stage.
12   Q.  Why was that?
13   A.  As -- as an engineering company, it was very
14 common practice to have administrator access to your
15 device, uh, for people to install a device driver,
16 people to install a printer, people to do some level of
17 self-management.
18   Q.  How did you enforce there being a difference
19 between admin. rights to your own device as opposed to
20 admin. rights in the network?
21   A.  Yeah, extremely, extremely, extremely different.
22 So in order to be admin. rights on your device, it's
23 simply that you're on the device and you have access to
24 your device and you could install a printer.  In order
25 to have admin. rights on a application or a server, you

216

1 needed to go through an additional approval process that
2 said you needed that to do your job. So, very, very
3 different environments, completely different.
4   Q. So if I had local admin. rights on my laptop,
5 could I install solitaire on it even if it wasn't
6 provided by the company?
7   A. Yeah. And then we would catch that through our
8 Endpoint Management system as saying that you installed
9 something on your device.
10   Q. Okay. If someone were to install mal-ware on
11 their own device, would they be able to do that on their
12 own device if they had local administrator rights?
13   A. So they could, yes. They could install
14 anything.
15   Q. Okay. And would that pose a security risk for
16 SolarWinds' network?
17   A. So there are a number of safeguards in place
18 against mal-ware. So some of them are Next Generation
19 Firewalls, uh, that were installed across the network.
20 So if you were going to affect the system on SolarWinds'
21 network, you would need to go through the Next
22 Generation Firewall that depending on the mal-ware that
23 was there would be picked up. Symantec antivirus was
24 installed on the device that would pick up that, uh,
25 mal-ware when it was, you know, installed.

217

1   Q. So earlier I think you talked about compensating
2 controls. Did I have that term correct?
3   A. Correct.
4   Q. So if someone has local admin. rights and they
5 install mal-ware on their laptop and would the -- are
6 you talking about the firewall being the compensating
7 control to protect the network against that?
8   A. A firewall is one compensating control. The
9 Endpoint Security is another compensating control that
10 as your position or your department would dictate what
11 piece of the network you had access to. Again, Brad
12 Cline can go into microsegmentation of different models
13 that limit access, but all of those are compensating
14 controls.
15   Q. Isn't that leaning really hard on the -- the
16 firewall to protect the network that people can put
17 anything they want on their own laptop?
18     MR. TURNER: Objection to form.
19   A. It's the job of the firewall. It's how if
20 you -- we install Palo Alto firewalls, which are the top
21 firewall by many accounts, that do a very good job at
22 their -- their job.
23   Q. And I'd like to turn your attention, uh, again
24 to the "Role Based Access" section of the security
25 statement there.

218

1   A. Uh-huh.
2   Q. And familiarize yourself with the paragraph if
3 you need to. I was just going to ask you in that third
4 sentence there is a statement, "Access controls to
5 sensitive data and our databases, systems, and
6 environments are set on a need-to-know/least privilege
7 necessary basis." Is there any tension between there
8 being expansive local administrator rights and there
9 being a need-to-know/least privilege necessary basis
10 policy for access controls to sensitive data in our
11 databases, systems, and environments?
12   A. No, no tension at all. Again, local
13 administrative rights allow you onto the device and to
14 potentially make changes on those devices. To get at
15 sensitive data in our database systems or environments,
16 you need to connect through the network and you need to
17 be able to have the appropriate role to be able to even
18 access those systems.
19   Q. At SolarWinds was there ever a finding as to
20 whether there were too many people with administrator
21 rights in the network setting as opposed to local access
22 on their own devices?
23     MR. TURNER: Object to form.
24   A. A finding in which context?
25   Q. There were too many people who had admin. rights

219

1 on -- the network as opposed to admin. rights on their own
2 device.
3   A. Uh, the -- I was not directly involved in audits
4 of -- of things. In some of the documents in prep I saw
5 some document that stated that there were too many
6 admin. rights in certain things. I don't recall the
7 details.
8     MR. TURNER: Tim, answer to what you
9 specifically know.
10     THE WITNESS: Yeah.
11   A. So -- so no.
12   Q. Okay. So turning your attention back to when in
13 the -- that 2018 to 2020 --
14   A. Yep.
15   Q. -- timeframe, would it have been part of your
16 job duties to be involved in a review of who had
17 administrator rights within the network?
18   A. So the IT team did audits and reviews of access
19 reviews. That was not my team's activity.
20   Q. Would you have occasion to review those audits?
21     MR. TURNER: Objection, asked and answered
22 a while back.
23   A. Only -- only in the context of possibly --
24 not -- I would not review. I may have seen results in a
25 meeting with Rani and her direct report.

220

1    **Q.** Do you recall ever suggesting some action with
2    respect to people having administrative rights on the
3    network as a result of anything you would have seen in
4    that 2018 to 2020 timeframe?
5    **A.** In the context of Rani's meetings, I -- again,
6    she directed people to fix those things that were out
7    of -- out of scope or out of policy and an audit could
8    have occurred for some reason.  I'm aware that things
9    were not perfect, uh, and I'm aware that they were
10   directed to be fixed.  My team did not do that direction
11   to be fixed.
12            MR. TURNER:  So just listen to the
13   question.  The question was, do you ever recall
14   suggesting some action?
15            THE WITNESS:  No.  Okay.  Thank you.
16   **Q.** Once an action was directed, if any, what, if
17   any, role would your team have played in implementing
18   that action with respect to people having admin. rights
19   on the network?
20   **A.** No role in the implementation.
21   **Q.** Who would have had that role?
22   **A.** The owner of the systems.  So, most likely, IT.
23   **Q.** And in that place would that be Mr. Cline's
24   group?
25   **A.** Or someone under Rani.

                                    221

1            THE WITNESS:  Rani, R-a-n-i, Johnson.
2            (Brown Exhibit 15 was marked.)
3    **Q.** And, Mr. Brown, you've been, uh, presented with
4    what's been marked as Brown Exhibit 15.  It has Bates
5    No. SW-SEC00001551.  It appears to be a PowerPoint
6    marked "solarwinds" SECURE & -- "SECURITY & COMPLIANCE
7    PROGRAM QUARTERLY" November 15th of 2019.
8            Do you recognize this document, sir?
9    **A.** (Flipping pages.)  (Reading)  (Pause)  Yes.
10   **Q.** And this is another in the series of "Security &
11   Compliance Program" quarterlies, uh, similar to the
12   August one?
13   **A.** Uh, yes, it looks like it's four months or --
14   four months later or three months later.
15   **Q.** August to November I'm guessing is three months.
16   Does that sound correct?
17            THE REPORTER:  I'm sorry?
18   **Q.** August to November would be three months?
19   **A.** Three, yes.
20   **Q.** Was your role in the process for preparing this
21   document similar to that for the August '19 document
22   that we just discussed?
23   **A.** Yes, correct.
24   **Q.** And, uh, did you similarly have meetings with
25   Ms. Johnson and Ms. Pierce to discuss the content for

                                    222

1    the items where you were providing content?
2    **A.** Yes, similar to -- to the other processes.
3    **Q.** I'll direct your attention back to Bates 1575.
4    It has the "25" in the lower right of the document.
5    (Pause)  Are you there?
6    **A.** Yes.
7    **Q.** And is this another, uh, is this another -- this
8    slide's following another scorecard for the NIST
9    controls?
10   **A.** Yes.
11   **Q.** And did you follow a similar process for
12   generating the input for these and then for the previous
13   August '19 presentation?
14   **A.** Yes, correct.
15   **Q.** Did you come up with new numbers for the scores
16   for each of these quarterly reviews or did you just use
17   the ones from the last one and just update them ever so
18   often?
19   **A.** If a program had completed or a major
20   advancement had been done or an advancement had been
21   done, we would have updated the score.
22   **Q.** Was there a fixed schedule on which you'd say,
23   Oh, time to update the store?  Or did you just do it
24   when some significant milestone had been accomplished?
25   **A.** Uh, we would have updated it.  Uh, it appears

                                    223

1    these are happening quarterly (pointing) at this point
2    in time.  So when we looked at them for quarterly, uh,
3    there's a number of updates (pointing) in the document
4    about programs.
5    **Q.** Uh-huh.
6    **A.** So that would have -- could have spurred a
7    completion of a program that could change a score.
8    **Q.** So if there was a completion of a program, could
9    you walk me through the process where the -- that new
10   information would be factored into the score?
11   **A.** Uh, there wasn't a defined fixed process as, uh,
12   Kellie ran a lot of the programs for the IT group and
13   for security.  So that's one of the reasons she was
14   there.  If we had said -- I don't know -- we'd have to
15   look here to see what.
16            There's program status on each one of
17   these.  So if a program had been completed, that would
18   lead into saying, yep, we have completed something;
19   therefore, a program, uh -- a score could get updated.
20   But it wasn't a formal process that was followed all the
21   time.
22   **Q.** I'll just direct your attention to the -- the
23   next slide after that with Identify with Bates 1577.
24   **A.** Yes.
25   **Q.** It looks like you've got the same numbers there

                                    224

Timothy Brown
10/3/2024

1    **A.** Yeah.
2    **Q.** Do you know what that's talking about?
3    **A.** No.
4    **Q.** And based on your experience, was there a plan
5    in progress to address an issue with ITSM G-Suite
6    potentially externally exposing financial data at
7    SolarWinds in November, 2019?
8    **A.** Again, the only thing I know is that, uh, we had
9    programs to be able to move from Google -- away from
10   Google to Azure as our central source of truth, but I
11   don't know if that has anything to do with this.  So
12   I -- I don't have context.
13   **Q.** Do you have any idea from a technical
14   perspective as to why ITSM G-Suite is believed that
15   it could potentially externally expose financial data?
16   **A.** No.
17   **Q.** Turning to the third bullet, it states, "Pushing
18   forward with AD authentication guidelines for mission
19   critical systems."  Do you see that?
20   **A.** Yes.
21   **Q.** What's your understanding of that issue as of
22   November, 2019?
23   **A.** Again, six years ago, I don't have the context.
24   **Q.** Do you have an understanding as to what the AD
25   authentication guidelines that are being referred to

229

1    **Q.** Do you know whether SOx -- SOx, is that
2    referring to Sarbanes-Oxley?
3    **A.** Correct.
4    **Q.** Were you involved in Sarbanes-Oxley-related
5    compliance issues as they related to security training
6    at SolarWinds?
7    **A.** I don't understand your question.
8    **Q.** You said that, uh, you don't think SOx has a
9    requirement for training.  What was your basis for that
10   statement?
11   **A.** From the document that you show, uh, I believe X
12   and X means that it was a requirement for those -- those
13   ISO and SOC2.  I know that ISO and SOC2 require
14   training.  I don't know if SOx requires training.
15   **Q.** So you don't know whether the blank spaces here
16   refer to items that weren't required to be done at all
17   or if they're just deficiencies that weren't yet
18   resolved.  Is that correct?
19   **A.** I do not know.
20   **Q.** I'll turn your attention to the Bates 1560 in
21   the document.
22   **A.** (Flipping pages.)
23   **Q.** It's marked "Important Highlights" at the top
24   and then it has a blue bar "SECURITY" at the top of the
25   page.

231

1    here are?
2    **A.** Uh, no, I don't.
3    **Q.** So I'll turn your attention to the next slide in
4    the deck with Bates 1553, please.
5    **A.** Yes.
6    **Q.** It's a slide marked "Compliance Themes, Resolved
7    SOC 2 Deficiencies."  Do you see that?
8    **A.** Yes.
9    **Q.** I'll direct your attention to the third item
10   there, "Annual Security Training & Attestation."  It
11   looks like the "Description" has two items.  One is
12   "Security training for all new hires and employees is a
13   requirement."  And second is "Leveraging Audit Board for
14   training content and track training participation/
15   attendance" bearing "($0 cost)."
16        Do you have an understanding as to what
17   this issue was referring to?
18   **A.** I don't believe it's an issue.  I believe it's a
19   checkmark that indicates that it's complete.
20   **Q.** Do you have an understanding as to why there's
21   no X in the box for SOx, for that one, but there is a
22   box -- an X for ISO and SOC2?
23   **A.** Uh, my (reading) -- ISO and SOC2 have the
24   requirement for training.  I don't believe SOx has a
25   requirement for training.

230

1    **A.** (Reading)
2    **Q.** Are you there, sir?
3    **A.** I am there.
4    **Q.** Was your involvement in the generation of
5    content for this similar to what it was for the previous
6    quarterly review?
7    **A.** So these are appendix slides I believe from the
8    original document, uh, if I'm correct.  Or is there a
9    new document that started?  It's after the "THANK YOU!"
10   slide.  So this is a set of -- of programs that are
11   going on with IT, uh, sometimes security, but these are
12   all the -- on this slide it lists engineering through IT
13   is the teams that are supported.  So, uh, those would be
14   different teams associated with this than me.
15   **Q.** And as you sit here, do you have any reason to
16   believe that any of the identification of the
17   initiatives, descriptions, or status were inaccurate?
18        MR. TURNER:  Objection to foundation.
19   **A.** I have no idea if they're accurate or
20   inaccurate.
21        (Brown Exhibit 16 was marked.)
22   **Q.** Mr. Brown, you've been marked -- presented with
23   a document marked as Brown Exhibit 16.  It has the Bates
24   No. SW-SEC00001608.  It appears to be a PowerPoint
25   marked "solarwinds Q1 2020 QUARTERLY RISK REVIEW" dated

232

March 3rd, 2020.
2        Would you, please, let me know if you
3 recognize this document?
4        **A.** Yes.
5        **Q.** What, if any, role did you play in preparation
6 of the quarterly risk reviews?
7        **A.** So same as previously answered.  Do -- do I need
8 to say it again?
9        **Q.** Uh, I guess my question would be -- all right.
10 So the previous document was called "Security &
11 Compliance Program Quarterly Overview."  This document
12 is called Quarterly Risk Review.  Is there a difference
13 in, uh, the process that would go into the security
14 compliance portion of the Quarterly Risk Review as
15 opposed to the Security & Compliance Program Overview?
16        So for example, Quarterly Risk Review,
17 front page, it says, "SECURITY & COMPLIANCE PROGRAM
18 OFFICE ... +LEGAL+FINANCE."  So my question is, for the
19 portion of it that is Security & Compliance Program
20 Office, was your role --
21        **A.** The same.
22        **Q.** -- similar to that one than it was for the
23 previous document that was called Security & Compliance
24 Program Quarterly Overview?
25        **A.** Yes, you're correct.

233

1        **Q.** Okay.  Turning your attention to the second page
2 of the item, a document marked "Agenda," and the first
3 section is marked "Security," and then it has three
4 bullet points.  You see that?
5        **A.** Yes.
6        **Q.** Who determined the agenda?
7        **A.** Many of these are outside of my control.  So I
8 would say that Rani built the agenda.
9        **Q.** Okay.  Turning your attention to the third page
10 of the document marked "Security" --
11        **A.** Uh-huh.
12        **Q.** -- there were -- there are three bullets there,
13 uh, "Risk Scorecard & 2020 Target Tactics; Incident
14 Response Status Report & Process Improvements;" and
15 "Security & Compliance Improvement Plans ..."  Do you
16 see that?
17        **A.** Yes.
18        **Q.** Did your -- did you provide input in all three
19 of those?
20        **A.** Uh, yes.
21        **Q.** Turning your attention to the next page of the
22 document, uh, marked with Bates 1611, the title is
23 "SolarWinds Scorecard, NIST Maturity Level."
24        **A.** Yes.
25        **Q.** Okay.  Was your role in preparation of this

234

1 scorecard similar to that for the scorecards in the
2 November '19 and August '19 documents that we looked at
3 previously?
4        **A.** Yes.  Correct.
5        **Q.** And in looking at the chart, it looks like there
6 is a new, uh, column there for "2020 Target."  How was
7 that set?
8        **A.** So this was in March of 2020.  So our target is
9 to get to an improvement level for each one of these
10 scores by the end of 2020.
11        **Q.** In looking at the columns here, uh, for
12 2020, you've got, for example, Identify there's a 3.3
13 with an up arrow.  What does the up arrow mean?
14        **A.** Up arrow would indicate that the score was going
15 up.
16        **Q.** Is that a target for where you want to be at the
17 end of the year or an indication of where you felt you
18 were at that point in time?
19        **A.** That is a target.
20        **Q.** Was it a target for the end of the year?
21        **A.** Yes.
22        **Q.** I'll turn your attention to the "Key Risks"
23 column.  How were those bullets drafted?
24        **A.** Uh, I expect it would be the same process as
25 before as we were pulling these together in a room with,

235

1 uh, Kellie and Rani.  Kellie probably kept notes and
2 highlighted the risks that she heard everybody talk
3 about.
4        **Q.** And were you aware of the language that was
5 going into this "Key Risks" column at the time --
6        **A.** No.
7        **Q.** -- it was being formulated?
8        **A.** Yeah, so I'm not aware of how the exact language
9 came out.  Simply that we had a target to improve and
10 the, uh, "Key Improvements" to -- that would reach us to
11 those higher scores.
12        **Q.** Turning your attention to "Identify" under "Key
13 Improvements," it has two bullets.  One is "Increase SDL
14 adoption."  The second is "Expand product
15 certifications."
16        Do you see that?
17        **A.** Yes.
18        **Q.** Are those improvements that are anticipated
19 you'll need to do in order to reach your 2020 target?
20        **A.** I don't know if those are the only improvements
21 or a full list of improvements that we need to do.  They
22 are key improvements, examples I guess of improvements
23 that could help us along that path.
24        **Q.** Are they meant to describe prospective
25 improvements or retrospective?

236

1    MR. TURNER:  Do you understand the
2  question, Tim?  Are these improvements that had already
3  been made or are these improvements that were planned?
4      **A.**  Key improvements for the future, I believe.
5      **Q.**  Okay.  Turning your attention to the second line
6  for "Protect," uh, there's a key risk identified of
7  "Significant deficiencies in user access management."
8  Do you see that?
9      **A.**  Yes.
10     **Q.**  Why is that language there?
11     **A.**  Uh, again, I don't have enough context with one
12  bullet.
13     **Q.**  Were you in a meeting when it was decided what
14  the content in this slide was?
15     **A.**  Uh, I assume that we did, but I cannot recollect
16  that from '20 -- whatever this was, 2020.
17     **Q.**  Did you raise any objection to this slide
18  saying, "Significant deficiencies in user access
19  management"?
20     MR. TURNER:  Object to form.
21     **A.**  Again, the content was for a presentation, uh,
22  and to talk through that presentation.  We were -- this
23  isn't a finding.  This is simply a statement.  So I
24  don't know what significant deficiencies is referred to.
25     **Q.**  And I just want to make sure our question and

237

1  answer are meeting.  I asked, did you raise any
2  objection to this slide saying "Significant deficiencies
3  in user access management"?  Your answer went through
4  "... I don't know what significant deficiencies is
5  referred to."
6          I just want to make sure is it fair to say
7  that you did not raise an objection to the language on
8  this slide prior to this meeting?
9      MR. TURNER:  Objection to form.
10     **A.**  It's fair to say that I don't recall this
11  meeting.  And whether I did or did not raise an
12  objection, I'd be guessing again.
13     **Q.**  I'm turning your attention to the "Key
14  Improvements" column to the statement "AD Authentication
15  for critical systems."  Is it consistent with your
16  understanding that as of March 3rd, 2020, that AD
17  Authentication for critical systems was an effort that
18  was ongoing in the future in pursuit of increasing the
19  maturity level to the target levels stated in this
20  slide?
21     **A.**  So in this slide it states we're going a 3.2,
22  which is very good, to a 3.3, which is very good plus a
23  little bit.  So it's not a major improvement that we're
24  looking at.  It is a point one improvement.
25     **Q.**  Is your understanding the "AD Authentication for

238

1  critical systems" would be the item that is being looked
2  at to move from the 3.2 to the 3.3?
3      **A.**  Again, I don't recall the meeting.  I don't
4  recall the details.  Again, it's a point one
5  improvement.  So it's not saying that we didn't have "AD
6  Authentication for critical systems."  It's saying that
7  there's an area of improvement of a point one.
8      **Q.**  Do you have an understanding as to what the
9  improvement in the "AD Authentication for critical
10  systems" that is being referred to in this slide would
11  be?
12     **A.**  No.
13     **Q.**  Under Detect there's a key risk identified as
14  "Inconsistent security scanning."  Do you see that?
15     **A.**  Yes.
16     **Q.**  What is your understanding as to why that was
17  identified as a key risk?
18     **A.**  Uh, back again, I don't recall the details of
19  this, but it's saying that we're staying from a 3.4 to a
20  3.4.  So we're not doing any major improvements planned.
21     **Q.**  The "Key Improvements" column says, "Expand and
22  standardize VAT, Pen OpenSource, and code analysis."
23  Do you see that?
24     **A.**  Yes.
25     **Q.**  What does VAT mean in this context?

239

1      **A.**  I don't know.
2      **Q.**  What does Pen OpenSource mean in this context?
3      **A.**  Uh, again, I don't know.
4      **Q.**  What does code analysis mean in this context?
5      **A.**  Uh, code analysis could be Checkmarx,
6  Whitesource.  It could -- could be implementing tools
7  across the platform.  But again, we're staying
8  consistent from a 3.4 to a 3.4.
9      **Q.**  I'll direct your attention to the next slide
10  marked "2020 YTD Security Incident Summary," please.
11     **A.**  Uh-huh.
12     **Q.**  And what, if any, involvement did you have in
13  preparation of the content for this slide?
14     **A.**  So this content was devised -- derived from our
15  incident response process, one of the subteams under
16  Eric Quitugua.
17     THE REPORTER:  I'm sorry?
18     THE WITNESS:  Eric -- under Eric Quitugua.
19     **A.**  So in -- in our context an incident is a
20  vulnerability within our products that was reported by
21  someone and managed through the process.  That's part of
22  the incident response process.  So this slide is a
23  export from our incident response system that tracked --
24  tracked incidents for each different products.
25     **Q.**  Why were you reporting to senior management on

240

1     MR. TURNER:  Thank you.
2     Q.  I'll direct your attention to -- under "Customer
3  Support" for "Protect" there's a bullet that says,
4  "Remediate access management risks."  What's that
5  referring to?
6     A.  Uh, I don't have enough context to answer that.
7     Q.  Under "Compliance" for "DevOps IT," there's a
8  bullet that says, "Security Awareness Training."  What
9  is that referring to?
10    A.  Uh, again, we had security awareness training.
11  I'm not sure what that expanded training.  It's
12  referring to some level of expanded training.
13    Q.  Why do you believe it's referring to expanded
14  training?
15    A.  Because I know that we had on-boarding training.
16  I went through it in 2017 and I know that slides were
17  created in additional years for on-boarding training.
18    MR. TODOR:  Now's a good time for a break.
19    MR. TURNER:  Thank you.
20    THE VIDEOGRAPHER:  Going off the record,
21  the time is 6:08.
22    (Short recess)
23    (Whereupon, Mr. Berkowitz left.)
24    THE VIDEOGRAPHER:  Back on the record.
25  The time is 6:29.

245

1     Q.  (By Mr. Todor)  Welcome back, Mr. Brown.
2     A.  Thank you.
3     (Brown Exhibit 17 was marked.)
4     Q.  You've been presented a document marked Brown
5  Exhibit 17.  It has Bates No. SW-SEC00001582.  It
6  appears to be a PowerPoint marked "solarwinds Q4 2020
7  Quarterly Risk Review" dated October 27, 2020.  Do you
8  recognize this document, sir?
9     A.  (Flipping pages.)  Yes, I do.
10    Q.  And was your role in the preparation of this
11  document similar to that for the Q1 2020 document that
12  we looked at before the break?
13    A.  Yes.
14    Q.  I'll direct your attention to the page with
15  Bates 1587 which is marked as "SolarWinds Scorecard."
16  And please familiarize yourself if you need to.
17    A.  Yes.
18    Q.  Was your role in the preparation of this
19  scorecard similar to that for the Q1 2020 document we
20  looked at before the break?
21    A.  Yes.
22    Q.  There's a statement at the top, "Steady progress
23  in 1H.  On track for overall improvement in 2020."  Does
24  1H refer to the first half of 2020?
25    A.  Yes.

246

1     Q.  And to your knowledge, is this statement
2  accurate?
3     MR. TURNER:  Objection to form.
4     A.  Uh, yes.
5     Q.  Directing your attention to the "Key Risks," it
6  appears -- and you can look at the Q1 2020 --
7     A.  Right.
8     Q.  -- document if you need to.  It appears that the
9  key risks that are identified are the same as in the Q1
10  2020 document; is that correct?
11    A.  That is correct.
12    Q.  To your knowledge are these referring to
13  anything different than what was being referred to in
14  the Q1 2020 document?
15    A.  Uh, no, the same -- same as the Q1 2020.
16    Q.  And again, you can look at the Q1 2020 for
17  comparison.  There are -- there's what's in the right
18  column is now called a -- looks the second half of 2020
19  Improvement Plan and there are some bullet points.  Are
20  those bullet points essentially the same issues as what
21  were being referred to in the first quarter of 2020
22  document that we looked at before the break?
23    MR. TURNER:  Take your time to look at the
24  document.
25    A.  There -- there is wording differences, uh,

247

1  compared -- compared to the two.
2     Q.  Okay.
3     A.  And there's, uh, scoring targets in some places
4  that have increased.
5     Q.  Okay.  As you sit here, are you aware of any
6  reasons for differences between these bullets and the
7  ones in the Q1 document?
8     A.  Uh, no, I don't have any -- any direct knowledge
9  of what -- what drove those differences.
10    Q.  I'll direct your attention to the next slide
11  marked "Security YTD Incident Response" with Bates 1588.
12    A.  Yes.
13    Q.  Was your process for this slide similar to that
14  for the Q1 2020 document we looked at before the break?
15    A.  Correct.
16    Q.  And, uh, the number of incidents reported, was
17  that based on information you received in the course of
18  your business?
19    A.  Correct.
20    Q.  And the incident response highlights there, were
21  those generated following a similar process to that for
22  the Q1 2020 document?
23    A.  Yes, the document was created by the incident
24  response team from their system that tracked it.
25    Q.  All right.  I want to direct your attention to

248

Timothy Brown
10/3/2024

1  after being there less than 30 days could not support
2  facts associated with that statement whatsoever.
3     Q.  Okay.  I'm not asking about the facts you had in
4  your possession at the time.  I'm just asking whether
5  you believed that statement to be true when you said it.
6     A.  And again, you're talking eight years ago.  So
7  I -- I don't recall my state of mind during that
8  statement.
9     Q.  Okay.  In looking at this document, this
10  document was dated, uh, October 29th of 2018, correct?
11     A.  No, August of 2017.
12     Q.  No, the -- the Exhibit 11 is an email that you
13  sent on October 29th of 2018, correct?  You can look at
14  this first page of the document to refresh yourself if
15  you need to.
16     A.  So the slide remained the same as a reference.
17  It did not -- it did not change.  The slide was a, uh --
18  the original plan and request from August, 2017.  And
19  then the next slide was a color coded we have made
20  progress in these areas (pointing).  And the slide
21  content did not change between the two.
22     Q.  So you had been on the job for well over a year
23  as of October 29th of 2018, correct?
24     A.  So once again, the slide content did not change.
25  The color coding changed between the two slides.

289

1     Q.  You were asked some questions about, uh, the
2  NIST scorecard process --
3     A.  Yes.
4     Q.  -- during your redirect.  You stated that Ms.
5  Pierce was not a technical person.
6     A.  Correct.
7     Q.  As VP of Security and Architecture at
8  SolarWinds, were you a technical person?
9     A.  Absolutely.
10     Q.  And did you have the opportunity to review Ms.
11  Pierce's, uh, notations on that NIST scorecard before it
12  was submitted as part of those quarterly Security &
13  Compliance Reviews or Quarterly Risk Reviews?
14     A.  It was not submitted.  Again, you're indicating
15  a formalized process of submission.  As stated before,
16  Kellie, myself, and Rani were in a room drafting
17  something.  As said by the misspelling of identify, not
18  every word on the document was reviewed for or audited.
19  It was simply a, uh, subjective review that occurred
20  with Kellie taking notes for us during that process.
21     Q.  For something like the quarterly risk review,
22  was that being submitted to -- is it your understanding
23  that was being submitted to SolarWinds' senior executive
24  staff?
25        MR. TURNER:  Objection to form, submitted.

290

1     A.  Some of the quarterly risk reviews were
2  discussed in additional meetings with, uh, the executive
3  team.  I am not sure whether the documents that you
4  showed me were those -- those same slides.
5     Q.  Would you expect Joseph Kim to have reviewed the
6  scorecard slide that is in quarterly risk review --
7     A.  Yes.
8     Q.  -- and as part of that meeting?
9     A.  Correct.
10     Q.  And Mr. Kim was your boss' boss?
11     A.  Correct.
12     Q.  Did you believe it was important to tell the
13  truth to Mr. Kim about cybersecurity issues at
14  SolarWinds?
15     A.  Yes, and I never said I didn't tell the truth.
16        MR. TODOR:  I have no further questions at
17  this time.
18          EXAMINATION
19  BY MR. TURNER:
20     Q.  And, Mr. Brown, you were asked whether you
21  conducted an independent technical assessment of the
22  security statement.  First of all, do you know what in
23  the world they're talking about?
24     A.  No.
25     Q.  (Laughs) Okay.  Did you, uh, did you conduct

291

1  some sort of audit of the security statement before it
2  was published?
3     A.  No.
4     Q.  Did you go around asking, you know, all the
5  subject matter experts who might be relevant whether
6  everything in there was accurate?
7        MR. TODOR:  Objection, leading.
8     Q.  Did you?
9     A.  No, I did not.
10     Q.  You said that, uh, a lot of the material was
11  already, uh -- had already been reviewed.
12     A.  Correct.
13     Q.  So how did that, uh, influence the amount of
14  review that you gave these statements?
15     A.  So these were our --
16        MR. TODOR:  Objection, leading.
17     A.  The statements had -- had already been approved
18  by legal and in the process that Eric went through.  So
19  they were already legally approved.  The statements are
20  also very basic and would be met by most companies.
21     Q.  So how much time did you spend reviewing the
22  document?
23     A.  Uh, very, very little.  A review of does this --
24  you know, is this statement equivalent to what the
25  statement is there?  Could it be worded slightly

292

1  personal knowledge of the processes that was followed to
2  verify the statements in the security statement if they
3  occurred before you joined the company?
4      **A.** Correct.
5          MR. TODOR:  No further questions at this
6  time.
7          MR. TURNER:  I'll keep going.
8              EXAMINATION
9  BY MR. TURNER:
10     **Q.** Mr. Brown, you just stated earlier that if a new
11 question came in, it would be referred to the
12 appropriate subject matter expert --
13     **A.** Correct.
14     **Q.** -- who would vet the answer.
15     **A.** Correct.
16     **Q.** Do you have any reason to believe that any
17 different process was followed before you arrived with
18 SolarWinds?
19     **A.** No reason to believe that that -- that a
20 different process was being followed.
21         MR. TURNER:  No further questions.
22         MR. TODOR:  I have no further questions.
23         THE REPORTER:  Are there any stipulations
24 counsel would like to put on the record before it
25 concludes?

297

1          MR. TODOR:  That it's getting dark.
2          MR. TURNER:  We'll just take our usual
3  order.
4          MR. TODOR:  And we believe we have a
5  standing order with Gradillas for receipt of the
6  transcript.
7          THE VIDEOGRAPHER:  This concludes today's
8  testimony of Timothy Brown.  Going off the record, the
9  time is 7:43.
10         (Deposition concluded at 7:43 p.m.)
11         (Signature waived.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

298

1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
2
3  SECURITIES AND EXCHANGE   )
   COMMISSION,               )
4          Plaintiff,        )
                             )  Case No.
5      vs.                   )  23-cv-9518-PAE
   SOLARWINDS CORP. and      )
6  TIMOTHY G. BROWN,         )
          Defendants.        )
7  _____)
8              REPORTER'S CERTIFICATION
9              VIDEOTAPED DEPOSITION
10                    OF
11             TIMOTHY G. BROWN
12             OCTOBER 3, 2024
13              VOLUME 1 OF 1
14     I, Camille A. Bruess, Certified Shorthand
15 Reporter in and for the State of Texas and Registered
16 Professional Reporter, hereby certify to the following:
17     That the witness, TIMOTHY G. BROWN, was duly
18 sworn by the officer and that the transcript of the
19 videotaped deposition is a true record of the testimony
20 given by the witness to the best of my ability;
21     That examination and signature of the witness
22 to the deposition transcript was waived by the
23 witness and agreement of the parties at the time of
24 the deposition;
25     That the original deposition was delivered to

299

1  counsel for Plaintiff;
2
3      That the amount of time used by each party at
4  the deposition is as follows:
5      Mr. Bruckmann    0 hours, 0 minutes
6      Mr. Brutlag      0 hours, 0 minutes
7      Mr. Carney       0 hours, 0 minutes
8      Ms. Stone        0 hours, 0 minutes
9      Mr. Todor        7 hours, 4 minutes
10     Mr. Berkowitz    0 hours, 0 minutes
11     Ms. Lee          0 hours, 0 minutes
12     Mr. Turner       0 hours, 13 minutes
13     Mr. Biles        0 hours, 0 minutes
14     Mr. Koch         0 hours, 0 minutes
15
16     I further certify that I am neither attorney nor
17 counsel for, related to, nor employed by any of the
18 parties in the action in which this testimony was taken.
19     Further, I am not a relative or employee of any
20 attorney of record in this cause, nor am I financially
21 or otherwise interested in the outcome of the action.
22
23
24
25

300

**Timothy Brown**
**10/3/2024**

```
 1        Subscribed and sworn to on this 17th day of
 2   October, 2024.
 3
 4
 5   _____
     CAMILLE A. BRUESS, RPR, Texas CSR #3824
 6   Expiration Date:  4/30/25
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                               301