# Exhibit 19

**Excerpts of 30(b)(6) Jason
Bliss Deposition
Transcripts**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
            Plaintiff,              )
 6                                  ) Case No.
          v.                        ) 23-cv-9518-PAE
 7                                  )
     SOLARWINDS CORP. and TIMOTHY G. )
 8   BROWN,                         )
                                    )
 9          Defendants.             )
     _____)
10
11
12
13
14      (30)(b)(6) STENOGRAPHIC VIDEOTAPED DEPOSITION OF
15         SOLARWINDS CORPORATION BY ITS DESIGNEE
16                 JASON WALLACE BLISS
17              WEDNESDAY, OCTOBER 16, 2024
18
19
20
21
22
23
     Reported by:
24   BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 241016BLO
```

1

```
 1   APPEARANCES OF COUNSEL:
 2
 3
 4   FOR THE PLAINTIFF:
 5
 6
 7      SECURITIES AND EXCHANGE COMMISSION
 8      100 F Street, N.E.
 9      Washington, D.C.  20549-6553
10      Telephone:  202.551.4661
11      Email:  todorj@sec.gov
12         carneyc@sec.gov
13         wardenk@sec.gov
14         stonel@sec.gov
15      BY:  JOHN "JJ" TODOR, ESQUIRE
16         CHRISTOPHER CARNEY, ESQUIRE
17         KRISTEN M. WARDEN, ESQUIRE
18         LORY STONE, ESQUIRE (Remote)
19
20
21
22
23
24
25
```

3

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
            Plaintiff,              )
 6                                  ) Case No.
          v.                        ) 23-cv-9518-PAE
 7                                  )
     SOLARWINDS CORP. and TIMOTHY G. )
 8   BROWN,                         )
                                    )
 9          Defendants.             )
     _____)
10
11
12
13      Stenographic (30)(b)(6) videotaped deposition
14   of SOLARWINDS CORP. by its designee JASON WALLACE BLISS,
15   taken on behalf of Plaintiff, held at the offices of
16   Latham & Watkins, 1271 Avenue of the Americas, Floor 33,
17   New York, New York, commencing at 9:50 a.m. and ending
18   at 7:47 p.m., on Wednesday, October 16, 2024, before
19   Bridget Lombardozzi, Certified Shorthand Reporter,
20   Certified Realtime Reporter, Registered Merit Reporter,
21   and Notary Public of the states of New York and New
22   Jersey, pursuant to notice.
23
24
25
```

2

```
 1   A P P E A R A N C E S (Continued):
 2
 3   FOR THE DEFENDANTS:
 4
 5      LATHAM & WATKINS LLP
 6      1271 Avenue of the Americas
 7      New York, New York
 8      Telephone:  212.906.1330
 9      Email:  serrin.turner@lw.com
10         maurice.baynard@lw.com
11         matthew.valenti@lw.com.
12         nicolas.luongo@lw.com
13      BY:  SERRIN TURNER, ESQUIRE
14         MAURICE BAYNARD, ESQUIRE
15         MATTHEW VALENTI, ESQUIRE
16         NICOLAS LUONGO, ESQUIRE (Remote)
17
18   ALSO PRESENT:
19
20      JONATHAN JUAREZ, VIDEOGRAPHER
21      BECKY MELTON, In-house Counsel for SolarWinds
22
23
24
25
```

4

1  product.  And there was a time when it was
2  centralized to the CIO, but they -- they span
3  between products and CIO in their function because
4  of the complexity that cloud products have brought
5  to traditional organizations.
6       Q.   Okay.  And at SolarWinds was there
7  something called the information security group
8  within the IT group, I believe?
9       A.   Yes.
10      Q.   And who was responsible for oversight of
11 that?
12           MR. TURNER:  Time period?
13      Q.   Within the 2018 to 2020 timeframe.
14      A.   That would have been -- Rani was CIO.
15 And Tim Brown reported to Rani, so Tim Brown would
16 oversee information security.
17      Q.   Was anyone -- were -- were there any
18 audit functions with respect to the work done in
19 the information security group?
20           MR. TURNER:  Object to form.
21      A.   Yes.  There were numerous activities you
22 could call audits that information security would
23 have a piece of, SOC-2 being one.
24      Q.   So focusing for the purposes of the
25 question on -- for Sarbanes-Oxley compliance, were

25

1  there any audits with respect to Sarbanes-Oxley
2  compliance related to the work of the information
3  security group?
4           MR. TURNER:  Object to form and
5      scope.
6      A.   The -- the -- the evolution of -- in the
7  industry was that they started to add IT general
8  controls and -- and every year those would -- the
9  scope of that would broaden as the world was
10 thinking more of cyber and the IT in this time
11 period.  So there was involvement with information
12 security in the Sarbanes-Oxley process during that
13 time period as -- as IT general controls were
14 incorporated more and more into that overall
15 process.
16      Q.   I think we might be blending into this,
17 but I'd like to ask some questions about Topic 2
18 in the notice, which is "SolarWinds' executives,
19 employees, contractors, and their duties,
20 compensation, locations, and reporting lines as
21 they relate to SolarWinds' cybersecurity practices
22 and the security statement on SolarWinds'
23 website."
24      So with -- with that topic in mind --
25      A.   Mm-hmm.

26

1       Q.   -- focusing first on the information
2  security group, I believe you mentioned Tim Brown
3  was head of that.
4       Was he head of that throughout the 2018
5  through 2020 time frame?
6       A.   Yes.
7       Q.   What were his duties with respect to
8  oversight of that group?
9       A.   He would make sure that a baseline --
10 and I apologize.  Are you talking only for
11 Sarbanes-Oxley?
12      Q.   I'm -- I'm talking about what -- what
13 were his duties --
14      A.   All of his duties?
15      Q.   Yes.
16      A.   Okay.
17      Q.   What were his duties?
18      A.   Okay.
19           MR. TURNER:  With respect to
20      the InfoSec group.
21           MR. TODOR:  Yes.
22      A.   He would lead the InfoSec group.  So he
23 would, one, be making sure that with the help of
24 his group, they were understanding the external
25 macro environment of what threat actors were

27

1  doing, what regulations are -- are being put into
2  place, and making sure that the information
3  security element of the company was progressing
4  with those overall elements of the macro, and he
5  would be making sure he was deploying resources in
6  a cost-effective manner to make sure that we were
7  addressing all of that globally.
8       And he would then be making sure
9  executives were informed and -- about the material
10 elements of information security that both is
11 going on externally, that's going on internally,
12 and making sure it's part of the overall
13 decision-making of the business.
14      Q.   You said he -- one of his roles is to
15 make sure executives were being informed.
16      Which executives were you referring to
17 in that answer?
18      A.   His reporting line.  So it would be Rani
19 above him, Joe Kim above him, but he would also
20 report to me, as general counsel, through the
21 various meetings and Bart as CFO in various
22 meetings.
23      Q.   How would he do that?
24      A.   In multiple ways.  So one would be
25 formalized meetings.  But all of those individuals

28

1 that I just mentioned sat within a hundred yards
2 of each other in an Austin office, so there were a
3 number of informal discussions and meetings that
4 were conducted as well, whether through
5 one-on-ones or the conversations in offices.
6    **Q.**  Turning to the employees in the InfoSec
7 group, during the 2018 to 2020 time frame, how
8 many employees reported to Mr. Brown in that
9 InfoSec group?
10    **A.**  During, sorry, '18 to 2020?
11    **Q.**  '18 to '20, yes.
12    **A.**  Roughly around -- and you mean all --
13 the whole group, not just who reported to Tim?
14    **Q.**  Correct.
15    **A.**  Okay.
16    **Q.**  The whole group.
17    **A.**  So roughly around five to eight, I
18 believe.
19    **Q.**  And there's an executive, Eric Quituga.
20 Was he the -- I guess the principal deputy to
21 Mr. Brown?
22    **A.**  Yes.  Eric -- Eric had been with the
23 company as far back as 2015 and -- as an
24 information security principal.
25    **Q.**  Did Mr. Brown ever request to have more

29

---

1 personnel starting in -- okay.
2       First, was Mr. Brown hired sometime in
3 the middle of 2017?
4    **A.**  Yes.
5    **Q.**  Did Mr. Brown ever request more people
6 to have working for him between, let's say, that
7 2017 time frame and 2020?
8    **A.**  I don't recall if he ever requested
9 more people, but I'd be shocked if he never did
10 because we all did.  That's part of what a company
11 does.
12    **Q.**  And what was the annual budget for the
13 information security group in this 2018 to 2020
14 time frame roughly?
15    **A.**  It -- it changed, but I would say
16 mid/high single digits to low double digits in the
17 millions.
18    **Q.**  Did that include salaries and technical
19 resources they had available?
20    **A.**  That would include salaries, bonus, cash
21 compensation in general.  It would include tools
22 that would be allocated to that group.  What it
23 does not include, which is part of cybersecurity,
24 are other elements in the business that would
25 handle product security, for instance, or, as I

30

---

1 mentioned before, the legal department, who'd had
2 a compliance function with cybersecurity.  So that
3 would only be his information security group
4 budget.
5          MR. TURNER:  I just want to
6       note my objection to -- for the record,
7       an objection to scope with respect to
8       budget.  I don't believe that was
9       specified in the notice.
10          MR. TODOR:  I'll just note
11       that compensation is listed there in
12       Topic 2.
13          MR. TURNER:  That's fine, but I
14       said budget.  The witness was not
15       specifically prepared to testify about
16       specific budget numbers, so I just wanted
17       to note that for the record.
18 BY MR. TODOR:
19    **Q.**  In terms of locations of the employees
20 in the InfoSec group, where were the employees
21 located?
22    **A.**  There were -- so Tim was in Austin.
23 Eric was in Austin.  There was an individual --
24 actually, Josh is in Austin.  So mostly in Austin.
25 There was an individual that came online in

31

---

1 Ireland.  And I believe that was it.
2    **Q.**  Okay.  Was there a Tomas Sejna within
3 the InfoSec group?
4    **A.**  I don't have him in the Infosec group,
5 as I recall.  I believe Tomas Sejna either was
6 prior to the relevant period or was in product
7 security.
8    **Q.**  Okay.  And the individual in Ireland you
9 referred to, is that Harry Griffiths?
10    **A.**  That is.
11    **Q.**  And did Josh Vanhoose -- is that the
12 Josh you were referring to?
13    **A.**  Correct.
14    **Q.**  Any others that you're aware of?
15    **A.**  There's a gentleman by the name of Ralph
16 Greer.  I don't know his location.  And there was
17 one other I can't recall.
18    **Q.**  What were Kellie Pierce's duties as they
19 related to cybersecurity?
20    **A.**  Kellie was within the CIO office and
21 she was a program manager.  So Kellie's role was
22 more to make sure that the trains were running on
23 time, that notes were taken accordingly, that
24 materials were produced.  She wasn't a technical
25 resource.

32

1  acquisition.  So those teams would come in with
2  their Dev-Ops teams and over time get integrated
3  into the back office structure.
4       So most of those resources would go to
5  the CIO function and they sit in CIO function
6  today, but we had a concept of hard-lined/dotted
7  line, if you've heard of that in organizations.
8  They may hard line into CIO but they dotted-lined
9  into engineering.  So they kind of sat between the
10  two groups even today.
11  **Q.**  What do you mean by "hard-lined/dotted
12  line"?
13  **A.**  Hard-lined refers to your primary
14  manager, like who would do your performance
15  reviews, for instance, right, and who would manage
16  you and your compensation and things of that
17  nature.
18       Dotted line would be someone that's
19  super important that you need to respond to as
20  well.  And so you kind of -- when you have a
21  hard-lined/dotted-line situation, you kind of sit
22  in what's called a matrix organization.
23  **Q.**  Turning back to Mr. Brown's role at
24  SolarWinds, was his job title vice president of
25  security and architecture throughout the 2018

45

1  through 2020 period?
2  **A.**  Yes.
3  **Q.**  Why was -- did he not have the title of
4  chief information security officer?
5  **A.**  He in particular felt if his title was
6  chief information security officer at that time,
7  that it more archetyped him into the one role
8  of -- that we spoke of of overseeing risk from the
9  macro and the internal IT environment.  He wanted
10  to make sure that his title gave him the
11  perception internally of being able to advise in
12  risk to the product team and was one of the
13  reasons his title wasn't CISO.
14       THE REPORTER:  His title
15  wasn't?
16       THE WITNESS:  CISO, C-I-S-O.
17  Sorry.
18  **Q.**  Why did his title change to CISO
19  later?
20  **A.**  Post-cyberattack, we had the need to
21  have a person with that title engaging with
22  customers and we felt also at that time, after two
23  years, it didn't matter that the title of VP
24  security and architecture or CISO at that time,
25  everybody understood who he was.  He had been

46

1  there for a while.  And so the reason for not
2  being a CISO wasn't really a reason anymore.
3  **Q.**  Did his responsibilities change when he
4  became -- had the title of CISO as opposed to VP
5  of security and architecture?
6  **A.**  Not because of that title change, no.
7  **Q.**  How did they change?
8  **A.**  So as I mentioned before, he had three
9  overall duties.  We were also in the middle of
10  2020 announcing a split of the company where the
11  MSP business unit was going to split away from
12  SolarWinds, which it ultimately did in 2021.  But
13  in preparation for that, we were segregating
14  duties to be -- have individuals more aligned to
15  one or the other business unit.  So the MSP group
16  was taking on the -- the role that Tim played with
17  the MSP business unit.
18  **Q.**  And was there an individual within the
19  MSP group who took on the role that Mr. Brown had
20  previously played for that group as one of his
21  duties as VP of security and architecture?
22  **A.**  There is for sure today.  And in 2021
23  they had hired someone.  In 2020, as we began the
24  shift, they were searching for someone, but I
25  don't know when exactly that person came in.

47

1  **Q.**  And the spinoff of the MSP group, is
2  that what's known as N-central?
3  **A.**  N-able.
4  **Q.**  N-able?
5  **A.**  N-A-B-L-E.
6  **Q.**  Is N-central one of their products?
7  **A.**  That is one of their products.
8  N-C-N-T-R-A-L (sic).
9  **Q.**  Is N-able -- was it spun off you said in
10  2021?
11  **A.**  Correct.
12  **Q.**  Okay.  Does it have any ongoing ties to
13  SolarWinds after the spinoff?
14  **A.**  Yes, small ties.  I believe we OEM or
15  resell one of their products and I believe they
16  OEM or resell one of our products, but they're not
17  material revenue lines.
18  **Q.**  Okay.
19  **A.**  We also have certain contractual
20  provisions in the spinoff documentation that
21  are there as well that are pretty typical in a
22  spin.
23  **Q.**  Turning to Mr. Brown's reporting
24  responsibilities, with respect to his oversight of
25  the InfoSec group, did he report to the CIO

48

1  throughout the relevant period?
2      A.  He did.  Joe was -- actually, let me
3  take that back.  He reported to Rani throughout
4  the relevant period because she was CIO.  She left
5  the company right before the end of 2020.  And we
6  were also in the middle of allocating spin, like
7  the spin, S-P-I-N, between the companies.  So Tim
8  reported to an individual called Chris Day, who we
9  had found to be our CIO within the business for
10  SolarWinds and another individual went over to
11  N-able to be CIO.
12      Q.  And was Mr. Day kind of the acting CIO
13  after Ms. Johnson left the company or --
14      A.  Yes.
15      Q.  Okay.  Why wasn't Mr. Brown promoted to
16  be the CIO?
17      A.  It's not his full skill set.  He is
18  great at information security and that's his
19  passion, but his passion is not to do business
20  applications and to do the implementation of IT
21  operations.  He -- he likes information security
22  and he wanted to stay in that role.
23      Q.  Turning back to Mr. Brown's duties when
24  he was hired, was one of the -- okay.
25      Was Mr. Brown's position new, newly

49

1  created, when he was hired?
2      A.  So we had an information security group.
3  And as the world was changing, we identified the
4  need to augment that with an experienced leader,
5  and that's why Tim was brought in.  So there was
6  a -- a VP role created within information security
7  for Tim to take on, but we had an information
8  security group.
9      Q.  Okay.  Was one of the reasons for
10  Mr. Brown's hiring to increase the maturity levels
11  of SolarWinds's cybersecurity practices compared
12  to prior to his hiring?
13      A.  Yes.  And as I had said before, in order
14  to keep abreast of what's going on in the world,
15  yes.
16      Q.  Did SolarWinds believe that its
17  cybersecurity practices were deficient when
18  Mr. Brown was hired?
19      A.  No.
20      MR. TURNER:  Object to form.
21      Q.  Did SolarWinds believe that its
22  cybersecurity practices were in need of
23  improvement to meet industry standard when
24  Mr. Brown was hired?
25      MR. TURNER:  Object to form.

50

1      A.  Not to meet industry standard, but we
2  knew, given how the world was changing, that we
3  were going to need to invest in improving the
4  overall cybersecurity posture of the company.
5      Q.  Did Mr. Brown ever directly report to
6  the chief technology officer?
7      A.  I don't believe so.  The chief
8  technology officer was Joe and I believe he always
9  reported through Rani to Joe.
10      Q.  And is that Joseph Kim, for the record?
11      A.  Yes.
12      Q.  Did Mr. Brown ever report directly to
13  the CEO, Mr. Kevin Thompson?
14      A.  No.
15      Q.  I think you might have touched on this
16  earlier.  I just wanted to clarify.
17      Why was it decided to create a position
18  of vice president for security and architecture
19  for the SolarWinds in 2017?
20      A.  So, again, we had a need in the three
21  areas I spoke of earlier, first of all.
22      Second of all, we were simply maturing
23  as a company.  This is prior to being public.  And
24  looking at where we needed to invest to react to
25  the overall macro environment.  And in 2017 we

51

1  were being faced with increased cyberattacks and
2  threats around the world.  We were staring at the
3  face of global interests in privacy regulation in
4  particular and all of these were Herculean efforts
5  to be able to stay with and to comply with.  And
6  so we knew we needed to bring in somebody who had
7  been experienced in creating programs of that as
8  it relates to internal IT.
9      MR. TODOR:  Counsel, this might
10      be a logical breaking point if you feel
11      it's time to take a break.
12      MR. TURNER:  Sure.
13      THE VIDEOGRAPHER:  The time
14      right now is 10:42 a.m. and we're off the
15      record.
16      (Whereupon, a recess is taken.)
17      THE VIDEOGRAPHER:  The time
18      right now is 11:06 a.m. and we're back on
19      the record.
20  BY MR. TODOR:
21      Q.  Welcome back, Mr. Bliss.  I have a
22  document -- couple documents to present to you.
23      MR. TODOR:  First will be Bliss
24      Exhibit 2, marked as the Amended
25      Complaint filed by the SEC.

52

1    form and scope.
2    A.  So access controls, broadly, we were in
3  this period of time, for instance, looking to
4  improve our tools as new tools became available.
5  So, for instance, we would have an Active
6  Directory that was the tool we used for identity
7  management which had access control lists embedded
8  into it.  And during the relevant period, we were
9  undertaking a project to implement Azure AD,
10 A-Z-U-R-E, which was a newer tool from Microsoft
11 that was cloud based that the team wanted to
12 implement during that time.
13     Q.  What was Mr. Brown's role with respect
14 to the selection and implementation of the Azure
15 AD?
16     A.  He -- he would have been a resource, but
17 he would not have been proposing that change.
18     Q.  Who did?
19     A.  That would have been from IT ops with
20 the help in a collaborative fashion with Tim and
21 team as to what's the best solution.
22     Q.  And by "IT ops," are you referring to
23 Brad Cline, C-L-I-N-E, and his group?
24     A.  It was -- Brad was the leader of that
25 group for some period.  He had left the company

61

1  and come back as well, but that group is the one
2  I'm referring to, yes.
3     Q.  Do you have anything to add to
4  Mr. Cline's deposition with respect to the
5  selection and implementation of Azure AD?
6     A.  I do not.  He would be much more
7  detailed on it that.
8     Q.  Turning back to paragraph 22 of the
9  amended complaint, turning back to the sentence we
10 were looking at, there's an allegation in the
11 complaint:  "Brown was responsible for the
12 company's ongoing security efforts, as well as
13 security architecture within its products."
14     What, if any, role did Brown have with
15 respect to the company's security architecture
16 within its products?
17     A.  Again, very collaborative.  He would be
18 in an advising role in that situation.
19     Q.  And would he be advising the -- the --
20 the product heads or who would he be advising?
21     A.  It could be a combination of Joe, which
22 those -- the product teams ultimately reported --
23 the engineering teams reported up and into.  It
24 could be the product security team within
25 engineering.  It could be the architecture team

62

1  within engineering, but it was a pretty open
2  dialogue.
3     And an example would be Tim could see
4  in his role threat actors doing something new in
5  the world, as was happening, and he would go back
6  and say, "Hey, have you seen this activity from
7  this threat actor that's trying to go after this
8  library?  Do we have it in our product?" for
9  instance.  That would be an advisory type role.
10     Q.  Turning your attention to the last
11 sentence here in paragraph 22, starting at the
12 bottom of the page:  "Throughout the relevant
13 period, Brown also served as SolarWinds'
14 cybersecurity spokesperson, making many public
15 statements about SolarWinds' cybersecurity
16 practices."
17     Is that statement accurate?
18         MR. TURNER:  Object to form.
19     A.  I don't think we had one designated
20 cybersecurity spokesperson for the entire company
21 at this time.  For instance, we had people within
22 the MSP organization that would talk about
23 cybersecurity, for instance.
24     Did Tim talk about cybersecurity in a
25 public forum during the relevant period?  I'm sure

63

1  he did, but I don't think he was designated as the
2  one spokesperson.
3     Q.  Was he authorized to speak publicly on
4  behalf of SolarWinds with respect to SolarWinds'
5  cybersecurity practices during the relevant
6  period?
7         MR. TURNER:  Object to form.
8     A.  In what type of format do you mean?
9     Q.  In the -- making public statements, log
10 posts, appearing at conferences.  Any kind of
11 public statement on behalf of SolarWinds with
12 respect to cybersecurity.
13     A.  He would be authorized to talk about
14 cybersecurity generally, but we often did not talk
15 publicly about specific practices because you
16 don't want to make those things public or it gives
17 a roadmap to threat actors to attack your
18 environment.
19     Q.  Did Mr. Brown make public statements
20 about SolarWinds' cybersecurity practices during
21 the relevant period?
22     A.  I don't recall if he did specifically.
23     Q.  All right.
24     A.  I don't recall any specific statements,
25 but I wouldn't be surprised if he did.

64

1    **Q.** Okay. And am I understanding correctly
2  that he did -- was authorized to speak publicly
3  about cybersecurity generally in his role at
4  SolarWinds?
5        MR. TURNER: Object to form.
6    **A.** Sorry. Is -- is your question about
7  whether SolarWinds authorized him to speak about
8  cybersecurity generally while he was employed at
9  SolarWinds?
10   **Q.** Yes.
11   **A.** Yes.
12   **Q.** Did SolarWinds ever organize Mr. Brown
13 to appear at a public event to discuss
14 cybersecurity issues --
15       MR. TURNER: Object to form.
16   **Q.** -- during the relevant period?
17   **A.** I don't recall a specific event this
18 long ago, but, you know, as part of his role
19 during the relevant period, he, again, would meet
20 with, in particular, MSP customers in his role
21 that we spoke of previously.
22   **Q.** Was he kind of the face of cybersecurity
23 for the company?
24       MR. TURNER: Object to form.
25   **A.** I would not say that.

65

1    **Q.** Who else would be?
2        MR. TURNER: Object to form.
3    **A.** There was an individual whose name
4  escapes me within MSP, for instance, that in
5  addition to Tim would augment that.
6    **Q.** I direct your attention back to the
7  notice of deposition, to Topic 4, which is
8  "SolarWinds' information security group structure,
9  employees, and reporting responsibilities
10 regarding cybersecurity issues during the relevant
11 period."
12       Do you have anything to add on this
13 topic beyond what you've testified to for Topics 2
14 and 3?
15       MR. TURNER: Object to form. I
16    don't understand the question.
17   **A.** I would only add that the name escaped
18 me in the information security group that I
19 remembered as I continue to testify was Chris
20 Campbell.
21   **Q.** Okay.
22   **A.** And I think I addressed this earlier,
23 but in terms of reporting responsibilities, if
24 it's just -- you know, as to reporting
25 responsibilities, I have nothing to add.

66

1    **Q.** What were Chris Campbell's duties?
2    **A.** I don't know specifically how he
3  differed within others, but he was a more
4  technical resource on the information security
5  group. He does some incident response activities,
6  for instance.
7    **Q.** Okay. Do you have anything else to add
8  beyond what Mr. -- Mr. Brown's deposition with
9  response -- with respect to the duties of any of
10 the individuals within the information security
11 group?
12       MR. TURNER: Object to form.
13   **A.** I do not.
14   **Q.** I turn your attention to Topic 5 in the
15 outline -- I mean in the deposition notice --
16   **A.** Mm-hmm.
17   **Q.** -- which is "SolarWinds' drafting,
18 establishment, maintenance, preservation, purpose,
19 approval process, control over content, use,
20 dissemination, and distribution of the security
21 statement on its public website during (and
22 leading up to) the relevant period, including, but
23 not limited to: A, responsible personnel and
24 approval process for the content on the security
25 statement; B, all information used or relied upon

67

1  in preparing the security statement; and, C,
2  responsible personnel and approval process for
3  changes, if any, to the security statement."
4        Did I read that correctly?
5        You're being presented with a document
6  being marked as Bliss Exhibit 5 marked as
7  "SolarWinds Security Statement."
8        (Whereupon, exhibit is received
9    and marked Bliss Deposition Exhibit 5 for
10   identification.)
11 BY MR. TODOR:
12   **Q.** Mr. Bliss, you've been handed a document
13 marked as Bliss Exhibit 5 marked as "SolarWinds
14 Security Statement."
15       Do you recognize this as the
16 public-facing security statement on SolarWinds'
17 website during the relevant period?
18   **A.** It looks like it, yes.
19   **Q.** Why was this drafted?
20   **A.** So we do about 10,000 transactions a
21 quarter and we get a number of questions as we go
22 through these transactions. And a lot of those
23 would root from procurement officers or purchasing
24 agents within companies that more or less have
25 check-the-box-type questions to make sure that

68

1 purchasing process with information that they were
2 typically and more often requesting during this
3 time period.
4     Q.  Turn your attention to -- I'll just ask
5 a few questions about the drafting process.
6         Who wrote the initial draft of the
7 public-facing security statement?
8     A.  So the sec -- security statement was
9 more or less a summary of that knowledge base I
10 spoke of earlier.  So to say it was a -- it was
11 "drafted" is probably an overstatement.  It was
12 brought together by the information security group
13 based on that knowledge base.
14     Q.  By who in the information security
15 group?
16     A.  I believe it was Eric Quituga.
17     Q.  What was Mr. Brown's role in res -- we
18 can break it down first.
19         What was Mr. Brown's role with respect
20 to the drafting of the content in the security
21 statement?
22     A.  He would have been reviewing it, but I
23 do not think he was drafting these sentences.
24     Q.  What distinction is there between
25 reviewing and drafting, as you've put it there?

                        73

1     A.  The material was brought together from
2 the knowledge base and he would have looked at
3 that product and said, Does this look good to him
4 as a security statement?
5     Q.  And after he does that, what would
6 happen or what did happen?
7     A.  I don't know specifically what did
8 happen, but the -- the expectation of Mr. Brown
9 and -- and others who reviewed it would be that if
10 they felt something needed to change, they would
11 suggest changes.
12     Q.  And did Mr. Brown have the ability to
13 suggest changes to the statement as it -- as he
14 received it from Mr. Quitugua?
15     A.  Did he have the ability to make comments
16 to it?
17     Q.  To make changes, yes.
18     A.  Yes.
19     Q.  Okay.  And Mr. Brown was Mr. Quituga's
20 superior in the organization, correct?
21     A.  Correct.
22     Q.  So if Mr. Brown wanted to redline the
23 document and make changes, he had the ability to
24 do that with Mr. Quitugua's draft, correct?
25     A.  Correct.  And those changes would have

                        74

1 also been reviewed by other people.
2     Q.  What other people would have reviewed
3 the draft after Mr. Brown?
4     A.  The legal team would have reviewed it.
5 His superior, Rani, reviewed it.
6     Q.  And what was the -- the scope of --
7 let's break that down -- Ms. Johnson's review of
8 the security statement?
9     A.  As far as I know, the same as Tim's:
10 Reviewing it, making sure she's comfortable with
11 the statement.
12     Q.  Was Ms. Johnson making a technical
13 content review of the security statement?
14         MR. TURNER:  Object to form.
15     A.  She would have approached it with her
16 expertise, which is why it was a collaborative
17 effort, and been comfortable with -- with those
18 elements, but I don't think any one individual is
19 going to be an expert on all the elements of the
20 security statement.
21     Q.  And you made reference to the "legal
22 team."  And I'd ask you to pause after my
23 question, make sure if your counsel needs to
24 interpose an objection.
25         Did the legal team provide any input as

                        75

1 to the technical aspects of the security
2 statement?
3     A.  They could have reviewed at a high level
4 some of the elements.  And it depends on what you
5 mean by "technical aspects," but mostly they would
6 be performing a role of asking questions if they
7 were unsure of things or making sure the statement
8 reads appropriately as well.
9     Q.  To your knowledge, did the legal team
10 make any changes to the technical representations
11 in the security statement as to what the actual
12 security practices involved were?
13     A.  I do not know.  I do not know.
14     Q.  Okay.
15     A.  Sorry.
16     Q.  Which individuals in the legal team
17 reviewed the security statement?
18     A.  Jenny Zador, Z-A-D-O-R.
19     Q.  And did you review it?
20     A.  I don't recall.
21     Q.  What were the steps in the process
22 between the initial draft and the document being
23 approved for being posted on the public-facing
24 website?
25     A.  I -- I don't recall there being, you

                        76

1    **Q.**  What degree of control did Mr. Brown
2    have over SolarWinds' cybersecurity practices as
3    they relate to following the NIST cybersecurity
4    framework?
5            MR. TURNER:  Object to form.
6    **A.**  I don't understand.
7    **Q.**  Did Mr. Brown have the authority to say,
8    yes, we're going to follow NIST cybersecurity
9    framework or some other approach?
10   **A.**  He certainly could have provided that
11   input, yes.
12   **Q.**  Who would have made the decision on that
13   ultimately?
14           MR. TURNER:  Object to form.
15   **A.**  That level of decision probably would
16   have been made from not just Tim in a vacuum, but
17   it would have included Rani as well and perhaps
18   even Joe.
19   **Q.**  You say SolarWinds started looking, I
20   think you said in your prior response, at the NIST
21   cybersecurity framework in 2017.
22           At -- at some point did SolarWinds start
23   having scorecards for its maturity level on this
24   cybersecurity framework?
25   **A.**  When you say "scorecard," what exactly

85

1    do you mean?
2    **Q.**  So in the quarterly risk reviews and the
3    security compliance quarterlies, there would be
4    scorecards.  We might see some of them later.
5    **A.**  Yes.
6    **Q.**  Why was that decision made and -- and
7    did that reflect some -- let's answer that one
8    first.  Why was that decision made?
9    **A.**  So the scorecard was a template or a
10   format that presented the underlying NIST
11   assessments.  The decision was made to create that
12   template or that visual because it provided
13   distilled information at the level for the
14   audience there, which in the QRRs were
15   executives.
16   **Q.**  Okay.  Was SolarWinds tracking maturity
17   levels on the NIST cybersecurity framework before
18   it started having the scorecards on the
19   presentations to the senior executives?
20   **A.**  Yes.
21   **Q.**  When did it start doing that?
22   **A.**  I don't know a precise date, but I know
23   that Eric Quitugua was looking at the NIST
24   cybersecurity framework in early 2017.
25   **Q.**  Was that an organizational decision that

86

1    Mr. Quitugua would be making that analysis or was
2    that something Mr. Quitugua did on his own?
3            MR. TURNER:  Object to form.
4    **A.**  I'm not aware of the exact process
5    there.
6    **Q.**  Were there any action items as a result
7    of maturity levels on the NIST cybersecurity
8    framework within SolarWinds during the relevant
9    time period as in you need to improve X area as a
10   result of NIST cybersecurity maturity levels that
11   were measured?
12           MR. TURNER:  Object to form.
13   **A.**  Are you saying did we adjust overall
14   resources and activities with the scorecard or the
15   underlying NIST framework assessment in response
16   to those?
17   **Q.**  Yes.
18   **A.**  Yes.  That's part of the purpose of the
19   CSF, is to identify and assess your environment
20   and look at where you have existing activities and
21   to measure what is being done.
22   **Q.**  What -- who at SolarWinds would be
23   making that kind of decision?
24   **A.**  I think it would be varied based on the
25   materiality of those activities.

87

1    **Q.**  I turn your attention later to the
2    page 3 of the document where it says "Access
3    Controls."
4            What, if any, control did Mr. Brown have
5    over SolarWinds' cybersecurity practices that
6    related to access controls as described in this
7    paragraph?
8    **A.**  Again, he would be a very important
9    voice in advising on what's happening in the
10   industry, how it's evolving, how we should
11   evolve, and advising IT operations who, in this
12   specific example, implemented role-based access
13   controls.
14   **Q.**  Looking to the next section on
15   "Authentication and Authorization."  And you can
16   familiarize yourself with the section as you need
17   to.  My question will be similar.
18           What degree of control did Mr. Brown
19   have over SolarWinds' cybersecurity practices as
20   they relate to authentication and authorization as
21   described in this section?
22   **A.**  It's difficult to answer because the
23   statements are very high level.  For instance, we
24   say "We require that authorized users be
25   provisioned with unique account IDs."  That is

88

1  This was a nontechnical program manager that did
2  her job to try to understand roughly what do the
3  controls look like in FedRAMP and how big of an
4  initiative would this be based on the limited
5  knowledge she knew in her head without doing
6  diligence throughout the company?
7      **Q.**  Was there a decision made whether or not
8  to pursue FedRAMP certification after Ms. Pierce's
9  analysis?
10     **A.**  We have not pursued FedRAMP
11 certification.
12     **Q.**  Why have you not pursued it?
13     **A.**  Because it is a long, arduous, expensive
14 initiative that we felt the return of doing that
15 was greatly outweighed by the investment and time
16 on that project which could be spent better on
17 other projects.
18     **Q.**  Okay.  If I were to present you with
19 the -- the FedRAMP assessment documents, would you
20 be in a position to talk about any of the
21 technical issues set forth in them, or would you
22 be deferring to the testimony of other witnesses
23 who had spoken to the technical issues?
24     **A.**  Yeah, I would not recall the reasons
25 for -- or understand the controls or understand

189

1  the reasons for the assessment underneath it.  I
2  would defer to Kellie.
3      **Q.**  Was there ever -- so you had said that
4  this effort was not a technical person going forth
5  and really evaluating whether SolarWinds was
6  following its controls correctly.
7          Was there such an assessment by some
8  technical person at some point in the relevant
9  period?
10         MR. TURNER:  Object to form.
11     **A.**  Based on 800-53 or FedRAMP?
12     **Q.**  Or in the cybersecurity framework
13 generally.
14         MR. TURNER:  Object to form.
15     **A.**  Yeah, there -- there was never a
16 technical person that did a FedRAMP assessment --
17     **Q.**  Okay.
18     **A.**  -- that I'm aware of.
19     **Q.**  Was there -- let me see if I can look at
20 the prior answer.
21         In the prior answer, you had said "This
22 was not a technical person reviewing our
23 cybersecurity program fact-finding and assessing
24 the program."
25         At some point in the 2018 to 2020 time

190

1  frame, was there a technical person reviewing your
2  cybersecurity program, fact-finding and assessing
3  the program?
4          MR. TURNER:  Objection to
5          form.
6      **A.**  Broad question, but if you look at,
7  like, the security scorecards and kind of
8  subjective determinations that folks were making
9  there, I would say they were assessing our
10 cybersecurity program, yes.
11     **Q.**  Are there -- were there any other
12 routine efforts at SolarWinds other than
13 these NIST cybersecurity scorecards that
14 represented this kind of effort by the technical
15 people to assess the state of the cybersecurity
16 program?
17     **A.**  I'm sure.
18     **Q.**  What were those?
19     **A.**  I mean, there's lots of examples in the
20 broad definition of that:  Penetration testing,
21 things that the information security team would
22 do, things the product security team would do.
23 They're too voluminous for me to -- to cite them
24 all, yeah.
25     **Q.**  And I was referring specifically to

191

1  assessment of the program as a whole.
2          Other than the -- the -- the
3  cybersecurity, the NIST scorecards, were there
4  efforts to assess the state of the program as a
5  whole?
6          MR. TURNER:  Object to form.
7      **A.**  I -- I just don't understand that
8  question.
9      **Q.**  Okay.  We'll see the specific ones
10 later.
11         Turn your attention to Topic 8.b, the
12 deposition notice, which is the "April 2021
13 assessment of" sober -- "SolarWinds'
14 cybersecurity using NIST 800-53 referred to in
15 SW-SEC185450."
16         (Whereupon, exhibit is received
17         and marked Bliss Deposition Exhibit 10
18         for identification.)
19         THE REPORTER:  Bliss 10 for
20         identification.
21 BY MR. TODOR:
22     **Q.**  Okay.  Mr. Bliss, you've been presented
23 with a document marked as Bliss Exhibit 10 for
24 identification; has Bates number SW-SEC00185450
25 through 5453.  It appears to be an email sent from

192

1 investing, the static state today is going to
2 leave us in a vulnerable state. And I hope every
3 cyber person thinks that because if you stand
4 still, you will be in a vulnerable state years
5 from now as the macro is changing.
6       And I think that's -- the risk here that
7 he's identifying is the macro's changing
8 dramatically and we need to be investing in that.
9     Q.  What is SolarWinds' understanding as to
10 whether Mr. Brown was using hyperbole in this
11 statement?
12    A.  I would -- I would think he is using
13 hyperbole in this statement.
14    Q.  What's SolarWinds' basis for that
15 conclusion?
16    A.  It's natural human nature when you're in
17 a budget request to be -- particularly in cyber,
18 to be stating things of why you need budget. But,
19 again, this isn't a fact of which he's being
20 hyper -- hyperbolic about. This is a risk he's
21 identifying.
22    Q.  I direct your attention down to the
23 fifth bullet. There's a statement: "Without
24 training our employees will continue to be one of
25 our biggest risks," which is coded in red.

217

1       What is SolarWinds' understanding as to
2 why that's coded in red?
3    A.  I don't have recollections as to why
4 this is a red.
5    Q.  What was the status of SolarWinds'
6 security training initiatives in October 2018 as
7 they related to secure development training?
8       MR. TURNER:  Objection to
9       form and scope and foundation.
10    A.  As it related to the Colquitt
11 initiative?
12    Q.  So I'm referring specifically -- there's
13 a budget request slide here --
14    A.  Mm-hmm.
15    Q.  -- on the right that says "Secure
16 Development Training, $30,000," and that is coded
17 in red.
18    A.  Mm-hmm.
19    Q.  So what is SolarWinds' understanding as
20 to why that is coded in red?
21    A.  I don't have a specific recollection as
22 to why that is coded in red, but as a reminder,
23 Steven Colquitt had a program that he was
24 introducing to up-level the secure development
25 within the company. And as with a program that

218

1 big, it takes time to implement. And as you talk
2 about training people, you're training people not
3 just on the programs and the workflows, but on new
4 tools you're introducing, for instance, and
5 operationalizing that.
6       So you're doing that on a regular
7 cadence. So when you bring in new developers or
8 you acquire companies and you bring in developers
9 en masse from acquisitions, you can get them to
10 scale up the learning curve and standardize with
11 the procedures he was recommending to augment our
12 activities.
13    Q.  Was this secure development training a
14 budget request for an additional $30,000 approved?
15    A.  I don't recall what the request was for
16 or what was funded and whether it wasn't needed to
17 be funded because, for instance, he might have
18 been thinking about a tool, but we just
19 encompassed it into our broader training tool, for
20 instance, so I don't have the answer to that.
21    Q.  You said in an earlier answer that
22 this -- that these risks of noninvestment were not
23 factual findings.
24       Is that what you said?
25    A.  That first one in particular, yeah.

219

1 That's an identified risk of in Tim's mind what a
2 risk would be, much like we would say in risk
3 factors, if we stayed still.
4    Q.  So is the statement "Current state of
5 security leaves us in a very vulnerable state for
6 our critical assets" not a factual finding?
7    A.  I do not think it is a factual
8 finding.
9    Q.  Why not?
10    A.  I don't think that they believed there
11 was any material issue with their cybersecurity
12 program at this time.
13    Q.  Why is saying "a very vulnerable state"
14 not saying that there was a material issue with
15 the cybersecurity program?
16       MR. TURNER:  Okay. Object.
17       You're asking him about Tim's state of
18       mind. Tim has already testified that
19       this was not a factual finding. You're
20       asking about the company's position.
21       He's told you the company's position.
22       Beyond that I'm -- I'm not sure
23       what other information this witness has
24       to provide.
25       MR. TODOR:  That's what I'm

220

1    trying to find out.
2         A.   I'd just go back to my hyperbole
3    comments and he's identifying a risk and this is
4    not a factual finding.  And I'd defer to his
5    testimony with respect to that as well.
6         Q.   Turning your attention to the third
7    bullet on 3361 under "Risk of Noninvestment."
8    There's a statement:  "We have had 22 reported
9    security incidents this year.  Reactive responses
10   costs significantly more than being proactive."
11   It appears to be coded red.
12        What's SolarWinds' understanding as to
13   why that's coded red?
14             MR. TURNER:  Objection to
15        scope.
16        A.   I don't recollect the reason for why
17   that's red.
18        Q.   I direct your attention --
19        A.   I defer -- I defer to Tim's testimony.
20        Q.   Okay.  I direct your attention to the
21   "Overall Budget Request" section to the section on
22   "internal/external pen test."  And there are
23   figures that are coded yellow.
24        What's SolarWinds' understanding as to
25   why that's coded yellow?

221

1         A.   Again, I'd defer to Tim's testimony on
2    why that's yellow.
3         Q.   Did SolarWinds make a decision to
4    prioritize internal as opposed to external pen
5    testing at this time?
6             MR. TURNER:  Objection to
7        form, foundation, and scope.
8         A.   I would defer to Tim if he testified on
9    that, but I don't know.
10        Q.   Okay.
11             MR. TODOR:  Next document.
12             (Whereupon, exhibit is received
13        and marked Bliss Deposition Exhibit 14
14        for identification.)
15             THE REPORTER:  Bliss 14 for
16        identification.
17             THE WITNESS:  Thanks.
18   BY MR. TODOR:
19        Q.   And you've been presented with a
20   document marked as Bliss Exhibit 14 marked with
21   Bates SW-SEC00001635 through 1652.  Appears to be
22   a PowerPoint, "SolarWinds Security and Compliance
23   Program Quarterly, May 17, 2019."
24        So what was the purpose of security and
25   compliance program quarterly documents within

222

1    SolarWinds?
2         A.   I'd have to be reminded on the audience
3    for this particular one.
4         Q.   What is your understanding of who the
5    audience was?
6         A.   So -- so there are various reports of
7    security compliance programs that would be perhaps
8    more detailed within the IT organization that
9    would get summarized as -- as we went to report to
10   the executives, for instance.  I'm not sure which
11   one this exactly is.  It looks to me like it's for
12   presentation to the IT organization given the
13   cover, but I didn't want to presume that without
14   knowing.
15        Q.   If you look at the second page, it looks
16   like there are security and compliance initiatives
17   as "legal, financial, product, federal, security,
18   and information technology."
19        Does that suggest anything to you about
20   who the audience would be?
21        A.   No, not this slide.  No.
22        Q.   Okay.  Is it likely it's someone fairly
23   senior?
24        A.   I don't know.
25        Q.   Do you have any knowledge -- and you can

223

1    look at the page 1641 for security compliance
2    initiatives listed for security.
3         Do you have any knowledge of the
4    technical input that went into these?
5         A.   Are you asking if I have knowledge as to
6    the kind of diligence underneath these?
7         Q.   Yeah.  So, like,what would be the -- the
8    workflow for coming up with that first item,
9    "Secure Development Life Cycle, working with the
10   engineering and development teams to continue to
11   mature and adopt the SDL"?
12        How was that statement generated?
13        A.   I don't know who authored it or
14   generated it.
15        Q.   Okay.  Would it be a typical practice
16   for the information security group to take the
17   lead on developing the security and compliance
18   initiatives for security?
19             MR. TURNER:  Object to form.
20        A.   Can you say that maybe slightly
21   differently?
22        Q.   Okay.  So the secure development life
23   cycle says "Working with the engineering and
24   development teams..."
25        Who is working with the engineering and

224

1  development teams?
2      A.  I'm not sure exactly again audience and
3  who's saying that, but I would assume it is the IT
4  team broadly speaking under Rani.
5      Q.  Okay.
6      A.  You see on the right under "Teams," it
7  talk about -- talks about the teams who were
8  involved, it looks like.  That's engineering and
9  DOIT, which was the catchy name that Rani had for
10  the IT team.
11      Q.  That's all on that one.
12          (Whereupon, exhibit is received
13          and marked Bliss Deposition Exhibit 15
14          for identification.)
15          THE REPORTER:  Bliss 15 for
16          identification.
17  BY MR. TODOR:
18      Q.  And you've been handed a document marked
19  as Bliss Exhibit 15.  It has Bates SW-SEC00001497
20  through 1550.  Appears to be a PowerPoint,
21  "SolarWinds Security and Compliance Programs,
22  Quarterly Overview, August 16, 2019."
23          Do you have an understanding as to the
24  audience for this document?
25      A.  I -- not precisely, but my understanding

225

1  by looking at it here is that it probably had an
2  executive audience and I would -- don't know
3  who -- what that large group is.  This could be a
4  precursor to the QRRs.
5      Q.  Okay.  And the QRRs, was there a
6  regular meeting group who would meet to discuss
7  the QRRs?
8      A.  That would be the -- the audience for
9  when the QRRs were presented?
10      Q.  Yes.
11      A.  Yes.  Every at least quarter we would
12  have an overall readout between the CFO, myself,
13  Joe Kim, Rani would be included, and then Tim and
14  members of the various teams.
15      Q.  Okay.  Were -- were there similar
16  meetings to discuss these security and compliance
17  program quarterly overviews?
18      A.  That -- that's my only hesitation.  I
19  believe this was a precursor to it being called
20  the quarterly risk review.
21      Q.  Okay.
22      A.  And this is a similar meeting, but I
23  can't verify that without the company invite or
24  email.
25      Q.  Okay.  I'll direct your attention to

226

1  Bates 1504 and 1505, which 1504 appears to be
2  overview of SolarWinds' security program.
3          Are -- are you there?
4      A.  Mm-hmm.  Yes.
5      Q.  And 1505 appears to be a SolarWinds
6  scorecard for NIST maturity level?
7      A.  Yes.
8      Q.  Was this the first time the NIST
9  maturity level scorecard was reported to senior
10  management to SolarWinds's knowledge?
11      A.  I believe it was.
12      Q.  What was the purpose for presenting the
13  SolarWinds' NIST maturity level scorecard to
14  senior management at this time?
15      A.  So I want to be specific.  This was the
16  first time this format was used.  That's what the
17  scorecard was, was a template, as I mentioned
18  earlier in my deposition, of broadcasting the NIST
19  maturity level in this type of arrangement.
20      Q.  Okay.  How, if at all, were the NIST
21  maturity levels reported to senior management
22  before implementation of having these
23  scorecards?
24      A.  I recollect there being other documents
25  I mentioned, Excels and Word documents, that the

227

1  information security team would have.  And if we
2  had a readout of that before, it would either be
3  through verbal, but probably not the detailed
4  document.
5      Q.  Okay.  Turning your attention here to
6  the scorecard, what was the process for
7  generating the -- the individual numerical scores
8  seen here?
9      A.  So I'd defer to Tim's testimony on this,
10  but ultimately utilizing the NIST CSF categories
11  and subcategories, they would make subjective
12  determinations as to what we were doing and
13  focused on investing in within each of the
14  subcategories and ascribing a score based on where
15  they thought we were at.
16      Q.  If you look at the individual sub scores
17  starting at Bates 1506 going through 1510, those
18  appear to be 2019 NIST maturity level scores.
19          Does SolarWinds have an understanding as
20  to how the scores for 2017 and 2018 were
21  generated?
22      A.  No.  I'd have to defer to the testimony
23  of Eric and Tim.
24      Q.  Okay.  Turn your attention to the Bates
25  1506.  And I'd just ask you also to keep -- and

228

1  you can refer back to 1505.  It has a description
2  of what the various maturity levels are
3  corresponding to under NIST.
4      **A.**  Mm-hmm.
5      **Q.**  I direct you to the "Secure software
6  development life cycle" security category.  And
7  there's an objective:  "Employees are aware of
8  an" -- it looks like "and" should be -- "utilize a
9  security software development lifecycle in their
10  day-to-day activities."  And there's a NIST
11  maturity level of 2.
12      What's SolarWinds's understanding as to
13  why the ranking was 2?
14      **A.**  So this was indicating at this time
15  period part of the initiative that we spoke of
16  with Steven Colquitt and rolling out his
17  enhancement to the development life cycle and
18  making sure not only that people were trained, but
19  that we had an operationalized training system to
20  bring full awareness of the program.
21      And, you know, it's -- again, it's not a
22  zero, which is like it's not happening.  It's a 2,
23  which is not a bad score.  That probably is
24  talking about having documentation in place, for
25  instance, behind it and making sure that we are

1  proactively creating a cadence to train people.
2      **Q.**  Are you aware of any additional security
3  activities as opposed to documentation or
4  standardized training that was being implemented
5  as part of the secure software development life
6  cycle during this period?
7      **A.**  Not specific documentation, for
8  instance, but we had seen some prior evidence of a
9  document that was being revised, for instance,
10  right.
11      **Q.**  Is that -- when we were looking at the
12  list of policies document --
13      **A.**  Correct.
14      **Q.**  -- is that what you're referring to?
15      **A.**  Correct.
16      **Q.**  Turn your attention to the next page,
17  Bates 1607 marked "Protect" at the top --
18      **A.**  Mm-hmm.
19      **Q.**  -- and direct your attention to the
20  bullets at the top under "Highlights."  And the
21  first bullet states "Access and privilege to
22  critical systems/data is inappropriate.  Need to
23  improve internal processes/procedures."
24      What's SolarWinds's understanding as to
25  the basis for that statement?

1      **A.**  I -- I first believe this is a -- again,
2  another hyperbolic statement here probably
3  overstated, because we did have access rights and
4  privilege rights, certainly at a minimum what was
5  in the securities statement.
6      What this might be referring to is we
7  had ongoing improvement processes going on.  And
8  around this time, we were doing various
9  improvement activities around identity management,
10  for instance.  And it was more around
11  standardizing on a tool, standardizing on a
12  process across the entire country.  And we are
13  also implementing Thycotic -- T-H-Y-C-O-T-I-C --
14  privilege access management.
15      And so I think amongst those two
16  projects that were going on for standardization
17  and evolution, that's probably why that bullet
18  existed.
19      **Q.**  You used the term "Thycotic."
20      What does that mean?
21      **A.**  Thycotic is a product, third-party
22  product from a company called -- the product's
23  called Secret Server and it is a tool that helps
24  with privilege access management.
25      **Q.**  What's SolarWinds's understanding as to

1  the critical system/data that are being referred
2  to in that bullet?
3      **A.**  I don't know if there was a specific
4  underlying system or data that is being referred
5  to in this bullet or as a general statement is a
6  belief we have that access and privilege needs to
7  be standardized across the entire company and we
8  need to make improvements in tooling, which are
9  now coming online in the market.
10      **Q.**  What is -- what is SolarWinds's
11  understanding of the processes and procedures that
12  are being referred to in this bullet as needing to
13  improve?
14      **A.**  I think it probably relates to that
15  standardization of processes and procedures
16  through the company around how do you -- you have
17  an identity management program over here, perhaps
18  Google Identity Management.  You have Active
19  Directory.  We're trying to bring Azure on line.
20  A-Z-U-R-E.  And with the standardization of tools,
21  there's also a standardization of process and
22  procedure and workflow that go with that.  And
23  these naturally connect.
24      **Q.**  I direct your attention to the fourth
25  bullet under "Highlights."  There's a statement:

1  "Moving towards zero trust model (where we
2  loosely protect all and strongly protect those
3  that can do material harm).  Less requirements on
4  VPN."
5      What is SolarWinds' understanding as to
6  what the status of progress was towards zero trust
7  model as of the date of this presentation in
8  August 16th, 2019?
9      A.  We -- we're always looking to improve
10 and zero trust is another model that was around
11 that we were looking to make sure that as we
12 provisioned and monitored, we were doing it
13 according to that model.  So it's -- it's just
14 simply an improvement upon the least privilege
15 model that we were implementing at this time.
16     Q.  Why does it say "Less requirements on
17 VPN"?
18     A.  I'm not sure and I'd have to defer to
19 any testimony that discussed that.  It's probably
20 more of a technical issue than I know.
21     Q.  I direct your attention to the "Security
22 Category" section and to the last row there.  It
23 states "Authentication, Authorization and Identity
24 Management," and the objective is "user identity,
25 authentication and authorization are in place and

233

1  actively monitored across the company."  And it
2  says NIST maturity level is 1.
3      What is SolarWinds' understanding as to
4  why the NIST maturity level was 1 for that item?
5      A.  So, again, subjective determination.
6  Generated a conversation in this venue in
7  particular of ongoing activities.  I mentioned
8  Azure, A-Z-U-R-E, as one of those activities.  And
9  it refers again to standardization of the identity
10 management across all of SolarWinds and its
11 properties.
12     Q.  What was SolarWinds' understanding of
13 what steps needed to be taken to improve the NIST
14 maturity level from 1 to a higher level as of this
15 point?
16     A.  The completion of a -- of projects that
17 were in place, in particular Azure AD, and the
18 rolling out of that tool and training behind that
19 tool to the full organization is an example.
20     Q.  Any other examples that you're aware
21 of?
22     A.  I'm not aware of this determination
23 referring to more than that, but I would defer to
24 any testimony that might highlight anything.
25     Q.  I turn your attention to Bates 1523

234

1  within the document.  And this is a slide marked
2  "Financial:  Enterprise Access Management (SOX
3  compliance)."
4      What was the role for, I guess, the --
5  the financial review for enterprise access
6  management at SolarWinds?
7          MR. TURNER:  Objection to
8      form.
9      A.  What -- what do you mean by the
10 process?
11     Q.  So was it something that would be part
12 of the SOX compliance audit?
13         MR. TURNER:  Would -- would
14     what be part of the --
15         MR. TODOR:  Enterprise access
16     management.
17     A.  It would be part of the Sarbanes-Oxley
18 initiative, yes.
19     Q.  Okay.  And I direct your attention to
20 the description that states "Access management
21 describes the management of individual identities,
22 their authentication, authorization, roles, and
23 privileges within the enterprise in order to
24 minimize security risks associated the use of
25 privileged and nonprivileged access."  It

235

1  looks like there probably should have been a
2  "with."
3      Was that an initiative at SolarWinds to
4  improve on access management in the -- on around
5  August 2019?
6          MR. TURNER:  Object to form.
7      A.  I think this was an attempt to describe
8  what this project is.
9      Q.  Okay.
10     A.  Probably imperfect.
11     Q.  Okay.  And looking at the "Issues, Risks
12 and Dependencies," category 1.1, it says "Concept
13 of least privilege not followed as a best
14 practice."
15     What was SolarWinds' basis for
16 describing that as an issue, risk, or
17 dependency?
18     A.  I believe that's an identified risk.
19 That could be the case, but I don't know -- I
20 don't agree that least privilege was not followed,
21 if that's your question, at this time period
22 because there's ample evidence that it was.
23     Q.  Okay.  There are some timelines here,
24 key milestones.
25     Do these relate to progress on the

236

1  cadence or not on when to assess it, but -- yeah,
2  I'd defer to testimony on that from Eric and Tim
3  in particular.
4      Q.   Was there an every three months, every
5  six months, annual-type review of the scorecards
6  as a general matter?
7      A.   At a minimum, we would see annual
8  updates.  But I don't know with Eric and Tim the
9  cadence of their revisiting the maturity level and
10 the audit they performed on that or --
11     Q.   And by "cadence," were you referring to
12 frequency of -- of regularly conducted activity of
13 some kind?
14     A.   Only with respect to them taking on the
15 task to go through the subjective determination in
16 their mind as to the snapshot in time as to where
17 we stand across the NIST CSF.  I'm not sure
18 there's a formulaic time period you should be
19 doing that on.  NIST certainly is a voluntary
20 program to begin with.
21         So I don't know if that team had a
22 defined time period that they would do that on or
23 if they would do interim checks.
24     Q.   Okay.
25              MR. TURNER:  JJ, do you have

                          245

1          any idea how much longer you have?
2              MR. TODOR:  Depends on how long
3         the answers take.
4              MR. TURNER:  Always.
5              MR. TODOR:  Yeah.
6              MR. TURNER:  Assuming we're --
7              MR. TODOR:  An hour-ish range
8         probably.
9              MR. TURNER:  -- a cadence.
10        Okay.
11             (Whereupon, exhibit is received
12        and marked Bliss Deposition Exhibit 17
13        for identification.)
14             THE REPORTER:  Exhibit 17 for
15        identification.
16             MR. TODOR:  Thank you.
17 BY MR. TODOR:
18     Q.   And, Mr. Bliss, you've been presented
19 with a document marked Bliss Exhibit 17.  It has
20 Bates SW-SEC00001608 through 1634.  It appears to
21 be a --
22             THE REPORTER:  Three-four?
23             MR. TODOR:  Three-four.
24     Q.   It appears to be a PowerPoint marked
25 "SolarWinds Q1 2020 Quarterly Risk Review (QRR)."

                          246

1          What is the difference, if any, between
2  a quarterly risk review and a security and
3  compliance quarterly review within SolarWinds?
4      A.   So Exhibit 15 is a security and
5  compliance program quarterly overview without the
6  subheader of --
7      Q.   Okay.
8      A.   -- DOIT, D-O-I-T.
9          That, again, looked to have an executive
10 audience.
11         The Q1 2020 QRR, this one has a
12 subheader that says "Security and compliance
13 program office," which then goes on to describe
14 Dev-Ops plus IT plus legal plus finance.
15         I am not certain if this is the same as
16 the QRR presented to executives or not.
17     Q.   Okay.  What executives would attend the
18 QRR presentations?
19     A.   Typically Joe, myself, Bart Kalsu and --
20 those are the executives.  You had Rani and Tim as
21 next layer down.
22     Q.   Okay.  I'll direct your attention to
23 page 4 of the deck with Bates 1611.  It's marked
24 as "SolarWinds scorecard NIST maturity level."
25         What is SolarWinds' understanding as to

                          247

1          how those 2020 targets were generated?
2      A.   I'd defer to Eric and Tim's testimony on
3  that.
4      Q.   Okay.  I direct your attention to the
5  "Identify Key Risks" section.  There's a
6  statement: "Security processes not consistently
7  implemented."
8          What is SolarWinds' understanding of the
9  basis for identifying that as a key risk?
10     A.   I'm not sure of the underlying reasons
11 there as to why that is identified as a risk.  Not
12 an issue but a risk.
13     Q.   Okay.  Were there -- was SolarWinds
14 aware of any security processes that were not
15 consistently implemented as of the March 3rd,
16 2020, date of this QRR?
17             MR. TURNER:  Objection; form,
18        foundation, and scope.
19     A.   No.  I -- I -- again, as it relates to
20 identify, we were always looking to standardize
21 and to automate.  And if there's processes,
22 there's security processes, they may be fine in
23 each system, but they're not consistent amongst
24 the two.  That's the only thing I can think of.
25     Q.   Under "Key Improvements," the first

                          248

1    A.  I'm sorry.  Is your question whether
2  there were any access?
3    Q.  Access audit deficiencies brought to
4  SolarWinds' senior management around this time.
5    A.  I'm --
6        MR. TURNER:  Object to scope,
7      foundation.
8    A.  I'm not sure around this time, but,
9  again, with user access reviews, we might find
10  isolated cases of access rights that we'd identify
11  and the team would remediate.
12    Q.  Okay.  Do you recall any specific action
13  items taken as a result of this one?
14    A.  I honestly can't read the left side of
15  this slide so it's tough for me to say.
16        (Whereupon, exhibit is received
17      and marked Bliss Deposition Exhibit 19
18      for identification.)
19        THE REPORTER:  Bliss 19 for
20      identification.
21  BY MR. TODOR:
22    Q.  This is a document marked Bliss 19.  It
23  has Bates SW-SEC00388330.  Appears to be an email
24  from Danielle Campbell to various individuals
25  March -- dated March 2nd, 2020.  "Subject:  SOX:

257

1  Control Deficiencies FY19."  And then the body of
2  the email states "Hi, I wanted to send you an
3  email to let you know that we have control
4  deficiencies from our FY '19 SOX audit that
5  will need to be remediated by your teams.  I have
6  set up meetings with the control owners over the
7  next couple of weeks.  The goal of these meetings
8  will be to determine what remediation steps will
9  be taken and how quickly they can be put in
10  place."
11        Was it a routine audit function to have
12  audits as to SOX control deficiencies as they
13  related to SolarWinds' access controls as of
14  fiscal year 2019?
15    A.  This was -- yes.  This was part of the
16  auditing of access controls that we would do to
17  make sure that we were implementing them in the
18  right manner.
19    Q.  And at the bottom of the email, there's
20  a statement:  "We have the security and compliance
21  quarterly risk review meeting tomorrow with Jason
22  Bliss and Bart Kalsu.  We have a couple slides
23  dedicated to the SOX findings.  I did not want it
24  to be a surprise to you that these are included in
25  that discussion."

258

1        Was part of your and Mr. Kalsu's duties
2  to have briefings on SOX control deficiencies?
3    A.  Yes.  In the QRR, we would --
4    Q.  Mm-hmm.
5    A.  -- see these.
6    Q.  And would those include audit findings
7  related to access controls?
8    A.  It would have identified at a higher
9  level the summary of the issues, yes.
10    Q.  And coming back to the Q2 2020 document
11  we were looking at, does this -- does that appear
12  to be dealing with the audit findings with
13  respect to access that are being alluded to in the
14  email?
15    A.  You're talking about Slide 17?
16    Q.  The slide with --
17    A.  The one I couldn't read?
18    Q.  Yeah.  The one -- yes.
19    A.  I don't know if this is specifically a
20  readout of what this email pertains to.  I
21  remember a more simplified form than this.
22    Q.  Okay.  And as you're aware -- are you
23  aware of any action SolarWinds took with respect
24  to remediating an audit efficiency with respect to
25  access controls in or after March of 2020?

259

1    A.  So this audit would identify where there
2  are exceptions to the overall access policy and
3  would then remediate those to the extent they can
4  be remediated.
5        So, yes, I -- I do know there are
6  activities to remediate findings of -- through
7  user access reviews, for instance.
8    Q.  Okay.
9        (Whereupon, exhibit is received
10      and marked Bliss Deposition Exhibit 20
11      for identification.)
12        THE REPORTER:  Bliss 20 for
13      identification.
14  BY MR. TODOR:
15    Q.  Mr. Bliss, you've been presented with a
16  document marked Bliss Exhibit 20.  It has Bates
17  SW-SEC00001582 through 1601.  Appears to be a
18  PowerPoint marked "SolarWinds Q4 2020 Quarterly
19  Risk Review" dated October 27, 2020.
20        Is this another quarterly risk review
21  slide deck that you would have received --
22  reviewed along with senior management at
23  SolarWinds?
24    A.  This does look like the QRR deck and I'm
25  assuming this is the final version, but I can't

260

1  confirm that without source.
2      Q.  Okay.  And I'll refer your attention to
3  Bates 1587, the one that marked as the "SolarWinds
4  scorecard."
5      And was SolarWinds's understanding as to
6  the progress, if any, made with respect to the
7  second half of 2020 improvement plan items that
8  are listed first for "Identify" for "Increase SDL
9  awareness and adoption" compared to the previous
10 QRR that we reviewed?
11     A.  That was Exhibit...
12     Q.  This one was 18.  Would have been --
13 this one is 20.  It would have been 18.
14     A.  Okay.  So the key risks are the same,
15 which is what I would expect.  The improvement
16 plan has some changes on it.
17     Q.  And what -- was there any -- what --
18 what was the state of progress on those
19 improvement plans according to SolarWinds'
20 knowledge of this review compared to the prior
21 ones we looked at?
22         MR. TURNER:  I would just
23         note there -- there are two prior pages
24         that seem to go into greater detail on
25         this.  There are also a number of

261

1          second-half updates after the -- this
2          slide as well.
3  BY MR. TODOR:
4      Q.  I guess -- let me ask this way.
5      Do you have any reason -- does
6  SolarWinds have any reason to believe that the
7  descriptions of the projects and their update
8  status as listed in this slide deck are
9  inaccurate?
10     A.  I'm not sure if they accurately or
11 inaccurately project activities going on.  You
12 know, one obvious observation is the world pretty
13 much blew up in this time right now, right?  So
14 this was COVID and our entire employee workforce
15 was now at home.  So, you know, this wasn't
16 predicted earlier in 2020.  And as any good team
17 does, they would have to shift priorities to
18 addressing that which was an impressive effort.
19     So I think that context is super
20 critical to this entire assessment of 2020 and I
21 trust there were some advances.
22     Q.  Mm-hmm.
23         (Whereupon, exhibit is received
24         and marked Bliss Deposition Exhibit 21
25         for identification.)

262

1          THE REPORTER:  Bliss 21 for
2          identification.
3  BY MR. TODOR:
4      Q.  Okay.  You've been marked -- presented a
5  document marked Bliss 21.  It has Bates
6  SW-SEC00006628 through 664 -- 6628 through 6648.
7  Appears to be a PowerPoint marked "SolarWinds PM
8  Security Vulnerability and Incident Review, July
9  10, 2020."
10     What was the function of this document
11 within SolarWinds?
12         MR. TURNER:  Object to scope
13         and foundation.
14     A.  I'd have to defer to the testimony of
15 Tim.
16     Q.  Okay.  Is -- to your understanding, is
17 this a document Mr. Brown would have prepared?
18         MR. TURNER:  Same objection.
19     A.  I am not sure if Tim would prepare this,
20 contribute to it, or not.
21     Q.  I turn your attention to Bates 6635, and
22 this is a slide marked "ITOM Core Highlights and
23 Asks."
24     What does ITOM mean?
25     A.  ITOM here refers to the business unit

263

1  that I previously referred to called Core-IT.  It
2  had a different nomenclature, but ITOM was this
3  kind of preceding this.
4      Q.  I direct your attention to under
5  "Highlights."  The fourth bullet there states:
6  "Inconsistent internal security testing as part of
7  product final security reviews don't always
8  include web application testing before release."
9      What is SolarWinds' understanding as to
10 the basis for that statement?
11     A.  I'd have to defer to the testimony of
12 somebody like Tim on this, but it's under
13 "Highlights" with both Whitesource and checkmarks
14 with green checkmarks next to them --
15     Q.  Mm-hmm.
16     A.  -- which my interpretation of this is
17 this is an improvement on the overall program that
18 you're looking at.
19     Q.  Okay.  And what are Whitesource --
20 what's Whitesource?
21     A.  It's a -- it's a tool in the development
22 life cycle.  What precisely it does, I'd have to
23 defer to Tim's testimony on.
24     Q.  Okay.  And I think you discussed
25 checkmarks previously.

264

1    Is that --
2    **A.** I did.
3    **Q.** -- the same understanding as to what
4 function it would have with respect to internal
5 security testing as in your prior answer?
6    **A.** Yes.
7    **Q.** There's a -- the first bullet states
8 "Customers continue to actively engage third-party
9 penetration testers as part of their compliance
10 efforts."
11    Does that -- what is SolarWinds'
12 understanding as to why the customers would be
13 engaging third-party penetration testers?
14    **A.** The industry at large was evolving
15 around this time. And just like we were getting
16 more questions, people were now engaging with
17 penetration testers that they preferred or liked
18 and we rely on those.
19    **Q.** Okay. Was this a statement that
20 SolarWinds's penetration testing was inadequate?
21    **A.** No.
22    **Q.** What's the basis for that statement or
23 that response?
24    **A.** My general experience with these
25 customer inquiries is there are a number of

265

1 penetration tools that were out there and we used
2 some of them and they were good. Customers would
3 sometimes use a different tool and would not
4 necessarily rely on what the company had done with
5 their tool.
6    So that just created potential friction
7 and, thus, create a risk in the sales process.
8    **Q.** Okay.
9    MR. TURNER: Jason, I think the
10    question was, was the fact that customers
11    were doing pen tests at all an indication
12    SolarWinds' pen testing was inadequate?
13    THE WITNESS: The -- the answer
14    to that is no, and it was more just this
15    is part of customer activity of doing pen
16    tests themselves just like we would on
17    vendors.
18 BY MR. TODOR:
19    **Q.** Do you have any other understanding as
20 to why that was listed as a -- a highlight in
21 that section beyond what you've testified to so
22 far?
23    **A.** No.
24    MR. TODOR: We are getting to
25    Topic 8.d. We can either press on or

266

1 if you need to take a break, we can do
2 that.
3    MR. TURNER: Up to you, Jason.
4    THE WITNESS: Let's take a
5 quick break before my bladder blows up.
6    THE VIDEOGRAPHER: The time
7 right now is 6:28 p.m. and we are off the
8 record.
9    (Whereupon, a recess is taken.)
10    THE VIDEOGRAPHER: The time
11 right now is 6:44 p.m. and we're back on
12 the record.
13 BY MR. TODOR:
14    **Q.** Hello again, Mr. Bliss. I direct your
15 attention to Topic 8.d of the deposition notice,
16 which is "Internal audits relating to
17 cybersecurity practices, including, but not
18 limited to, audits of IT general controls,
19 Sarbanes-Oxley audits, SOC Type 2 audits, and ISO
20 27001 audits," and then some Bates numbers.
21    We discussed SOX audits earlier.
22    Are you aware -- is SolarWinds aware of
23 any other findings in SOX audits with respect to a
24 deficiency with respect to access controls other
25 than the one that we discussed in the March 2020

267

1 email and in the QRR?
2    **A.** I don't --
3    MR. TURNER: Objection to
4    scope.
5    **A.** I don't recall any other than those
6 isolated events that we looked at.
7    **Q.** Okay. And in audits of IT general
8 controls, were there any findings of
9 deficiencies with respect to access controls
10 at SolarWinds --
11    MR. TURNER: Same objection.
12    **Q.** -- in the relevant time period?
13    **A.** I don't -- I mean, you the word
14 "deficiency." I'd say there were exceptions to
15 the overall access rights that were identified and
16 remediated, none of which rose to the level of a
17 significant deficiency, much less a material
18 weakness, for instance.
19    So I hesitate to call it deficiency
20 because it relates to an accounting term.
21    **Q.** Okay. With respect to SOC Type 2
22 audits, were there any findings of deficiencies
23 with respect to access controls in the relevant
24 time period?
25    **A.** I don't recall. Obviously, a SOC-2

268

1 audit is a very intense review of all sorts of
2 things on products and controls. Obviously, well
3 beyond the types of things said in the security
4 statement.
5     **Q.** Okay. Were there any deficiencies found
6 relating to issues of the issues we've been
7 discussing with respect to the security statement
8 for access controls, software development life
9 cycle, network monitoring, or password policy in
10 the SOC-2 audits?
11     **A.** Nothing that I recall as material,
12 no.
13     **Q.** Is that the same for the Sarbanes-Oxley
14 audits?
15     **A.** Nothing material, yeah.
16     **Q.** And is that the same for the IT general
17 control audits?
18     **A.** Yeah, nothing material.
19     **Q.** What is an ISO 27001 audit?
20     **A.** I'll defer to someone on the technical
21 side that -- to explain this, but from a very high
22 level, an ISO 27001 is more about a location than
23 a product, for instance. So where you might house
24 data or things of that sort.
25     **Q.** Okay. And were there any deficiencies

269

1 found in any of those audits that would relate to
2 the issues we've been discussing with respect to
3 the security statement of access controls,
4 software development life cycle, network
5 monitoring, or password policy?
6     **A.** Nothing material.
7     **Q.** Turn to Topic 8.e in the deposition
8 notice, which is "MSP products security
9 evaluations, including, but not limited to,
10 SW-SEC00166790." And I have a document for you.
11     (Whereupon, exhibit is received
12     and marked Bliss Deposition Exhibit 22
13     for identification.)
14     THE REPORTER: Bliss 22 for
15     identification.
16 BY MR. TODOR:
17     **Q.** And you've been presented with a
18 document marked Bliss 22. It has Bates
19 SW-SEC00166790 through 6799. Appears to be a
20 document marked "SolarWinds MSP Products Security
21 Evaluation, Confidential, July 2019."
22     Did you review this document for your
23 deposition preparation?
24     **A.** I've seen this document in the course of
25 the depositions, yes.

270

1     **Q.** What was the purpose of this document?
2     **A.** I don't know.
3     **Q.** Who are Stas Starikevich and Wojciech
4 Pitera?
5     **A.** Other than members of the MSP team, I --
6 they're not part of leadership and I don't know
7 them.
8     **Q.** Okay. I turn your attention to the page
9 marked Bates 6792. And under "Summary
10 Objectives," it states "Perform high level
11 assessment of the operational maturity level that
12 exists today for our key products - RMM, N-central
13 and backup."
14     Are those key products in the MSP group
15 as of this time?
16     **A.** Yes, those are products within the MSP
17 business unit.
18     **Q.** Okay. And turning your attention to the
19 heading "Methodology," statement is "NIST, the
20 enterprise standard security framework is being
21 used to perform the assessments that will allows
22 us to improve our ability to prevent, detect and
23 respond to cyber attacks."
24     What is SolarWinds' understanding as to
25 why this analysis or this assessment was being

271

1 done pursuant to the NIST security framework?
2     **A.** I don't think SolarWinds has an
3 understanding of why this analysis was being done
4 or being done according to NIST. And given his
5 reference to NIST as the enterprise security
6 framework, I'm not sure, you know, what it is.
7     **Q.** Was it a regular practice of SolarWinds
8 to conduct assessments of the security of its MSP
9 products?
10     **A.** Can you specify your question a little
11 bit? Because there are nuances.
12     **Q.** Was it something to be done on a regular
13 basis, like quarterly/annual, something like that,
14 or was this a one-time thing?
15     **A.** I'm not sure.
16     **Q.** Okay. I turn your attention to the next
17 page of the document with Bates 6793. And turn
18 your attention to the third subheading under
19 "Asset Management," which is "Communication and
20 data flows are mapped." And please read that
21 paragraph and familiarize yourself and let me know
22 when you're ready to discuss.
23     **A.** Okay.
24     **Q.** First statement is "Design documentation
25 overall is lacking and unstructured for the

272

1  majority products," I'm guessing it could be "of
2  products."
3         What is SolarWinds' understanding for
4  the basis for that statement?
5      A.  I don't have any basis for that
6  statement.
7      Q.  Okay.  The second sentence states "In
8  addition, there is no governance in place to help
9  provide consistency."
10         What is SolarWinds' understanding of the
11  basis for that statement?
12      A.  I -- SolarWinds doesn't believe there is
13  a basis for this statement.  We just pored through
14  a number of large documents that suggest
15  otherwise.
16      Q.  And with respect in particular to the
17  RMM and central and backup documents that are
18  being referred to as "key MSP products" on the
19  previous page, what is SolarWinds' understanding
20  as to the design documentation for those products
21  as relates to the issues discussed here?
22         MR. TURNER:  Objection to form
23      and scope.
24      A.  I don't think that SolarWinds
25  understands these authors and what they're trying

273

1  to communicate with this statement.
2      Q.  Okay.
3      A.  Because it -- the fact that design
4  documentation is lacking, we know there's design
5  documentation for products, so I don't know if
6  he's -- what he's expecting.  And I'm not sure he
7  had a firm basis for that or not.
8      Q.  Does SolarWinds have an understanding
9  of what the governance that is being referred to
10  in the -- the second sentence would be referring
11  to?
12      A.  No.
13      Q.  Turn to the third sentence there.
14  There's a statement "These are crucial for
15  threat modeling and other security activities in
16  SSDLC."
17         What is SolarWinds' understanding as to
18  the basis for that statement?
19      A.  I'm not sure of the precise basis of the
20  statement.  Again, we were doing threat modeling,
21  so I'm not sure where he's getting his information
22  to come to these conclusions.
23      Q.  Was -- is it SolarWinds' understanding
24  that SSDLC is referring to secure software
25  development life cycle?

274

1      A.  I'm not sure if Stas was referring to
2  that specifically or the program.  It's kind of
3  unclear.
4      Q.  Next statement is "This should be
5  covered by architecture, as part of the SSDLC
6  process being formed."
7         What is SolarWinds' understanding as to
8  the basis for that statement?
9      A.  I don't understand the basis for the
10  statement or what he's referring to when he's
11  precisely saying "the SSDLC process" in the
12  statement.
13      Q.  As of July 2019, was there a secure
14  development life cycle process being formed for
15  MSP products separate from that for the Core-IT?
16      A.  I'm not aware of one.
17      Q.  By "architecture," which group at
18  SolarWinds is being referred to there to
19  SolarWinds' knowledge?
20      A.  Not -- I don't understand precisely
21  which team he's referring to, but there is a group
22  that's considered architects in engineering.
23      Q.  I turn your attention to the next page
24  of the document, Bates 6794.  And I'll turn your
25  attention to the heading "Risk assessment

275

1  (Identify)," and would ask you to look first at
2  the first subheading there.  Let me know when
3  you're ready to discuss.
4      A.  Okay.
5      Q.  And the first subheading is "Asset
6  vulnerabilities are identified and documented."
7  The statement is "Each product seems to have its
8  own ways of marking security issues that do not
9  follow recently established SW standards."
10         What is SolarWinds' understanding for
11  the basis for that statement?
12      A.  I don't think we understand the basis of
13  the statement and I'm not sure I understand what
14  the statement is really saying.
15      Q.  Next -- I'd ask you to read the next
16  subheading and statement and let me know when
17  you're ready to discuss.
18      A.  Okay.
19      Q.  And the statement "Currently, there is
20  no formal process in place for reporting" --
21  the -- the heading "Threat and vulnerability
22  information is received from external sources."
23  The first statement is "Currently, there is
24  no formal process in place for reporting
25  purposes."

276

1     What is SolarWinds' understanding for
2  the basis for that statement?
3     **A.**  I have no understanding for the basis of
4  that statement because there was a process in
5  place for reporting purposes.
6     **Q.**  I direct your attention to the last
7  sentence in that section.  There's a statement, "A
8  pre-requirement to have a policy to maintain
9  proper third-party asset list, OS versions
10  utilized, et cetera, to have data to work with."
11     What is SolarWinds' understanding for
12  the basis for that statement?
13     **A.**  SolarWinds doesn't understand what that
14  statement is saying.  It -- my guess is this may
15  be an English-as-a-second-language author --
16     **Q.**  Mm-hmm.
17     **A.**  -- and I'm not sure I would apply such
18  precision to much of these words, but I don't
19  understand that last sentence.
20     **Q.**  Okay.  I direct your attention to the
21  third subheading and ask you to review that and
22  let me know when you're ready to discuss.
23     **A.**  Okay.
24     **Q.**  And the first statement, "No" -- the
25  subheading is "Threats internal and external are

277

1     **A.**  I admit I'm not sure what likelihoods
2  and impacts are here, but if it was identifying
3  threats and identifying vulnerabilities and
4  determining risk, yes, we were doing that.
5     **Q.**  Okay.  I turn your attention to Bates
6  6796 within the document and direct your attention
7  to the I guess first main heading "Awareness and
8  Training (protect)," and ask you to read that
9  section and let me know when you're ready to
10  discuss.
11     **A.**  Just the "All users are informed and
12  trained" part?
13     **Q.**  Yes.
14     **A.**  Okay.  Okay.
15     **Q.**  And the statement is -- the subheading
16  is "All users are informed and trained."  The
17  statement is "There is no security awareness
18  training as well there is no security training
19  during the onboarding process."
20     What is SolarWinds' understanding for
21  the basis of that statement?
22     **A.**  Again, I do not know what the basis for
23  that statement was as there was security training
24  being done.
25     **Q.**  There were a lot of I guess what would

279

1  identified and documented."  The statement "No
2  threat modeling nor analysis is performed as part
3  of any process (except MSP backup engineering)."
4     What is SolarWinds' understanding for
5  the basis for that statement?
6     **A.**  We have no knowledge of the basis for
7  that statement, as we know threat modeling was
8  done and analysis was being performed.
9     **Q.**  Okay.  Turn your attention to the fifth
10  subheading.  I'd ask you to help read that with
11  you.  Statement is "Threats, vulnerabilities,
12  likelihoods and impacts are used to determine
13  risk."  The statement is "No coverage due to
14  missing pre-requirements."
15     What is SolarWinds' understanding for
16  the basis for that statement?
17     **A.**  Again, I'm not sure SolarWinds
18  understands what that statement is even saying,
19  much less what the basis of that statement is.
20     **Q.**  Does SolarWinds have an understanding
21  as to whether threats, vulnerabilities,
22  likelihoods, and impacts are used -- were used to
23  determine risk for its MSP products as of July
24  2019?
25     MR. TURNER:  Object to form.

278

1  appear to be alarming statements in here as to the
2  types of security practices.
3     Did SolarWinds take any action in
4  response to this document?
5     MR. TURNER:  Object to the
6     characterization.
7     **A.**  I'm not sure whether there were
8  specific actions taken, but the fact that I don't
9  know these gentlemen's names suggests to me they
10  were likely very junior members of the team that
11  may not have full context or information as to
12  what was going on and perhaps was putting
13  together a document with very bad English that
14  maybe they needed to deliver.  But -- and as
15  part of a smaller business unit of the company, I
16  am not going to be alarmed by simply looking at
17  this.
18     **Q.**  Okay.  Does SolarWinds know to whom this
19  document was sent?
20     **A.**  No.
21     **Q.**  Does SolarWinds know whether any
22  specific action items were taken as a result of
23  any of the statements in the document?
24     **A.**  No.
25     **Q.**  Turning to Topic 8.f in the deposition

280

1 comparison of ourselves versus others. Mostly
2 because it's almost impossible to do because you
3 don't talk about all of your cybersecurity
4 practices in public forums. So we didn't -- we
5 didn't do that side-by-side comparison.
6     Q.  Okay. Was there any respect in which
7 SolarWinds believed that its cybersecurity
8 practices were not up to industry standard in any
9 of the topics we've been discussing in -- with
10 respect to the security statement of access
11 controls, software development life cycle, network
12 monitoring or password policy during the relevant
13 period?
14         MR. TURNER:  Object to scope,
15     form.
16     A.  No. We -- we felt good about our
17 cybersecurity program. And the cyber intrusion
18 was conducted by one of the most sophisticated
19 nation-state actors in the world that would have
20 gotten through most any cybersecurity program. So
21 we did not feel, you know, when we were reviewing
22 it, that we were below any industry standards with
23 respect to cybersecurity.
24     Q.  Okay. I turn your attention to Topic 9
25 of the deposition notice. And first is "Any

285

1 the security statement during the relevant
2 period?
3     A.  No.
4     Q.  Second, did SolarWinds have any
5 communications with investors regarding
6 SolarWinds' cybersecurity practices or the
7 security statement during the relevant period?
8         MR. TURNER:  Objection to scope
9     and -- and form.
10     A.  So by "investors," do you mean public
11 company investors or do you mean our Board?
12     Q.  With public investors.
13     A.  No.
14     Q.  Okay. Without asking about the
15 substance of particular communications with
16 customers, was it the practice of SolarWinds to
17 direct customers to the public-facing security
18 statements to answer questions regarding security
19 practices?
20     A.  I think it was a practice. Was it
21 always the practice to say here's your security
22 statement? I don't think I can say that. It'd
23 depend on the nature of the conversation with the
24 customer, the size of the customer, the inquiries
25 of the customer.

287

1 internal or external communications by SolarWinds
2 concerning," and I have six subparts. The first
3 is "Internal assessments of SolarWinds'
4 cybersecurity practices."
5         My question is, we've looked at a
6 variety of presentation documents today. There's
7 been QRRs, security and compliance quarterlies,
8 information risk reviews, security incident
9 review, a SOX compliance audit.
10         Were there any other kinds of routine
11 assessments of SolarWinds' cybersecurity practices
12 that were presented for -- in the form of a
13 presentation other than those?
14         MR. TURNER:  Object to form and
15     foundation and scope.
16     A.  That is an enormously broad question
17 that I can't recollect anything at this moment.
18     Q.  Okay. Turn to Topic 9.b, which is
19 "Communications with securities analysts,
20 investors, or customers regarding SolarWinds'
21 cybersecurity practices or the security
22 statement."
23         First question:  Did SolarWinds have
24 any communications with securities analysts
25 regarding SolarWinds' cybersecurity practices or

286

1     Q.  Okay. Topic 9.c is "Changes to the
2 security statement."
3         Did SolarWinds make any changes to the
4 security statement during the relevant period of
5 the public-facing security statement?
6     A.  Nothing material.
7     Q.  Topic 9 -- Topic 9.d, "Communications
8 regarding evaluation of changes to the security
9 statement."
10         Did SolarWinds have any internal or
11 external communications regarding evaluating
12 actual or potential changes to the security
13 statement after it was published on the
14 SolarWinds' website during the relevant
15 period?
16     A.  Can you phrase that question maybe a
17 little differently so I understand exactly what
18 you're asking?
19     Q.  Okay. So after -- you said in the
20 previous question there were no change -- there
21 were no material changes made.
22         Did SolarWinds evaluate whether to
23 make any in a process where there was a proposed
24 change and were evaluating whether to make that
25 change?

288

**Page 313**

1  **A.** Well, there are many questions outside
2  of what's here in the knowledge base. So legal
3  would have a level of technical that I explained,
4  but not necessarily to a depth of perhaps somebody
5  in the Dev-Ops team, for instance, and would ask
6  questions -- and that person might have answered
7  the question to begin with -- but asked questions
8  about the veracity of the information.
9       MR. TODOR: No further
10  questions at this time.
11       MR. TURNER: Just briefly.
12  RECROSS-EXAMINATION
13  BY MR. TURNER:
14  **Q.** We talked about vetting these
15  statements. This a password statement, okay, is a
16  statement simply that complex passwords are
17  required that use alpha and numeric characters.
18       Was that done at SolarWinds?
19  **A.** Yes.
20  **Q.** It was done through Active Directory.
21  That's your testimony, right?
22  **A.** Yes.
23  **Q.** Would Eric Quitugua needed to have spent
24  significant time to vet that information?
25  **A.** No.

**Page 314**

1  **Q.** Why?
2  **A.** Because it was obvious.
3  **Q.** Thank you.
4       MR. TURNER: No further
5  questions.
6       MR. TODOR: No further
7  questions at this time.
8       THE VIDEOGRAPHER: The time
9  right now is 7:47 p.m. and we're off the
10  record.
11       (Whereupon, the deposition was
12  concluded at 7:47 p.m.)

**Page 315**

1  STATE OF NEW YORK.    )
2                  ) ss:
3  COUNTY OF NEW YORK    )
4       I hereby certify that the
5  witness in the foregoing deposition, JASON WALLACE
6  BLISS, was by me duly sworn to testify to the
7  truth, the whole truth and nothing but the truth,
8  in the within-entitled cause; that said deposition
9  was taken at the time and place herein named; and
10  that the deposition is a true record of the
11  witness's testimony as reported by me, a duly
12  certified shorthand reporter and a disinterested
13  person, and was thereafter transcribed into
14  typewriting by computer.
15       I further certify that I am not
16  interested in the outcome of the said action, nor
17  connected with nor related to any of the parties
18  in said action, nor to their respective counsel.
19       IN WITNESS WHEREOF, I have hereunto
20  set my hand this 29th day of October 2014.
21       Reading and Signing was:
22  ___ requested    ___ waived   _X_ not discussed
23
24  _____
25       BRIDGET LOMBARDOZZI, CSR, RMR, CRR

**Page 316**

1       CERTIFICATE OF WITNESS
2
3  I, JASON WALLACE BLISS, do hereby declare under
4  penalty of perjury that I have read the entire
5  foregoing transcript of my deposition testimony,
6  or the same has been read to me, and certify that
7  it is a true, correct and complete transcript of
8  my testimony given on October 16, 2024, save and
9  except for changes and/or corrections, if any, as
10  indicated by me on the attached Errata Sheet, with
11  the understanding that I offer these changes and/or
12  corrections as if still under oath.
13       _____ I have made corrections to my deposition.
14       _____ I have NOT made any changes to my deposition.
15
16  Signed: _____
17       JASON WALLACE BLISS 30(b)(6)
18
19  Dated this _____ day of _____ of 20____.
20
21
22
23
24
25