# Exhibit 25

**Excerpts of Eric Quitugua
Deposition Transcripts**

```
 1        UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
          Plaintiff,  )
 6                    ) Case No.
     vs.              ) 23-cv-9518-PAE
 7                    )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9        Defendants.  )
     _____)
10
11
12
13       VIDEOTAPED DEPOSITION OF
14             ERIC QUITUGUA
15             Austin, Texas
16      Tuesday, September 17, 2024
17
18
19
20
21
22
23
24   Reported by:
     Micheal A. Johnson, RDR, CRR
25   Job No. 240917MJ
                    1
```

```
 1        UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
          Plaintiff,  )
 6                    ) Case No.
     vs.              ) 23-cv-9518-PAE
 7                    )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9        Defendants.  )
     _____)
10
11
12
13
14       Videotaped Deposition of ERIC QUITUGUA,
15  taken on behalf of Plaintiff, at Latham & Watkins,
16  LLP, 300 Colorado Street, Suite 2400, Austin, Texas,
17  beginning at 9:08 a.m. and ending at 7:16 p.m. on
18  September 17, 2024, before Micheal A. Johnson, a
19  Registered Diplomate Reporter, Certified Realtime
20  Reporter, and Notary Public of the State of Texas.
21
22
23
24
25
                    2
```

```
 1  APPEARANCES:
 2  ON BEHALF OF PLAINTIFF:
 3      U.S. SECURITIES AND EXCHANGE COMMISSION
        BY:  John J. Todor
 4           Kristen M. Warden
             Christopher J. Carney
 5           Lory C. Stone (Via Zoom)
             Christopher M. Bruckmann (Via Zoom)
 6      100 F Street, NE
        Washington, D.C. 20549
 7      (202) 256-7941
        todorj@sec.gov
 8      wardenk@sec.gov
        carneyc@sec.gov
 9      stonel@sec.gov
        bruckmannc@sec.gov
10
11  ON BEHALF OF DEFENDANTS
    SOLAR WINDS CORP. AND TIMOTHY G. BROWN:
12
        LATHAM & WATKINS LLP
13      BY:  Serrin Turner
             Nicolas Luongo
14      1271 Avenue of the Americas
        New York, New York 10020
15      (212) 906-1330
        serrin.turner@lw.com
16      nicolas.luongo@lw.com
17
    ON BEHALF OF DEFENDANT
18  TIMOTHY G. BROWN:
19      KING & SPALDING LLP
        BY:  Michael J. Biles (Via Zoom)
20      500 West 2nd Street, Suite 1800
        Austin, Texas 78701
21      (512) 457-2051
        mbiles@kslaw.com
22
23
24
25
                    3
```

```
 1  APPEARANCES (CONTINUED):
 2  ALSO PRESENT:
 3      Becky Melton
        Laurie Hakes
 4
 5  VIDEOGRAPHER:
 6      Timothy Desadier
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    4
```

**Page 37**

 1   **A.**   My contributions to this particular were
 2  to highlight any areas, like what I just described
 3  earlier, our team's role, right.  If there was any
 4  vulnerability trends, incident response trends, end
 5  point security trends, soliciting that feedback back
 6  to the input for the document.
 7  BY MR. TODOR:
 8       **Q.**   So it talks about security and compliance
 9  incident.  Was your team the security part?
10       **A.**   Generally, yes.
11       **Q.**   Turning your attention to the third page
12  of the document with Bates ending 6516.  At the top
13  it says DevOps and IT leadership team.
14           Do you see that?
15       **A.**   Yes, I do.
16       **Q.**   And it looks like your name is second
17  down on the right in the right-most column.  Does
18  that -- looks like you are under Mr. Brown and looks
19  like a Kellie Pierce is also -- is she under you or
20  is she under Mr. Brown as well directly?
21       **A.**   She would have been under Mr. Brown
22  directly.
23       **Q.**   And is that -- does this chart accurately
24  reflect your understanding of what the leadership
25  structure of the DevOps and IT leadership team was

**Page 38**

 1  as of June 2020?
 2       **A.**   For the security team, I could say that
 3  that is accurate.
 4       **Q.**   And the individuals you mentioned who
 5  reported to you, those weren't here -- I guess
 6  they're not leadership, but they would be under you
 7  day-to-day?
 8       **A.**   Yes, they would be under me day-to-day.
 9       **Q.**   Could you please turn your attention to
10  the next page of the document ending in 6517.  And
11  it's marked SolarWinds Scorecard.
12           Have you worked on documents similar to
13  this one in your work at SolarWinds?
14             MR. TURNER:  Objection to form.
15       **A.**   Are you asking if I worked on this
16  particular one specifically or --
17  BY MR. TODOR:
18       **Q.**   I'm asking generally have you worked on
19  scorecards for SolarWinds security during your time
20  in the 2018 to 2020 time frame?
21       **A.**   I can -- I recall that I worked on
22  several self-assessments or security assessments.
23       **Q.**   What did you understand to be the purpose
24  of the security assessments?
25       **A.**   To establish a security baseline.

**Page 39**

 1       **Q.**   What do you mean by a security baseline?
 2       **A.**   To get a -- it's a review of specific
 3  security controls and how teams, groups, the
 4  organization within the company adhere to those
 5  guidelines or controls or not.
 6       **Q.**   Was this in connection with the NIST
 7  cybersecurity framework guidelines?
 8       **A.**   Specific to the scorecard data?
 9       **Q.**   Yes.
10       **A.**   I would say yes.
11       **Q.**   Do you have an understanding as to why
12  SolarWinds was performing self-assessments in this
13  2018 to 2020 time frame as reflected in scorecards
14  like this one?
15       **A.**   I could say that we were always looking
16  to improve the different cybersecurity processes,
17  shore up the cybersecurity program, make
18  improvements in areas where we identified areas of
19  opportunity to improve.
20       **Q.**   Turning your attention back to the 2018
21  time frame, did there come a point where you spoke
22  with Mr. Brown about the need to do self-assessments
23  such as this one to determine whether SolarWinds was
24  meeting the security baseline as you were saying?
25             MR. TURNER:  Objection to form.

**Page 40**

 1       **A.**   Tim and I always had ongoing
 2  conversations about how to improve the security
 3  program.  There wasn't one, like, defining moment or
 4  specific instance where we said this needed to be
 5  done.  I think over time we recognized that there
 6  were opportunities to improve various parts of the
 7  program, whether it be vulnerability management, end
 8  point security, auditing and logging.
 9  BY MR. TODOR:
10       **Q.**   Turning your attention back to, again,
11  the 2018 time frame, were there particular issues
12  that you had in mind that these were places where
13  SolarWinds' security program could stand to be
14  improved?
15       **A.**   No pervasive issues.  There were things
16  that, again, when we talk about security incidents
17  or reports of, you know, a phishing e-mail or
18  something like that, we had processes in place to
19  deal with it depending on the severity level, right.
20           So again, nothing specific concern, but
21  we generally talked about how can we continuously
22  improve over time.
23       **Q.**   Were there certain issues where -- it's
24  like looking at this chart, start at 2017, you have
25  2018, 2019, 2020.  Most of the numbers seem to go up

**Page 189**

1  A.   But again, I don't recall the timing of
2  when we added the CVSS scores into the Trust Center.
3  BY MR. TODOR:
4      Q.   Is Mr. Brown the manager responsible for
5  the Trust Center?
6          MR. TURNER:  Objection, foundation.
7      A.   I don't know if he was the manager of the
8  Trust Center.
9  BY MR. TODOR:
10     Q.   Do you know anyone other than Mr. Brown
11 at SolarWinds who would have responsibility for the
12 Trust Center?
13         MR. TURNER:  Same objection.
14     A.   I don't know.
15 BY MR. TODOR:
16     Q.   At some point in the 2018 -- or 2017 to
17 2020 time frame, did SolarWinds perform any internal
18 cybersecurity assessments?
19     A.   Could you describe for me what you mean
20 by "internal cybersecurity assessments"?
21     Q.   Do you have an understanding of the term
22 "internal cybersecurity assessment"?
23     A.   Yes, I do have an understanding of what a
24 cybersecurity assessment is.
25     Q.   Did SolarWinds perform any of those in

**Page 190**

1  the 2017 to 2020 time frame?
2      A.   I recall, yes.
3      Q.   Okay.  Why did SolarWinds do that?
4          MR. TURNER:  Objection to the form of
5  the question.
6      A.   Could you please repeat?  I'm not sure.
7  BY MR. TODOR:
8      Q.   Why did SolarWinds do that?
9          MR. TURNER:  Object to the vague
10 reference in the question.
11     A.   I don't recall SolarWinds as an
12 organization doing a security assessment.  I do
13 recall that I worked on a security assessment.
14 BY MR. TODOR:
15     Q.   What was your understanding of the reason
16 why you were working on a security assessment?
17     A.   As part of managing the security program,
18 I felt that we should establish some kind of
19 baseline to work off of so that we could generate
20 some kind of roadmap on improving the security
21 program, you know, moving forward.
22     Q.   What do you mean by "baseline"?
23     A.   So when I describe the baseline, it's
24 really a starting point so that we know where we
25 are, current state, at a point in time.

**Page 191**

1      Q.   Was the intent to identify a baseline and
2  then identify areas for improvement?
3      A.   Generally, yes.
4      Q.   You say "generally."  What other purposes
5  would there be?
6      A.   There could be many reasons to establish
7  a baseline, but for, you know, what I was looking to
8  do was set a starting point at which we identify,
9  again, like, a point in time of where we were as an
10 organization when it came down to adhering to a
11 security control framework.
12     Q.   You'll be presented with a document which
13 will be labeled Quitugua Exhibit 11.
14         (Deposition Exhibit 11 marked for
15 identification.)
16 BY MR. TODOR:
17     Q.   And this is a document
18 Bates SW-SEC0035067 with a attachment that does not
19 appear to be Bates labeled.  Appears to be an e-mail
20 from you dated August 9th, 2017, to Mr. Brown,
21 subject, SWI security program assessment.
22         Please tell me if you recognize this
23 document.  Take what time you need to familiarize
24 yourself with it.
25         (Witness reviews document.)

**Page 192**

1      A.   Yes, I am familiar with the document.
2  BY MR. TODOR:
3      Q.   What is it?
4      A.   It is a framework used by CIS, which is
5  Center For Internet Security, the top 20 critical
6  security controls.
7      Q.   The text in the e-mail states:  Here is
8  my assessment of the state of our security program
9  here at SWI with my assessment based on the CIS top
10 20 critical security controls mapped to the NIST
11 cybersecurity framework.
12         Do you see that?
13     A.   I do.
14     Q.   Why were you making an assessment of the
15 state of SolarWinds' security program in this
16 document?
17     A.   If I recall, the timeline here is when
18 Tim just joined the organization.  I had been doing
19 some part of this work previously and I thought as a
20 manager of the program it would be nice for me to
21 provide Tim with some kind of baseline of current
22 state of my own personal assessment of the
23 organization in terms of security control.
24     Q.   And was this just kind of giving your new
25 boss a lay of the land of where things stood?

[Page 193]

A. In general, that was part of the intent, but again, like I said, I was doing this work previously before Tim joined the organization. I used it as an opportunity to set a baseline to describe to Tim what he was coming into and how we could further improve the security program.

Q. I won't ask you to get into the specifics since I don't think even with glasses I could read that print that small.

A. They're really small.

Q. But could you give me a sense of what the analysis you were doing here was and what you were measuring it against?

A. So, again, if I -- it's pretty small, but what I can recall is that the CIS benchmarking, it's kind of an industry benchmark, focuses on 20 critical security controls. A lot of those controls we see throughout a lot of the other exhibits that we've seen: Access control, vulnerability management, incident response. The CIS benchmark at the time is what I was using to help kind of just set that baseline.

Q. If you can turn -- appears to be seventh-from-the-last page in the document. It's a chart that has the word "governance" in vertical on

[Page 194]

the left side and then has a column Function, it has Identify, Protect, Detect, Respond and Recover.

Can you tell me when you find that, please.

A. I'm on that page.

Q. Okay. Is this chart something you prepared as part of this review?

A. There was a point in time during this time period where I went -- I took the CIS security controls, the top 20 critical controls, and made an attempt to map it to the NIST cybersecurity framework, which is what you see here.

Q. Why were you doing that?

A. In my experience, again, working with customer questionnaires, a lot of the customers didn't really make the connection with CIS Critical Security Controls. However, they did talk about how do you comply with NIST, do you have controls that address NIST control, you know, number, number, number.

And so, again, looking at how to improve our processes and how to address customer questions around our compliance to NIST, I took it upon myself to say, Let me do the mapping internally as best I could, take what I started with the CIS controls and

[Page 195]

map it as closely as I could to the NIST cybersecurity framework.

Q. To your knowledge, was there any previous scorecard of the NIST maturity levels at SolarWinds prior to this document?

A. Could you repeat the question, please?

Q. To your knowledge, was there any previous scorecard of the NIST maturity levels at SolarWinds prior to this document?

A. Not that I can recall.

Q. Why did you decide to create the scorecard?

A. Again, as I described earlier, it wasn't really even a scorecard, per se. It was more of an assessment. Mapping from the CIS controls over to the NIST cybersecurity framework. Part of that was customers re-asking adherence or how closely we followed the controls as defined by NIST.

Q. Did you make your personal judgments as to which of the CIS top 20 controls mapped to the various NIST categories Identify, Protect, Detect and so forth?

A. I do recall doing some research if there were any other documents out in the public domain on whether -- you know, that describe, Here's how you

[Page 196]

take -- or here's how relevant a CIS benchmark is to the NIST cybersecurity framework.

Q. There appear to be some 0 to 5 rankings on the right in the legend for the -- I guess the NIST framework. Did you assign the numbers? Under organization there's scores for, looks like Core IT, MST and monitoring cloud. Do you see that?

A. I do see that.

Q. Did you come up with the scores?

A. I recall, yes, I did.

Q. How did you go about that?

A. Again, I took -- if you look back -- it's hard to see in this exhibit, but I took what I initially accessed in the CIS control framework for benchmarks and I just copied it and put it here so that I could use this framework as a starting point moving forward.

Q. So just looking at this, and then I guess if you look to the next page, next few pages there seems to be, I guess, some controls and subcategories. Is that a correct description of what those are? And the last page is CIS 20 Critical Security Controls. I'm just asking generally if that's what those pages are supposed to be.

```
 1         MR. TURNER:  Objection to form.
 2     A.   To be clear, what we're seeing in the
 3  last few pages here with the NIST categories and
 4  then the subcategories, these are all specific to
 5  NIST cybersecurity framework.
 6  BY MR. TODOR:
 7     Q.   And then the CIS controls -- okay.  So
 8  this is --
 9     A.   No.
10     Q.   So this next page, Identify, is this just
11  a description what the NIST controls are?
12     A.   Yes.
13     Q.   Okay.
14     A.   Yes.
15     Q.   And then the last page you have the top
16  20 -- CIS 20 critical security controls?
17     A.   Okay.
18     Q.   Is that correct?
19     A.   That is correct.
20     Q.   And your mapping of those to the NIST
21  categories is on that page with the chart that we
22  just looked at; is that right?
23     A.   The last page that we see in the exhibit
24  is just a high-level summary of the 20 controls.
25  Each one of these controls also has subcategories.
```
197

```
 1  It's hard to read, but when you look at the first
 2  set of screenshots, a lot of these -- you can't
 3  really read here -- are subcategories of those 20
 4  controls.
 5     Q.   So between August 2017 and I think we
 6  looked earlier, the security statement was posted to
 7  the SolarWinds public website, it's in that e-mail,
 8  I guess, December 27th, appears to have come live
 9  sometime in January '18.
10         Are you aware of any material change in
11  the NIST maturity level for any of these
12  cybersecurity categories listed in this chart for
13  SolarWinds between October -- August of 2017 and
14  January of 2018?
15         MR. TURNER:  Object to the form.
16     A.   If you're asking me to draw conclusions
17  between my internal assessment of the controls
18  versus what we put on the security statement,
19  they're two totally different -- two totally
20  different --
21  BY MR. TODOR:
22     Q.   I was asking a slightly different
23  question.
24     A.   Okay.
25     Q.   Just in terms of -- you made a certain, I
```
198

```
 1  guess, judgment as to what the maturity levels were
 2  for these various categories as of August '17.
 3         Between then and January of '18, without
 4  reference to the specific language in the security
 5  statement, just as of that date, are you aware of
 6  any material change in any of these maturity levels
 7  between August '17 and January of '18?
 8         MR. TURNER:  Object to the form.  Are
 9  you asking him whether another assessment was done?
10         MR. TODOR:  I'm asking whether he's
11  aware of any change in the maturity levels between
12  August '17 when he had done this analysis and
13  January of '18.
14         MR. TURNER:  Object to the form of
15  the question.
16     A.   When you say "material change," are you
17  saying was there a change in maturity level?
18  BY MR. TODOR:
19     Q.   Yes.
20     A.   I don't recall if there was any specific
21  change to any one of these control areas, no.
22     Q.   Something got dramatically better or
23  dramatically worse, anything like that?
24         MR. TURNER:  Objection to form and
25  foundation.
```
199

```
 1     A.   Again, I don't recall specifics, yeah.
 2  BY MR. TODOR:
 3     Q.   To clarify, in your earlier response
 4  about setting a baseline, I believe you said you
 5  were trying to set a baseline to describe what Tim
 6  was coming into.
 7         Is it fair to say that that means that
 8  you were trying to access SolarWinds' current state
 9  of cybersecurity as of August of 2017?
10     A.   When I put these CIS benchmarks together,
11  again, I was doing this previously to Tim.  I was
12  using it as an opportunity to help Tim understand
13  when he entered into the organization where we were
14  generally with, you know, adherence to some kind of
15  security control.
16     Q.   A new document coming.  This will be
17  Quitugua Exhibit 12.
18         (Deposition Exhibit 12 marked for
19  identification.)
20  BY MR. TODOR:
21     Q.   You've been handed what's been marked as
22  Quitugua Exhibit 12.  It's an e-mail
23  Bates SW-SEC00042892 through 964.
24         Appears to be an e-mail from Brad Cline
25  to Rani Johnson dated March 16th, 2018, subject,
```
200

### Page 201

1  Updated slides.
2      Mr. Quitugua, I'd ask you to turn to the
3  second page, appears to be a PowerPoint slide titled
4  Major Project Portfolio.
5      Did you play any role at SolarWinds in
6  the collection of information for a major project
7  portfolio presentation around this time?
8      A.  There may be security-specific slides in
9  this presentation, but I'd have to -- you have to
10  give me a few minutes to review.
11      Q.  Well, maybe I can help you.  Can you turn
12  to the one with Bates 42906.  And this appears to be
13  a slide titled Security Assessment and Remediation
14  of the top -- appears to say DOIT lead, you; is that
15  correct?
16      A.  Uh-huh.
17      Q.  Does that fresh your recollection as to
18  whether you played any role in preparing this slide
19  or something like it for this particular
20  presentation?
21      A.  For this particular slide, yes.
22      Q.  What was your role?
23      A.  Again, let me look at the time frame.
24  2018.  If I recall, we were working through GDPR
25  readiness and one of the tasks was to conduct a

### Page 202

1  security assessment and remediation.
2      Q.  Had you done any security assessments or
3  remediations outside of GDPR readiness at this time?
4          MR. TURNER:  Objection to form.
5      A.  You mean as part of the actual portfolio
6  work that is in this exhibit?
7  BY MR. TODOR:
8      Q.  As part of your job outside of this
9  exhibit.
10      A.  Other than what we already had talked
11  about earlier, this was -- this was the only other
12  one I could think of.
13      Q.  Look at the description for the slide.
14  It states:  Conduct an enterprisewide security
15  assessment of access control and security standards
16  and guidelines using the NIST cybersecurity
17  framework.
18          Do you see that?
19      A.  (Nods head.)
20      Q.  Why were you doing that?
21      A.  First, yes, I do see that.
22          Second, it was a -- this was a task that
23  was generated, again, I don't recall who generated
24  it, either Rani and/or Tim, but it was assigned to
25  me as the lead to ensure that I followed through.

### Page 203

1      Q.  You're saying it's either Rani Johnson or
2  Tim Brown who decided that this was going to be the
3  task and it got assigned to you?
4      A.  Yes.
5      Q.  Do you know why it was being
6  assigned -- or why this was a task that SolarWinds
7  was doing at this time?
8      A.  Again, what I can recall is that we were
9  working through GDPR readiness.  That's what I can
10  recollect.
11      Q.  Do you know whether it was specifically
12  tied to GDPR or was it a more general initiative?
13          MR. TURNER:  Objection, asked and
14  answered.
15      A.  Again, my recollection is that we were in
16  the middle -- or in the process of assessing our
17  readiness for GDPR.
18  BY MR. TODOR:
19      Q.  Next sentence says:  Develop a risk
20  register and provide security guidance as part of
21  remediation efforts to prevent, detect and respond
22  to cybersecurity attacks and comply with applicable
23  regulations.
24          Do you see that?
25      A.  I do see that.

### Page 204

1      Q.  And was this, again, an objective that
2  was come up with above you and was assigned to you
3  to work on?
4      A.  Again, I don't recall the specifics
5  around, you know, the scope of the actual task of
6  the work.  I took all my guidance for direct work
7  from Tim Brown and Rani Johnson.
8      Q.  There's a budget figure of zero dollars
9  listed for this.
10          Is that consistent with your
11  recollection?
12          MR. TURNER:  Objection to form.
13      A.  It does state zero across the columns
14  there.
15  BY MR. TODOR:
16      Q.  Did you get any funding to conduct an
17  enterprisewide security assessment of access control
18  and security standards and guidelines using the NIST
19  cybersecurity frameworking?
20          MR. TURNER:  Object to form.
21      A.  I don't recall if we ever even needed
22  funding to do the internal security -- or the
23  assessment to accomplish this work.
24  BY MR. TODOR:
25      Q.  Did you perform such an assessment in

**Page 205**

```
 1  connection with the project that's listed here?
 2      A.   I recall doing some kind of readiness
 3  assessment as part of GDPR.
 4      Q.   Turning your attention down further in
 5  that block there's a list of issues, risks and
 6  dependencies.
 7           Do you see that?
 8      A.   Let me see here.  Excuse me.
 9           Yes, I do.
10      Q.   And the first is inconsistent application
11  of baseline security controls.
12           Do you see that?
13      A.   Yes.
14      Q.   Who came up with that description, and if
15  you know, why?
16      A.   As part of the portfolio work that we
17  were doing, although I wasn't -- I was assigned as
18  the head lead, I would have -- I would have
19  collaborated, coordinated with other groups as part
20  of this work.  I don't recall if that came from me
21  or if that came from, you know, someone else within
22  the -- within the team.
23      Q.   And this says: Action required, develop
24  security baseline.
25           Is that something you were working on
```

**Page 206**

```
 1  with respect to application of baseline security
 2  controls as of the time of this document?
 3           MR. TURNER:  Object to form.
 4      A.   If the -- if the baseline wasn't already
 5  established, that would have been a reasonable
 6  recommendation to make.
 7  BY MR. TODOR:
 8      Q.   Is it fair to say from looking at this
 9  that you still needed to develop a security baseline
10  with respect to application of baseline security
11  controls?
12           MR. TURNER:  Object to the form.
13           Just note that the document is
14  obviously in draft form.
15      A.   I don't -- I don't recall the specifics,
16  but I do know that when I did my work with the CIS
17  controls, mapped it to NIST framework, there were
18  some areas where I personally did not observe the
19  control being implemented, for example.  And so it's
20  reasonable also to expect that we would establish
21  baselines for those areas that were unobserved.
22  BY MR. TODOR:
23      Q.   Turn your attention to the second -- I
24  guess issue, risk and dependency listed there.  It
25  says: Enterprise adoption of NIST security
```

**Page 207**

```
 1  framework.
 2           Do you see that?
 3      A.   I do.
 4      Q.   And who came up with that item?
 5      A.   Again, I don't recall the specifics
 6  around who came up with that.  Again, because I was
 7  the lead, I recall coordinating through other
 8  groups, but, again, I can't speak to did I put that
 9  there or did somebody recommend that it was an issue
10  of risk or dependency.
11      Q.   It says: Action required, ID
12  stakeholders and brief security framework.
13           What do you mean by brief security
14  framework?
15           MR. TURNER:  Object to form.
16           MR. TODOR:  Did you finish your
17  objection?
18           MR. TURNER:  There's no testimony
19  that he said it.
20  BY MR. TODOR:
21      Q.   Do you know who came up with that as
22  action required?
23      A.   Again, I don't recall.  It would have
24  been a collaborative effort.  I honestly don't
25  remember.
```

**Page 208**

```
 1      Q.   Do you have an understanding of what is
 2  meant by brief security framework?
 3      A.   I mean, just that -- looking at this
 4  without any additional context, no.
 5      Q.   Turn to the third issue, risk and
 6  dependencies: Need to identify security controls
 7  that don't already map to NIST framework.
 8           Do you see that?
 9      A.   I do.
10      Q.   Do you know who came up with that and why
11  it's there?
12      A.   Again, I don't recall the specifics.  I
13  did collaborate on this body of work, but I don't
14  remember either who brought it up as an issue, risk
15  or dependency, or who raised it as a concern.
16      Q.   And the action item, review of all
17  existing security processes and procedures.  First,
18  do you know who came up with that?
19      A.   I honestly don't recall, honestly.
20      Q.   And was that something you were working
21  on?
22      A.   I was the DOIT lead for this particular
23  body of work.  But as part of that work I did a lot
24  of collaboration.  I just don't remember.
25      Q.   Turn your attention to the Key Milestones
```

**Page 209**

and Status section. The first one says: Conduct risk assessment against existing security processes. It says start 8/1/17, finished 8/15/17.

Do you see that? Is that the document we just looked at from August of '17?

**A.** I don't recall if there was a correlation between my work -- doing that work individually for Tim and that was part of the GDPR readiness assessment. I can't recall if they were linked together.

**Q.** Looking further down on the status, it has some complete security status assessments, status has 3/16/18, which -- does that mean they were still ongoing or expect to be complete as of 3/16/18?

MR. TURNER: I'm just going to lodge a continuing objection to these questions. Just they're ignoring -- there's a giant banner on this page that says, Please Update. So to the extent that the questions are premised on the idea that the slide was accurate and current, I think it should be noted.

BY MR. TODOR:

**Q.** Do you understand my question?

**A.** No, please restate.

**Page 210**

**Q.** It says: Complete security assessments, and has a status and it has a date of 3/16/18.

Was it your understanding that the security assessments that are referred to in this document were not yet complete as of March 16th, 2018?

MR. TURNER: Objection to form.

**A.** I don't recall, I mean, if they were or were not done right at this point in time.

BY MR. TODOR:

**Q.** Then next statement: Approved plan -- approved risk acceptance business/function it looks like. Again, it has a status date of March 30, 2018.

First, do you know what is meant by approved risk acceptance business/function?

**A.** In the context of the security assessment and remediation, the milestone for that particular body of work was related to -- for any items found developing a process to accept the -- if there was risk identified, the body of work was related to establishing a process to accept that risk, review it, talk through it and then document the risk.

**Q.** To your knowledge, was that process still ongoing as of March 16th, 2018?

**Page 211**

**A.** I recall that there was multiple forms of accessing the different levels of either business risk or cyber risk. Again, there were different methods put in place at the time.

**Q.** But, to your knowledge, was that process still ongoing as in not -- whatever item was being contemplated here was not completed as of March 16th, 2018?

MR. TURNER: Sitting here today, do you know whether it was completed as of that date?

**A.** No, I don't recall if it was completed at that date.

BY MR. TODOR:

**Q.** Referring to the document, there's a banner saying Please Update.

Do you know what that's referring to?

**A.** Rani and her leadership team met on a recurring basis and she would send out copies of the draft for the next iteration or the next cadence meeting and she would place the banner for all leads or all whoever's responsible for that particular slide to work with whoever they're working with to get that content updated and accurate so that they could present it at the next meeting -- project meeting.

**Page 212**

**Q.** Were these meetings held on a regular basis?

**A.** For the portfolio meetings they were, but again, I don't recall the cadence at which they were held.

**Q.** Like monthly, weekly, something like that?

**A.** I don't exactly recall. I don't recall. But they were held on a regular cadence.

**Q.** Turning your attention to the next page of the document with Bates ending in 90 -- turning back to 906, there's a note listed under the chart dated October 16th, 2017, stating: As part of GDPR we are collecting and accessing the security controls across the environment.

I don't know, maybe they meant assessing.

Does that refresh your recollection at all as to the purpose of the issues, risks and dependencies and actions that are listed in this document?

**A.** It doesn't help. Again, multiple teams and groups had access to the actual file itself. They could have come in and added comments and notes.

**Q.** Next sentence states: Pen tests are

1  planned across the MSP customer-facing
2  infrastructure and hopefully across the shared IT
3  infrastructure.
4      Do you see that?
5   **A.**  Uh-huh.  Yes.
6   **Q.**  Does that refresh your recollection as to
7  whether penetration testing had begun across the MSP
8  customer-facing infrastructure as of October 2017?
9   **A.**  I don't recall.  Yeah, I don't recall if
10 that -- if that was true at the time.
11  **Q.**  And is the same -- is that the same for
12 the shared IT infrastructure?
13  **A.**  I don't know if I understand the
14 question.
15  **Q.**  I'm trying not to repeat my words.
16     Does this refresh your recollection as to
17 whether pen tests had begun for the shared IT
18 infrastructure as of October 2017?
19  **A.**  I don't recall if they were or not.
20  **Q.**  And the third sentence states:  Security
21 guidelines and access control guidelines closely
22 aligning to NIST have been created as part of GDPR.
23     Do you see that?
24  **A.**  Yes, I do.
25  **Q.**  Does this refresh your recollection as to

213

1  whether security guidelines and access control
2  guidelines had been created as of October 2017?
3   **A.**  I don't know when the exact timeline is
4  for when the guidelines were created, honestly.  I
5  know that I had worked to, you know, draft some of
6  the content of the guidelines, but I can't tell you
7  right now the timing of it.
8   **Q.**  Did you personally work on the security
9  guidelines and access control guidelines that are
10 being referred to here?
11  **A.**  Yes.
12  **Q.**  Did anyone else work on them?
13  **A.**  Multiple people helped contribute to the
14 content and the guidelines.
15  **Q.**  Were you the lead on that portion of the
16 project?
17  **A.**  For the guidelines?
18  **Q.**  Yes.
19  **A.**  I don't recall if I was or not.
20  **Q.**  So in this sentence it's referring to
21 security guidelines.  Were you the lead for those?
22      MR. TURNER:  Object to form.
23  **A.**  I don't recall being the lead to publish
24 the guidelines.
25

214

1  BY MR. TODOR:
2   **Q.**  And I'm just asking because you're listed
3  as DOIT lead at top of the slide.  So this note is
4  referring to work being done on security guidelines
5  and access control guidelines.
6     Were you the lead for that work?
7   **A.**  I was the lead for producing the, you
8  know, item No. 5 in the portfolio.  Part of that
9  work could have been coordinating with others who
10 had responsibility to put content into or publish
11 the guidelines.
12  **Q.**  Do you know when, if at all, pen tests
13 were actually conducted across the MSP
14 customer-facing infrastructure?
15  **A.**  During this time period?
16  **Q.**  Or at any point moving forward from the
17 date of this document.
18  **A.**  My team at this point in time still did
19 not have responsibility to do any of those, so I
20 wouldn't have visibility.
21  **Q.**  Do you know whether pen
22 tests -- penetration tests were performed across the
23 shared IT infrastructure at some point in the 2018
24 to 2020 time frame?
25  **A.**  I don't have direct knowledge that that

215

1  occurred.
2   **Q.**  Turn your attention to the next page of
3  the document with 907 as the Bates.  This appears to
4  be a slide marked Enterprise Access Management
5  (Standards and Audit).  And it appears to have you
6  listed as the team lead.
7     Were you the team lead for that?
8   **A.**  I recall that I was assigned for this
9  No. 6 portfolio item.
10  **Q.**  What did you understand to be the scope
11 of your assignment?
12  **A.**  To conduct a risk assessment around
13 enterprise access management.
14  **Q.**  What's your understanding of the term
15 "enterprise access management"?
16  **A.**  I understood the term to mean
17 provisioning of user roles that are mapped to their,
18 you know, job function.
19  **Q.**  Does that include -- well, I guess maybe
20 we can focus on the language.
21     There's a description listed:  Access
22 management describes the management of individual
23 identities, their authentication, authorization,
24 roles, and privileges within the enterprise in order
25 to minimize security risks associated the use of

216

**Page 217**

1 privileged and nonprivileged access. Probably
2 needed to end there.
3     Does that description sound accurate to
4 you?
5     MR. TURNER: Object to form.
6   **A.** As written in the description for the
7 actual project task itself?
8 BY MR. TODOR:
9   **Q.** Yes.
10  **A.** Right. I mean, that's what I understand
11 it to be.
12  **Q.** Does that match your understanding of
13 what the scope of your assignment was in terms of
14 the issue you were addressing?
15  **A.** It described the scope.
16  **Q.** Again, she seems to list a budget of zero
17 dollars.
18     Is that consistent with your
19 recollection?
20     MR. TURNER: Object to form.
21  **A.** Again, during this time period it may
22 not -- we would have done the assessment and if it
23 didn't cost external dollars to conduct it, like we
24 were going to do it ourselves, that's what we would
25 have put.

**Page 218**

1 BY MR. TODOR:
2   **Q.** What resources would you have available
3 to assess your access management if you're not
4 spending additional dollars?
5   **A.** This really referenced external spending,
6 right. It didn't really address -- there was
7 no -- it was assigned to the security team, but they
8 didn't tie dollars to the internal security team
9 doing this work. This was intended to track
10 external budget --
11  **Q.** Supply a new security tool, something
12 like that?
13  **A.** Hire a contractor or, right, a vendor.
14 That would have been reflected under the budget.
15  **Q.** This would be just if you're adding it to
16 your own internal to-do list, there wouldn't be an
17 extra external budget figure attached to it; is that
18 correct?
19  **A.** Right.
20  **Q.** Turn down to the issues, risks and
21 dependencies. Click the first one, it says:
22 Concept of least privilege not followed as a best
23 practice.
24     Do you see that?
25  **A.** I do.

**Page 219**

1   **Q.** Do you have an understanding as to why
2 that's there?
3   **A.** Again, since this was a kind of a point
4 in time, that could have very well been raised as a
5 concern. I would expect that in phase 1 where it is
6 marked as complete, that there's a correlation
7 between that body of work and any addressing of the
8 issues, risks and dependencies. I can't sit here
9 today and tell you that that was a risk and concern
10 at that point in time because, again, there was work
11 to be done here before the next presentation.
12  **Q.** So I'm just talking about March 16, 2018.
13  **A.** Uh-huh.
14  **Q.** Was it considered to be an issue, risk
15 and dependency that the concept of least privilege
16 was not followed as a best practice within
17 SolarWinds?
18     MR. TURNER: Objection to form and
19 foundation.
20  **A.** The issue, risk and dependencies listed
21 here, doesn't indicate that it was a problem across
22 the organization. As part of the assessment, it may
23 have been found that a particular system wasn't
24 following the concept of least privilege.
25

**Page 220**

1 BY MR. TODOR:
2   **Q.** As we're sitting here today, do you
3 recall any particular instances within SolarWinds
4 that the concept of least privilege was not being
5 followed as a best practice as of this March 2018
6 time frame?
7   **A.** Not that I can distinctly recall. But
8 like I described earlier, we do have those kind of
9 defined steps to go through to identify, take in the
10 reports and then address and fix.
11  **Q.** Turning to the Action Required column,
12 appears to state: ID existing permission levels
13 within the enterprise.
14     Do you see that?
15  **A.** Uh-huh. Yes.
16  **Q.** Is that an action that you were in charge
17 of as of March 2018?
18  **A.** It would have been an action that we
19 worked collectively as a group in order to
20 accomplish this particular project task.
21  **Q.** And were you the lead on that particular
22 aspect of the task?
23  **A.** For that particular issue, risk and
24 dependencies, I don't recall if I was or not.
25  **Q.** Turn to the second description.

1  Statement: Use of shared accounts throughout
2  internal and external applications.
3         Do you see that? What's your
4  understanding of what that issue is?
5     A.   I'm trying to recall. I don't have a
6  recollection of what shared accounts in that
7  particular context meant.
8     Q.   What is a shared account, based on your
9  knowledge, generally?
10    A.   Generally it's an account that's shared.
11    Q.   By more than one user within the
12 organization?
13    A.   Not necessarily.
14    Q.   Who would be sharing it?
15    A.   A computer.
16    Q.   Could you please explain what you mean by
17 that?
18    A.   Yeah. So sometimes an account different
19 from a human account can be used by a computer to
20 perform its function. And that same service
21 account -- or account could be used in a different
22 computer, again, doing the same function to do its
23 job as well.
24         MR. TURNER: Hey, JJ, just flagging
25 that we're past the hour mark, so whenever you have

221

1  a break coming up soon.
2         MR. TODOR: Sure.
3  BY MR. TODOR:
4     Q.   To your knowledge, with respect to the
5  previous issue, who at SolarWinds would know whether
6  a particular system was not following a concept of
7  least privilege?
8         MR. TURNER: Objection to form.
9     A.   Are you asking if there was one
10 individual that would -- I don't know if I -- I
11 don't understand the question. Could you please...
12 BY MR. TODOR:
13    Q.   So who would be responsible for
14 identifying whether a particular system was
15 following a concept of least privilege?
16        MR. TURNER: Objection to form.
17    A.   There would be multiple ways in which we
18 would identify or get -- get reports of, you know,
19 systems or applications or users not following.
20 BY MR. TODOR:
21    Q.   Would Mr. Brown be in charge of that?
22        MR. TURNER: Objection to form and
23 asked and answered.
24    A.   Again, there are multiple ways that we
25 would get it and we would follow the standardized

222

1  process.
2  BY MR. TODOR:
3     Q.   Turn to the second action required.
4  There's a statement: Work with teams to
5  decommission use of shared accounts.
6         Do you know what that means?
7     A.   I mean, looking at the document again, it
8  says to work with teams to decommission accounts.
9     Q.   What does decommission use of shared
10 accounts mean?
11    A.   To basically disable the account or
12 separate the use of that account by multiple systems
13 or multiple people.
14    Q.   And were you tasked with making sure that
15 happened?
16    A.   Again, I was tasked to ensure that I
17 delivered the project. I worked with multiple
18 people. There could have been others on the team or
19 within the IT groups that were responsible for doing
20 that.
21    Q.   Okay.
22        MR. TODOR: Counsel, we can take a
23 break now if you'd like.
24        MR. TURNER: Sure. Thank you.
25        THE VIDEOGRAPHER: Going off the

223

1  record. Time is 3:18.
2         (Recess taken from 3:18 p.m. to
3  3:39 p.m.)
4         THE VIDEOGRAPHER: Back on the
5  record. Time is 3:39.
6  BY MR. TODOR:
7     Q.   Welcome back, Mr. Quitugua. I believe we
8  were discussing the page with Bates 42907 in the
9  lower right. Are you still there?
10    A.   Yes.
11    Q.   Okay. I'll just draw your attention to
12 the key milestones and status list there, and just
13 ask, do you have an understanding as to how those
14 milestones were generated and...
15    A.   I don't know if I understand the
16 question. Just kind of how were they laid out?
17    Q.   Yeah. How was it decided that those
18 would be the milestones?
19    A.   As part of all the project kickoffs,
20 there's, like, a discovery phase and then in the
21 discovery phase each of the different key dates or
22 milestones would be described, and then there was
23 some discussion on timing, right. So that's where
24 you see the start-to-finish dates in there.
25    Q.   What role, if any, did you play in

224

**Page 225**

1 determining the milestones and the timing?
2    **A.**   Other than getting assigned the actual
3 task, I don't recall being directly involved in
4 setting up the actual milestones for the project
5 task.
6    **Q.**   Do you have any reason to believe, as
7 you're sitting here today, that the status of the
8 various milestones was anything other than what was
9 set forth here in the document as of March 16, 2018?
10           MR. TURNER:  Object to the form of
11 the question.
12    **A.**   I don't have any reason to believe that
13 they were inaccurate.
14 BY MR. TODOR:
15    **Q.**   Turning your attention back up to the
16 banner saying Please Update.  Do you have an
17 understanding of why that's there?
18    **A.**   Yes.  Again, as I described earlier,
19 these slides were a snapshot in time that were
20 presented to Rani Johnson in terms of overall
21 project portfolio status.  She would throw on the
22 Please Update banner indicating that each respective
23 lead for that particular project in the portfolio
24 was responsible for ensuring that the data was
25 refreshed and up to date for the next set of

**Page 226**

1 meetings.
2    **Q.**   And would the updating be in terms of the
3 timeline or in terms of what the tasks were?
4    **A.**   There were a variety of reasons why the
5 content within the project, the project tasks, would
6 be updated.
7    **Q.**   Do you have any specific recollection of
8 changes to either the issues, risks and dependencies
9 or the key milestones for this particular project?
10    **A.**   No particular recollection of any
11 specific changes that were made as part of this body
12 of work.
13    **Q.**   Direct your attention to the note under
14 the chart.  Do you know who'd generate these notes
15 under these slides?
16    **A.**   The document itself was available to all
17 of Rani's leadership team.  And without looking at
18 the actual file itself, I couldn't tell you, you
19 know, who put the comment or the note in there.
20    **Q.**   First statement is:  10/16/17, obtain
21 update.  Identity management continues to be a
22 concern.  Appropriate checks are in place to grant
23 access but audit of access is not consistently
24 implemented.  Multifactor authentication should also
25 be utilized in more environments.  A risk assessment

**Page 227**

1 will be completed by 12/31.
2           Is this statement consistent with your
3 understanding as to the status of identity
4 management as of October 2017?
5           MR. TURNER:  Objection to form.
6    **A.**   I don't recall who made that specific
7 note within the document.  And so I don't know, I
8 just -- I don't have a recollection of who would
9 have made that note or the comment.
10 BY MR. TODOR:
11    **Q.**   Apart from who made the comment, is this
12 statement consistent with your understanding as to
13 the status of identity management at SolarWinds as
14 of on or around October 2017?
15           MR. TURNER:  Objection to the form of
16 the question.
17    **A.**   My team was constantly doing assessments
18 over the course of the day-to-day work that we do.
19 Again, I don't recall any specific instances where
20 we raised a concern around identity management.
21 What I can say is that when -- again, when issues,
22 security, you know, concerns are brought up, we do
23 have a defined process to follow to work through and
24 address those concerns.
25

**Page 228**

1 BY MR. TODOR:
2    **Q.**   The next portion of the note here says:
3 Review roles, review membership.
4           Do you know what that's referring to?
5    **A.**   I do not.
6    **Q.**   The next says:  Implement MFA for
7 high-value areas.
8           Do you know what that's referring to?
9    **A.**   I do not.
10    **Q.**   Next it says:  VPN.  Do you know what
11 that's referring to?
12    **A.**   No.
13    **Q.**   Is VPN a term of art in the IT industry?
14    **A.**   It is.
15    **Q.**   What is the term "VPN"?
16    **A.**   It's -- it's an acronym for virtual
17 private network.
18    **Q.**   And did SolarWinds utilize virtual
19 private networks in its business?
20    **A.**   We utilize VPNs across multiple different
21 environments within the organization.
22    **Q.**   Would this be part of what you referred
23 to earlier as the corporate IT environment as
24 opposed to the software environment?
25    **A.**   In that context, yes.

**Page 253**

1  Q. Do you know if there was any analysis
2  within the organization of the issue Mr. Krajcir
3  raised between August '18 and January 2020?
4  A. I don't remember -- or don't -- I don't
5  recall if we had any direct discussion between
6  then -- or between his initial and the follow-up
7  that he sent. And I don't know if he had those
8  internal discussions with his network team or with
9  the IT team -- broader team in general. I don't
10 know.
11 Q. Direct your attention to the second
12 e-mail in the string at the bottom of page 779, it
13 appears to be an e-mail from you to Tim Brown,
14 Mr. Krajcir dated January 16, 2020.
15     Do you see that?
16 A. Yes.
17 Q. And then it appears you say in the
18 e-mail: Tim, this was Robert Krajcir's suggestion
19 on how to address noncorporate machines from
20 connecting to the network using GP VPN.
21 A. Uh-huh.
22 Q. Why did you send this to Mr. Brown?
23 A. Robert was looking to get, like, a
24 follow-up on his initial presentation and I reached
25 out to Tim to summarize, you know, that, Hey, look,

**Page 254**

1  Robert wanted to implement machine-based
2  authentication, is there anything that we can do to
3  support.
4      Granted we already had existing controls
5  in place for the global protect VPN. Like what
6  we're looking at here is improving the VPN and
7  making -- him wanting to make a recommendation to
8  implement machine-based authentication really on top
9  of user-based authentication. So my intent of
10 reaching out to Tim during this time frame, if I
11 recall, was to really say, you know, Robert feels
12 like there wasn't any traction, is there anything
13 else we can do to, you know, support and improve the
14 global protect VPN posture.
15 Q. Turning your attention to the second
16 sentence in your e-mail. You state: As you know,
17 this did not get any traction, but wanted to share
18 with you so that we can circle this back and see if
19 we can reassess and possibly implement some type of
20 enforcement.
21     Do you see that?
22 A. Yes, I do.
23 Q. What is your understanding as to why this
24 did not get any traction as of January 16th, 2020?
25 A. During this time frame the way global

**Page 255**

1  protect VPN, we already had enforced specific
2  security controls that allowed very specific access
3  to the internal network resources, but it wasn't
4  like -- you know, it wasn't implemented. There were
5  controls in place and what we were looking to do is
6  improve on them based on Robert's recommendation.
7  He felt, again, individually as his opinion, that he
8  wasn't getting the support he needed and I reached
9  out to Tim in my capacity as information security
10 manager to say, Is there anything that we can do to,
11 you know, support his request to implement
12 machine-based authentication and get global protect
13 VPN implemented.
14 Q. In your previous answer you said, "There
15 were controls in place and what we were looking to
16 do is improve on them based on Robert's
17 recommendation."
18     Who's the "we" you're talking about in
19 that answer?
20 A. "We" in terms of who was making the
21 recommendation?
22 Q. Yeah. You said what we were looking to
23 do. So who's the "we"?
24 A. Could you -- can you just rephrase or
25 repeat the -- my previous testimony?

**Page 256**

1  Q. I was repeating your previous testimony.
2  A. Could you please repeat it?
3  Q. It says, "What we were looking to do was
4  improve on them based on Robert's recommendation."
5  You said, "There were controls in place and what we
6  were looking to do is improve on them based on
7  Robert's recommendation."
8      My question was, what -- who's the "we"?
9  A. I believe -- I used the term "we" in
10 general to describe that we collectively as a group.
11 Q. So if you're saying that the idea didn't
12 get any traction, how are you saying that we were
13 looking to improve if his idea didn't get any
14 traction?
15 A. We're always looking to improve, whether
16 it's process improvements, whether it's security
17 posture improvements. I mean, that's --
18 Q. Is it fair to say that no one at
19 SolarWinds had implemented any kind of enforcement
20 for Mr. Krajcir's suggestion as of January 16th,
21 2020, and you were forwarding the presentation to
22 Mr. Brown to see if it could get some kind of
23 traction after you reintroduced it?
24 A. I don't think it's fair to say that we
25 didn't take any action on it. I think there were --

**Page 257**

again, I don't recall any specific follow-on discussions we had, but if we did, we would have documented it in some kind of ticketing system.

**Q.** So why did you say, "See if we can reassess and possibly implement some kind of enforcement"?

**A.** Again, in the spirit of process improvements and, you know, getting better, improving on what we currently have, I made the suggestion -- or I made -- I reached out and said, Is there anything we can do to support that inquiry for his suggestion. We were specifically talking about machine-based authentication for the global protect VPN.

**Q.** So with respect to machine-based authentication for global protect VPN, is it your understanding that as of January 16th, 2020, there had been no enforcement to support Mr. Krajcir's suggestion regarding machine certificate authentication?

MR. TURNER: Objection to the form.

**A.** Specifically for machine-based authentication, we didn't have that specific setting set. However, there were compensating controls that were already in place.

**Page 258**

BY MR. TODOR:

**Q.** And what were those?

**A.** So, again, we talked about user -- user identification, authentication, right. So you had to be an authorized user of global protect VPN. You had to also have an account in active directory. You also had to be provisioned with the level of privilege in order to access specific resources on the internal network.

So machine-based authentication was just another recommendation by Robert to say, Let's add this so that we can then, you know, add additional layer of protection around the machines. So it's not like we didn't have any protections in place. We had some level of protection already to properly identify, authenticate and grant access to resources. What Robert was making a recommendation on was let's implement machine-based authentication to get better.

**Q.** Turning your attention to the top e-mail in the string from Mr. Krajcir dated January 16, 2020. What did you understand to be what he was communicating with respect to the status of his recommendation?

**A.** What I understood from Robert in his

**Page 259**

follow-up e-mail was that since his initial recommendation to implement machine-based authentication, he was already of the understanding that other steps were already being put in place by his network team to address -- or to implement additional compensating controls. And he talks about some of those compensating controls in the second paragraph.

**Q.** Turning to the second paragraph, Mr. Krajcir is saying: Regarding GP VPN we are still standing on the same spot. Anyone connect from anywhere as long as they know AD credentials.

So why are you saying that he's talking about compensating controls if he's saying, We're still standing on the same spot?

**A.** As I read his reply, he also states that there are some access that was trimmed. He also goes on to state other things that we consider -- that we wouldn't have considered as a compensating control despite the fact that, look, there's still a possibility of, you know, anyone connecting.

**Q.** Turning your attention to the last sentence in the second paragraph, Mr. Krajcir says: While certificates would be able to solve this for us, they are useless as long as users have full

**Page 260**

admin rights (certificate can be exported and installed anywhere if user is an admin).

Do you see that?

**A.** I do.

**Q.** What do you understand Mr. Krajcir to have been saying, that certificates are useless as long as users have full admin rights?

**A.** I don't know if he was speaking about machine-based certificates or user-based certificates in that particular context.

**Q.** Can you review the paragraph and explain what you understand him to be saying?

**A.** I mean, he starts off with global protect VPN. He talk about some of the compensating controls and then he pivots to certificates. What I don't understand -- I didn't get it out of the -- his reply here, what he meant by certificates, whether they were user-based or machine-based.

**Q.** Turn your attention to the third paragraph, the first sentence. Mr. Krajcir states: The best thing we can currently hope for is implementation of NAC which would solve all these issues.

What's NAC?

## Page 261

1  A.  NAC is an acronym that means network
2  access control.
3  Q.  Is that a specific company's product or
4  is it a technique within the IT industry?
5  A.  It is a technique to manage, control and
6  enforce access controls on the network.
7  Q.  Next Mr. Krajcir states:  We are
8  currently talking to vendors about their solutions.
9  We'll have quotes available soon.  Let's hope budget
10 will allow us to purchase such solution as planned.
11 However, this process will get at least six months
12 if not entire year till full adoption.
13      Do you see that?
14 A.  Yes.
15 Q.  To your knowledge, was NAC implemented at
16 SolarWinds at some point after January 16, 2020?
17 A.  Yes.
18 Q.  When was it implemented?
19 A.  I don't recall the specific dates, but I
20 do know that it was implemented after.
21 Q.  Was it in the 2020 time frame?
22 A.  I don't recall.  I don't recall if it was
23 or not.
24 Q.  Do you think it's more likely it was in
25 2021, '22?

## Page 262

1  A.  Again, I don't recall specific dates.  I
2  would have to look at, you know, historical
3  documentation.
4  Q.  Do you recall whether you had any further
5  conversations with Mr. Brown regarding Mr. Krajcir's
6  suggestion following January 16, 2020?
7  A.  It's been so -- I don't recall.  I don't
8  recall.
9  Q.  Do you recall what, if any, steps
10 SolarWinds took to address the VPN issues raised by
11 Mr. Krajcir following January 16, 2020?
12 A.  I don't recall if we did or not.
13     MR. TURNER:  Can we -- if you are
14 about to switch to another document, I'll just flag
15 we've been going for almost another hour.  Is this a
16 good time for a break?
17     MR. TODOR:  I see the break soon sign
18 is up, so I guess we can take a break if you're all
19 right.
20     THE VIDEOGRAPHER:  Going off the
21 record.  Time is 4:35.
22     (Recess taken from 4:35 p.m. to
23 4:59 p.m.)
24     THE VIDEOGRAPHER:  Back on the
25 record.  Time is 4:59.

## Page 263

1  BY MR. TODOR:
2  Q.  Welcome back, Mr. Quitugua.  You've been
3  presented -- or you're about to be presented with a
4  document marked as Quitugua Exhibit 16.
5      (Deposition Exhibit 16 marked for
6  identification.)
7  BY MR. TODOR:
8  Q.  It has a Bates of SW-SEC00010210 through
9  229.  Appears to be an e-mail from you dated
10 September 11, 2018 to a Johnathan Lyman.
11     Please tell me whether you recognize this
12 document.
13     (Witness reviews document.)
14 A.  Yes, I do.  It's familiar.
15 BY MR. TODOR:
16 Q.  What is this document, sir?
17 A.  This is the copy of the detailed security
18 statement.
19 Q.  I'd like to draw your attention first to
20 the e-mail at 210.  You state:  Hi, Jonathan.  Let's
21 start by sharing the detailed security statement.
22 This answers most of the questions in their
23 questionnaire.
24     Was this in response to -- the subject is
25 Vendor Security Assessment from CBS Casting.  Was

## Page 264

1  that a prospective customer or who were they?
2  A.  I don't recall specifically who CBS
3  Casting was, I mean, whether they were a potential
4  customer or an existing customer.
5  Q.  Was it a routine practice to send a
6  detailed SolarWinds security statement in response
7  to a vendor security assessment as of 2018?
8  A.  During this time frame we would, again,
9  start with the public-facing statement or the, you
10 know, the nondetailed security statement.  If
11 customers had additional questions, wanted to dig in
12 on, you know, specific controls, then we would, you
13 know, get into a NDA if they were potential
14 customers or share with existing customers if it
15 would help answer additional questions they had.
16 Q.  And if it helps, the first e-mail on the
17 string starting at the bottom of the page and
18 continuing to the top page, looks like Mr. Lyman is
19 saying:  CBS Casting is a current customer of ours
20 and has vendor assessment requirements they need to
21 fulfill to continue doing business.  They sent over
22 this spreadsheet with a handful of questions.
23 Please let me know if they need to sign an NDA for
24 any of this information.  Thanks, Johnathan Lyman,
25 paper trail support.

Eric Quitugua
9/17/2024

**p. 297**

1 JIRA ticketing system that we used for incidents
2 that would have described what that was.
3   Q.   So if you were trying to find out what
4 the unauthorized access items here, you would look
5 back through your JIRA system to find that?
6   A.   You would look back at the historical
7 documents, comments, discussions that were being
8 had.
9        (Deposition Exhibit 25 marked for
10 identification.)
11 BY MR. TODOR:
12   Q.   Mr. Quitugua, you've been presented with
13 a document marked as Quitugua Exhibit 25. It has
14 Bates SW-SEC00001602 through 1607. And could you
15 please -- seems to be a PowerPoint marked SolarWinds
16 Q2 2020 Quarterly Risk Review.
17        I would ask you to take a look at the
18 document and tell me whether you recognize it.
19        (Witness reviews document.)
20   A.   I recognize one slide in this
21 presentation.
22 BY MR. TODOR:
23   Q.   Please direct me to it.
24   A.   Slide ending in 1605.
25   Q.   Okay. And what, if any, content did you

**p. 298**

1 provide for this one?
2   A.   It would have been the same -- if Tim
3 asked me for recommendations or trends or metrics
4 that support his scoring, I would provide that to
5 him.
6        MR. TURNER: The question is whether
7 you remember any content that you provided for this
8 slide. Yes or no?
9   A.   I don't remember any specific content
10 that I provided for this slide.
11 BY MR. TODOR:
12   Q.   Was it a -- was this the type of -- was
13 it a routine occurrence that you would provide
14 information for Mr. Brown in his preparation of the
15 scorecards for documents like this one?
16        MR. TURNER: Objection to form.
17   A.   Could you repeat the question, please?
18 BY MR. TODOR:
19   Q.   Was it a routine occurrence that you
20 would provide information for Mr. Brown in his
21 preparation of the scorecards for documents like
22 this one?
23   A.   For this particular document, again, I
24 don't recall if I did or did not.
25   Q.   I'm just -- generally for scorecards like

**p. 299**

1 this one, we've seen several documents with
2 scorecards like this one.
3        Was it a routine occurrence that you
4 would provide information for Mr. Brown in his
5 preparation of those?
6        MR. TURNER: Objection to the form.
7 "Like this."
8   A.   Again, if Tim asked me to provide
9 recommendations, I would. He's my boss, so I would
10 provide the recommendations as I was expected to
11 ask -- or answer.
12 BY MR. TODOR:
13   Q.   What sorts of recommendations would you
14 provide?
15   A.   I mean, there are many. I mean, there
16 are -- if he asked me to provide -- again,
17 looking -- we reviewed the incident response
18 dashboard. The majority of the feedback and input
19 that I have -- I had was really around the security
20 incidents since my team was responsible for
21 documenting, tracking. And so when I say I'd be
22 making those recommendations, really that's the area
23 I would have primarily focused on.
24   Q.   And with respect to the risks and
25 improvement plan items identified here, did you have

**p. 300**

1 any role in providing input into what those would
2 be?
3        MR. TURNER: Objection, asked and
4 answered.
5   A.   I don't recall.
6        MR. TODOR: Our court reporter seems
7 to have put out the break soon sign. Counsel, is
8 this good time for a break for you?
9        MR. TURNER: Sure.
10       THE VIDEOGRAPHER: Going off the
11 record. Time is 5:56.
12       (Recess taken from 5:56 p.m. to
13 6:18 p.m.)
14       THE VIDEOGRAPHER: Back on the
15 record. Time is 6:18.
16       MR. TODOR: Please pass the document
17 to the witness.
18       (Deposition Exhibit 26 marked for
19 identification.)
20 BY MR. TODOR:
21   Q.   Welcome back, Mr. Quitugua.
22 Mr. Quitugua, you've been presented with a document
23 marked as Quitugua Exhibit 26. It has Bates number
24 SW-SEC00001582 through 1601. It appears to be a
25 PowerPoint marked SolarWinds Q4 2020 Quarterly Risk

**Page 337**

1  submitted to kick off the account provisioning
2  process.
3  **Q.** To whom was the form submitted?
4  **A.** It was submitted -- IT eventually got the
5  form to process and created the accounts and set up
6  the level of access and level of permission.
7  **Q.** And was that Mr. Cline's group?
8  **A.** Yes, that would have been Mr. Cline's
9  group.
10  **Q.** Did the InfoSec group have any role with
11  respect to the setting of user privilege levels in
12  response to a SARF?
13  **A.** No, I don't recall that we had direct --
14  a direct responsibility for, you know, adding that
15  content. What I can say is if there were -- if
16  there was an access that didn't meet the existing
17  roles that were defined, my team would have been
18  advised or consulted and said, you know, There's a
19  business justification for this, you know, could we
20  go ahead and document this access request. And
21  that's the extent of our involvement.
22  **Q.** Forgive me if I'm misremembering, but I
23  thought during my original examination of you I had
24  asked about when someone applies and then there'd be
25  permission levels set by an individual manager at

**Page 338**

1  SolarWinds.
2  Is that different from what you're
3  describing here with this SARF process?
4  **A.** Individual levels ascribed by the
5  manager? If I recall what we were talking about
6  previously, the hiring manager defined what roles
7  the new employee or their direct report needed
8  access to or, you know, what resources.
9  That determined what groups -- what user
10  access lists that new employee would be -- become a
11  member of.
12  **Q.** And then was that information sent to the
13  IT group for setting of the user privilege level or
14  nonprivilege level for that particular employee in
15  response to a SARF?
16  **A.** It would be sent to the IT to configure
17  the settings or add that account to the respective
18  groups that were already set in active directory.
19  **Q.** Did that process vary from group to group
20  within SolarWinds?
21  **A.** Could you describe -- I don't understand.
22  **Q.** From the 2018 to 2020 time frame, would
23  the process of a manager determining the privilege
24  level to be given to a given employee and sending it
25  to IT for them to set the privileges, was that

**Page 339**

1  uniform companywide or was there some variation?
2  **A.** I don't recall if there were a separate
3  process for that.
4  **Q.** Did some managers decide that some
5  employees would need more access than a manager in
6  another section might decide that an employee with
7  similar job duties might need?
8  MR. TURNER: Objection to form and
9  foundation.
10  **A.** The user access lists were already
11  predefined based on the user's role and job within
12  the organization. As I described earlier, if a
13  manager or individual requested additional levels of
14  access, that followed a very similar process where
15  the access would be reviewed, there was a business
16  justification, and once those were in place, then
17  the IT team would go ahead and, you know, create
18  that user privilege or user access.
19  BY MR. TODOR:
20  **Q.** You were asked some questions about the
21  e-mail from Mr. Krajcir in August of '18 and I
22  believe during your direct examination you were
23  asked questions with respect to his issue he raised
24  regarding full admin rights for users to have at
25  SolarWinds.

**Page 340**

1  Do you remember that testimony?
2  **A.** Yes.
3  **Q.** Were you concerned when Mr. Krajcir
4  raised that issue?
5  **A.** I don't recall during that time period
6  whether what he said raised to a level that would
7  warrant us to track it as a security incident.
8  **Q.** If you don't recall that time period,
9  whether what he said raised to a level that would
10  warrant you to track it as a security incident, why
11  did you go back to Mr. Brown in January of 2020 and
12  ask him to look at it again?
13  **A.** I was just doing my part. I was doing my
14  part to say, Hey, look, is it something that you
15  want me -- you want us to dig deeper in? And that's
16  really what the intent was.
17  **Q.** You were asked some questions about use
18  of active directory with respect to the password
19  policy during your direct. To your knowledge, was
20  there -- starting in the 2018 to 2020 time frame,
21  was there any audit done to see whether active
22  directory was being properly implemented at
23  SolarWinds?
24  MR. TURNER: Object to form.
25  **A.** I don't recall if there were any audits

```
 1  or team, you know, triggered this alert and we would
 2  dig in and find out the reason why.
 3      Q.  And when you say "we," what's that a
 4  reference to?
 5      A.  That is a reference to the security team.
 6      Q.  Okay.  And did that happen during the
 7  2018 to '20 time frame?
 8      A.  Yes.
 9      Q.  And what was the purpose of having those
10  alerts in place?
11      A.  So that we could detect any, you know,
12  triggers or issues that may arise --
13      Q.  More specifically, what was the purpose
14  of getting an alert about somebody getting more
15  privileges added to their account?
16          MR. TODOR:  Objection, form.
17      A.  So that we can --
18          MR. TURNER:  Leading.
19      A.  So we could detect whether or not, you
20  know, the controls that were in place were
21  effective.
22          MR. TURNER:  No further questions.
23          FURTHER EXAMINATION
24  BY MR. TODOR:
25      Q.  Probably just have one more.  You used
```
345

```
 1  the term "user access reviews."  Who would do those
 2  at SolarWinds?
 3      A.  I do know that it wasn't primarily done
 4  by the security team.  It was done by somebody in
 5  Brad Cline's organization.
 6      Q.  Do you know why they would do those?
 7      A.  They would do it to review, again, like I
 8  described earlier, whether or not the access that
 9  was granted was still legitimate.
10          MR. TODOR:  I have no further
11  questions.
12          MR. TURNER:  Okay.  Thanks.  No
13  further questions from me.
14          THE VIDEOGRAPHER:  This concludes
15  today's testimony of Eric Quitugua.  Going off the
16  record.  Time is 7:16.
17          (Deposition concluded at 7:16 p.m.)
18
19
20
21
22
23
24
25
```
346

```
 1          REPORTER'S CERTIFICATION
 2      I, Micheal A. Johnson, Registered Diplomate
 3  Reporter and Notary Public in and for the State of
 4  Texas, certify that on the 17th day of
 5  September, 2024 I reported the Videotaped Deposition
 6  of ERIC QUITUGUA, after the witness had first been
 7  duly cautioned and sworn to testify under oath; said
 8  deposition was subsequently transcribed by me and
 9  under my supervision and contains a full, true and
10  complete transcription of the proceedings had at
11  said time and place; and that reading and signing
12  was not requested.
13      I further certify that I am neither counsel
14  for nor related to any party in this cause and am
15  not financially interested in its outcome.
16      GIVEN UNDER MY HAND AND SEAL of office on
17  this 23rd day of September, 2024.
18
19      _____
        MICHEAL A. JOHNSON, RDR, CRR
20      NCRA Registered Diplomate Reporter
        NCRA Certified Realtime Reporter
21
        Notary Public in and for the
22      State of Texas
        My Commission Expires:  8/8/2028
23
24
25
```
347