# Exhibit 36

**Excerpts of Eric Quitugua
Investigative Testimony Transcripts**

# C-08755

# *Quitugua, Eric - Vol. I.20210831.344327-C*

*8/31/2021 9:58 AM*

**Condensed Transcript**

**Prepared by:**

Lory Stone
C-08755

Sunday, October 10, 2021

Page 1

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:         )
4                            ) File No. C-08755-A
5  SOLARWINDS CORPORATION    )
6                            )
7  WITNESS:  Eric Quitugua
8  PAGES:    1 through 225
9  PLACE:    Securities and Exchange Commission
10           175 West Jackson Blvd
11           Chicago, Illinois
12 DATE:     Tuesday, August 31, 2021
13
14     The above-entitled matter came on for hearing, via
15 WebEx, pursuant to notice, at 9:58 a.m.
16
17
18
19
20
21
22
23
24        Diversified Reporting Services, Inc.
25             (202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      WILLIAM NEY, ESQ.,  Senior Counsel
5      LORY STONE, ESQ., Senior Counsel
6      BENJAMIN BRUTLAG, ESQ., Senior Counsel
7      MICHAEL BAKER, ESQ., Senior Counsel
8      KENNETH ZAVOS, IT Forensics Specialist
9
10     Securities and Exchange Commission
11     Division of Enforcement
12     175 West Jackson Blvd
13     Chicago, Illinois
14     (202) 551-7612
15
16 On behalf of the Witness:
17     JULIE RIEWE, ESQ.
18     ANNA MOODY, ESQ.
19     JONATHAN DEMARS, ESQ.
20     Debevoise & Plimpton
21     801 Pennsylvania Avenue N.W.
22     Washington, D.C. 20004
23     (202) 383-8070
24
25

Page 3

1  APPEARANCES(CONT.):
2
3  Also Present:
4
5      Jason Winds, SolarWinds EVP and Chief
6      Administrative Officer
7      Becky Melton, SolarWinds, VP of Legal
8      Era Calhoun, SEC Paralegal

Page 4

1                C O N T E N T S
2
3  WITNESS                            EXAMINATION
4  Eric Quitugua                          5
5
6  EXHIBITS:    DESCRIPTION              IDENTIFIED
7   1      Formal Order                       7
8   2      SEC Form 1662                      8
9   3      Testimony Procedures              12
10  6      Incident Improvement Plan 6/22/20   23
11  7      Org Chart                         31
12  15     2H 2019 CTO/DOIT R4R Goals       106
13  17     Campbell Email to Quitugua        65
14  19     Quarterly Overview 8/16/19        60
15  31     8/18/21 Subpoena                  13
16  32     Background Questionnaire 8/18/21   18
17  33     Q4 2020 QRR 10/27/20              52
18  34     Quitugua Email to Lyman 9/11/18  121
19  35     Vulnerability Incident Review 7/20  156

Page 133

1 would triage that, create tickets, do the follow-up. So
2 depending on which part of the team those assignments
3 went to.
4     Q    You referred to SEM. Is that S-I-E-M, just
5 for the court reporter?
6     A    Yeah, apologize. It's LEM, Log & Event
7 Manager, was renamed to Security Events Manager so I'll
8 use them interchangeably, LEM, SEM.
9     Q    So it's just S-E-M?
10    A    Yeah, just S-E-M, yeah. There's also a SIM,
11 sorry. I don't want to confuse, so.
12    Q    Got it. So beyond having the change
13 management policies in place, did Solar -- did
14 SolarWinds actually follow or apply those change
15 management guidelines on a daily basis?
16    A    Yes.
17    Q    Are you aware of any deficiencies in the
18 change management process before -- in the 2018 to 2020
19 time period?
20    A    Not that I'm aware of, no.
21    Q    Did anyone ever tell you that there were
22 deficiencies in the change management process during
23 that time period?
24    A    Not that I can recall, no.
25    Q    If you go to the next page, which is -- if you

Page 134

1 go to Page 9, you'll see a section there regarding
2 network security. Do you see that?
3     A    Yes, I do.
4     Q    All right. In the first -- well, there's
5 several questions. One is environments for development
6 staging, testing, QA, and production supported and
7 maintained. Do you see that?
8     A    Yes.
9     Q    From a security standpoint, is it important
10 for the development staging, testing, QA, and production
11 environment to be separated?
12    A    Yes.
13    Q    Why?
14    A    So that any changes within the development and
15 staging environments don't affect production systems
16 that could potentially bring down and make them
17 unavailable for -- for the services that they provide.
18    Q    And does the production -- the production
19 environment that's described there, is that the
20 environment in which the SolarWinds' products are
21 created or produced or what is -- well, let me just ask
22 this: What is the production environment that's
23 described there?
24    A    So production environments are environments
25 where there are strict change management procedures,

Page 135

1 right. These are production systems that are operating
2 and providing the actual services to the end user. In
3 this case, could be the employees. It could be our
4 customers, which if there are application servers that
5 are on the internet, those would be considered
6 production systems.
7     Q    Okay. What is the -- what's the development
8 environment?
9     A    The development environment is the environment
10 where all the, you know, development and testing of
11 updates and modifications to product code are done.
12    Q    So is that separate from the testing
13 environment or not at SolarWinds?
14    A    I don't know the answer to that. I know that
15 there is a -- there's two domains at SolarWinds, a DEV
16 Domain and a TUL domain. One is considered production,
17 and one's considered development.
18    Q    Okay. And so which one is production?
19    A    The TUL domain.
20    Q    And when you said "TUL," that's T-U-L?
21    A    T-U-L.
22    Q    Okay. And the DEV domain, that's the
23 development domain?
24    A    Yes.
25    Q    And that's D-E-V?

Page 136

1     A    Yes.
2     Q    Okay. Is that domain sometimes referred to as
3 SWDEV?
4     A    Yes.
5     Q    Okay. The next question down under this
6 section says, "Are firewalls used to segment network
7 zones and terminate connections to external networks?"
8 Do you see that?
9     A    Yes.
10    Q    Can you describe that? What is the importance
11 of firewalls segmenting the network zones for
12 cybersecurity purposes?
13    A    Sure. So again, firewalls are used to ensure
14 the segmentation so that the appropriate traffic as well
15 as access to resources within that specific zone or
16 network are adequate -- there are adequate security
17 controls that allow access or denial into those specific
18 environments.
19    Q    Okay. And so for example, between the DEV and
20 the TUL domains, was there a firewall used to segment
21 those two network zones?
22    A    Yes.
23    Q    And then it also refers to terminating
24 connections to external networks. Do you see that?
25    A    Yes.

Page 221

1 a pretty -- a pretty large difference between those for
2 a process that was going on.
3    A    I think the -- the big thing that we were
4 doing at this time is that we were continuously evolving
5 our processes and continuously improving upon any
6 additional gaps that we were finding, right.  So again,
7 I can't speak directly to the timing of whether or not
8 we were already doing the reviews or not during this
9 time.
10    Q    Were you finding a lot of gaps?  You said that
11 you were going back and you were -- you were identifying
12 gaps to improve on.  Did you find a lot of gaps?
13    A    Again, from -- as we identified those gaps, we
14 worked with, you know, the VP of security and our CIO,
15 but to put those into some formalized tracking and
16 program.
17    Q    Okay.  What was the formalized tracking and
18 program?  Where is that -- where is that documented --
19    A    So we were --
20    Q    -- reports we've been looking at today?
21    A    We reviewed a document called the R4R.  Part
22 of those gaps were reflected there as goals and
23 objectives.
24    Q    Okay.  So things that were goals and
25 objectives there were gaps prior to that time period?

Page 222

1    A    No, that's not correct.
2    Q    Okay.  So what were you saying then about the
3 R4Rs?  How can that help me identify what the gaps were?
4    A    So if we identified a gap, you know, and then
5 we got it through the risk review process, Tim, Rani
6 would say, well, okay, is this a way to improve the
7 overall security posture of the program?  And if it was,
8 say okay, well, let's make that as a goal and objective.
9        Part of that was SCIP.  Part of that was conducting
10 routine vulnerability assessments, as an example.
11    Q    So would the gaps then be identified in the
12 SCIPs and in the QRRs, the quarterly risk reviews?
13    A    If you looked at the -- yes, the actions
14 needed in the SCIPs, it was part of that would have
15 resulted from gaps that were identified.
16    Q    Okay.
17        So we looked at product management
18 SCIPs before, and there were various actions needed.
19 Those are the things that you would refer -- that you'd
20 be referring to as gaps here?
21    A    Yes.
22    Q    Okay.  Okay.  I think that's going to pretty
23 well wrap up what we're going to cover today, Mr.
24 Quitugua.
25        Prior to adjourning your testimony today, do

Page 223

1 you wish to clarify anything or add anything else to the
2 statements you've already made?
3    A    No.
4        MR. NEY:  Okay.  Counsel, do you wish to ask
5 any clarifying questions at this time?
6        MS. RIEWE:  I don't think so.  Obviously
7 reserve for tomorrow, but we can -- we have the benefit
8 of a second day so we can do it tomorrow.
9        MR. NEY:  Yes, any clarifying questions that
10 you want to ask, tomorrow either at the beginning or at
11 the end, let me know.
12        Okay.  At this time, we're adjourning the
13 testimony until tomorrow morning.
14        Mr. Quitugua, although your testimony is
15 adjourned, you remain under subpoena, and when we come
16 back tomorrow, I will go ahead and put your under oath
17 again, okay?
18        We are off the record at 4:44 p.m. on August
19 31st, 2021.
20        (Whereupon, at 4:44 p.m., the examination was
21 adjourned.)
22              * * * * *
23
24
25

Page 224

1              PROOFREADER'S CERTIFICATE
2
3 In the Matter of:  SOLARWINDS, INC.
4 Witness:         Eric Quitugua
5 File No:         C-08755-A
6 Date:            Tuesday, August 31, 2021
7 Location:        Chicago, Illinois
8
9    This is to certify that I, Christine Boyce,
10 (the undersigned) do hereby certify that the foregoing
11 transcript is a complete, true and accurate
12 transcription of all matters contained on the recorded
13 proceedings of the investigative testimony.
14
15
16
17
18
19 _____   9-13-2021
20
21
22
23
24
25

Page 225

```
 1                REPORTER'S CERTIFICATE
 2
 3  I, Kevin Carr, reporter, hereby certify that the
 4  foregoing transcript is a complete, true and accurate
 5  transcript of the testimony indicated, held on 8-31-21,
 6  at Chicago, IL in the matter of:
 7  SOLARWINDS, INC.
 8
 9  I further certify that this proceeding was recorded by
10  me, and that the foregoing transcript has been prepared
11  under my direction.
12
13
14
15  9-13-2021
16
17
18
19
20
21
22
23
24
25
```

# C-08755

## *Quitugua, Eric - Vol. II.20210901.344328-C*

*9/1/2021 9:32 AM*

**Condensed Transcript**

**Prepared by:**

Lory Stone
C-08755

Sunday, October 10, 2021

Page 226

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:         )
4                            ) File No. C-08755-A
5  SOLARWINDS CORPORATION    )
6                            )
7  WITNESS: Eric Quitugua
8  PAGES:   226 through 427
9  PLACE:   Securities and Exchange Commission
10           175 West Jackson Blvd.
11           Chicago, Illinois
12  DATE:   Wednesday, September 1, 2021
13
14    The above-entitled matter came on for hearing, via
15  WebEx, pursuant to notice, at 9:32 a.m.
16
17
18
19
20
21
22
23
24       Diversified Reporting Services, Inc.
25            (202) 467-9200

Page 227

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4     WILLIAM NEY, ESQ., Senior Counsel
5     LORY STONE, ESQ., Senior Counsel
6     BENJAMIN BRUTLAG, ESQ., Senior Counsel
7     MICHAEL BAKER, ESQ., Senior Counsel
8     KENNETH ZAVOS, IT Forensics Specialist
9     Securities and Exchange Commission
10     Division of Enforcement
11     175 West Jackson Blvd.
12     Chicago, Illinois
13     (202) 551-7612
14
15  On behalf of the Witness:
16     JULIE RIEWE, ESQ.
17     ANNA MOODY, ESQ.
18     JONATHAN DEMARS, ESQ.
19     Debevoise & Plimpton
20     801 Pennsylvania Avenue N.W.
21     Washington, D.C. 20004
22     (202) 383-8070
23
24
25

Page 228

1  APPEARANCES(CONT.):
2
3  Also Present:
4
5     Jason Winds, SolarWinds EVP and Chief
6     Administrative Officer
7     Becky Melton, SolarWinds, VP of Legal
8     Era Calhoun, Paralegal
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 229

1                  C O N T E N T S
2
3  WITNESS                              EXAMINATION
4  Eric Quitugua                             230
5  EXHIBITS:    DESCRIPTION              IDENTIFIED
6  1         Formal Order                    231
7  6         Incident Improvement Plan 6/22/20  282
8  18        Security Compliance 5/17/19     310
9  19        Quarterly Overview 8/16/19      326
10  23       Pierce Email 1/11/18            336
11  25       Q1 2020 QRR 3/3/20              319
12  31       8/18/21 Subpoena                231
13  36       Brown Email 11/19/19            264
14  37       PSIRT Email 11/19/19            356
15  39       Trump Email 4/25/17             366
16  40       Security Team Email 11/6/20     370
17  41       WhiteSource Email 9/8/20        386
18  42       Pierce Email 6/13/18            394
19  43       Esquitin Email 6/5/20           398
20  44       Kanalyanee Email 9/18/20        403
21  46       Confluence RAF 9/3/20           409
22  47       ITOM DOJ Malware Issues         414
23  48       Security Review 6/24/20         423
24  49       Brown-Nels Messaging 12/7/20    420
25

Page 286

1  TUL or the DEV domain.  Do you recall that?
2     A    Yes.
3     Q    And I just wanted to ask so I understand
4  better.  So with -- well, let's focus specifically on
5  the issue that we were talking about, the concept of
6  least privileged not being followed on those -- on those
7  workstations.  How can you remediate that if those
8  workstations are not connected to one of the Active
9  Directory domains?
10    A    So first thing that we do is identify, and the
11 way we identify those systems is we run -- you know, we
12 talked about automated scanning of the corporate
13 infrastructure.  So those are automated scheduled scans.
14 They'll return whether or not a system that was scanned
15 is either in a work group or in a domain.
16         So we'll group those systems in buckets of
17 work group and which domains they're joined to, and then
18 that's the list that we go down and work with the
19 network security or network management teams to
20 determine first, are they authorized on the network, and
21 we run through those playbooks.  That's -- that's one of
22 the ways that we find these systems that are not joined
23 to the domain.
24    Q    Okay.  And so that's how you can find the
25 system that's not joined to the domain.  Is there any

Page 287

1  way to -- to remediate the fact that they're not using
2  the concept of least privileged, though, other than
3  making them -- putting those systems on the domain?
4     A    Yeah, I mean, we -- we first look at business
5  justification, right.  Our processes say, look, all
6  systems that are on the network, the managed network,
7  must be or should be on the domain, right.  And so the
8  first question we ask is, well, what is -- why is it not
9  joined to any domain?  What is the business
10 justification?  And if they -- if one can't be given,
11 then we work with the system owner to put it on the
12 domain so it does get the domain policies.
13    Q    Okay.  Then so the only way to make sure that
14 the domain policies are being followed is if you
15 actually add those workstations to one of the existing
16 domains?
17    A    It gives the IT groups the ability to control
18 what policies get enforced, yes.
19    Q    Okay.  And if it's not -- if it's not on one
20 of the domains, you don't have the ability to enforce
21 that?
22    A    We have the ability to reach out and find who
23 -- you know, who owns it and then have those subsequent
24 conversations about, you know, why isn't it on the
25 domain, those types of things.

Page 288

1     Q    Yes.  But you can't apply the rules to it if
2  it's not --
3     A    You can't apply the domain rules, yes.
4     Q    Okay.  Looking again at the slide that's in
5  12273 in Exhibit 36, it's the same slide we had been
6  looking at before we went to the org chart, there's a
7  second issue that's identified and says, "The use of
8  shared accounts throughout internal and external
9  applications."  Can you tell me what that issue refers
10 to?
11    A    That was specifically addressing service
12 accounts that were being shared.
13    Q    Is there a security issue relating to the use
14 of those shared accounts?
15    A    Yes, we talked a little bit about that
16 yesterday and some of the risks associated with that.
17 There's no way for -- for teams to identify, you know,
18 who was the individual using that shared credential.
19    Q    And so that would -- so would that be access
20 control or an access management issue?
21    A    It would be an item, yes, that needs to be
22 remediated, yes.
23    Q    Okay.  So we had talked -- we had talked about
24 access -- access control.  Let me ask this first.  This
25 slide entitled "Enterprise Access Management," is that

Page 289

1  the same as what you referred to yesterday as access
2  control?
3     A    I'm not sure I understand the question.  Could
4  you repeat?
5     Q    The top of this slide is entitled "Enterprise
6  Access Management."  Yesterday we looked at a policy or
7  a guideline that related to access control.  Are those
8  the same thing?
9     A    Yeah, I would say they are, yes.
10    Q    Access management and access control, in your
11 -- in your mind, those are referring to the same thing?
12    A    In the context of the project, yes.  The
13 access management project dealt with how we improve
14 access controls as defined in our guidelines.
15    Q    Okay.  In the -- so in this early 2018 time
16 period, why was it that shared accounts were being used
17 throughout the internal and external applications?
18    A    I'm not sure I understand.  Can you repeat one
19 more time, please?
20    Q    Yeah.  So early 2018, and you were saying that
21 the use of shared accounts was an issue that you
22 identified in this presentation.  I'm just wondering why
23 was it that shared accounts were being used in time
24 period?
25    A    So shared accounts, service accounts that were

Page 358

1  A  That means that the credential was not
2  encrypted so any user who was able to access that repo
3  was able to see the credential.
4  Q  Okay. And was the repo -- are those repos --
5  they're part of the public GitHub. So is it your
6  understanding that that repo was publicly available?
7  A  Again, based on our investigation of this
8  particular security issue, we did find that the public
9  GitHub repo was owned by the intern.
10  Q  Okay. And was it available to members of the
11  public?
12  A  It was confirmed that it was available to
13  members of the public.
14  Q  Okay. There was no -- no -- no limitations on
15  who had access to it?
16  A  I don't recall. No, I don't believe so, not
17  from the investigations we did as part of the security
18  incident.
19  Q  And when you refer to credentials, you mean
20  user name and password, correct?
21  A  Yes.
22  Q  Okay. What is the -- just a moment. There's
23  a reference further down to a FTP URL, and it's
24  SolarWinds.upload.akamai, a-k-a-m-a-i, .com. Do you see
25  that?

Page 359

1  A  Yes.
2  Q  What is -- what is Akamai, if you know?
3  A  Akamai is our content delivery network
4  provider, a CDN.
5  Q  And what does that mean? What is a CDN?
6  A  They basically -- we use Akamai as a content
7  distribution point for distributing, you know, our own
8  files and whatnot. They also serve as our DNS, but for
9  this particular purpose, we use them as a CDN.
10  Q  When you refer to content distribution point,
11  what -- what kind of content are you referring to being
12  distributed?
13  A  In this specific case, access to it was done
14  by FTP.
15  Q  Okay. I guess what I don't understand is what
16  content was distributed by SolarWinds through Akamai.
17  Is it -- is it products? Is it product updates? Is it
18  -- what did SolarWinds distribute through Akamai?
19  A  Downloads of our -- of our product.
20  Q  Okay. The next portion of the -- of the
21  description provided has the user name as SolarWinds,
22  and then it has the password solarwinds123. Do you see
23  that?
24  A  Yes.
25  Q  Were you able to confirm that that was indeed

Page 360

1  the password and user name for that Akamai account?
2  A  I'm trying to think. I would have to refer to
3  the incident notes. If it was confirmed and validated,
4  it would have been captured in the incident log.
5  Q  Okay. Towards the end, the report states that
6  "via this, any hacker could upload malicious exe and
7  update it with released SolarWinds' products." Do you
8  see that?
9  A  Yes.
10  Q  Is that an accurate statement of the risk
11  presented by this -- by these publicly available
12  credentials?
13  A  With -- with those credentials, yes, any --
14  anybody could upload executables to the repository -- to
15  the Akamai FTP site.
16  Q  The password solarwinds123, there's no
17  capitals in that, that is -- that is inconsistent with
18  SolarWinds' password requirements, correct?
19  A  Yes, that's correct.
20  Q  Is this a system that was outside SolarWinds
21  -- the SolarWinds domain?
22  A  This application was not immigrated into
23  Active Directory single sign-on.
24  Q  Was that -- that's a better way to state it.
25  And so is that the reason why this password that

Page 361

1  violated SolarWinds' password policy could be -- could
2  be used for that application?
3  A  Yes.
4  Q  Okay. If it was part of the Active Directory,
5  then the Active Directory rules would -- would apply to
6  it, correct?
7  A  Yes, that is correct.
8  Q  Okay. And I think I stated at the -- let me
9  just clarify with you. You would agree, wouldn't you,
10  that solarwinds123 is inconsistent with the -- with
11  SolarWinds' password requirements that we looked at
12  earlier?
13  A  Yes.
14  Q  Okay. Would you agree that that is a very
15  weak password?
16  A  Yes.
17  Q  For what reasons? As a cybersecurity
18  professional, what's wrong with solarwinds123 as a
19  password?
20  A  You know, numbers in sequence, all lower case,
21  no complexity, uses common names.
22  Q  All those things?
23  A  Uh-huh.
24  Q  Also lack of any special character?
25  A  Yes.

Page 362

1  Q   Okay.  Was solarwinds123 a password that was
2  used on other systems at SolarWinds?
3  A   I want to make sure I understand the question.
4  You're asking if the password used here in the -- as
5  part of this report was used also elsewhere within the
6  organization?
7  Q   Yes.  Are you aware of solarwinds123 being
8  used as a password in other parts of the organization?
9  A   For applications and systems that were drawing
10 to the domain, that would not have been possible because
11 of the group policy enforcements.  In our lab
12 environments, there could have -- I'm sorry, no.  There
13 may have been the possibility that in the lab
14 environments, passwords such as, you know, weak
15 passwords that were in use.
16     MS. RIEWE:  And maybe just to jump in, Eric, I
17 think he's asking you if you know.  Anything in the
18 world is possible in theory.  So if you know, you know.
19 If you don't, you don't.  I think leave it at that so
20 you're not speculating on possibilities.
21     THE WITNESS:  Not during this time period, no.
22     BY MR. NEY:
23 Q   You're not aware of it being used in others
24 during the time period?
25 A   Not during this time, no.

Page 363

1  Q   Okay.  Just going back to the possibility that
2  you did address this, what area were you saying that
3  possibility existed in?
4  A   Again, we talked about systems that weren't
5  connected to the domain who may have like weak passwords
6  or, you know, local administrators.  That's what I was
7  referencing.
8  Q   I think there was a particular system that you
9  -- that you mentioned.
10 A   Again, I described that as a lab environment.
11 Q   What is the -- what does that -- what were you
12 referring to when you referred to the lab environment?
13 A   Environments where we have workstations and
14 servers are used to do testing.
15 Q   Okay.  And those were not connected to the
16 SolarWinds' Active Directory?
17 A   Not that I can recall, no.
18 Q   Was solarwinds123 used as the original
19 password for company-owned devices that were provided to
20 employees?
21 A   I don't know if it was or was not.
22 Q   Was solarwinds123 the password for the company
23 -- the company's Wi-Fi?
24 A   I don't believe so, no.
25 Q   Have you signed onto the company's Wi-If

Page 364

1  previously?
2  A   Yes, I have.
3  Q   And you don't recall solarwinds123 being the
4  password for that?
5  A   I do not recall it being that password, no.
6  Q   Do you recall it being used as the password
7  for any servers at SolarWinds?
8  A   Not to my knowledge, no.
9  Q   As the senior security manager at SolarWinds,
10 do you have access to -- to the passwords that are used
11 for SolarWinds' servers?
12 A   I only have access to the credentials that we
13 use to run our vulnerability scanner.
14 Q   Okay.  The -- does your group provide any sort
15 of auditing or review of the passwords that are used for
16 SolarWinds -- for SolarWinds' servers to make sure
17 they're consistent with the password policy?
18 A   I don't recall if we did the checks during
19 this timeframe or not.  I don't have any recollection
20 right now if we did or not during this time period.
21 Q   Okay.  Are there checks that you do now?
22 A   Yes.
23 Q   During this time period, who would have been
24 responsible for doing those checks, if anyone did?
25 A   The IT operations group and the systems

Page 365

1  engineering group.
2  Q   Are you familiar with the phrase "hard coded
3  password"?
4  A   I've heard the term before.
5  Q   Do you have an understanding of what it means?
6  A   In what context?
7  Q   A password for a application or server.
8  A   Yeah, in that context, it would be a
9  credential used and placed within product code, for
10 example, or a script, you know, that you're running.
11 Q   And so what does -- what does that mean?
12 What's the impact of having a hard coded password and
13 product code?
14 A   It allows the product function or processes
15 running within the application to authenticate without
16 any interaction.
17 Q   Are you familiar with the phrase as it relates
18 to software applications, "default passwords"?
19 A   As it relates to applications?
20 Q   Yes.
21 A   Yes, default passwords, yes, I'm familiar.
22 Q   What is a -- what is a default password?
23 A   In the context of products, it's typically
24 credentials that are used during the installation of a
25 product and then, you know, changed shortly afterwards.

Page 422

1  Q   And you know -- just looking at this and
2  without those details in front of you, it was -- I was
3  asking about the conclusion previously.  Do you recall
4  whether any analysis -- whether your team did any
5  analysis to try to reach a conclusion about that?  Did
6  they do any analysis to try to figure out if this was
7  the same vulnerability or a different vulnerability?
8  A   As with all other externally reported issues,
9  we worked with the customers to try and verify,
10 replicate, or recreate what they're reporting to us.
11 Again, because we're following those same processes, our
12 engineering teams would have attempted to recreate what
13 this customer was reporting.
14 Q   I guess my question's a little bit different.
15 What I was asking is so without -- without regard to
16 any conclusions you reached about similarities between
17 this attack and the DOJ attack, do you recall if your
18 team did any analysis, your security team did any
19 analysis to try to determine whether this was -- whether
20 this involved the same vulnerability?
21 A   I don't have -- I don't have any recollection
22 of that.  The information we would have gotten would
23 have come from the engineering teams, and then we would
24 have compared that, but again, I don't have the details
25 in front of me.

Page 423

1  Q   I'm going to show you just one more -- one
2  more document.  If I can refer you to Exhibit 48.
3        (SEC Exhibit No. 48 was marked for
4        identification.)
5  BY MR. NEY:
6  Q   Exhibit 48 is an exhibit that's
7  architecture/engineering security vulnerability and
8  incident review dated June 24th, 2020.  If you flip
9  through it, you'll see some of the same -- same
10 dashboards or same type of dashboards that we looked at
11 previously.  First, let me ask:  Are you familiar with
12 these architecture/engineering security vulnerability
13 and incident reviews?
14 A   Yes, I am familiar with it.
15 Q   Okay.  And is this -- were these used in
16 meetings that you would attend?
17 A   No, I don't believe these were meetings that I
18 would have attended.
19 Q   Okay.  How are you familiar with these
20 reports?
21 A   I would have been asked to provide the BI
22 reports that are shown in the exhibit.
23 Q   Okay.  I just want to ask about one very small
24 item in here.  If you flip to the Bates page ending in
25 6872, there's a year-to-date ITOM product review

Page 424

1  relating to security.  Do you see that?
2  A   Yes.
3  Q   At the bottom of that page, there is an
4  incident number, ITOM 2020570, and the description and
5  the title says that SolarWinds Papertrail customer
6  claims there's an attacker inside SolarWinds.  Do you
7  see that?
8  A   Yes.
9  Q   Do you have a recollection of that incident --
10 that incident in -- what came of that incident?
11 A   I don't recall the details around that
12 incident.  Again, we can always reference back to the
13 incident number in Confluence to get the details, but I
14 don't -- I don't recall the details around it.
15 Q   Okay.  And so with that incident number, then
16 you could -- you could find that and see what you-all
17 did and what you determined?
18 A   We would -- we would be able to look at the
19 logs and see what types of investigative steps were
20 taken.
21      MR. NEY:  Give me just a moment.  I'm just
22 going to see if there's any additional things.  Let me
23 just go ahead and ask that:  Is there -- are there any
24 additional questions that members of SEC team wanted to
25 ask at this point?

Page 425

1      MR. BAKER:  This is Mike, not from me.  Thank
2  you.
3      MS. STONE:  Not from me either, Brad.  Thanks.
4      MR. BRUTLAG:  Not from me.  Thank you.
5      MR. NEY:  Ken, any additional questions?
6      MR. ZAVOS:  I didn't have anything else.
7      MR. NEY:  Okay.  Great.  I think we are going
8  to go ahead and wrap up for today.  Mr. Quitugua, we
9  have no further questions for you at this time.  We may,
10 however, call you to testify again in this
11 investigation, and should that be necessary, we'll
12 contact you through your counsel again.
13     Before we close the record, do you wish to
14 clarify anything with respect to the statements that
15 you've made over the last two days?
16     THE WITNESS:  No.
17     MR. NEY:  Counsel, do you have any clarifying
18 questions that you'd like to ask before we close for the
19 day?
20     MS. RIEWE:  We do not.
21     MR. NEY:  We are off the record at 4:10 p.m.
22 on September 1st, 2021.
23     (Whereupon, at 4:10 p.m., the examination was
24 concluded.)
25           * * * * *

Page 426

1 PROOFREADER'S CERTIFICATE
2
3 In the Matter of: SOLARWINDS, INC.
4 Witness: Eric Quitugua
5 File No: C-08755-A
6 Date: Wednesday, September 1, 2021
7 Location: Chicago, Illinois
8
9 This is to certify that I, Christine Boyce,
10 (the undersigned) do hereby certify that the foregoing
11 transcript is a complete, true and accurate
12 transcription of all matters contained on the recorded
13 proceedings of the investigative testimony.
14
15
16
17
18
19 _____ 9-13-2021
20
21
22
23
24
25

Page 427

1 REPORTER'S CERTIFICATE
2
3 I, Kevin Carr, reporter, hereby certify that the
4 foregoing transcript is a complete, true and accurate
5 transcript of the testimony indicated, held on 9-1-21,
6 at Chicago, IL in the matter of:
7 SOLARWINDS, INC.
8
9 I further certify that this proceeding was recorded by
10 me, and that the foregoing transcript has been prepared
11 under my direction.
12
13
14
15 9-13-2021
16
17
18
19
20
21
22
23
24
25