# Exhibit 43

**Excerpts of
Woong Joseph Kim
Deposition Transcripts**

### Page 1

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE   )
     COMMISSION,               )
 5                             )
         Plaintiff,             )
 6                             ) Case No.
      vs.                       ) 23-cv-9518-PAE
 7                             )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9       Defendants.            )
     _____)
10
11
12
13        VIDEOTAPED DEPOSITION OF
14            WOONG JOSEPH KIM
15              Austin, Texas
16        Monday, September 16, 2024
17
18
19
20
21
22
23
24   Reported by:
     Micheal A. Johnson, RDR, CRR
25   Job No. 240916MJ
```

### Page 2

```
 1         UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE   )
     COMMISSION,               )
 5                             )
         Plaintiff,             )
 6                             ) Case No.
      vs.                       ) 23-cv-9518-PAE
 7                             )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9       Defendants.            )
     _____)
10
11
12
13
14      Videotaped Deposition of WOONG JOSEPH KIM,
15   taken on behalf of Plaintiff, at Latham & Watkins,
16   LLP, 300 Colorado Street, Suite 2400, Austin, Texas,
17   beginning at 9:11 a.m. and ending at 6:02 p.m. on
18   September 16, 2024, before Micheal A. Johnson, a
19   Registered Diplomate Reporter, Certified Realtime
20   Reporter, and Notary Public of the State of Texas.
21
22
23
24
25
```

### Page 3

```
 1   APPEARANCES:
 2   ON BEHALF OF PLAINTIFF:
 3       U.S. SECURITIES AND EXCHANGE COMMISSION
         BY:  Kristen M. Warden
 4            John J. Todor
              Christopher J. Carney
 5            Lory C. Stone (Via Zoom)
         100 F Street, NE
 6       Washington, D.C. 20549
         (202) 256-7941
 7       wardenk@sec.gov
         todorj@sec.gov
 8       carneyc@sec.gov
         stonel@sec.gov
 9
10   ON BEHALF OF DEFENDANTS
     SOLAR WINDS CORP. AND TIMOTHY G. BROWN:
11
         LATHAM & WATKINS LLP
12       BY:  Serrin Turner
         1271 Avenue of the Americas
13       New York, New York 10020
         (212) 906-1330
14       serrin.turner@lw.com
15       LATHAM & WATKINS LLP
         BY:  Kirsten Caroline Lee
16       330 North Wabash Avenue, Suite 330
         Chicago, Illinois 60611
17       (312) 777-7281
         kirsten.lee@lw.com
18
19   ON BEHALF OF DEFENDANT
     TIMOTHY G. BROWN:
20
         KING & SPALDING LLP
21       BY:  Michael J. Biles (Via Zoom)
         500 West 2nd Street, Suite 1800
22       Austin, Texas 78701
         (512) 457-2051
23       mbiles@kslaw.com
24
25
```

### Page 4

```
 1   APPEARANCES (CONTINUED):
 2   ON BEHALF OF THE WITNESS:
 3       CHOATE HALL & STEWART LLP
         BY:  Michael T. Gass
 4            April C. DeLuca
         Two International Place, 31st Floor
 5       Boston, Massachusetts 02110
         (617) 248-4750
 6       mgass@choate.com
         adeluca@choate.com
 7
 8   ALSO PRESENT:
 9       Becky Melton
         Cope Davis
10
11   VIDEOGRAPHER:
12       Timothy Desadier
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5:

```
                  INDEX
             WOONG JOSEPH KIM
             September 16, 2024

    APPEARANCES                              3

    PROCEEDINGS                              8


    EXAMINATION OF WOONG JOSEPH KIM:

    BY MS. WARDEN                            9


    REPORTER'S CERTIFICATION                290
```

Page 6:

```
             DEPOSITION EXHIBITS
              WOONG JOSEPH KIM
              September 16, 2024

    EXHIBIT NO.    DESCRIPTION           MARKED

    Exhibit 1      October 17, 2022          10
                   Investigative Hearing
                   Transcript Testimony of
                   Woong Joseph Kim
    Exhibit 2      September 15, 2022        17
                   Background Questionnaire
                   of Woong Joseph Kim
                   JOKI-000009 - JOKI-000018

    Exhibit 3      July 8, 2021 SolarWinds   101
                   Security Statement
    Exhibit 4      January 30, 2018 E-mail,  130
                   Steven Colquitt to Brno
                   Engineering Management,
                   et al.
                   SW-SEC00238141 -
                   SW-SEC00238142

    Exhibit 5      September 20, 2018        146
                   E-mail, Rani Johnson to
                   Joe Mitchen, et al.
                   SW-SEC00237608 -
                   SW-SEC00237609

    Exhibit 6      October 2018 Information  152
                   Security Risk Review
                   SW-SEC00313351 -
                   SW-SEC00313362
    Exhibit 7      February 13, 2019 E-mail, 169
                   August Wehrmann to SW MSP
                   Engineering, et al.
                   SW-SEC-SDNY_00000004 -
                   SW-SEC-SDNY_00000005
    Exhibit 7A     Attachment to Exhibit 7   169
                   Produced in Native Format
                   SW-SEC-SDNY_00000006
```

Page 7:

```
             DEPOSITION EXHIBITS
              WOONG JOSEPH KIM
              September 16, 2024

    EXHIBIT NO.    DESCRIPTION           MARKED

    Exhibit 7B     SolarWinds MSP R&D 2019   169
                   Kick-off
    Exhibit 8      August 29, 2019 E-mail,   186
                   Rani Johnson to Mary Beth
                   Labuda
                   SW-SEC-SDNY_00006030 -
                   SW-SEC-SDNY_00006036
    Exhibit 9      July 2019 MSP Products    199
                   Security Evaluation
                   SW-SEC00166790 -
                   SW-SEC00166799

    Exhibit 10     September 11, 2018        214
                   E-mail, Timothy Brown to
                   Joe Kim
                   SW-SEC00266673
    Exhibit 10A    September 2018            214
                   Information Security
                   Incident Review
    Exhibit 11     October 3, 2018 E-mail,   227
                   Eric Quitugua to Joe Kim,
                   et al.
                   SW-SEC-SDNY_00006396

    Exhibit 12     August 16, 2019 E-mail,   238
                   Rani Johnson to Joseph
                   Kim, et al.
                   SW-SEC00264310 -
                   SW-SEC00264364
```

Page 8:

```
            Austin, Texas, Monday, September 16, 2024
                    9:11 a.m. - 6:02 p.m.

            THE VIDEOGRAPHER:  This is the
   videotaped deposition of Joseph Kim in the matter of
   the Securities and Exchange Commission versus
   SolarWinds Corporation, et al., Case No.
   23-cv-9518-PAE.
            The deposition is being held at
   Latham & Watkins at 300 Colorado Street, Austin,
   Texas.  Today's date is September 16th, 2024.  The
   time on the video monitor is 9:11 a.m.
            My name is Timothy Desadier,
   certified legal video specialist with Gradillas
   Court Reporters located at 400 North Brand
   Boulevard, Suite 950, Glendale, California 91203.
            Would counsel and all present please
   voice identify themselves.
            MS. WARDEN:  Kristen Warden, JJ Todor
   and Christopher Carney for the Securities and
   Exchange Commission.
            MR. TURNER:  Serrin Turner for
   SolarWinds and Mr. Brown from Latham & Watkins.
            MR. GASS:  Mike Gass and April DeLuca
   from Choate Hall & Stuart representing the witness
```

**Page 137**

1  lifecycle. We will be -- we will be working with
2  teams throughout 2018 to begin incorporating the SDL
3  into their development lifecycle. This begins with
4  general SDL training for all of the engineering
5  along with several SDL pilots with specific teams in
6  Q1.
7      A.  Yeah.
8      Q.  Will continue to pragmatically roll out
9  the SDL to additional teams each quarter.
10     A.  Yeah.
11     Q.  Do you see that?
12     A.  I do see that.
13     Q.  Okay. And you would have received this
14 e-mail?
15     A.  Yeah. I mean, I will -- if you said I
16 was part of the CTO direct reports, I probably did
17 receive it.
18     Q.  Did you have any conversation with
19 Mr. Colquitt about this e-mail?
20     A.  I do not recall this e-mail, so I can't
21 respond to say did I have a conversation with Steve
22 about this specific e-mail.
23     Q.  Do you -- I'll rephrase.
24         Did you have any conversation with
25 Mr. Colquitt regarding his concerns regarding the

**Page 138**

1  SDL language in the security statement?
2         MR. TURNER: Objection to form.
3      A.  I did not have any specific questions or
4  concerns with Steve about the security statement.
5  Like I answered earlier, I had Steve and Tim go out
6  and see if we can continue to improve how we do
7  security within the software development lifecycle.
8  And so that was an initiative that I had Steve and
9  Tim run. And -- go ahead.
10 BY MS. WARDEN:
11     Q.  So Mr. Colquitt's statement that we don't
12 do some of the things that are indicated in the
13 statement below, was that an accurate statement?
14         MR. TURNER: Objection to form.
15     A.  When I --
16         THE WITNESS: Go ahead.
17         MR. TURNER: Go ahead.
18     A.  When I read this security statement, it
19 is -- the security statement is accurate on what is
20 in here around software development lifecycle. We
21 did all of the statements that are listed here
22 around quality assurance, vulnerability testing,
23 regression testing, penetration testing and product
24 security assessments. We did do all of those things
25 within SolarWinds when the statement was published.

**Page 139**

1  BY MS. WARDEN:
2      Q.  So is it your testimony that
3  Mr. Colquitt's statement that we don't do some of
4  the things that are indicated in the statement below
5  is not true?
6         MR. TURNER: Objection to form.
7      A.  It is -- it is not true in terms of
8  specifically the security statement that is listed
9  here. The piece here that I think is important to
10 clarify and it might be a confusion here is are
11 you -- are you indicating that SDL, the secure
12 development lifecycle, the internal project name
13 that Steve is utilizing here is the same thing as
14 the software development lifecycle?
15 BY MS. WARDEN:
16     Q.  I'm just focusing in on the language in
17 the e-mail --
18     A.  Yeah.
19     Q.  -- that CTO direct reports received.
20     A.  Yeah.
21     Q.  So based upon the language that's in this
22 e-mail I guess is how you should interpret your
23 understanding of the language. So --
24         MR. TURNER: Objection to form. Are
25 you asking him whether based on this e-mail he had

**Page 140**

1  reason to think that any of these things in this
2  statement were untrue?
3  BY MS. WARDEN:
4      Q.  Do you agree with Mr. Colquitt's
5  statements in Bates ending in 41?
6      A.  I don't know because I have not seen this
7  e-mail before. I have not -- I don't recall seeing
8  this e-mail before. I don't recall it. And so when
9  I had the discussion with Steve, like I stated
10 earlier, the context to which we're looking at SDL
11 as is indicated here, which is secure development
12 lifecycle, that is an internal name that Steve and
13 Tim came up with. And sometimes it was called
14 software security development lifecycle, SSDL, and
15 it's the reason why in this e-mail he is
16 capitalizing the words SDL and Secure Development
17 Lifecycle.
18         It says: Simple response, there is
19 improvement needed to be able to meet the
20 security --
21         THE REPORTER: Slow down, please.
22     A.  Security expectations of a Secure
23 Development Lifecycle. You see that in the second
24 paragraph? The Secure Development Lifecycle is
25 capitalized, whereas if you look at the bottom, it

```
 1  says: Our security development lifecycle. It is
 2  not capitalized. It happened to be that Steve is
 3  creating an internal project called SDL or SSDL in
 4  certain documents. I'm sure you got documents that
 5  referred to it as SSDL as well, is a new project
 6  that I had Tim Brown and Steven Colquitt initiate to
 7  better improve how we run security and how do we
 8  standardize some of the security practices within
 9  SolarWinds.
10          So to clarify, the statement at the
11  bottom where it says: Our secured development
12  lifecycle follows standard security practices
13  including vulnerability testing, regression testing,
14  penetration testing and product security
15  assessments, is a true statement. This is not
16  referring to necessarily the project that was being
17  taken underneath with Steve's e-mail thread here
18  with a capital S, capital D and capital L. It just
19  happens they're using similar language between the
20  two.
21  BY MS. WARDEN:
22     Q.   You believe that Mr. Colquitt is
23  referring to something different than the reference
24  to software development lifecycle in the security
25  statement?
```

141

```
 1     A.   Yes. Here SDL clearly he is stating
 2  this -- there is improvement needed to be able to
 3  meet the security expectations of a capital S,
 4  secure, capital D, development, capital L,
 5  lifecycle. And sometimes that project internally
 6  was referred to as software secure development
 7  lifecycle, which is SSDL.
 8     Q.   Okay. Let's take a look at Kim 3, which
 9  is the security statement.
10     A.   Yes.
11     Q.   And the reference to software secure
12  development lifecycle, is that capitalized?
13     A.   No, it is not.
14     Q.   Okay. So is this -- is that referring to
15  the SDL project that Brown is developing?
16     A.   The --
17          MR. TURNER: Brown or Colquitt?
18  BY MS. WARDEN:
19     Q.   Well, you mentioned there was a
20  project --
21     A.   Yes. I was asking --
22          THE REPORTER: Got to let her finish.
23  BY MS. WARDEN:
24     Q.   Go ahead.
25     A.   I was asking for Tim Brown and Steve to
```

142

```
 1  take on an initiative to help -- just like we were
 2  doing with the rest of the cybersecurity areas with
 3  things like NIST CSF to help standardize and
 4  continue to improve security within our software
 5  development lifecycle as well. So I had asked the
 6  two of them to take on that initiative.
 7     Q.   This is all your -- this is -- you didn't
 8  have any conversation with Mr. Colquitt to clarify
 9  your understanding of this exhibit at the time,
10  right?
11     A.   No. I mean, I -- but I -- like I said,
12  like I don't recall receiving this specific e-mail,
13  but you're asking me to read into what Steve's
14  intentions are in the e-mail. So likewise --
15     Q.   That's not what I asked you. As to your
16  understanding of his words.
17          MR. TURNER: Yes. After he told you
18  he didn't receive the e-mail, you asked for his
19  understanding. He's doing his best to give you his
20  guess, his understanding. That's exactly what you
21  asked for.
22     A.   That's what you asked.
23          MS. WARDEN: I'm going to object
24  again to your speaking.
25
```

143

```
 1  BY MS. WARDEN:
 2     Q.   Mr. Kim, as the CTO, was Mr. Colquitt's
 3  concern about the security statement something you
 4  had a responsibility to address?
 5     A.   I gave Steve the project to help improve
 6  the standardization and security of the product in
 7  the software development lifecycle. I specifically
 8  asked Steve and Tim to go run that project. And so,
 9  yes, I wanted to see improvements there just like we
10  did with NIST CSF and the rest of the other areas of
11  cybersecurity.
12     Q.   Okay. Did anyone share concerns with you
13  about that the language of -- the language about the
14  software development lifecycle in the security
15  statement was different than the reality?
16     A.   Did anyone raise a concern that the
17  statements was different than reality?
18     Q.   With respect to software development
19  lifecycle.
20     A.   No one raised any issues that I recall in
21  terms of the language in the security statement
22  being accurate or not. What I can tell you is that
23  the language in the Software Development Lifecycle
24  section of the security statement is accurate.
25     Q.   Okay. So who should Mr. Colquitt have
```

144

## Page 145

 1  shared concerns about the accuracy of language in
 2  the security statement with?
 3          MR. TURNER:  Okay.  Objection to form
 4  and foundation.  Again, he's already told
 5  you -- you've already asked him to provide his
 6  understanding and then you've questioned where he's
 7  getting his understanding from and now you're asking
 8  him who this understanding should have been shared
 9  with.  He doesn't remember the e-mail.  He doesn't
10  remember talking with Steven.  So the question
11  doesn't make sense.
12          MS. WARDEN:  I'm going to continue my
13  objection.
14          MR. TURNER:  Well, you're -- I will
15  object to your lecturing the witness when he doesn't
16  give you the answer he wants and then blaming him
17  for misunderstanding the question when the questions
18  aren't well formed.
19          MS. WARDEN:  I'm objecting to you
20  lecturing to SEC counsel.
21  BY MS. WARDEN:
22     Q.   Okay.  Let me show you another document,
23  Mr. Kim.
24     A.   Sure.
25     Q.   Mr. Kim, I'm marking this Exhibit Kim 5

## Page 146

 1  and for the record it's SW-SEC00237608 through 09.
 2          (Deposition Exhibit 5 marked for
 3  identification.)
 4  BY MS. WARDEN:
 5     Q.   So, Mr. Kim, you're not on this e-mail,
 6  but I'm just going to ask you about a sentence in
 7  the e-mail.
 8     A.   Sure.
 9     Q.   Let me know when you're ready.
10     A.   Give me a second.
11          (Witness reviews document.)
12     A.   Yeah.
13  BY MS. WARDEN:
14     Q.   Okay.  So directing you to the top half
15  of Bates ending in 08, you see Mr. Colquitt e-mailed
16  Tim Brown and Rani Johnson on May 21, 2018.
17          Do you see that?
18     A.   I do.
19     Q.   Okay.  And the subject says:  Re:  Please
20  confirm (particularly the threat modeling).
21          Do you see that in the subject line?
22     A.   Yes.
23     Q.   Okay.  Mr. Brown and Ms. Johnson were
24  your subordinates, right?
25     A.   Yes.  Rani reported to me directly and

## Page 147

 1  Tim Brown reported in to Rani Johnson.
 2     Q.   Okay.  So Mr. Colquitt says:  TM'ing is a
 3  process.  It's a part of the -- it's part of the SDL
 4  and we are just barely beginning to understand how
 5  teams are going to be doing this activity, so I am
 6  not sure what you are looking for in terms of
 7  confirmation.
 8          Do you see that?
 9     A.   I do.
10     Q.   Okay.  Did Ms. Johnson, who was your CIO
11  at the time, did she ever discuss this e-mail with
12  you?
13     A.   Not that I recall.
14     Q.   And what do you understand TM'ing to
15  mean?
16     A.   I would think that it says particularly
17  the threat modeling, so I would assume -- again, I'm
18  not on this e-mail thread, TM'ing probably means
19  threat modeling.
20     Q.   Have you ever referred to threat modeling
21  in e-mails with that acronym?
22     A.   I personally have not, no.
23     Q.   No.  Okay.
24          Did you ever hear any -- any complaints
25  from anyone at SolarWinds regarding what

## Page 148

 1  Mr. Colquitt said, We're just barely beginning to
 2  understand how teams are going to be doing this
 3  activity, referring to threat modeling?
 4          MR. TURNER:  Objection to the form.
 5     A.   Have I personally heard people
 6  complaining about it?  Not that I can recall.
 7  BY MS. WARDEN:
 8     Q.   And as of May 21, 2018, was it your
 9  understanding that threat modeling was being
10  followed?
11          MR. TURNER:  As of May 21, 2018?
12     A.   I don't know about the specific dates per
13  se, but we were doing threat modeling between the
14  products.  That specific process was not
15  standardized across the different parts of the
16  organization.  As Steve here rightly kind of points
17  out, it's more of a process in terms of how you
18  would utilize all the products together in order for
19  you to be able to do a level of threat modeling.
20          Again, I can't -- I'm not on the thread
21  so I don't know exactly what he means by doing this
22  activity.  I don't know if it's around
23  standardization or whatever the case is, but I know
24  that threat modeling was being done in the company.
25

**1**    **A.**    Sure. I remember it was the October time
**2**  frame, yeah.
**3**    **Q.**    And Mr. Quitugua was one of your direct
**4**  reports in the engineering group?
**5**    **A.**    No, Eric reported in to Tim Brown who
**6**  reported to Rani Johnson.
**7**    **Q.**    Okay. Had you received -- do you
**8**  routinely receive e-mails directly from
**9**  Mr. Quitugua?
**10**    **A.**    I mean, I ask people to communicate as
**11**  often and openly as possible. As part of the
**12**  internal, like, incident response process, you would
**13**  have to have a certain classification before it gets
**14**  escalated up to the C-level executives, but I did
**15**  encourage people to let folks know where incidents
**16**  stood and things like that. So this isn't the only
**17**  time that I would have received an e-mail like this.
**18**    **Q.**    So Mr. Quitugua wrote to you: Team, the
**19**  following is a list of open security incidents
**20**  currently in our queue and are actively being worked
**21**  on that you should be aware of.
**22**    Do you see that?
**23**    **A.**    I do.
**24**    **Q.**    All right. And then there's a chart.
**25**  And do you see the column -- left-most column

229

**1**  entitled Business?
**2**    **A.**    Yes.
**3**    **Q.**    All right. So let's take a look at row 2
**4**  under the second column entitled Title. Do you see
**5**  where it says: Orion platform lacks proper access
**6**  controls?
**7**    **A.**    I do.
**8**    **Q.**    What does that mean?
**9**    MR. TURNER: Objection, foundation.
**10**    **A.**    I don't specifically know, you know, what
**11**  that would mean in the context of this specific
**12**  incident. Obviously, you know, it's not like
**13**  there's no access control in the Orion platform,
**14**  otherwise the incident classification wouldn't be a
**15**  one low. So I don't know exactly how they were
**16**  filling that out, if it was typed in or if it's a
**17**  dropdown box or something like that from the report
**18**  that they were running. So I mean, again, I don't
**19**  have the necessary context for that specific title.
**20**  BY MS. WARDEN:
**21**    **Q.**    Okay. Let's back up. What is Orion?
**22**    **A.**    Orion is the Core platform where a lot of
**23**  the Core IT business unit's products are built on
**24**  top of.
**25**    **Q.**    Okay. Is it fair to say Orion generated

230

**1**  a majority of SolarWinds' revenue when you were
**2**  there?
**3**    **A.**    You had asked that question earlier today
**4**  and in terms of the revenue breakdown, I wouldn't
**5**  know that. I know that it was utilized much more
**6**  than the other products that were within the
**7**  SolarWinds portfolio. So I think that's probably
**8**  the case, but I wouldn't know the dollar figures
**9**  necessarily attached to it.
**10**    **Q.**    When you say "utilized much more than
**11**  other products" it means --
**12**    **A.**    More users.
**13**    **Q.**    -- had more customers, the most customers
**14**  of any product at SolarWinds?
**15**    **A.**    That's what I recall, yes.
**16**    **Q.**    Okay. Fair to say that Orion was a
**17**  flagship product at SolarWinds?
**18**    **A.**    I think that's fair to say.
**19**    **Q.**    Fair to say it was a crown jewel product?
**20**    MR. TURNER: Objection to form.
**21**    **A.**    Fair to say it's a very important
**22**  platform for the SolarWinds company.
**23**  BY MS. WARDEN:
**24**    **Q.**    And when Mr. Quitugua wrote to you:
**25**  Orion platform lacks proper access controls, did you

231

**1**  take that to mean that -- all of access controls
**2**  involving Orion or some?
**3**    MR. TURNER: Objection to form.
**4**    **A.**    Yeah, I had already answered. I did not
**5**  take it as all of Orion platform lacks proper access
**6**  controls. The reason why I would say that is
**7**  obviously from an incident classification
**8**  perspective that would not be considered a low
**9**  incident if that was the case.
**10**  BY MS. WARDEN:
**11**    **Q.**    Oh, you're tethering it to the last
**12**  column that it was classified as a one?
**13**    **A.**    Yes.
**14**    **Q.**    Okay. And you're inferring based upon
**15**  that it had a classification of one that the
**16**  reference to Orion platform lacks proper access
**17**  controls does not involve all of Orion's access
**18**  controls?
**19**    **A.**    Correct.
**20**    **Q.**    Okay. Any insight as to which particular
**21**  access controls this is referring to?
**22**    **A.**    I don't have any -- any specific
**23**  recollection or what this incident was for.
**24**  Obviously if the incident classification was much
**25**  higher, I would have dug into it, but, you know,

232

**Page 233**

1 being at an incident classification of low, I'm just
2 letting the team handle it at this point just with
3 the FYI.
4    Q.   And did you give guidance Mr. Quitugua
5 regarding how to classify -- you know, how -- what
6 kind of classification scheme to use?
7    A.   The internal incident response process
8 has with it a classification set of, you know,
9 requirements on what would be classified as what.
10 So that's part of the incident response process.
11 And exactly which incidents go with which
12 classification, I mean, I would have to, you know,
13 look at other documentation, but I know that we had
14 that pretty clarified.
15    Q.   And as of October 3rd, 2018, is this the
16 first time you recall learning that the Orion
17 platform lacked proper access controls?
18        MR. TURNER:  Objection to the form,
19 mischaracterization of the document.
20    A.   There again, I don't know what the very
21 specifics of this incident was.  That title around:
22 Orion platform lacks proper access controls, I don't
23 know how it is filled up, if it is a dropdown box
24 or, you know, if there's no other option to pick
25 anything else.  I was predominantly looking at the

**Page 234**

1 incident classification to see what the impact of
2 that specific incident was more so than anything
3 else.
4 BY MS. WARDEN:
5    Q.   How about just generally in the fall of
6 2018, do you recall learning about access control
7 issues involving Orion?
8        MR. TURNER:  Objection to form.
9    A.   We would keep track of all of the
10 incidents that would go through the system.  And you
11 can see here even on the Confluence page link, every
12 single incident that occurred would have a lot of
13 these specifics categorized.  Again, like in this
14 case, I don't know what the specifics are, but it
15 had something to do with access control within
16 Orion.  But the specifics I wouldn't know by looking
17 at this document.
18 BY MS. WARDEN:
19    Q.   And did you take any next steps to follow
20 up with Mr. Quitugua regarding the -- the row:
21 Orion platform lacks proper access controls?
22    A.   For an incident that was categorized as
23 one that didn't actually meet as part of the process
24 an escalation, no, I do not recall following up on
25 this specific incident.

**Page 235**

1    Q.   Okay.  Who has supervisory responsibility
2 over access control issues involving Orion?
3        MR. TURNER:  Objection, foundation.
4    A.   Yeah, I'm trying -- can you clarify --
5 BY MS. WARDEN:
6    Q.   Are you aware of the Orion platform,
7 security related to the Orion platform, who was in
8 charge of that?
9    A.   I mean, from a security perspective,
10 again, the culture that we push was that everyone
11 should care about security across the organization.
12 It wasn't, like, one person's job where their sole
13 job was the Orion platform security or something
14 like that.  Again, the -- in order for you to have
15 good security in the company, what you want to do is
16 to make sure that from a cultural perspective that
17 everyone had a good understanding of kind of their
18 importance in terms of putting good security
19 practices in place.  And it's because, again, you
20 can knock down the -- lock down the platform, but
21 they -- external people trying to get into your
22 products can come from anywhere.  So as a general
23 practice we didn't have one person responsible for
24 Orion platform access control.
25    Q.   In the next row below it says Orion NCM

**Page 236**

1 Credential Exposure in the column title.
2        Do you see that?
3    A.   I do.
4    Q.   And what do you understand that to mean?
5    A.   It's very similar.  So the Orion platform
6 is a core platform where you had built additional
7 products on top of that platform.  NCM was one of
8 the products that was built on top of the Orion
9 platform, network configuration manager.  And so
10 this specific, you know, incident -- you know,
11 low-classed incident was probably something to do
12 with the NCM product on top of the Orion platform.
13    Q.   So is it fair to say NCM is, like, a
14 subcategory under Orion?
15    A.   NCM is the -- ultimately how the customer
16 buys what's in the Orion platform.  So NCM is -- you
17 can see their core Orion NCM.  Likewise, when it
18 says Orion -- the row underneath it, Orion NPM.  So
19 NPM is another product that sits on top of the Orion
20 platform.
21    Q.   So is this describing some type of access
22 control issue?
23        MR. TURNER:  Objection, foundation.
24    A.   Again, like, I would need more specifics,
25 you know, from the confluence page on exactly what

**Page 237**

    the -- what the incident was for me to be able to
    adequately answer that question.
BY MS. WARDEN:
    Q.  Okay.  And shifting to the right under
Summary it says:  Plain text credentials for access
to configure nodes expose an HTML source code.
        Do you understand what that means?
    A.  It can mean many, many things.  So not
specifically for this incident.
    Q.  Does it relate to passwords not being
individually salted or hashed?
    A.  I can't tell from this line item on if
it's a salting or hashing issue.  In the incident
commander it says David and it says externally
reported by CJD IT Consultancy on it.  And so,
again, I don't know the specifics of this incident,
but, you know, it could be, you know, somebody
externally from a -- either a Bug Bounty program or
something like that ended up reporting a very
specific issue in the code.  So there's no way
to -- like that I can look at this slide and say it
was a salting or hashing issue.
    Q.  Did you take any next steps after
learning of what's in this chart, Orion NCM
credential exposure?

**Page 238**

    A.  No.  As the incident classification says,
it's a low.
    Q.  Okay.  I'm going to hand you what we'll
mark Kim 12.  It's Bates SW-SEC264310 through 364.
        (Deposition Exhibit 12 marked for
identification.)
        (Witness reviews document.)
BY MS. WARDEN:
    Q.  Okay.  Mr. Kim, do you recognize Kim 12?
    A.  Yeah.  It looks like one of the earlier
quarterly reviews of the security and compliance
programs that were happening within SolarWinds.
    Q.  Okay.  And the first -- so Bates ending
in 10 is an August 16, 2019, e-mail from Rani
Johnson to you, right?
    A.  Uh-huh.
    Q.  And to Mr. Kalsu, Mr. Bliss, Ms. Pierce,
Mr. Brown, Ms. Zader, correct?
    A.  Yes.
    Q.  And the subject:  Security and compliance
Q3 2019 quarterly review.
        Do you see that?
    A.  I do.
    Q.  All right.  So Ms. Johnson told you:
Thanks for your time today.  The presentation we

**Page 239**

reviewed is attached.  Please advise if you have any
questions or would like additional information.
        Do you see that?
    A.  I do.
    Q.  The next page, Bates ending in 11, is the
attached slide deck, which goes until Bates ending
in 64 and it's entitled Security and Compliance
Program Quarterly Overview.
        Do you see that?
    A.  I do.
    Q.  Now, many hours ago when we started
talking, we discussed a quarterly security review.
        Do you remember that?
    A.  I do.
    Q.  Okay.  And I believe you testified you
thought that it began in 2019, correct?
    A.  I -- yes, that's what I recall.
    Q.  Okay.  Did -- at some point was that
renamed Security and Compliance Program Quarterly?
    A.  I can't recall, like, if there was naming
changes or anything like that.  But, yeah, I mean
there was quarterly reviews associated with just
everything that was happening from a security and
compliance perspective.
    Q.  Okay.  Sometimes were they referred to as

**Page 240**

quarterly risk reviews, QRRs?
    A.  I don't recall the naming changes.
    Q.  All right.  And you see this is dated
August 16, 2019, right?
    A.  I do.
    Q.  Okay.  Who do you understand wrote this
slide deck?  Do you know who wrote this slide deck?
    A.  I'm sure a lot of people were involved in
the background.  I don't know the specifics of who
wrote the slide deck.  What I do know is it's a
compilation of security and compliance projects that
eventually at some point, you know, got summarized
at Rani and Tim and Jenny Zader's level.
    Q.  Okay.  Was this the first sort of
quarterly security review slide deck that you
received?
    A.  I can't recall.
    Q.  Okay.
    A.  But it's a good representation of
normally what we would see.
    Q.  All right.  So let's go to Bates ending
in 12.  Do you see it says Agenda at the top?
    A.  I do.
    Q.  And then it says:  Security compliance
project highlights executive ask.

**Page 241**

1  Do you see that?
2  A. I do.
3  Q. What were the executive asks? What is
4  that referring to?
5  A. It's referring to, you know, there were
6  two parts of the security and compliance review.
7  One of them was obviously to inform us what was
8  happening with all of the security and compliance
9  projects, I mean, there was a lot that we
10 emphasized. And the executive asks were sort of
11 from the team of Rani and Jenny Zader and Tim Brown
12 and others where they would ask, you know, Bart,
13 myself and Jason on some additional help in terms of
14 putting pressure either within our own organizations
15 or other C-level executives' organizations to, you
16 know, put additional emphasis around certain
17 projects.
18     So that would be the executive ask.
19 Q. Okay. And when you say, Putting pressure
20 within our own organization or other C-level
21 executive organizations, pressure in terms of what?
22 A. Pressure in terms of, you know, more
23 prioritization of doing one set of initiatives that
24 was, you know, security and compliance focused
25 versus other initiatives that a function or a

**Page 242**

1  product organization would prioritize.
2  Q. Can pressure include increased funding
3  for a particular project?
4  A. I don't remember any asks -- I don't
5  recall any asks where the executive ask around these
6  reviews was additional ask for funding for pressure,
7  per se.
8  Q. And then the third bullet on this
9  document Bates ending in 12 says: Security Incident
10 Improvement Plan (SIIP) Update.
11     What does that mean?
12 A. I don't recall exactly what that third
13 bullet point was for.
14 Q. Okay. If you can turn to page ending in
15 Bates 18.
16 A. Yeah.
17 Q. At the top it says SolarWinds Security
18 Program and underneath it says: Security controls
19 based on NIST controls.
20     Do you see that?
21 A. Yeah. This is the NIST CSF framework.
22 Q. Okay. And if you turn to the next page,
23 it says: SolarWinds Scorecard NIST Maturity Level.
24 A. Yeah.
25 Q. Okay. The scorecard covers five

**Page 243**

1  different areas: Identity, protect, detect,
2  respond, and recover.
3     Do you see that?
4  A. I do.
5  Q. Are those from the NIST CSF?
6  A. Correct. Those are the different
7  categories in NIST CSF.
8  Q. And then it just, directing your
9  attention to the last row in Bates ending in 19,
10 where it says Overall, do you see in 2017 it has a
11 score of 1 and it's color coded orange?
12     Do you see that?
13 A. Oh, for overall?
14 Q. Yeah.
15 A. Yes, I do see that.
16 Q. Just a couple other questions. How did
17 SolarWinds come up with these scores?
18     MR. TURNER: Object to foundation.
19 BY MS. WARDEN:
20 Q. Do you know how SolarWinds came up with
21 these scores?
22 A. I mean, internally I don't know exactly
23 what the assessment was that Rani and Tim and team
24 ran, but it was I think a self-assessment. We
25 didn't have third parties come in in accordance to

**Page 244**

1  sort of what the maturity level is listed here in
2  terms of 0 through 5. So in the descriptions, for
3  example, 1.0 would indicate that the organization
4  has ad hoc inconsistent or reactive approach to
5  meeting the security control objectives.
6  Q. So you mentioned that you thought Rani
7  Johnson and Tim Brown did the assessment to
8  determine the scores; is that accurate?
9  A. Internally I'm sure they, you know, did a
10 lot of checks and things like that, you know,
11 themselves. I did not, you know, drill down into,
12 you know, how did you come up with such-and-such
13 score, et cetera.
14 Q. Did Mr. Brown or Ms. Johnson consult you
15 on the scoring legend?
16     MR. TURNER: Objection to form.
17 BY MS. WARDEN:
18 Q. That we see on Bates ending in 19?
19 A. No. I mean, I would have to go back and
20 see what the NIST CSF during 2000 and -- you know,
21 what the standards were back in August of 2019.
22 But, no, I didn't have any input or anything like
23 that in terms of how they came up with the legend.
24 Q. Okay. Besides Mr. Brown and Ms. Johnson,
25 any other SolarWinds employees involved in coming up

```
 1  overall score went from 1 to 2.5.
 2      Do you see that?
 3   A.  I do.
 4   Q.  All right. And in 2019, the next column
 5  over --
 6   A.  Yeah.
 7   Q.  -- the overall score increased to 2.8.
 8      Do you see that?
 9   A.  I do.
10   Q.  And you don't know how those scores were,
11  like, granularly arrived at, correct?
12   A.  I mean, I'm -- in terms of the granular
13  level of how they came to be, no, I don't know all
14  of the specifics around that. You know, obviously
15  this was --
16          MR. TURNER: That was the question.
17          THE WITNESS: Yes.
18   A.  No, I don't know the granular details of
19  how those were derived.
20  BY MS. WARDEN:
21   Q.  So let's look at the maturity level
22  description for -- well, they're color coded in
23  light green. So that would be: The organization
24  has a documented, detailed approach to meeting the
25  security control objectives, and regularly measures
```

249

```
 1  its compliance.
 2      Is -- are the scores that you see as
 3  reflected in this scorecard for 2018 and 2019, are
 4  they accurate to you?
 5          MR. TURNER: Objection to form and
 6  foundation.
 7   A.  From the way that it is documented of an
 8  18 being between overall a 2 and a 3, and being
 9  closer to a three in 2019, it's -- again, like I --
10  without the specifics, just, you know, how we, you
11  know, felt like things that we were improving, I
12  would say those are -- it's a good representation.
13  BY MS. WARDEN:
14   Q.  And why were things improving?
15   A.  Because we were starting to standardize
16  and not have inconsistencies in terms of the way
17  that we're utilizing technologies in these areas.
18   Q.  Okay. So do you think that the reason
19  for the improvement was limited to the
20  standardization?
21   A.  No. I mean it's also in other areas as
22  well. For example, in Respond, when you go to a
23  2.8, you know, when you continue to improve your
24  incident response process, for example, obviously,
25  you know, you would continue to improve your scores.
```

250

```
 1  Because, again, if you -- once you get from 1 to a
 2  2, it says other things in here that you would need
 3  now for you to be able to get from a 2 to a 3,
 4  right. So yes. I mean first step was around, you
 5  know, how do you standardize and then secondly how
 6  do you get more consistent in terms of meeting the
 7  security controls.
 8   Q.  Okay. Let's look at the next page. It's
 9  Bates ending in 20, please.
10   A.  Okay.
11   Q.  The top of the slide -- it says
12  indentify. I believe that's a typo. Should be
13  identify.
14   A.  Yeah.
15   Q.  Is that a -- does identify come from the
16  NIST --
17   A.  CSF --
18   Q.  -- CSF?
19   A.  -- framework, yes, it does.
20   Q.  All right. So under --
21          (Admonition by reporter.)
22  BY MS. WARDEN:
23   Q.  Under Security Category, do you see that
24  column?
25   A.  I do see that column.
```

251

```
 1   Q.  Okay. It says: Secure software
 2  development lifecycle SSDL.
 3      Do you see that?
 4   A.  I do see that.
 5   Q.  Okay. And next to the reference to SSDL
 6  it says: Employees are aware of and utilize a
 7  security software development lifecycle in their
 8  day-to-day activities.
 9      Do you see that?
10   A.  I do see that.
11   Q.  All right. And in the next column over
12  it has the NIST maturity level. And that row for
13  SSDL was given a 2.
14      Do you see that?
15   A.  I do see that.
16   Q.  Okay. And I don't know if you want to
17  reference the previous page to see what the
18  description for 2 means. I'll let you do that.
19   A.  Yeah. I can -- I can read that.
20   Q.  Okay. Any reason to believe this score
21  of 2 for the SSDL was not accurate?
22          MR. TURNER: Objection to form.
23   A.  I don't have any reason to believe that
24  the score of 2 is inaccurate when I read the
25  description on page 19 or slide No. 9. I don't have
```

252

1  anything -- reason to think that it is inaccurate,
2  no.
3  BY MS. WARDEN:
4     Q.   Okay.  So the definition for 2, maturity
5  level 2, on doc ending in Bates 19 includes that.
6  It says:  But it is still mostly reactive and
7  undocumented.  The organization does not routinely
8  measure or enforce policy compliance.
9         So in what ways, Mr. Kim, was the SSDL as
10  of August 2019, in what ways was it mostly reactive
11  and undocumented?
12         MR. TURNER:  Object to form and
13  foundation.
14     A.   In terms of the very specifics of the
15  SSDL rolling out where it can be more proactive than
16  reactive, is that, you know, I had mentioned earlier
17  that when you look at the software development
18  lifecycle, right, we're using SAFe at the moment,
19  the requirement and the prioritization would be
20  determined in a lot of ways from the product
21  management organization, you know, as well.  And so
22  as part of -- again, there's probably some documents
23  around this.  As part of getting this more proactive
24  is to not only do this from an engineering
25  perspective but also to be able to educate and push

253

1  with the product management organization how
2  critical doing things like secure software
3  development lifecycle programs were.  So I think
4  from that perspective it absolutely could have been
5  more consistent and proactive than the way that we
6  were in 2019.
7  BY MS. WARDEN:
8     Q.   So is it fair to say as of 2019 the
9  secure software development lifecycles were
10  inconsistent and reactive?
11         MR. TURNER:  Objection to form, and
12  misstates testimony.
13     A.   Yeah, I thought I answered that.  The way
14  that I looked at that score was that the
15  requirements and the prioritization across these
16  requirements were still being established and set
17  with the product management organization, which was
18  outside of the engineering organization.  And so
19  part of the way that I saw that score and what we
20  can do was to push the importance of things like
21  SSDL programs to a department that prioritized the
22  work for the engineers, which did not report in to
23  me.  And so there were other efforts to make sure
24  that we were properly educating the importance of
25  making sure that these items were being executed on

254

1  by the program management office as well -- the
2  product management office, excuse me, as well.
3  BY MS. WARDEN:
4     Q.   So is the reference as to SSDL on Bates
5  ending in 20, is it the same as the reference to
6  software development lifecycle in the security
7  statement?
8     A.   It does not.  The SSDL here is directly
9  in conjunction with the SDL or the SSDL program that
10  I had Steven Colquitt and Tim Brown work on to push
11  extra security for the SDLC process.  So it's coming
12  out of that specific project.
13     Q.   Why was software development lifecycle
14  not given an assessed NIST maturity level?
15         MR. TURNER:  Objection, foundation.
16     A.   Software development lifecycle goes
17  beyond areas of security.  Software development
18  lifecycle is the general processes and practices
19  that you would be following to deploy software.  So
20  although security could be a part of the software
21  development lifecycle, it includes other areas that
22  are not related to security.
23  BY MS. WARDEN:
24     Q.   So was the security component of the
25  software development lifecycle assessed a NIST

255

1  maturity level?
2         MR. TURNER:  Objection to form.
3     A.   I'm trying to accurately answer the
4  question.  What are you specifically referring to?
5  Are you asking if the software security development
6  lifecycle program included security components or
7  that the SDLC that we utilized included security
8  pieces or if our security statement, the items that
9  are in there on those security practices conducted?
10  I'm trying to answer your question.
11  BY MS. WARDEN:
12     Q.   So this scorecard that we were looking at
13  Bates ending in 20 --
14     A.   Yeah.
15     Q.   -- right, assigns a NIST maturity level
16  to the SSDL; correct?
17     A.   DL, yes, yes.
18         (Simultaneous discussion interrupted
19  by reporter.)
20         THE WITNESS:  Sorry.
21  BY MS. WARDEN:
22     Q.   Which is distinct from the software
23  development lifecycle that is contained in the
24  security statement Kim Exhibit 3, correct?
25     A.   Yes, correct.

256

```
 1  at the time?
 2          MR. TURNER:  Objection, foundation.
 3     A.   Just as I stated on the other parts of
 4  the appendix slides, I don't -- I would need, again,
 5  the context and things like that around what that
 6  line item means or what in progress means.
 7          MR. TURNER:  Then you don't need to
 8  answer further.
 9          MS. WARDEN:  Let's take a break.
10          MR. TURNER:  How long?
11          THE VIDEOGRAPHER:  Going off the
12  record.  Time is 5:48.
13          (Recess taken from 5:48 p.m. to
14  6:02 p.m.)
15          THE VIDEOGRAPHER:  Back on the
16  record.  Time is 6:02.
17          MS. WARDEN:  Mr. Kim, we have no
18  further questions at this time.
19          MR. TURNER:  No redirect.
20          THE WITNESS:  Thank you.
21          THE VIDEOGRAPHER:  This concludes
22  today's testimony of Joseph Kim.  Going off the
23  record.  Time is 6:02.
24          (Deposition concluded at 6:02 p.m.)
25
```

289

```
 1          REPORTER'S CERTIFICATION
 2      I, Micheal A. Johnson, Registered Diplomate
 3  Reporter and Notary Public in and for the State of
 4  Texas, certify that on the 16th day of
 5  September, 2024 I reported the Videotaped Deposition
 6  of WOONG JOSEPH KIM, after the witness had first
 7  been duly cautioned and sworn to testify under oath;
 8  said deposition was subsequently transcribed by me
 9  and under my supervision and contains a full, true
10  and complete transcription of the proceedings had at
11  said time and place; and that reading and signing
12  was not requested.
13      I further certify that I am neither counsel
14  for nor related to any party in this cause and am
15  not financially interested in its outcome.
16      GIVEN UNDER MY HAND AND SEAL of office on
17  this 23rd day of September, 2024.
18
19      _____
            MICHEAL A. JOHNSON, RDR, CRR
20          NCRA Registered Diplomate Reporter
            NCRA Certified Realtime Reporter
21
            Notary Public in and for the
22          State of Texas
            My Commission Expires:  8/8/2028
23
24
25
```

290