# Exhibit 52

**Excerpts of Rani Johnson
Deposition Transcripts**

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
          PLAINTIFF,            )
 6                              )  Case No.
          vs.                   )  23-cv-9518-PAE
 7                              )
     SOLARWINDS CORP. AND TIMOTHY )
 8   G. BROWN,                  )
                                )
 9        DEFENDANTS.           )
     _____ )
10
11
12
13          VIDEOTAPED DEPOSITION OF
14              RANI JOHNSON
15          REPORTED REMOTELY VIA ZOOM
16           Tuesday, August 27, 2024
17
18
19
20
21
22
23   Reported By:
     KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
24   California CSR 10068, Nevada CCR 995, Texas CSR
     12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
25   JOB No. 240827KWI
```

**Page 2**

```
 1        VIDEOTAPED DEPOSITION OF RANI JOHNSON
 2         BE IT REMEMBERED that on Tuesday,
 3   August 27, 2024, commencing at the hour of 9:06 a.m.
 4   thereof, before me, Kathleen A. Maltbie,
 5   RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified
 6   Stenographic Shorthand Reporter, in and for the
 7   State of California, Nevada and Texas, personally
 8   appeared RANI JOHNSON, a witness in the
 9   above-entitled court and cause, who, being by me
10   first remotely duly sworn, was thereupon examined as
11   a witness in said action.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          APPEARANCES OF COUNSEL
 2   FOR THE PLAINTIFF:
 3      SECURITIES AND EXCHANGE COMMISSION
        100 F Street, N.E.
 4      Washington, D.C.  20549
        BY:  KRISTEN M. WARDEN, ESQ.
 5          CHRISTOPHER BRUCKMANN, ESQ. (ZOOM)
            LORY STONE, ESQ. (ZOOM)
 6      Telephone:  (202) 256-7941
        Email:  WardenK@sec.gov
 7              BruckmannC@sec.gov
                StoneL@sec.gov
 8
 9   FOR THE DEFENDANTS:
10      LATHAM & WATKINS, LLP
        330 North Wabash Avenue, Suite 2800
11      Chicago, Illinois  60611
        BY:  KIRSTEN C. LEE, ESQ. (Zoom)
12      Telephone:  (312) 777-7281
        Email:  Kirsten.lee@lw.com
13      LATHAM & WATKINS, LLP
        1271 Avenue of the Americas
14      New York, New York  10020
        BY:  SERRIN TURNER, ESQ.
15          JOSH KATZ, ESQ.
        Telephone:  (212) 906-1330
16      Email:  Serrin.turner@lw.com
                Josh.Katz@lw.com
17
18   FOR DEFENDANT TIMOTHY E. BROWN:
19      KING & SPALDING, LLP
        1700 Pennsylvania Avenue, NW
        Suite 900
20      Washington, D.C.  20006
        BY:  ALEC KOCH, ESQ. (ZOOM)
21      Telephone:  (202) 626-8982
        Email:  Akoch@kslaw.com
22
23
24
25
```

**Page 4**

```
 1       APPEARANCES OF COUNSEL (Continued)
 2   FOR THE WITNESS:
 3      WILSON SONSINI GOODRICH ROSATI
        650 Page Mill Road
 4      Palo Alto, California  94304-1050
        BY:  CAZ HESHEMI, ESQ.
 5      Telephone:  (650) 320-4827
        Email:  Chashemi@wsgr.com
 6
     ALSO PRESENT:
 7
        (Via Zoom Videoconference)
 8      Frank Quirarte, Videographer
        Becky Melton, Deputy General Counsel and Vice
 9          President, SolarWinds
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Rani Johnson
8/27/2024

INDEX
INDEX OF EXAMINATIONS
PAGE
Morning Session                                    8
Examination By Ms. Warden              9
Afternoon Session                             112

INDEX OF EXHIBITS
EXHIBIT          DESCRIPTION                PAGE
Exhibit 1      Document entitled,              10
               "C-08755 Johnson, Rani -
               Vol. 1.20220210.373327-C"
Exhibit 2      Document entitled,              12
               "C-08755 Johnson, Rani -
               Vol. 1.20220317.378494-C"
Exhibit 3      Document entitled,              17
               "Background
               Questionnaire"
Exhibit 4      Document entitled,              72
               "SolarWinds Security
               Statement"
Exhibit 5      Document Bates stamped          92
               SW-SEC00259614 through
               SW-SEC00259618
Exhibit 6      Document Bates stamped          112
               SW-SEC00302323 through
               SW-SEC00302334
Exhibit 7      Email from Timothy Brown        129
               to Rani Johnson, with
               attachments, Bates
               stamped SW-SEC00313350
               through SW-SEC00313362

5

INDEX OF EXHIBITS (Continued)
EXHIBIT          DESCRIPTION                PAGE
Exhibit 16     Document entitled, "PM         284
               Security Vulnerability &
               Incident Review," Bates
               stamped SW-SEC00006628
               through SW-SEC00006648

*** EXHIBITS BOUND SEPARATELY ***

7

INDEX OF EXHIBITS (Continued)
EXHIBIT          DESCRIPTION                PAGE
Exhibit 8      Document entitled,             150
               "Monthly 1:1 Meeting,"
               Bates stamped
               SW-SEC00305126 through
               SW-SEC00305155
Exhibit 9      Email from Kellie Pierce       186
               to Keith Kuchler, with
               attachments, Bates
               stamped SW-SEC00045356
               through SW-SEC00045357
Exhibit 9A     Email attachment               187
Exhibit 10     Document entitled, "Q1         209
               2020 Quarterly Risk
               Review (QRR)," Bates
               stamped SW-SEC00001608
               through SW-SEC00001634
Exhibit 11     Document entitled, "Q4         228
               2020 Quarterly Risk
               Review (QRR)," Bates
               stamped SW-SEC00001582
               through SW-SEC00001601
Exhibit 12     String of emails Bates         230
               stamped SW-SEC00043080
               through SW-SEC00043084
Exhibit 13     Document Bates stamped         248
               SW-SEC388331
               through SW-SEC388331
Exhibit 13A    Attachment to Exhibit 13       248
Exhibit 14     String of emails Bates         263
               stamped SW-SEC00238141
               through SW-SEC00238142
Exhibit 15     String of emails Bates         274
               stamped SW-SEC00000673
               through SW-SEC00000678

6

AUGUST 27, 2024              9:06 A.M. PACIFIC TIME
                   P R O C E E D I N G S

                   MORNING SESSION
           THE VIDEOGRAPHER:  Good morning, ladies
and gentlemen.  This is the beginning of Videotape
Number 1 in the deposition of Rani Johnson in the
matter of SEC versus SolarWinds Corp., et al., Case
Number 23-cv-9518.
           This deposition is being held at 140
Scott Drive in Menlo Park, California.  Today's date
is August 27th, 2024, and the time is
approximately 9:06 a.m.
           My name is Frank Quirarte.  I'm your legal
certified legal videographer today.  I'm here with
Gradillas Court Reporters located at 400 North Brand
Boulevard, Suite 950, Glendale, California 91203.
           At this time, will all counsel and all
present please identify yourselves for the record?
           MS. WARDEN:  Kristen Warden and
Christopher Bruckmann for the Securities and
Exchange Commission.
           MR. TURNER:  Serrin Turner,
Latham & Watkins, for SolarWinds and Mr. Brown.
           MR. KATZ:  Josh Katz, Latham & Watkins,

8

1  for SolarWinds and Mr. Brown.
2      MR. HESHEMI:  Caz Heshemi.  I'm here for
3  Rani Johnson.
4      THE VIDEOGRAPHER:  Counsel on Zoom.
5      MR. KOCH:  This is Alec Koch,
6  King & Spalding, representing Mr. Brown.
7      MS. STONE:  Lory Stone for the Securities
8  and Exchange Commission.
9      THE VIDEOGRAPHER:  Court reporter, will
10 you please swear in the witness.
11          RANI JOHNSON,
12     having been duly remotely sworn,
13     was examined and testified as follows:
14       EXAMINATION BY MS. WARDEN
15 BY MS. WARDEN:
16  Q.  Good morning.  Please state your name, and
17 spell your name for the record.
18  A.  Rani Johnson, R-A-N-I, J-O-H-N-S-O-N.
19  Q.  I'm just going to go over some preliminary
20 rules for today's deposition.
21      So have you ever been deposed before?
22  A.  Yes, in this matter.
23  Q.  So do you recall previously sitting for
24 investigative testimony in this matter as opposed to
25 a deposition?

9

1  A.  Wait.  I don't legally understand the
2  difference in that question.
3  Q.  Okay.  Let -- let me show you what I'm
4  going to mark Johnson Exhibit 1.  This is the
5  February 10th, 2022 investigative testimony of
6  Rani Johnson.
7      (Whereupon, Deposition Exhibit 1
8      was marked for identification.)
9      THE WITNESS:  Testimony, not a deposition
10 then.
11 BY MS. WARDEN:
12  Q.  Hold on one second.  I just want to ...
13      Okay.  So my question, Ms. Johnson, is, do
14 you recall ever being deposed before?
15  A.  Again, I don't recognize the legal
16 difference in deposed and investigative testimony.
17  Q.  Okay.  So let's look at -- you're looking
18 at Johnson 1.
19      Do you recognize this?
20  A.  I recognize this.
21  Q.  Okay.  And what is it?
22  A.  This appears to be the transcript of my
23 testimony in February of 2022.
24  Q.  Okay.  And have you reviewed the
25 transcript of your February 10th, 2022 testimony

10

1  before?
2  A.  I have looked at excerpts of it, but not
3  in whole.
4  Q.  And when did you look at excerpts of your
5  February 2022 investigative testimony?
6  A.  In the last few days.
7  Q.  And did you do your best to tell the truth
8  during your February 10th, 2022 testimony?
9  A.  I did the best to tell the truth.
10  Q.  And did you notice anything in reviewing
11 the February 10th, 2022 transcript that you now
12 believe is incorrect?
13  A.  I have not read the transcript in whole.
14  Q.  Okay.  But in the parts of the transcript
15 of the February 20, 2022 transcript that you read,
16 do you notice anything that you believe is now
17 incorrect?
18      MR. TURNER:  Object to form.
19      THE WITNESS:  I read very few pieces of
20 this document.
21 BY MS. WARDEN:
22  Q.  And in the pieces that you reviewed, was
23 anything incorrect to you?
24  A.  Nothing was incorrect, that I read.
25  Q.  I'm going to hand you what I'm going to

11

1  mark Johnson Exhibit 2.
2      (Whereupon, Deposition Exhibit 2
3      was marked for identification.)
4  BY MS. WARDEN:
5  Q.  Ms. Johnson, do you recognize this
6  exhibit?
7  A.  I don't know the difference in the two
8  exhibits, but I recognize that I testified in two
9  occasions.
10  Q.  Okay.  Do you see a date on --
11  A.  Yes.
12  Q.  -- Johnson Exhibit 2?
13      What is the date?
14  A.  March 17th, 2022.
15  Q.  Okay.  And so do you recognize this
16 exhibit?
17  A.  I recognize the date on the exhibit, but I
18 have not read the difference in --
19  Q.  Do you want to just flip through it and --
20 the question is, do you recognize this exhibit?
21      MR. TURNER:  Object to form.
22      She's explained she understands she
23 testified on this date, she trusts that this is the
24 transcript of that testimony.
25  //

12

1  related to IT systems, did it identify any problems
2  with respect to SolarWinds' password policies?
3       MR. TURNER:  Objection to form.  Time
4  frame.
5       THE WITNESS:  I -- I don't recall.  There
6  were clear -- a practice setup for risk to be --
7  when a risk is registered, there are clear
8  remediation steps that the technical asset owner
9  must take to either ensure there's a compensating
10 mitigating control or to ensure that there is a
11 clear time frame for which that risk would be
12 mitigated.
13      The owner of the asset would get the --
14 what they call a treatment ticket or the action
15 required to remediate that risk within a clear time
16 period.  The action owner would be the person that
17 would be notified of that work.  On a regular basis,
18 the security team would be reviewing risks that were
19 logged in the risk register to ensure that the risks
20 were remediated in a timely period.
21      If risks were specific to assets earned by
22 IT, my leadership and me would have the visibility
23 into those risks being remediated, but the risks
24 were generally directed at the person or the leader
25 that had the ability to technically remediate that

89

1  system.
2       Specific to your question, I do not
3  recall, because that was a regular practice, what
4  risks may have been raised during my tenure, as it
5  was seven to four years ago.
6       Q.  You mentioned you had some visibility,
7  though, into the risk remediated?
8       A.  The risks that were raised for IT managed
9  systems.
10      Q.  Okay.  What's an example of one of those
11 risks?
12      A.  I cannot recall a risk from that long ago.
13      Q.  Do you recall any of the risks relating to
14 password policy?
15      MR. TURNER:  Objection.  Asked and
16 answered.
17      THE WITNESS:  I do not -- I do not recall
18 risks to IT systems related to passwords, as it was
19 many years ago.  If presented information, I can
20 speak to that.
21 BY MS. WARDEN:
22      Q.  How does this risk register, as it relates
23 to IT guidelines, relate to risk acceptance form?
24      A.  The risk register, a risk acceptance form,
25 is when there is not a clear compensating or

90

1  mitigating control that reduces the risks.  And so
2  there is a period of time for which the technical
3  asset owner has to remediate that risk.  That period
4  of time is logged in the risk acceptance form and
5  that risk acceptance form outlines the period for
6  which that risk acceptance expires.
7       Q.  Were you aware of any instances in which a
8  SolarWinds product had a default password of, quote,
9  password?
10      A.  My responsibility as CIO was for IT
11 systems, not for products.
12      Q.  So you were not aware of that?
13      A.  Can you restate your question?
14      Q.  Were you aware of any instances in which a
15 SolarWinds product had a default password of, quote,
16 password?
17      A.  Not during my tenure, I was not aware of
18 it.
19      Q.  Were you aware that multiple critical
20 systems did not comply with the password policy?
21      MR. TURNER:  Objection to form.
22      THE WITNESS:  You -- restate the question.
23 Critical systems, are -- critical IT systems?
24      MS. WARDEN:  Strike the question.
25 //

91

1  BY MS. WARDEN:
2       Q.  Ms. Johnson, I'm handing you what I've
3  marked Johnson 5.  Take your time in looking at it.
4       MS. WARDEN:  Sorry.  For the record, we
5  took back that one we marked Johnson 5, and we're
6  marking this document Johnson 5, which is Bates
7  number SW-SEC00259614 through -9618.
8       (Whereupon, Deposition Exhibit 5
9       was marked for identification.)
10 BY MS. WARDEN:
11      Q.  Take your time looking at it.
12      Ms. Johnson, do you recognize this
13 document?
14      A.  I do.
15      Q.  And what is it?
16      A.  It appears to be a summary of the work
17 that my team participated in in service of,
18 probably, my performance review.
19      Q.  Is this a draft self-assessment that you
20 created?
21      A.  You probably could tell me better because
22 I tend to label my documents.
23      Q.  Yeah.
24      So I'll represent to you that the metadata
25 shows this document is dated January 10, 2018 and

92

1  that you were the custodian.
2      **A.**  Does it have a title?
3      **Q.**  Yeah.  The title was the -- the file path
4  was Johnson, Rani\Johnson Rani,
5  Rani_johnson_solarwinds_com\documents, documents/all
6  activities and milestones against 2H2017 work goal
7  one.DOCX.
8          Does that help --
9      **A.**  Yes.
10     **Q.**  -- refresh your recollection?
11     **A.**  Mm-hmm.
12     **Q.**  Was this a draft performance
13  self-assessment?
14     **A.**  These are -- appear to be the activities
15  that I outlined that the -- actually, it wasn't the
16  view IT at the time -- that the IT team was intended
17  to undertake in our performance against those
18  objectives.
19     **Q.**  Well, first, do you recall drafting this
20  document, Exhibit Johnson 5?
21     **A.**  I do not directly recall, but I recognize
22  this artifact.
23     **Q.**  Okay.  And what was the purpose of
24  Johnson 5?
25     **A.**  To summarize the work accomplished in the

93

1  second half of 2017, it appears.
2      **Q.**  And why would you need to summarize the
3  work accomplished in the second half of 2017?
4          What was the end goal?
5      **A.**  To the best of my recollection, this is an
6  artifact showing Joe Kim the work against our plan.
7      **Q.**  Okay.  So -- and -- and why would you need
8  to tell Joe Kim summarizing the work that you've
9  done?
10     **A.**  Because Joe Kim was my boss.
11     **Q.**  Okay.  So is it fair to say this is, like,
12  a summary -- your summary of your work
13  accomplishments in the preceding six months?
14     **A.**  It's not a summary of all work
15  accomplishments; it's the work against the stated
16  goals at the beginning of the year.  So it's not
17  comprehensive.
18     **Q.**  Do you recall whether this was ever
19  finalized?
20     **A.**  This is an artifact, it is not a
21  requirement.  This is not a thing that becomes
22  finalized.  It was a document to have a conversation
23  with my boss.
24     **Q.**  Okay.  And when you refer to the word
25  "artifact," what do -- what do you mean?

94

1      **A.**  Some documents are -- I'm going to use the
2  word "record," a record that I -- you would use
3  to -- it's finalized and is a complete statement.
4  This is a component of a conversation.
5      **Q.**  And do you recall providing this to
6  Joe Kim?
7      **A.**  I recognize the document, but I do not
8  recall the nature of my conversation in 2017.
9      **Q.**  Okay.  Do you know what Joe Kim did with
10  the self-assessments that you provided him?
11         MR. TURNER:  She already said it wasn't
12  provided, that it was just used during conversation.
13         THE WITNESS:  I wouldn't expect -- I
14  produced a lot of material.  I don't expect the
15  leaders kept or used them outside of my review
16  conversations.
17  BY MS. WARDEN:
18     **Q.**  In the time you were at SolarWinds, you
19  don't recall, like, submitting a self-assessment to
20  Joe Kim?
21     **A.**  That was done in a HR system of record and
22  not through with this.
23     **Q.**  Do you recall whether you submitted
24  Exhibit 5 into an HR system of record?
25     **A.**  I -- I don't recall, but chances are no

95

1  system of record would take five pages of my
2  accomplishments.
3      **Q.**  Right.
4          Let's look at page 4 of the document.
5  It's Bates SW-SEC00259617.
6          If you look at the bottom of the page, it
7  starts with -- do you see where it says,
8  "Development Goal 1"?
9      **A.**  Yes.
10     **Q.**  Okay.  So it says (as read):
11             Development Goal 1, outline
12         DOIT plan to shore up deficiencies
13         that may affect IPO
14         valuation/readiness.
15         Do you see that?
16     **A.**  Yes.
17     **Q.**  Okay.  Who came up with this developmental
18  goal?
19     **A.**  It's a developmental goal, so I -- I would
20  assume I did.
21     **Q.**  So it's your developmental goal?
22     **A.**  Yes.
23     **Q.**  And what does DOIT stand for?
24     **A.**  That's development operations and
25  information technology.

96

1    THE WITNESS:  That what may affect
2 SolarWinds' stock price?
3 BY MS. WARDEN:
4    Q.  A shortcoming, the identified
5 shortcomings.
6    You say (as read):
7        Identify the following
8        shortcomings that may affect IPO
9        valuation.
10    A.  SolarWinds was not public, it did not have
11 a stock price.
12    Q.  But it would affect a future SolarWinds'
13 stock price?
14    MR. TURNER:  Objection to form and
15 foundation.
16    THE WITNESS:  The intention of this
17 document was to prepare.  That's partially why it
18 says backslash readiness.  It was to prepare
19 SolarWinds such that some specific operational
20 components were in place to reduce the overall cost
21 of operations to make sure that it was efficient and
22 to ensure that the controls would be in place for
23 SOX readiness, period.
24 BY MS. WARDEN:
25    Q.  Would cyber security problems affect the

109

1 IPO valuation?
2    MR. TURNER:  Objection to form and
3 foundation.
4    THE WITNESS:  Are you asking me in general
5 in the world or -- it wasn't public --
6 BY MS. WARDEN:
7    Q.  In this January 2018 self-assessment, you
8 identified certain shortcomings that may affect IPO
9 valuation or readiness.  So how can --
10    MR. TURNER:  Is there a question?
11 BY MS. WARDEN:
12    Q.  How can cyber security problems affect IPO
13 valuation?
14    MR. TURNER:  She's already explained that
15 at least five times.  Asked and answered.
16    THE WITNESS:  The intention when I wrote
17 this statement was to note a set of initiatives that
18 our team wanted to lead that we thought would have a
19 positive impact on our readiness for IPO and would
20 reduce the cost of our operations.
21 BY MS. WARDEN:
22    Q.  Did you have any conversations with anyone
23 at SolarWinds regarding how cyber security problems
24 could affect the value -- could affect IPO
25 valuation?

110

1    A.  I -- I don't recall.  I don't recall.
2    Q.  Okay.
3    A.  That's --
4    Q.  And then the last line says (as read):
5        Work is underway to bolster by
6        2019.
7        Do you see that?
8    A.  Yes.
9    Q.  What does that mean?
10    A.  That means that we would like to initiate
11 some -- these collection of projects to do this work
12 by 2019.
13    Q.  At least a year away from when you drafted
14 this, correct?
15    A.  This statement is -- appears to be
16 contradicting itself.  Work is underway means that
17 there's some component of this that is happening and
18 that that work would be ready by 2019.  I'm
19 presuming I thought we would IPO by 2019, and that's
20 why it's here.  I think the company IPO'd in 2018.
21    Q.  Mm-hmm.  But is it fair to say that your
22 identified shortcomings that you reference in
23 document ending in -9618, that they were not planned
24 to be fixed until 2019?
25    A.  No.  This is me presuming that the company

111

1 wouldn't IPO until 2019.  This is literally me
2 giving bullet points to my boss to have a
3 performance review conversation around the work that
4 we would like to lead or we are initiating or we
5 have kicked off.
6    Q.  But you picked the date 2019 because you
7 thought that's when the company would go public?
8    A.  That's when I thought the company would go
9 public.  I had -- not that the work wouldn't be
10 ready before then, but that's when I assumed the
11 company would go public.
12    MS. WARDEN:  Okay.  We can take a break.
13    THE VIDEOGRAPHER:  Off the record.  Time
14 is 11:38 a.m.
15    (Whereupon, a lunch recess was taken
16    from 11:38 a.m. to 12:33 p.m.)
17        AFTERNOON SESSION
18    THE VIDEOGRAPHER:  We're back on the
19 record.  Time is 12:33 p.m.
20 BY MS. WARDEN:
21    Q.  Ms. Johnson, I'm handing you what I'm
22 marking Johnson 6.
23    (Whereupon, Deposition Exhibit 6
24    was marked for identification.)
25 //

112

BY MS. WARDEN:
 1  BY MS. WARDEN:
 2    **Q.**  Take your time looking at it.
 3    MS. WARDEN:  Sorry.  For the record, this
 4  is Bates ending in -2323 through -2334.
 5    THE WITNESS:  Can you advise what I'm
 6  looking at?
 7  BY MS. WARDEN:
 8    **Q.**  I can represent that the metadata shows
 9  that this file is dated June 20th, 2018, and you
10  were the custodian.
11    Do you want me to read you the file path?
12    **A.**  Yeah.  Please.
13    **Q.**  Okay.
14    MR. TURNER:  Do you want to explain what
15  custodian means?  She may not be aware of that.
16  BY MS. WARDEN:
17    **Q.**  When it was produced to us, when you look
18  at the source, the custodian says it was pulled from
19  your -- from you.
20    MR. BRUCKMANN:  Files.
21    THE WITNESS:  From my files.
22    MS. WARDEN:  I'll read you the file path
23  for the record.  Johnson, Rani, access, Johnson
24  Rani,
25  Rani_johnson_solarwinds_com\documents\documents\

113

 1  leveragescale.docx.
 2  BY MS. WARDEN:
 3    **Q.**  And one of the things SolarWinds also
 4  admitted that this document, that you wrote this
 5  document in June 2018, so ...
 6    MR. BRUCKMANN:  I don't have it in front
 7  of me, but I'll take your word for it.
 8    THE WITNESS:  Partially why I ask is that
 9  there -- this appears to be more than one document.
10  It's got attachments in each document.  And
11  different fonts.  I hate different fonts, so I
12  usually write documents with one font.  I was just
13  trying to understand what the name of this document
14  was and what its purpose was, but I recognize
15  elements of it.
16  BY MS. WARDEN:
17    **Q.**  Okay.  What do you recognize it to be?
18    **A.**  It -- it appears to be an aggregation of
19  work products at different points in time.
20    **Q.**  Your work products?
21    **A.**  No.  A summary of work products, not all
22  mine.
23    **Q.**  Some of them.
24    Which one looks like your work product?
25    **A.**  So starting from the back, this is

114

 1  Joe Kim's performance review of me.
 2    **Q.**  Okay.  Yeah, we're on page ending in -33?
 3    **A.**  Starting from the front ending in page -23
 4  and -24, it looks like this is the summary of the
 5  objectives for a fiscal year.  I can't -- I'm not
 6  sure what year that was.  And it looks -- appears to
 7  be working drafts of responses to the items set out
 8  in the fiscal year.  So this appears to be a
 9  work-in-progress aggregation of multiple documents.
10    **Q.**  Okay.  Let's take it from the first page.
11  So the Bates ending in -23.
12    Do you see under 3, and then under that
13  3.3, do you see continue to improve security
14  pasture, e.g. SDL, product scorecards, et cetera,
15  and attachment of industry regulations, e.g., GDPR,
16  NIST --
17    **A.**  Yes.
18    **Q.**  -- et cetera.
19    Do you see that?
20    **A.**  Okay.  So, again, this came
21  from -- from -- you were the custodian, and it was
22  dated June 20th, 2018.
23    So do you recall writing this?
24    **A.**  I did not write this.
25    **Q.**  Okay.

115

 1    **A.**  On page --
 2    **Q.**  Do you know who did?
 3    **A.**  I -- I do not know for certain.  This
 4  appears to be the set of objectives for the CTO
 5  organization, including the relevant components for
 6  the DOIT organization.
 7    **Q.**  Okay.  Do you recall whether this document
 8  was provided to Joe Kim?
 9    **A.**  I recognize this document as an artifact
10  used by the CTO organization.  I am not the author
11  of the first one -- the pages leveraging scale 1
12  through 4.  This appears just to be the goals of the
13  organization, the CTO organization, including DOIT.
14    THE COURT:  For the court reporter, it's
15  D-O-I-T.
16  BY MS. WARDEN:
17    **Q.**  Ms. Johnson, if you can turn to Bates
18  ending in -2325.
19    Does the -- does the writing on this page
20  look like something that you would have written?
21    **A.**  To clarify, I'm responding to the writing
22  on items 1 through 4.2, which were not from me.  The
23  updates in line in this document appear to be
24  responses to the objectives.
25    **Q.**  Okay.  So the -- the language in Bates

116

1   **A.** It was to a broader -- the CTO
2   organization.
3   **Q.** You and others?
4   **A.** Me and others.
5   **Q.** Okay. What is your understanding of what
6   the reference to product scorecards?
7   **A.** I don't believe this was targeted at me.
8   I don't have a recollection of what that meant, or
9   IT.
10  **Q.** What is your understanding of security
11  posture?
12  **A.** Joe's words articulate this better than I
13  can presume.
14  **Q.** All right. Let's look at the page Bates
15  ending in -26 where you -- you recognize that, and
16  you were the author of this table, right?
17  **A.** No. I was not the author of the table.
18  **Q.** Who was the author of the table?
19  **A.** It was coauthored. There were objectives
20  laid out and tactics proposed. This is a work in
21  progress of tactics proposed and the owner of that
22  tactic is probably named to the right.
23  **Q.** Okay. So the leftmost column, to use your
24  language, does that represent a tactic proposed?
25  **A.** That's a tactic proposed, yes.

121

1   **Q.** Okay. And you're -- you're listed in
2   every line item in the column to the right, and why
3   is that?
4   **A.** This table may have had 200 tactics in it.
5   This filtered view shows only the tactics for which
6   I had organizational responsibility. And the
7   leaders in my team would have -- been the owner
8   of the tactic. This is a filtered view to show what
9   the DOIT organization or DOIT organization was
10  leading.
11  **Q.** Does the column to the right represent the
12  person who was responsible for executing the action
13  item on the left?
14  **A.** No.
15  **Q.** No.
16  **A.** Tim was within my organization, as his
17  direct -- his -- his people leader, my name would be
18  part of how Joe was rolling up the summary of the
19  tactics. If you can see the entire table, you could
20  see more than likely this line item was assigned to
21  him.
22  **Q.** Okay. Let's look at page Bates ending
23  in -2330. And it might help to orient you to look
24  at the prior page ending in -29.
25  **A.** Okay.

122

1   **Q.** Do you recognize this portion of Exhibit 6
2   Bates ending in -30, as your writing?
3   **A.** I don't necessarily recognize it as my
4   writing, but I recognize that it is an in-progress
5   artifact that appears to take next steps from the
6   Exhibit Johnson 5.
7   **Q.** Okay. And who was the audience for this
8   artifact, as you call it?
9   **A.** There was no audience. This is a
10  work-in-progress document that is a copy/paste
11  from -- that has lost its formatting. This is not
12  a -- this is some reference words.
13  **Q.** Okay. At the bottom of this page ending
14  in -30, second to last sentence, do you see it says
15  (as read):
16          Participated in the
17          development of SDL?
18  **A.** I see it.
19  **Q.** And it's under -- if you look at the prior
20  page, it's under work goal achievements summary.
21      So at the time, this is June 2018, what
22  was your understanding about the development of SDL?
23  **A.** This document is a copy/paste mush of lots
24  of artifacts from lots of people. I don't recog- --
25  this is not meant to be the final summary of

123

1   anything. This appears to be components of multiple
2   documents.
3   **Q.** Okay.
4   **A.** Multiple -- performance review documents.
5   **Q.** Let's look at the page ending in -2332.
6   The second to last paragraph, I'll let you get
7   there. I'm sorry.
8       Are you there?
9   **A.** Yeah.
10  **Q.** It says (as read):
11          Development Goal 1.
12      And then it says (as read):
13          Outline DOIT plan to shore up
14          deficiencies that may affect IPO
15          valuation readiness, identify the
16          following shortcomings that may
17          affect IPO valuation readiness.
18      Do you recognize that language?
19  **A.** I recognize that as a summary of Exhibit 5
20  in literally a copy/paste no formatting. So that is
21  a portion of another document.
22  **Q.** Okay. It's the same language that was in
23  Exhibit 5?
24  **A.** Yes.
25  **Q.** Okay. And what does -- again, this is six

124

1  months after you -- you prepared Exhibit 5, right?
2      **A.**  Right.
3      **Q.**  We're in June 2018?
4      **A.**  At the time that this was time stamped it
5  appears, yes.
6      **Q.**  Okay.  And, again, it says (as read):
7          The plan to shore up
8          deficiencies that may affect IPO
9          valuation/readiness.
10         What does that mean?
11     MR. TURNER:  Object to form.
12     THE WITNESS:  That is a copy of the prior
13  document.  It is not a statement of a current
14  status.  It literally is an unformatted copy of that
15  same document smashed into the back of this document
16  to aggregate the status of the -- this is a --
17  literally an in-progress document to create a -- to
18  create a status.  The status is not finished.
19  BY MS. WARDEN:
20     **Q.**  Okay.
21     **A.**  These are --
22     **Q.**  This was -- this statement was included in
23  a document where the metadata shows it's
24  June 28th, 2018.
25     **A.**  SharePoint, if I was to smash documents

125

1  together, and this appears what this is, this was a
2  component of an aggregated document at a point in
3  time.  This is not a final document.  This is not
4  how I would represent the status of my work to
5  anyone.  This is a work-in-progress document.  This
6  takes pieces of other documents that is not saying
7  that the status at the time equals what is on this
8  page.  It is the data being compiled from multiple
9  sources to create a -- not a final work product.
10     **Q.**  Okay.  This document identifies -- then
11  after, it says, "The following shortcomings," we see
12  identity and access management.
13         Do you see that?
14     **A.**  It is identical to the words that were in
15  the prior one because it is a copy of that, those
16  answers at the back of this document as a reference.
17  It was not a final artifact.
18     **Q.**  But my question is, it's included in a
19  document from June 2018.
20         So are you saying that these statements
21  are not accurate as of June 2018?
22     **A.**  I'm saying these statements are identical
23  to the words that were in a prior document.  They
24  have not been updated.  It is a source to answer the
25  status six months later.

126

1      **Q.**  So is the statement not accurate?
2      **A.**  It's a -- if I'm referring to an article
3  not to provide this artifact -- the intention of
4  this artifact, I think, is being misunderstood.
5      **Q.**  I'm just asking whether the statement,
6  "outlined DOIT plan to shore up deficiencies that
7  may affect IPO valuations," it listed two things
8  that were listed in Exhibit 5, six months prior,
9  identity and access management, and then security
10  standards.
11         Do you see that?
12     MR. TURNER:  The witness has already
13  testified that this was not intended as a statement
14  of the current status as of the time of this
15  document.
16         So was this a reliable statement of the
17  situation at the time?
18     THE WITNESS:  This is not a reliable
19  statement.  This is a collection of notes.  This was
20  not meant to go to anyone.  This is a working
21  document that probably was finalized somewhere else,
22  but this is not it.
23  BY MS. WARDEN:
24     **Q.**  But did you contribute to this working
25  document?

127

1      **A.**  The data that you're pulling from is the
2  identical set of words that is a resource being used
3  to create something.  It's as if you were pointing
4  to a magazine article.  The magazine article is not
5  updated; it's just pointing to something that was
6  used as a reference.  It is not an updated
7  reference, it is not an updated status.  It is
8  merely leveraging old content to answer something
9  that has not been completed yet.
10     **Q.**  Okay.  So I see work is underway to
11  bolster by 2019.
12         We saw that in Exhibit 5, correct?
13     **A.**  Because it's the exact same words as it
14  was Exhibit 5.
15     **Q.**  And what does that mean?
16     MR. TURNER:  Objection.  Form.  Asked and
17  answered.
18     THE WITNESS:  There are artifacts that I
19  created that had -- that produced the status
20  incomplete.  This is an incomplete and unreliable
21  document to reference.
22  BY MS. WARDEN:
23     **Q.**  All right.
24     MS. WARDEN:  Okay.  I'm handing you what
25  I've marked Johnson 7.

128

1 approved.
2     So the reaction was let us -- we have made
3 a strong business case, let us request the money.
4 The money was granted, and the objectives then were
5 meant to be actioned.
6 BY MS. WARDEN:
7     Q.  Do you know whether anyone at SolarWinds
8 above you was aware of this statement, the current
9 state of security leaves us in a very vulnerable
10 state for our critical assets?
11     MR. TURNER:  Objection to form.
12     THE WITNESS:  That statement is imprecise
13 and not accurately reflecting -- it is a business
14 case justification, like, of a problem statement.
15 BY MS. WARDEN:
16     Q.  Do you recall asking Mr. Brown to revise
17 this statement in Bates ending in -61?
18     A.  The intention of this document, and there
19 were -- this -- this business case format was used
20 for other requests for investments, was not a
21 precise statement.  It was a justification for
22 investments.  No one was asking to qualify what
23 those words meant.  The request was made to invest,
24 the investment request was granted.
25     Q.  So you didn't ask Mr. Brown to delete this

141

1 statement from the slide deck?
2     A.  The statements he was making in a slide
3 deck to his boss and to make a business
4 justification weren't a statement of status or
5 qualified in any way.  It was merely meant to make a
6 business justification.  So I did not ask Tim Brown
7 to delete words that he was saying to me.
8     Q.  But you don't believe that statement is
9 accurate?
10     A.  It is not accurate.
11     Q.  And did you have a conversation with
12 Mr. Brown about how you thought that that statement
13 was not accurate?
14     A.  I didn't have a conversation with
15 Mr. Brown about how I thought this statement was not
16 accurate.
17     Q.  And do you know what he meant by the
18 yellow -- this is a yellow --
19     MR. BRUCKMANN:  Objection.  Asked and
20 answered.
21     THE WITNESS:  I do not know what Tim meant
22 by a red yellow green color coding system.  It was
23 not consistent with how we represented status.
24 BY MS. WARDEN:
25     Q.  And did you discuss with anyone else

142

1 this -- this sentence in Bates ending in -61, did
2 you discuss it with anyone else at SolarWinds?
3     A.  Tim Brown was having a meeting with his
4 boss in which he brought materials to have a
5 conversation around an investment request that we
6 advanced.  Tim -- there was no need to have another
7 conversation around Tim's document.
8     Q.  Are you saying that were -- you got
9 the investment after the date of this document,
10 which was October 28th, 2018?
11     A.  I'm saying in 2017, as part of the GDPR
12 Compliance Point, GDPR review, a set of actions were
13 proposed to all of the different business
14 departments and functions.  The teams then sized and
15 estimated what do they need to take those actions
16 on.  Part of that was to outline what Tim wanted in
17 2017, which appears on the document ending in
18 page -59.  The whole of those requests for funding,
19 support or investment were made to leadership, and
20 the entire set of requests were funded by leadership
21 to prepare for GDPR.
22     Q.  Okay.  After you saw this PowerPoint
23 saying, "The current state of security leaves us in
24 a very vulnerable state for critical assets," do you
25 recall whether there were any next steps taken in

143

1 light of that statement?
2     A.  All of these initiatives were rolled up
3 into projects.  Those projects were reported on
4 monthly in the DOIT monthly portfolio.  This is why
5 I do not accept this is a status report because
6 there was an actual formal and finalized status
7 report of the work being done to create a proactive
8 security model.  That was reported on monthly
9 throughout my tenure.  This is not that artifact.
10     Q.  After you received this -- this
11 PowerPoint, did you consider whether the statements
12 in the security statement were still true?
13     A.  No.  What -- the words here are not
14 precise.  I knew them to be not precise at that
15 time.  It did not cause me to question whether or
16 not the security statement was true.
17     Q.  Okay.  You didn't consider revising the
18 security statement at all?
19     A.  I had no responsibility for the creation
20 or the revisions to the security statement, and no,
21 when I read this intentionally imprecise business
22 justification, it did not cause me to wish to revise
23 a security statement for which I didn't have
24 responsibility.
25     Q.  And who had responsibility for revisions

144

1      And under that, it says (as read):
2          Executive asks.
3      What was executive ask?
4    **A.** On the subsequent page 40, in bright red
5    where it says "EA," those were the executive asks.
6    **Q.** Just broadly, the term "executive ask" --
7    **A.** It wasn't broadly.
8    **Q.** -- what did that mean?
9    **A.** It was in this particular presentation,
10   there were some asks of the executives, we wanted to
11   draw their attention to it so we put a red circle
12   that says "EA" on it so it was very clear. The ask
13   being made of the representatives was around the
14   payment services directive and SoC 2 organizational
15   controls.
16   **Q.** Okay. And who was included in executive,
17   under executive ask?
18   **A.** It is not that broad. It is specific to
19   this specific presentation. On the PSD2, it says
20   delays in mitigation plans in progress, chances are
21   there's a mitigation -- some link to mitigation
22   somewhere in the back of this. In fact, yep, on
23   page ending -42, executive asks summarized, it says
24   (as read):
25          Risk and mitigation plan

157

1      awareness.
2      We wanted them to be aware of how we were
3    doing mitigation among SoC 2. It was human
4    resources, we needed a contact to assist with
5    HR-related controls.
6    **Q.** Okay. Let's turn to Bates ending in -42.
7    **A.** Mm-hmm.
8    **Q.** At the top, it says (as read):
9          Executive asks, items
10         requiring your attention awareness.
11     So, again, is it fair to say the items on
12   this executive asks is something that you wanted the
13   SolarWinds' executive's attention for?
14   **A.** It was directed, but yes.
15   **Q.** What do you mean, "It was directed"?
16   **A.** So the executive ask on PSD2 was payment
17   services directive. A new European Union services
18   requirement. The ask would have been to make sure
19   that Bart Kalsu was aware of how we were planning on
20   dealing with that payment services directive. As I
21   mentioned before, we presented those from the
22   project slides. There's a project slide on the
23   payment services directive and what is happening and
24   what's not. The action required is listed on the
25   end of -41 in the standard format that we present

158

1    status.
2    **Q.** Okay. If you can turn to Bates ending
3    in -45, please.
4      Do you see the slide SolarWinds security
5    program at the top?
6    **A.** Yes.
7    **Q.** Okay. And then right below it, it says
8    (as read):
9          Security controls based on
10         NIST controls.
11     Do you see that?
12   **A.** Yes.
13   **Q.** What does security controls based on NIST
14   controls mean?
15   **A.** It's security controls based on the NIST
16   framework, but it is the five categories of NIST
17   that I described earlier, identify, protect, detect,
18   respond, and recover, for which we created a
19   framework for the conversations with our leadership
20   and identification of key areas of focus.
21   **Q.** So were the security controls based upon
22   the NIST 800-53?
23   **A.** The security controls leveraged that
24   framework for the basis of identifying areas of
25   focus and to standardize on a common language and

159

1    framework to talk about security.
2    **Q.** All right. And then turn to Bates ending
3    in -47, please.
4      Do you see at the top, it says -- I think
5    it's a typo.
6    **A.** It is.
7    **Q.** I think it should be "identify."
8    **A.** Yes.
9    **Q.** Okay. And then it has security category
10   on the left, and then the second below security
11   category, it says:
12         Secure software development
13         lifecycle (SSDL).
14         Do you see that?
15   **A.** I do.
16   **Q.** All right. What is -- the next column
17   over says "objective." And then next to the SSDL,
18   it says (as read):
19         Employees are aware of and
20         utilize a security software
21         development lifecycle in their
22         day-to-day activities.
23         Do you see that?
24   **A.** I do.
25   **Q.** So what is -- what is secure software

160

1  development lifecycle?
2     **A.**  I think we talked about it earlier.  It's
3  the -- the way that employees who develop software
4  utilize the practices of the SDL.
5     **Q.**   And this security category was assessed a
6  NIST maturity level, you'll see in the column to the
7  right.
8        Do you see that?
9     **A.**  I do.
10     **Q.**   And that NIST maturity level, is that
11  based off of NIST 800-53?
12     **A.**  No.  This is a NIST framework where,
13  frankly, some of us security leaders designed or
14  summarized leveraging the NIST framework a set of
15  descriptions that -- on how to assess.  So this does
16  not -- this is not precise.  This is a summary for
17  us to assess our general maturity against -- it's a
18  maturity framework.
19     **Q.**   Against the NIST cyber security framework
20  generally?
21     **A.**  It's against the outlined objectives and
22  then leveraging a set of descriptions that were
23  outlined in summary here, but were in more detail in
24  other documentation to create a baseline for the
25  state of security maturity.

                            161

1     **Q.**   Okay.  Do you know who created the NIST
2  maturity level ratings?
3        MR. TURNER:  Objection to form.
4        THE WITNESS:  There were multiple leaders
5  involved in -- in this.  The final summary that
6  you're seeing here would have likely -- well, the
7  final summary you see here, I've had involvement in.
8  BY MS. WARDEN:
9     **Q.**   You had involvement in?
10     **A.**  I had involvement in summarizing.
11     **Q.**   Did you put in the NIST maturity level
12  scores in the document Bates ending -47?
13     **A.**  No.  That was a -- an assessment based on
14  the objectives, owners of that security category and
15  the collective aggregate of the assessments that
16  were being performed.
17     **Q.**   Did you approve the NIST maturity levels
18  that are in Bates -47?
19     **A.**  There's no approving.  It was math.  You
20  summarize the answers from the different security
21  assessments to form a formulaic score.
22     **Q.**   Okay.  So, again, going back to SSDL, it
23  was to assess a NIST maturity level of 2.
24        Do you see that?
25     **A.**  I do.

                            162

1     **Q.**   And in the document ending in -48, the
2  next one.  This one.
3        Ms. Johnson, you mentioned, when I asked
4  you about the NIST maturity levels, you said that it
5  was just math, right?
6     **A.**  Mm-hmm.
7     **Q.**   What do you mean by that?
8     **A.**  In 2017, the baseline was the Compliance
9  Point security assessments.  And so the -- their
10  assessment framework was leveraged to come up with
11  the initial maturity score.  We then did a mapping
12  of maturity score, there was multiple different
13  score -- scoring systems around the company.  So we
14  decided to centralize on one so we can baseline and
15  measure maturity and measure maturity in what we
16  called the security category areas.
17        If you looked at versions of this document
18  over the course of years, you would note that even
19  in the -- let's say the category identify, the
20  subcategories might change over time, because that
21  might be a different focus area over time.  But each
22  of the subcategories, the business departments that
23  were -- the technical owners of each major asset
24  were being asked to go through a self-assessment.
25  That self-assessment would score the -- their

                            163

1  alignment with that security objective.  All of
2  those asset scores would roll into a score for the
3  security and maturity.
4        By the time we're in 2019, that was a
5  formulaic summary.  In 2018, it was being -- it was
6  assessed through -- a little bit more -- less
7  formulaic means, but by 2019, it was a -- it was
8  created using the assessments themselves.  They
9  scored it.
10     **Q.**   Which assessments?
11     **A.**  There's a security -- there's assessment
12  against the security and access control guidelines
13  that major assets were asked to score themselves
14  against.  Compliance with the -- the principles
15  outlined in that document.
16     **Q.**   Okay.  And who is doing the scoring?
17     **A.**  The -- the teams would answer the
18  questionnaire, and the questionnaire itself created
19  the score.  So if there were 50 questions and eight
20  were answered affirmatively, 80 percent were
21  answered affirmatively, you would have the score of
22  whatever 80 percent is.
23     **Q.**   I see.
24        So was there -- there was, like, a program
25  that your employees, they answered questions and

                            164

BY MS. WARDEN:
 2    **Q.**  So this PowerPoint was presented to your
 3 boss, right, Joe Kim?
 4    **A.**  Yes.
 5    **Q.**  So did -- did you review it for accuracy
 6 before it was presented to Joe Kim?
 7    **A.**  I would have reviewed it, not specifically
 8 for accuracy, but reviewed it for its content, for
 9 its relevance, for its completeness.
10    **Q.**  Wasn't part of your job responsibilities
11 to make sure that the information in Exhibit 8 was
12 accurate?
13    **A.**  My responsibilities were to make sure, to
14 the best of my ability, that the information I was
15 presenting to my boss was comprehensive, complete
16 and generally accurate, but not to verify the
17 specific accuracy of every line item.
18    **Q.**  Okay.  Did it surprise you that SSDL got a
19 NIST maturity level of 2?
20    **A.**  I don't recall what my reaction or being
21 surprised or not.
22    **Q.**  Any discussions with anyone else at
23 SolarWinds about slide ending in -47 and SSDL
24 getting a NIST maturity level of 2?
25    **A.**  No discussions.  However, our -- the

                        173

 1 intention of the security -- security and compliance
 2 reviews was to take anything that could benefit from
 3 concentrated improvement and create a security and
 4 compliance improvement plan for that line item.
 5    **Q.**  So could the score of 2 for SSDL, could it
 6 have benefited from improvement?
 7        MR. TURNER:  Objection to form and
 8 foundation.
 9 BY MS. WARDEN:
10    **A.**  The company would decide what the focus
11 areas would be based on the need for improvement.
12 It was not my scope of responsibility to determine
13 whether or not that item needed improvement.
14 However, we can look at the security improvement
15 plans to see what next steps happened or came about
16 from that.
17    **Q.**  But do -- do you recall next steps from
18 the SSDL being -- receiving a 2 rating?
19    **A.**  No.  But the -- we can look ahead in the
20 artifact and see if there was any.
21        There's nothing -- there's nothing in this
22 artifact that talks to the skip specifically for the
23 SDL.
24    **Q.**  Okay.  Let's turn to Bates ending in -48.
25        At the top, it says "Protect."

                        174

 1        Do you see that?
 2    **A.**  Yes.
 3    **Q.**  All right.  Under Highlights, we've got
 4 first bullet (as read):
 5            Access and privilege to
 6        critical systems/data is
 7        inappropriate.  Need to improve
 8        internal processes procedures.
 9        Do you see that?
10    **A.**  I do.
11    **Q.**  Any reason to believe this information is
12 not accurate?
13        MR. TURNER:  Objection to form.
14        THE WITNESS:  This is a summarized
15 highlight pointing to the opportunity to leverage
16 technology called Thycotic Secret Server to mid --
17 to manage privileged access credentials in a secret
18 server.
19 BY MS. WARDEN:
20    **Q.**  Ms. Johnson, my question was, is there any
21 reason to believe that this statement, "Access and
22 privilege to critical systems/data is
23 inappropriate," is not accurate?
24        MR. TURNER:  Objection to form.
25        THE WITNESS:  On its face summarized, I

                        175

 1 don't stand behind that statement.  The statement
 2 was in reference to the opportunity to leverage a
 3 centralized secret server to store privileged
 4 credentials.
 5 BY MS. WARDEN:
 6    **Q.**  As written, you don't agree with this
 7 statement?
 8    **A.**  As written, it was part of a presentation
 9 that was -- had significantly more context.
10        It was a project to deal with privileged
11 access management, and this was referring to the
12 opportunity to accelerate moving all privileged
13 credentials into Thycotic Secret Server.
14    **Q.**  Did Tim Brown draft this statement?
15    **A.**  I don't know who the original author is of
16 each bullet.  This is an aggregated summary of IT
17 business and product security leaders.
18    **Q.**  All right.  So it says (as read):
19            Access and privileged to
20        critical systems status is
21        inappropriate.
22        Which systems?
23        MR. TURNER:  Objection to form.
24        THE WITNESS:  SolarWinds had hundreds of
25 systems, critical systems.  I don't know how -- what

                        176

1  the count was at the particular time that this was
2  in place, but this is specifically talking about the
3  privileged access.  And privileged access could be
4  managed in a centralized secret server versus
5  decentralized servers with different technologies
6  managing the credential.  It is a summarized
7  industry jargon term that is meant to have impact,
8  but not to stand alone without context in
9  conversation.
10 BY MS. WARDEN:
11     Q.  But was it true?
12        MR. TURNER:  Objection to form.  Asked and
13 answered.
14        THE WITNESS:  Privileged access management
15 could be improved by the use of a centralized secret
16 server where its credential was maintained in
17 Thycotic.  The opportunity to improve that was what
18 was being presented here.
19 BY MS. WARDEN:
20     Q.  And it says that the access and privilege
21 is inappropriate.
22        What -- inappropriate how?
23        MR. TURNER:  Objection to form.
24        THE WITNESS:  I don't know how to answer
25 differently than I have.

177

1  BY MS. WARDEN:
2     Q.  What was your reaction upon learning this?
3        MR. TURNER:  Objection to form and
4  foundation.
5        THE WITNESS:  I'm not learning in --
6  this -- this is not a presentation --
7  BY MS. WARDEN:
8     Q.  You were emailed this presentation,
9  correct?
10    A.  No.  I wasn't emailed this presentation.
11 I participated in putting in the content for the
12 presentation.  The statements that were being made,
13 I had context and I understood what was being
14 proposed here.  This is offering the opportunity to
15 invest in Thycotic Secret Servers for managing the
16 credentials of critical systems across the
17 enterprise.  At the time, IT was the only team that
18 was leveraging -- I shouldn't say only.  IT was the
19 team that managed the secret server, and not all
20 privileged credentials were being managed in this
21 newer technology.  There was an opportunity to
22 invest in Thycotic and make sure that Thycotic had a
23 full business continuity plan so that all of the
24 different business departments could manage their
25 credentials out of Thycotic.  That was the point of

178

1  that bullet to indicate we can do privileged access
2  management more effectively.
3     Q.  The second sentence, "need to improve
4  internal processes, procedures," what -- what
5  internal processes?
6     A.  The -- the process and procedure that was
7  referred to here, Thycotic required -- so much
8  detail.  The way credentials were being managed in
9  IT, the business departments wanted their own
10 credential stores.  For IT to be able to manage --
11 for IT to be able to be responsible for the
12 credential store for the company, there would --
13 needed to be business continuity and access set up
14 so they could do that work.  This was a poorly
15 written statement that should not be relied upon
16 because what was in effect happening was the request
17 to leverage Thycotic as a centralized secret server
18 store so that privileged access could be maintained
19 in something that we had centralized and
20 standardized faith upon -- in.
21     Q.  Did you have -- so the sentence is need to
22 improve internal processes.
23        Did that occur?
24     A.  There was an initiative to -- around
25 privileged access management to leverage Thycotic as

179

1  a central store.  The processes -- internal
2  processes had to change to enable to leverage a
3  centralized store.
4     Q.  And who was in charge of those efforts?
5     A.  The project was being program-managed by
6  Eric Quitugua and Kellie to centralize the
7  privileged access management in a single credential
8  store, but each business department had to
9  participate in changing their processes so that you
10 could leverage a store.  So every business, the MSP,
11 the core and the cloud business departments all had
12 to participate in that project to get to centralized
13 credential management.
14    Q.  Did Mr. --
15    A.  Quitugua.
16    Q.  -- Quitugua report to Mr. Brown?
17    A.  He did.
18    Q.  All right.  If you look at the last
19 security category, authentication, authorization and
20 identity management.
21        Do you see that?
22    A.  Yeah.
23    Q.  What does that mean?
24    A.  It's a collection of security objectives
25 in a category around identity and access management.

180

1      Q.   And then under objective, it says (as
2   read):
3           User identity, authentication
4        authorization are in place and
5        actively monitored across the
6        company.
7        Do you see that?
8      A.   I do.
9      Q.   All right.  And then next to it, there's a
10  NIST maturity level?
11     A.   Yes.
12     Q.   And the score was 1.
13        Do you see that?
14     A.   I do.
15     Q.   Any reason to -- to doubt the accuracy of
16  that score?
17        MR. TURNER:  Objection to form.
18        THE WITNESS:  I didn't participate in
19  calculations.  However, this also points to, one,
20  the privilege access opportunity and the making
21  Azure AD the authoritative source of identity
22  because identity was centralized in multiple on-prem
23  ADs.
24  BY MS. WARDEN:
25     Q.   Sorry, to go back to the objective, what

1   is user identity?
2      A.   I'm sorry, where do you see that?
3        Okay, user identity.  So this is the
4   individual user of a -- an employee.
5      Q.   And authentication is what?
6      A.   I --
7      Q.   Sorry, the next phrase, authentication.
8      A.   So the identity is how you individually
9   understand what a -- who is the human actor trying
10  to get access.  Authentication is the way that you
11  ensure that they have access.  Authorization is the
12  determination that they should have the access and
13  making sure that all three are in place and
14  monitored across the company, is what this objective
15  is.
16     Q.   Is a score of 1 a low score?
17        MR. TURNER:  Objection to form.
18        Do you want to just ask her what her
19  understanding is as to why it was a 1?
20  BY MS. WARDEN:
21     Q.   What is your understanding as to why the
22  score was 1?
23     A.   I mentioned before, the -- there was
24  detailed summaries around how we get to maturity
25  levels.  For the purpose of an executive

1   presentation, we made very cursory summaries and
2   very, frankly, crude descriptions to speak to why we
3   needed do something different.
4        The rationale at the time for why this was
5   a 1 is because there was an opportunity to make an
6   investment in Thycotic as a secret server for the
7   entire company, and two, to make the investment in
8   Azure AD as the authoritative source for identity
9   and authorization for the company.  Those two
10  things, we needed an investment and we were making a
11  point in this presentation.
12     Q.   So if the audience was not executive
13  management, would the score have been different?
14     A.   The opportunity to centralize was still
15  real.  User identity across three different
16  organizations, managing it separately, is really an
17  expensive endeavor and requires a lot of oversight.
18  The challenge is -- the opportunity to improve that
19  is a consistent theme across the organization.
20     Q.   Did you intentionally give a falsely lower
21  score in order to get a bigger budget?
22     A.   No.
23     Q.   But did you intentionally provide
24  leadership with a lower score?
25     A.   No.  When you read the objectives as we're

1   calling out, my point in making the statement around
2   how this user, loosely worded, the objective Palo
3   Alto fireworks -- firewalls, that is a specific
4   thing, us making a point that we have deployed Palo
5   Alto firewalls, next generation firewalls, across
6   the company.  That is creating a clear note that the
7   perimeter protection was strong, but we called out
8   specifically the objective as Palo Alto firewalls.
9        This was calling out the opportunity more
10  clearly so we weren't in a generic statement.  We
11  were specific to the executives around what we were
12  trying to accomplish by calling out the privilege
13  access and the Azure AD opportunity, but the reality
14  is the opportunity to centralize and standardize
15  security in a single authoritative source was an
16  important objective.
17     Q.   Did you take any next steps in light of
18  the category of authentication, authorization and
19  identity management receiving a score of 1?
20     A.   We authorized two projects.  The privilege
21  access management project for Thycotic and the
22  Azure AD, what was called the identity and access
23  management project.
24     Q.   And whose decision was it to authorize
25  those projects?

1    part in the documentation
2    implementation and/or testing of
3    the individual controls.
4        And she attaches a spreadsheet, which is
5  what we were looking at, Exhibit 9A.
6    **A.** She says being a strawman.
7        MR. TURNER: Wait for the question.
8  BY MS. WARDEN:
9    **Q.** So why don't we -- if you look at the
10 column to the right, so -- so this may help orient
11 you.
12       If you go to the top of that column that I
13 was looking at, Column F, do you see it says, "NIST
14 control description from NIST SP 800"?
15   **A.** Yes.
16   **Q.** Okay. So that's the title of that. And
17 then we're going to be looking at Column S.
18       Do you see that's titled "Kellie's
19 comments, notes"?
20   **A.** Yes.
21   **Q.** All right. So we're going to look at
22 control, and then Kellie's comments column.
23       So let's go back to Count 17. And I read
24 you the control. Won't do that again. Then
25 Kellie's comment, do you see it's in red, says --

193

1  I'll let you get there in Column S, KP627, she
2  writes (as read):
3        We have no explicit
4        authorization policy, nor is this
5        documented that I am aware of for
6        the company or individual products.
7        Are you aware of any reason this
8  assessment was not accurate?
9        MR. TURNER: Objection to form.
10       THE WITNESS: This was not an assessment.
11 BY MS. WARDEN:
12   **Q.** Okay. What -- how would you describe it?
13   **A.** This was a preliminary reaction to a
14 request to make an investment in fedRAMP readiness
15 for products that did not have a strong business
16 justification. What Denny and I asked her to do was
17 perform a level of assessment -- level-of-effort
18 assessment on what it would cost the company to
19 prepare for fedRAMP readiness. It was a very
20 cursory collection of data across a number of
21 leaders to say this is going to take this much
22 effort because the formality and the requirement of
23 leveraging a third-party assessment organization or
24 a 3PAO for fedRAMP is very expensive and you have to
25 create years -- at least a year of reporting

194

1  documentation. And that's why she speaks to the
2  being -- doing the work in 2020 with readiness in
3  2021.
4        The ask here is truly to do a
5  level-of-effort estimate around how much work we
6  need to prepare to create the reporting
7  documentation to ready those assets for fedRAMP so
8  we can -- say, if this cost 2 million, how much in
9  sales is there to potentially justify this
10 investment.
11       Kellie is not -- Kellie nor myself would
12 be equipped to answer the company's process
13 readiness without having the specific asset owner of
14 each one of those assets answer in response to each
15 line item. The fact that Kellie writes her own
16 letters and dates on this shows that this is her
17 reaction.
18       What's more, the -- there was intended,
19 like a hypothesis on Kellie's part and certainly
20 mine because she and I have run programs before to
21 prepare companies for product certifications. The
22 reality that these products don't have the
23 U.S.-based staffing infrastructure means that we
24 knew that we would -- this would be too inexpensive
25 of an effort. So this was a very cursory, very

195

1  preliminary swag at this is gonna cost too much and
2  not going to be worth the effort in this time frame.
3    **Q.** Are you aware of Ms. Pierce ever providing
4  a final assessment?
5        MR. TURNER: Objection.
6  BY MS. WARDEN:
7    **Q.** Of the 325 controls.
8        MR. TURNER: Objection to form.
9        THE WITNESS: During my tenure, I'm not
10 aware of a final assessment. However, there -- this
11 work product during my tenure was not an assessment;
12 it was a preliminary review to determine through
13 swag that this level of effort doesn't warrant the
14 investment.
15 BY MS. WARDEN:
16   **Q.** Are you aware if whether this preliminary
17 review was ever updated?
18   **A.** Not in my tenure.
19   **Q.** And are you aware of whether this
20 preliminary review was ever finalized?
21   **A.** Not in my tenure. The time frame that
22 this would have happened would be outside the scope
23 of my tenure.
24   **Q.** So -- okay. Let's look back at the
25 control description in Count 17, please.

196

1    **A.** I did not.
2    **Q.** Did you ever ask Ms. Pierce what she meant
3 in Count 17?
4    **A.** I did not.
5    **Q.** You did not?
6    **A.** (Shakes head.)
7    **Q.** All right. You can -- we're going to go
8 to a different exhibit.
9         Handing you what I'm -- what I am marking
10 Johnson 10.
11        (Whereupon, Deposition Exhibit 10
12        was marked for identification.)
13 BY MS. WARDEN:
14    **Q.** Take your time.
15        MS. WARDEN: For the record, this is
16 Bates -1608 through -1634.
17 BY MS. WARDEN:
18    **Q.** Ms. Johnson, do you recognize this
19 document?
20    **A.** I do.
21    **Q.** And what is it?
22    **A.** This is a Q1 quarterly risk review for
23 2020.
24    **Q.** Did you receive this document?
25    **A.** I curated this document.

209

1    **Q.** And what do you -- what do you mean by
2 "curated"?
3    **A.** I organized the aggregation of inputs from
4 multiple departments as outlined on the first page,
5 dev ops, IT, legal and finance.
6    **Q.** Does that mean you put the whole slide
7 deck together?
8    **A.** It means, to your point, multiple people
9 put their slides in the deck, and we finalized the
10 artifact.
11    **Q.** Okay. Who finalized it?
12    **A.** That -- for a small software company,
13 there's no finalizer. It's an aggregate work
14 product.
15    **Q.** Did Tim Brown contribute to Exhibit 10?
16    **A.** Tim Brown and his team would have
17 contributed, yes.
18    **Q.** Okay. And was this slide deck presented
19 at a QRR?
20    **A.** It was presented at a QRR.
21    **Q.** Sorry, at the -- at the March 3rd, 2020
22 QRR?
23    **A.** I can't say specifically it was on that
24 date, but generally, we dated the documents to be
25 the date we were presenting it.

210

1    **Q.** Okay. And who did you present Exhibit 10
2 to?
3    **A.** The audience, the general audience for a
4 QRR was Burt Kalsu, the CFO, Joe Kim, the CTO, and
5 Jason Bliss as general counsel. Participants
6 generally included Danielle Campbell from finance,
7 Jenny Zador from legal, Tim, Kellie, myself and any
8 other special attendees as needed based on the
9 agenda.
10    **Q.** And do you recall presenting on some of
11 these slides?
12    **A.** I did present on some of these slides.
13    **Q.** Which ones?
14    **A.** Do you want to go slide by slide?
15    **Q.** Sure.
16    **A.** Okay. I probably would have intro'd
17 Slide 3 ending in -610, I probably would have
18 intro'd Slide 4 --
19    **Q.** I'm sorry, when you say -- you're saying
20 "intro"?
21    **A.** Intro'd.
22    **Q.** Introduced?
23    **A.** Introduced, yes. Reminding people what
24 they've seen last.
25    **Q.** And then introduced another speaker to

211

1 speak to that slide?
2    **A.** This was an informal software company. We
3 didn't have to --
4    **Q.** Okay. You spoke on that slide?
5    **A.** Multiple people could speak on -- would
6 speak on a slide.
7    **Q.** Okay. Sorry. I thought -- sorry. You
8 mentioned slide --
9    **A.** So what I would do is reorient this group
10 because they would not see this necessarily but once
11 a quarter, so reorienting them to what they'd seen,
12 and Tim would walk them through the details. If
13 there was some specific thing that we wanted to
14 spend more time on, it -- we would invite another
15 person to -- to add to the commentary.
16        Tim would have spoken to slide ending in
17 -612. Tim and I would have spoken to slide ending
18 in -613. I see architecture and engineering
19 customer support and marketing. We may have had
20 additional participants in a meeting to speak to
21 their work or we may have spoke on their behalf.
22 When it comes to policy, this would -- starting on
23 slide ending in -615, Kellie generally spoke to
24 policy.
25    **Q.** Pierce?

212

1  the word "consistently" didn't cause me concern or
2  the key risk noted, and then I looked over to the
3  column where it showed -- showed the 3.3 rating.
4      Q.  Okay.  And would a 3.3 rating cause you
5  concern?
6      A.  A 3.3 maturity in a certain security
7  category, without understanding what the objectives
8  were, the numbers -- the numbers are a visual
9  representation.  Numbers wouldn't get my -- wouldn't
10 alarm or concern me.  It would be the details, and
11 whenever there's something that stood out that
12 needed attention, we were very clear around what the
13 executives needed to do or what we needed from them.
14     Q.  Is there a particular rating that would
15 cause you concern?
16     A.  Again, a rating or a number isn't the
17 thing that would concern me.  My team had clear
18 vehicles to request for investment, request for
19 attention.  There was many ways to -- there was
20 incident reviews, there was -- there was vehicles to
21 raise attention to -- to the need for us to address
22 something.
23         The -- a quarterly review would not be the
24 forum for -- with the -- with the maturity score.
25 That's not the -- the way to get attention.  The

217

1  call for that would be a specific slide on a
2  specific need to do something else.
3         So this would not be the vehicle to get
4  attention.  Quarterly would not be appropriate to
5  wait for a vehicle quarterly to get attention, and a
6  NIST scorecard or SolarWinds maturity scorecard
7  wouldn't be the vehicle to do it.
8      Q.  What about that -- what it says under key
9  risks, "security processes not consistently
10 implemented," would that -- did that not cause you
11 concern?
12     MR. TURNER:  Objection.  Asked and
13 answered.
14     THE WITNESS:  This is not the vehicle to
15 alert my concern.  It's a quarterly vehicle.  This
16 is -- this work product is not for me.  This is not
17 how I would be alerted to a concern.
18 BY MS. WARDEN:
19     Q.  How would you be alerted to a concern?
20     A.  If there was an incident, this was a clear
21 incident response plan, and there was a clear
22 incident response process and executive
23 notification.  If there was a particular
24 vulnerability.  There were vehicles for all ways to
25 provide inputs that required escalation.  This was

218

1  not an escalation vehicle, this was an awareness
2  vehicle for leadership.
3      Q.  And how would Joe Kim be apprised of a --
4      A.  A security incident?
5      Q.  -- a security issue?
6      A.  I would walk right over to him and
7  interrupt him in a meeting if we were in a security
8  incident.
9      Q.  Okay.  But you did not -- you did not
10 alert Joe Kim that security processes were not
11 consistently implemented?
12     MR. TURNER:  Objection.  Form.  Asked and
13 answered.
14     THE WITNESS:  Joe Kim was aware of the
15 opportunities that we were taking to improve
16 security.  We created this vehicle to summarize and
17 provide awareness to other business departments.
18 Joe Kim and I met at least on a weekly basis.  There
19 was nothing -- this would never be the vehicle I
20 would use to advise him of a risk.  I had much more
21 frequent cadence meetings with him and unplanned
22 check-ins throughout the -- throughout the week and
23 day.
24 BY MS. WARDEN:
25     Q.  To the right of key risks is key

219

1  improvements.
2         Do you see that?
3      A.  Yes.
4      Q.  All right.  And then to the right of that,
5  the first bullet under key improvements is "Increase
6  SDL adoption."
7      A.  Yes.
8      Q.  What do you understand that to mean?
9      A.  I'm going to read through all of them to
10 make sure I have context.
11     Q.  Sure.
12     A.  In reading, not in context of that time, I
13 look at key improvements as the improvements that
14 are in progress of being made or areas of focus to
15 improve.
16     Q.  So SDL was an area of focus to improve?
17     A.  SDL was an area of focus to improve, but
18 it also -- it's showing here because it's likely
19 improving.  These are things that are in progress to
20 improve.
21     Q.  Is it fair to say SDL was not fully
22 adapted as of March 2020?
23     A.  It's not --
24     MR. TURNER:  Object to form and
25 foundation.

220

1     identification.)
2 BY MS. WARDEN:
3    **Q.**  Take a moment to review it.
4     MR. TURNER:  You don't have this in native
5 form you can send on the computer?
6     MS. WARDEN:  I don't think we are going to
7 go through the attachment.  I just produced it to be
8 complete.
9 BY MS. WARDEN:
10    **Q.**  Do you recognize this document,
11 Ms. Johnson?
12    **A.**  I do.
13    **Q.**  Okay.  What is it?
14    **A.**  This is an email from Danielle Campbell,
15 who was providing the status of our business and IT
16 general controls.
17    **Q.**  Okay.  And it's dated March 2nd, 2020,
18 correct?
19    **A.**  That's correct.
20    **Q.**  And then the subject line is SOX, control
21 deficiencies, FY2019.
22     Do you see that?
23    **A.**  I do.
24    **Q.**  All right.  So who is Ms. Campbell again?
25    **A.**  She was the director of internal audit.

1    **Q.**  Okay.  And you are -- are copied on this
2 email, correct?
3    **A.**  I am copied on this email.
4    **Q.**  Okay.  In the "to" line, it lists
5 Sandy Ensminger?
6    **A.**  Yes.
7    **Q.**  Do you know who that is?
8    **A.**  I believe she was the controller at the
9 time.
10    **Q.**  Okay.  And who is Chris Day?
11    **A.**  Chris Day, at the time, was responsible
12 for dev ops.
13    **Q.**  Who is August Wehrmann?
14    **A.**  He was the product -- person responsible
15 for the MSP product line engineering.
16    **Q.**  And who is David Owens?
17    **A.**  David Owens.  David Owens had some
18 responsibility for finance.  I don't think I ever
19 knew the extent of his responsibility, but he was a
20 European country manager who had a finance
21 objective.
22    **Q.**  Okay.  So on March 2nd, 2020
23 Danielle Campbell says (as read):
24     I wanted to send you an email
25     to let you know that we have

1     control deficiencies from our FY19
2     SOX audit that will need to be
3     remediated by your teams.
4     Do you see that?
5    **A.**  I do.
6    **Q.**  Who conducted the FY2019 SOX audit?
7    **A.**  There is an internal audit function that's
8 aided by a third party and an external audit
9 function.  The internal audits, Danielle, then
10 there's internal audit aided by a third party.  I
11 don't know what that -- looks like it's -- the
12 external auditor would have been PwC, but their
13 support that was given to internal audit as well.
14    **Q.**  Is it your understanding that the
15 reference to -- sorry, Ms. Campbell's reference to
16 the FY19 SOX audit is to the internal audit?
17    **A.**  She runs internal audit, and her team was
18 guided by a set of auditors who participated in
19 consulting us in internal audit.  Then there was an
20 external auditor, PwC, who provide -- who basically
21 was responsible for the final certification of our
22 financial reporting.
23    **Q.**  Okay.  Who supervised the internal FY19
24 SOX audit?
25    **A.**  Danielle Campbell.

1    **Q.**  Campbell supervised it.  Okay.
2     And she reported to Tim Brown?
3    **A.**  No.  Danielle Campbell reported to
4 finance.
5    **Q.**  Kalsu?
6    **A.**  Kalsu, Burt Kalsu.
7    **Q.**  And did Tim Brown have any role in the
8 FY19 SOX audit?
9    **A.**  There are some SOX objectives that align
10 to security objectives.  Tim Brown would be made
11 aware of them, but the systems that were in scope
12 for SOX control were not under Tim Brown's
13 responsibility directly.
14    **Q.**  Okay.  And did you have any role in the
15 FY19 SOX audit?
16    **A.**  My teams in -- some of the systems in
17 scope for SOX were the responsibility of my team's
18 to operate.
19    **Q.**  Okay.  So you were apprised of updates to
20 the FY2019 audit?
21    **A.**  Yes.
22    **Q.**  Okay.  All right.  If you can turn to
23 Bates -- the next page, Bates ending in -31.
24     The last sentence, Ms. Campbell writes (as
25 read):

1     However, we do have areas for
2  improvement around these controls.
3     Do you see that?
4     A.  I do.
5     Q.  Any reason to doubt the accuracy of
6  Ms. Campbell's statement?
7        MR. TURNER:  Objection.  Foundation.
8        THE WITNESS:  I don't have reason to doubt
9  her statement.
10 BY MS. WARDEN:
11    Q.  Did you have any conversations with
12 Ms. Campbell about her March 2nd, 2020 email?
13    A.  In preparation for our control reviews, I
14 talked to Danielle Campbell frequently.
15    Q.  But did you talk to her about what she
16 flagged with respect to the FY2019 SOX audit in her
17 March 2nd, 2020 email?
18    A.  Danielle wouldn't send an email to this
19 many people without first giving me a heads up.  So
20 I'm sure I met with her before she sent this, and
21 then after she sent this to make sure that I
22 understood how to assist my teams in any areas of
23 remediation.
24    Q.  Okay.  What do you recall about your
25 discussion with Ms. Campbell prior to receiving her

253

1  March 2nd, 2019 -- 2020 email?
2     A.  I don't recall a specific discussion, but
3  our practice was that before we send a report to
4  multiple people, that we are internally reviewing it
5  and understand it.  The email is the courtesy that
6  is take action, and then I engage Danielle
7  frequently with my team to review the areas that
8  we -- so it was very clear what the actions we
9  needed to take to do remediation.
10    Q.  So do you agree with Ms. Campbell's
11 statement that there are areas for improvement
12 around these controls?
13    A.  I want to clarify what "these controls"
14 are.  What's listed here are business controls and
15 IT general controls.  IT general controls are not
16 all security-based controls.
17    Q.  Okay.
18    A.  These -- yes.  These controls, they just
19 don't equal security and certainly don't equal Tim.
20 I'm not sure he's even copied.
21    Q.  You're saying the -- if you look at Bates
22 ending in -30, the 300 business controls, that has
23 nothing to do with the cyber security controls?
24    A.  I would need to see the 300 controls
25 tested.  But generally, the business controls are

254

1  related to what the business is doing to warrant the
2  accuracy of our financial reports.  The IT general
3  controls usually deal with change management and
4  access management.
5     Q.  Do the IT general controls relate to
6  access controls?
7     A.  Some of the IT general controls do relate
8  to access management.
9     Q.  Okay.  So would you say, as of March 2020,
10 they were areas of improvement around access
11 controls?
12        MR. TURNER:  Objection.  Foundation.
13        THE WITNESS:  I would need to look at each
14 one of the controls that were listed.  But access
15 controls under SOX are not -- or access management
16 under SOX is not around access control only.  It's
17 around user access reviews.  It's around reporting,
18 it's around investigation of the user access that
19 might -- that needs to be reported.  It's around
20 access approvals and whether or not that was
21 reported and recorded.  There's a lot of reporting
22 requirements under SOX that are above and beyond an
23 access control in terms of security access controls.
24 BY MS. WARDEN:
25    Q.  Did you have any discussions with

255

1  Tim Brown regarding Exhibit 13?
2     A.  I don't know that I did, but Danielle
3  talked to Tim directly frequently.
4     Q.  Okay.  And did you discuss Ms. Campbell's
5  March 2nd, 2020 email with Mr. Joe Kim?
6     A.  The -- the purpose of her formal email was
7  in preparation for the quarterly risk review.  I
8  would not surprise my boss with a quarterly risk
9  review that had details that he hadn't seen before,
10 so I'm certain that I presented anything that had
11 SOX findings to Joe Kim, not specifically this
12 email, but any area that we had intention to create
13 improvements around IT general controls, I would
14 have shared with Joe Kim.  Because this meeting was
15 the next day, I'm certain that I would have shared
16 before this meeting.  So can't specifically say
17 whether or not I provided this to him.
18    Q.  I'm handing you what I marked ... oh, you
19 took them all?
20        Okay.  Can you take a look at Exhibit 10,
21 please.
22    A.  Yes.
23    Q.  So you -- you previously testified that
24 you received this -- you -- what was the word -- how
25 did you receive this document, Exhibit 10?

256

```
 1   entire security lifecycle of release is part of the
 2   SDL.  That is one element of it.  That does not make
 3   up the entire SDL.
 4   BY MS. WARDEN:
 5       Q.  Is it -- did it concern you that -- that
 6   security testing didn't always include web
 7   application testing?
 8       A.  I can't speak to my memory of concern.
 9   What was appropriate is that any opportunities or
10   any areas that weren't consistent in its practice,
11   meaning consistent in standardized were elevated to
12   multiple leaders in multiple vehicles.  And so I --
13   having a transparent conversation with product
14   management was an important element of deciding to
15   align around how we focused our security objectives.
16       Q.  Is web application testing related to
17   threat modeling?
18       MR. TURNER:  Objection.  Foundation.
19       THE WITNESS:  I am an IT leader, not a
20   software development leader.  I have familiarity
21   with those concepts.  It is outside of this scope of
22   my expertise or experience to even comment on what
23   those mean in context of these statements.
24   BY MS. WARDEN:
25       Q.  Did you have any conversations with
```

                              289

```
 1   Mr. Brown about this highlight on Bates -6635 that
 2   "inconsistent internal security testing is part of
 3   product final security don't always include web
 4   application testing before release"?
 5       A.  One of the -- my role in being Tim's
 6   people leader is to ensure he has vehicles so, when
 7   he has a proposal, that we can either authorize it
 8   in a project or make a clear ask to leadership.
 9   He's done that effectively where he highlights the
10   needs here, and the next step in was to initiate a
11   project or to put in a risk -- log something in a
12   risk register so that remediation is involved.
13       So I -- there was -- there was nothing
14   that needed to additionally be done here.
15       MR. TURNER:  Rani, can you just answer the
16   question?  Do you recall any conversation you had
17   with Mr. Brown about this slide?
18       THE WITNESS:  I don't specifically
19   remember a conversation about this slide.
20       MS. WARDEN:  We're going to do a new
21   exhibit, but let's take a five-minute break.
22       THE VIDEOGRAPHER:  Going off the record.
23   The time is 5:27 p.m.
24       (Whereupon, a recess was taken from
25       5:27 p.m. to 5:35 p.m.)
```

                              290

```
 1       THE VIDEOGRAPHER:  We're back on record.
 2   Time is 5:35 p.m.
 3       MS. WARDEN:  We are passing the witness.
 4       MR. TURNER:  One moment, please.  I hate
 5   to do this, but let me just take a three-minute
 6   break.
 7       MS. WARDEN:  That's fine.
 8       THE VIDEOGRAPHER:  Going off the record.
 9   The time is 5:36 p.m.
10       (Whereupon, a recess was taken from
11       5:36 p.m. to 5:38 p.m.)
12       THE VIDEOGRAPHER:  We're back on the
13   record.  The time is 5:38 p.m.
14       MR. TURNER:  No redirect from defendants.
15       MS. WARDEN:  We have no further questions
16   of Ms. Johnson at this time.  But we may, and so if
17   we do, we will contact your counsel.
18       THE VIDEOGRAPHER:  Kathleen?
19       THE REPORTER:  Mr. Turner and Mr. Heshemi,
20   do you need transcripts or roughs?
21       MR. TURNER:  Yes, please.
22       THE REPORTER:  Mr. Heshemi?
23       MR. HESHEMI:  I don't need a transcript.
24       THE REPORTER:  Thank you.
25       All set, Frank.
```

                              291

```
 1       MR. TURNER:  Thank you.
 2       THE VIDEOGRAPHER:  This concludes today's
 3   deposition of Rani Johnson.  Master media of today's
 4   deposition will remain in the custody of Gradillas
 5   Court Reporting.  Time is 5:39 p.m.  We are now off
 6   the record.
 7       (Whereupon, the deposition adjourned
 8       at 5:39 p.m.)
 9            --oOo--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                              292

**Rani Johnson**
**8/27/2024**

## CERTIFICATE OF WITNESS

```
1        CERTIFICATE OF WITNESS
2
3    I, RANI JOHNSON, do hereby declare under
4    penalty of perjury that I have read the entire
5    foregoing transcript of my deposition testimony,
6    or the same has been read to me, and certify that
7    it is a true, correct and complete transcript of
8    my testimony given on August 27, 2024, save and
9    except for changes and/or corrections, if any, as
10   indicated by me on the attached Errata Sheet, with
11   the understanding that I offer these changes and/or
12   corrections as if still under oath.
13        _____ I have made corrections to my deposition.
14        _____ I have NOT made any changes to my deposition.
15
16   Signed: _____
          RANI JOHNSON
17
18
19   Dated this _____ day of _____ of 20____.
20
21
22
23
24
25
                    293
```

## ERRATA SHEET

```
1                 ERRATA SHEET
2    Deposition of: RANI JOHNSON
     Date taken: AUGUST 27, 2024
3    Case:  SEC v. SOLARWINDS CORP., et al.
4    PAGE  LINE
               CHANGE: _____
5              REASON: _____
6              CHANGE: _____
               REASON: _____
7
               CHANGE: _____
8              REASON: _____
9              CHANGE: _____
               REASON: _____
10
               CHANGE: _____
11             REASON: _____
12             CHANGE: _____
               REASON: _____
13
               CHANGE: _____
14             REASON: _____
15             CHANGE: _____
               REASON: _____
16
               CHANGE: _____
17             REASON: _____
18             CHANGE: _____
               REASON: _____
19
               CHANGE: _____
20             REASON: _____
21             CHANGE: _____
               REASON: _____
22
               CHANGE: _____
23             REASON: _____
24   Signed_____
25   Dated_____
                    295
```

## CERTIFICATE OF REPORTER

```
1        CERTIFICATE OF REPORTER
2        I, Kathleen A. Maltbie, Certified
3    Shorthand Reporter licensed in the State of
4    California, License No. 10068, the State of Nevada,
5    CCR 995, and the State of Texas, CSR 12212, hereby
6    certify that deponent was by me first duly sworn,
7    and the foregoing testimony was reported by me and
8    was thereafter transcribed with computer-aided
9    transcription; that the foregoing is a full,
10   complete, and true record of proceedings.
11        I further certify that I am not of counsel
12   or attorney for either or any of the parties in the
13   foregoing proceeding and caption named or in any way
14   interested in the outcome of the cause in said
15   caption.
16        The dismantling, unsealing, or unbinding
17   of the original transcript will render the
18   reporter's certificates null and void.
19        In witness whereof, I have hereunto set my
20   hand this day:
21   _____ Reading and Signing was requested.
        _____ Reading and Signing was waived.
22   ___x___ Reading and Signing was not requested.
23   _____
        KATHLEEN A. MALTBIE
24   RPR-RMR-CRR-CCRR-CLR-CRC-RDR
        California CSR 10068, Nevada CCR 995
25   Texas CSR 12212
                    294
```