# Exhibit 54

**Excerpts of Kevin Thompson
Deposition Transcripts**

```
 1        UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
            Plaintiff,          )
 6                              ) Case No.
       vs.                      ) 23-cv-9518-PAE
 7                              )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9          Defendants.         )
     _____)
10
11
12
13        VIDEOTAPED DEPOSITION OF
14            KEVIN B. THOMPSON
15              Austin, Texas
16       Wednesday, October 2, 2024
17
18
19
20
21
22
23
24   Reported by:
     Micheal A. Johnson, RDR, CRR
25   Job No. 241002MJ
                     1
```

```
 1        UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE    )
     COMMISSION,                )
 5                              )
            Plaintiff,          )
 6                              ) Case No.
       vs.                      ) 23-cv-9518-PAE
 7                              )
     SOLARWINDS CORP. and       )
 8   TIMOTHY G. BROWN,          )
                                )
 9          Defendants.         )
     _____)
10
11
12
13
14       Videotaped deposition of KEVIN B. THOMPSON,
15   taken on behalf of Plaintiff, at Latham & Watkins,
16   LLP, 300 Colorado Street, Suite 2400, Austin, Texas,
17   beginning at 9:10 a.m. and ending at 5:39 p.m. on
18   October 2, 2024, before Micheal A. Johnson, a
19   Registered Diplomate Reporter, Certified Realtime
20   Reporter, and Notary Public of the State of Texas.
21
22
23
24
25
                     2
```

```
 1  APPEARANCES:
 2  ON BEHALF OF PLAINTIFF:
 3      U.S. SECURITIES AND EXCHANGE COMMISSION
        BY: John J. Todor
 4          Kristen M. Warden
            Christopher J. Carney
 5      100 F Street, NE
        Washington, D.C. 20549
 6      (202) 256-7941
        todorj@sec.gov
 7      wardenk@sec.gov
        carneyc@sec.gov
 8
 9  ON BEHALF OF DEFENDANTS
    SOLAR WINDS CORP. AND TIMOTHY G. BROWN:
10
        LATHAM & WATKINS LLP
11      BY: Sean M. Berkowitz
            Kirsten Caroline Lee
12      330 North Wabash Avenue, Suite 330
        Chicago, Illinois 60611
13      (312) 777-7016
        sean.berkowitz@lw.com
14      kirsten.lee@lw.com
15
    ON BEHALF OF THE WITNESS:
16
        ROPES & GRAY LLP
17      BY: R. Daniel O'Connor
        800 Boylston Street
18      Boston, Massachusetts 02199
        (617) 951-7260
19      daniel.oconnor@ropesgray.com
20      ROPES & GRAY LLP
        BY: Edward R. McNicholas (Via Zoom)
21      2099 Pennsylvania Avenue, NW
        Washington, D.C. 20006
22      (202) 508-4779
        edward.mcnicholas@ropesgray.com
23
24
25
                     3
```

```
 1  APPEARANCES (CONTINUED):
 2  ALSO PRESENT:
 3      Jason Bliss
        Annie Gravelle (Via Zoom)
 4
 5  VIDEOGRAPHER:
 6      Timothy Desadier
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                     4
```

```
                    INDEX
               KEVIN B. THOMPSON
                 October 2, 2024

      APPEARANCES                           3

      PROCEEDINGS                           8


  EXAMINATION OF KEVIN B. THOMPSON:

      BY MR. TODOR                          9


      REPORTER'S CERTIFICATION            306
```

page 5

```
               DEPOSITION EXHIBITS
               KEVIN B. THOMPSON
                 October 2, 2024

  EXHIBIT NO.      DESCRIPTION            MARKED

  Exhibit 1    September 1, 2022            11
               Transcript of Kevin
               Thompson

  Exhibit 2    SolarWinds Security          65
               Statement

  Exhibit 3    January 30, 2018 E-mail,    127
               Steven Colquitt to Brno
               Engineering Management,
               et al.
               SW-SEC00238141 -
               SW-SEC00238142

  Exhibit 4    SolarWinds PowerPoint,      134
               Monthly 1:1 Meeting; 1:1
               with CEO, Kevin B.
               Thompson
               SW-SEC00305126 -
               SW-SEC00305155

  Exhibit 5    SolarWinds PowerPoint,      190
               SolarWinds KBT Offsite,
               DOIT and R&D
               SW-SEC00298924 -
               SW-SEC00298934

  Exhibit 6    SolarWinds PowerPoint,      207
               SolarWinds KBT Offsite,
               DOIT and R&D
               SW-SEC00031447 -
               SW-SEC00031470

  Exhibit 7    March 3, 2020 Q1 2020       232
               Quarterly Risk Review
               (QRR), Security &
               Compliance Program Office
               (DevOps + IT) + Legal +
               Finance
               SW-SEC00001608 -
               SW-SEC00001634
```

page 6

```
               DEPOSITION EXHIBITS
               KEVIN B. THOMPSON
                 October 2, 2024

  EXHIBIT NO.      DESCRIPTION            MARKED

  Exhibit 8    May 22, 2020 Q2 2020        245
               Quarterly Risk Review
               (QRR), DO + IT, Legal,
               Finance
               SW-SEC00148267 -
               SW-SEC00148294

  Exhibit 9    October 27, 2020 Q4 2020    250
               Quarterly Risk Review
               (QRR), DO + IT, Legal,
               Finance
               SW-SEC00001582 -
               SW-SEC00001601

  Exhibit 10   October 18, 2018 SEC Form   263
               S-1 for SolarWinds
               Corporation
```

page 7

```
 1      Austin, Texas, Wednesday, October 2, 2024
 2              9:10 a.m. - 5:39 p.m.
 3
 4           THE VIDEOGRAPHER:  Here begins the
 5   deposition of Kevin Thompson taking place at Latham
 6   & Watkins at 300 Colorado Street, Austin, Texas in
 7   the matter of Securities and Exchange Commission
 8   versus SolarWinds Corporation, et al.  The case
 9   number is 23-cv-9518-PAE.  Today's date is
10   October 2nd, 2024.  The time on video is 9:10 a.m.
11           The videographer is Timothy Desadier
12   and the court reporter is Micheal Johnson.  Counsel,
13   please identify yourselves and state whom you
14   represent.
15           MR. TODOR:  John Todor representing
16   plaintiff Securities and Exchange Commission.
17           MR. CARNEY:  Christopher Carney for
18   the SEC.
19           MS. WARDEN:  Kristen Warden for the
20   SEC.
21
22           MR. O'CONNOR:  Morning.  Dan O'Connor
23   from Ropes & Gray for Kevin Thompson.
24           MR. BERKOWITZ:  Sean Berkowitz and
25   Kirsten Lee on behalf of SolarWinds and Tim Brown.
```

page 8

**Q.** Then let me turn back to the external audit findings with respect to need-to-know/least-privilege-necessary basis.
Were there any external audit findings of some kind of failure to follow that policy?
MR. BERKOWITZ: Object to the form.
**A.** I don't recall specific findings by the external auditors. However, what I do know is that they did not have any findings in the period of time I was at SolarWinds, all 15 years or 2018 to 2020, where they found any significant weaknesses in our controls.
BY MR. TODOR:
**Q.** And would the external auditors' reports with respect to that policy also be reported to the audit committee on the board?
MR. BERKOWITZ: Object to the form.
**A.** It would be -- they would meet with the audit committee at least twice a year and present all of the findings of their audit and part of their findings was of their SOX audit, which is where they test internal controls. So they would present an interim -- set of results before the end of the year and then they would have another meeting with the audit committee after the end of the fiscal year and

105

present their full-year findings.
BY MR. TODOR:
**Q.** Direct your attention to the next subparagraph marked Authentication and Authorization and ask you to review that section and let me know when you're ready.
(Witness reviews document.)
**A.** Okay.
BY MR. TODOR:
**Q.** Looking at the first paragraph, there's a statement: We require that authorized users be provisioned with unique account IDs. Our password policy covers all applicable information systems, applications and databases. Our password best practices enforce the use of complex passwords that include both alpha and numeric characters which are deployed to protect against unauthorized use of passwords. Passwords are individually salted and hashed.
Please let me know if you need me to break it apart, but does this paragraph, is this consistent with your understanding of SolarWinds' policies with respect to passwords in the 2018 to 2020 time frame?
MR. BERKOWITZ: Object to the form.

106

**A.** So it's consistent with my understanding, though I will tell you I have no idea what "passwords are individually salted and hashed" means.
BY MR. TODOR:
**Q.** Turning your attention -- more generally. What was your understanding of the purpose of there being a password policy?
**A.** To limit access to systems, applications, to those individuals that we wanted to have access to those systems and applications.
**Q.** Was it important to SolarWinds' business that people not have access to systems that they don't need to have access to?
MR. BERKOWITZ: Object to the form.
**A.** I think the answer to that question depends a little bit on two things: What the system or application happened to be, and when you say the word "people," what you mean by the word "people."
BY MR. TODOR:
**Q.** I was referring back to your previous question [sic] where I asked, What is your understanding of the purpose of there being a password policy and your answer was, To limit access to systems, applications, to those individuals that

107

we wanted to have access to those systems and applications.
So I guess I said people instead of individuals, but it means the same thing.
**A.** Can you just rephrase the question for me, then?
**Q.** Was it important to SolarWinds' business that there be a limit to access to systems and applications to those individuals that you wanted to have access to them?
MR. BERKOWITZ: Object to the form.
**A.** I think it's important -- was important to the business to ensure that our employees or individuals, which is a word I used, had access to the systems and applications they needed to have access to in order to effectively do their job. So I think that was important.
I think it's important to SolarWinds and also to any other company that you don't have unauthorized access to your systems by either your employees or by individuals outside your organization.
BY MR. TODOR:
**Q.** Why do you say that it's important to SolarWinds and also to any other company that you

108

**Page 109**

don't have unauthorized access to your systems by either your employees or by individuals outside your organization?

**A.** When unauthorized access occurs, whether it's an employee or an external party, you could have a negative consequence. And I do -- I think it's important to say the word "could." Doesn't mean you will, but you could. And so protecting your environment, limiting access provides -- now it's probably a double positive, but provides security around the environment that protects the organization.

**Q.** The transcript is -- okay. Clearing up.

In your previous answer you said, When unauthorized access occurred, whether its employee or an external party you could have a negative consequence.

What did you mean by a negative consequence?

**A.** There are a number of different types of negative consequences. Someone could steal data if they had unauthorized access. Someone could, you know, share information you don't want shared if they have unauthorized access. There's a number of things that could occur.

**Page 110**

**Q.** And could those negative consequences have a negative impact on SolarWinds' business?

**A.** Potentially.

**Q.** Turn your attention to the second paragraph here under Authentication and Authorization. There's a statement: SolarWinds employees are granted a limited set of default permissions to access company resources such as their e-mail and the corporate intranet.

Is that consistent with your understanding of SolarWinds' practices in the 2018 to '20 time frame?

**A.** It is.

MR. BERKOWITZ: Object to form.

BY MR. TODOR:

**Q.** Next statement: Employees are granted access to certain additional resources based on their specific job function.

Same question.

MR. BERKOWITZ: Form.

**A.** Once again, it's my understanding that's what we were doing.

BY MR. TODOR:

**Q.** Next statement: Requests for additional access follow a formal process that involves a

**Page 111**

request and an approval from a data or system owner, manager or other executives as defined by our security guidelines.

Is that statement consistent with your understanding of SolarWinds' policies as they existed in the 2018 to '20 time frame?

MR. BERKOWITZ: Object to form.

**A.** I believe that it is and I think I referred to that process in one of your earlier questions.

BY MR. TODOR:

**Q.** This statement refers to security guidelines. Are you aware of any security guidelines at SolarWinds concerning this process in the 2018 to 2020 time frame?

MR. BERKOWITZ: Object to form, foundation.

**A.** I don't recall what the specific security guidelines were during that time frame.

BY MR. TODOR:

**Q.** Do you know who at SolarWinds would have been responsible for coming up with the security guidelines?

MR. BERKOWITZ: Object to form.

**A.** It would be the IT team, the security

**Page 112**

team.

BY MR. TODOR:

**Q.** Direct your attention to the third subsection under Access Control marked Software Development Lifecycle and please read that section and tell me when you're ready.

(Witness reviews document.)

**A.** Okay.

BY MR. TODOR:

**Q.** Do you have an understanding based upon your knowledge of SolarWinds' business as CEO in your previous roles of what a software development lifecycle is?

**A.** Yes.

**Q.** What is a software development lifecycle?

**A.** A software development lifecycle is a process you go through from inception of an idea for an application to the building and deployment of that application into an environment. That could be something you built yourself, so a custom application that an organization built just for them to use. It could be an application you procured from a third-party vendor and made the decision to implement in your -- into your environment.

**Q.** Is that a process that would apply to

**Page 153**

1    **A.** I don't recognize these at all.
2    **Q.** Turn your attention to Bates -- you can
3 refer to any one that you need to to familiarize
4 yourself, but I was going to ask you about Bates
5 5144 for these highlights. And directing you
6 specifically to the heading, the top one, for
7 security. And tell me when you've had your chance
8 to familiarize yourself with that.
9       (Witness reviews document.)
10    **A.** Okay.
11 BY MR. TODOR:
12    **Q.** The first Initiative/Effort column item
13 says Security Tool Standardization &
14 Rationalization.
15       Were you aware as of on or about
16 August 2019 of an initiative or effort around
17 security tool standardization and rationalization at
18 SolarWinds?
19    **A.** I don't recall this specific topic or
20 conversation, no.
21    **Q.** The next item -- initiative or effort is
22 marked Security Incident Improvement Plan.
23       Do you have any recollection of that
24 initiative or effort on or about August 2019?
25    **A.** No, I don't have any specific

**Page 154**

1 recollection.
2    **Q.** The third one is Security Training. It
3 says (SDL, IRC, GDPR Bootcamp).
4       Do you have any recollection of an
5 initiative or effort around security training on or
6 about August 2019?
7    **A.** Once again, I don't have any specific
8 recollection of this.
9    **Q.** Did you have any role with respect to
10 deciding what kinds of training SolarWinds employees
11 would be required to take?
12    **A.** That was not something where I spent any
13 specific time. That was handled by my functional
14 leaders and my HR leaders.
15    **Q.** So for security training, would that be
16 under either Mr. Kim or Mr. Johnson [sic] to decide
17 who would be getting training and on what topics?
18       MR. BERKOWITZ: Object to the form.
19    **A.** I think I indicated earlier, that would
20 be likely a conversation between the functional
21 leader, which in this case might have been Joe, Rani
22 and HR leadership.
23 BY MR. TODOR:
24    **Q.** I'll direct your attention to Bates 5145.
25       MR. O'CONNOR: Counsel, do you have a

**Page 155**

1 lot more on this deck?
2       MR. TODOR: Are we hitting lunchtime?
3       MR. BERKOWITZ: If you're going to
4 finish this --
5       MR. TODOR: This will be -- yeah. It
6 won't be five minutes, so this might be the
7 appropriate time for the lunch break, if you want to
8 do it that way.
9       THE WITNESS: It's up to you guys.
10       MR. O'CONNOR: Yeah. Let's take a
11 break.
12       THE VIDEOGRAPHER: Going off the
13 record. Time is 12:31.
14       (Recess taken from 12:31 p.m. to
15 1:35 p.m.)
16       THE VIDEOGRAPHER: Back on the
17 record. Time is 1:35.
18 BY MR. TODOR:
19    **Q.** Welcome back, Mr. Thompson. I'd like to
20 direct your attention -- the document we were
21 looking at before the lunch break I believe was
22 marked as Thompson Exhibit 4. Mark [sic] you to the
23 Bates ending in 5145, please. And it appears to be
24 a slide marked SolarWinds Security Program.
25       The subheading is Security Controls Based

**Page 156**

1 on NIST Controls.
2       Do you see that?
3    **A.** I do.
4    **Q.** What is your understanding of NIST
5 controls?
6       MR. BERKOWITZ: Object to form.
7    **A.** NIST is a security maturity model that
8 was developed by the federal government to my
9 understanding, that we were using to grade ourselves
10 against in terms of the maturity of our security
11 environment.
12 BY MR. TODOR:
13    **Q.** Okay. And you said "we were using to
14 grade ourselves." Do you have an understanding as
15 to when SolarWinds started to use the NIST security
16 model to grade itself?
17    **A.** I don't recall the exact date we started
18 that, no.
19    **Q.** Would it have been before or after 2018?
20    **A.** I don't recall exactly when we started
21 doing it. So I don't know if it was before 2018 or
22 sightly after.
23    **Q.** How was the decision made for SolarWinds
24 to use the NIST security model to grade itself?
25    **A.** That was a decision that Joe and his team

**Page 157**

made. There are a number of approaches and models you could take and they made the decision they wanted to grade us -- the maturity of our security program against the NIST framework. And so that's a decision that Joe and his team made.

**Q.** Does maturity have particular meaning in the context of the NIST controls?

**A.** It does.

**Q.** What is your understanding of the meaning of maturity in the context of the NIST controls?

**A.** My understanding is maturity refers to the -- a little bit to the definition of the word "maturity," which is how advanced are the controls, how automated are the controls. That's the way I think about maturity as it relates to NIST.

**Q.** So this presentation as -- you can look back, I believe it was dated August 16th, 2019. Had there been, to your knowledge, a presentation to you regarding the status of the SolarWinds security program based on the NIST controls at some date earlier than August 16th of 2019?

MR. BERKOWITZ: Object to form.

**A.** I don't recall if there was a presentation earlier than this date or not. It's something that Rani and I would periodically

**Page 158**

discuss, but I don't remember when those discussions started.

BY MR. TODOR:

**Q.** Did you ask Mr. Kim or Ms. Johnson to give you updates on the progress of the maturity of the NIST controls?

**A.** I did not specifically ask them to give me progress on maturity of the NIST controls. As I indicated, it's something that Rani would periodically update me on.

**Q.** There are five subheadings under this. Appears to be Protect, Respond, Identify, Detect and Recover.

Do you have an understanding as to what these five subheadings would mean in the context of the NIST controls?

**A.** I have a general understanding. I wouldn't say I have a deep detailed understanding because that's not my area of expertise, but I have a general understanding.

**Q.** What is your general understanding?

**A.** Of NIST in totality?

**Q.** Of the meaning of these five subcategories as they relate to NIST controls as they were applied at SolarWinds.

**Page 159**

**A.** In general the Protect category is the level of defensive protection you have of the environment.

Respond is when you have an incident, because no matter how good your security program is, you will have incidents. How do you respond to those incidents, what's the process.

Identify is a combination of understanding the asset environment that you have and the characteristics of those assets and the level of security that you need to have around those assets or that are built into those assets.

Detect is when someone is trying to get in your environment or trying to, you know, do something else, like a phishing attempt, you know, you detect those issues, how quickly do you detect them.

And the Recover, if you have an issue that causes a problem, how fast can you recover from that.

That's the way I understand the maturity model.

**Q.** And is it your understanding that SolarWinds would continue to evaluate itself against these five subcategories as part of its assessment

**Page 160**

of the maturity of its NIST controls?

MR. BERKOWITZ: Object to form. And just for clarification, you're referring to NIST CSF?

MR. TODOR: I'm referring to NIST in the sense it's used here on this document.

MR. BERKOWITZ: Which I believe is CSF. There are different types of NIST and I just want to see if that -- if the witness understands that, if your question is meant to capture a particular category of them.

BY MR. TODOR:

**Q.** So in the sense of NIST controls as stated here on this document, sir, do you have an understanding as to whether SolarWinds would identify -- would evaluate its maturity of its controls with respect to these five subcategories?

**A.** Yes.

MR. BERKOWITZ: Object to form.

**A.** With regard to the maturity level, we're using the NIST maturity framework. That's the part of NIST that we were grading ourselves against.

BY MR. TODOR:

**Q.** What is your understanding of the NIST maturity framework?

**Page 169**

1  presentation as of August 16th, 2019.  Do you have
2  an understanding as to whether the scores here for
3  2019 are reflecting the status as of August 16th,
4  2019?
5      A.   I don't recall the conversation that
6  would have told me exactly what date this was
7  measured at.
8      Q.   What were -- what was important to you as
9  the CEO in looking at scorecards like this one?
10     A.   What was important to me is when I look
11 at the category scores, were those category scores
12 improving because that was -- we were trying to
13 mature our approach to security.  We believe we had
14 a solid secure approach to security, but like any
15 organization as it grows, as it gets bigger you can
16 mature with everything that you do.  So what I was
17 focused on was what were the overall scores for
18 Identify, Protect -- Identify, Protect, Detect,
19 Respond, Recover, what were those overall scores and
20 were those overall scores improving, because that
21 was the goal.
22     Q.   Was it important in your mind to
23 SolarWinds' business from a financial perspective to
24 improve the maturity of its approach to security?
25          MR. BERKOWITZ:  Object to the form.

**Page 170**

1      A.   I did not have a concern during any of
2  this period of time that our financial performance
3  was going to be negatively impacted by the approach
4  we had at the time to security.
5  BY MR. TODOR:
6      Q.   Why was that?
7      A.   Because I believe we had a solid approach
8  to security that it was something the team was doing
9  a good job of.  Could we mature?  Yes, we could
10 mature in every business practice we have and every
11 business can no matter how old and large it gets,
12 but I wasn't worried about the approach to security
13 that it was going to have a negative impact on our
14 financial performance at the time note.
15     Q.   Would you periodically look at these
16 scorecards over time to see how the maturity process
17 was coming along?
18          MR. BERKOWITZ:  Object to the form.
19     A.   Only when Rani would bring the scorecards
20 into a meeting and if in that meeting she decided to
21 take me through them and give me an update, that's
22 when I would review them.
23 BY MR. TODOR:
24     Q.   Was it important to you to see
25 improvement over time in each individual

**Page 171**

1  subcomponent of the NIST scorecard?
2          MR. BERKOWITZ:  Object to the form.
3      A.   It -- the thing I was focused on as I
4  indicated before is the scores at the category level
5  because it's the category that I believe is
6  important, not any individual items underneath the
7  category by themselves.  The categories are Protect,
8  Identify, Detect, Respond, Recover.  Those
9  categories and the total score is what tells you
10 where your maturity is at the aggregate level, which
11 is what I believed at the time and still believe is
12 important.
13 BY MR. TODOR:
14     Q.   Direct your attention to the next page
15 with Bates 5147.  And it looks like we've got a bit
16 of a typo at the top of the page.  It says
17 indentify.  I'm guessing that means identify from
18 what we've looked at previously.  Does that sound
19 right to you?
20     A.   I would assume, yeah.
21     Q.   And then there's a statement of
22 highlights with some subbullets underneath.
23          Do you see those?
24     A.   Barely.  Small print.
25     Q.   Yeah.  Did Ms. Johnson or anyone else

**Page 172**

1  discuss these highlights with you during your
2  periodic meetings?
3      A.   I don't recall specific conversations of
4  any one of these individual bullets, no.  Not saying
5  that she didn't, I just don't recall it.
6      Q.   I'll turn your attention down to the
7  security category chart there, and direct your
8  attention to the second item marked Secure Software
9  Development Lifecycle.
10          Do you see that?
11     A.   I do.
12     Q.   Do you have an understanding of what that
13 term would mean in the context of SolarWinds'
14 business as of August 16th, 2019?
15     A.   Yes.
16     Q.   What is that understanding?
17     A.   I think we talked about it earlier, but
18 that the process -- that we had a defined process of
19 how we intended to build software and that we
20 were -- our goal was to consistently apply that
21 process across our different development teams, but
22 consistently does not mean identically.
23     Q.   And do you see it has a NIST maturity
24 level of 2?
25     A.   I do.

Kevin Thompson
10/2/2024

**Q.** Do you have an understanding of why that's lower than the other categories here?
**A.** I don't recall why that individual item was lower. As I mentioned, I really focused in my conversations with Rani on the category level scores, not the individual scores inside of the category because I believe that was the metric that was most important to us an as organization.
**Q.** I'll direct your attention back to the previous page, the 5145, for the description of what maturity level 2 means. You can look at it for yourself to familiarize.
    (Witness reviews document.)
**A.** I see that.
BY MR. TODOR:
**Q.** And it states: The organization has a consistent overall approach to meeting the security control objectives, but it is still mostly reactive and undocumented. The organization does not routinely measure or enforce policy compliance.
    Is that what it says there?
**A.** What you read is what it says.
**Q.** Turning back to 5147, is that description consistent with your understanding of the status of SolarWinds' secure software development lifecycle

173

practices as of August 2019?
    MR. BERKOWITZ: Object to the form.
**A.** Not -- it is not. I think you also are assuming that the -- all the sentences apply in the score of 2 when you've got to pick a score of 2, 3 or 4. So these are not our descriptions. These are the descriptions that come out of NIST.
BY MR. TODOR:
**Q.** Okay. I'm just asking for what your understanding was.
**A.** I believe we had a --
    THE REPORTER: A what?
    MR. O'CONNOR: Software. Slow down.
**A.** I believe the team had a software development lifecycle that they were following that they were trying to ensure that was consistently used across the different development teams in the organization.
    As I indicated, we had 60 products or more, which is a lot of products and a lot of development teams. And so I believe that we did have a process we were following.
BY MR. TODOR:
**Q.** In your answer I believe you said they were trying to ensure that was consistently used.

174

By that, did you mean that there were differing rates of adoption in various parts of the organization?
    MR. BERKOWITZ: Object to the form.
**A.** What I mean by that is that we talked about -- we made a number of acquisitions as a company. And we made acquisitions almost every year that I was at SolarWinds. And so we were constantly having to take our processes and methodologies and approaches and have organizations we were adding to our company adopt them. So it was a continuous effort versus an effort you finished and you were done and you never had to do it again.
BY MR. TODOR:
**Q.** Did you have any concern over the subscore of 2 for secure software development lifecycle at the time?
    MR. BERKOWITZ: Object to the form.
**A.** I don't recall the subscore of 2 on the individual line item. As I indicated, I was really focused on the category score because I believe that's what was important to measure how mature that category of Identify is. It's the category I believe that's important -- has the most importance. And that's where I focused my -- any conversations I

175

had with Rani.
BY MR. TODOR:
**Q.** Direct your attention to the next slide with Bates 5148. It's marked Protect at the top. And please familiarize yourself with the slide.
    (Witness reviews document.)
**A.** Okay.
BY MR. TODOR:
**Q.** I'll direct your attention first to the top section marked Highlights. The first bullet says: Access and privilege to critical systems/data is inappropriate.
    Do you see that?
**A.** I do.
**Q.** Did you review this language at the time in August of 2019?
**A.** I don't recall specifically reading that language, no.
**Q.** It states further in that line: Need to improve internal processes/procedures.
    Do you see that?
**A.** I do.
**Q.** Do you have an understanding as to what processes or procedures are being referred to there?
**A.** I don't specifically recall what

176

**Page 261**

about when to go public and whether to go public, yes.

**Q.** And how was it decided to pick the -- that -- the time October 2018 to go public?

MR. BERKOWITZ: Object to the form.

**A.** You don't really pick an exact time when you're going to go public. When you make an initial public offering you make a decision that you're going to get ready, and then you have to go through the process of creating a document, having that document filed and reviewed by the SEC, responding to comments and then evaluating market conditions to make a decision of when you go.

So we made the decision we would get ready to go public in 2018. We ended up going public in October of 2018, but it wasn't a specific, We will go public in October of 2018 if we would get ready.

BY MR. TODOR:

**Q.** Thank you. When was the decision to start getting the ball rolling made?

**A.** I don't recall the exact time that decision was made.

**Q.** Was there a board meeting in connection with it or was there just kind of going back and

**Page 262**

forth? How was that process conducted?

**A.** I don't recall whether we had a special board meeting or whether it was just discussed at our normal quarterly board meetings.

**Q.** Do you have a sense for about how long it took from when you started the ball rolling to actually making the IPO?

MR. BERKOWITZ: Object to the form.

**A.** I don't recall exactly, but the process generally is going to take six months or more.

BY MR. TODOR:

**Q.** Did you provide input to the board as to whether 2018 was an opportue time to go public again?

MR. BERKOWITZ: Object to the form.

**A.** I was a member of the board in addition to being CEO at that point. I don't know that I would say I -- the way you phrased it, I wouldn't say that's exactly what I did. I think the board believed it was a good time, that the company was performing well, that the markets were in a decent position, and that we had an opportunity to go public again and made the decision that we should. I did not object to that decision.

**Page 263**

BY MR. TODOR:

**Q.** And you said that -- I believe you said that the board believed it was a good time. Do you have an understanding for why the board believed it was a good time?

MR. BERKOWITZ: Object, asked and answered.

**A.** A combination of the fact that the business was performing well consistent with their expectations, and the market at the time we began to get ready was positive.

(Deposition Exhibit 10 marked for identification.)

BY MR. TODOR:

**Q.** Mr. Thompson, you've been presented with a document marked as Thompson Exhibit 10. Do you recognize it?

**A.** It appears to be the S-1 that we filed on October 18, 2018, based on the date on the document.

**Q.** Okay. And you don't have to read the entire thing, but let me see if I could ask --

**A.** We would be here a very long time.

**Q.** -- ask some pertinent questions.

Was it your understanding that this form S-1 would inform investors about SolarWinds'

**Page 264**

business in connection with its initial public offering?

**A.** It was.

**Q.** Did you -- what, if any, efforts did you make to ensure the accuracy of the representations regarding SolarWinds' business in this document?

**A.** I read this document on more than one occasion and provided comments to my team, asked questions of my team.

In addition, I have experts -- had experts and legal, in finance and accounting, we had external legal counsel who was very involved. So a number of experts involved in drafting the document that I also relied on.

**Q.** And Mr. Bliss in this room, was he involved?

**A.** He was.

**Q.** And I'm guessing you didn't write the first draft of the whole thing yourself. What, if any, role did you play in the review process?

**A.** I did not do the first draft of any of the pages on this document, I don't believe. I was a part of the review process. I read the drafts and as I indicated, if I had questions about anything in the document, I would ask the appropriate person

### Page 285

to factor in the amount of time it would take to implement security fixes in deciding whether to purchase a piece of software?

    MR. BERKOWITZ: Object to the form.

    A.  Once again, technology professionals are faced with the challenge on a daily basis of patching the software that they use. It's a part of the job and the processes that they go through. So it's something that is -- that they expect they're going to have to do.

BY MR. TODOR:

    Q.  Do you have an understanding that Google Chromebooks are marketed that you don't have to do the same kind of work to implement security patches that you do for Windows?

    MR. BERKOWITZ: Object to the form.

    A.  I don't use a Google Chromebook. Never have.

BY MR. TODOR:

    Q.  Would it be an advantage from the perspective from a technology professional not to have to spend as much time dealing with security fixes on a piece of software as opposed to another one?

    MR. BERKOWITZ: Object to the form.

### Page 286

    A.  I guess I'm struggling to understand the question, what you're looking for.

BY MR. TODOR:

    Q.  I'll try to ask a slightly different question, then.

    Would you expect that a technology professional would factor in whether a -- the amount of time it would take to fix a security issue would be important in deciding whether to purchase a piece of software?

    MR. BERKOWITZ: Object to form, asked and answered. We're late in the day and so perhaps I'm a little bit more aggravated, but you could have called technology customers in to testify to this. I don't know that you're going to get any more out of this witness.

    Answer to the extent that you can.

    A.  I don't think I have anything else to add other than what I've already said on the topic.

BY MR. TODOR:

    Q.  I would like to direct your attention to what is marked -- what is page 30 of 229, bottom right of the document, which is page 26 in the bottom center under the text there.

    A.  And what paragraph am I looking at?

### Page 287

    Q.  I am -- well, familiarize yourself. Obviously it's a long passage, but I was going to focus your attention to the passage starting, If we sustain system failures.

    (Witness reviews document.)

    A.  Okay.

BY MR. TODOR:

    Q.  Did you review risk disclosures as part of the process of the IPO?

    A.  I did.

    Q.  What did you understand to be the purpose of the risk disclosures?

    A.  I understood from conversations with both external and internal legal counsel that the intent of risk factors is to provide investors a view of the risk to the business that could have an impact on the business's performance over time.

    Q.  Without getting into any content of any legal advice you may have received in the process, can you describe to me what the review process was like for risk disclosures?

    A.  The risk factors were generally initially drafted by a combination of internal and external legal counsel. It was reviewed by the finance organization. It was reviewed by myself. I don't

### Page 288

know who all the other reviewers were.

    Q.  Speaking for your knowledge of SolarWinds' actions here, did SolarWinds make efforts to ensure that the risk disclosures were accurate?

    A.  We did.

    MR. BERKOWITZ: Object to the form.

    THE WITNESS: Sorry.

BY MR. TODOR:

    Q.  I would like to direct your attention to this section in general. What did you understand to be the reason for making this particular risk disclosure?

    A.  And are you speaking to the risk disclosure that starts, If we us stain system failures?

    Q.  Yes, sir.

    A.  Because there is a risk if we sustain system failures, cyberattacks or other data security breaches that we could suffer -- not that we will suffer, but that we could suffer a loss of revenue and increased costs. And the sentence goes on.

    Q.  It goes on. Were there any particular risks you had in mind that were particularly acute when this was written?

```
 1         MR. BERKOWITZ:  Object to the form.
 2     A.  I didn't write the risk factor.  I didn't
 3  review the risk factor.  But, no, there were no
 4  particular risks that we had in mind when we wrote
 5  the risk factor.
 6  BY MR. TODOR:
 7     Q.  I'd like to direct your attention to the
 8  next page, which has 31 of 229 at the bottom right
 9  and 27 in the bottom middle there.
10     A.  Okay.
11     Q.  And I'd like to direct your attention to
12  the second full paragraph on the page, and
13  specifically the third sentence of that second full
14  paragraph, but please familiarize yourself with
15  whatever you need to, sir.
16         (Witness reviews document.)
17     A.  And you're referring to the
18  paragraph that starts with the word "During"?
19  BY MR. TODOR:
20     Q.  That's correct.
21     A.  Let me finish reading it.
22         (Witness reviews document.)
23     A.  Okay.
24  BY MR. TODOR:
25     Q.  And directing your attention to the third
```
289

```
 1  sentence in that paragraph, it states:  Despite our
 2  security measures, unauthorized access to or
 3  security breaches of our software or systems could
 4  result in the loss, compromise or corruption of
 5  data, loss of business, severe reputational damage
 6  adversely affecting customer or investor confidence,
 7  regulatory investigations and orders, litigation,
 8  indemnity obligations, damages for contract breach,
 9  penalties for violation of applicable laws or
10  regulations, significant costs for remediation and
11  other liabilities.
12         Did I read that correctly, sir?
13     A.  That's what it says.
14     Q.  To your knowledge, was this statement
15  accurate when made?
16         MR. BERKOWITZ:  Object to the form.
17     A.  I don't recall the specific sentence, but
18  as I read it now, I believe it's accurate for
19  SolarWinds.  It would be accurate for almost any
20  other company in the world that has technology.
21  BY MR. TODOR:
22     Q.  Direct your attention to the first clause
23  in the sentence.  There's a statement:  Despite our
24  security measures.
25         Do you see that?
```
290

```
 1     A.  I do.
 2     Q.  Were there specific security measures you
 3  were referring to in that sentence?
 4         MR. BERKOWITZ:  Object to the form.
 5     A.  I don't believe we were referring to
 6  specific security measures.  I think we were
 7  referring to all of the different things we did from
 8  a security perspective that dealt with all the items
 9  that are listed in that sentence.
10  BY MR. TODOR:
11     Q.  You'll recall earlier in the day I showed
12  you a document which was that public-facing security
13  statement on the SolarWinds website.
14         Do you remember that?
15     A.  I do recall that.
16     Q.  You can look to that if you need to, to
17  refresh yourself.  My question is simply, if an
18  investor read this disclosure and wanted to know
19  more about what SolarWinds' security measures were
20  as stated here in the form S-1, could that investor
21  look at the public-facing security statement to get
22  additional information about what SolarWinds'
23  security measures were as of the time of the IPO?
24         MR. BERKOWITZ:  Object to the form,
25  calls for speculation.
```
291

```
 1     A.  I don't recall when and don't know that I
 2  know when the security statement was published
 3  because I didn't remember seeing that security
 4  statement.  So I don't know what was on the website
 5  at the time of the IPO.
 6  BY MR. TODOR:
 7     Q.  Do you know whether the security
 8  statement was on the public-facing website at the
 9  time of the IPO?
10     A.  I don't know what -- you'd have to tell
11  me.
12     Q.  Assuming that it was on the website at
13  the time of the IPO, could an investor who wanted to
14  know more about what the security measures that were
15  referred to here in the form S-1 look at that
16  public-facing security statement to learn more about
17  what SolarWinds' security measures were as of the
18  time of the IPO?
19         MR. BERKOWITZ:  Object to the form,
20  calls for speculation.
21     A.  Since I don't know if it was on the
22  website or not, I don't think I can answer that
23  question for you.
24  BY MR. TODOR:
25     Q.  Is it fair to say that it would be
```
292

**Page 293**

important to an investor to know what -- the security measures SolarWinds had at the time of the IPO to assess the likelihood of the risks of unauthorized access to or security breaches of its software or systems?

MR. BERKOWITZ: Object to the form.

A. I think you would have to speak to an investor. As I indicated earlier in one of my responses, I don't recall having an investor ever ask me about our security measures.

BY MR. TODOR:

Q. Do you have an understanding as to why unauthorized access to or security breaches of SolarWinds' software or systems could result in the various consequences that are listed in that sentence?

MR. BERKOWITZ: Object to the form.

A. I understand the concept of unauthorized access. And depending on what someone had unauthorized access to, you could have different outcomes.

BY MR. TODOR:

Q. So to focus a little bit. Do you have an understanding as to why unauthorized access to or security breaches of SolarWinds' software or systems

**Page 294**

could result in the loss of business?

MR. BERKOWITZ: Object to the form and also state that it's a lengthy risk factor that may contain some of the answers to your question.

A. So to respond to your question, and you're asking me why unauthorized access to or security breaches of our software systems could result in a loss of business, that's the question you're asking me?

BY MR. TODOR:

Q. Yes, sir.

A. Depending on what that unauthorized access was, what happened as a result of that unauthorized access, it could result -- once again, could, not will, it could result in a customer or a potential customer making a decision to buy or not buy software from SolarWinds.

Q. You said that depending on what that unauthorized access was, what happened as a result of that unauthorized access, it could result -- once again, could, not will, it could result in a customer or a potential customer making a decision to buy or not buy software from SolarWinds.

Could you explain why that is?

A. What part of that question you want

**Page 295**

to -- do you want me to explain why to?

Q. Why would it -- why could it result in a customer or a potential customer making a decision to buy or not buy software from SolarWinds?

MR. O'CONNOR: Objection, calls for speculation.

A. Once again, I can't put myself in the mind of the customer. However, my statement was based on the fact that if there was an issue with loss of data or something with our software or systems, that it might impact a customer's buying decision.

BY MR. TODOR:

Q. Turning your attention to later in the sentence, there is a reference to reputation. Do you have an understanding as to the connection between unauth -- the potential of unauthorized access to or -- we can get back to where we were here.

MR. BERKOWITZ: Can we take a break so you can get your thoughts straight?

MR. TODOR: Here we are. Flip the page over.

BY MR. TODOR:

Q. Turning back to the sentence: Despite

**Page 296**

our security measure, unauthorized access to or security breaches of our software could result in, and then one of the consequences listed is severe reputational damage adversely affecting customer or investor confidence.

Could you please explain the basis for that statement?

MR. BERKOWITZ: Object to the form.

A. Once again, this is a risk factor that you're asking me questions about. We're presenting the risks that could occur if certain things happen. And depending on what might happen, it could impact the company's reputation in the market.

BY MR. TODOR:

Q. Turning back to the sentence, there's a statement: Despite our security measures, unauthorized access to or security breaches of our software or systems could result in, and another consequence listed is significant costs for remediation and other liabilities.

Could you explain your understanding of what is meant by significant costs for remediation and other liabilities?

A. Depending on what happens in an incident, it could cost more or less to remediate that

**Page 297**

incident, and would -- if this risk factor were to come to pass, it would be the intent of the company to remediate the incident and it's not possible to estimate what the costs might be if you don't know what the incident is, which is what the risk factor refers to.

MR. TODOR: We've been going now for an hour.

MR. BERKOWITZ: Yeah.

MR. TODOR: Probably a good time for a break.

THE VIDEOGRAPHER: Going off the record. Time is 5:11.

(Recess taken from 5:11 p.m. to 5:30 p.m.)

THE VIDEOGRAPHER: Back on the report. Time is 5:30.

BY MR. TODOR:

Q. Welcome back, Mr. Thompson. Was the SolarWinds IPO completed?

A. The IPO in 2018?

Q. Yes.

A. Yes, it was.

Q. And did SolarWinds bring in revenue as a result of the IPO?

**Page 298**

A. We raised some amount of cash as a part of the IPO.

Q. Were any of your shares sold as part of the IPO?

A. I don't recall if I sold any shares in the IPO or not. It would be disclosed if I did.

Q. Would all of those sales be disclosed in some security filings at SolarWinds?

A. They would be.

Q. Did SolarWinds issue a Form 10-K for the 2018 year, the next year? I have documents here, I'm just trying to get you through it without looking at them.

MR. BERKOWITZ: You're saying in 2019?

BY MR. TODOR:

Q. Yeah, in 2019 did SolarWinds issue a Form 10-K for the year 2018?

A. Yes, we did, that I recall.

Q. Were you involved in the review process for that 10-K?

A. I was.

Q. And did you make efforts to ensure that the 10-K was accurate?

A. I did.

**Page 299**

Q. Without disclosing any advice you -- or communication to or from your legal advisors, please describe the review process for the 10-K.

A. The review process for the 10-K was similar to the review process that I discussed earlier of the S-1, which is the 10-K was drafted by a combination of our legal departments, our finance organization, and internal and external legal counsel reviewed, internal finance reviewed, PricewaterhouseCoopers reviewed and I reviewed that 10-K.

Q. And did you conclude that the representations in the 10-K were accurate when you made them?

A. I believe they were.

Q. Did SolarWinds issue a 10-K in 2020 for the year 2019?

A. We did.

Q. And did -- was the process for that 10-K similar to the one for the 10-K for 2018?

A. It was the same process that we followed for the 10-K we filed in 2019 for 2018.

Q. To your knowledge, were the representations in the 2019 10-K that was issued in 2020 accurate?

**Page 300**

A. I believe they were.

Q. Did SolarWinds issue Forms 10-Q after its initial public offering?

A. Once we were at a spot where we were required to issue a Form 10-Q, yes.

Q. Did you have a review process for the Forms 10-Q?

A. The review process for the Form 10-Q was similar to the review process we followed for a 10-K, even though that document is shorter.

Q. Were there additional steps in the review process for the 10-K as opposed to the 10-Qs?

A. I believe the basic review process was the same as I recall.

Q. To your knowledge, were the representations in the Forms 10-Q accurate when made?

A. I believe they were.

Q. At some point did you make the decision to leave SolarWinds?

A. I did.

Q. When was that?

A. I made the final decision to leave SolarWinds in -- in or around August 2020. 2020? Yes, 2020. And it's something I had been

```
 1            MR. BERKOWITZ:  Object to form.
 2       A.   I don't recall.
 3  BY MR. TODOR:
 4       Q.   Ballpark figure for how much money you
 5  got for the shares that you sold.
 6       A.   Once again, I have not looked back at
 7  that information, so I don't recall.
 8       Q.   Would that information be set forth in
 9  some security filing of some kind from SolarWinds?
10       A.   Yes, I believe it will.
11            MR. TODOR:  Pass the witness.
12            MR. BERKOWITZ:  We have no questions
13  of Mr. Thompson on behalf of SolarWinds and
14  Mr. Brown at this time.  I don't know if his counsel
15  does.
16            MR. O'CONNOR:  No.  Thank you.
17            THE VIDEOGRAPHER:  This concludes
18  today's testimony of Kevin Thompson.  Going off the
19  record.  Time is 5:39.
20            (Deposition concluded at 5:39 p.m.)
21
22
23
24
25
                      305
```

```
 1            REPORTER'S CERTIFICATION
 2       I, Micheal A. Johnson, Registered Diplomate
 3  Reporter and Notary Public in and for the State of
 4  Texas, certify that on the 2nd day of October, 2024
 5  I reported the Videotaped Deposition of KEVIN B.
 6  THOMPSON, after the witness had first been duly
 7  cautioned and sworn to testify under oath; said
 8  deposition was subsequently transcribed by me and
 9  under my supervision and contains a full, true and
10  complete transcription of the proceedings had at
11  said time and place; and that reading and signing
12  was not requested.
13       I further certify that I am neither counsel
14  for nor related to any party in this cause and am
15  not financially interested in its outcome.
16       GIVEN UNDER MY HAND AND SEAL of office on
17  this 7th day of October, 2024.
18
19       _____
         MICHEAL A. JOHNSON, RDR, CRR
20       NCRA Registered Diplomate Reporter
         NCRA Certified Realtime Reporter
21
         Notary Public in and for the
22       State of Texas
         My Commission Expires:  8/8/2028
23
24
25
                      306
```