# Exhibit 55

**Excerpts of Matthew Hedberg
Deposition Transcripts**

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF NEW YORK
3
4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
         Plaintiff,                  )
6                                    )
    v.                               ) Civil Action No.
7                                    ) 23-cv-9518-PAE
    SOLARWINDS CORP. and TIMOTHY G.  )
8   BROWN,                           )
                                     )
9        Defendants.                 )
    _____)
10
11
12
13
14          VIDEO DEPOSITION OF
15           MATTHEW HEDBERG
16          Friday, July 26, 2024
17              8:37 a.m.
18
19
20
21
22
23
24  Reporter:
    Barbara J. Carey, RPR
25  JOB No. 240726ICR
```

**Page 2**

```
1   APPEARANCES:
2
3   ATTORNEY FOR PLAINTIFF:
4      CHRISTOPHER BRUCKMANN (Via Zoom)
       KRISTEN M. WARDEN
5      BENJAMIN BRUTLAG
       Attorneys at Law
6      SECURITIES AND EXCHANGE COMMISSION
       100 F Street, N.E.
7      Washington, D.C. 20549
       bruckmannC@sec.gov
8      wardenK@sec.gov
       brutlagB@sec.gov
9
10
    ATTORNEY FOR DEFENDANTS:
11
       SEAN BERKOWITZ
12     KIRSTEN C. LEE
       Attorneys at law
13     LATHAM & WATKINS, LLP
       330 North Wabash Avenue, Suite 2800
14     Chicago, Illinois 60611
       sean.berkowitz@lw.com
15     kirsten.lee@lw.com
16
       SERRIN TURNER (Via Zoom)
17     Attorney at Law
       LATHAM & WATKINS, LLP
18     1271 Avenue of the Americas
       New York, New York 10020
19     serrin.turner@lw.com
20
21
22
23
24
25
```

**Page 3**

```
1   APPEARANCES (Continuing):
2
3   ATTORNEY FOR THE WITNESS:
4      MICHAEL ROWE
       Attorney at Law
5      DORSEY WHITNEY LLP
       50 South Sixth Street, Suite 1500
6      Minneapolis, Minnesota 55402-1498
       rowe.michael@dorsey.com
7
8   ALSO PRESENT:
9      David Newman (Via Zoom)
       In-House Counsel
10     RBC Capital Markets
11
       Steve Smith, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                I N D E X
2   EXAMINATION OF MATTHEW HEDBERG:          PAGE
3      By Mr. Brutlag          8, 245
4      By Mr. Berkowitz        164, 254
5
6   EXHIBITS:
7   Number          Description          Page
8   Exhibit 1.......................... 13
       Matt Hedberg LinkedIn Profile
9      (3 pages)
10  Exhibit 2.......................... 38
       RBC Capital Markets - The 10-Minute
11     Take:  Cyber Threat
       (8 pages)
12
       Exhibit 3.......................... 60
13     Security Resources - SolarWinds
       Trust Center
14     (6 pages)
15  Exhibit 4.......................... 66
       SolarWinds Security Statement
16     (4 pages)
17  Exhibit 5.......................... 79
       RBC Capital Markets, 10/27/20,
18     SolarWinds Corporation, SMB Showing
       Signs of Improvement; Q3/20 Review
19     (12 pages)
20  Exhibit 6.......................... 84
       RBC Capital Markets, 12/15/20,
21     SolarWinds Corporation, Fluid Situation;
       Initial Thoughts Around the SolarWinds
22     Cyber Attack
       (14 pages)
23
               (Continued...)
24
25
```

I N D E X (Continued):
EXHIBITS:
Number        Description        Page

Exhibit 7......................................... 93
    9/18/19 E-Mail Re: SWICUS: Security
    Risk Assessment
    Bates: SW-SEC00151471 to 473
Exhibit 8......................................... 103
    SolarWinds Q1 2020 Quarterly Risk
    Review
    Bates: SW-SEC00001608 to 1634
Exhibit 9......................................... 111
    FedRAMP Security Controls Baseline
    (148 pages)
Exhibit 10....................................... 126
    6/24/20 E-Mail Re: SDL and Orion
    Improvement Program
    Bates: SW-SEC00000673 to 678
Exhibit 11....................................... 133
    SolarWinds PM Security Vulnerability &
    Incident Review, July 10, 2020
    Bates: SW-SEC00006628 to 6648
Exhibit 12....................................... 140
    SolarWinds MSP Products Security
    Evaluation, Confidential, July 2019
    Bates: SW-SEC00166790 to 166799
Exhibit 13....................................... 175
    RealPage, Inc. Form 10-Q
    (4 pages)
Exhibit 14....................................... 180
    SolarWinds Corporation Form 8-K
    (4 pages)
Exhibit 15....................................... 183
    SolarWinds Corporation Form 8-K
    (4 pages)
                (Continued...)

5

I N D E X (Continued):
EXHIBITS:
Number        Description        Page
Exhibit 16....................................... 184
    SolarWinds Corporation NYSE:
    SWI FQ4 2020 Earnings Call Transcripts
    (20 pages)
Exhibit 17....................................... 240
    SolarWinds Corporation Form 10-K
    (3 pages)
Exhibit 18....................................... 255
    RBC Capital Markets, 4/29/21,
    SolarWinds Corporation Keep On,
    Keeping On; Q1/21 Review
    (14 pages)

                * * * * *

6

VIDEO DEPOSITION OF MATTHEW HEDBERG,
held pursuant to Notice of Taking Deposition and held at
Dorsey Whitney LLP, 50 South Sixth Street, Suite 1500,
Minneapolis, Minnesota 55402-1498, before Barbara J.
Carey, Registered Professional Reporter.

WHEREUPON, the following proceedings
were duly had:

THE VIDEOGRAPHER:  Good morning.  We are
on the record.  This is the videotaped deposition of
Matt Hedberg in the matter of Securities & Exchange
Commission vs. SolarWinds Corporation, et al., Case
Number 23-CV-9518-PAE.

This deposition is being held at Dorsey
Whitney, LLP, 50 South Sixth Street, Suite 1500 in
Minneapolis, Minnesota.

Today's date is July 26th, 2024, and the time
on the video monitor is 8:37 a.m., Central Daylight Time.
My name is Steven Smith, the legal video specialist.

Would counsel and all present please voice-
identify themselves.

MR. BRUTLAG:  This is Benjamin Brutlag
from the U.S. Securities and Exchange Commission.

MS. WARDEN:  Kristen Warden from the
U.S. Securities and Exchange Commission.

MR. BERKOWITZ:  Sean Berkowitz from

7

Latham & Watkins on behalf of SolarWinds.

MS. LEE:  And Kristen Lee from Latham &
Watkins on behalf of SolarWinds.

MR. ROWE:  Mike Rowe on behalf of the
witness, Mike Hedberg.

THE VIDEOGRAPHER:  Thank you very much.
Would the court reporter, please, swear in the
witness and we may proceed.

THE REPORTER:  Raise your right hand.

MATTHEW HEDBERG,
After having been first duly sworn, was called as a
witness and testified as follows:

THE REPORTER:  Thank you.

EXAMINATION
BY MR. BRUTLAG:

Q.  Mr. Hedberg, thanks very much for joining us
this morning.

A.  Sure.

Q.  I introduced myself before we went on the
record.  My name is Benjamin Brutlag with the
U.S. Securities and Exchange Commission.

First question is, have you ever previously
provided sworn testimony?

A.  I have not.

Q.  All right.  So I just wanted to provide you

8

1    So now, have you discussed cybersecurity
2  issues generally with customers in your work?
3        MR. BERKOWITZ:  Same objection.
4    A.  So you're asking just in general?
5  BY MR. BRUTLAG:
6    Q.  In general, yes.
7    A.  Not a particular company?
8    Q.  Right.
9    A.  Could you repeat the question?
10   Q.  Sure.  Have customers discussed cybersecurity
11 issues generally to you?
12   A.  Yes.
13   Q.  Okay.  And what sort of cybersecurity issues
14 have you discussed with customers?
15       MR. BERKOWITZ:  Form.
16   A.  Generally, it's around, you know, the efficacy
17 of products, you know, are they doing what they are
18 supposed to do, how do they compare with alternative
19 security products, things of that nature.
20 BY MR. BRUTLAG:
21   Q.  So the comments that you've received -- or
22 discussions you've had with customers regarding
23 cybersecurity have focused on specific products?
24   A.  Yes.
25   Q.  Okay.  And is the products that customers have

25

1  used or already purchased from a company?
2    A.  They could be.
3    Q.  Why do you say they might not be?
4    A.  Well, they could be future purchases.
5    Q.  Are you familiar with SolarWinds Corp.?
6    A.  Yes.
7    Q.  And was SolarWinds Corp. one of the companies
8  you covered in 2020?
9    A.  Yes.
10   Q.  Do you still cover SolarWinds Corp.?
11   A.  Yes.
12   Q.  And when did you first institute coverage of
13 SolarWinds?
14   A.  I don't recall the exact date, but it would
15 have been during the IPO process.
16   Q.  So after the company IPOed, would that have
17 been around 2018?
18   A.  I don't remember exactly.  If that's when it
19 was, then yes, but I don't remember the exact time frame.
20   Q.  And you've covered SolarWinds continuously
21 since then?
22   A.  Yes.
23   Q.  So we discussed your equity research reports.
24       Have you drafted any other form of published
25 reports in your work at RBC Capital Markets?

26

1    A.  We publish general industry reports, white
2  papers, primers, general financial -- you know -- you
3  know, quarterly recaps, quarterly previews, things of that
4  nature.
5    Q.  And specific to the same industry, the
6  software industry?
7    A.  Yes.
8    Q.  Have any of those research reports addressed
9  cybersecurity?
10   A.  Yes.
11   Q.  Can you just name a few for us off the top of
12 your head?
13   A.  Reports?
14   Q.  Any of those reports that you've issued that
15 have addressed cybersecurity?
16   A.  We've written cybersecurity primers to kind of
17 give investors a perspective of the cybersecurity
18 landscape, we publish reports on, you know, how generally
19 cybersecurity companies are trending, things of that
20 nature.
21   Q.  And is this based upon your experience just in
22 your regular line of equity coverage of companies, or do
23 you do additional research in preparation for these
24 primers?
25   A.  I guess I don't understand the question.

27

1    Q.  Do you do any additional research beyond your
2  normal equity coverage in order to prepare these primers?
3    A.  Not really.  It's just part of, you know --
4  it's just part of our -- just my job.  I wouldn't say
5  there's anything additional.
6    Q.  And in preparing primers including those that
7  address cybersecurity, did customer feedback inform your
8  analysis in connection with those reports?
9        MR. BERKOWITZ:  Object to the form.
10   A.  So is the question does customer feedback
11 contribute to our cybersecurity primers?
12 BY MR. BRUTLAG:
13   Q.  Yes.
14   A.  Yes.
15   Q.  All right.  And how?
16   A.  Influence us in thinking what are trends
17 today, where they might go in the future.  Cybersecurity
18 is a broad category.  There's lots of different
19 subcategories within cybersecurity.  Some are trending up,
20 some are trending down.
21   Q.  And what about customer feedback with respect
22 to specific equity research reports regarding a particular
23 company; does customer feedback inform your analysis in
24 connection with those?
25   A.  So is the question...

28

1    **A.** Correct.
2    **Q.** Okay. Next is, "Access Controls" on that same
3  page, page 11. Under "Role Based Access," it says, "Role
4  based access controls are implemented for access
5  information systems."
6       Is that also an industry best practice?
7    **A.** Yes.
8    **Q.** And why is role-based access controls, why is
9  that industry best practice?
10    **A.** Because there are a lot of roles in an
11  organization, and you need to limit who has access to
12  what, and so by implementing role-based access, it
13  ensures that Employee A doesn't have the same access as
14  Employee B or C, because different roles exist within an
15  organization.
16    **Q.** And why is it important that Employee A in
17  this example doesn't have access to information that
18  should be provided to Employee B or C?
19    **A.** Because Employee A maybe doesn't need access
20  to it, and it could open up a vulnerability if that
21  employee's access is compromised and they have access to
22  something that they shouldn't. Or, if there's a bad
23  actor, and that Employee A, that doesn't have access to
24  something, is doing something malicious internally, it's
25  another standard just to have individual roles locked down

73

1  to their particular task in an organization and really
2  know more.
3    **Q.** So you expect any company that you cover to
4  engage in role-based access controls?
5    **A.** Yes.
6    **Q.** Next to the software development lifecycle,
7  also on page 11.
8       What is the software development lifecycle?
9    **A.** Generically, its business owners have needs
10  for software. They convey them to developers. It gets
11  back to that DevOps comment that we talked about earlier
12  where business owners or operations work with developers
13  to develop software, so the software development lifecycle
14  is that whole process to go from idea to the end product,
15  which is a piece of software.
16    **Q.** And so for any company that produces software
17  that you cover, is it an expectation that they would
18  follow the software development lifecycle?
19    **A.** Yes.
20    **Q.** Because it's industry best practice?
21    **A.** Yes.
22    **Q.** So there's an expectation specifically that
23  SolarWinds would follow SDL?
24       MR. BERKOWITZ: Object to the form.
25    **A.** Yes.

74

1  BY MR. BRUTLAG:
2    **Q.** Would you expect statements published by
3  SolarWinds, like in Hedberg Exhibit 4, on its website
4  relating to cybersecurity to be accurate?
5    **A.** You're referencing this document?
6    **Q.** Yes.
7    **A.** Would I expect this to be accurate?
8    **Q.** Yes.
9    **A.** Yes.
10    **Q.** And why do you say that?
11    **A.** Because there's a certain level of trust.
12  There's only so much that we can do to determine what a
13  company's doing, so relying on statements is, you know, an
14  important part of analysis.
15    **Q.** What can do you to confirm the accuracy of
16  statements made by a company like SolarWinds --
17    **A.** It's very difficult because you're not inside
18  the company. You have no idea what's going on. I can't
19  read emails, I can't -- you know, generally, I can't talk
20  to employees.
21    **Q.** So what can you do? What are your resources
22  in order to determine whether or not this is accurate?
23    **A.** Seeing what management is saying or
24  publishing, talking to third party participants, like I
25  said before, or perhaps customers.

75

1    **Q.** And do you specifically expect cybersecurity
2  statements in Hedberg Exhibit 4 --
3       (Reporter clarification.)
4  BY MR. BRUTLAG:
5    **Q.** And do you specifically expect statements in
6  Hedberg Exhibit 4 to be accurate?
7    **A.** Yes.
8       MR. BERKOWITZ: Object to form,
9  foundation.
10  BY MR. BRUTLAG:
11    **Q.** As part of your equity research analysis, do
12  you follow changes on company websites?
13    **A.** Yes.
14    **Q.** And how do you do that?
15    **A.** I use the Wayback Time Machine, you know, just
16  kind of understanding what's on a website and what's new.
17  You just notice things.
18    **Q.** And why do you do that as part of your
19  analysis, go back to the Wayback Machine?
20    **A.** To understand what's changed.
21    **Q.** But why?
22    **A.** Change is important, to be able to identify
23  when things change.
24    **Q.** What if changes are made to a company's
25  cybersecurity page; would you pay attention to that?

76

1  essential hit to the company's reputational risk, it could
2  lead to investors selling SolarWinds' stock; right?
3      **A.** Yes.
4      **Q.** All right. Now, if we go to risks on the
5  second page, there's a reference to a cyber attack.
6  That's Risk Number 6.
7      Why was the recent cyber attack added as a
8  risk factor here?
9      **A.** It creates uncertainty, and we just talked
10  about it. Until more details come out, there's a bit of
11  an unknown.
12      **Q.** Is there any -- does the numbering of the
13  risks, does that have any relation to their relative
14  importance?
15      **A.** No.
16      **Q.** So even though this is Risk Number 6, this
17  could be potentially the most important risk to the
18  company?
19      MR. BERKOWITZ: Object to the form.
20      **A.** It's not in -- it's -- the list is arbitrary.
21  BY MR. BRUTLAG:
22      **Q.** And how significant was the risk as you saw it
23  from Sunburst when it was first disclosed?
24      MR. BERKOWITZ: Object to the form.
25      **A.** Significant.

89

1  BY MR. BRUTLAG:
2      **Q.** Why do you say "significant"?
3      **A.** Because of the unknown nature of what could
4  come.
5      **Q.** And could the increased reputational risk
6  impact SolarWinds' ability to continue to attract
7  business?
8      **A.** Yes.
9      **Q.** Other than the reputational risk, were you
10  considering any other risks associated with the cyber
11  attack?
12      **A.** From what perspective?
13      **Q.** For example, potential impact on customers,
14  themselves?
15      **A.** Yes.
16      **Q.** And what sort of risk did you see as
17  potentially impacting SolarWinds' customers?
18      **A.** What risk did I see to SolarWinds' customers?
19      **Q.** From the cyber attack.
20      **A.** If they were part of the incident, like, if
21  their data was lost, that could cause increased levels of
22  churn that we talked about earlier. Concerned about a
23  customer's willingness to buy more software, all that's
24  important.
25      MR. BRUTLAG: Why don't we take a brief

90

1  break.
2      Let's go off the record.
3      THE VIDEOGRAPHER: Going off the record,
4  the time is 10:36 a.m.
5      (Whereupon, a recess was taken
6      from 10:36 a.m. to 10:48 a.m.)
7      THE VIDEOGRAPHER: Back on the record,
8  and the time is 10:48 a.m.
9  BY MR. BRUTLAG:
10      **Q.** So we earlier discussed, in connection with
11  the security statement, user access controls.
12      What's your understanding of what "user access
13  controls" refers to?
14      MR. BERKOWITZ: Object to the form.
15      **A.** Can I look at the document again or is it --
16  or are you referencing a prior document?
17  BY MR. BRUTLAG:
18      **Q.** Just the term "user access controls."
19      **A.** You know, we were talking about role-based
20  access, but you know, user -- the term, again, that you
21  wanted?
22      **Q.** "User access controls."
23      **A.** Yeah, it's similar to role-based controls, but
24  making sure certain people have access to certain
25  functions and data.

91

1      **Q.** All right. And is it important -- is it
2  important that only authorized users have access to
3  company systems?
4      **A.** Yes.
5      **Q.** And why is that?
6      **A.** Because unauthorized access can lead to bad
7  things.
8      **Q.** All right. And are you familiar with the term
9  "administrator access"?
10      **A.** Yes.
11      **Q.** And what is that?
12      **A.** Administrator is access to everything.
13      **Q.** So it's a greater level of access to company
14  systems?
15      **A.** Yes, yes.
16      **Q.** Assuming it's true, would you want to have --
17  to know that, you know, contrary to company policy, many
18  employees at SolarWinds had administrator access rights?
19      MR. BERKOWITZ: Object to the form.
20      MR. ROWE: Object to the form.
21      **A.** Is it important -- would it be important to
22  know that?
23  BY MR. BRUTLAG:
24      **Q.** Yes.
25      **A.** Yeah. It's generally not something that's

92

1  discussed, but yeah, if that were -- if we were aware of
2  that, that would be potentially bad.
3      **Q.** And how could it impact your analysis if many
4  SolarWinds' employees had admin rights beyond what they
5  should have been authorized to have?
6          MR. BERKOWITZ: Object to the form.
7          MR. ROWE: Object to the form.
8      **A.** It increases the risk for unauthorized access
9  to certain information. It increases the risk. It
10 doesn't guarantee it, but it increases the risk.
11 BY MR. BRUTLAG:
12     **Q.** Would it also increase the risk if
13 unauthorized employees had administrator rights for
14 prolonged periods of multiple years?
15     **A.** Yes.
16     **Q.** And why is that?
17     **A.** It increases the risk.
18     **Q.** And it increases the risk for what?
19     **A.** Unauthorized access.
20     **Q.** Which could be a bad thing for a company?
21     **A.** Which could be a bad thing.
22         (Whereupon, Exhibit 7 was
23         marked.)
24 BY MR. BRUTLAG:
25     **Q.** I've handed you a document marked as Hedberg

93

1  Exhibit Number 7. It's an email from Kellie Pierce to
2  Rani Johnson and Tim Brown, all at SolarWinds, dated
3  September 18, 2019 at 1:45 p.m., Bates Number is
4  SW-SEC00151471, and there's also a native attachment that
5  we've included with this exhibit.
6          So this is an internal document at SolarWinds,
7  so I expect it's correct that you have not seen this
8  before; is that right?
9      **A.** Correct. Correct.
10     **Q.** So if we look at this email, the subject line
11 is, "SWICUS: Security Risk Assessment," and Ms. Pierce is
12 writing to Ms. Johnson and Mr. Brown.
13         Do you know any of those individuals?
14     **A.** I know Mr. Brown.
15     **Q.** Who is Mr. Brown?
16     **A.** I believe he's the CISO of SolarWinds.
17     **Q.** Chief Information Security Officer?
18     **A.** Correct.
19     **Q.** And that's his current position; is that
20 right?
21     **A.** Correct.
22     **Q.** Do you know if he held that position in 2019?
23     **A.** I don't know.
24     **Q.** Have you previously heard of Rani Johnson
25 Kellie Pierce?

94

1      **A.** No.
2      **Q.** So if we go through this email, Ms. Pierce is
3  reporting to Rani and Tim, she says, "I have been working
4  with Eric and Nelson on the SWICUS self-assessment and
5  want to raise awareness around some of the deficiencies
6  identified."
7          She then goes on to list several deficiencies
8  as well as, at the bottom, providing a summary of security
9  controls, generally, for the "Summary of Security
10 Controls."
11         Do you see that chart at the bottom of the
12 page?
13     **A.** Yes.
14     **Q.** She provides percentages. So for the security
15 controls "not met," it's a percentage of 27 percent.
16         We, then, go through some of the specific, as
17 she says, deficiencies that were identified. Ms. Pierce
18 emphasizes under "User Account Management," the first
19 white bullet is, "Local administer rights are not
20 prohibited nor tracked."
21         Also, a third white bullet is, "Access is not
22 audited nor monitored."
23         Do you see that?
24     **A.** Yes.
25     **Q.** Did you know this previously?

95

1          MR. ROWE: Object to the form.
2      **A.** No.
3  BY MR. BRUTLAG:
4      **Q.** We'll keep on going through the user access
5  management bullets.
6          "Logical access rights are not disabled if not
7  used within 30 days."
8          Below the "Access is not audited nor
9  monitored," she writes, "No separation of duties related
10 to implemented. There is no limit to the number of
11 concurrent sessions for privileged and non-privileged
12 access, and there is no session lockout timing set."
13         Is this something that you would want to know?
14         MR. BERKOWITZ: Object to the form.
15 BY MR. BRUTLAG:
16     **Q.** Did you know any of these facts prior to
17 today?
18         MR. BERKOWITZ: Object to form.
19         MR. ROWE: Object to form.
20 BY MR. BRUTLAG:
21     **Q.** You can answer.
22     **A.** Okay. I'm uncertain.
23         MR. ROWE: You can answer, yes.
24 BY MR. BRUTLAG:
25     **Q.** That's fine.

96

1 deficiencies in user access management."
2      Is it, in your experience, best practice for
3 companies in the software industry to have "significant
4 deficiencies in user access management"?
5      MR. BERKOWITZ:  Object to foundation;
6 form.
7      **A.**  No.
8 BY MR. BRUTLAG:
9      **Q.**  So just to be clear, is it a best practice to
10 have significant deficiencies in user access management?
11      **A.**  That is not a best practice.
12      **Q.**  All right.  Does it give you any concern to
13 see SolarWinds identifying both "significant deficiencies
14 in user access management"?
15      MR. ROWE:  Object to the form.
16      MR. BERKOWITZ:  Object to the form.
17      **A.**  Is that in the reference to the 3.3?
18 BY MR. BRUTLAG:
19      **Q.**  Yes.  On Bates Number ending in 1611.
20      **A.**  I guess -- is the up arrow with 3.3, is
21 that --
22      **Q.**  That's the target, right, for 2020, but just
23 the key risk identified of "significant deficiencies in
24 user access management."
25      **A.**  Okay.  I wasn't sure if I should be looking at

105

1 the numbers.
2      So maybe just restate the question.
3      **Q.**  Just looking at the "Key Risk" column;
4 right?
5      **A.**  Yes.
6      **Q.**  Under "Significant deficiencies in user access
7 management," does it give you any concern to see
8 SolarWinds identifying this deficiency in user access
9 management?
10      MR. BERKOWITZ:  Object to the form.
11      MR. ROWE:  Objection.
12      **A.**  I guess implying that listing it here is a
13 risk.  I guess I don't know if that's in relationship to
14 the numbers or not, but if the question is, if having
15 significant deficiencies of user access management under
16 "Risk," if that's problematic?
17 BY MR. BRUTLAG:
18      **Q.**  Yes.
19      **A.**  Yes.
20      **Q.**  Did you know if this was a key risk for
21 SolarWinds in 2020?
22      **A.**  No.
23      MR. BERKOWITZ:  Object to the form.
24      MR. ROWE:  Objection.
25      MR. BERKOWITZ:  Define -- what's the

106

1 thing you're asking about?
2 BY MR. BRUTLAG:
3      **Q.**  SolarWinds was identifying as -- significant
4 deficiencies in user access management as a key risk?
5      MR. ROWE:  Can I interpose?
6      MR. BRUTLAG:  Sure.
7      MR. ROWE:  You're asking him questions
8 about a document that he's never seen and asking him to
9 interpret what it could or could not mean, and I just want
10 a standing objection to the extent you continue to ask him
11 about this document seems problematic to me.
12      **A.**  Part of that was the question about the
13 numbers.  I guess I'm not sure what 3.3 is.  I'm not sure
14 what up arrow, I'm not sure what the colors signify.
15 BY MR. BRUTLAG:
16      **Q.**  Would you have wanted to know that SolarWinds
17 was identifying significant deficiencies in user access
18 management as a key risk in 2020?
19      MR. BERKOWITZ:  Same objection.  I think
20 it's incredibly misleading that you continue to put
21 documents, don't explain the context, and then ask him if
22 he would have wanted to know it, and that's unfair.  And
23 there will be a standing objection.
24      MR. BRUTLAG:  That's fine.
25      **A.**  So restate the question.

107

1 BY MR. BRUTLAG:
2      **Q.**  Sure.  Now that you are seeing this, would you
3 have wanted to know that SolarWinds was identifying as a
4 key risk significant deficiencies in user access
5 management?
6      **A.**  Well, I guess when you say "see this," I guess
7 I don't understand the context of "this," but if the
8 question is would understanding significant deficiencies
9 in user access management, if that was identified as a
10 risk, yes, that's important.
11      **Q.**  And why would it be important to your
12 evaluation of SolarWinds?
13      **A.**  Because sufficient deficiencies in user access
14 management could imply unauthorized access, which could be
15 problematic.
16      **Q.**  When you say "problematic," again, that could
17 impact customer churn?
18      **A.**  Correct.
19      **Q.**  And so significant deficiencies in user
20 aspect -- access management could ultimately result in
21 reduced revenues for SolarWinds?
22      MR. BERKOWITZ:  Object to the form.
23      **A.**  Correct.
24 BY MR. BRUTLAG:
25      **Q.**  All right.  If you go to the section marked

108

1    Do you see that with Count 16 here?
2    A. Yes. It says 15.
3    Q. 15, all right.
4    So for Count 16 onto the specific control, it
5 says, "The organization employs the principle of least
6 privilege allowing only authorized access for users."
7    Then under "Supplemental Guidance," it says,
8 "Organizations employ least privilege for specific duties
9 and information systems. The principle of least privilege
10 also applies to information system processes ensuring that
11 the processes operate at privileged levels no higher than
12 necessary to accomplish required organizational missions
13 and business functions."
14    Do you see that?
15    A. Yes.
16    Q. So is this the concept of least privileged
17 that we were discussing earlier where only certain
18 analysis' are provided -- only certain systems are
19 provided that -- scratch that.
20    Does this refer to what we were discussing
21 earlier where employees were provided with only access to
22 company systems associated with their work function?
23    MR. BERKOWITZ: Object to the form.
24    MR. ROWE: Objection to the foundation.
25 You're, again, asking him about what appears to be

117

1 100-page spreadsheet for which he's never seen, and I
2 don't know how he's supposed to interpret that.
3 BY MR. BRUTLAG:
4    Q. Do you understand the term "least privileged"?
5    A. Yes.
6    Q. All right. What does "least privileged" mean
7 to you?
8    A. "Least privileged" means you only have access
9 to what you should have access to.
10    Q. Okay. So with that understanding and
11 understanding the control, if you, then, go to the right
12 and what Ms. Pierce entered in this -- for this entry, she
13 says, "This is included in the access/security guidelines
14 document. An audit that this is in place has never been
15 performed." And it's dated 6/27.
16    So again, this is 6/27/2019.
17    Do you see that?
18    A. Yes.
19    Q. Okay. Does it surprise you that a SolarWinds'
20 employee stating that an audit is in place but it's never
21 been performed with respect to this control?
22    MR. BERKOWITZ: Object; foundation and
23 form.
24    MR. ROWE: I think this is the problem,
25 Ben, is that he -- he can define words, but he has no idea

118

1 what Ms. Pierce means by whatever it is she put in this
2 document. I'm not trying to be an obstructionist. God
3 knows I want to get out of here.
4    MR. BRUTLAG: I understand.
5    MR. ROWE: It's awfully hard to answer a
6 document -- questions about a document you've never seen,
7 especially when it's come across as this.
8    MR. BRUTLAG: Understood.
9 BY MR. BRUTLAG:
10    Q. I mean, that being said, would you expect that
11 SolarWinds would have audited its access controls, in
12 particular with respect to this least privilege control by
13 2019?
14    MR. BERKOWITZ: Objection; form,
15 foundation.
16 BY MR. BRUTLAG:
17    Q. You can answer.
18    MR. BERKOWITZ: Assumes --
19    A. Yeah, I would assume that an audit would be in
20 place for security parameters.
21 BY MR. BRUTLAG:
22    Q. All right. Now that you've seen this, would
23 you have wanted to have known at the time, in 2019, when
24 you were covering SolarWinds?
25    MR. BERKOWITZ: Object to the form of

119

1 that. That's the exact issue that Mr. Rowe pointed out,
2 wanted to know this in the context of the document. So I
3 think it's almost an impossible question to answer.
4 BY MR. BRUTLAG:
5    Q. You can answer.
6    A. So...
7    Q. Would you have wanted to know that SolarWinds
8 internally had documents stating that least privileged
9 access was not audited in 2019?
10    MR. BERKOWITZ: Object to the form.
11    A. Yes.
12 BY MR. BRUTLAG:
13    Q. And why would you want to know that?
14    A. Because it could increase the risk for
15 unauthorized access.
16    Q. Could that have affected your evaluation as to
17 whether or not investors should purchase SolarWinds'
18 stock?
19    A. Yes.
20    Q. And why is that?
21    A. Because increased risk of unauthorized access
22 could increase the risk of a hack.
23    Q. And again, that could negatively impact the
24 company?
25    A. Correct.

120

1    **Q.**  And potentially reduce its revenues, as well?
2    **A.**  Correct.
3    **Q.**  Just generally, is it industry best practice
4  for companies in the software industry to audit their user
5  access controls?
6          MR. BERKOWITZ:  Object to the form.
7    **A.**  Yes.
8  BY MR. BRUTLAG:
9    **Q.**  And specifically, that only authorized users
10  had access to certain systems?
11    **A.**  That's part of an audit, typically, yes.
12    **Q.**  If we go down to row -- or Count 19, I'm going
13  to take you left, and then go through the comments, as
14  well.
15          So this is another control for access control,
16  least privilege, privileged accounts.  The control is "The
17  organization restricts privileged accounts on the
18  information system to organization defined personnel or
19  roles."
20          Do you see that?
21    **A.**  Yes.
22    **Q.**  It includes under "Supplemental Guidance,"
23  "Privileged accounts are typically described as system
24  administrator for various types of commercial
25  off-the-shelf operating systems."

121

1  was being controlled for and go back again to Ms. Pierce's
2  comments, whatever's easiest for you in responding to the
3  question.
4    **A.**  It is what you just read previously, the other
5  column over.
6    **Q.**  Yeah.
7    **A.**  And so the question is what?
8    **Q.**  Is, would it concern you that, if accurate,
9  the company under this control did not have an explicit
10  restriction policy regarding access by administrator
11  accounts?
12          MR. BERKOWITZ:  Object to form and
13  foundation.
14    **A.**  Yeah, if there's -- yes, it would, if there's
15  no restriction to the prior policy that was read.
16  BY MR. BRUTLAG:
17    **Q.**  I mean, seeing this, would you have wanted to
18  know what's stated here in this internal document?
19          MR. BERKOWITZ:  Object to the form.
20    **A.**  Yes.
21  BY MR. BRUTLAG:
22    **Q.**  All right.  And why is that?
23    **A.**  Because it could increase the risk of
24  unauthorized access.
25    **Q.**  And how would that have impacted your analysis

123

1          Do you see that?
2    **A.**  Yes.
3    **Q.**  If we, then, go to Ms. Pierce's statements,
4  her comments.  It says, "Also, on 6/27, we have no
5  explicit restriction policy, nor is this documented that I
6  am aware of with a company or individual products."
7          Do you see that?
8    **A.**  Yes.
9    **Q.**  Does it concern you that, if accurate, the
10  company did not have a, quote, "explicit restriction
11  policy" regarding access by administrator accounts?
12          MR. BERKOWITZ:  Object to the form.  Are
13  you saying would it concern him about not having it all or
14  this specific product?
15          MR. BRUTLAG:  It says, "Organization,"
16  under the control.
17          MS. LEE:  And it also says "the
18  information system."
19  BY MR. BRUTLAG:
20    **Q.**  Go ahead.
21          Do you want to look at the control further to
22  answer the question?
23    **A.**  Is that not what we referenced earlier?
24    **Q.**  That's what we were referencing, yeah.  I can
25  go ahead and show you a specific control, what it says it

122

1  as to whether or not investors should purchase or sell
2  SolarWinds' stock?
3          MR. BERKOWITZ:  Object to the form.
4    **A.**  It could increase the risk of a hack or a
5  breach, data loss, customer loss, also revenue.
6  BY MR. BRUTLAG:
7    **Q.**  And again, that could impact your analysis as
8  to whether or not investors should purchase SolarWinds'
9  stock; is that right?
10    **A.**  Yes.
11    **Q.**  If you wanted to know more in response to any
12  of these controls that we are looking at and the comments
13  for Ms. Pierce, what would you have done?  Where would you
14  go for further information?
15    **A.**  CEO, CFO, investor relations, typical points
16  of contact.
17    **Q.**  All right.  What questions would you have
18  asked?
19    **A.**  If I knew of this document?
20    **Q.**  If you had seen that document.
21    **A.**  Why isn't -- why have not audits been
22  performed?  Why aren't passwords being rotated, password
23  restrictions?  I mean, I guess in terms of -- I don't
24  remember the specifics of that document, but I guess the
25  context of the question is around what we've been talking

124

1  know what the context of this is.
2  BY MR. BRUTLAG:
3      **Q.** I'll just represent to you that Orion
4  improvement programs that you know, it collects, evaluates
5  performance and usage data from SolarWinds' customers.
6      **A.** Okay.
7      **Q.** So outward facing.
8      I mean, how would it affect your assessment of
9  whether directly linked to investors that, you know, they
10  buy or sell SolarWinds' stock if one of these outer-facing
11  programs was not subject to software development
12  lifecycle?
13      MR. BERKOWITZ: Object to the form and
14  the characterization and the SEC testifying about what it
15  is.
16  BY MR. BRUTLAG:
17      **Q.** Okay. All right. So I'll strike the
18  question, then.
19      Did you know the statement made at the top of
20  677 that OIP today, that product is not covered by a
21  software development lifecycle?
22      **A.** I did not know that.
23      **Q.** Okay. Now that, assuming that this is
24  accurate, now that you know that internally SolarWinds was
25  saying that in June 2020, would you have wanted to know

1  that statement?
2      MR. BERKOWITZ: Object to the form.
3      MR. ROWE: Same.
4      **A.** You know, the -- the context is still limited.
5  I mean, just by reading that -- just looking at what he
6  said but we should seems like -- I mean, again, I have no
7  context of this, but, you know, if it's not being covered
8  and we should, that strikes me as interesting.
9  BY MR. BRUTLAG:
10      **Q.** And why would it be interesting that
11  particular applications at SolarWinds that should be
12  covered by SDL were not?
13      MR. BERKOWITZ: Object to the form.
14  "Should be covered."
15  BY MR. BRUTLAG:
16      **Q.** According to the SolarWinds employee?
17      **A.** Again, I don't have a lot of context.
18      So is the question that this OIP was not
19  following a typical software development lifecycle, is
20  that problematic?
21      **Q.** No. Specifically, that employees are saying
22  that particular applications should be covered by software
23  development lifecycle but were not?
24      MR. BERKOWITZ: Object to the form;
25  foundation.

1      **A.** Seeing that this particular individual, it
2  says but it should be, leads me to believe it's important.
3  BY MR. BRUTLAG:
4      **Q.** All right. And why would it be important for
5  particular applications to be covered by the software
6  development lifecycle?
7      MR. BERKOWITZ: Object to the form.
8      **A.** To know that, you know, a company's following
9  standard practice to write code and to promote code.
10  BY MR. BRUTLAG:
11      **Q.** And is it important to your analysis of
12  whether or not investors should purchase SolarWinds' stock
13  that the company was not covering a software development
14  lifecycle, particular applications that it says should
15  have been?
16      MR. BERKOWITZ: Object to the form.
17      **A.** It feels -- it's hard without context. I
18  don't know the importance of this, if this is material, if
19  this is important. I guess it's just hard without knowing
20  a lot of the context. Some of the other stuff you talked
21  about strikes me as more troublesome. I don't know that
22  this is in and of itself -- it's hard to know.
23  BY MR. BRUTLAG:
24      **Q.** What was more troublesome in your view that
25  we've discussed again today?

1      **A.** Not changing passwords, not adhering by at
2  least privileged access.
3      **Q.** All right.
4      **A.** You know, following whether a piece of
5  software or didn't follow MSLP practice, it's hard to know
6  if that would have been deemed a bad thing. It may have
7  raised a question with an executive. Again, we don't
8  normally have access to documents like this, so I don't
9  normally see any stuff like this.
10      **Q.** Why would it raise a question to an executive,
11  if a particular application did not fall with the SDL --
12      **A.** "I don't believe we cover OIP today but we
13  should."
14      (Reporter clarification.)
15      **A.** It says, "I don't believe we cover OIP today
16  but we should."
17      It would lead to a follow-up question of why,
18  why should it.
19  BY MR. BRUTLAG:
20      **Q.** Okay. And if particular applications were not
21  covered by the SDL but should have been, could that have
22  led to customer churn, as well?
23      MR. BERKOWITZ: Object to form;
24  foundation.
25      **A.** It's hypothetical. Maybe. It's hard for me

1  factors were for customer churn at the time you downgraded
2  SolarWinds?
3      **A.** Do you have the report?
4      **Q.** I'm just asking you as you're sitting here
5  today.
6      **A.** Okay. I don't -- I don't recall.
7      **Q.** You're saying that those factors would have
8  been listed in your report?
9      **A.** Honestly, I don't recall.
10     **Q.** So what is the connection, if any, between
11 customer churn and downgrading SolarWinds' securities?
12     **A.** What is the connection?
13     **Q.** Yeah.
14     **A.** I guess I don't -- the question?
15     **Q.** If there's increased customer churn, is that
16 more likely to result in a downgrade?
17     **A.** Just generically speaking?
18     **Q.** Generically speaking.
19     **A.** Yes.
20     **Q.** In the case of your downgrade of SolarWinds'
21 stock, was it impacted in any way by customer churn?
22         MR. BERKOWITZ: Objection to form;
23 foundation.
24     **A.** I think you've asked that same question.
25 I don't recall. If you have it, I could review it.

253

1  BY MR. BERKOWITZ:
2      **Q.** And with respect to any of your customers,
3  you would want to understand and know more about any
4  deficiencies that they had; correct?
5      **A.** Sure. Yes.
6      **Q.** Mark a final exhibit in response to some
7  questions about the impact of Sunburst on customer churn.
8  This will be Exhibit Number 18.
9             (Whereupon, Exhibit 18 was
10            marked.)
11 BY MR. BERKOWITZ:
12     **Q.** This is an April 29, 2021, RBC report on
13 SolarWinds; correct?
14     **A.** Yes.
15     **Q.** And this was about over four months after the
16 hack; correct?
17     **A.** Yes.
18     **Q.** You're still at outperform?
19     **A.** Correct.
20     **Q.** Turn, if you would, to page 6, and there's
21 something that says "Key Fundamental Questions."
22         Do you see that?
23     **A.** Yes. Well, wait a minute. Oh, yeah, 6. Yep.
24     **Q.** "Are we past the disruption from the SUNBURST
25 breach? Our view. At this point, the company has had two

255

1  BY MR. BRUTLAG:
2      **Q.** If you had been aware of cybersecurity
3  deficiencies at SolarWinds prior to the Sunburst attack,
4  would you have wanted to know more about those
5  deficiencies?
6      **A.** Yes.
7      **Q.** And why?
8      **A.** Because it increases the risk of data loss,
9  unauthorized access; things we talked about previously.
10     **Q.** And what would you have done to learn more
11 about those deficiencies?
12     **A.** I would have asked the CEO, the CFO, or the IR
13 team.
14     **Q.** We don't have any further questions.
15         MR. BERKOWITZ: Two minutes.
16 BY MR. BERKOWITZ:
17     **Q.** You asked about cybersecurity deficiencies and
18 wanting to know more.
19         I think, earlier, you testified, Mr. Hedberg,
20 that all the companies you cover likely have cybersecurity
21 deficiencies at any given point in time; correct?
22         MR. BRUTLAG: Objection; form,
23 foundation.
24     **A.** Cybersecurity is a very fluid thing.
25 Things change.

254

1  stabilizing quarters and the initial impact was less than
2  many had feared. While there likely remains a near-term
3  negative impact to the core IT business, the number of
4  customers noted as impacted has been significantly less
5  than what was originally disclosed. Maintenance renewals
6  likely dip in CY/21, and while new business and renewals
7  are temporarily depressed, we think some business that
8  paused rather than left could eventually return. Their
9  MSP business, N-Able, remains unaffected by the breach."
10         Was that your view at the time, sir?
11     **A.** Yes.
12     **Q.** No further questions.
13         FURTHER EXAMINATION
14 BY MR. BRUTLAG:
15     **Q.** And then, you downgraded SolarWinds' stock
16 after April 29, 2021; right?
17     **A.** Is that --
18     **Q.** That was Hedberg Exhibit 18.
19     **A.** After this day?
20     **Q.** Yes.
21     **A.** Yes.
22         MR. BRUTLAG: That's all. Thank you
23 very much.
24         MR. ROWE: We will read and sign.
25 Thank you.

256

**Matthew Hedberg**
**7/26/2024**

```
 1              THE VIDEOGRAPHER:  Time is 3:10 p.m.  We
 2   are going off the record.  This ends the deposition from
 3   Matt Hedberg.  Thank you very much, everyone.
 4              (The video deposition of Matthew Hedberg
 5              concluded at approximately 3:10 p.m.)
 6                      * * * * *
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

257

```
 1                CERTIFICATE OF WITNESS
 2
 3         I, MATTHEW HEDBERG, do hereby declare under
 4   penalty of perjury that I have read the entire
 5   foregoing transcript of my deposition testimony,
 6   or the same has been read to me, and certify that
 7   it is a true, correct and complete transcript of
 8   my testimony given on July 26, 2024, save and
 9   except for changes and/or corrections, if any, as
10   indicated by me on the attached Errata Sheet, with
11   the understanding that I offer these changes and/or
12   corrections as if still under oath.
13         _____ I have made corrections to my deposition.
14         _____ I have NOT made any changes to my deposition.
15
16   Signed: _____
17              MATTHEW HEDBERG
18   Dated this _____ day of _____ of 20_____.
19
20
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS _____ DAY OF _____, 20_____.
23   _____
24   (Notary Public)  My Commission Expires: _____
25
```

259

```
 1                   CERTIFICATE
 2         I, Barbara J. Carey, Registered Professional
 3   Reporter and Certified Shorthand Reporter, do hereby
 4   certify that prior to the commencement of the examination,
 5   Matthew Hedberg was duly sworn by me to testify to the
 6   truth, the whole truth and nothing but the truth.
 7         I DO FURTHER CERTIFY that the foregoing is a
 8   verbatim transcript of the testimony as taken
 9   stenographically by me at the time, place and on the date
10   hereinbefore set forth, to the best of my ability.
11         I DO FURTHER CERTIFY that I am neither a
12   relative nor employee nor attorney nor counsel of any of
13   the parties to this action, and that I am neither a
14   relative nor employee of such attorney or counsel, and
15   that I am not financially interested in the action.
16
17
18
19   _____
20   BARBARA J. CAREY
21   Registered Professional Reporter
22   Certified Shorthand Reporter
23   Notary Public
24   Dated:  August 6, 2024
25
```

258

```
 1                   ERRATA SHEET
 2   Deposition of: MATTHEW HEDBERG
     Date taken: JULY 26, 2024
 3   Case:  SEC v. SOLARWINDS CORP., et al.
 4   PAGE  LINE
          _____ CHANGE: _____
 5        REASON: _____
 6        _____ CHANGE: _____
          REASON: _____
 7
          _____ CHANGE: _____
 8        REASON: _____
 9        _____ CHANGE: _____
          REASON: _____
10
          _____ CHANGE: _____
11        REASON: _____
12        _____ CHANGE: _____
          REASON: _____
13
          _____ CHANGE: _____
14        REASON: _____
15        _____ CHANGE: _____
          REASON: _____
16
          _____ CHANGE: _____
17        REASON: _____
18        _____ CHANGE: _____
          REASON: _____
19
          _____ CHANGE: _____
20        REASON: _____
21        _____ CHANGE: _____
          REASON: _____
22
          _____ CHANGE: _____
23        REASON: _____
24   Signed_____
25   Dated_____
```

260