# Exhibit 56

**Excerpts of Brent Thill
Deposition Transcripts**

```
 1        UNITED STATES DISTRICT COURT
 2        SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE     )
     COMMISSION,                 )
 5                               )
        PLAINTIFF,                )
 6                               ) Case No.
     vs.                         ) 23-cv-9518-PAE
                                 )
 7   SOLARWINDS CORP. AND TIMOTHY )
     G. BROWN,                   )
 8                               )
        DEFENDANTS.               )
 9   _____)
10
11
12
13        VIDEOTAPED DEPOSITION OF
14              BRENT THILL
15        Wednesday, August 28, 2024
16          San Francisco, California
17
18
19
20
21
22
23   Reported By:
     KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
24   California CSR 10068, Nevada CCR 995, Texas CSR
     12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
25   JOB No. 240828KWI
```

1

```
 1        VIDEOTAPED DEPOSITION OF BRENT THILL
 2        BE IT REMEMBERED that on Wednesday,
 3   August 28, 2024, commencing at the hour of 9:06 a.m.
 4   thereof, before me, Kathleen A. Maltbie,
 5   RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified
 6   Stenographic Shorthand Reporter, in and for the
 7   State of California, Nevada and Texas, personally
 8   appeared BRENT THILL, a witness in the
 9   above-entitled court and cause, who, being by me
10   first duly sworn, was thereupon examined as a
11   witness in said action.
```

2

```
 1            APPEARANCES OF COUNSEL
 2   FOR THE PLAINTIFF:
 3     SECURITIES AND EXCHANGE COMMISSION
       100 F Street, N.E.
 4     Washington, D.C. 20549
       BY:  CHRISTOPHER BRUCKMANN, ESQ.
 5         BENJAMIN BRUTLAG, ESQ.
       Telephone:  (202) 256-7941
 6     Email:  BruckmannC@sec.gov
              brutlagb@sec.gov
 7
     FOR THE DEFENDANTS:
 8
       LATHAM & WATKINS, LLP
 9     1271 Avenue of the Americas
       New York, New York 10020
10     BY:  SERRIN TURNER, ESQ.
            JOSH KATZ, ESQ.
11     Telephone:  (212) 906-1330
       Email:  Serrin.turner@lw.com
12            Josh.Katz@lw.com
13     LATHAM & WATKINS, LLP
       330 North Wabash Avenue, Suite 2800
14     Chicago, Illinois  60611
       BY:  KIRSTEN C. LEE, ESQ. (Zoom)
15     Telephone:  (312) 777-7281
       Email:  Kirsten.lee@lw.com
16
     FOR JEFFERIES AND THE WITNESS:
17
       WILMERHALE
18     1 Front Street, Suite 3500
       San Francisco, California 94111
19     BY:  MICHAEL MUGMOM, ESQ.
       Telephone:  (628) 235-1006
20     Email:  Michael.mugmon@wilmerhale.com
21     WILMERHALE
       60 State Street
22     Boston, Massachusetts 02109
       BY:  JESSICA NOTEBAERT, ESQ.
23     Telephone:  (617) 526-6721
       Email:  Jessica.notebaert@wilmerhale.com
24
25
```

3

```
 1         APPEARANCES (Continued)
 2
     ALSO PRESENT:
 3
       Frank Quirarte, Videographer
 4     Greg Rose, Jefferies (Zoom)
 5
```

4

Brent Thill
8/28/2024

```
                    INDEX
                INDEX OF EXAMINATIONS
                                              PAGE
Morning Session                                  8
Examination By Mr. Bruckmann                     9
Afternoon Session                              108
Examination By Mr. Turner                      129
Further Examination By Mr. Bruckmann           154
Further Examination By Mr. Turner              155

                INDEX OF EXHIBITS
EXHIBIT          DESCRIPTION                  PAGE
Exhibit 1     Jefferies Publication             31
              entitled, "Steady LT
              Growth Despite ST License
              Hiccup"
Exhibit 2     Document entitled,                48
              "SolarWinds Security
              Statement"
Exhibit 3     String of emails Bates            73
              stamped SW-SEC00266673,
              SW-SEC00266674.00001
              through
              SW-SEC00266674.00009
Exhibit 4     String of emails Bates            84
              stamped SW-SEC00013676
              through SW-SEC00013677
              and non-Bates stamped
              pages
Exhibit 5     Document entitled,                91
              "Security Operations
              Summary, December 2018,
              Development, Operations &
              Information Technology
              (DOIT)," Bates stamped
              SW-SEC00638663.00001
              through
              SW-SEC00638663.00015
```

5

```
              INDEX OF EXHIBITS (Continued)
EXHIBIT          DESCRIPTION                  PAGE
Exhibit 6     Email from Kellie Pierce          95
              to Keith Kuchler, with
              attachments, Bates
              stamped SW-SEC00045356
              through SW-SEC00045356
Exhibit 6A    Document entitled,                96
              "fedRAMP Security
              Controls Baseline"
Exhibit 7     Document entitled,               103
              "Security & Compliance
              Program Quarterly
              Overview," Bates stamped
              SW-SEC00001497.00001
              through
              SW-SEC00001497.00054
Exhibit 8     Document entitled, "MSP          108
              Support Security
              Improvement," Bates
              stamped
              SW-SEC00631418.00001
              through
              SW-SEC00631418.00010
Exhibit 9     Document entitled, "MSP          110
              Products Security
              Evaluation," Bates
              stamped
              SW-SEC00166790.00001
              through
              SW-SEC00166790.00010
Exhibit 10    Document entitled, "Q1           112
              2020 Quarterly Risk
              Review (QRR)," Bates
              stamped SW-SEC00001608
              through SW-SEC00001634
```

6

```
              INDEX OF EXHIBITS (Continued)
EXHIBIT          DESCRIPTION                  PAGE
Exhibit 11    Document BA, "Q4 2020           114
              Quarterly Risk Review
              (QRR)," Bates stamped
              SW-SEC00001582.00001
              through
              SW-SEC00001582.00020
Exhibit 12    String of emails Bates          116
              stamped SW-SEC00237608
              through SW-SEC00237609
Exhibit 13    Document entitled, "Form        151
              10-K"
```

7

```
 1   AUGUST 28, 2024           9:44 A.M. PACIFIC TIME
 2                P R O C E E D I N G S
 3
 4              MORNING SESSION
 5        THE VIDEOGRAPHER:  Good morning, ladies
 6   and gentlemen.  This is the beginning -- this is the
 7   video-recorded deposition of Brent Thill in the
 8   matter of SEC versus SolarWinds Corp., et al.  It's
 9   Case Number 23-cv-9518.
10        This deposition is being held at
11   44 Montgomery Street in San Francisco, California.
12   Today's date is August 28, 2024.  The time is
13   approximately 9:44 a.m.
14        My name is Frank Quirarte.  I'm your
15   legal -- certified legal videographer today.  I'm
16   here with Gradillas Court Reporters.  We're located
17   at 400 North Brand Boulevard, Suite 950, Glendale,
18   California 91203.
19        At this time, will counsel and all
20   present, including Zoom, please identify yourselves.
21        MR. BRUCKMANN:  This is
22   Christopher Bruckmann for the Securities and
23   Exchange Commission.
24        MR. BRUTLAG:  Benjamin Brutlag for the
25   Securities and Exchange Commission.
```

8

**Page 13**

hours each.
    **Q.** And were each of those by videoconference?
    **A.** Correct.
    **Q.** I want to start just by going through a little bit of your work history. If you can just explain to me at a high level whether your career has generally been the same or if it's changed over time.
    **A.** I've been in research for over two decades. It's largely been the same. Looking at different facts from doing research to looking at financials to talking to management teams. It's largely been -- it's largely been the same.
    **Q.** When -- when you say "research," what specifically do you research?
    **A.** We research software companies. So we do work on the industry, understand the management team, the products, the competitive landscape, everything that has to go into whether an investor would make a decision to invest in a software company or not.
    **Q.** So investment research?
    **A.** Correct.
    **Q.** Are you familiar with the terms "buy side" and "sell side" research?

**Page 14**

    **A.** Yes. I'm on the sell side.
    **Q.** All right. What is the difference between buy side and sell side?
    **A.** Sell side is helping the buy side understand ideas so they can buy the asset. So we're effectively selling our view and helping them make a decision whether they believe it's a good investment or not. Buy side is actually the ones that manage your 401(k) money to actually invest the money.
    **Q.** In -- in doing investment research, what sectors have you worked on over the course of your career?
    **A.** Software and internet. So technology for over two decades.
    **Q.** And what company do you work at now?
    **A.** Jefferies.
    **Q.** How long have you worked there?
    **A.** Seven-plus years.
    **Q.** What was your title when you started?
    **A.** Managing director.
    **Q.** Generally, as a managing director, what were your responsibilities at Jefferies?
    **A.** Help lead our tech team, help lead a group of associates and research analysts to better

**Page 15**

understand the industry, to help our clients understand what's happening, to help -- to effectively do work on -- on writing reports, models, financial models, helping -- helping our buy side clients understand what's -- what's a good investment and what's not.
    **Q.** Okay. When you say the "buy side clients," I don't need the -- the names of your clients, but generally, what is the typical type of client that you serve?
    **A.** We -- we serve institutional clients. So clients that are typically the largest holders of -- of these assets. So they make up the majority. They're not individual investors.
    **Q.** When you say "institutional clients," would that be things like pension funds?
    **A.** Correct. Pension funds, mutual funds, firms like Fidelity, Janis, the big investment firms.
    **Q.** And how big is the team that you supervised when you started at Jefferies?
    **A.** We have had, in the last seven years, anywhere between five to seven on the team. It's been upwards of 15 at times. So it kind of rotates at times. But I run our tech research group. So

**Page 16**

it's a collection of -- of individuals across the team.
    **Q.** And you said your title was managing director when you started?
    **A.** Correct.
    **Q.** What is your title now?
    **A.** Managing director.
    **Q.** And have your responsibilities generally stayed the same over your seven years at Jefferies?
    **A.** Largely the same. I started in internet, and then I transitioned to software. Then I had both. Then I went back to mainly software. So I had a period where I was -- had quite a bit on my plate, and then went -- went purely back to software. So there's been a little bit of flux, but largely the same thing I've been doing for the last 25 years.
    **Q.** For the last 25 years, you focused on investment research for technology companies?
    **A.** Correct.
    **Q.** How much of that has focused specifically on software companies?
    **A.** I'd say over 75 percent of my time has been on software.
    **Q.** How many companies do you currently follow

**Page 29**

BY MR. BRUCKMANN:
   Q.   When doing your research analysis, do you talk to customers of companies that you cover about their views about cyber security?
   A.   We don't focus on it specifically for a lot of our companies because we, by definition, believe that most of the software companies are default by nature.
       So we tend to focus on what is the product doing for your organization, how are your users using it. We tend to focus on if they bring it up. But we don't necessarily focus specifically on it because we, by definition, believe if you get in a car, you believe the car is going to drive safe. If you eat food or drink water, you believe by default it's safe. So that's not where I spend my time. Not to say it's not important, but that's not where I spend my time.
   Q.   Explain to me a little bit more about that assumption.
       What is that assumption?
   A.   I think the assumption is, like, you wake up and you -- you drink a cup of coffee and you feel like, hey, that Peet's Coffee is safe, like, you can drink it. Or you get in your car or you put your

**Page 30**

daughter on the bus like I did this morning for my daughter, first day of school, I put her on the bus, and that bus driver is going to be safe, he's had a security check, we know he's not a known criminal, right? By definition of everything you're doing, you don't think of it. As you get on a plane, you don't think of, hey, you take a risk, but you're taking every safety precaution you can.
       So I don't -- I don't think we wake up every day thinking that there's some massive flaw or issue or it's not going to work. We think -- we think that it's going to work. My phone is going to work, and I'm having a secure conversation with my wife. I don't have all my friends listening.
       So you, by definition, believe that it's -- these are safe products.
   Q.   Are you familiar with SolarWinds Corporation?
   A.   Yes, I am.
   Q.   Do you presently cover SolarWinds?
   A.   No.
   Q.   Did you ever cover SolarWinds?
   A.   I did.
   Q.   When did you start covering SolarWinds?
   A.   I don't remember the exact time frame, but

**Page 31**

it was a team approach. My team had covered it prior to the time I came to the firm, and they had covered it and knew more about the company than I did. And then I picked up coverage as part of the team. But that, I believe, was in the 2000 -- 2000, 2001 time frame. Time frame is unclear, but ...
   Q.   Okay. All the way back to, like, 2001 you're thinking --
   A.   No. No. Sorry, 2019, 2020. And I independently covered them because we -- they were an important player in the industry. We had a lot of admiration for Kevin Thompson, who I had worked with at Red Hat, and he became the CEO. And I was -- had high admiration for Kevin as a leader, so covered -- covered it independently, like from a distance, not formally, but from a distance for a while.
   Q.   So roughly what time period do you think you covered SolarWinds from?
   A.   I don't have an exact start date. I don't.
       MR. BRUCKMANN:   I'll ask the court reporter to mark this as Thill 1, please.
       (Whereupon, Deposition Exhibit 1 was marked for identification.)

**Page 32**

BY MR. BRUCKMANN:
   Q.   Mr. Thill, do you recognize the document that I've put in front of you that's been marked as Exhibit Thill 1?
   A.   Yes, I do.
   Q.   What is it?
   A.   It's a research report from Jefferies, our firm. This is our standard template we've put research in.
   Q.   Okay. And who's the primary person responsible for this research report?
   A.   That would be me.
   Q.   And which company does it relate to?
   A.   SolarWinds.
   Q.   All right. If you look at the top left, underneath SolarWinds, it says (as read):
       Steady LT growth despite ST license hiccup.
       And underneath that, there's a date of February 5th, 2020.
       Do you see that?
   A.   Yes.
   Q.   At least in early 2020, were you covering SolarWinds?
   A.   Yes.

**Page 41**

```
 1  access controls?
 2       MR. TURNER:  I'm going to object to
 3  foundation.  The witness has already testified he's
 4  not an expert on access or access controls.
 5       MR. BRUCKMANN:  Let me rephrase it.
 6  BY MR. BRUCKMANN:
 7    Q.  How important is it for you, as an
 8  investment research analyst, that a software company
 9  you cover has strong access controls?
10    A.  Access control may not be the only thing.
11  I think what we're looking for is -- is there are a
12  comprehensive security model, again, a layered
13  security model for each of the components.  If
14  it's -- if it's a saved lock or a master lock or
15  whatever, just ensuring that there are proper --
16  there's a proper security model around it despite
17  what the -- the term of it is, that there is a
18  comprehensive security model that is in place, that
19  it's tested, and that they haven't had any prior
20  breaches.  Or -- or understanding, if there was a
21  breach, what the issue was.
22       But that's where we tend to go with our
23  work, which is we don't get into, you know, what --
24  what lock is on or what steel is made of each --
25  each checkpoint or who the maker is.  That's not
```

**Page 42**

```
 1  where we typically go with our work.  And that's
 2  outside my -- my realm of understanding.
 3    Q.  Are you familiar with the term "security
 4  development lifecycle"?
 5    A.  I am.
 6    Q.  What does that term mean to you?
 7    A.  That as you give birth to software from
 8  the beginning of the code to the end of the code,
 9  that it goes through a process, as I understand it.
10  I may be off.  But as I understand it, there's a --
11  there's a process that -- that you go through that
12  the -- the upbringing of that software all the way
13  through the final ship of the product.
14       So there's a development cycle, you build
15  the first product, you test it, you understand, you
16  ensure, like, is it safe, is it -- can be
17  compromised, and then you're -- software is always
18  evolving.  So how do you ensure that through that
19  lifecycle, that it's -- it's safe and secure.
20       And that process can take -- that process
21  could take years, and it -- it could -- it could
22  stretch against -- across different product
23  launches.  And this is the problem, you know, which
24  has been happening in the industry, which is
25  software is becoming more complex.  And that can
```

**Page 43**

```
 1  create these -- these issues where the bad guys can
 2  get in.
 3    Q.  Do you have any understanding of what the
 4  components of a security development lifecycle are?
 5    A.  I don't know every layer of every
 6  component.
 7    Q.  Do you know some of them?
 8    A.  I don't know the technical layers, no.
 9    Q.  How important is it to you in covering a
10  company as an investment research analyst, a
11  software company, that it follows a secured
12  development lifecycle for its products?
13    A.  I think it's pretty important to cover a
14  process.  Because it's critical to ensuring the
15  success of the software over -- over time.  Again,
16  without knowing every technical layer, but it's,
17  like, is that water purified.  I would assume.  I
18  don't know all the steps it goes through, but it --
19  I'm assuming that is being -- it's drinkable, right.
20    Q.  Did you make any particular assumptions
21  about SolarWinds' cyber security practices when you
22  started following it?
23    A.  No.  It didn't really even really cross my
24  mind.  Again, going back to what I said earlier was,
25  in our work, we tend to focus on -- we focused on
```

**Page 44**

```
 1  other things that our clients focus on it.  Our
 2  clients are focused on other important things, and
 3  most of our clients we'll assume by default that the
 4  companies are operating a procedure that they're
 5  doing the right thing.
 6    Q.  Why do customers operate under default
 7  that companies are doing the right thing?
 8       MR. MUGMOM:  Objection.  Form.
 9       MR. TURNER:  Foundation and form.
10       THE WITNESS:  I think customers that are
11  buying multimillion dollar software systems are
12  ensuring that they're secure and safe.  And it's up
13  to them to test them and do their own due diligence
14  to ensure that.
15       So, you know, the first thing that we do
16  as a firm is, you know, we're -- we're regulated and
17  we want to ensure that the products work, and we'll
18  go through a rigorous testing cycle.  A lot of the
19  clients will go through these testing cycles on
20  their own to ensure that without -- without, like,
21  just trusting that the software vendor, they'll go
22  through that in their own process work.  And it
23  never came up -- it never came up in a lot of our
24  due diligence of any of our other companies that we
25  worked with that this was an issue for -- a broader
```

```
 1  follow, and this is kind of a standard list that,
 2  you know, I think companies put up to say here's
 3  what we follow and here's the process and protocol.
 4  It looks like a fairly generic statement, but it
 5  doesn't -- it doesn't -- doesn't describe how they
 6  make the donuts.  It's, like, here's our -- here's
 7  the process.
 8      Q.  Have you ever heard of a software company
 9  not having a security statement?
10      A.  No.
11      Q.  Would it be concerning to you if a
12  software company didn't?
13      A.  Yes.
14      Q.  Why?
15      A.  As I said earlier, everything is being put
16  on top of these platforms to run our economy.  And
17  software is invading every part of what we do.
18  And -- and so at the foundation, security --
19  software companies are expected to have, you know,
20  the basic locks and bolts to ensure that consumers
21  and enterprises are protected.
22      Q.  If you could take a look at the first
23  page, do you see the bold header, "organizational
24  security"?
25      A.  Mm-hmm.
                          49
```

```
 1      Q.  If you could just read to yourself the two
 2  paragraphs underneath that beginning with
 3  "Information security roles," and just let me know
 4  once you've read those two paragraphs, please.
 5      A.  I did review this yesterday, so ...
 6          MR. MUGMOM:  You don't need to talk about
 7  what we -- we did together.
 8          MR. BRUCKMANN:  I don't want to get into
 9  what --
10          (Simultaneous speakers - inaudible.)
11          THE WITNESS:  I've read it, yeah.
12  BY MR. BRUCKMANN:
13      Q.  So let me just sort of use as a marker in
14  time.
15          Are you aware of the Sunburst hack?
16      A.  Yes.
17      Q.  All right.  Have you read those two
18  paragraphs that I've just discussed prior to the
19  Sunburst -- Sunburst hack at any time?
20      A.  I had not.
21      Q.  Do you know if anyone in your team had?
22      A.  I don't know if anyone had read this, but
23  everyone that covers industry by definition believes
24  that this -- this statement is followed by
25  100 percent of the software industry.
                          50
```

```
 1      Q.  How important are the steps in those two
 2  paragraphs under organizational security, from your
 3  perspective?
 4          MR. TURNER:  Objection to form.
 5          MR. MUGMOM:  Same objection.
 6          MR. TURNER:  He just testified that he
 7  never saw it before, so how would it be important to
 8  him?
 9          THE WITNESS:  The layered -- layered
10  security model, as I said earlier, is, I think,
11  something that's been in the industry for two
12  decades.  It's not new.  It's not new in anything we
13  do, whether it's your house access, your billing --
14  you're billing software, getting in a car.  Like,
15  there's layered security, and layered security is
16  important.
17  BY MR. BRUCKMANN:
18      Q.  If you found out that a software company
19  that you followed was not following the steps
20  described in those two paragraphs, how would that
21  affect your coverage of that company?
22      A.  It depends because you could leave a back
23  door of your house open and the bad guys don't get
24  in, but do you have the right locks, do you have the
25  right alarm, do you have the right processes in
                          51
```

```
 1  place.  So it really -- it really depends.  It -- as
 2  I said, it's a layered model, so all the components
 3  have to work together.  And sometimes there could be
 4  one component that doesn't work perfectly, but it
 5  doesn't mean it's going to comprise -- compromise
 6  the entire system.  And that's the beauty of having
 7  a layered model, which is you tend to -- you tend to
 8  find issues because it is layered.
 9      Q.  If you could go to the second page of the
10  document.  And there's a header, "Operational
11  Security," and underneath that, there's another
12  header, "Change Management."
13          Do you see that section?
14      A.  Yes.
15      Q.  If you could just take a minute and read
16  the paragraph under "Change Management" to yourself.
17  I know you may have read this recently previously,
18  but I'd just ask that you do it again now, if you
19  don't mind.
20      A.  I reviewed it.
21      Q.  Okay.  Do you know if you read that
22  paragraph prior to the Sunburst hack?
23      A.  No, I did not.
24      Q.  Do you know if anyone on your team did?
25      A.  I don't know.
                          52
```

**Page 53**

1  Q. How important are the steps that are
2  described in that paragraph under "Change
3  Management"?
4      MR. MUGMOM: Objection to form.
5      MR. TURNER: Same objection.
6      THE WITNESS: It's really important
7  because if you update the software and, let's say,
8  an employee leaves and then a new developer comes in
9  and it's not reviewed and they made some changes and
10 the change goes into the software and it's not
11 reviewed, then the software could be compromised.
12 So yeah, I mean, every -- every change in the
13 software process should be ensured that it's -- it's
14 checked and it -- and it runs correctly. I think
15 most software companies run this where they're going
16 to make a lot of changes to the software and then
17 they run it through a final system to ensure that
18 it -- that it's -- it's been reviewed and
19 understands, hey, like there are no -- there are no
20 open doors.
21 BY MR. BRUCKMANN:
22  Q. Are the steps in the paragraph under
23 "Change Management" part of the steps that you said
24 you assumed that all software companies follow?
25  A. It's by definition you would assume that

**Page 54**

1  that's how it's run. There's no head of R&D I would
2  meet that wouldn't run that process.
3  Q. A couple paragraphs down, there's a
4  header, "Auditing and Logging."
5      Do you see that header?
6  A. Mm-hmm.
7  Q. If you could just read the paragraph under
8  "Auditing and Logging" to yourself, please.
9  A. Yes.
10 Q. Did you read that paragraph at any point
11 prior to the Sunburst hack?
12 A. No.
13 Q. Do you know if anyone on your team did?
14 A. I don't know.
15 Q. How important are the steps in the
16 paragraph under "Auditing and Logging"?
17     MR. MUGMOM: Objection as to form.
18     MR. TURNER: Same.
19     THE WITNESS: Same as "Change Management,"
20 that you need to understand who's in the system, who
21 made the changes, why they were there, how long were
22 they there for, you want to understand the -- the
23 log of who was in the system.
24 BY MR. BRUCKMANN:
25 Q. And are these steps that you assumed that

**Page 55**

1  all software companies you followed employed?
2  A. Hundred percent.
3  Q. A few paragraphs down, there's a header,
4  "Network Security."
5      Do you see that?
6  A. Yes.
7  Q. If you could just take a moment and read
8  the three paragraphs under "Network Security" to
9  yourself, please.
10 A. Yes.
11 Q. Did you read those three paragraphs at any
12 point prior to the Sunburst hack?
13 A. No.
14 Q. Do you know if anyone on your team did?
15 A. Not sure.
16 Q. How important are the steps that are
17 described in those three paragraphs?
18     MR. MUGMOM: Objection as to form.
19     MR. TURNER: Same.
20     THE WITNESS: Every company from small to
21 large has a network security platform. And it could
22 be virtual, it could be on premise, but every --
23 every company has to have a proper network security
24 platform. And most of this is embedded in -- if you
25 go to a public club provider, they're going to have

**Page 56**

1  network security. If you run a large corporation,
2  you're probably going to have firewalls on ground or
3  you're going to have virtual firewalls. Every --
4  every major customer has a -- has a firewall.
5  BY MR. BRUCKMANN:
6  Q. I guess you talked about everybody having
7  it. I think you said, at one point, everyone had to
8  have it.
9      Why does everyone -- why is it the case
10 that everyone had to have it?
11     MR. TURNER: Objection. Form and
12 foundation.
13     THE WITNESS: So effectively, it's the
14 point of where the network is running and who's on
15 the network, who got into the network, is your speed
16 of network up. You know, there are companies like
17 Palo Alto Networks, Fortinet and Barracuda. There's
18 a handful of companies that all provide these
19 technologies. It's pretty standard.
20     As we go back to the security stack, as we
21 called it, and this layered defense system, this is
22 one, it's like baking a cake. This is like the
23 flour. You know, all these other systems, they're
24 parts of the overall layered cake model.
25     So this is a very important one. And you

**Page 57**

1 can look to the market caps of Palo Alto Networks
2 and Fortinet and many of the others in the industry
3 to understand why it's important, because they
4 create a huge value. Most of these companies are
5 deploying network firewalls.
6         MR. MUGMOM: We've been going for about an
7 hour, if there's a convenient time in the next few
8 minutes to take a break, I'd appreciate it.
9         MR. BRUCKMANN: Yeah.
10 BY MR. BRUCKMANN:
11    Q. Are the steps that are described in the
12 paragraphs under "Network Security" ones that you
13 assumed that all software companies you covered
14 followed?
15    A. Yes.
16         MR. BRUCKMANN: Now is as good a time as
17 any for a break.
18         MR. MUGMOM: Thank you.
19         THE VIDEOGRAPHER: We're going off the
20 record. The time is 10:44 a.m.
21         (Whereupon, a recess was taken from
22         10:44 a.m. to 10:55 a.m.)
23         THE VIDEOGRAPHER: We're back on the
24 record. The time is 10:55 a.m.
25 //

**Page 58**

1 BY MR. BRUCKMANN:
2    Q. Mr. Thill, if you could turn to page 3 of
3 Exhibit Thill 2 for me.
4         And there's a header, "Access Controls"
5 and underneath that, there's a header, "Roll Based
6 Access."
7         Do you see that?
8    A. Yes.
9    Q. If could you read the paragraph under
10 "Roll-Based Access" to yourself, and let me know
11 once you've done that.
12    A. Yes.
13    Q. First, let me just ask for the entire
14 document.
15         Did you read any of this document prior to
16 the Sunburst hack?
17    A. No.
18    Q. And do you know if anyone on your team
19 read any of this document prior to the Sunburst
20 hack?
21    A. I don't know.
22    Q. All right. The paragraph that I just had
23 you read under "Roll-Based Access," how important
24 are the steps in that paragraph for a software
25 company to follow from your perspective as an

**Page 59**

1 investment research analyst?
2    A. They are very important. As I mentioned,
3 security is a -- is a layered model, and this is one
4 of many layers in that security model.
5    Q. Specifically in that first paragraph,
6 there's -- on the second line, there's a sentence
7 that says (as read):
8         Access controls to sensitive
9         database in our databases, systems
10        and environments are set on a
11        need-to-know least-privileged
12        necessary basis.
13        Do you see that?
14   A. Yes.
15   Q. What is your understanding of the concept
16 of least-privileged necessary basis is?
17        MR. MUGMOM: Objection as to form.
18        THE WITNESS: So not everyone inside the
19 company needs to understand what's happening in the
20 system. And effectively what you'd want to do is
21 basically set it so that users can't get access
22 to -- to any of the critical information. There
23 should only be one or two privileged users that
24 could -- could get access to -- to these certain
25 systems.

**Page 60**

1 BY MR. BRUCKMANN:
2    Q. And how important is it that a company
3 follows the concept of least-privileged access, from
4 your perspective as an investment research analyst?
5    A. Very important.
6    Q. Why is that?
7    A. For every business, you -- there are
8 certain data that you don't need everyone to have
9 access -- access to. So there's only certain people
10 that should be able to access an HR system or a
11 customer system. You don't -- you don't need the
12 intern looking at information. You may need only
13 the CEO looking at that information. So everyone's
14 access should have different -- different --
15 different levels. And it -- it shouldn't be
16 universally open to everyone.
17   Q. You've referred a few times to privileged
18 access.
19        Are you familiar with the concept of
20 administrative users or administrative access?
21   A. Yes.
22   Q. What do you understand that to be?
23   A. There are set people inside the
24 organization, there are admins that have the
25 right -- that have these rights to get in, and there

**Page 61**

1  are very few of them.  And they hold the keys to get
2  in and potentially make these changes.  So the
3  number of those users are -- should be smaller and
4  are -- are fewer, and they should be the most senior
5  people on the team that people trust.
6      Q.  How important is it for a software company
7  to properly restrict administrative access?
8          MR. MUGMOM:  Objection as to form.
9          MR. TURNER:  Objection as to form.
10 BY MR. BRUCKMANN:
11     Q.  From your perspective as an investment
12 research analyst, how important is it for a software
13 company to properly restrict administrative user
14 access?
15     A.  It's -- it's very important.
16     Q.  Why?
17     A.  Because you don't let everyone in the
18 company have access to all data.  You let certain
19 users in.
20     Q.  On that same page, there's a header,
21 "Authentication and Authorization."
22         Do you see that?
23     A.  Yes.
24     Q.  If you could read the two paragraphs
25 underneath that to yourself for me, and let me know

**Page 62**

1  once you've done so.
2      A.  Yes.
3      Q.  From your perspective as an investment
4  research analyst, how important is it for a software
5  company to follow the practices set forth in those
6  two paragraphs?
7      A.  Very important.
8      Q.  Why?
9      A.  You want to understand who is in the
10 system.  You want to understand that they have the
11 right passwords and that these passwords are
12 changed, that they're updated, that -- that who is
13 accessing is who -- who is getting -- you know, who
14 says they're getting in is actually who is getting
15 in and that these passwords aren't shared, that
16 they're individual to each -- each user.  So you
17 actually know who's in and who's out.
18     Q.  If you look in the first paragraph
19 starting in the second line, there's a sentence (as
20 read):
21             Our password best practices
22         enforce the use of complex
23         passwords that include both alpha
24         and numeric characters, which are
25         deployed to protect against

**Page 63**

1          unauthorized use of passwords.
2          Do you see that?
3      A.  Yes.
4      Q.  How important is it, from your perspective
5  as an investment research analyst, that a software
6  company follow that practice?
7      A.  Very important.
8      Q.  Tell me why.
9      A.  Any website you -- you put your password
10 in, you want to have a unique password that's long
11 and that the hackers can't guess.  Simple passwords,
12 you know, can guess, bad guys can get in.  And the
13 more complex, the better.  And it keeps -- keeps the
14 bad guys out.
15     Q.  The next paragraph down, the first
16 sentence says (as read):
17             SolarWinds employees are
18         granted a limit set of default
19         permissions to access company
20         resources, such as their email and
21         the corporate intranet.
22         Do you see that sentence?
23     A.  Yes.
24     Q.  From your perspective as an investment
25 research analyst, how important is it that a

**Page 64**

1  software company follow the practice described in
2  that sentence?
3      A.  Very.
4      Q.  Tell me why.
5      A.  Again, I think going back to what I had
6  said earlier, like all these -- all these components
7  are layered security, and they all are important,
8  and they should all be treated seriously and
9  everyone should have a strict -- a strict
10 authentication authorization into the system.  It's
11 just good practice.  It's just standard practice.
12 It's standard practice for every company, not even
13 just a software company.  We keep that in our own
14 organization.
15     Q.  Okay.  If you look on that same page,
16 there's a header, "Software Development Lifecycle."
17         Do you see that?
18     A.  Yes.
19     Q.  If you could please read to yourself the
20 two paragraphs under that header, and let me know
21 once you've done so.
22     A.  Okay.
23     Q.  Sorry, I just realized I forgot to ask a
24 couple questions I meant to ask.  I don't want to
25 confuse you.  So I'm referring now back to the

**Page 65**

"Access Controls" sections we were just looking at.
  A. Yes.
  Q. Okay. So referring back to the three paragraphs under "Access Controls," are the practices in each of those paragraphs practices that you assume that software companies you follow employ?
  A. They all follow it.
  Q. You assume that?
  A. We assume, by default.
  Q. All right. Now turning back to the software development lifecycle and those two paragraphs.
      How important is it, from your perspective as an investment research analyst, that a software company follow practices described in those two paragraphs?
  A. Very important.
  Q. Why is that?
  A. Software goes through a lifecycle being an infant to a teenager to an adult and those processes, just to get it to fully shipping, has to follow the process. And that process is, as the software grows, it gets more complex, and the potential for holes in the -- in gateways and

**Page 66**

different ways the bad guys can get in grow as the software grows in complexity.
      So this concept of a development lifecycle is constantly testing, ensuring that the product can't -- can't have this issue, having -- thinking like a hacker and really trying to break into the system. So there's always, you know, this mind-set of how do you -- how do you create the software so that you can ensure that. But then you have to test it, you have to actually -- it's like a car, blender, whatever you build, then you have to test, ensure that it does what your -- your R&D and your process believes it's going to do.
  Q. And why is that testing so important, from your perspective?
  A. There's a lot of employees that have their hands on the code. There could be different developers and different teams. There's different processes. There could be -- you know, there could be an issue where someone breaks into the code, could be final, ready to go, and someone broke into the code and put some nasty, you know, bug in the system. And, you know, you don't know until it's final. And we've all learned the lesson as -- as consumers about bad software. I could go through 15

**Page 67**

different examples, but you got to ensure that it works. And it's -- it's gone through that process.
  Q. If you look at the first paragraph under "Software Development Lifecycle," in the second line, there's a sentence (as read):
      Security and security testing
      are implemented throughout the
      entire software development
      methodology.
      Do you see that?
  A. Yes.
  Q. Is that what you were just referring to?
  A. Yes.
  Q. And in the second paragraph, the sentence -- the first sentence says (as read):
      Our security development
      lifecycle follows standard security
      practices, including vulnerability
      testing, regression testing,
      penetration testing and product
      security assessments.
      Do you see that?
  A. Yes.
  Q. All right. What do you understand vulner- -- vulnerability testing to be?

**Page 68**

  A. You -- you ensure that something bad could happen. So -- effectively you're testing something bad could happen. So you're -- you're ensuring it's not, like, you buy a GORE-TEX rain jacket, you bring it into the rain, right? You understand, like -- using the analogy because it's easier to understand -- but, like, understanding does the code hold up, can someone bad break in, can -- you know, does it boot the right way, does it -- does it hold up to the -- if you have 1,000 people in the system or 100,000 people in the system, you know, can it hold up underneath those conditions.
  Q. And how important is it that a software company follow that specific practice?
      MR. MUGMOM: Objection as to form.
BY MR. BRUCKMANN:
  Q. From your perspective as an investment research analyst, how important is it that a company follow that specific practice of vulnerability testing?
  A. It's very important.
  Q. The next part refers to regression testing.
      Do you see that?
  A. Yes.

**Page 69**

1  Q. What is your understanding of what
2  regression testing refers to?
3  A. I'm not an expert in regression testing.
4  But, you know, I think many of these, when you look
5  at -- you're talking about can the bad guys get in,
6  can -- is there an open door, is there the right
7  security protocol. There are multiple aspects of
8  this entire sentence that basically refer to can
9  someone bad get in, is it sustainable, can it hold
10 it effectively. When you look at different releases
11 of software, can -- can this insure, that is,
12 they -- if they had to roll back to a prior release
13 or roll forward to another release, can -- are
14 these -- are these systems, you know, basically
15 incorporating the same processes and procedures.
16      But I'm not an expert on regression
17 testing. But overall, the -- this whole SDL or
18 software development lifecycle is -- these are --
19 these are pretty standard tests that everyone runs.
20 But I'm not a regression testing expert.
21  Q. What about the next one, penetration
22 testing, what do you understand that that refers to?
23  A. You're a hacker, you're trying to get in,
24 you're trying to penetrate the system, you're acting
25 as a bad person, you're literally just trying to get

**Page 70**

1  into the system.
2  Q. From your perspective as an investment
3  research analyst, how important is it that a
4  software company employ penetration testing as part
5  of its software development?
6  A. Pretty critical.
7  Q. Why?
8  A. Once you build the software, you got to
9  ensure that the bad guys can't get in. So you're
10 ensuring every situation -- there are cyber security
11 companies that are built now, they try to hack into
12 your system. So there are companies that are
13 for-profit that are literally just trying to break
14 in.
15      And so, you know, you -- you have to think
16 like -- you have to think like a good person, a
17 person that's trying to do the right thing for the
18 world, but there are a lot of bad people out there,
19 so you have to think, okay, the other side of this,
20 there's going to be someone bad, how are they going
21 to get in, let's try every aspect to try to -- to
22 break the system down.
23      So there's no ...
24  Q. Okay. How would it have affected your
25 coverage of SolarWinds in the 2020 time frame if you

**Page 71**

1  had learned that SolarWinds was not following a
2  secure development lifecycle for the software
3  created?
4      MR. MUGMOM: Objection. Calls for
5  speculation.
6      MR. TURNER: Same objection.
7      THE VIDEOGRAPHER: Counsel, try not to
8  cover your mouth.
9      THE WITNESS: It depends. Because as
10 we've said, there's multiple aspects of the
11 secure -- the security layer system. And if one
12 piece isn't perfect, because it's a layer, the other
13 pieces can pick up and detect.
14      And so there could be one aspect that
15 there's a door open, but the other -- the other
16 security systems pick up on that. And so, again, it
17 depends. In general, I would want to know. We'd
18 want to know. The analysts want to know more than
19 less. So we would want more, we don't get that
20 level of detail.
21 BY MR. BRUCKMANN:
22  Q. From your perspective as an investment
23 research analyst, are all cyber security problems
24 the same or are some more critical than others?
25  A. They're all --

**Page 72**

1      MR. TURNER: Objection to form.
2      THE WITNESS: -- all very unique. They're
3  all different. They seem -- they seem to follow a
4  common pattern. Someone bad gets in, they stay for
5  six, nine months, no one knows they're there, and
6  then they figure out they're there.
7      There are surveys by IBM and other
8  companies that have run these -- these surveys,
9  which is every single company we cover is having a
10 cyber security issue. There's not one. It's all of
11 them. It's a massive issue.
12 BY MR. BRUCKMANN:
13  Q. Are there types of cyber security problems
14 that are more concerning to you as an investment
15 research analyst than others?
16  A. I wouldn't say no. I -- I think the
17 problem is -- for us is, I think, disclosure of
18 understanding when it hits, how long it's been
19 there, and that, I think, it's hard for companies
20 because they don't know. They may have a signal and
21 they may do due diligence, but they don't know. I
22 think this is a hard thing for all these companies,
23 and the whole thing for the industry is there's such
24 sophisticated methods that it seems like every day,
25 I wake up and there's another issue.

```
 1  investment -- investing public and expect them to --
 2  to figure out whether there's a material weakness or
 3  not?
 4      A.  Yes.  And that, I think, is important to
 5  highlight, which is there are a lot of -- there's a
 6  lot that takes to run a company.  Some of it isn't
 7  necessarily get -- should get to our level because
 8  it becomes data that isn't material to how we would
 9  look at a company.  So I think that line has to be
10  determined by your own internal legal team and your
11  CIO and CICO -- to make that determination.
12      Q.  And you haven't seen any evidence of such
13  a determination was made in any of the documents
14  you've seen today?
15      A.  None.
16          MR. TURNER:  No further questions.
17          MR. BRUCKMANN:  Nothing further from the
18  SEC.  I think we are done for today.
19          THE REPORTER:  Could I just ask if anyone
20  needs a transcript or a rough?
21          MR. TURNER:  Yes, I'd like a rough,
22  please.
23          MR. BRUCKMANN:  We'll take the rough,
24  yeah.
25          MR. BRUTLAG:  I want to make sure, the
                          157
```

```
 1  Latham & Watkins attorney, Christine Lee, joined as
 2  well, so you might want to include her on the
 3  attendees.
 4          THE REPORTER:  Thank you.
 5          THE VIDEOGRAPHER:  This concludes today's
 6  deposition of Brent Thill.  Master media of today's
 7  deposition will remain in the custody of Gradillas
 8  Court Reporters.  The time is 1:56 p.m.  We are now
 9  off the record.
10          (Whereupon, the deposition concluded
11          at 1:56 p .m.)
                          158
```

```
 1              CERTIFICATE OF WITNESS
 2
 3      I, BRENT THILL, do hereby declare under
 4  penalty of perjury that I have read the entire
 5  foregoing transcript of my deposition testimony,
 6  or the same has been read to me, and certify that
 7  it is a true, correct and complete transcript of
 8  my testimony given on August 28, 2024, save and
 9  except for changes and/or corrections, if any, as
10  indicated by me on the attached Errata Sheet, with
11  the understanding that I offer these changes and/or
12  corrections as if still under oath.
13      _____ I have made corrections to my deposition.
14      _____ I have NOT made any changes to my deposition.
15
16  Signed: _____
            BRENT THILL
17
18
19  Dated this _____ day of _____ of 20____.
                          159
```

```
 1              CERTIFICATE OF REPORTER
 2      I, Kathleen A. Maltbie, Certified
 3  Shorthand Reporter licensed in the State of
 4  California, License No. 10068, the State of Nevada,
 5  CCR 995, and the State of Texas, CSR 12212, hereby
 6  certify that deponent was by me first duly sworn,
 7  and the foregoing testimony was reported by me and
 8  was thereafter transcribed with computer-aided
 9  transcription; that the foregoing is a full,
10  complete, and true record of proceedings.
11      I further certify that I am not of counsel
12  or attorney for either or any of the parties in the
13  foregoing proceeding and caption named or in any way
14  interested in the outcome of the cause in said
15  caption.
16      The dismantling, unsealing, or unbinding
17  of the original transcript will render the
18  reporter's certificates null and void.
19      In witness whereof, I have hereunto set my
20  hand this day:
21  _____ Reading and Signing was requested.
        _____ Reading and Signing was waived.
22  ___x___ Reading and Signing was not requested.
23      _____
        KATHLEEN A. MALTBIE
24      RPR-RMR-CRR-CCRR-CLR-CRC-RDR
        California CSR 10068, Nevada CCR 995
25      Texas CSR 12212
                          160
```

```
 1              ERRATA SHEET
 2    Deposition of: BRENT THILL
      Date taken: AUGUST 28, 2024
 3    Case:  SEC v. SOLARWINDS CORP., et al.
 4    PAGE  LINE
      _____ _____ CHANGE: _____
 5          REASON: _____
 6    _____ _____ CHANGE: _____
            REASON: _____
 7
            _____ CHANGE: _____
 8          REASON: _____
 9    _____ _____ CHANGE: _____
            REASON: _____
10
            _____ CHANGE: _____
11          REASON: _____
12    _____ _____ CHANGE: _____
            REASON: _____
13
            _____ CHANGE: _____
14          REASON: _____
15    _____ _____ CHANGE: _____
            REASON: _____
16
            _____ CHANGE: _____
17          REASON: _____
18    _____ _____ CHANGE: _____
            REASON: _____
19
            _____ CHANGE: _____
20          REASON: _____
21    _____ _____ CHANGE: _____
            REASON: _____
22
            _____ CHANGE: _____
23          REASON: _____
24    Signed_____
25    Dated_____
                          161
```