# Exhibit 60

**Excerpts of Gregory Rattray
Deposition Transcripts**

```
 1       UNITED STATES DISTRICT COURT
 2       SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE    )
    COMMISSION,                )
 5                             )
        Plaintiff,             )
 6                             ) Civil Action No.
     v.                        ) 23-cv-9518-PAE
 7                             )
    SOLARWINDS CORP. and       )
 8  TIMOTHY G. BROWN,          )
                               )
 9      Defendants.            )
    _____)
10
11
12
13
14       VIDEO RECORDED EXAMINATION OF
15             GREGORY RATTRAY
16       WEDNESDAY, FEBRUARY 12, 2025
17           NEW YORK, NEW YORK
18
19
20
21
22
    CERTIFIED STENOGRAPHER:
23  JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
    CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
24  CCR-WA (No. 21007264), CSR-CA (No. 14420),
    REALTIME SYSTEMS ADMINISTRATOR
25  JOB NO. 250212JWAA
                                1
```

```
 1
 2
 3       VIDEO RECORDED EXAMINATION of
 4  GREGORY RATTRAY, taken before
 5  JESSICA R. WAACK, Registered Professional
 6  Reporter, Registered Merit Reporter,
 7  Certified Realtime Reporter, Registered
 8  Diplomate Reporter, California Certified
 9  Realtime Reporter, New Jersey Certified Court
10  Reporter (License No. 30XI008238700); Texas
11  Certified Shorthand Reporter (License No.
12  11958); Washington State Certified Court
13  Reporter (License No. 21007264); California
14  Certified Shorthand Reporter (License No.
15  14420); New York Association Certified
16  Reporter, New York Realtime Court Reporter
17  and Notary Public of Washington, D.C. and the
18  States of New York, Pennsylvania, Delaware,
19  Maryland and Virginia, at Latham & Watkins,
20  1271 Avenue of the Americas, New York, New
21  York, on Wednesday, February 12, 2025,
22  commencing at 9:41 a.m. and concluding at
23  6:46 p.m.
24
25
                                2
```

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4      SECURITIES AND EXCHANGE COMMISSION
 5      BY: CHRISTOPHER CARNEY, ESQ.
 6      BY: JOHN TODOR, ESQ.
 7      BY: CHRISTOPHER BRUCKMANN, ESQ.
 8      BY: KRISTEN WARDEN, ESQ. (Remote)
 9      BY: LORY STONE, ESQ. (Remote)
10      100 F Street, N.E.
11      Washington, D.C.  20549
12      PHONE:  800-732-0330
13      EMAIL:  Carneyc@sec.gov
14
15  ON BEHALF OF THE DEFENDANTS:
16      LATHAM & WATKINS LLP
17      BY: SERRIN TURNER, ESQ.
18      BY: MATTHEW VALENTI, ESQ. (Remote)
19      1271 Avenue of the Americas
20      New York, New York  10020
21      PHONE:  212-906-1330
22      EMAIL:  Serrin.turner@lw.com
23
24
25
                                3
```

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE DEFENDANTS:
 4      LATHAM & WATKINS LLP
 5      BY: SEAN M. BERKOWITZ, ESQ.
 6      BY: MAURICE BAYNARD, ESQ.
 7      330 North Wabash Avenue, Suite 2800
 8      Chicago, Illinois  60611
 9      PHONE:  312-777-7016
10      EMAIL:  Sean.berkowitz@lw.com
11
12           A L S O   P R E S E N T
13                 (REMOTE)
14  ANNIE GRAVELLE
15  BECKY MELTON
16
17           A L S O   P R E S E N T
18
19  DANNY ORTEGA, videographer
20  ERIC COLE
21  ROZALIA (ROZI) KEPES
22
23                --o0o--
24
25
                                4
```

```
 1           INDEX TO EXAMINATION
 2       WITNESS:  GREGORY RATTRAY
 3
 4       EXAMINATION              PAGE
 5  BY MR. CARNEY                  10
 6  BY MR. TURNER                 303
 7  BY MR. CARNEY                 309
 8
 9           INDEXED PAGES
10                          PAGE
11  GREGORY RATTRAY, sworn          9
12  REPORTER CERTIFICATE          313
13  DECLARATION UNDER PENALTY OF PERJURY   314
14  ERRATA SHEET                  315
15
16
17       INFORMATION REQUESTED
18           None
19
20    WITNESS INSTRUCTED NOT TO ANSWER
21           None
22
23
24
25
                    5
```

```
 1           INDEX TO EXHIBITS
 2       WITNESS:  GREGORY RATTRAY
 3       Wednesday, February 12, 2025
 4  MARKED       DESCRIPTION          PAGE
 5  Exhibit 10 Ticket: 260058;
 6       SW-SEC-SONY_00050922        176
 7  Exhibit 11 SolarWinds Development Process
 8       slide deck                  199
 9  Exhibit 12 Final Security Review SRM
10       (2019.4); SW-SEC-SONY
11       _00055119                   205
12  Exhibit 13 Email chain ending on
13       November 18, 2019;
14       SW-SEC00254254              217
15  Exhibit 14 MSP Products Security
16       Evaluation - confidential -
17       July 2019; SW-SEC00166790   231
18  Exhibit 15 Final Security Review
19       ipMonitor (Doberman - 2019.4);
20       SW-SEC-SONY_00069825        237
21  Exhibit 16 Final Security Review IPAM
22       (2019.2 Finn);
23       SW-SEC-SONY_00055006        240
24
25
                    7
```

```
 1           INDEX TO EXHIBITS
 2       WITNESS:  GREGORY RATTRAY
 3       Wednesday, February 12, 2025
 4  MARKED       DESCRIPTION          PAGE
 5  Exhibit 1  Gregory Rattray expert report
 6       dated November 22, 2024      41
 7  Exhibit 2  Expert report of Gregory
 8       Rattray dated November 22,
 9       2024                         42
10  Exhibit 3  Article, "JPMorgan Reassigns
11       Security Team Leader a Year
12       After Data Breach"           91
13  Exhibit 4  Article, "Building a Focused
14       Approach to Cyber Defense"   99
15  Exhibit 5  "SolarWinds Security
16       Statement"                  119
17  Exhibit 6  SARF dated December 12, 2017;
18       SW-SEC-SONY_0005545         131
19  Exhibit 7  Ticket : 193821;
20       SW-SEC-SONY_00049602        147
21  Exhibit 8  Ticket : 202365;
22       SW-SEC-SONY_00047323        159
23  Exhibit 9  MailAssure User Access
24       Follow-Ups                  171
25
                    6
```

```
 1           INDEX TO EXHIBITS
 2       WITNESS:  GREGORY RATTRAY
 3       Wednesday, February 12, 2025
 4  MARKED       DESCRIPTION          PAGE
 5  Exhibit 17 Native document;
 6       SW-SEC00168780              285
 7
 8       ** EXHIBITS BOUND SEPARATELY ***
 9
10
11              --o0o--
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                    8
```

Gregory Rattray
2/12/2025

## Page 9

```
               ******
            PROCEEDINGS
        February 12, 2025, 9:41 a.m.
            New York, New York
               ******
        THE VIDEOGRAPHER: We are now on the
record.
        My name's Danny Ortega, and I'm the
legal videographer for Gradillas Reporting.
Today's date is February 12, 2025, and the time is
9:41 a.m.
        This video deposition is being held at
1271 Avenue of the Americas, New York, New York,
in the matter of SEC vs. SolarWinds Corp., et al.
        The deponent today is Gregory Rattray.
All counsel will be noted on the stenographic
record.
        The court reporter today is Jessie
Waack, and will now swear in the witness.
               *****
        GREGORY RATTRAY, sworn
  on oath and/or affirmed, called as a witness
  herein, was examined and testified as follows:
               *****
///
```

## Page 10

```
            EXAMINATION
BY MR. CARNEY:
    Q.   Good morning, Dr. Rattray.
    A.   Good morning.
    Q.   Just we haven't met before. My name's
Chris Carney. I'm an attorney with the SEC.
        Sir, you've had your deposition taken
before, right?
    A.   Yes, I have.
    Q.   So I know you know the ground rules,
but let me just walk through some of them really
quickly.
        So obviously our court reporter here
is taking down everything we're saying, so it's
important that we don't talk over each other. So
even if you see where I'm going, just let me
finish my question, and then you respond, and
we'll have a clean record.
        Is that okay?
    A.   Understood.
    Q.   And we'll take breaks from time to
time, but if at any point you need a break, just
let me know.
        And the only thing I would ask is that
if there's a question pending, that you just
```

## Page 11

```
answer the question, and then we can take the
break.
        And obviously the most important thing
is that you're under oath the same as if you were
in a court. So just give the answers truthfully
to the best of your abilities.
        Is that okay?
    A.   Yep, I understand.
    Q.   Okay. And is there anything that
would prevent you from being able to testify fully
and truthfully today?
    A.   No.
    Q.   All right. And were you retained to
provide expert services in this case?
    A.   Yes, I was.
    Q.   And who are you retained by?
    A.   The -- Latham, the law firm.
    Q.   Okay. And so you were hired directly
by Latham & Watkins?
    A.   Actually, Serrin, you know, I --
        THE WITNESS: I believe we were hired
by Latham, right?
        You know, I don't know if the
contractual relationship is with SolarWinds
directly.
```

## Page 12

```
BY MR. CARNEY:
    Q.   Okay. All right. When you get paid,
is it Latham & Watkins that pays you?
    A.   Again, my team invoices, and I get
paid. So I'm actually not exactly sure --
        MR. TURNER: I can represent that
SolarWinds pays the invoices.
        THE WITNESS: SolarWinds.
BY MR. CARNEY:
    Q.   And do you know how much you've been
paid so far in this case?
    A.   I don't know the total amount.
    Q.   Okay. Do you know how many hours you
personally have spent on this case?
    A.   I would say 200-ish, yeah.
    Q.   All right. And for purposes of this
case, what do you consider your area of expertise
to be?
    A.   My area of expertise relevant to this
case is, you know, understanding how companies,
enterprises control their information environment,
implement security controls.
    Q.   Okay. And is there a field of
expertise that you would fold that into?
    A.   You know, different labels are used,
```

**Page 233**

1  A. That was a pretty complex question.
2  Q. Sure.
3  A. Can you restate --
4  Q. Sure.
5  A. -- it?
6  Q. I'll break it down for you.
7     Paragraph 212, you say that Mr. Graff
8  cites a notation in this assessment --
9  A. Yes.
10 Q. -- Exhibit 14, that says no threat
11 modeling or analysis is performed as part of any
12 process except MSP backup engineering, right?
13 A. Yes. I see that, yep.
14 Q. And then you say that it's -- you go
15 on to say, "It's unclear exactly what was meant by
16 the remark in the document," right?
17 A. That's right.
18 Q. And you also go on to say that the
19 authors who wrote this assessment, they may have
20 had in mind a formalized type of threat modeling
21 that they wanted to be done rather than meaning to
22 say that no type of threat modeling was being done
23 in any sense.
24    I wonder, what is the basis for your
25 statement about what they may have had in mind.

**Page 234**

1  A. You know, well, it starts from the
2  discussion that we had, you know, I think at the
3  beginning, you know, of today, which is, you know,
4  "threat modeling" is, you know, a broad term.
5     And, you know, as we've discussed
6  during the course of the day, you know, I see
7  evidence, you know, that threat modeling, you
8  know, existed in SolarWinds's practice noting that
9  threat modeling is not part of the securities
10 statement.
11    But, you know -- you know, I did sort
12 of look at the SolarWinds practices to the extent
13 that they, you know, evidenced threat modeling,
14 and I find that evidence there.
15    So because of that, you know, I was --
16 you know, I spec -- you know, speculated that they
17 may have a formalized view of threat modeling,
18 because I -- what they found was in the face of
19 what I saw related to the existence of threat
20 modeling, you know.
21    And I reviewed the -- the FSRs for
22 those specific, you know, products or applications
23 just the fact that there was an FSR is evidence of
24 threat modeling in my mind.
25    So that was why I thought that they

**Page 235**

1  might have a more formalistic view of threat
2  modeling.
3  Q. And what would a formalistic view of
4  threat modeling entail?
5  A. You know, again, because I don't --
6  you know, I see it broadly. You know, I've seen,
7  you know, at times detailed descriptions of threat
8  modeling processes.
9     You know, that maybe, again, they were
10 looking for a checklist around, you know, the
11 performance of threat modeling specifically or the
12 production of specific threat modeling artifacts.
13    Which, again, there are processes that
14 exist that cause that to happen. But, you know,
15 it's -- as discussed, you know, multiple times, I
16 don't see that as sort of the general industry
17 approach for threat modeling.
18    It's more a broad set of activities
19 related to identification of security risk, taking
20 that into account as you do software development.
21 Q. So specifically related to MSP
22 products, which this exhibit that we were looking
23 at is discussing Exhibit 14 --
24 A. Uh-huh.
25 Q. -- what, if any, documents did you

**Page 236**

1  review regarding threat modeling in MSP products?
2  A. Well, you know, as stated in my
3  report, I looked at the FSRs for the software
4  releases for the three cited, you know, RMM,
5  backup and N-Central.
6     And, you know, they show that the
7  development teams were doing threat modeling, you
8  know, identifying risks to software and developing
9  mitigation.
10    So that was the documentation that I
11 used in this specific case.
12 Q. Okay. So let's take a look at that
13 then.
14    If I could ask you to turn to
15 page 114, paragraph 210 of your report.
16 A. Uh-huh.
17 Q. And you state that, "I've also seen
18 evidence of threat modeling and FSRs that I've
19 reviewed. The FSRs have sections addressing
20 security design considerations with such headings
21 as proactive review of all FAS, high-level design
22 documents, documents with security design
23 implications for security-related features
24 identified by teams."
25    Do you see that?

**Page 237**

1    A.    Yes.
2    Q.    So the first quote that you have where
3  it says, "Proactive review of all" -- and this is
4  in all caps, "FAS," and then parentheses,
5  "(high-level design documents,)" you cite to --
6  you have Footnote 346, and you cite to a document.
7          Do you see that?
8    A.    Yes.
9          (Whereupon, Exhibit 15 is marked for
10         identification.)
11 BY MR. CARNEY:
12   Q.    And just, for the record, you've been
13 handed what's been marked as Exhibit 15.  And this
14 is the document that you cite in Footnote 346,
15 paragraph 210, and the Bates stamp is
16 SW-SEC-SDNY_00069825.
17         First of all, what does -- in this
18 sentence that I just read, "Proactive Review of
19 All FAS High-Level Design Documents," what does
20 FAS mean?
21   A.    I don't know.  I do not know what
22 that -- that breakdown of that acronym is.
23   Q.    And would you agree that under
24 "Proactive Review of All FAS High-Level Feature
25 Design Documents," which is on the first page of

**Page 238**

1  this document --
2    A.    Uh-huh.
3    Q.    -- there's an empty table?
4    A.    You know, in this case, the table is
5  empty.  But the statement is about, you know, the
6  fact that FSRs are asking the teams to, you know,
7  look at, you know -- you know, design documents in
8  light of security.
9          The first statement of paragraph -- or
10 sorry, yeah, the first statement of paragraph 210
11 is to the point where -- to the point that broadly
12 you have threat modeling is about bringing in
13 security to design considerations.
14         And the point being made is -- it's
15 actually the second sentence, that the FSRs
16 have -- are as templates have sections that are,
17 you know, asking -- you know, the teams in terms
18 of the security element of their, you know,
19 software -- yeah, the security -- yeah, security
20 element of this software development to consider
21 things.
22         In any given instance, it -- you know,
23 I'm not trying to say that, you know, every FSR
24 needs to, you know, have implementations of, you
25 know, the headings that are in the FSR.

**Page 239**

1          The point here is that this FSR
2  process is an element of, you know, them having
3  generally threat modeling.
4    Q.    Okay.  So, first of all, this document
5  is the one document that you cite related to
6  proactive review of all FAS high-level design
7  documents, right?
8    A.    Yes.  This is the document.
9    Q.    Okay.
10   A.    Yeah.  I cite it as showing that FSRs
11 have headings, and the heading is in the document.
12   Q.    And so is it fair to say that you're
13 relying on the heading on the document and not the
14 substance of any design review that was done,
15 right?
16         MR. TURNER:  In this particular case?
17         MR. CARNEY:  In the one example that
18 he selected, yes.
19         THE WITNESS:  Yeah, the -- I mean, you
20 know, the sentence is not intended to, you know,
21 look at any of these specific FSRs as -- you know,
22 any of these specific FSRs.
23         It's to make the point that the
24 process of final security reviews included design
25 considerations, which is part of, you know, a

**Page 240**

1  broad conception of threat modeling, which is not
2  even in the securities statement.
3  BY MR. CARNEY:
4    Q.    Okay.  And so -- but would you agree,
5  that given there's an empty table here, that this
6  particular document does not support the statement
7  that SolarWinds's developers conducted proactive
8  reviews of all FAS documents?
9          MR. TURNER:  Object to form.
10         THE WITNESS:  No.  I mean, because the
11 simple point being made in paragraph 210 is the
12 FSR process, you know, included, you know,
13 callouts to look at these things.  The sentence
14 was never to look at the -- the specific
15 implementation against a specific, you know,
16 app -- application.
17         Again, it's just making the general
18 point that they had a strong FSR process, and that
19 that -- you know, also meant that they were -- you
20 know, especially because of the way they
21 implemented it, they were doing threat modeling.
22         (Whereupon, Exhibit 16 is marked for
23         identification.)
24 BY MR. CARNEY:
25   Q.    All right.  Doctor, I've handed you --

**Page 241**

```
 1   if you look at the next sort of part of that
 2   sentence, it refers to -- in paragraph 210 of
 3   Exhibit 1, first to "documents with security
 4   design implications," and there's a Footnote 347.
 5        Do you see that?
 6     A.   Yes.
 7     Q.   Okay.  And so what you've been handed
 8   as Exhibit 16 is the document that is cited in
 9   Footnote 347.
10        MR. CARNEY:  And, for the record,
11   that's SW-SEC-SDNY_00055006.
12   BY MR. CARNEY:
13     Q.   Do you -- where it says "Documents
14   With Security Design Implications or Data Privacy
15   Concerns" at the top, do you see the table
16   underneath that?
17     A.   I do.
18     Q.   And that table has -- appears to have
19   links to two documents?
20     A.   That's correct.
21     Q.   Have you been able to access either
22   the documents that these links point to?
23     A.   There was no need for me to access
24   either of those documents.
25     Q.   And why not?
```

**Page 242**

```
 1     A.   Because as we were just discussing
 2   with the heading proactive review of all FAS
 3   high-level design documents, that the heading
 4   documents with design implications was simply to
 5   illuminate that the FSRs have, as a -- as
 6   templates, you know -- you know, look at, you
 7   know, security as a feature in design.
 8        And, you know, call out for
 9   development teams, because they will go through
10   the FSR process to look for the presence of these
11   things.
12        As I said in the last conversation
13   around the proactive review of all FAS high-level
14   design documents, the intent of that sentence was
15   never to look at a specific, you know, FSR, you
16   know, as evidence of implementation of, you know,
17   threat modeling.
18        It was to show that the FSR process
19   hit the things that threat modeling, you know,
20   calls for.
21     Q.   Okay.  So the documents in that table,
22   do you know whether they relate to security design
23   implications versus data privacy concerns?
24     A.   I feel like I just answered that
25   question.  You know, I answered that I didn't look
```

**Page 243**

```
 1   at the documents for the reasons that that was
 2   unnecessary.
 3     Q.   Let me ask you:  Outside of litigation
 4   when you're assessing the cybersecurity of a
 5   company, would it be your practice to rely on the
 6   title of a section in a document versus looking at
 7   the underlying documentation?
 8        MR. TURNER:  Object to form.
 9        THE WITNESS:  In terms of, you know --
10   can you repeat the question?
11   BY MR. CARNEY:
12     Q.   Sure.
13        I'm just -- I'm trying to understand
14   this -- you know, you talk about how Next Peak
15   does this cybersecurity --
16     A.   Uh-huh.
17     Q.   -- assessments, and I'm wondering if
18   the concept of looking at a heading in a final
19   security review without looking at the underlying
20   documentation is consistent with the sort of
21   non-litigation cybersecurity assessments that you
22   perform at Next Peak?
23        MR. TURNER:  Object to form.
24        THE WITNESS:  That -- you know,
25   this -- we're talking about a specific sentence
```

**Page 244**

```
 1   where I look at the presence of headings in
 2   documents.
 3        I've -- you know, as we've talked
 4   about, looked at over 50 FSRs, right?  There was a
 5   simple point being made here that the FSRs, you
 6   know, do lead a security team through a process
 7   that includes, you know, things that, you know,
 8   you would expect if you were -- you know, to see
 9   if threat modeling.
10        So, you know, this -- again, was a
11   sort of a specific assessment of implementation of
12   threat modeling for an application.
13        This was the articulation of the fact
14   that the FSRs clearly called at the process level
15   for doing this.  So this is just one of many
16   elements of, you know, my overall assessment that
17   threat modeling was occurring.
18        Again, something that was not present
19   in the securities statement, but that I do
20   believe, you know, the evidence in total, not this
21   sentence only, you know, clearly indicates that
22   they were doing.
23   BY MR. CARNEY:
24     Q.   Okay.  In that same paragraph 210, you
25   say, "Some of the FSRs also include design reviews
```

**Page 245**

```
 1   by the architecture team further reflecting
 2   consideration of security at the design stage."
 3       Do you see that?
 4   A.  Yes.
 5   Q.  You didn't add a citation to that
 6   sentence, did you?
 7   A.  I did not.
 8   Q.  Okay.  Do you recall which FSRs you
 9   had in mind here?
10   A.  I don't recall the specific FSRs.
11   Q.  And have you been able to look at any
12   design reviews by the architecture team?
13   A.  It would be similar to the -- the
14   answer to the previous question.  That was, you
15   know, not the point of this paragraph as a whole.
16       It's to the point that the FSR process
17   includes steps, and at times, you know, included,
18   you know, this step, design reviews by an
19   architecture team.
20       You know, my -- my approach is similar
21   to what's used in the industry.  You're not trying
22   to check, you know, every -- you know, every
23   implementation down to the specific, you know --
24   the specific -- you know, the follow-through on
25   every single specific FSR.
```

**Page 246**

```
 1       The FSR process at the level of the
 2   security statement, you know, demonstrates what
 3   people reading that security statement would
 4   expect from SolarWinds.
 5   Q.  Okay.  So in reviewing the FSRs, you
 6   assessed whether SolarWinds had the opportunity to
 7   do threat modeling, but not whether they actually
 8   did threat modeling, right?
 9   A.  No.  You know, I looked at a lot of
10   FSRs.  The FSRs, you know -- you know, show
11   activity that falls in, you know, the conduct of
12   threat modeling.
13       Again, you know, threat modeling is
14   not part of the securities statement, but there's
15   no reason to believe that the steps that are
16   outlined in the FSRs in the documentation that is,
17   you know -- you know, present -- you know, the
18   lengths of the documentation present in the FSRs,
19   you know, would not have occurred, right?
20       There's just every reason to believe
21   these FSRs are -- you know, the FSR process
22   itself, you know, threat modeling is -- it's a
23   strong process that there's no reason to believe
24   that the things that are called for, you know,
25   when they're present and the FSR didn't happen.
```

**Page 247**

```
 1   Q.  Well, let me just see if I can break
 2   that down a little bit.
 3       Would you agree with me that "threat
 4   modeling" is a term of art in cybersecurity?
 5       MR. TURNER:  Object to form.
 6       THE WITNESS:  Yeah, term of art is --
 7   I'm not -- I'm not quite sure what you mean by
 8   "term of art."
 9   BY MR. CARNEY:
10   Q.  It has a, sort of, generally accepted
11   meaning in cybersecurity, the term "threat
12   modeling"?
13   A.  You know, "threat modeling" is one of
14   the terms in cybersecurity where there are a lot
15   of, you know, sort of interpretations of what
16   those words mean.
17       Yeah, you know, so I think a lot of
18   people have a -- you know, different
19   conceptualizations of what is meant when you use
20   the words "threat modeling" in cybersecurity.
21   Q.  In your view, is threat modeling the
22   same as risk identification?
23   A.  You know, threat is an element of
24   risk.  They're not synonymous, but they're -- you
25   know, I guess I would consider them overlapping.
```

**Page 248**

```
 1   Q.  So what's the difference between
 2   threat modeling and risk identification?
 3   A.  Well, risk identification, you know,
 4   also includes the understanding of vulnerability.
 5   You know, that's sort of classic terminology in
 6   cybersecurity regarding risk is its threat and
 7   vulnerability.
 8   Q.  Okay.  Is there a difference between
 9   threat modeling and risk mitigation?
10   A.  In general in the field or --
11   Q.  In the cybersecurity field.
12   A.  Yes, there's -- the two things, they
13   are different.  "Threat modeling" could be an
14   element -- to me is a broader term of risk
15   mitigation.
16   Q.  Are you aware of any steps that are
17   part of threat modeling as a cybersecurity best
18   practice?
19       MR. TURNER:  Objection to form.
20       THE WITNESS:  You know -- you know, I
21   think we've discussed this.  That, you know,
22   threat modeling is -- you know, broadly, you know,
23   the identification of, you know, what act -- you
24   know, actors could do in terms of threatening a
25   specific, you know, organization.
```

**Page 309**

```
 1  sometimes particularly relevant to one's expertise
 2  in order to conduct these processes.
 3  BY MR. TURNER:
 4      Q.  And has any of your clients ever asked
 5  you for certifications before engaging you to
 6  conduct cybersecurity assessments?
 7      A.  No.
 8          MR. TURNER:  No further questions.
 9          MR. CARNEY:  Just one brief follow-up
10  question.
11                  EXAMINATION
12  BY MR. CARNEY:
13      Q.  Mr. Turner had asked you about your
14  reliance on evidence or documents from before the
15  relevant period.
16          Do you recall that?
17      A.  Yes.
18      Q.  Okay.  And so, for instance, he
19  mentioned the slide deck relating to SDL.
20          Do you recall that?
21      A.  I think -- I think it's development
22  process.  You know, I mean, it was in our
23  discussion of SDL, but -- this slide deck --
24      Q.  Yeah.
25      A.  -- is I believe what we were talking
```

**Page 310**

```
 1  about -- I was talking about with Mr. Turner.
 2      Q.  Okay.  And the fact that you relied on
 3  documents like the slide deck that predated the
 4  relevant period, does that mean you were unable to
 5  find equivalent documentation to that slide deck
 6  from during the relevant period?
 7      A.  No.  I mean, it does not mean that.
 8  As I stated, the types of things that were, you
 9  know, begun, you know, in training starting in,
10  you know, 2015 as outlined in this deck were
11  evidenced by, you know -- you know, processes like
12  we discussed at length like the final security
13  review, which was definitely prevalent throughout
14  the -- you know, the relevant period.
15      Q.  But did you find an equivalent slide
16  deck from the relevant period?
17      A.  I didn't -- I'm not sure even why I
18  would have looked for one.  You know, the point
19  was -- you know, at least in my assessment was to
20  show that, you know, they had -- they had in
21  place, you know, during the relevant period per
22  the securities statement processes.
23          This deck shows they initiated those
24  processes and other evidence, you know, shows that
25  they -- you know, they were implementing those
```

**Page 311**

```
 1  processes during the relevant period.
 2      Q.  And then actually just one more.
 3          The folks that work for you at Next
 4  Peak, that, for instance, do penetration testing,
 5  did they have the certifications that Mr. Turner
 6  was asking you about?
 7          MR. TURNER:  Object to form.
 8          THE WITNESS:  Yeah, for the pen
 9  testers?
10  BY MR. CARNEY:
11      Q.  Yes.
12      A.  You know, I actually don't know
13  necessarily if they -- they have those
14  certifications or not.  I mean, I'm -- yeah, I
15  don't know for certain whether they have them.
16          MR. CARNEY:  All right.  No further
17  questions, sir, thank you.
18          THE WITNESS:  All right.
19          MR. TURNER:  None for me.
20          THE VIDEOGRAPHER:  The time right now
21  is 6:45 p.m.
22          We are off the record.
23          THE STENOGRAPHER:  Mr. Turner, did you
24  want a rough draft?
25          MR. TURNER:  Yes, please.
```

**Page 312**

```
 1          THE STENOGRAPHER:  And regular
 2  delivery on final?
 3          MR. TURNER:  Yeah, that's fine.
 4          (Time noted:  6:46 p.m.)
```

```
 1           REPORTER CERTIFICATE
 2     I, the undersigned, do hereby certify:
 3     That GREGORY RATTRAY was by me duly sworn
 4  in the within-entitled cause; that said
 5  deposition was taken at the time and place
 6  herein named; and that the deposition is a
 7  true record of the witness's testimony as
 8  reported by me, a disinterested person, and
 9  thereafter was transcribed.
10     I further certify that I am not
11  interested in the outcome of the said
12  action, nor connected with, nor related to
13  any of the parties in said action, nor to
14  their respective counsel.
15     IN WITNESS WHEREOF, I have hereunto set
16  my hand this 25th day of February, 2025.
17  Signature: __Requested__Waived_X_Not Requested
18
19
20     _____
21            JESSICA R. WAACK
            Registered Diplomate Reporter
22           Certified Realtime Reporter
         California Certified Realtime Reporter
23           New York Realtime Court Reporter
           New York Association Court Reporter
24             Notary Public, State of New York
       CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
25      CCR-WA (No. 21007264), CSR-CA (No. 14420)
                         313
```

```
 1              ERRATA SHEET
 2  Deposition of: GREGORY RATTRAY
    Date taken:  FEBRUARY 12, 2025
 3  Case:  SEC v. SOLARWINDS CORP., et al.
 4  PAGE  LINE
    _____ _____ CHANGE: _____
 5        REASON: _____
    _____ _____ CHANGE: _____
 6        REASON: _____
 7
    _____ _____ CHANGE: _____
 8        REASON: _____
    _____ _____ CHANGE: _____
 9        REASON: _____
10
    _____ _____ CHANGE: _____
11        REASON: _____
    _____ _____ CHANGE: _____
12        REASON: _____
13
    _____ _____ CHANGE: _____
14        REASON: _____
    _____ _____ CHANGE: _____
15        REASON: _____
16
    _____ _____ CHANGE: _____
17        REASON: _____
    _____ _____ CHANGE: _____
18        REASON: _____
19
    _____ _____ CHANGE: _____
20        REASON: _____
    _____ _____ CHANGE: _____
21        REASON: _____
22
    _____ _____ CHANGE: _____
23        REASON: _____
24  Signed_____
25  Dated_____
                         315
```

```
 1          CERTIFICATE OF WITNESS
 2
 3     I, GREGORY RATTRAY, do hereby declare under
 4  penalty of perjury that I have read the entire
 5  foregoing transcript of my deposition testimony,
 6  or the same has been read to me, and certify that
 7  it is a true, correct and complete transcript of
 8  my testimony given on February 12, 2025, save and
 9  except for changes and/or corrections, if any, as
10  indicated by me on the attached Errata Sheet, with
11  the understanding that I offer these changes and/or
12  corrections as if still under oath.
13     _____ I have made corrections to my deposition.
14     _____ I have NOT made any changes to my deposition.
15
16  Signed: _____
              GREGORY RATTRAY
17
18
19  Dated this _____ day of _____ of 20____.
20
21
22
23
24
25
                         314
```