# Exhibit 63

**Excerpts of Kellie Pierce
Deposition Transcripts**

## Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
 5                               )
           Plaintiff,            )
 6                               ) Civil Action No.
        v.                       ) 23-cv-9518-PAE
 7                               )
    SOLARWINDS CORP. and         )
 8  TIMOTHY G. BROWN,            )
                                 )
 9          Defendants.          )
    _____)
10
11
12
13
14
15     VIDEOTAPED DEPOSITION OF KELLIE JAIE PIERCE
16              Plano, Texas
17           Wednesday, July 24, 2024
18
19
20
21
22  Reported by
23  April R. Brunson
24  Texas CSR No. 7495
25  Job No. 240724SREP
```

## Page 2

```
 1          UNITED STATES DISTRICT COURT
 2          SOUTHERN DISTRICT OF NEW YORK
 3
 4  SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
 5                               )
           Plaintiff,            )
 6                               ) Civil Action No.
        v.                       ) 23-cv-9518-PAE
 7                               )
    SOLARWINDS CORP. and         )
 8  TIMOTHY G. BROWN,            )
                                 )
 9          Defendants.          )
    _____)
10
11
12
13
14     VIDEOTAPED DEPOSITION OF KELLIE JAIE PIERCE, taken
15  on behalf of the Plaintiff, at the Law Offices of
16  Spencer Fane located at 5700 Granite Parkway, Suite 650,
17  Plano, Texas, beginning at 9:30 a.m. and ending at
18  3:10 p.m. on Wednesday, July 24, 2024, before April R.
19  Brunson, Certified Shorthand Reporter Number 7495.
20
21
22
23
24
25
```

## Page 3

```
 1  APPEARANCES:
 2
 3  For the Plaintiff:
 4     UNITED STATES SECURITIES AND EXCHANGE COMMISSION
       BY:  MR. CHRISTOPHER J. CARNEY
 5          MS. KRISTEN M. WARDEN
            MR. CHRISTOPHER M. BRUCKMANN
 6          (Via Videoconference)
            MR. BENJAMIN BRUTLAG
 7          (Via Videoconference)
       100 F Street NE
 8     Washington, D.C.  20549
       202.551.5986
 9     carneyc@sec.gov
       wardenk@sec.gov
10     brutlagb@sec.gov
       bruckmannc@sec.gov
11
12
    For Defendant Solarwinds Corp. and for the Witness:
13
       LATHAM & WATKINS, L.L.P.
14     BY:  MR. SERRIN TURNER
       BY:  MR. NICOLAS LUONGO
15     1271 Avenue of the Americas
       New York, New York  10020
16     212.906.1207
       serrin.turner@lw.com
17     nicolas.luongo@lw.com
18      - and -
19     SPENCER FANE
       BY:  MR. JAMES T. DRAKELEY
20     5700 Granite Parkway
       Suite 650
21     Plano, Texas  75024-6622
       972.324.0350
22     972.324.0301  (Fax)
       jdrakeley@spencerfane.com
23
24
25
```

## Page 4

```
 1  APPEARANCES (CONTINUED):
 2
    FOR THE DEFENDANT TIMOTHY G. BROWN:
 3
       KING & SPALDING, L.L.P.
 4     BY:  MR. ALEC KOCH
            (Via Videoconference)
 5     1700 Pennsylvania Avenue, NW
       Suite 900
 6     Washington, D.C. 20006
       202.737.0500
 7     akoch@kslaw.com
 8
 9  Also Present:
10     JASON BLISS, SolarWinds Corporate Representative
11
12  The Videographer:
13     JOHN HINES
14
15  Certified Shorthand Reporter:
16     APRIL R. BRUNSON, TEXAS CSR NO. 7495
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              INDEX
 2  WITNESS:                    EXAMINATION
 3  KELLIE JAIE PIERCE
 4     BY MR. CARNEY.........................9
 5     BY MR. TURNER.........................123
 6     BY MR. CARNEY.........................132
 7     BY MR. TURNER.........................135
 8
 9              EXHIBITS
10  EXHIBIT NO.   DESCRIPTION           PAGE
11  Exhibit 1    Kellie Pierce LinkedIn Page   16
12  Exhibit 2    E-mail, 7/24/2019 from Kellie  39
             Pierce to Vincent Phelan, et al.
13           With attachment
             (SW-SEC00151585 - 151603)
14           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
15
    Exhibit 3    Message, 1/20/2020 from Kellie  41
16           Pierce to Steve Close
             (S2-SEC00179411)
17           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
18
    Exhibit 4    E-mail, 6/28/2019 from Kellie   46
19           Pierce to Ikong Fu, et al.
             With attachment
20           (SW-SEC00151673 - 151674)
             CONFIDENTIAL TREATMENT
21           REQUESTED BY SOLARWINDS
22  Exhibit 5    E-mail, 8/28/2019 from Kellie   62
             Pierce to Keith Kuchler, et al.
23           With attachment
             (SW-SEC00045356 - 45358)
24           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
25
```

**Page 6**

```
 1  EXHIBIT LIST CONTINUED
    EXHIBIT NO.   DESCRIPTION         PAGE
 2
    Exhibit 6    E-mail, 9/25/2019 from Kellie   75
 3           Pierce to Keith Kuchler, et al.
             With attachment
 4           (SW-SEC00218068 - 2180069)
             CONFIDENTIAL TREATMENT
 5           REQUESTED BY SOLARWINDS
 6  Exhibit 7    E-mail, 1/27/2020 from Kellie   79
             Pierce to Eric Quitugua, et al.
 7           With attachment
             (SW-SEC00061296 - 61297)
 8           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
 9
    Exhibit 8    E-mail, 1/23/2020 from Kellie   85
10           Pierce to Timothy Brown, et al.
             With attachment
11           (SW-SEC00149897 - 149898)
             CONFIDENTIAL TREATMENT
12           REQUESTED BY SOLARWINDS
13  Exhibit 9    E-mail series ending 9/19/2019  88
             Between Kellie Pierce, et al.
14           With attachment
             (SW-SEC00015235 - 15237)
15           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
16
    Exhibit 10   MSP Products Security        99
17           Evaluation, July 2019
             (SW-SEC00166790 - 166799)
18           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
19
    Exhibit 11   MSP Support Security        104
20           Improvement, November 2019
             (SW-SEC00631418 - 631427)
21           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
22
    Exhibit 12   E-mail series ending 4/15/2020  108
23           Between Kellie Pierce, et al.
             With attachment
24           (SW-SEC00149537 - 19546)
             CONFIDENTIAL TREATMENT
25           REQUESTED BY SOLARWINDS
```

**Page 7**

```
 1  EXHIBIT LIST CONTINUED
    EXHIBIT NO.   DESCRIPTION            PAGE
 2
    Exhibit 13   Message, 8/20/2020 from Kellie  112
 3           Pierce to Josh Vanhoose
             (SW-SEC00230670)
 4           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
 5
    Exhibit 14   Message, 3/10/2021 from Kellie  114
 6           Pierce to Ashley Thornton
             (SW-SEC00195539)
 7           CONFIDENTIAL TREATMENT
             REQUESTED BY SOLARWINDS
 8
    Exhibit 15   E-mail series ending 7/19/2019  119
 9           Between Rebecca Gallegos, et al.
             (SW-SEC-SDNY_00040089 - 40091)
10           CONFIDENTIAL
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1       Plano, Texas, Wednesday, July 24, 2024
 2          9:30 a.m. - 3:10 p.m.
 3
 4       THE VIDEOGRAPHER:  This is Tape 1 in
 5  the video deposition of Kellie Pierce in the matter
 6  of SEC versus SolarWinds, et al.  This deposition is
 7  taking place in Plano, Texas, on Wednesday, July 24th,
 8  2024.
 9       We are now on record at 9:30 a.m.
10  Will attorneys please introduce themselves for the
11  record.
12       MR. CARNEY:  Good morning.  This is
13  Christopher Carney with the U.S. Securities and Exchange
14  Commission.
15       MS. WARDEN:  Kristen Warden with the
16  U.S. Securities and Exchange Commission.
17       MR. TURNER:  And Serrin Turner with
18  Latham & Watkins for Ms. Pierce.
19       MR. DRAKELEY:  Jim Drakeley with Spencer
20  Fane for Ms. Pierce.
21       MR. LUONGO:  Nicolas Luongo with Latham &
22  Watkins for Ms. Pierce.
23       MR. BLISS:  Jason Bliss with SolarWinds.
24       THE WITNESS:  And Kellie Pierce.
25       (Simultaneous speaking.)
```

1  BY MR. CARNEY:
2      **Q.**  And just with -- the same question with
3  respect to pen testing, can you tell me about the common
4  policies and practices you established relating to pen
5  testing?
6      **A.**  I would coordinate with the vendors -- pen
7  test vendors, make sure we have the contract in place
8  and then work with the product teams to perform the
9  tests which was a requirement of the SOC 2s.
10      **Q.**  And in the context of the work that you did at
11  SolarWinds, what does pen testing mean?
12      **A.**  I don't know.
13      **Q.**  More generally, do you know what pen testing
14  refers to?
15      **A.**  We would -- the vendors would test -- test the
16  product.  How they conducted the test or what exactly
17  they tested, I'm not -- I'm not exactly sure.  I'm not a
18  technical person.
19      **Q.**  Okay.  And is "pen" short for "penetration"?
20      **A.**  I believe, yes.
21      **Q.**  Okay.  All right.  Let me ask you then about
22  the -- you mentioned security training.  What -- what
23  was your involvement in establishing common policies and
24  practices related to security training?
25      **A.**  As it relates to the SOC 2 or the ISO 27001, I

                          21

1  would work with -- in order to obtain records to show
2  that people had completed their security training.
3          I also coordinated like a training
4  presentation between Tim Brown and our legal team to --
5  for some of the training over my tenure there.
6      **Q.**  Was this one training presentation?
7      **A.**  Correct.
8      **Q.**  And what was that training presentation
9  related to?
10      **A.**  I do not remember.
11      **Q.**  And so when you say you coordinated training
12  presentation between Tim Brown and the legal team, was
13  it a training for them or with Tim Brown and the legal
14  team reviewing the training to give to other people?
15      **A.**  I don't remember exactly how the -- how the
16  training was rolled out or if it was rolled out.
17      **Q.**  Okay.  And I think you mentioned a minute ago
18  that -- you said something along the line -- and correct
19  me if I'm wrong -- that you don't have sort of a
20  technical background; is that right?
21      **A.**  That's correct.
22      **Q.**  So I'm just going to ask you some -- some
23  questions, and it might seem silly given what you just
24  said, but I just want to establish for the record.
25          With respect to security training, did you

                          22

1  offer any technical input to that program?
2      **A.**  No.
3      **Q.**  And how about with respect to pen testing?
4  Did you offer any technical input?
5      **A.**  No.
6      **Q.**  Did you have any technical responsibility for
7  network monitoring for security vulnerabilities?
8      **A.**  No.
9      **Q.**  All right.  Putting aside the technical
10  responsibility for that, did you have any administrative
11  responsibility for network monitoring?
12          MR. TURNER:  Objection to form.
13      **A.**  No.
14  BY MR. CARNEY:
15      **Q.**  Did you have any technical responsibility for
16  the company's password policy?
17      **A.**  No.
18      **Q.**  Did you have any sort of nontechnical
19  administrative responsibility for the company's password
20  policy?
21          MR. TURNER:  Objection to form.
22      **A.**  Could you repeat that?
23  BY MR. CARNEY:
24      **Q.**  Sure.
25          I was wondering, putting aside -- you just

                          23

1  said you don't have any technical responsibility for the
2  password policy.  Do you have any -- did you have any
3  nontechnical sort of administrative responsibility for
4  SolarWinds' password policy?
5          MR. TURNER:  Same objection.
6      **A.**  For the -- for the policies, my role was
7  really just to coordinate against -- with the technical
8  people, with Tim on any of the policies including the
9  password policy, just to make -- we had an annual review
10  requirement.
11  BY MR. CARNEY:
12      **Q.**  Okay.
13      **A.**  So it was more on the coordination.
14      **Q.**  And you said "any of the policies."  So
15  besides the password policy, what other policies are you
16  referring to?
17      **A.**  I don't recall all of them.  I just -- I know
18  the password policy.  I remember the password policy
19  since we're talking about it.
20      **Q.**  Were the IT access controls one of the
21  policies?
22      **A.**  Yes.
23      **Q.**  And so you would have had responsibility for
24  coordinating the review of that policy?
25      **A.**  Correct.

                          24

1 of the steps that I went over with SOC 2, reviewing the
2 controls, making sure the engineers understood the
3 controls, collecting evidence and then having that third
4 party attest that we met those controls.
5        But this is just the very basic, like,
6 Level 1.  It's a discussion for investment.  So I
7 actually don't know what happened after, you know, once
8 this was submitted.
9    Q.  And you mentioned if the company had decided
10 to move forward with the FedRAMP investment.  Do you
11 know whether the company decided to do that?
12    A.  I don't know.
13    Q.  Is that you don't know one way or the other?
14    A.  No, I don't.
15    Q.  Okay.  And as I understood earlier, you had
16 said that the FedRAMP certification was needed to sell
17 to the federal government; is that right?
18    A.  That was --
19        MR. TURNER:  Objection to form.
20    A.  That was my understanding.
21 BY MR. CARNEY:
22    Q.  Okay.  And it's also your understanding
23 SolarWinds did have federal government customers?
24        MR. DRAKELEY:  Object to form.
25    A.  I don't know.

                         61

1 BY MR. CARNEY:
2    Q.  Okay.  All right.  And if we look at the third
3 tab from the left, I'll just pull that up on the screen
4 right now.  It says:  Moderate KP metrics.
5        So first of all, "KP" refers to you; is
6 that right?
7    A.  Where do you see that?
8    Q.  So that's the name of the tab.
9    A.  Oh, the tab.  Yes.
10    Q.  And you don't have to cross-check all the
11 numbers in here, but does this appear to be the same
12 chart that you included in your e-mail?
13    A.  Yes.
14    Q.  All right.  You may put that one aside,
15 please.
16        (Exhibit 5 was marked for identification.)
17 BY MR. CARNEY:
18    Q.  Okay.  Ms. Pierce, once again, take your time,
19 please.  I've handed you what's been marked as
20 Exhibit 5; and for the record, it has on the first page
21 Bates stamp of SW-SEC00045356.
22        Do you recognize this document?
23    A.  I don't recall this specific -- this
24 document -- or this e-mail chain.
25    Q.  Okay.  But the previous one, Exhibit 4, you do

                         62

1 recall that e-mail chain?
2    A.  I do, yes.
3    Q.  Okay.  So just back to Exhibit 4 for a second,
4 when was the last time you think you saw Exhibit 4?
5        MR. TURNER:  I'll object to the extent it
6 calls for work product, the documents shown during prep
7 sessions.
8        You don't have to answer.
9        THE WITNESS:  Thank you.
10 BY MR. CARNEY:
11    Q.  All right.  So focusing on Exhibit 5 for a
12 second, is this an e-mail that you sent on August 28th,
13 2019?
14    A.  Yes.
15    Q.  And I'm just going to ask you about some of
16 the names up at the top that you're sending it to.  So
17 who is Keith Kuchler?  And that's K-U-C-H-L-E-R.
18    A.  Keith was one of the leaders in the
19 engineering group.
20    Q.  And what would his role have been in this
21 FedRAMP certification assessment?
22    A.  I don't -- I don't recall.
23    Q.  Okay.  And do you know Chris Day?
24    A.  I do.
25    Q.  And who is Chris Day?

                         63

1    A.  Chris Day is currently the CIO of SolarWinds.
2    Q.  Okay.  And do you know what his position was
3 at -- at that time?
4    A.  I don't know in 2019.
5    Q.  And do you know Brad Cline?
6    A.  I do.
7    Q.  And it's C-L-I-N-E.  Who was Brad Cline?
8    A.  He was on the IT team.
9    Q.  And if you look at the attached spreadsheet --
10 and I'm going to show you the native one in a second,
11 but does this appear to be a similar spreadsheet to the
12 one that we just looked at in Exhibit 4?
13    A.  Yes, it looks similar.
14    Q.  Okay.  And I know you said you don't recall
15 this e-mail, but do you recall what the purpose of this
16 August iteration of the controls baseline spreadsheet
17 would have been?
18    A.  No, I don't remember.
19    Q.  All right.  In the cover e-mail, if you look
20 at the second paragraph starting with the words "in the
21 attached spreadsheet," you'll see there's a reference in
22 that paragraph to a staffing strawman.  Do you see that?
23    A.  Okay.  Yeah.  Yes.
24    Q.  What did you mean by a "staffing strawman"?
25    A.  Normally when I use "strawman," it's a -- like

                         64

1  a draft that can be changed.
2      **Q.**  Okay.  And with respect to staffing, what
3  would that draft be?
4          MR. TURNER:  Object to form.
5  BY MR. CARNEY:
6      **Q.**  I'll rephrase.
7          Just in the context of staffing, what does
8  it mean for strawman?
9      **A.**  Staffing normally refers to additional head
10 count that's needed.
11     **Q.**  And so is the strawman in that context just
12 the draft sort of placeholder?
13     **A.**  Correct.
14     **Q.**  All right.  I'm going to ask you now to look
15 at -- I've got it up on the screen.  If you look at
16 the -- let me find it -- the moderate -- see the
17 moderate KP Metrics tab, do you see that one?
18     **A.**  I do.  Is this the --
19         MR. TURNER:  Is this the same one?  I
20 don't think it is.
21         MR. CARNEY:  Yeah, this is the --
22         MR. TURNER:  This doesn't match the --
23 oh, I see.
24         MR. CARNEY:  Yeah, it should be.  If you
25 notice the Bates number is --

65

1          MR. TURNER:  56 and this is two pages
2  later.
3          MR. CARNEY:  Yeah.  To my under -- my
4  understanding, this is the spreadsheet that's attached
5  to this e-mail.
6          MR. TURNER:  Okay.
7  BY MR. CARNEY:
8      **Q.**  So if we look at the Moderate KP Metrics tab
9  that I'm on right now.
10     **A.**  Yes.
11     **Q.**  And so does it -- does it appear that the
12 percent of controls -- and you can look back at your
13 e-mail -- previous e-mail in Exhibit 4 if you want, but
14 does it appear that the percent of controls and the
15 number of controls, 198 with no program in place has
16 stayed the same from the June spreadsheet we just looked
17 at?
18     **A.**  Yes.
19     **Q.**  Okay.  And do you have an understanding as
20 to -- as to why it would stay the same?  And I can
21 clarify if that helps.
22     **A.**  If you don't mind.
23     **Q.**  Yeah.  So did it stay the same because this
24 is -- you know, no more work had been done to update the
25 spreadsheet between that time?  Or did it stay the same

66

1  because no additional programs had been added in that
2  time?
3          MR. TURNER:  Object to foundation.
4      **A.**  I'm not 100 percent sure why it stayed the
5  same.  I just don't know.
6  BY MR. CARNEY:
7      **Q.**  Fair enough.  And I guess what I'm getting at,
8  do you know whether there were any efforts taken
9  following these spreadsheets to try and get the number
10 of red entries down or not?
11         MR. DRAKELEY:  Object to form.
12     **A.**  Yeah, this is a, again, just preliminary
13 assessment in order for investment, so I wouldn't -- I
14 wouldn't expect -- until -- any changes.
15 BY MR. CARNEY:
16     **Q.**  Okay.  All right.  And I'm going to look at
17 the -- show you the tab on the screen, Moderate Baseline
18 Controls again.  Let me see.  All right.  Let's see.
19         We'll go up to -- this is one we looked at
20 earlier, and that's -- do you recall looking at this one
21 earlier?  It's Row 19, Entry 17:  Least privilege,
22 authorize access to security functions.
23         Do you recall that one?
24     **A.**  Yes.
25     **Q.**  And then if we scroll all the way over, this

67

1  is the one where you said we have no explicit
2  authorization policy, nor is this document that I'm
3  aware of for the company or individual products.
4          Do you remember that?
5      **A.**  Yes.
6      **Q.**  So this would have -- this would have stayed
7  the same between those two iterations of the
8  spreadsheet, right?
9      **A.**  (Nods head up and down.)
10     **Q.**  Okay.  So we already talked about that one.
11 So why don't we move on to a different one.
12         So if we go down to Row 21 and it's entry
13 19, you see -- and it says -- go up a little bit.  So
14 you see it says -- under Access Controls and then
15 Column E it says:  Lease privilege, privileged accounts.
16         And then Column F, I'll just read the
17 first sentence.  It says:  The organization restricts
18 privileged accounts on the information systems to -- and
19 then it's got brackets, assignment organization defined
20 personnel or roles, end bracket.
21         First of all, do you know what that's
22 referring to there?
23     **A.**  Controls related to access control.
24     **Q.**  Or "restricts privileged accounts," what's a
25 privileged account?

68

1      A.  I don't know.
2      Q.  And you'll see that the Column J indicates
3  that this is -- and it falls into the process category,
4  right?
5      A.  I see that, yes.
6      Q.  And then if we go all the way over to where
7  your comments are, it says:  KP 6/27, we have no
8  explicit restriction policy, nor is this documented,
9  that I am aware of, for the company or individual
10  products.
11          First of all, do you know what you meant
12  by that statement?
13      A.  That I have -- I hadn't seen that language in
14  a -- in a policy document.
15      Q.  And when you say "that language," you're
16  referring to language that restricts privileged accounts
17  on the information system?
18      A.  If you can scoot back over --
19      Q.  Sure.
20      A.  -- I can tell you.
21      Q.  Sure.
22      A.  Yes, that's correct.
23      Q.  Okay.  And so once again, that -- that entry
24  and the red sort of coloring of that entry would have
25  been based on your sort of preliminary assessment?

69

1      A.  Preliminary assessment and my best guess of --
2  yes, my preliminary assessment and my best guess.
3      Q.  All right.  And I guess the -- how would you
4  be -- have been in a position to make a best guess or
5  preliminary assessment?  Like, what knowledge had you
6  acquired while working at the company that would allow
7  you to make that assessment?
8      A.  Working on SOC 2 or the ISO 27001 was what I
9  was pulling from.
10      Q.  Okay.  So you -- from that work that you just
11  described, you became familiar with the sort of written
12  security policies of the company?
13      A.  I was familiar and coordinated the security
14  policies.
15      Q.  So when did -- based on that experience and
16  knowledge, did you feel comfortable making the
17  preliminary assessments that you were making here and
18  coding these in the red column?
19          MR. TURNER:  Objection to form.
20  BY MR. CARNEY:
21      Q.  Red?
22      A.  Yes, I was.  Yes.
23      Q.  All right.  I'm just going to do three more.
24  That's it.  Three more.
25          If I could go down to Row 39.  All right.

70

1  It is Row 39, Entry 37, and it's access control and
2  Column C.  Then over on Column E, it says:  Access
3  control for mobile devices.
4          Do you see that?
5      A.  Yes.
6      Q.  Okay.  And then if I go -- scroll all the way
7  over to the end to where your comments are.  Make sure
8  I'm in the right -- it says:  KP 6/27, the company does
9  not have a policy on nonnetwork devices connecting to
10  the network.
11          Can you describe what you mean by that?
12      A.  I had not seen that language in any of the
13  policies that I had worked with.
14      Q.  And if there had been a policy, do you think,
15  based on your experience and knowledge at the company,
16  you would have been aware of it?
17      A.  Not necessarily.
18      Q.  And why do you say "not necessarily"?
19      A.  There may have been policies I wasn't aware of
20  within either the engineering teams -- you know, this is
21  engineering focused -- or other groups that I just
22  hadn't -- that weren't in the scope of SOC 2 or ISO
23  27001.
24      Q.  And so did you ever -- when you marked some of
25  these controls as not being present and you coded them

71

1  in the red category, did you ever ask anyone to kind of
2  give it a second look to see if they were aware of any
3  such policies?
4      A.  Not that I recall.
5      Q.  All right.  Was it part of your job duties
6  at SolarWinds to be aware of the written security
7  policies?
8          MR. TURNER:  Objection to form.
9      A.  Not that I recall.
10  BY MR. CARNEY:
11      Q.  All right.  So now I'm going to ask you,
12  Ms. Pierce, to look at Row 40, Entry 38.  It's under
13  Access Control, and then it says over on Column E:
14  Access control for mobile devices, full
15  device/container-based encryption.
16          Do you see that?
17      A.  I do.
18      Q.  And over here, it says -- so first of all, you
19  see that in Column J it says "Process," right?
20      A.  I do.
21      Q.  And then in Column S, it says:  KP 6/27, the
22  company does not have an access control for mobile
23  devices.
24          So first of all, what did you -- what did
25  you mean by "the company does not have an access control

72

1  for mobile devices"?
2     **A.** I had not seen any documentation around the
3  access control for mobile devices, so that's what I
4  meant.
5     **Q.** And that -- and that was based on your sort
6  of -- you're basing that on your own sort of personal
7  knowledge?
8     **A.** Yes.
9     **Q.** And putting that aside, do you have an
10 understanding of what an access control for mobile
11 devices would mean?
12    **A.** Just the rules around how access would be set
13 up or maintained or used for mobile devices, is my
14 understanding.  I'm not sure how technically that would
15 be implemented.
16    **Q.** So would -- and just using this one as an
17 example, would you have -- once you marked that red,
18 would you have alerted anyone to the fact that, hey, we
19 don't have a access control for mobile devices?
20       MR. TURNER:  Objection to form.
21    **A.** I -- I don't recall.
22 BY MR. CARNEY:
23    **Q.** Do you have an understanding as to why it
24 would be important to have access control for mobile
25 devices?

73

1       MR. TURNER:  Objection to form.
2    **A.** No, I don't know.
3 BY MR. CARNEY:
4    **Q.** All right.  Just one more.  I promise.
5    **A.** Okay.
6    **Q.** Let's go to Row 44, Entry 42.  In Column C it
7 says "Access Control."  Column E, "Information Sharing."
8 And if I scroll over, you see this one also says
9 "Process," right?
10    **A.** I do, yes.
11    **Q.** And then if we look at Column S, it says:
12 6/27 KP, authorized versus unauthorized users has not
13 been defined and policies are not fully comprehensive to
14 meet this control.
15       Can you tell me what -- what you meant by
16 that statement?
17    **A.** That we would need additional definition
18 within an existing policy if we were to move forward
19 with this FedRAMP certification.
20    **Q.** And when you say that the policies are not
21 fully comprehensive to meet this control, what do you --
22 what does that mean?
23    **A.** The -- again, the wording in the control was
24 not specific in our policies, so that's, you know, my
25 opinion.  We would need to look at that -- our -- at

74

1  that policy to confirm that those controls would be met
2  by these four products for this particular
3  certification.
4     **Q.** And so ask me if this is a fair statement --
5  or let me know if this is a fair statement:  In contrast
6  to the ones where you said the company does not have a
7  policy, is this one where the company had a policy but
8  you thought it wasn't comprehensive enough?
9     **A.** I would say it had a -- we had a policy, but
10 we might need to further define based on the criteria in
11 FedRAMP.
12    **Q.** Okay.  And do you have an understanding why
13 you would have marked this one red in that case if there
14 was a policy?
15    **A.** I just -- my best guess and flagging that
16 additional work would be needed potentially.
17    **Q.** All right.  I think I just -- all right.  I
18 think I just have one more of these for you.
19       (Exhibit 6 was marked for identification.)
20 BY MR. CARNEY:
21    **Q.** Okay.  Ms. Pierce, once again, take as much
22 time as you need.  But what you've been handed that's
23 been marked as Exhibit 6 is a document with -- the first
24 page has a Bates stamp of SW-SEC00218068, and it appears
25 to be a September 25th, 2019 e-mail from Ms. Pierce.

75

1       Do you recognize this document?
2    **A.** Yes.
3    **Q.** Okay.  And what is this document?
4    **A.** This is the -- like, a quantified estimate for
5  the amount of budget we would need if we wanted to move
6  forward with the FedRAMP certification.
7    **Q.** So you're detailing how much it would cost the
8  company to obtain the FedRAMP certification?
9    **A.** Estimating for a budget request as to, you
10 know, how -- what the initial cost would be for -- for
11 the AppMan products.
12    **Q.** And if you -- if you flip through past the
13 budget, the spreadsheets after this, does this appear to
14 be -- and I'll represent I think -- and I can show it to
15 you on the screen if you want, but that some of the
16 columns have been hidden just to make the printout
17 easier.  But does this -- this appear to be a updated
18 version of the spreadsheets that we were just looking
19 at?
20       MR. DRAKELEY:  Object to form.
21    **A.** This appears to be the same as in Exhibit 4
22 with just the columns hidden.
23 BY MR. CARNEY:
24    **Q.** Okay.  And in your e-mail, you say that we've
25 updated the spreadsheet with the latest figures.  Do you

76

1 see that?
2    A.  I do.
3    Q.  And it says -- I'm sorry.  Let me strike that.
4        It says:  Hello, guys.  I've updated the
5 spreadsheet with the latest figures.
6        So were you -- were you the one that
7 was making the updates to the spreadsheet that's
8 attached?
9    A.  I'm not sure.
10   Q.  And you mention in here -- well, let me back
11 up a sec.
12       Would that have been something that you
13 would have done, made updates to a spreadsheet like
14 that?
15   A.  More than, you know, pulling in cost estimates
16 or resource numbers from various team members to
17 create -- to create the spreadsheet.
18   Q.  Okay.  And what about the -- the -- putting
19 aside the budget spreadsheet, the controls spreadsheet
20 that we've looked at a few times, would you have made
21 updates to that spreadsheet?
22       MR. TURNER:  Objection to form.  Which
23 spreadsheet?
24       MR. CARNEY:  So if you look beyond the
25 first page --

77

1        MR. TURNER:  Oh, okay.
2        MR. CARNEY:  -- there is the budget.  But
3 then after that, Ms. Pierce said that this is an updated
4 version of the previous spreadsheet we looked at in
5 Exhibit 4 but with some of the columns hidden.
6 BY MR. CARNEY:
7    Q.  And I'm asking whether you would have been
8 involved in updating that spreadsheet as well?
9    A.  I -- the only update I see to the spreadsheet
10 is just the columns are hidden.  I don't -- I don't know
11 if the -- if there were updates made between these two
12 e-mails.
13   Q.  Okay.
14   A.  But I would be involved as the coordinator if
15 I had heard -- you know, received new information or --
16 but I don't see any changes.
17   Q.  Okay.  And you say in your e-mail that you
18 plan to share this with Cillian on Friday.  Do you know
19 who that is?
20   A.  Cillian was in the budget.
21   Q.  Okay.  And do you know Cillian's last name?
22   A.  No, I'm sorry, I don't.
23   Q.  Okay.  Do you know what Cillian's role was in
24 the budget office?
25   A.  I don't remember.

78

1    Q.  All right.
2        (Exhibit 7 was marked for identification.)
3 BY MR. CARNEY:
4    Q.  Okay.  Ms. Pierce, I've handed you what's been
5 marked as Exhibit 7; and just for the record, this is a
6 document Bates-stamped SW-SEC00061296.  And it's a
7 January 27th, 2020 e-mail from Ms. Pierce to
8 Mr. Quitugua.  Sorry if I'm mispronouncing that.
9        Do you recognize this document?
10   A.  Yes.
11   Q.  And what is it?
12   A.  This is a security scorecard, risk scorecard.
13   Q.  And who is Mr. Quitugua?
14   A.  Eric Quitugua is -- he works in the SecOps
15 section.
16   Q.  What is the SecOps section?
17   A.  Security operations.
18   Q.  And do you know what he did in that section?
19   A.  He was the manager of the SecOps group.
20   Q.  All right.  And so the risk scorecard matrix
21 that you're sending him, did you put that together, that
22 scorecard?
23       MR. TURNER:  Objection to form.
24   A.  I don't remember how it came together exactly,
25 but I would be, again, coordinating the PowerPoint

79

1 across various people.
2 BY MR. CARNEY:
3    Q.  All right.  And with respect to the risk
4 scorecards, though, what was your role in coordinating?
5    A.  Putting together the PowerPoint and
6 circulating for input for the highlights and working
7 with Eric or Tim or Rani on the -- on capturing the
8 details, like a -- basically somewhat like a scribe.
9    Q.  And so the document that's -- that's attached,
10 though, that's a -- does that look like a spreadsheet,
11 though?
12   A.  It may have been a spreadsheet.  It could have
13 been a PowerPoint as well.  I don't know.
14   Q.  And if you look at the -- on the front page of
15 the e-mail, the attachment.
16   A.  It is Excel, okay.
17   Q.  Do you see that where it says --
18   A.  I do, yeah.
19   Q.  Does that indicate that it's an Excel
20 spreadsheet?
21   A.  Yes, it does.
22   Q.  Okay.  And would you have been involved in
23 putting together this Excel spreadsheet?
24   A.  Yes.
25   Q.  And so what would have been your role in

80

1 putting together the Excel spreadsheet?
2     **A.** Again, coordinating, inputs from Tim or Eric
3 on what they would want to add for identify, protect,
4 detect, and then working with them and/or Rani to
5 score -- provide a score. So really just a coordinator
6 and a scribe.
7         I might have -- so for the areas of
8 responsibility that I had, like, GDPR as an example, I
9 would provide some metrics for the highlights that were
10 specific to my role, so data privacy or the SOC 2
11 audits.
12     **Q.** And what -- do you know why you would have
13 been sending this to -- sorry if I'm mispronouncing his
14 name -- Mr. Quitugua?
15     **A.** I don't recall this specific e-mail as to why.
16     **Q.** And so if we go through the -- if we just walk
17 quickly through the tabs, so the first one says
18 "Identify." Do you know what "identify" means in this
19 context?
20     **A.** No. This is -- no, I don't know.
21     **Q.** And so the tabs after that are Protect,
22 Detect, Respond, Recover. Would you have any
23 information about the specific technical aspects of any
24 of those tabs?
25     **A.** No.

81

1     **Q.** And you would have obtained that information
2 from others?
3     **A.** Correct.
4     **Q.** And when you're putting together a spreadsheet
5 like this based on information you obtained from others,
6 would you try to make it as accurate as possible?
7     **A.** Yes.
8         MR. TURNER: Object to form.
9     **A.** Yes.
10 BY MR. CARNEY:
11     **Q.** All right. I'm going to put it up on your
12 screen just because this might be a little bit easier to
13 look at this way. But if you look at the tab all the
14 way to the right, it says, History '17, '18, '19 is the
15 name of the tab. What information is shown on this tab?
16     **A.** The security categories and then the 2017, '18
17 and '19 score.
18     **Q.** Would you have gathered that, the historical
19 scores that are contained in this spreadsheet?
20     **A.** I don't -- I don't remember how -- how this
21 came -- how I had this information.
22     **Q.** If you wanted to obtain the scores from
23 previous years, was there somewhere that you would go to
24 access them?
25     **A.** I would potentially just look at our

82

1 historical documents or our SharePoint.
2     **Q.** And so for instance, let's just use the first
3 box there. Identify 2017, it says 0.8.
4         Do you know who would have given the
5 identify category that score?
6     **A.** The scores were discussed between Tim and
7 Rani.
8     **Q.** Okay. So were -- was it your understanding
9 that Tim and Rani were responsible for coming up with
10 the final scores?
11     **A.** I don't know who was responsible for the final
12 scores, but I -- I was in the room with Tim and Rani
13 when we would talk through these scores. I don't know
14 where it went from there.
15     **Q.** And just for the record, we're talking about
16 Tim Brown and Rani Johnson?
17     **A.** Correct.
18     **Q.** Okay. And so you don't know if either of them
19 or both of them were the final decision-maker on the
20 scores?
21     **A.** Correct.
22     **Q.** Okay. Do you know whether they transmitted
23 those scores to anyone above them?
24     **A.** I don't know.
25     **Q.** All right. Thank you.

83

1         MR. CARNEY: We've been going over
2 another hour. Do you want to do the lunch break now?
3         MR. DRAKELEY: Sure, that would be fine.
4         MR. TURNER: Sure.
5         THE VIDEOGRAPHER: We're off the record
6 at 11:51 a.m.
7         (Break was taken.)
8         THE VIDEOGRAPHER: We're back on record
9 at 1:16 p.m.
10 BY MR. CARNEY:
11     **Q.** Good afternoon, Ms. Pierce. If I can just --
12 I just briefly wanted to redirect your attention to
13 Exhibit 4 which should be in your pile over there.
14         And I just wanted to quickly ask you --
15 you know, I'm asking you for your -- your just own
16 personal view or opinion. For the controls that you
17 scored in the red category, the 198, did you have an
18 opinion one way or the other as to whether it was a
19 problem that that many controls had no program or
20 practice in place?
21         MR. TURNER: Object to form.
22     **A.** No.
23 BY MR. CARNEY:
24     **Q.** You had no opinion one way or the other?
25     **A.** No.

84

1    **Q.**  Did anyone express to you an opinion about
2  whether adding 61 percent of the controls with no
3  program or practice in place was problematic?
4    **A.**  No.
5        MR. TURNER:  Object to form.
6    **A.**  Not that I recall.
7        (Sotto voce conversation.)
8        MR. TURNER:  Do you have copies?
9        THE REPORTER:  It's not --
10        MR. CARNEY:  Yeah, moving on to a new
11  one.
12        MR. TURNER:  Oh, is this one you already
13  provided?
14        MR. CARNEY:  Yeah, we already asked.  I
15  just wanted to make sure I had the right exhibit.
16        (Exhibit 8 was marked for identification.)
17  BY MR. CARNEY:
18    **Q.**  Okay.  Ms. Pierce, I've handed you what's been
19  marked as Exhibit 8; and for the record, the first Bates
20  stamp in this document is SW-SEC00149897.  And this is a
21  January 23rd, 2020 e-mail from you to a number of
22  individuals.
23        Do you recognize this, this document?
24    **A.**  I don't remember this specific e-mail.
25    **Q.**  Okay.  If you look at the subject line of this

85

1  document, it says:  A possible mad experiment.
2        After looking over the e-mail that you
3  sent and the attachment, do you know why you would
4  referred to this as a possible mad experiment?
5    **A.**  No, I don't know.  I don't remember.
6    **Q.**  And having reviewed this document, you're
7  sending this to -- to Tim Brown and to Rani Johnson.
8  Can you explain what you're asking them to do here?
9    **A.**  I was asking them to score the risk assessment
10  or the risk scorecard independently.
11    **Q.**  And when you say "independently," what do you
12  mean?
13    **A.**  Each had a file, so for each of them to fill
14  it out on their own.
15    **Q.**  And when you say "each of them," are you
16  referring to Mr. Brown and Ms. Johnson?
17    **A.**  Correct.
18    **Q.**  And how is this different than what you had
19  previously done?
20    **A.**  I don't remember how it was done every single
21  time, but based on this e-mail, this was just having
22  them each complete a scorecard.
23    **Q.**  And there's a reference in the first sentence
24  to the security and compliance QBR.  What's the security
25  and compliance QBR?

86

1    **A.**  I don't recall.  QBR stands for quarterly
2  business review, but I don't recall the security and
3  compliance QBR.
4    **Q.**  You don't -- I'm sorry.  So you don't recall
5  there being a security and compliance QBR?
6    **A.**  I don't -- I don't remember exactly what the
7  security and compliance QBR would have covered.
8    **Q.**  Do you remember what your role would have been
9  with respect to the security and compliance QBR?
10    **A.**  Similar to pretty much my entire role at
11  SolarWinds.  It would have been a coordination role.
12  But I just don't remember that, what that meeting or
13  what that event was.
14    **Q.**  And you see in your -- in your e-mail, you
15  reference the historical information for 2017, 2018 and
16  all of the 2019 detailed info.  Do you see that?
17    **A.**  I do, yes.
18    **Q.**  And before lunch, you talked about how you
19  would have gone about gathering historical information
20  on these scores.  Would you have done the same thing
21  here?  So how would you have gathered that historical
22  information in this -- in this context?
23    **A.**  Yeah, looked at previous presentations or in
24  our SharePoint.
25    **Q.**  I think we can put that one aside.

87

1        (Exhibit 9 was marked for identification.)
2  BY MR. CARNEY:
3    **Q.**  So, Ms. Pierce, I've handed you what's been
4  marked as Exhibit 9, and the first page of this has the
5  Bates stamp SW-SEC00015235.  And the top e-mail on here
6  is a September 19th, 2019 e-mail from Kellie Pierce to
7  Eric Quitugua.
8        Do you recognize this document?
9    **A.**  Yes.
10    **Q.**  And what is this?  What is this document?
11        MR. TURNER:  The attachment or the
12  e-mail?
13        MR. CARNEY:  Let's start with the e-mail.
14  BY MR. CARNEY:
15    **Q.**  What's -- what's the e-mail?
16    **A.**  The e-mail is to Eric providing him the
17  summary of the week self-assessment.
18    **Q.**  And you'll notice there's an e-mail below that
19  September 18th to -- from you to Rani Johnson and Tim
20  Brown, subject:  SWICUS security risk assessment.
21        Can you tell me what the purpose of that
22  e-mail to Mr. Brown and Ms. Johnson was?
23    **A.**  To provide -- to let them know I was working
24  with Eric and Nelson on the SWICUS self-assessment and
25  identifying some of the areas that were marked red by

88

1  the -- or marked -- sorry -- yellow by the document
2  authors.
3      Q.  When you say "marked yellow," how do you know
4  it was ones that were marked yellow?
5      A.  They were the -- the ones either blank or
6  no -- answered in no.
7      Q.  And you're talking about -- you're referring
8  to the attached spreadsheet?
9      A.  Correct, yes.
10     Q.  And so yellow would just indicate either a no
11 or a no answer; is that right?
12     A.  That is correct.
13     Q.  And is the Eric that's referred to here
14 Mr. Quitugua?
15     A.  Eric Quitugua, yes.
16     Q.  How do you pronounce it?
17     A.  Quitugua.
18     Q.  All right.
19         And who is Nelson?
20     A.  I don't remember his last name, but he worked
21 on Eric's team.
22     Q.  And that's the I think you said security team,
23 right?
24     A.  Security team, yes.  Security operations team.
25     Q.  And what is SWICUS?

89

1      A.  SWICUS is some type of application that was
2  developed within -- within SolarWinds.
3      Q.  And do you know what it's an application for?
4      A.  I don't remember.
5      Q.  Is it an application for internal use or is it
6  a product that's sold to customers?
7          MR. TURNER:  Objection, foundation.
8      A.  I don't know.  I don't know.
9  BY MR. CARNEY:
10     Q.  And so if you look at -- do you know what --
11 just let me -- just to close the loop on it, do you know
12 what the SWICUS self-assessment is, what that means?
13     A.  The self-assessment was sent to various
14 engineering groups for them to perform a self-assessment
15 before they -- as they developed an application or made
16 a change to an application.  So any change, they would
17 receive these self-assessments, and then they would --
18 the tech team would fill it out.
19     Q.  And does the self-assessments that you're
20 describing, does it relate at all to the NIST framework
21 that we talked about?
22     A.  Oh, I don't know how it relates to NIST.
23     Q.  But you don't -- the assessment that you're
24 asking them to perform, you don't know if that's done
25 under a NIST framework or not?

90

1          MR. TURNER:  Objection to form,
2  mischaracterizes testimony.
3      A.  Could you repeat your question just one more
4  time?
5  BY MR. CARNEY:
6      Q.  Sure.
7          I'm trying to understand you -- whether
8  the self-assessments that you're circulating for the
9  engineering groups to perform, whether those were
10 supposed to be done under a NIST framework or not?
11         MR. TURNER:  Objection, foundation.
12     A.  I don't know.
13 BY MR. CARNEY:
14     Q.  Okay.  The attached spreadsheet, would you
15 have had any role in preparing it?
16     A.  This particular...?
17     Q.  Yes.
18     A.  No.
19     Q.  Okay.  And if you look -- if you look at the
20 spreadsheet under -- the first page of the spreadsheet,
21 under Document Author, it says Fredrik Skogman and Mark
22 Martin.  Do you know who they are?
23     A.  Yes.
24     Q.  Who are they?
25     A.  Engineers that worked on the SWICUS.

91

1      Q.  Okay.  All right.  In your e-mail, so for back
2  on the first page, your e-mail to Ms. Johnson and
3  Mr. Brown, you have a bulleted list of deficiencies that
4  you identified.  Do you see that?
5          MR. TURNER:  Objection to form.
6      A.  I do see the list, yes.
7  BY MR. CARNEY:
8      Q.  Okay.  And so first of all, why were these
9  deficiencies being identified?
10     A.  As Fredrik or Martin completed the
11 self-assessment, they identified these areas with --
12 with a no or left it blank, so it didn't meet the -- it
13 didn't meet the security requirement that was listed.
14     Q.  All right.  And in terms of the -- we don't
15 have to go through all the specific bullets underneath
16 there, but would you have played any role in identifying
17 these bulleted deficiencies that are listed here?
18     A.  No.  I'm just summarizing in the e-mail what
19 was on the self-assessment.
20     Q.  Okay.  So for -- and I'll just use one example
21 then.  So under -- at the top where it says:  User
22 access management.  And then it says:  Account
23 management.  The first sub-bullet says:  Local
24 administer rights are not prohibited nor tracked.
25         First of all, do you know what that means?

92

1    **A.** Not from a technical perspective, no.
2    **Q.** Do you know from a nontechnical perspective?
3        MR. TURNER: Object to the form.
4    **A.** No.
5 BY MR. CARNEY:
6    **Q.** Okay. And so I guess back to my original
7 question, so the -- so using that as an example, is that
8 something that Mr. Skogman and Mr. Martin would have
9 identified in the spreadsheet and then you put that into
10 the e-mail?
11        MR. DRAKELEY: Object to form.
12    **A.** Fredrik or Martin would have identified this,
13 and then I just summarized it in the e-mail.
14 BY MR. CARNEY:
15    **Q.** So for these deficiencies that you've
16 identified in this e-mail, did you perform any technical
17 assessment?
18    **A.** No.
19    **Q.** Why -- so why would you have been identifying
20 these -- these deficiencies for Ms. Johnson and
21 Mr. Brown in an e-mail like this?
22    **A.** When an application -- or when a
23 self-assessment was performed, the technical team would
24 do the assessment. One of my roles was to manage the
25 risk register, so we would -- we would want to capture

93

1 areas of concern or areas of risk deficiencies so that
2 we could track those and then make sure that they were
3 remediated.
4    **Q.** And what would you -- what -- well, first of
5 all, let me ask you, what was your role in making sure
6 that they were remediated?
7    **A.** Tracking only. I would add it to the -- add
8 it to the log, put a date, a due date, and then circle
9 back with the individuals to see if they had completed
10 it or not.
11    **Q.** And you would -- you were the one responsible
12 for maintaining the risk register, though?
13    **A.** I don't recall if I had ultimate
14 responsibility. I think Eric also had the ability to
15 add to the risk register as well.
16    **Q.** And was there someone that was responsible for
17 making sure that the items on the risk register were
18 remediated?
19    **A.** We -- the risk register was frequently
20 reviewed with Tim, Tim Brown.
21    **Q.** And did you have an understanding as to
22 whether Mr. Brown was responsible for making sure the
23 items on the risk register were remediated?
24        MR. TURNER: Object to form.
25    **A.** I don't know.

94

1 BY MR. CARNEY:
2    **Q.** And so is this SWICUS self-assessment, is this
3 just one example of a number of these types of
4 self-assessments that would have been done?
5    **A.** Yes, I believe so.
6    **Q.** And so anytime one of these self-assessments
7 was done, would that information then be added to the
8 risk register?
9    **A.** I'm not sure that every self-assessment was
10 added, but that was the practice for this self-assess --
11 any issues with the self-assessment that needed
12 remediation to be tracked to completion.
13    **Q.** And were the self-assessments, were they done
14 on a sort of companywide basis?
15        MR. TURNER: Object to form, foundation.
16    **A.** Yeah, I don't know.
17 BY MR. CARNEY:
18    **Q.** And I'll try to ask it a little better.
19        What type of -- of products within
20 SolarWinds would a self-assessment be done on?
21    **A.** I'm not -- I don't know.
22    **Q.** If -- so if you look at the title of the --
23 the attachment, it refers to access control
24 self-assessment. Do you see that?
25    **A.** I do, yes.

95

1    **Q.** So when it says -- when it says "access
2 control," is that referring to access control at
3 SolarWinds generally?
4        MR. TURNER: Objection to form and
5 foundation.
6    **A.** I don't know.
7 BY MR. CARNEY:
8    **Q.** Okay. And I'm trying to understand if the
9 self-assessments are limited to products that SolarWinds
10 was putting out or were there self-assessments of
11 security at large?
12    **A.** I don't know how those self-assessments were
13 handed out or who they were assigned to or when, so I'm
14 not -- I don't know.
15    **Q.** Okay. If you would please flip over to the
16 second page of Exhibit 9, there is a -- see the little
17 chart, the summary of security controls?
18    **A.** Yes.
19    **Q.** And is that summary, is that related
20 specifically to SWICUS?
21    **A.** Yes.
22    **Q.** Okay. And how would -- how did you go about
23 calculating the -- the number of controls that were not
24 met? Is that just based on the spreadsheet?
25    **A.** Yes.

96

1    Q.  Sure.
2         So when you put together the spreadsheet
3  that's in Exhibit 4 and added your column with your
4  notes, that information was accurate to your
5  understanding at the time that you added those notes,
6  right?
7         MR. TURNER:  Same objection.
8    A.  Yes.
9  BY MR. CARNEY:
10    Q.  And the sort of technical information in
11  Exhibit 4 was based on information provided to you by
12  engineers within SolarWinds, right?
13         MR. TURNER:  Object to form.
14    A.  There -- repeat it one more time.
15  BY MR. CARNEY:
16    Q.  Sure.
17         The technical information in the
18  spreadsheet in Exhibit 4 was based on information that
19  was provided to you by SolarWinds' engineers, right?
20    A.  Product managers commented on each control.
21    Q.  Okay.
22    A.  I don't know that there was a technical
23  assessment performed.
24    Q.  Okay.  And when the product managers
25  provided you that information, did you have any reason

                              133

1  to doubt the accuracy at the time the spreadsheet was
2  prepared?
3    A.  No.
4    Q.  And in the notes section that you added to the
5  spreadsheet, you tried to include the most accurate
6  information available to you at the time, right?
7         MR. TURNER:  Object to form.
8    A.  This information is, you know, based on my
9  experience with the audits.  So this was based on my
10  understanding, my limited knowledge about the entire
11  company.  It wasn't looking at the entire company.  We
12  were just looking at these four products in this quick
13  preliminary assessment.
14  BY MR. CARNEY:
15    Q.  Okay.  And just to clarify, if you knew
16  information was inaccurate, you would not have included
17  it in Exhibit 4, right?
18    A.  Correct.
19         MR. TURNER:  Object to form.
20    A.  Correct.
21         MR. CARNEY:  All right.  That's all I
22  have.  Thank you.
23         MR. TURNER:  I'll have just a couple
24  follow-ups.
25

                              134

1              FURTHER EXAMINATION
2  BY MR. TURNER:
3    Q.  Do you know whether the information in your
4  notes was accurate or was it a best guess based on your
5  limited knowledge?
6         MR. CARNEY:  Objection, leading.
7    A.  It was my best guess based on my understanding
8  of the criteria.
9         MR. TURNER:  No further questions.
10         MR. CARNEY:  Nothing further, thank you.
11         THE VIDEOGRAPHER:  Before we go off,
12  would you guys like a copy of the video?
13         MR. TURNER:  Yes, please.
14         THE REPORTER:  And the transcript as
15  well?
16         MR. TURNER:  For sure.
17         THE REPORTER:  Yeah.  Okay.
18         THE VIDEOGRAPHER:  We're off record at
19  3:10 p.m.
20         (Sotto voce conversation.)
21         THE REPORTER:  You're saying that you do
22  want her to read and sign it?
23         MR. TURNER:  Yeah, I'm sorry.
24         MR. DRAKELEY:  Yeah, I would prefer her
25  to read and sign.  And sign in front of a notary is

                              135

1  fine?
2         THE REPORTER:  Yes.  And I'm making a
3  rough draft.  Do you guys need a copy of that?
4         MR. DRAKELEY:  I do not.
5         MR. TURNER:  Sure.  Please.
6         (Ending time: 3:10 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                              136

1    DEPONENT'S DECLARATION UNDER PENALTY OF PERJURY

2

3       I, KELLIE JAIE PIERCE, do hereby declare under

4  penalty of perjury that I have read the entire foregoing

5  transcript of my deposition testimony, or the same has

6  been read to me, and certify that it is a true, correct

7  and complete transcript of my testimony given on

8  July 24, 2024, save and except for changes and/or

9  corrections, if any, as indicated by me on the attached

10  Errata Sheet, with the understanding that I offer these

11  changes and/or corrections as if still under oath.

12  _____ I have made corrections to my deposition.

13  _____ I have NOT made any changes to my deposition.

14

15  Signed: _____

         KELLIE JAIE PIERCE

16

17  Dated this _____ day of _____, 20_____.

18

19

20

21    SUBSCRIBED AND SWORN BEFORE ME

22    THIS _____ DAY OF _____, 20_____.

23    _____

24  (Notary Public) My Commission Expires: _____

25

137

---

1       ERRATA SHEET

2  Deposition of: KELLIE JAIE PIERCE

   Date taken:  JULY 24, 2024

3  Case:        SEC VS. SOLARWINDS CORP., ET AL.

4  PAGE LINE

5  ____ ____ CHANGE:_____

6       REASON:_____

7  ____ ____ CHANGE:_____

8       REASON:_____

9  ____ ____ CHANGE:_____

10      REASON:_____

11  ____ ____ CHANGE:_____

12      REASON:_____

13  ____ ____ CHANGE:_____

14      REASON:_____

15  ____ ____ CHANGE:_____

16      REASON:_____

17  ____ ____ CHANGE:_____

18      REASON:_____

19  ____ ____ CHANGE:_____

20      REASON:_____

21  ____ ____ CHANGE:_____

22      REASON:_____

23

   Signed_____

24

25  Dated_____

138

---

1    CERTIFICATE OF SHORTHAND REPORTER

2

3    I, April Brunson, Certified Shorthand

4  Reporter in and for the State of Texas, do

5  hereby certify:

6

7    That the foregoing proceedings were

8  taken before me at the time and place herein

9  set forth; that any witnesses in the foregoing

10  proceedings, prior to testifying, were duly

11  sworn by me; that a verbatim record of the

12  proceedings was made by me using machine

13  shorthand to the best of my ability, which was

14  thereafter transcribed under my direction; that

15  the foregoing transcript is a true record of the

16  testimony given.

17

18    Further, that if the foregoing pertains

19  to the original transcript of a deposition in

20  a Federal Case, before completion of the

21  proceedings, review of the transcript

22  _X___was/_____was not requested and reserved.

23

24    I further certify I am neither financially

25  interested in the action nor a relative or employee

139

---

1  of any attorney of a party to this action.

2

3       IN WITNESS WHEREOF, I have this date

4  subscribed my name :  August 5, 2024.

5

6    _____

7       April R. Brunson

8       Texas CSR No. 7495

9       Expiration Date:  4/30/2026

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

140

---